**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In re: | : | |
| SHAPES/ARCH HOLDINGS L.L.C., | : | CHAPTER 11 |
| Debtor. | : | CASE NO. 08- |
| | : | |
| In re: | : | CHAPTER 11 |
| SHAPES L.L.C., | : | CASE NO. 08- |
| Debtor. | : | |
| | : | |
| In re: | : | CHAPTER 11 |
| DELAIR L.L.C., | : | CASE NO. 08- |
| Debtor. | : | |
| | : | |
| In re: | : | CHAPTER 11 |
| ACCU-WELD L.L.C., | : | CASE NO. 08- |
| Debtor. | : | |
| | : | |

| | | |
|---|---|---|
| In re: | : | CHAPTER 11 |
| ULTRA L.L.C., | : | CASE NO. 08- |
| Debtor. | : | |
| | : | |

**DEBTORS' VERIFIED MOTION FOR AN ORDER DIRECTING
JOINT ADMINISTRATION AND PROCEDURAL CONSOLIDATION**

Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), Shapes L.L.C. ("Shapes"), Delair L.L.C. ("Delair"), Accu-Weld L.L.C. ("Accu-Weld") and Ultra L.L.C. ("Ultra", and with Shapes/Arch, Shapes, Delair and Accu-Weld, collectively, the "Debtors") hereby move (the "Motion") before this Court for an Order directing joint administration and procedural consolidation of their Chapter 11 cases, pursuant to Bankruptcy Rule 1015(b), and in support thereof respectfully represent as follows:

**Background**

1. On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

2. On the Petition Date, the Debtors filed various "first day" motions, including a motion seeking to have their cases jointly administered under the lead debtor, "Shapes/Arch Holdings L.L.C."

3. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. No trustee or examiner has been appointed in these cases. No official committee of unsecured creditors has been appointed in these cases.

5.  The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### Description of Debtors and Their Businesses

6.  *Shapes/Arch* is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

7.  *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.  Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a

3

variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

8. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

9. *Delair* manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

10. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

11. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12. *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania.

Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14. *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

15. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

The Bank Debt

17. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase

Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Corporation (the "Lender Group").

18. Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit. The Financing Agreement has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enables the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and requires that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

19. The Financing Agreement currently provides for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

20. As of the Petition Date, the outstanding borrowings from the Lender Group are as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

Reasons for Filing

21. The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

22. With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

23. Over the course of the past four months, the Lender Group has worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24. More recently, the Debtors have explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

25.     The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presents a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

<u>The White Knight</u>

26.     With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million over the next few weeks, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

27.     In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("<u>Versa</u>"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction.  Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

28.     Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("<u>Phoenix</u>"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

29.     In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other

8

things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

30. In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31. Contemporaneously with the filing of the petitions, the Debtors have filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.

32. The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

33. The Debtors have worked diligently over the past several weeks in a difficult setting toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

### Relief Requested

34. By this Motion, the Debtors seek an order pursuant to Fed.R.Bankr.P. 1015(b) authorizing the joint administration and procedural consolidation of their Chapter 11 cases.

### Basis for Relief

35. This Court may order the joint administration and procedural consolidation of the estates of a debtor and an affiliate. Bankruptcy Rule 1015(b) provides in relevant part that if "two or more petitions are pending in the same court by . . . a debtor and an affiliate, the court may order a joint administration of the estates."
Fed.R.Bankr.P. 1015(b).

36. The Debtors are affiliates as that term is defined in 11 U.S.C. § 101(2) and employed in Bankruptcy Rule 1015(b).

37. The Debtors anticipate that during the course of these cases it will be necessary to file numerous motions and applications seeking relief on behalf of all the Debtors. Moreover, on the Petition Date the Debtors have filed a joint plan and disclosure statement. Accordingly, the Debtors respectfully submit that joint administration of Debtors' estates is in the best interests of the Debtors' creditors, and will further the interests of judicial economy and administrative expediency by, among other things, obviating the necessity of arguing similar issues multiple times, duplicate motions, entering duplicate orders, and forwarding duplicate notices to creditors and parties-in-interest.

38. The rights of the Debtors' respective creditors will not be adversely affected by joint administration of these cases since each creditor may still file its claim against the particular estate which allegedly owes it money. In fact, the rights of creditors will be enhanced by the reduction in cost resulting from joint administration and procedural consolidation. The Court will also be relieved of the burden of considering nearly identical factual and legal issues in each of the cases. Finally, supervision of the administrative aspects of the Chapter 11 cases by the office of the United States Trustee will be simplified.

39. The Debtors do not seek substantive consolidation by this Motion.

40. The Debtors request that these cases be jointly administered in the name of <u>In re Shapes/Arch Holdings L.L.C</u>.

WHEREFORE, the Debtors respectfully request that this Court enter an order directing that these cases be jointly administered and procedurally consolidated, and granting such other and further relief as this Court deems just and proper.

Dated: March 16, 2008               COZEN O'CONNOR

                                    By:   */s/ Jerrold N. Poslusny, Jr.*
                                        Mark E. Felger
                                        Jerrold N. Poslusny, Jr.

                                        Proposed Attorneys for the Debtors

## VERIFICATION

Steven Grabell of full age, certifies and states as follows:

1. I am the Chief Executive Officer of Shapes/Arch Holdings L.L.C. and Shapes L.L.C.[1], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2. I have read the foregoing Motion and I hereby certify and verify that all of the statements contained therein are true.

3. I hereby verify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

_____
Steven Grabell

Dated: March 10 2008

---

[1] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.

CHERRY_HILL\429896\1 077771.000