**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

| | |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
| | FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., et al., | : |
| | CHAPTER 11 |
| | : |
| Debtors. | CASE NO. 08- |
| | : |

**DEBTORS' VERIFIED MOTION FOR AN ORDER AUTHORIZING BUT
NOT DIRECTING PAYMENT OF PRE-PETITION WAGES, SALARIES,
COMPENSATION, EMPLOYEE BENEFITS, BUSINESS REIMBURSEMENT
EXPENSES, CERTAIN UNION PAYMENTS, AND THE CONTINUATION
OF THE DEBTORS' WORKERS' COMPENSATION PROGRAM AND
POLICIES PURSUANT TO 11 U.S.C. §§ 105(a), 507(a)(4) AND (5)**

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors"),[1]

the debtors and debtors-in-possession, hereby move (the "Motion") for an order authorizing by

not directing payment of pre-petition wages, salaries, compensation, employee benefits,

reimbursement expenses, certain union benefits and the continuation of the Debtors' workers'

compensation program and policies, and in support thereof submit as follows:

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of
which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date
(defined below):  Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C.
("Accu-Weld"); and Ultra L.L.C. ("Ultra").

**Background**

1.       On March 16, 2008 (the "Petition Date"), the Debtors filed their respective

petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy

Code").

2.       On the Petition Date, the Debtors filed various "first day" motions, including a

motion seeking to have their cases jointly administered under the lead debtor, "Shapes/Arch

Holdings L.L.C."

3.       The Debtors are operating their businesses and managing their properties as

debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.       No trustee or examiner has been appointed in these cases.  No official committee

of unsecured creditors has been appointed in these cases.

5.       The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28

U.S.C. § 157(b)(2).

Description of Debtors and Their Businesses

6.       *Shapes/Arch* is a holding company that owns each of the four operating

companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in

New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and

began focusing on producing aluminum extrusions.  The Debtors have consistently expanded

their businesses over the years by investing in new facilities and technology and by establishing

new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8

million, with Shapes generating approximately 65% of that revenue.  The Debtors have over

1000 employees, approximately 70% of whom are members of either the International

Brotherhood of Teamsters Local 837 ("Local 837"), or the United Independent Union ("UIU").

7.      *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and

over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety

of industries, including road and rail transportation and commercial and residential construction.

Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to

create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the

necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press

capacity and because all of its casting, extruding, fabricating and finishing is completed in one

facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates

twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be

pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a

variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of

extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World

Records" for the largest free standing aluminum structure ever created in connection with the

restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in

connection with the restoration of the Washington Monument.

8.      In 2007 Shapes' revenues decreased by approximately $35 million compared to

2006.  This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to

the trailer, truck body and railcar sectors, all of which have been experiencing an economic

downturn.

9.      *Delair* manufactures maintenance free aluminum fence systems for residential

and commercial use, and manufactures America's most recognized brand of above-ground pools.

Both product lines are sold through dealers, distributors and major retailers throughout the United States.

10.    Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey.  Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

11.    Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12.    *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors.  Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States.  Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13.    Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006.  The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14.    *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China.  Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

4

15.    Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16.    Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

The Bank Debt

17.    Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement").  The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Corporation (the "Lender Group").

18.    Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit.  The Financing Agreement has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses.  The fifteenth amendment enables the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and requires that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

19.    The Financing Agreement currently provides for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million.  Shapes/Arch and its parent, Ben

5

LLC, are guarantors of the debt to the Lender Group.  The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

20.     As of the Petition Date, the outstanding borrowings from the Lender Group are as follows:  (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

<u>Reasons for Filing</u>

21.     The Debtors' Chapter 11 filings were precipitated by a number of factors.  The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008.  The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million.  The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007.  The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

22.     With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

6

23.    Over the course of the past four months, the Lender Group has worked with the Debtors to attempt to find a solution.  In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business.  Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24.    More recently, the Debtors have explored a possible sale/leaseback transaction with certain third parties.  The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

25.    The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presents a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

<u>The White Knight</u>

26.    With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million over the next few weeks, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

27.    In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction.  Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

28.     Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

29.     In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize).  As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights.  This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment  in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

30.     In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31.     Contemporaneously with the filing of the petitions, the Debtors have filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.

