**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

| | |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
| | FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., <u>et</u> | : |
| <u>al.</u>, | CHAPTER 11 |
| | : |
| Debtors. | CASE NO. 08- |
| | : |

**VERIFIED MOTION FOR INTERIM AND FINAL ORDERS:  (I) PROHIBITING**
**UTILITY COMPANIES FROM DISCONTINUING, ALTERING OR**
**REFUSING SERVICES; (II) DEEMING UTILITY COMPANIES TO HAVE**
**ADEQUATE ASSURANCE OF PAYMENT; AND (III) ESTABLISHING**
**PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL**
<u>**ASSURANCE PURSUANT TO 11 U.S.C. § 366**</u>

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "<u>Debtors</u>"),[1]

the debtors and debtors-in-possession, hereby move (the "<u>Motion</u>") for interim and final orders:

(i) prohibiting utilities from altering, refusing or discontinuing services on the basis of the

commencement of these cases or on account of any unpaid invoice for service provided prior to

the Petition Date; (ii) deeming utility companies to have adequate assurance of payment; and (iii)

establishing procedures for determining requests for additional adequate assurance pursuant to

11 U.S.C. § 366.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("<u>Shapes/Arch</u>"), the following entities, all of
which are wholly owned subsidiaries or Shapes/Arch, also filed petitions on the Petition Date
(defined below):  Shapes L.L.C. ("<u>Shapes</u>"); Delair L.L.C. ("<u>Delair</u>"); Accu-Weld L.L.C.
("<u>Accu-Weld</u>"); and Ultra L.L.C. ("<u>Ultra</u>").

**Background**

1.      On March 16, 2008 (the "Petition Date"), the Debtors filed their respective

petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy

Code").

2.      On the Petition Date, the Debtors filed various "first day" motions, including a

motion seeking to have their cases jointly administered under the lead debtor, "Shapes/Arch

Holdings L.L.C."

3.      The Debtors are operating their businesses and managing their properties as

debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.      No trustee or examiner has been appointed in these cases.  No official committee

of unsecured creditors has been appointed in these cases.

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28

U.S.C. § 157(b)(2).

Description of Debtors and Their Businesses

6.      *Shapes/Arch* is a holding company that owns each of the four operating

companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in

New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and

began focusing on producing aluminum extrusions.  The Debtors have consistently expanded

their businesses over the years by investing in new facilities and technology and by establishing

new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8

million, with Shapes generating approximately 65% of that revenue.  The Debtors have over

2

1000 employees, approximately 70% of whom are members of either the International

Brotherhood of Teamsters Local 837, or the United Independent Union.

7.      *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and

over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety

of industries, including road and rail transportation and commercial and residential construction.

Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to

create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the

necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press

capacity and because all of its casting, extruding, fabricating and finishing is completed in one

facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates

twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be

pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a

variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of

extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World

Records" for the largest free standing aluminum structure ever created in connection with the

restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in

connection with the restoration of the Washington Monument.

8.      In 2007 Shapes' revenues decreased by approximately $35 million compared to

2006.  This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to

the trailer, truck body and railcar sectors, all of which have been experiencing an economic

downturn.

9.      *Delair* manufactures maintenance free aluminum fence systems for residential

and commercial use, and manufactures America's most recognized brand of above-ground pools.

Both product lines are sold through dealers, distributors and major retailers throughout the United States.

10.     Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey.  Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

11.     Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12.     *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors.  Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States.  Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13.     Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006.  The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14.     *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China.  Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

4

15.     Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16.     Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

<u>The Bank Debt</u>

17.     Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("<u>CIT</u>"), as agent, and Bank One, National Association ("<u>Bank One</u>") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "<u>Financing Agreement</u>").  The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("<u>JP Morgan</u>") and Textron Corporation (the "<u>Lender Group</u>").

18.     Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit.  The Financing Agreement has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses.  The fifteenth amendment enables the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "<u>PP&E Equity Borrowing Base Component</u>"), and requires that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

5

19.      The Financing Agreement currently provides for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million.  Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group.  The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

20.      As of the Petition Date, the outstanding borrowings from the Lender Group are as follows:  (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

Reasons for Filing

21.      The Debtors' Chapter 11 filings were precipitated by a number of factors.  The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008.  The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million.  The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007.  The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

22.      With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations

6

under their existing lending arrangement and find themselves in a situation in which they can not

repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of

$15 million.

