**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

| | |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., et al., | : CHAPTER 11 |
| Debtors. | : CASE NO. 08- |
| | : |

## MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors"),[1] the debtors and debtors-in-possession, hereby move for an Order pursuant to 11 U.S.C. §§ 105(a) and 331 establishing procedures for payment of interim compensation and reimbursement of expenses to professionals (the "Motion"). In support of the Motion, the Debtors respectfully represent as follows:

### Background

1.    On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C. ("Accu-Weld"); and Ultra L.L.C. ("Ultra").

2. On the Petition Date, the Debtors filed various "first day" motions, including a motion seeking to have their cases jointly administered under the lead debtor, "Shapes/Arch Holdings L.L.C."

3. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. No trustee or examiner has been appointed in these cases. No official committee of unsecured creditors has been appointed in these cases.

5. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

Description of Debtors and Their Businesses

6. *Shapes/Arch* is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra. The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows. By 1959, the business had expanded and began focusing on producing aluminum extrusions. The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines. On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue. The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

7. *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.

Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

8. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

9. *Delair* manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

10. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

3

11. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12. *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14. *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

15. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

The Bank Debt

17. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Corporation (the "Lender Group").

18. Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit. The Financing Agreement has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enables the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and requires that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

19. The Financing Agreement currently provides for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

20.     As of the Petition Date, the outstanding borrowings from the Lender Group are as follows:  (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

Reasons for Filing

21.     The Debtors' Chapter 11 filings were precipitated by a number of factors.  The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008.  The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million.  The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007.  The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

22.     With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

23.     Over the course of the past four months, the Lender Group has worked with the Debtors to attempt to find a solution.  In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the

business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24. More recently, the Debtors have explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

25. The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presents a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

## The White Knight

26. With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million over the next few weeks, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

27. In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

28. Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

7

liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

29. In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

30. In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31. Contemporaneously with the filing of the petitions, the Debtors have filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among

8

other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.

32. The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

33. The Debtors have worked diligently over the past several weeks in a difficult setting toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

**Relief Requested**

34. The Debtors seek to establish administrative procedures for the interim compensation and reimbursement of expenses for the Professionals that permits the Court, the Office of the United States Trustee and other interested parties sufficient oversight of the fees and expenses of the Professionals. The Debtors and the Professionals respectfully request, as set forth more fully below, that the Debtors have authority to pay interim compensation to the Professionals on a monthly basis upon the submission of monthly fee applications followed by

hearings to consider such applications on a quarterly basis.  This process should provide the appropriate balance between promoting the efficient administration of payment of compensation and reimbursement of expenses for the Professionals and providing the Court and parties-in-interest with sufficient opportunity to review, and when appropriate, object to payments to the Professionals.

### Basis for Relief

35.     Pursuant to 11 U.S.C. § 331, any professional employed under 11 U.S.C. § 327 or 1103 is permitted to submit applications for interim compensation and reimbursement of expenses every 120 days, or more often if the Court permits.  In addition, 11 U.S.C. § 105(a) authorizes the Court to issue any order "that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.

36.     Recognizing this authority and recognizing a need to "implement policies and procedures to better serve the bench, bar and public in chapter 11 cases" the judges in this District approved the General Order Adopting Guidelines Governing Procedures for Payment of Interim Compensation and Reimbursement of Expenses to Professionals (the "General Order").

37.     The Debtors propose that the Professionals retained pursuant to an order of the Court in these Chapter 11 cases be permitted to seek interim payment of compensation and reimbursement of expenses in accordance with the General Order, as set forth below (collectively, the "Compensation Procedures").

38.     The Debtors submit that the Compensation Procedures are appropriate in these case based upon size of these cases, the number of creditors, and the benefit to all parties of being able to monitor professional fees in these cases on monthly basis rather than every 120 days.

A. <u>Interim Compensation</u>

39. The Debtors propose to adopt the following procedures for the payment of interim compensation, which are adopted from the General Order:

    a. On or before the twenty-fifth (25th) day of each month following the month for which compensation is sought, each Professional seeking compensation shall file with the Court and serve a monthly fee and expense statement (the "<u>Monthly Fee Statement</u>"), by regular mail, electronic mail (if acceptable to the particular Notice Party (defined below)) or by any means directed by the Court upon the following parties (collectively, the "<u>Notice Parties</u>"):

        (i). Attorneys for the Debtors;

        (ii). Attorneys for the official committee of unsecured creditors (if one is appointed);

        (iii). Attorneys for the Lender Group;

        (iv). Office of the United States-Region III; and

        (v). All parties filing an entry of appearance and request for notices pursuant to Fed. R. Bankr. P. 2002.

    b. Each Monthly Fee Statement shall comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of New Jersey (the "<u>Local Rules</u>") with the exception that provisions of DNJ LBR 2016-1(a)(8) and (a)(9) are not required. All timekeepers must maintain contemporaneously time entries for each individual in increments of tenths (1/10th) of an hour.

    c. Each Notice Party will have twenty (20) days after service of a Monthly Fee Statement to review it (the "<u>Objection Deadline</u>").

    d. Upon the expiration of the Objection Deadline, each Professional may file and serve on the Notice Parties a certificate of no objection or a certificate of partial objection, whichever is applicable, after which Debtors are authorized to pay each Professional an amount

(the "Actual Interim Payment") equal to the lesser of: (i) eighty percent (80%) of the fees and 100 percent (100%) of the expenses requested in the Monthly Fee Statement or (ii) eighty percent (80%) of the fees and 100 percent (100%) of the expenses not subject to an objection.

