Mark E. Felger Esquire
Jerrold N. Poslusny, Jr., Esquire
Cozen O'Connor
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill NJ 08002
(856) 910-5000

Proposed Attorneys for the Debtors/Debtors-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
(CAMDEN VICINAGE)**

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | |
| | ) | |
| Shapes/Arch Holdings L.L.C., | ) | Case No. _____ |
| Shapes L.L.C., Delair L.L.C., Accu-Weld | ) | (jointly administered) |
| L.L.C., and Ultra L.L.C. | ) | |
| | ) | |
| Debtors. | ) | Chapter 11 |
| _____) | | |

**JOINT DISCLOSURE STATEMENT FOR THE
DEBTORS' JOINT PLAN OF REORGANIZATION**

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY.  THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION, WHICH THE DEBTORS FILED ON THE PETITION DATE. DEBTORS BELIEVE THAT THEIR PLAN OF REORGANIZATION IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. DEBTORS URGE THAT THE VOTER ACCEPT THE PLAN.

WILMINGTON\75649\3  099997.000

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION AND SUMMARY..................................................................................3
    A.   Disclosure Statement Enclosures ...........................................................................3
    B.   Only Impaired Classes Vote ..................................................................................4
    C.   Confirmation Hearing ............................................................................................5

II. OVERVIEW OF THE PLAN ...........................................................................................5
    A.   Introduction ...........................................................................................................5
    B.   Summary of Distributions .....................................................................................5

III. OVERVIEW OF CHAPTER 11 ......................................................................................7

IV. DESCRIPTION OF THE DEBTORS' BUSINESS ........................................................7
    A.   The Debtors ...........................................................................................................7
    B.   The Pre-Petition Capital Structure ........................................................................9
    C.   Events Leading to Chapter 11 Filing ....................................................................9

V. THE FILING...................................................................................................................11
    A.   Significant "First Day" Motions ........................................................................11
    B.   DIP Financing and Use of Cash Collateral ........................................................12
    C.   Claims Process ....................................................................................................13

VI. DESCRIPTION OF SIGNIFICANT LITIGATION .....................................................13
    A.   Preferences, Fraudulent Transfers and Other Avoidance Actions.....................13
    B.   Other Causes of Action .......................................................................................14
    C.   Claims Concerning the Environmental Protection Agency .................................15

VII. SUMMARY OF PLAN PROVISIONS ........................................................................15
    A.   Introduction .........................................................................................................15
    B.   Method of Classification of Claims and Interests and General Provisions ..................16
    C.   Unclassified Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims
         and Fee Claims...................................................................................................17
    D.   Classification and Treatment of Claims and Interests ........................................18
    E.   Means For Implementation Of The Plan .............................................................21
    F.   Treatment Of Executory Contracts And Unexpired Leases ...........................27
    G.   Effect of Confirmation of the Plan......................................................................28
    H.   Retention of Jurisdiction .....................................................................................31
    I.   Miscellaneous Provisions....................................................................................31
    J.   Effectiveness of the Plan.....................................................................................32
    K.   Provisions Regarding Corporate Governance and Management of the Reorganized
         Debtors ...............................................................................................................32

VIII. CERTAIN RISK FACTORS TO BE CONSIDERED .................................................33
    A.   Taxation ..............................................................................................................33
    B.   Distributions to Holders of Claims .....................................................................34
    C.   Objections to Classification ................................................................................34
    D.   Inherent Uncertainty of Financial Projections ...................................................34

WILMINGTON\75649\3  099997.000

    E.   Certain Bankruptcy Law Considerations .......................................................................35

IX.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......35
    A.   Liquidation Under Chapter 7 .......................................................................................35
    B.   Alternative Plan of Reorganization ..............................................................................35

X.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................36
    A.   Federal Income Tax Consequences in General .............................................................36
    B.   Federal Income Tax Consequences of the Liquidation Trust .......................................37
    C.   Federal Income Tax Consequences to Holders of Allowed Claims in Class 5 ............38
    D.   Federal Income Tax Consequences to Holders of Allowed Class 6, 7 and 8 Interests..39
    E.   Importance of Obtaining Professional Tax Assistance ..................................................39

WILMINGTON\75649\3  099997.000

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS OR INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALL CREDITORS AND INTERESTS HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," Article VIII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN.  NOTHING

IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.  THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, ITS BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASE, HAS BEEN PREPARED AND OBTAINED BY THE DEBTORS AND ITS PROFESSIONALS FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTORS.  NEITHER THE DEBTORS NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER.  AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT.  SEE SECTION VII.  THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE FINANCIAL PROJECTIONS ATTACHED HERETO WERE PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF ITS RESTRUCTURING ADVISOR BASED ON INFORMATION AVAILABLE TO THE DEBTORS AND NUMEROUS ASSUMPTIONS THAT ARE AN INTEGRAL PART OF THE FINANCIAL PROJECTIONS, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND SOME OR ALL OF WHICH MAY NOT MATERIALIZE.  THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS.  ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE

SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON, THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

## I.  INTRODUCTION AND SUMMARY

Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C., the above-captioned Debtors (the "Debtors"), submits this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Joint Plan of Reorganization dated March 13, 2008 [Docket No. ___], as such plan may be amended (the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the District of New Jersey (Camden Vicinage) (the "Bankruptcy Court"), and (ii) the Confirmation Hearing scheduled for _____, 2008 at 10:00 a.m. (ET).  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement together with any relevant Exhibits and Appendices.

Concurrently with the filing of this Disclosure Statement, the Debtors filed the Plan which sets forth how Claims against and Interests in the Debtors will be treated in this chapter 11 case. This Disclosure Statement describes certain aspects of the Plan, the Debtors' prior operations, significant events occurring in the Debtors' chapter 11 case and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

### A.    *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- The Order of the Bankruptcy Court (without exhibits) (the "Solicitation Procedures Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or to reject the Plan (Exhibit B) [TO BE ATTACHED];

- Financial Projections (Plan Supplement);

- Liquidation Analysis (Plan Supplement);

3

- Schedule of Environmental Claims

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Impaired Claims and Interests that the Debtors believe are entitled to vote to accept or reject the Plan.

The Solicitation Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of an Impaired Claim or Interest entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Solicitation Procedures Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code and the Solicitation Procedures Order.

### B.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

In addition, if any Impaired Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Under the Plan, Claims in Classes 3, 4, 5, 8, 9, 10 and 11 are or may be Impaired and are entitled to vote on the Plan. Holders of Interests in Class 6 will receive no distribution and, accordingly, such holders are deemed to reject the Plan. Votes from holders of Interests in Class 7 are not being solicited. Under the Plan, Claims in Classes 1, 2 and 7 are unimpaired, and the holders of Class 1, 2 and 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. ACCORDINGLY, A BALLOT FOR ACCEPTANCE

OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS
IN CLASSES 3, 4, 5, 8, 9, 10 and 11.

For a summary of the treatment of each Class of Claims and Interests, see "Overview of
the Plan" below.

### C.    *Confirmation Hearing*

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2008 at
10:00 a.m. (ET) in the United States Bankruptcy Court for the District of New Jersey, 401
Market Street, Camden, New Jersey 08101.  The Bankruptcy Court has directed that objections,
if any, to confirmation of the Plan be served and filed on or before _____, 2008 at 4:00
p.m. (ET) in the manner described in the Notice accompanying this Disclosure Statement.  The
date of the Confirmation Hearing may be adjourned from time to time without further notice
except for an in-court announcement at the Confirmation Hearing of the date and time as to
which the Confirmation Hearing has been adjourned.

## II. OVERVIEW OF THE PLAN

### A.    *Introduction*

The Plan is the product of the effort by the Debtors' management and its professional
advisors to develop a plan that will enable Creditors and Interest holders to receive the maximum
recovery possible in these cases.  The valuation of the Debtors and the Reorganized Debtors,
upon which certain distributions contemplated by the Plan are based, is derived in part from
projections of the future performance of the Reorganized Debtors.  The financial projections,
which were prepared by the Debtors with the assistance of its advisors, are attached as Exhibit C
to this Disclosure Statement.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO
MAXIMIZE THE RECOVERY TO THEIR CREDITORS AND INTEREST HOLDERS AND
THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS,
THEIR CREDITORS AND INTEREST HOLDERS.  THE DEBTORS THEREFORE URGE
THOSE PARTIES ENTITLED TO CAST A BALLOT TO ACCEPT THE PLAN.

