**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY
## (CAMDEN VICINAGE)

– – – – – – – – – – – – – – – – – – – – – – – – – – — X

In re:

Shapes/Arch Holdings L.L.C.,
Shapes L.L.C., Delair L.L.C., Accu-Weld
L.L.C., and Ultra L.L.C.,

                        Debtors.

– – – – – – – – – – – – – – – – – – – – – – – – – – — X

Case No. _____
(Jointly Administered)

Chapter 11

Hearing Date: March __, 2008
Oral Argument is Requested

**VERIFIED MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I)
AUTHORIZING AND APPROVING POSTPETITION FINANCING; (II) GRANTING
LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; (III) MODIFYING AUTOMATIC STAY;
AND (IV) SCHEDULING FINAL HEARING, PURSUANT TO SECTIONS 105,
362, 363 AND 364 OF THE BANKRUPTCY CODE AND FEDERAL RULES
OF BANKRUPTCY PROCEDURE 2002 AND 4001(C) AND (D)**

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), by

and through their undersigned counsel, hereby move (the "Motion") this Court for the entry and

approval of interim and final orders: (a) authorizing and approving postpetition financing;

(b) granting liens and security interests and providing superpriority administrative expense

status; (c) modifying automatic stay; and (d) scheduling final hearing, pursuant to sections 105,

362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Federal

Rules of Bankruptcy Procedure 2002 and 400l(c) and (d) of the Federal Rules of Bankruptcy (the

"Bankruptcy Rules"), in the forms[1] attached hereto as Exhibit A and incorporated herein by reference in the case of the interim orders (the "Interim Orders"), and substantially in the form of the Interim Orders with requisite conforming changes in the case of the final orders (the "Final Orders"), providing, among other things, authorization for the Debtors to: (i) obtain credit from (a) The CIT Group/Business Credit, Inc., ("CIT") as agent for itself and for JPMorgan Chase Bank, N.A. and Textron Financial Corporation by incurring postpetition debt in an amount equal to up to the aggregate principal amount of Sixty Million Dollars ($60,000,000.00) (the "Revolver DIP Facility"), based upon a "Borrowing Base" formula, as more fully described in the Revolver DIP Facility, using one aggregate borrowing base of all Debtors' assets, secured by first priority liens on all Revolver Senior Collateral (as defined in the Interim Order approving the Term DIP Facility), all as more fully defined and described in the DIP Facilities agreements attached hereto and that certain intercreditor agreement to be entered into between CIT, as agent and Arcus ASI Funding, LLC ("Arcus"), as agent (the "Intercreditor Agreement") and, as applicable, the Orders approving this Motion pursuant to sections 364(c)(2), 364(c)(3), and 364(c)(4) of the Bankruptcy Code, and with priority as provided in section 364(c)(1) of the Bankruptcy Code, and liens junior only to Term Agent (as defined below) on all Term Senior Collateral (as defined in the Interim Order approving the Term DIP Facility), and (b) Term Lenders (as defined below), by incurring post-petition debt in an amount equal to at least the principal amount of Twenty-Five Million Dollars ($25,000,000.00) (the "Term DIP Facility", and together with the Revolver DIP Facility, the "DIP Facilities") secured by first priority liens on all Term Senior Collateral pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, and with priority as provided

---

[1]    It is contemplated that the Court will consider two Interim Orders and two Final Orders with respect to this Motion, *i.e.,* one Interim and one Final Order with respect to each of the debtor in possession facilities described herein.

in section 364(c)(1) of the Bankruptcy Code, and liens junior only to Revolver Agent on all Revolver Senior Collateral; (ii) enter into and comply with in all respects with the debtor in possession financing arrangements, as provided in (x) that certain Debtor-In-Possession Term Loan Financing Agreement by and among Arcus as agent (in such capacity, together with its respective successors, assigns and transferees, "Term Agent"), and lender ("Term Lender") on the one hand, and Shapes/Arch Holdings, L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C. and Ultra L.L.C., as Borrowers on the other, and (y) that certain Debtor-In-Possession Revolving Credit Financing Agreement by and among CIT as agent (in such capacity together with its respective successors, assigns and transferees, the "Revolver Agent" and together with Term Agent, the "DIP Agents") and for itself, Textron Financial Corporation and JPMorgan Chase Bank, N.A. (the "Revolver DIP Lenders" and together with the Term Lender, the "DIP Lenders") on the one hand, and Shapes/Arch Holdings, L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C., as Borrowers, on the other, substantially in the form attached to the Interim Orders as Exhibits (together, the "DIP Credit Agreements") and together with the other loan documents referenced in the DIP Credit Agreements, the "DIP Facility Documents"); (iii) authorize the Debtors to pay CIT in respect of all Prepetition Obligations (as defined below); (iv) providing the DIP Lenders with valid, binding, continuing, enforceable, fully perfected and unavoidable first priority (subject to the terms of the Intercreditor Agreement) senior security interests in, and liens (all such liens and security interests granted to the DIP Lenders, pursuant to the Interim Order and the DIP Facility Documents, the "DIP Facility Liens") upon the Collateral (as defined below); (v) granting the DIP Lenders pari passu superpriority claims over any and all administrative expenses, other than those set forth in the Interim Orders and the DIP Credit Agreements; (vi) modifying the automatic stay to the extent

