UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ  08002
(856) 910-5000
Proposed Attorneys for the Debtors

In re:                                              Case No. 08-

SHAPES/ARCH HOLDINGS L.L.C., et al.,

                    Debtors.                         Judge:

                                                    Chapter:  11

**INTERIM ORDER PURSUANT TO SECTION 364(c) OF THE BANKRUPTCY CODE
AND RULE 4001 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE
AUTHORIZING DEBTORS (1) TO OBTAIN INTERIM POST-PETITION FINANCING,
(2) GRANTING SENIOR LIENS AND PRIORITY ADMINISTRATIVE EXPENSE
STATUS, (3) MODIFYING THE AUTOMATIC STAY, (4) AUTHORIZING DEBTORS
TO ENTER INTO AGREEMENTS WITH THE CIT GROUP/ BUSINESS CREDIT, INC.,
FOR ITSELF AND AS AGENT FOR CERTAIN LENDERS AND (5) PRESCRIBING
FORM AND MANNER OF NOTICE AND TIME FOR FINAL HEARING UNDER
FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(c)**

The relief set forth on the following pages numbered 2 through [30] is hereby ORDERED

AND GRANTED.

THIS MATTER came before the Court on March ___, 2008, upon the Motion ("Motion"), filed on March 17, 2008, of Shapes/Arch Holdings L.L.C., Shapes, L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C., Debtors and Debtors-in-Possession (jointly and severally, the "Debtors") seeking, inter alia:

1.        authority, pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) and 364 (d) of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), for the Debtors to obtain post-petition loans, advances and other financial accommodations on an interim basis for a period through and including April 4, 2008, from The CIT Group/ Business Credit, Inc., for itself and as agent for the lenders pursuant to the Debtor in Possession Revolving Credit Financing Agreement attached to this order (the "DIP Revolving Credit Agreement"), with the defined terms "Agent," "Lender" and "Lenders" having the meaning given to them in the DIP Revolving Credit Agreement, inclusive of the amount of all pre-petition indebtedness owed by the Debtors to the Agent and the Lenders as pre-petition lenders, and in accordance with the lending formulas, the sublimits and the terms and conditions set forth in the DIP Revolving Credit Agreement, secured by security interests in and liens upon all of the Collateral (as hereinafter defined) pursuant to Sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Code;

2.        authority for Debtors to enter into the DIP Revolving Credit Agreement, dated of even date herewith, by and between the Debtors, the Agent and the Lenders (capitalized terms not otherwise defined in this Order shall have the respective meanings given to them in the DIP Credit Agreement);

3.        the modification of the automatic stay to the extent hereinafter set forth;

4.      the grant to the Agent and the Lenders of super-priority administrative

claim status pursuant to Section 364(c)(1) of the Code; and

5.      the setting of a final hearing on the Motion.

IT APPEARING THAT, at or prior to the hearing on the Motion, each of the parties set

forth below received actual notice of the Motion, whether by telephone, telecopy, e-mail (if

agreed to by the recipient), overnight courier or by hand delivery to:  (i) the Office of the United

States Trustee for the District of New Jersey, (ii), the attorneys for the Agent, (iii)  the Debtors'

twenty (20) largest unsecured creditors on a consolidated basis, (iv) Arcus ASI Funding, LLC

("Arcus"), proposed post petition term loan lender to the Debtors, (v) the taxing authorities to

which the Debtors pay taxes, , and (vi) certain other parties identified in this certificate of service

filed with this court; and it further

APPEARING, the Debtors filed voluntary petitions for relief under Chapter 11 of the

Bankruptcy Code on March 16, 2008 (the "Petition Date"), and are continuing in the

management and possession of their businesses and properties as a debtors-in-possession

pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and it further

APPEARING, that the Agent (on behalf of the Lenders) and the Debtors have

represented to this Court that, prior to the commencement of Debtors' Chapter 11 cases, the

Agent and the Lenders made loans and advances, and provided other credit accommodations to

and for the benefit of each of the Debtors, pursuant to the terms and conditions of that certain

Financing Agreement dated December 30, 2003 (as amended, modified and supplemented, the

"Existing Loan Agreement"), and certain other security agreements, mortgages, guarantees and

other related agreements, documents and instruments executed and/or delivered by the Debtors

with, to or in favor of the Agent and the Lenders (all of such loan and security agreements,

mortgages, guarantees, financing statements and all other related agreements, documents and

instruments executed in connection therewith or related thereto being referred to collectively as

the "Existing Financing Agreements");

APPEARING, that the Debtors and the Agent (on behalf of the Lenders) have

represented to the Court that (1) the principal amount of all loans, advances and other

indebtedness owed by the Debtors to the Agent and the Lenders pursuant to the Existing Loan

Agreement and the other Existing Financing Agreements, and existing as of March 14, 2008,

consists of Revolving Loans (as defined in the Existing Loan Agreement) in the aggregate

principal amount of not less than $47,170,801, Letters of Credit (as defined in the Existing Loan

Agreement) in the aggregate principal amount of not less than $3,555,000, and Term Loans (as

defined in the Existing Loan Agreement) of $8,353,374.89, together with interest accrued and

accruing thereon and fees, costs, expenses and other charges accrued and accruing with respect

thereto (collectively, the "Pre-Petition Debt"), and (2) as of the Petition Date, the Pre-Petition

Debt is fully secured pursuant to the Existing Financing Agreements by perfected and valid first

priority security interests and liens granted by the Debtors to or for the benefit of the Agent and

the Lenders upon all of the Collateral (as defined in the Existing Loan Agreement) existing as of

the time immediately prior to the filing of the petitions for relief herein, and the post-petition

proceeds and products thereof (collectively, together with any other property of the Debtors'

estates in which a security interest or lien has been granted to or for the benefit of the Agent

and/or the Lenders, as applicable, prior to the filing of the petition for relief herein, the "Pre-

Petition Collateral"); and it further

APPEARING, that the Debtors have acknowledged and agreed that: (a) the Existing

Loan Agreement and the other Existing Financing Agreements executed and/or delivered with,

to or in favor of the Agent and the Lenders are valid, binding and enforceable agreements and

obligations of the Debtors, (b) the security interests and liens granted to or for the benefit of the

Agent and the Lenders upon the Pre-Petition Collateral are valid, perfected, senior to all other

security interests and liens upon the Pre-Petition Collateral (except for senior liens, if any,

constituting "Permitted Encumbrances," as defined in the Existing Loan Agreement) and are

valid, enforceable and non-voidable, (c) all of the Pre-Petition Debt constitutes allowable claims

against the Debtors and is valid, enforceable and non-voidable in the amount of the Pre-Petition

Debt, and (d) the Debtors do not possess and shall not assert any claim, counterclaim, setoff or

defense of any kind or nature, which would in any way affect the validity, enforceability and

non-avoidability of any of the Pre-Petition Debt and the Agent and the Lenders' security interests

in and liens upon the Pre-Petition Collateral, or which would in any way reduce or affect the

absolute and unconditional obligation of the Debtors to pay in full, in cash all of the Pre-Petition

Debt; and it further

APPEARING, that the Debtors are unable to obtain unsecured credit for working capital

purposes as an administrative expense of their estates; and it further

APPEARING, that the Agent and the Debtors have represented to the Court that, at the

time of the filing of the petition for relief herein, the Pre-Petition Debt is fully secured by the

Pre-Petition Collateral; and it further

APPEARING, that without the financing proposed by the Motion, the Debtors will not

have the funds necessary to pay their payroll, payroll taxes, inventory suppliers, overhead and

other expenses necessary for the continued operation of the Debtors' business and the

management and preservation of the Debtors' assets and properties; and it further

APPEARING, that the Debtors have requested that the Lenders make or cause to be

made available loans and advances, and provide other financial and credit accommodations to

the Debtors in order to provide funds to be used by Debtors for their general operating, working

capital and other business purposes in the ordinary course of their businesses; and it further

APPEARING, that all such additional loans, advances and other financial

accommodations by or on behalf of the Lenders will benefit the Debtors, their estates and

creditors; and it further

APPEARING, that the Lenders are willing to make such loans and advances and provide

such other financial and credit accommodations on a secured basis as more particularly described

herein and subject to the terms and conditions contained herein; and it further

APPEARING, that the ability of the Debtors to continue their businesses and remain an

operating entity depends upon the Debtors' obtaining such financing from the Lenders; and it

further

APPEARING, that the relief requested in the Motion is necessary, essential and

appropriate for the continued operation of the Debtors' businesses and the management and

preservation of the Debtors' assets and properties and is in the best interests of the Debtors, their

estates and creditors; and it further

APPEARING, that this Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§

157(b)(2)(A), (D) and (M) and 1334;

NOW, THEREFORE, upon the record set forth by the Debtors, including the Motion, the filings and pleadings in this case, the record of the proceedings held before this Court with respect to the Motion, and upon completion of the interim hearing and sufficient cause appearing therefor, the Court finds:

A.      The Debtors are unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, or pursuant to Sections 364(a) and (b) of the Bankruptcy Code.

B.      Under the circumstances, no other source of financing exists on terms more favorable than those offered by the Lenders.

C.      The Motion was filed on March __, 2008, and the Debtors have provided notice of the Motion and the relief requested thereunder, the interim hearing in respect of the Motion and the terms of this Order, whether by telephone, telecopy, e-mail (if agreed to by the recipient), overnight courier, or by-hand delivery to (1) the Office of the United States Trustee for the District of New Jersey, (2) the attorneys for the Agent, (3) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, (4) Arcus, (5) the taxing authorities to which the Debtors pay taxes, and (6) certain other parties identified in this certificate of service filed with this court; and it further

D.      Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (O).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

E.      Based on the record before the Court, the Agent and the Lenders are extending financing to the Debtors in good faith and, therefore, each of the Agent and the Lenders are entitled to the benefits of the provisions of Section 364(e) of the Bankruptcy Code. Based on the record before the Court, the terms of the Financing Agreements (as defined below) by and between the Debtors, the Agent and the Lenders, as applicable, pursuant to which the post-petition loans, advances or other financial and credit accommodations will be made or provided to the Debtors by the Lenders have been negotiated at arm's length and in good faith, as that term is defined in Section 364(e) of the Bankruptcy Code, and are in the best interest of the Debtors, their estates and their creditors, and provide each of the Debtors with reasonably equivalent value and fair consideration for all purposes under the Bankruptcy Code and other applicable law.

F.      Adequate notice of the hearing requesting the entry of this Order and the hearing thereon has been provided.

G.      The relief granted by this Court pursuant to this Order is necessary to avoid immediate and irreparable harm and injury to the Debtors' estate.

H.      Adequate and sufficient cause has been shown to justify the granting of the interim relief requested herein, and the immediate entry of this Order.

I.      A committee has not yet been appointed in this case pursuant to Section 1102 of the Bankruptcy Code.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

1.      The Motion is granted and approved to the extent provided below.  This

Order shall hereinafter be referred to as the "Interim Order."

2.      The Debtors are hereby authorized and empowered to immediately borrow

and obtain, on a joint and several basis, Revolving Loans and/or Letters of Credit from the Agent

and/or the Lenders, as applicable, on a revolving basis pursuant to the terms of this Interim Order

and the terms and conditions set forth in the DIP Revolving Credit Agreement, such amount or

amounts as may be made available to the Debtors by the Agent and/or the Lenders pursuant to

the lending formulas and the terms and conditions set forth in the DIP Revolving Credit

Agreement and this Interim Order, for the period commencing on the date hereof and terminating

on April ___, 2008.  Without limiting the general nature of the foregoing approval, the Court

specifically approves the provisions of the DIP Revolving Credit Agreement allowing advances

to be made to any one or more of the Debtors based upon the combined assets of all of the

Debtors and, additionally, in no event shall the Agent and/or the Lenders, as applicable, be

obligated to fund any requested advance where there has occurred an Event of Default (as

defined below) or if an Event of Default (as defined below) would be caused by any requested

advance including, without limitation, exceeding the available Borrowing Base or other

borrowing limitations set forth in the DIP Revolving Credit Agreement.

3.      The Debtors shall use the proceeds of the Revolving Loans and Letters of

Credit provided to the Debtors pursuant to this Interim Order and the DIP Revolving Credit

Agreement for, inter alia, the payment of employee salaries, payroll, taxes, the purchase of

inventory and other general operating and working capital purposes in the ordinary course of the

Debtors' businesses, including amounts paid for such purposes which may constitute

administrative expense claims under the Bankruptcy Code attributable to the operation of

Debtors' businesses, expenditures authorized by order of the Court and the fees of the U.S.

Trustee and the Clerk of this Court.

4.    The Debtors are authorized to execute, deliver, perform and comply with

the terms and covenants of the DIP Revolving Credit Agreement, pursuant to which, inter alia,

(a) the Debtors shall ratify, extend, assume, adopt and/or amend, as applicable, the Existing

Financing Agreements in a manner deemed necessary or advisable by the Agent as a result of the

credit to be provided under the DIP Revolving Credit Agreement, and (b) the Debtors shall

ratify, extend, assume, adopt and/or amend the other agreements, documents and instruments by

and among the Debtors, the Agent and the Lenders, as applicable, and certain third parties,

including, without limitation, four separate multi-party blocked account agreements each dated

as of February 10, 2004, executed and delivered by each of the Debtors (other than Shapes/Arch

Holdings, L.L.C.) in favor of Bank One, National Association, predecessor in interest to

JPMorgan Chase Bank, N.A., one of the Lenders pursuant to the Existing Financing Agreement,

and a Lender under the DIP Revolving Credit Agreement (the "Blocked Account Agreement"

and, together with the DIP Revolving Credit Agreement, the Existing Financing Agreements, as

applicable, and all other agreements, documents and instruments now or in the future executed

and/or delivered in connection with, or related to, the financing arrangements between the

Debtors and the Agent and/or the Lenders, collectively, the "Financing Agreements").

5.    The Debtors are authorized to comply with the terms, conditions and

covenants of the DIP Revolving Credit Agreement and the other Financing Agreements.  Such

terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing

arrangements by and among the Debtors and the Agent and the Lenders, as applicable, and of the

Debtors' assumption and adoption of the terms, conditions and covenants of the DIP Revolving

Credit Agreement and the other Financing Agreements for all purposes, including, without

limitation, to the extent applicable, the payment of all principal, interest, commissions, fees,

servicing fees, unused line fees, early termination fees, and other fees and expenses, including

attorneys' fees and legal expenses, as more fully set forth in the Financing Agreements.

6.      The extent, legality, validity, perfection,  enforceability and other matters

noted in this paragraph with respect to the Existing Financing Agreements, as well as the Pre-

Petition Debt and the Agents and the Lender's pre-petition liens upon and security interests in

the Pre-Petition Collateral, are for all purposes subject only to the rights of the Official

Committee of Unsecured Creditors appointed pursuant to Section 1102 of the Bankruptcy Code

(the "Committee") for a period, commencing on the date of the appointment of counsel for the

Committee, of forty-five(45) days (or, if no Committee is appointed, any party in interest for a

period ending sixty (60) days after the Petition Date), which in any way seeks to (a) challenge in

any manner the Pre-Petition Debt, and/or assert claims or causes of action of any nature in any

way arising out of or relating to the Pre-Petition Debt or the Existing Financing Agreements, or

(b)  assert or allege any other any matters in any way arising out of or relating to the Pre-Petition

Debt or the Existing Financing Agreements, or (c)  challenge the extent, legality, validity,

perfection and/or enforceability of Agents and/or any Lenders pre-petition liens upon and

security interests in the Pre-Petition Collateral pursuant to the Bankruptcy Code.  If such

proceeding is not timely filed within such forty-five (45) day period set forth above (or, if no

Committee is appointed, by a party in interest within the sixty (60) day period set forth above),

(a) the Pre-Petition Debt and the Agents and the Lenders' security interests in and liens upon the

Pre-Petition Collateral shall be recognized and allowable as valid, binding, in full force and

effect, not subject to any claims, counterclaims, setoff or defenses, perfected and senior to all

other liens upon and claims against the Pre-Petition Collateral with respect to all parties in this

case, <u>except</u> for senior liens expressly permitted in the Financing Agreements (to the extent such

permitted liens are valid, perfected, enforceable and non-avoidable, or as otherwise provided in

the "Intercreditor Agreement," as defined below), or to the extent entitled to priority as provided

in paragraph 8 below, and (b) the Agent, the Lenders and their respective agents, officers,

directors and employees shall be deemed released and discharged from all claims and causes of

action arising out of or in any way relating to the Existing Financing Agreements entered into

with the Debtors prior to the entry of this Interim Order.

7.     To secure the prompt payment and performance of any and all obligations,

liabilities and indebtedness of the Debtors to the Agent and the Lenders of whatever kind or

nature or description, absolute or contingent, now existing or hereafter arising, including, without

limitation, to the fullest extent applicable, all Pre-Petition Debt and all post-petition obligations,

liabilities and indebtedness of any Debtors to the Agent and/or the Lenders arising under the

Financing Agreements (collectively, the "Revolving Credit Obligations"), the Agent, for itself

and on behalf of each Lender, shall have and is hereby granted, effective on and after the date of

this Interim Order, valid and perfected first priority security interests and liens, superior to all

other creditors of Debtors' estates, <u>except</u> for Permitted Liens (as defined below) to the extent

entitled to priority as provided in paragraph 8 below, in and upon all of the existing and future

assets and properties of the Debtors, whether acquired prior to, concurrently with or after the

filing of the petition commencing Debtors' Chapter 11 cases (collectively, the "Collateral"),

including, without limitation, and by way of general description (with terms below having, as

applicable, the meaning given to them in the Uniform Commercial Code):

(a)      All of the Collateral (as defined in the DIP Revolving Credit

Agreement);

(b)      all present and future accounts and accounts receivable;

(c)      all other present and future general intangibles (including

intellectual property and existing and future leasehold interests in

equipment, real estate and fixtures), chattel paper, documents,

instruments, investment property (including securities, whether

certificated or uncertificated, securities accounts, security

entitlements, commodity contracts or commodity accounts), letters

of credit, bankers' acceptances and guaranties;

(d)      all present and future monies, securities and other investment

property, credit balances, deposits, deposit accounts and other

property of the Debtors now or hereafter held or received by or in

transit to the Agent or any Lender or their affiliates or at any other

depository or other institution from or for the account of the

Debtors, whether for safekeeping, pledge, custody, transmission,

collection or otherwise, and all present and future liens, security

interests, rights, remedies, title and interest in, to and in respect of

accounts, accounts receivable and other Collateral, including,

without limitation, (A) rights and remedies under or relating to

guaranties, contracts of suretyship, letters of credit and credit and

other insurance related to the Collateral, (B) rights of stoppage in

transit, replevin, repossession, reclamation and other rights and

remedies of an unpaid vendor, lienor or secured party, (C) goods

described in invoices, documents, contracts or instruments with

respect to, or otherwise representing or evidencing accounts,

accounts receivable or other Collateral, including, without

limitation, returned, repossessed and reclaimed goods, and (D)

deposits by and property of account debtors or other persons

securing the obligations of account debtors;

(e)     all inventory;

(f)     all equipment;

(g)     all real property;

(h)     all leasehold interests;

(i)     all claims, rights, interests, assets and properties (recovered by or

on behalf of any Debtor or any trustee of any Debtor (whether in

the Chapter 11 Case or any subsequent case to which the Chapter

11 Case is converted), including, without limitation, all property

recovered as a result of transfers or obligations avoided or actions

maintained or taken pursuant to Sections 545, 547, 548, 549, 550

and 553 of the Bankruptcy Code and including, without limitation,

Avoidance Actions and Avoidance Action Recoveries (as defined

in the DIP Revolving Credit Agreement);

(j)     all books and records; and

(k)     all products and proceeds of the foregoing, in any form, including, without limitation, insurance proceeds and all claims against third parties for loss or damage to or destruction of any or all of the foregoing.

8.      Notwithstanding anything to the contrary set forth in this Interim Order, including paragraph 7 of this Interim Order, the Agents and the Lenders' security interests in and liens upon the Collateral shall not have priority over (a) Permitted Encumbrances with respect to the Arcus Term Loan (as defined in the DIP Revolving Credit Agreement), subject to all of the terms and conditions of the DIP Revolving Credit Agreement and that certain intercreditor agreement to be dated on or about the date of this order between the Agent, on behalf of the Lenders, and Arcus, and as acknowledged by the Debtors ( the "Intercreditor Agreement") ("Permitted Liens"), (b) the fees of the Clerk of the Bankruptcy Court for the District of New Jersey and the Office of the United States Trustee and the Professional Fee Carve-Out (as defined below), as specifically provided for and only to the extent specifically set forth or referred to in paragraph 19 of this Interim Order.

9.      Notwithstanding anything to the contrary set forth herein, each of the Debtors, the Agent, the Lenders and Arcus acknowledge and agree that the terms, conditions and covenants of the Intercreditor Agreement are approved, and that the terms, conditions and covenants of such agreement shall apply to and govern the respective rights, obligations and priorities of the Agent, the Lenders and Arcus (for itself an as agent for others), respectively, with respect to the Collateral and these Debtors' bankruptcy cases.

10.     The Agent is authorized to apply in full all amounts initially advanced under the DIP Revolving Credit Agreement (together with the amounts to be advanced under the Arcus Term Loan, as defined in the DIP Revolving Credit Agreement) to repay in full all Pre-Petition Debt and other obligations of any nature or type owing to the Agent and/or the Lenders, as applicable.

11.     In accordance with Sections 552(b) and 361 of the Bankruptcy Code, the value, if any, in any of the Collateral, in excess of the amount of the Revolving Credit secured by such Collateral, after satisfaction of the post-petition obligations, liabilities and indebtedness of the Debtors to the Agent or any Lender, as applicable, shall constitute additional security for the repayment of the Pre-Petition Debt and adequate protection for the use by the Debtors and the diminution in the value of the Collateral existing on the Petition Date.

12.     This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the post-petition security interests in and liens upon the property of Debtors' estates granted to the Agent and the Lenders as set forth herein and in the Financing Agreements, without the necessity of filing, recording or serving any financing statements, mortgages or other documents which may otherwise be required under federal or state law in any jurisdiction, or the taking of any other action to validate, reaffirm or perfect the post-petition security interests and liens granted in this Interim Order and the Financing Agreements.  If the Agent shall, in its discretion, elect for any reason to file any such financing statements, mortgages or other documents with respect to such security interests and liens, the Debtors are authorized and directed to execute, or cause to be executed, all such financing statements, mortgages or other documents upon Agent's request, and the filing, recording or service thereof (as the case may be) of such financing statements, mortgages or similar

documents shall be deemed to have been made at the time of and on the Petition Date.  The

Agent may, in its discretion, file a certified copy of this Interim Order in any filing or recording

office in any county or other jurisdiction in which any Debtor has an interest in real or personal

property and, in such event, the subject filing or recording office is authorized to file or record

such certified copy of this Interim Order in accordance with applicable law.

13.     The Debtors and the Agent and the Lenders, as applicable, are authorized

to implement after the entry of this Interim Order, in accordance with the terms of the Financing

Agreements, any amendments to and modifications of any of the Financing Agreements without

further order of the Court on the following conditions: (1) the amendment or modification does

not constitute a material change to the terms of the Financing Agreements (and, for purposes of

this Order, a "material change" shall mean a change that operates to (i) increase the rate of

interest other than as currently provided in the Financing Agreements, (ii) add specific additional

events of default, (iii) increases the aggregate amount of the commitments or (iv) enlarges the

nature and extent of default remedies available to the Agent following an event of default), and

(2) copies of the amendment or modification must be served upon counsel for the Committee, if

any, counsel for Arcus and the U.S. Trustee.  Any amendment or modification that constitutes a

material change, to be effective, must be approved by the Court.

14.     The Debtors are authorized to perform all acts, and execute and comply

with the terms of such other documents, instruments and agreements, in addition to the above

Financing Agreements, as the Agent or the Lenders, as applicable, may reasonably require as

evidence of and for the protection of the Revolving Credit, the Collateral, or which may be

otherwise deemed necessary by the Agent or any Lenders, as applicable, to effectuate the terms

and conditions of this Interim Order and the Financing Agreements, each of such documents,

instruments, and agreements executed and delivered to Lender being included in the definition of "Financing Agreements" contained herein.

15.    The Debtors are authorized to (a) continue the existing Blocked Account Agreements and arrangements in favor of the Agent, and to enter into similar arrangements with such other banks as are designated for such purposes pursuant to the DIP Revolving Credit Agreement (the "Blocked Accounts"); (b) deposit or caused to be deposited, or to remit, in kind, immediately to the Agent, all monies, checks, credit card sales drafts, credit card sales or charge slips or receipts, or other forms of store receipts, drafts and any other payments or proceeds of Collateral received from account debtors and other parties, now or hereafter obligated to pay for inventory or other property of any Debtors' estates into the Blocked Accounts established by the Agent for the benefit of the Lenders; (c) instruct all parties now or hereafter in possession of monies, claims or other payments for the account of any Debtors or other property of any Debtors' estate in which the Agent or any Lender has a security interest or lien to remit such payments to the Blocked Accounts; and (d) to enter into such agreements as may be necessary to effectuate the foregoing.

16.    The Debtors are authorized, without further order of this Court, to pay or reimburse the Agent and the Lenders for all present and future reasonable costs and expenses, including reasonable professional fees and legal expenses paid or incurred by the Agent or any Lender to effectuate the financing transactions as provided in this Interim Order and the Financing Agreements, all of which are and shall be included as part of the principal amount of the Revolving Credit Obligations, and shall be secured by the Collateral.

17.     Except as it relates to the Agent or any Lender's rights under paragraph 23 below, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Agent and any Lender, as applicable, to implement the terms and conditions of the Financing Agreements and this Interim Order.

18.     As additional security for all of the Revolving Credit Obligations of the Debtors to the Agent and the Lenders, now existing or hereafter arising pursuant to this Interim Order, the Financing Agreements or otherwise, and in addition to the foregoing, the Agent is granted an allowed super-priority administrative claim in accordance with Section 364(c)(1) of the Bankruptcy Code having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors (except as provided in the Intercreditor Agreement), now in existence or hereafter incurred by any Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a) and 507(b) of the Bankruptcy Code, subject only to the fees of the Clerk of the Bankruptcy Court of New Jersey and the Office of the United States Trustee.

19.     The existence of "Carve Out Expenses" for "Allowed Professional Fees" and a "Professional Fee Carve Out" for "Professionals," and the terms and conditions under which such a carve out is available, as well as certain other matters, are governed by and more fully set forth and provided for in Sections 2.3 and 2.5 of that certain Interim Order dated of even date with this Order, approving a $25,000,000 post-petition debtor-in-possession term loan facility to the Debtors to be provided by Arcus.  As more fully set forth in that Order, the Professional Fee Carve-Out is not available and does not apply with respect to assets in which the Agent and the Lenders have or obtain a first priority lien and security interest, as more fully

described and set forth in the Intercreditor Agreement.  Other than with respect to the

Professional Fee Carve-Out as aforesaid, neither the Agent nor any Lender or the Collateral shall

be responsible for the payment or reimbursement of any fees or disbursements of any

Professionals incurred in connection with the Chapter 11 case or any succeeding case under the

Bankruptcy Code, and nothing in this paragraph shall be construed to obligate the Agent or any

Lender in any way, to pay compensation or expense reimbursement to Professionals or to assure

that the Debtors have sufficient funds on hand to pay such compensation or expense

reimbursement.  Except as provided for herein or in the Intercreditor Agreement, no other claim

shall be granted or allowed priority superior to or pari passu with the priority of the claims of the

Agent and the Lenders granted by this Interim Order in favor of them while any Obligation of

the Debtors to the Agent and/or the Lenders remains outstanding or, if there are no Revolving

Credit Obligations outstanding, loans or other extensions of credit remain available under the

DIP Revolving Credit Agreement.

20.    Except as expressly permitted under the DIP Revolving Credit Agreement,

the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the

Collateral without the prior written consent of the Agent (and no such consent shall be implied,

from any other action, inaction or acquiescence by the Agent or any Lender) except for sales of

Debtors' Inventory in the ordinary course of its business.

21.    Except with respect to the Professional Fee Carve-Out and fees and

expenses of the Clerk of the Court and the Office of the United States Trustee, upon entry of a

final order approving the DIP Revolving Credit Agreement and other Financing Agreements

provided for by this Interim Order, no costs or expenses of administration which have or may be

incurred in any Debtor's Chapter 11 case, any conversion of any Debtor's Chapter 11 case

pursuant to Section 1112 of the Bankruptcy Code, pursuant to Sections 105, 506(c) or Section

552(b) of the Bankruptcy Code, or otherwise, or in any future proceedings or cases related

thereto, shall be charged against the Agent or any Lender, their claims, or the Collateral, without

the prior written consent of the Agent and the affected Lender, and no such consent shall be

implied from any other action, inaction or acquiescence by the Agent and/or the Lenders, as

applicable, and no obligations incurred or payments or other transfers made by or on behalf of

any Debtor on account of the financing arrangements with the Agent and the Lenders shall be

avoidable or recoverable from the Agent or any Lender under Sections 547, 548, 550, 553, or

any other provision of the Bankruptcy Code.

