Order Filed on
**3/18/2008**
by Clerk U.S. Bankruptcy
Court District of New Jersey

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ  08002
(856) 910-5000
Proposed Attorneys for the Debtors

In re:

SHAPES/ARCH HOLDINGS L.L.C., et al.,

                    Debtors.

Case No. 08-14631

Judge: Gloria M. Burns

Chapter:  11

**INTERIM ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), AND (B) TO REFINANCE CERTAIN PRE-PETITION SECURED INDEBTEDNESS; (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; (III) GRANTING OTHER RELIEF; AND (IV) <u>SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(c)</u>**

The relief set forth on the following pages numbered 2 through 38 is hereby ORDERED

AND GRANTED.

**DATED: 3/18/2008**

Honorable Gloria M Burns
United States Bankruptcy Court Judge

This matter is before this Court upon the motion (the "**Motion**"), dated March 16, 2008, of Shapes/Arch Holdings, L.L.C. ("**Holdings**"), Shapes L.L.C. ("**Shapes**"), Delair L.L.C. ("**Delair**"), Accu-Weld L.L.C. ("**Accu-Weld**") and Ultra L.L.C. ("**Ultra**" and, together with Holdings, Shapes, Delair and Accu-Weld, collectively, the "**Debtors**" and each individually a "**Debtor**"), each as a debtor and debtor-in-possession in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), which Motion seeks, among other things:

(1)    authorization and approval for the Debtors to obtain post-petition loans, advances and other financial accommodations (the "**Post-Petition Financing**") on an interim basis for a period through and including the date of the Final Hearing (as defined below) under or in connection with (a) a debtor-in-possession term loan facility (the "**Post-Petition Term Loan Facility**") in an amount up to the aggregate principal amount of $25 million at any time outstanding (the "**Post-Petition Term Loans**") (the actual available principal amount at any time being subject to those conditions set forth in the Post-Petition Term Loan Agreement (as defined below)) from Arcus ASI Funding, LLC ("**Arcus**"), as agent (in such capacity, the "**Term Loan Agent**") for itself and a syndicate of financial institutions (together with Arcus, the "**Term Loan Lenders**") to be arranged by Arcus or affiliates thereof, and (b) a debtor-in-possession revolving credit facility (the "**Post-Petition Revolving Credit Facility**" and, together with the Post-Petition Term Loan Facility, the "**Post-Petition Facilities**") in an amount up to the aggregate principal amount of $60 million at any time outstanding (the "**Post-Petition Revolving Credit Loans**" and, together with the Post-Petition Term Loans, the "**Post-Petition Loans**") (the actual available principal amount at any time being subject to those conditions set

*Approved by Judge Gloria M. Burns March  18, 2008*

forth in the DIP Revolving Credit Agreement and the other Financing Agreements (in each case, as defined in the Interim Revolving Credit Order) (collectively, the "**Post-Petition Revolving Credit Documents**") from The CIT Group/Business Credit, Inc. ("**CIT**"), as agent (in such capacity, the "**Revolving Credit Agent**" and, together with the Term Loan Agent, the "**Agents**"), for itself and lenders currently consisting of JPMorgan Chase Bank, N.A. and Textron Financial Corporation (together with CIT, the "**Revolving Credit Lenders**" and, together with the Term Loan Lenders, the "**Lenders**");

(2)     authorization and approval for the Debtors to execute and enter into the Post-Petition Financing Documents (as defined below) and to perform such other and further acts as may be required in connection with the Post-Petition Financing Documents;

(3)     the grant to each Agent, for the benefit of itself and the Lenders for which it acts as agent, of valid and perfected security interests and liens in and upon the Collateral (as defined below) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in accordance with the terms hereof and the terms of the Interim Revolving Credit Order (as defined below), with the priorities set forth herein and in the Interim Revolving Credit Order (as defined below);

(4)     the grant to each Agent, for the benefit of itself and the Lenders for which it acts as agent, of superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in accordance with the terms hereof and the terms of the Interim Revolving Credit Order;

(5)     modification of the automatic stay to the extent set forth herein and in the Interim Revolving Credit Order;

(6)     pursuant to Bankruptcy Rule 4001(c), that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of:

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

(a) this order (this "**<u>Interim Order</u>**") (a) authorizing and granting approval for the Debtors, on an interim basis, to forthwith execute the Post-Petition Term Loan Documents (as defined below) and borrow from the Term Loan Lenders up to an aggregate principal amount at any time outstanding not to exceed $25 million to be used (i) to refinance the outstanding principal balance of the term loan under the Financing Agreement, dated as of December 30, 2003 (as amended, supplemented, extended or otherwise modified from time to time, the "**<u>Pre-Petition Loan Agreement</u>**"), by and among the Debtors (other than Holdings), the Revolving Credit Agent and the Revolving Credit Lenders, (ii) to refinance the balance of the PP&E Equity Collateral Borrowing Base Component under (and as defined in) the Pre-Petition Loan Agreement, and (iii) for working capital and other general corporate purposes of the Debtors (subject to any limitations of borrowings under the Post-Petition Term Loan Documents), and (b) granting the other relief described herein; and

(b) an order (the "**<u>Interim Revolving Credit Order</u>**") (a) authorizing and granting approval for the Debtors, on an interim basis, to forthwith execute the Post-Petition Revolving Credit Documents and borrow or obtain letters of credit from the Revolving Credit Lenders under the Post-Petition Revolving Credit Documents up to an aggregate principal or face amount at any time outstanding not to exceed $60 million to be used (i) to refinance all amounts outstanding as of the Petition Date (as defined below) under the Pre-Petition Loan Agreement, to the extent not refinanced with the proceeds of the Post-Petition Term Loans as described above, and (ii) for working capital and other general corporate purposes of the Debtors (subject to any limitations of borrowings and issuances of letters of credit under the Post-Petition Revolving Credit Documents), including the deeming of all outstanding letters of credit issued under the Pre-Petition Loan Agreement (as defined below) to

*Approved by Judge Gloria M. Burns March  18, 2008*

constitute letters of credit issued under the Post-Petition Revolving Credit Agreement, and (b) granting the other relief described in the Interim Revolving Credit Order; and

(7)     that this Court schedule a final hearing (the "**Final Hearing**") to be held not later than April **[4]**, 2008 to consider entry of:

(a)     a final order (the "**Final Order**") (a) authorizing and granting approval for the Post-Petition Term Loan Documents and the balance of the borrowings under the Post-Petition Term Loan Documents on a final basis, as set forth in the Motion and the Post-Petition Term Loan Documents, and (b) granting the other relief described in the Final Order; and

(b)     a final order (the "**Final Revolving Credit Order**") authorizing and approving (a) the Post-Petition Revolving Credit Documents and the balance of the borrowings and letter of credit issuances under the Post-Petition Revolving Credit Documents on a final basis, as set forth in the Motion and the Post-Petition Revolving Credit Documents, and (b) granting the other relief described in the Final Revolving Credit Order.

This Court having found that due and appropriate notice, under the circumstances, of the Motion, the relief requested therein, and the Interim Hearing (the "**Notice**") has been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on (i) the Agents and the Lenders, (ii) the United States Trustee for the District of New Jersey (the "**U.S. Trustee**"), (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis (but no less than the holders of the five (5) largest unsecured claims in each Case) (the "**Largest Unsecured Creditors**"), (iv) the Internal Revenue Service, (v) the New Jersey Attorney General, (vi) the Commonwealth of Pennsylvania Department of Revenue, and (vii) certain other parties identified in the certificate of service filed with this Court (collectively, the "**Noticed Parties**").

This Court having held the Interim Hearing on the Motion on March 18, 2008.

*Approved by Judge Gloria M. Burns March  18, 2008*

Upon the record made by the Debtors at the Interim Hearing, including the Motion, and the filings and pleadings in the Cases, and good and sufficient cause appearing therefor;

THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    <u>Petition</u>.  On March 16, 2008 (the "**Petition Date**"), each Debtor filed a voluntary petition (the "**Petition**") under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M). Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>.  Notice of the Interim Hearing, the Motion and proposed entry of this Interim Order has been provided to the Noticed Parties. Under the circumstances, requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(c) and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, Sections 102(1) and 364 of the Bankruptcy Code, and no further notice of, or hearing on, the Motion or this Interim Order is necessary or required.

D.    <u>Preliminary Findings Regarding the Post- Petition Financing</u>.

(i)    <u>Postpetition Financing</u>.  The Debtors have requested from the Term Loan Agent and the Term Loan Lenders, and the Term Loan Agent and the Term Loan Lenders are willing to extend, the Post-Petition Term Loan Facility, as more particularly

6

*Approved by Judge Gloria M. Burns March  18, 2008*

described, and on the terms and conditions set forth, in this Interim Order and the Post-Petition

Term Loan Documents.

(ii)    <u>Need for Post-Petition Financing</u>.    The Debtors do not have

sufficient available sources of working capital and liquidity to operate their businesses in the

ordinary course without the Post-Petition Financing, including the Post-Petition Term Loan

Facility.    The Debtors' ability to maintain business relationships with their vendors, suppliers

and customers, to pay their employees, to make capital expenditures and to otherwise fund their

operations is essential to the Debtors' continued viability.    The ability of the Debtors to obtain

sufficient working capital and liquidity through the proposed Post-Petition Financing on the

terms set forth in the Post-Petition Financing Documents, this Interim Order and the Interim

Revolving Credit Order is vital to the preservation and maintenance of the going concern value

of the Debtors and to a successful reorganization of the Debtors.    Accordingly, the Debtors have

an immediate need to obtain the Post-Petition Financing, including the Post-Petition Term Loan

Facility, in order to, among other things, permit the orderly continuation of the operation of their

businesses, minimize the disruption of their business operations, manage and preserve the assets

of the Debtors' bankruptcy estates (as defined under Section 541 of the Bankruptcy Code, the

"**Estates**") in order to maximize the recovery to all stakeholders of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.    The Debtors are

unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of

the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the

Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to

Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on all or substantially all of

the Debtors' assets pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.    The Debtors

have been unable to procure the necessary financing on terms more favorable than the financing

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

offered by the Agents and the Lenders pursuant to the Post-Petition Financing Documents, this Interim Order and the Interim Revolving Credit Order.

(iv)     <u>Budget</u>.  The Debtors have prepared and delivered to the Term Loan Agent and the Term Loan Lenders the Budget (as defined in the Post-Petition Term Loan Agreement), a copy of which is annexed hereto as **<u>Exhibit 1</u>**.  The Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby.  The Debtors believe in good faith that the Budget is achievable and will allow the Debtors to operate in Chapter 11 without the accrual of unpaid administrative expenses during the term of the Budget.  The Term Loan Agent and the Term Loan Lenders are relying upon the Debtors' compliance with the Budget in determining to enter into the Post-Petition Term Loan Documents.

(v)     <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>. The terms of the Post-Petition Term Loan Documents and this Interim Order are fair, just, reasonable and appropriate under the circumstances, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms and conditions of the Post-Petition Term Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors, on one hand, and the Term Loan Agent and the Term Loan Lenders, on the other hand, with all parties being represented by counsel.  Any credit extended under the terms of this Interim Order shall be deemed to have been extended in "good faith" as that term is used in Section 364(e) of the Bankruptcy Code and in express reliance upon the protections afforded by Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

(vi)   <u>Good Cause</u>.   The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and on-going operations, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all of the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their stakeholders, their businesses, their employees, and their assets.

(vii)   <u>Immediate Entry</u>.   Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).   No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.   <u>Authorization and Conditions to Financing</u>.

1.1   <u>Motion Granted</u>.   The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order and the Interim Revolving Credit Order.  This Interim Order shall immediately become effective upon its entry.

1.2   <u>Authorization to Borrow and Use of Loan Proceeds</u>.   The Debtors are hereby authorized and empowered to immediately borrow and obtain loans and to incur indebtedness and obligations (including, without limitation, the "Obligations" under (and as defined in) the Post-Petition Term Loan Agreement) owing to the Term Loan Agent and the Term Loan Lenders (collectively, the "**<u>Post-Petition Term Loan Obligations</u>**"), on a joint and

9

*Approved by Judge Gloria M. Burns March  18, 2008*

several basis, on the terms and subject to the conditions set forth in the Post-Petition Term Loan Documents and this Interim Order, during the period commencing on the date of this Interim Order through and including the date of the Final Hearing as set forth in <u>Section 7</u> of this Interim Order (the "**Interim Financing Period**"), in such amounts as may be made available to the Debtors by the Term Loan Agent and the Term Loan Lenders in accordance with all of the terms and conditions set forth in the Post-Petition Term Loan Documents.  Subject to the terms and conditions contained in the Post-Petition Term Loan Documents and this Interim Order, the Debtors shall use the proceeds of the loans and any other financial accommodations provided to the Debtors (a) to refinance the outstanding principal balance of the term loan under the Pre-Petition Loan Agreement, (b) to refinance the balance of the PP&E Equity Collateral Borrowing Base Component under (and as defined in) the Pre-Petition Loan Agreement, and (c) for working capital and other general corporate purposes of the Debtors (subject to any limitations of borrowings under the Post-Petition Term Loan Documents), including the repayment of amounts outstanding under the Post-Petition Revolving Credit Agreement and including the payment of interest, fees and expenses under the Post-Petition Financing Documents, in each case, in accordance with the terms and conditions of the Post-Petition Term Loan Documents, the Intercreditor Agreement and this Interim Order.[1]  The Post-Petition Term Loan Obligations and the Revolving Credit Obligations (as defined in the Interim Revolving Credit Order) are sometimes collectively referred to herein as the "**Obligations**".

      1.3    <u>Financing Agreements</u>.

---

[1] Notwithstanding any approval by the Term Loan Agent and the Term Loan Lenders of the Budget (or, in their sole discretion, any amended Budget(s)), the Term Loan Agent and the Term Loan Lenders will not, and shall not be required to, provide any loans or other financial accommodations pursuant to the Budget or to fund any specific expenses or disbursements set forth in the Budget, but shall only provide loans and other financial accommodations pursuant to the terms and conditions set forth in the Post-Petition Term Loan Documents and this Interim Order. The inclusion of this provision in this Interim Order is not intended to affect any applicable rights of the Revolving Credit Agent under the Intercreditor Agreement (as defined below).

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

1.3.1    <u>Authorization</u>.  The Debtors are hereby authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the Debtor-in-Possession Term Loan Financing Agreement (as amended, supplemented, extended or otherwise modified from time to time, the "**Post-Petition Term Loan Agreement**"), in substantially the form annexed hereto as **<u>Exhibit 2</u>**, and all other agreements, documents and instruments executed or delivered with, to, or in favor of the Term Loan Agent and the Term Loan Lenders from time to time, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Post-Petition Term Loan Agreement, as amended, supplemented, extended or otherwise modified from time to time, collectively, the "**Post-Petition Term Loan Documents**" and, together with the Post-Petition Revolving Credit Documents, collectively, the "**Post-Petition Financing Documents**"), each of which shall constitute valid, binding, enforceable and non-avoidable obligation of the Debtors and their Estates in accordance with its terms for all purposes during the Cases, any subsequently converted case of any Debtor under Chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of any Case.  The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of all additional agreements, instruments and documents, as the Term Loan Agent may reasonably require from time to time as evidence of and for the protection of the Post-Petition Term Loan Obligations and the Collateral or which may be otherwise deemed necessary by the Term Loan Agent to effectuate the terms and conditions of this Interim Order and the Post-Petition Term Loan Documents.

1.3.2    <u>Approval</u>.  The Post-Petition Term Loan Documents and each term set forth therein are approved, and the terms of the Post-Petition Term Loan Agreement are

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

incorporated into this Interim Order by this reference as if more fully set forth herein.  All of the terms, conditions and covenants set forth in the Post-Petition Term Loan Documents shall be sufficient and conclusive evidence of the financing arrangements by and among the Debtors, the Term Loan Agent and the Term Loan Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the Post-Petition Term Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all Post-Petition Term Loan Obligations, including, without limitation, all principal, interest, fees (including, without limitation, the arrangement fee, the agent/facility fees, the collateral monitoring and servicing fees and the termination fee set forth in Section 9 of the Post-Petition Term Loan Agreement), indemnities, costs and expenses, including, without limitation, all of the Term Loan Agent's and the Term Loan Lenders' attorneys' and other professionals' fees and expenses, in each case, in accordance with and as more fully set forth in the Post-Petition Term Loan Documents.  Without limiting the generality of the foregoing, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse the Term Loan Agent and the Term Loan Lenders, in accordance with and as more fully set forth in the Post-Petition Term Loan Documents, for all present and future costs and expenses paid or incurred by the Term Loan Agent and the Term Loan Lenders in connection with the Post-Petition Financing, all of which shall be and are included as part of the principal amount of the applicable Post-Petition Term Loan Obligations and secured by the Collateral.

      1.3.3    Amendment.    Subject to the terms and conditions of the Post-Petition Term Loan Documents and the Intercreditor Agreement (as defined below), the Debtors and the Term Loan Agent and the Term Loan Lenders may amend, modify, supplement or waive any provision of the such Post-Petition Term Loan Documents (an "**Amendment**") without further approval or order of this Court; provided that (a) any such Amendment must be in writing

12

*Approved by Judge Gloria M. Burns March  18, 2008*

and served upon (i) the Revolving Loan Agent, (ii) the U.S. Trustee and (iii) counsel to the official committee of unsecured creditors appointed in the Cases under Section 1102 of the Bankruptcy Code (the "**Creditors' Committee**"), or in the event no Creditors' Committee is appointed at the time of such Amendment, the Largest Unsecured Creditors; and (b) any such Amendment that operates to increase the interest rate (other than as currently provided in the Post-Petition Term Loan Agreement), increase the aggregate loan commitment amounts available under the Post-Petition Term Loan Agreement, shorten the scheduled maturity date under the Post-Petition Term Loan Agreement, add specific new events of default or enlarge the nature and extent of default remedies available to the Term Loan Agent and the Term Loan Lenders following an event of default must be filed with this Court and served upon the parties described in the preceding clause (a), and such parties shall have 5 days to object to such Amendment (and if no such party objects to such Amendment within such time frame, it shall immediately become effective).

Section 2.    <u>Collateral and Superpriority Administrative Claim Status</u>.

    2.1    <u>Collateral</u>.

        2.1.1    <u>Lien Grant</u>.

           a.    For purposes hereof, (i) the "**Revolver Senior Collateral**" and the "**Term Senior Collateral**" shall have the meanings set forth set forth on **Exhibit 3** annexed hereto, and (ii) "**Collateral**" shall mean, collectively, the Revolver Senior Collateral and the Term Senior Collateral.

           b.    To secure the prompt payment and performance of any and all Post-Petition Term Loan Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall have and is hereby granted, effective as of the

13

*Approved by Judge Gloria M. Burns March  18, 2008*

Petition Date, (i) valid and perfected first priority security interests and liens in and upon all of the Term Senior Collateral, superior to all other presently existing and future liens, security interests, claims or interests in property that any creditor of any Debtor's Estate may have in and upon any such Collateral pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, but subject in the case of priority only to the applicable Permitted Liens and Claims (as defined below), as and to the extent expressly provided in <u>Section 2.1.2</u> below, and (ii) valid and perfected second priority security interests and liens in and upon all of the Revolver Senior Collateral, superior to all other presently existing and future liens, security interests, claims or interests in property that any creditor of any Debtor's Estate may have in and upon any such Collateral pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, but subject in the case of priority only to (y) the first priority security interests and liens in and upon the Revolver Senior Collateral in favor of the Revolving Credit Agent, for the benefit of itself and the Revolving Credit Lenders, granted pursuant to the Interim Revolving Credit Order (or any subsequently entered Final Revolving Credit Order) as security for the Revolving Credit Obligations (the "**<u>Revolving Credit Facility Liens</u>**"), and (z) the other applicable Permitted Liens and Claims (as defined below), as and to the extent expressly provided in <u>Section 2.1.2</u> below.

        c.    Upon entry of the Final Order, the Term Senior Collateral (and therefore the assets subject to the first priority security interests and liens of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders) shall include any and all avoidance actions under Chapter 5 or Section 724(a) of the Bankruptcy Code and the proceeds thereof.

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

2.1.2    Lien Priority.  The post-petition liens and security interests of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, granted under the Post-Petition Term Loan Documents and this Interim Order in the Collateral shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of this Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law; provided, however, that the liens on and security interests in the Collateral of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall be subject in the case of priority only to (a) the Permitted Encumbrances (as defined in the Post-Petition Term Loan Agreement), including in the case of the Revolver Senior Collateral only, the Revolving Credit Facility Liens, and (b) the Carve Out Expenses (as defined below) solely to the extent provided for in Sections 2.3, 2.4 and 2.5 of this Interim Order (the items described in foregoing clauses (a) and (b) are sometimes collectively referred to in this Interim Order as the "**Permitted Liens and Claims**").  Without limiting the generality of the foregoing, the post-petition liens and security interests of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, granted under the Post-Petition Term Loan Documents and this Interim Order in the Collateral shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors and their Estates pursuant to Section 551 of the Bankruptcy Code.

2.1.3    Post-Petition Lien Perfection.  This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect

15

*Approved by Judge Gloria M. Burns March  18, 2008*

such security interest or lien, including without limitation, control agreements with any financial institution(s) holding any deposit account of any Debtor (a "**Perfection Act**").  Notwithstanding the foregoing, if the Term Loan Agent shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, the Term Loan Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the Term Loan Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. The Term Loan Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should the Term Loan Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

> 2.1.4  <u>Nullifying    Restrictions    to    Post-Petition    Financing</u>. Notwithstanding anything to the contrary contained in any agreement, contract, lease, document, note or instrument to which any Debtor is or becomes a party or under which any Debtor is or becomes obligated, any provision that restricts, limits or impairs in any way any Debtor from granting the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements

16

*Approved by Judge Gloria M. Burns March  18, 2008*

to which any Debtor is a party), or otherwise entering into and complying with all of the terms, conditions and provisions hereof or the Post-Petition Term Loan Documents (all such provisions being collectively referred to as the "**Restrictive Clauses**") shall not (i) be effective and/or enforceable against any such Debtors, the Term Loan Agent or the Term Loan Lenders, or (ii) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, pursuant to this Interim Order, the Post-Petition Term Loan Documents or otherwise, to the maximum extent permitted under the Bankruptcy Code and other applicable law.  Such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by any Debtor (or by the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, pursuant to the provisions contained in this Interim Order), or in any way impair or limit the ability or right of any Debtor (or by the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, on behalf of any Debtor, pursuant to the provisions contained in this Interim Order) to assume and/or assign any contract or lease under Sections 365 or 1123 of the Bankruptcy Code.

      2.1.5  <u>After-Acquired Property</u>.  Pursuant to Section 552(a) of the Bankruptcy Code, no property acquired by the Debtors after the Petition Date is or will be subject to any security interest or lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except (a) to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable security interest or lien as of the Petition Date which is not subject to subordination under Section 510(c) of the Bankruptcy Code or other provisions or principles of applicable law, or (b) as set forth in the Interim Revolving Credit Order.

17

*Approved by Judge Gloria M. Burns March  18, 2008*

2.1.6    Insurance Policies.  Upon entry of this Interim Order, the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral.   The Debtors are authorized and directed to take any action necessary to have the Term Loan Agent added as an additional insured and loss payee on each insurance policy.

2.2    Superpriority Administrative Expense.  To secure the prompt payment and performance of any and all Post-Petition Term Loan Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claim**"), whether or not such administrative expenses or priority claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claim shall be payable from and have recourse to all pre and post-petition property of the Debtors and all proceeds thereof; provided that, the Superpriority Claim shall be subject only to the Carve Out Expenses to the extent expressly set forth in this Interim Order.  The Superpriority Claim of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall be pari passu with the superpriority claim (as described in  Section 18 of the Interim Revolving Credit Order) of the Revolving Credit Agent, for the benefit of itself and the Revolving Credit Lenders, granted pursuant to the Interim

18

*Approved by Judge Gloria M. Burns March  18, 2008*

Revolving Credit Order (both such Superpriority Claims, collectively, the "**Superpriority**

**Claims**").

        2.3    <u>Carve Out Expenses</u>.

        2.3.1    <u>Carve Out Expenses</u>.  The liens, claims and security interests in the

Collateral in favor of the Agents and the Lenders and the Superpriority Claims, shall be subject

only to the right of payment of the following expenses (the "**Carve Out Expenses**"):

        a.    statutory fees payable to the U.S. Trustee pursuant to 28

U.S.C. §§ 1930(a)(6);

        b.    fees payable to the Clerk of this Court; and

        c.    subject to the terms and conditions of this Interim Order,

the unpaid and outstanding reasonable fees and expenses actually incurred on or after the

Petition Date, and approved by a final order of this Court pursuant to Sections 326, 328,

330, or 331 of the Bankruptcy Code (collectively, the "**Allowed Professional Fees**"), by

attorneys, accountants and other professionals retained by the Debtors and the Creditors'

Committee under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the

"**Professionals**"), in a cumulative, aggregate sum not to exceed: (i) $1,125,000, inclusive

of all retainers, for Professionals retained by the Debtors (the "**Debtors' Professional**

**Fee Carve Out**"), and (ii) $250,000 for Professionals retained by the Creditors'

Committee (the "**Committee's Professional Fee Carve Out**" and, together with the

Debtors' Professional Fee Carve Out, collectively, the "**Professional Fee Carve Out**").

        Effective upon the earlier of (a) the entry of a Final Order approving the Motion

or (b) the entry of an order extending the Interim Financing Period beyond April **[4]**, 2008

(which entry, without the prior written consent of the Term Loan Agent, shall constitute an Event

of Default) (such effectiveness to be retroactive to the date of entry of this Interim Order), in

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

exchange for the Professional Fee Carve-Out, all parties entitled to be paid therefrom shall not be entitled, directly or indirectly, to charge the Collateral whether by operation of Sections 105, 506(c) or 552(b) of the Bankruptcy Code or otherwise.

        2.3.2    <u>Excluded Professional Fees</u>.    Notwithstanding anything to the contrary in this Interim Order, neither the Carve Out Expenses nor the proceeds of any loans or Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:  (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or the Agents' and the Lenders' liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Agents' and the Lenders' liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying the Agents' or the Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Order or the Interim Revolving Credit Order, (b) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code), (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than the Post-Petition Financing, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against either Agent, any Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from such Agent or any Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the

20

*Approved by Judge Gloria M. Burns March  18, 2008*

rights and remedies of either Agent or any Lender, or which is contrary, in a manner that is material and adverse to either Agent or any Lender, to any term or condition set forth in or acknowledged by the Post-Petition Financing Documents, this Interim Order or the Interim Revolving Credit Order and which results in the occurrence of an Event of Default; provided, however, that an amount not to exceed $25,000 in the aggregate of the Post-Petition Facilities may be used to pay the Allowed Professional Fees of the Creditors' Committee to investigate claims against and objections with respect to the Pre-Petition Debt (as defined in the Interim Revolving Credit Order) and pre-petition liens and security interests of the Revolving Credit Agent and the Revolving Credit Lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Revolving Credit Agent and the Revolving Lenders), including formal discovery proceedings in connection therewith.  Any such amount once paid shall reduce the Committee's Professional Fee Carve Out on a dollar-for-dollar basis.

2.4     Carve Out Reserve.  At the Term Loan Agent's sole discretion, the Term Loan Agent may at any time establish (and adjust) a reserve against the amount of loans or other credit accommodations that would otherwise be made available to the Debtors pursuant to the Post-Petition Term Loan Agreement in respect of the Professional Fee Carve Out and the other Carve Out Expenses.  Without duplication, in its sole discretion, the Term Loan Agent may elect from time to time to fund, from the proceeds of loans under the Post-Petition Term Loan Agreement, a cash reserve in respect of the Professional Fee Carve Out and the other Carve Out Expenses (and, upon any such election, the Debtors shall be deemed to have made one or more loan requests from time to time in the amount necessary to fund such cash reserve).

2.5     Payment of Carve Out Expenses.

*Approved by Judge Gloria M. Burns March  18, 2008*

2.5.1    The Debtors shall be permitted to pay to the Professionals compensation and reimbursement of expenses that accrued prior to the occurrence of an Event of Default and in the ordinary course of the Debtors' business, and that are otherwise allowed and payable under Section 328, 330 and 331 of the Bankruptcy Code and any interim procedures order, as the same may be due and payable, but subject in any event to the times and amounts specified therefor in the Budget, and the amounts so paid shall permanently reduce the Debtors' Professional Fee Carve Out or the Committee's Professional Fee Carve Out, as applicable, on a dollar-for-dollar basis.  Any Professional of the Debtors holding a retainer shall not be required to apply any portion of such retainer to its unpaid compensation and expenses prior to seeking any payment of Allowed Professional Fees in accordance with the first sentence of this Section 2.5.1, but shall be required to apply the full amount of such retainer prior to seeking payment in excess of such retainer from the Debtors' Professional Fee Carve-Out.  The application of any retainer to Allowed Professional Fees shall permanently reduce the Debtors' Professional Fee Carve Out on a dollar-for-dollar basis.

