EXECUTION COPY

# DEBTOR IN POSSESSION REVOLVING CREDIT
## FINANCING AGREEMENT

**The CIT Group/Business Credit, Inc.**
**(as Agent and a Lender),**

**the lenders party hereto from time to time**
**(as Lenders),**

**and**

**Shapes/Arch Holdings L.L.C.**
**Shapes L.L.C.,**
**Delair L.L.C.,**
**Ultra L.L.C.**
**and**
**Accu-Weld L.L.C.**
**(the Companies which are borrowers and debtors in possession hereunder)**

**Dated: March    , 2008**

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| SECTION 1 | Definitions | 1 |
| SECTION 2 | Conditions Precedent | 17 |
| SECTION 3 | Revolving Loans | 21 |
| SECTION 4 | Superpriority Claims, Etc. | 25 |
| SECTION 5 | Letters of Credit | 27 |
| SECTION 6 | Collateral | 29 |
| SECTION 7 | Representations, Warranties and Covenants | 31 |
| SECTION 8 | Interest. Fees and Expenses | 39 |
| SECTION 9 | Powers | 44 |
| SECTION 10 | Events of Default and Remedies | 45 |
| SECTION 11 | Termination | 49 |
| SECTION 12 | Miscellaneous | 49 |
| SECTION 13 | Agreement between the Lenders | 52 |
| SECTION 14 | Agency | 54 |

EXHIBIT

Exhibit A - Form of Revolving Loan Promissory Note
Exhibit B - Form of Assignment and Transfer Agreement

SCHEDULES

Schedule IP - Permitted Indebtedness
Schedule 1R - Real Estate
Schedule 2.1(s) - Collateral Information
Schedule 4.1 - Permitted Encumbrances
Schedule 7.1 - Various Information

B # 761460 v.5

THE CIT GROUP/BUSINESS CREDIT, INC., a New York corporation (hereinafter "**CIT**"), with offices located at 11 West 42nd Street, New York, New York 10036, as agent for the other lenders (the "**Agent**") and as a lender, and any other party which now or hereafter becomes a lender hereunder pursuant to Section 13 hereof (including CIT in its capacity as a lender hereunder, individually a "**Lender**" and collectively the "**Lenders**") are pleased to confirm on this ____ day of March, 2008 (the "**Effective Date**"), the terms and conditions under which the Agent shall make Revolving Loans and other financial accommodations to Shapes/Arch Holdings L.L.C., a New Jersey limited liability company ("**Shapes/Arch**"), with a principal place of business located at 9000 River Road, Delair, New Jersey 08110, Shapes L.L.C., a New Jersey limited liability company ("**Shapes**") with a principal place of business located at 9000 River Road, Delair, New Jersey 08110, Delair L.L.C., a New Jersey limited liability company ("**Delair**") with a principal place of business at 8600 River Road, Delair, New Jersey 08110, Ultra L.L.C., a New Jersey limited liability company ("**Ultra**") with a principal place of business at 1777 Hylton Road, Pennsauken, New Jersey 08110, and Accu-Weld L.L.C., a Pennsylvania limited liability company ("**Accu-Weld**") with a principal place of business at 1211 Ford Road, Bensalem, Pennsylvania 19020 (in this Financing Agreement, Shapes/Arch, Shapes, Delair, Ultra and Accu-Weld are sometimes referred to individually as a "**Company**" and are referred to collectively, jointly and severally as the "**Companies**").

## SECTION 1    Definitions

**Accounts** shall mean all of each of the Companies' now existing and future: (a) accounts (as defined in the UCC), and any and all other receivables (whether or not specifically listed on schedules furnished to the Agent), including, without limitation, all accounts created by, or arising from, all of the Companies' sales, leases, rentals of goods or renditions of services to their customers, including but not limited to, those accounts arising under any of the Companies' trade names or styles, or through any of the Companies' divisions; (b) any and all instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing., including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant hereto; (f) guarantees, supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any and all of the foregoing (including all rights to payment, including any and all Intercompany Debt and other liabilities and those arising in connection with bank and non-bank credit cards), and including books and records and any electronic media and software thereto; (i) notes, deposits or property of account debtors securing the obligations of any such account debtors to the Companies; and (j) cash and non-cash proceeds (as defined in the UCC) of any and all of the foregoing.

**Agent's Fee Letter** shall mean the letter with respect to the payment of certain fees and reimbursement of certain costs which has been executed as of the Closing Date.

**Anniversary Date** shall mean the date occurring six (6) months from the Closing Date, as may be extended pursuant to Section 11 hereof.

**Arcus** shall mean and refer to Arcus ASI Funding, LLC, a Delaware limited liability company, its successors and assigns.

**Arcus Term Loan** shall mean the delayed draw term loan in the original principal amount of $25,000,000.00 extended to the Companies on the date of this Agreement, by Arcus, secured by liens and security interests against the Companies' tangible and intangible assets, (the priority of which relative to the liens and security interests granted to Agent and Lenders under this Financing Agreement are defined in the Intercreditor Agreement), pursuant to a term loan agreement, dated on or about the date hereof between the Companies and Arcus (the "**Arcus Term Loan Agreement**"), together with all other agreements, documents and instruments evidencing, securing and pertaining to the Arcus Term Loan (referred to collectively with the Arcus Term Loan Agreement as, the "**Arcus Term Loan Documents**").

**Assignment and Transfer Agreement** shall mean the Assignment and Transfer Agreement in the form of Exhibit B hereto.

**Availability** shall mean, at any time of calculation, the amount by which the Companies' Borrowing Base exceeds the outstanding aggregate amount of all Obligations with respect to the Revolving Loan, but excluding Letters of Credit.

**Availability Reserve** shall mean the sum of: (a) (i) six (6) months rental payments or similar charges for leased premises or other Collateral locations in New Jersey, for which the Companies have not delivered to the Agent a landlord's waiver in form and substance reasonably satisfactory to the Agent, plus (ii) three (3) months rental payments or similar charges for leased premises or other Collateral locations in Pennsylvania and elsewhere, for which the Companies have not delivered to the Agent a landlord's waiver in form and substance reasonably satisfactory to the Agent plus (iii) six (6) months' estimated payments plus any other fees or charges owing by any Company to any applicable warehousemen or third party processor or other bailee (as determined by the Agent in its reasonable business judgment), provided that any of the foregoing amounts shall be adjusted from time to time hereafter upon (x) delivery to the Agent of any such acceptable waiver and/or access agreement executed by one or more applicable landlords or other bailees, (y) the opening or closing of a Collateral location and/or (z) any change in the amount of rental, storage or processor payments or similar charges; (b) in the event that the Agent determines that the Dilution Percentage with respect to the Accounts exceeds five percent (5%), a dilution reserve in the amount equal to such excess; (c) any other reserve which the Agent may reasonably require from time to time pursuant to this Financing Agreement, including without limitation, for Letters of Credit pursuant to Paragraph 5.1 of Section 5 hereof; (d) an amount equal to the notional credit risk or exposure with respect to Swaps of any Lender which holds an interest in the Loans hereunder; (e) the Periodic Swap Reserve (but only if and for so long as such Periodic Swap Reserve has not been paid); (f) such other reserves as the Agent deems necessary in its commercially reasonable judgment as a result of (x) negative forecasts and/or trends in any Company's business, industry, prospects, profits, operations or financial condition or (y) other issues, circumstances or facts that could otherwise negatively impact any Company, its business, prospects, profits, operations, industry, financial condition or assets; and (g) to the full amount of any of the Carve-Out, to the extent that it applies to or is in any way imposed upon Collateral upon which the Agent has a first priority lien or security interest. Notwithstanding the foregoing, Availability Reserves shall be administered in a manner Consistent With Past Practices.

**Avoidance Action Recoveries** shall mean any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case under any or all of Sections 544, 547, 548, 549, 550, 551 and 553 of, and any other avoidance actions under, the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code, Section 724(a) of the Bankruptcy Code, or otherwise.

**Avoidance Actions** shall mean any and all actions in the Bankruptcy Case under any or all of Sections 544, 547, 548, 549, 550 and 553 of, and any other avoidance actions under, the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code, Section 724(a) of the Bankruptcy Code or otherwise.

**Bailee Agreement** shall mean a tri-party agreement in form and substance acceptable to the Agent and acknowledged and agreed to by the Companies, whereby a bailee of Inventory (whether warehouseman, customs broker, freight forwarder, consignee or the like) (i) acknowledges the Agent's security interest, (ii) agrees to act as the Agent's agent and/or at the direction of the Agent with respect to the possession and disposition of the Inventory in such Person's custody or control and, (iii) if required by the Agent, provides evidence reasonably satisfactory to the Agent in its discretion that, at all times, the Agent's security interest in and to such Inventory shall be a duly perfected, first-priority security interest, subject to no other Liens.

**Bankruptcy Case** shall mean, the cases under Chapter 11 of the Bankruptcy Code in which each Company is a debtor and debtor-in-possession, pending before the Bankruptcy Court.

**Bankruptcy Case Expenses** shall mean Agents' fees and expenses (including reasonable attorneys' fees) in connection with the Bankruptcy Case (including, without limitation, attorneys' fees and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code, any other action or participation by Agent in the Bankruptcy Case or any defense or participation by Agent in any actions involving Agent and/or any Lender).

**Bankruptcy Code** shall mean the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., as in effect from time to time.

B # 761460 v.5

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of New Jersey, or such other court having jurisdiction over the Bankruptcy Case.

**Borrower Representative** shall mean and refer to Shapes/Arch, in its capacity as such, as more fully defined in Section 12.6 of this Financing Agreement.

**Borrowing Base** shall mean at any time (determined by Agent in a manner Consistent With Past Practices), the sum of:

(a) eighty-five percent (85%) of the Companies' aggregate outstanding Eligible Accounts Receivable, plus

(b) the least of (i) sixty-five percent (65%) of the aggregate value of the Companies' Eligible Inventory, valued at the lower of cost or market, on a first in, first out basis, or (ii) eighty-five percent (85%) of the Net Orderly Liquidation Value of such Inventory, or (iii) the Inventory Loan Cap, plus

(c) the lesser of (i) sixty-five percent (65%) of the aggregate value of Ultra's Eligible In-Transit Inventory, valued at the lower of cost or market, on a first in, first out basis, or (ii) eighty-five percent (85%) of the Net Orderly Liquidation Value of such Inventory or (iii) the In-Transit Inventory Loan Cap, less

(d) all applicable Availability Reserves.

**Budget** shall mean the budget prepared in good faith based upon assumptions which the Companies believe to be reasonable setting forth, inter alia, a thirteen (13) week cash flow forecast in reasonable detail satisfactory to the Agent including receipts, disbursements and such line item detail as satisfactory to the Agent, as well as projected borrowings and availability under the Revolving Credit Agreement and the Term Loan Agreement for the thirteen weeks ended June 15, 2008, in the form attached to the Term Loan Agreement as Exhibit B (a true complete and correct copy of which has been provided by to the Agent prior to the date hereof), as updated weekly as contemplated by the Arcus Term Loan Documents, provided that within one business day following any such update thereof, a copy of the Budget, as so updated will be provided by the Companies to the Agent.

**Budget Compliance** shall mean that as of any time of analysis, (i) as of each week, for such week and the Cumulative Period, the actual cash receipts received by Companies shall not be less than 95% of the cash receipts for the corresponding period as set forth in the Budget, (ii) as of each week, for such week and the Cumulative Period, the actual cash disbursements of the Companies shall be no more than 5% more than the cash disbursements for the corresponding period as set forth in the Budget, and (iii) As of each week, for such week and the Cumulative Period, the actual Cumulative Cash Change (as defined in the Budget) of the Companies, shall not represent a consumption of cash greater than 105% of the Cumulative Cash Change for the corresponding period as set forth in the Budget.

**Business Day** shall mean any day on which the Agent, JPMorgan Chase Bank, and, in the case of settlements among the Lenders or the making of advances by the Lenders, the Lenders are open for business.

**Capital Expenditures** shall mean, for any period, the aggregate expenditures of the Companies during such period on account of property, plant, Equipment or similar fixed assets that, in conformity with GAAP, are required to be reflected in the balance sheet of the Companies.

**Capital Improvements** shall mean operating Equipment and facilities (other than land) acquired or installed for use in the Companies' business operations.

**Capital Lease** shall mean any lease of property (whether real, personal or mixed) which, in conformity with GAAP, is accounted for as a capital lease or a Capital Expenditure in the balance sheet of the Companies.

**Cargo Insurance** shall mean a policy or policies of insurance which (i) provide warehouse-to-warehouse coverage for all of the Companies' in-transit Inventory; (ii) insuring against loss and casualty, as a result of any and

-3-

all perils (including perils on the sea and of the sea) and misfortunes; (iii) include a marine extension clause; (iv) are for the full insured value of such Inventory (that is invoice cost, guaranteed freight, other costs, and insurance premiums, plus ten percent (10%)); (v) are issued by one or more insurance carriers which are acceptable to the Agent in its discretion, and (vi) name the Agent, for the benefit of the Lenders as a loss payee.

**Carve-Out** shall have the meaning given to the term "Carve-Out Expenses" in the Final Order or, prior to the entry of the Final Order, the Interim Financing Order provided, however, that in no case should the Carve-Out include any Ineligible Professional Expenses.

**Chase Bank Rate** shall mean the rate of interest per annum announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its principal office in New York City. (The prime rate is not intended to be the lowest rate of interest charged by JPMorgan Chase Bank to its borrowers).

**Chase Bank Rate Loans** shall mean any loans or advances pursuant to this Financing Agreement made or maintained at a rate of interest based upon the Chase Bank Rate.

**Chase Swap** shall mean that certain interest rate swap transaction entered into on or about July 13, 2005, among JPMorgan Chase Bank, National Association and the Companies, bearing reference numbers 200000005062058, 2000005062059/JR under that certain ISDA 2002 Master Agreement dated as of June 30, 2005 among JPMorgan Chase Bank, National Association and the Companies, which Chase Swap was terminated by the parties thereto as of January 31, 2008, resulting in a termination amount due to Chase Bank in the amount of $555,000 (the "**Termination Amount**"), of which the Swap Termination Balance remains due, owing and outstanding on the date of this Agreement.

**Closing Date** shall mean the date that this Financing Agreement has been duly executed by the parties hereto and delivered to the Agent and the initial Revolving Loan hereunder has been funded.

**Collateral** shall mean all present and future real and personal property of the Companies, including, without limitation, Accounts, Equipment, Inventory, Documents of Title, General Intangibles, Real Estate, pledged stock or membership interests of the Companies' subsidiaries and Other Collateral and the proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including, without limitation, hazard, flood, environmental and credit insurance and cargo insurance), negotiable instruments and other instruments for the payment of money (including without limitation all instruments evidencing Intercompany Debt), chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds, Avoidance Actions and Avoidance Action Recoveries and commercial tort claim proceeds;.

**Commitment** shall mean each Lender's commitment in accordance with this Financing Agreement to make Revolving Loans (the "**Revolving Credit Commitment**"), in the amount of their respective pro rata share set forth in schedules prepared by the Agent or the Assignment and Transfer Agreement executed by each such Lender.

**Consistent With Past Practices** shall mean actions taken or not taken, as applicable, in a manner consistent with Agent's past practices. A determination as to whether Agent is acting in a manner Consistent With Past Practices shall (i) take into account that the Companies are debtors and debtors-in-possession in the Bankruptcy Case, (ii) be subject to the occurrence of material changes in market conditions after the date hereof, beyond the control of Lenders, that adversely affect or negatively impact banks and commercial finance companies generally or that could reasonably be expected to cause a bank or commercial finance company to modify the manner in which it would evaluate and/or administrate a discretionary matter, and (iii) assume that the Companies, and the management and nature of the businesses thereof, are consistent with the Companies' past practices. Notwithstanding the foregoing, the parties acknowledge, understand and agree that Lenders shall have no obligation whatsoever or under any circumstances to provide any Overadvances or any other accommodations to the Companies, except as set forth herein.

**Consolidated Balance Sheet** shall mean a consolidated or compiled, as applicable, balance sheet for the Companies, eliminating all inter-company transactions and prepared in accordance with GAAP.

B # 761460 v.5

**Consolidating Balance Sheet** shall mean a Consolidated Balance Sheet plus individual balance sheets for each of the Companies, showing all eliminations of inter-company transactions, including a balance sheet for the Companies exclusively, all prepared in accordance with GAAP.

**Controlled Group** shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Company, are treated as a single employer under Section 414 of the Internal Revenue Code.

**Copyrights** shall mean all of each of the Companies' present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, goodwill, any and all general intangibles, intellectual property and rights pertaining thereto, and all cash and non-cash proceeds thereof.