32.     The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

33.     The Debtors have worked diligently over the past several weeks in a difficult setting toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

## Relief Requested

34.     By this Motion, the Debtors request that the Court authorize but not direct the Debtors to (i) pay and/or honor certain pre-petition wages and benefits to its union and non-union workforce (in the event that any prepetition payroll checks are not honored, the Debtors seek permission to issue new checks to pay those dishonored amounts); (ii) pay the withholding

9

taxes to the appropriate governmental authority as and when they become due; (iii) pay certain

employee business expenses in the ordinary course of business; (iv) continue to honor

Garnishments, whether with respect to pre-petition or post-petition wages or salaries of

employees; and (v) continue their pre-petition workers' compensation programs.

35.    If the relief sought is granted, with the exception of approximately fifteen

employees (as discussed below), no employee will receive more than the $10,950 statutory

maximum under 11 U.S.C. § 507.  With regard to the Employees that would potentially be

entitled to receive more than the statutory cap, the Debtors seek authority but not the requirement

to honor accrued vacation and sick time in the ordinary course of business, but not to "cash-out"

those amounts to the affected Employees.

36.    The Debtors are not hereby seeking the approval of any executive severance

packages or incentive programs, but reserve the right to do so at a later date.  In addition, the

Debtors are not seeking to assume or reject any executory contract through this Motion.

<u>Union Employees</u>

37.    The Debtors employ over 700 people that are members of either the Local 837 or

UIU (the "<u>Union Employees</u>").  The Debtors' Union Employees are paid every Wednesday for

the previous week ending Friday.  The Union Employees were last paid on March 12, 2008, for

the period from March 1 through March 7, 2008.  Therefore, as of the Petition Date, Union

Employees will be due nine days of pre-petition wages (the "<u>Unpaid Union Wages</u>").  The

weekly payroll to Union Employees, including payroll taxes is approximately $600,000.

38.    The Debtors have collective bargaining agreements in place with Local 837 and

UIU.  In particular, Shapes and Delair have a common collective bargaining agreement with

Local 837; Ultra has a separate collective bargaining agreement with Local 837; and Accu-Weld

has three separate collective bargaining agreements with UIU (one each for extrusion,

10

manufacturing, and trucking ) (the Debtors' collective bargaining agreements are collectively referred to as the "CBAs").  Each of the CBAs provides benefits to the Union Employees employed pursuant to that particular CBA.  A full discussion of those benefits by Debtor and particular CBA is attached as Exhibit "A" (collectively, the "Union Benefits").  The Union Benefits include unpaid vacation and sick time as well as other monetary and non-monetary benefits to the Union Employees.

39.     Each month, pursuant to the CBAs, the Debtors are required to make payments to various union pension and benefit funds for, inter alia, medical insurance, and retirement benefits as required under the CBAs (the "Union Payments").

40.     As of the Petition Date, the Debtors owe Union Payments totaling approximately $1.3 million, which represents amounts due for the December, 2007, January, 2008 and February, 2008.  Finally, Debtors have accrued certain benefit obligations for the period between March 1 and the Petition Date, which will come due on April 10, 2008, the pre-petition total of which is approximately $225,000.

41.     The Debtors seek authority to make, in the ordinary course of business, the Union Payments due on April 10, 2008 in the approximate amount of $225,000.  The balance of the Union Payments will be addressed through a separate motion or the plan of reorganization.

42.     Failure to make the requested payments to the Union Employees could jeopardize the Debtors' relationship with its unionized workforce.  If the payments are not made, the Union Employees could strike or walk off their jobs, which would irreparably harm the Debtors' businesses and put at risk the Debtors' opportunity to reorganize at this critical stage of these cases.

CHERRY_HILL\430192\4

Non-Union Employees

43.     The Debtors' non-union Employees ("Non-Union Employees" and collectively with the Union Employees, the "Employees") are paid every other Thursday for the previous two weeks ending Friday.  The Non-Union Employees were last paid on March 13, 2008, for the period from February 23 through March 7, 2008.  Therefore, as of the Petition Date, Non-Union Employees will be due nine days of pre-petition wages (the "Unpaid Non-Union Wages" and with the Unpaid Union Wages, the "Accrued Wage Claims").  The bi-weekly payroll for Non-Union Employees is approximately $600,000 (thus, the Debtors' overall payroll is $600,000 one week and $1.2 million the next).

44.     The Debtors provide certain benefits to their Non-Union employees, including vacation and sick time, which are still owed to the Non-Union Employees.  A full discussion of the benefits provided to Non-Union Employees is attached as Exhibit "B" (collectively, the "Non-Union Benefits").