23.     Over the course of the past four months, the Lender Group has worked with the

Debtors to attempt to find a solution.  In late 2007, CIT Capital Securities LLC, an affiliate of the

agent for the Lender Group, was engaged to attempt to obtain additional financing for the

business.  Despite their efforts, they were unable to identify any lender willing to provide

additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24.     More recently, the Debtors have explored a possible sale/leaseback transaction

with certain third parties.  The Debtors, however, were not successful in negotiating a transaction

that would adequately address the Debtors' needs going forward.

25.     The Debtors also explored potential sale opportunities with existing management

and third parties, but elected not to pursue these potential opportunities in favor of the Versa

transaction (described hereinbelow) because the Versa transaction presents a better opportunity

to preserve the going concern and maximize a recovery for all creditor constituencies.

<u>The White Knight</u>

26.     With the Debtors' need for borrowings in excess of the borrowing base provided

for in the Financing Agreement projected to increase to over $7.4 million over the next few

weeks, without factoring in any payment to restructuring professionals or to venders on the past

due trade debt, and the Lender Group's inability and unwillingness to fund any additional

overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick

and efficient transaction.

27.     In January, 2008, the Debtors began a dialogue with Versa Capital Management,

Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible

transaction.  Versa expressed interest and conducted extensive due diligence with respect to the

Debtors' businesses in late January.

28.     Also during this time frame, the Debtors retained Phoenix Management Services,

Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working

with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

liquidity issues were and would become over the following weeks and months; and (iii) explore

the Debtors' alternatives.

29.     In February, Versa, the Debtors and representatives of the owners of Ben LLC

engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI

Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other

things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and

provide additional funding and an equity infusion to help the Debtors reorganize).  As part of

that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of

the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting

rights.  This transaction was made subject to many terms and conditions, including Versa's

ability to reach an agreement with the Lender Group with respect to the terms and conditions of

Versa's investment  in the Debtors' businesses as part of a plan of reorganization, as well as

obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for

the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on

the terms and conditions upon which Arcus would provide additional financing to the Debtors

(and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

30.    In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31.    Contemporaneously with the filing of the petitions, the Debtors have filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.

32.    The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

33.    The Debtors have worked diligently over the past several weeks in a difficult setting toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the

Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

## **Relief Requested**

34.     By this Motion, the Debtors seek entry of Interim and Final Orders, in the forms submitted herewith, pursuant to 11 U.S.C. § 366 prohibiting the utility companies listed on Exhibit "A" (the "Utility Companies") from altering, refusing or discontinuing services to, or discriminating against, the Debtors on the basis of the commencement of these cases or on account of any unpaid invoice for service provided prior to the Petition Date; (ii) deeming the Utility Companies adequately assured of future performance on the basis of payment a two week deposit; (iii) establishing procedures for resolving requests for additional assurance of payment; and (iv) authorizing the Debtors to supplement the Utility Companies listed on Exhibit "A", to add Utility Companies not presently listed, but subsequently discovered.  The Debtors note that Hess Corporation provided electricity to Shapes, Delair and Ultra until February 4, 2008 and natural gas to Shapes, Delair and Ultra until March 5, 2008.  Since that time Shapes, Delair and Ultra have received electricity and natural gas from PSE&G.  The Debtors believe that the average monthly cost for electricity and natural gas from PSE&G will be the same as it was from Hess Corporation.  Therefore, Debtors propose a deposit based upon usage averages that include Hess Corporation.

35.     In the operation of their businesses, the Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, gas, water/sewer and telephone service.

36.     Prior to the Petition Date, the Debtors' combined average monthly cost of utilities was approximately $1,028,000 as further indicated on <u>Exhibit "A"</u>.  Therefore, the Debtors propose to make deposits totaling approximately $514,000.

37.     Uninterrupted utility services are essential to the Debtors' ongoing operations and eventual reorganization.  Should one or more of the Utility Companies discontinue service even for a brief period, the Debtors' operations would be severely disrupted, if not shut down.  It is critical that utility services continue uninterrupted.

Adequate Assurance of Payment

38.     Section 366 of the Bankruptcy Code prohibits utility companies from altering, refusing or discontinuing service to a debtor for the first thirty (30) days of a bankruptcy case (the "<u>Utility Stay Period</u>").  Upon expiration of the Utility Stay Period, section 366 provides that a utility company may terminate service if a debtor has not provided such utility with adequate assurance of payment.  Section 366(c)(1)(A) provides that the "'assurance of payment' means (i) a cash deposit; (ii) a letter of credit; (iii) a certificate of deposit; (iv) a surety bond; (v) a prepayment of utility consumption; or (vi) another form of security that is mutually agreed on between the utility and the debtor or the trustee."  11 U.S.C. § 366(c)(1)(A).