  e. If any party objects to a Monthly Fee Statement, it must file a written objection (the "Notice of Objection To Monthly Fee Statement") and serve it upon the Professional and the Notice Parties so that the Notice of Objection to the Monthly Fee Statement is received on or before the Objection Deadline.

  f. The Notice of Objection to Monthly Fee Statement must set forth the nature of the objection and the amount of fees and/or expenses at issue.

  g. If the Debtors receive an objection to a particular Monthly Fee Statement, the Debtors shall withhold payment of that portion of the Monthly Fee Statement to which the objection is directed and promptly pay the remainder of the fees and disbursements in the percentages set forth in subparagraph (d), above.

  h. If the parties to an objection are able to resolve their respective dispute(s) following service of a Notice of Objection to Monthly Fee Statement and if the party whose Monthly Fee Statement was objected to serves upon the Notice Parties a statement indicating that the objection is withdrawn and describing in detail the terms of the resolution, the Debtors shall promptly pay in accordance with section (d), above, that portion of the Monthly Fee Statement which is no longer subject to an objection.

  i. If the parties are unable to reach a resolution of the objection within twenty (20) days after service of the objection, then the affected Professional may either (a) file a response to the objection with the Court together with a request for payment of the difference, if any, between the Actual Interim Payment and the non-objected to portion of the Actual Interim

Payment made the affected Profession (the "Incremental Amount"); or (b) forgo payment of the Incremental Amount until the next interim or final fee application or any other date and time so directed by the Court at which time it will consider and dispose of the objection, if so requested.

    j.  The service of an objection to a Monthly Fee Statement shall not prejudice the objecting party's right to object to any fee application made to the Court in accordance with the Bankruptcy Code on any ground whether raised in the objection or not. Furthermore, the decision by any party not to object to a Monthly Fee Statement shall not be a waiver of any kind or prejudice that party's right to object to any fee application subsequently made to the Court in accordance with the Bankruptcy Code and applicable rules.

  40.  Pursuant to the Compensation Procedures, Professionals would be entitled to submit their first Monthly Fee Statement on or before April 25, 2008, and such Monthly Fee Statement would be for the period from the Petition Date through March 31, 2008.

B. Fee Applications

  41.  The Debtors propose that the Court adopt the General Order's proposed requirements for fee applications, which are as follows:

    a.  Beginning with the period ending on June 30, 2008, at 120-day intervals or at such other intervals directed by the Court (the "Interim Period"), each Professional seeking approval of its interim fee application shall file with the Court and serve on the Notice Parties an interim application for allowance of compensation and reimbursement of expense, pursuant to 11 U.S.C. § 331, of the amounts sought in the Monthly Fee Statements issued during such period (the "Interim Fee Application").

    b.  The Interim Fee Application must include a summary of the Monthly Fee Statements that are the subject of the request and any other information requested by the Court

and shall comply with the mandates of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, the Local Rules and the applicable Third Circuit law.

      c.      An Interim Fee Application must be filed and served on the Notice Parties within forty-five (45) days of the conclusion of the Interim Period.

      d.      Any Professional who fails to file an Interim Fee Application when due will be ineligible to receive further interim payments of fees or expenses until such time as the Interim Fee Application is submitted.

      e.      The pendency of a fee application or a Court order that payment of compensation or reimbursement of expenses was improper as to a particular Monthly Fee Statement shall not disqualify a Professional from further payment of compensation or reimbursement of expenses as set forth above, unless otherwise ordered by the Court. Additionally, the pendency of an objection to payment of compensation or reimbursement of expenses will not disqualify a Professional from future payment of compensation or reimbursement of expenses, unless the Court orders otherwise.

      f.      Neither the payment of, nor the failure to pay, in whole or in part, monthly compensation and reimbursement as provided herein shall have any effect on the Court's interim or final allowance of compensation and reimbursement of expenses by any Professionals.

      g.      Counsel for the committee, if appointed, may, in accordance with the forgoing procedures for monthly compensation and reimbursement to professionals, collect and submit statements of expenses, with supporting vouchers, from members of the committee; provided, however, that such committee counsel ensures that these reimbursement request comply with the applicable rules and the General Order.

14

CHERRY_HILL\430484\2 077771.000

### C. Administrative Issues

42. Finally, the Debtors request that the Court put the following administrative procedures in place, all of which are set forth in the General Order:

    a. Any party may object to requests for payments made pursuant to an order granting this Motion on the grounds that: (i) the Debtors have not timely filed Monthly Operating Reports, (ii) the Debtors have not remained current with their administrative expenses (including payment quarterly fees to the United State Trustee under 28 U.S.C. § 1930), or (iii) a manifest exigency exists, by seeking a further order of this Court.

    b. The Debtors will include all payments to Professionals on their Monthly Operating Reports, detailed so as to state the amount paid to the Professionals.

    c. All fees and expenses paid to Professionals would be subject to disgorgement until final allowance by the Court.

43. The Debtors finally request that the above proposed Compensation Procedures remain in effect during the pendency of the case.

### Notice

44. Notice of this Motion has been provided to: (1) counsel for the Lender Group, (2) counsel for Versa, (3) the Office of the United States Trustee, (4) the Internal Revenue Service, (5) the New Jersey Attorney General, (6) the Commonwealth of Pennsylvania Department of Revenue, and (7) the Debtors' consolidated list of top 30 unsecured creditors (but no less than the five largest unsecured creditors from each case). In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested herein and such other and further relief as is just.

Dated: March 16, 2008                                COZEN O'CONNOR

                                                By:   */s/ Jerrold N. Poslusny, Jr.*
                                                       Mark E. Felger
                                                       Jerrold N. Poslusny, Jr.

                                                       Proposed Attorneys for the Debtors