### B.    *Summary of Distributions*

Under the Plan, Claims against and Interests in the Debtors are divided into Classes and
will receive the distributions and recoveries (if any) described in the table below.  The following
table briefly summarizes the classification and treatment of Claims and Interests under the Plan.
The ranges of the Estimated Amount of Allowed Claims set forth in the following table reflect
the amounts listed in the Debtors' Bankruptcy Schedules (low end of range) and the official
claims' register maintained by Epiq Bankruptcy Solutions LLC which includes duplicate,
amended and late filed claims (high end of range).  The Debtors have not completed the analysis
or reconciliation of the Claims.

5

| Class | Type of Claim or Membership Interest | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Unclassified | Administrative Claims | $ | 100% |
| Unclassified | Arcus DIP Claims | $25,000,000 | 100% |
| Unclassified | Fee Claims | $ [1] | 100% |
| Unclassified | Priority Tax Claims | $ [2] | 100% |
| 1 | Other Priority Claims | $2,000,000 | 100% |
| 2 | Miscellaneous Secured Claims | $ | 100% |
| 3 | CIT Claims | $50,000,000 | 100% |
| 4 | Collateralized Insurance Program Claims | | 100% |
| 5 | General Unsecured Claims | $31,000,000[3] | 2% |
| 6 | Ben Interests | N/A[4] | 0% |
| 7 | Class 7 Interests | N/A | 100% |
| 8 | Class 8 EPA/NJDEP Claims | $350,000 | 100% |
| 9 | Class 9 Secured Real Estate Claims | $950,000 | 100% |
| 10 | Class 10 Secured Claims of Crown Credit Company | $30,087.93 | 100% |
| 11 | Class 11 Secured Claims of Warehousemen and Shippers | $[5] | 100% |

ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED RECOVERY, THERE IS NO ASSURANCE THAT THE FINAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE ABOVE AND THEREFORE POSSIBLY DEPLETE THE ESTIMATED PERCENTAGE RECOVERY.    The actual recoveries under the Plan by the Debtors' creditors will be dependent upon a variety of factors including, but not limited to, whether, and to what extent, Disputed Claims are resolved in favor of the Debtors rather than the Creditors.  Accordingly, no representation can be or is being made with respect to whether each estimated recovery shown in the table above will be realized by the

---

[1]  The above estimate represents the total amount of Fee Claims that have been incurred and requested from the Petition Date through April ___, 2008.

[2]  Certain of the Debtors' taxes are currently the subject of an audit and therefore, the actual allowed amount of the Priority Tax Claims could be materially higher or lower.

[3]  The above estimate is preliminary and includes all unsecured creditors in all of the Debtors' cases and no representations are being made with respect thereto as underlying this estimate are a number of assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors.

[4]  In consideration for the Plan Funders Debt Commitment and Plan Funders Equity Commitments, the Plan Funders shall receive 100% on the New L.L.C. Interests in Reorganized Shapes/Arch Holdings L.L.C.

[5]  Debtors are currently analyzing the amount of claims in this class but estimate the same are in excess of $100,000.00 and less than $400,000.00.

holder of an Allowed Claim or Interest.  The Debtors have filed the Plan for administrative convenience and each class referenced above shall apply to each of the Debtors' estates with the funding for each Class to be shared pro-rata amongst creditors in each estate as if the estates had been substantially consolidated.

## III.  OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders.  A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the bankruptcy court makes the plan binding upon, among others, a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

After a plan has been filed and a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan has been approved by the court, the holders of claims against or interests in a debtor may vote to accept or reject the plan under certain circumstances.

## IV.  DESCRIPTION OF THE DEBTORS' BUSINESS

### A.    The Debtors

Shapes/Arch Holdings L.L.C. ("Shapes/Arch") was created to integrate the operations and management of the company's four business units.   Shapes L.L.C. ("Shapes") is a manufacturer, fabricator and distributor of a broad array of customized, large profile aluminum extrusions.  Delair L.L.C. ("Delair") offers a wide variety of maintenance free aluminum fence systems and has one of America's most recognized brands of above ground pools.  Accu-Weld L.L.C. ("Accu-Weld") designs, manufactures and distributes high quality made to order vinyl, residential windows and steel entry doors.  Ultra L.L.C. ("Ultra") is a leading supplier of value priced, globally sourced hardware products. The membership interest of Shapes/Arch is held 100% by Ben LLC while the voting rights, under the Company's operating agreement, are held by Arcus ASI, Inc. (79.9% of the vote of all members) and by Ben LLC (20.1% of the vote of all members).  Ben, L.L.C. is controlled by various family members who are related to the founder of the company (which was formed in 1952).  Shapes/Arch owns 100% of the membership interests in each of the operating entities.

The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum

extrusions.  The Debtors have consistently expanded their business over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of customer aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.  Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.  In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006.  This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools.  Both product lines are sold through dealers, distributors and major retailers throughout the United States.  Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey.  Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.  Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors.  Accu-Weld's produces are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States.  Accu-Weld operates out of 100,000 square foot facility in Bensalem, Pennsylvania.  Unlike many of its competitors, Accu-Weld extrudes its own final profiles, which results in faster production and delivery to the customer.  Accu-Welds' net revenues in 2007 were $24.9 million, down from $37 million in 2006.  The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware.  Ultra has

WILMINGTON\75649\3  099997.000

over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufactures. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey with two million cubic feet of storage space. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

### B.    The Pre-Petition Capital Structure

Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and/or co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Revolving Credit Facility"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) and Textron Corporation (the "Lender Group"). Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit ("Loan"). The Revolving Credit Facility has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the "over advance" needs of the Debtors in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enables the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and requires that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008. The Revolving Credit Facility currently provides for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has asserted a first priority lien on and security interest in substantially all of Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof. As of the Petition Date, the outstanding borrowings from the Lender Group are as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

### C.    Events Leading to Chapter 11 Filing

Prior to the filing of these Chapter 11 cases, the Debtors had attempted to sell the companies and had engaged TM Capital in May of 2006 to explore selling all of the entities. Those efforts did not result in a sale of the entities and the Debtors attempted to raise significant additional capital in the fourth quarter of 2007 with the assistance of its principal lender, CIT Group. Aside from the Plan Funders' proposal, no other timely and viable opportunities presented themselves. Phoenix Management Services, Inc. ("Phoenix") was engaged by the Debtors to review the Debtors' current financial situation and to review the 2008 business plan and financial forecast and otherwise assist the Debtors in exploring their strategic alternatives.

The Debtors filed these cases as a result of serious liquidity issues. The Debtors consolidated statements for year ending 2007 showed a decline in net revenue by $48.5 million

dollars from $322.3 million dollars to $273.8 million dollars.  EBITDA declined by almost $17 million from $20.6 million in 2006 to less than $4 million dollars in 2007.  The majority of the loss related primarily to the depressed results that were obtained by Shapes.  Although the net revenue of Ultra increased slightly in 2007 from $45.5 million dollars in 2006 to $46.1 million dollars in 2007, its EBITDA decreased from $3.3 million in 2006 to $1.1 million in 2007.  Both Delair and Accu-Weld had significant declines in net revenue during 2007 as well as significant declines in EBITDA.

A substantial portion of the Debtors' revenue has been impacted by various contractions in various industries throughout the United States.  By way of example, Shapes' sales are primarily to trailer, truck body and rail car sector customers that are all experiencing declines in their own industry.  Delair's customer base is strongly associated with consumer confidence in the economy and housing industry and as such, has been affected by the spending habits of consumers.  Ultra and Accu-Weld are likewise significantly affected by consumer spending in the construction industry and home remodeling sectors and have been adversely affected by the same.  Lastly, due to the seasonality of their businesses, the Debtors are faced with a significant liquidity crises under their current revolving loan with the Lender Group.  In brief summary, the significant decline in revenue and seasonal liquidity position compelled the Debtors to seek an alternative to its current position which included, without limitation, seeking relief under Chapter 11 of the United States Bankruptcy Code.