-3-

necessary and as required by the DIP Facility Documents; and (vii) scheduling a final hearing (the "Final Hearing") to consider the entry of an order authorizing and approving the DIP Facilities, and the DIP Facility Documents, and the Interim Orders on a final basis.[2]  In support of this Motion, the Debtors respectfully represent as follows:

**SUMMARY OF RELIEF REQUESTED**

Bankruptcy Rule 4001 requires that motions requesting authority to use cash collateral or incur post-petition financing begin with a concise statement of the relief requested that summarizes the material terms and sets forth where such material terms can be found in the pertinent documents.  In addition, Bankruptcy Rule 4001 requires that in the event certain types of provisions as enumerated therein are included in the relief requested, they must be listed or summarized, identified as to location in the proposed cash collateral or financing agreement and form of order, and further identified if those provisions are proposed to remain in effect if interim approval is granted but final relief is denied.  Below is a concise statement summarizing the material terms (and where such terms are located in the documents) of the Debtors' Motion.[3]

| Material Terms | Brief Summary | Reference |
|---|---|---|
| Loan Parties[4] | Shapes/Arch Holdings L.L.C.<br>Shapes L.L.C.<br>Delair L.L.C.<br>Accu-Weld L.L.C.<br>Ultra L.L.C. | Preamble to each of the DIP Credit Agreements |

---

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim Orders.  To the extent the descriptions provided in this Motion differ in any way from the terms of the Interim Orders, the terms of the Interim Orders shall control.

[3]    This summary is qualified in its entirety by reference to the provisions of the DIP Credit Agreements and Interim Orders.  The DIP Credit Agreements will control in the event of any inconsistency between this Motion and the DIP Credit Agreements.

[4]    References in this summary to "¶" are to paragraphs in the Interim Order and references to "§" are to sections in the DIP Facilities.  References in this summary or elsewhere in this Motion to (i) the "Arcus Order" are to the Interim Order approving the Term DIP Facility, (ii) the "CIT Order" are to the Interim Order approving the Revolver DIP Facility, (iii) the "Arcus Loan Agreement" are to the DIP Credit Agreement among the Debtors, the Term Agent and the Term Lenders, and (iv) the "CIT Loan Agreement" are to the DIP Credit Agreement among the Debtors, the Revolver Agent and the Revolver Lenders.

WILMINGTON\75654\5  100000.000

| Material Terms | Brief Summary | Reference |
|---|---|---|
| Lenders and Agents | The CIT Group/Business Credit, Inc., as agent for itself and for JPMorgan Chase Bank, N.A. and Textron Financial Corporation, as Revolving DIP Lenders<br><br>Arcus ASI Funding LLC, as Term Lender and Term Lender | Preamble to each of the applicable DIP Credit Agreements |
| Commitment and Availability | $60,000,000 through the Revolver DIP Facility and $25,000,000 through the Term DIP Facility. | Definition of "Revolving Line of Credit" in the CIT Loan Agreement and definition of "Term Loan Facility Amount" in the Arcus Loan Agreement |
| Collateral | The Revolver DIP Facility will be secured by (a) a <u>pari passu</u> first priority superpriority administrative claim and expense under the Bankruptcy Code Section 364(c)(1), (b) a perfected first priority security interest on all Revolver Senior Collateral, and (c) a second priority perfected security interest (subject only to a first priority perfected security interest in favor of the Term Agent) in the Term Senior Collateral, including, without limitation, all claims in avoidance actions under Chapter 5 and Section 724(a) of the Bankruptcy Code ("<u>Avoidance Actions</u>"); all as more fully defined and described in the applicable DIP Credit Agreement and the Intercreditor Agreement.<br><br>The Term DIP Facility will be secured by (a) a <u>pari passu</u> first priority superpriority administrative claim and expense under the Bankruptcy Code Section 364(c)(1), (b) a perfected first priority security interest on all Term Senior Collateral, including, without limitation, all Avoidance Actions, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, and (c) a second priority perfected security interest (subject only to a first priority perfected security interest in favor of the Revolver Agent) in the Revolver Senior Collateral; all as more fully defined and described in the applicable DIP Credit Agreement and the | ¶¶7 & 8 of CIT Order<br><br><br><br><br><br><br><br><br><br><br><br>¶2.1 of Arcus Order |