22.    In the event of the occurrence of any of the following:  (a) the failure of

any Debtor to perform in any material respect any of its obligations pursuant to this Interim

Order, or (b) the occurrence of any "Event of Default" under the Financing Agreements,

including the failure to comply with or perform any of the terms and conditions of the DIP

Revolving Credit Agreement or the other Financing Agreements (the foregoing being referred to

in this Interim Order, individually, as an "Event of Default" and collectively, as "Events of

Default") then (unless such Event of Default is specifically waived in writing by the Agent/and

or other Lenders, as required by the DIP Revolving Credit Agreement, and which waiver shall

not be implied from any other action, inaction or acquiescence by any Agent or Lender ) and

upon or after the occurrence of any of the foregoing, and at all times thereafter, after giving three

(3) business days notice in writing, served by overnight delivery service or telecopy, to the

Debtors, the Debtors' counsel, counsel to the Committee, counsel to Arcus, the United States

Trustee and the Court: (i) all of the Revolving Credit Obligations shall become immediately due

and payable, (ii) the automatic stay provided for pursuant to Section 362 of the Bankruptcy Code

and any other restrictions on the enforcement by the Agent and the Lenders of their liens upon

and security interests in the Collateral (or any other rights under the Financing Agreements

granted to or for the benefit of the Agent and the Lenders or pursuant to this Interim Order) shall

be automatically vacated and modified without any further action being required, and (iii) the

Agent and/or the Lenders, as applicable, without further notice, hearing or approval of this Court,

shall be, and are hereby authorized, in their discretion, to take any and all actions or remedies

which they may deem appropriate to proceed against and realize upon the Collateral and any

other property of any or all of the Debtors' estates upon which the Agent or any Lender has been

or may hereafter be granted liens and security interests to obtain repayment of the Revolving

Credit Obligations.  The Agent and the Lenders shall have no obligation to lend or advance any

additional funds to any Debtor, or provide other financial accommodations to any Debtor, upon

or after the occurrence of an Event of Default.

23.    Upon the expiration of the Debtors' authority to borrow and obtain other

credit accommodations from the Agent and the Lenders, as applicable, pursuant to the terms of

the Interim Order, and after giving three (3) business days notice in writing sent by overnight

delivery service or telecopy, to the Debtors, the Debtors' counsel, counsel to the Committee,

counsel to Arcus, the United States Trustee and the Court, unless an Event of Default set forth in

Paragraph 22 above occurs sooner and the automatic stay has been lifted or modified, all of the

Revolving Credit Obligations shall immediately become due and payable, and the Agent and the

Lenders shall be automatically and completely relieved from the effect of any stay under Section

362 of the Bankruptcy Code or any other restriction on the enforcement of their liens upon and

security interests in the Collateral or any other rights granted to the Agent and the Lenders

pursuant to the terms and conditions of the Financing Agreements and this Interim Order, and the

Agent and the Lenders, as applicable, shall be and are hereby authorized, in their discretion, to

take any and all actions and remedies which they may deem appropriate and to proceed against

and realize upon the Collateral and any other property of the Debtors' estates.

24.     The Debtors shall not, without the consent of the Agent, enter into any

agreement to return any inventory to any of their creditors for application against any pre-

petition indebtedness under Section 546(h) of the Bankruptcy Code, or consent to any creditor

taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant

to Section 553(b)(1) of the Bankruptcy Code, or otherwise.

25.     In consideration of  the Agent and the Lenders making post-petition loans,

advances and providing other credit and financial accommodations to the Debtors pursuant to the

provisions of the Financing Agreements and this Interim Order, the Debtors, on behalf of

themselves and their successors and assigns, (collectively, the "Releasors"), but without

prejudice to the rights of the Committee and other parties in interest to assert claims on behalf of

the Debtors' estate as provided in paragraph 6, above, shall and do forever release, discharge and

acquit the Agent and each Lender, and each of their respective officers, directors, agents,

attorneys and predecessors-in-interest (collectively, the "Releasees") of and from any and all

claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness

and obligations, of every kind, nature and description, including, without limitation, any so-

called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have

against Releasees as of the date hereof, in respect of events that occurred on or prior to the date

hereof with respect to any Debtor, the Pre-Petition Debt, the Financing Agreements and any

Revolving Loans, Letters of Credit or other financial accommodations made by the Agent or any

Lender to any Debtors pursuant to the Financing Agreements.  In addition, upon the payment in

full, in cash of all Revolving Credit Obligations owed to Agent and the Lenders by the Debtors,

and termination of the rights and obligations arising under the Financing Agreements and this

Interim Order, the Agent and each Lender shall be released from any and all obligations,

liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection

with or related to the Financing Agreements and/or this Interim Order on terms and conditions

acceptable to the Agent and each Lender.

26.     Until all of the Revolving Credit Obligations shall have been indefeasibly

paid in full, in cash and satisfied, and without further order of the Court:  (a) except as provided

in the Intercreditor Agreement, no other party shall foreclose or otherwise seek to enforce any

lien or other right such other party may have in and to any property of any Debtors' estate upon

which the Agent or any Lender, as applicable, holds or asserts a lien or security interest; (b) upon

and after the occurrence of an Event of Default, and subject to the Agent being granted relief

from the automatic stay, the Agent, in its discretion, in connection with a liquidation of any of

the Collateral may (i) enter upon, occupy and use any real property, equipment, leasehold

interests, warehouse arrangements, trademarks, tradenames, copyrights, licenses, patents or any

other assets of any Debtor, which are owned by or subject to a lien of any third party and which

are used by any Debtor in its business, all without interference from the respective lessors,

licensors or other third parties for the purpose of conducting liquidation sales of any Debtors'

assets and properties, provided, that, except as otherwise provided in the Intercreditor Agreement

or as otherwise provided in any agreement which the Agent or any Lender maintains with any of

the following named type of third parties, the Lenders shall be responsible for the payment of the

monthly rent and/or other charges (taxes, insurance, common area charges and utilities), rentals

or royalties due such lessor or licensor solely for the period of time that the Agent actually

occupies or uses the leased premises, the leased equipment or the intellectual property.

27.    All post-petition Revolving Loans and Letters of Credit under the DIP

Revolving Credit Agreement are made in reliance on this Interim Order, and there shall not at

any time be entered in any Debtor's Chapter 11 case any order which (a) authorizes the use of

cash collateral of any Debtor in which the Agent or any Lender has an interest, or the sale, lease,

or other disposition of property of any Debtor's estate in which the Agent or any Lender has a

lien or security interest, or (b) authorizes the obtaining of credit or the incurring of indebtedness

under Section 364 of the Bankruptcy Code secured by a lien or security interest which is equal or

senior to a lien or security interest in property in which the Agent or any Lender, as applicable,

holds a lien or security interest, or which is entitled to priority administrative claim status which

is equal or superior to that granted to the Agent and the Lenders herein, unless, in each instance

(i) the Agent or the Lenders, as applicable, shall have given its or their express prior written

consent thereto[1], no such consent being implied from any other action, inaction or acquiescence

by the Agent or any Lender, or (ii) such other order requires that the Revolving Credit

Obligations, without limitation, shall first be indefeasibly paid in full, in cash, including all debts

and obligations of the Debtors to the Agent and the Lenders which arise or result from the

obligations, loans, security interests and liens authorized herein.  The security interests and liens

granted to or for the benefit of the Agent and the Lenders hereunder and the rights of the Agent

and the Lenders pursuant to this Interim Order with respect to the Revolving Credit Obligations

---

[1]  Matters pertaining to the consent, agreement or other similar matters as referred to in this Interim Order are, as between the Agent and the Lenders, governed by the provisions of the DIP Revolving Credit Agreement as to matters which require the consent or agreement, as applicable, of the Agent, all of the Lenders or "Required Lenders," and the provisions of the DIP Revolving Credit Agreement as among the Lenders and the Debtors shall govern in that regard.

and the Collateral are cumulative, and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of any Debtor and, in the event the Agent and each Lender, as applicable, shall, in their sole discretion, expressly consent in writing that the Revolving Credit Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

28.     To the fullest extent permitted by applicable law, the provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) converting any Debtor's Chapter 11 case to a Chapter 7 case, (b) confirming or consummating any plan of reorganization of any Debtor or (c) dismissing any Debtor's Chapter 11 case or any subsequent Chapter 7 case pursuant to Sections 303, 305 or 1112 of the Bankruptcy Code, and the terms and provisions of this Interim Order, as well as the priorities in payment, liens, and security interests granted pursuant to this Interim Order and the Financing Agreements shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Interim Order until all Revolving Credit Obligations are indefeasibly paid in full, in cash and satisfied; provided, that, all obligations and duties of the Agent and the Lenders hereunder, under the Financing Agreements or otherwise with respect to any future loans and advances or otherwise shall terminate immediately upon the earlier of the date of any termination date provided in the DIP Revolving Credit Agreement, the occurrence of any Event of Default or the date that a plan of reorganization of any Debtors becomes effective, unless the Agent and the Lenders have given their express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by the Agent and the Lenders.

29.    The provisions of this Interim Order shall inure to the benefit of the

Debtors, the Agent and each Lender, shall be binding upon the Debtors, the Agent and each

Lender and their respective successors and assigns, including any trustee, examiner or other

fiduciary hereafter appointed as a legal representative of any Debtor or with respect to property

of the estate of any Debtor, whether under Chapter 11 of the Bankruptcy Code or any subsequent

Chapter 7 case, and shall also be binding upon all creditors of the Debtors and other parties in

interest.

30.    The provisions of this Interim Order shall be effective immediately upon

entry of this Interim Order pursuant to Bankruptcy Rules 6004(h) and 7062 by the Court, and

any actions taken pursuant thereto shall survive entry of, and shall govern with respect to any

conflict with, any Order which may entered confirming any plan of reorganization, dismissing

the Chapter 11 Case pursuant to Sections 303, 305 or 1112 of the Bankruptcy Code, or

converting the Chapter 11 Case from Chapter 11 to Chapter 7, and the terms and provisions of

this Interim Order as well as the priorities in payment, liens, and security interests granted

pursuant to this Interim Order and the Financing Agreements shall continue in this or any

superseding case under the Bankruptcy Code, and such priorities in payment, liens and security

interests shall maintain their priority as provided by this Interim Order until all Revolving Credit

Obligations are indefeasibly paid in full, in cash and satisfied; provided, that, all obligations and

duties of the Agent and the Lenders hereunder, under the Financing Agreements or otherwise

with respect to any future loans and advances or otherwise shall terminate immediately upon the

earlier of the date of any termination date provided in the DIP Revolving Credit Agreement, the

occurrence of any Event of Default, or the date that a plan of reorganization of any Debtors

becomes effective unless the Agent and each Lender, as applicable, has given its express prior

written consent thereto, no such consent being implied from any other action, inaction or

acquiescence by the Agent or any Lender.

31.    The Debtors irrevocably waive any right to seek any modifications or

extensions of this Interim Order without the prior written consent of the Agent and the Lenders,

as applicable, and no such consent shall be implied by any other action, inaction or acquiescence

by the Agent or any Lender.

32.    To the extent the terms and conditions of the Financing Agreements are in

direct conflict with the terms and conditions of this Interim Order, the terms and conditions of

this Interim Order shall control.

33.    The terms of the financing arrangements between the Debtors, the Agent

and each Lender have been negotiated in good faith and at arms' length between Debtors, the

Agent and each Lender, and any loans, advances or other financial and credit accommodations

which are made or caused to be made to any Debtors pursuant to the Financing Agreements are

deemed to have been extended in good faith, as the term "good faith" is used in Sections 363(m)

and 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e)

of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated,

reversed or modified, on appeal or otherwise.

34.    This matter is set for a final hearing on _____ o'clock on April ___,

2008 ("Final Hearing"), at _____, at which time any party-in-

interest may appear and state its objections, if any, to the financing arrangements between the

Agent, the Lenders and the Debtors in accordance with the Financing Agreements and this

Interim Order.  The following parties shall immediately, but in no event later than March ___,

2008, be mailed copies of this Interim Order or such written summary of this Interim Order as the Court may approve:  (a) the Office of the United States Trustee, (b) the Agent and its attorneys, (c) all creditors known to the Debtors who may have liens against any of the Debtors' assets, (d) the Debtors' twenty (20) largest unsecured creditors, (e) Arcus and its attorneys, (f) the United States Internal Revenue Service, (g) all landlords, owners, operators and/or mortgagors of the premises at which any Debtors' inventory or equipment is located, (h) all equipment lessors of the Debtors, (i) all licensors of any intellectual property to any Debtor, (j) the state taxing authorities, (k) all utilities providing services to any Debtors and (l) all parties in interest that have filed notices of appearance in this Chapter 11 case.  Objections shall be in writing and shall be filed with the Clerk of the Bankruptcy Court, with a copy served upon; Cozen O'Conner, Chase Manhattan Centre, 1201 North Market Street, Suite 1400, Wilmington, DE 19801, Attention: Mark E. Felger, Esquire and Stradley, Ronon, Stevens and Young, LLP, 2600 One Commerce Square, Philadelphia, PA  19103, Attention: Paul A. Patterson, Esquire, so that such objections are received on or before the close of business _____, 2008. Except as otherwise provided in this paragraph, the terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors and all other parties-in-interest from and after the date of the entry of this Interim Order by this Court.  In the event this Court modifies any of the provisions of this Interim Order and the Financing Agreements following such further hearing, such modifications shall not affect the rights and priorities of the Agent and the Lenders pursuant to this Interim Order with respect to the Collateral, and any portion of the Revolving Credit Obligations which arises or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

35.     Notwithstanding anything to the contrary contained in this Interim Order, the rights and obligations of Arcus (for itself and its agent for other lenders) and the Agent (for itself and the other Lenders) to one another, and with respect to the Collateral (as defined in the Intercreditor Agreement), are subject to the terms of the Intercreditor Agreement among each of the foregoing agents and lenders.  With respect to such rights and obligations, and with respect to the Collateral (as defined in the Intercreditor Agreement), in the event of a conflict between the terms and provisions of the Intercreditor Agreement and this Interim Order, the terms and provisions of the Intercreditor Agreement shall govern and control.  Pursuant to the Intercreditor Agreement, each of The CIT Group/Business Credit, Inc. and Arcus, as agent for itself and lenders for which it acts as agent, has consented to the liens on its security interest in the Collateral of the other agent, for the benefit of itself and the lenders for which it acts as agent, and the priority of such liens and security interests, all as more fully defined, described and set forth in the Intercreditor Agreement.


Dated:  March ___, 2008                    _____

                                           UNITED STATES BANKRUPTCY JUDGE

**EXECUTION COPY**

**DEBTOR IN POSSESSION REVOLVING CREDIT
FINANCING AGREEMENT**

**The CIT Group/Business Credit, Inc.
(as Agent and a Lender),**

**the lenders party hereto from time to time
(as Lenders),**

**and**

**Shapes/Arch Holdings L.L.C.
Shapes L.L.C.,
Delair L.L.C.,
Ultra L.L.C.
and
Accu-Weld L.L.C.
(the Companies which are borrowers and debtors in possession hereunder)**

**Dated:  March     , 2008**

B # 761460 v.5

## TABLE OF CONTENTS

Page

SECTION 1        Definitions ........................................................................................................1

SECTION 2        Conditions Precedent ........................................................................................17

SECTION 3        Revolving Loans ...............................................................................................21

SECTION 4        Superpriority Claims, Etc..................................................................................25

SECTION 5        Letters of Credit ...............................................................................................27

SECTION 6        Collateral...........................................................................................................29

SECTION 7        Representations, Warranties and Covenants .....................................................31

SECTION 8        Interest.  Fees and Expenses .............................................................................39

SECTION 9        Powers...............................................................................................................44

SECTION 10       Events of Default and Remedies .......................................................................45

SECTION 11       Termination .......................................................................................................49

SECTION 12       Miscellaneous ...................................................................................................49

SECTION 13       Agreement between the Lenders........................................................................52

SECTION 14       Agency...............................................................................................................54

EXHIBIT

    Exhibit A - Form of Revolving Loan Promissory Note
    Exhibit B - Form of Assignment and Transfer Agreement

SCHEDULES

    Schedule IP - Permitted Indebtedness
    Schedule 1R - Real Estate
    Schedule 2.1(s) - Collateral Information
    Schedule 4.1 - Permitted Encumbrances
    Schedule 7.1 - Various Information

B # 761460 v.5

**THE CIT GROUP/BUSINESS CREDIT, INC.,** a New York corporation (hereinafter "**CIT**"), with offices located at 11 West 42nd Street, New York, New York 10036, as agent for the other lenders (the "**Agent**") and as a lender, and any other party which now or hereafter becomes a lender hereunder pursuant to Section 13 hereof (including CIT in its capacity as a lender hereunder, individually a "**Lender**" and collectively the "**Lenders**") are pleased to confirm on this ____ day of March, 2008 (the "**Effective Date**"), the terms and conditions under which the Agent shall make Revolving Loans and other financial accommodations to Shapes/Arch Holdings L.L.C., a New Jersey limited liability company ("**Shapes/Arch**"), with a principal place of business located at 9000 River Road, Delair, New Jersey 08110, Shapes L.L.C., a New Jersey limited liability company ("**Shapes**") with a principal place of business located at 9000 River Road, Delair, New Jersey 08110, Delair L.L.C., a New Jersey limited liability company ("**Delair**") with a principal place of business at 8600 River Road, Delair, New Jersey 08110, Ultra L.L.C., a New Jersey limited liability company ("**Ultra**") with a principal place of business at 1777 Hylton Road, Pennsauken, New Jersey 08110, and Accu-Weld L.L.C., a Pennsylvania limited liability company ("**Accu-Weld**") with a principal place of business at 1211 Ford Road, Bensalem, Pennsylvania 19020 (in this Financing Agreement, Shapes/Arch, Shapes, Delair, Ultra and Accu-Weld are sometimes referred to individually as a "**Company**" and are referred to collectively, jointly and severally as the "**Companies**").

## SECTION 1    Definitions

**Accounts** shall mean all of each of the Companies' now existing and future:  (a) accounts (as defined in the UCC), and any and all other receivables (whether or not specifically listed on schedules furnished to the Agent), including, without limitation, all accounts created by, or arising from, all of the Companies' sales, leases, rentals of goods or renditions of services to their customers, including but not limited to, those accounts arising under any of the Companies' trade names or styles, or through any of the Companies' divisions; (b) any and all instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing., including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant hereto; (f) guarantees, supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any and all of the foregoing (including all rights to payment, including any and all Intercompany Debt and other liabilities and those arising in connection with bank and non-bank credit cards), and including books and records and any electronic media and software thereto; (i) notes, deposits or property of account debtors securing the obligations of any such account debtors to the Companies; and (j) cash and non-cash proceeds (as defined in the UCC) of any and all of the foregoing.

**Agent's Fee Letter** shall mean the letter with respect to the payment of certain fees and reimbursement of certain costs which has been executed as of the Closing Date.

**Anniversary Date** shall mean the date occurring six (6) months from the Closing Date, as may be extended pursuant to Section 11 hereof.

**Arcus** shall mean and refer to Arcus ASI Funding, LLC, a Delaware limited liability company, its successors and assigns.

**Arcus Term Loan** shall mean the delayed draw term loan in the original principal amount of $25,000,000.00 extended to the Companies on the date of this Agreement, by Arcus, secured by liens and security interests against the Companies' tangible and intangible assets, (the priority of which relative to the liens and security interests granted to Agent and Lenders under this Financing Agreement are defined in the Intercreditor Agreement), pursuant to a term loan agreement, dated on or about the date hereof between the Companies and Arcus (the "**Arcus Term Loan Agreement**"), together with all other agreements, documents and instruments evidencing, securing and pertaining to the Arcus Term Loan (referred to collectively with the Arcus Term Loan Agreement as, the "**Arcus Term Loan Documents**").

**Assignment and Transfer Agreement** shall mean the Assignment and Transfer Agreement in the form of Exhibit B hereto.

**Availability** shall mean, at any time of calculation, the amount by which the Companies' Borrowing Base exceeds the outstanding aggregate amount of all Obligations with respect to the Revolving Loan, but excluding Letters of Credit.

**Availability Reserve** shall mean the sum of:  (a) (i) six (6) months rental payments or similar charges for leased premises or other Collateral locations in New Jersey, for which the Companies have not delivered to the Agent a landlord's waiver in form and substance reasonably satisfactory to the Agent, plus (ii) three (3) months rental payments or similar charges for leased premises or other Collateral locations in Pennsylvania and elsewhere, for which the Companies have not delivered to the Agent a landlord's waiver in form and substance reasonably satisfactory to the Agent plus (iii) six (6) months' estimated payments plus any other fees or charges owing by any Company to any applicable warehousemen or third party processor or other bailee (as determined by the Agent in its reasonable business judgment), provided that any of the foregoing amounts shall be adjusted from time to time hereafter upon (x) delivery to the Agent of any such acceptable waiver and/or access agreement executed by one or more applicable landlords or other bailees, (y) the opening or closing of a Collateral location and/or (z) any change in the amount of rental, storage or processor payments or similar charges; (b) in the event that the Agent determines that the Dilution Percentage with respect to the Accounts exceeds five percent (5%), a dilution reserve in the amount equal to such excess; (c) any other reserve which the Agent may reasonably require from time to time pursuant to this Financing Agreement, including without limitation, for Letters of Credit pursuant to Paragraph 5.1 of Section 5 hereof; (d) an amount equal to the notional credit risk or exposure with respect to Swaps of any Lender which holds an interest in the Loans hereunder; (e) the Periodic Swap Reserve (but only if and for so long as such Periodic Swap Reserve has not been paid); (f) such other reserves as the Agent deems necessary in its commercially reasonable judgment as a result of (x) negative forecasts and/or trends in any Company's business, industry, prospects, profits, operations or financial condition or (y) other issues, circumstances or facts that could otherwise negatively impact any Company, its business, prospects, profits, operations, industry, financial condition or assets; and (g) to the full amount of any of the Carve-Out, to the extent that it applies to or is in any way imposed upon Collateral upon which the Agent has a first priority lien or security interest.  Notwithstanding the foregoing, Availability Reserves shall be administered in a manner Consistent With Past Practices.

**Avoidance Action Recoveries** shall mean any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case under any or all of Sections 544, 547, 548, 549, 550, 551 and 553 of, and any other avoidance actions under, the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code, Section 724(a) of the Bankruptcy Code, or otherwise.

**Avoidance Actions** shall mean any and all actions in the Bankruptcy Case under any or all of Sections 544, 547, 548, 549, 550 and 553 of, and any other avoidance actions under, the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code, Section 724(a) of the Bankruptcy Code or otherwise.

**Bailee Agreement** shall mean a tri-party agreement in form and substance acceptable to the Agent and acknowledged and agreed to by the Companies, whereby a bailee of Inventory (whether warehouseman, customs broker, freight forwarder, consignee or the like) (i) acknowledges the Agent's security interest, (ii) agrees to act as the Agent's agent and/or at the direction of the Agent with respect to the possession and disposition of the Inventory in such Person's custody or control and, (iii) if required by the Agent, provides evidence reasonably satisfactory to the Agent in its discretion that, at all times, the Agent's security interest in and to such Inventory shall be a duly perfected, first-priority security interest, subject to no other Liens.

**Bankruptcy Case** shall mean, the cases under Chapter 11 of the Bankruptcy Code in which each Company is a debtor and debtor-in-possession, pending before the Bankruptcy Court.

**Bankruptcy Case Expenses** shall mean Agents' fees and expenses (including reasonable attorneys' fees) in connection with the Bankruptcy Case (including, without limitation, attorneys' fees and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code, any other action or participation by Agent in the Bankruptcy Case or any defense or participation by Agent in any actions involving Agent and/or any Lender).

**Bankruptcy Code** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as in effect from time to time.

B # 761460 v.5

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of New Jersey, or such other court having jurisdiction over the Bankruptcy Case.

**Borrower Representative** shall mean and refer to Shapes/Arch, in its capacity as such, as more fully defined in Section 12.6 of this Financing Agreement.

**Borrowing Base** shall mean at any time (determined by Agent in a manner Consistent With Past Practices), the sum of:

(a)        eighty-five percent (85%) of the Companies' aggregate outstanding Eligible Accounts Receivable, plus

(b)        the least of (i) sixty-five percent (65%) of the aggregate value of the Companies' Eligible Inventory, valued at the lower of cost or market, on a first in, first out basis, or (ii) eighty-five percent (85%) of the Net Orderly Liquidation Value of such Inventory, or (iii) the Inventory Loan Cap, plus

(c)        the lesser of (i) sixty-five percent (65%) of the aggregate value of Ultra's Eligible In-Transit Inventory, valued at the lower of cost or market, on a first in, first out basis, or (ii) eighty-five percent (85%) of the Net Orderly Liquidation Value of such Inventory or (iii) the In-Transit Inventory Loan Cap, less

(d)        all applicable Availability Reserves.

**Budget** shall mean the budget prepared in good faith based upon assumptions which the Companies believe to be reasonable setting forth, inter alia, a thirteen (13) week cash flow forecast in reasonable detail satisfactory to the Agent including receipts, disbursements and such line item detail as satisfactory to the Agent, as well as projected borrowings and availability under the Revolving Credit Agreement and the Term Loan Agreement for the thirteen weeks ended June 15, 2008, in the form attached to the Term Loan Agreement as Exhibit B (a true complete and correct copy of which has been provided by to the Agent prior to the date hereof), as updated weekly as contemplated by the Arcus Term Loan Documents, provided that within one business day following any such update thereof, a copy of the Budget, as so updated will be provided by the Companies to the Agent.

**Budget Compliance** shall mean that as of any time of analysis, (i) as of each week, for such week and the Cumulative Period, the actual cash receipts received by Companies shall not be less than 95% of the cash receipts for the corresponding period as set forth in the Budget, (ii) as of each week, for such week and the Cumulative Period, the actual cash disbursements of the Companies shall be no more than 5% more than the cash disbursements for the corresponding period as set forth in the Budget, and (iii) As of each week, for such week and the Cumulative Period, the actual Cumulative Cash Change (as defined in the Budget) of the Companies, shall not represent a consumption of cash greater than 105% of the Cumulative Cash Change for the corresponding period as set forth in the Budget.

**Business Day** shall mean any day on which the Agent, JPMorgan Chase Bank, and, in the case of settlements among the Lenders or the making of advances by the Lenders, the Lenders are open for business.

**Capital Expenditures** shall mean, for any period, the aggregate expenditures of the Companies during such period on account of property, plant, Equipment or similar fixed assets that, in conformity with GAAP, are required to be reflected in the balance sheet of the Companies.

**Capital Improvements** shall mean operating Equipment and facilities (other than land) acquired or installed for use in the Companies' business operations.

**Capital Lease** shall mean any lease of property (whether real, personal or mixed) which, in conformity with GAAP, is accounted for as a capital lease or a Capital Expenditure in the balance sheet of the Companies.

**Cargo Insurance** shall mean a policy or policies of insurance which (i) provide warehouse-to-warehouse coverage for all of the Companies' in-transit Inventory; (ii) insuring against loss and casualty, as a result of any and

all perils (including perils on the sea and of the sea) and misfortunes; (iii) include a marine extension clause; (iv) are for the full insured value of such Inventory (that is invoice cost, guaranteed freight, other costs, and insurance premiums, plus ten percent (10%)); (v) are issued by one or more insurance carriers which are acceptable to the Agent in its discretion, and (vi) name the Agent, for the benefit of the Lenders as a loss payee.

**Carve-Out** shall have the meaning given to the term "Carve-Out Expenses" in the Final Order or, prior to the entry of the Final Order, the Interim Financing Order provided, however, that in no case should the Carve-Out include any Ineligible Professional Expenses.

**Chase Bank Rate** shall mean the rate of interest per annum announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its principal office in New York City. (The prime rate is not intended to be the lowest rate of interest charged by JPMorgan Chase Bank to its borrowers).

**Chase Bank Rate Loans** shall mean any loans or advances pursuant to this Financing Agreement made or maintained at a rate of interest based upon the Chase Bank Rate.

**Chase Swap** shall mean that certain interest rate swap transaction entered into on or about July 13, 2005, among JPMorgan Chase Bank, National Association and the Companies, bearing reference numbers 200000005062058, 2000005062059/JR under that certain ISDA 2002 Master Agreement dated as of June 30, 2005 among JPMorgan Chase Bank, National Association and the Companies, which Chase Swap was terminated by the parties thereto as of January 31, 2008, resulting in a termination amount due to Chase Bank in the amount of $555,000 (the "**Termination Amount**"), of which the Swap Termination Balance remains due, owing and outstanding on the date of this Agreement.

**Closing Date** shall mean the date that this Financing Agreement has been duly executed by the parties hereto and delivered to the Agent and the initial Revolving Loan hereunder has been funded.

**Collateral** shall mean all present and future real and personal property of the Companies, including, without limitation, Accounts, Equipment, Inventory, Documents of Title, General Intangibles, Real Estate, pledged stock or membership interests of the Companies' subsidiaries and Other Collateral and the proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including, without limitation, hazard, flood, environmental and credit insurance and cargo insurance), negotiable instruments and other instruments for the payment of money (including without limitation all instruments evidencing Intercompany Debt), chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds, Avoidance Actions and Avoidance Action Recoveries and commercial tort claim proceeds;.

**Commitment** shall mean each Lender's commitment in accordance with this Financing Agreement to make Revolving Loans (the "**Revolving Credit Commitment**"), in the amount of their respective pro rata share set forth in schedules prepared by the Agent or the Assignment and Transfer Agreement executed by each such Lender.

**Consistent With Past Practices** shall mean actions taken or not taken, as applicable, in a manner consistent with Agent's past practices. A determination as to whether Agent is acting in a manner Consistent With Past Practices shall (i) take into account that the Companies are debtors and debtors-in-possession in the Bankruptcy Case, (ii) be subject to the occurrence of material changes in market conditions after the date hereof, beyond the control of Lenders, that adversely affect or negatively impact banks and commercial finance companies generally or that could reasonably be expected to cause a bank or commercial finance company to modify the manner in which it would evaluate and/or administrate a discretionary matter, and (iii) assume that the Companies, and the management and nature of the businesses thereof, are consistent with the Companies' past practices. Notwithstanding the foregoing, the parties acknowledge, understand and agree that Lenders shall have no obligation whatsoever or under any circumstances to provide any Overadvances or any other accommodations to the Companies, except as set forth herein.