2.5.2    Any payment or reimbursement made either directly by either Agent or any Lender at any time, or directly or indirectly by or on behalf of the Debtors (including the application of any retainers), in respect of any Allowed Professional Fees shall, in either case, permanently reduce the Debtors' Professional Fee Carve Out or the Committee's Professional Fee Carve Out, as applicable, on a dollar-for-dollar basis.

2.5.3    To the extent that the Term Loan Agent and the Term Loan Lenders elect to directly fund or otherwise pay the Professional Fee Carve Out or the other Carve Out Expenses, such amounts shall be added to and made a part of the Post-Petition Term Loan Obligations, secured by the Collateral, and entitle the Term Loan Agent and the Term Loan Lenders to all of the rights, claims, liens, priorities and protections under this Interim Order, the

Post-Petition Term Loan Documents, the Bankruptcy Code or applicable law.  Payment of any

Carve Out Expenses, whether by or on behalf of the Term Loan Agent or any Term Loan

Lender, shall not and shall not be deemed to reduce the Post-Petition Term Loan Obligations,

and shall not and shall not be deemed to subordinate any of the Term Loan Agent's and the Term

Loan Lenders' liens and security interests in the Collateral or their Superpriority Claim to any

pre- or post-petition lien, interest or claim in favor of any other party.  The Term Loan Agent and

the Term Loan Lenders shall not, under any circumstance, be responsible for the direct payment

or reimbursement of any fees or disbursements of any Professionals incurred in connection with

the Cases or under any chapter of the Bankruptcy Code (other than to turnover proceeds of the

Collateral or the Superpriority Claim actually received by the Term Loan Agent or any Term

Loan Lender following an Event of Default), and nothing in Section 2.3, 2.4, 2.5 or 2.6 of this

Interim Order shall be construed to obligate the Term Loan Agent or any Term Loan Lenders in

any way, to pay compensation to or to reimburse expenses of any Professional (other than as set

forth in the preceding parenthetical), or to ensure that the Debtors have sufficient funds to pay

such compensation or reimbursement.

2.5.4              For avoidance of doubt, it is understood that the

Professional Fee Carve Out referred to in this Interim Order is the only "professional fee carve

out" available in the Cases, i.e., no "professional fee carve out" is or will be available under the

Interim Revolving Credit Order (or any subsequently entered Final Revolving Credit Order) and

the Revolving Credit Facility Liens in the Revolver Senior Collateral is not and will not be

subject to any "professional fee carve out".

Section 3.      Default; Rights and Remedies; Relief from Stay.

3.1      Events of Default.  The occurrence of any of the following events shall

constitute an "**Event of Default**" under this Interim Order:

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March 18, 2008*

a.      Any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under this Interim Order; or

b.      Any "Event of Default" under (and as defined in) the Interim Revolving Credit Order; or

c.      Any "Event of Default" under (and as defined in) any of the Post-Petition Term Loan Documents.

3.2      <u>Rights and Remedies Upon Event of Default</u>.  Upon the occurrence of and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Interim Order and the Post-Petition Term Loan Documents, and (ii) the Term Loan Agent shall be entitled to take any act or exercise any right or remedy as provided in this Interim Order and the Post-Petition Term Loan Documents, including, without limitation, (v) declaring all Post-Petition Term Loan Obligations immediately due and payable, (w) accelerating the Post-Petition Term Loan Obligations, (x) ceasing to extend loans or other financial accommodations to or on behalf of the Debtors, (y) subject to <u>Section 3.4</u> below, setting off any Post-Petition Term Loan Obligations under the Post-Petition Term Loan Documents with Collateral or proceeds in the Term Loan Agent's or any Term Loan Lender's possession, and (z) subject to <u>Section 3.4</u> below, enforcing any and all rights with respect to the Collateral.  Upon the occurrence and during the continuance of an Event of Default and the exercise by the Term Loan Agent of its rights and remedies under the Post-Petition Term Loan Documents, the Debtors shall assist the Term Loan Agent in effecting any sale or other disposition of the Collateral required by the Term Loan Agent, including any sale of Collateral pursuant to Section 363 of the Bankruptcy Code or assumption and assignment of Collateral consisting of contracts and leases pursuant to Section 365 of the Bankruptcy Code, in each case, upon such terms that are designed to maximize the proceeds obtainable from such sale or other

123285.01601/21672882v.8

disposition and otherwise acceptable to the Term Loan Agent.  The Term Loan Agent and the Term Loan Lenders shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

      3.3    <u>Expiration of Commitment</u>.  Upon the expiration of the Debtors' authority to borrow and obtain other financial accommodations from the Term Loan Agent and the Term Loan Lenders pursuant to the terms of this Interim Order and the Post-Petition Term Loan Documents (except if such authority shall be extended with the prior written consent of the Term Loan Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender), unless an Event of Default set forth in <u>Section 3.1</u> above occurs sooner and the automatic stay has been lifted or modified pursuant to <u>Section 3.4</u> of this Interim Order, all of the Post-Petition Term Loan Obligations shall immediately become due and payable and the Term Loan Agent and the Term Loan Lenders shall be automatically and completely relieved from the effect of any stay under Section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the Collateral or any other rights granted to the Term Loan Agent and the Term Loan Lenders pursuant to the terms and conditions of the Post-Petition Term Loan Documents or this Interim Order, and the Term Loan Agent, acting on behalf of itself and the Term Loan Lenders, shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Interim Order, the Post-Petition Term Loan Documents or applicable law which the Term Loan Agent may deem appropriate and to proceed against and realize upon the Collateral or any other property of the Debtors' Estates.

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

3.4    <u>Relief from Automatic Stay</u>. The automatic stay provisions of Section 362 of the Bankruptcy Code and any other restriction imposed by an order of this Court or applicable law are hereby modified and vacated without further notice, application or order of this Court to the extent necessary to permit the Term Loan Agent and the Term Loan Lenders to perform any act authorized or permitted under or by virtue of this Interim Order or the Post-Petition Term Loan Documents, including, without limitation, (a) to implement the Post-Petition Financing arrangements authorized by this Interim Order and pursuant to the terms of the Post-Petition Term Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Post-Petition Term Loan Obligations under the Post-Petition Term Loan Documents, including, without limitation, all interests, fees, costs and expenses under such Post-Petition Term Loan Documents, and apply such payments to such Post-Petition Term Loan Obligations pursuant to the Post-Petition Term Loan Documents and this Interim Order. In addition and without limiting the foregoing, without further notice, application or order of this Court, upon the occurrence and during the continuance of an Event of Default, and after providing 3 business days' prior written notice thereof (the "**<u>Enforcement Notice</u>**") to counsel for the Debtors, counsel for the Revolving Credit Agent, counsel for the Creditors' Committee (if one is appointed), and the U.S. Trustee, the Term Loan Agent, acting on behalf of itself and the Term Loan Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the Post-Petition Term Loan Documents or applicable law as the Term Loan Agent may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of the Debtors' Estates upon which the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, has been or may hereafter be granted liens or security interests

26

*Approved by Judge Gloria M. Burns March  18, 2008*

to obtain the full and indefeasible payment of all Post-Petition Term Loan Obligations under the

Post-Petition Term Loan Documents.

Section 4.    <u>Representations; Covenants; and Waivers</u>.

    4.1    <u>Objections to Pre-Petition Obligations</u>.  Section 6 of the Interim Revolving

Credit Order is incorporated into this Interim Order as if more fully set forth in this Interim

Order.  Section 6 of the Interim Revolving Credit Order shall not be modified without the prior

written consent of the Term Loan Agent (and no such consent shall be implied from any other

action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

    4.2    <u>Debtors' Waivers</u>.  At all times during the Cases, and whether or not an

Event of Default has occurred, unless otherwise consented to by the Term Loan Agent in writing

in advance (and no such consent shall be implied from any other action, inaction or acquiescence

by the Term Loan Agent or any Term Loan Lender), the Debtors irrevocably waive (a) any right

to seek any modifications or extensions of this Interim Order; and (b) any right that they may

have to seek authority (i) to use Cash Collateral of the Term Loan Agent and the Term Loan

Lenders under Section 363 of the Bankruptcy Code; (ii) to obtain post-petition loans or other

financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than

the Post-Petition Financing; (iii) to challenge the use of proceeds or the application of any

payments authorized by this Interim Order and the Interim Revolving Credit Order; (iv) to

propose or support a plan of reorganization that does not provide for the indefeasible payment in

full and satisfaction of all Post-Petition Term Loan Obligations on the effective date of such

plan; or (v) to seek relief under the Bankruptcy Code, including without limitation, under Section

105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the

rights and remedies of the Term Loan Agent and the Term Loan Lenders as provided in this

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

Interim Order or the Post-Petition Term Loan Documents or the Term Loan Agent's and the Term Loan Lenders' exercise of such rights or remedies.

4.3    Section 506(c) Claims.    Effective upon the earlier of (a) the entry of a Final Order approving the Motion or (b) the entry of an order extending the Interim Financing Period beyond April **[4]**, 2008 (which entry, without the prior written consent of the Term Loan Agent, shall constitute an Event of Default) (such effectiveness to be retroactive to the date of entry of this Interim Order), no costs or expenses of administration which have or may be incurred in any Case or in any subsequently converted case under Chapter 7 of the Bankruptcy Code at any time shall be charged or asserted against the Term Loan Agent or any Term Loan Lender, their respective claims or the Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of the Term Loan Agent (and no such consent shall be implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

4.4    Collateral Rights.    Until all of the Post-Petition Term Loan Obligations shall have been indefeasibly paid and satisfied in full:

4.4.1    subject to the Intercreditor Agreement, no other party shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral;

4.4.2    in the event that any party who holds a lien or security interest in any of the Collateral that is junior and/or subordinate to the liens and claims of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, in such Collateral receives or is paid proceeds of the Collateral prior to the indefeasible payment and satisfaction in full of all Post-Petition Term Loan Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, such Collateral proceeds in trust for the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, and, subject to the Intercreditor Agreement, shall

28

*Approved by Judge Gloria M. Burns March  18, 2008*

immediately turnover to the Term Loan Agent such proceeds for application to the Petition Term

Loan Obligations in accordance with the Post-Petition Term Loan Documents; and

4.4.3   upon and after the occurrence of an Event of Default, and subject

to the Term Loan Agent obtaining relief from the automatic stay as provided for herein, in

connection with a liquidation of any of the Collateral, the Term Loan Agent (or any of its

employees, agents, consultants, contractors or other professionals) shall have the right, at the sole

cost and expense of the Debtors, to: (i) enter upon, occupy and use any real or personal property,

fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by the

Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any

other similar assets of the Debtors, which are owned by or subject to a lien of any third party and

which are used by the Debtors in their businesses.  The Term Loan Agent and the Term Loan

Lenders will be responsible for the payment of any applicable fees, rentals, royalties or other

amounts due such lessor, licensor or owner of such property (other than the Debtors) for the

period of time that the Term Loan Agent actually uses the equipment or the intellectual property

(but in no event for any accrued and unpaid fees, rentals or other amounts due for any period

prior to the date that the Term Loan Agent actually occupies or uses such assets or properties).

4.5    Release.  Upon the entry of this Interim Order, in consideration of and as a

condition to the Term Loan Agent and the Term Loan Lenders making post- petition loans and

providing other financial accommodations to the Debtors pursuant to the provisions of the Post-

Petition Term Loan Documents and this Interim Order, each Debtor, on behalf of itself and its

successors and assigns (collectively, the "**Releasors**"), shall, forever release, discharge and

acquit the Term Loan Agent, each Term Loan Lender and their respective affiliates, officers,

directors, agents and attorneys (collectively, the "**Releasees**") of and from any and all claims,

demands, liabilities, responsibilities, disputes, remedies, causes of action and obligations, of

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

every kind, nature and description, that Releasors had, have or hereafter can or may have against

Releasees as of the date hereof, in respect of events occurring on or prior to the date hereof,

whether arising from or in connection with or related to the Post-Petition Financing or any

related or unrelated transaction.  In addition, upon the payment in full of all Post-Petition Term

Loan Obligations owed to the Term Loan Agent and the Term Loan Lenders by the Debtors and

termination of the rights and obligations arising under the Post-Petition Term Loan Documents

and either a Final Order or extended Interim Order, as the case may be (which payment and

termination shall be on terms and conditions acceptable to the Term Loan Agent), the Releasees

shall be released from any and all claims, demands, liabilities, responsibilities, disputes,

remedies, causes of action and obligations, of every kind, nature and description, whether arising

from or in connection with or related to the transactions contemplated by this Interim Order and

the Post-Petition Term Loan Documents or any related or unrelated transaction, including

without limitation any obligation to pay or otherwise fund the Carve Out Expenses, on terms and

conditions acceptable to the Term Loan Agent.

Section 5.    Other Rights and Obligations.

     5.1    No Modification or Stay of this Interim Order.  Notwithstanding (i) any

stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim

Order, the Post-Petition Term Loan Documents or any term hereunder or thereunder, (ii) the

failure to obtain a Final Order pursuant to Bankruptcy Rule 400l(c)(2), or (iii) the dismissal or

conversion of one or more of the Cases (each, a "**Subject Event**"), (x) the acts taken by the Term

Loan Agent and the Term Loan Lenders in accordance with this Interim Order, and (y) the Post-

Petition Term Loan Obligations incurred or arising prior to the Term Loan Agent's actual receipt

of written notice from the Debtors expressly describing the occurrence of such Subject Event

shall, in each instance, be governed in all respects by the original provisions of this Interim

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

Order, and the acts taken by the Term Loan Agent and the Term Loan Lenders in accordance with this Interim Order, and the liens and security interests granted to the Term Loan Agent and the Term Loan Lenders in the Collateral, and all other rights, remedies, privileges, and benefits in favor of the Term Loan Agent and the Term Loan Lenders pursuant to this Interim Order and the Post-Petition Term Loan Documents shall remain valid and in full force and effect pursuant to Section 364(e) of the Bankruptcy Code.   For purposes of this Interim Order, the term "appeal", as used in Section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2    <u>Non-Dischargeability</u>.  The Post-Petition Term Loan Obligations shall not be discharged by the entry of an order confirming a plan of reorganization in the Cases pursuant to Section 1141(d)(4) of the Bankruptcy Code or otherwise, unless and until all Post-Petition Term Loan Obligations are indefeasibly paid in full in accordance with the terms and conditions of the Post-Petition Term Loan Documents prior to or concurrently with the entry of such order.

5.3    <u>Power to Waive Rights; Duties to Third Parties</u>.  The Term Loan Agent and the Term Loan Lenders shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of the Term Loan Agent and the Term Loan Lenders (the "**<u>Lender Rights</u>**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by the Term Loan Agent or the Term Loan Lenders of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject the Term Loan Agent or the Term Loan Lenders to any liability to any other party, nor cause or enable any other

31

*Approved by Judge Gloria M. Burns March  18, 2008*

party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Term Loan Agent or the Term Loan Lenders.

       5.4    <u>Disposition of Collateral</u>   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the Term Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender), except for sales of the Debtors' Inventory in the ordinary course of their business.

       5.5    <u>Reservation of Rights</u>.   The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of the Term Loan Agent and the Term Loan Lenders to pursue any and all rights and remedies under the Bankruptcy Code, the Post-Petition Term Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estate.  Without limiting the generality of the foregoing, entry of this Interim Order is without prejudice to any rights that the Term Loan Agent and the Term Loan Lenders have or may acquire against any third party.

       5.6    <u>Binding Effect</u>.

       5.6.1   The provisions of this Interim Order and the Post-Petition Term Loan Documents, the Post-Petition Term Loan Obligations, the Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of the Term Loan Agent and the Term Loan Lender provided or acknowledged in this Interim Order, and any actions taken pursuant thereto,

32

*Approved by Judge Gloria M. Burns March  18, 2008*

shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(h) and 7062, shall continue in full force and effect, shall survive entry of any other order (including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases), and shall continue in this or any superseding case under the Bankruptcy Code (and all priorities in payment, liens and security interests in favor of the Term Loan Agent and the Term Loan Lenders shall maintain their priority as provided by this Interim Order until all Post-Petition Term Loan Obligations are indefeasibly paid and satisfied in full).

5.6.2    Any order dismissing one or more of the Cases under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the Superpriority Claim and the Term Loan Agent's and the Term Loan Lenders' liens on and security interests in the Collateral shall continue in full force and effect notwithstanding such dismissal until the Post-Petition Term Loan Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and such liens and security interests in the Collateral.

5.6.3    In the event this Court modifies any of the provisions of this Interim Order or the Post-Petition Term Loan Documents following a Final Hearing, (a) such modifications shall not affect the rights or priorities of the Term Loan Agent and the Term Loan Lenders pursuant to this Interim Order with respect to the Collateral or any portion of the Post-Petition Term Loan Obligations which arises or is incurred or is advanced prior to such modifications, and (b) this Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March 18, 2008*

5.6.4    This Interim Order shall be binding upon the Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of the Term Loan Agent, the Term Loan Lenders, the Debtors and their respective successors and assigns.  For avoidance of doubt, the Term Loan Agent and the Term Loan Lenders shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible person appointed for the Debtors' Estates.

5.6.5    Other than the Carve Out Expenses to the extent expressly set forth in this Interim Order and the pari passu superpriority claim of the Revolving Credit Agent, no claim having a priority superior or pari passu with those granted by this Interim Order to the Term Loan Agent and the Term Loan Lenders shall be granted or permitted by any order of the Court heretofore or hereafter entered in any Case, while any portion of the Post-Petition Term Loan Obligations (or any refinancing thereof) or the commitment thereunder remains outstanding without the prior written consent of the Term Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

5.7    Marshalling.  In no event shall the Term Loan Agent or any Term Loan Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

5.8    Term; Termination.  Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among the Debtors, the Term Loan Agent and the Term Loan Lenders authorized by this Interim Order may be terminated pursuant to the terms of the Post-Petition Term Loan Documents.

34

*Approved by Judge Gloria M. Burns March  18, 2008*

5.9   <u>Limited Effect</u>.  Unless the Interim Order specifically provides otherwise, in the event of a conflict between the terms and provisions of any of the Post-Petition Term Loan Documents and this Interim Order, the terms and provisions of this Interim Order shall govern and control, interpreted as most consistent with the terms and provisions of the Post-Petition Term Loan Documents.

5.10   <u>Objections Overruled</u>.  All objections to the entry of this Interim Order are, to the extent not withdrawn, hereby overruled.

5.11   <u>Restrictions on Use of Cash Collateral, Additional Financing</u>.  All post-petition loans and other financial accommodations under the Post-Petition Term Loan Documents are made in reliance on this Interim Order and in the event that any order is entered at any time in any Case or in any subsequently converted case under Chapter 7 of the Bankruptcy Code (other than the Final Order) which (a) authorizes the use of Cash Collateral of the Debtors or the sale, lease, or other disposition of any Collateral, except as expressly permitted under the Post-Petition Term Loan Documents, or (b) authorizes, under Section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness (other than the Post-Petition Financing) secured by a lien or security interest in the Collateral which is equal or senior to the Term Loan Agent's liens and security interests in the Collateral, or which is entitled to priority administrative claim status which is equal or superior to the Superpriority Claim; then, in each instance described in clauses (a) and (b) above, such other order shall require that all Post-Petition Term Loan Obligations first shall be indefeasibly paid in full in immediately available funds, unless the Term Loan Agent shall first have given its prior written consent thereto (no such consent being implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).  The liens and security interests granted to or for the benefit of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, hereunder and the

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

rights of the Term Loan Agent and the Term Loan Lenders pursuant to this Interim Order and the Post-Petition Term Loan Documents with respect to the Post-Petition Term Loan Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors, unless the Term Loan Agent shall first have given its prior written consent thereto (no such consent being implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender), and shall continue after confirmation and effectiveness of any such plan.

5.12     Limitation of Liability.  Nothing in this Interim Order or the Post-Petition Term Loan Documents shall in any way be construed or interpreted to impose, or allow the imposition upon the Term Loan Agent or any Term Loan Lender of, any liability for any claims arising from the pre-petition or post-petition activities by the Debtors in the operation of their businesses or in connection with their restructuring efforts.

Section 6.     Good Faith.

The terms of the financing arrangements among the Debtors, the Term Loan Agent and the Term Loan Lenders have been negotiated in good faith and at arms' length among the Debtors, the Term Loan Agent and the Term Loan Lenders and any loans or other financial accommodations which are made or caused to be made to the Debtors by the Term Loan Agent and the Term Loan Lenders pursuant to the Post-Petition Term Loan Documents are deemed to have been made and provided in good faith, as the term "good faith" is used in Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or the Post-Petition Term Loan Documents or any provisions are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the prior written consent of the Term Loan Agent (and no such

123285.01601/21672882v.8

consent shall be implied, from any other action, inaction or acquiescence by the Term Loan

Agent or any Term Loan Lender).

Section 7.        <u>Final Hearing and Response Dates</u>.

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled

for __April 3_____, 2008 at 10:00 am before this Court.  The Debtors shall promptly mail

copies of this Interim Order to (a) the Noticed Parties, (b) all landlords and warehousemen of the

Debtors, (c) all parties who have filed UCC-1 financing statements against the Debtors, or who,

to the Debtors' knowledge, have asserted any liens on any of the Debtors' assets, (d) to any other

party that has filed a request for notices with this court and (e) to counsel for the Creditors'

Committee (if one is appointed).  Any party in interest objecting to the relief sought at the Final

Hearing shall serve and file written objections, which objections shall be served upon (i) counsel

for the Debtors, Cozen O'Connor LLP, LibertyView, Suite 300, 457 Haddonfield Road, Cherry

Hill, New Jersey 08002, Attn: Mark E. Felger, Esq.; (ii) counsel for the Revolving Credit Agent,

Stradley Ronon Stevens & Young, LLP, 2600 One Commerce Square, Philadelphia,

Pennsylvania 19103, Attn: Paul A. Patterson, Esq.; (iii) counsel for the Term Loan Agent, Blank

Rome LLP, One Logan Square, 130 N. 18th Street, Philadelphia, Pennsylvania 19103-6998; Attn:

Joel C. Shapiro, Esq.; (iv) counsel for the Creditors' Committee (if one is appointed); and (v) the

U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the

District of New Jersey, in each case, to allow actual receipt of the foregoing no later than

March 31, 2008 at 4:00 p.m._____ prevailing Eastern time.

Section 8.        <u>Intercreditor Agreement</u>.

Notwithstanding anything to the contrary contained in this Interim Order, the rights and

obligations of the Agents and Lenders to one another, and with respect to the Collateral, are

subject to the terms of the Intercreditor Agreement, dated on or about the date hereof (as

37

*Approved by Judge Gloria M. Burns March  18, 2008*

amended, supplemented, extended or otherwise modified from time to time, the "**Intercreditor**

**Agreement**") among the Agents and the Lenders.  With respect to such rights and obligations,

and with respect to the Collateral, in the event of a conflict between the terms and provisions of

the Intercreditor Agreement and this Interim Order, the terms and provisions of the Intercreditor

Agreement shall govern and control.  Pursuant to the Intercreditor Agreement, each of the

Revolving Credit Agent, for itself and the Revolving Credit Lenders, and the Term Loan Agent,

for itself and the Term Loan Lenders, has consented to the liens on its security interest in the

Collateral of the other Agent, for the benefit of itself and the Lenders for which it acts as agent,

and the priority of such liens and security interests, all as more fully defined, described and set

forth in the Intercreditor Agreement.

123285.01601/21672882v.8

*Approved by Judge Gloria M. Burns March  18, 2008*

# EXHIBIT 1

## BUDGET

(ATTACHED)

**Shapes/Arch Holdings, LLC**
*Summary Consolidated DIP Cash Flow*

| Post-Petition Week: | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 3/23/2008 | 3/30/2008 | 4/6/2008 | 4/13/2008 | 4/20/2008 | 4/27/2008 | 5/4/2008 | 5/11/2008 | 5/18/2008 | 5/25/2008 | 6/1/2008 | 6/8/2008 | 6/15/2008 | |
| **Revenues** | | | | | | | | | | | | | | |
| Net Revenues | 4,642,260 | 4,655,358 | 4,659,289 | 4,667,826 | 4,667,826 | 4,667,826 | 5,123,807 | 5,240,434 | 5,290,434 | 5,340,434 | 4,920,462 | 5,550,462 | 5,600,462 | 65,026,880 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| A/R Collections | 3,074,481 | 3,310,942 | 4,448,332 | 3,785,933 | 3,844,756 | 4,288,002 | 5,052,988 | 3,933,706 | 4,282,598 | 4,377,018 | 4,479,230 | 4,530,499 | 4,554,537 | 53,963,021 |
| Total Cash Receipts | 3,074,481 | 3,310,942 | 4,448,332 | 3,785,933 | 3,844,756 | 4,288,002 | 5,052,988 | 3,933,706 | 4,282,598 | 4,377,018 | 4,479,230 | 4,530,499 | 4,554,537 | 53,963,021 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Material | 2,156,609 | 2,262,297 | 2,295,812 | 2,311,898 | 2,892,898 | 2,892,898 | 3,120,265 | 3,190,665 | 3,222,665 | 2,998,665 | 2,659,465 | 3,062,665 | 3,094,685 | 36,165,666 |
| Manufacturing & Warehouse | 217,361 | 245,222 | 223,965 | 344,026 | 229,026 | 1,427,026 | 253,776 | 270,174 | 245,174 | 1,443,174 | 284,073 | 242,573 | 277,573 | 5,683,144 |
| Payroll and Benefit Expenses | 91,233 | 568,720 | 483,523 | 1,838,231 | 678,523 | 1,262,749 | 1,838,231 | 1,838,231 | 678,523 | 1,262,749 | 678,523 | 1,262,749 | 1,254,005 | 12,098,048 |
| Delivery Expenses | 569,954 | 569,721 | 197,878 | 95,106 | 188,540 | 130,106 | 110,680 | 78,680 | 119,799 | 226,680 | 112,113 | 75,113 | 104,464 | 1,298,193 |
| Selling Expenses | 72,710 | 113,963 | 107,878 | 75,106 | 188,540 | 130,106 | 110,680 | 78,680 | 119,799 | 226,680 | 112,113 | 75,113 | 139,277 | 1,550,046 |
| G&A Expenses | 21,000 | 102,000 | 222,000 | 159,500 | 246,000 | 68,000 | 105,000 | 259,500 | 105,000 | 48,000 | 286,205 | 106,000 | 101,500 | 1,827,705 |
| CAPEX | 105,000 | 105,000 | 222,000 | 120,000 | 105,000 | 405,000 | 320,000 | 120,000 | 105,000 | 105,000 | 405,000 | 120,000 | 105,000 | 2,010,000 |
| Professional Expenses | | 180,000 | | 514,104 | 110,000 | 405,000 | 320,000 | 152,000 | | 10,000 | 240,000 | | 416,000 | 514,104 |
| Utility Deposits | | | 130,000 | | | | | | | | | | | 130,000 |
| Senior Lender Amortization | | | 517,518 | | | | | | | | | 573,542 | | 514,104 |
| DIP Facility Interest & Fees | | | | | | | 535,341 | | | | | | | 1,628,922 |
| Total Cash Disbursements | 2,664,614 | 3,666,622 | 4,183,650 | 5,458,331 | 4,552,472 | 6,288,265 | 5,220,751 | 6,016,347 | 4,500,135 | 6,195,500 | 4,542,908 | 5,546,228 | 5,492,484 | 64,328,288 |
| | | | | | | | | | | | | | | |
| Net Cash Change | 409,866 | (355,680) | 264,682 | (1,672,398) | (707,717) | (2,000,263) | (167,763) | (2,082,641) | (217,537) | (1,818,483) | (63,678) | (1,015,729) | (937,947) | (10,365,287) |
| Cumulative Cash Change | 409,866 | 54,187 | 318,869 | (1,353,529) | (2,061,245) | (4,061,508) | (4,229,272) | (6,311,913) | (6,529,450) | (8,347,932) | (8,411,611) | (9,427,340) | (10,365,287) | (10,365,287) |
| DIP Facility Draws | (409,866) | 355,680 | (264,682) | 1,672,398 | 707,717 | 2,000,263 | 167,763 | 2,082,641 | 217,537 | 1,818,483 | 63,678 | 1,015,729 | 937,947 | 10,365,287 |
| | | | | | | | | | | | | | | |
| Ending Cash Balance | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **DIP Revolver Facility – $60 Million** | | | | | | | | | | | | | | |
| Opening Balance | 41,984,467 | 42,066,576 | 42,300,475 | 41,844,881 | 42,528,872 | 43,028,992 | 43,003,856 | 42,806,224 | 43,828,247 | 44,595,129 | 45,209,133 | 45,456,152 | 46,233,342 | 41,984,467 |
| DIP Facility Draws | (409,866) | 355,680 | (264,682) | 1,672,398 | 707,717 | 2,000,263 | 167,763 | 2,082,641 | 217,537 | 1,818,483 | 63,678 | 1,015,729 | 937,947 | 41,984,467 |
| Letters of Credit: Pre-Petition | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 |
| Letters of Credit: Post-Petition | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 |
| Reserved Termination Interest Rate Swap | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Total DIP Funding Requirement | 46,679,600 | 48,077,256 | 48,220,793 | 49,697,278 | 49,542,589 | 51,460,256 | 49,726,619 | 50,600,784 | 52,968,612 | 51,827,811 | 53,026,881 | 53,726,290 | 58,904,764 | |
| | | | | | | | | | | | | | | |
| Revolver DIP Borrowing Base Availability | 47,171,576 | 47,955,475 | 48,029,881 | 48,709,872 | 49,334,992 | 49,433,856 | 49,361,224 | 50,383,247 | 51,150,129 | 51,764,133 | 52,011,152 | 52,788,342 | 53,587,601 | 53,587,601 |
| Senior Term Loan Funding | 491,976 | (121,780) | (190,913) | (987,406) | (207,596) | (2,026,399) | (385,395) | (1,060,618) | (549,346) | (1,204,479) | (183,341) | (238,539) | (138,689) | (5,317,153) |
| | | | | | | | | | | | | | | |
| Total DIP Revolver Funding | 47,171,576 | 47,955,475 | 48,029,881 | 48,709,872 | 49,334,992 | 49,433,856 | 49,361,224 | 50,383,247 | 51,150,129 | 51,764,133 | 52,011,152 | 52,788,342 | 53,587,601 | 53,587,601 |
| | | | | | | | | | | | | | | |
| **DIP Term Loan Facility – $25 Million** | | | | | | | | | | | | | | |
| Opening Balance | 15,489,908 | 14,997,932 | 15,119,713 | 15,310,626 | 16,298,032 | 16,505,628 | 18,532,027 | 18,897,423 | 19,958,041 | 19,408,695 | 20,613,174 | 20,429,833 | 20,668,372 | 15,489,908 |
| Plus: Senior Term Loan Funding | (491,976) | 121,780 | 190,913 | 987,406 | 207,596 | 2,026,399 | 385,395 | 1,060,618 | 549,346 | 1,204,479 | (183,341) | 238,539 | 138,689 | 5,317,153 |
| Total DIP Term Loan Funding | 14,997,932 | 15,119,713 | 15,310,626 | 16,298,032 | 16,505,628 | 18,532,027 | 18,897,423 | 19,958,041 | 19,408,695 | 20,613,174 | 20,429,833 | 20,668,372 | 20,807,061 | 20,807,061 |
| Total DIP Term Loan Facility | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 |
| Total DIP Term Loan Availability | 10,002,068 | 9,880,287 | 9,689,374 | 8,701,968 | 8,494,372 | 6,467,973 | 6,102,577 | 5,041,959 | 5,591,305 | 4,386,826 | 4,570,167 | 4,331,628 | 4,192,939 | 4,192,939 |