**Creditors' Committee** shall mean the official committee of unsecured creditors appointed in the Case.

**Cumulative Period** shall mean the period from the Filing Date through the Friday of the most recent four-week period then ended or if a four-week period has not then elapsed from the Filing Date, such shorter period since the Filing Date through the Friday of the most recent week then ended.

**Current Assets** shall mean those assets of the Companies which, in accordance with GAAP, are classified as current.

**Current Liabilities** shall mean those liabilities of the Companies which, in accordance with GAAP, are classified as "current," provided however, that, notwithstanding GAAP, the Revolving Loans and the current portion of Permitted Indebtedness shall be considered "current liabilities."

**Default** shall mean any event specified in Section 10 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act, has been satisfied.

**Default Rate of Interest** shall mean a rate of interest per annum on any Obligations hereunder, equal to the sum of: (a) two percent (2%) and (b) (i) the applicable increment over the Chase Bank Rate (as set forth in paragraph 8.1 hereof) plus the Chase Bank Rate, or (ii) the applicable increment over the LIBOR Rate (as set forth in paragraph 8.14 hereof) plus the LIBOR Rate, which the Agent shall be entitled to charge the Companies on all Obligations due the Agent on behalf of the Lenders, as further set forth in Paragraph 10.2 of Section 10 of this Financing Agreement.

**Depository Accounts** shall mean the collection accounts, which are subject to the Agent's instructions, as specified in Paragraph 3.4 of Section 3 of this Financing Agreement.

**Dilution Percentage** shall mean, as of the time of calculation, the sum of a Company's credits, claims, allowances, discounts, write-offs, contras, off-sets and any other decrease to Trade Accounts Receivable, divided by such Company's gross sales, all calculated on a rolling ninety (90) day average, as determined and calculated by the Agent from time to time.

**DIP Revolver Maturity Date** shall mean the earlier to occur or (a) the date of entry of an order confirming a plan of reorganization, or (b) the termination date set forth in the most recent Financing Order.

**Documentation Fee** shall mean (a) all reasonable fees and expenses incurred in connection with or by the Agent's external legal counsel in negotiating, documenting, preparing for and attending a closing with respect to this Financing Agreement, the Collateral, and/or the Obligations (all exclusive of Out-of-Pocket Expenses), plus (b) subsequent to the Closing Date, the reasonable fees of the Agent's legal counsel, whether or not in-house legal counsel, relating to any and all modifications, waivers, releases, amendments or additional collateral with respect to this Financing Agreement, the Collateral and/or the Obligations (all exclusive of Out-of-Pocket Expenses).

B # 761460 v.5

**Documents of Title** shall mean all of each of the Companies' present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or not and all goods and Inventory relating thereto and all cash and non-cash proceeds of the foregoing.

**Early Termination Date** shall mean the date on which the Companies terminate this Financing Agreement or the Revolving Line of Credit which date is prior to the Anniversary Date. Notice of termination as aforesaid, by a Manager of Borrower Representative on behalf of the Companies, shall be deemed to be notice by all of the Companies for the purposes hereof.

**EBITDA** shall mean, as of the date of determination, (a) consolidated net income of the Companies and their subsidiaries, if any, plus (b) to the extent included in the determination of net income, (i) the provision (less the benefit) for income Taxes, if any, plus (ii) interest expense (less interest income), if any, plus (iii) depreciation and amortization, if any, plus (iv) all provisions and expenses related to the Bankruptcy Case related to professionals, advisors or other costs incurred in connection with the preparation, negotiation and closing of the financing transactions under this Agreement, the Arcus Term Loan Agreement and any transactions related hereto or thereto, plus (v) all extraordinary losses (and minus any extraordinary gains) or unusual or non-recurring charges, if any, all prepared in accordance with GAAP consistently applied.

**Eligible Accounts Receivable** shall mean as to any Company the gross amount of such Company's Trade Accounts Receivable that are subject to a valid, exclusive, first priority and fully perfected security interest in favor of the Agent, on behalf of the Lenders, which conform to the warranties contained herein and which, at all times, continue to be acceptable to the Agent in the exercise of its reasonable business judgment, less, without duplication, the sum of (a) any returns, discounts, claims, credits and allowances of any nature (whether issued, owing, granted, claimed or outstanding), and (b) reserves for any such Trade Accounts Receivable that arise from or are subject to or include: (i) sales to the United States of America, any state or other governmental entity or to any agency, department or division thereof, except for any such sales as to which such Company has complied with the Assignment of Claims Act of 1940 or any other applicable statute, rules or regulation, to the Agent's satisfaction in the exercise of its reasonable business judgment; (ii) foreign sales, other than sales which otherwise comply with all of the other criteria for eligibility hereunder and are (x) secured by letters of credit (in form and substance satisfactory to the Agent) issued or confirmed by, and payable at, banks having a place of business in the United States of America, or (y) to customers residing in Canada or Puerto Rico; (iii) Accounts that remain unpaid more than ninety (90) days from invoice date, excepting only in the case of Delair, with respect to those of its customers which are granted dating terms and are acceptable to the Agent, invoices which are unpaid more than one hundred eighty days (180) days from invoice date and provided further that for such invoices as are unpaid more than one hundred fifty days (150) days from invoice date not more than an aggregate of One Million Eight Hundred Thousand Dollars ($1,800,000.00) of such invoices shall be included as Eligible; (iv) contra accounts; (v) sales to any other Company, any subsidiary, or to any Persons affiliated with the Companies in any way; (vi) bill and hold (deferred shipment) or consignment sales; (vii) sales to any customer which is: (A) insolvent, (B) the debtor in any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceedings under any federal or state law, (C) negotiating, or has called a meeting of its creditors for purposes of negotiating, a compromise of its debts, or (D) financially unacceptable to the Agent or has a credit rating unacceptable to the Agent; (viii) all sales to any customer if fifty percent (50%) or more of the aggregate dollar amount of all outstanding invoices to such customer are unpaid more than ninety (90) days from invoice date or in the case of Delair with respect to those of its customers which are granted dating terms and are acceptable to the Agent, one hundred eighty (180) days; (ix) pre-billed receivables and receivables arising from progress billing; (x) an amount (without duplication of those items included in calculating the Dilution Percentage) representing, historically, returns, discounts, claims, credits, allowances and applicable terms; (xi) sales not payable in United States currency; (xii) sales on a C.O.D. basis or paid by credit card; and (xiii) any other reasons deemed necessary by the Agent in its reasonable business judgment, including without limitation those which are customary either in the commercial finance industry or in the lending practices of the Agent and/or the Lenders.

**Eligible In-Transit Inventory** shall mean Inventory of Ultra that otherwise meets all requirements of Eligible Inventory except that it is Inventory (i) which is in transit from a foreign port to a port located in the United States or is in the possession of a customs broker or other bailee in the United States; (ii) for which title has passed to Ultra or, if required by the Agent, to the Agent, (iii) which is insured to the full value thereof by the Cargo

Insurance, and (iv) for which the Agent shall have in its possession (a) all negotiable bills of lading issued in a format acceptable to the Agent or Issuing Bank and properly endorsed and delivered to the Agent or Issuing Bank in connection with Issuing Bank's issuance of a documentary Letter of Credit for the benefit of the supplier of such Inventory, and (b) all non-negotiable (straight consignment) bills of lading consigned to Ultra and designating Ultra as the "importer of record" for all transactions not backed by a documentary letter of credit.  Provided further, at Agent's option, the Agent need not be in physical possession of the original of non-negotiable bills of lading, provided the Agent has received a true and complete copy of each non-negotiable bill of lading and all originals thereof have been delivered to and shall be held by a Person acceptable to the Agent in all respects, which or who shall have entered into Bailee Agreement.

**Eligible Inventory** shall mean as to any Company the gross amount of such Company's Inventory that is subject to a valid, exclusive, first priority and fully perfected security interest in favor of the Agent, on behalf of the Lenders, and which conforms to the warranties contained herein and which, at all times, continues to be acceptable to the Agent in the exercise of its reasonable business judgment, less, without duplication, any (a) supplies (other than raw materials), (b) Inventory not present in the United States of America or Puerto Rico, (c) Inventory returned or rejected by such Company's customers (other than goods that are undamaged and resalable in the normal course of business) and goods to be returned to such Company's suppliers, (d) Inventory in transit to third parties (other than the Company's agents or warehouses), or in the possession of a warehouseman, bailee, third party processor, or other third party, unless such warehouseman, bailee or third party has executed a notice of security interest agreement (in form and substance satisfactory to the Agent) and the Agent shall have a first priority perfected security interest in such Inventory, and (e) reserves required by the Agent in its reasonable discretion, including without limitation for special order goods, discontinued, slow-moving and obsolete Inventory, market value declines, bill and hold (deferred shipment), consignment sales, shrinkage and any applicable customs, freight, duties and Taxes.

**Equipment** shall mean all of each of the Companies' present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto and all proceeds thereof of whatever sort.

**ERISA** shall mean the Employee Retirement Income Security Act or 1974, as amended from time to time and the rules and regulations promulgated thereunder from time to time.

**Eurocurrency Reserve Requirements** for any day, as applied to a LIBOR Loan, shall mean the aggregate (without duplication) of the maximum rates of reserve requirements (expressed as a decimal fraction) in effect with respect to the Agent and/or any present or future Lender or participant on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under Regulation D or any other applicable regulations of the Board of Governors of the Federal Reserve System or other governmental authority having jurisdiction with respect thereto, as now and from time to time in effect, dealing with reserve requirement., prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by the Agent and/or any such Lenders or participants (such rate to be adjusted to the nearest one sixteenth of one percent (1/16 of 1%) or, if there is not a nearest one sixteenth of one percent (1/16 of 1%), to the next higher one sixteenth of one percent (1/16 of 1%)).

**Existing Financing Agreements** shall mean that certain Financing Agreement among the Companies, Agent and Lenders, dated December 30, 2003, as amended, pursuant to which the Companies have heretofore received financial accommodations including revolving loans, term loans and letter of credit guarantees in an amount of up to $75,680,000, and all related documents, instruments supporting obligations and agreements, contemplated thereby, as any or all of the foregoing have been amended, modified, supplemented or extended from time to time.

**Event(s) of Default** shall have the meaning provided for in Section 10 of this Financing Agreement.

**Financing Order(s)** shall mean, as applicable, an order (whether the Interim Order or the Final Order) entered in the Bankruptcy Case, from time to time, in form and substance satisfactory to the Agent, authorizing the Companies to obtain the financing contemplated by and described in this Agreement.

B # 761460 v.5

**Filing Date** shall mean March 16, 2008.

**Final Order** shall mean a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a final hearing, in form and substance satisfactory to the Agent and the Lenders. The Final Order shall include, without limitation, provisions that have:

(a)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Revolving Line of Credit;

(b)    granted the claim and lien status and liens described in Sections 4 and 6, and prohibited the granting of additional liens on the assets of Companies, other than Permitted Encumbrances;

(c)    provided that such liens are automatically perfected by the entry of the Final Order and also granted to the Agent for the benefit of the Agent and the Lenders;

(d)    granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and ensure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(e)    provided that no Person will be permitted to surcharge the collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(f)    provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 10.2;

(g)    provided that the Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated;

(h)    found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made and done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(i)    providing for repayment in full, in cash of all obligations owing to the Lenders as pre-petition lenders under the Existing Financing Agreements of all sums due and owing to them, the refinancing of which shall constitute Obligations owing under this Financing Agreement.

**Fiscal Quarter** shall mean, with respect to the Companies, each three (3) month period ending on March 31, June 30, September 30, and December 31 of each Fiscal Year.

**Fiscal Year** shall mean each twelve (12) month period commencing on January 1 of each year and ending on the following December 31.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply, provided that in the event Shapes/Arch or the Companies modify their accounting principles and procedures as applied as of the Closing Date, the Companies shall provide to the Agent and the Lenders such statements of reconciliation as shall be in form and substance) acceptable to the Agent.

**General Intangibles** shall mean all of each of the Companies' present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all Trademarks, corporate names, business names, and any other designs or sources of

-8-

business identities, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) inventions, (g) all applications with respect to the foregoing, (h) all right, title and interest in and to any and all extensions and renewals, (i) all goodwill with respect to any of the foregoing, (j) any other forms of similar intellectual property, (k) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, together with all monies and claims for monies now or hereafter due and payable in connection with any of the foregoing or otherwise, (1) all choses in action, causes of action, corporate and business records, and (m) all cash and non-cash proceeds thereof including, without limitation, the proceeds or royalties of any licensing agreements between the Companies and any licensee of any of the Companies' General Intangibles.

**Guaranties** shall mean the guaranty documents executed and delivered by the Guarantors guaranteeing the Obligations.

**Guarantors** shall mean each of the Companies as cross-corporate guarantors and any other Person who shall agree to be a guarantor or surety for the Obligations.

**Indebtedness** shall mean, without duplication, all liabilities, contingent or otherwise, which are any of the following: (a) obligations in respect of borrowed money or for the deferred purchase price of property, services or assets, other than Inventory, or (b) Capital Lease obligations.

**Ineligible Professional Expenses** shall mean fees or expenses incurred by Person, including the Creditors' Committee, in (a) preventing, hindering or delaying Agent's or Lenders' enforcement or realization upon any of the Collateral once an Event of Default has been declared by the Agent, (b) applying for or consummating use of cash collateral or sell any Collateral without Agent's prior written consent (except to the extent permitted by this Agreement), (c) incurring Indebtedness without Agent's prior written consent (except to the extent permitted by this Agreement), (d) any action which contravenes a right or protection of Agent and Lenders under the Loan Documents, and (e) objecting to or consenting in any manner, or in raising any defenses to, the validity, extent, perfection, priority or enforceability of the Obligations or any liens or claims with respect thereto, or any other rights or interests of Agent and Lenders, or in asserting any claims, causes of action or equitable subordination claims against Agent or Lenders and, (f) any other fees and expenses excluded by virtue of the applicable Financing Order.

**Insurance Proceeds** shall mean proceeds or payments from an insurance carrier with respect to any loss, casualty or damage to Collateral.

**Intercompany Debt** shall mean all Indebtedness outstanding from any one of the Companies to any other of the Companies.

**Intercreditor Agreement** shall mean that certain Intercreditor Agreement dated the date of the Closing Date, between the Agent, the Companies and Arcus, in form and substance satisfactory to the Agent in its sole discretion.

**Interest Period** shall mean:

(a)     with respect to any initial request by any of the Companies for a LIBOR Loan, a one month, two month, or three month period commencing on the borrowing or conversion date with respect to a LIBOR Loan and ending one, two, or three months thereafter, as applicable; and

(b)     thereafter with respect to any continuation of, or conversion to, a LIBOR Loan, at the option of any of the Companies, any one month, two month, or three month period commencing on the last day of the immediately preceding Interest Period applicable to such LIBOR Loan and ending one, two, or three months thereafter, as applicable;

provided that, the foregoing provisions relating to Interest Periods are subject to the following:

B # 761460 v.5

(i)    if any Interest Period would otherwise end on a day which is not a Working Day, that Interest Period shall be extended to the next succeeding Working Day, unless the result of such extension would extend such payment into another calendar month in which event such Interest Period shall end on the immediately preceding Working Day;

(ii)    any Interest Period that begins on the last Working Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month, at the end of such Interest Period) shall end on the last Working Day of a calendar month; and

(iii)    for purposes of determining the availability of Interest Periods, such Interest Periods shall be deemed available if (x) JPMorgan Chase Bank quotes an applicable rate or the Agent determines LIBOR, as provided in the definition of LIBOR, (y) the LIBOR determined by JPMorgan Chase Bank or the Agent will adequately and fairly reflect the cost of maintaining or funding its loans bearing interest at LIBOR, for such Interest Period, and (z) such Interest Period will end on or before the Anniversary Date.  If a requested Interest Period shall be unavailable in accordance with the foregoing sentence, the Companies shall continue to pay interest on the Obligations at the applicable per annum rate based upon the Chase Bank Rate.

**Interim Financing Order** means an order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a preliminary hearing under Rule 4001 of the Bankruptcy Code, in form and substance satisfactory to Agent and the Lenders.  The Interim Financing Order shall include, without limitation, provisions that have:

(a)    authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Revolving Line of Credit.

(b)    granted the claim and lien status and liens described in Sections 4 and 6, and prohibited the granting of additional liens on the assets of the Companies other than Permitted Encumbrances.

(c)    provided that such liens are automatically perfected by the entry of the Interim Financing Order and also granted to the Agent for the benefit of the Lenders.

(d)    granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable the Agent, if the Agent elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by the Agent to perfect, protect and insure the priority of its liens upon the Collateral as a matter of non-bankruptcy law.