45.     The Debtors' Non-Union Employees (like their Union Employees) are critical to the Debtors' continued operations and consequently to their ability to reorganize and continue operations through confirmation of the Plan and thereafter.  Even a relatively minor disruption in payment to the Debtors' workforce resulting from the Debtors' current financial difficulties would have an immediate and injurious effect on the Debtors' ability to continue operations.

46.     The Debtors estimate that the aggregate amount of the Accrued Wage Claims are approximately $1.1 million, and the total amount of Accrued Wage Claims, accrued vacation and sick time and unpaid payroll taxes is approximately $3.1 million (the vast majority of which is attributable to accrued vacation and sick time) and except as discussed below will not exceed $10,950 per employee.

CHERRY_HILL\430192\4

47.     Approximately fifteen of the Debtors' Employees (most of these Employees are management of the Debtors) would be entitled to Unpaid Non-Union Wages or Non-Union Benefits with a total value exceeding $10,950.  However, the actual cash payments to these employees would not total more than $10,950.  The remainder of the amount owed to these employees is on account of accrued, but unused, vacation and sick time.  The Debtors do not propose to make cash payments to these Employees on account of vacation or sick time, but rather seek Court authority to honor accrued vacation and sick time in the ordinary course of their businesses.

48.     Failure to timely pay the Accrued Wage Claims will adversely affect Employee morale at a critical state of the Debtors' reorganization and may cause Union and Non-Union Employees to seek employment at other companies.  Further, many Employees are not highly compensated individuals and live paycheck to paycheck.   These Employees will suffer severe hardship if they miss even one paycheck or if their wages are interrupted or delayed in any way.

### Taxes and Other Employee and Wage Related Items

49.     Pursuant to federal and state laws, the Debtors are required to withhold federal, state, and, in some instances, municipal taxes from wages and salaries of the Employees (the "Withheld Taxes").  Historically, the Debtors have held the Withheld Taxes in trust until payment is due to the appropriate governmental authority, at which time such payments are made.

50.     Prior to the Petition Date, certain Employees incurred a variety of business expenses either directly or through credit cards (the "Employee Business Expenses") which, consistent with ordinary business practice, are payable or reimbursable by the Debtors based on standard documentation requirements.  Failure to pay for the Employee Business Expenses would jeopardize the Debtors' reorganization by undermining morale, and by restricting

13

Employees' ability to incur additional reimbursable expenses on the Debtors' behalf.  The

Debtors estimate that the outstanding Employee Business Expenses as of the Petition Date are

under $10,000.

51.     From time to time the Debtors may be served with garnishments with respect to

the wages or salaries of employees (the "Garnishments").

Workers' Compensation Program

52.     In connection with their operations, the Debtors maintain certain workers'

compensation liability insurance policies.  These policies provide the Debtors' employees with

the workers' compensation benefits required under applicable state law (the "Workers'

Compensation Program").

53.     For the periods between April, 2001 and April, 2004, the Debtors were insured

under policies providing for a per claim deductible of $250,000, with a maximum yearly

deductible ranging from $1.5 million to $1.93 million.  In April 2004, the Debtors increased the

deductible amount to $350,000 per claim and a yearly maximum deductible of $4.1 million.  The

per claim amount has remained the same through the present, but the maximum yearly

deductible was reduced to $3.5 million for the 2006-07 year and was eliminated for the 2007-08

year.  As security for its deductible obligations, the Debtors have caused letters of credit to be

issued under the various workers' compensation policies in the aggregate amount of $3,380,000

(the "Surety L/Cs") in favor of their insurers, which Surety L/Cs were arranged and in place

before the Petition Date.

54.     The Debtors current workers' compensation liability insurance policy (the "Sentry

Policy") is with Sentry Insurance ("Sentry") and runs through May 1, 2008.[2]  The Sentry Policy

---

[2] For the years 2001-02 through 2003-04 the Debtors insurance was provided by Royal Insurance
Company; for 2004-05 through 2006-07, the insurance was provided by Argonaut Insurance
Company.

14

covers the Debtors' workers' compensation claims in excess of $350,000, i.e., claim amounts in

excess of the Debtors' deductible obligations.  The annual premium due with respect to the

Sentry Policy is $341,000 and the Debtors are current with respect to this policy as of the

Petition Date.  The Workers' Compensation Program is administered by the insurer, which

relieves the Debtors of the daily burden of having to handle the administration of hundreds of

claims.