39.     In accordance with section 366(c)(1)(A)(i), the Debtors propose to provide a security deposit equal to approximately two weeks' estimated average utility consumption (the "<u>Utility Deposit</u>") to each Utility Company listed on <u>Exhibit "A"</u>, within ten (10) business days after the entry of a Final Order granting this Motion.

40.     Additionally, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional assurance of future payment, in the event that a Utility

11

Company believes that the Utility Deposit does not provide adequate assurance.  The Debtors

submit that reasonable procedures (the "Procedures") would provide that:

a.      Absent any further order of this Court and except as otherwise provided herein, the Utility Companies may not alter, refuse or discontinue service to, or discriminate against, the Debtors on account of the commencement of these Chapter 11 cases or any unpaid prepetition charges, or request payment of an additional deposit or receipt of other security in connection with any unpaid prepetition charges;

b.      The Debtors will serve the Motion and the Interim Order, if granted by the Court, via first-class mail, within five (5) business days after the date that the Interim Order is entered by the Court, on each of the Utility Companies identified on Exhibit "A" attached hereto.  In the event that any Utility Company was omitted from Exhibit "A", the Debtors shall have the right to supplement Exhibit "A" and shall promptly provide notice of the Interim Order upon learning of such Utility Company;

c.      Any Utility Company may request additional assurance of payment (an "Additional Payment Request") within thirty (30) days after the Petition Date (the "Additional Payment Request Deadline") by submitting the request to counsel to the Debtors, Cozen O'Connor, LibertyView, Suite 300, 457 Haddonfield Road, Cherry Hill, NJ  08002, Attention: Jerrold N. Poslusny, Jr., Esq.;

d.      Any Additional Payment Request must (i) be in writing, (ii) set forth the location for which utility services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits or other pre-payments or assurances previously provided by the Debtors, (iv) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not constitute satisfactory adequate assurance of payment, (v) include a proposal for what would constitute adequate assurance from the Debtors, along with an explanation of why such proposal is reasonable;

e.      If a Utility Company makes a timely Additional Payment Request that the Debtors believe is reasonable, the Debtors shall be authorized in their sole discretion to comply with such request without further order of the Court;

f.      If the Debtors believe that a Utility Company's Additional Payment Request is unreasonable, the Debtors will schedule a hearing in this case (a "Determination Hearing") to determine adequate assurance to such Utility Company as necessary, or if additional assurance as to payment to such Utility Company is necessary;

12

g.      Pending resolution of a Utility Company's Additional Payment Request at a Determination Hearing, such party shall be prohibited from altering, refusing or discontinuing service to the Debtors;

h.      If a Utility Company fails to send an Additional Payment Request by the Additional Payment Request Deadline, such Utility Company shall have waived its right to make an Additional Payment Request and shall be deemed to have received adequate assurance of payment in accordance with section 366(c)(1)(A)(vi) by virtue of the Utility Deposit;

i.      A Utility Company shall be deemed to have adequate assurance of payment unless and until a future Order of this Court is entered requiring further adequate assurance of payment.

**<u>Basis for Relief</u>**

41.    Section 366 of the Bankruptcy Code states as follows:

(a)      Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b)      Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

(c)(1)(A) For purposes of this subsection, the term "assurance of payment" means-

> (i)      a cash deposit;
> (ii)     a letter of credit;
> (iii)    a surety bond;
> (iv)     a prepayment of utility consumption; or
> (v)      another form of security that is mutually agreed on between the utility and the debtor or the trustee.

(B) for purposes of this subsection an administrative expense priority shall not constitute an assurance of payment.

(2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

(3)(A) On request of a party in interest and after notice and hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

(B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider-

(i)    the absence of security before the date of the filing of the petition;

(ii)    the payment by the debtor of charges for utility services in a timely manner before the date of the filing of the petition; or

(iii)    the availability of an administrative expense priority.

(4) Notwithstanding any other provision of law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the debtor before the date of the filing of the petition without notice or order of the court.

11 U.S.C. § 366.

42.    While the Bankruptcy Code specifies the form of assurance that is adequate, the amount of assurance that must be provided is solely within this Court's discretion.  Courts generally look to the facts and circumstances of each case to ensure that utility companies were not subjected to an unreasonable risk of nonpayment for post-petition services.  See, e.g., In re Kevdata Cork, 12 B.R. 156, 158 (1st Cir. BAP 1981).  Courts construing section 11 U.S.C. § 366(b) have long recognized that adequate assurance of payment does not constitute an absolute guaranty of the debtor's ability to pay.  See, e.g., In re Caldor, Inc. NY, 199 B.R. 1, 3 (S.D.N.Y. 1996), In re Penn Jersey Corp., 72 B.R. 981, 982 (Bankr. E.D.Pa. 1987).