With the Debtors' need for borrowing in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million over the next few weeks, without factoring in any payments to restructuring professionals or to vendors on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.  In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm to discuss Versa's interest in a possible transaction.  Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.  Also during this time frame, and as set forth above, the Debtors retained Phoenix.

In February of 2008, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during its Chapter 11 proceeding (and provide additional funding and an equity infusion to help reorganize the Debtors).  As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) in Shapes/Arch and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights.  This transaction was made subject to many terms and conditions including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization as well as obtaining the Lender Group's commitment to provide DIP and exit financing for the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any chapter 11 process as well as provide an exit facility for the Debtors.

The Plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Arcus of approximately $25 million.

## V. THE FILING

On March 16, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue in possession of their property pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have, with the Bankruptcy Court's approval, employed and retained (a) Cozen O'Connor, as its bankruptcy counsel; and (b) Phoenix, as its restructuring advisor.

### A.    Significant "First Day" Motions

Immediately after the filing of its chapter 11 petition, the Debtors filed numerous "first day" motions seeking orders from the Bankruptcy Court authorizing the Debtors to retain professionals and providing the Debtors certain relief from certain administrative requirements imposed by the Bankruptcy Code.  These orders were requested to ease the strain on the Debtors' relationships with customers, employees and others as a consequence of the filing.  In particular, the Debtors obtained orders approving the following motions and applications:

- Verified Motion for an Order Directing Joint Administration and Procedural Consolidation [Docket No. ___]:

- Verified Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Modifying Automatic Stay; and (IV) Scheduling Final Hearing, Pursuant to §§ 105, 362, 363 and 364 of the Bankruptcy code and Federal Rules of Bankruptcy Procedures 2002 and 4001(c) and (d) [Docket No. ___];

- Verified Motion for an Order Authorizing the Debtors to Maintain Current Bank Accounts, Maintain Their Pre-Petition Cash Management System, and Use Existing Business Forms [Docket No. ___];

- Debtors' Verified Motion for an Order Authorizing But Not Directing Payment of Pre-Petition Wages, Salaries, Compensation, Employee Benefits, Business Reimbursement Expenses, Certain Union Payments, and the Continuation of the Debtors' Workers' Compensation Program and Policies Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and (5) [Docket No. ___];

- Verified Motion for Interim and Final Orders: (I) Prohibiting Utility Companies form Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies to Have Adequate Assurance of Payment; and (III) Establishing

11

Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366 [Docket No. ___];

- Verified Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales and Use Taxes [Docket No. ___];

- Application for Retention of Epiq Bankruptcy Solutions, LLC, as Official Noticing Claims and/or Solicitation and Balloting Agent for the Debtors [Docket No. ___];

- Debtors' Verified Motion for an Order Establishing a Bar Date Pursuant to Fed. R. Bankr. P. 2002(a)(7) and 3003(c)(3) [Docket No. ___];

- Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. ___]; and

- Debtors' Motion to:  (I) to Confirm Grant of Administrative Expense Status to Obligations Arising from Postpetition Delivery of Goods; (II) Establish Authority to Pay Certain Expenses in the Ordinary Course of Business and (III) Prohibit Third Parties from Interfering with Delivery of Good [Docket No. ___].

**B.    *DIP Financing and Use of Cash Collateral***

1.    *DIP Financing*

Essential to the Debtors' efforts to reorganize was obtaining a source of post-petition funding.  To that end, on March ___, 2008, the Debtors filed the Debtors' Motion for Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (II) Granting Related Relief [Docket No. ____] (the "DIP Motion").  By Order of the Bankruptcy Court dated _____, 2008 [Docket No. ____] (the "Final DIP Order"), the Bankruptcy Court approved the DIP Motion and authorized the Debtors to enter that certain Debtors-in-Possession Loan and Security Agreement by and between the Debtors and the Arcus Funding (the "DIP Agreement").  Pursuant to the terms of the DIP Agreement, Arcus has made $25,000,000 available to the Debtors.  As of the anticipated date of the Confirmation Hearing, the Debtors estimate that it will have drawn approximately $22,000,000 on the DIP Facility.  The Obligations (as defined in the Final DIP Order) are secured by valid and perfected priming liens and security interests granted to Arcus Funding on all of the Debtors' assets and properties (subject to first lien in favor of CIT on the Inventory and Accounts Receivable).  CIT had also agreed to provide the Debtors with additional availability under a new Sixty Million Dollar Debtor-in-Possession Revolving Credit Agreement ("DIP Revolver Agreement") to fund operations pending confirmation of the Plan.  Debtors' obligations to CIT have been reduced by utilizing a portion of the proceeds of the DIP Loan from Arcus to reduce/satisfy the Term Loan and PP&E Equity Borrowing Base Component due and owing to CIT.

12

C.    **Claims Process**

1.    _Last Date to File Proofs of Claim_

On _____, 2008, the Bankruptcy Court entered an order (the "Bar Date Order")
[Docket No. \_\_\_\_] generally requiring any Person holding or asserting a Claim against the
Debtors to file a written proof of claim with Debtors, c/o _____
_____ on or before 5:00 p.m., prevailing Eastern Time on _____, 2008.
The Bar Date Order provided that any person or entity failing to timely file a proof of claim will
be forever barred, estopped and enjoined from (a) asserting a timely filed claim against the
Debtors that the entity has that (i) is in an amount that exceeds the amount, if any, that is
identified in the Schedules of Assets and Liabilities on behalf of such entity as undisputed,
noncontingent and liquidated (if no amount is identified therein for that entity then the entity
shall be forever barred, estopped and enjoined from asserting any claim at all against the
Debtors) or (ii) is of a different nature or a different classification than any claim identified in the
Schedules of Assets and Liabilities on behalf of such entity; or (b) voting upon, or receiving
distributions under, any plan or plans of reorganization in this case in respect of a Claim.  The
Bar Date Order provides other bar dates in other circumstances as set forth in that order.

## VI.  DESCRIPTION OF SIGNIFICANT LITIGATION

A.    **Preferences, Fraudulent Transfers and Other Avoidance Actions**

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential
transfers of property, including Cash, made while insolvent during the ninety (90) days
immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the
extent the transferee received more than it would have in respect of the pre-existing debt had the
transferee not received the payment and had the debtor been liquidated under chapter 7 of the
Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year
preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business
according to the ordinary business terms are not recoverable.  Furthermore, if the transferee
extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy
case), such extension may constitute a defense, to the extent of any new value, against any
otherwise recoverable transfer of property.  If a preferential transfer were recovered by the
debtor, the transferee would have a general unsecured claim against the debtor to the extent of
the debtor's recovery.

The Debtors estimate that it made payments in the approximate amount of
$_____ to various creditors within the ninety-day period preceding the Petition Date
and payments of $_____ to insiders within the one-year period preceding the Petition
Date.  The Debtors have not yet analyzed whether any of these payments are preferences (within
the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a
defense to a preference action, if commenced.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover
certain prepetition transfers of property, including the grant of a security interest in property,

13

made while insolvent to the extent the Debtors received less than fair value for such property. In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. As of the date of the distribution of this Disclosure Statement, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions. Under the Plan, the Reorganized Debtors will have the authority to investigate and prosecute all such Avoidance Actions in accordance with section 1123(b)(3) of the Bankruptcy Code or decline to do the same in their discretion.

## B.    *Other Causes of Action*

1.    <u>*Investigation of Causes of Action*</u>

The Reorganized Debtors have not, but will, investigate causes of action against a number of Persons, relating to, among other things, the following (collectively, the "<u>Causes of Action</u>"):

•    All actual or potential Avoidance Actions pursuant to any applicable section of the Bankruptcy Code, including, but not limited to, sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code arising from any transaction involving or concerning the Debtors;

•    Any lawsuits for, or in any way involving, the collection of accounts receivable or any matter related to the Plan;

•    Any actions against landlords, lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;

•    Any litigation or lawsuit initiated by the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association or any other court or tribunal;

•    Any and all potential Causes of Action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and

•    Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' business operations.

In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and as a result, cannot be raised during the pendency of the case (collectively, "<u>Unknown Causes of Action</u>"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtors, to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors and Reorganized Debtors.