| Material Terms | Brief Summary | Reference |
|---|---|---|
| | Intercreditor Agreement. | |
| | Relative priority rights will be defined in the Intercreditor Agreement. The security interests of the Term Agents and Revolver Agent shall each be subject, as to priority, only to a carve-out in an amount and scope to be agreed upon by Revolver Agent, Term Agent and Debtors (the "Carve-Out"). All of Debtors' obligations under the DIP Facilities shall be entitled to super-priority administrative claim status, subject, as to priority, only to the Carve-Out. | ¶8 of CIT Order<br><br>¶¶ 2.2 & 2.3 of Arcus Order |
| Liens | The DIP Agents will receive first priority automatically perfected liens (subject to the Carve-Out) on the Collateral. | ¶12 of CIT Order<br><br>¶2.1.3 of Arcus Order |
| DIP Super-Priority Claim | The DIP Agents will receive super-priority claims subject only to the Carve-Out. | ¶18 of CIT Order<br><br>¶2.2 of Arcus Order |
| Use of Proceeds | The proceeds of the Revolver DIP Facility shall be used to repay in full, together with the initial advance under Term DIP Facility, Prepetition Indebtedness owing to the Revolving DIP Lenders and funding of working capital needs.  The proceeds of the Term DIP Facility shall be used to (a) satisfy the PP&E Equity Borrowing Base Component (inclusive of the Reserve Termination Amount) of the Pre-Petition Indebtedness, (b) pay-off the Pre-Petition term loan owing to the Revolver DIP Lenders, and (c) satisfy working capital needs. | ¶¶3 & 10 of CIT Order<br><br>¶1.2 of Arcus Order |
| Carve-Out | The Carve-out permits $1,375,000 in the aggregate for payments to professional advisors to the Debtors and the Committee, subject to certain conditions, and U.S. Trustee and Clerk fees. There is a $1,125,000 Carve-out for the Debtors' Professionals and a $250,000 Carve-out for the Committee's Professionals. | ¶19 of CIT Order<br><br>¶2.3 of Arcus Order |
| Fees | Revolver DIP Facility Fees:  An unused line fee at a rate | §§ 8.3, 8.6 & |

WILMINGTON\75654\5  100000.000

| Material Terms | Brief Summary | Reference |
|---|---|---|
| | per annum equal to 0.25 % payable on the average daily unutilized portion of the Revolver DIP Facility.  An L/C fee at the applicable margin per annum used for determining interest payable in respect of LIBOR loans made under the Revolver DIP Facility on the average daily undrawn amount of L/Cs. All fees, costs or expenses (including fronting fees) due to any banking or financial institution (other than DIP Agent) for any L/Cs issued by such other banking or financial institution in reliance on credit support furnished by DIP Agent.  An annual administrative agent fee of up to $40,000, and an annual collateral agent fee in the amount of up to $125,000 each payable solely to the DIP Agent as more fully set forth in its fee letters. | 8.10 of CIT Loan Agreement and Agent's Fee Letter |
| | Term DIP Facility Fees:  An unused facility fee at a rate per annum equal to 200 bps payable on the daily undrawn portion of the Term DIP Facility. A collateral monitoring fee of $40,000 per month payable monthly in advance to Term Agent. An agent/facility fee of $40,000 per month payable monthly in advance to Term Agent.  An arrangement fee equal to 1.5% of the total credit available under the DIP Facilities.  An early termination fee equal to 2% of the Term DIP Facility payable upon (i) confirmation of a plan of reorganization or plan of liquidation other than such plan proposed, funded and/or sponsored by Term Agent; (ii) entry of an order authorizing a sale of all or substantially all of Borrowers' assets or business pursuant to Section 363 of the Bankruptcy Code to a purchaser other than Arcus or its affiliate, or (iii) repayment of Term DIP Facility prior to the Effective Date of the Plan.  All fees, once paid, are non refundable. | §§ 9.4 through 9.8 of Arcus Loan Agreement |
| Interest Rate | Under the Revolver DIP Facility, Prime plus .25% per annum or LIBOR rate plus 2% per annum. | §§ 8.1 & 8.13 of CIT Loan Agreement |
| | Under Term DIP Facility, Prime (which cannot be lower than 6% per annum) plus 6% per annum. | § 9.1(a) of Arcus Loan Agreement |
| Events of Default | Revolver DIP Facility:  Events of defaults will include those consistent with the Prepetition Loan and in addition will include (i) defaults relating to the Chapter 11 Cases, (ii) cross default to the Term DIP Facility, (iii) conversion into a Chapter 7 case, (iv) change in status of the current | §10 of CIT Loan Agreement |

WILMINGTON\75654\5  100000.000

| Material Terms | Brief Summary | Reference |
|---|---|---|
| | chief executive officer and (v) such other events of default as the Revolver DIP Lenders may, in their sole discretion, deem to be usual, customary, necessary and/or advisable in light of the Chapter 11 Cases, including some, but not all, of the type of Term DIP Facility events of default referred to below.  Upon the occurrence of an Event of Default, Revolver Agent shall have automatic relief from the stay pursuant to Section 362 of the Bankruptcy Code upon three (3) business days notice to certain parties. | |
| | Term DIP Facility:  Events of defaults will include those consistent with the Prepetition Loan and such events of default customarily found in financing transactions of the type contemplated by the Term DIP Facility, including, but not limited to: nonpayment of principal or reimbursement obligations when due; nonpayment of interest, fees or other amounts; inaccuracy of representations and warranties; violation of covenants; cross-default to material indebtedness; certain ERISA events; material judgments; change of management; shareholder litigation or other shareholder actions materially adverse to Term Agent or Term Lenders; default under the Interim Order or Final Order; payment of pre-petition obligations other than as permitted by the Interim Order or Final Order or specifically authorized by the Bankruptcy Court; cessation of material business operations; substantive consolidation; dismissal of the Case; conversion into a Chapter 7 case; appointment of a trustee of examiner; revocation or modification of the Interim Order or Final Order or the DIP Facility Documents; and such other events of default as the Term Lenders may, in their sole discretion, deem to be usual, customary, necessary and/or advisable in light of the Chapter 11 Cases.  Upon the occurrence of an Event of Default, Term Agent shall have automatic relief from the stay pursuant to Section 362 of the Bankruptcy Code upon three (3) business days notice to certain parties. | §11 of Arcus Loan Agreement |
| Waiver of Applicability of Nonbankruptcy Law Relating to Perfection, Foreclosure or Other Enforcement of Lien | The Interim Orders contain provisions waiving the applicability of nonbankruptcy law to the perfection and enforcement of a lien. | ¶12 of CIT Order<br><br>¶2.1.3 of Arcus Order |