**Consolidated Balance Sheet** shall mean a consolidated or compiled, as applicable, balance sheet for the Companies, eliminating all inter-company transactions and prepared in accordance with GAAP.

-4-

**Consolidating Balance Sheet** shall mean a Consolidated Balance Sheet plus individual balance sheets for each of the Companies, showing all eliminations of inter-company transactions, including a balance sheet for the Companies exclusively, all prepared in accordance with GAAP.

**Controlled Group** shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Company, are treated as a single employer under Section 414 of the Internal Revenue Code.

**Copyrights** shall mean all of each of the Companies' present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, goodwill, any and all general intangibles, intellectual property and rights pertaining thereto, and all cash and non-cash proceeds thereof.

**Creditors' Committee** shall mean the official committee of unsecured creditors appointed in the Case.

**Cumulative Period** shall mean the period from the Filing Date through the Friday of the most recent four-week period then ended or if a four-week period has not then elapsed from the Filing Date, such shorter period since the Filing Date through the Friday of the most recent week then ended.

**Current Assets** shall mean those assets of the Companies which, in accordance with GAAP, are classified as current.

**Current Liabilities** shall mean those liabilities of the Companies which, in accordance with GAAP, are classified as "current," provided however, that, notwithstanding GAAP, the Revolving Loans and the current portion of Permitted Indebtedness shall be considered "current liabilities."

**Default** shall mean any event specified in Section 10 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act, has been satisfied.

**Default Rate of Interest** shall mean a rate of interest per annum on any Obligations hereunder, equal to the sum of:  (a) two percent (2%) and (b) (i) the applicable increment over the Chase Bank Rate (as set forth in paragraph 8.1 hereof) plus the Chase Bank Rate, or (ii) the applicable increment over the LIBOR Rate (as set forth in paragraph 8.14 hereof) plus the LIBOR Rate, which the Agent shall be entitled to charge the Companies on all Obligations due the Agent on behalf of the Lenders, as further set forth in Paragraph 10.2 of Section 10 of this Financing Agreement.

**Depository Accounts** shall mean the collection accounts, which are subject to the Agent's instructions, as specified in Paragraph 3.4 of Section 3 of this Financing Agreement.

**Dilution Percentage** shall mean, as of the time of calculation, the sum of a Company's credits, claims, allowances, discounts, write-offs, contras, off-sets and any other decrease to Trade Accounts Receivable, divided by such Company's gross sales, all calculated on a rolling ninety (90) day average, as determined and calculated by the Agent from time to time.

**DIP Revolver Maturity Date** shall mean the earlier to occur or (a) the date of entry of an order confirming a plan of reorganization, or (b) the termination date set forth in the most recent Financing Order.

**Documentation Fee** shall mean (a) all reasonable fees and expenses incurred in connection with or by the Agent's external legal counsel in negotiating, documenting, preparing for and attending a closing with respect to this Financing Agreement, the Collateral, and/or the Obligations (all exclusive of Out-of-Pocket Expenses), plus (b) subsequent to the Closing Date, the reasonable fees of the Agent's legal counsel, whether or not in-house legal counsel, relating to any and all modifications, waivers, releases, amendments or additional collateral with respect to this Financing Agreement, the Collateral and/or the Obligations (all exclusive of Out-of-Pocket Expenses).

-5-

**Documents of Title** shall mean all of each of the Companies' present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or not and all goods and Inventory relating thereto and all cash and non-cash proceeds of the foregoing.

**Early Termination Date** shall mean the date on which the Companies terminate this Financing Agreement or the Revolving Line of Credit which date is prior to the Anniversary Date. Notice of termination as aforesaid, by a Manager of Borrower Representative on behalf of the Companies, shall be deemed to be notice by all of the Companies for the purposes hereof.

**EBITDA** shall mean, as of the date of determination, (a) consolidated net income of the Companies and their subsidiaries, if any, plus (b) to the extent included in the determination of net income, (i) the provision (less the benefit) for income Taxes, if any, plus (ii) interest expense (less interest income), if any, plus (iii) depreciation and amortization, if any, plus (iv) all provisions and expenses related to the Bankruptcy Case related to professionals, advisors or other costs incurred in connection with the preparation, negotiation and closing of the financing transactions under this Agreement, the Arcus Term Loan Agreement and any transactions related hereto or thereto, plus (v) all extraordinary losses (and minus any extraordinary gains) or unusual or non-recurring charges, if any, all prepared in accordance with GAAP consistently applied.

**Eligible Accounts Receivable** shall mean as to any Company the gross amount of such Company's Trade Accounts Receivable that are subject to a valid, exclusive, first priority and fully perfected security interest in favor of the Agent, on behalf of the Lenders, which conform to the warranties contained herein and which, at all times, continue to be acceptable to the Agent in the exercise of its reasonable business judgment, less, without duplication, the sum of (a) any returns, discounts, claims, credits and allowances of any nature (whether issued, owing, granted, claimed or outstanding), and (b) reserves for any such Trade Accounts Receivable that arise from or are subject to or include: (i) sales to the United States of America, any state or other governmental entity or to any agency, department or division thereof, except for any such sales as to which such Company has complied with the Assignment of Claims Act of 1940 or any other applicable statute, rules or regulation, to the Agent's satisfaction in the exercise of its reasonable business judgment; (ii) foreign sales, other than sales which otherwise comply with all of the other criteria for eligibility hereunder and are (x) secured by letters of credit (in form and substance satisfactory to the Agent) issued or confirmed by, and payable at, banks having a place of business in the United States of America, or (y) to customers residing in Canada or Puerto Rico; (iii) Accounts that remain unpaid more than ninety (90) days from invoice date, excepting only in the case of Delair, with respect to those of its customers which are granted dating terms and are acceptable to the Agent, invoices which are unpaid more than one hundred eighty days (180) days from invoice date and provided further that for such invoices as are unpaid more than one hundred fifty days (150) days from invoice date not more than an aggregate of One Million Eight Hundred Thousand Dollars ($1,800,000.00) of such invoices shall be included as Eligible; (iv) contra accounts; (v) sales to any other Company, any subsidiary, or to any Persons affiliated with the Companies in any way; (vi) bill and hold (deferred shipment) or consignment sales; (vii) sales to any customer which is: (A) insolvent, (B) the debtor in any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceedings under any federal or state law, (C) negotiating, or has called a meeting of its creditors for purposes of negotiating, a compromise of its debts, or (D) financially unacceptable to the Agent or has a credit rating unacceptable to the Agent; (viii) all sales to any customer if fifty percent (50%) or more of the aggregate dollar amount of all outstanding invoices to such customer are unpaid more than ninety (90) days from invoice date or in the case of Delair with respect to those of its customers which are granted dating terms and are acceptable to the Agent, one hundred eighty (180) days; (ix) pre-billed receivables and receivables arising from progress billing; (x) an amount (without duplication of those items included in calculating the Dilution Percentage) representing, historically, returns, discounts, claims, credits, allowances and applicable terms; (xi) sales not payable in United States currency; (xii) sales on a C.O.D. basis or paid by credit card; and (xiii) any other reasons deemed necessary by the Agent in its reasonable business judgment, including without limitation those which are customary either in the commercial finance industry or in the lending practices of the Agent and/or the Lenders.

**Eligible In-Transit Inventory** shall mean Inventory of Ultra that otherwise meets all requirements of Eligible Inventory except that it is Inventory (i) which is in transit from a foreign port to a port located in the United States or is in the possession of a customs broker or other bailee in the United States; (ii) for which title has passed to Ultra or, if required by the Agent, to the Agent, (iii) which is insured to the full value thereof by the Cargo

Insurance, and (iv) for which the Agent shall have in its possession (a) all negotiable bills of lading issued in a format acceptable to the Agent or Issuing Bank and properly endorsed and delivered to the Agent or Issuing Bank in connection with Issuing Bank's issuance of a documentary Letter of Credit for the benefit of the supplier of such Inventory, and (b) all non-negotiable (straight consignment) bills of lading consigned to Ultra and designating Ultra as the "importer of record" for all transactions not backed by a documentary letter of credit.  Provided further, at Agent's option, the Agent need not be in physical possession of the original of non-negotiable bills of lading, provided the Agent has received a true and complete copy of each non-negotiable bill of lading and all originals thereof have been delivered to and shall be held by a Person acceptable to the Agent in all respects, which or who shall have entered into Bailee Agreement.

**Eligible Inventory** shall mean as to any Company the gross amount of such Company's Inventory that is subject to a valid, exclusive, first priority and fully perfected security interest in favor of the Agent, on behalf of the Lenders, and which conforms to the warranties contained herein and which, at all times, continues to be acceptable to the Agent in the exercise of its reasonable business judgment, less, without duplication, any (a) supplies (other than raw materials), (b) Inventory not present in the United States of America or Puerto Rico, (c) Inventory returned or rejected by such Company's customers (other than goods that are undamaged and resalable in the normal course of business) and goods to be returned to such Company's suppliers, (d) Inventory in transit to third parties (other than the Company's agents or warehouses), or in the possession of a warehouseman, bailee, third party processor, or other third party, unless such warehouseman, bailee or third party has executed a notice of security interest agreement (in form and substance satisfactory to the Agent) and the Agent shall have a first priority perfected security interest in such Inventory, and (e) reserves required by the Agent in its reasonable discretion, including without limitation for special order goods, discontinued, slow-moving and obsolete Inventory, market value declines, bill and hold (deferred shipment), consignment sales, shrinkage and any applicable customs, freight, duties and Taxes.

**Equipment** shall mean all of each of the Companies' present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto and all proceeds thereof of whatever sort.

**ERISA** shall mean the Employee Retirement Income Security Act or 1974, as amended from time to time and the rules and regulations promulgated thereunder from time to time.

**Eurocurrency Reserve Requirements** for any day, as applied to a LIBOR Loan, shall mean the aggregate (without duplication) of the maximum rates of reserve requirements (expressed as a decimal fraction) in effect with respect to the Agent and/or any present or future Lender or participant on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under Regulation D or any other applicable regulations of the Board of Governors of the Federal Reserve System or other governmental authority having jurisdiction with respect thereto, as now and from time to time in effect, dealing with reserve requirement., prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by the Agent and/or any such Lenders or participants (such rate to be adjusted to the nearest one sixteenth of one percent (1/16 of 1%) or, if there is not a nearest one sixteenth of one percent (1/16 of 1%), to the next higher one sixteenth of one percent (1/16 of 1%)).

**Existing Financing Agreements** shall mean that certain Financing Agreement among the Companies, Agent and Lenders, dated December 30, 2003, as amended, pursuant to which the Companies have heretofore received financial accommodations including revolving loans, term loans and letter of credit guarantees in an amount of up to $75,680,000, and all related documents, instruments supporting obligations and agreements, contemplated thereby, as any or all of the foregoing have been amended, modified, supplemented or extended from time to time.

**Event(s) of Default** shall have the meaning provided for in Section 10 of this Financing Agreement.

**Financing Order(s)** shall mean, as applicable, an order (whether the Interim Order or the Final Order) entered in the Bankruptcy Case, from time to time, in form and substance satisfactory to the Agent, authorizing the Companies to obtain the financing contemplated by and described in this Agreement.

B # 761460 v.5

**Filing Date** shall mean March 16, 2008.

**Final Order** shall mean a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a final hearing, in form and substance satisfactory to the Agent and the Lenders.  The Final Order shall include, without limitation, provisions that have:

(a)      authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Revolving Line of Credit;

(b)      granted the claim and lien status and liens described in Sections 4 and 6, and prohibited the granting of additional liens on the assets of Companies, other than Permitted Encumbrances;

(c)      provided that such liens are automatically perfected by the entry of the Final Order and also granted to the Agent for the benefit of the Agent and the Lenders;

(d)      granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and ensure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(e)      provided that no Person will be permitted to surcharge the collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(f)      provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 10.2;

(g)      provided that the Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated;

(h)      found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made and done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(i)      providing for repayment in full, in cash of all obligations owing to the Lenders as pre-petition lenders under the Existing Financing Agreements of all sums due and owing to them, the refinancing of which shall constitute Obligations owing under this Financing Agreement.

**Fiscal Quarter** shall mean, with respect to the Companies, each three (3) month period ending on March 31, June 30, September 30, and December 31 of each Fiscal Year.

**Fiscal Year** shall mean each twelve (12) month period commencing on January 1 of each year and ending on the following December 31.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply, provided that in the event Shapes/Arch or the Companies modify their accounting principles and procedures as applied as of the Closing Date, the Companies shall provide to the Agent and the Lenders such statements of reconciliation as shall be in form and substance) acceptable to the Agent.

**General Intangibles** shall mean all of each of the Companies' present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to:  (a) all Trademarks, corporate names, business names, and any other designs or sources of

business identities, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) inventions, (g) all applications with respect to the foregoing, (h) all right, title and interest in and to any and all extensions and renewals, (i) all goodwill with respect to any of the foregoing, (j) any other forms of similar intellectual property, (k) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, together with all monies and claims for monies now or hereafter due and payable in connection with any of the foregoing or otherwise, (1) all choses in action, causes of action, corporate and business records, and (m) all cash and non-cash proceeds thereof including, without limitation, the proceeds or royalties of any licensing agreements between the Companies and any licensee of any of the Companies' General Intangibles.

**Guaranties** shall mean the guaranty documents executed and delivered by the Guarantors guaranteeing the Obligations.

**Guarantors** shall mean each of the Companies as cross-corporate guarantors and any other Person who shall agree to be a guarantor or surety for the Obligations.

**Indebtedness** shall mean, without duplication, all liabilities, contingent or otherwise, which are any of the following:  (a) obligations in respect of borrowed money or for the deferred purchase price of property, services or assets, other than Inventory, or (b) Capital Lease obligations.

**Ineligible Professional Expenses** shall mean fees or expenses incurred by Person, including the Creditors' Committee, in (a) preventing, hindering or delaying Agent's or Lenders' enforcement or realization upon any of the Collateral once an Event of Default has been declared by the Agent, (b) applying for or consummating use of cash collateral or sell any Collateral without Agent's prior written consent (except to the extent permitted by this Agreement), (c) incurring Indebtedness without Agent's prior written consent (except to the extent permitted by this Agreement), (d) any action which contravenes a right or protection of Agent and Lenders under the Loan Documents, and (e) objecting to or consenting in any manner, or in raising any defenses to, the validity, extent, perfection, priority or enforceability of the Obligations or any liens or claims with respect thereto, or any other rights or interests of Agent and Lenders, or in asserting any claims, causes of action or equitable subordination claims against Agent or Lenders and, (f) any other fees and expenses excluded by virtue of the applicable Financing Order.

**Insurance Proceeds** shall mean proceeds or payments from an insurance carrier with respect to any loss, casualty or damage to Collateral.

**Intercompany Debt** shall mean all Indebtedness outstanding from any one of the Companies to any other of the Companies.

**Intercreditor Agreement** shall mean that certain Intercreditor Agreement dated the date of the Closing Date, between the Agent, the Companies and Arcus, in form and substance satisfactory to the Agent in its sole discretion.

**Interest Period** shall mean:

(a)    with respect to any initial request by any of the Companies for a LIBOR Loan, a one month, two month, or three month period commencing on the borrowing or conversion date with respect to a LIBOR Loan and ending one, two, or three months thereafter, as applicable; and

(b)    thereafter with respect to any continuation of, or conversion to, a LIBOR Loan, at the option of any of the Companies, any one month, two month, or three month period commencing on the last day of the immediately preceding Interest Period applicable to such LIBOR Loan and ending one, two, or three months thereafter, as applicable;

provided that, the foregoing provisions relating to Interest Periods are subject to the following:

(i)       if any Interest Period would otherwise end on a day which is not a Working Day, that Interest Period shall be extended to the next succeeding Working Day, unless the result of such extension would extend such payment into another calendar month in which event such Interest Period shall end on the immediately preceding Working Day;

(ii)      any Interest Period that begins on the last Working Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month, at the end of such Interest Period) shall end on the last Working Day of a calendar month; and

(iii)     for purposes of determining the availability of Interest Periods, such Interest Periods shall be deemed available if (x) JPMorgan Chase Bank quotes an applicable rate or the Agent determines LIBOR, as provided in the definition of LIBOR, (y) the LIBOR determined by JPMorgan Chase Bank or the Agent will adequately and fairly reflect the cost of maintaining or funding its loans bearing interest at LIBOR, for such Interest Period, and (z) such Interest Period will end on or before the Anniversary Date.  If a requested Interest Period shall be unavailable in accordance with the foregoing sentence, the Companies shall continue to pay interest on the Obligations at the applicable per annum rate based upon the Chase Bank Rate.

**Interim Financing Order** means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a preliminary hearing under Rule 4001 of the Bankruptcy Code, in form and substance satisfactory to Agent and the Lenders.  The Interim Financing Order shall include, without limitation, provisions that have:

(a)       authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Revolving Line of Credit.

(b)       granted the claim and lien status and liens described in Sections 4 and 6, and prohibited the granting of additional liens on the assets of the Companies other than Permitted Encumbrances.

(c)       provided that such liens are automatically perfected by the entry of the Interim Financing Order and also granted to the Agent for the benefit of the Lenders.

(d)       granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its liens upon the Collateral as a matter of non-bankruptcy law.

(e)       provided that no Person, effective as of entry of the Final Order or any extension of the Interim Financing Order, will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.

(f)       provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 11.2.

(g)       provided that the Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated.

(h)       found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made or done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(i)       approving a repayment in full, in cash of all obligations owing to the Lenders as pre-petition lenders under the Existing Financing Agreements of all sums due and owing to them, the refinancing of which shall constitute Obligations owing under this Financing Agreement.

-10-

**In-Transit Inventory Loan Cap** shall mean the amount of Two Million Dollars ($2,000,000.00) which may be outstanding with respect to Eligible In-Transit Inventory owned by Ultra.

**Inventory** shall mean all of each of the Companies' present and hereafter acquired inventory (as defined in the UCC) and including, without limitation, all merchandise, inventory and goods, and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging or shipping same in all stages of production from raw materials through work-in-process to finished goods and all proceeds thereof of whatever sort.

**Inventory Loan Cap** shall mean the amount which, in the aggregate as to all Companies, is the lesser of (a) Thirty Million Dollars ($30,000,000.00), or (b)(i) during the six-month period commencing April 1 and continuing through September 30 the amount which is one hundred percent (100%) of aggregate availability with respect to the Companies' Eligible Accounts and (ii) during each six-month period commencing October 1 and continuing through March 31 the amount which is one hundred twenty-five percent (125%) of aggregate availability with respect to the Companies' Eligible Accounts, which in the case of each of (i) and (ii) shall be calculated in accordance with clause (a) of the definition of the Borrowing Base.

**Investment Property** shall mean all now owned and hereafter acquired investment property (as defined in the UCC) and all proceeds thereof.

**Issuing Bank** shall mean the bank issuing Letters of Credit for the Companies.

**Letters of Credit** shall mean all letters of credit issued with the assistance of the Agent on behalf of the Lenders in accordance with Section 5 hereof by the Issuing Bank for or on behalf of the Companies including, for purposes of clarification, any letter(s) of credit which were issued under the Existing Financing Agreements and remain outstanding.

**Letter of Credit Guaranty** shall mean the guaranty delivered by the Agent, on behalf of the Lenders, to the Issuing Bank of the Companies' reimbursement obligations under the Issuing Bank's reimbursement agreement, application for Letter of Credit or other like document.

**Letter of Credit Guaranty Fee** shall mean the fee the Agent, on behalf of the Lenders, may charge the Companies under Paragraph 8.3 of Section 8 of this Financing Agreement for (a) issuing a Letter of Credit Guaranty, and/or (b) otherwise aiding the Companies in obtaining Letters of Credit, all pursuant to Section 5 hereof.

**Letter of Credit Sub-Line** shall mean the commitment of the Lenders to assist the Companies in obtaining Letters of Credit, pursuant to Section 5 hereof in an aggregate amount of up to Eight Million Dollars ($8,000,000.00) with respect to documentary letters of credit issued for the purchase of imported Inventory and with respect to stand-by Letters of Credit issued for the Companies' business purposes unrelated to the purchase of Inventory.

**LIBOR** shall mean, at any time of determination, and subject to availability, for each applicable Interest Period, a variable rate of interest equal to:  (a) at CIT's election (i) the rate set forth in the New York edition of The Wall Street Journal under the "Money Rates" section for "London Interbank Offered Rates," (ii) the applicable LIBOR quoted to CIT by JPMorgan Chase Bank (or any successor thereof), or (iii) the rate of interest determined by CIT at which deposits in U.S. dollars are offered for the relevant Interest Period based on information presented on Telerate Systems at Page 3750 as of 11:00 A.M. (London time) on the day which is two (2) Business Days prior to the first day of such Interest Period, provided that, if at least two such offered rates appear on the Telerate Page 3750 (or any successor thereof) in respect of such Interest Period, the arithmetic mean of all such rates (as determined by CIT) will be the rate used; divided by (b) a number equal to 1.0 minus the aggregate (but without duplication) of the rates (expressed as a decimal fraction) of Eurocurrency Reserve Requirements in effect on the day which is two (2) Business Days prior to the beginning of such Interest Period.

**LIBOR Lending Office** with respect to the Agent, shall mean the office of JPMorgan Chase Bank, or any successor thereof maintained at 270 Park Avenue, New York, NY 10017.

B # 761460 v.5

**LIBOR Loan** shall mean any loans made pursuant to this Financing Agreement which are made or maintained at a rate of interest based upon LIBOR, provided, however, that the Agent shall have no obligation to permit the Companies to elect interest based upon LIBOR in the event that (i) an Event of Default has occurred hereunder, which has not been Waived In Writing By Agent, and (ii) the LIBOR Loan Interest Period requested would end subsequent to the Anniversary Date or any applicable Early Termination Date.

**Line of Credit** shall mean the aggregate commitment of the Lenders to (a) make Revolving Loans pursuant to Section 3 of this Financing Agreement and (b) assist the Companies in opening Letters of Credit and providing the Letter of Credit Guarantees therefor, pursuant to Section 5 of this Financing Agreement, in the aggregate amount equal to Sixty Million Dollars ($60,000,000.00); provided that nothing herein shall be deemed to increase any Lender's commitment hereunder, and which commitment shall be set forth in the applicable schedules maintained by the Agent or the Assignment and Transfer Agreements executed by such Lender.

**Line of Credit Fee** shall:  (a) mean the fee due the Agent for the benefit of the Lenders at the end of each month for the Line of Credit, and (b) be determined by multiplying the difference between (i) the Revolving Line of Credit, and (ii) the sum, for said month, of (x) the average daily balance of Revolving Loans plus (y) the average daily balance of Letters of Credit outstanding for said month, by one quarter of one percent (0.25%) per annum for the number of days in said month.

**Loan Documents** shall mean this Financing Agreement, the Financing Orders, the Promissory Note, the Mortgages, the other closing documents and any other ancillary loan and security agreements executed from time to time in connection with this Financing Agreement, all as may be renewed, amended, extended, increased, restated or supplemented from time to time.

**Mortgages** shall mean, collectively, (i) that certain Open-End Mortgage and Security Agreement dated December 30, 2003, from Accu-Weld in favor of Agent, recorded on January 23, 2004, at Book 3820, page 1879 et seq., in the Bucks County (Pennsylvania) Recorder's Office, encumbering the Real Estate located at 1211 Ford Road, Bensalem, Pennsylvania (the "**Bensalem Property**"), as amended by that certain Mortgage Modification Agreement dated June 30, 2005, between Accu-Weld and Agent, recorded on August 3, 2005, at Book 4561, page 1204 et seq., in the Bucks County (Pennsylvania) Recorder's Office, (ii) that certain Mortgage and Security Agreement dated December 30, 2003, from Shapes in favor of Agent, recorded on February 20, 2004, at Mortgage Book 07369, page 0056 et seq., and re-recorded on July 13, 2004, at Mortgage Book 07511, page 0609 et seq., in the Camden County (New Jersey) Clerk's Office, encumbering the Real Estate located at (A) 8600/9000 River Road, Delair, New Jersey (the "**Delair Property**") and (B) 1777 Hylton Road, Pennsauken, New Jersey (the "**Pennsauken Property**"), as amended by that certain Mortgage Modification Agreement dated June 30, 2005, between Shapes and Agent, recorded on July 27, 2005, at Mortgage Book 07897, page 1147 et seq., in the Camden County (New Jersey) Clerk's Office, (iii) that certain Assignment of Leases, Rents and Profits dated December 30, 2003, from Accu-Weld in favor of Agent, recorded on January 23, 2004, at Book 3820, page 1926 et seq., with respect to the Bensalem Property, as amended by that certain Modification of Assignment of Leases, Rents and Profits dated June 30, 2005, between Accu-Weld and Agent, recorded on August 3, 2005, at Book 4561, page 1213 et seq., in the Bucks County (Pennsylvania) Recorder's Office, and (iv) that certain Assignment of Leases, Rents and Profits dated December 30, 2003, from Shapes in favor of Agent, recorded on February 20, 2004, at Book 07369, page 0102 et seq., with respect to the Delair Property and the Pennsauken Property, as amended by that certain Modification of Assignment of Leases, Rents and Profits dated June 30, 2005, between Shapes and Agent, recorded on July 27, 2005, in the Camden County (New Jersey) Clerk's Office, as each of the same may be further modified by those certain modifications or amendments between the parties thereto dated as of the date hereof, as the same may hereafter be further amended, modified, restated, replaced and/or supplemented from time to time.

**Net Orderly Liquidation Value** shall mean the value of the Companies' Inventory in an orderly liquidation, after giving effect to all fees and expenses attendant to such sale, as determined by an appraiser selected by the Agent in its discretion.

**Notice of Non-Funding** shall mean a written notice by Arcus to the Companies and Agent, pursuant to which Arcus advises such parties that Arcus (for itself or as agent for any other lender under the Arcus Term Loan Agreement) does not intend to fund loans under the Arcus Term Loan Agreement.

B # 761460 v.5

**Obligations** shall mean all loans, advances and extensions of credit made or to be made by the Agent and/or the Lenders to the Companies or any one of them or to others for the account of any Company (including, without limitation, all Revolving Loans, Letter of Credit Guaranties (whether arising under this Financing Agreement, the Existing Financing Agreements, or otherwise), and the Swap Termination Balance under or pursuant to this Agreement, the Financing Orders or the Loan Documents, which may at any time be owing by the Companies or any one of them to the Agent and/or the Lenders howsoever arising, whether now in existence or incurred by the Companies or any one of them from time to time hereafter under or pursuant to the Loan Documents and the Existing Financing Agreements, whether principal, interest, fees, costs, expenses or otherwise (including reasonable attorneys' fees); whether secured by pledge, lien upon or security interest in any of the Companies' Collateral, assets or property or the assets or property of any other Person; whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether the Companies or any one of them are liable to the Agent and/or the Lenders for such indebtedness as principal, surety, endorser, guarantor or otherwise. Obligations shall also include indebtedness owing to the Agent and/or the Lenders by the Companies or any one of them under any Loan Document, indebtedness or obligations incurred by, or imposed on, the Agent and/or the Lenders as a result of environmental claims arising out of any of the Companies' operations, premises or waste disposal practices or sites in accordance with paragraph 7.7 hereof; the Companies' liability to the Agent and/or the Lenders as maker or endorser of any promissory note or other instrument for the payment of money; the Companies' liability for Out-of-Pocket Expenses; the Companies' liability to the Agent and/or the Lenders under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which the Agent and/or the Lenders may make or issue to others for the Companies' account as contemplated by the Loan Documents, including any Letter of Credit Guaranty or other accommodation extended by CIT with respect to applications for Letters of Credit, the Agent's and/or Lenders' acceptance of drafts or the Agent's and/or Lenders' endorsement of notes or other instruments for the Companies' account and benefit. Without limitation of the foregoing, (i) Obligations shall include Bankruptcy Case Expenses and shall include all such obligations, liabilities and indebtedness arising after the commencement of the Bankruptcy Case, and (ii) all Obligations owing under this Agreement shall be secured in full by all of the Collateral of all nature and types, whether arising before, on or after the filing of the Bankruptcy Case and, similarly all indebtedness and obligations of any nature of type owing under the Existing Financing Agreements shall be secured by all of the Collateral, whether rising before, on or after the commencement of the Bankruptcy Case.

**Operating Leases** shall mean all leases of property (whether real, personal or mixed) other than Capital Leases.

**Other Collateral** shall mean all of each of the Companies' now owned and hereafter acquired lockbox, blocked account and any other deposit accounts maintained with any bank or financial institutions into which the proceeds of Collateral are or may be deposited; all other deposit accounts and all Investment Property; all cash and other monies and property in the possession or control of the Agent and/or any of the Lenders; all books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; and all cash and non-cash proceeds of the foregoing.

**Out-of-Pocket Expenses** shall mean all of the Agent's present and future costs and expenses incurred relative to this Financing Agreement or any other Loan Documents (which shall include the reasonable fees of counsel for the Lenders incurred after the occurrence of an Event of Default which is not Waived In Writing By Agent), whether incurred heretofore or hereafter, which expenses shall include, without being limited to: the cost of record searches, all costs and expenses incurred by the Agent in opening bank accounts, depositing checks, syndicating loan, receiving and transferring funds, and wire transfer charges, any charges imposed on the Agent due to returned items and "insufficient funds" of deposited checks and the Agent's standard fees relating thereto, any amounts paid by, incurred by or charged to, the Agent and/or the Lenders by the Issuing Bank under a Letter of Credit Guaranty or the Companies' reimbursement agreement, application for Letters of Credit or other like document which pertain either directly or indirectly to such Letters of Credit, and the Agent's standard fees relating to the Letters of Credit and any drafts thereunder, travel, lodging and similar expenses of the Agent's personnel, agents or representatives in connection with inspecting and monitoring the Collateral from time to time hereunder, any applicable counsel fees and disbursements, fees and taxes relative to the filing of financing statements, all expenses, costs and fees set forth in Paragraph 10.3 of Section 10 of this Financing Agreement, and title insurance

premiums, real estate survey costs, and costs of preparing and recording mortgages/deeds of trust against the Real Estate, and the Bankruptcy Case Expenses.