# EXHIBIT 2

## POST-PETITION TERM LOAN AGREEMENT
(ATTACHED)

**[EXECUTION VERSION]**

## DEBTOR-IN-POSSESSION TERM LOAN FINANCING AGREEMENT

**ARCUS ASI FUNDING, LLC**
**(as Lead Arranger, Agent and a Lender),**

**the lenders party hereto from time to time**
**(as Lenders),**

**and**

**Shapes/Arch Holdings L.L.C.,**
**Shapes L.L.C.,**
**Delair L.L.C.,**
**Ultra L.L.C.**
**and**
**Accu-Weld L.L.C.**
**(the Companies which are borrowers hereunder)**

**Dated: March ___, 2008**

# TABLE OF CONTENTS

Page

SECTION 1.          Definitions.................................................................................1

SECTION 2.          Conditions Precedent ...............................................................14

SECTION 3.          RESERVED...............................................................................19

SECTION 4.          Term Loans ...............................................................................19

SECTION 5.          RESERVED...............................................................................21

SECTION 6.          Collateral....................................................................................22

SECTION 7.          Superpriority Claims, Collateral, Security, Etc. ......................27

SECTION 8.          Representations, Warranties and Covenants.............................30

SECTION 9.          Interest, Fees and Expenses .....................................................40

SECTION 10.         Powers.......................................................................................44

SECTION 11.         Events of Default and Remedies...............................................44

SECTION 12.         Termination...............................................................................51

SECTION 13.         Miscellaneous ...........................................................................51

SECTION 14.         Agreement between the Lenders................................................54

SECTION 15.         Agency ......................................................................................56

<u>EXHIBIT</u>

Exhibit A – Form of Term Loan Promissory Note
Exhibit B – Form of Budget

<u>SCHEDULES</u>

Schedule 1R – Real Estate
Schedule 2.1 – Collateral Information
Schedule 7.1 – Senior Claims
Schedule 8.1 – Organization

**ARCUS ASI FUNDING, LLC**, a Delaware limited liability company (hereinafter "Arcus"), with offices located at 2929 Arch Street, Philadelphia, PA 19104, and Arcus in its capacity as agent (the "Agent"), for itself and any other party which now or hereafter becomes a lender hereunder pursuant to Section 14 hereof (individually a "Lender" and collectively the "Lenders") is pleased to confirm the terms and conditions under which Lenders shall make a Term Loan Facility and other financial accommodations available to **Shapes/Arch Holdings L.L.C.**, a New Jersey limited liability company, as debtor and debtor-in-possession ("Shapes/Arch"), with a principal place of business at 9000 River Road, Delair, New Jersey 08110, **Shapes L.L.C.**, a New Jersey limited liability company, as debtor and debtor-in-possession ("Shapes"), with a principal place of business located at 9000 River Road, Delair, New Jersey 08110, **Delair L.L.C.**, a New Jersey limited liability company, as debtor and debtor-in-possession ("Delair"), with a principal place of business at 8600 River Road, Delair, New Jersey 08110, **Ultra L.L.C.**, a New Jersey limited liability company, as debtor and debtor-in-possession ("Ultra"), with a principal place of business at 1777 Hylton Road, Pennsauken, New Jersey 08110, and **Accu-Weld L.L.C.**, a Pennsylvania limited liability company, as debtor and debtor-in-possession ("Accu-Weld"), with a principal place of business at 1211 Ford Road, Bensalem, Pennsylvania 19020 (in this Agreement, Shapes/Arch, Shapes, Delair, Ultra and Accu-Weld are referred to collectively, jointly and severally as the "Companies" and individually, each as a "Company" and sometimes referred to as "Borrowers" and individually, each a "Borrower").

## SECTION 1.  Definitions

**363 Sale** shall mean the sale of all or substantially all of Borrowers' assets or business pursuant to Section 363 of the Bankruptcy Code.

**Accounts** shall mean all of each of the Companies' now existing and future: (a) accounts (as defined in the UCC), and any and all other receivables (whether or not specifically listed on schedules furnished to the Agent), including, without limitation, all accounts created by, or arising from, all of the Companies' sales, leases, rentals of goods or renditions of services to their customers, including but not limited to, those accounts arising under any of the Companies' trade names or styles, or through any of the Companies' divisions; (b) any and all instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing, including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant hereto; (f) guarantees, supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any and all of the foregoing (including all rights to payment, including any and all Intercompany Debt and other liabilities and those arising in connection with bank and non-bank credit cards), and including books and records and any electronic media and software thereto; (i) notes, deposits or property of account debtors securing the obligations of any such account debtors to the Companies; and (j) cash and non-cash proceeds (as defined in the UCC) of any and all of the foregoing.

**Applicable Margin** shall mean six percent (6%).

1

**Agreement** shall mean this Debtor-In-Possession Term Loan Financing Agreement.

**Assignment and Transfer Agreement** shall mean an Assignment and Transfer Agreement in form and substance satisfactory to Agent.

**Availability** shall have the meaning specified thereunder in the Revolver Agreement in effect as of the date hereof.

**Avoidance Actions** shall mean any and all actions of a Company or its estate under Chapter 5 or Section 724(a) of the Bankruptcy Code and proceeds thereof.

**Bankruptcy Code** shall mean Title 11 of the United States Code entitled "Bankruptcy," as the same may be amended, modified or supplemented from time to time and any successor statute thereto.

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of New Jersey, or such other court having jurisdiction over the Case.

**Base Rate** shall mean the rate of interest per annum announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its principal office in New York City; provided, however, that the "Base Rate," for the purposes hereof, shall in no event be deemed to be lower than 6%. (The prime rate is not intended to be the lowest rate of interest charged by JPMorgan Chase Bank to its borrowers).

**Books and Records** shall mean books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral or otherwise necessary or helpful in the collection thereof or realization thereon.

**Borrowing Base** shall have the meaning specified thereunder in the Revolver Agreement in effect as of the date hereof.

**Borrowing Base Assets** shall mean (a) all of the (i) Accounts (as defined in the Intercreditor Agreement) and (ii) Borrowers' present and hereafter acquired inventory (as defined in the UCC), (b) all of the Borrowers' now owned and hereafter acquired lockbox, Blocked Account or any other deposit accounts maintained with any bank of financial institutions into which the proceeds of Borrowing Base Assets are or may be deposited, but only to the extent of such proceeds, (c) the Books and Records or general intangibles (as defined in the UCC) at any time evidencing or containing information relating to any of the Borrowing Base Assets described herein or otherwise necessary or helpful in the collection thereof or realization thereon, and (d) all proceeds (including, without limitation, insurance proceeds) and products of any and all of the foregoing (whether or not in the possession, custody or control of the Revolver Agent and/or any Revolver Lender), and all accessions thereto, substitutions for or replacements of and rents and profits from any and all of the foregoing.

**Budget** shall mean a budget prepared in good faith based upon assumptions which the Companies believe to be reasonable setting forth, inter alia, a thirteen (13) week cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability under the

Revolver Agreement and the Term Loan Facility for the thirteen weeks ended June 15, 2008, in the form attached hereto as Exhibit B, as updated weekly with Agent's consent.

**Business Day** shall mean any day on which the Agent, JPMorgan Chase Bank, N.A., and, in the case of settlements among the Lenders or the making of advances by the Lenders, the Lenders are open for business.

**Capital Expenditures** shall mean, for any period, the aggregate expenditures of the Companies during such period on account of property, plant, Equipment or similar fixed assets that, in conformity with GAAP, are required to be reflected in the balance sheet of the Companies.

**Capital Improvements** shall mean operating Equipment and facilities (other than land) acquired or installed for use in the Companies' business operations.

**Capital Lease** shall mean any lease of property (whether real, personal or mixed) which, in conformity with GAAP, is accounted for as a capital lease or a Capital Expenditure in the balance sheet of the Companies.

**Cargo Insurance** shall mean a policy or policies of insurance which (i) provide warehouse-to-warehouse coverage for all of the Companies' in-transit Inventory; (ii) insuring against loss and casualty, as a result of any and all perils (including perils on the sea and of the sea) and misfortunes; (iii) include a marine extension clause; (iv) are for the full insured value of such Inventory (that is invoice cost, guaranteed freight, other costs, and insurance premiums, plus ten percent (10%)); (v) are issued by one or more insurance carriers which are acceptable to the Agent in its discretion, and (vi) name the Agent, for the benefit of the Lenders as a loss payee.

**Carve-Out** shall have the meaning given to the term "Carve-Out Expenses" in the Final Order, or, prior to the entry of the Final Order, the Interim Financing Order; provided, however, that in no case shall the Carve-Out include any Ineligible Professional Expenses.

**Case** shall mean collectively, the Companies' reorganization cases under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

**CIT** shall mean The CIT Group/Business Credit, Inc.

**Closing Date** shall mean the date that this Agreement has been duly executed by the parties hereto and delivered to the Agent and the initial Term Loan Advance under the Term Loan Facility has been funded.

**Collateral** shall mean all present and future real and personal property of the Companies, including, without limitation, Accounts, Equipment, Inventory, Documents of Title, General Intangibles, Real Estate, pledged stock or membership interests of the Companies' subsidiaries and Other Collateral and the proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including, without limitation, hazard, flood, environmental and credit insurance and cargo insurance), negotiable instruments and other instruments for the

3

payment of money (including without limitation all instruments evidencing Intercompany Debt), chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds, Avoidance Actions and commercial tort claims.

**Commitment** shall mean each Lender's Term Loan Commitment, in the amount of its respective pro rata share set forth in schedules prepared by the Agent or the Assignment and Transfer Agreement executed by each such Lender.

**Commitment Fee** shall mean the fee due to Agent at the end of each month for the Term Loan Facility determined by multiplying the difference between (i) the Term Loan Facility Amount, and (ii) the sum, for said month, of the average daily balance of Term Loan Advances outstanding by two percent (2%) per annum for the number of days in said month.

**Consolidated Balance Sheet** shall mean a consolidated or combined, as applicable, balance sheet for Shapes/Arch and the Companies, eliminating all inter-company transactions and prepared in accordance with GAAP.

**Consolidating Balance Sheet** shall mean a Consolidated Balance Sheet plus individual balance sheets for Shapes/Arch and each of the Companies, showing all eliminations of inter-company transactions, all prepared in accordance with GAAP.

**Controlled Group** shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Company, are treated as a single employer under Section 414 of the Internal Revenue Code.

**Copyrights** shall mean all of each of the Companies' present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, goodwill, any and all general intangibles, intellectual property and rights pertaining thereto, and all cash and non-cash proceeds thereof.

**Creditors' Committee** shall mean the official unsecured creditors' committee appointed in the Case.

**Cumulative Period** shall mean the period from the Filing Date through the Friday of the most recent four-week period then ended or if a four-week period has not then elapsed from the Filing Date, such shorter period since the Filing Date through the Friday of the most recent week then ended.

**Default** shall mean any event specified in Section 11 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act, has been satisfied.

**Default Rate of Interest** shall mean a rate of interest per annum on any Obligations hereunder, equal to the sum of: (a) three percent (3%), plus (b) the Applicable Margin, plus (c) the Base Rate, which the Agent shall be entitled to charge the Companies on all Obligations due the Agent on behalf of the Lenders, as further set forth in Paragraph 11.2 of Section 11 of this Agreement.

4

**Depository Accounts** shall mean the collection accounts, which are subject to the Agent's instructions, as specified in Paragraph 6.14 of Section 6 of this Agreement.

**Documentation Fee** shall mean (a) all fees and expenses incurred in connection with or by the Agent's external legal counsel in negotiating, documenting, preparing for and attending a closing with respect to this Agreement (and all related agreements and transactions giving rise to the necessity for the Term Loan Facility), the Collateral, and/or the Obligations (all exclusive of Out-of-Pocket Expenses), plus (b) subsequent to the Closing Date, the fees of the Agent's legal counsel, whether or not in-house legal counsel, relating to any and all modifications, waivers, releases, amendments or additional collateral with respect to this Agreement, the Collateral and/or the Obligations (all exclusive of Out-of-Pocket Expenses).

**Documents of Title** shall mean all of each of the Companies' present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or not and all goods and Inventory relating thereto and all cash and non-cash proceeds of the foregoing.

**EBITDA** shall mean, as of the date of determination, (a) consolidated net income of the Companies and their subsidiaries, if any, plus (b) to the extent included in the determination of net income, (i) the provision (less the benefit) for income Taxes, if any, plus (ii) interest expense (less interest income), if any, plus (iii) depreciation and amortization, if any, plus (iv) all provisions and expenses related to the Case related to professionals, advisors or other costs incurred in connection with the preparation, negotiation and closing of the financing transactions under this Agreement, the Revolver Agreement and any transactions related hereto or thereto, plus (v) all extraordinary losses (and minus any extraordinary gains) or unusual or non-recurring charges, if any, all prepared in accordance with GAAP consistently applied.

**Equipment** shall mean all of each of the Companies' present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto and all proceeds thereof of whatever sort.

**ERISA** shall mean the Employee Retirement Income Security Act or 1974, as amended from time to time and the rules and regulations promulgated thereunder from time to time.

**Event(s) of Default** shall have the meaning provided for in Section 11 of this Agreement.

**Filing Date** shall mean March 16, 2008.

**Final Order** shall mean a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to Agent and Lenders. The Final Order shall, among other things, have:

(a)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Term Loan Facility Amount provided for herein;

5

(b)      granted the claim and lien status and liens described in Sections 6 and 7, and prohibited the granting of additional liens on the assets of Companies, other than Permitted Encumbrances;

(c)      provided that such liens are automatically perfected by the entry of the Final Order and also granted to the Agent for the benefit of the Agent and the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and ensure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(d)      provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(e)      provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 11.2;

(f)      provided that the Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated; and

(g)      declared that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made and done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code.

**Fiscal Year** shall mean each twelve (12) month period commencing on January 1 of each year and ending on the following December 31.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply, provided that in the event Shapes/Arch or any other Company modify their accounting principles and procedures as applied as of the Closing Date, the Companies shall provide to the Agent and the Lenders such statements of reconciliation as shall be in form and substance acceptable to the Agent.

**General Intangibles** shall mean all of each of the Companies' present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all Trademarks, corporate names, business names, and any other designs or sources of business identities, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) inventions, (g) all applications with respect to the foregoing, (h) all right, title and interest in and to any and all extensions and renewals, (i) all goodwill with respect to any of the foregoing, (j) any other forms of similar intellectual property, (k) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, together with all monies and claims for monies now or hereafter due and payable in connection with any of the foregoing or otherwise, (l) all choses in action, causes of action, corporate and business records, and (m) all cash and non-cash proceeds thereof including, without limitation, the proceeds or

6

royalties of any licensing agreements between the Companies and any licensee of any of the Companies' General Intangibles.

**Indebtedness** shall mean, without duplication, all liabilities, contingent or otherwise, which are any of the following: (a) obligations in respect of borrowed money or for the deferred purchase price of property, services or assets, other than Inventory, or (b) Capital Lease obligations.

**Ineligible Professional Expenses** shall mean fees or expenses incurred by Person, including the Creditors' Committee, in (a) preventing, hindering or delaying Agent's or Lenders' or Revolver Agent's or Revolver Lenders' enforcement or realization upon any of the Collateral once the Termination Date has occurred, (b) applying for or consummating use of cash collateral or sell any Collateral without Agent's prior written consent (except to the extent permitted by this Agreement), (c) incurring Indebtedness without Agent's prior written consent (except to the extent permitted by this Agreement), (d) any action which contravenes a right or protection of Agent and Lenders under the Loan Documents or of Revolver Agent and Revolver Lenders under the "Loan Documents" (as defined in the Revolver Agreement), (e) objecting to or consenting in any manner, or in raising any defenses to, the validity, extent, perfection, priority or enforceability of the Obligations or any liens or claims with respect thereto, or any other rights or interests of Agent and Lenders or Revolver Agent and Revolver Lenders, or in asserting any claims, causes of action or equitable subordination claims against Agent or Lenders or Revolver Agent and Revolver Lenders, and (f) any other fees or expenses excluded by virtue of the operation of Section 2.3.2 of the Orders.

**Insurance Proceeds** shall mean proceeds or payments from an insurance carrier with respect to any loss, casualty or damage to Collateral.

**Intercompany Debt** shall mean all Indebtedness outstanding from any one of the Companies to any other of the Companies.

**Intercreditor Agreement** shall mean an intercreditor agreement executed and delivered by Revolver Agent and Agent, in form and substance satisfactory to Agent, in its sole discretion.

**Interim Financing Order** means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a preliminary hearing under Rule 4001 of the Bankruptcy Code, in form and substance satisfactory to Agent. The Interim Financing Order shall, among other things, have:

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Term Loan Facility Amount provided for herein;

(b)     granted the claim and lien status and liens described in Sections 6 and 7, and prohibited the granting of additional liens on the assets of the Companies other than Permitted Encumbrances;

7

(c)    provided that such liens are automatically perfected by the entry of the Interim Financing Order and also granted to the Agent for the benefit of the Lenders relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(d)    provided that no Person, effective as of entry of the Final Order or any extension of the Interim Financing Order, will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(e)    provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 11.2;

(f)    provided that the Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated; and

(g)    declared that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made and done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code.

**Inventory** shall mean all of each of the Companies' present and hereafter acquired inventory (as defined in the UCC) and including, without limitation, all merchandise, inventory and goods, and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging or shipping same in all stages of production from raw materials through work-in-process to finished goods and all proceeds thereof of whatever sort.

**Investment Property** shall mean all now owned and hereafter acquired investment property (as defined in the UCC) and all proceeds thereof.

**Lead Arranger** shall mean Arcus in its capacity as lead arranger of the Term Loan Credit Facility and the credit facility established pursuant to the Revolver Agreement.

**Loan Accounts** shall mean the accounts on the Agent's books, in names of each of the Companies, in which each Company will be charged with all applicable Obligations under this Agreement.

**Loan Documents** shall mean this Agreement, the Orders, the Term Loan Promissory Notes, the Mortgages, the other closing documents and any other ancillary loan and security agreements executed from time to time in connection with this Agreement, all as may be renewed, amended, extended, increased, restated or supplemented from time to time.

**Mandatory Prepayment** shall mean a Proceeds-Based Prepayment.

8

**Maturity Date** shall mean September 16, 2008 as may be extended by Agent, in its sole discretion, for additional periods in one or more weekly or monthly increments; provided, however, that the Maturity Date shall in no event be extended beyond September 16, 2009.

**Non-Borrowing Base Assets** shall mean the existing and future assets of the Companies and the proceeds thereof other than the Borrowing Base Assets (whether or not in the possession, custody or control of the Agent and/or any Lender), and all accessions thereto, substitutions for or replacements of and rents and profits from any and all of the foregoing.  To the extent that Avoidance Actions and/or the proceeds thereof constitute part of the Collateral, the Non-Borrowing Base Assets shall also include suc h Avoidance Actions.  In addition, the Non-Borrowing Base Assets shall include all title insurance policies of Revolver Agent with respect to the Real Estate.

**Non-Borrowing Base Asset Proceeds** shall mean the collections, payments and proceeds (including without limitation insurance proceeds covering Non-Borrowing Base Assets and any condemnation awards and payments in lieu thereof) received by any Company from, or corresponding to, the Non-Borrowing Base Assets, which shall include, without limitation, all amounts corresponding to claims under any and all title insurance policies relating to the Real Estate and Avoidance Actions recoverable in conjunction with the Case.

**Obligations** shall mean all loans, advances and extensions of credit made or to be made by the Agent and/or the Lenders to the Companies or any one of them or to others for the account of any Company (including, without limitation, the Term Loans) under or pursuant to this Agreement, the Orders, or any other Loan Document, which may at any time be owing by the Companies or any one of them to the Agent and/or the Lenders howsoever arising, whether now in existence or incurred by the Companies or any one of them from time to time hereafter under or pursuant to the Loan Documents, whether principal, interest, fees, costs, expenses or otherwise (including reasonable attorneys' fees); whether secured by pledge, lien upon or security interest in any of the Companies' Collateral, assets or property or the assets or property of any other Person; whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether the Companies or any one of them are liable to the Agent and/or the Lenders for such indebtedness as principal, surety, endorser, guarantor or otherwise. Obligations shall also include indebtedness owing to the Agent and/or the Lenders by the Companies or any one of them under any Loan Document, indebtedness or obligations incurred by, or imposed on, the Agent and/or the Lenders as a result of environmental claims arising out of any of the Companies' operations, premises or waste disposal practices or sites in accordance with paragraph 8.7 hereof; the Companies' liability to the Agent and/or the Lenders as maker or endorser of any promissory note or other instrument for the payment of money; the Companies' liability for Out-of-Pocket Expenses; the Companies' liability to the Agent and/or the Lenders under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which the Agent and/or the Lenders may make or issue to others for the Companies' account as contemplated by the Loan Documents, including the Agent's and/or Lenders' acceptance of drafts or the Agent's and/or Lenders' endorsement of notes or other instruments for the Companies' account and benefit.

**Operating Leases** shall mean all leases of property (whether real, personal or mixed) other than Capital Leases.

9

**Order** shall mean, whichever is then applicable and as the context may require, either the Final Order or the Interim Financing Order.

**Other Collateral** shall mean all of each of the Companies' now owned and hereafter acquired lockbox, blocked account and any other deposit accounts maintained with any bank or financial institutions into which the proceeds of Collateral are or may be deposited; all other deposit accounts and all Investment Property; all cash and other monies and property in the possession or control of the Agent and/or any of the Lenders; all books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; and all cash and non-cash proceeds of the foregoing.

**Out-of-Pocket Expenses** shall mean all of the Agent's and Lenders' and their respective affiliates' present and future costs and expenses incurred in connection with the transactions contemplated by this Agreement and the other Loan Documents or the Case, or any other transaction among Agent, any Lender or any of their respective affiliates, on one hand, and any Borrower or any of its affiliates, on the other hand, whether related or unrelated to the transactions contemplated by this Agreement and the other Loan Documents or the Case, whether or not any such transaction was or hereafter is consummated, in each case, whether such costs and expenses were heretofore or are hereafter incurred, which costs and expenses shall include, without being limited to: all costs and expenses incurred in connection with due diligence; all costs of record searches, all costs and expenses incurred in preparing for the Case; all costs and expenses incurred in the monitoring of and participation in the Case; all costs and expenses incurred by the Agent in opening bank accounts, depositing checks, receiving and transferring funds, and wire transfer charges; all charges imposed on the Agent due to returned items and "insufficient funds" of deposited checks and the Agent's standard fees relating thereto; all travel, lodging, appraisal, consulting, accounting and auditing fees and any other expenses of the Agent's and Lenders' personnel, agents or representatives in connection with inspecting and monitoring the Collateral from time to time hereunder; all legal, accounting, consultant and other professional fees and costs; all fees and taxes relative to the filing of financing statements and other lien perfection documents; all expenses, costs and fees set forth in Paragraphs 11.2 and 11.3 of Section 11 of this Agreement; and all title insurance premiums, real estate survey costs, and costs of preparing and recording mortgages/deeds of trust against the Real Estate (including taxes).

**Parent** shall mean Ben LLC, a New Jersey limited liability company.

**Patents** shall mean all of each of the Companies' present and hereafter acquired patents, patent applications, registrations, any reissues or renewals thereof licenses, any inventions and improvements claimed thereunder, and all general intangible, intellectual property and patent rights with respect thereto of the Companies or any one of them, and all income, royalties, cash and non-cash proceeds thereof.

**Permitted Encumbrances** shall mean: (a) liens existing on the date hereof on specific items of Equipment, liens arising after the date hereof on the same specific items of Equipment for the refinance of purchase-money Indebtedness, and other liens expressly permitted, or consented to in writing by the Agent and/or the Required Lenders; (b) Purchase Money Liens;

10

(c) deposits made (and the liens thereon) in the ordinary course of business of the Companies (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations arising under applicable non-bankruptcy law, and other similar obligations arising as a result of progress payments under government contracts; (d) easements (including, without limitation, reciprocal easement agreements and utility agreements), encroachments, minor defects or irregularities in title, variation and other restrictions, charges or encumbrances (whether or not recorded) affecting the Real Estate, if applicable, and which in the aggregate (A) do not materially interfere with the occupation, use or enjoyment by any of the Companies of their business or the property so encumbered and (B) in the reasonable business judgment of the Agent do not materially and adversely affect the value of such Real Estate; (e) liens granted to the Agent by the Companies or any one of them; (f) consignment purchases not to exceed, in the aggregate, the sum of Three Million Dollars ($3,000,000.00) outstanding at any time, (g) subject to the Intercreditor Agreement, liens granted to Revolver Agent by the Company or to any one of them, under the Revolver Agreement and the "Loan Documents" (as defined therein), and (h) tax liens which are not yet due and payable or which are being diligently contested in good faith by the Companies by appropriate proceedings, and which liens are not (1) filed on any public records, or (2) senior to the liens of the Agent.