(e)    provided that no Person, effective as of entry of the Final Order or any extension of the Interim Financing Order, will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.

(f)    provided Agent with relief from the automatic stay in a manner consistent with the terms of Section 11.2.

(g)    provided that the Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated.

(h)    found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made or done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(i)    approving a repayment in full, in cash of all obligations owing to the Lenders as pre-petition lenders under the Existing Financing Agreements of all sums due and owing to them, the refinancing of which shall constitute Obligations owing under this Financing Agreement.

B # 761460 v.5

**In-Transit Inventory Loan Cap** shall mean the amount of Two Million Dollars ($2,000,000.00) which may be outstanding with respect to Eligible In-Transit Inventory owned by Ultra.

**Inventory** shall mean all of each of the Companies' present and hereafter acquired inventory (as defined in the UCC) and including, without limitation, all merchandise, inventory and goods, and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging or shipping same in all stages of production from raw materials through work-in-process to finished goods and all proceeds thereof of whatever sort.

**Inventory Loan Cap** shall mean the amount which, in the aggregate as to all Companies, is the lesser of (a) Thirty Million Dollars ($30,000,000.00), or (b)(i) during the six-month period commencing April 1 and continuing through September 30 the amount which is one hundred percent (100%) of aggregate availability with respect to the Companies' Eligible Accounts and (ii) during each six-month period commencing October 1 and continuing through March 31 the amount which is one hundred twenty-five percent (125%) of aggregate availability with respect to the Companies' Eligible Accounts, which in the case of each of (i) and (ii) shall be calculated in accordance with clause (a) of the definition of the Borrowing Base.

**Investment Property** shall mean all now owned and hereafter acquired investment property (as defined in the UCC) and all proceeds thereof.

**Issuing Bank** shall mean the bank issuing Letters of Credit for the Companies.

**Letters of Credit** shall mean all letters of credit issued with the assistance of the Agent on behalf of the Lenders in accordance with Section 5 hereof by the Issuing Bank for or on behalf of the Companies including, for purposes of clarification, any letter(s) of credit which were issued under the Existing Financing Agreements and remain outstanding.

**Letter of Credit Guaranty** shall mean the guaranty delivered by the Agent, on behalf of the Lenders, to the Issuing Bank of the Companies' reimbursement obligations under the Issuing Bank's reimbursement agreement, application for Letter of Credit or other like document.

**Letter of Credit Guaranty Fee** shall mean the fee the Agent, on behalf of the Lenders, may charge the Companies under Paragraph 8.3 of Section 8 of this Financing Agreement for (a) issuing a Letter of Credit Guaranty, and/or (b) otherwise aiding the Companies in obtaining Letters of Credit, all pursuant to Section 5 hereof.

**Letter of Credit Sub-Line** shall mean the commitment of the Lenders to assist the Companies in obtaining Letters of Credit, pursuant to Section 5 hereof in an aggregate amount of up to Eight Million Dollars ($8,000,000.00) with respect to documentary letters of credit issued for the purchase of imported Inventory and with respect to stand-by Letters of Credit issued for the Companies' business purposes unrelated to the purchase of Inventory.

**LIBOR** shall mean, at any time of determination, and subject to availability, for each applicable Interest Period, a variable rate of interest equal to: (a) at CIT's election (i) the rate set forth in the New York edition of The Wall Street Journal under the "Money Rates" section for "London Interbank Offered Rates," (ii) the applicable LIBOR quoted to CIT by JPMorgan Chase Bank (or any successor thereof), or (iii) the rate of interest determined by CIT at which deposits in U.S. dollars are offered for the relevant Interest Period based on information presented on Telerate Systems at Page 3750 as of 11:00 A.M. (London time) on the day which is two (2) Business Days prior to the first day of such Interest Period, provided that, if at least two such offered rates appear on the Telerate Page 3750 (or any successor thereof) in respect of such Interest Period, the arithmetic mean of all such rates (as determined by CIT) will be the rate used; divided by (b) a number equal to 1.0 minus the aggregate (but without duplication) of the rates (expressed as a decimal fraction) of Eurocurrency Reserve Requirements in effect on the day which is two (2) Business Days prior to the beginning of such Interest Period.

**LIBOR Lending Office** with respect to the Agent, shall mean the office of JPMorgan Chase Bank, or any successor thereof maintained at 270 Park Avenue, New York, NY 10017.

B # 761460 v.5

**LIBOR Loan** shall mean any loans made pursuant to this Financing Agreement which are made or maintained at a rate of interest based upon LIBOR, provided, however, that the Agent shall have no obligation to permit the Companies to elect interest based upon LIBOR in the event that (i) an Event of Default has occurred hereunder, which has not been Waived In Writing By Agent, and (ii) the LIBOR Loan Interest Period requested would end subsequent to the Anniversary Date or any applicable Early Termination Date.

**Line of Credit** shall mean the aggregate commitment of the Lenders to (a) make Revolving Loans pursuant to Section 3 of this Financing Agreement and (b) assist the Companies in opening Letters of Credit and providing the Letter of Credit Guarantees therefor, pursuant to Section 5 of this Financing Agreement, in the aggregate amount equal to Sixty Million Dollars ($60,000,000.00); provided that nothing herein shall be deemed to increase any Lender's commitment hereunder, and which commitment shall be set forth in the applicable schedules maintained by the Agent or the Assignment and Transfer Agreements executed by such Lender.

**Line of Credit Fee** shall: (a) mean the fee due the Agent for the benefit of the Lenders at the end of each month for the Line of Credit, and (b) be determined by multiplying the difference between (i) the Revolving Line of Credit, and (ii) the sum, for said month, of (x) the average daily balance of Revolving Loans plus (y) the average daily balance of Letters of Credit outstanding for said month, by one quarter of one percent (0.25%) per annum for the number of days in said month.

**Loan Documents** shall mean this Financing Agreement, the Financing Orders, the Promissory Note, the Mortgages, the other closing documents and any other ancillary loan and security agreements executed from time to time in connection with this Financing Agreement, all as may be renewed, amended, extended, increased, restated or supplemented from time to time.

**Mortgages** shall mean, collectively, (i) that certain Open-End Mortgage and Security Agreement dated December 30, 2003, from Accu-Weld in favor of Agent, recorded on January 23, 2004, at Book 3820, page 1879 et seq., in the Bucks County (Pennsylvania) Recorder's Office, encumbering the Real Estate located at 1211 Ford Road, Bensalem, Pennsylvania (the "**Bensalem Property**"), as amended by that certain Mortgage Modification Agreement dated June 30, 2005, between Accu-Weld and Agent, recorded on August 3, 2005, at Book 4561, page 1204 et seq., in the Bucks County (Pennsylvania) Recorder's Office, (ii) that certain Mortgage and Security Agreement dated December 30, 2003, from Shapes in favor of Agent, recorded on February 20, 2004, at Mortgage Book 07369, page 0056 et seq., and re-recorded on July 13, 2004, at Mortgage Book 07511, page 0609 et seq., in the Camden County (New Jersey) Clerk's Office, encumbering the Real Estate located at (A) 8600/9000 River Road, Delair, New Jersey (the "**Delair Property**") and (B) 1777 Hylton Road, Pennsauken, New Jersey (the "**Pennsauken Property**"), as amended by that certain Mortgage Modification Agreement dated June 30, 2005, between Shapes and Agent, recorded on July 27, 2005, at Mortgage Book 07897, page 1147 et seq., in the Camden County (New Jersey) Clerk's Office, (iii) that certain Assignment of Leases, Rents and Profits dated December 30, 2003, from Accu-Weld in favor of Agent, recorded on January 23, 2004, at Book 3820, page 1926 et seq., with respect to the Bensalem Property, as amended by that certain Modification of Assignment of Leases, Rents and Profits dated June 30, 2005, between Accu-Weld and Agent, recorded on August 3, 2005, at Book 4561, page 1213 et seq., in the Bucks County (Pennsylvania) Recorder's Office, and (iv) that certain Assignment of Leases, Rents and Profits dated December 30, 2003, from Shapes in favor of Agent, recorded on February 20, 2004, at Book 07369, page 0102 et seq., with respect to the Delair Property and the Pennsauken Property, as amended by that certain Modification of Assignment of Leases, Rents and Profits dated June 30, 2005, between Shapes and Agent, recorded on July 27, 2005, in the Camden County (New Jersey) Clerk's Office, as each of the same may be further modified by those certain modifications or amendments between the parties thereto dated as of the date hereof, as the same may hereafter be further amended, modified, restated, replaced and/or supplemented from time to time.

**Net Orderly Liquidation Value** shall mean the value of the Companies' Inventory in an orderly liquidation, after giving effect to all fees and expenses attendant to such sale, as determined by an appraiser selected by the Agent in its discretion.

**Notice of Non-Funding** shall mean a written notice by Arcus to the Companies and Agent, pursuant to which Arcus advises such parties that Arcus (for itself or as agent for any other lender under the Arcus Term Loan Agreement) does not intend to fund loans under the Arcus Term Loan Agreement.

B # 761460 v.5

**Obligations** shall mean all loans, advances and extensions of credit made or to be made by the Agent and/or the Lenders to the Companies or any one of them or to others for the account of any Company (including, without limitation, all Revolving Loans, Letter of Credit Guaranties (whether arising under this Financing Agreement, the Existing Financing Agreements, or otherwise), and the Swap Termination Balance under or pursuant to this Agreement, the Financing Orders or the Loan Documents, which may at any time be owing by the Companies or any one of them to the Agent and/or the Lenders howsoever arising, whether now in existence or incurred by the Companies or any one of them from time to time hereafter under or pursuant to the Loan Documents and the Existing Financing Agreements, whether principal, interest, fees, costs, expenses or otherwise (including reasonable attorneys' fees); whether secured by pledge, lien upon or security interest in any of the Companies' Collateral, assets or property or the assets or property of any other Person; whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether the Companies or any one of them are liable to the Agent and/or the Lenders for such indebtedness as principal, surety, endorser, guarantor or otherwise. Obligations shall also include indebtedness owing to the Agent and/or the Lenders by the Companies or any one of them under any Loan Document, indebtedness or obligations incurred by, or imposed on, the Agent and/or the Lenders as a result of environmental claims arising out of any of the Companies' operations, premises or waste disposal practices or sites in accordance with paragraph 7.7 hereof; the Companies' liability to the Agent and/or the Lenders as maker or endorser of any promissory note or other instrument for the payment of money; the Companies' liability for Out-of-Pocket Expenses; the Companies' liability to the Agent and/or the Lenders under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which the Agent and/or the Lenders may make or issue to others for the Companies' account as contemplated by the Loan Documents, including any Letter of Credit Guaranty or other accommodation extended by CIT with respect to applications for Letters of Credit, the Agent's and/or Lenders' acceptance of drafts or the Agent's and/or Lenders' endorsement of notes or other instruments for the Companies' account and benefit. Without limitation of the foregoing, (i) Obligations shall include Bankruptcy Case Expenses and shall include all such obligations, liabilities and indebtedness arising after the commencement of the Bankruptcy Case, and (ii) all Obligations owing under this Agreement shall be secured in full by all of the Collateral of all nature and types, whether arising before, on or after the filing of the Bankruptcy Case and, similarly all indebtedness and obligations of any nature of type owing under the Existing Financing Agreements shall be secured by all of the Collateral, whether rising before, on or after the commencement of the Bankruptcy Case.

**Operating Leases** shall mean all leases of property (whether real, personal or mixed) other than Capital Leases.

**Other Collateral** shall mean all of each of the Companies' now owned and hereafter acquired lockbox, blocked account and any other deposit accounts maintained with any bank or financial institutions into which the proceeds of Collateral are or may be deposited; all other deposit accounts and all Investment Property; all cash and other monies and property in the possession or control of the Agent and/or any of the Lenders; all books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; and all cash and non-cash proceeds of the foregoing.

**Out-of-Pocket Expenses** shall mean all of the Agent's present and future costs and expenses incurred relative to this Financing Agreement or any other Loan Documents (which shall include the reasonable fees of counsel for the Lenders incurred after the occurrence of an Event of Default which is not Waived In Writing By Agent), whether incurred heretofore or hereafter, which expenses shall include, without being limited to: the cost of record searches, all costs and expenses incurred by the Agent in opening bank accounts, depositing checks, syndicating loan, receiving and transferring funds, and wire transfer charges, any charges imposed on the Agent due to returned items and "insufficient funds" of deposited checks and the Agent's standard fees relating thereto, any amounts paid by, incurred by or charged to, the Agent and/or the Lenders by the Issuing Bank under a Letter of Credit Guaranty or the Companies' reimbursement agreement, application for Letters of Credit or other like document which pertain either directly or indirectly to such Letters of Credit, and the Agent's standard fees relating to the Letters of Credit and any drafts thereunder, travel, lodging and similar expenses of the Agent's personnel, agents or representatives in connection with inspecting and monitoring the Collateral from time to time hereunder, any applicable counsel fees and disbursements, fees and taxes relative to the filing of financing statements, all expenses, costs and fees set forth in Paragraph 10.3 of Section 10 of this Financing Agreement, and title insurance

-13-

B # 761460 v.5

premiums, real estate survey costs, and costs of preparing and recording mortgages/deeds of trust against the Real Estate, and the Bankruptcy Case Expenses.

**Overadvances** shall mean the amount by which (a) the sum of all outstanding Revolving Loans, Letters of Credit and advances made hereunder exceed (b) the Borrowing Base.

**Parent** shall mean Shapes/Arch, which owns one hundred percent (100%) of each of the other Companies.

**Patents** shall mean all of each of the Companies' present and hereafter acquired patents, patent applications, registrations, any reissues or renewals thereof licenses, any inventions and improvements claimed thereunder, and all general intangible, intellectual property and patent rights with respect thereto of the Companies or any one of them, and all income, royalties, cash and non-cash proceeds thereof.

**Periodic Swap Reserve** shall mean an amount equal to $50,000 per week that may be taken into reserve against the Borrowing Base (or in lieu of imposing a reserve, may be paid to JP Morgan Chase Bank), commencing on March 21, 2008 and continuing thereafter on a weekly basis up to the aggregate amount of the Swap Termination Balance, and which, to the extent not previously paid, will be fully paid, satisfied and discharged on or before April 7, 2008.

**Permitted Encumbrances** shall mean:   (a) liens existing on the date hereof on specific items of Equipment, liens arising after the date hereof on the same specific items of Equipment for the refinance of purchase-money Indebtedness, and other liens expressly permitted, or consented to in writing by the Agent and/or the Required Lenders; (b) Purchase Money Liens; (c) liens of local or state authorities for franchise or other like Taxes, provided that the aggregate amounts of such liens shall not exceed One Hundred Thousand Dollars ($100,000.00) in the aggregate at any one time; (d) statutory liens of landlords and liens of carriers, warehousemen, bailees, mechanics, materialmen and other like liens imposed by law, created in the ordinary course of business and for amounts not yet due (or which are being contested in good faith, by appropriate proceedings or other appropriate actions which are sufficient to prevent imminent foreclosure of such liens) and with respect to which adequate reserves or other appropriate provisions are being maintained by the Companies in accordance with GAAP:, (e) deposits made (and the liens thereon) in the ordinary course of business of the Companies (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts; (f) easements (including, without limitation, reciprocal easement agreements and utility agreements), encroachments, minor defects or irregularities in title, variation and other restrictions, charges or encumbrances (whether or not recorded) affecting the Real Estate, if applicable, and which in the aggregate (A) do not materially interfere with the occupation, use or enjoyment by any of the Companies of their business or the property so encumbered and (B) in the reasonable business judgment of the Agent do not materially and adversely affect the value of such Real Estate; (g) liens granted to the Agent by the Companies or any one of them; (h) liens of judgment creditors provided such liens do not exceed, in the aggregate, at any time, Two-Hundred Thousand Dollars ($200,000.00) (other than liens bonded or insured to the reasonable satisfaction of the Agent); (i) consignment purchases not to exceed, in the aggregate, the sum of Three Million Dollars ($3,000,000.00) outstanding at any time, provided, however, such Inventory shall not be Eligible Inventory; (j) tax liens which are not yet due and payable or which are being diligently contested in good faith by the Companies by appropriate proceedings, and which liens are not (A) filed on any public records, (B) other than with respect to Real Estate, senior to the liens of the Agent or (C) for Taxes due the United States of America or any state thereof having similar priority statutes, as further set forth in Paragraph 7.6 hereof; and (k) the liens and security interests in favor of Arcus pursuant to the Arcus Term Loan Documents, subject to the terms and conditions of the Intercreditor Agreement.