## **Basis for Relief**

55.    This Court has a number of legal bases on which to grant the requested relief and

permit the Debtors to maintain the Employees' confidence.  First, 11 U.S.C. § 507(a)(4) affords

priority to employees' claims for wages, salaries, or commission, including vacation, severance,

and sick pay, up to $10,950 per individual.  Section 507(a)(5) affords priority to claims for

contributions to employee benefit plans, up to an aggregate amount of $10,950 multiplied by the

number of employees covered less any amounts paid to such Employees under section 507(a)(4).

Except as noted above, the Debtors pre-petition obligations to the Employees, as well as

contributions to the Benefit Plans will not exceed the limits for priority claims imposed by

section 507(a)(4) and (5); that such claims are therefore entitled to priority status; and such

claims must therefore be paid in full under any plan of reorganization.  See 11 U.S.C.

§ 1129(a)(9)(B).  Thus, the payment of employee compensation and benefit claims at this time

would not prejudice the rights of other creditors, but would merely accelerate payments that

would otherwise need to be paid in full under the Debtors' plan of reorganization, while at the

same time help to preserve morale of the Employees who are necessary to the Debtors'

reorganization.

56.    With regard to the few Employees that would conceivably be entitled to more

than the $10,950 statutory cap, the Debtors note that these Employees are critical to the Debtors

continued operations.  Many of these Employees are specially trained and have skills that the

Debtors would not easily be able to replace, especially in a short time.  Moreover, as noted

above, the Debtors do not propose to "cash-out" these Employees' vacation and sick time, but

instead request Court authority to honor the use of vacation and sick time in the ordinary course

of business.

57.    Amounts deducted from the Employees' paychecks as contributions to Benefit

Plans and the Withheld Taxes may be held in trust for such Employees and/or the appropriate

taxing authorities.  Because the Debtors may not have an equitable interest in such employee

contributions and withholding taxes collected by the Debtors before the Petition Date, such

amounts may not be property of the Debtors' estates as defined in 11 U.S.C. § 541(d).  See In re

Tap, Inc., 52 B.R. 271, 278 (Bankr. D.Mass. 1985) (withholding taxes).

58.    Section 105(a) of the Bankruptcy Code provides in part:  "[t]he court may issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).  Section 105 essentially codifies the Bankruptcy Court's inherent

equitable powers.  See In re Allegheny Int'l Inc., 118 B.R. 276, 302 (Bankr. W.D.Pa. 1990)

(court's equitable power derived from section 105 constitutes "extremely broad grant of

authority"); Browning v. Navarro, 37 B.R. 201, 208 (N.D.Tex. 1983) ("Through section 105(a),

Congress grants the bankruptcy court sweeping authority to tailor its orders to meet the needs of

bankruptcy proceedings."), rev'd on other grounds, 743 F.2d 1069, 1084 (5th Cir. 1984).

59.    The Court thus has ample authority to permit the payment or honoring of these

prepetition obligations to the Employees.  In a long line of well-established cases, beginning with

railroad reorganizations dating back to the turn of the century, the courts have consistently

permitted postpetition payment of prepetition obligations where necessary to preserve or enhance

the value of a debtor's estate for the benefit of all creditors.  See, e.g., Miltenberger v.

16

Logansport Ry. Co., 106 U.S. 286, 311-12 (1882) (payment of pre-receivership claim prior to

reorganization permitted to prevent "stoppage of . . . [crucial] business relations . . . ."), Gregg v.

Metro. Trust Co., 197 U.S. 183, 187 (1905) ("the payment of the employees of the [rail]road is

more certain to be necessary in order to keep it running than the payment of any other class of

previously incurred debt"), In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987) (approving

lower court order authorizing debtor prior to plan stage of case to pay prepetition wages, salaries,

expenses and benefits), In re Sharon Steel Corp., 159 B.R. 730, 736-37 (Bankr. W.D.Pa 1993)

(allowing immediate payment of prepetition wage claims under necessity of payment doctrine),

In re Gulf Air, Inc., 112 B.R. 152 (Bankr. W.D.La. 1989) (allowing payment of prepetition

employee wage and benefit claims).  Courts have also determined that it is appropriate to allow

payments beyond the statutory cap.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175-76

(Bankr. S.D.N.Y. 1989) ("Ionosphere III").