14

43.     Further, in determining what constitutes "adequate" assurance, a bankruptcy court should "focus upon the need of the utility for assurance, and. . . require that the debtor supply no more than that, since the debtor almost perforce has a conflicting need to conserve scarce financial resources." Virginia Elec. & Power Co. v. Caldor Inc.-NY, 117 F.3d 646, 650 (2d Cir. 1997) (quoting Penn Jersey, 72 B.R. at 985).

44.     As set forth above, if Utility Companies are permitted to terminate utility services on the thirty-first day after the Petition Date, a substantial disruption to the Debtors' operations will occur, and the Debtors' business will be irreparably harmed.  If faced with imminent termination of utility services, the Debtors would then be forced to pay whatever amounts are demanded by the Utility Companies to avoid the cessation of essential utility services and, ultimately, the demise of its business.

45.     The Debtors submit that the Procedures set forth herein provide an orderly process for providing adequate assurance of payment to the Utility Companies, without risking irreparable harm to the estate.  The fundamental nature of section 366 of the Bankruptcy Code has not been changed by the 2005 amendments - the Court has discretion to modify any request for assurance of payment and that the assurance of payment need only be adequate in light of the facts and circumstances of a given case.  However, as set forth above, and in accordance with section 366(c)(1)(A), the Debtors will provide additional assurance of payment, if deemed necessary by the Court, and if a Utility Company makes an Additional Payment Request.

46.     Without the Procedures, the Debtors could be forced to address numerous requests by Utility Companies in a haphazard manner.  The Debtors could be forced to capitulate to almost any demands made by its Utility Companies, or face the discontinuation of utility services.  The orderly process contemplated by the procedures set forth herein will avert such a

potentially disastrous outcome, enabling the Debtors to make a smooth transition into Chapter 11, while ensuring a fair process for providing adequate assurance to the Utility Companies as required by the Bankruptcy Code.

47.     The Procedures similar to the procedures detailed herein have been approved by courts in the Circuit under the standards set forth by Congress in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.  See In re Trenton Convalescent Center Urban Renewal Associates, L.P., et al., Case No. 07-25874 (Bankr.D.N.J. Dec. 7, 2007), In re TekConnect Corp., Case No. 06-18759 (GMB) (Bankr. D.N.J. Sept. 21, 2006), In re Neilson Nutraceutical, Inc., Case No. 06-10072 (PJW) (Bankr. D.Del. Feb. 28, 2006).

48.     Accordingly, based on the foregoing facts and authorities, the Debtors believe that granting the relief requested herein will not prejudice the rights of the Utility Companies under section 366 of the Bankruptcy Code.

49.     Additionally, this Court has the authority to grant the relief requested herein under 11 U.S.C. § 105(a), which permits the court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  In that regard, the Court should note that payments to the Utility Companies on behalf of the Debtors is essential to the Debtors' cases in that any failure to receive services from the Utility Company will invariably result in a disruption in the Debtors' operations, and a consequent interruption of revenues received directly from them.

50.     Notice of this Motion has been provided to: (1) counsel for the Lender Group, (2) counsel for Versa, (3) the Office of the United States Trustee, (4) the Internal Revenue Service, (5) the New Jersey Attorney General, (6) the Commonwealth of Pennsylvania Department of Revenue, and (7) the Debtors' consolidated list of top 30 unsecured creditors (but no less than

16

the five largest unsecured creditors from each case).  The Debtors intend to notify the Utilities by

overnight mail on March 17, 2008.  In light of the nature of the relief requested herein, the

Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully requests entry of an Interim and Final Order (i)

prohibiting the Utility Companies from altering, refusing or discontinuing services on the basis

of the commencement of these cases or on account of any unpaid invoice for service provided

prior to the Petition Date; (ii) deeming the Utility Companies adequately assured of future

performance on the basis of the establishment of Utility Deposits; (iii) establishing procedures

for resolving requests for additional assurance of payment; and (vi) granting such other and

further relief as the Court deems just and proper.

Dated: March 16, 2008                          COZEN O'CONNOR


                                               By:    */s/ Jerrold N. Poslusny, Jr.*
                                                     Mark E. Felger
                                                     Jerrold N. Poslusny, Jr.

                                                     Proposed Attorneys for the Debtors

17

## VERIFICATION

Steven Grabell of full age, certifies and states as follows:

1.     I am the Chief Executive Officer of Shapes/Arch Holdings L.L.C. and Shapes

L.L.C.[2], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2.     I have read the foregoing Motion and I hereby certify and verify that all of the

statements contained therein are true.