2.       *Preservation of All Causes of Action Not Expressly Settled or Released*

The Debtors have attempted to disclose all material Causes of Action, including Avoidance Actions and other actions that it may hold against third parties.  However, the Debtors have not performed an extensive investigation or analysis of potential claims and Causes of Action against third parties.  It is the contemplation of the Debtors, that such investigation and analysis will occur post-Confirmation by the Reorganized Debtors, as applicable. You should not rely on the omission of the disclosure of a claim or Cause of Action to assume that the Debtors holds no claim or Cause of Action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or Causes of Action against third parties are specifically reserved and will be transferred to the Reorganized Debtors.

The Debtors' failure to identify a claim or Cause of Action herein is specifically not a waiver of any claim or Cause of Action.  The Debtors will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or Causes of Action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtors' failure to identify a claim or Cause of Action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or Causes of Action which could be asserted against third parties, including Creditors of the Debtors which may be reading this Disclosure Statement and/or casting a Ballot except where such claims or Causes of Action have been released in the Plan or the Confirmation Order.

**C.      Claims Concerning the Environmental Protection Agency**

Numerous environmental claims have been asserted against one or more Debtors as more fully set forth in Schedule 4.5 to the Plan.  The Debtors believe that most if not all of the claims are covered by applicable insurance policies.  Without effecting the obligations of any third parties (i.e. insurance companies), and except for the Claims of EPA/NJDEP, all other environmental claims (or claims of third parties relating to environmental claims and including those set forth in Sections III and IV of Schedule 4.5 of the Plan) are treated as Class 5 General Unsecured Claims and will be discharged.

## VII.  SUMMARY OF PLAN PROVISIONS

**D.      Introduction**

The Plan is the product of diligent efforts by the Debtors to formulate a plan that provides for a fair allocation of the Debtors' assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.  The liquidation analysis prepared by the Debtors with the assistance of Phoenix  reflected an aggregate value for the Debtors as more fully set forth in the Plan Supplement.  The aggregate Secured Claims of CIT and Arcus are approximately seventy five million dollars ($75,000,000.00).

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtors' creditors and interest holders. The Debtors believe, and will demonstrate to the Bankruptcy Court, that the Debtors' creditors will receive significantly more value under the Plan than any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

**E.    *Method of Classification of Claims and Interests and General Provisions***

1.    *General Rules of Classification.*

Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes. Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

2.    *Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims.*

Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article III of the Plan in accordance with section 1 l23(a)(1) of the Bankruptcy Code.

3.    *Bar Date for Administrative Claims.*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, no later than thirty (30) days after the Effective Date (the "Administrative Claim Bar Date"). Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, and the party requesting payment of an Administrative Claim within thirty (30) days after the filing of such request for payment.

4.    *Bar Date for Fee Claims.*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date, must be filed and served on the Plan Administrator and its counsel no later than thirty (30) days after the Effective Date (the "Fee Claim Bar Date"). Any Professional that is required to file and serve a request for payment of a Fee Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Fee Claim or participating in distributions under the Plan on account thereof. Objections to

16

Fee Claims must be filed and served on the Plan Administrator, its counsel, and the requesting party by thirty (30) days after the filing of the applicable request for payment of the Fee Claim.

      5.     *Intercompany Claims.*

As of the Effective Date, Intercompany Claims shall be extinguished. No distributions on account of Intercompany Claims will be made, however, Shapes/Arch Holdings L.L.C. shall retain the right and entitlement to receive final liquidating dividends from its subsidiaries.

**F.     Unclassified Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims**

Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims are not classified in the Plan. The treatment of and consideration to be received by holders of Allowed Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims shall be in full and complete satisfaction, settlement, release and discharge of such Claims. The Debtors' obligations in respect of such Allowed Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims shall be satisfied in accordance with the terms of the Plan.

Administrative Claims. Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree. The total amount of unpaid Allowed Administrative Claims shall be subject to approval by the Bankruptcy Court.

Priority Tax Claims. Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree, or (at the election of the Debtors or the Reorganized Debtors) (b) over a period of five (5) years from the Petition Date in equal monthly installments of principal plus interest at the rate of six percent per annum.

Arcus Holders DIP Claims. To the extent not otherwise paid prior to Confirmation and conditioned upon the New LLC Interests being received by the Plan Funders, on the Effective Date, the Arcus Holders DIP Claims shall be rolled over post-Effective Date and the DIP Agreement shall be amended and restated. At any time on or before the Effective Date, the Arcus Holders DIP Claims and Liens may be assigned (in whole or in part at election of Arcus Funding) to the Plan Funders. If such an assignment is made, then the Plan Funding Equity Commitments shall be adjusted to an amount equal to the amount of the Arcus Holders DIP

17

Claims assigned to Plan Funders. Subject to the terms and conditions of the Plan Funding Debt Commitments, on or before the Effective Date the Plan Funders shall fund their Plan Funding Debt Commitments (or assign such commitment to Arcus Funding), or a portion thereof, and such amount shall be added to the principal balance of the DIP Facility remaining due as of the Effective Date, plus all accrued and unpaid interest, costs and fees (including, without limitation, all costs, expenses and fees, including attorneys' fees incurred in connection with the administration of the Chapter 11 Cases and the Plan) shall be capitalized and added to the restated principal balance of the Exit Facility as of the Effective Date. The terms of the Exit Facility shall be set forth in the Plan Supplement. The Exit Facility shall be secured by an assignment of the Liens securing the DIP Facility and a first priority lien on all Property of the Reorganized Debtors (subject to any liens in favor of CIT that are acceptable to the Plan Funders). The Plan Funders' Lien shall attach to the Reserves, and Reserves Balances. The Liens and property interests of the Plan Funders shall remain perfected from and after the date of the Confirmation Order without the need of the Plan Funders to take any or further action or file or record any notes with respect thereto. The Confirmation Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of the Plan Funders' Liens without the necessity of filing or recording the Confirmation Order (other than as docketed in the Chapter 11 Case) or any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Plan Funders' Liens, or to entitle the Plan Funders to the priorities granted under the DIP Facility or herein (including, in respect of cash or deposits or investment property, any requirement that the Plan Funders have possession of or dominion and control over, any such cash in order to perfect an interest therein); provided that the Debtors or Reorganized Debtors shall execute and deliver to the Plan Funders and the Plan Funders may file or record financing statements or other instruments further to evidence or further to perfect the Plan Funders' Liens authorized, granted and perfected under the DIP Facility and hereby; and *provided further* that no such fling or recordation shall be necessary or required in order to create or perfect any such Lien.

<u>Fee Claims</u>. Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash on the Effective Date or as soon as practicable after such Fee Claim becomes an Allowed Claim.

**G.    *Classification and Treatment of Claims and Interests***

1.    *Class 1 Other Priority Claims*

Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Other Priority Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote.

2.      _Class 2 Miscellaneous Secured Claims_

To the extent there are any Allowed Secured Claims in this Class (and excluding any Secured Claims that are subject of a different treatment as provided in a separate Secured Class), each such Claim shall be deemed to be a separate subclass. At the option of the Debtors or the Reorganized Debtors, holders of Class 2 Claims shall receive either the return of the collateral securing such Allowed Secured Claim or the Net Proceeds realized by the Debtors or Reorganized Debtors from the disposition of the collateral securing such Allowed Secured Claim. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote.

3.      _Class 3 CIT Claim_

CIT shall retain its liens on Property of the Estate of each Debtor and the terms and conditions of the CIT Loan (or the CIT-DIP Loan in lieu thereof to the extent the same is approved by Order of the Bankruptcy Court) shall remain in full force and effect except that the same shall be modified as set forth in the Plan Supplement.  In the alternative at the election of the Plan Funders, to the extent not already paid in full prior to Confirmation, on the Effective Date, the CIT Loan shall be paid in full, with interest at the non-default contract rate. Reorganized Debtors shall also post cash collateral with CIT in the amount of 101% of the amounts outstanding under any undrawn letters of credit.  CIT is impaired and, therefore, is entitled to vote.

4.      _Class 4 Collateralized Insurance Program Claims_

This Class shall consist of the Allowed Secured Claims of those entities holding cash deposits or letters of credit which are acting as collateral security for the workers compensation insurance policies of the Debtors, each such Claim shall be deemed a separate subclass.  Each holder of a Class 4 Claim shall retain on account of its Allowed Secured Claim the cash deposit or Letter of Credit securing the same; provided, however, that such entities shall, on the Effective Date, return to the Reorganized Debtors all collateral being held in excess of their Allowed Secured Claims (as determined by agreement of the parties or further Order of the Bankruptcy Court in the event Debtors or holders request an estimation of any holders' claims under Section 502(c) of the Bankruptcy Code).  The holders of Claims in this Class are Impaired and therefore entitled to vote.