WILMINGTON\75654\5  100000.000

| Material Terms | Brief Summary | Reference |
|---|---|---|
| Validity, Enforceability and Priority of Prepetition Lenders' Liens and Claims | The Debtors stipulate to the validity, enforceability and priority of the Prepetition Lenders' liens and claims and waive claims against the Prepetition Lenders. The Committee, if appointed, will have 45 days to challenge the liens and claims of the Prepetition Lenders or bring causes of action against the Prepetition Lenders. If no Committee is appointed, any party in interest shall have 60 days from the Petition Date to bring such a claim or cause of action. | ¶6 of CIT Order<br><br>¶4.1 of Arcus Order |
| Modification of Automatic Stay | Automatic stay modified to permit the Debtors to grant liens and perform their obligations under the DIP Facilities and to allow the DIP Lenders to exercise remedies on 3 business days' notice to parties. | ¶17 of CIT Order<br><br>¶3.4 of Arcus Order |
| Waiver of Section 506(c) Surcharge | The DIP Lenders shall not be subject to a surcharge under Section 506(c), from and after the entry of a Final Order or an extension of the Interim Order. | ¶21 of CIT Order<br><br>¶4.3 of Arcus Order |
| Indemnification | The Debtors shall indemnify and hold harmless the DIP Lenders and their respective affiliates, directors, officers, employees, agents, representatives and controlling persons from and against any and all claims, damages, liabilities, and expenses (including, without limitation, fees and expenses of counsel) that may be incurred by or asserted against such indemnified party in connection with the investigation of, preparation for, or defense of any pending or threatened claim or any action or proceeding (whether or not such indemnified party is a party thereto) or otherwise arising out of or relating to any of the transactions contemplated hereby, any commitment or similar letter issued in connection therewith, any of the DIP Facility Documents, any of the transactions contemplated thereby, or any action or omission of any Indemnified Party or other matter or thing under or in connection with any of the foregoing, except for (with respect to any indemnified party) any such claims, damages, liabilities or expenses resulting solely from such indemnified party's own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final nonappealable order or judgment. | §7.12 of CIT Loan Agreement<br><br>§8.12 of Arcus Loan Agreement |

## Jurisdiction and Venue

1.      On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

2.      On the Petition Date, the Debtors filed various "first day" motions, including a motion seeking to have their cases jointly administered under the lead debtor, "Shapes/Arch Holdings L.L.C."

3.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.      No trustee or examiner has been appointed in these cases.  No official committee of unsecured creditors has been appointed in these cases.

5.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Description of Debtors and Their Businesses

6.      Shapes/Arch is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

WILMINGTON\75654\5  100000.000

7.      Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.  Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

8.      In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006.  This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

9.      Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools.  Both product lines are sold through dealers, distributors and major retailers throughout the United States.

WILMINGTON\75654\5  100000.000

10.     Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey.  Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

11.     Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12.     Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors.  Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States.  Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13.     Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006.  The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14.     Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China.  Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

15.     Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16.    Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

## The Bank Debt

17.    Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement").   The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) and Textron Financial Corporation (the "Lender Group" or the "Pre-Petition Lenders").

18.    Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loans, and letters of credit.   The Financing Agreement has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses.   The fifteenth amendment enables the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and requires that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

19.    The Financing Agreement currently provides for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million.   Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group.   The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including without limitations,

all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

20.    As of the Petition Date, the outstanding borrowings from the Lender Group are as follows:  (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

### Reasons for Filing

21.    The Debtors' Chapter 11 filings were precipitated by a number of factors.  The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008.  The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million.  The Debtors' EBITDA plummeted from about $21 million in 2006 to less than $4 million in 2007.  The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

22.    With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Equity Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

WILMINGTON\75654\5  100000.000

23.     Over the course of the past four months, the Lender Group has worked with the Debtors to attempt to find a solution.  In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business.  Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24.     More recently, the Debtors have explored a possible sale/leaseback transaction with certain third parties.  The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

25.     The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presents a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

## The White Knight

26.     With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million over the next few weeks, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

27.     In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction.  Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

28.     Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

29.     In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend at least $25 million to the Debtors during the Chapter 11 proceeding (and provide additional funding and an equity infusion to help Debtors reorganize).  As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch Holdings, LLC (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights.  This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the companies.

30.     In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, and representatives of

the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31.    Contemporaneously with the filing of the petitions, the Debtors have filed a plan and disclosure statement that provide, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.

32.    The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to pay-off the PP&E Equity Borrowing Base Component (inclusive of the Reserved Termination Amount), to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Arcus of approximately $25 million.