**Overadvances** shall mean the amount by which (a) the sum of all outstanding Revolving Loans, Letters of Credit and advances made hereunder exceed (b) the Borrowing Base.

**Parent** shall mean Shapes/Arch, which owns one hundred percent (100%) of each of the other Companies.

**Patents** shall mean all of each of the Companies' present and hereafter acquired patents, patent applications, registrations, any reissues or renewals thereof licenses, any inventions and improvements claimed thereunder, and all general intangible, intellectual property and patent rights with respect thereto of the Companies or any one of them, and all income, royalties, cash and non-cash proceeds thereof.

**Periodic Swap Reserve** shall mean an amount equal to $50,000 per week that may be taken into reserve against the Borrowing Base (or in lieu of imposing a reserve, may be paid to JP Morgan Chase Bank), commencing on March 21, 2008 and continuing thereafter on a weekly basis up to the aggregate amount of the Swap Termination Balance, and which, to the extent not previously paid, will be fully paid, satisfied and discharged on or before April 7, 2008.

**Permitted Encumbrances** shall mean:  (a) liens existing on the date hereof on specific items of Equipment, liens arising after the date hereof on the same specific items of Equipment for the refinance of purchase-money Indebtedness, and other liens expressly permitted, or consented to in writing by the Agent and/or the Required Lenders; (b) Purchase Money Liens; (c) liens of local or state authorities for franchise or other like Taxes, provided that the aggregate amounts of such liens shall not exceed One Hundred Thousand Dollars ($100,000.00) in the aggregate at any one time; (d) statutory liens of landlords and liens of carriers, warehousemen, bailees, mechanics, materialmen and other like liens imposed by law, created in the ordinary course of business and for amounts not yet due (or which are being contested in good faith, by appropriate proceedings or other appropriate actions which are sufficient to prevent imminent foreclosure of such liens) and with respect to which adequate reserves or other appropriate provisions are being maintained by the Companies in accordance with GAAP:, (e) deposits made (and the liens thereon) in the ordinary course of business of the Companies (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts; (f) easements (including, without limitation, reciprocal easement agreements and utility agreements), encroachments, minor defects or irregularities in title, variation and other restrictions, charges or encumbrances (whether or not recorded) affecting the Real Estate, if applicable, and which in the aggregate (A) do not materially interfere with the occupation, use or enjoyment by any of the Companies of their business or the property so encumbered and (B) in the reasonable business judgment of the Agent do not materially and adversely affect the value of such Real Estate; (g) liens granted to the Agent by the Companies or any one of them; (h) liens of judgment creditors provided such liens do not exceed, in the aggregate, at any time, Two-Hundred Thousand Dollars ($200,000.00) (other than liens bonded or insured to the reasonable satisfaction of the Agent); (i) consignment purchases not to exceed, in the aggregate, the sum of Three Million Dollars ($3,000,000.00) outstanding at any time, provided, however, such Inventory shall not be Eligible Inventory; (j) tax liens which are not yet due and payable or which are being diligently contested in good faith by the Companies by appropriate proceedings, and which liens are not (A) filed on any public records, (B) other than with respect to Real Estate, senior to the liens of the Agent or (C) for Taxes due the United States of America or any state thereof having similar priority statutes, as further set forth in Paragraph 7.6 hereof; and (k) the liens and security interests in favor of Arcus pursuant to the Arcus Term Loan Documents, subject to the terms and conditions of the Intercreditor Agreement.

**Permitted Indebtedness** shall mean:  (a) current Indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, Taxes or labor; (b) Indebtedness secured by Purchase Money Liens; (c) Subordinated Debt; (d) Indebtedness arising under Letters of Credit and this Financing Agreement; (e) deferred Taxes and other expenses incurred in the ordinary course of business; (f) Capital Lease Obligations having aggregate annual payments up to but not exceeding Four Hundred Thousand Dollars ($400,000.00); (g) insurance premiums financed by the insurance carrier; (h) Intercompany Debt; (i) unsecured

B # 761460 v.5

Indebtedness incurred prior to the Filing Date and listed on Companies' schedule filed with the Bankruptcy Court in connection with the Bankruptcy Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (j) administrative priority unsecured Indebtedness approved by the Bankruptcy Court in the Bankruptcy Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (k) the Swap Termination Balance; (l) the Arcus Term Loan; and (m) other Indebtedness existing on the date of execution of this Financing Agreement and set forth with particularity on **Schedule 1P** attached hereto.

**Permitted Investments** shall mean (a) obligations issued or guaranteed by the United States of America or any agency thereof, (b) commercial paper with maturities of not more than one hundred eighty (180) days and a published rating of not less than A-l or P-l (or the equivalent rating), (c) certificates of time deposit and bankers' acceptances having maturities of not more than one hundred eighty (180) days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000.00, or (ii) its debt obligations, or those of a holding company of which it is a subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, and (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof.

**Person** shall mean any individual, partnership, business entity, corporation, limited liability company, limited partnership, limited liability partnership, or other entity, including without limitation any governmental entity or the department thereof.

**Plan** shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Companies or any member of the Controlled Group or any such Plan to which any Company or any member of the Controlled Group is required to contribute on behalf of any of its employees.

**Prior Lender Subordination Agreement** shall mean that certain Existing Lender Standstill Subordination Agreement dated December 30, 2003, among PNC Bank, National Association, National City Bank of Pennsylvania, Wachovia Bank, National Association, Spring Street Associates, the Companies (other than Shapes/Arch) and Agent.

**Promissory Note** shall mean the Revolving Credit Note.

**Purchase Money Liens** shall mean liens on any item of Equipment acquired after the date of this Financing Agreement provided that (a) each such lien shall attach only to the Equipment to be ,acquired, (b) a description of the Equipment so acquired is furnished to the Agent, and (c) Indebtedness incurred in connection with such acquisitions shall not exceed, in the aggregate, Three Hundred Fifty Thousand Dollars ($350,000.00) in any Fiscal Year.

**Real Estate** shall mean all of each of the Companies' fee interests in real property, including any such real property which has been, or will be, encumbered, mortgaged or pledged or assigned to the Agent or its designee as set forth on **Schedule 1R**.

**Reorganization Plan** shall mean any plan or plans of reorganization proposed or confirmed in the Bankruptcy Case.

**Required Lenders** shall mean the Lenders holding (a) not less than sixty-six and two-thirds (66-2/3%) or (b) if there are fewer than three (3) Lenders, one hundred percent (100%), of the aggregate commitments under this Financing Agreement, or, if no commitments are outstanding, the Lenders holding (x) not less than sixty-six and two-thirds percent (66-2/3%) of the outstanding Loans or (y) if there are fewer than three (3) Lenders, Lenders holding one hundred percent (100%) of the outstanding Loans.

**Reserved Termination Amount** shall mean the amount of $425,000, representing the portion of the Termination Amount (as defined in the definition of Chase Swap herein) that was reserved for under the Existing

Financing Agreements, constituted part of the Obligations (under and as defined in the Existing Financing Agreements), and was advanced as a Revolving Loan immediately prior to the Effective Date.

**Revolving Credit Note** shall mean that certain promissory note in the form of Exhibit A to this Financing Agreement, dated as of the Closing Date, in the face amount of Sixty Million Dollars ($60,000,000.00) executed by the Companies to evidence the Revolving Loans made under the Revolving Line of Credit by the Agent and the Lenders under Section 3 hereof.

**Revolving Line of Credit** shall mean the aggregate commitment of the Lenders to make loans and advances pursuant to Section 3 of this Financing Agreement and issue Letter of Credit Guaranties pursuant to Section 5 hereof to the Companies, in the aggregate amount of up to Sixty Million Dollars ($60,000,000.00).

**Revolving Loan Accounts** shall mean the accounts on the Agent's books, in names of each of the Companies, in which each Company will be charged with all applicable Obligations under this Financing Agreement.

**Revolving Loans** shall mean the loans and advances made, from time to time, to or for the account of the Companies by the Agent, on behalf of the Lenders, pursuant to Section 3 of this Financing Agreement.

**Senior Claims** shall have the meaning provided for in Section 4.1 of this Agreement.

**Settlement Date** shall mean the date, weekly, and more frequently, at the discretion of the Agent, upon the occurrence of an Event of Default or a continuing decline or increase of the Revolving Loans that the Agent and the Lenders shall settle amongst themselves so that (a) the Agent shall not have, as the Agent, any money at risk and (b) on such Settlement Date the Lenders shall have a pro rata amount of all outstanding Revolving Loans and Letters of Credit subject to Letter of Credit Guarantees, provided that each Settlement Date for a Lender shall be a Business Day on which such Lender and its bank are open for business.

**Shapes/Arch** shall mean Shapes/Arch Holdings L.L.C., a New Jersey Limited Liability Company.

**Standstill Subordination Agreement** shall mean the Subordination Agreement dated December 30, 2003 among the Companies (other than Shapes/Arch), Stephen Kendall (or the Estate of Stephen Kendall), Frank Kessler, and A. Jerome Grossman, and Agent.

**Subordination Agreement(s)** shall mean each agreement (in form and substance satisfactory to the Agent) among the Companies, a Subordinating Creditor and the Agent, pursuant to which Subordinated Debt is subordinated, on terms set forth therein, to the prior payment and satisfaction of the Companies' Obligations to the Agent and the Lenders, including the Standstill Subordination Agreement and the Prior Lender Subordination Agreement.

**Subordinated Debt** shall mean the debt due a Subordinating Creditor (and the note(s) evidencing such) which has been subordinated by a Subordination Agreement (in form and substance satisfactory to the Agent), to the prior payment and satisfaction of the Obligations.

**Subordinating Creditor** shall mean each of the Subordinated Creditors (as defined in the Standstill Subordination Agreement) and any other Person hereafter executing a Subordination Agreement.

**Superpriority Claim** shall mean an allowed claim against a Company or its estate in the Case, which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

**Swaps** shall mean any interest rate cap, collar, swap, hedge or other derivative transaction entered into by the Companies in the ordinary course of their businesses for the purpose of hedging against interest rate fluctuations and not for the purpose of investment or speculation.

**Swap Termination Balance** shall mean the amount of $130,000, representing the Termination Amount (as defined in the Chase Swap) remaining outstanding and unpaid and for which there is no reserve against the Borrowing Base as of the Effective Date.

**Taxes** shall mean all federal, state, municipal and other governmental taxes, levies, charges, claims and assessments which are or may be due from the Companies with respect to their business, operations, Collateral or otherwise.

**Trade Accounts Receivable** shall mean that portion of the Companies' Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of the Companies' businesses.

**Trademarks** shall mean all of each of the Companies' present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, service marks, logos, prints and labels (on which any of the foregoing may appear)., licenses, reissues, renewals, and any other intellectual property and trademark rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all cash and non-cash proceeds thereof.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York.

**Waived In Writing By Agent** shall mean the written waiver of an Event of Default by the Agent either acting in its discretion or acting at the direction of the Required Lenders, in the case of the waiver of Events of Default which require such consent.

**Working Capital** shall mean Current Assets in excess of Current Liabilities.

**Working Day** shall mean any Business Day on which dealings in foreign currencies and exchanges between banks may be transacted.

**SECTION 2**        **Conditions Precedent**

**2.1**        The obligation of the Agent and the Lenders to make the initial loans hereunder is subject to the satisfaction of, or extension or waiver of in writing, on or prior to, the Closing Date, the following conditions precedent:

(a)        **Lien Searches** - The Agent shall have received tax, judgment and UCC searches satisfactory to the Agent for all locations presently occupied or used by each of the Companies and the Guarantors and for each jurisdiction wherein a Company or Guarantor is located as defined in the UCC.

(b)        **Casualty Insurance** - Each of the Companies shall have delivered to the Agent evidence satisfactory to the Agent that casualty insurance policies listing the Agent as additional insured, lender loss payee or mortgagee, as the case may be, are in full force and effect, all as set forth in Paragraph 7.5 of Section 7 of this Financing Agreement.

(c)        **UCC Filings** - Any financing statements required to be filed in order to create, in favor of the Agent, on behalf of the Lenders, a first perfected security interest in the Collateral (except as otherwise contemplated by the Intercreditor Agreement), subject only to the Permitted Encumbrances, shall have been properly filed in each office in each jurisdiction required in order to create in favor of the Agent for the benefit of the Lenders a perfected lien on the Collateral.  The Agent shall have received acknowledgment copies of all such filings (or, in lieu thereof the Agent shall have received other evidence satisfactory to the Agent that all such filings

-17-

B # 761460 v.5

have been made) and the Agent shall have received evidence that all necessary filing fees and all taxes or other expenses related to such filings have been paid in full.

(d)    **Member Consents/Board Resolution** - The Agent shall have received a copy of the consents or resolutions as applicable of the Members, Managers, or Board of Directors of each of the Companies and the Guarantors (as the case may be) authorizing the execution, delivery and performance of (i) this Financing Agreement, (ii) the Guaranties, and (iii) any related agreements, in each case certified by the Member, Manager or the Secretary or Assistant Secretary of the Companies and the Guarantors (as the case may be) as of the date hereof together with a certificate of the Member, Manager or the Secretary or Assistant Secretary of the Companies and the Guarantors (as the case may be) to the incumbency and signature of the officers, Member or Managers of the Companies and/or the Guarantors executing such Loan Documents and any certificate or other documents to be delivered by them pursuant hereto, together with evidence of the incumbency of such Member, Manager or Secretary or Assistant Secretary.

(e)    **Company/Corporate Organization** - The Agent shall have received (i) a copy of the Amended and Restated Certificate of Formation or Certificate of Incorporation, as applicable, of the Companies and the Guarantors which are not individual Persons certified by the Secretaries of State of the state of their formation or incorporation, and (ii) a copy of the Operating Agreement, Limited Liability Company Agreement, or By-Laws, as applicable, of the Companies and the Guarantor certified by the Manager or Secretary or Assistant Secretary thereof all as amended through the date hereof.

(f)    **Member's/Manager's/Officer's Certificate** - The Agent shall have received an executed Member's, Manager's or Officer's Certificate of the Companies, satisfactory in form and substance to the Agent, certifying on behalf of the Companies that: (i) the representations and warranties contained herein, and in the other Loan Documents, are true and correct in all material respects on and as of the Closing Date; (ii) the Companies are in compliance with all of the terms and provisions set forth herein and in the other Loan Documents; and (iii) no Default or Event of Default has occurred.

(g)    Intentionally omitted.

(h)    **Absence of Default** - No Default or Event of Default shall have occurred and no material adverse change shall have occurred in the financial condition, business, prospects, profits, operations or assets of the Companies or the Guarantors or any of their subsidiaries; provided that the commencement of the Bankruptcy Case shall not be deemed a material adverse change for the purposes of this section.

(i)    **Legal Restraints/Litigation** - As of the Closing Date, there shall be no: (x) litigation, investigation or proceeding (judicial or administrative) pending or threatened against the Companies or the Guarantors or any of their assets, by any agency, division or department of any county, city, state or federal government arising out of this Financing Agreement; (y) injunction, writ or restraining order restraining or prohibiting the consummation of the financing arrangements contemplated under this Financing Agreement; or (z) suit, action, investigation or proceeding (judicial or administrative) pending against any of the Companies or the Guarantors or their assets, which, in the opinion of the Agent, if adversely determined, could reasonably be expected to have a material adverse effect on the business, operation, assets, financial condition or Collateral of the Companies and/or the Guarantors or any one of them.

(j)    **Intercreditor Agreement** - Arcus and the Companies shall have entered into the Intercreditor Agreement with the Agent.

(k)    **Standstill Subordination Agreement** - The Subordinating Creditors under the Existing Financing Agreements shall have ratified and confirmed the continuing validity and binding nature of their respective Standstill Subordination Agreements with respect to this Agreement and any other Subordinating Creditors shall have executed and delivered to Agent for the benefit of the Lenders, a Subordination Agreement, in form and substance satisfactory to the Agent.

B # 761460 v.5

(l)      **Budget Projections** - The Agent and the Lenders shall have received, reviewed and been satisfied with the Budget.

(m)      **Additional Documents** - Each of the Companies and the Guarantors shall have executed and delivered to the Agent all Loan Documents necessary to consummate the lending arrangement contemplated between the Companies, the Agent and the Lenders, including, without limitation such mortgage reaffirmation and modification agreements as requested by Agent.

(n)      **Disbursement Authorization** - The Companies shall have delivered to the Agent all information necessary for the Agent and the Lenders to issue wire transfer instructions on behalf of the Companies for the initial and subsequent loans and/or advances to be made under this Financing Agreement including, but not limited to, disbursement authorizations in form acceptable to the Agent.

(o)      **Examination and Verification** - The Agent and each of the Lenders shall have completed, to their respective satisfaction, an examination and verification of the Accounts, Inventory, financial statements, books and records of each of the Companies which examination shall indicate that no material adverse change (as determined by the Agent in its discretion) has occurred in the business, prospects, profitability, assets or operations of any of the Companies, and Agent shall be satisfied there shall have been no other event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent) or prospect of any of the Companies, other than the commencement of the Bankruptcy Case and the consequences that would normally result therefrom, in each case, since February 29, 2008.

(p)      **Existing Financing Agreements** - The Agent shall receive proceeds from the Arcus Term Loan to be applied to a portion of the Obligations owing under the Existing Financing Agreements as follows: (i) up to $8,500,000 to fully pay, satisfy and discharge Lenders' term loans to the Companies under the Existing Financing Agreements, (ii) up to $4,400,000 to fully pay, satisfy and discharge the portion of the revolving loans outstanding under and advanced pursuant to the PP&E Equity Collateral Borrowing Base Component of the Borrowing Base under and as defined in the Existing Financing Agreements (which includes amounts advanced in connection with the Reserved Termination Amount), and (iii) such additional amounts as are necessary to fully pay, satisfy and discharge all outstanding fees, costs and expenses of the Lenders as of the Closing Date.

(q)      **Depository Accounts** - Each of the Companies shall have established a system of lockbox and bank accounts with respect to the collection of Accounts and the deposit of proceeds of Collateral as shall be acceptable to the Agent in all respects.  Such accounts shall be subject to three-party agreements (between the Companies, the Agent and the depository bank), in form and substance satisfactory to the Agent.

(r)      **Arcus Term Loan** - Arcus shall provide the Agent with the Arcus Term Loan Documentation, in form and substance satisfactory to the Agent.

(s)      **Schedules** - The Companies shall provide the Agent with schedules of (a) any of the Companies' and their subsidiaries' (i) Trademarks, (ii) Patents, and (iii) Copyrights, as applicable and all in such detail as to provide appropriate recording information with respect thereto, (b) any tradenames, (c) Collateral locations, and (d) Permitted Encumbrances, all of the foregoing in form and substance satisfactory to the Agent.

(t)      Intentionally omitted.

(u)      **Certain Bankruptcy Case Matters** -

(i)      The Companies shall have complied in full with the notice and other requirements of the Bankruptcy Code and the related local and Federal rules of bankruptcy procedure in a manner acceptable to the Agent and its counsel;

(ii)      The Bankruptcy Court shall have found that the Revolving Loans contemplated by this Agreement are made by the Lenders, and that all other Obligations are incurred by the Companies hereunder in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code;

-19-

(iii)    Interim Financing Order.    Entry by the Bankruptcy Court of the Interim Financing Order, by no later than three (3) days after the Filing Date in form and substance satisfactory to Agent and Lenders, which Interim Financing Order shall:  (A) have been entered upon application or motion of Companies reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (B) be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (C) not be the subject of a pending objection, appeal or motion for reconsideration in any respect.  The Companies, the Agent and the Lenders shall be entitled to rely in good faith upon the Interim Financing Order notwithstanding any such objection, appeal or motion for reconsideration.  The Agent and the Lenders shall be permitted, and the Companies shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the Interim Financing Order has been stayed by a court of competent jurisdiction.

(v)    **Arcus Term Loan Agreement Interim Order**.    Entry by the Bankruptcy Court of an interim financing order approving the transactions contemplated by the Arcus Term Loan Agreement in form and substance satisfactory to Agent.

(w)    **First Day Orders**.  The Agent shall have received drafts of the "first day" pleadings in form and substance satisfactory to the Agent on or before March 14, 2008.

(x)    **Fees, Costs and Expenses**.  Agent shall have received all fees, costs and expenses due and payable on or prior to the closing Date.

(y)    **Patriot Act**.  The Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the United States Patriot Act and OFAC.

Upon the execution of this Financing Agreement and the initial disbursement of loans hereunder, all of the above Conditions Precedent shall have been deemed satisfied except as otherwise set forth hereinabove or as the Companies and the Agent shall otherwise agree in writing.

**2.2    Conditions to Each Extension of Credit**

Subject to the terms of this Financing Agreement, including, without limitation, the Agent's rights pursuant to Paragraph 10.2 of Section 10 hereof the agreement of the Agent on behalf of the Lenders to make any extension of credit requested to be made by it to any of the Companies on any date (including without limitation, the initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)    **Representations and Warranties** - Each of the representations and warranties made by each of the Companies in or pursuant to this Financing Agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date except if limited to an earlier date.

(b)    **No Default** - No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extension of credit requested to be made on such date.

(c)    **Borrowing Base** - Except as may be otherwise agreed to from time to time by the Agent (with the consent of the Required Lenders, unless in accordance with Paragraph 14.10 of Section 14 of this Financing Agreement) and the Companies in writing, after giving effect to the extension of credit requested to be made by the Companies on such date, the aggregate outstanding balance of the Revolving Loans and outstanding Letters of Credit owing by each of the Companies will not exceed the lesser of (i) the Revolving Line of Credit or (ii) the Borrowing Base

(d)    **Notice of Non-Funding** - No Notice of Non-Funding has been received by Agent or the Companies.

-20-

(e)        Intentionally omitted.

(f)        **Compliance with Financing Orders** - The extension of credit requested shall not cause the aggregate outstanding amount of the Revolving Line of Credit to exceed the amount then authorized by the applicable Financing Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

(g)        **Final Order** – On or before April 4, 2008, and for each extension of credit thereafter, Agent shall have received satisfactory evidence of the entry of the Final Order.

(h)        **Financing Order** - The Final Order, or, prior to the entry of the Final Order, the Interim Financing Order, (i) shall have been entered upon application or motion of Companies reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Companies, the Agent and the Lenders shall be entitled to rely in good faith upon the applicable Order notwithstanding any such objection, appeal or motion for reconsideration. The Agent and the Lenders shall be permitted, and the Companies shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Order has been stayed by a court of competent jurisdiction.

(i)        **Arcus Term Loan Agreement Order**. - Entry by the Bankruptcy Court of an order approving the transactions contemplated by the Arcus Term Loan Agreement in form and substance satisfactory to the Agent.

Each borrowing by the Companies hereunder shall constitute a representation and warranty by all of the Companies as of the date of such loan or advance that (i) each of the representations, warranties and covenants contained in the Financing Agreement have been satisfied and are true and correct, except as the Companies and the Agent and/or the Required Lenders shall otherwise agree herein or in a separate writing, and (ii) at the time of and after giving effect to each borrowing hereunder, the Companies are in Budget Compliance, or, if the Companies are not in Budget Compliance, they have received and delivered to Agent a written waiver of such failure to be in Budget Compliance by Arcus, are not in default under or violation of the Arcus Term Loan Documents (unless such default or violation has been waived in writing by Arcus, a copy of which written waiver has been provided to Agent) and no Notice of Non-Funding or notice of default or notice of the occurrence of an Event of Default has been received by the Companies from Arcus (unless such Notice of Non-Funding, notice of default or notice of the occurrence of an Event of Default has been withdrawn in writing by Arcus, a copy of which written withdrawal has been provided to Agent).

## SECTION 3        Revolving Loans

3.1        (a)        The Agent and the Lenders agree, subject to the terms and conditions of this Financing Agreement, from time to time, to make loans and advances to the Companies on a revolving basis (i.e. subject to the limitations set forth herein, the Companies may borrow, repay and re-borrow Revolving Loans), for working capital purposes, until the date which is one (1) Business Day before the earlier of the (i) DIP Revolver Maturity Date or (ii) Anniversary Date. Such loans and advances shall not exceed the lesser of (i) the Companies' Availability or (ii) an amount which, when aggregated with all Revolving Loans (including, for purposes of clarification, amounts which remain unpaid under the Existing Financing Agreements) and Letters of Credit outstanding to the Companies, would not cause outstanding Revolving Loans and Letters of Credit to exceed the Revolving Line of Credit. All requests for loans and advances must be received by an officer of the Agent no later than (i) 1:00 P.M., New York time, of the Business Day on which any such Chase Bank Rate Loans and advances are required or (ii) three (3) Business Days prior to any requested LIBOR Loan.

(b)        (i)        Whenever any of the Companies request the Agent, on behalf of the Lenders, to make a Revolving Loan pursuant to this Section 3, it shall give the Agent notice in writing or irrevocable telephonic notice confirmed promptly in writing, specifying (A) the amount to be borrowed, and (B) the requested borrowing date (which shall be a Business Day and shall be prior to the Anniversary Date, and if applicable, any Early

Termination Date, or prior to any effective termination date of this Financing Agreement, all as further set forth herein), and (C) specify whether the requested Revolving Loan shall bear interest at the Chase Bank Rate or at the LIBOR Rate, as further set forth herein.  The procedure for Revolving Loans to be made on a requested borrowing date may be such other procedure as is mutually satisfactory to the Companies, the Agent and/or the Lenders.  Requests for loans and advances shall be made solely by the Companies and shall be directed solely to the Agent.

(ii)     Subject to Paragraph 14.10 of Section 14 of this Financing Agreement, should the Agent, on behalf of the Lenders, for any reason make any Overadvances, such Overadvance shall be made in the Agent's sole discretion, subject to any additional terms the Agent and/or the Required Lenders deem necessary.

(c)     The Agent shall on any Settlement Date, and upon notice given by the Agent no later than 2:00 P.M. New York time, request each Lender to make, and each Lender hereby agrees to make, a Revolving Loan in an amount equal to such Lender's Revolving Credit Commitment percentage (calculated with respect to the aggregate Revolving Credit Commitments then outstanding) of the aggregate amount of the Revolving Loans made by the Agent from the preceding Settlement Date to the date of such notice.  Each Lender's obligation to make the Revolving Loans referred to in Paragraph 3.1(a) and to make the settlements pursuant to this Paragraph 3.1(c) shall be absolute and unconditional and shall not be affected by any circumstance, including without limitation (i) any set-off counterclaim, recoupment, defense or other right which any such Lender or the Companies may have against the Agent, the Companies, any other Lender or any other Person for any reason whatsoever; (ii) the occurrence or continuance of a Default or an Event of Default; (iii) any adverse change in the condition (financial or otherwise) of the Companies; (iv) any breach of this Financing Agreement or any other Loan Document by the Companies or any other Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.  Without limiting the liability and obligation of each Lender to make such advances, the Companies authorize the Agent to charge the Companies' Revolving Loan Account with the Agent to the extent amounts received from the Lenders are not sufficient to repay in full the amount of any such deficiency.

(d)     The Companies'  Revolving Loan Obligations hereunder shall be evidenced by the Revolving Credit Note in the form of Exhibit A attached hereto.

3.2     In furtherance of the continuing assignment and security interest in each of the Companies' Accounts and Inventory, each of the Companies will, upon the creation of Accounts and purchase or acquisition of Inventory, execute and deliver to the Agent in such form and manner as the Agent may reasonably require, solely for the Agent's convenience in maintaining records of Collateral, such confirmatory schedules of Accounts and Inventory as the Agent may reasonably request, including, without limitation, weekly schedules of Accounts and monthly schedules of Inventory, all in form and substance satisfactory to the Agent, and such other appropriate reports designating, identifying and describing the Accounts and Inventory as the Agent may reasonably request, and provided further that the Agent may request any such information more frequently, from time to time, upon its reasonable prior request.  In addition, upon the Agent's request, each of the Companies shall provide the Agent with copies of agreements with, or purchase orders from, such Company's customers, and copies of invoices to customers, proof of shipment or delivery, access to its computers, electronic media and software programs associated therewith (including any electronic records, contracts and signatures) and such other documentation and information relating to said Accounts and other Collateral as the Agent may reasonably require.  Failure to provide the Agent with any of the foregoing shall in no way affect, diminish, modify or otherwise limit the security interests granted herein.  Each of the Companies hereby authorizes the Agent to regard such Company's printed name or rubber stamp signature on assignment schedules or invoices as the equivalent of a manual signature by one of such Company's authorized officers or agents.