**Permitted Indebtedness** shall mean:  (a) current Indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, Taxes or labor; (b) Indebtedness secured by Purchase Money Liens; (c) Indebtedness arising under this Agreement and the other Loan Documents; (d) deferred Taxes and other expenses incurred in the ordinary course of business; (e) Capital Lease Obligations having aggregate annual payments up to but not exceeding Four Hundred Thousand Dollars ($400,000.00); (f) insurance premiums financed by the insurance carrier; (g) Intercompany Debt; (h) unsecured Indebtedness incurred prior to the Filing Date and listed on Companies' schedule filed with the Bankruptcy Court in connection with the case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (i) administrative priority unsecured Indebtedness approved by the Bankruptcy Court in the Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (j) Indebtedness evidenced by the Revolver Agreement and the other "Loan Documents" (as defined therein); and (k) the Swap Termination Balance (as defined in the Revolver Agreement).

**Person** shall mean any individual, partnership, business entity, corporation, limited liability company, limited partnership, limited liability partnership, or other entity, including without limitation any governmental entity or the department thereof.

**Plan** shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Companies or any member of the Controlled Group or any such Plan to which any Company or any member of the Controlled Group is required to contribute on behalf of any of its employees.

123285.01601/11752902v.12

**Pre-Petition Financing Agreement** shall mean that certain Financing Agreement dated as of December 30, 2003 among CIT as agent, the lenders party thereto and Shapes, Ultra, Delair and Accu-Weld as borrowers, as amended through the Filing Date.

**Pre-Petition Payments** shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against a Company.

**Proceeds-Based Prepayment** shall have the meaning provided for in Paragraph 4.6 of this Agreement.

**Purchase Money Liens** shall mean liens on any item of Equipment acquired after the date of this Agreement provided that (a) each such lien shall attach only to the Equipment to be acquired, (b) a description of the Equipment so acquired is furnished to the Agent, and (c) Indebtedness incurred in connection with such acquisitions shall not exceed, in the aggregate, Three Hundred Fifty Thousand Dollars ($350,000) in any Fiscal Year.

**Real Estate** shall mean all of each Company's leasehold or fee interests in real property, including any such real property which has been, or will be, encumbered, mortgaged or pledged or assigned to the Agent or its designee as set forth on Schedule 1R.

**Reorganization Plan** shall mean a plan or plans of reorganization in the Case.

**Required Lenders** shall mean the Lenders holding greater than fifty percent (50%) of the outstanding Term Loans.

**Revolver Agent** shall mean CIT or any successor agent under the Revolver Agreement.

**Revolver Agreement** shall mean the Debtor-In-Possession Revolving Credit Financing Agreement dated March ___, 2008, by and among Revolver Agent, Revolver Lenders and Companies.

**Revolver Commitment** shall have the meaning given to the term "Commitment" in the Revolver Agreement.

**Revolver Lenders** shall mean the lenders under the Revolver Agreement.

**Revolving Loans** shall have the meaning specified thereto in the Revolver Agreement.

**Senior Claims** shall have the meaning provided for in Paragraph 7.1 of this Agreement.

**Settlement Date** shall mean the date, weekly, and more frequently, at the discretion of the Agent, upon the occurrence of an Event of Default that the Agent and the Lenders shall settle amongst themselves so that (a) the Agent shall not have, as the Agent, any money at risk and (b) on such Settlement Date the Lenders shall have a pro rata amount of all outstanding Term Loans, provided that each Settlement Date for a Lender shall be a Business Day on which such Lender and its bank are open for business.

**Shapes/Arch** shall mean Shapes/Arch Holdings L.L.C., a New Jersey Limited Liability Company.

**Superpriority Claim** shall mean an allowed claim against a Company or its estate in the Case, which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

**Taxes** shall mean all federal, state, municipal and other governmental taxes, levies, charges, claims and assessments which are or may be due from the Companies with respect to their business, operations, Collateral or otherwise.

**Term Loan Advance(s)** shall mean any monies advanced to or for the benefit of Borrowers, or any of them, by Lenders, under the Term Loan Facility.

**Term Loan Facility** shall mean the Superpriority Senior Secured Debtor-In-Possession term loan facility as more fully discussed in Section 4 below.

**Term Loan Facility Amount** shall mean the aggregate amount permitted to be outstanding at any time under the Term Loan Facility, which amount shall initially be $25,000,000.

**Term Loan Promissory Notes** shall mean the promissory notes in the form of Exhibit A hereto executed by the Companies to evidence the Term Loans made by the Lenders under Section 4 hereof.

**Term Loan(s)** shall mean each Term Loan Advance made by the Lenders pursuant to and repayable in accordance with the provisions of Section 4 of this Agreement which shall be advanced to the Companies.

**Term Loan Commitment** shall mean each Lender's commitment in accordance with this Agreement to make the Term Loans.

**Termination Date** shall mean the earliest to occur of (a) the Maturity Date, (b) (i) the date of entry of a confirmation order confirming a Reorganization Plan other than a Reorganization Plan proposed, funded and/or sponsored by Arcus or (ii) to the effective date of a Reorganization Plan proposed, funded and/or sponsored by Arcus that has been confirmed by an order of the Bankruptcy Court, (c) (i) an order is entered by the Bankruptcy Court authorizing a 363 Sale other than to Versa, or (ii) the date of a 363 Sale to Versa, (d) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, (e) the date of the dismissal of the Case, (f) the date of the cessation of material business operations of the Companies, (g) the last termination date set forth in the Order, or (h) such earlier date on which the Term Loans shall become due and payable, in whole, in accordance with the terms of this Agreement.

**Termination Event** shall mean the date (a) on which the Companies terminate this Agreement and the Term Loans are intentionally prepaid in full following notice of termination

as set forth herein, which date is prior to the Maturity Date; or (b) the date of (i) confirmation of a Reorganization Plan or plan of liquidation other than such plan proposed, funded and/or sponsored by Versa, (ii) entry of an order authorizing a 363 Sale to a purchaser other than Versa. Notice of termination as aforesaid in clause (a) above, by an manager or officer of Shapes/Arch on behalf of the Companies, shall be deemed to be notice by all of the Companies for the purposes hereof.

**Termination Fee** shall:  (a) mean the fee the Agent, on behalf of the Lenders, is entitled to charge the Companies upon the occurrence of a Termination Event; and (b) be determined by multiplying the Term Loan Facility Amount by two percent (2%).

**Trade Accounts Receivable** shall mean that portion of the Companies' Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of the Companies' businesses.

**Trademarks** shall mean all of each of the Companies' present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, service marks, logos, prints and labels (on which any of the foregoing may appear), licenses, reissues, renewals, and any other intellectual property and trademark rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all cash and non-cash proceeds thereof.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York.

**Versa** shall mean, collectively, Versa Capital Management, Inc. and its subsidiaries and affiliates.

**Waived In Writing By Agent** shall mean the written waiver of an Event of Default by the Agent either acting in its discretion or acting at the direction of the Required Lenders, in the case of the waiver of Events of Default which require such consent.

## SECTION 2.  Conditions Precedent

**2.1**    The obligation of the Agent and the Lenders to make the initial loans hereunder is subject to the satisfaction of, or extension or waiver of in writing, on or prior to, the Closing Date, the following conditions precedent:

(a)    **Lien Searches**.  The Agent shall have received tax, judgment and UCC searches satisfactory to the Agent for all locations presently occupied or used by each of the Companies and for each jurisdiction wherein a Company is located as defined in the UCC.    Agent acknowledges such condition has been satisfied.

(b)    **Casualty Insurance**.  Each of the Companies shall have delivered to the Agent evidence satisfactory to the Agent that casualty insurance policies listing the Agent as additional insured, lender loss payee or mortgagee, as the case may be, are in full force and effect, all as set forth in Paragraph 8.5 of Section 8 of this Agreement.

14

(c)     **UCC Filings**.  Any financing statements required to be filed in order to create, in favor of the Agent, on behalf of the Lenders, subject to the Intercreditor Agreement, a first perfected security interest in the Collateral, subject only to the Permitted Encumbrances, shall have been properly filed in each office in each jurisdiction required in order to create in favor of the Agent for the benefit of the Lenders a perfected lien on the Collateral.  The Agent shall have received acknowledgment copies of all such filings (or, in lieu thereof the Agent shall have received other evidence satisfactory to the Agent that all such filings have been made) and the Agent shall have received evidence that all necessary filing fees and all taxes or other expenses related to such filings have been paid in full.

(d)     **Member Consents/Board Resolution.**  The Agent shall have received a copy of the consents or resolutions as applicable of the Members, Managers or Board of Directors of each of the Companies (as the case may be) authorizing the execution, delivery and performance of this Agreement and any related agreements, in each case certified by the Member, Manager or the Secretary or Assistant Secretary of the Companies (as the case may be) as of the date hereof together with a certificate of the Member, Manager or the Secretary or Assistant Secretary of the Companies (as the case may be) to the incumbency and signature of the officers, Member or Managers of the Companies executing such Loan Documents and any certificate or other documents to be delivered by them pursuant hereto, together with evidence of the incumbency of such Member, Manager or Secretary or Assistant Secretary.

(e)     **Company/Corporate Organization**.  The Agent shall have received (i) a copy of the Amended and Restated Certificate of Formation or Certificate of Incorporation, as applicable, of the Companies which are not individual Persons certified by the Secretaries of State of the state of their formation or incorporation, and (ii) a copy of the Operating Agreement, Limited Liability Company Agreement, or By-Laws, as applicable, of the Companies certified by the Manager or Secretary or Assistant Secretary thereof all as amended through the date hereof.

(f)     **Member's/Manager's/Officer's Certificate**.  The Agent shall have received an executed Member's, Manager's or Officer's Certificate of the Companies, satisfactory in form and substance to the Agent, certifying on behalf of the Companies that: (i) the representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects on and as of the Closing Date; (ii) the Companies are in compliance with all of the terms and provisions set forth herein and in the other Loan Documents; and (iii) no Default or Event of Default has occurred.

(g)     **Absence of Default**.  No Default or Event of Default shall have occurred and no material adverse change shall have occurred in the financial condition, business, prospects, profits, operations or assets of the Companies or any of their subsidiaries (other than the commencement of the Case and the consequences that would normally result therefrom).

(h)     **Legal Restraints/Litigation**.  Except for the pendency of the Case, as of the Closing Date, there shall be no: (x) litigation, investigation or proceeding (judicial or administrative) pending or threatened against the Companies or any of their assets, by any agency, division or department of any county, city, state or federal government arising out of this Agreement; (y) injunction, writ or restraining order restraining or prohibiting the consummation of the financing arrangements contemplated under this Agreement; or (z) suit, action,

15

investigation or proceeding (judicial or administrative) pending against any of the Companies or their assets, which, in the opinion of the Agent, if adversely determined, could reasonably be expected to have a material adverse effect on the business, operation, assets, financial condition or Collateral of the Companies or any one of them.

(i)     **Pledge Agreement**.  Companies, as the case may be, shall have executed and delivered to the Agent, on behalf of the Lenders, a pledge and security agreement pledging to the Agent, on behalf of the Lenders, as additional collateral for the Obligations of the Companies not less than 100% of the issued and outstanding membership interests of the Companies (other than Shapes/Arch) and not less than 100% of the stock or membership interests of all subsidiaries of the Companies.

(j)     **Intercreditor Agreement**.  Revolver Agent, the Companies and Agent shall have entered into the Intercreditor Agreement which Intercreditor Agreement shall be in full force and effect.

(k)     **Additional Documents**.    Each of the Companies shall have executed and delivered to the Agent all Loan Documents necessary to consummate the lending arrangement contemplated between the Companies, the Agent and the Lenders.

(l)     **Disbursement Authorization**.  The Companies shall have delivered to the Agent all information necessary for the Agent and the Lenders to issue wire transfer instructions on behalf of the Companies for the initial and subsequent loans and/or advances to be made under this Agreement including, but not limited to, disbursement authorizations in form acceptable to the Agent.

(m)     **Examination and Verification**.  The Agent and each of the Lenders shall have completed, to, their respective satisfaction, an examination and verification of the financial statements, books and records of each of the Companies which examination shall indicate that no material adverse change (as determined by the Agent in its discretion) has occurred in the business, prospects, profitability, assets or operations of any of the Companies and Agent shall be satisfied there shall have been other no event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent) or prospects of any of the Companies, other than the commencement of the Case and the consequences that would normally result therefrom, in each case, since February 29, 2008.

(n)     **Depository Accounts**.  Each of the Companies shall have established a system of lockbox and bank accounts with respect to the collection of Accounts and the deposit of proceeds of Collateral as shall be acceptable to the Agent in all respects.

(o)     **Fees, Costs and Expenses**.    Agent shall have received all fees, costs and expenses due and payable on or prior to the Closing Date.

(p)     **Mortgages/Deeds of Trust**.  The Companies shall have executed and delivered to the Agent, an agent of the Agent or to a title insurance company acceptable to the Agent, such mortgages and/or deeds of trust as the Agent on behalf of the Lenders may reasonably require to

16

obtain first liens on the Real Estate, together with assignments of the leases and rents for each parcel of Real Estate.

(q)    **Title Report**.  The Agent shall have received, in respect of each mortgage or deed of trust, a title report in form and substance satisfactory to the Agent to confirm that the mortgage or deed of trust is, after giving effect to the Intercreditor Agreement, a valid first lien on the property covered by such mortgage or deed of trust, free and clear of all defects and encumbrances except those acceptable to the Agent.

(r)    **Schedules**.  The Companies shall provide the Agent with schedules of (a) any of the Companies' and their subsidiaries' (i) Trademarks, (ii) Patents, and (iii) Copyrights, as applicable and all in such detail as to provide appropriate recording information with respect thereto, (b) any tradenames, (c) Collateral locations, and (d) Permitted Encumbrances, all of the foregoing in form and substance satisfactory to the Agent as listed on Schedule 2.1.

(s)    **Labor Relations**.   Agent's satisfactory review of the current status of the Companies' labor negotiations.

(t)    **Interim Financing Order.**   Entry by the Bankruptcy Court of the Interim Financing Order, by no later than three (3) days after the Filing Date in form and substance satisfactory to Agent and Lenders, which Interim Financing Order shall (i) have been entered upon application or motion of Companies reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. Companies, Agent and Lenders shall be entitled to rely in good faith upon the Interim Financing Order notwithstanding any such objection, appeal or motion for reconsideration.  Agent and Lenders shall be permitted and Companies shall be required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the Interim Financing Order has been stayed by a court of competent jurisdiction.

(u)    **Revolver Agreement Interim Order.**   Entry by the Bankruptcy Court of an interim financing order approving the transactions contemplated by the Revolver Agreement in form and substance satisfactory to Agent and substantially similar to the Interim Financing Order.

(v)    **Budget.**  The Agent and each Lender shall have received the Budget in form and substance satisfactory to Agent.

(w)    **First Day Orders**.  The Agent shall have received drafts of the "first day" pleadings in form and substance satisfactory to the Agent on or before March 13, 2008.

(x)    **Revolver Agreement**.  The Agent shall have received executed copies of the Revolver Agreement and the "Loan Documents" (as defined therein) in form and substance satisfactory to Agent.

(y)    **Funding of Revolving Loans**.    The initial Revolving Loans shall have been funded.

(z)    **Exit Financing Commitment**.    The Agent shall have received, in form and substance satisfactory to Agent, a commitment letter executed and delivered by Revolver Agent and the Lenders under the Revolver Agreement to the Companies and Versa to provide financing to the Companies or Versa, as applicable, upon the exit of the Companies from bankruptcy or in conjunction with a 363 Sale.

(aa)    **Reorganization Plan.**    The Agent shall have received a draft of a Reorganization Plan and disclosure statement of the Borrowers, the terms and conditions of which are acceptable to Agent and Lenders and their respective counsel.    Agent acknowledges such condition has been satisfied.

**2.2    Conditions to Each Extension of Credit**

Subject to the terms of this Agreement, including, without limitation, the Agent's rights pursuant to Paragraph 11.2 of Section 11 hereof, the agreement of the Agent on behalf of the Lenders to make any Term Loan Advance requested to be made by it to any of the Companies on any date (including without limitation, the initial extension of credit and any subsequent Term Loan Advance) is subject to the satisfaction of the following conditions precedent:

(a)    **Representations and Warranties**.    Each of the representations and warranties made by each of the Companies in or pursuant to this Agreement or any other Loan Document shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality or the like in the text thereof) on and as of such date as if made on and as of such date except if limited to an earlier date.

(b)    **No Default**.    No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extension of credit requested to be made on such date.

(c)    **Budget Variance**.    The actual amount of cash funds and receipts received by Companies and cash disbursements made and expenses incurred by Companies during the prior week or Cumulative Period (and on a pro forma basis after giving effect to such Term Loan Advance) do not vary from the Budget approved by Agent and Lenders for such period by an amount greater than five percent (5%).

(d)    **Compliance with Orders**.    The extension of credit requested shall not cause the aggregate outstanding amount of the Term Loan Facility to exceed the amount then authorized by the applicable Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

(e)    **Final Order**.    For each extension of credit on or after April 4, 2008, Agent shall have received satisfactory evidence of the entry of the Final Order.

(f)     **Order.**  The Final Order, or, prior to the entry of the Final Order, the Interim Financing Order, shall (i) have been entered upon application or motion of Companies reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect.  Companies, Agent and Lenders shall be entitled to rely in good faith upon the applicable Order notwithstanding any such objection, appeal or motion for reconsideration.  Agent and Lenders shall be permitted and Companies shall be required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Order has been stayed by a court of competent jurisdiction.

(g)     **Revolver Agreement Order**.  Entry by the Bankruptcy Court of an order approving the transactions contemplated by the Revolver Agreement in form and substance satisfactory to Agent and substantially similar to the Final Order.

(h)     **Revolver Funding**.  Revolver Agent and Revolver Lenders shall have funded, to the extent of any Availability, any and all Revolving Loans requested by Borrowers.

Each request for a Term Loan Advance hereunder shall constitute a representation and warranty by all of the Companies as of the date of such request that each of the representations, warranties and covenants contained in this Agreement have been satisfied and are true and correct, except as the Companies and the Agent and/or the Required Lenders shall otherwise agree herein or in a separate writing.

## SECTION 3.  RESERVED

## SECTION 4.  Term Loans

**4.1**     The Companies hereby agree to execute and deliver to the Agent, on behalf of the Lenders, the Term Loan Promissory Notes, to evidence the Term Loan to be extended under the Term Loan Facility and this Agreement.

**4.2**     Upon receipt of such Term Loan Promissory Notes, the Lenders each hereby agree severally and not jointly to extend the initial Term Loan Advance to the Companies, pro rata according to the Commitment of each Lender.  The Term Loan Facility may be funded in multiple Term Loan Advances, but no Term Loan Advances under the Term Loans shall be made within one (1) Business Day of the Maturity Date.  Borrowers shall deliver to Agent no later than 3:00 PM (Eastern Time) one (1) Business Day prior to such proposed Term Loan Advance, a written request to make a Term Loan Advance along with an updated Budget satisfactory to Agent and calculation of the remaining availability under the Term Loan Facility and the Availability under the Revolver Agreement.  Borrower shall have the right to reborrow any portion of the Term Loan which is repaid or prepaid (including, without limitation, pursuant to a Mandatory Prepayment) from time to time prior to the Termination Date, provided however that no Term Loan Advances under the Term Loans shall be made within one (1) Business Day of the Maturity Date.

19

**4.3**     The principal amount of the Term Loans shall be due and payable and shall be repaid by the Companies to the Agent on behalf of Lenders in full on the Termination Date together with all accrued and unpaid interest and all other Obligations.

**4.4**     In the event this Agreement is terminated by either the Agent in accordance with this Agreement or the Companies for any reason whatsoever, the Term Loans shall become due and payable, in full, on the effective date of such termination notwithstanding any provision to the contrary in the Term Loan Promissory Notes or this Agreement.

**4.5**     The Companies may prepay at any time, at their option, in whole or in part, the Term Loans, provided that on each such prepayment, the Companies shall pay accrued interest on the principal so prepaid to the date of such prepayment.  Any such prepayment shall be applied to the Term Loan, as determined by Agent in its sole discretion, in the inverse order of maturity.

**4.6**     Immediately upon the receipt by any of the Companies of (i) any Non-Borrowing Base Asset Proceeds, Companies shall pre-pay the outstanding principal amount of the Obligations in an amount equal to 100% of such Non-Borrowing Base Asset Proceeds; provided that, so long as (a) no Default or Event of Default shall have occurred, (b) Borrowers shall have given Agent prior written notice of such Borrower's intention to apply such monies to the cost of replacement of the properties or assets that are the subject of such sale or disposition, (c) Agent has given prior written consent and (d) Companies complete such replacement purchase or construction within 30 days after the initial receipt of such monies, Companies shall have the option to apply such monies to the cost of replacement of the Non-Borrowing Base Asset that is the source of such Non-Borrowing Base Asset Proceeds unless and to the extent that such applicable period shall have expired without such replacement, purchase or construction being made or completed, in which case, the amount of such Non-Borrowing Base Asset Proceeds shall be paid to Agent; and (ii) the proceeds of the issuance or incurrence of any Indebtedness (other than Permitted Indebtedness), Companies shall prepay the outstanding principal amount of the Obligations in an amount equal to 100% of the net cash proceeds received by such Person in connection with such issuance or incurrence (each Mandatory Prepayment set forth in clauses (i) and (ii) above, a "Proceeds-Based Prepayment").  Such Mandatory Prepayment shall be applied to the outstanding balance of the Term Loans or any of them, as the Agent shall elect, however, the Term Loan Facility Amount shall not be reduced by the amount of such Mandatory Prepayment and shall remain available for borrowing as set forth in Paragraph 4.2 above.

**4.7**     Intentionally Omitted.

**4.8**     Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this agreement or any of the other Loan Documents, Lenders shall be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

**4.9**     (a)  The Agent shall maintain a Loan Account on its books in which each of the Companies will be charged with all loans and advances made by the Agent and the Lenders to such Company or for its account, and with any other Obligations, including any and all costs, expenses and reasonable attorney's fees which the Agent may incur in connection with the

exercise by or for the Agent of any of the rights or powers herein conferred upon the Agent, or in the prosecution or defense of any action or proceeding to enforce or protect any rights of the Agent in connection with this Agreement, the other Loan Documents or the Collateral assigned hereunder, or any Obligations owing by such Company. The Companies will be credited with all amounts received by the Agent and/or the Lenders from the Companies or from others for the Companies' account, and such amounts will be applied to payment of the Obligations as set forth herein.

(b)     Each of the Companies acknowledges and agrees that: (i) the Agent shall have no responsibility to inquire into the correctness of the apportionment, allocation, or disposition of (x) any loans and advances made to any of the Companies or (y) any of the Agent's expenses and charges relating thereto; (ii) each of the Companies jointly and severally unconditionally guarantee to the Agent and Lenders the prompt payment in full of all loans and advances made and to be made by the Agent and Lenders to any of them under this Agreement, as well as all other Obligations of the Companies to Agent and Lenders; (iii) all Accounts assigned to the Agent by any of the Companies and all other Collateral and any other collateral security now or hereafter given to the Agent by any of the Companies (be it Accounts or otherwise), shall secure all loans and advances made by the Agent and Lenders to any of the Companies, and shall be deemed to be pledged to the Agent as security for any and all other Obligations of the Companies as set forth under this Agreement or any other agreements between the Agent and any of the Companies; and (iv) to induce the Agent and Lenders to extend financial accommodations hereunder, and in consideration thereof, each of the Companies hereby agrees to indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless against any and all liability, expense, loss or claim of damage or injury, made against the Agent or the Lenders by any of the Companies or by any third party whosoever, arising from or incurred solely by reason of (A) the method of handling the accounts of the Companies as herein provided, (B) Agent's relying on any instructions of any of the Companies, or (C) any other action taken by the Agent in accordance with this subparagraph (b) of this Paragraph 4.9, except to the extent arising from the gross negligence or willful misconduct of the Agent and/or Lenders.

4.10     The initial Term Loan Advance, subject to approval under the terms of an Order, shall be used to (i) refinance and fully pay, satisfy and discharge the balance of portion of the loans outstanding under and advanced pursuant to the PP&E Equity Collateral Borrowing Base Component (as defined in the Pre-Petition Financing Agreement) of the Borrowing Base (as defined in the Pre-Petition Financing Agreement) in an amount not to exceed $4,400,000 (which includes amounts advanced in connection with the Reserved Termination Amount (as defined in the Revolver Agreement)), (ii) refinance and fully pay, satisfy and discharge the term loan balance in an amount not to exceed $8,500,000 under the Pre-Petition Financing Agreement and (iii) to pay for the Documentation Fee, the Out-of-Pocket Expenses and all other fees and expenses associated with or otherwise due under the Term Loan Facility, the Revolver Agreement, and all transactions related hereto and thereto. Subsequent Term Loan Advances may be used to fund general corporate purposes and ongoing working capital needs of Borrowers as set forth in the Budget to the extent such general corporate purposes and working capital needs exceed Availability under the Borrowing Base provided for in the Revolver Agreement.

**SECTION 5.  RESERVED**

**SECTION 6.  Collateral**

6.1    As security for the prompt payment in full of all Obligations, each of the Companies hereby pledges and grants to the Agent, on behalf of the Lenders, a first priority continuing general lien upon, and security interest in, all of their now owned and hereafter acquired real and personal property (subject to the Intercreditor Agreement), including, without limitation:

(a)    Accounts;

(b)    Inventory;

(c)    General Intangibles;

(d)    Documents of Title;

(e)    Other Collateral;

(f)    Equipment;

(g)    Avoidance Actions;

(h)    Real Estate; and

(i)    Intercompany Debt; together with

(j)    all proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

6.2    The security interests granted hereunder shall extend and attach to:

(a)    All Collateral which is owned by any of the Companies or in which the Companies have any interest, whether held by the Companies or others for their account, and, if any Collateral is Equipment, whether the Companies' interest in such Equipment is as owner, finance lessee or conditional vendee;

(b)    All Equipment, whether the same constitutes personal property or fixtures, including, but without limiting the generality of the foregoing, all dies, jigs, tools, benches, molds, tables, accretions, component parts thereof and additions thereto, as well as all accessories, motors, engines and auxiliary parts used in connection with, or attached to, the Equipment; and

(c)    All Inventory and any portion thereof which may be returned, rejected, reclaimed or repossessed by either the Agent or the Companies from the Companies' customers, as well as to all supplies, goods, incidentals, packaging materials, labels and any other items which

22

contribute to the finished goods or products manufactured or processed by the Companies, or to the sale, promotion or shipment thereof.

**6.3**     The Companies agree to safeguard, protect and hold all Inventory for the Agent's account and make no disposition thereof except in the ordinary course of the business of the Companies, as herein provided.  Upon the sale, exchange, or other disposition of Inventory, as herein provided, the security interest in the Inventory provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Trade Accounts Receivable, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sale, exchange or disposition. As to any such sale, exchange or other disposition, the Agent shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation. The Companies hereby agree to immediately forward any and all proceeds of Collateral to the Depository Account, and to hold any such proceeds (including any notes and instruments), in trust for the Agent, on behalf of the Lenders, pending delivery to the Agent. Irrespective of the Agent's perfection status in any and all of the General Intangibles, including, without limitations, any Patents, Trademarks, Copyrights or licenses with respect thereto, the Companies hereby irrevocably grant the Agent a royalty free license to sell, or otherwise dispose or transfer, in accordance with Paragraph 11.3 of Section 11 of this Agreement, and the applicable terms hereof of any of the Inventory upon the occurrence of an Event of Default which has not been Waived In Writing By Agent.  Notwithstanding anything to the contrary, each of the provisions of this Paragraph 6.3 shall be subject to the Intercreditor Agreement.