**Permitted Indebtedness** shall mean:   (a) current Indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, Taxes or labor; (b) Indebtedness secured by Purchase Money Liens; (c) Subordinated Debt; (d) Indebtedness arising under Letters of Credit and this Financing Agreement; (e) deferred Taxes and other expenses incurred in the ordinary course of business; (f) Capital Lease Obligations having aggregate annual payments up to but not exceeding Four Hundred Thousand Dollars ($400,000.00); (g) insurance premiums financed by the insurance carrier; (h) Intercompany Debt; (i) unsecured

B # 761460 v.5

Indebtedness incurred prior to the Filing Date and listed on Companies' schedule filed with the Bankruptcy Court in connection with the Bankruptcy Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (j) administrative priority unsecured Indebtedness approved by the Bankruptcy Court in the Bankruptcy Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (k) the Swap Termination Balance; (l) the Arcus Term Loan; and (m) other Indebtedness existing on the date of execution of this Financing Agreement and set forth with particularity on **Schedule 1P** attached hereto.

      **Permitted Investments** shall mean (a) obligations issued or guaranteed by the United States of America or any agency thereof, (b) commercial paper with maturities of not more than one hundred eighty (180) days and a published rating of not less than A-l or P-l (or the equivalent rating), (c) certificates of time deposit and bankers' acceptances having maturities of not more than one hundred eighty (180) days and repurchase agreements backed by United States government securities of a commercial bank if (i) such bank has a combined capital and surplus of at least $500,000,000.00, or (ii) its debt obligations, or those of a holding company of which it is a subsidiary, are rated not less than A (or the equivalent rating) by a nationally recognized investment rating agency, and (d) U.S. money market funds that invest solely in obligations issued or guaranteed by the United States of America or an agency thereof.

      **Person** shall mean any individual, partnership, business entity, corporation, limited liability company, limited partnership, limited liability partnership, or other entity, including without limitation any governmental entity or the department thereof.

      **Plan** shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Companies or any member of the Controlled Group or any such Plan to which any Company or any member of the Controlled Group is required to contribute on behalf of any of its employees.

      **Prior Lender Subordination Agreement** shall mean that certain Existing Lender Standstill Subordination Agreement dated December 30, 2003, among PNC Bank, National Association, National City Bank of Pennsylvania, Wachovia Bank, National Association, Spring Street Associates, the Companies (other than Shapes/Arch) and Agent.

      **Promissory Note** shall mean the Revolving Credit Note.

      **Purchase Money Liens** shall mean liens on any item of Equipment acquired after the date of this Financing Agreement provided that (a) each such lien shall attach only to the Equipment to be ,acquired, (b) a description of the Equipment so acquired is furnished to the Agent, and (c) Indebtedness incurred in connection with such acquisitions shall not exceed, in the aggregate, Three Hundred Fifty Thousand Dollars ($350,000.00) in any Fiscal Year.

      **Real Estate** shall mean all of each of the Companies' fee interests in real property, including any such real property which has been, or will be, encumbered, mortgaged or pledged or assigned to the Agent or its designee as set forth on **Schedule 1R.**

      **Reorganization Plan** shall mean any plan or plans of reorganization proposed or confirmed in the Bankruptcy Case.

      **Required Lenders** shall mean the Lenders holding (a) not less than sixty-six and two-thirds (66-2/3%) or (b) if there are fewer than three (3) Lenders, one hundred percent (100%), of the aggregate commitments under this Financing Agreement, or, if no commitments are outstanding, the Lenders holding (x) not less than sixty-six and two-thirds percent (66-2/3%) of the outstanding Loans or (y) if there are fewer than three (3) Lenders, Lenders holding one hundred percent (100%) of the outstanding Loans.

      **Reserved Termination Amount** shall mean the amount of $425,000, representing the portion of the Termination Amount (as defined in the definition of Chase Swap herein) that was reserved for under the Existing

B # 761460 v.5

Financing Agreements, constituted part of the Obligations (under and as defined in the Existing Financing Agreements), and was advanced as a Revolving Loan immediately prior to the Effective Date.

**Revolving Credit Note** shall mean that certain promissory note in the form of Exhibit A to this Financing Agreement, dated as of the Closing Date, in the face amount of Sixty Million Dollars ($60,000,000.00) executed by the Companies to evidence the Revolving Loans made under the Revolving Line of Credit by the Agent and the Lenders under Section 3 hereof.

**Revolving Line of Credit** shall mean the aggregate commitment of the Lenders to make loans and advances pursuant to Section 3 of this Financing Agreement and issue Letter of Credit Guaranties pursuant to Section 5 hereof to the Companies, in the aggregate amount of up to Sixty Million Dollars ($60,000,000.00).

**Revolving Loan Accounts** shall mean the accounts on the Agent's books, in names of each of the Companies, in which each Company will be charged with all applicable Obligations under this Financing Agreement.

**Revolving Loans** shall mean the loans and advances made, from time to time, to or for the account of the Companies by the Agent, on behalf of the Lenders, pursuant to Section 3 of this Financing Agreement.

**Senior Claims** shall have the meaning provided for in Section 4.1 of this Agreement.

**Settlement Date** shall mean the date, weekly, and more frequently, at the discretion of the Agent, upon the occurrence of an Event of Default or a continuing decline or increase of the Revolving Loans that the Agent and the Lenders shall settle amongst themselves so that (a) the Agent shall not have, as the Agent, any money at risk and (b) on such Settlement Date the Lenders shall have a pro rata amount of all outstanding Revolving Loans and Letters of Credit subject to Letter of Credit Guarantees, provided that each Settlement Date for a Lender shall be a Business Day on which such Lender and its bank are open for business.

**Shapes/Arch** shall mean Shapes/Arch Holdings L.L.C., a New Jersey Limited Liability Company.

**Standstill Subordination Agreement** shall mean the Subordination Agreement dated December 30, 2003 among the Companies (other than Shapes/Arch), Stephen Kendall (or the Estate of Stephen Kendall), Frank Kessler, and A. Jerome Grossman, and Agent.

**Subordination Agreement(s)** shall mean each agreement (in form and substance satisfactory to the Agent) among the Companies, a Subordinating Creditor and the Agent, pursuant to which Subordinated Debt is subordinated, on terms set forth therein, to the prior payment and satisfaction of the Companies' Obligations to the Agent and the Lenders, including the Standstill Subordination Agreement and the Prior Lender Subordination Agreement.

**Subordinated Debt** shall mean the debt due a Subordinating Creditor (and the note(s) evidencing such) which has been subordinated by a Subordination Agreement (in form and substance satisfactory to the Agent), to the prior payment and satisfaction of the Obligations.

**Subordinating Creditor** shall mean each of the Subordinated Creditors (as defined in the Standstill Subordination Agreement) and any other Person hereafter executing a Subordination Agreement.

**Superpriority Claim** shall mean an allowed claim against a Company or its estate in the Case, which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

B # 761460 v.5

**Swaps** shall mean any interest rate cap, collar, swap, hedge or other derivative transaction entered into by the Companies in the ordinary course of their businesses for the purpose of hedging against interest rate fluctuations and not for the purpose of investment or speculation.

**Swap Termination Balance** shall mean the amount of $130,000, representing the Termination Amount (as defined in the Chase Swap) remaining outstanding and unpaid and for which there is no reserve against the Borrowing Base as of the Effective Date.

**Taxes** shall mean all federal, state, municipal and other governmental taxes, levies, charges, claims and assessments which are or may be due from the Companies with respect to their business, operations, Collateral or otherwise.

**Trade Accounts Receivable** shall mean that portion of the Companies' Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of the Companies' businesses.

**Trademarks** shall mean all of each of the Companies' present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, service marks, logos, prints and labels (on which any of the foregoing may appear)., licenses, reissues, renewals, and any other intellectual property and trademark rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all cash and non-cash proceeds thereof.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York.

**Waived In Writing By Agent** shall mean the written waiver of an Event of Default by the Agent either acting in its discretion or acting at the direction of the Required Lenders, in the case of the waiver of Events of Default which require such consent.

**Working Capital** shall mean Current Assets in excess of Current Liabilities.

**Working Day** shall mean any Business Day on which dealings in foreign currencies and exchanges between banks may be transacted.

## SECTION 2    Conditions Precedent

**2.1**     The obligation of the Agent and the Lenders to make the initial loans hereunder is subject to the satisfaction of, or extension or waiver of in writing, on or prior to, the Closing Date, the following conditions precedent:

(a)     **Lien Searches** - The Agent shall have received tax, judgment and UCC searches satisfactory to the Agent for all locations presently occupied or used by each of the Companies and the Guarantors and for each jurisdiction wherein a Company or Guarantor is located as defined in the UCC.

(b)     **Casualty Insurance** - Each of the Companies shall have delivered to the Agent evidence satisfactory to the Agent that casualty insurance policies listing the Agent as additional insured, lender loss payee or mortgagee, as the case may be, are in full force and effect, all as set forth in Paragraph 7.5 of Section 7 of this Financing Agreement.

(c)     **UCC Filings** - Any financing statements required to be filed in order to create, in favor of the Agent, on behalf of the Lenders, a first perfected security interest in the Collateral (except as otherwise contemplated by the Intercreditor Agreement), subject only to the Permitted Encumbrances, shall have been properly filed in each office in each jurisdiction required in order to create in favor of the Agent for the benefit of the Lenders a perfected lien on the Collateral. The Agent shall have received acknowledgment copies of all such filings (or, in lieu thereof the Agent shall have received other evidence satisfactory to the Agent that all such filings

-17-

B # 761460 v.5

have been made) and the Agent shall have received evidence that all necessary filing fees and all taxes or other expenses related to such filings have been paid in full.

        (d)    **Member Consents/Board Resolution** - The Agent shall have received a copy of the consents or resolutions as applicable of the Members, Managers, or Board of Directors of each of the Companies and the Guarantors (as the case may be) authorizing the execution, delivery and performance of (i) this Financing Agreement, (ii) the Guaranties, and (iii) any related agreements, in each case certified by the Member, Manager or the Secretary or Assistant Secretary of the Companies and the Guarantors (as the case may be) as of the date hereof together with a certificate of the Member, Manager or the Secretary or Assistant Secretary of the Companies and the Guarantors (as the case may be) to the incumbency and signature of the officers, Member or Managers of the Companies and/or the Guarantors executing such Loan Documents and any certificate or other documents to be delivered by them pursuant hereto, together with evidence of the incumbency of such Member, Manager or Secretary or Assistant Secretary.

        (e)    **Company/Corporate Organization** - The Agent shall have received (i) a copy of the Amended and Restated Certificate of Formation or Certificate of Incorporation, as applicable, of the Companies and the Guarantors which are not individual Persons certified by the Secretaries of State of the state of their formation or incorporation, and (ii) a copy of the Operating Agreement, Limited Liability Company Agreement, or By-Laws, as applicable, of the Companies and the Guarantor certified by the Manager or Secretary or Assistant Secretary thereof all as amended through the date hereof.

        (f)    **Member's/Manager's/Officer's Certificate** - The Agent shall have received an executed Member's, Manager's or Officer's Certificate of the Companies, satisfactory in form and substance to the Agent, certifying on behalf of the Companies that: (i) the representations and warranties contained herein, and in the other Loan Documents, are true and correct in all material respects on and as of the Closing Date; (ii) the Companies are in compliance with all of the terms and provisions set forth herein and in the other Loan Documents; and (iii) no Default or Event of Default has occurred.

        (g)    Intentionally omitted.

        (h)    **Absence of Default** - No Default or Event of Default shall have occurred and no material adverse change shall have occurred in the financial condition, business, prospects, profits, operations or assets of the Companies or the Guarantors or any of their subsidiaries; provided that the commencement of the Bankruptcy Case shall not be deemed a material adverse change for the purposes of this section.

        (i)    **Legal Restraints/Litigation** - As of the Closing Date, there shall be no: (x) litigation, investigation or proceeding (judicial or administrative) pending or threatened against the Companies or the Guarantors or any of their assets, by any agency, division or department of any county, city, state or federal government arising out of this Financing Agreement; (y) injunction, writ or restraining order restraining or prohibiting the consummation of the financing arrangements contemplated under this Financing Agreement; or (z) suit, action, investigation or proceeding (judicial or administrative) pending against any of the Companies or the Guarantors or their assets, which, in the opinion of the Agent, if adversely determined, could reasonably be expected to have a material adverse effect on the business, operation, assets, financial condition or Collateral of the Companies and/or the Guarantors or any one of them.

        (j)    **Intercreditor Agreement** - Arcus and the Companies shall have entered into the Intercreditor Agreement with the Agent.

        (k)    **Standstill Subordination Agreement** - The Subordinating Creditors under the Existing Financing Agreements shall have ratified and confirmed the continuing validity and binding nature of their respective Standstill Subordination Agreements with respect to this Agreement and any other Subordinating Creditors shall have executed and delivered to Agent for the benefit of the Lenders, a Subordination Agreement, in form and substance satisfactory to the Agent.

B # 761460 v.5

(l)      **Budget Projections** - The Agent and the Lenders shall have received, reviewed and been satisfied with the Budget.

(m)      **Additional Documents** - Each of the Companies and the Guarantors shall have executed and delivered to the Agent all Loan Documents necessary to consummate the lending arrangement contemplated between the Companies, the Agent and the Lenders, including, without limitation such mortgage reaffirmation and modification agreements as requested by Agent.

(n)      **Disbursement Authorization** - The Companies shall have delivered to the Agent all information necessary for the Agent and the Lenders to issue wire transfer instructions on behalf of the Companies for the initial and subsequent loans and/or advances to be made under this Financing Agreement including, but not limited to, disbursement authorizations in form acceptable to the Agent.

(o)      **Examination and Verification** - The Agent and each of the Lenders shall have completed, to their respective satisfaction, an examination and verification of the Accounts, Inventory, financial statements, books and records of each of the Companies which examination shall indicate that no material adverse change (as determined by the Agent in its discretion) has occurred in the business, prospects, profitability, assets or operations of any of the Companies, and Agent shall be satisfied there shall have been no other event, development or circumstance that has had or could reasonably be expected to have a material adverse effect on the business, assets, liabilities (actual or contingent) or prospect of any of the Companies, other than the commencement of the Bankruptcy Case and the consequences that would normally result therefrom, in each case, since February 29, 2008.

(p)      **Existing Financing Agreements** - The Agent shall receive proceeds from the Arcus Term Loan to be applied to a portion of the Obligations owing under the Existing Financing Agreements as follows: (i) up to $8,500,000 to fully pay, satisfy and discharge Lenders' term loans to the Companies under the Existing Financing Agreements, (ii) up to $4,400,000 to fully pay, satisfy and discharge the portion of the revolving loans outstanding under and advanced pursuant to the PP&E Equity Collateral Borrowing Base Component of the Borrowing Base under and as defined in the Existing Financing Agreements (which includes amounts advanced in connection with the Reserved Termination Amount), and (iii) such additional amounts as are necessary to fully pay, satisfy and discharge all outstanding fees, costs and expenses of the Lenders as of the Closing Date.

(q)      **Depository Accounts** - Each of the Companies shall have established a system of lockbox and bank accounts with respect to the collection of Accounts and the deposit of proceeds of Collateral as shall be acceptable to the Agent in all respects. Such accounts shall be subject to three-party agreements (between the Companies, the Agent and the depository bank), in form and substance satisfactory to the Agent.

(r)      **Arcus Term Loan** - Arcus shall provide the Agent with the Arcus Term Loan Documentation, in form and substance satisfactory to the Agent.

(s)      **Schedules** - The Companies shall provide the Agent with schedules of (a) any of the Companies' and their subsidiaries' (i) Trademarks, (ii) Patents, and (iii) Copyrights, as applicable and all in such detail as to provide appropriate recording information with respect thereto, (b) any tradenames, (c) Collateral locations, and (d) Permitted Encumbrances, all of the foregoing in form and substance satisfactory to the Agent.

(t)      Intentionally omitted.

(u)      **Certain Bankruptcy Case Matters** -

(i)      The Companies shall have complied in full with the notice and other requirements of the Bankruptcy Code and the related local and Federal rules of bankruptcy procedure in a manner acceptable to the Agent and its counsel;

(ii)      The Bankruptcy Court shall have found that the Revolving Loans contemplated by this Agreement are made by the Lenders, and that all other Obligations are incurred by the Companies hereunder in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code;

-19-

B # 761460 v.5

(iii)     Interim Financing Order.   Entry by the Bankruptcy Court of the Interim Financing Order, by no later than three (3) days after the Filing Date in form and substance satisfactory to Agent and Lenders, which Interim Financing Order shall: (A) have been entered upon application or motion of Companies reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (B) be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (C) not be the subject of a pending objection, appeal or motion for reconsideration in any respect.  The Companies, the Agent and the Lenders shall be entitled to rely in good faith upon the Interim Financing Order notwithstanding any such objection, appeal or motion for reconsideration.  The Agent and the Lenders shall be permitted, and the Companies shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the Interim Financing Order has been stayed by a court of competent jurisdiction.