60.     These decisions to permit the payment of prepetition obligations postpetition have

been supported by the "doctrine of necessity," also referred to as the "necessity of payment"

principle.  See In re Columbia Gas Sys., Inc., 171 B.R. 189, 192 (Bankr. D.Del. 1994) (necessity

of payment doctrine applies where payment is essential to continued operation of business).  In

discussing the principle at length in the railroad reorganization decision of In re Lehigh and New

England Ry. Co., 657 F.2d 570 (3d Cir. 1981), the Third Circuit stated:

> [T]he "necessity of payment" doctrine, as it has developed since its
> original enunciation in Miltenberger, teaches no more than, if
> payment of claim which arose prior to reorganization is essential to
> the continued operation of the railroad during reorganization,
> payment may be authorized even if it is made out of corpus.

Id. at 581 (citation omitted).

61.     A thorough discussion of the "doctrine of necessity" is contained in Ionosphere

III.  In that case, the Court had granted Eastern Air Lines' motion to pay certain prepetition

wage, salary, medical benefit and business expense claims of its active employees.  Eastern's

labor unions then applied to the Court for an order extending that relief to all Eastern employees,

including primarily those union-represented employees who were then on strike. While rejecting

the request extension, the Court explained the basis for the original order.  The court concluded

that Eastern had "clearly demonstrated sound business reasons to justify such payments," and

that on the basis of that demonstration the Court was legally authorized to permit payment of the

prepetition claims:

> The ability of a Bankruptcy Court to authorize the payment of pre-
> petition debt when such payment is needed to facilitate the
> rehabilitation of Debtor is not a novel concept.  It was first
> articulated by the United States Supreme Court in Miltenberger v.
> Logansport, C. & S.W.R. Co. . . . and is commonly referred to as
> either the "doctrine of necessity" or the "necessity of payment"
> rule.  This rule recognizes the existence of the judicial power to
> authorize a debtor in a reorganization case to pay pre-petition
> claims where such payment is essential to the continued operation
> of Debtor.

Id. at 175-76.

      62.    The Ionosphere III court noted that the doctrine permits "immediate payment of

claims of creditors where those creditors will not supply services or material essential to the

conduct of the business until their pre-reorganization claims shall have been paid."  98 B.R. at

176 (quoting In re Lehigh & New England Ry. Co., 657 F.2d at 581 (3d Cir. 1981)).  Rejecting

union claims that the principle of equality among creditors prevented the court from authorizing

Eastern's payment of prepetition employee claims unless such claims of striking employees were

also paid, the Court held:

> The policy of equality among creditors as articulated by IAM may
> be of significance in liquidation cases under Chapter 7, however,
> the paramount policy and goal of Chapter 11, to which all other
> bankruptcy policies are subordinated, is the rehabilitation of
> Debtor.  This policy was clearly articulated by the United States
> Supreme Court in NLRB v. Bildisco & Bildisco, which stated

CHERRY_HILL\430192\4

> "[t]he fundamental policy of reorganization is to prevent Debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."

Id. at 176-77 (citation omitted).

63.    The relief the Debtors seek by this Motion is fully justified under the "doctrine of necessity."  The Debtors risk collapse of customer service, loss of goodwill, adverse publicity, and a resulting disruption and/or shutdown of their businesses if they do not make these prepetition Employee payments and honor the Employees' benefits.  Thus, prompt payment or honoring of these prepetition obligations is crucial not only to protection of the Debtors' businesses and ultimate reorganization, but also to their very survival.  Indeed, "retention of skills, organizations, and reputation for performance must be considered valuable assets contributing to going-concern value and aiding rehabilitation where that is possible." Gulf Air, 112 B.R. at 154.  The obligations the Debtors wish to pay represent a small percentage of their total pre-petition debts, and satisfaction of these claims contributes mightily to the Debtors' revenue-generating capability.

64.    Authorizing the payments that the Debtors are requesting in this Motion is in the best interest of the Debtors, their estates and their creditors.

65.    It is essential to the continued operation of the Debtors' business and the success of their reorganization that the Workers' Compensation Program be maintained and continued on an ongoing and uninterrupted basis.  Any interruption in the Workers' Compensation Program or any payments due thereunder could severally impair the Debtors' ability to continue to do business.  Moreover, any risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the Debtors' employees and their willingness to remain in the Debtors' employ.  Departures by employees at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest.