3.     I hereby verify that the foregoing statements made by me are true.  I am aware

that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

_____
Steven Grabell

Dated: March / 6 2008

---

[2] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.

18

**Shapes L.L.C.**

**Utility Deposits**

| Vendor | Product | Average Per Month | Proposed Deposit |
|--------|---------|------------------:|------------------:|
| PSE&G/Hess | Natural Gas - ISG | $    475,733 | 237,866 |
| PSE&G | Natural Gas - ISG Transportation | 30,422 | 15,211 |
| PSE&G/Hess | Natural Gas - LVG | 5,117 | 2,558 |
| PSE&G | Natural Gas - LVG Transportation | 4,867 | 2,433 |
| PSE&G/Hess | Electric | 219,005 | 109,503 |
| PSE&G | Electric Transportation | 53,246 | 26,623 |
| PPL | Electric | 100,325 | 50,162 |
| CCMUA | County Sewer | 16,642 | 8,321 |
| Pennsauken Sewer Authority | Township Sewer | 11,696 | 5,848 |
| Merchantville Water | Township Water | 14,254 | 7,127 |
| Arch Wireless | Pagers | 305 | 153 |
| Verizon | Telephone | 606 | 303 |
| Sprint | Nextel phones | 1,009 | 505 |
| ACC Wireless LLC | Cell Phones | 590 | 295 |
| Verizon | Internet Connection | 1,154 | 577 |
| XO Communications | Telephone | 2,625 | 1,312 |
| | | $    937,595 | 468,798 |

**Notes:**
1. Hess stopped providing electricity on 2/4/08, and this product is now supplied by PSE&G.
2. Hess stopped providing natural gas on 3/5/08, and this product is now supplied by PSE&G.
3. PPL provides electricity from the adjacent landfill under a supply agreement with Shapes.

**Delair L.L.C.**

**Utility Deposits**

| Vendor | Product | Average Per Month | Proposed Deposit |
|---|---|---|---|
| PSE&G/Hess | Natural Gas - ISG | $    20,036 | 10,018 |
| PSE&G | Natural Gas - ISG Transportation | 5,823 | 2,911 |
| PSE&G/Hess | Electric | - | - |
| PSE&G | Electric Transportation | 129 | 65 |
| Pennsauken Sewer Authority | Township Sewer | 176 | 88 |
| Merchantville Water | Township Water | 276 | 138 |
| Telephone | | - | - |
| Cell Phones | | - | - |
| Internet Connection | | - | - |
| | | $    26,440 | 13,220 |

**Notes:**
1. Hess stopped providing natural gas on 3/5/08, and this product is now supplied by PSE&G.
2. Electric supply for Delair is invoiced to Shapes, who in turn invoices Delair.

| Ultra L.L.C. | | | |
|---|---|---|---|
| | | | |
| | | | |
| **Utility Deposits** | | | |
| | | | |
| | | **Average** | **Proposed** |
| **Vendor** | **Product** | **Per Month** | **Deposit** |
| PSE&G/Hess | Natural Gas - ISG | $    1,826 | 913 |
| PSE&G | Natural Gas - ISG Transportation | 720 | 360 |
| PSE&G/Hess | Electric | 7,807 | 3,903 |
| PSE&G | Electric Transportation | - | 0 |
| CCMUA | County Sewer | 236 | 118 |
| Pennsauken Sewer Authority | Township Sewer | 94 | 47 |
| Merchantville Water | Township Water | 363 | 182 |
| ETI | Internet Connection | 53 | 27 |
| XO Communication | Telephone | 3,709 | 1,854 |
| Verizon Wireless | Cell Phones | 1,506 | 753 |
| Verizon | Alarm | 139 | 70 |
| AT&T | Blackberry | 670 | 335 |
| | | $    17,123 | 8,562 |
| **Notes:** | | | |
| 1. Hess stopped providing electricity on 2/4/08, and this product is now supplied by PSE&G. | | | |
| 2. Hess stopped providing natural gas on 3/5/08, and this product is now supplied by PSE&G. | | | |

**Accu-Weld L.L.C.**

**Utility Deposits**

| Vendor | Product | Average Per Month | Proposed Deposit |
|--------|---------|-------------------|------------------|
| AQUA | Water & Sewer | $ 2,840 | 1,420 |
| Bucks County Water Authority | County Water | 37 | 19 |
| Bucks County Water Authority | County Water | 3,433 | 1,716 |
| PECO | Natural Gas | 1,879 | 939 |
| PECO | Electric | 33,825 | 16,913 |
| XO Communication | Telephone | 2,421 | 1,210 |
| Nextel | Cell Phones | 2,614 | 1,307 |
| | | | |
| | | $ 47,049 | 23,524 |