5.      _Class 5 General Unsecured Claims_

This Class shall consist of General Unsecured Claims. Unless otherwise agreed to by the holder of an Allowed General Unsecured Claim and the Plan Administrator, each holder of a General Unsecured Claim shall receive their pro rata share of the sum of $500,000.00 as follows: (i) on the Effective Date or as soon as practicable thereafter, each such holder shall receive its Pro Rata share of the Class 5 Pool on account of the amount of such Allowed Claim from the Class 5 Pool Escrow; (ii) from time to time each such holder shall receive its Pro Rata share of the Reserves Balances. On the Effective Date, all Class 5 Claims shall be transferred to and assumed by the Liquidation Trust and the Debtors and their Property, and the Reorganized Debtors and their property shall be free and clear of all Class 5 Claims, and be deemed released and discharged from all Class 5 Claims. In addition, in exchange for an Optional Release, as

19

described in Article VI below, those holders of General Unsecured Claims that elect to grant an Optional Release shall receive their Pro Rata of the Class 5 Plan Funder Individual Release Consideration without regard to whether the holders of the Class 5 Allowed Claims otherwise received payment in the full amount of their Allowed Claims.  All environmental claims set forth in Sections III and IV of Schedule 4.5 shall be treated as Class 5 general unsecured claims.  The holders of Claims in this Class are impaired and therefore entitled to vote.

6.    *Class 6 Ben Claims*

This Class shall consist of the Ben Interests. On the Effective Date, all Class 6 Interests shall be deemed cancelled, null and void and of no force and effect.  Accordingly, Class 6 Interests are deemed to reject the Plan and, therefore, are not entitled to vote.

7.    *Class 7 Interests*

On the Effective Date, all Class 7 Interests shall remain unaffected, valid and binding such that 100% of the membership interests of Shapes L.L.C., Delair L.L.C., Accu-Weld, L.L.C. and Ultra L.L.C. shall continue to be owned by Shapes/Arch Holdings L.L.C.

8.    *Class 8 Claims*

On the Effective Date, the EPA shall receive the sum of $300,000.00 in full and complete satisfaction of its claims set forth in Section I of Schedule 4.5 attached to the Plan and the sum of $25,000.00 in full and complete satisfaction of its claims set forth in Section II of Schedule 4.5 attached to the Plan.  The NJDEP shall receive the sum of $25,000.00 in full and complete satisfaction of its claims set forth in Section II, III and IV of Schedule 4.5 attached to the Plan. Funding for the distributions to this class will be made solely  from proceeds of applicable insurance policies.  Any other environmental claims set forth in Sections III and IV of Schedule 4.5 of the Plan  shall be treated as General Unsecured Class 5 Claims.  Accordingly, Class 8 is impaired and is entitled to vote.

9.    *Class 9 Claims*

This Class shall consist of the holders of Allowed Secured Real Estate tax claims relating to the Delair Real Estate, Accu-Weld Real Estate, Shapes Real Estate and Ultra Real Estate. Each holder shall be deemed to be a separate subclass.  Each member of the subclass shall have an allowed secured claim in the amount of Real Estate taxes due and owing as of the Petition Date (including any interest due and owing but excluding any late charges or penalties in the amount as set forth in the Debtors' Schedules and Statement of Financial Affairs) and such claims shall be paid (at the election of the Debtors) (i) in full, in cash on the Effective Date or (ii) in equal monthly installments of principle commencing on the first day of the first month following the Effective Date and continuing until the date which is sixty months from the Petition Date, with interest at the rate of six percent per annum.  Reorganized Debtors shall have the right to prepay one or more of the Class 9 holders at any time without penalty.  Class 9 claims are impaired and entitled to vote.

10.   *Class 10 Claims*

Class 10 shall consist of the claim of Crown Credit Company. Class 11 shall have an allowed Secured Claim in the amount of $30,087.93 which claim shall be repaid in thirty-five (35) monthly principal installments of $863.72, plus interest at the rate of six percent (6%) commencing on the first day of the second month following the Effective Date. Reorganized Debtors shall have the right to prepay the Class 10 claims in whole or in part without penalty.

11.   *Class 11 Claims*

Class 11 shall consist of holders of Allowed Secured Claims of the Debtors' Shippers and Warehousemen (who are in possession of Property). Each holder shall be deemed to be a separate subclass. Each member of the subclass shall have an Allowed Secured Claim in the amount of the charges due and owing to them (by agreement of the parties or as allowed by Order of the Bankruptcy Court) and such claims shall be paid (at the election of the Debtors) (i) in full (without interest) on the Effective Date or (ii) in 24 equal monthly installments of principal (commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter) with interest at the rate of six percent (6%) per annum. On the Effective Date any Property then in the possession of a Class 11 holder shall be released to the Reorganized Debtors. Class 11 claims are impaired and entitled to vote.

**H.   *Means For Implementation Of The Plan***

1.   *Corporate Action*

On the Effective Date and automatically and without further action, (i) each existing member (or manager of each operating entity) of the Debtors will be deemed to have resigned, (ii) the new board members/managers of the Reorganized Debtors shall be those identified in the Plan Supplement, and (iii) the Plan Administrator and Reorganized Debtors shall be authorized and empowered to take all such actions and measures necessary to implement and administer the terms and conditions of the Plan. Each Debtors' Operating Agreement will be amended as of the Effective Date to the extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code. The rights and interests of the New LLC Interests shall be governed by and controlled pursuant to the terms and conditions of the Reorganized Debtors' Operating Agreements, which shall be included in and filed with the Plan Supplement.

2.   *Liquidation Trust*

On the Effective Date the Debtors shall execute and deliver the Plan Administration Agreement, which shall create a trust, appoint the Plan Administrator, provide for the acceptance of the Reserves provided for in the Plan, and set forth the terms and conditions for distributions from such Reserves.

From and after the Effective Date, the Liquidation Trust and the Plan Administrator shall hold and administer the following Reserves:

21

Class 5 Pool Escrow - $500,000

Cure Escrow - $25,000

Plan Expense Reserve - $100,000

Plan Funders Release Escrow - $100,000.00

All of the Reserves shall vest with the Plan Administrator on the Effective Date and any amounts remaining in the Reserves under Section 5.2(i) and (iv) after distribution to Class 5 Creditors shall be donated to a charity of choice at the election of the Plan Administrator.  All other amounts remaining in the Reserves under Sections 5.2(ii) and (iii) upon the Closing of the Case shall be returned to Reorganized Debtors.

3.     *Plan Administrator*

On or before the Effective Date, the Plan Funders, with the consent of the Debtors shall appoint one Plan Administrator to serve as such pursuant to the Plan Administration Agreement (the "Plan Administration Agreement"). The Plan Administration Agreement is to be attached as an exhibit to the Plan Supplement. The Plan Administrator shall administer the Plan subject to the foregoing duties and powers, which shall include the following:

(a)     To prosecute, compromise or settle objections to Claims and/or Interests (disputed or otherwise) and to make or direct that distributions be made to holders of Allowed Claims;

(b)     To make decisions regarding the retention or engagement of Professionals and to pay, without court order, all reasonable fees and expenses incurred after the Effective Date;

(c)     To make or direct distributions to holders of Allowed Claims and to otherwise implement and administer the Reserves and the Plan;

(d)     To file with the Bankruptcy Court the reports and other documents and to pay any and all fees required by the Plan or otherwise required to close the Chapter 11 Case, including the preparation and filing of a motion for a final decree (subject to the rights of Reorganized Debtors for the case to remain open pending the completion of the prosecution of any Avoidance Actions);

(e)     To set off amounts owed to the Debtors against any and all amounts otherwise due to be distributed to the holder of an Allowed Claim under the Plan; and

(f)     To take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with administering the Plan.