33.    The Debtors have worked diligently over the past several weeks in a difficult setting toward a solution that will maximize a return for all creditor constituencies and, at the same time, maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

### The Debtors' Proposed Postpetition Credit Facilities

34.    The Debtors have an immediate need to obtain the DIP Facilities in order to permit, among other things, (a) the orderly continuation of the operation of their businesses, (b) the management and preservation of Debtors' assets and properties, (c) the maintenance of

business relationships with vendors, suppliers and customers (including issuance of new letters of credit by the Revolving DIP Lenders where required), (e) payment of payroll obligations, (f) the satisfaction of other working capital and operational needs, and (g) the maintenance of the going concern value of the Debtors' estates pending confirmation of the Plan. The Debtors are convinced that, without immediate access to a postpetition financing facility, they lack sufficient liquidity to preserve and maintain the going concern value of the Debtors while they pursue the confirmation of the Plan and their estates would be irreparably harmed.

35.    The Debtors do not have any currently available sources of funds other than the cash collateral of the Prepetition Lenders to provide necessary funding for the Debtors' operations.  The Debtors' analysis shows that it can not continue to operate solely through the use of cash collateral.

36.    In view of this, the Debtors have engaged in discussions and negotiations with the Prepetition Lenders and the DIP Lenders in an effort to ensure that the Debtors continue to have access to credit facilities. The Debtors, the Prepetition Lenders and the DIP Lenders engaged in good faith and extensive arm's length negotiations that culminated in several agreements which are embodied in the DIP Credit Agreements.

37.    By virtue of the fact that (a) the Debtors require immediate access to cash, (b) the Debtors require immediate access to the funds provided by the DIP Facilities, (c) the Debtors believe that any alternative lenders' proposals will not be as favorable as the terms proposed by the Prepetition Lenders and the DIP Lenders (which assumes the unlikely fact that another subordinate or replacement lender(s) could be found), and (d) all of the Debtors' assets are encumbered by liens held by the Prepetition Lenders, the Debtors have concluded that the DIP

Facilities from the DIP Lenders present the best option for preservation of the Debtors' business and addressing their working capital and liquidity needs pending confirmation of the Plan.

### Relief Requested

38.     This Motion contemplates, and the Debtors hereby request, this Court's authorization, for a two-step procedure whereby this Court would: (a) at the conclusion of the interim hearing on the Motion, enter the Interim Orders substantially in the form attached hereto as <u>Exhibit A</u>, authorizing and approving on an interim basis, *inter alia*, the Debtors' use of interim availability under the Revolver DIP Facility (and a rollup of the Pre-Petition Indebtedness) and the Term DIP Facility in accordance with the budget (the "<u>DIP Budget</u>"), attached to the Arcus Order as Exhibit 1, and (b) at the conclusion of the final hearing, enter orders authorizing and approving on a final basis, *inter alia*, the Debtors' use of the Revolver DIP Facility and the Term DIP Facility.

39.     As indicated above, an immediate need exists for the Debtors to obtain funds in order to continue their operations and preserve the value of their estates, the absence of which will immediately and irreparably harm the Debtors, their estates and their creditors, as well as the consummation of a successful reorganization under the Plan.  Without these facilities, there can be no reorganization.   It is anticipated that the Debtors will utilize availability under the Revolving DIP Facility and the Term DIP Facility in order to pay in full the Prepetition Lenders in respect of all Prepetition Indebtedness, and to provide critically needed liquidity for the Debtors' operations (including the issuance of new, post-petition letters of credit which are critical to the Debtors' ongoing operations), and to fund and facilitate consummation of the Debtors' proposed Plan.  Significantly, simultaneously with the Chapter 11 filing and the filing of this Motion, the Debtors have filed a Joint Plan and Disclosure Statement.  The funding

described in this Motion will enable the Debtors to confirm the Plan, emerge from Chapter 11, and consummate the Plan with the distributions to creditors as described therein.

40.    The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d), on more favorable terms and conditions other than those provided in the DIP Credit Agreements.  The Debtors are unable to obtain credit for borrowed money without the Debtors granting: (a) to the DIP Lenders, liens on all of the assets[5] of the Debtors pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code; and (b) to the DIP Lenders, superpriority administrative expense claim status as provided in section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than as set forth in the Interim Order.

41.    The DIP Facilities and the DIP Facility Documents were negotiated in good faith and at arm's length between the Debtors, the Prepetition Lenders and the DIP Lenders. The ability of the Debtors to finance their operations and the availability of sufficient working capital and the incurrence of indebtedness for money borrowed and other financial accommodations is vital to the Debtors' ability to operate and maximize the value of their estate for the benefit of their creditor constituencies. For these reasons, the Debtors contend that it is in the best interest of their estate to be authorized to secure the DIP Facilities contemplated herein.

42.    Nothing in the DIP Facility Documents, the DIP Credit Agreements or the Interim Order shall be deemed to constitute an admission of any subsequently appointed creditors'

---

[5]    **The DIP Lenders are not seeking a Lien upon any Avoidance Actions as part of the Interim Orders. The DIP Lenders are requiring, as part of the Final Orders, a lien on any and all Avoidance Actions. In addition, under the Plan, it is anticipated that both of these lender groups will provide the exit financing needed to consummate the Plan.**

committee (the "Committee") or to bind the Committee to the Debtors' releases, acknowledgements, admissions, or waivers, subject to the right of any Committee or party in interest, as provided in the Interim Orders, to commence, within the time period specified in the Interim Orders, a proceeding seeking to avoid any security or collateral interest in assets of the Debtors claimed by the Prepetition Lenders or otherwise asset claims or causes of action.