3.3     Each of the Companies hereby represents and warrants that: each Trade Account Receivable is based on an actual and bona fide sale and delivery of Inventory or rendition of services to its customers, made by such Company in the ordinary course of its business; the Inventory being sold, and the Trade Accounts Receivable created, are the exclusive property of such Company and are not and shall not be subject to any lien, consignment arrangement other than consignment sales disclosed to Agent in an amount not to exceed Three Hundred Thousand Dollars ($300,000.00) per month and not more than One Million ($1,000,000.00) in the aggregate outstanding at any time, encumbrance, security interest or financing statement whatsoever, other than the Permitted Encumbrances; the invoices evidencing such Trade Accounts Receivable are in the name of such Company; and its customers owe and are obligated to pay the full amounts stated in the invoices according to their terms, without dispute, offset, defense,

counterclaim or contra, except for disputes and other matters arising in the ordinary course of business with respect to which such Company has complied with the notification requirements of Paragraph 3.5 of this Section 3. The Companies confirm to the Agent that any and all Taxes or fees relating to their business, their sales, the Accounts or Inventory relating thereto, are their sole responsibility and that same will be paid by the Companies when due subject to Paragraph 7.6 of Section 7 of this Financing Agreement, and that none of said Taxes or fees represent a lien on or claim against the Accounts. The Companies hereby further represent and warrant that they shall not acquire any Inventory on a consignment basis (except Inventory not exceeding Three Million Dollars ($3,000,000) in aggregate value which is not commingled with other Inventory and which is specifically identified on each Inventory report as ineligible Inventory consigned to such Company), nor co-mingle their Inventory with any of their customers or any other Person, including pursuant to any bill and hold sale or otherwise and that their Inventory is marketable to their customers in the ordinary course of business of that Companies, except as a Company may otherwise report in writing to the Agent pursuant to Paragraph 3.5 hereof from time to time. Each of the Companies also warrants and represents it a duly and validly existing limited liability company and qualified in all states where the failure to so qualify would have a material adverse effect on either the business of the Companies or the ability of the Companies to enforce collection of Accounts due from customers residing in that state. The Companies agree to maintain such books and records regarding Accounts and Inventory as the Agent may reasonably require and agree that the books and records of the Companies will reflect the Agent's interest in the Accounts and Inventory. All of the books and records of each of the Companies will be available to the Agent during normal business hours, including any records handled or maintained for the Companies by any other company or entity.

3.4    (a)    Until the Agent has advised the Companies to the contrary after the occurrence of an Event of Default which has not been Waived In Writing By Agent, the Companies, at their expense, will enforce, collect and receive all amounts owing on their respective Accounts in ordinary course of their business and any proceeds they so receive shall be subject to the terms hereof and held on behalf of and in trust for the Agent, on behalf of the Lenders. Such privilege shall terminate at the election of the Agent, upon the occurrence of an Event of Default, until such Event of Default is Waived In Writing By Agent. Any checks, cash, credit card sales and receipts, notes or other instruments or property received by a Company with respect to any Collateral, including Accounts, shall be held by such Company in trust for the Agent on behalf of the Lenders, separate from such Company's own property and funds, and promptly turned over to the Agent with proper assignments or endorsements by deposit to the Depository Accounts. Each of the Companies shall: (i) indicate on all of their invoices that funds should be delivered to and deposited in a Depository Account; (ii) direct all of their account debtors to deposit any and all proceeds of Collateral into the Depository Accounts; (iii) irrevocably authorize and direct any banks which maintain the Companies' initial receipt of cash, checks and other items to promptly wire transfer all available funds to a Depository Account; and (iv) advise all such banks of the Agent's security interest in such funds. The Companies shall provide the Agent with prior written notice of any and all deposit accounts opened or to be opened subsequent to the Closing Date. All amounts received by the Agent in payment of Accounts will be credited to the Revolving Loan Account when the Agent is advised by its bank of its receipt of "collected funds" at the Agent's bank account in New York, New York on the Business Day of such advise if advised no later than 1:00 P.M. EST or on the next succeeding Business Day if so advised after 1:00 PM EST. No checks, drafts or other instrument received by the Agent shall constitute final payment to the Agent and/or the Lenders unless and until such instruments have actually been collected.

(b)    The Companies shall establish and maintain, in their name and at their expense, deposit accounts with such banks as are acceptable to the Agent (the "Blocked Accounts") into which the Companies shall promptly cause to be deposited: (i) all proceeds of Collateral received by the Companies, including all amounts payable to the Companies from credit card issuers and credit card processors, and (ii) all amounts on deposit in deposit accounts used by the Companies at each of their locations, all as further provided in Paragraph 3.4(a) above. The banks at which the Blocked Accounts are established shall enter into an agreement, in form and substance satisfactory to the Agent (the "Blocked Account Agreements"), providing that all cash, checks and items received or deposited in the Blocked Accounts are the property of the Agent, that the: depository bank has no lien upon, or right of set off against, the Blocked Accounts and any cash, checks, items, wires or other funds from time to time on deposit therein, except as otherwise provided in the Blocked Account Agreements, and that automatically, on a daily basis the depository bank will wire, or otherwise transfer, in immediately available funds, all funds received or deposited into the Blocked Accounts to such bank account as the Agent may from time to time designate for such purpose. The Companies hereby confirm and agree that all amounts deposited in such Blocked Accounts and any

B # 761460 v.5

other funds received and collected by the Agent, whether as proceeds of Inventory or other Collateral or otherwise, shall be the property of the Agent.

**3.5** The Companies agree to notify the Agent: (a) of any matters affecting the value, enforceability or collectibility of any Account and of all customer disputes, offsets, defenses, counterclaims, returns, rejections and all reclaimed or repossessed merchandise or goods, and of any adverse effect in the value of its Inventory, in their daily, weekly and monthly collateral reports (as applicable) provided to the Agent hereunder, in such detail and format as the Agent may reasonably require from time to time and (h) promptly of any such matters which are material, as a whole, to the Accounts and/or the Inventory. The Companies agree to issue credit memoranda promptly (with duplicates to the Agent upon request after the occurrence of an Event of Default) upon accepting returns or granting allowances. Upon the occurrence of an Event of Default (which is not Waived In Writing By Agent) and on notice from the Agent, the Companies agree that all returned, reclaimed or repossessed merchandise or goods shall be set aside by the Companies, marked with the Agent's name (as secured party) and held by the Companies for the Agent's account.

**3.6** (a) The Agent shall maintain a Revolving Loan Account on its books in which each of the Companies will be charged with all loans and advances made by the Agent and the Lenders to such Company or for its account, and with any other Obligations, including any and all costs, expenses and reasonable attorney's fees which the Agent may incur in connection with the exercise by or for the Agent of any of the rights or powers herein conferred upon the Agent, or in the prosecution or defense of any action or proceeding to enforce or protect any rights of the Agent in connection with this Financing Agreement, the other Loan Documents or the Collateral assigned hereunder, or any Obligations owing by such Company. The Companies will be credited with all amounts received by the Agent and/or the Lenders from the Companies or from others for the Companies' account, including, as above set forth, all amounts received by the Agent in payment of Accounts, and such amounts will be applied to payment of the Obligations as set forth herein. In no event shall prior recourse to any Accounts or other security granted to or by the Companies be a prerequisite to the Agent's right to demand payment of any Obligation. Further, it is understood that the Agent and/or the Lenders shall have no obligation whatsoever to perform in any respect any of the Companies' contracts or obligations relating to the Accounts.

(b) Each of the Companies acknowledges and agrees that: (i) requests for loans and advances may be made by one or more of the Managers of Borrower Representative or the Chief Financial Officer of Borrower Representative and the Agent is hereby authorized and directed to accept, honor and rely on such instructions and requests, subject to the limitation and provisions set forth in this Financing Agreement; (ii) the Agent shall have no responsibility to inquire into the correctness of the apportionment, allocation, or disposition of (x) any loans and advances made to any of the Companies or (y) any of the Agent's expenses and charges relating thereto; (iii) each of the Companies jointly and severally unconditionally guarantee to the Agent and Lenders the prompt payment in full of (A) all loans and advances made and to be made by the Agent and Lenders to any of them under this Financing; Agreement, as well as (B) all other Obligations of the Companies to the Agent and the Lenders and hereby expressly confirm in all respects the Guaranties executed by each of the Companies in the Agent's favor for the benefit of Lenders as more fully set forth therein; (iv) all Accounts assigned to the Agent by any of the Companies and all other Collateral and any other collateral security now or hereafter given to the Agent by any of the Companies (be it Accounts or otherwise), shall secure all loans and advances made by the Agent and Lenders to any of the Companies, and shall be deemed to be pledged to the Agent as security for any and all other Obligations of the Companies as set forth under this Financing Agreement, the Guaranties, or any other agreements between the Agent and any of the Companies; (v) to induce the Agent and Lenders to extend financial accommodations hereunder, and in consideration thereof, each of the Companies hereby agrees to indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless against any and all liability, expense, loss or claim of damage or injury, made against the Agent or the Lenders by any of the Companies or by any third party whosoever, arising from or incurred solely by reason of (A) the method of handling the accounts of the Companies as herein provided, (B) Agent's relying on any instructions of any of the Companies, or (C) any other action taken by the Agent in accordance with this subparagraph (b) of this Paragraph 3.6, except to the extent arising from the gross negligence or willful misconduct of the Agent and/or Lenders.

**3.7** After the end of each month, the Agent shall promptly send the Companies a statement showing the accounting for the charges, loans, advances and other transactions occurring between the Agent and each of the Companies during that month. The monthly statements shall be deemed correct and binding upon each of the

B # 761460 v.5

Companies and shall constitute an account stated between the Companies and the Agent unless the Agent receives a written statement of the exceptions within thirty (30) days of the date of the monthly statement.

**3.8**    In the event that any requested advance exceeds Availability or that (a) the sum of (i) the outstanding balance of Revolving Loans plus (ii) the outstanding undrawn face amount of Letters of Credit exceeds (b)(x) the Borrowing Base or (y) the Revolving Line of Credit, any such nonconsensual Overadvance shall be due and payable to the Agent on behalf of the Lenders immediately upon the Agent's demand therefor.

## SECTION 4    Superpriority Claims, Etc.

**4.1**    **Superpriority Claims and Collateral Security**.  The Companies represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Final Order, all of the Obligations:

(a)    shall at all times constitute a Superpriority Claim having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any claims of any Person (other than the claims of Arcus, which are pari passu), whether now existing or hereafter arising, including any claims under Sections 105(a), 326, 330, 328, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1 113 and 1 114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out; and

(b)    pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code, shall at all times be secured by a first priority perfected lien in all of the assets (including, without limitation, any Avoidance Actions and Avoidance Action Recoveries, subject to the Intercreditor Agreement, whether now owned or hereafter acquired, of each Company and its estate, subject, as to priority, only to the Carve-Out and Permitted Encumbrances securing those valid, perfected, non-avoidable secured claims existing on the Filing Date and listed on Schedule 4.1(b) (collectively, "Senior Claims").  The liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

The agreement of Agent and Lenders to provide post-petition financing to Borrowers will not prohibit Agent or Lenders from moving in the Bankruptcy Court for any other and further relief which Agent or Lenders believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the Collateral (including a request for Company to abandon any part of the Collateral) or otherwise.

**4.2**    **No Filings Required**.  Notwithstanding Section 6, the liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Financing Order or Final Order, whichever occurs first.  The Agent shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien granted by or pursuant to each Order or this Agreement or any other Loan Document.

**4.3**    **Grants, Rights and Remedies**.  The lien and administrative priority granted by or pursuant to the Financing Orders or this Agreement or any other Loan Document are independently granted.  The Financing Orders and this Agreement and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

**4.4**    **No Discharge; Survival of Claims**.  The Companies agree that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Companies, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge), (b) the Superpriority Claim granted to Agent and Lenders pursuant to the Financing Orders, and the liens granted to Agent, for the benefit of Agent and the Lenders pursuant to the Financing Orders and the other Loan Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (c) the Companies shall not propose or support any Reorganization Plan that is not conditioned upon termination of this Agreement and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Companies and their estate, in each case, on or before the effective date of such Reorganization Plan, and (d) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

B # 761460 v.5

**4.5**    **Survival**.  The liens, lien priority, administrative priorities and other rights and remedies granted to Agent and Lenders pursuant to the Financing Orders, this Agreement and the other Loan Documents (including, without limitations, the existence, perfection and priority of the liens provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Company (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code pursuant to Section 552(b) of the Bankruptcy Code (or otherwise), are or will be prior to or on a parity with any claim of Agent or any Lender against the Companies in respect of any Obligation;

(b)    the liens securing the Obligations shall constitute valid and perfected liens and, subject only to the Carve-Out and Permitted Encumbrances securing Senior Claims, shall be prior to all other liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the liens securing the Obligations shall continue to be valid and perfected without the necessity that Agent file financing statements, mortgages or otherwise perfect its lien under applicable non-bankruptcy law.

**4.6**    **Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances**.  The Companies, the Agent and the Lenders know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances").  Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case.  With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Company:  (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of each Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with each Order and the transactions contemplated by this Agreement and having either Order entered that would serve as a basis to allege such Changed Circumstances.  Each Company understands and agrees that Agent and Lenders are not willing to bear any of the risks involved in Company's business enterprises and Agent and Lenders are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Company expressly assumes all risks of any and all such matters, and the consequences that Agent and Lenders will enforce their legal, equitable, and contractual rights if Agent and Lenders are not paid and dealt with strictly in accordance with the terms and conditions of the applicable Financing Order and the other Loan Documents.  Without limiting the foregoing in any way, Company's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement and the applicable Financing Order, and, until all Obligations are indefeasibly paid and satisfied in full either before or after a termination of this Agreement, Companies will not seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever

**4.7**    **Exclusive Remedy For Any Alleged Post-Petition Claim**.  If any Company asserts that it has any adverse claims against Agent or Lenders, with respect to this Agreement and the transactions contemplated hereby, each Company agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (the "Damage Lawsuit").  Any such Damage Lawsuit, regardless of the procedural

form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Agent and Lenders of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Loan Documents, and the Damage Lawsuit (including any and all adverse claims alleged against Agent or Lenders) cannot be asserted by any Company as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by Agent or Lenders of their legal, equitable, and contractual rights under the Order, the other Loan Documents, and otherwise.

       **4.8**      **Prohibition on Surcharge; Etc.**  No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code Section 552(b) of the Bankruptcy Code (or otherwise), nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out. The prohibition on surcharging or priming of the liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a lien or rights (through any means, at law or in equity) which in any case is equal or senior to the liens of Agent on the Collateral.

       **4.9**      **Marshalling Obligations**. The right of Agent to seek the equitable remedy of marshalling is expressly preserved, and Companies will cooperate fully with any effort by Agent to exercise its equitable remedy of marshalling.

## SECTION 5     Letters of Credit

       In order to assist the Companies in establishing or opening Letters of Credit with an Issuing Bank, the Companies have requested the Agent, on behalf of the Lenders, to join in the applications for such Letters of Credit, and/or guarantee payment or performance of such Letters of Credit and any drafts or acceptances thereunder through the issuance of the Letter of Credit Guaranty, thereby lending the Agent's credit to the Companies and the Agent has agreed to do so. These arrangements shall be handled by the Agent subject to the terms and conditions set forth below.

       **5.1**      Within the Availability, the Agent on behalf of the Lenders shall assist the Companies in obtaining Letter(s) of Credit in an amount not to exceed the outstanding amount of the Letter of Credit Sub-Line, the Agent's assistance for amounts in excess of the limitation set forth herein shall at all times and in all respects be in the Agent's sole discretion. It is understood that the term, form and purpose of each Letter of Credit and all documentation in connection therewith, and any amendments, modifications or extensions thereof must be mutually acceptable to the Agent, the Issuing Bank and the Companies, provided that Letters of Credit shall not be used for the purchase of domestic Inventory or to secure present or future debt of domestic Inventory suppliers. Any and all outstanding Letters of Credit shall be subtracted dollar for dollar from the Borrowing Base as an Availability Reserve.

       **5.2**      The Agent shall have the right, without notice to the Companies, to charge the Companies' Revolving Loan Account with the amount of any and all indebtedness, liability or obligation of any kind incurred by the Agent and/or the Lenders under the Letter of Credit Guarantees at the earlier of (a) payment by the Agent under the Letter of Credit Guaranty; or (b) the occurrence of an Event of Default which has not been Waived In Writing By Agent. Any amount charged to Companies' Revolving Loan Account shall be deemed a Revolving Loan hereunder and shall incur interest at the rate provided in Paragraph 8.1 of Section 8 of this Financing Agreement.

       **5.3**      The Companies unconditionally, jointly and severally, indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless from any and all loss, claim or liability incurred by the Agent arising from any transactions or occurrences relating to Letters of Credit and Letter of Credit Guaranties established or opened for the Companies' account, the collateral relating thereto and any drafts or acceptances thereunder, and all Obligations thereunder, including any such loss or claim due to any errors, omissions, negligence, misconduct or action taken by any Issuing Bank, other than for any such loss, claim or liability arising out of the gross negligence or willful misconduct by the Agent and/or the Lenders under the Letters of Credit or Letter of Credit Guaranty. This indemnity shall survive termination of this Financing Agreement. The Companies agree that any charges incurred by the Agent and/or the Lenders for the Companies' account by the Issuing Bank shall be conclusive on the Agent and may be charged to the Companies' Revolving Loan Account.

B # 761460 v.5

5.4      In connection with any draw under a Letter of Credit or Letter of Credit Guaranty, the Agent and the Lenders shall not be responsible for:  (a) the existence, character, quality, quantity, condition, packing, value or delivery of the goods purporting to be represented by any documents; (b) any difference or variation in the character, quality, quantity, condition, packing, value or delivery of the goods from that expressed in the documents; (c) the validity, sufficiency or genuineness of any documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged; (d) the time, place, manner or order in which shipment is made; (e) partial or incomplete shipment, or failure or omission to ship any or all of the goods referred to in the Letters of Credit or documents; (f) any deviation from instructions; (g) delay, default, or fraud by the shipper and/or anyone else in connection with the goods or the shipping thereof or (h) any breach of contract between the shipper or vendors and the Companies.

5.5      The Companies agree that any action taken by the Agent and/or the Lenders, if taken in good faith, or any action taken by any Issuing Bank, under or in connection with the Letters of Credit, the Letter of Credit Guarantees, the drafts or acceptances, or the Collateral, shall be binding on the Companies, jointly and severally, and shall not result in any liability whatsoever of the Agent or the Lenders to the Companies.  In furtherance thereof the Agent shall have the full right and authority to:  (a) clear and resolve any questions of non-compliance of documents; (b) give any instructions as to acceptance or rejection of any documents or goods; (c) execute any and all steamship or airways guaranties (and applications therefor), indemnities or delivery orders; (d) grant any extensions of the maturity of time of payment for, or time of presentation of any drafts, acceptances, or documents; and (e) agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit and Letter of Credit Guaranties, drafts or acceptances; all in the Agent's sole name.  The Issuing Bank shall be entitled to comply with and honor any and all such documents or instruments executed by or received solely from the Agent, all without any notice to or any consent from the Companies.  Notwithstanding any prior course of conduct or dealing with respect to the foregoing including amendments and non-compliance with documents and/or the Companies' instructions with respect thereto, the Agent may exercise its rights hereunder in its sole and reasonable judgment.  In addition, without the Agent's express consent and endorsement in writing, the Companies agree:  (a) not to execute any and all applications for steamship or airway guaranties, indemnities or delivery orders; to grant any extensions of the maturity of time of payment for, or time of presentation of any drafts, acceptances or documents; or to agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit, drafts or acceptances; and (b) after the occurrence of an Event of Default which is not cured within any applicable grace period, if any, or waived by the Agent, not to (i) clear and resolve any questions of non-compliance of documents, or (ii) give any instructions as to acceptances or rejection of any documents or goods.

5.6      The Companies agree that:  (a) any necessary import, export or other licenses or certificates for the import or handling of the Collateral will have been promptly procured; (b) all foreign and domestic governmental laws and regulations in regard to the shipment and importation of the Collateral, or the financing thereof will have been promptly and fully complied with; and (c) any certificates in that regard that the Agent may at any time request will be promptly furnished on behalf of the Companies.  In connection herewith, the Companies warrant and represent that all shipments made under any such Letters of Credit are in accordance with the laws and regulations of the countries in which the shipments originate and terminate, and are not prohibited by any such laws and regulations.  The Companies assume all risk, liability and responsibility for, and agrees to pay and discharge, all. present and future local, state, federal or foreign Taxes, duties, or levies.  Any embargo, restriction, laws, customs or regulations of any country, state, city, or other political subdivision, where the Collateral is or may be located, or wherein payments are to be made, or wherein drafts may be drawn, negotiated., accepted, or paid, shall be solely the Companies' risk, liability and responsibility.

5.7      Upon any payments made to the Issuing Bank under the Letter of Credit Guaranty, the Agent on behalf of the Lenders shall acquire by subrogation, any rights, remedies, duties or obligations granted or undertaken by the Companies to the Issuing Bank in any application for Letters of Credit, any standing agreement relating to Letters of Credit or otherwise, all of which shall be deemed to have been granted to the Agent on behalf of the Lenders and apply in all respects to the Agent and shall be in addition to any rights, remedies, duties or obligations contained herein.

B # 761460 v.5

**SECTION 6**    <u>**Collateral**</u>

**6.1**    As security for the prompt payment in full of all Obligations, each of the Companies hereby pledges and grants (and confirms and reaffirms its prior pledge and grant pursuant to the Existing Financing Agreements) to the Agent, on behalf of the Lenders, a first priority continuing general lien and replacement lien under the Bankruptcy Code upon, and security interest in, all of their now owned and hereafter acquired (and whether acquired prior or subsequent to the commencement of the Bankruptcy Case) real and personal property, (subject to the Intercreditor Agreement), including, without limitation:

      (a)      Accounts;

      (b)      Inventory;

      (c)      General Intangibles;

      (d)      Documents of Title;

      (e)      Other Collateral;

      (f)      Equipment;

      (g)      Real Estate;

      (h)      Intercompany Debt; and

      (i)      Avoidance Actions and Avoidance Action Recoveries, together with

      (j)      all proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

**6.2**    The security interests granted hereunder shall extend and attach to:

      (a)      All Collateral which is owned by any of the Companies or in which the Companies have any interest, whether held by the Companies or others for their account, and, if any Collateral is Equipment, whether the Companies' interest in such Equipment is as owner, finance lessee or conditional vendee;

      (b)      All Equipment, whether the same constitutes personal property or fixtures, including, but without limiting the generality of the foregoing, all dies, jigs, tools, benches, molds, tables, accretions, component parts thereof and additions thereto, as well as all accessories, motors, engines and auxiliary parts used in connection with, or attached to, the Equipment; and

      (c)      All Inventory and any portion thereof which may be returned, rejected, reclaimed or repossessed by either the Agent or the Companies from the Companies' customers, as well as to all supplies, goods, incidentals, packaging materials, labels and any other items which contribute to the finished goods or products manufactured or processed by the Companies, or to the sale, promotion or shipment thereof.

**6.3**    The Companies agree to safeguard, protect and hold all Inventory for the Agent's account and make no disposition thereof except in the ordinary course of the business of the Companies, as herein provided. The Companies represent and warrant that Inventory will be sold and shipped by the Companies to their customers only in the ordinary course of the Companies' business, and then only on open account (except in the case of sales on a C.O.D. basis or paid by credit card, all of which shall be excluded from the Borrowing Base as Accounts Receivable, which are ineligible) and on terms currently being extended by the Companies to their customers,

-29-

provided that except as provided in Section 3.3 hereof, the Companies shall not sell Inventory on a consignment basis nor retain any lien or security interest in any sold Inventory.  Upon the sale, exchange, or other disposition of Inventory, as herein provided, the security interest in the Inventory provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Trade Accounts Receivable, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sale, exchange or disposition.  As to any such sale, exchange or other disposition, the Agent shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.  The Companies hereby agree to immediately forward any and all proceeds of Collateral to the Depository Account, and to hold any such proceeds (including any notes and instruments), in trust for the Agent, on behalf of the Lenders, pending delivery to the Agent.  Irrespective of the Agent's perfection status in any and all of the General Intangibles, including, without limitations, any Patents, Trademarks, Copyrights or licenses with respect thereto, the Companies hereby irrevocably grant the Agent a royalty free license to sell, or otherwise dispose or transfer, in accordance with Paragraph 10.3 of Section 10 of this Financing Agreement, and the applicable terms hereof of any of the Inventory upon the occurrence of an Event of Default which has not been Waived In Writing By Agent.

6.4    The Companies agree at their own cost and expense to keep the Equipment in as good and substantial repair and condition as the same is now or at the time the lien and security interest granted herein shall attach thereto, reasonable wear and tear and casualty excepted, making any and all repairs and replacements when and where necessary.  The Companies also agree to safeguard, protect and hold all Equipment in accordance with the terms hereof and subject to the Agent's security interest.  The Companies may, in the ordinary course of their business, sell, exchange or otherwise dispose of obsolete or surplus Equipment provided, however, that: (a) the then value of the Equipment so disposed of in any Fiscal Year does not exceed Five Hundred Thousand Dollars ($500,000.00) in the aggregate.  The proceeds from the sale of such obsolete or surplus equipment may be used to pay down the Companies' Arcus Term Loan or otherwise replace such equipment with Arcus' consent.  Upon the sale, exchange, or other disposition of the Equipment, as herein provided, the security interest provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Accounts, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sales, exchange or disposition.  As to any such sale, exchange or other disposition, the Agent and the Lenders shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

6.5    The rights and security interests granted to the Agent and the Lenders hereunder are to continue in full force and effect, notwithstanding the termination of this Financing Agreement or the fact that the Revolving Loan Accounts may from time to time be temporarily in a credit position, until the final indefeasible payment in full, in cash to the Agent of all Obligations and the termination of this Financing Agreement.  Any delay, or omission by the Agent to exercise any right hereunder shall not be deemed a waiver thereof, or be deemed a waiver of any other right, unless such waiver shall be in writing and signed by the Agent.  A waiver on any one occasion shall not be construed as a bar to, or waiver of any right or remedy on any future occasion.

6.6    Notwithstanding the Agent's security interest in the Collateral and to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral or by the guarantee, endorsement, assets or property of any other Person, the Agent shall have the right in its sole discretion to determine which rights, liens, security interests or remedies the Agent shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of them, or any of the Agent's and/or the Lenders' rights hereunder.

6.7    Any balances to the credit of the Companies and any other property or assets of the Companies in the possession or control of the Agent and/or the Lenders may be held by the Agent as security for any Obligations and applied in whole or partial satisfaction of such Obligations when due.  The liens and security interests granted herein, and any other lien or security interest the Agent and/or the Lenders may have in any other assets of the Companies, shall secure payment and performance of all now existing and future Obligations.  The Agent may, in its discretion, charge any or all of the Obligations to the Revolving Loan Account when due.

6.8    Each of the Companies possesses all General Intangibles and rights thereto necessary to conduct their business as conducted as of the Closing Date and the Companies shall maintain their rights in, and the value of,

B # 761460 v.5

the foregoing in the ordinary course of their business, including, without limitation, by making timely payment with respect to any applicable licensed rights.  The Companies shall deliver to the Agent, and/or shall cause the appropriate party to deliver to the Agent, from time to time such pledge or security agreements with respect to General Intangibles (now or hereafter acquired) of the Companies and their subsidiaries as the Agent shall require to obtain valid first liens thereon, subject to the terms and conditions of the Intercreditor Agreement.  In furtherance of the foregoing, the Companies shall provide timely notice to the Agent of any additional Patents, Trademarks, Copyrights, brand names, and other trade designations acquired or applied for subsequent to the Closing Date and the Companies shall execute such documentation as the Agent may reasonably require to obtain and perfect its lien thereon.  The Companies hereby confirm that they shall deliver to the Agent each note or other instrument evidencing indebtedness owed to them, including without limitation all intercompany indebtedness among the Companies, whether such note or other instrument now exists or arises or is issued at any time hereafter, in each case endorsed to the Agent pursuant to an endorsement in form and substance acceptable to the Agent.  The Companies hereby confirm that they shall deliver, or cause to be delivered, any pledged stock or membership interest (if certificated) issued subsequent to the Closing Date to the Agent in accordance with the applicable terms of the Pledge Agreement and prior to such delivery, shall hold any such stock in trust for the Agent.  The Companies hereby irrevocably grant to the Agent a royalty-free, non-exclusive license in the General Intangibles, including Trademarks, Copyrights, Patents, licenses, and any other proprietary and intellectual property rights and any and all right, title and interest in any of the foregoing, for the sole purpose, upon the occurrence of an Event of Default which is not Waived In Writing By Agent, of the right to:  (i) advertise for sale and sell or transfer any Inventory bearing any of the General Intangibles, and (ii) make, assemble, prepare for sale or complete, or cause others to do so, any applicable raw materials or Inventory bearing any of the General Intangibles, including use of the Equipment and Real Estate for the purpose of completing the manufacture of unfinished goods, raw materials or work-in-process comprising Inventory, and apply the proceeds thereof to the Obligations hereunder, all as further set forth in this Financing Agreement and irrespective of the Agent's lien and perfection in any General Intangibles.

**6.9**     This Financing Agreement and the obligation of the Companies to perform all of their covenants and obligations hereunder are further secured by mortgages and assignments of leases and rents on the Real Estate.

**6.10**     The Companies shall give to the Agent from time to time such mortgage(s), deed(s) of trust or assignment(s) on the Real Estate or real estate acquired after the date hereof as the Agent shall require to obtain a valid first lien thereon subject only to (a) those exceptions of title as set forth in future title insurance policies that are satisfactory to the Agent and (b) the terms and conditions of the Intercreditor Agreement.

**6.11**     In the event the Companies form a subsidiary, or acquire a subsidiary, the Companies shall cause and direct such subsidiary to:  (a) guaranty, jointly and severally with the Companies, all Obligations, and (b) deliver to the Agent for the benefit of the Agent and the Lenders, a security interest or mortgage on or in all assets, including real estate, of such subsidiary.