**6.4**     The Companies agree at their own cost and expense to keep the Equipment in as good and substantial repair and condition as the same is now or at the time the lien and security interest granted herein shall attach thereto, reasonable wear and tear and casualty excepted, making any and all repairs and replacements when and where necessary. The Companies also agree to safeguard, protect and hold all Equipment in accordance with the terms hereof and subject to the Agent's security interest.  Absent the Agent's prior written consent, any sale, exchange or other disposition of any Equipment shall be made by the Companies in the ordinary course of business and as set forth herein.  The Companies may not, without prior written consent of Agent, such consent not to be unreasonably withheld, in the ordinary course of their business, sell, exchange or otherwise dispose of obsolete or surplus Equipment; provided, that, subject to Paragraph 4.6 above, the proceeds of any such sales or dispositions consented to by Agent shall be held in trust by the Companies for the Agent and shall be immediately delivered to the Agent, except that, subject to the prior written consent of Agent, the Companies may retain and use such proceeds to purchase forthwith replacement Equipment which the Companies determine in their reasonable judgment to have a collateral value at least equal to the Equipment so disposed of or sold; provided, however, that the aforesaid right shall automatically cease upon the occurrence of an Event of Default which is not Waived In Writing By Agent. Upon the sale, exchange, or other disposition of the Equipment, as herein provided, the security interest provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Accounts, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sales, exchange or disposition. As to any such sale, exchange or other disposition, the Agent and the Lenders shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

123285.01601/11752902v.12

6.5     The rights and security interests granted to the Agent and the Lenders hereunder are to continue in full force and effect, notwithstanding the termination of this Agreement, until the final indefeasible payment in full in cash to the Agent of all Obligations and the termination of this Agreement. Any delay, or omission by the Agent to exercise any right hereunder shall not be deemed a waiver thereof, or be deemed a waiver of any other right, unless such waiver shall be in writing and signed by the Agent. A waiver on any one occasion shall not be construed as a bar to, or waiver of any right or remedy on any future occasion.

6.6     Notwithstanding the Agent's security interest in the Collateral and to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral or by the guarantee, endorsement, assets or property of any other person, the Agent shall have the right in its sole discretion to determine which rights, liens, security interests or remedies the Agent shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of them, or any of the Agent's and/or the Lenders' rights hereunder.

6.7     Any balances to the credit of the Companies and any other property or assets of the Companies in the possession or control of the Agent and/or the Lenders may be held by the Agent as security for any Obligations and applied in whole or partial satisfaction of such Obligations when due. The liens and security interests granted herein, and any other lien or security interest the Agent and/or the Lenders may have in any other assets of the Companies, shall secure payment and performance of all now existing and future Obligations. The Agent may, in its discretion, charge any or all of the Obligations to the Loan Account when due.

6.8     Each of the Companies possesses all General Intangibles and rights thereto necessary to conduct their business as conducted as of the Closing Date and the Companies shall maintain their rights in, and the value of, the foregoing in the ordinary course of their business, including, without limitation, by making timely payment with respect to any applicable licensed rights. The Companies shall deliver to the Agent, and/or shall cause the appropriate party to deliver to the Agent, from time to time such pledge or security agreements with respect to General Intangibles (now or hereafter acquired) of the Companies and their subsidiaries as the Agent shall require to obtain valid first liens thereon. In furtherance of the foregoing, the Companies shall provide timely notice to the Agent of any additional Patents, Trademarks, Copyrights, brand names, and other trade designations acquired or applied for subsequent to the Closing Date and the Companies shall execute such documentation as the Agent may reasonably require to obtain and perfect its lien thereon. The Companies hereby confirm that they shall deliver to the Agent each note or other instrument evidencing indebtedness owed to them including without limitation all intercompany indebtedness among the Companies, whether such note or other instrument now exists or arises or is issued at any time hereafter, in each case endorsed to the Agent pursuant to an endorsement in form and substance acceptable to the Agent. The Companies hereby confirm that they shall deliver, or cause to be delivered, any pledged stock or membership interests (if certificated) issued subsequent to the Closing Date to the Agent in accordance with the applicable terms of the Pledge Agreement and prior to such delivery, shall hold any such stock or membership interests (if certificated) in trust for the Agent. The Companies hereby irrevocably grant to the Agent a royalty-free, non-exclusive license in the General Intangibles, including Trademarks, Copyrights, Patents, licenses, and any other proprietary and intellectual property rights and any and all right, title and interest in any of the

24

foregoing, for the sole purpose, upon the occurrence of an Event of Default which is not Waived In Writing By Agent, of the right to: (i) advertise for sale and sell or transfer any Inventory bearing any of the General Intangibles, and (ii) make, assemble, prepare for sale or complete, or cause others to do so, any applicable raw materials or Inventory bearing any of the General Intangibles, including use of the Equipment and Real Estate for the purpose of completing the manufacture of unfinished goods, raw materials or work-in-process comprising Inventory, and apply the proceeds thereof to the Obligations hereunder, all as further set forth in this Agreement and irrespective of the Agent's lien and perfection in any General Intangibles. Notwithstanding anything to the contrary, each of the provisions of this Paragraph 6.8 shall be subject to the Intercreditor Agreement.

6.9    The Companies confirm to the Agent that any and all Taxes or fees relating to their business, their sales, the Accounts or Inventory relating thereto, are their sole responsibility and that same will be paid by the Companies when due, subject to Paragraph 8.6 of Section 8 of this Agreement, and that none of said Taxes or fees represent a lien (other than Permitted Encumbrances) on or claim against the Accounts. The Companies hereby further represent and warrant that they shall not acquire any Inventory on a consignment basis (except Inventory not exceeding Three Million Dollars ($3,000,000) in aggregate value which is not commingled with other Inventory and which is specifically identified on each Inventory report as ineligible Inventory consigned to such Company), nor co-mingle their Inventory with any of their customers or any other person, including pursuant to any bill and hold sale or otherwise, and that their Inventory is marketable to their customers in the ordinary course of business of the Companies, except as a Company may otherwise report in writing to the Agent from time to time. Each of the Companies also warrants and represents it is a duly and validly existing limited liability company and qualified in all states where the failure to so qualify would have a material adverse effect on either the business of the Companies or the ability of the Companies to enforce collection of Accounts due from customers residing in that state. The Companies agree to maintain such books and records regarding Accounts and Inventory as the Agent may reasonably require and agree that the books and records of the Companies will reflect the Agent's interest in the Accounts and Inventory.  All of the books and records of each of the Companies will be available to the Agent during normal business hours, including any records handled or maintained for the Companies by any other company or entity.

6.10    In furtherance of the continuing assignment and security interest in each of the Companies' Accounts and Inventory, each of the Companies will, upon the creation of Accounts and purchase or acquisition of Inventory, execute and deliver to the Agent in such form and manner as the Agent may reasonably require, solely for the Agent's convenience in maintaining records of Collateral, such confirmatory schedules of Accounts and Inventory as the Agent may reasonably request, including, without limitation, weekly schedules of Accounts and monthly schedules of Inventory, all in form and substance satisfactory to the Agent, and such other appropriate reports designating, identifying and describing the Accounts and Inventory as the Agent may reasonably request, and provided further that the Agent may request any such information more frequently, from time to time, upon its reasonable prior request.  In addition, upon the Agent's request, each of the Companies shall provide the Agent with copies of agreements with, or purchase orders from, such Company's customers, and copies of invoices to customers, proof of shipment or delivery, access to its computers, electronic media and software programs associated therewith (including any electronic records, contracts and signatures) and

25

such other documentation and information relating to said Accounts and other Collateral as the Agent may reasonably require. Failure to provide the Agent with any of the foregoing shall in no way affect, diminish, modify or otherwise limit the security interests granted herein. Each of the Companies hereby authorizes the Agent to regard such Company's printed name or rubber stamp signature on assignment schedules or invoices as the equivalent of a manual signature by one of such Company's authorized officers or agents.

6.11     This Agreement and the obligation of the Companies to perform all of their covenants and obligations hereunder are further secured by mortgages and assignments of leases and rents on the Real Estate.

6.12     The Companies shall give to the Agent from time to time such mortgage(s), deed(s) of trust or assignment(s) on the Real Estate or real estate acquired after the date hereof as the Agent shall require to obtain a valid first lien thereon subject only to those exceptions of title as set forth in future title insurance policies that are satisfactory to the Agent.

6.13     In the event the Companies form a subsidiary, or acquire a subsidiary, the Companies shall cause and direct such subsidiary to: (a) join as a Borrower hereunder and become liable for, jointly and severally with the Companies, all Obligations, and (b) deliver to the Agent for the benefit of the Agent and the Lenders, a security interest or mortgage on or in all assets, including real estate, of such subsidiary.

6.14     (a) Until the Agent has advised the Companies to the contrary after the occurrence of an Event of Default which has not been Waived In Writing By Agent, the Companies, at their expense, will enforce, collect and receive all amounts owing on their respective Accounts in the ordinary course of their business and any proceeds they so receive shall be subject to the terms hereof and held on behalf of and in trust for the Agent, on behalf of the Lenders. Such privilege shall terminate at the election of the Agent, upon the occurrence of an Event of Default, until such Event of Default is Waived In Writing By Agent. Any checks, cash, credit card sales and receipts, notes or other instruments or property received by a Company with respect to any Collateral, including Accounts, shall be held by such Company in trust for the Agent on behalf of the Lenders, separate from such Company's own property and funds, and promptly turned over to the Agent with proper assignments or endorsements by deposit to the Depository Accounts. Each of the Companies shall: (i) irrevocably authorize and direct any banks which maintain the Companies' initial receipt of cash, checks and other items to promptly wire transfer all available funds to a Depository Account; and (ii) advise all such banks of the Agent's security interest in such funds. The Companies shall provide the Agent with prior written notice of any and all deposit accounts opened or to be opened subsequent to the Closing Date. No checks, drafts or other instrument received by the Agent shall constitute final payment to the Agent and/or the Lenders unless and until such instruments have actually been collected. Notwithstanding anything to the contrary, each of the provisions of this Paragraph 6.14(a) shall be subject to the Intercreditor Agreement.

(b)     Subject to the Intercreditor Agreement, the Companies shall establish and maintain, in their name and at their expense, deposit accounts with such banks as are acceptable to the Agent (the "Blocked Accounts") into which the Companies shall promptly cause to be deposited: (i) all proceeds of Collateral received by the Companies, including all amounts

26

payable to the Companies from credit card issuers and credit card processors, and (ii) all amounts on deposit in deposit accounts used by the Companies at each of their locations, all as further provided in Paragraph 6.14(a) above.  At such time as the Agent and Lenders are entitled to a first lien on the Blocked Accounts, in accordance with the Intercreditor Agreement, the banks at which the Blocked Accounts are established shall enter into an agreement, in form and substance satisfactory to the Agent (the "Blocked Account Agreements"), providing that all cash, checks and items received or deposited in the Blocked Accounts are the property of the Agent, that the depository bank has no lien upon, or right of set off against, the Blocked Accounts and any cash, checks, items, wires or other funds from time to time on deposit therein, except as otherwise provided in the Blocked Account Agreements, and that, subject to the Intercreditor Agreement, automatically, on a daily basis the depository bank will wire, or otherwise transfer, in immediately available funds, all funds received or deposited into the Blocked Accounts to such bank account as the Agent may from time to time designate for such purpose.  The Companies hereby confirm and agree that all amounts deposited in such Blocked Accounts and any other funds received and collected by the Agent, whether as proceeds of Inventory or other Collateral or otherwise, shall be, subject to the Intercreditor Agreement, the property of the Agent.

**SECTION 7.  Superpriority Claims, Collateral Security, Etc.**

   **7.1    Superpriority Claims and Collateral Security.**  Companies hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Final Order, all of the Obligations:

   (a)    shall at all times constitute a Superpriority Claim having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any claims of any Person (other than Revolver Agent, which claims shall be pari passu), whether now existing or hereafter arising, including any claims under Sections 105(a), 326, 330, 328, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out; and

   (b)    pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code shall at all times be secured by a first priority perfected lien in all of the assets (including, without limitation, any Avoidance Actions), subject to the Intercreditor Agreement, whether now owned or hereafter acquired, of each Company and its estate, subject, as to priority, only to the Carve-Out and Permitted Encumbrances securing those valid, perfected, non-avoidable secured claims existing on the Filing Date and listed on Schedule 7.1 (collectively, "Senior Claims").  The liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

   The agreement of Agent and Lenders to provide post-petition financing to Borrowers will not prohibit Agent or Lenders from moving in the Bankruptcy Court for any other and further relief which Agent or Lenders believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the Collateral (including a request for Company to abandon any part of the Collateral) or otherwise.

   **7.2    No Filings Required.**    Notwithstanding Section 6, the liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Financing Order or Final Order, whichever occurs first.  Agent shall not be required to file any

27

financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien granted by or pursuant to each Order or this Agreement or any other Loan Document.

**7.3    Grants, Rights and Remedies.**  The lien and administrative priority granted by or pursuant to the Orders or this Agreement or any other Loan Document are independently granted.  The Orders and this Agreement and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

**7.4    No Discharge; Survival of Claims.**  Companies agree that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and Companies, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge), (b) the Superpriority Claim granted to Agent and Lenders pursuant to the Orders, and the liens granted to Agent, for the benefit of Agent and the Lenders pursuant to the Orders and the other Loan Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (c) Companies shall not propose or support any Reorganization Plan that is not conditioned upon termination of this Agreement and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Companies and their estate, in each case, on or before the effective date of such Reorganization Plan, and (d) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

**7.5    Survival.**  The liens, lien priority, administrative priorities and other rights and remedies granted to Agent and Lenders pursuant to the Orders, this Agreement and the other Loan Documents (specifically including, without limitation, the existence, perfection and priority of the liens provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Company (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code, are or will be prior to or on a parity with any claim of Agent or any Lender against the Companies in respect of any Obligation;

(b)    the liens securing the Obligations shall constitute valid and perfected liens and, subject only to the Carve-Out and Permitted Encumbrances securing Senior Claims, shall be prior to all other liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the liens securing the Obligations shall continue to be valid and perfected without the necessity that Agent file financing statements, mortgages or otherwise perfect its lien under applicable non-bankruptcy law.

28

**7.6    Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances.** Companies, Agent and Lenders know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances"). Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case. With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Company: (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of each Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with each Order and the transactions contemplated by this Agreement and having either Order entered that would serve as a basis to allege such Changed Circumstances. Each Company understands and agrees that Agent and Lenders are not willing to bear any of the risks involved in Company's business enterprises and Agent and Lenders are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Company expressly assumes all risks of any and all such matters, and the consequences that Agent and Lenders will enforce their legal, equitable, and contractual rights if Agent and Lenders are not paid and dealt with strictly in accordance with the terms and conditions of the Order and the other Loan Documents. Without limiting the foregoing in any way, Company's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement and the Order, and, until all Obligations are indefeasibly paid and satisfied in full either before or after a termination of this Agreement, Companies will not seek authority from the Bankruptcy Court to otherwise use any cash collateral that included in the Collateral for any purpose whatsoever.

**7.7    Exclusive Remedy For Any Alleged Post-Petition Claim.** If any Company asserts that it has any adverse claims against Agent or Lenders, with respect to this Agreement and the transactions contemplated hereby, each Company agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (the "Damage Lawsuit"). Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Agent and Lenders of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Loan Documents, and the Damage Lawsuit (including any and all adverse claims alleged against Agent or Lenders) cannot be asserted by any Company as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by Agent or Lenders of their legal, equitable, and contractual rights under the Order, the other Loan Documents, and otherwise.

**7.8**    **Prohibition on Surcharge; Etc.**  No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.  The prohibition on surcharging or priming of the liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a lien or rights (through any means, at law or in equity) which in any case is equal or senior to the liens of Agent on the Collateral.  Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this Paragraph 7.8.

**7.9**    **Marshalling Obligations.**  The right of Agent to seek the equitable remedy of marshalling is expressly preserved, and Companies will cooperate fully with any effort by Agent to exercise its equitable remedy of marshalling.

## SECTION 8.  Representations, Warranties and Covenants

**8.1**    Each of the Companies hereby warrants, represents and covenants that: (i) Schedule 8.1 hereto correctly and completely sets forth the Companies' (A) chief executive office, (B) Collateral locations and (C) tradenames; (ii) except for the Permitted Encumbrances, upon entry of the Interim Financing Order (or, when applicable, the Final Order), this Agreement creates a valid, perfected and first priority security interest in and to the Collateral and the security interests granted herein constitute and shall at all times constitute the first and only liens on the Collateral; (iii) except for the Permitted Encumbrances, the Companies are, or will be, at the time additional Collateral is acquired by them, the absolute owners of the Collateral with full right to pledge, sell, consign, transfer and create a security interest therein, free and clear of any and all claims or liens in favor of others; (iv) the Companies will, at their expense, at all times warrant and, at the Agent's request, defend the same from any and all claims and demands of any other Person other than a holder of a Permitted Encumbrance; (v) the Companies will not grant, create or permit to exist, any lien upon, or security interest in, the Collateral, or any proceeds thereof in favor of any other person other than the holders of the Permitted Encumbrances; (vi) the Equipment does not comprise a part of the Inventory of any of the Companies; and (vii) the Equipment is and will only be used by the Companies in their business and will not be held for sale or lease, or removed from their premises, or otherwise disposed of by the Companies except as otherwise permitted in this Agreement.

**8.2**    Each of the Companies agrees to maintain books and records pertaining to the Collateral in accordance with GAAP and in such additional detail, form and scope as the Agent shall reasonably require. The Companies agree that the Agent or its agents at the Companies' cost and expense, and any of the Lenders who may wish to accompany the Agent at their own cost and expense, may enter upon the Companies' premises at any time during normal business hours, and from time to time in its reasonable business judgment, for the purpose of inspecting the Collateral and any and all records pertaining thereto. The Companies agree to afford the Agent thirty (30) days prior written notice of any change in the location of any Collateral. The Companies are also to advise the Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or on the security interests granted to the Agent therein.

**8.3**    Each of the Companies agrees to: (a) execute and deliver to the Agent, from time to time, solely for the Agent's convenience in maintaining a record of the Collateral, such written statements and schedules as the Agent may reasonably require, designating, identifying or describing the Collateral; and (b) provide the Agent, on request, with an appraisal of the Equipment, Inventory, and/or Real Estate. During (i) each calendar year, the Companies shall pay for not more than one (1) appraisal for Inventory and (ii) each calendar year, the Companies shall pay for not more than one (1) appraisal for each of Equipment and Real Estate, all conducted at a time when no Event of Default exists. The Companies shall pay for each appraisal performed when any Event of Default has occurred which has not been Waived In Writing By Agent. All appraisers and appraisals shall be acceptable to Agent in all respects. The Companies' failure, however, to promptly give the Agent such statements or schedules shall not affect, diminish, modify or otherwise limit the Agent's and/or the Lenders' security interests in the Collateral.

**8.4**    Each of the Companies agrees to comply with the requirements of the Bankruptcy Code and all state and federal laws in order to grant to the Agent valid and perfected first security interests in the Collateral, subject only to the Permitted Encumbrances. The Agent is hereby authorized by the Companies to file (including pursuant to the applicable terms of the UCC) from time to time any financing statements, continuations or amendments covering the Collateral.  Such financing statements may indicate that the Collateral consists of  "all assets" and/or "all personal property" of Companies (or any collateral description of lesser scope and/or more specificity).  The Companies hereby consent to and ratify any and all execution and/or filing of financing statements on or prior to the Closing Date by the Agent. The Companies agree to do whatever the Agent may reasonably request, from time to time, by way of (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof (b) cooperating with the Agent's agents and employees; (c) keeping Collateral records; (d) subject to the Intercreditor Agreement, transferring proceeds of Collateral to the Agent's possession; and (e) performing such further acts as the Agent and/or the Lenders may reasonably require in order to effect the purposes of this Agreement including but not limited to obtaining control agreements with respect to deposit accounts and/or Investment Property.

**8.5**    (a) Each of the Companies agrees to maintain insurance on their Real Estate, Equipment and Inventory under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times reasonably satisfactory to the Agent. All policies covering the Real Estate, Equipment and Inventory are, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, to be made payable to the Agent, on behalf of the Lenders, in case of loss, under a standard non-contributory "mortgagee", "lender" or "secured party" clause and are to contain such other provisions as the Agent may require to fully protect the Agent's interest in the Real Estate, Inventory and Equipment and to any payments to be made under such policies. All original policies or true copies thereof are to be delivered to the Agent, premium paid to date as billed, with the loss payable endorsement in the Agent's favor, and shall provide for not less than thirty (30) days prior written notice to the Agent of the exercise of any right of cancellation. At the Companies' request, or if the Companies fail to maintain such insurance, the Agent may arrange for such insurance, but at the Companies' expense and without any responsibility on the Agent's part for: (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims. Upon the occurrence of an Event

31

of Default which is not Waived In Writing By Agent, the Agent shall, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, have the sole right and at its option, in the name of the Agent or the Companies, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(b)    Subject to Paragraph 4.6, in the event any part of any of the Non-Borrowing Base Assets is damaged by fire or other casualty, the Agent shall promptly apply such Insurance Proceeds to the Obligations in such order as Agent may elect in its sole discretion.

(c)    In the event the Companies or any one of them fail to provide the Agent with timely evidence, acceptable to the Agent, of their maintenance of insurance coverage required pursuant to Paragraph 8.5(a) above, the Agent may purchase, at the Companies' expense, insurance to protect the Agent's interests in the Collateral. The insurance acquired by the Agent may, but need not, protect the Companies' interest in the Collateral, and therefore such insurance may not pay claims which the Companies may have with respect to the Collateral or pay any claim which may be made against the Companies in connection with the Collateral. In the event the Agent purchases, obtains or acquires insurance covering all or any portion of the Collateral, the Companies shall be responsible for all of the applicable costs of such insurance, including premiums, interest (at the applicable Base Rate set forth in paragraph 9.1 of Section 9 hereof), fees and any other charges with respect thereto, until the effective date of the cancellation or the expiration of such insurance. The Agent may charge all of such premiums, fees, costs, interest and other charges to the Companies' Loan Accounts. The Companies hereby acknowledge that the costs of the premiums of any insurance acquired by the Agent may exceed the costs of insurance which the Companies may be able to purchase on their own. In the event that the Agent purchases such insurance, the Agent will notify the Companies of said purchase within thirty (30) days of the date of such purchase. If within thirty (30) days after the date of such notice, the Companies provide the Agent with proof that the Companies had the insurance coverage required pursuant to 8.5(a) above (in form and substance satisfactory to the Agent) as of the date on which the Agent purchased insurance and the Companies continued at all times to have such insurance, then the Agent agrees to cancel the insurance purchased by the Agent and credit the Companies' Loan Account with the amount of all costs, interest and other charges associated with any insurance purchased by the Agent, including with any amounts previously charged to the Loan Account.

**8.6**    Each of the Companies agrees to pay, when due, all Taxes, including sales taxes, assessments, claims and other charges lawfully levied or assessed upon the Companies or the Collateral unless such Taxes are being diligently contested in good faith by the Companies by appropriate proceedings and adequate reserves are established in accordance with GAAP. Notwithstanding the foregoing, if any lien shall be filed or claimed thereunder (a) for Taxes due to the United States of America, or (b) which in the Agent's opinion might create a valid obligation having priority over the rights granted to the Agent herein (exclusive of Real Estate), such lien shall not be deemed to be a Permitted Encumbrance hereunder and the Companies shall immediately pay such tax and remove the lien of record. If the Companies or any one of them fail to do so promptly, then at the Agent's election, the Agent may, upon the occurrence of a

Default or Event of Default, imminent risk of seizure, filing of any priority lien, forfeiture, or sale of the Collateral, pay Taxes on the Companies' behalf and the amount thereof shall be an Obligation secured hereby and due on demand.

8.7    Each of the Companies: (a) agrees to comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the business or operations of the Companies or any one of them, provided that the Companies may contest any acts, rules, regulations, orders and directions of such bodies or officials in any reasonable manner which will not, in the Agent's reasonable opinion, materially and adversely effect the Agent's and/or the Lenders' rights or priority in the Collateral; (b) agrees to comply with all environmental statutes, acts, rules, regulations or orders as presently existing or as adopted or amended in the future, applicable to the Collateral, the ownership and/or use of the Real Estate and operation of their business, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the operation of the business of the Companies or any one of them; and (c) shall not be deemed to have breached any provision of this Paragraph 8.7 if (i) the failure to comply with the requirements of this Paragraph 8.7 resulted from good faith error or innocent omission, (ii) the Companies promptly commence and diligently pursue a cure of such breach, and (iii) such failure is cured within (30) days following the Companies' receipt of notice of such failure, or if such cannot in good faith be cured within thirty (30) days, then such breach is cured within a reasonable time frame based upon the extent and nature of the breach and the necessary remediation, and in conformity with any applicable consent order, consensual agreement and applicable law.

8.8    Until termination of this Agreement and payment and satisfaction of all Obligations due hereunder, the Companies agree that, unless the Agent shall have otherwise consented in writing, the Companies will furnish to the Agent and each Lender: (a) within one hundred twenty (120) days after the end of the Fiscal Year of the Companies ended December 31, 2007, an audited Consolidated Balance Sheet, with a Consolidating Balance Sheet attached thereto, as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus of the Companies and all subsidiaries of each for such year, audited by independent public accountants selected by the Companies and satisfactory to the Agent, and within ninety (90) days after the end of each Fiscal Year of the Companies ending after December 31, 2007, an audited Consolidated Balance Sheet, with a Consolidating Balance Sheet attached thereto, as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus of the Companies and all subsidiaries of each for such year, audited by independent public accountants selected by the Companies and satisfactory to the Agent; (b) within thirty (30) days after the end of each month a Consolidated Balance Sheet with a Consolidating Balance Sheet attached thereto as at the end of such period and statements of profit and loss, cash flow and surplus of the Companies and all subsidiaries for such period, certified on behalf of the Companies by an authorized financial or accounting officer of the Companies; (c) monthly financial covenant compliance certificates certified as fairly and accurately reflecting the statements contained therein on behalf of the Companies' by the Chief Financial Officer of Shapes; (d) contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by or on behalf of Companies, or any of them, in the Case or otherwise provided by Companies to the Bankruptcy Court, the United States Trustee, the Chapter 11 Trustee and any other statutorily

33

appointed or ad hoc committee in the Case, with copies of all such papers and documents also provided to or served on Agent's counsel; (e) promptly after the sending thereof, copies of all material written reports and all term sheets for a Reorganization Plan given by Companies to the Creditors' Committee or any other official or unofficial committee in the Case, with copies of such reports and term sheets also provided to or served on Agent's counsel; (f) not less than five (5) Business Days prior to any Company assuming or rejecting any lease or contract or making any motion to assume or reject any lease or contract, Companies shall notify Agent in writing setting forth in detail such Company's reason why such assumption or rejection (A) will be in the best interest of such Company and (B) could not reasonably be expected to have a material adverse effect; (g) on or before 6:00 p.m. on Tuesday of each week, an updated Budget in form and substance satisfactory to Agent, including a comparison of actual cash funds and revenues received by Companies and cash disbursements and expenses made by Companies for the prior week and the Cumulative Period to the Budget previously delivered to Agent, and (h) from time to time, such further information regarding the business affairs and financial condition of the Companies and/or any subsidiaries thereof as the Agent or any Lender may reasonably request, including, without limitation (i) the accountant's management practice letter, if any, and (ii) annual cash flow projections in form satisfactory to the Agent. Each financial statement which the Companies are required to submit hereunder must be accompanied by a manager's or an officer's certificate, signed by the Manager, Chairman, Chief Executive Officer, Chief Financial Officer, President, Vice President, Controller, or Treasurer, pursuant to which any one such manager or officer must certify on behalf of the Companies that: (x) the financial statement(s) fairly and accurately represent(s) each of the Companies' financial condition at the end of the particular accounting period, as well as the Companies' operating results during such accounting period, subject to year-end audit adjustments; and (y) during the particular accounting period: (A) there has been no Default or Event of Default under this Agreement, provided, however, that if any such manager or officer has knowledge that any such Default or Event of Default, has occurred during such period, the existence of and a detailed description of same shall be set forth in such officer's certificate; (B) the Companies have not received any notice of cancellation with respect to property insurance policies which have not been replaced by policies which comply with the requirements of this Agreement; (C) the Companies have not received any notice that would reasonably be expected to result in a material adverse effect on the value of the Collateral taken as a whole; and (D) the exhibits attached to such financial statement(s) constitute detailed calculations showing compliance with all financial covenants contained in this Agreement.

**8.9**    Until termination of the Agreement and payment and satisfaction of all Obligations hereunder, each of the Companies agrees that, without the prior written consent of the Agent, except as otherwise herein provided, the Companies or any one of them will not:

(a)    Mortgage, assign, pledge, or otherwise permit any lien, charge, security interest, encumbrance or judgment (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise), to exist on any of the Companies' Collateral or any other assets, whether now owned or hereafter acquired, except for the Permitted Encumbrances;

(b)    Incur, create or suffer to exist any Indebtedness, off balance sheet liabilities, rate management obligations, or sale leasebacks, other than the Permitted Indebtedness;

34

(c)    Sell, lease, assign, transfer or otherwise dispose of (i) Collateral, except Inventory in the ordinary course of business and as otherwise specifically permitted by this Agreement, or (ii) either all or substantially all of any of the Companies' assets which do not constitute Collateral; provided however, if the Companies desire to sell a business or line of business or Shapes/Arch desires to sell all or a controlling portion of the membership interests in one or more of the Companies, then such sale may be consummated only upon: (u) approval of the Bankruptcy Court, (v) such sale's being an arm's length transaction for fair market value, (w) not less than thirty (30) days' prior written notice to Agent, which notice shall include copies of all then current drafts of the relevant documents and instruments evidencing the terms of such transaction, (x) Agent's determination, in its sole discretion, that the terms and conditions of such transaction and such documents and instruments are acceptable as to form and substance, (y) Agent's giving its prior written consent, and (z) subject to the Intercreditor Agreement, Agent's receipt of the proceeds of such sale for application to the Obligations in such order as Agent shall elect.