(v)     **Arcus Term Loan Agreement Interim Order**.   Entry by the Bankruptcy Court of an interim financing order approving the transactions contemplated by the Arcus Term Loan Agreement in form and substance satisfactory to Agent.

(w)     **First Day Orders**.  The Agent shall have received drafts of the "first day" pleadings in form and substance satisfactory to the Agent on or before March 14, 2008.

(x)     **Fees, Costs and Expenses**.  Agent shall have received all fees, costs and expenses due and payable on or prior to the closing Date.

(y)     **Patriot Act**.  The Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the United States Patriot Act and OFAC.

Upon the execution of this Financing Agreement and the initial disbursement of loans hereunder, all of the above Conditions Precedent shall have been deemed satisfied except as otherwise set forth hereinabove or as the Companies and the Agent shall otherwise agree in writing.

## 2.2     **Conditions to Each Extension of Credit**

Subject to the terms of this Financing Agreement, including, without limitation, the Agent's rights pursuant to Paragraph 10.2 of Section 10 hereof the agreement of the Agent on behalf of the Lenders to make any extension of credit requested to be made by it to any of the Companies on any date (including without limitation, the initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)     **Representations and Warranties** - Each of the representations and warranties made by each of the Companies in or pursuant to this Financing Agreement shall be true and correct in all material respects on and as of such date as if made on and as of such date except if limited to an earlier date.

(b)     **No Default** - No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extension of credit requested to be made on such date.

(c)     **Borrowing Base** - Except as may be otherwise agreed to from time to time by the Agent (with the consent of the Required Lenders, unless in accordance with Paragraph 14.10 of Section 14 of this Financing Agreement) and the Companies in writing, after giving effect to the extension of credit requested to be made by the Companies on such date, the aggregate outstanding balance of the Revolving Loans and outstanding Letters of Credit owing by each of the Companies will not exceed the lesser of (i) the Revolving Line of Credit or (ii) the Borrowing Base

(d)     **Notice of Non-Funding** - No Notice of Non-Funding has been received by Agent or the Companies.

-20-

(e)    Intentionally omitted.

(f)    **Compliance with Financing Orders** - The extension of credit requested shall not cause the aggregate outstanding amount of the Revolving Line of Credit to exceed the amount then authorized by the applicable Financing Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

(g)    **Final Order** – On or before April 4, 2008, and for each extension of credit thereafter, Agent shall have received satisfactory evidence of the entry of the Final Order.

(h)    **Financing Order** - The Final Order, or, prior to the entry of the Final Order, the Interim Financing Order, (i) shall have been entered upon application or motion of Companies reasonably satisfactory in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) shall be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Companies, the Agent and the Lenders shall be entitled to rely in good faith upon the applicable Order notwithstanding any such objection, appeal or motion for reconsideration. The Agent and the Lenders shall be permitted, and the Companies shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Order has been stayed by a court of competent jurisdiction.

(i)    **Arcus Term Loan Agreement Order**. - Entry by the Bankruptcy Court of an order approving the transactions contemplated by the Arcus Term Loan Agreement in form and substance satisfactory to the Agent.

Each borrowing by the Companies hereunder shall constitute a representation and warranty by all of the Companies as of the date of such loan or advance that (i) each of the representations, warranties and covenants contained in the Financing Agreement have been satisfied and are true and correct, except as the Companies and the Agent and/or the Required Lenders shall otherwise agree herein or in a separate writing, and (ii) at the time of and after giving effect to each borrowing hereunder, the Companies are in Budget Compliance, or, if the Companies are not in Budget Compliance, they have received and delivered to Agent a written waiver of such failure to be in Budget Compliance by Arcus, are not in default under or violation of the Arcus Term Loan Documents (unless such default or violation has been waived in writing by Arcus, a copy of which written waiver has been provided to Agent) and no Notice of Non-Funding or notice of default or notice of the occurrence of an Event of Default has been received by the Companies from Arcus (unless such Notice of Non-Funding, notice of default or notice of the occurrence of an Event of Default has been withdrawn in writing by Arcus, a copy of which written withdrawal has been provided to Agent).

**SECTION 3     Revolving Loans**

**3.1**    (a)    The Agent and the Lenders agree, subject to the terms and conditions of this Financing Agreement, from time to time, to make loans and advances to the Companies on a revolving basis (i.e. subject to the limitations set forth herein, the Companies may borrow, repay and re-borrow Revolving Loans), for working capital purposes, until the date which is one (1) Business Day before the earlier of the (i) DIP Revolver Maturity Date or (ii) Anniversary Date. Such loans and advances shall not exceed the lesser of (i) the Companies' Availability or (ii) an amount which, when aggregated with all Revolving Loans (including, for purposes of clarification, amounts which remain unpaid under the Existing Financing Agreements) and Letters of Credit outstanding to the Companies, would not cause outstanding Revolving Loans and Letters of Credit to exceed the Revolving Line of Credit. All requests for loans and advances must be received by an officer of the Agent no later than (i) 1:00 P.M., New York time, of the Business Day on which any such Chase Bank Rate Loans and advances are required or (ii) three (3) Business Days prior to any requested LIBOR Loan.

(b)    (i)    Whenever any of the Companies request the Agent, on behalf of the Lenders, to make a Revolving Loan pursuant to this Section 3, it shall give the Agent notice in writing or irrevocable telephonic notice confirmed promptly in writing, specifying (A) the amount to be borrowed, and (B) the requested borrowing date (which shall be a Business Day and shall be prior to the Anniversary Date, and if applicable, any Early

Termination Date, or prior to any effective termination date of this Financing Agreement, all as further set forth herein), and (C) specify whether the requested Revolving Loan shall bear interest at the Chase Bank Rate or at the LIBOR Rate, as further set forth herein. The procedure for Revolving Loans to be made on a requested borrowing date may be such other procedure as is mutually satisfactory to the Companies, the Agent and/or the Lenders. Requests for loans and advances shall be made solely by the Companies and shall be directed solely to the Agent.

    (ii)  Subject to Paragraph 14.10 of Section 14 of this Financing Agreement, should the Agent, on behalf of the Lenders, for any reason make any Overadvances, such Overadvance shall be made in the Agent's sole discretion, subject to any additional terms the Agent and/or the Required Lenders deem necessary.

    (c)  The Agent shall on any Settlement Date, and upon notice given by the Agent no later than 2:00 P.M. New York time, request each Lender to make, and each Lender hereby agrees to make, a Revolving Loan in an amount equal to such Lender's Revolving Credit Commitment percentage (calculated with respect to the aggregate Revolving Credit Commitments then outstanding) of the aggregate amount of the Revolving Loans made by the Agent from the preceding Settlement Date to the date of such notice. Each Lender's obligation to make the Revolving Loans referred to in Paragraph 3.1(a) and to make the settlements pursuant to this Paragraph 3.1(c) shall be absolute and unconditional and shall not be affected by any circumstance, including without limitation (i) any set-off counterclaim, recoupment, defense or other right which any such Lender or the Companies may have against the Agent, the Companies, any other Lender or any other Person for any reason whatsoever; (ii) the occurrence or continuance of a Default or an Event of Default; (iii) any adverse change in the condition (financial or otherwise) of the Companies; (iv) any breach of this Financing Agreement or any other Loan Document by the Companies or any other Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing. Without limiting the liability and obligation of each Lender to make such advances, the Companies authorize the Agent to charge the Companies' Revolving Loan Account with the Agent to the extent amounts received from the Lenders are not sufficient to repay in full the amount of any such deficiency.

    (d)  The Companies' Revolving Loan Obligations hereunder shall be evidenced by the Revolving Credit Note in the form of Exhibit A attached hereto.

    **3.2**  In furtherance of the continuing assignment and security interest in each of the Companies' Accounts and Inventory, each of the Companies will, upon the creation of Accounts and purchase or acquisition of Inventory, execute and deliver to the Agent in such form and manner as the Agent may reasonably require, solely for the Agent's convenience in maintaining records of Collateral, such confirmatory schedules of Accounts and Inventory as the Agent may reasonably request, including, without limitation, weekly schedules of Accounts and monthly schedules of Inventory, all in form and substance satisfactory to the Agent, and such other appropriate reports designating, identifying and describing the Accounts and Inventory as the Agent may reasonably request, and provided further that the Agent may request any such information more frequently, from time to time, upon its reasonable prior request. In addition, upon the Agent's request, each of the Companies shall provide the Agent with copies of agreements with, or purchase orders from, such Company's customers, and copies of invoices to customers, proof of shipment or delivery, access to its computers, electronic media and software programs associated therewith (including any electronic records, contracts and signatures) and such other documentation and information relating to said Accounts and other Collateral as the Agent may reasonably require. Failure to provide the Agent with any of the foregoing shall in no way affect, diminish, modify or otherwise limit the security interests granted herein. Each of the Companies hereby authorizes the Agent to regard such Company's printed name or rubber stamp signature on assignment schedules or invoices as the equivalent of a manual signature by one of such Company's authorized officers or agents.

    **3.3**  Each of the Companies hereby represents and warrants that: each Trade Account Receivable is based on an actual and bona fide sale and delivery of Inventory or rendition of services to its customers, made by such Company in the ordinary course of its business; the Inventory being sold, and the Trade Accounts Receivable created, are the exclusive property of such Company and are not and shall not be subject to any lien, consignment arrangement other than consignment sales disclosed to Agent in an amount not to exceed Three Hundred Thousand Dollars ($300,000.00) per month and not more than One Million ($1,000,000.00) in the aggregate outstanding at any time, encumbrance, security interest or financing statement whatsoever, other than the Permitted Encumbrances; the invoices evidencing such Trade Accounts Receivable are in the name of such Company; and its customers owe and are obligated to pay the full amounts stated in the invoices according to their terms, without dispute, offset, defense,

counterclaim or contra, except for disputes and other matters arising in the ordinary course of business with respect to which such Company has complied with the notification requirements of Paragraph 3.5 of this Section 3. The Companies confirm to the Agent that any and all Taxes or fees relating to their business, their sales, the Accounts or Inventory relating thereto, are their sole responsibility and that same will be paid by the Companies when due subject to Paragraph 7.6 of Section 7 of this Financing Agreement, and that none of said Taxes or fees represent a lien on or claim against the Accounts. The Companies hereby further represent and warrant that they shall not acquire any Inventory on a consignment basis (except Inventory not exceeding Three Million Dollars ($3,000,000) in aggregate value which is not commingled with other Inventory and which is specifically identified on each Inventory report as ineligible Inventory consigned to such Company), nor co-mingle their Inventory with any of their customers or any other Person, including pursuant to any bill and hold sale or otherwise and that their Inventory is marketable to their customers in the ordinary course of business of that Companies, except as a Company may otherwise report in writing to the Agent pursuant to Paragraph 3.5 hereof from time to time. Each of the Companies also warrants and represents it a duly and validly existing limited liability company and qualified in all states where the failure to so qualify would have a material adverse effect on either the business of the Companies or the ability of the Companies to enforce collection of Accounts due from customers residing in that state. The Companies agree to maintain such books and records regarding Accounts and Inventory as the Agent may reasonably require and agree that the books and records of the Companies will reflect the Agent's interest in the Accounts and Inventory. All of the books and records of each of the Companies will be available to the Agent during normal business hours, including any records handled or maintained for the Companies by any other company or entity.

3.4    (a)    Until the Agent has advised the Companies to the contrary after the occurrence of an Event of Default which has not been Waived In Writing By Agent, the Companies, at their expense, will enforce, collect and receive all amounts owing on their respective Accounts in ordinary course of their business and any proceeds they so receive shall be subject to the terms hereof and held on behalf of and in trust for the Agent, on behalf of the Lenders. Such privilege shall terminate at the election of the Agent, upon the occurrence of an Event of Default, until such Event of Default is Waived In Writing By Agent. Any checks, cash, credit card sales and receipts, notes or other instruments or property received by a Company with respect to any Collateral, including Accounts, shall be held by such Company in trust for the Agent on behalf of the Lenders, separate from such Company's own property and funds, and promptly turned over to the Agent with proper assignments or endorsements by deposit to the Depository Accounts. Each of the Companies shall: (i) indicate on all of their invoices that funds should be delivered to and deposited in a Depository Account; (ii) direct all of their account debtors to deposit any and all proceeds of Collateral into the Depository Accounts; (iii) irrevocably authorize and direct any banks which maintain the Companies' initial receipt of cash, checks and other items to promptly wire transfer all available funds to a Depository Account; and (iv) advise all such banks of the Agent's security interest in such funds. The Companies shall provide the Agent with prior written notice of any and all deposit accounts opened or to be opened subsequent to the Closing Date. All amounts received by the Agent in payment of Accounts will be credited to the Revolving Loan Account when the Agent is advised by its bank of its receipt of "collected funds" at the Agent's bank account in New York, New York on the Business Day of such advise if advised no later than 1:00 P.M. EST or on the next succeeding Business Day if so advised after 1:00 PM EST. No checks, drafts or other instrument received by the Agent shall constitute final payment to the Agent and/or the Lenders unless and until such instruments have actually been collected.

(b)    The Companies shall establish and maintain, in their name and at their expense, deposit accounts with such banks as are acceptable to the Agent (the "Blocked Accounts") into which the Companies shall promptly cause to be deposited: (i) all proceeds of Collateral received by the Companies, including all amounts payable to the Companies from credit card issuers and credit card processors, and (ii) all amounts on deposit in deposit accounts used by the Companies at each of their locations, all as further provided in Paragraph 3.4(a) above. The banks at which the Blocked Accounts are established shall enter into an agreement, in form and substance satisfactory to the Agent (the "Blocked Account Agreements"), providing that all cash, checks and items received or deposited in the Blocked Accounts are the property of the Agent, that the: depository bank has no lien upon, or right of set off against, the Blocked Accounts and any cash, checks, items, wires or other funds from time to time on deposit therein, except as otherwise provided in the Blocked Account Agreements, and that automatically, on a daily basis the depository bank will wire, or otherwise transfer, in immediately available funds, all funds received or deposited into the Blocked Accounts to such bank account as the Agent may from time to time designate for such purpose. The Companies hereby confirm and agree that all amounts deposited in such Blocked Accounts and any

-23-

other funds received and collected by the Agent, whether as proceeds of Inventory or other Collateral or otherwise, shall be the property of the Agent.

3.5    The Companies agree to notify the Agent: (a) of any matters affecting the value, enforceability or collectibility of any Account and of all customer disputes, offsets, defenses, counterclaims, returns, rejections and all reclaimed or repossessed merchandise or goods, and of any adverse effect in the value of its Inventory, in their daily, weekly and monthly collateral reports (as applicable) provided to the Agent hereunder, in such detail and format as the Agent may reasonably require from time to time and (h) promptly of any such matters which are material, as a whole, to the Accounts and/or the Inventory. The Companies agree to issue credit memoranda promptly (with duplicates to the Agent upon request after the occurrence of an Event of Default) upon accepting returns or granting allowances. Upon the occurrence of an Event of Default (which is not Waived In Writing By Agent) and on notice from the Agent, the Companies agree that all returned, reclaimed or repossessed merchandise or goods shall be set aside by the Companies, marked with the Agent's name (as secured party) and held by the Companies for the Agent's account.

3.6    (a)    The Agent shall maintain a Revolving Loan Account on its books in which each of the Companies will be charged with all loans and advances made by the Agent and the Lenders to such Company or for its account, and with any other Obligations, including any and all costs, expenses and reasonable attorney's fees which the Agent may incur in connection with the exercise by or for the Agent of any of the rights or powers herein conferred upon the Agent, or in the prosecution or defense of any action or proceeding to enforce or protect any rights of the Agent in connection with this Financing Agreement, the other Loan Documents or the Collateral assigned hereunder, or any Obligations owing by such Company. The Companies will be credited with all amounts received by the Agent and/or the Lenders from the Companies or from others for the Companies' account, including, as above set forth, all amounts received by the Agent in payment of Accounts, and such amounts will be applied to payment of the Obligations as set forth herein. In no event shall prior recourse to any Accounts or other security granted to or by the Companies be a prerequisite to the Agent's right to demand payment of any Obligation. Further, it is understood that the Agent and/or the Lenders shall have no obligation whatsoever to perform in any respect any of the Companies' contracts or obligations relating to the Accounts.