66.    Furthermore, if the Debtors are not authorized to pay amounts owing in respect of workers' compensation claims of present and former employees of the Debtors, including pre-petition claims, the claims will ultimately be paid by the insurer through a draw on the Surety L/C resulting in a secured claim against the estates which would have to be paid in full under a plan of reorganization.  In the unlikely event that the Surety L/Cs were insufficient to satisfy workers' compensation, the insurer claims against the Debtors may be treated as priority claims pursuant to section 507(a)(8) of the Bankruptcy Code, which claims would be required to be paid in full under any confirmed plan of reorganization.  Compare In re Olga Coal Co., 194 B.R. 741, 747 (Bankr.S.D.N.Y. 1966) ("[T]his district has recently determined that, in general, the payment of workers' compensation claims is an excise tax.") with In re Park, 212 B.R. 430, 436 (Bankr.D.Mass. 1997) (reimbursement claims are not an excise tax because reimbursement burden was not universally applied to all similarly situated constituents).

### Notice

67.    Notice of this Motion has been provided to: (1) counsel for the Lender Group, (2) counsel for Versa, (3) the Office of the United States Trustee, (4) the Internal Revenue Service, (5) the New Jersey Attorney General, (6) the Commonwealth of Pennsylvania Department of Revenue, and (7) the Debtors' consolidated list of top 30 unsecured creditors (but no less than the five largest unsecured creditors from each case).  In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors request that the attached order be entered authorizing them to pay prepetition employee compensation and withheld compensation obligations, as previously

described herein, and that the Court grant to Debtors such other and further relief as is just and

proper.

Dated: March 16, 2008                        COZEN O'CONNOR

                                             By: ___/s/ Jerrold N. Poslusny, Jr.___
                                                  Mark E. Felger
                                                  Jerrold N. Poslusny, Jr.

                                             Proposed Attorneys for the Debtors

21

## VERIFICATION

Steven Grabell of full age, certifies and states as follows:

1.      I am the Chief Executive Officer of Shapes/Arch Holdings L.L.C. and Shapes

L.L.C.[3], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2.      I have read the foregoing Motion and I hereby certify and verify that all of the

statements contained therein are true.

3.      I hereby verify that the foregoing statements made by me are true.  I am aware

that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

Steven Grabell

Dated: March 16 2008

---

[3] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.

22

**Exhibit "A"**

**UNION BENEFITS**

**A.**     **Shapes/Delair (Local 837)**

| Benefit |
|---|
| Holidays  - 12 paid |
| Vacations<br><br>after 1 year = 5 days at 48 hours straight time<br>after 3 years = 10 days at 96 hours straight time<br>after 10 years = 15 days at 144 hours straight time<br>after 16 years = 20 days at 240 hours straight time<br>after 20 years = 25 days at 240 hours straight time |
| Vacation Sell Back – Employees may sell back up to 50% of their vacation allotment in one week blocks. |
| Health and Welfare Payments<br><br>$746 per Employee, per month for Employees hired on or before January 1, 2005.<br><br>$614 per Employee, per month for Employees hired after January 1, 2005. |
| Pension Fund Contributions<br><br>A monthly payment equal to 2.75% of the total gross monthly wages earned by and payable to each Employee who completes his/her probationary period. |
| 401(k)<br><br>Shapes and Delair maintain a 401(k) plan for union members and acts as the plan fiduciary.  Neither Shapes nor Delair provides any matching contributions. |

- 1 -

| Supplemental Sick Pay Benefits |
| --- |
| 40 hours of straight time pay for Employees with 2 years seniority who are absent from work for 6 consecutive weeks and who have received 5 consecutive disability checks from the State.  Paid only once per eligible Employee per contract year. |
| **Christmas Turkeys** |
| $10 Gift Certificate |
| **Funeral Leave** |
| In case of death of family member, 3 consecutive calendar days during which Employee receives straight time pay for those days missed on which he/she was scheduled to work. |
| **Points Buy Back Program** |
| On December 31 of each year, Employees with Company for at least 1 year will be paid $4 per uncharged attendance point for the difference between 24 points and the number of points on their record as of December 31 provided the difference is at least 12 points. |

**B.**    **Ultra (Local 827)**

| **Benefit** |
| --- |
| Holidays – 11 Paid |
| Vacations |
| after 1 year = 5 days at 40 hours straight time<br>after 3 years = 10 days at 80 hours straight time<br>after 10 years = 15 days at 120 hours straight time |
| Health and Welfare Payments |
| $700 per member per month |
| Pension Fund Contributions |
| A monthly payment equal to 2.75% of the total gross |