4.      _Exit Financing and Equity Commitments_

At any time on or before the Effective Date, the DIP Facility and the Arcus Holders DIP Claims may be assigned (in whole or in part at the election of Arcus Funding) to the Plan Funders. The terms and conditions of the Exit Facility shall be as set forth in the Amended and Restated Loan and Security Agreement, which shall be included in and filed with the Plan Supplement. The material terms of the Exit Facility are described above in the treatment afforded to the Arcus Holders DIP Claims. The principal amount of the Exit Facility upon the Effective Date shall be $25 million plus any and all unpaid interest, costs and fees that accrued prior to the Effective Date. Except as expressly set forth in the Plan, or the Plan Funding Debt Commitment or the Plan Funders Equity Commitments, working capital of the Debtors and Reorganized Debtors together with the proceeds of the Plan Funding Debt Commitment and the Plan Funders Equity Commitments shall be used for general working capital and capital expenditures of the Reorganized Debtors, to fund the Reserves, to pay the Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority claims, and Allowed Other Priority Claims; and shall not be funded, available or used for distributions to holders of other Allowed General Unsecured Claims treated pursuant to the Plan. In consideration for meeting its funding commitments under the Plan Funding Equity Commitments in the aggregate amount of no less than One Million Five Hundred Thousand Dollars ($1,500,000.00) (which will be paid in cash or by way of a conversion of the Arcus Holders DIP Claims assigned to the Plan Funders), each Plan Funder shall receive Pro Rata 100% of the New LLC Interests in the Reorganized Shapes/Arch Holdings L.L.C. that are authorized and issued as of the Effective Date, subject to dilution from time to time upon the implementation of the Management Equity Incentive Plan, (at the election of the Plan Funders) which when fully implemented would result in the Plan Funders holding not less than 95% of the equity interests of the Reorganized Shapes/Arch Holdings L.L.C. outstanding.

5.      _Revesting_

Except as otherwise provided for in the Plan or the Confirmation Order, on the Effective Date, without any further action, each of the Reorganized Debtors will be vested with all of the Property of the Estate (including all Avoidance Actions), free and clear of all Claims, Liens and Interests, and shall have all of the powers of a limited liability company under applicable law. As of the Effective Date, the Reorganized Debtors may operate their business and use, acquire and dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court or Plan Administrator, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.      _Transfer of Real Estate_

On the Effective Date, (a) Reorganized Shapes, L.L.C. may (at its election) (i) convey the Shapes Real Estate to Shapes Realty New Jersey L.L.C., (ii) convey the Delair Real Estate to Delair Realty New Jersey L.L.C. (or Shapes Realty New Jersey LLC); and (iii) convey the Ultra Real Estate to Ultra Realty New Jersey L.L.C.; and (b) Reorganized Accu-Weld L.L.C. may convey the Accu-Weld Real Estate to Accu-Weld Realty Pennsylvania L.L.C., free and clear of all liens, claims and encumbrances other than the Class 9 Real Estate Claims.

7.      _Distributions for Claims Allowed as of the Effective Date_

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

8.      _Reserve Accounts_

As soon as practicable after the Effective Date, the Plan Administrator will establish and maintain the following reserve accounts:

> (a)      Reserve for Plan Expenses.  A reserve in an amount equal to the estimated Plan Expenses (the "Plan Expense Reserve"), which upon the closing of the Chapter 11 Case, the remainder, if any, will be released and distributed to the Reorganized Debtors.

On or before the Effective Date, the Debtors will establish and maintain the following reserve accounts:

> (b)      Reserve for Administrative Claims.  A reserve (the "Administrative Claims Reserve" for Administrative Claims that may be asserted prior to or on the Administrative Claims Bar Date; and

> (c)      Reserve for Fee Claims.  A reserve for payment of estimated unpaid Fee Claims in an amount equal to the amount that the Debtors and Arcus Holders anticipate will be incurred for fees and expenses by Professionals retained in the Chapter 11 Case up to and including the Effective Date, and the balance of such Cash, if any, remaining after all Fee Claims have been resolved and paid, shall be released and distributed to the Reorganized Debtors.

9.      _Reserves for Disputed Administrative, Fee, Priority Tax and Other Priority Claims_

On or before the Effective Date, the Debtors shall establish and maintain a reserve in an amount equal to all Disputed Fee Claims, Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Other Priority Claims in an amount equal to what would be distributed to holders of Disputed Administrative, Disputed Fee, Disputed Priority Tax, and Disputed Other Priority Claims if their Disputed Claims had been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Debtors; provided however, that the Debtors shall not be required to reserve funds on account of employee Claims for paid time off or vacation benefits of employees whose employment was continued by the Debtors or will be continued by the Reorganized Debtors. With respect to such Disputed Claims, if, when, and to the extent any such

24

Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Reorganized Debtors to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Disputed Administrative, Disputed Fee, Disputed Priority Tax, and Disputed Other Priority Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed to the Reorganized Debtors. No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order

10.    *Reserves for Disputed General Unsecured Claims*

On or before the Effective Date, the Plan Administrator shall establish and maintain a reserve for all Disputed General Unsecured Claims. For purposes of establishing a reserve for Disputed General Unsecured Claims, Cash will be set aside as soon as practicable after the Effective Date equal to the amount that would have been distributed to the holders of Disputed General Unsecured Claims had their Disputed General Unsecured Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court. With respect to such Disputed General Unsecured Claims, if, when, and to the extent any such Disputed General Unsecured Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Plan Administrator to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Disputed General Unsecured Claims have been resolved and distributions made in accordance with the Plan, shall be released and re-distributed to holders of Allowed Claims.  No payments or distributions shall be made with respect to a Claim that is a Disputed General Unsecured Claim pending the resolution of the dispute by Final Order. No payments or distributions shall be made with respect to post-Petition Date interest accruing on any Claim other than the Arcus Holders DIP Claims and CIT Claim. No payments or distributions shall be made with respect to Allowed Claims in an amount in excess of such Allowed Claims, except that the Class 5 Plan Funder Individual Release Consideration shall be distributed in addition to full payment of such Allowed Claims.

11.    *Claims Objection Deadline*

Notwithstanding D.N.J. LBR 3007-1, Objections to Claims shall be filed and served upon each affected Creditor no later than ninety (90) days after the Effective Date, provided however, that this deadline may be extended by the Bankruptcy Court upon motion of the Plan Administrator or Reorganized Debtors, with or without notice or hearing. Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of, or other assertion of a Claim filed after the Confirmation Date shall be automatically disallowed as a late filed Claim, without any action by the Plan Administrator or the Reorganized Debtors, unless and until the party filing such Claim obtains the written consent of, the Plan Administrator or the Reorganized Debtors, as applicable, or obtains an order of the Bankruptcy Court upon notice to the Plan Administrator and Reorganized Debtors that permits the late filing of the Claim, and the holder of such disallowed Claim shall be forever barred from asserting such Claim against the Liquidation Trust the Debtors, the Estate or Property, Reorganized Debtors or their property. In the event any proof of claim is permitted to be filed after the Confirmation Date pursuant to an order of the Bankruptcy Court, the Plan Administrator or

25

Reorganized Debtors, as applicable, shall have sixty (60) days from the filing of such proof of claim or order to object to such Claim, which deadline maybe extended by the Bankruptcy Court upon motion of the Plan Administrator with or without notice or a hearing.

12.    *Settlement of Disputed Claims*

Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in this section. After the Effective Date, and subject to the terms of this Plan, the Plan Administrator may settle any Disputed Claim where the result of the settlement or compromise is an Allowed Claim in an amount  of $100,000 or less without providing any notice or obtaining an order from the Bankruptcy Court. All proposed settlements of Disputed Claims where the amount to be settled or compromised exceeds $100,000 shall be subject to the approval of the Bankruptcy Court after notice and an opportunity for a hearing.

13.    *Unclaimed Property*

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Plan Administrator to be distributed Pro Rata to holders of Allowed Claims in such Class in accordance with this Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such unclaimed property will be distributed to the Reorganized Shapes/Arch Holdings L.L.C.

14.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, including, without limitation, the Lien securing the DIP Facility, CIT Loan and Exit Facility shall survive Confirmation and shall remain valid, enforceable and perfected Liens against property of the Reorganized Debtors, respectively.  On the Effective Date and except as otherwise set forth in the Plan, all other mortgages, deeds of trust, Liens or other security interests against the Property of the Debtors' estate shall be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to Reorganized Debtors and their successors and assigns.