43.     In addition, the liens, security interests and adequate protection granted under the DIP Credit Agreements and the Interim Orders shall be subordinate to the Carve-Out, as outlined above and as set forth in the DIP Credit Agreements and the Interim Orders.

44.     The DIP Facilities should provide the Debtors with sufficient liquidity to survive the early stages of the Chapter 11 process through completion of the proposed plan process and substantial consummation thereof.  In contrast, without access to the DIP Facilities, the Debtors will have little available cash and will effectively be denied any hope of maximizing the value of their estate for the benefit of their creditor constituencies.

**Basis For Relief**

A.     **Basis for Emergency Relief**

45.     Pursuant to Bankruptcy Rule 4001(c)(2), a minimum of fifteen (15) days notice is required before a final hearing on this Motion may take place. However, that rule also provides that the Court "may conduct a hearing before such 15-day period expires, but ... may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed.R.Bankr.P. 4001(c)(2).

46.     It is essential to the continued operation of the Debtors' business that they be authorized by this Court to obtain interim debtor in possession financing in the requested amounts pending a final hearing on the Motion. The funds are urgently needed to meet the Debtors' working capital and other liquidity needs. Thus, the interim relief requested hereby is

-21-

necessary, appropriate, and fully warranted, and is essential to avoid immediate and irreparable

harm to the Debtors, their estates and their creditors.

**B.      Debtors' Exercise of Sound Business Judgment**

47.    Section 364 of the Bankruptcy Code governs a debtor in possession's ability to

incur debt or obtain credit postpetition as follows:

(c)    If the trustee is unable to obtain unsecured credit allowable under section
503(b)(1) of this title as an administrative expense, the court, after notice
and a hearing, may authorize the obtaining of credit or the incurring of
debt -

(1)    with priority over any and all administrative expenses of the kind
specified in section 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise
subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a
lien.

(d)    (1)    The court, after notice and a hearing, may authorize the obtaining
of credit or the incurring of debt secured by a senior or equal lien
on property of the estate that is subject to a lien only if -

(A)    the trustee is unable to obtain such credit otherwise; and

(B)    there is adequate protection of the interest of the holder of
the lien on the property of the estate on which such senior
or equal lien is proposed to be granted.

48.    Generally, sections 364(c) and (d) of the Bankruptcy Code require a debtor to

demonstrate that alternative sources of credit are not available under sections 364(a) or (b). See

In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("a debtor is not required

to seek credit from every possible source ... [but only to] show that it has made a reasonable

effort to seek other sources of credit available."). "The statute imposes no duty to seek credit

from every possible lender before concluding that such credit is unavailable." In re Snowshoe

Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also Ames, 115 B.R. at 40 (holding that debtor

made a reasonable effort to secure financing when it selected the least onerous financing option

from the remaining two lenders). Moreover, where few lenders are likely to be able and willing

to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the

debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113

(Bankr. N.D. Ga. 1988), affd sub nom.. Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R.

117, 120 nA (N.D. Ga. 1989).

49.    Against this statutory backdrop, courts will evaluate the facts and circumstances

of a debtor's case and will accord significant weight to the debtor's business judgment regarding

the necessity for obtaining the financing. See, e.g., Bray v. Shenandoah Fed., Sav. & Loan Ass'n

(In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); Ames, 115 B.R. at 40. For example,

the need for a swift injection of cash to preserve a debtor's business satisfies the requirements of

section 364(d) of the Bankruptcy Code, when coupled with unsuccessful attempts to locate

alternative financing.  See Ames, 115 B.R. at 40; Snowshoe, 789 F.2d at 1088 (primary facts

supporting priming included lack of alternative financing sources and need to obtain prompt cash

infusion to preserve value of debtors' business).

50.    The Debtors do not believe that they would be able to obtain the funds required in

the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, an

administrative expense pursuant to sections 364(a) or (b) of the Bankruptcy Code, unsecured

debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code or debt secured

only as described in sections 364(c)(2) or (3) of the Bankruptcy Code, because the Prepetition

Liens of the Prepetition Lenders encumber all of the Debtors' assets. Additionally, the Debtors

do not believe that they would be able to obtain an alternative borrowing facility proposed by

another lender on any terms given the Debtors' significant financial difficulties.

WILMINGTON\75654\5  100000.000

51.     In light of the circumstances, the Debtors concluded, in the exercise of their sound business judgment, that the proposals for debtor in possession financing provided by the DIP Lenders were the most favorable under the circumstances and addressed the Debtors' reasonably foreseeable working capital needs.

52.     The Debtors' efforts to seek necessary postpetition financing from other sophisticated lending institutions satisfy the statutory requirements of section 364(c).  See, e.g., In re Phoenix Steel Corp., 39 B.R. 218, 222 and n.9 (D. Del. 1984) (requiring demonstration that less onerous financing was unavailable); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr E.D. Pa. 1987) (same); Ames, 115 B.R. at 40 (approving section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor "must make an effort to obtain credit without priming a senior lien").