**SECTION 7     Representations, Warranties and Covenants**

**7.1**     Each of the Companies hereby warrants and represents that:  (i) Schedule 7.1 hereto correctly and completely sets forth the Companies' (A) chief executive office, (B) Collateral locations and (C) tradenames, (ii) except for the Permitted Encumbrances, and subject to the entry of the applicable Financing Order, this Financing Agreement creates a valid, perfected and first priority security interest in and to the Collateral and the security interests granted herein constitute and shall at all times constitute the first and only liens on the Collateral, except as contemplated by the Intercreditor Agreement; (iii) except for the Permitted Encumbrances, the Companies are, or will be, at the time additional Collateral is acquired by them, the absolute owners of the Collateral with full right to pledge, sell, consign, transfer and create a security interest therein, free and clear of any and all claims or liens in favor of others; (iv) the Companies will, at their expense, at all times warrant and, at the Agent's request, defend the same from any and all claims and demands of any other Person other than a holder of a Permitted Encumbrance; (v) the Companies will not grant, create or permit to exist, any lien upon, or security interest in, the Collateral, or any proceeds thereof in favor of any other Person other than the holders of the Permitted Encumbrances; (vi) the Equipment does not comprise a part of the Inventory of any of the Companies; and (vii) the Equipment is and will only be used by the Companies in their business and will not be held for sale or lease, or removed from their premises, or otherwise disposed of by the Companies except as otherwise permitted in this Financing Agreement.

B # 761460 v.5

**7.2**      Each of the Companies agrees to maintain books and records pertaining to the Collateral in accordance with GAAP and in such additional detail, form and scope as the Agent shall reasonably require.  The Companies agree that the Agent or its agents, and any of the Lenders who may wish to accompany the Agent at their own cost expense, may enter upon the Companies' premises at any time during normal business hours, and from time to time in its reasonable business judgment, for the purpose of inspecting the Collateral and any and all records pertaining thereto.  The Companies agree to afford the Agent thirty (30) days prior written notice of any change in the location of any Collateral, other than to locations, that as of the Closing Date, are known to the Agent and at which the Agent has filed financing statements and otherwise fully perfected its liens thereon.  The Companies are also to advise the Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or on the security interests granted to the Agent therein.

**7.3**      Each of the Companies agrees to:  (a) execute and deliver to the Agent, from time to time, solely for the Agent's convenience in maintaining a record of the Collateral, such written statements, and schedules as the Agent may reasonably require, designating, identifying or describing the Collateral; and (b) provide the Agent, on request, with an appraisal of the Equipment, Inventory, and/or Real Estate.  During (i) each calendar year, the Companies shall pay for not more than one (1) appraisal for Inventory, conducted at a time when no Event of Default exists.  Such Inventory appraisals shall be performed in August of each calendar year.  The Companies shall pay for each appraisal performed when any Event of Default has occurred which has not been Waived In Writing By Agent.  All appraisers and appraisals shall be acceptable to the Agent in all respects.  The Companies' failure, however, to promptly give the Agent such statements, or schedules shall not affect, diminish, modify or otherwise limit the Agent's and/or the Lenders' security interests in the Collateral.

**7.4**      Each of the Companies agrees to comply with the requirements of all state and federal laws in order to grant to the Agent valid and perfected first security interests in the Collateral, subject only to the Permitted Encumbrances.  The Agent is hereby authorized by the Companies to file (including pursuant to the applicable terms of the UCC) from time to time any financing statements, continuations or amendments covering the Collateral.  The Companies hereby consent to and ratify any and all execution and/or filing of financing statements on or prior to the Closing Date by the Agent.  The Companies agree to do whatever the Agent may reasonably request, from time to time, by way of (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof (b) cooperating with the Agent's agents and employees; (c) keeping Collateral records; (d) transferring proceeds of Collateral to the Agent's possession; and (e) performing such further acts as the Agent and/or the Lenders may reasonably require in order to effect the purposes of this Financing Agreement including but not limited to obtaining control agreements with respect to deposit accounts and/or Investment Property.

**7.5**      (a)      Each of the Companies agrees to maintain insurance on their Real Estate, Equipment and Inventory under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as at all times reasonably satisfactory to the Agent.  All policies covering the Real Estate, Equipment and Inventory are, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, to be made payable to the Agent, on behalf of the Lenders, in case of loss, under a standard non-contributory "mortgagee," "lender" or "secured party" clause and are to contain such other provisions as the Agent may require to fully protect the Agent's interest in the Real Estate, Inventory and Equipment and to any payments to be made under such policies.  All original policies or true copies thereof are to be delivered to the Agent, premium paid to date as billed, with the loss payable endorsement in the Agent's favor, and shall provide for not less than thirty (30) days prior written notice to the Agent of the exercise of any right of cancellation.  At the Companies' request, or if the Companies fail to maintain such insurance, the Agent may arrange for such insurance, but at the Companies' expense and without any responsibility on the Agent's part for:  (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims.  Upon the occurrence of an Event of Default which is not Waived In Writing By Agent, the Agent shall, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, have the sole right and at its option, in the name of the Agent or the Companies, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(b)      (i)      In the event of any loss or damage by fire or other casualty, insurance proceeds relating to a Company's Inventory shall reduce the Revolving Loan.  Upon the occurrence of a Default or Event of

-32-

Default which is not Waived In Writing By Agent, such Insurance Proceeds may be applied to the Obligations in such order as the Agent may elect;

(ii)    Subject to the rights of Arcus, as contemplated by the Intercreditor Agreement, in the event any part of any of the Companies' Real Estate or Equipment is damaged by fire or other casualty and the Insurance Proceeds for such damage or other casualty is less than or equal to One Hundred Thousand Dollars ($100,000.00), the Agent shall promptly apply such Insurance Proceeds to reduce the Companies' outstanding balance in the Revolving Loan Account.  Upon the occurrence of an Event of Default which is not Waived In Writing By Agent, such Insurance Proceeds may be applied to the Obligations in such order as the Required Lenders may reasonably elect;

(iii)    Subject to the rights of Arcus, absent the occurrence of an Event of Default which is not Waived In Writing By Agent, and provided that (x) such Company has business interruption insurance in an amount not less than the difference between the lost profits of such Company's facilities and the policy deductible, and (y) the Insurance Proceeds are in excess of One Hundred Thousand Dollars ($100,000.00) but less than Five Million Dollars ($5,000,000.00) (the "**Cap**"), such Company may elect (by delivering written notice to the Agent) to replace, repair or restore such Real Estate or Equipment to substantially the equivalent condition prior to such fire or other casualty as set forth herein.  If the Companies do not or cannot (due to the occurrence of an Event of Default which is not Waived In Writing By Agent) elect to use the Insurance Proceeds or the Insurance Proceeds are in excess of the Cap as set forth above, the Agent may, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, apply the Insurance Proceeds, first to the fees and expenses due to Agent, second to accrued interest with respect to the Obligations, third to the outstanding principal balance of the Obligations, in such order as the Required Lenders may elect, and fourth to any other Obligations in such order as the Required Lenders may elect;

(iv)    Subject to the rights of Arcus, if the Companies elect to use the Insurance Proceeds for the repair, replacement or restoration of any Real Estate and/or Equipment and provided no Event of Default has occurred which has not been Waived In Writing By Agent, (x) Insurance Proceeds for any loss in excess of One Hundred Thousand Dollars ($100,000.00) on Equipment and/or Real Estate will b applied to the reduction of the Revolving Loans and (y) the Agent may set up an Availability Reserve in an amount equal to said Insurance Proceeds.  The Availability Reserve will be reduced dollar-for-dollar upon receipt of non-cancelable executed purchase orders, delivery receipts or contracts for the replacement, repair or restoration of Equipment and/or the Real Estate and disbursements in connection therewith.  Upon Agent's request, prior to the commencement of all, material restoration, repair or replacement of Real Estate, the Companies shall provide the Agent with a restoration plan and a total budget certified by an independent third party experienced in construction costing.  If there are insufficient Insurance Proceeds to cover the cost of restoration as so determined, the Companies shall be responsible for the amount of any such insufficiency, prior to the commencement of restoration and shall demonstrate evidence of such before the reserve will be reduced.  Completion of restoration shall be evidenced by a final, unqualified certification of the design architect employed, if any; an unconditional Certificate of Occupancy, if applicable; such other certification as may be required by law; or if none of the above is applicable, a written good faith determination of completion by the Companies (herein collectively the "**Completion**").  Upon Completion, any remaining reserve as established" hereunder will be automatically released; and

(v)    Agent, Lenders and the Companies acknowledge that until the Arcus Term Loan is paid in full in cash, all Insurance Proceeds arising out of claims with respect to Non-Borrowing Base Assets (as defined in the Arcus Term Loan Agreement) shall be paid to Arcus in accordance with the terms and provisions of the Arcus Term Loan Agreement; provided, however, that the Companies shall provide Agent with notice of such payment to Arcus contemporaneously with such payment.

(c)    In the event the Companies or any one of them fail to provide the Agent with timely evidence, acceptable to the Agent, of their maintenance of insurance coverage required pursuant to Paragraph 7.5(a) above, the Agent may purchase, at the Companies' expense, insurance to protect the Agent's interests in the Collateral.  The insurance acquired by the Agent may, but need not, protect the Companies' interest in the Collateral, and therefore such insurance may not pay claims which the Companies may have with respect to the Collateral or pay any claim which may be made against the Companies in connection with the Collateral.  In the event the Agent purchases, obtains or acquires insurance covering all or any portion of the Collateral, the Companies

B # 761460 v.5

shall be responsible for all of the applicable costs of such insurance, including; premiums, interest (at the applicable Chase Bank Rate for Revolving Loans set forth in Paragraph 8.1 of Section 8 hereof), fees and any other charges with respect thereto, until the effective date of the cancellation or the expiration of such insurance. The Agent may charge all of such premiums, fees, costs, interest and other charges to the Companies' Revolving Loan Accounts. The Companies hereby acknowledge that the costs of the premiums of any insurance acquired by the Agent may exceed the costs of insurance which the Companies may be able to purchase on their own. In the event that the Agent purchases such insurance, the Agent will notify the Companies of said purchase within thirty (30) days of the date of such purchase. If within thirty (30) days after the date of such notice, the Companies provide the Agent with proof that the Companies had the insurance coverage required pursuant to 7.5(a) above (in form and substance satisfactory to the Agent) as of the date on which the Agent purchased insurance and the Companies continued at all times to have such insurance, then the Agent agrees to cancel the insurance purchased by the Agent and credit the Companies' Revolving Loan Account with the amount of all costs, interest and other charges associated with any insurance purchased by the Agent, including with any amounts previously charged to the Revolving Loan Account.

**7.6**    Each of the Companies agrees to pay, when due, all Taxes, including sales taxes assessments, claims and other charges lawfully levied or assessed upon the Companies or the Collateral unless such Taxes are being diligently contested in good faith by the Companies by appropriate proceedings and adequate reserves are established in accordance with GAAP and except to the extent payment is stayed or excused by operation of the Bankruptcy Code. Notwithstanding the foregoing, if any lien shall be filed or claimed thereunder (a) for Taxes due to the United States of America, or (b) which in the Agent's opinion might create a valid obligation having priority over the rights granted to the Agent herein (exclusive of Real Estate), such lien shall not be deemed to be a Permitted Encumbrance hereunder and the Companies shall immediately pay such tax and remove the lien of record. If the Companies or any one of them, fail to do so promptly, then at the Agent's election, the Agent may (i) create an Availability Reserve in such amount as it may deem appropriate in its business judgment, or (ii) upon the occurrence of a Default or Event of Default, imminent risk of seizure, filing of any priority lien, forfeiture, or sale of the Collateral, pay Taxes on the Companies' behalf and the amount thereof shall be an Obligation secured hereby and due on demand.

**7.7**    Each of the Companies:  (a) agrees to comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the business or operations of the Companies or any one of them, provided that the Companies may contest any acts, rules, regulations, orders and directions of such bodies or officials in any, reasonable manner which will not, in the Agent's reasonable opinion, materially and adversely effect the Agent's and/or the Lenders' rights or priority in the Collateral; (b) agrees to comply with all environmental statutes, acts, rules, regulations or orders as presently existing or as adopted or amended in the future, applicable to the Collateral, the ownership and/or use of the Real Estate and operation of their business, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the operation of the business of the Companies or any one of them; and (c) shall not be deemed to have breached any provision of this Paragraph 7.7 if (i) the failure to comply with the requirements of this Paragraph 7.7 resulted from good faith error or innocent omission, (ii) the Companies promptly commence and diligently pursue a cure of such breach, and (iii) such failure is cured within (30) days following the Companies' receipt of notice of such failure, or if such cannot in good faith be cured within thirty (30) days, then such breach is cured within a reasonable time frame based upon the extent and nature of the breach and the necessary remediation, and in conformity with any applicable consent order, consensual agreement and applicable law.

**7.8**    Until termination of this Financing Agreement and payment and satisfaction of all Obligations due hereunder, the Companies agree that, unless the Agent shall have otherwise consented in writing, the Companies will furnish to the Agent and each Lender: (a) within one hundred twenty (120) days after the end of the Fiscal Year of the Companies ended December 31, 2007, an audited Consolidated Balance Sheet, with a Consolidating Balance Sheet attached thereto, as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus of the Companies and all subsidiaries of each for such year, audited by independent public accountants selected by the Companies and satisfactory to the Agent, and within ninety (90) days after the end of each Fiscal Year of the Companies ending after December 31, 2007, an audited Consolidated Balance Sheet, with a Consolidating Balance Sheet attached thereto, as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus of the Companies and all subsidiaries of each for such year, audited by independent public accountants selected by the Companies and satisfactory to the Agent; (b) within sixty (60) days

B # 761460 v.5

after the end of each Fiscal Quarter a Consolidated Balance Sheet and Consolidating Balance Sheet as at the end of such period and statements of profit and loss, cash flow and surplus of the Companies and all subsidiaries of each, certified on behalf of the Companies by an authorized financial or accounting officer of the Companies; (c) within thirty (30) days after the end of each month a Consolidated Balance Sheet with a Consolidating Balance Sheet attached thereto as at the end of such period and statements of profit and loss, cash flow and surplus of the Companies and all subsidiaries for such period, certified on behalf of the Companies by an authorized financial or accounting officer of the Companies; (d) on the first day of each week a Borrowing Base Certificate as to each Company on a consolidating basis and for all Companies on a consolidated basis; (e) on or before the tenth (10th) day of each month:  (x) an aging of each Company's Accounts Receivable, (y) an Inventory report showing each Company's Inventory at cost or market value, and (z) an accounts payable aging, all as of the last day of the prior month in form and substance reasonably satisfactory to the Agent; (f) quarterly financial covenant compliance certificates certified as fairly and accurately reflecting the statements contained therein on behalf of the Companies' by the Chief Financial Officer of Shapes; and (g) from time to time, such further information regarding the business affairs and financial condition of the Companies and/or any subsidiaries thereof as the Agent or any Lender may reasonably request, including, without limitation (i) the accountant's management practice letter, if any, (ii) annual cash flow projections in form satisfactory to the Agent, (iii) on each Tuesday (commencing on March 25, 2008), a comparative statement of the Companies' actual results compared to the Budget for the preceding week and for the Cumulative Period, and (iv) as requested by Agent, (A) until May 1, 2008, bi-weekly Inventory reports showing each Company's Inventory at the lower of cost or market value, or (B) on and after May 1, 2008, weekly Inventory reports showing each Company's Inventory at the lower of cost or market value.  Each financial statement which the Companies are required to submit hereunder must be accompanied by a manager's or an officer's certificate, signed by the Manager, Chairman, Chief Executive Officer, Chief Financial Officer, President, Vice President, Controller, or Treasurer, pursuant to which any one such manager or officer must certify on behalf of the Companies that:  (x) the financial statement(s) fairly and accurately represent(s) each of the Companies' financial condition at the end of the particular accounting period, as well as the Companies' operating results during such accounting period, subject to year-end audit adjustments; and (y) during the particular accounting period:  (A) there has been no Default or Event of Default under this Financing Agreement, provided however, that if any such manager or officer has knowledge that any such Default or Event of Default, has occurred during such period, the existence of and a detailed description of same shall be set forth in such officer's certificate; (B) the Companies have not received any notice of cancellation with respect to property insurance policies which have not been replaced by policies which comply with the requirements of this Financing Agreement; (C) the Companies have not received any notice that would reasonably be expected to result in a material adverse effect on the value of the Collateral taken as a whole; and (D) the exhibits attached to such financial statement(s) constitute detailed calculations showing compliance with all financial covenants contained in this Financing Agreement.

7.9     Until termination of the Financing Agreement and payment and satisfaction of all Obligations hereunder, each of the Companies agrees that, without the prior written consent of the Agent, except as otherwise herein provided, the Companies or any one of them will not:

(a)     Mortgage, assign, pledge, or otherwise permit any lien, charge, security interest, encumbrance or judgment, (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise) to exist on any of the Companies' Collateral or any other assets, whether now owned or hereafter acquired, except for the Permitted Encumbrances;

(b)     Incur or create any Indebtedness, off balance sheet liabilities, rate management obligations, or sale leasebacks, other than the Permitted Indebtedness;

(c)     Sell, lease, assign, transfer or otherwise dispose of (i) Collateral, except for sales of Inventory in the ordinary course of business and as otherwise specifically permitted by this Financing Agreement, or (ii) either all or substantially all of any of the Companies' assets, which do not constitute Collateral; provided however, if the Companies desire to sell a business or line of business or Parent desires to sell all or a controlling portion of the membership interests in one or more of the Companies, then such sale may be consummated only upon:  (A) approval of the Bankruptcy Court, (B) such sales being an arm's length transaction for fair market value, (C) not less than thirty (30) days' prior written notice to Agent, which notice shall include copies of all then current drafts of the relevant documents and instruments evidencing the terms of such transaction, (D) Agent's determination, in its sole discretion, that the terms and conditions of such transaction and such documents and

B # 761460 v.5

instruments are acceptable as to form and substance, (E) Agent's giving its prior written consent, and (F) Agent's receipt of the proceeds of such sale for application to the Obligations in such order as Agent shall elect, subject to the terms of the Intercreditor Agreement.

(d)    Merge, consolidate or otherwise alter or modify their respective registered names, principal places of business, formation as limited liability companies or structure, or existence, reincorporate or re-organize, or enter into or engage in any operation or activity materially different from that presently being conducted by the Companies or any one of them, except that any of the Companies may change its registered name or its address; provided that:  (i) such Company shall give the Agent thirty (30) days prior written notice thereof and (ii) such Company shall execute and deliver, prior to or simultaneously with any such action, any and all documents and agreements requested by the Agent to confirm the continuation and preservation of all security interests and liens granted to the Agent hereunder;

(e)    Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(f)    Declare or pay any dividend or distributions of any kind on, or purchase, acquire, redeem or retire, any of the capital stock or equity interest, of any class whatsoever, whether now or hereafter outstanding; provided however, the Companies (other than Parent) may make distributions to Parent and Parent may make distributions to the equity owners of Parent, in an aggregate amount equal to the actual federal, state and local income tax liability of the equity owners of Parent for any applicable taxable year (or applicable portion thereof) attributable to the Companies' income resulting from operations for each taxable year, provided that, (y) as a condition precedent to any such payment, no Default or Event of Default shall have occurred before or after giving effect to any such payment and each Company shall (i) deliver to the Agent a letter, in form and substance satisfactory to the Agent, from its independent public accountants detailing the amount necessary to be applied to Parent's equity owners' tax liability, which letter can relate to the estimated tax payments for the next succeeding four quarters, and (ii) such distribution shall be limited to the amount(s) specified in said letter; and (z) provided further that any income tax refund received by the equity owners of Parent as a result of losses suffered by the Companies or any of them shall not be retained by such equity owners, but shall be lent immediately to the Companies as Subordinated Debt;

(g)    Make any advance or loan to, or any investment in, any Person, or purchase or acquire all or substantially all of the stock or assets of any Person, except that the Companies may:  (i) make Permitted Investments; (ii) incur Inter-Company Debt; and (iii) make advances to employees in the ordinary course of business for travel and related expenses;

(h)    Pay any management, consulting or other similar fees to any Person, except (i) payments among the Companies, or (ii) payments to Phoenix Management Services or other independent third parties retained in the ordinary course of business pursuant to applications to employ professionals that have been approved by the Bankruptcy Court (subject to Agent's right to object thereto); or

(i)    Directly or indirectly, amend, modify, alter, increase or change any of the terms or conditions of the Arcus Term Loan, except as permitted by the Intercreditor Agreement.

7.10    Until termination of the Financing Agreement and payment and satisfaction in full of all Obligations hereunder, the Companies shall:

(a)    achieve EBITDA, measured on a monthly and period-to-date basis, of at least the required amount set forth below for the applicable month or period-to-date set forth opposite such amount:

| Fiscal Period | EBITDA |
|---|---|
| (i)    For the month ending | $700,000 |

-36-

April 30, 2008

| | | |
|---|---|---|
| (ii)    For the month ending May 31, 2008 | | $1,500,000 |
| (iii)    For the two month period ending May 31, 2008 | | $2,200,000 |
| (iv)    For the month ending June 30, 2008 | | $1,200,000 |
| (v)    For the three month period ending June 30, 2008 | | $3,400,000 |
| (vi)    For the month ending July 31, 2008 | | $1,200,000 |
| (vii)    For the four month period ending July 31, 2008 | | $4,600,000 |

(b)    Intentionally Omitted.

(c)    without the prior written consent of the Agent, no Company will contract for, purchase, make expenditures for, lease pursuant to a Capital Lease or otherwise incur obligations with respect to Capital Expenditures (whether subject to a security interest or otherwise) which would cause the aggregate amount expended by all Companies for Capital Expenditures to exceed (i) $2,000,000 from the Closing Date through June 15, 2008 and (ii) an amount (for the applicable period of time satisfactory to Agent) to be mutually agreed upon between Companies and Agent on or before June 1, 2008; provided, however, that the failure of the parties to reach agreement on the foregoing by such date will be an Event of Default hereunder.

**7.11**    The Companies agree to advise the Agent in writing of:  (a) all expenditures (actual or anticipated) in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate from the budgeted amount therefor in any Fiscal Year for (i) environmental clean-up, (ii) environmental compliance or (iii) environmental testing and the impact of said expenses on the Companies' Working Capital; and (b) any notices the Companies receives from any local, state or federal authority advising the Companies of any environmental liability (real or potential) stemming from the Companies' operations, their premises, their waste disposal practices, or waste disposal sites used by the Companies and to provide the Agent with copies of all such notices if so required.

**7.12**    Each of the Companies hereby agrees to indemnify and hold harmless the Agent and Lenders and their respective officers, directors, employees, attorneys and agents (each an "**Indemnified Party**") from, and holds each of them harmless against, any and all losses, liabilities, obligations, claims, actions, damages, costs and expenses (including attorney's fees) and any payments made by the Agent pursuant to any indemnity provided by the Agent with respect to or to which any Indemnified Party could be subject insofar as such losses, liabilities, obligations, claims, actions, damages, costs, fees or expenses with respect to the Loan Documents, including without limitation those which may arise from or relate to:  (a) the Depository Account, the Blocked Accounts, the lockbox and/or any other depository account and/or the agreements executed in connection therewith; and (b) any and all claims or expenses asserted against the Agent as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate; or any asserted claim or expense which results from the any of the Companies' operations (including, but not limited to, any of the Companies' off-site disposal practices) and use of the Real Estate, which the Agent may sustain or incur (other than solely as a result of the physical actions of the Agent on the Companies' premises which are determined to constitute gross negligence or willful misconduct by a court of competent jurisdiction), all whether through the alleged or actual negligence of such person or otherwise, except and to the extent that the same results solely and directly from the gross negligence or willful misconduct of

-37-

such Indemnified Party as finally determined by a court of competent jurisdiction.  The Companies hereby agree that this indemnity shall survive termination of this Financing Agreement, as well as payments of Obligations which may be due hereunder.  The Agent may, in its reasonable business judgment, establish such Availability Reserves with respect thereto as it may deem advisable under the circumstances and, upon any termination hereof hold such reserves as cash reserves for any such contingent liabilities.

7.13    Without the prior written consent of the Agent, the Companies agree that they will not enter into any transaction (except transactions among the Companies), including, without limitation, any purchase, sale, lease, loan or exchange of property with any subsidiary or affiliate of the Companies, provided that, except as otherwise set forth in this Financing Agreement, the Companies or any one of them may enter into sale and service transactions among the Companies, or with any subsidiary or affiliate of any of the Companies in the ordinary course of their business and pursuant to the reasonable requirements of the Companies, and upon standard terms and conditions and fair and reasonable terms, no less favorable to the Companies than the Companies could obtain in a comparable arms length transaction with an unrelated third party, provided further that no Default or Event of Default exists or will occur hereunder prior to and after giving effect to any such transaction.

7.14    Reserved.

7.15    The Companies covenant and agree to provide the Agent, promptly upon Agent's demand, a statement, in writing, of the then current status of the Companies' union negotiations or union contracts in such form and in such detail as the Agent shall require.

7.16    **Payments of Fees and Claims**.  The Companies shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Sect 1930 (a)(6).  In addition, without prior approval of the Bankruptcy Court and the prior written consent of Agent, the Companies shall not make any payment of any proceeds constituting part of the Collateral or other cash (including, without limitation, proceeds of Revolving Loans) to any creditor of any Company on account of claims arising prior to the commencement of the Bankruptcy Case (including without limitation payments in respect of reclamation claims of unpaid suppliers of goods delivered to the Companies prior to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code)) prior to confirmation of a plan of reorganization.

7.17    Intentionally omitted.

7.18    **Chapter 11 Claims**.  No Company shall incur, create, assume, suffer to exist or permit any administrative expense or claim (whether now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with the liens granted to the Agent, on behalf of the Lenders, by this Agreement and the other Loan Documents or the Financing Order, other than the pari passu claims of Arcus.

7.19    **Notices**.  The Companies shall, in writing:

(a)    promptly after becoming aware thereof, notify the Agent of any application or motion of any person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application motion or pleading filed in the Bankruptcy Case that, either immediately or with the passage of time, might result in an Event of Default hereunder; and

(b)    promptly notify the Agent of the filing of (and provide Lenders with copies of) all operating and other reports and/or financial information provided by the Companies to the Bankruptcy Court, the United States Trustee, the Chapter 11 Trustee, and any other statutorily appointed or ad hoc committee in the Bankruptcy Case, and copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of any and/or all of the Companies with the Bankruptcy Court in the Bankruptcy Case, or distributed by or on behalf of any and/or all of the Companies to any official committee appointed in the Bankruptcy Case.

7.20    The Companies represent, warrant and covenant, that:

-38-

(a)    Subject to the entry by the Bankruptcy Court of the Interim Financing Order or Final Order, as applicable, and subject to the Intercreditor Agreement, (i) the Obligations will constitute a Superpriority Claim, subject, as to priority, only to the Carve-Out, the claims of Arcus and Permitted Encumbrances securing Senior Claims, and (ii) the liens of Agent, for the benefit of Agent and Lenders, securing the Obligations are valid and perfected first priority liens subject, as to priority only, to the Carve-Out and Permitted Encumbrances securing Senior Claims;

(b)    The Companies are not transferring the Collateral nor incurring any obligation with any intent to hinder, delay or defraud any of its respective present or future creditors;

(c)    The Interim Financing Order (with respect to the period prior to entry of the Final Order) or Final Order (with respect to the period on and after entry of the Final Order), as the case may be, has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended, modified or stayed, or reversed; and

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

7.21    The Companies will not, directly or indirectly, seek, consent to, suffer to exist or permit (i) any modification, stay, vacation or amendment to either Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Agent and the Lenders in respect to the Obligations, except for the Carve-Out and the claims of Arcus; or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of the Agent in respect of the Obligations, except for the Carve-Out and Permitted Encumbrances securing Senior Claims.

7.22    The Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Order, (b) the hearing for the approval of the Interim Financing Order and (c) the hearing for the approval of the Final Order, has been or will be given.  The Companies shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in such Order.

7.23    The Companies shall not request any extension of the period of time within which the Companies have exclusive rights to solicit acceptance of its plan until the date which is nine (9) months from the Filing Date.

7.24    The Companies covenant and agree, in each case, unless extended by Agent in sole and absolute discretion, (a) the Interim Financing Order shall be entered no later than March 18, 2008; (b) the Final Order shall be entered no later than April 4, 2008.

**SECTION 8        Interest,  Fees and Expenses**

8.1    (a)    Except as set forth in Paragraph 8.13 of Section 8 of this Financing Agreement, interest on the Revolving Loans shall be payable monthly as of the end of each month.  Revolving Loans that are Chase Bank Rate Loans shall be at a rate equal to the Chase Bank Rate plus one quarter of one percent (0.25%) per annum on the aggregate net balances owing by the Companies to the Agent in the Revolving Loan Account at the close of each day during such month.  In the event of any change in said Chase Bank Rate, the rate hereunder for Chase Bank Rate Loans shall change, as of the date of such change, so as to remain equal to one quarter of one percent (0.25%) above the new Chase Bank Rate.  The rate hereunder shall be calculated based on a 360-day year.  The

B # 761460 v.5

Agent shall be entitled to charge the Companies' Revolving Loan Account at the rate provided for herein when due until all Obligations have been paid in full, in cash.

(b)    Notwithstanding any provision to the contrary contained in this Section 8, in the event that the sum of (i) the outstanding Revolving Loans and (ii) the outstanding Letters of Credit exceed the lesser of either, as applicable, (x) the maximum aggregate amount available under Sections 3 and 5 of this Financing Agreement or (y) the Revolving Line of Credit for any other reason whatsoever, including any Overadvance made pursuant to Paragraph 3.1(b)(ii) of Section 3 herein and/or in connection with any Agent Permitted Overadvances (herein "**Other Overadvances**") and such Other Overadvances continue for five (5) or more consecutive days, the average net balance of all Revolving Loans for such month shall bear interest at the Default Rate of Interest.