(d)    Merge, consolidate or otherwise alter or modify their respective registered names, principal places of business, formation as limited liability companies, or existence, re-incorporate or re-organize, or enter into or engage in any operation or activity materially different from that presently being conducted by the Companies or any one of them, except that any of the Companies may change its registered name or its address; provided that: (i) such Company shall give the Agent thirty (30) days prior written notice thereof and (ii) such Company shall execute and deliver, prior to or simultaneously with any such action, any and all documents and agreements requested by the Agent to confirm the continuation and preservation of all security interests and liens granted to the Agent hereunder;

(e)    Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(f)    Declare or pay any dividend or distributions of any kind on, or purchase, acquire, redeem or retire, any of the capital stock or equity interest, of any class whatsoever, whether now or hereafter outstanding; provided however, the Companies may make distributions to Versa or Parent in an aggregate amount equal to the actual federal, state and local income tax liability of Versa or Parent attributable to the Companies' income resulting from operations for each taxable year;

(g)    Directly or indirectly, amend, modify, alter, increase or change any of the terms or conditions of the Revolver Agreement or any of the "Loan Documents" (as defined therein), except as permitted under the Intercreditor Agreement;

(h)    Make any advance or loan to, or any investment in, any Person, or purchase or acquire all or substantially all of the stock or assets of any Person, except that the Companies may: (i) make Permitted Investments; (ii) incur Inter-Company Debt; and (iii) make advances to employees in the ordinary course of business for travel and related expenses; or

(i)    Pay any management, consulting or other similar fees to any Person, except (i) payments among the Companies, (ii) payments to independent third parties retained in the

35

ordinary course of business pursuant to approval of the Bankruptcy Court (subject to Agent's right to object thereto) and (iii) payments to Versa.

8.10    Until termination of Agreement and payment and satisfaction in full of all Obligations hereunder, the Companies shall:

(a)    achieve EBITDA, measured on a monthly and period-to-date basis, of at least the required amount set forth below for the applicable month or period-to-date set forth opposite such amount:

| Fiscal Period | EBITDA |
|---|---|
| (i)      For the month ending April 30, 2008 | $700,000 |
| (ii)     For the month ending May 31, 2008 | $1,500,000 |
| (iii)    For the two month period ending May 31, 2008 | $2,200,000 |
| (iv)     For the month ending June 30, 2008 | $1,200,000 |
| (v)      For the three month period ending June 30, 2008 | $3,400,000 |
| (vi)     For the month ending July 31, 2008 | $1,200,000 |
| (vii)    For the four month period ending July 31, 2008 | $4,600,000 |

(b)    Intentionally Omitted.

(c)    without the prior written consent of the Agent, no Company will contract for, purchase, make expenditures for, lease pursuant to a Capital Lease or otherwise incur obligations with respect to Capital Expenditures (whether subject to a security interest or otherwise) which would cause the aggregate amount expended by all Companies for Capital Expenditures to exceed (i) $2,000,000 from the Closing date through June 15, 2008 and (ii) an amount (for the applicable period of time satisfactory to Agent) to be mutually agreed upon between Companies and Agent on or before June 1, 2008; provided, however, that the failure of the parties to reach agreement on the foregoing by such date will be an Event of Default hereunder.

8.11    The Companies agree to advise the Agent in writing of: (a) all expenditures (actual or anticipated) in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate from the budgeted amount therefor in any Fiscal Year for (i) environmental clean-up,

(ii) environmental compliance or (iii) environmental testing and the impact of said expenses on the Companies' working capital; and (b) any notices the Companies receives from any local, state or federal authority advising the Companies of any environmental liability (real or potential) stemming from the Companies' operations, their premises, their waste disposal. practices, or waste disposal sites used by the Companies and to provide the Agent with copies of all such notices if so required.

8.12    Each of the Companies hereby agrees to indemnify and hold harmless the Agent and Lenders and their respective officers, directors, employees, attorneys and agents (each an "Indemnified Party") from, and holds each of them harmless against, any and all losses, liabilities, obligations, claims, actions, damages, costs and expenses (including attorney's fees) and any payments made by the Agent pursuant to any indemnity provided by the Agent with respect to or to which any Indemnified Party could be subject insofar as such losses, liabilities, obligations, claims, actions, damages, costs, fees or expenses with respect to the Loan Documents, including without limitation those which may arise from or relate to: (a) the Depository Account, the Blocked Accounts, the lockbox and/or any other depository account and/or the agreements executed in connection therewith; and (b) any and all claims or expenses asserted against the Agent as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate; or any asserted claim or expense which results from the any of the Companies' operations (including, but not limited to, any of the Companies' off-site disposal practices) and use of the Real Estate, which the Agent may sustain or incur (other than solely as a result of the physical actions of the Agent on the Companies' premises which are determined to constitute gross negligence or willful misconduct by a court of competent jurisdiction), all whether through the alleged or actual negligence of such person or otherwise, except and to the extent that the same results solely and directly from the gross negligence or willful misconduct of such Indemnified Party as finally determined by a court of competent jurisdiction. The Companies hereby agree that this indemnity shall survive termination of this Agreement, as well as payments of Obligations which may be due hereunder.

8.13    Without the prior written consent of the Agent, the Companies agree that they will not enter into any transaction (except transactions among the Companies), including, without limitation, any purchase, sale, lease, loan or exchange of property, with any subsidiary or affiliate of any of the Companies, provided that, except as otherwise set forth in this Agreement, the Companies, or any one of them, may enter into sale and service transactions among the Companies or with any subsidiary or affiliate of any of the Companies in the ordinary course of their business and pursuant to the reasonable requirements of the Companies, and upon standard terms and conditions and fair and reasonable terms, no less favorable to the Companies than the Companies could obtain in a comparable arms-length transaction with an unrelated third party, provided further that no Default or Event of Default exists or will occur hereunder prior to and after giving effect to any such transaction.

8.14    Intentionally Omitted.

8.15    Intentionally Omitted.

**8.16**    The Companies covenant and agree to provide the Agent, promptly upon Agent's demand, a statement, in writing, of the then current status of the Companies' union negotiations or union contracts in such form and in such detail as the Agent shall require.

**8.17**    The Companies represent, warrant and covenant, that:

(a)    Subject to the entry by the Bankruptcy Court of the Interim Financing Order or Final Order, as applicable, and subject to the Intercreditor Agreement, (i) the Obligations will constitute a Superpriority Claim, subject, as to priority, only to the Carve-Out, the claims of Revolver Agent (which shall be parri passu) and Permitted Encumbrances securing Senior Claims, and (ii) the liens of Agent, for the benefit of Agent and Lenders, securing the Obligations are valid and perfected first priority liens subject, as to priority only, to the Carve-Out and Permitted Encumbrances securing Senior Claims;

(b)    The Companies are not transferring the Collateral nor incurring any obligation with any intent to hinder, delay or defraud any of its respective present or future creditors;

(c)    The Interim Financing Order (with respect to the period prior to entry of the Final Order) or Final Order (with respect to the period on and after entry of the Final Order), as the case may be, has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended, modified or stayed, or reversed; and

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

**8.18**    (a) Companies will not, directly or indirectly, seek, consent to, suffer to exist or permit (i) any modification, stay, vacation or amendment to either Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Agent and the Lenders in respect to the Obligations, except for the Carve-Out and the claims of Revolver Agent (which shall be parri passu); or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of the Agent in respect of the Obligations, except for the Carve-Out and Permitted Encumbrances securing Senior Claims.

(b)    Prior to the date on which the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated, Companies shall not pay any administrative expense claims except (i) the Carve-Out, (ii) any Obligations due and payable hereunder or under the Revolver Agreement, and (iii) subject to compliance with the Budget, other administrative expense claims incurred in the ordinary course of business of Companies and not prohibited by the terms of this Agreement.

123285.01601/11752902v.12

**8.19**    The Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Order, (b) the hearing for the approval of the Interim Financing Order and (c) the hearing for the approval of the Final Order, has been or will be given.  The Companies shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in such Order.

**8.20**    (a) As of each week, for such week and the Cumulative Period, the actual cash receipts received by Companies shall not be less than 95% of the cash receipts for the corresponding period in the Budget.

(b)    As of each week, for such week and the Cumulative Period, the actual cash disbursements of the Companies shall be no more than 5% more than the cash disbursements for the corresponding period as set forth in the Budget.

(c)    As of each week, for such week and the Cumulative Period, the actual Cumulative Cash Change (as defined in the Budget) of the Companies, shall not represent a consumption of cash greater than 105% of the Cumulative Cash Change for the corresponding period as set forth in the Budget.

(d)    As of each week, the actual Borrowing Base shall not be less than the Borrowing Base set forth in the Budget for such week as indicated in the Budget line item marked "Revolver DIP Borrowing Base Availability."

**8.21**    Companies shall not request any extension of the period of time within which the Companies have exclusive rights to file a plan under Section 1121 of the Bankruptcy Code.

**8.22**    Companies shall not assume or reject any lease or contract without the prior written consent of Agent.

**8.23**    Companies hereby agree that if at any time any Company receives from a third party a bona fide offer, term sheet or commitment, or any Company makes a bona fide proposal substantially acceptable to or accepted by any person or entity (all of the foregoing being referred to as an "Offer"), which Offer is from a reputable financial institution or such other lender with sufficient net worth to consummate a closing and provide the terms set forth therein and provides for replacement debtor-in-possession financing or exit financing of any kind or nature, the applicable Company shall first forward the Offer to the Agent which will have fifteen (15) days after receipt thereof (the "Option Period") to agree to provide similar financing in the place of such person or entity upon the terms and conditions set forth in the Offer and to notify the applicable Company in writing of the Agent's, for and on behalf of the Lenders, acceptance of the Offer (the "Acceptance Notice").  If the Company has not received an Acceptance Notice within the Option Period, the Company shall be free to consummate the transaction described in the Offer with the third party providing the Offer (the "Transaction"); provided, however, that the foregoing, and Agent's failure to respond to issue an Acceptance Notice, shall not be construed as a waiver of any of the terms, covenants or conditions of the Loan Documents.  In the event that the Transaction is not consummated under similar terms with such person or entity

during the ninety (90) day period following the expiration of the Option Period, or any material term is changed, the applicable Company shall not be permitted to consummate the Transaction without again complying this Section. The right of first refusal granted to the Agent, for itself on behalf of the Lenders, hereunder shall survive payment in full of all of this Agreement and the other Loan Documents for a period of six (6) months following such payment. For purposes of this Section, "Lender" shall mean and include either of Lender or any other parent company, subsidiary or affiliate of Lender. Nothing in this section is intended, or shall be construed, to constitute the Agent's or the Lenders' consent to the consummation of any transaction described in any Offer.

**8.24**    The Companies covenant and agree, in each case, unless extended by Agent in sole and absolute discretion, (a) the Interim Financing Order shall be entered no later than March 18, 2008; (b) the Final Order shall be entered no later than April 4, 2008; (c) schedules and statements of financial affairs shall be filed in the case for all Companies no later than the Closing Date; (d) a Reorganization Plan satisfactory in form and substance to Agent and a disclosure statement satisfactory in form and substance to Agent shall be filed no later than Filing Date; (e) a written disclosure statement satisfactory in form and substance to Agent shall be approved, after notice and a hearing, by the Bankruptcy Court no later than April 17, 2008; (f) solicitation of acceptance of a Reorganization Plan in form and substance satisfactory to Agent shall have commenced no later than April 20, 2008; (g) solicitation of acceptance of a Reorganization Plan satisfactory as to form and substance to Agent shall have concluded no later than May 19, 2008; (h) a Reorganization Plan that satisfies the requirements set forth in Paragraph 7.4 of the Section 7 hereof and in form and substance satisfactory to Agent shall be confirmed no later than May 30, 2008; (i) the effective date of such Reorganization Plan set forth in clause (h) above shall be no later than June 10, 2008; (j) all collective bargaining agreements and other labor or union contracts shall be modified in form and substance acceptable to Agent (including modifications which may give rise to withdrawal liability under Section 4202 of ERISA or otherwise under MEPPA) or such agreements or contracts shall be rejected by Companies in the Case no later than the day prior to any confirmation hearing related to a Reorganization Plan; and (k) Companies shall remedy and take all other actions necessary related to all environmental matters satisfactory to Agent no later than the day prior to any confirmation hearing related to a Reorganization Plan.

**8.25**    Companies shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Sect 1930 (a)(6).

**8.26**    Companies shall, in writing, promptly after becoming aware thereof, notify Agent of any application or motion of any Person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application motion or pleading filed in the Case that, either immediately or with the passage of time, might result in an Event of Default hereunder

## SECTION 9.  Interest, Fees and Expenses

**9.1**    (a) Interest on the Term Loan Advances shall be payable monthly in arrears as of the end of each month. Term Loans shall accrue interest at a rate equal to the Base Rate plus the Applicable Margin per annum on the aggregate net balances owing by the Companies to the Agent in the Loan Account at the close of each day during such month. In the event of any

change in said Base Rate, the rate hereunder for Term Loan Advances shall change, as of the date of such change, so as to remain equal to the new Base Rate plus the Applicable Margin. The rate hereunder for Term Loan Advances shall be calculated on the basis of a 360-day year and based on the actual number of days elapsed.

(b)      Upon and after the occurrence and during the continuance of an Event of Default and in accordance with the provisions of Section 11, Paragraph 11.2 hereof, all Obligations shall bear interest at the Default Rate of Interest.

**9.2**      Intentionally Omitted.

**9.3**      Intentionally Omitted.

**9.4**      The Companies shall pay to Lead Arranger a nonrefundable arrangement fee equal to 1.5% of the Commitment and Revolver Commitment, which fee shall be fully earned and payable as of the date hereof.

**9.5**      The Companies, jointly and severally, shall reimburse or pay (a) the Agent for: (i) all Out-of-Pocket Expenses and (ii) any applicable Documentation Fee and (b) the Lenders for all Out-of Pocket Expenses incurred after the occurrence of an Event of Default which is not Waived In Writing By Agent.

**9.6**      Upon the last Business Day of each month, commencing on March 31, 2008, the Companies shall pay to the Agent for the benefit of the Agent and the other Lenders the Commitment Fee; such Commitment Fee to be nonrefundable and payable in arrears on the basis of a 360 day year and based on the actual number of days elapsed on the last Business Day of each month and the Termination Date.

**9.7**      Upon a Termination Event, the Companies shall pay to Agent the Termination Fee.

**9.8**      The Companies shall pay Agent (i) a nonrefundable agent/facility fee equal to $40,000 per month on the Closing Date and on the first Business Day of each month thereafter until indefeasible payment in full of all Obligations and termination of this Agreement and (ii) a nonrefundable collateral monitoring and servicing fee equal to $40,000 per month on the Closing Date and on the first Business Day of each month thereafter until indefeasible payment in full of all Obligations and termination of this Agreement. Each such fee shall be deemed earned in full on the date when such fee is due and payable hereunder and shall not be subject to rebate or proration upon termination of this Agreement for any reason.

**9.9**      The Companies shall pay the Agent's standard charges and fees for the Agent's personnel used by the Agent for reviewing the books and records of the Companies and for verifying, testing, protecting, safeguarding, preserving or disposing of all or any part of the Collateral (which fees shall be in addition to any other fees described herein and any Out-of-Pocket Expenses). As of the Closing Date, the standard rate charged for such personnel is One Thousand Dollars ($1,000.00) per person per day; however Agent in its discretion may change such standard rate periodically. During each 360-day period (with the initial 360-day period beginning on January 1, 2008), the Companies shall pay for not more than one (1) field

41

examination conducted at a time when no Event of Default exists, provided, however, the Companies shall pay for each field examination performed when an Event of Default has occurred which has not been waived in writing by Agent.

**9.10**    Each of the Companies hereby authorizes Agent to charge their respective Loan Account(s) with the amount of all their Obligations due hereunder as such payments become due. The Companies hereby confirm and agree that they shall, jointly and severally, promptly pay any Obligations, including, without limitation, all of the fee obligations (including without limitation, those set forth in 9.5 through 9.9 above) and Out-of-Pocket Expenses) to Agent upon its request therefor.

**9.11**    In the event that the Agent or any Lender (or any financial institution which may from time to time become a Lender hereunder) shall have determined in the exercise of its reasonable business judgment that, subsequent to the Closing Date, any change in applicable law, rule, regulation or guideline regarding capital adequacy, or any change in the interpretation or administration thereof, or compliance by the Agent or Lender with any new request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent's or such Lender's capital as a consequence of its obligations hereunder to a level below that which the Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration the Agent or such Lender's policies with respect to capital adequacy) by an amount reasonably deemed by the Agent or such Lender to be material, then, from time to time, the Companies shall pay no later than five (5) days following demand to the Agent or such Lender such additional amount or amounts as will compensate the Agent's or such Lender's for such reduction. In determining such amount or amounts, the Agent or such Lender may use any reasonable averaging or attribution methods. The protection of this Paragraph 9.11 shall be available to the Agent or such Lender regardless of any possible contention of invalidity or inapplicability with respect to the applicable law, regulation or condition. A certificate of the Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate the Agent or such Lender with respect to this Section 9 and the calculation thereof when delivered to the Companies shall be conclusive on the Companies absent manifest error. Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determines that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required to be made whole, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

**9.12**    In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by the Agent or such Lender with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject the Agent or such Lender to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to the Agent or such Lender of principal, fees, interest or any other amount payable hereunder or under any other documents (except for changes in the rate of tax on the overall net income of the Agent or such Lender by the federal government or the jurisdiction in which it maintains its principal office);

42

(b)      impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by the Agent or such Lender by reason of or in respect to this Agreement and the Loan Documents, including (without limitation) pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)      impose on the Agent or such Lender any other condition with respect to this Agreement or any other document, and the result of any of the foregoing is to increase the cost to the Agent or such Lender of making, renewing or maintaining its loans hereunder by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the loans by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment, then, in any case the Companies shall pay the Agent or such Lender, within five (5) days following its demand, such additional cost or such reduction, as the case may be. The Agent or such Lender shall certify the amount of such additional cost or reduced amount to the Companies and the calculation thereof and such certification shall be conclusive upon the Companies absent manifest error. Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determine that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required pursuant hereto, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

**9.13**    Intentionally Omitted.

**9.14**    Intentionally Omitted.

**9.15**    Intentionally Omitted.

**9.16**    Intentionally Omitted.

**9.17**    Intentionally Omitted.

**9.18**    Intentionally Omitted.

**9.19**    Notwithstanding anything to the contrary contained herein, the Agent shall apply all proceeds of Collateral and all other amounts received by it from or on behalf of the Companies to the Obligations in such order as the Required Lenders shall reasonably elect; provided, however, upon the occurrence of an Event of Default which is not Waived in Writing By Agent, the Agent may apply all proceeds of Collateral first to the fees and expenses due to Agent, second to accrued interest with respect to the Obligations, third to the outstanding principal balance of the Obligations, in such order as the Required Lenders may elect, and fourth to any other Obligations in such order as the Required Lenders may elect.

**9.20**    Intentionally Omitted.

**9.21**    For purposes of each of the indemnity provisions contained in this Agreement, any reference to the Agent shall include all Lenders and any financial institution which may become a Lender subsequent to the Closing Date.

## SECTION 10.  Powers

Each of the Companies hereby constitutes the Agent, or any person or agent the Agent may designate, as its attorney-in-fact, at such Company's cost and expense, to exercise all of the following powers, which being coupled with an interest, shall be irrevocable until all Obligations to the Agent have been paid in full in cash:

(a)    To receive, take, endorse, sign, assign and deliver, all in the name of the Agent or the Companies or any one of them, any and all checks, notes, drafts, and other documents or instruments relating to the Collateral;

(b)    To receive, open and dispose of all mail addressed to the Companies or any one of them and to notify postal authorities to change the address for delivery thereof to such address as the Agent may designate;

(c)    To request from customers indebted on Accounts at any time, in the name of the Agent information concerning the amounts owing on the Accounts;

(d)    To request from customers indebted on Accounts at any time, in the name of the Companies or any one of them, in the name of certified public accountant designated by the Agent or in the name of the Agent's designee, information concerning the amounts owing on the Accounts;

(e)    To transmit to customers indebted on Accounts notice of the Agent's interest therein and to notify customers indebted on Accounts to make payment directly to the Agent for the Companies' account; and

(f)    To take or bring, in the name of the Agent or the Companies or any one of them, all steps, actions, suits or proceedings deemed by the Agent necessary or desirable to enforce or effect collection of the Accounts.

Notwithstanding anything hereinabove contained to the contrary, the powers set forth in (b), (c), (e) and (f) above may only be exercised subject to the Intercreditor Agreement and after the occurrence of an Event of Default and until such time as such Event of Default is Waived In Writing By Agent.

## SECTION 11.  Events of Default and Remedies

**11.1**    Notwithstanding anything hereinabove to the contrary, the Agent may, and at the direction of the Required Lenders shall terminate, this Agreement immediately upon the occurrence of any of the following Events of Default:

(a)    cessation of the business of any Company (except as the result of (i) the sale of substantially all of the assets of such Company and the application of the proceeds of such sale to

44

the Obligations, all in accordance with the terms and conditions of this Agreement and the Intercreditor Agreement or (ii) the contribution of substantially all of the assets of such Company to another Company);

(b)    Intentionally Omitted;

(c)    Intentionally Omitted;

(d)    breach by any Company of any warranty, representation or covenant contained herein (other than those referred to in sub-paragraph (e) below) or in any other written agreement between any Company or the Agent, provided that such Default of any of the warranties, representations or covenants referred in this clause (d) shall not be deemed to be an Event of Default unless and until such Default shall remain unremedied to the Agent's satisfaction for a period of ten (10) days from the date of such breach;

(e)    breach by any Company of any warranty, representation or covenant of; Paragraphs 6.3, 6.4 (other than the first sentence of Paragraph 6.4) and 6.14 of Section 6 hereof; Section 7 hereof; or Paragraphs 8.1, 8.5, 8.6, and 8.8 through 8.26 hereof;

(f)    failure of the Companies or any one of them to pay any of the Obligations within five (5) Business Days of the due date thereof provided that nothing contained herein shall prohibit the Agent from charging such amounts to the Loan Accounts on the due date thereof;

(g)    with respect to any Plan other than a "multiemployer plan," as defined in Section 3(37) of ERISA, and other than a defined contribution plan (solely for the purposes of clauses (ii), (iii), (iv) and (v)), any Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) have any "accumulated funding deficiency" as defined in ERISA, (iii) have any "reportable event" as defined in ERISA, for which the requirement to provide notice has not, within the regulations issued under ERISA, been waived, (iv) terminate any Plan, or (v) be engaged in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of such Plan, and with respect to this sub-paragraph (g) such event or condition (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in the reasonable opinion of the Agent, subject such Company to any tax, penalty or other liability material to the business, operations or financial condition of such Company;

(h)    Intentionally Omitted;

(i)    Intentionally Omitted;

(j)    the occurrence of any default or event of default (after giving effect to any applicable grace or cure periods) under any instrument or agreement evidencing any pre-petition Indebtedness (which is affirmed after the Filing Date) (except for defaults occasioned by the filing of the Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits Companies from complying or permits Companies not to comply) and any post-petition Indebtedness of the Companies or any one of them;

(k)      Steven S. Grabell, as Chief Executive Officer, ceases for any reason whatsoever to be Chief Executive Officer and actively engaged in the management of the Companies unless a successor acceptable to Agent is appointed within ten (10) days;

(l)      if any of the Loan Documents shall be cancelled, terminated, revoked or rescinded; or any action at law, suit or in equity or other legal proceeding to cancel, revoke, rescind or otherwise challenge any of the Loan Documents or the liens securing the Obligations shall be commenced by any Person; or any court or any other governmental or regulatory authority or agency of competent jurisdiction shall make a determination that, or issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof;

(m)      the Bankruptcy Court shall enter any order (i) revoking, reversing, staying, vacating, rescinding, modifying, superseding, supplementing or amending either Order, this Agreement or any other Loan Document (except as otherwise approved by Agent in writing) or the Revolver Agreement or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Company equal or superior to the priority of Agent or the Lenders in respect of the Obligations, or there shall arise any such Superpriority Claim, except for the Carve-Out or the Obligations (as defined in the Revolver Agreement) or (iii) to grant or permit the grant of a lien on the Collateral other than Permitted Encumbrances;

(n)      the Bankruptcy Court shall enter any order (i) appointing an interim or permanent Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision making or other management authority over some or all of any Companies senior management, (iv) substantively consolidating the estate of Companies with the estate of any other Person, (v) dismissing the Case or (vi) converting the Case to a Chapter 7 case;

(o)      the Bankruptcy Court shall enter any order granting relief for the automatic stay to any creditor holding or asserting a lien or reclamation claim;

(p)      any application for any of the orders described in clauses (m), (n) or (o) above shall be made and, if made by a Person other than a Company, such application is not being diligently contested by Companies in good faith;

(q)      except as permitted by the Orders or the "first day orders" or as otherwise agreed to by Agent, Companies shall make any Pre-Petition Payment following the Closing Date other than Pre-Petition Payments authorized by the Bankruptcy Court in connection with the assumption of executory contracts and unexpired leases;

(r)      Companies shall be unable to pay their postpetition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make such payments, as and when such payments become due;

46

(s)    Companies or any other Person shall file a motion in the Case, execute a written agreement or file any plan of reorganization or disclosure statement attendant thereto (i) to use cash collateral under Section 363(c) of the Bankruptcy Code without Agent's prior written consent, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (iii) to grant any lien other than Permitted Encumbrances upon or affecting the Collateral, (iv) to sell all or substantially all of the assets of Company, or the sale of any business unit of a Company without Agent's prior written consent, (v) to recover from any portions of the Collateral any cost or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (vi) to take any other action or actions adverse to Agent or Lenders or their rights and remedies hereunder or under any of the other Loan Documents or Agent's or Lenders' interest in any of the Collateral;

(t)    (i) Companies shall file a Reorganization Plan in the Case which does not contain provisions for the termination of this Agreement and indefeasible payment in full of cash of all Obligations and the release of Agent and Lenders in full from all claims of the Companies and their estates, in each case, on or before, and the continuation of the liens and security interests granted to Agent until, the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for the termination of this Agreement and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of the Companies and their estates on or before, and the continuation of the liens and security interests granted to Agent until, the effective date of such Reorganization Plan upon entry thereof;

(u)    the commencement of a suit or action against the Agent or any Lender and, as to any suit or action brought by any Person other than a Company or a subsidiary, officer or employee of a Company, the continuation thereof without dismissal for thirty (30) days after service thereof on Agent or such Lender, that asserts or seeks by or on behalf of any Company, the Environmental Protection Agency, any state environmental protection or health and safety agency, and official committee in the Case or any other party in interest in the Case, a claim or any legal or equitable remedy that would (i) have the effect of subordinating any or all of the Obligations or liens of Agent or any Lender under the Loan Documents to any other claim, or (ii) have a material adverse effect on the rights and remedies of Agent or any Lender under any Loan Document or the collectability or all or any portion of the Obligations;

(v)    the entry of an order in the Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents;

(w)    (i) the failure of a Reorganization Plan that satisfied the requirements set forth in clause (t) above to be confirmed by May 30, 2008 or (ii) the failure to substantially consummate such Reorganization Plan by June 10, 2008;

(x)    the appointment of more than one official unsecured creditors' committee in the Case;

47

(y)    the existing or former shareholders or members of any Company or of Parent shall initiate or threaten against the Companies or any of them or any of their assets any litigation, investigation or proceeding (judicial or administrative) or take any other action which, in the opinion of Agent, if adversely determined, could reasonably be expected to have a material adverse effect on the business, operation, assets, financial condition or Collateral of the Companies or any of them or otherwise be materially adverse to Agent or Lenders;

(z)    the failure of any Revolver Lender to fund a Revolving Loan under the terms of the Revolver Agreement;

(aa)    any lien or security interest created by this Agreement or the Order shall, for any reason, cease to be valid;

(bb)    any action is commenced which contests any provision of any Order or the validity, perfection, priority or enforceability of any of the liens and security interest of Agent;

(cc)    the Final Order is not entered immediately following the expiration of the Interim Financing Order and, in any case, not later than April 4, 2008; or

(dd)    a default or event of default occurs under either Order or under the Revolver Agreement.