(b)    Each of the Companies acknowledges and agrees that: (i) requests for loans and advances may be made by one or more of the Managers of Borrower Representative or the Chief Financial Officer of Borrower Representative and the Agent is hereby authorized and directed to accept, honor and rely on such instructions and requests, subject to the limitation and provisions set forth in this Financing Agreement; (ii) the Agent shall have no responsibility to inquire into the correctness of the apportionment, allocation, or disposition of (x) any loans and advances made to any of the Companies or (y) any of the Agent's expenses and charges relating thereto; (iii) each of the Companies jointly and severally unconditionally guarantee to the Agent and Lenders the prompt payment in full of (A) all loans and advances made and to be made by the Agent and Lenders to any of them under this Financing; Agreement, as well as (B) all other Obligations of the Companies to the Agent and the Lenders and hereby expressly confirm in all respects the Guaranties executed by each of the Companies in the Agent's favor for the benefit of Lenders as more fully set forth therein; (iv) all Accounts assigned to the Agent by any of the Companies and all other Collateral and any other collateral security now or hereafter given to the Agent by any of the Companies (be it Accounts or otherwise), shall secure all loans and advances made by the Agent and Lenders to any of the Companies, and shall be deemed to be pledged to the Agent as security for any and all other Obligations of the Companies as set forth under this Financing Agreement, the Guaranties, or any other agreements between the Agent and any of the Companies; (v) to induce the Agent and Lenders to extend financial accommodations hereunder, and in consideration thereof, each of the Companies hereby agrees to indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless against any and all liability, expense, loss or claim of damage or injury, made against the Agent or the Lenders by any of the Companies or by any third party whosoever, arising from or incurred solely by reason of (A) the method of handling the accounts of the Companies as herein provided, (B) Agent's relying on any instructions of any of the Companies, or (C) any other action taken by the Agent in accordance with this subparagraph (b) of this Paragraph 3.6, except to the extent arising from the gross negligence or willful misconduct of the Agent and/or Lenders.

3.7    After the end of each month, the Agent shall promptly send the Companies a statement showing the accounting for the charges, loans, advances and other transactions occurring between the Agent and each of the Companies during that month. The monthly statements shall be deemed correct and binding upon each of the

B # 761460 v.5

Companies and shall constitute an account stated between the Companies and the Agent unless the Agent receives a written statement of the exceptions within thirty (30) days of the date of the monthly statement.

    **3.8**    In the event that any requested advance exceeds Availability or that (a) the sum of (i) the outstanding balance of Revolving Loans plus (ii) the outstanding undrawn face amount of Letters of Credit exceeds (b)(x) the Borrowing Base or (y) the Revolving Line of Credit, any such nonconsensual Overadvance shall be due and payable to the Agent on behalf of the Lenders immediately upon the Agent's demand therefor.

**SECTION 4**    <u>Superpriority Claims, Etc.</u>

    **4.1**    <u>Superpriority Claims and Collateral Security</u>.  The Companies represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Final Order, all of the Obligations:

    (a)    shall at all times constitute a Superpriority Claim having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any claims of any Person (other than the claims of Arcus, which are pari passu), whether now existing or hereafter arising, including any claims under Sections 105(a), 326, 330, 328, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1 113 and 1 114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out; and

    (b)    pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code, shall at all times be secured by a first priority perfected lien in all of the assets (including, without limitation, any Avoidance Actions and Avoidance Action Recoveries), subject to the Intercreditor Agreement, whether now owned or hereafter acquired, of each Company and its estate, subject, as to priority, only to the Carve-Out and Permitted Encumbrances securing those valid, perfected, non-avoidable secured claims existing on the Filing Date and listed on Schedule 4.1(b) (collectively, "Senior Claims").  The liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

The agreement of Agent and Lenders to provide post-petition financing to Borrowers will not prohibit Agent or Lenders from moving in the Bankruptcy Court for any other and further relief which Agent or Lenders believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the Collateral (including a request for Company to abandon any part of the Collateral) or otherwise.

    **4.2**    <u>No Filings Required</u>.  Notwithstanding Section 6, the liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Financing Order or Final Order, whichever occurs first.  The Agent shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien granted by or pursuant to each Order or this Agreement or any other Loan Document.

    **4.3**    <u>Grants, Rights and Remedies</u>.  The lien and administrative priority granted by or pursuant to the Financing Orders or this Agreement or any other Loan Document are independently granted.  The Financing Orders and this Agreement and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

    **4.4**    <u>No Discharge; Survival of Claims</u>.  The Companies agree that (a) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and the Companies, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge), (b) the Superpriority Claim granted to Agent and Lenders pursuant to the Financing Orders, and the liens granted to Agent, for the benefit of Agent and the Lenders pursuant to the Financing Orders and the other Loan Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (c) the Companies shall not propose or support any Reorganization Plan that is not conditioned upon termination of this Agreement and indefeasible payment in full in cash of all Obligations and the release of Agent and Lenders in full from all claims of Companies and their estate, in each case, on or before the effective date of such Reorganization Plan, and (d) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

B # 761460 v.5

4.5    **Survival**.  The liens, lien priority, administrative priorities and other rights and remedies granted to Agent and Lenders pursuant to the Financing Orders, this Agreement and the other Loan Documents (including, without limitations, the existence, perfection and priority of the liens provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Company (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code pursuant to Section 552(b) of the Bankruptcy Code (or otherwise), are or will be prior to or on a parity with any claim of Agent or any Lender against the Companies in respect of any Obligation;

(b)    the liens securing the Obligations shall constitute valid and perfected liens and, subject only to the Carve-Out and Permitted Encumbrances securing Senior Claims, shall be prior to all other liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)    the liens securing the Obligations shall continue to be valid and perfected without the necessity that Agent file financing statements, mortgages or otherwise perfect its lien under applicable non-bankruptcy law.

4.6    **Disavowal and Waiver of Any Subsequent Relief Based on Changed Circumstances**.  The Companies, the Agent and the Lenders know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "Changed Circumstances").  Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case.  With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Company:  (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of each Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with each Order and the transactions contemplated by this Agreement and having either Order entered that would serve as a basis to allege such Changed Circumstances.  Each Company understands and agrees that Agent and Lenders are not willing to bear any of the risks involved in Company's business enterprises and Agent and Lenders are not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Company expressly assumes all risks of any and all such matters, and the consequences that Agent and Lenders will enforce their legal, equitable, and contractual rights if Agent and Lenders are not paid and dealt with strictly in accordance with the terms and conditions of the applicable Financing Order and the other Loan Documents.  Without limiting the foregoing in any way, Company's use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement and the applicable Financing Order, and, until all Obligations are indefeasibly paid and satisfied in full either before or after a termination of this Agreement, Companies will not seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever

4.7    **Exclusive Remedy For Any Alleged Post-Petition Claim**.  If any Company asserts that it has any adverse claims against Agent or Lenders, with respect to this Agreement and the transactions contemplated hereby, each Company agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (the "Damage Lawsuit").  Any such Damage Lawsuit, regardless of the procedural

B # 761460 v.5

form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Agent and Lenders of their legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Loan Documents, and the Damage Lawsuit (including any and all adverse claims alleged against Agent or Lenders) cannot be asserted by any Company as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by Agent or Lenders of their legal, equitable, and contractual rights under the Order, the other Loan Documents, and otherwise.

**4.8    Prohibition on Surcharge; Etc.**  No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code Section 552(b) of the Bankruptcy Code (or otherwise), nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.  The prohibition on surcharging or priming of the liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a lien or rights (through any means, at law or in equity) which in any case is equal or senior to the liens of Agent on the Collateral.

**4.9    Marshalling Obligations.**  The right of Agent to seek the equitable remedy of marshalling is expressly preserved, and Companies will cooperate fully with any effort by Agent to exercise its equitable remedy of marshalling.

**SECTION 5    Letters of Credit**

In order to assist the Companies in establishing or opening Letters of Credit with an Issuing Bank, the Companies have requested the Agent, on behalf of the Lenders, to join in the applications for such Letters of Credit, and/or guarantee payment or performance of such Letters of Credit and any drafts or acceptances thereunder through the issuance of the Letter of Credit Guaranty, thereby lending the Agent's credit to the Companies and the Agent has agreed to do so.  These arrangements shall be handled by the Agent subject to the terms and conditions set forth below.

**5.1**    Within the Availability, the Agent on behalf of the Lenders shall assist the Companies in obtaining Letter(s) of Credit in an amount not to exceed the outstanding amount of the Letter of Credit Sub-Line, the Agent's assistance for amounts in excess of the limitation set forth herein shall at all times and in all respects be in the Agent's sole discretion.  It is understood that the term, form and purpose of each Letter of Credit and all documentation in connection therewith, and any amendments, modifications or extensions thereof must be mutually acceptable to the Agent, the Issuing Bank and the Companies, provided that Letters of Credit shall not be used for the purchase of domestic Inventory or to secure present or future debt of domestic Inventory suppliers.  Any and all outstanding Letters of Credit shall be subtracted dollar for dollar from the Borrowing Base as an Availability Reserve.

**5.2**    The Agent shall have the right, without notice to the Companies, to charge the Companies' Revolving Loan Account with the amount of any and all indebtedness, liability or obligation of any kind incurred by the Agent and/or the Lenders under the Letter of Credit Guarantees at the earlier of (a) payment by the Agent under the Letter of Credit Guaranty; or (b) the occurrence of an Event of Default which has not been Waived In Writing By Agent.  Any amount charged to Companies' Revolving Loan Account shall be deemed a Revolving Loan hereunder and shall incur interest at the rate provided in Paragraph 8.1 of Section 8 of this Financing Agreement.

**5.3**    The Companies unconditionally, jointly and severally, indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless from any and all loss, claim or liability incurred by the Agent arising from any transactions or occurrences relating to Letters of Credit and Letter of Credit Guaranties established or opened for the Companies' account, the collateral relating thereto and any drafts or acceptances thereunder, and all Obligations thereunder, including any such loss or claim due to any errors, omissions, negligence, misconduct or action taken by any Issuing Bank, other than for any such loss, claim or liability arising out of the gross negligence or willful misconduct by the Agent and/or the Lenders under the Letters of Credit or Letter of Credit Guaranty.  This indemnity shall survive termination of this Financing Agreement.  The Companies agree that any charges incurred by the Agent and/or the Lenders for the Companies' account by the Issuing Bank shall be conclusive on the Agent and may be charged to the Companies' Revolving Loan Account.

B # 761460 v.5

**5.4**      In connection with any draw under a Letter of Credit or Letter of Credit Guaranty, the Agent and the Lenders shall not be responsible for: (a) the existence, character, quality, quantity, condition, packing, value or delivery of the goods purporting to be represented by any documents; (b) any difference or variation in the character, quality, quantity, condition, packing, value or delivery of the goods from that expressed in the documents; (c) the validity, sufficiency or genuineness of any documents or of any endorsements thereon, even if such documents should in fact prove to be in any or all respects invalid, insufficient, fraudulent or forged; (d) the time, place, manner or order in which shipment is made; (e) partial or incomplete shipment, or failure or omission to ship any or all of the goods referred to in the Letters of Credit or documents; (f) any deviation from instructions; (g) delay, default, or fraud by the shipper and/or anyone else in connection with the goods or the shipping thereof or (h) any breach of contract between the shipper or vendors and the Companies.

**5.5**      The Companies agree that any action taken by the Agent and/or the Lenders, if taken in good faith, or any action taken by any Issuing Bank, under or in connection with the Letters of Credit, the Letter of Credit Guarantees, the drafts or acceptances, or the Collateral, shall be binding on the Companies, jointly and severally, and shall not result in any liability whatsoever of the Agent or the Lenders to the Companies. In furtherance thereof the Agent shall have the full right and authority to: (a) clear and resolve any questions of non-compliance of documents; (b) give any instructions as to acceptance or rejection of any documents or goods; (c) execute any and all steamship or airways guaranties (and applications therefor), indemnities or delivery orders; (d) grant any extensions of the maturity of time of payment for, or time of presentation of any drafts, acceptances, or documents; and (e) agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit and Letter of Credit Guaranties, drafts or acceptances; all in the Agent's sole name. The Issuing Bank shall be entitled to comply with and honor any and all such documents or instruments executed by or received solely from the Agent, all without any notice to or any consent from the Companies. Notwithstanding any prior course of conduct or dealing with respect to the foregoing including amendments and non-compliance with documents and/or the Companies' instructions with respect thereto, the Agent may exercise its rights hereunder in its sole and reasonable judgment. In addition, without the Agent's express consent and endorsement in writing, the Companies agree: (a) not to execute any and all applications for steamship or airway guaranties, indemnities or delivery orders; to grant any extensions of the maturity of time of payment for, or time of presentation of any drafts, acceptances or documents; or to agree to any amendments, renewals, extensions, modifications, changes or cancellations of any of the terms or conditions of any of the applications, Letters of Credit, drafts or acceptances; and (b) after the occurrence of an Event of Default which is not cured within any applicable grace period, if any, or waived by the Agent, not to (i) clear and resolve any questions of non-compliance of documents, or (ii) give any instructions as to acceptances or rejection of any documents or goods.

**5.6**      The Companies agree that: (a) any necessary import, export or other licenses or certificates for the import or handling of the Collateral will have been promptly procured; (b) all foreign and domestic governmental laws and regulations in regard to the shipment and importation of the Collateral, or the financing thereof will have been promptly and fully complied with; and (c) any certificates in that regard that the Agent may at any time request will be promptly furnished on behalf of the Companies. In connection herewith, the Companies warrant and represent that all shipments made under any such Letters of Credit are in accordance with the laws and regulations of the countries in which the shipments originate and terminate, and are not prohibited by any such laws and regulations. The Companies assume all risk, liability and responsibility for, and agrees to pay and discharge, all. present and future local, state, federal or foreign Taxes, duties, or levies. Any embargo, restriction, laws, customs or regulations of any country, state, city, or other political subdivision, where the Collateral is or may be located, or wherein payments are to be made, or wherein drafts may be drawn, negotiated., accepted, or paid, shall be solely the Companies' risk, liability and responsibility.

**5.7**      Upon any payments made to the Issuing Bank under the Letter of Credit Guaranty, the Agent on behalf of the Lenders shall acquire by subrogation, any rights, remedies, duties or obligations granted or undertaken by the Companies to the Issuing Bank in any application for Letters of Credit, any standing agreement relating to Letters of Credit or otherwise, all of which shall be deemed to have been granted to the Agent on behalf of the Lenders and apply in all respects to the Agent and shall be in addition to any rights, remedies, duties or obligations contained herein.

B # 761460 v.5

## SECTION 6    Collateral

6.1    As security for the prompt payment in full of all Obligations, each of the Companies hereby pledges and grants (and confirms and reaffirms its prior pledge and grant pursuant to the Existing Financing Agreements) to the Agent, on behalf of the Lenders, a first priority continuing general lien and replacement lien under the Bankruptcy Code upon, and security interest in, all of their now owned and hereafter acquired (and whether acquired prior or subsequent to the commencement of the Bankruptcy Case) real and personal property, (subject to the Intercreditor Agreement), including, without limitation:

(a)    Accounts;

(b)    Inventory;

(c)    General Intangibles;

(d)    Documents of Title;

(e)    Other Collateral;

(f)    Equipment;

(g)    Real Estate;

(h)    Intercompany Debt; and

(i)    Avoidance Actions and Avoidance Action Recoveries, together with

(j)    all proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including hazard, flood and credit insurance), negotiable instruments and other instruments for the payment of money, chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and tort claim proceeds.

6.2    The security interests granted hereunder shall extend and attach to:

(a)    All Collateral which is owned by any of the Companies or in which the Companies have any interest, whether held by the Companies or others for their account, and, if any Collateral is Equipment, whether the Companies' interest in such Equipment is as owner, finance lessee or conditional vendee;

(b)    All Equipment, whether the same constitutes personal property or fixtures, including, but without limiting the generality of the foregoing, all dies, jigs, tools, benches, molds, tables, accretions, component parts thereof and additions thereto, as well as all accessories, motors, engines and auxiliary parts used in connection with, or attached to, the Equipment; and

(c)    All Inventory and any portion thereof which may be returned, rejected, reclaimed or repossessed by either the Agent or the Companies from the Companies' customers, as well as to all supplies, goods, incidentals, packaging materials, labels and any other items which contribute to the finished goods or products manufactured or processed by the Companies, or to the sale, promotion or shipment thereof.