- 2 -

| |
|---|
| monthly wages earned by and payable to each Employee who completes his/her probationary period. |
| Scholarship Fund<br><br>$2 per Employee, per month |
| Funeral Leave<br><br>3 days off with pay for death of close family member.  1 day off with pay for death grandmother, grandfather and in-laws. |
| Safety Shoe Allowance<br><br>$45 per year reimbursement for purchase of safety shoes |
| Attendance Bonus<br><br>$25 for any Employee with perfect attendance for a given month<br>Additional $50 bonus for 3 consecutive perfect months of attendance |

### C.    Accu-Weld (UIU)

| Benefit | Bargaining Unit |
|---|---|
| Holidays – 11 Paid | Manufacturing / Extrusion / Trucking |
| Funeral Pay<br><br>3 paid days | Manufacturing / Extrusion / Trucking |
| Jury Duty & Reserve Duty<br><br>Difference between pay received for such service and 2 weeks pay at regular 40 hour work week | Manufacturing / Extrusion/Trucking |
| Sick & Personal Leave<br><br>After 1 year = 2 days<br>After 2 years = 4 days<br>After 3 year = 6 days | Manufacturing / Extrusion |

- 3 -

| | |
|---|---|
| 6 paid days per calendar year after 1 year seniority.<br>Cash out of unused days at year end. | Trucking |

| | |
|---|---|
| Vacation<br><br>1 year seniority = 1 week<br>3 years = 2 weeks<br>6 years = 3 weeks<br>12 years = 4 weeks | Manufacturing / Extrusion/Trucking |
| Weekly Attendance Bonus<br><br>Any Employee who works 40 hours per week receives a $.25 per hour increase | Manufacturing |
| Health and Welfare Benefits<br><br>Up to $431 dollars for single coverage and 50% of any additional premium for dependant coverage. | Manufacturing |
| Up to $453.75 dollars for single coverage and 50% of any additional premium for dependant coverage. | Extrusion |
| Company pays the following after Employee contributions:<br>Single Coverage = 452.86<br>Two Party Coverage = $1,005.85<br>Family Coverage = $1,285.19 | Trucking |
| Legal Benefits<br><br>$25 per month, per Employee | Manufacturing/ Extrusion/Trucking |
| Pension Fund Contributions<br><br>$0.35 per compensated hour per Employee | Manufacturing |

- 4 -

| | |
|---|---|
| $0.50 per compensated hour per Employee | Extrusion |
| $5.10 per week, per Employee | Trucking |

| | |
|---|---|
| Meal Money<br><br>$45 per day meal allowance | Trucking |
| Lodging Allowance<br><br>$150 per day allowance during involuntary shutdowns | Trucking |
| 401K<br><br>Employees permitted to participate in Non-Union 401K | Trucking |

- 5 -

## Exhibit "B"

## NON-UNION EMPLOYEE BENEFITS[*]

**Holidays**

    11 Paid Holidays per calendar year

**Vacation**

    Employees accrue vacation time based upon length of service. Debtors use a calendar year (January 1 - December 31) as its vacation year. Any vacation earned may be taken at any time following the date earned. Any vacation earned in a particular calendar year may be carried over to the following calendar year. However, Employees may not stockpile or rollover multiple years of accrued/unused vacation.

    After the first full or partial calendar year of employment, Employees accrue vacation at the rate of 5/6th of a day per month of service, except that vacation will accrue at the rate of 1.25 days per month of service after an Employee's 11th full calendar year.

**Sick / Personal Days**

    4 paid days per calendar year

**Medical – Amerihealth POS Plus**

*Effective: 1st of the month following 30 days of employment*

- Biweekly Employee cost: Single $67.60, Employee plus one $127.43 and Family $147.40

**Dental-Guardian**

*Effective: 1st of the month following 30 days of employment*

- Two plans offered; Base and Buy up
- Biweekly Employee cost for Option one: Single $0.00, Husband/Wife $12.18, Parent/Child $10.60 and Family $19.02
- Biweekly Employee cost for Option two: Single $7.65, Husband/Wife $21.49, Parent/Child $19.15 and Family $32.22

**401(k)**

*Effective: Upon starting employment*

- 401K Immediate eligibility
- Employee contribution only
- Fully Vested

---

*\* This Summary of Benefits is provides the most important details of non-union Employee benefits, and is current to the best of Debtors' knowledge.*