15.    *Withholding Taxes*

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

16.     *Fractional Cents*

Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

17.     *Payments of Less than Twenty-Five Dollars*

If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than twenty-five ($25.00) dollars (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, the Plan Administrator shall not be required to make such payment and such funds shall be otherwise distributed to holders of Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such excess fractional dollars will be distributed to the Reorganized Debtors.

**I.    *Treatment Of Executory Contracts And Unexpired Leases***

1.     Rejection of All Agreements

Any and all pre-petition leases or executory contracts included on the Debtors' Schedule G not previously assumed by the Debtors (and not otherwise previously rejected or the subject of a motion to assume pending on the Confirmation Date), shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date. Any and all pre-petition leases and executory contracts not included on the Debtors' Schedule G not previously assumed or rejected by the Debtors, shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date. Before the hearing to consider approval of this Disclosure Statement, the Debtors shall serve a notice to parties to executory contracts and unexpired leases whose agreements may be assumed by the Debtors under the Plan. That notice shall include the proposed cure payment to be made to such party and a means by which such party may receive a package of information regarding the providing of adequate assurance. The Debtors reserve the right to supplement the notice to include or exclude additional contracts by way of a supplemental notice to parties to pre-petition leases and executory contracts at a time at least three (3) days prior to the confirmation hearing.

2.     Collective Bargaining Agreements

Following the filing of the Chapter 11 Petitions and consistent with the requirements of Section 1113(b)(1), the Debtors have/will make a proposal to the authorized representatives of the employees covered by the collective bargaining agreements ("CBA") which provide for the necessary modifications in the employee benefits to permit the reorganization of the Debtors. The Debtors are hopeful that such modifications can be accomplished through negotiation without the need for Court intervention. As the modifications are a necessary condition to consummation of the Plan, the Debtors reserve the right, if necessary, to seek a rejection of the same under 11 U.S.C. §1113(c) and (d).

3.      <u>Claims for Damages</u>

All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of Effective Date. All proofs of claim with respect to Claims arising from the rejection of executory contracts shall be treated as Class 5 General Unsecured Claims, as applicable, for purposes of a distribution pursuant to the Plan, unless and until the Person or Entity asserting such Claim obtains an order of the Bankruptcy Court upon notice to the Debtors, that allows the Claims in another Class under the Plan. Unless otherwise permitted by Final Order, any proof of claim that is not filed before the earlier of the Bar Date or the Confirmation Hearing (other than those Claims arising from the rejection of executory contracts or leases which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall automatically be disallowed as a late filed Claim, without any action by the Plan Administrator, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, the Estate, the Reorganized Debtors or property of Reorganized Debtors.

## J.      *Effect of Confirmation of the Plan*

Without limiting any provision of the Plan, the Plan provides for the following release, exculpation, discharge and injunctions:

1.      *<u>General Release and Injunction</u>*

On the Effective Date, (i) the Debtors, the Estates, and their respective successors or assigns, including, without limitation, the Liquidation Trust, and any Person or Entity claiming a right in a derivative capacity on their behalf (the "<u>Debtors Claimants</u>") are deemed to, with respect to any and all derivative claims, whether or not asserted, including, and (ii) the Debtors Claimants under "Class 5 General Unsecured Claims" who submits a Ballot consenting to release the parties identified below (the "<u>Optional Release</u>") by not checking the appropriate box on the Ballot to opt out of such Optional Release (the "<u>Third Party Claimants</u>" and together with the Debtors Claimants, the "<u>Releasors</u>"), hereby unconditionally and irrevocably release the Arcus Holders, Arcus Funding, the Plan Funders and the Debtors' directors, managers and board observers, and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (collectively, the "<u>Released Parties</u>"), as set forth more fully below, from any and all direct, indirect or derivative claims, obligations, suits, judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of contribution and indemnification, and all other controversies of every type, kind, nature, description or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place from the beginning of the world to the Effective Date arising from or relating in any way, directly or indirectly, to the Debtors, its Properties, assets, operations or liabilities, the Chapter 11 Case, the Plan, or the Disclosure Statement; *provided however*, that the Releasors shall not be deemed to have released any rights to enforce the terms of the Plan or their rights to distributions

28

thereunder. BY RETURNING A BALLOT AND FAILING TO CHECK THE OPT OUT BOX FOR THE OPTIONAL RELEASE, THE RELEASORS CONSENT TO AND GRANT THIS RELEASE AND ACKNOWLEDGE THAT THEY MAY HAVE CLAIMS OR LOSSES OF WHICH THEY ARE NOT CURRENTLY AWARE, OR THEY MAY HAVE UNDERESTIMATED. The Releasors hereby waive any rights or benefits under California Civil Code Section 1542, which provides that:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with Debtors and any rights or benefits under similar laws. The Confirmation Order shall specifically provide for the foregoing releases.**

**Injunction**.  On the Effective Date, the Debtors Claimants respecting the claims released above, and the Releasors shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place inconsistent with the releases granted to the Released Parties pursuant to the Plan. The Confirmation Order shall specifically provide for such injunction.

The Debtors do not believe and are not aware of any claims that may be asserted against the Released Parties.  The Debtors are not aware of any facts that would give rise to such claims, but will nonetheless conduct, or cause to be conducted, an investigation prior to confirmation regarding the existence of claims against the Released Parties, if any, and, if such claims exist, the extent to which such claims have merit.

2.    *Exculpation*

On the Effective Date, (a) the Debtors, and their direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) and (b) Arcus, Arcus Holders and the Plan Funders and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other, and by all holders of Claims or Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring solely during the period prior to the Effective Date, generally, including, without limitation, any act or omission occurring during the Chapter 11 Case, the DIP Facility, the Exit Facility, the Plan Funding Debt Commitment, the Plan Funding Equity Commitments, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of

29

counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

3.    *Discharge*

Except as otherwise provided for in the Plan or in the Confirmation Order, in accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of all debts, Claims against, Liens on, and Interests in the Debtors, their assets and Property, which debts, Claims, Liens and Interests arose at any time before the entry of the Confirmation Order.  The discharge of the Debtors shall be effective as to each Claim and Interest, regardless of whether a proof of Claim or Interest was filed or whether the Claim or Interest was Allowed or whether the holder of the Claim or Interest votes to accept the Plan. On the Effective Date, as to each and every discharged Claim and Interest, any holder of such Claim or Interest shall be precluded from asserting such Claim or Interest against the Debtors or Reorganized Debtors or their assets or properties.

4.    *Injunction*

On and after the Confirmation Date, except to enforce the terms and conditions of the Plan before the Bankruptcy Court, all Persons or Entities who have held, hold or may hold any Claim against or Interest in the Debtors are, with respect to any such Claim or Interest, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Debtors or Reorganized Debtors or Plan Administrator or the Liquidation Trust or any of their properties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants, or any property of any of the foregoing (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

5.    *Insurance*

This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, its officers or directors) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

### K.    Retention of Jurisdiction

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the case, the Plan, and the Liquidation Trust to the fullest extent permitted by law pursuant to, and for the purposes of Section 105(a) and Section 1142 of the Bankruptcy Code and for the other purposes described in Article X of the Plan.

### L.    Miscellaneous Provisions

#### 1.    *Pre-Confirmation Modification*

On notice to and opportunity to be heard by the United States Trustee, the Plan, may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders.

#### 2.    *Post-Confirmation Immaterial Modification*

With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and without notice to holders of Claims and Interests, the Plan Administrator, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders.

#### 3.    *Post-Confirmation Material Modification*

On notice to and an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Reorganized Debtors or the Plan Administrator in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders.

#### 4.    *Withdrawal or Revocation of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, then the Plan shall be deemed null and void.

#### 5.    *Payment of Statutory Fee*

All fees payable pursuant to Section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) or by the Plan Administrator when otherwise due out of the reserve set aside on the Effective Date by the Plan Administrator to fund Plan Expenses.

6.      *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

7.      *Exemption From Transfer Taxes*

Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, the transfers to be made under Section 5.7 of the Plan, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar tax by applicable law.