53.     The Debtors' decision to enter into the DIP Facilities quite clearly represents an exercise of sound business judgment. Without the financing, the Debtors simply cannot conduct their operations. Without such funds, the Debtors will not be able to pay their payroll and other direct operating expenses and obtain goods and services needed to carry on their business during this critical period. Equally important, without financing to cover the Debtors' cash needs, the Debtors will be unable to timely satisfy their administrative obligations. The DIP Facilities addresses this need by providing the Debtors with funds necessary to meet ongoing operating needs, and by instilling the Debtors' customers and employees with a sense of the Debtors' financial security.

54.    Further, the Debtors have negotiated the best financing arrangement that it can realistically expect to obtain under the circumstances. The fees required by the DIP Lenders are customary and reasonable for the level of risk associated with such loans. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.  See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992). The costs of failing to approve the DIP Facility (*e.g.,* loss of jobs and the inability to reorganize) would be catastrophic to creditors and parties in interest. See, e.g., In re Western Pacific Airlines, Inc., 223 B.R. 567, 570-71 (Bankr. D. Colo. 1997).

55.    Based upon the foregoing, the Debtors respectfully request that the Court approve the DIP Facilities in accordance with the terms set forth in the DIP Credit Agreements and the Interim Orders.

**C.    The DIP Facilities Are Vital to the Debtors' Ability
to Consummate a Successful Reorganization**

56.    The continued operation of the Debtors' business should provide the Debtors with an opportunity to maximize the value of their estate for the benefit of their creditor constituencies and allow the consummation of the plan that they filed contemporaneously herewith (the "Plan") to occur.

57.    The Debtors have focused their business strategy to preserve capital and reduce costs, and at the same time have undertaken a process to reorganize through the terms of the Plan.  An immediate need exists for the Debtors to obtain funds with which to pay current operating expenses, and to administer and preserve the value of its estate. Absent immediate access to funds, the Debtors will likely have to shut down and discharge their employees.

58.    It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the opportunity of a debtor to successfully reorganize:

A debtor, attempting to reorganize a business under Chapter 11 clearly has a compelling need to use "cash collateral" in its effort to rebuild, without the availability of cash to meet daily operating expenses, such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

See generally Chrysler Credit Com. v. Ruggiere, 727 F.2d. 1017, 1019 (11th Cir. 1984).

**D.      Rollup**

59.      As noted above, no potential lender was willing to extend credit to the Debtors on a junior priority basis (all of the Debtors' assets are encumbered by the liens and security interests securing the Debtors' obligations under the secured Prepetition Financing Agreement). Thus, absent payment in full of the obligations owed to the Prepetition Lenders, the Debtors would be required to attempt to "prime" the Prepetition Lenders. The Prepetition Lenders would not consent to being primed without repayment in full of their obligations, which means that if the Debtors were able to locate a debtor in possession lender willing to provide a priming lien, the Debtors would be required to engage in a contested financing hearing, the outcome of which most certainly would be unfavorable.

60.      Furthermore, the Prepetition Lenders have a prepetition security interest in substantially all of the Debtors' property including its inventory –which is used and consumed in the Debtors' business every day. At a minimum, the Debtors would be required to give the Prepetition Lenders a replacement lien in all of its postpetition inventory and/or pay the proceeds to the Prepetition Lenders as a result of the sale thereof. The DIP Credit Facilities basically provide the second of these two options by refinancing the Prepetition Financing Agreement with the DIP Credit Facilities and repaying in full the Prepetition Lenders with a portion of the proceeds from the DIP Credit Facilities and receiving replacement liens (on the same collateral that secured the pre-petition facilities).

61.     Lastly, repayment of the debt owed to the Prepetition Lenders will not prejudice other creditors because the Interim Orders provide that the approval of the DIP Credit Facilities are without prejudice to the right of any official committee (and, absent any Committee, a party in interest) appointed in these cases to contest or challenge the validity of the Prepetition Lenders' liens.

62.     The Debtors assert that under the consensual arrangement embodied in the DIP Revolving Credit Agreement, the repayment of the obligations under the Prepetition Financing Agreement are appropriate. Indeed, numerous courts have approved debtor in possession financing facilities that contemplated repayment of pre-petition indebtedness owed under secured pre-petition credit facilities. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 39-41 (Bankr. S.D.N.Y. 1990) (financing approved, including cross-collateralization provisions, where it appeared that the purpose of the loan was to benefit estate rather than party in interest); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Cola. 1985) (court would not second-guess debtor's business judgment, based on distinct awareness of its financial needs, to put aside cash to effectuate a refinancing of its debts); In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 21, 2006); In re Winn-Dixie Stores, Inc., Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. Mar. 23, 2005) (permitting payment in full of pre-petition lenders); In re Donnkenny Apparel, Inc., No. 05-1 0712 (RDD) (Bankr. S.D.N.Y. Feb. 9, 2005) (approving roll up of pre-petition debt); In re Twinlab Corp., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 25, 2003) (Docket No. 80) (authorizing Debtors to repay existing pre-petition bank debt); In re Radnor Holdings Corporation, Case No. 06-10894 (PJW) (Bankr. D. Del. September 22, 2006); In re Ultimate Electronics, Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Feb. 14, 2005).