(c)    Upon and after the occurrence and during the continuance of an Event of Default and the giving of any required notice by the Agent in accordance with the provisions of Section 10, Paragraph 10.2 hereof, all Obligations shall bear interest at the Default Rate of Interest.

8.2    Intentionally Omitted.

8.3    In consideration of the Letter of Credit Guaranty of the Agent, the Companies shall pay the Agent the Letter of Credit Guaranty Fee which shall be an amount equal to (a) three percent (3.0%) on the face amount of each documentary Letter of Credit payable upon issuance thereof and (b) three percent (3.0%) per annum, payable monthly, on the face amount of each standby Letter of Credit less the amount of any and all amounts previously drawn under such standby Letter of Credit.

8.4    Any and all charges, fees, commissions, costs and expenses charged to the Agent for the Companies' account by any Issuing Bank in connection with, or arising out of, Letters of Credit or out of transactions relating thereto will be charged to any one or more of the Revolving Loan Accounts in full (but without duplication) when charged to, or paid by the Agent, or as may be due upon any termination of this Financing Agreement hereof, and when made by any such Issuing Bank shall be conclusive on the Agent.

8.5    The Companies, jointly and severally, shall reimburse or pay (a) the Agent for:  (i) all Out-of-Pocket Expenses and (ii) any applicable Documentation Fee and (b) the Lenders for all Out-of-Pocket Expenses incurred after the occurrence of an Event of Default which is not Waived In Writing By Agent.

8.6    Upon the last Business Day of each month, commencing on March 31, 2008, the Companies shall pay to the Agent for the benefit of the Agent and the other Lenders the Line of Credit Fee.

8.7    Intentionally omitted.

8.8    Intentionally omitted.

8.9    The Companies shall pay the Agent's standard charges and fees for the Agent's personnel used by the Agent for reviewing the books and records of the Companies and for verifying, testing, protecting, safeguarding, preserving or disposing of all or any part of the Collateral (which fees shall be in addition to the Administrative Management Fee and any Out-of-Pocket Expenses).  As of the Closing Date, the standard rate charged for such personnel is One Thousand Dollars ($1,000.00) per person per day; however Agent in its discretion may change such standard rate periodically.

8.10    Each of the Companies hereby authorizes Agent to charge their respective Revolving Loan Account(s) with the amount of all their Obligations due hereunder and under the Agent Fee Letter as such payments become due.  The Companies hereby confirm and agree that they shall, jointly and severally, promptly pay any Obligations to Agent upon its request therefor.  Each of the Companies confirms that (a) its liability for any and all of the fee obligations (including without limitation, those set forth in 8.6 through 8.9 above) and Out-of-Pocket Expenses, set forth in this Financing Agreement and in any of the other Loan Documents is joint and several, (b) the Companies, as between themselves, shall determine how to pro-rate any such payments due hereunder, and (c) for ease of administration, Agent may charge any one or more of their Revolving Loan Accounts with the amount of

-40-

any such fee payments and any such charges which Agent may so make to any of the Companies' Revolving Loan Account(s) as herein provided will be made as an accommodation to the Companies and solely at Agent's discretion.

      **8.11**     In the event that the Agent or any Lender (or any financial institution which may from time to time become a Lender hereunder) shall have determined in the exercise of its reasonable business judgment that, subsequent to the Closing Date, any change in applicable law, rule, regulation or guideline regarding capital adequacy, or any change in the interpretation or administration thereof, or compliance by the Agent or Lender with any new request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent's or such Lender's capital as a consequence of its obligations hereunder to a level below that which the Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration the Agent or such Lender's policies with respect to capital adequacy) by an amount reasonably deemed by the Agent or such Lender to be material, then, from time to time, the Companies shall pay no later than five (5) days following demand to the Agent or such Lender such additional amount or amounts as will compensate the Agent's or such Lender's for such reduction.  In determining such amount or amounts, the Agent or such Lender may use any reasonable averaging or attribution methods.  The protection of this Paragraph 8.11 shall be available to the Agent or such Lender regardless of any possible contention of invalidity or inapplicability with respect to the applicable law, regulation or condition.  A certificate of the Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate the Agent or such Lender with respect to this Section 8 and the calculation thereof when delivered to the Companies shall be conclusive on the Companies absent manifest error.  Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determines that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required to be made whole, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

      **8.12**     In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by the Agent or such Lender with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

      (a)     subject the Agent or such Lender to any tax of any kind whatsoever with respect to this Financing Agreement or change the basis of taxation of payments to the Agent or such Lender of principal, fees, interest or any other amount .payable hereunder or under any other documents (except for changes in the rate of tax on the overall net income of the Agent or such Lender by the federal government or the jurisdiction in which it maintains its principal office);

      (b)     impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by the Agent or such Lender by reason of or in respect to this Financing Agreement and the Loan Documents, including (without limitation) pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

      (c)     impose on the Agent or such Lender any other condition with respect to this Financing Agreement or any other document, and the result of any of the foregoing is to increase the cost to the Agent or such Lender of making, renewing or maintaining its loans hereunder by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the loans by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment, then, in any case the Companies shall pay the Agent or such Lender, within five (5) days following its demand, such additional cost or such reduction, as the case may be.  The Agent or such Lender shall certify the amount of such additional cost or reduced amount to the Companies and the calculation thereof and such certification shall be conclusive upon the Companies absent manifest error.  Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determine that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required pursuant hereto, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

-41-

**8.13**    The Companies may request LIBOR Loans with respect to Revolving Loans on the following terms and conditions:

(a)    Commencing on the date which is thirty (30) days after the Closing Date and from time to time thereafter the Companies may elect (i) to request any loan made hereunder to be a LIBOR Loan as of the date of such loan or (ii) to convert Chase Bank Rate Loans to LIBOR Loans, and may elect from time to time to convert LIBOR Loans to Chase Bank Rate Loans by giving the Agent at least three (3) Business Days' prior irrevocable notice of such election, provided that any such conversion of LIBOR Loans to Chase Bank Rate Loans shall only be made, subject to the second following sentence, on the last day of an Interest Period with respect thereto. Should the Companies elect to convert Chase Bank Rate Loans to LIBOR Loans, it shall give the Agent at least three (3) Business Days' prior irrevocable notice of such election. If the last day of an Interest Period with respect to a loan that is to be converted is not a Business Day or Working Day, then such conversion shall be made on the next succeeding Business Day or Working Day, as the case may be, and during the period from such last day of an Interest Period to such succeeding Business Day, as the case may be, such loan shall bear interest as if it were an Chase Bank Rate Loan. All or any part of outstanding Chase Bank Rate Loans then outstanding with respect to Revolving Loans may be converted to LIBOR Loans as provided herein, provided that partial conversions shall be in a minimum principal amount of One Million Dollars ($1,000,000.00) and in increments of One Hundred Thousand Dollars ($100,000.00) in excess thereof.

(b)    Any LIBOR Loans may be continued as such upon the expiration of an Interest Period, provided the Companies so notify the Agent, at least three (3) Business Days' prior to the expiration of said Interest Period, and provided further that no LIBOR Loan may be continued as such upon the occurrence of any Event of Default which has not been Waived In Writing By Agent under this Financing Agreement, but shall be automatically converted to a Chase Bank Rate Loan on the last day of the Interest Period during which occurred such Event of Default which has not been Waived In Writing By Agent. Absent such notification, LIBOR Rate Loans shall convert to Chase Bank Rate Loans on the last day of the applicable Interest Period. Each notice of election, conversion or continuation furnished by the Companies pursuant hereto shall specify whether such election, conversion or continuation is for a one, two, three or six month period. Notwithstanding anything to the contrary contained herein, the Agent (or any participant, if applicable) shall not be required to purchase United States Dollar deposits in the London interbank market or from any other applicable LIBOR Rate market or source or otherwise "match fund" to fund LIBOR Rate Loans, but any and all provisions hereof relating to LIBOR Rate Loans shall be deemed to apply as if the Agent (and any participant, if applicable) had purchased such deposits to fund any LIBOR Rate Loans.

(c)    The Companies may request a LIBOR Loan, convert any Chase Bank Rate Loan or continue any LIBOR Loan provided there is then no Event of Default in effect which has not been Waived In Writing By Agent.

**8.14**    (a)    The LIBOR Loans shall bear interest for each Interest Period with respect thereto on the unpaid principal amount thereof at a rate per annum equal to the LIBOR determined for each Interest Period in accordance with the terms hereof plus two percent (2.0%) with respect to Revolving Loans.

(b)    If all or a portion of the outstanding principal amount of the Obligations shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such outstanding amount, to the extent it is a LIBOR Loan, shall be converted to a Chase Bank Rate Loan at the end of the last Interest Period therefor.

(c)    The Companies may not have more than six (6) LIBOR Loans outstanding at any given time.

**8.15**    (a)    Interest in respect of the LIBOR Loans shall be calculated on the basis of a 360 day year and shall be payable as of the end of each month.

(b)    The Agent shall, at the request of the Companies, deliver to the Companies a statement showing the quotations given by JPMorgan Chase Bank and the computations used in determining any interest rate pursuant to Paragraph 8.14 of Section 8 hereof.

-42-

**8.16**    As further set forth in Paragraph 8.12 above, in the event that the Agent (or any financial institution which may become a Lender hereunder) shall have determined in the exercise of its reasonable business judgment (which determination shall be conclusive and binding upon the Companies) that by reason of circumstances affecting the interbank LIBOR market, adequate and reasonable means do not exist for ascertaining LIBOR applicable for Interest Period with respect to:  (a) a proposed loan that the Companies have requested be made as a LIBOR Loan; (b) a LIBOR Loan that will result from the requested conversion of a Chase Bank Rate Loan into LIBOR Loan; or (c) the continuation of LIBOR Loans beyond the expiration of the then current Interest Period with respect thereto, the Agent shall forthwith give written notice of such determination to the Companies at least one day prior to, as the case may be, the requested borrowing date for such LIBOR Loan, the conversion date of such Chase Bank Rate Loan or the last day of such Interest Period.  If such notice is given (i) any requested LIBOR Loan shall be made as a Chase Bank Rate Loan, (ii) any Chase Bank Rate Loan that was to have been converted to a LIBOR Loan shall be continued as a.  Chase Bank Rate Loan, and (iii) any outstanding LIBOR Loan shall be converted, on the last day of the then current Interest Period with respect thereto, to a Chase Bank Rate Loan.  Until such notice has been withdrawn by the Agent, no further LIBOR Loan shall be made nor shall the Companies have the right to convert a Chase Bank Rate Loan to a LIBOR Loan.

**8.17**    If any payment on a LIBOR Loan becomes due and payable on a day other than a Business Day or Working Day, the maturity thereof shall be extended to the next succeeding Business Day or Working Day unless the result of such extension would be to extend such payment into another calendar month in which event such payment shall be made on the immediately preceding Business Day or Working Day.

**8.18**    Notwithstanding any other provisions herein, if any law, regulation, treaty or directive or any change therein or in the interpretation or application thereof shall make it unlawful for the Agent to make or maintain LIBOR Loans as contemplated herein, the then outstanding LIBOR Loans, if any, shall be converted automatically to Chase Bank Rate Loans as of the end of such month, or within such earlier period as required by law.  The Companies hereby agree promptly to pay the Agent or any Lender, upon demand, any additional amounts necessary to compensate the Agent for any costs incurred by the Agent or any Lender in making any conversion in accordance with this Section 8 including, but not limited to, any interest or fees payable by the Agent or any Lender to lenders of funds obtained by the Agent in order to make or maintain LIBOR Loans hereunder.

**8.19**    The Companies agree to indemnify and to hold the Agent and the Lenders harmless from any loss or expense which the Agent or such Lender may sustain or incur as a consequence of:  (a) default by the Companies in payment of the principal amount of or interest on any LIBOR Loans, as and when the same shall be due and payable in accordance with the terms of this Financing Agreement, including, but not limited to, any such loss or expense arising from interest or fees payable by the Agent or to Lenders of funds obtained by either of them in order to maintain the LIBOR Loans hereunder; (b) default by the Companies in making a borrowing or conversion after the Companies have given a notice in accordance with Paragraph 8.13 of Section 8 hereof; (c) any prepayment of LIBOR Loans on a day which is not the last day of the Interest Period applicable thereto, including, without limitation, prepayments arising as a result of the application of the proceeds of Collateral to the Revolving Loans; and (d) default by the Companies in making any prepayment after the Companies have given notice to the Agent thereof.  The determination by the Agent of the amount of any such loss or expense, when set forth in a written notice to the Companies, containing the Agent's calculations thereof in reasonable detail, shall be conclusive on the Companies in the absence of manifest error.  Calculation of all amounts payable under this paragraph with regard to LIBOR Loans shall be made as though the Agent had actually funded the LIBOR Loans through the purchase of deposits in the relevant market and currency, as the case may be, bearing interest at the rate applicable to such LIBOR Loans in an amount equal to the amount of the LIBOR Loans anus having a maturity comparable to the relevant interest period; provided, however, that the Agent may fund each of the LIBOR Loans in any manner the Agent sees fit and the foregoing assumption shall be used only for calculation of amounts payable under this paragraph.  In addition, notwithstanding anything to the contrary contained herein, the Agent shall apply all proceeds of Collateral and all other amounts received by it from or on behalf of the Companies (A) first to the Chase Bank Rate Loans and (B) then to LIBOR Loans; provided, however, (x) on the occurrence of an Event of Default which is not Waived in Writing By Agent or (y) in the event the aggregate amount of outstanding Loans and Letters of Credit exceeds Availability or the applicable maximum levels set forth therefor, the Agent (A) may apply all proceeds of Collateral, first to the fees and expenses due to Agent, second to accrued interest with respect to the Obligations, third to the outstanding principal balance of the Obligations, in such order as the Required Lenders may elect, and fourth to any other Obligations in such order as the Required Lenders may elect.  In the event that any

such amounts are applied to Revolving Loans which are LIBOR Loans, such application shall be treated as a prepayment of such loans and the Agent shall be entitled to indemnification hereunder.  This covenant shall survive termination of this Financing Agreement and payment of the outstanding Obligations.

       **8.20**    Notwithstanding anything to the contrary in this Financing Agreement, in the event that, by reason of any Regulatory Change (for purposes hereof "**Regulatory Change**" shall mean, with respect to the Agent, any change after the date of this Financing Agreement in United States federal, state or foreign law or regulations (including, without limitation, Regulation the adoption or making after such date of any interpretation, directive or request applying to a class of banks including the Agent of or under any United States federal, state or foreign law or regulations (whether or not having the force of law and whether or not failure to comply, therewith would be unlawful), the Agent either (a) incurs any material additional costs based on or measured by the excess above a specified level of the amount of a category of deposits or other liabilities of such bank which includes deposits by reference to which the interest rate on LIBOR Loans is determined as provided in this Financing Agreement or a category of extension of credit or other assets of the Agent which includes LIBOR Loans, or (b) becomes subject any material restrictions on the amount of such a category of liabilities or assets which it may hold, then, if the Agent so elects by notice to the Companies, the obligation of the Agent to make or continue, or to convert Chase Bank Rate Loans into LIBOR Loans hereunder shall be suspended until such Regulatory Change ceases to be in effect.

       **8.21**    For purposes of each of the indemnity provisions of this Section 8 and all other indemnity provisions contained in this Financing Agreement, any reference to the Agent shall include all Lenders and any financial institution which may become a Lender subsequent to the Closing Date.

**SECTION 9**    **Powers**

       Each of the Companies hereby constitutes the Agent, or any person or agent the Agent may designate, as its attorney-in-fact, at such Company's cost and expense, to exercise all of the following powers, which being coupled with an interest, shall be irrevocable until all Obligations to the Agent have been paid in full, in cash:

       (a)    To receive, take, endorse, sign, assign and deliver, all in the name of the Agent or the Companies or any one of them, any and all checks, notes, drafts, and other documents or instruments relating to the Collateral;

       (b)    To receive, open and dispose of all mail addressed to the Companies or any one of them and to notify postal authorities to change the address for delivery thereof to such address as the Agent may designate;

       (c)    To request from customers indebted on Accounts at any time, in the name of the Agent information concerning the amounts owing on the Accounts;

       (d)    To request from customers indebted on Accounts at any time, in the name of the Companies or any one of them, in the name of certified public accountant designated by the Agent or in the name of the Agent's designee, information concerning the amounts owing on the Accounts;

       (e)    To transmit to customers indebted on Accounts notice of the Agent's interest therein and to notify customers indebted on Accounts to make payment directly to the Agent for the Companies' account; and

       (f)    To take or bring, in the name of the Agent or the Companies or any one of them, all steps, actions, suits or proceedings deemed by the Agent necessary or desirable to enforce or effect collection of the Accounts.

       Notwithstanding anything hereinabove contained to the contrary, the powers set forth in (b), (c), (e) and (f) above may only be exercised after the occurrence of an Event of Default and until such time as such Event of Default is Waived In Writing By Agent.

B # 761460 v.5

**SECTION 10        Events of Default and Remedies**

**10.1**    Notwithstanding anything hereinabove to the contrary, the Agent may, and at the direction of the Required Lenders shall, terminate this Financing Agreement immediately upon the occurrence of any of the following Events of Default:

(a)        cessation of the business of any Company (except as the result of (i) the sale of substantially all of the assets of such Company and the application of the proceeds of such sale to the Obligations, all in accordance with the terms and conditions of this Financing Agreement and the Intercreditor Agreement, or (ii) the contribution of substantially all of the assets of such Company to another Company);

(b)        the Companies shall be unable to pay their respective post-petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make such payments, as and when such payments become due;

(c)        (i)        except as otherwise agreed to by the Agent, the bringing of a motion by any Company or any other Person in the Bankruptcy Case to obtain additional financing under Section 364 of the Bankruptcy Code, to use cash collateral of the Lenders under Section 363 of the Bankruptcy Code, or to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c), Section 552 of the Bankruptcy Code, or otherwise;

(ii)        any Company or any other Person seeks to incur, in a manner inconsistent with this Agreement or the then applicable Financing Order, indebtedness that is secured by a lien with priority equal to or superior to the post-petition liens or which is given super-priority administrative expense status under Bankruptcy Code Section 364(c)(i);

(iii)        notice is given of a sale under Section 363 of the Bankruptcy Code of all or part of the post-petition Collateral as to which Agent and Lenders are not proposed to be paid in full or with respect to which the Agent has not provided its prior written consent;

(iv)        the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on any Collateral, or (B) with respect to any lien of, or the granting of any lien on, any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on (1) any Company's ability to repay the Obligations hereunder in accordance with the terms hereof or (2) the Collateral or the Agent's liens granted hereunder on the Collateral or the priority of a material portion of such liens;

(v)        an order is entered by the Bankruptcy Court appointing, or any Company or any other Person files an application for an order seeking the appointment of, without the prior written consent of the Agent, an examiner with enlarged powers relating to the execution of the business (i.e., powers beyond those set forth in Sections 1 106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(vi)        an order is entered by the Bankruptcy Court, without the prior written consent of the Agent, (A) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Company equal or superior to the priority of the Agent with respect to the Obligations, except for any Carve-Out agreed to by the Agent in any Financing Order, or (B) granting or permitting the granting of a lien on the Collateral other than a Permitted Encumbrance;

(vii)        any Company fails to file a plan of reorganization containing a provision for termination of this Agreement and the indefeasible repayment in full, in cash of the Obligations of the Companies within the exclusivity period provided in Section 1121 of the Bankruptcy Code;

(viii)        an order is entered by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case which does not (i) contain a provision for termination of this Agreement and the indefeasible payment in full in cash of all Obligations of the Companies under this Agreement and the other Loan Documents

B # 761460 v.5

(including, for these purposes, any Existing Financing Agreements) on or before the effective date of such plan or plans, and (ii) provide for the continuation of the liens and security interests granted to the Agent (and maintains the priorities of such liens and security interests) until such plan effective date, unless the Obligations have been indefeasibly paid in full, in cash, and this Agreement and all other Loan Documents have been terminated;

(ix)    any Person shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the Agent, or any claims or rights against such Person, or to subject any of the Collateral to assessment pursuant to Section 506(c), 552(b), or otherwise, of the Bankruptcy Code, or pursuant to other applicable law;

(x)    any lien or security interest created by this Agreement or the Financing Order shall, for any reason, cease to be valid;

(xi)    any action is commenced which contests any provision of any Financing Order, or the validity, perfection, priority or enforceability of any of the liens and security interests of the Agent or the Lenders, as applicable;

(xii)    the Bankruptcy Case is dismissed, or is converted to a case under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed, or

(xiii)    any Company shall fail to perform any of its obligations in accordance with the terms of the then applicable Financing Order.

(d)    the Bankruptcy Court shall enter any order (i) suspending, superseding, revoking, reversing, staying, vacating, rescinding, modifying, supplementing or otherwise amending either Financing Order, this Agreement or any other Loan Document (except as otherwise approved by Agent in writing), or (ii) to grant or permit the grant of a lien on the Collateral other than Permitted Encumbrances;

(e)    the entry of an order in the Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents;

(f)    breach by any Company of any warranty, representation or covenant contained herein (other than those referred to in sub-paragraph (g) below) or in any other written agreement between any Company, the Agent or any Lender, provided that such Default of any of the warranties, representations or covenants referred in this clause (f) shall not be deemed to be an Event of Default unless and until such Default shall remain unremedied to the Agent's satisfaction for a period of ten (10) days from the date of such breach;

(g)    breach by any Company of any warranty, representation or covenant of Paragraphs 3.3 (other than the fourth sentence of Paragraph 3.3) and 3.4 of Section 3 and Section 4 hereof; Paragraphs 6.3 and 6.4 (other than the first sentence of Paragraph 6.4) of Section 6 hereof and Paragraphs 7.1, 7.5, 7.6, and 7.8 through 7.26 hereof;

(h)    failure of the Companies or any one of them to pay any of the Obligations within five (5) Business Days of the due date thereof provided that nothing contained herein shall prohibit the Agent from charging such amounts to the Revolving Loan Accounts on the due date thereof;

(i)    with respect to any Plan other than a "multiemployer plan," as defined in Section 3(37) of ERISA, and other than a defined contribution plan (solely for the purposes of clauses (ii), (iii), (iv) and (v)), any Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) have any "accumulated funding deficiency" as defined in ERISA, (iii) have any "reportable event" as defined in ERISA, for which the requirement to provide notice has not, within the regulations issued under ERISA, been waived, (iv) terminate any Plan, or (v) be engaged in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of such Plan, and with respect to this sub-paragraph (g) such event or condition (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in the

B # 761460 v.5

reasonable opinion of the Agent, subject such Company to any tax, penalty or other liability material to the business, operations or financial condition of such Company;

(j)        Intentionally omitted;

(k)        without the prior written consent of the Agent or as expressly permitted in the Subordination Agreement, the Companies or any one of them shall (x) amend or modify the Subordinated Debt, or (y) make any payment on account of the Subordinated Debt;

(l)        the occurrence of any default or event of default (after giving effect to any applicable grace or cure periods) under any instrument or agreement evidencing (x) Subordinated Debt or (y) any other Indebtedness of the Companies or any one of them having a principal amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00);

(m)        the failure of any Company to perform, keep, or observe any of the covenants, conditions, premises, agreements or obligations of such Company under the applicable Financing Order;

(n)        (i) Steven S. Grabell, as Chief Executive Officer, ceases for any reason whatsoever to be actively engaged in the management of the Companies unless a successor acceptable to Agent is appointed within sixty (60) days or (ii) more than twenty percent (20%) of the membership interests or stock of (x) the Companies (other than Shapes/Arch) presently held (directly or indirectly) by the Parent or (y) the Parent are transferred to any Person not an equitable or beneficial owner of such stock or membership interests as of the execution of this Financing Agreement

(o)        an event of default that has not been waived in writing by Arcus occurs under the Arcus Term Loan Documents;

(p)        the receipt by any Company or Agent of a Notice of Non-Funding, or the failure by Arcus to fund the Arcus Term Loan, or any draw thereunder, under the Arcus Term Loan Agreement; or

(q)        the making by any Company of any payment not permitted by, or in violation of, the Intercreditor Agreement.

**10.2**        Upon the occurrence of an Event of Default, unless such Event of Default has been Waived In Writing By Agent, notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any further application, motion or notice to, or order from, the Bankruptcy Court, the Agent in its sole discretion may, or upon the written direction of the Required Lenders the Agent shall, declare that, all loans, advances and extensions of credit provided for in Section 3 of this Financing Agreement shall be thereafter in the Agent's or the Required Lenders' sole discretion, and the obligation of the Agent and/or the Lenders to make Revolving Loans, open Letters of Credit and/or provide Letter of Credit Guaranties shall cease unless such Event of Default is Waived In Writing By Agent or cured to the Agent's or the Required Lenders' satisfaction in the exercise of the Agent's and the Lenders' reasonable judgment.  Upon the occurrence of an Event of Default not Waived In Writing By Agent, notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any further application, motion or notice to, or order from, the Bankruptcy Court, without prior notice, the Agent in its sole discretion may, or upon the written direction of the Required Lenders the Agent shall, take any one or more of the following actions, including, without limitation:  (a) to declare that all Obligations shall become immediately due and payable; (b) the Agent may charge the Companies the Default Rate of Interest on all then outstanding or thereafter incurred Obligations in lieu of the interest provided for in Section 8 of this Financing Agreement, provided that, with respect to this clause "(b)" the Agent has given the Companies written notice of the Event of Default; and (c) the Agent may immediately terminate this Financing Agreement upon notice to the Companies; and/or (d) Agent may exercise any rights and remedies provided to Agent or Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC; and, pursuant to the Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated (at Agent's election) to permit Agent to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise

-47-

any remedy in a nature of a liquidation of, or foreclosure on, any interest of Companies in the Collateral only upon three (3) Business Days prior written notice to Borrowers, the United States Trustee for the District of New Jersey, and any counsel approved by the Bankruptcy Court for the Creditors' Committee (the "Remedies Notice Period"); provided, however, that during such Remedies Notice Period, (i) the Borrowers may not challenge or object to or file any motions attempting to limit the remedies of Agent and Lenders hereunder other than to take any and all actions necessary to cure such Event of Default to Agent's satisfaction and (ii) Borrowers shall have no right to use or seek to use the Collateral or request or obtain Revolving Loans ; provided further if the Bankruptcy Court does not determine that an Event of Default has not occurred, and the Event of Default has not been Waived In Writing By Agent, upon the expiration of such Remedies Notice Period, Agent shall have relief from the automatic stay without further notice or order as set forth herein. Upon the occurrence of an Event of Default and the exercise by Agent of its rights and remedies under this Agreement and the other Loan Documents, Borrowers shall assist Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition; such assistance shall include, without limitation (if so requested), filing any motions under Sections 363 or 365 or any other applicable provisions of the Bankruptcy Code to authorize the transfer of all or any portion of the Collateral or otherwise assume and assign any lease or executory contract included therein. The exercise of any option is not exclusive of any other option, which may be exercised at any time by the Agent.

10.3     Immediately upon the occurrence of any Event of Default, unless such Event of Default has been Waived In Writing By Agent, the Agent may, to the extent permitted by law: (a) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including any electronic records, contracts and signatures pertaining thereto), documents, instruments, files and records, and any receptacles or cabinets containing same, relating to the Accounts, or the Agent may use, at the Companies' expense, such of the Companies' personnel, supplies or space at the Companies' places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) bring suit, in the name of the Companies or the Agent, and generally shall have all other rights respecting said Accounts, including without limitation the right to: accelerate or extend the time of payment, settle, compromise, release in whole or in part any amounts owing on any Accounts and issue credits in the name of the Companies or the Agent; (c) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed Inventory, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at the Agent's sole option and discretion, and the Agent may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Companies and, in furtherance of the foregoing, the Companies shall seek authorization from the Bankruptcy Court to conduct, on any of the Companies' owned or leased premises, one or more sales of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code; (d) foreclose the security interests in the Collateral created herein or by the Loan Documents by any available judicial procedure, or to take possession of any or all of the Collateral, including any Inventory, Equipment and/or Other Collateral without judicial process, and to enter any premises where any Inventory and Equipment and/or Other Collateral may be located for the purpose of taking possession of or removing the same; and (e) exercise any other rights and remedies provided in law, in equity, by contract or otherwise. The Agent shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, in the name of the Companies or the Agent, or in the name of such other party as the Agent may designate, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including but not limited to warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as the Agent in its sole discretion may deem advisable, and the Agent shall have the right to purchase at any such sale. If any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, the Agent shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as the Agent shall deem appropriate and any such costs shall be deemed an Obligation hereunder. Any action taken by Agent pursuant to this paragraph shall not affect commercial reasonableness of the sale. The Companies agree, at the request of the Agent, to assemble the Inventory and Equipment and to make it available to the Agent at premises of the Companies or elsewhere and to make available to the Agent the premises and facilities of the Companies for the purpose of the Agent's taking possession of removing or putting the Inventory and Equipment in saleable form. If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law. The net cash proceeds resulting from the Agent's exercise of any of the foregoing rights, (after deducting all charges, costs and expenses, including reasonable attorneys' fees) shall be applied by the

-48-

Agent to the payment of the Obligations, whether due or to become due, in such order as the Agent may elect, and the Companies shall remain liable to the Agent for any deficiencies, and the Agent in turn agrees to remit to the Companies or its successors or assigns, any surplus resulting therefrom. The enumeration of the foregoing rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative. The Companies hereby indemnify the Agent and hold the Agent harmless from any and all costs, expenses, claims, liabilities, Out-of-Pocket Expenses or otherwise, incurred or imposed on the Agent by reason of the exercise of any of its rights, remedies and interests hereunder, including, without limitation, from any sale or transfer of Collateral, preserving, maintaining or securing the Collateral, defending its interests in Collateral (including pursuant to any claims brought by the Companies, the Companies as debtors-in-possession, any secured or unsecured creditors of the Companies, any trustee or receiver in bankruptcy, or otherwise), and the Companies hereby agree to so indemnify and hold the Agent harmless, absent the Agent's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The foregoing indemnification shall survive termination of this Financing Agreement until such time as all Obligations (including the foregoing) have been finally and indefeasibly paid in full, in cash. In furtherance thereof the Agent, may establish such reserves for Obligations hereunder (including any contingent Obligations) as it may deem advisable in its reasonable business judgment. Any applicable mortgage(s), deed(s) of trust or assignment(s) issued to the Agent on the Real Estate shall govern the rights and remedies of the Agent thereto.