**11.2**    Upon the occurrence of an Event of Default, unless such Event of Default has been Waived In Writing By Agent, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, the Agent in its sole discretion may, or upon the written direction of the Required Lenders the Agent shall, declare that, all loans, advances and extensions of credit provided for in Section 4 of this Agreement shall be thereafter in the Agent's or the Required Lenders' sole discretion, and the obligation of the Agent and/or the Lenders to make Term Loans, shall cease unless such Event of Default is Waived In Writing By Agent. Upon the occurrence of any Event of Default not Waived In Writing By Agent, the rate of interest applicable to the Term Loans and the other Obligations may, in Agent's discretion, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, be increased as of the date of such Event of Default or notice, as applicable, as provided in Paragraph 9.1(b) of Section 9 hereof. Upon the occurrence of any Event of Default not Waived In Writing By Agent, the Agent in its sole and absolute discretion may, or upon the written direction of the Required Lenders the Agent shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, without prior notice, take any one or more of the following actions:  (a) terminate the Commitment whereupon Agent's and Lenders' obligation to make further Term Loans shall terminate; (b) declare that all Obligations shall become immediately due and payable; (c) Agent may immediately terminate this Agreement upon notice to the Companies; and/or (d) Agent may exercise any rights and remedies provided to Agent or Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC; and, pursuant to the Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated (at Agent's election) to permit Agent to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the

48

Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise any remedy in a nature of a liquidation of, or foreclosure on, any interest of Companies in the Collateral only upon three (3) Business Days prior written notice to Borrowers, the United States Trustee for the District of New Jersey, and any counsel approved by the Bankruptcy Court for the Creditors' Committee (the "Remedies Notice Period"); provided, however, that during such Remedies Notice Period, (i) the Borrowers may not challenge or object to or file any motions attempting to limit the remedies of Agent and Lenders hereunder, and (ii) Borrowers shall have no right to use or seek to use the Collateral; provided further if the Bankruptcy Court does not determine that an Event of Default has not occurred, and the Event of Default has not been Waived In Writing By Agent, upon the expiration of such Remedies Notice Period, Agent shall have relief from the automatic stay without further notice or order as set forth herein.  Upon the occurrence of an Event of Default and the exercise by Agent of its rights and remedies under this Agreement and the other Loan Documents, Borrowers shall assist Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition; such assistance shall include, without limitation (if so requested), notwithstanding any relief from the automatic stay under Section 362 of the Bankruptcy Code, filing any motions under Sections 363 or 365 or any other applicable provisions of the Bankruptcy Code to authorize the transfer of all or any portion of the Collateral or otherwise assume and assign any lease or executory contract included therein.  The exercise of any option is not exclusive of any other option, which may be exercised at any time by the Agent.

11.3    Immediately upon the occurrence of any Event of Default, unless such Event of Default has been Waived In Writing By Agent, Agent may, to the extent permitted by law and subject to the Intercreditor Agreement:  (a) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including any electronic records, contracts and signatures pertaining thereto), documents, instruments, files and records, and any receptacles or cabinets containing same, relating to the Accounts, or the Agent may use, at the Companies' expense, such of the Companies' personnel, supplies or space at the Companies' places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) bring suit, in the name of the Companies or the Agent, and generally shall have all other rights respecting said Accounts, including without limitation the right to:  accelerate or extend the time of payment, settle, compromise, release in whole or in part any amounts owing on any Accounts and issue credits in the name of the Companies or the Agent; (c) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed Inventory, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at Agent's sole option and discretion, and Agent may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Companies and, in furtherance of the foregoing, the Companies shall seek authorization from the Bankruptcy Court to conduct, on any of the Companies' owned or leased premises, one or more sales of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code; (d) foreclose the security interests in the Collateral created herein or by the Loan Documents by any available judicial procedure, or to take possession of any or all of the Collateral, including any Inventory, Equipment and/or Other Collateral without judicial process, and to enter any premises where any Inventory and Equipment and/or Other Collateral may be located for the purpose of taking possession of or removing the same; and (e) exercise any other rights and remedies

49

provided in law, in equity, by contract or otherwise. Agent shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, in the name of Companies or Agent, or in the name of such other party as Agent may designate, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including but not limited to warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as Agent in its sole discretion may deem advisable, and Agent shall have the right to purchase at any such sale. Subject to the Intercreditor Agreement, if any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, Agent shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as Agent shall deem appropriate and any such costs shall be deemed an Obligation hereunder. Any action taken by Agent pursuant to this paragraph shall not affect commercial reasonableness of the sale. Companies agree, at the request of Agent, to assemble the Inventory and Equipment and, subject to the Intercreditor Agreement, to make it available to Agent at premises of Companies or elsewhere and to make available to Agent the premises and facilities of Companies for the purpose of Agent's taking possession of removing or putting the Inventory and Equipment in saleable form. If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law. The net cash proceeds resulting from Agent's exercise of any of the foregoing rights, (after deducting all charges, costs and expenses, including reasonable attorneys' fees) shall be applied by Agent to the payment of the Obligations, whether due or to become due, in such order as Agent may elect, and Companies shall remain liable to Agent for any deficiencies, and Agent in turn agrees to remit to Companies or its successors or assigns, any surplus resulting therefrom. The enumeration of the rights set forth in Paragraph 11.2 above or in this Paragraph 11.3 is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative. Companies hereby indemnify Agent and hold Agent harmless from any and all costs, expenses, claims, liabilities, Out-of-Pocket Expenses or otherwise, incurred or imposed on Agent by reason of the exercise of any of its rights, remedies and interests hereunder, including, without limitation, from any sale or transfer of Collateral, preserving, maintaining or securing the Collateral, defending its interests in Collateral (including pursuant to any claims brought by Companies, Companies as debtors-in-possession, any secured or unsecured creditors of Companies, any trustee or receiver in bankruptcy, or otherwise), and Companies hereby agree to so indemnify and hold Agent harmless, absent Agent's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The foregoing indemnification shall survive termination of this Agreement until such time as all Obligations (including the foregoing) have been finally and indefeasibly paid in full in cash. In furtherance thereof Agent, may establish such reserves for Obligations hereunder (including any contingent Obligations) as it may deem advisable in its reasonable business judgment. Any applicable mortgage(s), deed(s) of trust or assignment(s) issued to Agent on the Real Estate shall govern the rights and remedies of Agent thereto.

**11.4** Companies hereby acknowledge and agree that Agent shall have no duty to marshal the Collateral and that Agent make take and dispose of any or all of the Collateral in such order and at such time or times as Agent, acting in its discretion, may elect.

**SECTION 12. <u>Termination</u>**

This Agreement shall terminate on the Termination Date. The Companies may terminate this Agreement at any time upon not less than twenty (20) days' prior written notice of the date of termination (the "<u>Noticed Termination Date</u>") given to the Agent by a Manager or an officer of Shapes/Arch, provided that the Companies shall have up to ten (10) additional days after the Noticed Termination Date in which to repay the Obligations in full in cash together with the Termination Fee. Notice of termination as aforesaid by any one Company shall be deemed to be a notice by all of the Companies for purposes hereof. All Obligations shall become due and payable as of any termination hereunder or under Section 11 hereof and, pending a final accounting, the Agent may withhold any balances in the Companies' accounts (unless supplied with an indemnity satisfactory to the Agent) to cover all of the Obligations, whether absolute or contingent, including, but not limited to, cash reserves for any contingent Obligations, provided however, as to reserves for environmental claims, the amount to be held shall be limited to an amount for which a claim has been asserted against Agent or any Lender. All of the Agent's rights, liens and security interests shall continue after any termination until all Obligations have been paid and satisfied in full.

**SECTION 13. <u>Miscellaneous</u>**

**13.1** Each of the Companies hereby waives diligence, notice of intent to accelerate, notice of acceleration, demand, presentment and protest and any notices (other than those specifically provided for herein) hereof as well as notice of nonpayment. No delay or omission of the Agent, the Lenders or the Companies to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or shall operate as a waiver thereof or as a waiver of any such Event of Default. No single or partial exercise by the Agent of any right or remedy precludes any other or further exercise thereof or precludes any other right or remedy.

**13.2** This Agreement and the other Loan Documents executed and delivered in connection therewith constitute the entire agreement among the Companies and the Agent and Lender; supersede any prior agreements; can be changed only by a writing signed by the Companies, the Agent and the Required Lenders (or by the Agent at the written request of the Required Lenders), unless the consent of all Lenders is required pursuant to Paragraph 15.10 herein below, and shall bind and benefit the Companies, the Lenders and the Agent and their respective successors and assigns, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. This Agreement shall be binding upon and inure to the benefit of Companies and Agent and each Lender and their respective successors and permitted assigns (including, in the case of Companies, except for the right to request Term Loan Advances, any trustee or similar responsible Person succeeding to the rights of the Companies pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code).

**13.3** In no event shall the Companies, upon demand by the Agent for payment of any Indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, the Agent and Lenders shall never be

entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law. If the Agent ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such; and if principal is paid in full in cash, any remaining excess shall be refunded to the Companies. This paragraph shall control every other provision hereof, the Loan Documents and of any other agreement made in connection herewith.

**13.4**    If any provision hereof or of any other agreement made in connection herewith is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

**13.5    EACH OF THE COMPANIES, THE LENDERS AND THE AGENT HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER. EACH OF THE COMPANIES HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL THE AGENT BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.**

**IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK. EACH OF THE COMPANIES HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE COMPANIES HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY COMPANY BY THE LENDERS IN ACCORDANCE WITH THIS SECTION.**

123285.01601/11752902v.12

**13.6**    Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (provided that, any electronic communications from the Companies with respect to any request, transmission, document, electronic signature, electronic mail or facsimile transmission shall be deemed binding on the Companies for purposes of this Agreement, provided further that any such transmission shall not relieve the Companies from any other obligation hereunder to communicate further in writing), and shall be deemed to have been validly served, given or delivered when hand delivered or sent by facsimile, or three (3) days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified or to such other address as any party hereto may designate for itself by like notice, as follows:

(A)    if to Arcus, at:

>  Arcus ASI Funding, LLC
>  2929 Arch Street
>  Philadelphia, PA  19104
>  Attn:   Paul Halpern, General Counsel
>  Fax No.:  (215) 609-3433
>
>  With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to Agent's counsel at:
>
>  Blank Rome LLP
>  One Logan Square
>  Philadelphia, PA  19103
>  Attn:   Lawrence F. Flick, II
>  Fax No.:  (215) 832-5556

(B)    if to the Companies at:

>  c/o Shapes L.L.C.
>  9000 River Road
>  Delair, New Jersey 08110
>  Attn:   Chief Executive Officer
>  Fax No.: (856) 662-6069

With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to the Companies' counsel at:

>  Cozen O'Connor
>  1900 Market Street
>  Philadelphia, Pennsylvania 19103-3508
>  Attn:   Sandra A. Bloch, Esq.
>  Fax No.:  (215) 665-2013

provided, however, that the failure of any Person to provide another Person's counsel with a copy of such notice shall not invalidate such notice and shall not give such Person any rights, claims or defenses due to the failure to provide such additional notice.

123285.01601/11752902v.12

**13.7** THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION AND EXCEPT TO THE EXTENT THAT THE APPLICATION OF THE BANKRUPTCY CODE IS MANDATORY.

**13.8** Unless the Order specifically provides otherwise, in the event of a conflict between the terms and provisions of this Agreement or any of the Loan Documents and the Order, the terms and provisions of the Order shall govern and control, interpreted as most consistent with the terms and provisions of this Agreement and the other Loan Documents. Nothing set forth in this Agreement shall require the Companies to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to the Agent's ability to declare the occurrence of an Event of Default based upon such action or failure to act. In the event of any inconsistency between this Agreement and any of the Loan Documents, this Agreement shall control.

**SECTION 14. Agreement between the Lenders**

**14.1** (a) The Agent, for the account of the Lenders, shall disburse all loans and advances to the Companies and shall handle all collections of Collateral and repayment of Obligations. It is understood that for purposes of advances to the Companies and for purposes of this Section 14 the Agent is using the funds of the Agent.

(b) Unless the Agent shall have been notified in writing by any Lender prior to any advance to the Companies that such Lender will not make the amount which would constitute its share of the borrowing on such date available to the Agent, the Agent may assume that such Lender shall make such amount available to the Agent on a Settlement Date, and the Agent may, in reliance upon such assumption, make available to the Companies a corresponding amount. A certificate of the Agent submitted to any Lender with respect to any amount owing under this Paragraph shall be conclusive, absent manifest error if no objection, in writing, is delivered to the Agent within ten (10) Business Days of receipt of such certificate. If such Lender's share of such borrowing is not in fact made available to the Agent by such Lender on the Settlement Date, the Agent shall be entitled to recover such amount with interest thereon at the rate per annum applicable to Term Loans hereunder, on demand, from the Companies without prejudice to any rights which the Agent may have against such Lender hereunder. Nothing contained in this Paragraph 14.1(b) shall relieve any Lender which has failed to make available its ratable portion of any borrowing hereunder from its obligation to do so in accordance with the terms hereof. Nothing contained herein shall be deemed to obligate the Agent to make available to the Companies the full amount of a requested advance when the Agent has any notice (written or otherwise) that any of the Lenders will not advance its ratable portion thereof.

**14.2** On the Settlement Date, the Agent and the Lenders shall each remit to the other, in immediately available funds, all amounts necessary so as to ensure that, as of the Settlement Date, the Lenders shall have their proportionate share of all outstanding Obligations.

**14.3**    The Agent shall forward to each Lender, at the end of each month, a copy of the account statement rendered by the Agent to the Companies.

**14.4**    The Agent shall, after receipt of any interest and fees earned under this Agreement, promptly remit to the Lenders: (a) their pro rata portion of all fees, provided, however, that the Lenders (other than Arcus in its role as the Agent) shall (i) not share in the fees set forth in Paragraphs 9.4, 9.5, 9.7 and 9.8 in Section 9 or the Documentation Fees; and (ii) receive their pro rata portion of the Commitment Fee; (b) interest computed at the rate and as provided for in Section 9 of this Agreement on all outstanding amounts advanced by the Lenders on each Settlement Date, prior to adjustment, that are subsequent to the last remittance by the Agent to the Lenders of the Companies' interest; and (c) its pro rata portion of all principal repaid on the Term Loans.

**14.5**    (a) The Companies acknowledge that the Lenders, with the prior written consent of the Agent, which consent shall not be unreasonably withheld, may sell, only to an affiliate of such Lender, participation interests in the loans and extensions of credit made and to be made to the Companies hereunder.

(b)    The Companies authorize each Lender to disclose to any participant or purchasing lender (each, a "Transferee") and any prospective Transferee any and all financial information in such Lender's possession concerning the Companies and their affiliates which has been delivered to such Lender by or on behalf of the Companies pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Companies in connection with such Lender's credit evaluation of the Companies and their affiliates prior to entering into this Agreement, provided that such Transferee agrees to hold such information in confidence in the ordinary course of its business.

**14.6**    The Companies hereby agree that each Lender is solely responsible for its portion of the Term Loan Facility and that neither the Agent nor any Lender shall be responsible for, nor assume any obligations for the failure of any Lender to make available its portion of the Term Loan Facility. Further, should any Lender refuse to make available its portion of the Term Loan Facility, then the other Lenders may, but without obligation to do so, increase, unilaterally, its portion of the Term Loan Facility in which event the Companies are so obligated to that other Lender.

**14.7**    In the event that the Agent, the Lenders or any one of them is sued or threatened with suit by the Companies or any one of them, or by any receiver, trustee, creditor or any committee of creditors on account of any preference, voidable transfer or lender liability issue, alleged to have occurred or been received as a result of or during the transactions contemplated under this Agreement, then in such event any money paid in satisfaction or compromise of such suit, action, claim or demand and any expenses, costs and attorneys' fees paid or incurred in connection therewith, whether by the Agent, the Lenders or any one of them, shall be shared proportionately by the Lenders. In addition, any costs, expenses, fees or disbursements incurred by outside agencies or attorneys retained by the Agent to effect collection or enforcement of any rights in the Collateral, including enforcing, preserving or maintaining rights under this Agreement shall be shared proportionately between and among the Lenders to the extent not reimbursed by the Companies or from the proceeds of Collateral. The provisions of this

paragraph shall not apply to any suits, actions, proceedings or claims that (x) predate the date of this Agreement or (y) are based on transactions, actions or omissions that predate the date of this Agreement.

14.8    Each of the Lenders agrees with each other Lender that any money or assets of the Companies held or received by such Lender, no matter how or when received, shall be applied to the reduction of the Obligations (to the extent permitted hereunder) after (x) the occurrence of an Event of Default and (y) the election by the Required Lenders to accelerate the Obligations. In addition, the Companies authorize, and the Lenders shall have the right, without notice, upon any amount becoming due and payable hereunder, to set-off and apply against any and all property held by, or in the possession of such Lender the Obligations due such Lenders.

14.9    The Agent shall, subject to, prior to the occurrence of an Event of Default, the prior written consent of Companies, which consent shall not be unreasonably withheld, have the right at any time to assign to one or more commercial banks, commercial finance lenders or other financial institutions all or a portion of its rights and obligations under this Agreement (including, without limitation, its obligations under the Term Loan Facility), provided the amount assigned to any one institution shall not be less than Two Million Dollars ($2,000,000.00); provided however, Companies' consent shall not be required if the proposed assignee or transferee is a Lender or an affiliate of Lender. Upon execution of an Assignment and Transfer Agreement, (a) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment, have the rights and obligations of the Agent as the case may be hereunder and (b) the Agent shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, relinquish its rights and be released from its obligations under this Agreement. The Companies shall, if necessary, execute any documents reasonably required to effectuate the assignments. No other Lender may assign its interest in the loans and advances and extensions of credit hereunder without the prior written consent of the Agent, and, prior to the occurrence of an Event of Default, the prior written consent of Companies, which consent shall not be unreasonably withheld. In the event that the Agent consents to any such assignment by any other Lender (i) the amount being assigned shall in no event be less than the lesser of (x) Two Million Dollars ($2,000,000.00) or (y) the entire interest of such Lender hereunder, and (ii) the parties to such assignment shall execute and deliver to the Agent an Assignment and Transfer Agreement, and at Agent's election, a processing fee of Three Thousand Five Hundred Dollars ($3,500) payable by the assigning Lender for its own account.

## SECTION 15.  Agency

15.1    Each Lender hereby irrevocably designates and appoints Arcus as the Agent for the Lenders under this Agreement and any ancillary loan documents and irrevocably authorizes Arcus as the Agent for such Lender, to take such action on its behalf under the provisions of this Agreement and all ancillary documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement and all ancillary documents together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement or any other Loan Documents, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender and no implied covenants, functions, responsibilities,

duties, obligations or liabilities shall be read into this Agreement and the ancillary documents or otherwise exist against the Agent.

**15.2**    The Agent may execute any of its duties under this Agreement and all ancillary documents by or through agents or attorneys-in-fact and shall be entitled to the advice of counsel concerning all, matters pertaining to such duties.

**15.3**    Neither the Agent nor any of its officers, directors, employees, agents, or attorneys-in-fact shall be (i) liable to any Lender for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement and all ancillary documents (except for its or such person's own gross negligence or willful misconduct), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Companies or any officer thereof contained in this Agreement and all ancillary documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement and all ancillary documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement and all ancillary documents or for any failure of the Companies to perform their obligations thereunder. The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of this Agreement and all ancillary documents or to inspect the properties, books or records of the Companies.

**15.4**    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Companies), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement and all ancillary documents unless it shall first receive such advice or concurrence of the Lenders, or the Required Lenders, as the case may be, as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and all ancillary documents in accordance with a request of the Lenders, or the Required Lenders, as the case may be, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

**15.5**    The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received written notice from a Lender or the Companies describing such Default or Event of Default. In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by Required Lenders; provided that unless and until the Agent shall have received such direction, the Agent may in the interim (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable and in the best interests of the Lenders. In the event the Agent in its sole

57

discretion, or at the request of the Required Lenders, continues to make Term Loans and advances under this Agreement upon the occurrence of a Default or Event of Default, any such Term Loans and advances may be in such amounts (subject to Paragraph 15.10 hereof) and on such additional terms and conditions as the Agent or the Required Lenders may deem appropriate.

**15.6**   Each Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it and that no act by the Agent hereinafter taken, including any review of the affairs of the Companies shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Companies and made its own decision to enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition or creditworthiness of the Companies. The Agent, however, shall provide the Lenders with copies of all financial statements, projections and business plans which come into the possession of the Agent or any of its officers, employees, agents or attorneys-in-fact.

**15.7**   (a)    The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Companies and without limiting the obligation of the Companies to do so), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements (including, without limitation, all Out-of-Pocket Expenses) of any kind whatsoever (including negligence on the part of the Agent) which may at any time be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Agreement or any ancillary documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the Agent's gross negligence or willful misconduct. The agreements in this paragraph shall survive the payment of the Obligations.

(b)    The Agent will use, subject to the terms of the Intercreditor Agreement, its reasonable business judgment in handling the collection of the Accounts, enforcement of its rights hereunder and realization upon the Collateral but shall not be liable to the Lenders for any action taken or omitted to be taken in good faith or on the written advice of counsel. The Lenders expressly release the Agent from any and all liability and responsibility (express or implied), for any loss, depreciation of or delay in collecting or failing to realize on any Collateral, the Obligations or any guaranties therefor and for any mistake, omission or error in judgment in passing upon or accepting any Collateral or in making (or in failing to make) examinations or

audits or for granting indulgences or extensions to the Companies, any account debtor or any guarantor, other than resulting from the Agent's gross negligence or willful misconduct.

**15.8**    The Agent may make loans to, and generally engage in any kind of business with the Companies as though the Agent were not the Agent hereunder. With respect to its loans made or renewed by it or loan obligations hereunder as Lender, the Agent shall have the same rights and powers, duties and liabilities under this Agreement as any Lender and may exercise the same as though it was not the Agent and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

**15.9**    The Agent may resign as the Agent upon 30 days' notice to the Lenders and such resignation shall be effective upon the appointment of a successor Agent. If the Agent shall resign as Agent, then the Lenders shall appoint a successor Agent for the Lenders whereupon such successor Agent shall succeed to the rights, powers and duties of the Agent and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. After any retiring Agent's resignation hereunder as the Agent the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent.

**15.10**    Notwithstanding anything contained in this Agreement to the contrary, the Agent will not, without the prior written consent of all Lenders affected thereby: (a) amend this Agreement to (i) increase the Commitment of any Lender; (ii) reduce the interest rates; (iii) reduce or waive (x) any fees in which the Lender(s) are entitled to share hereunder, or (y) the repayment of any Obligations due the Lender(s); (iv) extend the maturity of the Obligations; or (v) alter or amend (x) this Paragraph 15.10 or (y) the definitions of Collateral or Required Lenders; or (b) knowingly make any Term Loans if after giving effect thereto the total of Term Loans Advances would exceed the applicable Term Loan Facility Amount or, if less, authorized under the Order. Subject to the provisions of Section 11, Paragraph 11.2 and the provisions of this Paragraph 15.10 of Section 15 of this Agreement, in all other respects the Agent is authorized by each of the Lenders to take such actions or fail to take such actions under this Agreement if the Agent, in its reasonable discretion, deems such to be advisable and in the best interest of the Lenders. Notwithstanding any provision to the contrary contained in this Agreement (including the provisions of Section 11, Paragraph 11.2 and Section 15, Paragraph 15.10 hereof) the Agent is authorized to take such actions or fail to take such actions in connection with (a) the exercise of any and all rights and remedies under this Agreement (including but not limited to the exercise of rights and remedies under Section 11, Paragraph 11.2 of this Agreement) and/or (b) curing any ambiguity, defect or inconsistency in the terms of this Agreement and/or (c) releasing its lien and security interest in any Collateral; provided that the Agent, in its reasonable discretion, deems such to be advisable and in the best interests of the Lenders. In the event the Agent terminates this Agreement pursuant to the terms hereof, the Agent will cease making any loans or advances upon the effective date of termination except for any loans or advances (which will be treated as Term Loan Advances) which the Agent may deem, in its sole discretion, are reasonably required to maintain, protect or realize upon the Collateral.

**15.11**  In the event any Lender's consent is required pursuant to the provisions of this Agreement and such Lender does not respond to any request by the Agent for such consent within ten (10) Business Days after such request is made to the contact Person (whose name and contact information shall have been provided to Agent in writing by such Lender) at such Lender, such failure to respond shall be deemed a consent. In addition, in the event that any Lender declines to give its consent to any such request, it is hereby mutually agreed that the Agent and/or any other Lender shall have the right (but not the obligation) to purchase such Lender's share of the Loans for the full amount thereof together with accrued interest thereon to the date of such purchase.

**15.12**  Each Lender agrees that notwithstanding the provisions of Section 12 of this Agreement any Lender may terminate this Agreement and the Term Loan Facility only on the Termination Date. Termination of this Agreement by any of the Lenders as herein provided shall not affect the Lenders' respective rights and obligations under this Agreement incurred prior to the effective date of termination as set forth in the preceding sentence.

**15.13**  If the Agent is required at any time to return to the Companies or to a trustee, receiver, liquidator, custodian or other similar official any portion of the payments made by the Companies to the Agent as result of a bankruptcy or similar proceeding with respect to the, Companies, any guarantor or any other person or entity or otherwise, then each Lender shall, on demand of the Agent, forthwith return to the Agent its ratable share of any such payments made to such Lender by the Agent, together with its ratable share of interest and/or penalties, if any, payable by the Lenders; this provision shall survive the termination of this Agreement.

**15.14**  The Lenders agree to maintain the confidentiality of any non-public information provided by the Companies to them, in the ordinary course of their business, provided that the foregoing confidentiality provision shall terminate one (1) year after the termination date of this Agreement, and provided further that any such Lenders may disclose such information (i) to any applicable bank regulatory and auditor personnel and (ii) upon the advice of their counsel.

123285.01601/11752902v.12

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be effective, executed, accepted and delivered, by their proper and duly authorized officers as of the date set forth above.

<u>**COMPANIES:**</u>

**SHAPES/ARCH HOLDINGS L.L.C.**
a New Jersey limited liability company


By:_____
Name: Steven S. Grabell
Title:   Chief Executive Officer

**SHAPES L.L.C.**
a New Jersey limited liability company


By:_____
Name:  Steven S. Grabell
Title:   Chief Executive Officer

**DELAIR L.L.C.,**
a New Jersey limited liability company


By:_____
Name:  Steven S. Grabell
Title:   Vice President

**ACCU-WELD L.L.C.,**
a Pennsylvania limited liability company


By:_____
Name:  Steven S. Grabell
Title:   Vice President

**ULTRA L.L.C.**
a New Jersey limited liability company


By:_____
Name:  Steven S. Grabell
Title:   Vice President

**[SIGNATURES CONTINUE ON FOLLOWING PAGE(S)]**

**AGENT:**

**ARCUS ASI FUNDING, LLC**


By:_____
Name:  Gregory L. Segall
Title:   Authorized Signer


**LENDER:**

**ARCUS ASI FUNDING, LLC**


By:_____
Name:  Gregory L. Segall
Title:   Authorized Signer


**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION TERM LOAN FINANCING
AGREEMENT]**

123285.01601/11752902v.12

## EXHIBIT A

### TERM LOAN PROMISSORY NOTE

$25,000,000                                                                    March ___, 2008

FOR VALUE RECEIVED, each of the undersigned (collectively, "Borrowers"), intending to be legally bound hereby, unconditionally and jointly and severally, promises to pay to the order of ARCUS ASI FUNDING, LLC, a Delaware limited liability company ("Agent"), for the benefit of Arcus ASI Funding, LLC ("Lender"), at its principal office located at 2929 Arch Street, Phaildelphia, PA 19104, or at such other place as Agent may from time to time designate in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of Twenty-Five Million  Dollars ($25,000,000.00) or such lesser sum which represents the Lender's pro-rata share of the principal balance outstanding from time to time under the terms of the Financing Agreement (as defined below), together with interest thereon at the rate or rates hereafter specified until paid in full and any and all other sums which may be owing to the holder of this Note by Borrowers, or any of them, pursuant to this Note or the Financing Agreement.  The actual amount due and owing from time to time hereunder shall be evidenced by the Lender's records of disbursements and receipts with respect to the Term Loan Facility which shall be conclusive evidence of such amount, absent manifest error.  Capitalized terms used herein but not defined herein shall have the respective meanings assigned to such terms in the Financing Agreement.