6.3    The Companies agree to safeguard, protect and hold all Inventory for the Agent's account and make no disposition thereof except in the ordinary course of the business of the Companies, as herein provided. The Companies represent and warrant that Inventory will be sold and shipped by the Companies to their customers only in the ordinary course of the Companies' business, and then only on open account (except in the case of sales on a C.O.D. basis or paid by credit card, all of which shall be excluded from the Borrowing Base as Accounts Receivable, which are ineligible) and on terms currently being extended by the Companies to their customers,

B # 761460 v.5

provided that except as provided in Section 3.3 hereof, the Companies shall not sell Inventory on a consignment basis nor retain any lien or security interest in any sold Inventory. Upon the sale, exchange, or other disposition of Inventory, as herein provided, the security interest in the Inventory provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Trade Accounts Receivable, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sale, exchange or disposition. As to any such sale, exchange or other disposition, the Agent shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation. The Companies hereby agree to immediately forward any and all proceeds of Collateral to the Depository Account, and to hold any such proceeds (including any notes and instruments), in trust for the Agent, on behalf of the Lenders, pending delivery to the Agent. Irrespective of the Agent's perfection status in any and all of the General Intangibles, including, without limitations, any Patents, Trademarks, Copyrights or licenses with respect thereto, the Companies hereby irrevocably grant the Agent a royalty free license to sell, or otherwise dispose or transfer, in accordance with Paragraph 10.3 of Section 10 of this Financing Agreement, and the applicable terms hereof of any of the Inventory upon the occurrence of an Event of Default which has not been Waived In Writing By Agent.

6.4    The Companies agree at their own cost and expense to keep the Equipment in as good and substantial repair and condition as the same is now or at the time the lien and security interest granted herein shall attach thereto, reasonable wear and tear and casualty excepted, making any and all repairs and replacements when and where necessary. The Companies also agree to safeguard, protect and hold all Equipment in accordance with the terms hereof and subject to the Agent's security interest. The Companies may, in the ordinary course of their business, sell, exchange or otherwise dispose of obsolete or surplus Equipment provided, however, that: (a) the then value of the Equipment so disposed of in any Fiscal Year does not exceed Five Hundred Thousand Dollars ($500,000.00) in the aggregate. The proceeds from the sale of such obsolete or surplus equipment may be used to pay down the Companies' Arcus Term Loan or otherwise replace such equipment with Arcus' consent. Upon the sale, exchange, or other disposition of the Equipment, as herein provided, the security interest provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Accounts, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sales, exchange or disposition. As to any such sale, exchange or other disposition, the Agent and the Lenders shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

6.5    The rights and security interests granted to the Agent and the Lenders hereunder are to continue in full force and effect, notwithstanding the termination of this Financing Agreement or the fact that the Revolving Loan Accounts may from time to time be temporarily in a credit position, until the final indefeasible payment in full, in cash to the Agent of all Obligations and the termination of this Financing Agreement. Any delay, or omission by the Agent to exercise any right hereunder shall not be deemed a waiver thereof, or be deemed a waiver of any other right, unless such waiver shall be in writing and signed by the Agent. A waiver on any one occasion shall not be construed as a bar to, or waiver of any right or remedy on any future occasion.

6.6    Notwithstanding the Agent's security interest in the Collateral and to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral or by the guarantee, endorsement, assets or property of any other Person, the Agent shall have the right in its sole discretion to determine which rights, liens, security interests or remedies the Agent shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of them, or any of the Agent's and/or the Lenders' rights hereunder.

6.7    Any balances to the credit of the Companies and any other property or assets of the Companies in the possession or control of the Agent and/or the Lenders may be held by the Agent as security for any Obligations and applied in whole or partial satisfaction of such Obligations when due. The liens and security interests granted herein, and any other lien or security interest the Agent and/or the Lenders may have in any other assets of the Companies, shall secure payment and performance of all now existing and future Obligations. The Agent may, in its discretion, charge any or all of the Obligations to the Revolving Loan Account when due.

6.8    Each of the Companies possesses all General Intangibles and rights thereto necessary to conduct their business as conducted as of the Closing Date and the Companies shall maintain their rights in, and the value of,

B # 761460 v.5

the foregoing in the ordinary course of their business, including, without limitation, by making timely payment with respect to any applicable licensed rights. The Companies shall deliver to the Agent, and/or shall cause the appropriate party to deliver to the Agent, from time to time such pledge or security agreements with respect to General Intangibles (now or hereafter acquired) of the Companies and their subsidiaries as the Agent shall require to obtain valid first liens thereon, subject to the terms and conditions of the Intercreditor Agreement. In furtherance of the foregoing, the Companies shall provide timely notice to the Agent of any additional Patents, Trademarks, Copyrights, brand names, and other trade designations acquired or applied for subsequent to the Closing Date and the Companies shall execute such documentation as the Agent may reasonably require to obtain and perfect its lien thereon. The Companies hereby confirm that they shall deliver to the Agent each note or other instrument evidencing indebtedness owed to them, including without limitation all intercompany indebtedness among the Companies, whether such note or other instrument now exists or arises or is issued at any time hereafter, in each case endorsed to the Agent pursuant to an endorsement in form and substance acceptable to the Agent. The Companies hereby confirm that they shall deliver, or cause to be delivered, any pledged stock or membership interest (if certificated) issued subsequent to the Closing Date to the Agent in accordance with the applicable terms of the Pledge Agreement and prior to such delivery, shall hold any such stock in trust for the Agent. The Companies hereby irrevocably grant to the Agent a royalty-free, non-exclusive license in the General Intangibles, including Trademarks, Copyrights, Patents, licenses, and any other proprietary and intellectual property rights and any and all right, title and interest in any of the foregoing, for the sole purpose, upon the occurrence of an Event of Default which is not Waived In Writing By Agent, of the right to: (i) advertise for sale and sell or transfer any Inventory bearing any of the General Intangibles, and (ii) make, assemble, prepare for sale or complete, or cause others to do so, any applicable raw materials or Inventory bearing any of the General Intangibles, including use of the Equipment and Real Estate for the purpose of completing the manufacture of unfinished goods, raw materials or work-in-process comprising Inventory, and apply the proceeds thereof to the Obligations hereunder, all as further set forth in this Financing Agreement and irrespective of the Agent's lien and perfection in any General Intangibles.

6.9     This Financing Agreement and the obligation of the Companies to perform all of their covenants and obligations hereunder are further secured by mortgages and assignments of leases and rents on the Real Estate.

6.10     The Companies shall give to the Agent from time to time such mortgage(s), deed(s) of trust or assignment(s) on the Real Estate or real estate acquired after the date hereof as the Agent shall require to obtain a valid first lien thereon subject only to (a) those exceptions of title as set forth in future title insurance policies that are satisfactory to the Agent and (b) the terms and conditions of the Intercreditor Agreement.

6.11     In the event the Companies form a subsidiary, or acquire a subsidiary, the Companies shall cause and direct such subsidiary to: (a) guaranty, jointly and severally with the Companies, all Obligations, and (b) deliver to the Agent for the benefit of the Agent and the Lenders, a security interest or mortgage on or in all assets, including real estate, of such subsidiary.

## SECTION 7     Representations, Warranties and Covenants

7.1     Each of the Companies hereby warrants and represents that: (i) Schedule 7.1 hereto correctly and completely sets forth the Companies' (A) chief executive office, (B) Collateral locations and (C) tradenames, (ii) except for the Permitted Encumbrances, and subject to the entry of the applicable Financing Order, this Financing Agreement creates a valid, perfected and first priority security interest in and to the Collateral and the security interests granted herein constitute and shall at all times constitute the first and only liens on the Collateral, except as contemplated by the Intercreditor Agreement; (iii) except for the Permitted Encumbrances, the Companies are, or will be, at the time additional Collateral is acquired by them, the absolute owners of the Collateral with full right to pledge, sell, consign, transfer and create a security interest therein, free and clear of any and all claims or liens in favor of others; (iv) the Companies will, at their expense, at all times warrant and, at the Agent's request, defend the same from any and all claims and demands of any other Person other than a holder of a Permitted Encumbrance; (v) the Companies will not grant, create or permit to exist, any lien upon, or security interest in, the Collateral, or any proceeds thereof in favor of any other Person other than the holders of the Permitted Encumbrances; (vi) the Equipment does not comprise a part of the Inventory of any of the Companies; and (vii) the Equipment is and will only be used by the Companies in their business and will not be held for sale or lease, or removed from their premises, or otherwise disposed of by the Companies except as otherwise permitted in this Financing Agreement.

B # 761460 v.5

**7.2**      Each of the Companies agrees to maintain books and records pertaining to the Collateral in accordance with GAAP and in such additional detail, form and scope as the Agent shall reasonably require. The Companies agree that the Agent or its agents, and any of the Lenders who may wish to accompany the Agent at their own cost expense, may enter upon the Companies' premises at any time during normal business hours, and from time to time in its reasonable business judgment, for the purpose of inspecting the Collateral and any and all records pertaining thereto. The Companies agree to afford the Agent thirty (30) days prior written notice of any change in the location of any Collateral, other than to locations, that as of the Closing Date, are known to the Agent and at which the Agent has filed financing statements and otherwise fully perfected its liens thereon. The Companies are also to advise the Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or on the security interests granted to the Agent therein.

**7.3**      Each of the Companies agrees to: (a) execute and deliver to the Agent, from time to time, solely for the Agent's convenience in maintaining a record of the Collateral, such written statements, and schedules as the Agent may reasonably require, designating, identifying or describing the Collateral; and (b) provide the Agent, on request, with an appraisal of the Equipment, Inventory, and/or Real Estate. During (i) each calendar year, the Companies shall pay for not more than one (1) appraisal for Inventory, conducted at a time when no Event of Default exists. Such Inventory appraisals shall be performed in August of each calendar year. The Companies shall pay for each appraisal performed when any Event of Default has occurred which has not been Waived In Writing By Agent. All appraisers and appraisals shall be acceptable to the Agent in all respects. The Companies' failure, however, to promptly give the Agent such statements, or schedules shall not affect, diminish, modify or otherwise limit the Agent's and/or the Lenders' security interests in the Collateral.

**7.4**      Each of the Companies agrees to comply with the requirements of all state and federal laws in order to grant to the Agent valid and perfected first security interests in the Collateral, subject only to the Permitted Encumbrances. The Agent is hereby authorized by the Companies to file (including pursuant to the applicable terms of the UCC) from time to time any financing statements, continuations or amendments covering the Collateral. The Companies hereby consent to and ratify any and all execution and/or filing of financing statements on or prior to the Closing Date by the Agent. The Companies agree to do whatever the Agent may reasonably request, from time to time, by way of (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof (b) cooperating with the Agent's agents and employees; (c) keeping Collateral records; (d) transferring proceeds of Collateral to the Agent's possession; and (e) performing such further acts as the Agent and/or the Lenders may reasonably require in order to effect the purposes of this Financing Agreement including but not limited to obtaining control agreements with respect to deposit accounts and/or Investment Property.

**7.5**      (a)      Each of the Companies agrees to maintain insurance on their Real Estate, Equipment and Inventory under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times reasonably satisfactory to the Agent. All policies covering the Real Estate, Equipment and Inventory are, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, to be made payable to the Agent, on behalf of the Lenders, in case of loss, under a standard non-contributory "mortgagee," "lender" or "secured party" clause and are to contain such other provisions as the Agent may require to fully protect the Agent's interest in the Real Estate, Inventory and Equipment and to any payments to be made under such policies. All original policies or true copies thereof are to be delivered to the Agent, premium paid to date as billed, with the loss payable endorsement in the Agent's favor, and shall provide for not less than thirty (30) days prior written notice to the Agent of the exercise of any right of cancellation. At the Companies' request, or if the Companies fail to maintain such insurance, the Agent may arrange for such insurance, but at the Companies' expense and without any responsibility on the Agent's part for: (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims. Upon the occurrence of an Event of Default which is not Waived In Writing By Agent, the Agent shall, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, have the sole right and at its option, in the name of the Agent or the Companies, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(b)      (i)      In the event of any loss or damage by fire or other casualty, insurance proceeds relating to a Company's Inventory shall reduce the Revolving Loan. Upon the occurrence of a Default or Event of

Default which is not Waived In Writing By Agent, such Insurance Proceeds may be applied to the Obligations in such order as the Agent may elect;

(ii)    Subject to the rights of Arcus, as contemplated by the Intercreditor Agreement, in the event any part of any of the Companies' Real Estate or Equipment is damaged by fire or other casualty and the Insurance Proceeds for such damage or other casualty is less than or equal to One Hundred Thousand Dollars ($100,000.00), the Agent shall promptly apply such Insurance Proceeds to reduce the Companies' outstanding balance in the Revolving Loan Account.  Upon the occurrence of an Event of Default which is not Waived In Writing By Agent, such Insurance Proceeds may be applied to the Obligations in such order as the Required Lenders may reasonably elect;

(iii)    Subject to the rights of Arcus, absent the occurrence of an Event of Default which is not Waived In Writing By Agent, and provided that (x) such Company has business interruption insurance in an amount not less than the difference between the lost profits of such Company's facilities and the policy deductible, and (y) the Insurance Proceeds are in excess of One Hundred Thousand Dollars ($100,000.00) but less than Five Million Dollars ($5,000,000.00) (the "**Cap**"), such Company may elect (by delivering written notice to the Agent) to replace, repair or restore such Real Estate or Equipment to substantially the equivalent condition prior to such fire or other casualty as set forth herein.  If Companies do not or cannot (due to the occurrence of an Event of Default which is not Waived In Writing By Agent) elect to use the Insurance Proceeds or the Insurance Proceeds are in excess of the Cap as set forth above, the Agent may, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, apply the Insurance Proceeds, first to the fees and expenses due to Agent, second to accrued interest with respect to the Obligations, third to the outstanding principal balance of the Obligations, in such order as the Required Lenders may elect, and fourth to any other Obligations in such order as the Required Lenders may elect;

(iv)    Subject to the rights of Arcus, if the Companies elect to use the Insurance Proceeds for the repair, replacement or restoration of any Real Estate and/or Equipment and provided no Event of Default has occurred which has not been Waived In Writing By Agent, (x) Insurance Proceeds for any loss in excess of One Hundred Thousand Dollars ($100,000.00) on Equipment and/or Real Estate will b applied to the reduction of the Revolving Loans and (y) the Agent may set up an Availability Reserve in an amount equal to said Insurance Proceeds.  The Availability Reserve will be reduced dollar-for-dollar upon receipt of non-cancelable executed purchase orders, delivery receipts or contracts for the replacement, repair or restoration of Equipment and/or the Real Estate and disbursements in connection therewith.  Upon Agent's request, prior to the commencement of all, material restoration, repair or replacement of Real Estate, the Companies shall provide the Agent with a restoration plan and a total budget certified by an independent third party experienced in construction costing.  If there are insufficient Insurance Proceeds to cover the cost of restoration as so determined, the Companies shall be responsible for the amount of any such insufficiency, prior to the commencement of restoration and shall demonstrate evidence of such before the reserve will be reduced.  Completion of restoration shall be evidenced by a final, unqualified certification of the design architect employed, if any; an unconditional Certificate of Occupancy, if applicable; such other certification as may be required by law; or if none of the above is applicable, a written good faith determination of completion by the Companies (herein collectively the "**Completion**").  Upon Completion, any remaining reserve as established" hereunder will be automatically released; and

(v)    Agent, Lenders and the Companies acknowledge that until the Arcus Term Loan is paid in full in cash, all Insurance Proceeds arising out of claims with respect to Non-Borrowing Base Assets (as defined in the Arcus Term Loan Agreement) shall be paid to Arcus in accordance with the terms and provisions of the Arcus Term Loan Agreement; provided, however, that the Companies shall provide Agent with notice of such payment to Arcus contemporaneously with such payment.

(c)    In the event the Companies or any one of them fail to provide the Agent with timely evidence, acceptable to the Agent, of their maintenance of insurance coverage required pursuant to Paragraph 7.5(a) above, the Agent may purchase, at the Companies' expense, insurance to protect the Agent's interests in the Collateral.  The insurance acquired by the Agent may, but need not, protect the Companies' interest in the Collateral, and therefore such insurance may not pay claims which the Companies may have with respect to the Collateral or pay any claim which may be made against the Companies in connection with the Collateral.  In the event the Agent purchases, obtains or acquires insurance covering all or any portion of the Collateral, the Companies

B # 761460 v.5

shall be responsible for all of the applicable costs of such insurance, including; premiums, interest (at the applicable Chase Bank Rate for Revolving Loans set forth in Paragraph 8.1 of Section 8 hereof), fees and any other charges with respect thereto, until the effective date of the cancellation or the expiration of such insurance. The Agent may charge all of such premiums, fees, costs, interest and other charges to the Companies' Revolving Loan Accounts. The Companies hereby acknowledge that the costs of the premiums of any insurance acquired by the Agent may exceed the costs of insurance which the Companies may be able to purchase on their own. In the event that the Agent purchases such insurance, the Agent will notify the Companies of said purchase within thirty (30) days of the date of such purchase. If within thirty (30) days after the date of such notice, the Companies provide the Agent with proof that the Companies had the insurance coverage required pursuant to 7.5(a) above (in form and substance satisfactory to the Agent) as of the date on which the Agent purchased insurance and the Companies continued at all times to have such insurance, then the Agent agrees to cancel the insurance purchased by the Agent and credit the Companies' Revolving Loan Account with the amount of all costs, interest and other charges associated with any insurance purchased by the Agent, including with any amounts previously charged to the Revolving Loan Account.