**Profit Sharing**

- Eligible after 1000 hours
- Must be employed on the last day of the plan year
- Fully vested after 3 years

**Long Term Disability-Guardian**
*Effective: 1st of the month following 30 days of employment*

- 100% employee paid

**Company Life Insurance-Principal Financial**
*Effective: 1st of the month following 90 days of employment*

- Approximately equal to annual salary up to a maximum of $100,000
- 100% company paid

**Supplemental Life Insurance-Guardian**
*Effective: 1st of the month following 30 days of employment*

- Plans available for Employees, spouses and children
- 100% Employee paid

**Flexible Spending Accounts-ADP**
*Effective: 1st of the month following 30 days of employment*

- Health Care and Dependent Care accounts available

**Tuition Assistance**
*Effective: After six months of employment*

- Maximum of $1,200 per year

**Safety Shoe Benefit-By Department (for eligible employees)**
*Effective: Immediately*

- Maximum $40.00 benefit

**Enhanced Short Term Disability Benefits**

1. Less than 30 calendar days of service, then:
   a.    Employee receives the applicable State disability benefits.
   b.    The Company does not supplement State provided benefits.

2. 30 calendar days or more but less than one year of service, then:
   a.    Debtors pay the Employee's regular weekly pay for the first week of disability.

      b.       Starting with the second week of disability, the Employee receives the applicable State disability benefits only.

3.  More than one year but less than two years of service, then:

      a.       Debtors pay the Employee's regular weekly pay for the first week of disability.

      b.       For the second and third week of disability, Debtors pay the differential between (i) 80% of the Employee's regular weekly pay, and (ii) the State disability benefit.

      c.       Starting with the fourth week, the Employee receives the applicable State disability benefits only.

4.  Two or more years of service, then:

      a.       Debtors pay your regular weekly pay for the first week of disability.

      b.       Debtors pay the differential between (i) 80% of the Employee's regular weekly pay and (ii) the State disability benefit per the following schedule:

| Length of service is: | Employee will receive 80% pay less state disability benefits for the following period of disability: |
|---|---|
| More than 2 but less than 3 years | the 2nd through the 4th week of disability. |
| More than 3 but less than 4 years | the 2nd through the 5th week of disability |
| More than 4 but less than 5 years | the 2nd through the 6th week of disability |
| More than 5 but less than 6 years | the 2nd through the 8th week of disability |
| More than 6 but less than 7 years | the 2nd through the 9th week of disability |
| More than 7 but less than 12 years | the 2nd through the 12th week of disability |
| More than 13 years | the 2nd through the 16th week of disability |

5.  In the event an Employee's disability continues for more than three weeks, the State disability payment is retroactive to the first week of disability. Therefore, the Employee's pay from Debtors will be adjusted accordingly so that the Employee will receive the differential between 80% percent of the Employee's regular weekly pay and the State disability payment received for all weeks in which the Employee is entitled to payment from Debtors, including the first week of disability.

**Funeral/Bereavement Leave**

Three working days with pay for death of father, mother, sister, brother, child, or spouse.

**Jury Duty**

Up to 15 days with pay for jury service.

## NON-UNION EMPLOYEE BONUS PLANS/PROGRAMS

**Shapes**

Annual Discretionary Executive Bonuses

Extrusion Foreman Monthly Bonus Program
(Average bonus per eligible foreman is @ $500.00 per month. On average, total monthly cost of the Program is $7,000.00)

**Delair**

Sales Bonus Plan of 1.5% of all sales over prior year

Arbor Bonus Plan of $20 per unit sold

Annual Presentation of Discretionary Gift Cards ($50 value)

MAD Bonus Program for implementation of cost reductions

Management Bonus Plan of up to 7.5% of a department head's salary for attainment of key metrics.

Annual Discretionary Executive Bonuses

**Ultra**

Annual Discretionary Executive Bonuses

Sales Volume Based Bonuses for particular salespeople.

Annual Christmas Gift Cards ($50 value) to all non-union Employees.

**Accu-Weld**

Standard Sales Commission Program

2% commission on all paid sales in excess of individually established annual base sales target
1% commission for sales above annual base target for sales attributable to Window Depot and Premier Windows

Sales Commission Program for particular Employees

Standard Sales Commission Program, however commissions on all sales to Feldco are calculated at .75% and Mid South at 1.25%

Annual Discretionary Executive and Management Bonuses