## M.    *Effectiveness of the Plan*

The Plan shall not become effective unless and until each of the following conditions has been satisfied in full or waived by the Debtors and the Plan Funders:

(a)      The Bankruptcy Court shall have entered the Confirmation Order by May 31, 2008 (or such other date as agreed to in the sole discretion of Plan Funders) and such Order shall be in form and substance satisfactory to the Debtors, Arcus Holders and Plan Funders;

(b)      All escrow and reserve accounts described in the Plan have been adequately funded; and

(c)      The Confirmation Order shall have become a Final Order.

Effect of Failure of Condition.  In the event that the conditions specified above have not occurred on or before sixty (60) days after the Confirmation Date, the Confirmation Order may be vacated upon order of the Bankruptcy Court after motion made by the Debtors or any party in interest and an opportunity for parties in interest to be heard.

## N.    *Provisions Regarding Corporate Governance and Management of the Reorganized Debtors*

(a)      Directors, Officers and Managers of  Reorganized Shapes/Arch Holdings LLC. [as set forth in the Plan Supplement]

(b)      Directors, Officers and Managers of  Reorganized Shapes L.L.C. [as set forth in the Plan Supplement]

32

(c)     Directors, Officers and Managers of  Reorganized Delair L.L.C.
        [as set forth in the Plan Supplement]

(d)     Directors, Officers and Managers of  Reorganized Accu-Weld L.L.C.
        [as set forth in the Plan Supplement]

(e)     Directors, Officers and Managers of  Reorganized Ultra L.L.C.
        [as set forth in the Plan Supplement]

## VII.  CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934.  All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, and plans and objectives, including, but not limited to, statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.

The ultimate recoveries under the Plan to holders of Class 5 Claims depend, in part, upon the Plan Administrator's success in objecting to Disputed Claims.

*A.      Taxation*

Pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the basis which the holder has in such Allowed Claim or Interest.  The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim or Interest and the period for which the Claim or Interest was held by the holder.  The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Interest in light of its particular circumstances and income tax situation.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

**B.**     ***Distributions to Holders of Claims***

The Plan is based on making Distributions as provided under the priority scheme set forth in the Bankruptcy Code.  To this end, the Plan provides that all Allowed Administrative Claims, Priority Claims and Secured Claims will be paid or satisfied in full prior to the making of Distributions to holders of Allowed Claims in Class 4, 5, 9, 10 and 11.

The amount of Cash available for distribution to holders of Allowed Claims in Class 5 will depend upon a number of factors, including, but not limited to, the following: the cost of administering the Liquidation Trust; and the success of any objections to claims.  The Debtors are unable at this time to estimate with any certainty the ultimate resolution of such factors, and thus, the amount of available cash that ultimately will be available for Distribution to holders of Allowed Claims in Class 5.

In addition, the payment of a Distribution to each holder of an Allowed Claim in Class 4 and 5 will depend upon the Claims reconciliation and resolution process implemented by the Plan Administrator.

**C.**     ***Objections to Classification***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

**D.**     ***Inherent Uncertainty of Financial Projections***

The financial projections attached hereto as Exhibit C [TO BE ATTACHED] are based upon numerous assumptions that are an integral part of such financial projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material contingent or unliquidated litigation or indemnity claims, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not occur.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations.  These variations may be material and may adversely affect the ability of the Reorganized Debtors to pay the obligations owing under the Plan and other post-Effective Date indebtedness.  Because the actual results achieved throughout the periods covered by the financial projections may differ from the projected results, the financial projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

### E.    *Certain Bankruptcy Law Considerations*

#### 1.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

#### 2.    *Risk of Non-Occurrence of the Effective Date*

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied.

#### 3.    *Appeal of the Confirmation Order*

The Confirmation Order may be the subject of an appeal.  If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

## VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (ii) an alternative plan of reorganization.

### A.    *Liquidation Under Chapter 7*

If no plan is confirmed, the case may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' property for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of Claims and Interests is set forth in the Liquidation Analysis attached to the Plan Supplement.  The Debtors believe that liquidation under Chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because (i) the Debtors' assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be incurred, and (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a termination of the Debtors' businesses.

### B.    *Alternative Plan of Reorganization*

If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan.  The Plan is a reorganization of the Debtors' business and a different plan might involve some other form of reorganization or liquidation of the Debtors' assets.  The Debtors believe that the Plan,

35

as described herein, enables creditors to realize the highest and best value under the circumstances. The Debtors believe that any liquidation of the Debtors' assets or alternative form of Chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtors believe that their Plan provides the best recovery to their creditors by providing them with a distribution of cash rather than diminished recoveries following a liquidation of its assets or distribution of other property.

## IX. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    *Federal Income Tax Consequences in General*

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of Allowed Claims in Class 2, 3, 4, 5, 9 and holders of Allowed Interests in Class 7 and 8. The summary is based upon the Debtors' interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all of which are subject to change, possibly with retroactive effect. Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect to their Claims and Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim in 5 or an Allowed Interest in Class 6 or 7.

The federal income tax consequences of the Plan and the formation and operation of the Reorganized Debtors and the Liquidation Trust, as well as distributions from the Liquidation Trust, are complex and subject to significant uncertainties. The Debtors' interpretation of the federal income tax consequences set forth herein are not binding on the IRS, and the Debtors have not requested, and do not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be acceptable to the IRS. No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan. Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan or the formation or operation of the Reorganized Debtors or the Liquidation Trust could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, the Reorganized Debtors or the Liquidation Trust, nor does it purport to address all of the federal income tax consequences of the Plan, Reorganized Debtors or the Liquidation Trust. This summary also does not purport to address the federal income tax consequences of the Plan, Reorganized Debtors or the Liquidation Trust to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S

36

corporations, small business investment companies, mutual finds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST. ANY U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING OR PROMOTION OF THE PLAN. IT IS STRONGLY RECOMMENDED THAT EACH HOLDER OF A CLAIM OR INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.      *Federal Income Tax Consequences of the Liquidation Trust***

1.      *Consequences of the Liquidation Trust*

Pursuant to the Plan, certain holders of Allowed Claims will receive beneficial interests in the Liquidation Trust. The Liquidation Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. Thus, the Liquidation Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d). The provisions of the Plan Administration Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45-, 1994-2 C.B. 684. Under the Plan, all parties are required to treat the Liquidation Trust as a liquidating trust, subject to contrary definitive guidance from the IRS.

No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust. If the IRS were to challenge successfully the classification of the Liquidation Trust as a grantor trust, the federal income tax consequences to the Liquidation Trust and the holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

2.      *Creditor Trust Tax Reporting*

The Liquidation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the assets (*e.g.*, income, gain, loss, deduction and credit).

**C.**      ***Federal Income Tax Consequences to Holders of Allowed Claims in Class 5***

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 5 will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States.  The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

1.      *Receipt of Cash and Property by Holders of Allowed Claims in Class 5*

Generally, a holder of an Allowed Claim in Class 5 will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim.  In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

2.      *Receipt of Interest*

Pursuant to the Plan, consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.  Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest.  Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

3.      *Character of Gain or Loss*

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim

has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

4. *Withholding*

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding.

**D. Federal Income Tax Consequences to Holders of Allowed Class 6, 7 and 8 Interests**

The transactions contemplated by the Plan may cause some holders of Interests in the Debtors to recognize income, including cancellation of indebtedness income, with no corresponding cash distribution.

HOLDERS OF ALLOWED INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX TREATMENT RELATED TO THEIR INTERESTS UNDER THE PLAN.

**E. Importance of Obtaining Professional Tax Assistance**

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST. ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.

**[The Remainder of the Page Intentionally Left Blank]**

WILMINGTON\75649\3  099997.000

## CONCLUSION

The Debtors believe the Plan is in best interest of all creditors and recommends those entitled to vote to accept the Plan.

DATED: March 14, 2008

Respectfully submitted,

Shapes/Arch Holdings L.L.C.

By: _____

Name: Steven Grabell

Title: CEO

DATED: March 14, 2008

Shapes L.L.C.

By: _____

Name: Steven Grabell

Title: CEO

DATED: March 14, 2008

Delair L.L.C.

By: _____

Name: Richard M Grossman

Title: EVP

DATED: March 14, 2008

Accu-Weld L.L.C.

By: _____

Name: Steven Grabell

Title: CEO of Parent Company

DATED: March 14, 2008

Ultra L.L.C.

By: _____

Name: Daniel Carpey

Title: President

40