63.     The Debtors were advised that the Prepetition Lenders would not agree to provide the DIP Facilities absent the rollup of the Prepetition Financing and the new loans to be provided under the Term DIP Facility. The Debtors believe, in their reasonable business judgment, that the benefits of the DIP Facilities outweigh losing the ability to satisfy the Prepetition Financing otherwise in accordance with the Bankruptcy Code and the burdens on the estates of incurring an administrative claim. The nature of most of the Collateral (inventory and accounts receivable) makes it difficult to segregate the pre- and post-petition collateral. In the absence of the rollup contemplated in the DIP Facilities, the Debtors would have faced a difficult priming fight against secured creditors with security interests in substantially all of the Debtors' estates. The Debtors believe that even if they were successful in a non-consensual priming of the Prepetition Lenders, any such victory might well be a Pyrrhic victory, in light of the Debtors' fragile liquidity situation.  Moreover, since the DIP Lenders have agreed (subject to certain conditions) to continue funding subsequent to confirmation of the Plan, the effect on the estate and the plan process has been significantly reduced.

64.     Quite simply, the Debtors were unable to obtain financing on more favorable terms from sources other than the DIP Lenders. The Debtors have an immediate need to obtain fmancing in order to ensure, inter alia, that the Debtors have sufficient working capital and liquidity and can preserve and maintain the going concern value of the Debtors' estates during the Plan process. Accordingly, the Debtors believe that the aforementioned circumstances demonstrate that such extraordinary relief is necessary and appropriate and should be authorized and approved by the Court.

**E.      Good Faith**

65.     The terms and conditions of the DIP Facilities are fair and reasonable and were negotiated in good faith and at arm's length between the Debtors and the DIP Lenders.

Accordingly, the DIP Lenders should be accorded the benefits and protections of section 364(e) of the Bankruptcy Code with respect to the DIP Facilities. Accordingly, based on the foregoing, the Debtors respectfully request that the Court order that any loans, advances or other financial accommodations which are made or caused to be made to the Debtors by the DIP Lenders pursuant to the DIP Facilities are deemed to have been made and provided in good faith, as the term "good faith" is used in Bankruptcy Code section 364(e), and shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that the Interim Orders or the DIP Facilities or any provisions are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the DIP Lenders.

**F.    Modification of the Automatic Stay**

66.    Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Facilities contemplate a modification of the automatic stay, to the extent applicable and to the extent necessary, to permit the DIP Lenders to perform any act authorized or permitted under or by virtue of the Interim Orders or the DIP Credit Agreements.

67.    Stay modification provisions of this kind are ordinary and standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Therefore, the Debtors respectfully request that the Court authorize modification of the automatic stay in accordance with the terms set forth in the Interim Orders and the DIP Credit Agreements.

**Statement Pursuant to Local Bankruptcy Rule 9013-2**

68.    Pursuant to Local Bankruptcy Rule 9013-2, the Debtors assert that no brief in support of the Motion is necessary because there are no novel issues of law presented in this Motion.

WILMINGTON\75654\5  100000.000

## Notice

69.     The Debtors further request that the Court schedule the Final Hearing and authorize them to mail copies of the signed Interim Orders (assuming they are approved), to (a) the Office of the United States Trustee; (b) counsel to The CIT Group/Business Credit, Inc., Stradley Ronon Stevens & Young, LLP, 2600 One Commerce Square, Philadelphia, Pennsylvania 19103, Attn: Paul A. Patterson, Esq.; (c) counsel to Arcus ASI Funding, LLC, Blank Rome LLP, One Logan Square, Philadelphia, Pennsylvania 19103, Attn: Joel C. Shapiro, Esq.; (d) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; (e) the Internal Revenue Service; (f) the Securities and Exchange Commission; and (g) any other known lienholders. In addition, because this Motion seeks "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required by Local Bankruptcy Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

## No Prior Request

70.     No prior request for the relief sought herein has been made to this or any other Court.

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Orders and, after notice and a hearing, enter final orders (substantially in the form of the Interim Orders) (i) authorizing the Debtors to obtain interim and final secured postpetition financing pursuant to the DIP Facilities, the DIP Credit Agreements and the Interim Orders; (ii) granting the DIP Lender Liens and security interests and providing superpriority administrative expense status, to the extent requested herein, and subject to relative priorities set forth in the Intercreditor Agreement executed by the DIP Lenders; (iii) authorizing the Debtors' use of cash

collateral; (iv) modifying the automatic stay, to the extent requested herein; (v) scheduling a

Final Hearing on the Motion and prescribing the form and manner of notice thereto; and

(vi) granting such other relief as the Court determines to be just and proper.

Date:    March 16, 2008

/s/ Jerrold N. Poslusny, Jr.
Mark E. Felger (MF9985)
Jerrold N. Poslusny, Jr. (JP7140)
Cozen O'Connor
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000

Proposed Attorneys for the Debtors and
Debtors in Possession

WILMINGTON\75654\5  100000.000

## VERIFICATION

Steven Grabell of full age, certifies and states as follows:

1.      I am the Chief Executive Officer of Shapes/Arch Holdings L.L.C. and Shapes L.L.C.[6], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2.      I have read the foregoing Motion and I hereby certify and verify that all of the statements contained therein are true.

3.      I hereby verify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

_____
Steven Grabell

Dated: March 16, 2008

---

[6] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.

-32-