      **10.4**      The Companies hereby acknowledge and agree that Agent shall have no duty to marshal the Collateral and that Agent make take and dispose of any or all of the Collateral in such order and at such time or times as Agent, acting in its discretion, may elect.

**SECTION 11      Termination**

      This Agreement shall terminate on the earlier to occur of the (a) DIP Revolver Maturity Date or (b) the Anniversary Date, provided that, at the request of the Companies, Agent and Lenders shall extend the Anniversary Date of this Agreement for up to an additional nine (9) months, in one or more weekly or monthly periods; provided, that the Arcus Term Loan has been extended for the same additional period(s), and no Default or Event of Default has occurred or is continuing. Notwithstanding the foregoing, the Agent may terminate this Financing Agreement immediately upon the occurrence of an Event of Default. The Companies may terminate this Financing Agreement at any time upon not less than ten (10) days' prior written notice of the date of termination (the "**Noticed Termination Date**") given to the Agent by Borrower Representative, provided that the Companies shall have up to ten (10) additional days after the Noticed Termination Date in which to repay the Obligations in full, in cash. Notice of termination as aforesaid by any one Company shall be deemed to be a notice by all of the Companies for purposes hereof. All Obligations shall become due and payable as of any termination hereunder or under Section 10 hereof and, pending a final accounting, the Agent may withhold any balances in the Companies' accounts (unless supplied with an indemnity satisfactory to the Agent) to cover all of the Obligations, whether absolute or contingent, including, but not limited to, cash reserves for any contingent Obligations, including an amount of one hundred ten percent (110%) of the face amount of any outstanding Letters of Credit with an expiry date on, or within thirty (30) days of the effective date of termination of this Financing Agreement; provided however, as to reserves for environmental claims, the amount to be held shall be limited to an amount for which a claim has been asserted against Agent or any Lender. All of the Agent's rights, liens and security interests shall continue after any termination until all Obligations have been paid and satisfied in full.

**SECTION 12      Miscellaneous**

      **12.1**      Each of the Companies hereby waives diligence, notice of intent to accelerate, notice of acceleration, demand, presentment and protest and any notices (other than those specifically provided for herein) hereof as well as notice of nonpayment. No delay or omission of the Agent, the Lenders or the Companies to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or shall operate as a waiver thereof or as a waiver of any such Event of Default. No single or partial exercise by the Agent of any right or remedy precludes any other or further exercise thereof or precludes any other right or remedy.

      **12.2**      This Financing Agreement and the other Loan Documents executed and delivered in connection therewith constitute the entire agreement among the Companies and the Agent and Lender; supersede any prior

-49-

agreements; can be changed only by a writing signed by the Companies, the Agent and the Required Lenders (or by the Agent at the written request of the Required Lenders), unless the consent of all Lenders is required pursuant to Paragraph 14.10 herein below, and shall bind and benefit the Companies, the Lenders and the Agent and their respective successors and assigns, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**12.3**     In no event shall the Companies, upon demand by the Agent for payment of any Indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law.  Regardless of any provision herein or in any agreement made in connection herewith, the Agent and Lenders shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law.  If the Agent ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such; and if principal is paid in full, in cash, any remaining excess shall be refunded to the Companies. This paragraph shall control every other provision hereof, the Loan Documents and of any other agreement made in connection herewith.

**12.4**     If any provision hereof or of any other agreement made in connection herewith is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance.  Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

**12.5     EACH OF THE COMPANIES, THE LENDERS AND THE AGENT HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS FINANCING AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER.  EACH OF THE COMPANIES HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED.  IN NO EVENT WILL THE AGENT BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.**

**IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN_ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS \HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK.  EACH OF THE COMPANIES HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE.  EACH OF THE COMPANIES HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY COMPANY BY THE LENDERS IN ACCORDANCE WITH THIS SECTION.**

**12.6**     Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (provided that, any electronic communications from the Companies with respect to any request, transmission, document, electronic signature, electronic mail or facsimile transmission shall be deemed binding on the Companies for purposes of this Financing Agreement, provided further that any such transmission shall not relieve the Companies from any other obligation hereunder to communicate further in writing), and shall be deemed

to have been validly served, given or delivered when hand delivered or sent by facsimile, or three (3) days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified or to such other address as any party hereto may designate for itself by like notice, as follows:

(a)    if to CIT, at:

The CIT Group/Business Credit, Inc.
11 West 42nd Street, 13th Floor
New York, New York 10036
Attn:  Portfolio Manager
Fax No.:  (212) 461-7760

With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to Agent's counsel at:

Stradley, Ronon, Stevens & Young, LLP
2600 Commerce Square
Philadelphia, PA 19103
Attn:  Gary P. Scharmett, Esq.
Fax No.:  (215) 564-8120

(b)    if to the Companies or any of them to Shapes/Arch, in its capacity of Borrower Representative, at:

c/o Shapes Arch Holdings, L.L.C.
9000 River Road
Delair, NJ 08110
Attn:  Chief Executive Officer
Fax No.:  (856) 662-6069

With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to the Companies' counsel at:

Cozen O'Connor
Chase Manhattan Center
1201 North Market Street, Suite 1400
Wilmington, DE 19081
Attn:  Mark E. Felger, Esq.
Fax No.:  (302) 295-2013

and

Blank Rome LLP
One Logan Square
Philadelphia, PA 19103
Attn:  Lawrence F. Flick, II, Esq.
Fax No.:  (215) 832-5556

provided, however, that the failure of any Person to provide another Person's counsel with a copy of such notice shall not invalidate such notice and shall not give such Person any rights, claims or defenses due to the failure to provide such additional notice.  Each of the Companies hereby designates Shapes/Arch as its representative and agent ("**Borrower Representative**") on its behalf for the purposes of giving and receiving all notices and consents under this Financing Agreement, the other Loan Documents or under any other documents, instrument or agreement related thereto and taking all other actions (including in respect of compliance with covenants) on behalf of itself and/or each of the other Companies under the Loan Documents.  Borrower Representative hereby accepts such

appointment.  Agent may regard any notice or other communication pursuant to any of the Loan Documents from Borrower Representative as a notice or communication from each of the Companies, and may give any notice or communication required or permitted to be given to any of the Companies under any of the Loan Documents to Borrower Representative.  Each of the Companies agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such entity and shall be binding upon and enforceable against such entity to the same extent as if the same had been made directly by such entity.

**12.7    THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS FINANCING AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION.**

**12.8**    In the event any direct conflict between the terms and conditions of this Agreement and/or any of the Loan Documents and the specific terms and conditions of the Financing Order, the terms and conditions of the Financing Order shall prevail.  Nothing set forth in this Agreement shall require the Companies to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to the Agent's ability to declare the occurrence of an Event of Default based upon such action or failure to act.  In the event of any inconsistency between this Agreement and any of the Loan Documents, this Agreement shall control.

**SECTION 13    Agreement between the Lenders**

**13.1**    (a)    The Agent, for the account of the Lenders, shall disburse all loans and advances to the Companies and shall handle all collections of Collateral and repayment of Obligations.  It is understood that for purposes of advances to the Companies and for purposes of this Section 13 the Agent is using the funds of the Agent.

(b)    Unless the Agent shall have been notified in writing by any Lender prior to any advance to the Companies that such Lender will not make the amount which would constitute its share of the borrowing on such date available to the Agent, the Agent may assume that such Lender shall make such amount available to the Agent on a Settlement Date, and the Agent may, in reliance upon such assumption, make available to the Companies a corresponding amount.  A certificate of the Agent submitted to any Lender with respect to any amount owing under this paragraph shall be conclusive, absent manifest error if no objection, in writing, is delivered to the Agent within ten (10) Business Days of receipt of the Certificate.  If such Lender's share of such borrowing is not in fact made available to the Agent by such Lender on the Settlement Date, the Agent shall be entitled to recover such amount with interest thereon at the rate per annum applicable to Revolving Loans hereunder, on demand, from the Companies without prejudice to any rights which the Agent may have against such Lender hereunder.  Nothing contained in this paragraph shall relieve any Lender which has failed to make available its ratable portion of any borrowing hereunder from its obligation to do so in accordance with the terms hereof.  Nothing contained herein shall be deemed to obligate the Agent to make available to the Companies the full amount of a requested advance when the Agent has any notice (written or otherwise) that any of the Lenders will not advance its ratable portion thereof.

**13.2**    On the Settlement Date, the Agent and the Lenders shall each remit to the other, in immediately available funds, all amounts necessary so as to ensure that, as of the Settlement Date, the Lenders shall have their proportionate share of all outstanding Obligations.

**13.3**    The Agent shall forward to each Lender, at the end of each month, a copy of the account statement rendered by the Agent to the Companies.

**13.4**    The Agent shall, after receipt of any interest and fees earned under this Financing Agreement, promptly remit to the Lenders:  (a) their pro rata portion of all fees, provided, however, that the Lenders (other than CIT in its role as the Agent) shall (i) not share in the Collateral Management Fee or Documentation Fees; and (ii) receive their pro rata portion of the Line of Credit Fee; and (b) interest computed at the rate and as provided for in Section 8 of this Financing Agreement on all outstanding amounts advanced by the Lenders on each Settlement

B # 761460 v.5

Date, prior to adjustment, that are subsequent to the last remittance by the Agent to the Lenders of the Companies' interest.

**13.5**    (a)    The Companies acknowledge that the Lenders with the prior written consent of the Agent, which consent shall not be unreasonably withheld, may sell participation in the loans and extensions of credit made and to be made to the Companies hereunder.  The Companies further acknowledge that in doing so, the Lenders may grant to such participants certain rights which would require the participant's consent to certain waivers, amendments and other actions with respect to the provisions of this Financing Agreement, provided that the consent of any such participant shall not be required except for matters requiring the consent of all Lenders hereunder as set forth in Section 14, Paragraph 14.10 hereof.

(b)    The Companies authorize each Lender to disclose to any participant or purchasing lender (each, a "**Transferee**") and any prospective Transferee any and all financial information in such Lender's possession concerning the Companies and their affiliates which has been delivered to such Lender by or on behalf of the Companies pursuant to this Financing Agreement or which has been delivered to such Lender by or on behalf of the Companies in connection with such Lender's credit evaluation of the Companies and their affiliates prior to entering into this Agreement, provided that such Transferee agrees to hold such information in confidence in the ordinary course of its business.

**13.6**    The Companies hereby agree that each Lender is solely responsible for its portion of the Line of Credit and that neither the Agent nor any Lender shall be responsible for, nor assume any obligations for the failure of any Lender to make available its portion of the Line of Credit.  Further, should any Lender refuse to make available its portion of the Line of Credit, then the other Lender may, but without obligation to do so, increase, unilaterally, its portion of the Line of Credit in which event the Companies are so obligated to that other Lender.

**13.7**    In the event that the Agent, the Lenders or any one of them is sued or threatened with suit by the Companies or any one of them, or by any receiver, trustee, creditor or any committee of creditors on account of any preference, voidable transfer or lender liability issue, alleged to have occurred or been received as a result of or during the transactions contemplated under this Financing Agreement, then in such event any money paid in satisfaction or compromise of such suit, action, claim or demand and any expenses, costs and attorneys' fees paid or incurred in connection therewith, whether by the Agent, the Lenders or any one of them, shall be shared proportionately by the Lenders.  In addition, any costs, expenses, fees or disbursements incurred by outside agencies or attorneys retained by the Agent to effect collection or enforcement of any rights in the Collateral, including enforcing, preserving or maintaining rights under this Financing Agreement shall be shared proportionately between and among the Lenders to the extent not reimbursed by the Companies or from the proceeds of Collateral.  The provisions of this paragraph shall not apply to any suits, actions, proceedings or claims that (x) predate the date of this Financing Agreement or (y) are based on transactions, actions or omissions that predate the date of this Financing, Agreement.

**13.8**    Each of the Lenders agrees with each other Lender that any money or assets of the Companies held or received by such Lender, no matter how or when received, shall be applied to the reduction of the Obligations (to the extent permitted hereunder) after (x) the occurrence of an Event of Default and (y) the election by the Required Lenders to accelerate the Obligations.  In addition, the Companies authorize, and the Lenders shall have the right, without notice, upon any amount becoming due and payable hereunder, to set-off and apply against any and all property held by, or in the possession of such Lender the Obligations due such Lenders.

**13.9**    The Agent (upon the prior consent of the Companies, which consent shall not be unreasonably withheld, conditioned or delayed) shall have the right at any time to assign to one or more commercial banks, commercial finance lenders or other financial institutions all or a portion of its rights and obligations under this Financing Agreement, provided the amount assigned to any one institution shall not be less than Five Million Dollars ($5,000,000.00) (including, without limitation, its obligations under the Line of Credit, the Revolving Loans, and its rights and obligations with respect to Letters of Credit including the Letter of Credit Guarantees), provided further, that the Agent shall first offer to assign a pro rata share of such amounts to each of the Lenders. Notwithstanding the foregoing, Agent may, without the consent of the Companies, assign all or any portion of its rights and obligations under this Financing Agreement (A) to any other Lender hereunder or an affiliate of any Lender hereunder or an approved fund, or (B) after an Event of Default has occurred and is continuing hereunder.

Upon execution of an Assignment and Transfer Agreement, (a) the assignee thereunder shall be a party hereto and., to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment, have the rights and obligations of the Agent as the case may be hereunder and (b) the Agent shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, relinquish its rights and be released from its obligations under this Financing Agreement.  The Companies shall, if necessary, execute any documents reasonably required to effectuate the assignments.  No other Lender may assign its interest in the loans and advances and extensions of credit hereunder without the prior written consent of the Agent, which consent shall not be unreasonably withheld.  In the event that the Agent consents to any such assignment by any other Lenders (i) the amount being assigned shall in no event be less than the lesser of (x) Five Million Dollars ($5,000,000.00) or (y) the entire interest of such Lender hereunder, (ii) such assignment shall be of a pro-rata portion of all of such assigning Lender's loans and commitments hereunder and (iii) the parties to such assignment shall execute and deliver to the Agent an Assignment and Transfer Agreement, and, at the Agent's election, a processing and recording fee of Three Thousand Five Hundred Dollars ($3,500.00) payable by the assigning Lender to the Agent for its own account.

## SECTION 14    Agency

**14.1**    Each Lender hereby irrevocably designates and appoints CIT as the Agent for the Lenders under this Financing Agreement and any ancillary loan documents and irrevocably authorizes CIT as the Agent for such Lender, to take such action on its behalf under the provisions of this Financing Agreement and all ancillary documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Financing Agreement and all ancillary documents together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Financing Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Financing Agreement and the ancillary documents or otherwise exist against the Agent.

**14.2**    The Agent may execute any of its duties under this Financing Agreement and all ancillary documents by or through agents or attorneys-in-fact and shall be entitled to the advice of counsel concerning all matters pertaining to such duties.

**14.3**    Neither the Agent nor any of its officers, directors, employees, agents, or attorneys-in-fact shall be (i) liable to any Lender for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Financing Agreement and all ancillary documents (except for its or such person's own gross negligence or willful misconduct), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Companies or any officer thereof contained in this Financing Agreement and all ancillary documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Financing Agreement and all ancillary documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Financing Agreement and all ancillary documents or for any failure of the Companies to perform their obligations thereunder. The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of this Financing Agreement and all ancillary documents or to inspect the properties, books or records of the Companies.

**14.4**    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Companies), independent accountants and other experts selected by the Agent.  The Agent shall be fully justified in failing or refusing to take any action under this Financing Agreement and all ancillary documents unless it shall first receive such advice or concurrence of the Lenders, or the Required Lenders, as the case may be, as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Financing Agreement and all ancillary documents in accordance with a request of the Lenders, or the Required Lenders, as the case may be, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

B # 761460 v.5

14.5     The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received written notice from a Lender or the Companies describing such Default or Event of Default.  In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders.  The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Lenders, or Required Lenders, as the case may be; provided that unless and until the Agent shall have received such direction, the Agent may in the interim (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable and in the best interests of the Lenders.  In the event the Agent in its sole discretion, or at the request of the Required Lenders, continues to make Revolving Loans and advances under this Financing Agreement upon the occurrence of a Default or Event of Default, any such Revolving Loans and advances may be in such amounts (subject to Paragraph 14.10 hereof) and on such additional terms and conditions as the Agent or the Required Lenders may deem appropriate.

14.6     Each Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it and that no act by the Agent hereinafter taken, including any review of the affairs of the Companies shall be deemed to constitute any representation or warranty by the Agent to any Lender.  Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Companies and made its own decision to enter into this Financing Agreement.  Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the Financing Agreement and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition or creditworthiness of the Companies.  The Agent, however, shall provide the Lenders with copies of all financial statements, projections and business plans which come into the possession of the Agent or any of its officers, employees, agents or attorneys-in-fact.

14.7     (a)     The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Companies and without limiting the obligation of the Companies to do so), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements (including, without limitation, all Out-of-Pocket Expenses) of any kind whatsoever (including negligence on the part of the Agent) which may at any time be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Financing Agreement or any ancillary documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the Agent's gross negligence or willful misconduct.  The agreements in this paragraph shall survive the payment of the Obligations.

(b)     The Agent will use its reasonable business judgment in handling the collection of the Accounts, enforcement of its rights hereunder and realization upon the Collateral but shall not be liable to the Lenders for any action or omitted to be taken in good faith or on the written advice of counsel.  The Lenders expressly release the Agent from any and all liability and responsibility (express or implied), for any loss, depreciation of or delay in collecting or failing to realize on any Collateral, the Obligations or any guaranties therefor and for any mistake, omission or error in judgment in passing upon or accepting any Collateral or in making (or in failing to make) examinations or audits or for granting indulgences or extensions to the Companies, any account debtor or any guarantor, other than resulting from the Agent's gross negligence or willful misconduct.

14.8     The Agent may make loans to, and generally engage in any kind of business with the Companies as though the Agent were not the Agent hereunder.  With respect to its loans made or renewed by it or loan obligations hereunder as Lender, the Agent shall have the same rights and powers, duties and liabilities under this Financing Agreement as any Lender and may exercise the same as though it was not the Agent and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

**14.9**        The Agent may resign as the Agent upon 30 days' notice to the Lenders and such resignation shall be effective upon the appointment of a successor Agent.  If the Agent shall resign as Agent, then the Lenders shall appoint a successor Agent for the Lenders whereupon such successor Agent shall succeed to the rights, powers and duties of the Agent and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Financing Agreement.  After any retiring Agent's resignation hereunder as the Agent the provisions of this Section 14 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent.

**14.10**        Notwithstanding anything contained in this Financing Agreement to the contrary, the Agent will not, without the prior written consent of all Lenders: (a) amend the Financing Agreement to (i) increase the Line of Credit; (ii) reduce the interest rates; (iii) reduce or waive (x) any fees in which the Lenders share hereunder, or (y) the repayment of any Obligations due the Lenders; (iv) extend the maturity of the Obligations; or (v) alter or amend (x) this Paragraph 14.10 or (y) the definitions of Eligible Accounts Receivable, Eligible Inventory, Inventory Loan Cap, Collateral or Required Lenders, or (vi) increase the advance percentages against Eligible Accounts Receivable or Eligible Inventory or alter or amend the Agent's criteria for determining compliance with such definitions of Eligible Accounts Receivable and/or Eligible Inventory if the effect thereof is to increase Availability; (b) except as otherwise required in this Financing Agreement, release any guaranty or Collateral in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) during any year, or (c) knowingly make any Revolving Loan or assist in opening any Letter of Credit or issuing a Letter of Credit Guaranty hereunder if after giving effect thereto the total of Revolving Loans and Letters of Credit would exceed one hundred and five percent (105%) of the maximum amount available under this Financing Agreement (the portion in excess of 100% of such maximum available amount shall be referred to herein as the "**Agent Permitted Overadvances**"), provided that the Agent shall not be entitled to continue to knowingly make such Agent Permitted Overadvances, which shall include advances by the Agent to preserve and protect Collateral for a period in excess of twenty (20) days without the Lenders' consent.  Subject to the provisions of Section 12, Paragraph 12.22 and the provisions of this Paragraph 14.10 of Section 14 of this Financing Agreement, in all other respects the Agent is authorized by each of the Lenders to take such actions or fail to take such actions under this Financing Agreement if the Agent, in its reasonable discretion, deems such to be advisable and in the best interest of the Lenders.  Notwithstanding any provision to the contrary contained in this Financing Agreement (including the provisions of Section 12, Paragraph 12.2 and Section 14, Paragraph 14.10 hereof) the Agent is authorized to take such actions or fail to take such actions in connection with (a) the exercise of (i) any and all rights and remedies under this Financing Agreement (including but not limited to the exercise of rights and remedies under Section 10, Paragraph 10.2 of this Financing Agreement) and (ii) its reasonable discretion in (x) determining compliance with the eligibility requirements of Eligible Accounts Receivable and/or Eligible Inventory and establishing reserves against Availability in connection therewith and/or (y) the making of Agent Permitted Overadvances, and/or (b) the release of Collateral not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate during any fiscal year, and/or (c) curing any ambiguity, defect or inconsistency in the terms of this Financing Agreement; provided that the Agent, in its reasonable discretion, deems such to be advisable and in the best interests of the Lenders.  In the event the Agent terminates this Financing Agreement pursuant to the terms hereof the Agent will cease making any loans or advances upon the effective date of termination except for any loans or advances which the Agent may deem, in its sole discretion, are reasonably required to maintain, protect or realize upon the Collateral.

**14.11**        In the event any Lender's consent is required pursuant to the provisions of this Financing Agreement and such Lender does not respond to any request by the Agent for such consent within ten (10) Business Days after such request is made to the contact Person (whose name and contact information shall have been provided to Agent in writing by such Lender) at such Lender, such failure to respond shall be deemed a consent.  In addition, in the event that any Lender declines to give its consent to any such request, it is hereby mutually agreed that the Agent and/or any other Lender shall have the right (but not the obligation) to purchase such Lender's share of the Loans for the full amount thereof together with accrued interest thereon to the date of such purchase.

**14.12**        Each Lender agrees that notwithstanding, the provisions of Section 11 of this Financing Agreement any Lender may terminate this Financing Agreement and the Line of Credit only on the Anniversary Date.  Termination of this Financing Agreement by any of the Lenders as herein provided shall not affect the Lenders' respective rights and obligations under this Financing Agreement incurred prior to the effective date of termination as set forth in the preceding sentence.

B # 761460 v.5

**14.13**    If the Agent is required at any time to return to the Companies or to a trustee, receiver, liquidator, custodian or other similar official any portion of the payments made by the Companies to the Agent as result of a bankruptcy or similar proceeding with respect to the Companies, any guarantor or any other person or entity or otherwise, then each Lender shall, on demand of the Agent, forthwith return to the Agent its ratable share of any such payments made to such Lender by the Agent, together with its ratable share of interest and/or penalties, if any, payable by the Lenders; this provision shall survive the termination of this Financing Agreement.

**14.14**    The Lenders agree to maintain the confidentiality of any non-public information provided by the Companies to them, in the ordinary course of their business, provided that the foregoing confidentiality provision shall terminate one (1) year after the termination date of this Financing Agreement, and provided further that any such Lenders may disclose such information (i) to any applicable bank regulatory and auditor personnel, (ii) upon the advice of their counsel and (iii) to the applicable Office of the United States Trustee.

[Signatures appear on the following page]

B # 761460 v.5

**IN WITNESS WHEREOF**, the parties hereto have caused this Financing Agreement to be effective, executed, accepted and delivered at Philadelphia, Pennsylvania, by their proper and duly authorized officers as of the date set forth above.

**SHAPES/ARCH HOLDINGS L.L.C.**

By:_____
Name:  Steven S. Grabell, CEO


**SHAPES L.L.C.**
A New Jersey limited liability company


By:_____
Name:  Steven S. Grabell, CEO


**DELAIR L.L.C.**
A New Jersey limited liability company


By:_____
Name:  Steven S. Grabell, VP


**ACCU-WELD L.L.C.**
A Pennsylvania limited liability company


By:_____
Name:  Steven S. Grabell, VP


**ULTRA L.L.C.**
A New Jersey limited liability company


By:_____
Name:  Steven S. Grabell, VP


**THE CIT GROUP/BUSINESS CREDIT, INC.**
(as Agent and a Lender)


By:_____
    Julianne Low, Vice President

Commitment Percentage: 47.6592405%

B # 761460 v.5

**JPMORGAN CHASE BANK, N.A., successor by merger to Bank One, NA**
(as Co-Agent, Documentation Agent and a Lender)


By:_____
    Michael F. McCullough, Senior Vice President

Commitment Percentage: 39.6825316%

**TEXTRON FINANCIAL CORPORATION**
(a Lender)


By:_____
    Norbert Schmidt, Senior Account Executive

Commitment Percentage: 12.6582279%

-59-

## EXHIBIT A

## REVOLVING CREDIT NOTE

$60,000,000.00                                                                March_, 2008

FOR VALUE RECEIVED, the undersigned, SHAPES/ARCH HOLDINGS L.L.C., a New Jersey limited liability company, SHAPES L.L.C., a New Jersey limited liability company, DELAIR L.L.C., a New Jersey limited liability company, ACCU-WELD L.L.C., a Pennsylvania limited liability company, and ULTRA L.L.C., a New Jersey limited liability company (herein the "**Companies**"), hereby, absolutely and unconditionally promise to pay to the order of The CIT Group/Business Credit, Inc. as agent for the Lenders (the "**Agent**"), for the pro-rata benefit of the Lenders, and any other party which now or hereafter becomes a lender hereunder pursuant to Section 13 of the Financing Agreement, in lawful money of the United States of America and in immediately available funds, the principal amount of Sixty Million Dollars ($60,000,000.00), or such other principal amount advanced pursuant to Section 3 and Section 5 of the Financing Agreement (as herein defined), such Revolving Loan advances shall be repaid on a daily basis as a result of the application the proceeds of collections of the Accounts and the making of additional Revolving Loans as described in Section 3.  Subject to the terms of the Financing Agreement, the Revolving Loans may be borrowed, repaid and reborrowed by the Companies.  A final balloon payment in an amount equal to the outstanding aggregate balance of principal and interest remaining unpaid, if any, under this Note as shown on the books and records of the Agent shall be due and payable on the termination of the Financing Agreement as set forth in Section 11 thereof.

The Companies further absolutely and unconditionally promise to pay to the order of the Agent at said office, interest, in like money, on the unpaid principal amount owing hereunder from time to time from the date hereof on the dates and at the rates specified in Section 8, of the Financing Agreement.

If any payment on this Note becomes due and payable on a day other than a Business Day, the maturity' thereof shall be extended to the next succeeding Business Day, and with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

This Note is the Revolving Credit Note referred to in the Financing Agreement, dated as of March ___, 2008, between the undersigned, the Lenders and the Agent, as the same may be amended and/or restated and in effect from time to time, among the Companies, the Agent, and the Lenders thereto from time to time (as so amended, the "**Financing Agreement**"), and is subject to, and entitled to, all of the terms, provisions and benefits thereof and is subject to optional and mandatory prepayment, in whole or in part, as provided therein.  All capitalized terms used herein shall have the meaning provided therefor in the Financing Agreement, unless otherwise defined herein.

The date and amount of the advance(s) made hereunder may be recorded on the grid page or pages which are attached hereto and hereby made part of this Note or the separate ledgers maintained by the Agent.  The aggregate unpaid principal amount of all advances made pursuant hereto may be set forth in the balance column on said grid page or such ledgers maintained by the Agent.  All such advances, whether or not so recorded, shall be due as part of this Note.

The Companies confirm that any amount received by or paid to the Agent in connection with the Financing Agreement and/or any balances standing to its credit on any of its or their accounts on the Agent's books under the Financing Agreement may in accordance with the terms of the Financing Agreement be applied in reduction of this Note, but no balance or amounts shall be deemed to effect payment in whole or in part of this Note unless the Agent shall have actually charged such account or accounts for the purposes of such reduction or payment of this Note.

Upon the occurrence of any one or more of the Events of Default specified in the Financing Agreement or upon termination of the Financing Agreement, all amounts then remaining unpaid on this Note may become, or be declared to be, immediately due and payable as provided in the Financing Agreement.

The undersigned hereby waive diligence, notice of intent to accelerate, notice of acceleration, demand, presentment and protest and any notices thereof as well as notice of nonpayment other than notices agreed to be delivered pursuant to the Financing Agreement.

**IN WITNESS WHEREOF**, the due execution of this Revolving Credit Note as of the date first written above.

SHAPES/ARCH HOLDINGS L.L.C.


By: EXHIBIT ONLY
      Steven S. Grabell, CEO


SHAPES L.L.C.
A New Jersey limited liability company


By: EXHIBIT ONLY
      Steven S. Grabell, CEO


DELAIR L.L.C.
A New Jersey limited liability company


By: EXHIBIT ONLY
      Steven S. Grabell, VP


ACCU-WELD L.L.C.
A New Jersey limited liability company


By: EXHIBIT ONLY
      Steven S. Grabell, VP


ULTRA L.L.C.
A New Jersey limited liability company


By: EXHIBIT ONLY
      Steven S. Grabell, VP