This Term Loan Promissory Note ("Note") is issued under, and secured in accordance with the terms of, the Debtor-in-Possession Term Loan Financing Agreement dated as of even date herewith among Borrowers, Agent and Lender and the other lenders from time to time a party thereto (as from time to time amended, restated, supplemented or otherwise modified, the "Financing Agreement").

Interest on the outstanding principal amount of each Term Loan Advance evidenced by this Note shall accrue at the rate or rates specified in, and be payable in accordance with the terms of, the Financing Agreement.

The Financing Agreement provides for the acceleration of the payment of principal of and interest on the Term Loans upon the happening of certain Events of Default as defined in the Financing Agreement.

Borrowers waive presentment, demand for payment, notice of dishonor or acceleration, protest and notice of protest, and any and all other notices or demands in connection with this Note, except any notice expressly required by the Financing Agreement.

This Note shall be governed by and construed in accordance with the laws of the State of New York.

### [SIGNATURES ON FOLLOWING PAGE]

**SHAPES/ARCH HOLDINGS L.L.C.,**
a New Jersey limited liability company


By:_____
Name:
Title:

**SHAPES L.L.C.**
a New Jersey limited liability company


By:_____
Name:
Title:

**DELAIR L.L.C.,**
a New Jersey limited liability company


By:_____
Name:
Title:

**ULTRA L.L.C.,**
a New Jersey limited liability company


By:_____
Name:
Title:

**ACCU-WELD L.L.C.,**
a Pennsylvania limited liability company


By:_____
Name:
Title:


**[SIGNATURE PAGE TO TERM LOAN PROMISSORY NOTE]**

123285.01601/11758873v.1

# **EXHIBIT B**

## **FORM OF BUDGET**
### (ATTACHED)

**Shapes/Arch Holdings, LLC**
*Summary Consolidated DIP Cash Flow*

| | Week 1 3/23/2008 | Week 2 3/30/2008 | Week 3 4/6/2008 | Week 4 4/13/2008 | Week 5 4/20/2008 | Week 6 4/27/2008 | Week 7 5/4/2008 | Week 8 5/11/2008 | Week 9 5/18/2008 | Week 10 5/25/2008 | Week 11 6/1/2008 | Week 12 6/8/2008 | Week 13 6/15/2008 | 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Post-Petition Week:** | | | | | | | | | | | | | | |
| **Week Ending:** | | | | | | | | | | | | | | |
| **Beginning Cash Balance** | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Revenues** | | | | | | | | | | | | | | |
| Net Revenues | 4,642,280 | 4,655,358 | 4,659,289 | 4,667,826 | 4,667,826 | 4,667,826 | 5,123,807 | 5,240,434 | 5,290,434 | 5,340,434 | 4,920,462 | 5,550,462 | 5,600,462 | 65,026,880 |
| **Cash Collections** | | | | | | | | | | | | | | |
| A/R Collections | 3,074,481 | 3,310,942 | 4,448,332 | 3,785,933 | 3,844,756 | 4,288,002 | 5,052,988 | 3,933,706 | 4,282,598 | 4,377,018 | 4,479,230 | 4,530,499 | 4,554,537 | 53,963,021 |
| Total Cash Receipts | 3,074,481 | 3,310,942 | 4,448,332 | 3,785,933 | 3,844,756 | 4,288,002 | 5,052,988 | 3,933,706 | 4,282,598 | 4,377,018 | 4,479,230 | 4,530,499 | 4,554,537 | 53,963,021 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Material | 2,156,609 | 2,262,297 | 2,298,812 | 2,311,898 | 2,892,898 | 2,892,898 | 3,120,265 | 3,190,665 | 3,222,665 | 2,998,665 | 2,659,465 | 3,062,665 | 3,094,665 | 36,165,666 |
| Manufacturing & Warehouse | 217,361 | 245,222 | 223,965 | 344,026 | 229,026 | 1,427,026 | 253,776 | 270,174 | 245,174 | 1,443,174 | 284,073 | 242,573 | 277,573 | 5,683,144 |
| Payroll/Benefit Expenses | - | 568,720 | 483,523 | 1,838,231 | 678,523 | 1,262,749 | 1,838,231 | 678,523 | 1,262,749 | 1,262,749 | 483,523 | 678,523 | 1,254,005 | 12,095,048 |
| Delivery Expenses | 91,733 | 98,854 | 107,878 | 98,485 | 104,465 | 104,465 | 110,686 | 107,697 | 107,974 | 101,832 | 92,530 | 103,587 | 104,464 | 1,296,193 |
| Selling Expenses | 72,710 | 113,963 | 107,878 | 75,106 | 188,540 | 130,106 | 116,680 | 187,000 | 111,709 | 226,480 | 92,530 | 105,713 | 105,713 | 1,550,500 |
| G&A Expenses | 21,000 | 102,000 | 222,000 | 159,500 | 246,000 | 68,000 | 187,000 | 259,500 | 21,000 | 48,000 | 286,205 | 106,000 | 101,500 | 1,827,705 |
| CAPEX | 105,000 | 105,000 | 105,000 | 120,000 | 105,000 | 405,000 | 105,000 | 120,000 | 105,000 | 105,000 | 405,000 | 120,000 | 105,000 | 2,010,000 |
| Professional Expenses | | 180,000 | | | 110,000 | | 105,000 | 120,000 | 105,000 | 10,000 | 240,000 | | 416,000 | 1,428,300 |
| Utility Deposits | | | | 514,104 | | | | | | | | | | 514,104 |
| Senior Lender Amortization | | | 130,000 | | | | | | | | | | | 130,200 |
| DIP Facility Interest & Fees | | | 517,518 | | | | 535,341 | | | | | 573,542 | | 1,626,322 |
| **Total Cash Disbursements** | 2,664,514 | 3,666,622 | 4,183,650 | 5,458,331 | 4,552,472 | 6,288,265 | 5,220,751 | 6,016,347 | 4,500,135 | 6,195,500 | 4,542,908 | 5,546,228 | 5,492,484 | 64,328,807 |
| Net Cash Change | 409,866 | (355,680) | 264,682 | (1,672,398) | (707,717) | (2,000,263) | (167,763) | (2,082,641) | (217,537) | (1,818,483) | (63,678) | (1,015,729) | (937,947) | (10,365,287) |
| Cumulative Cash Change | 409,866 | 54,187 | 318,869 | (1,353,529) | (2,061,245) | (4,061,508) | (4,229,272) | (6,311,913) | (6,529,450) | (8,347,932) | (8,411,611) | (9,427,340) | (10,365,287) | (10,365,287) |
| DIP Facility Draws | (409,866) | 355,680 | (264,682) | 1,672,398 | 707,717 | 2,000,263 | 167,763 | 2,082,641 | 217,537 | 1,818,483 | 63,678 | 1,015,729 | 937,947 | 10,365,287 |
| **Ending Cash Balance** | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **DIP Revolver Facility - $60 Million** | | | | | | | | | | | | | | |
| Opening Balance | 41,984,467 | 42,066,576 | 42,300,475 | 41,844,881 | 42,529,872 | 43,029,992 | 43,003,856 | 42,806,224 | 43,828,247 | 44,595,129 | 45,209,133 | 45,456,152 | 46,233,342 | 41,984,467 |
| DIP Facility Draws | (409,866) | 355,680 | (264,682) | 1,672,398 | 707,717 | 2,000,263 | 167,763 | 2,082,641 | 217,537 | 1,818,483 | 63,678 | 1,015,729 | 937,947 | 10,365,287 |
| Letters of Credit: Pre-Petition | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 |
| Letters of Credit: Post-Petition | 1,500,000 | 2,500,000 | 2,500,000 | 2,625,000 | 2,750,000 | 2,975,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Reserved Termination Interest Rate Swap | 50,000 | 100,000 | 130,000 | | | | | | | | | | | |
| **Total DIP Funding Requirement** | 46,679,600 | 48,077,256 | 48,220,793 | 48,709,872 | 49,542,589 | 51,460,256 | 49,726,619 | 50,600,784 | 51,150,129 | 52,958,612 | 51,827,811 | 53,026,881 | 53,726,290 | 58,904,754 |
| Revolver DIP Borrowing Base Availability | 47,171,576 | 47,955,475 | 48,029,881 | 48,709,872 | 49,334,992 | 49,433,856 | 49,361,224 | 50,383,247 | 51,150,129 | 51,764,133 | 52,011,152 | 52,788,342 | 53,587,601 | 53,587,601 |
| Senior Term Loan Funding | 491,976 | (121,780) | (190,913) | (997,406) | (207,596) | (2,026,399) | (365,395) | (1,060,618) | 549,346 | (1,204,479) | 183,341 | (238,539) | (138,689) | (5,317,153) |
| **Total DIP Revolver Funding** | 47,171,576 | 47,955,475 | 48,029,881 | 48,709,872 | 49,334,992 | 49,433,856 | 49,361,224 | 50,383,247 | 51,150,129 | 51,764,133 | 52,011,152 | 52,788,342 | 53,587,601 | 53,587,601 |
| **DIP Term Loan Facility - $25 Million** | | | | | | | | | | | | | | |
| Opening Balance | 15,489,908 | 14,997,932 | 15,119,713 | 15,310,626 | 16,298,032 | 16,505,628 | 18,532,027 | 18,897,423 | 19,958,041 | 19,408,695 | 20,613,174 | 20,429,833 | 20,668,372 | 15,489,908 |
| Plus Senior Term Loan Funding | (491,976) | 121,780 | 190,913 | 987,406 | 207,596 | 2,026,399 | 365,395 | 1,060,618 | (549,346) | 1,204,479 | (183,341) | 238,539 | 138,689 | 5,317,153 |
| Total Ending DIP Term Loan | 14,997,932 | 15,119,713 | 15,310,626 | 16,298,032 | 16,505,628 | 18,532,027 | 18,897,423 | 19,958,041 | 19,408,695 | 20,613,174 | 20,429,833 | 20,668,372 | 20,807,061 | 20,807,061 |
| Total DIP Term Loan Facility | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 | 25,000,000 |
| Total DIP Term Loan Availability | 10,002,068 | 9,880,287 | 9,689,374 | 8,701,968 | 8,494,372 | 6,467,973 | 6,102,577 | 5,041,959 | 5,591,305 | 4,386,826 | 4,570,167 | 4,331,628 | 4,192,939 | 4,192,939 |

**Schedule 1R**

<u>**REAL ESTATE**</u>

Each Company's leasehold or fee interests in the following real property will be encumbered, mortgaged, pledged or assigned to the Agent or its designee:

1211 Ford Road, Bensalem, Pennsylvania, 19020
8600/9000 River Road, Delair, New Jersey, 08110
1777 Hylton Road, Pennsauken, New Jersey, 08110

**Schedule 2.1(r)**

## <u>COLLATERAL INFORMATION</u>

(a)   (i)    The Companies' Trademarks are set forth on Exhibit 2.1(r)(a)(i) attached hereto.

     (ii)   The Companies' Patents are set forth on Exhibit 2.1(r)(a)(ii) attached hereto.

     (iii)  None.

(b)   See Schedule 8.1(C).

(c)   See Schedule 8.1(B).

(d)   See Schedule 7.1.

PHILADELPHIA\3584456\2  077771.000

# EXHIBIT 2.1(s)(a)(i)
## Trademark List

| Trademark | Status Class(es) | Application Number/Date | Registration Number/Date |
|---|---|---|---|
| HIGH PERFORMANCE GLASS WITH A MEMORY ACCU-GLAZE & Design United States of America | REGISTERED 19 Int. | 75/118,355 13-Jun-1996 | 2,148,244 31-Mar-1998 |
| ACCU-GLAZE Z-GLASS United States of America | REGISTERED 19 Int. | 75/107,583 21-May-1996 | 2,221,921 02-Feb-1999 |
| ACCURA United States of America | REGISTERED 19 Int. | 75/312,195 20-Jun-1997 | 2,286,971 19-Oct-1999 |
| ACCU-WELD United States of America | REGISTERED 19 Int. | 73/703,306 28-Dec-1987 | 1,530,873 21-Mar-1989 |
| DELGARD United States of America | REGISTERED 06 Int. | 78/339,246 11-Dec-2003 | 2,913,225 21-Dec-2004 |
| ETERNITY FINISH United States of America | REGISTERED 06 Int. | 76/144,018 10-Oct-2000 | 2,759,463 2-Sep-2003 |
| JOHNNY WEISSMULLER United States of America | Registered 06 Int. | 78/339,252 11-Dec-2003 | 2,962,285 14-Jun-2005 |
| PATRIOT POOLS United States of America | Registered 06 Int. | 76/603,080 20-Jul-2004 | 3,061,680 28-Feb-2006 |
| ROCKLAND United States of America | Registered 06 Int. | 76/569,952 09-Jan-2004 | 3,015,986 15-Nov-2005 |
| SHIELD SECURITY & Design United States of America | REGISTERED 06 Int. | 76/539,567 22-Aug-2003 | 2,949,257 10-May-2005 |
| TOTAL COMFORT United States of America | REGISTERED 06 Int., 19 Int. | 74/262,393 03-Apr-1992 | 1,842,200 28-Jun-1994 |
| W. WESTMORE CLASSIC HARDWARE FOR FINE HOMES AND DESIGN United States of America | REGISTERED 06 Int. | 76/497,107 13-Mar-2003 | 2,900,433 02-Nov-2004 |
| WESTMORE United States of America | REGISTERED 06 Int. | 76/497,108 13-Mar-2003 | 2,913,666 21-Dec-2004 |

7

## EXHIBIT 2.1(s)(a)(ii)

### Patents

| Country Name | | Application Number/Date | Publication Number/Date | Patent Number/Date | Status Expiration D |
|---|---|---|---|---|---|
| United States of America | | 07/899,836<br>17-Jun-1992 | | 5,216,810<br>08-Jun-1993 | Granted<br>11-Jan-2011 |

*Title:* ALUMINUM EXTRUSION WITH MULTIPLE THERMAL BRAKE AND METHOD OF MAKING SAME

| United States of America | | 08/671,538<br>27-Jun-1996 | | 5,660,378<br>26-Aug-1997 | Granted<br>27-Jun-2016 |

*Title:* FENCE ASSEMBLY

| United States of America | | 10/609,412<br>1-Jul-2003 | 2004-0026932<br>12-Feb-2004 | 6,871,886<br>29-Mar-2005 | Granted<br>01-Jul-2023 |

*Title:* SASH LOCK

| United States of America | | 29/066,188<br>06-Feb-1997 | | D402,043<br>01-Dec-1998 | Granted<br>01-Dec-2012 |

*Title:* POOL SUPPORT MEMBER

| 680144.0004/<br>United States of America | PRI | 09/535,124<br>24-Mar-2000 | | 6,375,166<br>23-Apr-2002 | Granted<br>24-Mar-2020 |

AG Matter: 680144.0004

*Title:* FENCE WHICH ELIMINATES THE NEED FOR CONVENTIONAL FASTENERS

| 680144.0006/<br>United States of America | PRI | 08/384,017<br>06-Feb-1995 | | 5,649,780<br>22-Jul-1997 | GRANTED<br>06-Feb-2015 |

AG Matter: 680144.0006

*Title:* COLLET FOR TELESCOPING ASSEMBLY

| 680144.0007/<br>United States of America | PRI | 08/617,420<br>18-Mar-1996 | | 5,715,574<br>10-Feb-1998 | GRANTED<br>18-Mar-2016 |

AG Matter: 680144.0007

*Title:* ADJUSTABLE SELF-CLOSING HINGE ASSEMBLY

| 210603.0010/<br>United States of America | PRO | 60/944,925<br>19-Jun-2007 | | | Pending<br>19-Jun-2008 |

Atty. 10603-10US                    AG Matter: 210603.0010

8

*Title:* CASEMENT OPERATOR WITH BALL BEARING

210603.0012/1                ORD      11/774,623              US-2008-0005970-A1              Published
United States of America               09-Jul-2007            10-Jan-2008
                                       **Atty.** 10603-12U1                    **AG Matter:** 210603.0014
                                       *Title:* CASEMENT OPERATOR WITH MOVABLE COVER

210603.0013/                 PRO      60/943,082                                             Pending
United States of America               11-Jun-2007                                          11-Jun-2008
                                       **Atty.** 10603-13US                    **AG Matter:** 210603.0013
                                       *Title:* FRICTION CASEMENT HINGE

210603.0015/                 PRI      11/964,771                                             Pending
United States of America               27-Dec-2007
                                       **Atty.** 10603-15US                    **AG Matter:** 210603.0015
                                       *Title:* WINDOW LOCK AND METHOD OF USE

9

**Schedule 7.1**

**<u>SENIOR CLAIMS</u>**

**<u>TO BE PROVIDED</u>**

**Schedule 8.1**

## ORGANIZATION

(A)    The Companies' chief executive office is located at 9000 River Road, Delair, New Jersey, 08110.

(B)    Collateral of the Companies is located at the addresses set forth below:

1211 Ford Road, Bensalem, Pennsylvania, 19020
8600/9000 River Road, Delair, New Jersey, 08110
1777 Hylton Road, Pennsauken, New Jersey, 08110

Certain Collateral of Shapes L.L.C. is located at the addresses set forth below:

| | |
|---|---|
| Custom Manufacturing | 2542 State Road, Bensalem, PA  19020 |
| KVI | 1458 County Line Rd, Huntington Valley, PA 19006 |
| Eagle Engineering Corp. | 8869 Citation Rd, Baltimore,  MD 21221 |
| Willier Electric Motor Co. | P.O. Box 98, Gibbsboro, NJ  08026 |
| Advanced Fluid Systems | 3rd & Green St., Royersford, PA 19468 |
| Anchor Sales Associates | 9 Humphreys Drive, Warminster, PA 18974 |
| SMS Meer Service Inc. | 234 South Potter St., Bellefonte, PA 16823 |

Certain Collateral of Ultra L.L.C.  is located at the addresses set forth below:

| | |
|---|---|
| A Duie Pyle Inc., | PO Box 564, West Chester, PA 19381 0564 |
| Bay Cities Warehouse Co. Inc. | 31474 Hayman St.,  Hayward, CA 94544 |
| Con-Way Transportation Inc. | PO Box 642080, Pittsburgh, PA 152642080 |
| Dallas Transfer & Terminal Warehouse | PO Box 224301, Dallas, TX 752224301 |
| Estes Express Lines | PO Box 25612, Richmond, VA 23260 5612 |
| Federal Express Corporation | PO Box 1140, Memphis, TN 38101-1140 |
| Federal Express Ers | PO Box 371461, Pittsburgh, PA 15250-7461 |
| Gilco Trucking Company Inc. | PO Box 27474,  Salt Lake City, UT 84127 |
| New England Motor Freight Inc. | 1-71 North Ave, East PO Box 6031, Elizabeth, NJ 072076031 |
| Northstar Services Ltd. | PO Box 23148, Philadelphia, PA 19124 |
| Old Dominion Freight Line | 1300 Suckle Hwy, Pennsauken, NJ 08110 |
| Pitt Ohio Express LLC | PO Box 643271, Pittsburgh, PA 15264 |
| Standard Whse. & Dist Co Inc. | PO Box 308, Pennsauken, NJ 08110 |
| United Parcel Service | PO Box 7247-0244, Philadelphia, PA 19170-0001 |
| UPS Supply Chain Solutions Inc. | 28013 Network Place, Chicago, IL 60673 |
| William Parker Associates Inc. | 2845 E. Westmoreland St., Philadelphia, PA 19134 |
| Yellow Transportation Inc. | PO Box 13850, Newark, NJ 07188 0850 |

4

Certain Collateral of Accu-Weld L.L.C. is located at the addresses set forth below:

Grafco                              20 Regina Road, Woodbridge, Ontario, CA L4L8L6

Certain Collateral of Delair L.L.C. is located at the addresses set forth below:

| | |
|---|---|
| Celadon | 1830 Momentum Place, Chicago, IL  60689-5318 |
| CCT Transport | 107 Green St., Hulmeville, PA  19047-5543 |
| FEDEX | 4103 Collection Center Dr., Chicago, IL 60693 |
| Gray Trucking | 735 Broad  Street, Beverly, NJ 08010 |
| Jevic Transport | PO Box 13031, Newark, NJ 07188 |
| Rockwell Transport | PO Box 803, Perkasie, PA 18944-0803 |
| UPS | PO Box 7247-0244, Philadelphia, PA 19170-0001 |
| DDI | PO Box 81150, Cleveland, OH 44181 |
| MSC | 120 Enterprise Ave, Morrisville, PA 19067 |
| Metal Koting | 1430 Martin Grove Rd., Rexdale, Ontario CA M9W 4Y1 |
| Gill | 1384 Byberry Rd., Bensalem, PA 19020 |
| Malber | 2115 Byberry Rd., Huntingdon Valley, PA 19006 |
| CFM(Precoat) | 6754 Santa Barbara Court, Elkridge, MD 21075 |
| Bardot Plastics Inc. | 10 McFadden Road, Palmer Industrial Park, Easton, PA 18045-7817 |
| Toco Products | 1129 West River Drive, Mays Landing, NJ 08330 |
| Acme Corrugated | 2700 Turnpike Drive, Hatboro, PA 19040 |
| Fitzpatrick Container | 800 East Walnut Street, North Wales, PA 19454 |

(C) The Companies use the following trade names:

Shapes/Arch Holdings, L.L.C.
Aluminum Shapes, Inc.
Shapes, L.L.C. t/a Aluminum Shapes, L.L.C.
Shapes/Arch Holdings, L.L.C. t/a Arch America
Arch Aluminum, L.L.C. (sold in 1998)
Arch Aluminum & Glass Co., Inc. (sold in 1998)
Aluminum Shapes, Inc. t/a Aluminum Smelters of New Jersey (Inactive)
Aluminum Finishers Corp. (Inactive)
Ultra, L.L.C. t/a Ultra Hardware Products, L.L.C.
Ultra Hardware Products, Inc.
Accu-Weld, Inc.
Accu-Weld, L.L.C
Accu-Weld, L.L.C. t/a Secura – Seal Corp.
Delair, L.L.C. t/a Delair Group, L.L.C.
Delair Group, Inc.
Delgard Premier Fencing Co.
Esther Williams Swimming Pools of Canada, Ltd.

PHILADELPHIA\3584456\2 077771.000

Delair Group, Inc. t/a Esther Williams Swimming Pools
Delair Group, Inc. t/a/ Johnny Weismuller Pools
Delair Group, Inc. t/a The Patriot Swimming Pool Company
Delair Group, Inc. t/a/ Argus Vinyl Pool Liners
Delair Group, Inc. t/a Life Style Spas
Delair Group, Inc. t/a Le Spa International
Delair Group, Inc. t/a Family Ties

PHILADELPHIA\3584456\2 077771.000

# EXHIBIT 3

## DEFINITIONS
(ATTACHED)

## EXHIBIT 3

As used in the Interim Order to which this **Exhibit 3** is annexed, the terms "**Revolver Senior Collateral**" and "**Term Senior Collateral**" have the following meanings:

**Revolver Senior Collateral** shall mean (a) all of the Accounts, (b) all of the Inventory, (c) all of the Borrowers' now owned and hereafter acquired lockbox, blocked account and any other deposit accounts maintained with any bank or financial institutions into which the proceeds of Revolver Senior Collateral are or may be deposited, but only to the extent of such proceeds, (d) all Books and Records and General Intangibles at any time evidencing or containing information relating to any of the Revolver Senior Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon, and (e) all proceeds (including, without limitation, insurance proceeds) and products of any and all of the foregoing (whether or not in the possession, custody or control of the Revolver Agent and/or any Revolver Lender), and all accessions thereto, substitutions for or replacements of and rents and profits from any and all of the foregoing.

**Term Senior Collateral** shall mean the Real Estate and all of the Collateral other than the Revolver Senior Collateral, and all proceeds (including, without limitation, insurance proceeds) and products of any and all of the foregoing (whether or not in the possession, custody or control of the Term Agent and/or any Term Lender), and all accessions thereto, substitutions for or replacements of and rents and profits from any and all of the foregoing.  To the extent that Avoidance Actions constitute part of the Collateral, the Term Senior Collateral shall also include them.


As used in this **Exhibit 3**, the following additional terms have the following meanings:

**Accounts** shall mean all of the Borrowers' now existing and future (a) accounts (as defined in the UCC), other than accounts which arise from the sale or other disposition of the Term Senior Collateral, (b) rights to payment for inventory that has been or is to be sold, leased, licensed, assigned or otherwise disposed of or for services that were or are to be rendered, in either case, that are or may become evidenced by an instrument, (c) supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC) arising in connection with the sale of inventory, (d) unpaid seller's rights or lessors's rights (including recession, replevin, reclamation, repossession and stoppage in transit) relating to any of the foregoing or arising therefrom, (e) rights to any reclaimed, returned or repossessed goods comprising inventory, (f) reserves and credit balances arising in connection with or pursuant thereto, (g) credit or other insurance policies with respect to accounts and all rights relating thereto or arising thereunder, (h) to the extent not listed above, all deposit accounts, operating accounts and bank accounts into which Accounts or the proceeds of Accounts are deposited, including any lockbox account or blocked account (but only to the extent of such proceeds), (i) notes, deposits or property of account debtors securing the obligations of any such account debtors to the Borrowers, and (j) cash and non-cash proceeds (as defined in the UCC) of any and all of the foregoing.

**Avoidance Actions** shall mean any and all actions of a Borrower or its bankruptcy estate under Chapter 5 or Section 724(a) of the Bankruptcy Code and proceeds thereof.

123285.01601/21674738v.2

**Books and Records** shall mean books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral or otherwise necessary or helpful in the collection thereof or realization thereon.

**Borrowers** shall mean, collectively, Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Ultra L.L.C., and Accu-Weld L.L.C., each as a debtor and debtor-in-possession.

**Collateral** shall mean all property and interests in property now owned or hereafter acquired by Borrowers in or upon which a security interest, lien or mortgage is granted to Revolver Agent or Term Agent under the Revolving Credit Agreement or the Term Loan Agreement, respectively, or the applicable DIP Financing Order, including without limitation the Revolver Senior Collateral and the Term Senior Collateral. To the extent set forth in the DIP Financing Orders, the Collateral shall also include Avoidance Actions. In addition, the Collateral shall include all title insurance policies of Revolver Agent with respect to the Real Estate and the proceeds thereof.

**DIP Financing Orders** shall mean collectively the Orders (as defined in the Term Loan Agreement) and the Financing Orders (as defined in the Revolving Credit Agreement).

**General Intangibles** shall mean all of the Borrowers' present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all trademarks, corporate names, business names, and any other designs or sources of business identities, (b) patents, utility models, industrial models, and designs, (c) copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) inventions, (g) all applications with respect to the foregoing, (h) all right, title and interest in and to any and all extensions and renewals, (i) all goodwill with respect to any of the foregoing, (j) any other forms of similar intellectual property, (k) all customer lists, distribution agreements, supply agreements and blueprints, and (l) all corporate and business books and records.

**Inventory** shall mean all of the Borrowers' present and hereafter acquired inventory (as defined in the UCC).

**Real Estate** shall mean the real property owned by the Borrowers and located at (i) 1211 Ford Road, Bensalem, Pennsylvania, (ii) 8600/9000 River Road, Delair, New Jersey, and (iii) 1777 Hylton Road, Pennsauken, New Jersey.

**Revolver Agent** shall mean The CIT Group/Business Credit, Inc., as in its capacity agent for the Revolver Lenders under the Revolving Credit Agreement.

**Revolver Lenders** shall mean the lenders from time to time party to the Revolving Credit Agreement.

**Revolving Credit Agreement** shall mean the Debtor-in-Possession Revolving Credit Financing Agreement, dated on or about March ___, 2008, among Revolver Agent, Revolver Lenders and Borrowers, as amended, modified, restated or supplemented from time to time.

**Term Agent** shall mean Arcus ASI Funding LLC, in its capacity as agent for the Term Lenders under the Term Loan Agreement.

**Term Lenders** shall mean the lenders from time to time party to the Term Loan Agreement.

2

**Term Loan Agreement** shall mean the Debtor-in-Possession Term Loan Financing Agreement, dated on or about March ___, 2008, among Term Agent, Term Lenders and Borrowers, as amended, modified, restated or supplemented from time to time.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York, provided, however, in the event that, by reason of mandatory provisions of law, the attachment, perfection or priority of either Agents security interest in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the state of New York, then the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for the purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

3