7.6    Each of the Companies agrees to pay, when due, all Taxes, including sales taxes assessments, claims and other charges lawfully levied or assessed upon the Companies or the Collateral unless such Taxes are being diligently contested in good faith by the Companies by appropriate proceedings and adequate reserves are established in accordance with GAAP and except to the extent payment is stayed or excused by operation of the Bankruptcy Code. Notwithstanding the foregoing, if any lien shall be filed or claimed thereunder (a) for Taxes due to the United States of America, or (b) which in the Agent's opinion might create a valid obligation having priority over the rights granted to the Agent herein (exclusive of Real Estate), such lien shall not be deemed to be a Permitted Encumbrance hereunder and the Companies shall immediately pay such tax and remove the lien of record. If the Companies or any one of them, fail to do so promptly, then at the Agent's election, the Agent may (i) create an Availability Reserve in such amount as it may deem appropriate in its business judgment, or (ii) upon the occurrence of a Default or Event of Default, imminent risk of seizure, filing of any priority lien, forfeiture, or sale of the Collateral, pay Taxes on the Companies' behalf and the amount thereof shall be an Obligation secured hereby and due on demand.

7.7    Each of the Companies: (a) agrees to comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the business or operations of the Companies or any one of them, provided that the Companies may contest any acts, rules, regulations, orders and directions of such bodies or officials in any, reasonable manner which will not, in the Agent's reasonable opinion, materially and adversely effect the Agent's and/or the Lenders' rights or priority in the Collateral; (b) agrees to comply with all environmental statutes, acts, rules, regulations or orders as presently existing or as adopted or amended in the future, applicable to the Collateral, the ownership and/or use of the Real Estate and operation of their business, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the operation of the business of the Companies or any one of them; and (c) shall not be deemed to have breached any provision of this Paragraph 7.7 if (i) the failure to comply with the requirements of this Paragraph 7.7 resulted from good faith error or innocent omission, (ii) the Companies promptly commence and diligently pursue a cure of such breach, and (iii) such failure is cured within (30) days following the Companies' receipt of notice of such failure, or if such cannot in good faith be cured within thirty (30) days, then such breach is cured within a reasonable time frame based upon the extent and nature of the breach and the necessary remediation, and in conformity with any applicable consent order, consensual agreement and applicable law.

7.8    Until termination of this Financing Agreement and payment and satisfaction of all Obligations due hereunder, the Companies agree that, unless the Agent shall have otherwise consented in writing, the Companies will furnish to the Agent and each Lender: (a) within one hundred twenty (120) days after the end of the Fiscal Year of the Companies ended December 31, 2007, an audited Consolidated Balance Sheet, with a Consolidating Balance Sheet attached thereto, as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus of the Companies and all subsidiaries of each for such year, audited by independent public accountants selected by the Companies and satisfactory to the Agent, and within ninety (90) days after the end of each Fiscal Year of the Companies ending after December 31, 2007, an audited Consolidated Balance Sheet, with a Consolidating Balance Sheet attached thereto, as at the close of such year, and statements of profit and loss, cash flow and reconciliation of surplus of the Companies and all subsidiaries of each for such year, audited by independent public accountants selected by the Companies and satisfactory to the Agent; (b) within sixty (60) days

-34-

after the end of each Fiscal Quarter a Consolidated Balance Sheet and Consolidating Balance Sheet as at the end of such period and statements of profit and loss, cash flow and surplus of the Companies and all subsidiaries of each, certified on behalf of the Companies by an authorized financial or accounting officer of the Companies; (c) within thirty (30) days after the end of each month a Consolidated Balance Sheet with a Consolidating Balance Sheet attached thereto as at the end of such period and statements of profit and loss, cash flow and surplus of the Companies and all subsidiaries for such period, certified on behalf of the Companies by an authorized financial or accounting officer of the Companies; (d) on the first day of each week a Borrowing Base Certificate as to each Company on a consolidating basis and for all Companies on a consolidated basis; (e) on or before the tenth (10th) day of each month:  (x) an aging of each Company's Accounts Receivable, (y) an Inventory report showing each Company's Inventory at cost or market value, and (z) an accounts payable aging, all as of the last day of the prior month in form and substance reasonably satisfactory to the Agent; (f) quarterly financial covenant compliance certificates certified as fairly and accurately reflecting the statements contained therein on behalf of the Companies' by the Chief Financial Officer of Shapes; and (g) from time to time, such further information regarding the business affairs and financial condition of the Companies and/or any subsidiaries thereof as the Agent or any Lender may reasonably request, including, without limitation (i) the accountant's management practice letter, if any, (ii) annual cash flow projections in form satisfactory to the Agent, (iii) on each Tuesday (commencing on March 25, 2008), a comparative statement of the Companies' actual results compared to the Budget for the preceding week and for the Cumulative Period, and (iv) as requested by Agent, (A) until May 1, 2008, bi-weekly Inventory reports showing each Company's Inventory at the lower of cost or market value, or (B) on and after May 1, 2008, weekly Inventory reports showing each Company's Inventory at the lower of cost or market value.  Each financial statement which the Companies are required to submit hereunder must be accompanied by a manager's or an officer's certificate, signed by the Manager, Chairman, Chief Executive Officer, Chief Financial Officer, President, Vice President, Controller, or Treasurer, pursuant to which any one such manager or officer must certify on behalf of the Companies that:  (x) the financial statement(s) fairly and accurately represent(s) each of the Companies' financial condition at the end of the particular accounting period, as well as the Companies' operating results during such accounting period, subject to year-end audit adjustments; and (y) during the particular accounting period:  (A) there has been no Default or Event of Default under this Financing Agreement, provided however, that if any such manager or officer has knowledge that any such Default or Event of Default, has occurred during such period, the existence of and a detailed description of same shall be set forth in such officer's certificate; (B) the Companies have not received any notice of cancellation with respect to property insurance policies which have not been replaced by policies which comply with the requirements of this Financing Agreement; (C) the Companies have not received any notice that would reasonably be expected to result in a material adverse effect on the value of the Collateral taken as a whole; and (D) the exhibits attached to such financial statement(s) constitute detailed calculations showing compliance with all financial covenants contained in this Financing Agreement.

      7.9      Until termination of the Financing Agreement and payment and satisfaction of all Obligations hereunder, each of the Companies agrees that, without the prior written consent of the Agent, except as otherwise herein provided, the Companies or any one of them will not:

      (a)      Mortgage, assign, pledge, or otherwise permit any lien, charge, security interest, encumbrance or judgment, (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise) to exist on any of the Companies' Collateral or any other assets, whether now owned or hereafter acquired, except for the Permitted Encumbrances;

      (b)      Incur or create any Indebtedness, off balance sheet liabilities, rate management obligations, or sale leasebacks, other than the Permitted Indebtedness;

      (c)      Sell, lease, assign, transfer or otherwise dispose of (i) Collateral, except for sales of Inventory in the ordinary course of business and as otherwise specifically permitted by this Financing Agreement, or (ii) either all or substantially all of any of the Companies' assets, which do not constitute Collateral; provided however, if the Companies desire to sell a business or line of business or Parent desires to sell all or a controlling portion of the membership interests in one or more of the Companies, then such sale may be consummated only upon:  (A) approval of the Bankruptcy Court, (B) such sales being an arm's length transaction for fair market value, (C) not less than thirty (30) days' prior written notice to Agent, which notice shall include copies of all then current drafts of the relevant documents and instruments evidencing the terms of such transaction, (D) Agent's determination, in its sole discretion, that the terms and conditions of such transaction and such documents and

instruments are acceptable as to form and substance, (E) Agent's giving its prior written consent, and (F) Agent's receipt of the proceeds of such sale for application to the Obligations in such order as Agent shall elect, subject to the terms of the Intercreditor Agreement.

(d)    Merge, consolidate or otherwise alter or modify their respective registered names, principal places of business, formation as limited liability companies or structure, or existence, reincorporate or re-organize, or enter into or engage in any operation or activity materially different from that presently being conducted by the Companies or any one of them, except that any of the Companies may change its registered name or its address; provided that: (i) such Company shall give the Agent thirty (30) days prior written notice thereof and (ii) such Company shall execute and deliver, prior to or simultaneously with any such action, any and all documents and agreements requested by the Agent to confirm the continuation and preservation of all security interests and liens granted to the Agent hereunder;

(e)    Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(f)    Declare or pay any dividend or distributions of any kind on, or purchase, acquire, redeem or retire, any of the capital stock or equity interest, of any class whatsoever, whether now or hereafter outstanding; provided however, the Companies (other than Parent) may make distributions to Parent and Parent may make distributions to the equity owners of Parent, in an aggregate amount equal to the actual federal, state and local income tax liability of the equity owners of Parent for any applicable taxable year (or applicable portion thereof) attributable to the Companies' income resulting from operations for each taxable year, provided that, (y) as a condition precedent to any such payment, no Default or Event of Default shall have occurred before or after giving effect to any such payment and each Company shall (i) deliver to the Agent a letter, in form and substance satisfactory to the Agent, from its independent public accountants detailing the amount necessary to be applied to Parent's equity owners' tax liability, which letter can relate to the estimated tax payments for the next succeeding four quarters, and (ii) such distribution shall be limited to the amount(s) specified in said letter; and (z) provided further that any income tax refund received by the equity owners of Parent as a result of losses suffered by the Companies or any of them shall not be retained by such equity owners, but shall be lent immediately to the Companies as Subordinated Debt;

(g)    Make any advance or loan to, or any investment in, any Person, or purchase or acquire all or substantially all of the stock or assets of any Person, except that the Companies may:  (i) make Permitted Investments; (ii) incur Inter-Company Debt; and (iii) make advances to employees in the ordinary course of business for travel and related expenses;

(h)    Pay any management, consulting or other similar fees to any Person, except (i) payments among the Companies, or (ii) payments to Phoenix Management Services or other independent third parties retained in the ordinary course of business pursuant to applications to employ professionals that have been approved by the Bankruptcy Court (subject to Agent's right to object thereto); or

(i)    Directly or indirectly, amend, modify, alter, increase or change any of the terms or conditions of the Arcus Term Loan, except as permitted by the Intercreditor Agreement.

7.10    Until termination of the Financing Agreement and payment and satisfaction in full of all Obligations hereunder, the Companies shall:

(a)    achieve EBITDA, measured on a monthly and period-to-date basis, of at least the required amount set forth below for the applicable month or period-to-date set forth opposite such amount:

| Fiscal Period | EBITDA |
|---|---|
| (i)    For the month ending | $700,000 |

April 30, 2008

| | | |
|---|---|---|
| (ii) | For the month ending May 31, 2008 | $1,500,000 |
| (iii) | For the two month period ending May 31, 2008 | $2,200,000 |
| (iv) | For the month ending June 30, 2008 | $1,200,000 |
| (v) | For the three month period ending June 30, 2008 | $3,400,000 |
| (vi) | For the month ending July 31, 2008 | $1,200,000 |
| (vii) | For the four month period ending July 31, 2008 | $4,600,000 |

(b)    Intentionally Omitted.

(c)    without the prior written consent of the Agent, no Company will contract for, purchase, make expenditures for, lease pursuant to a Capital Lease or otherwise incur obligations with respect to Capital Expenditures (whether subject to a security interest or otherwise) which would cause the aggregate amount expended by all Companies for Capital Expenditures to exceed (i) $2,000,000 from the Closing Date through June 15, 2008 and (ii) an amount (for the applicable period of time satisfactory to Agent) to be mutually agreed upon between Companies and Agent on or before June 1, 2008; provided, however, that the failure of the parties to reach agreement on the foregoing by such date will be an Event of Default hereunder.

7.11    The Companies agree to advise the Agent in writing of: (a) all expenditures (actual or anticipated) in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate from the budgeted amount therefor in any Fiscal Year for (i) environmental clean-up, (ii) environmental compliance or (iii) environmental testing and the impact of said expenses on the Companies' Working Capital; and (b) any notices the Companies receives from any local, state or federal authority advising the Companies of any environmental liability (real or potential) stemming from the Companies' operations, their premises, their waste disposal practices, or waste disposal sites used by the Companies and to provide the Agent with copies of all such notices if so required.

7.12    Each of the Companies hereby agrees to indemnify and hold harmless the Agent and Lenders and their respective officers, directors, employees, attorneys and agents (each an "**Indemnified Party**") from, and holds each of them harmless against, any and all losses, liabilities, obligations, claims, actions, damages, costs and expenses (including attorney's fees) and any payments made by the Agent pursuant to any indemnity provided by the Agent with respect to or to which any Indemnified Party could be subject insofar as such losses, liabilities, obligations, claims, actions, damages, costs, fees or expenses with respect to the Loan Documents, including without limitation those which may arise from or relate to: (a) the Depository Account, the Blocked Accounts, the lockbox and/or any other depository account and/or the agreements executed in connection therewith; and (b) any and all claims or expenses asserted against the Agent as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate; or any asserted claim or expense which results from the any of the Companies' operations (including, but not limited to, any of the Companies' off-site disposal practices) and use of the Real Estate, which the Agent may sustain or incur (other than solely as a result of the physical actions of the Agent on the Companies' premises which are determined to constitute gross negligence or willful misconduct by a court of competent jurisdiction), all whether through the alleged or actual negligence of such person or otherwise, except and to the extent that the same results solely and directly from the gross negligence or willful misconduct of

-37-

such Indemnified Party as finally determined by a court of competent jurisdiction. The Companies hereby agree that this indemnity shall survive termination of this Financing Agreement, as well as payments of Obligations which may be due hereunder. The Agent may, in its reasonable business judgment, establish such Availability Reserves with respect thereto as it may deem advisable under the circumstances and, upon any termination hereof hold such reserves as cash reserves for any such contingent liabilities.

    **7.13**    Without the prior written consent of the Agent, the Companies agree that they will not enter into any transaction (except transactions among the Companies), including, without limitation, any purchase, sale, lease, loan or exchange of property with any subsidiary or affiliate of the Companies, provided that, except as otherwise set forth in this Financing Agreement, the Companies or any one of them may enter into sale and service transactions among the Companies, or with any subsidiary or affiliate of any of the Companies in the ordinary course of their business and pursuant to the reasonable requirements of the Companies, and upon standard terms and conditions and fair and reasonable terms, no less favorable to the Companies than the Companies could obtain in a comparable arms length transaction with an unrelated third party, provided further that no Default or Event of Default exists or will occur hereunder prior to and after giving effect to any such transaction.

    **7.14**    Reserved.

    **7.15**    The Companies covenant and agree to provide the Agent, promptly upon Agent's demand, a statement, in writing, of the then current status of the Companies' union negotiations or union contracts in such form and in such detail as the Agent shall require.

    **7.16**    **Payments of Fees and Claims**. The Companies shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Sect 1930 (a)(6). In addition, without prior approval of the Bankruptcy Court and the prior written consent of Agent, the Companies shall not make any payment of any proceeds constituting part of the Collateral or other cash (including, without limitation, proceeds of Revolving Loans) to any creditor of any Company on account of claims arising prior to the commencement of the Bankruptcy Case (including without limitation payments in respect of reclamation claims of unpaid suppliers of goods delivered to the Companies prior to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code)) prior to confirmation of a plan of reorganization.

    **7.17**    Intentionally omitted.

    **7.18**    **Chapter 11 Claims**. No Company shall incur, create, assume, suffer to exist or permit any administrative expense or claim (whether now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with the liens granted to the Agent, on behalf of the Lenders, by this Agreement and the other Loan Documents or the Financing Order, other than the pari passu claims of Arcus.

    **7.19**    **Notices**. The Companies shall, in writing:

        (a)    promptly after becoming aware thereof, notify the Agent of any application or motion of any person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application motion or pleading filed in the Bankruptcy Case that, either immediately or with the passage of time, might result in an Event of Default hereunder; and

        (b)    promptly notify the Agent of the filing of (and provide Lenders with copies of) all operating and other reports and/or financial information provided by the Companies to the Bankruptcy Court, the United States Trustee, the Chapter 11 Trustee, and any other statutorily appointed or ad hoc committee in the Bankruptcy Case, and copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of any and/or all of the Companies with the Bankruptcy Court in the Bankruptcy Case, or distributed by or on behalf of any and/or all of the Companies to any official committee appointed in the Bankruptcy Case.

    **7.20**    The Companies represent, warrant and covenant, that:

B # 761460 v.5