such Indemnified Party as finally determined by a court of competent jurisdiction. The Companies hereby agree that this indemnity shall survive termination of this Financing Agreement, as well as payments of Obligations which may be due hereunder. The Agent may, in its reasonable business judgment, establish such Availability Reserves with respect thereto as it may deem advisable under the circumstances and, upon any termination hereof hold such reserves as cash reserves for any such contingent liabilities.

7.13     Without the prior written consent of the Agent, the Companies agree that they will not enter into any transaction (except transactions among the Companies), including, without limitation, any purchase, sale, lease, loan or exchange of property with any subsidiary or affiliate of the Companies, provided that, except as otherwise set forth in this Financing Agreement, the Companies or any one of them may enter into sale and service transactions among the Companies, or with any subsidiary or affiliate of any of the Companies in the ordinary course of their business and pursuant to the reasonable requirements of the Companies, and upon standard terms and conditions and fair and reasonable terms, no less favorable to the Companies than the Companies could obtain in a comparable arms length transaction with an unrelated third party, provided further that no Default or Event of Default exists or will occur hereunder prior to and after giving effect to any such transaction.

7.14     Reserved.

7.15     The Companies covenant and agree to provide the Agent, promptly upon Agent's demand, a statement, in writing, of the then current status of the Companies' union negotiations or union contracts in such form and in such detail as the Agent shall require.

7.16     **Payments of Fees and Claims**.  The Companies shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Sect 1930 (a)(6).  In addition, without prior approval of the Bankruptcy Court and the prior written consent of Agent, the Companies shall not make any payment of any proceeds constituting part of the Collateral or other cash (including, without limitation, proceeds of Revolving Loans) to any creditor of any Company on account of claims arising prior to the commencement of the Bankruptcy Case (including without limitation payments in respect of reclamation claims of unpaid suppliers of goods delivered to the Companies prior to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code)) prior to confirmation of a plan of reorganization.

7.17     Intentionally omitted.

7.18     **Chapter 11 Claims**.  No Company shall incur, create, assume, suffer to exist or permit any administrative expense or claim (whether now existing or hereafter arising, of any kind or nature whatsoever) which is superior to or pari passu with the liens granted to the Agent, on behalf of the Lenders, by this Agreement and the other Loan Documents or the Financing Order, other than the pari passu claims of Arcus.

7.19     **Notices**.  The Companies shall, in writing:

(a)     promptly after becoming aware thereof, notify the Agent of any application or motion of any person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application motion or pleading filed in the Bankruptcy Case that, either immediately or with the passage of time, might result in an Event of Default hereunder; and

(b)     promptly notify the Agent of the filing of (and provide Lenders with copies of) all operating and other reports and/or financial information provided by the Companies to the Bankruptcy Court, the United States Trustee, the Chapter 11 Trustee, and any other statutorily appointed or ad hoc committee in the Bankruptcy Case, and copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of any and/or all of the Companies with the Bankruptcy Court in the Bankruptcy Case, or distributed by or on behalf of any and/or all of the Companies to any official committee appointed in the Bankruptcy Case.

7.20     The Companies represent, warrant and covenant, that:

-38-

(a)    Subject to the entry by the Bankruptcy Court of the Interim Financing Order or Final Order, as applicable, and subject to the Intercreditor Agreement, (i) the Obligations will constitute a Superpriority Claim, subject, as to priority, only to the Carve-Out, the claims of Arcus and Permitted Encumbrances securing Senior Claims, and (ii) the liens of Agent, for the benefit of Agent and Lenders, securing the Obligations are valid and perfected first priority liens subject, as to priority only, to the Carve-Out and Permitted Encumbrances securing Senior Claims;

(b)    The Companies are not transferring the Collateral nor incurring any obligation with any intent to hinder, delay or defraud any of its respective present or future creditors;

(c)    The Interim Financing Order (with respect to the period prior to entry of the Final Order) or Final Order (with respect to the period on and after entry of the Final Order), as the case may be, has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended, modified or stayed, or reversed; and

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

7.21    The Companies will not, directly or indirectly, seek, consent to, suffer to exist or permit (i) any modification, stay, vacation or amendment to either Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Agent and the Lenders in respect to the Obligations, except for the Carve-Out and the claims of Arcus; or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of the Agent in respect of the Obligations, except for the Carve-Out and Permitted Encumbrances securing Senior Claims.

7.22    The Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Order, (b) the hearing for the approval of the Interim Financing Order and (c) the hearing for the approval of the Final Order, has been or will be given. The Companies shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in such Order.

7.23    The Companies shall not request any extension of the period of time within which the Companies have exclusive rights to solicit acceptance of its plan until the date which is nine (9) months from the Filing Date.

7.24    The Companies covenant and agree, in each case, unless extended by Agent in sole and absolute discretion, (a) the Interim Financing Order shall be entered no later than March 18, 2008; (b) the Final Order shall be entered no later than April 4, 2008.

**SECTION 8**    **Interest, Fees and Expenses**

8.1    (a)    Except as set forth in Paragraph 8.13 of Section 8 of this Financing Agreement, interest on the Revolving Loans shall be payable monthly as of the end of each month. Revolving Loans that are Chase Bank Rate Loans shall be at a rate equal to the Chase Bank Rate plus one quarter of one percent (0.25%) per annum on the aggregate net balances owing by the Companies to the Agent in the Revolving Loan Account at the close of each day during such month. In the event of any change in said Chase Bank Rate, the rate hereunder for Chase Bank Rate Loans shall change, as of the date of such change, so as to remain equal to one quarter of one percent (0.25%) above the new Chase Bank Rate. The rate hereunder shall be calculated based on a 360-day year. The

B # 761460 v.5

Agent shall be entitled to charge the Companies' Revolving Loan Account at the rate provided for herein when due until all Obligations have been paid in full, in cash.

(b)     Notwithstanding any provision to the contrary contained in this Section 8, in the event that the sum of (i) the outstanding Revolving Loans and (ii) the outstanding Letters of Credit exceed the lesser of either, as applicable, (x) the maximum aggregate amount available under Sections 3 and 5 of this Financing Agreement or (y) the Revolving Line of Credit for any other reason whatsoever, including any Overadvance made pursuant to Paragraph 3.1(b)(ii) of Section 3 herein and/or in connection with any Agent Permitted Overadvances (herein "**Other Overadvances**") and such Other Overadvances continue for five (5) or more consecutive days, the average net balance of all Revolving Loans for such month shall bear interest at the Default Rate of Interest.

(c)     Upon and after the occurrence and during the continuance of an Event of Default and the giving of any required notice by the Agent in accordance with the provisions of Section 10, Paragraph 10.2 hereof, all Obligations shall bear interest at the Default Rate of Interest.

8.2     Intentionally Omitted.

8.3     In consideration of the Letter of Credit Guaranty of the Agent, the Companies shall pay the Agent the Letter of Credit Guaranty Fee which shall be an amount equal to (a) three percent (3.0%) on the face amount of each documentary Letter of Credit payable upon issuance thereof and (b) three percent (3.0%) per annum, payable monthly, on the face amount of each standby Letter of Credit less the amount of any and all amounts previously drawn under such standby Letter of Credit.

8.4     Any and all charges, fees, commissions, costs and expenses charged to the Agent for the Companies' account by any Issuing Bank in connection with, or arising out of, Letters of Credit or out of transactions relating thereto will be charged to any one or more of the Revolving Loan Accounts in full (but without duplication) when charged to, or paid by the Agent, or as may be due upon any termination of this Financing Agreement hereof, and when made by any such Issuing Bank shall be conclusive on the Agent.

8.5     The Companies, jointly and severally, shall reimburse or pay (a) the Agent for:  (i) all Out-of-Pocket Expenses and (ii) any applicable Documentation Fee and (b) the Lenders for all Out-of Pocket Expenses incurred after the occurrence of an Event of Default which is not Waived In Writing By Agent.

8.6     Upon the last Business Day of each month, commencing on March 31, 2008, the Companies shall pay to the Agent for the benefit of the Agent and the other Lenders the Line of Credit Fee.

8.7     Intentionally omitted.

8.8     Intentionally omitted.

8.9     The Companies shall pay the Agent's standard charges and fees for the Agent's personnel used by the Agent for reviewing the books and records of the Companies and for verifying, testing, protecting, safeguarding, preserving or disposing of all or any part of the Collateral (which fees shall be in addition to the Administrative Management Fee and any Out-of-Pocket Expenses).  As of the Closing Date, the standard rate charged for such personnel is One Thousand Dollars ($1,000.00) per person per day; however Agent in its discretion may change such standard rate periodically.

8.10     Each of the Companies hereby authorizes Agent to charge their respective Revolving Loan Account(s) with the amount of all their Obligations due hereunder and under the Agent Fee Letter as such payments become due.  The Companies hereby confirm and agree that they shall, jointly and severally, promptly pay any Obligations to Agent upon its request therefor. Each of the Companies confirms that (a) its liability for any and all of the fee obligations (including without limitation, those set forth in 8.6 through 8.9 above) and Out-of-Pocket Expenses, set forth in this Financing Agreement and in any of the other Loan Documents is joint and several, (b) the Companies, as between themselves, shall determine how to pro-rate any such payments due hereunder, and (c) for ease of administration, Agent may charge any one or more of their Revolving Loan Accounts with the amount of

B # 761460 v.5

any such fee payments and any such charges which Agent may so make to any of the Companies' Revolving Loan Account(s) as herein provided will be made as an accommodation to the Companies and solely at Agent's discretion.

**8.11**    In the event that the Agent or any Lender (or any financial institution which may from time to time become a Lender hereunder) shall have determined in the exercise of its reasonable business judgment that, subsequent to the Closing Date, any change in applicable law, rule, regulation or guideline regarding capital adequacy, or any change in the interpretation or administration thereof, or compliance by the Agent or Lender with any new request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent's or such Lender's capital as a consequence of its obligations hereunder to a level below that which the Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration the Agent or such Lender's policies with respect to capital adequacy) by an amount reasonably deemed by the Agent or such Lender to be material, then, from time to time, the Companies shall pay no later than five (5) days following demand to the Agent or such Lender such additional amount or amounts as will compensate the Agent's or such Lender's for such reduction. In determining such amount or amounts, the Agent or such Lender may use any reasonable averaging or attribution methods. The protection of this Paragraph 8.11 shall be available to the Agent or such Lender regardless of any possible contention of invalidity or inapplicability with respect to the applicable law, regulation or condition. A certificate of the Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate the Agent or such Lender with respect to this Section 8 and the calculation thereof when delivered to the Companies shall be conclusive on the Companies absent manifest error. Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determines that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required to be made whole, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

**8.12**    In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by the Agent or such Lender with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject the Agent or such Lender to any tax of any kind whatsoever with respect to this Financing Agreement or change the basis of taxation of payments to the Agent or such Lender of principal, fees, interest or any other amount .payable hereunder or under any other documents (except for changes in the rate of tax on the overall net income of the Agent or such Lender by the federal government or the jurisdiction in which it maintains its principal office);

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by the Agent or such Lender by reason of or in respect to this Financing Agreement and the Loan Documents, including (without limitation) pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on the Agent or such Lender any other condition with respect to this Financing Agreement or any other document, and the result of any of the foregoing is to increase the cost to the Agent or such Lender of making, renewing or maintaining its loans hereunder by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the loans by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment, then, in any case the Companies shall pay the Agent or such Lender, within five (5) days following its demand, such additional cost or such reduction, as the case may be. The Agent or such Lender shall certify the amount of such additional cost or reduced amount to the Companies and the calculation thereof and such certification shall be conclusive upon the Companies absent manifest error. Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determine that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required pursuant hereto, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

B # 761460 v.5

**8.13**    The Companies may request LIBOR Loans with respect to Revolving Loans on the following terms and conditions:

(a)    Commencing on the date which is thirty (30) days after the Closing Date and from time to time thereafter the Companies may elect (i) to request any loan made hereunder to be a LIBOR Loan as of the date of such loan or (ii) to convert Chase Bank Rate Loans to LIBOR Loans, and may elect from time to time to convert LIBOR Loans to Chase Bank Rate Loans by giving the Agent at least three (3) Business Days' prior irrevocable notice of such election, provided that any such conversion of LIBOR Loans to Chase Bank Rate Loans shall only be made, subject to the second following sentence, on the last day of an Interest Period with respect thereto. Should the Companies elect to convert Chase Bank Rate Loans to LIBOR Loans, it shall give the Agent at least three (3) Business Days' prior irrevocable notice of such election. If the last day of an Interest Period with respect to a loan that is to be converted is not a Business Day or Working Day, then such conversion shall be made on the next succeeding Business Day or Working Day, as the case may be, and during the period from such last day of an Interest Period to such succeeding Business Day, as the case may be, such loan shall bear interest as if it were an Chase Bank Rate Loan. All or any part of outstanding Chase Bank Rate Loans then outstanding with respect to Revolving Loans may be converted to LIBOR Loans as provided herein, provided that partial conversions shall be in a minimum principal amount of One Million Dollars ($1,000,000.00) and in increments of One Hundred Thousand Dollars ($100,000.00) in excess thereof.

(b)    Any LIBOR Loans may be continued as such upon the expiration of an Interest Period, provided the Companies so notify the Agent, at least three (3) Business Days' prior to the expiration of said Interest Period, and provided further that no LIBOR Loan may be continued as such upon the occurrence of any Event of Default which has not been Waived In Writing By Agent under this Financing Agreement, but shall be automatically converted to a Chase Bank Rate Loan on the last day of the Interest Period during which occurred such Event of Default which has not been Waived In Writing By Agent. Absent such notification, LIBOR Rate Loans shall convert to Chase Bank Rate Loans on the last day of the applicable Interest Period. Each notice of election, conversion or continuation furnished by the Companies pursuant hereto shall specify whether such election, conversion or continuation is for a one, two, three or six month period. Notwithstanding anything to the contrary contained herein, the Agent (or any participant, if applicable) shall not be required to purchase United States Dollar deposits in the London interbank market or from any other applicable LIBOR Rate market or source or otherwise "match fund" to fund LIBOR Rate Loans, but any and all provisions hereof relating to LIBOR Rate Loans shall be deemed to apply as if the Agent (and any participant, if applicable) had purchased such deposits to fund any LIBOR Rate Loans.

(c)    The Companies may request a LIBOR Loan, convert any Chase Bank Rate Loan or continue any LIBOR Loan provided there is then no Event of Default in effect which has not been Waived In Writing By Agent.

**8.14**    (a)    The LIBOR Loans shall bear interest for each Interest Period with respect thereto on the unpaid principal amount thereof at a rate per annum equal to the LIBOR determined for each Interest Period in accordance with the terms hereof plus two percent (2.0%) with respect to Revolving Loans.

(b)    If all or a portion of the outstanding principal amount of the Obligations shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such outstanding amount, to the extent it is a LIBOR Loan, shall be converted to a Chase Bank Rate Loan at the end of the last Interest Period therefor.

(c)    The Companies may not have more than six (6) LIBOR Loans outstanding at any given time.

**8.15**    (a)    Interest in respect of the LIBOR Loans shall be calculated on the basis of a 360 day year and shall be payable as of the end of each month.

(b)    The Agent shall, at the request of the Companies, deliver to the Companies a statement showing the quotations given by JPMorgan Chase Bank and the computations used in determining any interest rate pursuant to Paragraph 8.14 of Section 8 hereof.

B # 761460 v.5

**8.16**     As further set forth in Paragraph 8.12 above, in the event that the Agent (or any financial institution which may become a Lender hereunder) shall have determined in the exercise of its reasonable business judgment (which determination shall be conclusive and binding upon the Companies) that by reason of circumstances affecting the interbank LIBOR market, adequate and reasonable means do not exist for ascertaining LIBOR applicable for Interest Period with respect to:  (a) a proposed loan that the Companies have requested be made as a LIBOR Loan; (b) a LIBOR Loan that will result from the requested conversion of a Chase Bank Rate Loan into LIBOR Loan; or (c) the continuation of LIBOR Loans beyond the expiration of the then current Interest Period with respect thereto, the Agent shall forthwith give written notice of such determination to the Companies at least one day prior to, as the case may be, the requested borrowing date for such LIBOR Loan, the conversion date of such Chase Bank Rate Loan or the last day of such Interest Period.  If such notice is given (i) any requested LIBOR Loan shall be made as a Chase Bank Rate Loan, (ii) any Chase Bank Rate Loan that was to have been converted to a LIBOR Loan shall be continued as a.  Chase Bank Rate Loan, and (iii) any outstanding LIBOR Loan shall be converted, on the last day of the then current Interest Period with respect thereto, to a Chase Bank Rate Loan.  Until such notice has been withdrawn by the Agent, no further LIBOR Loan shall be made nor shall the Companies have the right to convert a Chase Bank Rate Loan to a LIBOR Loan.

**8.17**     If any payment on a LIBOR Loan becomes due and payable on a day other than a Business Day or Working Day, the maturity thereof shall be extended to the next succeeding Business Day or Working Day unless the result of such extension would be to extend such payment into another calendar month in which event such payment shall be made on the immediately preceding Business Day or Working Day.

**8.18**     Notwithstanding any other provisions herein, if any law, regulation, treaty or directive or any change therein or in the interpretation or application thereof shall make it unlawful for the Agent to make or maintain LIBOR Loans as contemplated herein, the then outstanding LIBOR Loans, if any, shall be converted automatically to Chase Bank Rate Loans as of the end of such month, or within such earlier period as required by law.  The Companies hereby agree promptly to pay the Agent or any Lender, upon demand, any additional amounts necessary to compensate the Agent for any costs incurred by the Agent or any Lender in making any conversion in accordance with this Section 8 including, but not limited to, any interest or fees payable by the Agent or any Lender to lenders of funds obtained by the Agent in order to make or maintain LIBOR Loans hereunder.

**8.19**     The Companies agree to indemnify and to hold the Agent and the Lenders harmless from any loss or expense which the Agent or such Lender may sustain or incur as a consequence of:  (a) default by the Companies in payment of the principal amount of or interest on any LIBOR Loans, as and when the same shall be due and payable in accordance with the terms of this Financing Agreement, including, but not limited to, any such loss or expense arising from interest or fees payable by the Agent or to Lenders of funds obtained by either of them in order to maintain the LIBOR Loans hereunder; (b) default by the Companies in making a borrowing or conversion after the Companies have given a notice in accordance with Paragraph 8.13 of Section 8 hereof; (c) any prepayment of LIBOR Loans on a day which is not the last day of the Interest Period applicable thereto, including, without limitation, prepayments arising as a result of the application of the proceeds of Collateral to the Revolving Loans; and (d) default by the Companies in making any prepayment after the Companies have given notice to the Agent thereof.  The determination by the Agent of the amount of any such loss or expense, when set forth in a written notice to the Companies, containing the Agent's calculations thereof in reasonable detail, shall be conclusive on the Companies in the absence of manifest error.  Calculation of all amounts payable under this paragraph with regard to LIBOR Loans shall be made as though the Agent had actually funded the LIBOR Loans through the purchase of deposits in the relevant market and currency, as the case may be, bearing interest at the rate applicable to such LIBOR Loans in an amount equal to the amount of the LIBOR Loans anus having a maturity comparable to the relevant interest period; provided, however, that the Agent may fund each of the LIBOR Loans in any manner the Agent sees fit and the foregoing assumption shall be used only for calculation of amounts payable under this paragraph.  In addition, notwithstanding anything to the contrary contained herein, the Agent shall apply all proceeds of Collateral and all other amounts received by it from or on behalf of the Companies (A) first to the Chase Bank Rate Loans and (B) then to LIBOR Loans; provided, however, (x) upon the occurrence of an Event of Default which is not Waived in Writing By Agent or (y) in the event the aggregate amount of outstanding Loans and Letters of Credit exceeds Availability or the applicable maximum levels set forth therefor, the Agent (A) may apply all proceeds of Collateral, first to the fees and expenses due to Agent, second to accrued interest with respect to the Obligations, third to the outstanding principal balance of the Obligations, in such order as the Required Lenders may elect, and fourth to any other Obligations in such order as the Required Lenders may elect.  In the event that any

-43-

B # 761460 v.5

such amounts are applied to Revolving Loans which are LIBOR Loans, such application shall be treated as a prepayment of such loans and the Agent shall be entitled to indemnification hereunder. This covenant shall survive termination of this Financing Agreement and payment of the outstanding Obligations.

      **8.20**    Notwithstanding anything to the contrary in this Financing Agreement, in the event that, by reason of any Regulatory Change (for purposes hereof "**Regulatory Change**" shall mean, with respect to the Agent, any change after the date of this Financing Agreement in United States federal, state or foreign law or regulations (including, without limitation, Regulation the adoption or making after such date of any interpretation, directive or request applying to a class of banks including the Agent of or under any United States federal, state or foreign law or regulations (whether or not having the force of law and whether or not failure to comply, therewith would be unlawful), the Agent either (a) incurs any material additional costs based on or measured by the excess above a specified level of the amount of a category of deposits or other liabilities of such bank which includes deposits by reference to which the interest rate on LIBOR Loans is determined as provided in this Financing Agreement or a category of extension of credit or other assets of the Agent which includes LIBOR Loans, or (b) becomes subject any material restrictions on the amount of such a category of liabilities or assets which it may hold, then, if the Agent so elects by notice to the Companies, the obligation of the Agent to make or continue, or to convert Chase Bank Rate Loans into LIBOR Loans hereunder shall be suspended until such Regulatory Change ceases to be in effect.

      **8.21**    For purposes of each of the indemnity provisions of this Section 8 and all other indemnity provisions contained in this Financing Agreement, any reference to the Agent shall include all Lenders and any financial institution which may become a Lender subsequent to the Closing Date.

## SECTION 9    Powers

      Each of the Companies hereby constitutes the Agent, or any person or agent the Agent may designate, as its attorney-in-fact, at such Company's cost and expense, to exercise all of the following powers, which being coupled with an interest, shall be irrevocable until all Obligations to the Agent have been paid in full, in cash:

      (a)    To receive, take, endorse, sign, assign and deliver, all in the name of the Agent or the Companies or any one of them, any and all checks, notes, drafts, and other documents or instruments relating to the Collateral;

      (b)    To receive, open and dispose of all mail addressed to the Companies or any one of them and to notify postal authorities to change the address for delivery thereof to such address as the Agent may designate;

      (c)    To request from customers indebted on Accounts at any time, in the name of the Agent information concerning the amounts owing on the Accounts;

      (d)    To request from customers indebted on Accounts at any time, in the name of the Companies or any one of them, in the name of certified public accountant designated by the Agent or in the name of the Agent's designee, information concerning the amounts owing on the Accounts;

      (e)    To transmit to customers indebted on Accounts notice of the Agent's interest therein and to notify customers indebted on Accounts to make payment directly to the Agent for the Companies' account; and

      (f)    To take or bring, in the name of the Agent or the Companies or any one of them, all steps, actions, suits or proceedings deemed by the Agent necessary or desirable to enforce or effect collection of the Accounts.

      Notwithstanding anything hereinabove contained to the contrary, the powers set forth in (b), (c), (e) and (f) above may only be exercised after the occurrence of an Event of Default and until such time as such Event of Default is Waived In Writing By Agent.

B # 761460 v.5

**SECTION 10    Events of Default and Remedies**

10.1    Notwithstanding anything hereinabove to the contrary, the Agent may, and at the direction of the Required Lenders shall, terminate this Financing Agreement immediately upon the occurrence of any of the following Events of Default:

(a)    cessation of the business of any Company (except as the result of (i) the sale of substantially all of the assets of such Company and the application of the proceeds of such sale to the Obligations, all in accordance with the terms and conditions of this Financing Agreement and the Intercreditor Agreement, or (ii) the contribution of substantially all of the assets of such Company to another Company);

(b)    the Companies shall be unable to pay their respective post-petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make such payments, as and when such payments become due;

(c)    (i)    except as otherwise agreed to by the Agent, the bringing of a motion by any Company or any other Person in the Bankruptcy Case to obtain additional financing under Section 364 of the Bankruptcy Code, to use cash collateral of the Lenders under Section 363 of the Bankruptcy Code, or to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c), Section 552 of the Bankruptcy Code, or otherwise;

(ii)    any Company or any other Person seeks to incur, in a manner inconsistent with this Agreement or the then applicable Financing Order, indebtedness that is secured by a lien with priority equal to or superior to the post-petition liens or which is given super-priority administrative expense status under Bankruptcy Code Section 364(c)(i);

(iii)    notice is given of a sale under Section 363 of the Bankruptcy Code of all or part of the post-petition Collateral as to which Agent and Lenders are not proposed to be paid in full or with respect to which the Agent has not provided its prior written consent;

(iv)    the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a lien on any Collateral, or (B) with respect to any lien of, or the granting of any lien on, any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on (1) any Company's ability to repay the Obligations hereunder in accordance with the terms hereof or (2) the Collateral or the Agent's liens granted hereunder on the Collateral or the priority of a material portion of such liens;

(v)    an order is entered by the Bankruptcy Court appointing, or any Company or any other Person files an application for an order seeking the appointment of, without the prior written consent of the Agent, an examiner with enlarged powers relating to the execution of the business (i.e., powers beyond those set forth in Sections 1 106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(vi)    an order is entered by the Bankruptcy Court, without the prior written consent of the Agent, (A) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Company equal or superior to the priority of the Agent with respect to the Obligations, except for any Carve-Out agreed to by the Agent in any Financing Order, or (B) granting or permitting the granting of a lien on the Collateral other than a Permitted Encumbrance;

(vii)    any Company fails to file a plan of reorganization containing a provision for termination of this Agreement and the indefeasible repayment in full, in cash of the Obligations of the Companies within the exclusivity period provided in Section 1121 of the Bankruptcy Code;

(viii)    an order is entered by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case which does not (i) contain a provision for termination of this Agreement and the indefeasible payment in full in cash of all Obligations of the Companies under this Agreement and the other Loan Documents

-45-

(including, for these purposes, any Existing Financing Agreements) on or before the effective date of such plan or plans, and (ii) provide for the continuation of the liens and security interests granted to the Agent (and maintains the priorities of such liens and security interests) until such plan effective date, unless the Obligations have been indefeasibly paid in full, in cash, and this Agreement and all other Loan Documents have been terminated;

(ix)    any Person shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the Agent, or any claims or rights against such Person, or to subject any of the Collateral to assessment pursuant to Section 506(c), 552(b), or otherwise, of the Bankruptcy Code, or pursuant to other applicable law;

(x)    any lien or security interest created by this Agreement or the Financing Order shall, for any reason, cease to be valid;

(xi)    any action is commenced which contests any provision of any Financing Order, or the validity, perfection, priority or enforceability of any of the liens and security interests of the Agent or the Lenders, as applicable;

(xii)    the Bankruptcy Case is dismissed, or is converted to a case under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed, or

(xiii)    any Company shall fail to perform any of its obligations in accordance with the terms of the then applicable Financing Order.

(d)    the Bankruptcy Court shall enter any order (i) suspending, superseding, revoking, reversing, staying, vacating, rescinding, modifying, supplementing or otherwise amending either Financing Order, this Agreement or any other Loan Document (except as otherwise approved by Agent in writing), or (ii) to grant or permit the grant of a lien on the Collateral other than Permitted Encumbrances;

(e)    the entry of an order in the Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents;

(f)    breach by any Company of any warranty, representation or covenant contained herein (other than those referred to in sub-paragraph (g) below) or in any other written agreement between any Company, the Agent or any Lender, provided that such Default of any of the warranties, representations or covenants referred in this clause (f) shall not be deemed to be an Event of Default unless and until such Default shall remain unremedied to the Agent's satisfaction for a period of ten (10) days from the date of such breach;

(g)    breach by any Company of any warranty, representation or covenant of Paragraphs 3.3 (other than the fourth sentence of Paragraph 3.3) and 3.4 of Section 3 and Section 4 hereof; Paragraphs 6.3 and 6.4 (other than the first sentence of Paragraph 6.4) of Section 6 hereof and Paragraphs 7.1, 7.5, 7.6, and 7.8 through 7.26 hereof;

(h)    failure of the Companies or any one of them to pay any of the Obligations within five (5) Business Days of the due date thereof provided that nothing contained herein shall prohibit the Agent from charging such amounts to the Revolving Loan Accounts on the due date thereof;

(i)    with respect to any Plan other than a "multiemployer plan," as defined in Section 3(37) of ERISA, and other than a defined contribution plan (solely for the purposes of clauses (ii), (iii), (iv) and (v)), any Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) have any "accumulated funding deficiency" as defined in ERISA, (iii) have any "reportable event" as defined in ERISA, for which the requirement to provide notice has not, within the regulations issued under ERISA, been waived, (iv) terminate any Plan, or (v) be engaged in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of such Plan, and with respect to this sub-paragraph (g) such event or condition (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in the

B # 761460 v.5

reasonable opinion of the Agent, subject such Company to any tax, penalty or other liability material to the business, operations or financial condition of such Company;

       (j)     Intentionally omitted;

       (k)     without the prior written consent of the Agent or as expressly permitted in the Subordination Agreement, the Companies or any one of them shall (x) amend or modify the Subordinated Debt, or (y) make any payment on account of the Subordinated Debt;

       (l)     the occurrence of any default or event of default (after giving effect to any applicable grace or cure periods) under any instrument or agreement evidencing (x) Subordinated Debt or (y) any other Indebtedness of the Companies or any one of them having a principal amount in excess of One Hundred Fifty Thousand Dollars ($150,000.00);

       (m)     the failure of any Company to perform, keep, or observe any of the covenants, conditions, premises, agreements or obligations of such Company under the applicable Financing Order;

       (n)     (i) Steven S. Grabell, as Chief Executive Officer, ceases for any reason whatsoever to be actively engaged in the management of the Companies unless a successor acceptable to Agent is appointed within sixty (60) days or (ii) more than twenty percent (20%) of the membership interests or stock of (x) the Companies (other than Shapes/Arch) presently held (directly or indirectly) by the Parent or (y) the Parent are transferred to any Person not an equitable or beneficial owner of such stock or membership interests as of the execution of this Financing Agreement

       (o)     an event of default that has not been waived in writing by Arcus occurs under the Arcus Term Loan Documents;

       (p)     the receipt by any Company or Agent of a Notice of Non-Funding, or the failure by Arcus to fund the Arcus Term Loan, or any draw thereunder, under the Arcus Term Loan Agreement; or

       (q)     the making by any Company of any payment not permitted by, or in violation of, the Intercreditor Agreement.

       **10.2**     Upon the occurrence of an Event of Default, unless such Event of Default has been Waived In Writing By Agent, notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any further application, motion or notice to, or order from, the Bankruptcy Court, the Agent in its sole discretion may, or upon the written direction of the Required Lenders the Agent shall, declare that, all loans, advances and extensions of credit provided for in Section 3 of this Financing Agreement shall be thereafter in the Agent's or the Required Lenders' sole discretion, and the obligation of the Agent and/or the Lenders to make Revolving Loans, open Letters of Credit and/or provide Letter of Credit Guaranties shall cease unless such Event of Default is Waived In Writing By Agent or cured to the Agent's or the Required Lenders' satisfaction in the exercise of the Agent's and the Lenders' reasonable judgment. Upon the occurrence of an Event of Default not Waived In Writing By Agent, notwithstanding the provisions of Section 362 of the Bankruptcy Code, and without any further application, motion or notice to, or order from, the Bankruptcy Court, without prior notice, the Agent in its sole discretion may, or upon the written direction of the Required Lenders the Agent shall, take any one or more of the following actions, including, without limitation:  (a) to declare that all Obligations shall become immediately due and payable; (b) the Agent may charge the Companies the Default Rate of Interest on all then outstanding or thereafter incurred Obligations in lieu of the interest provided for in Section 8 of this Financing Agreement, provided that, with respect to this clause "(b)" the Agent has given the Companies written notice of the Event of Default; and (c) the Agent may immediately terminate this Financing Agreement upon notice to the Companies; and/or (d) Agent may exercise any rights and remedies provided to Agent or Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC; and, pursuant to the Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated (at Agent's election) to permit Agent to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise

any remedy in a nature of a liquidation of, or foreclosure on, any interest of Companies in the Collateral only upon three (3) Business Days prior written notice to Borrowers, the United States Trustee for the District of New Jersey, and any counsel approved by the Bankruptcy Court for the Creditors' Committee (the "Remedies Notice Period"); provided, however, that during such Remedies Notice Period, (i) the Borrowers may not challenge or object to or file any motions attempting to limit the remedies of Agent and Lenders hereunder other than to take any and all actions necessary to cure such Event of Default to Agent's satisfaction and (ii) Borrowers shall have no right to use or seek to use the Collateral or request or obtain Revolving Loans ; provided further if the Bankruptcy Court does not determine that an Event of Default has not occurred, and the Event of Default has not been Waived In Writing By Agent, upon the expiration of such Remedies Notice Period, Agent shall have relief from the automatic stay without further notice or order as set forth herein. Upon the occurrence of an Event of Default and the exercise by Agent of its rights and remedies under this Agreement and the other Loan Documents, Borrowers shall assist Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition; such assistance shall include, without limitation (if so requested), filing any motions under Sections 363 or 365 or any other applicable provisions of the Bankruptcy Code to authorize the transfer of all or any portion of the Collateral or otherwise assume and assign any lease or executory contract included therein. The exercise of any option is not exclusive of any other option, which may be exercised at any time by the Agent.

   10.3    Immediately upon the occurrence of any Event of Default, unless such Event of Default has been Waived In Writing By Agent, the Agent may, to the extent permitted by law: (a) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including any electronic records, contracts and signatures pertaining thereto), documents, instruments, files and records, and any receptacles or cabinets containing same, relating to the Accounts, or the Agent may use, at the Companies' expense, such of the Companies' personnel, supplies or space at the Companies' places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) bring suit, in the name of the Companies or the Agent, and generally shall have all other rights respecting said Accounts, including without limitation the right to:  accelerate or extend the time of payment, settle, compromise, release in whole or in part any amounts owing on any Accounts and issue credits in the name of the Companies or the Agent; (c) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed Inventory, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at the Agent's sole option and discretion, and the Agent may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Companies and, in furtherance of the foregoing, the Companies shall seek authorization from the Bankruptcy Court to conduct, on any of the Companies' owned or leased premises, one or more sales of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code; (d) foreclose the security interests in the Collateral created herein or by the Loan Documents by any available judicial procedure, or to take possession of any or all of the Collateral, including any Inventory, Equipment and/or Other Collateral without judicial process, and to enter any premises where any Inventory and Equipment and/or Other Collateral may be located for the purpose of taking possession of or removing the same; and (e) exercise any other rights and remedies provided in law, in equity, by contract or otherwise. The Agent shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, in the name of the Companies or the Agent, or in the name of such other party as the Agent may designate, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including but not limited to warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as the Agent in its sole discretion may deem advisable, and the Agent shall have the right to purchase at any such sale. If any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, the Agent shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as the Agent shall deem appropriate and any such costs shall be deemed an Obligation hereunder. Any action taken by Agent pursuant to this paragraph shall not affect commercial reasonableness of the sale. The Companies agree, at the request of the Agent, to assemble the Inventory and Equipment and to make it available to the Agent at premises of the Companies or elsewhere and to make available to the Agent the premises and facilities of the Companies for the purpose of the Agent's taking possession of removing or putting the Inventory and Equipment in saleable form. If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law. The net cash proceeds resulting from the Agent's exercise of any of the foregoing rights, (after deducting all charges, costs and expenses, including reasonable attorneys' fees) shall be applied by the

B # 761460 v.5

Agent to the payment of the Obligations, whether due or to become due, in such order as the Agent may elect, and the Companies shall remain liable to the Agent for any deficiencies, and the Agent in turn agrees to remit to the Companies or its successors or assigns, any surplus resulting therefrom. The enumeration of the foregoing rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative. The Companies hereby indemnify the Agent and hold the Agent harmless from any and all costs, expenses, claims, liabilities, Out-of-Pocket Expenses or otherwise, incurred or imposed on the Agent by reason of the exercise of any of its rights, remedies and interests hereunder, including, without limitation, from any sale or transfer of Collateral, preserving, maintaining or securing the Collateral, defending its interests in Collateral (including pursuant to any claims brought by the Companies, the Companies as debtors-in-possession, any secured or unsecured creditors of the Companies, any trustee or receiver in bankruptcy, or otherwise), and the Companies hereby agree to so indemnify and hold the Agent harmless, absent the Agent's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The foregoing indemnification shall survive termination of this Financing Agreement until such time as all Obligations (including the foregoing) have been finally and indefeasibly paid in full, in cash. In furtherance thereof the Agent, may establish such reserves for Obligations hereunder (including any contingent Obligations) as it may deem advisable in its reasonable business judgment. Any applicable mortgage(s), deed(s) of trust or assignment(s) issued to the Agent on the Real Estate shall govern the rights and remedies of the Agent thereto.

       **10.4**     The Companies hereby acknowledge and agree that Agent shall have no duty to marshal the Collateral and that Agent make take and dispose of any or all of the Collateral in such order and at such time or times as Agent, acting in its discretion, may elect.

**SECTION 11**    **Termination**

       This Agreement shall terminate on the earlier to occur of the (a) DIP Revolver Maturity Date or (b) the Anniversary Date, provided that, at the request of the Companies, Agent and Lenders shall extend the Anniversary Date of this Agreement for up to an additional nine (9) months, in one or more weekly or monthly periods; provided, that the Arcus Term Loan has been extended for the same additional period(s), and no Default or Event of Default has occurred or is continuing. Notwithstanding the foregoing, the Agent may terminate the Financing Agreement immediately upon the occurrence of an Event of Default. The Companies may terminate this Financing Agreement at any time upon not less than ten (10) days' prior written notice of the date of termination (the "**Noticed Termination Date**") given to the Agent by Borrower Representative, provided that the Companies shall have up to ten (10) additional days after the Noticed Termination Date in which to repay the Obligations in full, in cash. Notice of termination as aforesaid by any one Company shall be deemed to be a notice by all of the Companies for purposes hereof. All Obligations shall become due and payable as of any termination hereunder or under Section 10 hereof and, pending a final accounting, the Agent may withhold any balances in the Companies' accounts (unless supplied with an indemnity satisfactory to the Agent) to cover all of the Obligations, whether absolute or contingent, including, but not limited to, cash reserves for any contingent Obligations, including an amount of one hundred ten percent (110%) of the face amount of any outstanding Letters of Credit with an expiry date on, or within thirty (30) days of the effective date of termination of this Financing Agreement; provided however, as to reserves for environmental claims, the amount to be held shall be limited to an amount for which a claim has been asserted against Agent or any Lender. All of the Agent's rights, liens and security interests shall continue after any termination until all Obligations have been paid and satisfied in full.

**SECTION 12**    **Miscellaneous**

       **12.1**     Each of the Companies hereby waives diligence, notice of intent to accelerate, notice of acceleration, demand, presentment and protest and any notices (other than those specifically provided for herein) hereof as well as notice of nonpayment. No delay or omission of the Agent, the Lenders or the Companies to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or shall operate as a waiver thereof or as a waiver of any such Event of Default. No single or partial exercise by the Agent of any right or remedy precludes any other or further exercise thereof or precludes any other right or remedy.

       **12.2**     This Financing Agreement and the other Loan Documents executed and delivered in connection therewith constitute the entire agreement among the Companies and the Agent and Lender; supersede any prior

B # 761460 v.5

agreements; can be changed only by a writing signed by the Companies, the Agent and the Required Lenders (or by the Agent at the written request of the Required Lenders), unless the consent of all Lenders is required pursuant to Paragraph 14.10 herein below, and shall bind and benefit the Companies, the Lenders and the Agent and their respective successors and assigns, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

    **12.3**    In no event shall the Companies, upon demand by the Agent for payment of any Indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law.  Regardless of any provision herein or in any agreement made in connection herewith, the Agent and Lenders shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law.  If the Agent ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such; and if principal is paid in full, in cash, any remaining excess shall be refunded to the Companies. This paragraph shall control every other provision hereof, the Loan Documents and of any other agreement made in connection herewith.

    **12.4**    If any provision hereof or of any other agreement made in connection herewith is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance.  Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

    **12.5    EACH OF THE COMPANIES, THE LENDERS AND THE AGENT HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS FINANCING AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER.  EACH OF THE COMPANIES HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL THE AGENT BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.**

    **IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS \HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK.  EACH OF THE COMPANIES HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE.  EACH OF THE COMPANIES HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY COMPANY BY THE LENDERS IN ACCORDANCE WITH THIS SECTION.**

    **12.6**    Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (provided that, any electronic communications from the Companies with respect to any request, transmission, document, electronic signature, electronic mail or facsimile transmission shall be deemed binding on the Companies for purposes of this Financing Agreement, provided further that any such transmission shall not relieve the Companies from any other obligation hereunder to communicate further in writing), and shall be deemed

B # 761460 v.5

to have been validly served, given or delivered when hand delivered or sent by facsimile, or three (3) days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified or to such other address as any party hereto may designate for itself by like notice, as follows:

(a)    if to CIT, at:

> The CIT Group/Business Credit, Inc.
> 11 West 42nd Street, 13th Floor
> New York, New York 10036
> Attn: Portfolio Manager
> Fax No.: (212) 461-7760

> With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to Agent's counsel at:

> Stradley, Ronon, Stevens & Young, LLP
> 2600 Commerce Square
> Philadelphia, PA 19103
> Attn: Gary P. Scharmett, Esq.
> Fax No.: (215) 564-8120

(b)    if to the Companies or any of them to Shapes/Arch, in its capacity of Borrower Representative, at:

> c/o Shapes Arch Holdings, L.L.C.
> 9000 River Road
> Delair, NJ 08110
> Attn: Chief Executive Officer
> Fax No.: (856) 662-6069

> With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to the Companies' counsel at:

> Cozen O'Connor
> Chase Manhattan Center
> 1201 North Market Street, Suite 1400
> Wilmington, DE 19081
> Attn: Mark E. Felger, Esq.
> Fax No.: (302) 295-2013

> and

> Blank Rome LLP
> One Logan Square
> Philadelphia, PA 19103
> Attn: Lawrence F. Flick, II, Esq.
> Fax No.: (215) 832-5556

provided, however, that the failure of any Person to provide another Person's counsel with a copy of such notice shall not invalidate such notice and shall not give such Person any rights, claims or defenses due to the failure to provide such additional notice. Each of the Companies hereby designates Shapes/Arch as its representative and agent ("**Borrower Representative**") on its behalf for the purposes of giving and receiving all notices and consents under this Financing Agreement, the other Loan Documents or under any other documents, instrument or agreement related thereto and taking all other actions (including in respect of compliance with covenants) on behalf of itself and/or each of the other Companies under the Loan Documents. Borrower Representative hereby accepts such

B # 761460 v.5

appointment. Agent may regard any notice or other communication pursuant to any of the Loan Documents from Borrower Representative as a notice or communication from each of the Companies, and may give any notice or communication required or permitted to be given to any of the Companies under any of the Loan Documents to Borrower Representative. Each of the Companies agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by Borrower Representative shall be deemed for all purposes to have been made by such entity and shall be binding upon and enforceable against such entity to the same extent as if the same had been made directly by such entity.

**12.7     THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS FINANCING AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION.**

12.8     In the event any direct conflict between the terms and conditions of this Agreement and/or any of the Loan Documents and the specific terms and conditions of the Financing Order, the terms and conditions of the Financing Order shall prevail. Nothing set forth in this Agreement shall require the Companies to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to the Agent's ability to declare the occurrence of an Event of Default based upon such action or failure to act. In the event of any inconsistency between this Agreement and any of the Loan Documents, this Agreement shall control.

## SECTION 13     <u>Agreement between the Lenders</u>

13.1     (a)     The Agent, for the account of the Lenders, shall disburse all loans and advances to the Companies and shall handle all collections of Collateral and repayment of Obligations. It is understood that for purposes of advances to the Companies and for purposes of this Section 13 the Agent is using the funds of the Agent.

(b)     Unless the Agent shall have been notified in writing by any Lender prior to any advance to the Companies that such Lender will not make the amount which would constitute its share of the borrowing on such date available to the Agent, the Agent may assume that such Lender shall make such amount available to the Agent on a Settlement Date, and the Agent may, in reliance upon such assumption, make available to the Companies a corresponding amount. A certificate of the Agent submitted to any Lender with respect to any amount owing under this paragraph shall be conclusive, absent manifest error if no objection, in writing, is delivered to the Agent within ten (10) Business Days of receipt of the Certificate. If such Lender's share of such borrowing is not in fact made available to the Agent by such Lender on the Settlement Date, the Agent shall be entitled to recover such amount with interest thereon at the rate per annum applicable to Revolving Loans hereunder, on demand, from the Companies without prejudice to any rights which the Agent may have against such Lender hereunder. Nothing contained in this paragraph shall relieve any Lender which has failed to make available its ratable portion of any borrowing hereunder from its obligation to do so in accordance with the terms hereof. Nothing contained herein shall be deemed to obligate the Agent to make available to the Companies the full amount of a requested advance when the Agent has any notice (written or otherwise) that any of the Lenders will not advance its ratable portion thereof.

13.2     On the Settlement Date, the Agent and the Lenders shall each remit to the other, in immediately available funds, all amounts necessary so as to ensure that, as of the Settlement Date, the Lenders shall have their proportionate share of all outstanding Obligations.

13.3     The Agent shall forward to each Lender, at the end of each month, a copy of the account statement rendered by the Agent to the Companies.

13.4     The Agent shall, after receipt of any interest and fees earned under this Financing Agreement, promptly remit to the Lenders: (a) their pro rata portion of all fees, provided, however, that the Lenders (other than CIT in its role as the Agent) shall (i) not share in the Collateral Management Fee or Documentation Fees; and (ii) receive their pro rata portion of the Line of Credit Fee; and (b) interest computed at the rate and as provided for in Section 8 of this Financing Agreement on all outstanding amounts advanced by the Lenders on each Settlement

B # 761460 v.5

Date, prior to adjustment, that are subsequent to the last remittance by the Agent to the Lenders of the Companies' interest.

13.5 (a)    The Companies acknowledge that the Lenders with the prior written consent of the Agent, which consent shall not be unreasonably withheld, may sell participation in the loans and extensions of credit made and to be made to the Companies hereunder.  The Companies further acknowledge that in doing so, the Lenders may grant to such participants certain rights which would require the participant's consent to certain waivers, amendments and other actions with respect to the provisions of this Financing Agreement, provided that the consent of any such participant shall not be required except for matters requiring the consent of all Lenders hereunder as set forth in Section 14, Paragraph 14.10 hereof.

(b)    The Companies authorize each Lender to disclose to any participant or purchasing lender (each, a "**Transferee**") and any prospective Transferee any and all financial information in such Lender's possession concerning the Companies and their affiliates which has been delivered to such Lender by or on behalf of the Companies pursuant to this Financing Agreement or which has been delivered to such Lender by or on behalf of the Companies in connection with such Lender's credit evaluation of the Companies and their affiliates prior to entering into this Agreement, provided that such Transferee agrees to hold such information in confidence in the ordinary course of its business.

13.6    The Companies hereby agree that each Lender is solely responsible for its portion of the Line of Credit and that neither the Agent nor any Lender shall be responsible for, nor assume any obligations for the failure of any Lender to make available its portion of the Line of Credit.  Further, should any Lender refuse to make available its portion of the Line of Credit, then the other Lender may, but without obligation to do so, increase, unilaterally, its portion of the Line of Credit in which event the Companies are so obligated to that other Lender.

13.7    In the event that the Agent, the Lenders or any one of them is sued or threatened with suit by the Companies or any one of them, or by any receiver, trustee, creditor or any committee of creditors on account of any preference, voidable transfer or lender liability issue, alleged to have occurred or been received as a result of or during the transactions contemplated under this Financing Agreement, then in such event any money paid in satisfaction or compromise of such suit, action, claim or demand and any expenses, costs and attorneys' fees paid or incurred in connection therewith, whether by the Agent, the Lenders or any one of them, shall be shared proportionately by the Lenders.  In addition, any costs, expenses, fees or disbursements incurred by outside agencies or attorneys retained by the Agent to effect collection or enforcement of any rights in the Collateral, including enforcing, preserving or maintaining rights under this Financing Agreement shall be shared proportionately between and among the Lenders to the extent not reimbursed by the Companies or from the proceeds of Collateral.  The provisions of this paragraph shall not apply to any suits, actions, proceedings or claims that (x) predate the date of this Financing Agreement or (y) are based on transactions, actions or omissions that predate the date of this Financing, Agreement.

13.8    Each of the Lenders agrees with each other Lender that any money or assets of the Companies held or received by such Lender, no matter how or when received, shall be applied to the reduction of the Obligations (to the extent permitted hereunder) after (x) the occurrence of an Event of Default and (y) the election by the Required Lenders to accelerate the Obligations.  In addition, the Companies authorize, and the Lenders shall have the right, without notice, upon any amount becoming due and payable hereunder, to set-off and apply against any and all property held by, or in the possession of such Lender the Obligations due such Lenders.

13.9    The Agent (upon the prior consent of the Companies, which consent shall not be unreasonably withheld, conditioned or delayed) shall have the right at any time to assign to one or more commercial banks, commercial finance lenders or other financial institutions all or a portion of its rights and obligations under this Financing Agreement, provided the amount assigned to any one institution shall not be less than Five Million Dollars ($5,000,000.00) (including, without limitation, its obligations under the Line of Credit, the Revolving Loans, and its rights and obligations with respect to Letters of Credit including the Letter of Credit Guarantees), provided further, that the Agent shall first offer to assign a pro rata share of such amounts to each of the Lenders. Notwithstanding the foregoing, Agent may, without the consent of the Companies, assign all or any portion of its rights and obligations under this Financing Agreement (A) to any other Lender hereunder or an affiliate of any Lender hereunder or an approved fund, or (B) after an Event of Default has occurred and is continuing hereunder.

B # 761460 v.5

Upon execution of an Assignment and Transfer Agreement, (a) the assignee thereunder shall be a party hereto and., to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment, have the rights and obligations of the Agent as the case may be hereunder and (b) the Agent shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, relinquish its rights and be released from its obligations under this Financing Agreement. The Companies shall, if necessary, execute any documents reasonably required to effectuate the assignments. No other Lender may assign its interest in the loans and advances and extensions of credit hereunder without the prior written consent of the Agent, which consent shall not be unreasonably withheld. In the event that the Agent consents to any such assignment by any other Lenders (i) the amount being assigned shall in no event be less than the lesser of (x) Five Million Dollars ($5,000,000.00) or (y) the entire interest of such Lender hereunder, (ii) such assignment shall be of a pro-rata portion of all of such assigning Lender's loans and commitments hereunder and (iii) the parties to such assignment shall execute and deliver to the Agent an Assignment and Transfer Agreement, and, at the Agent's election, a processing and recording fee of Three Thousand Five Hundred Dollars ($3,500.00) payable by the assigning Lender to the Agent for its own account.

## SECTION 14    Agency

**14.1**    Each Lender hereby irrevocably designates and appoints CIT as the Agent for the Lenders under this Financing Agreement and any ancillary loan documents and irrevocably authorizes CIT as the Agent for such Lender, to take such action on its behalf under the provisions of this Financing Agreement and all ancillary documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Financing Agreement and all ancillary documents together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Financing Agreement, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Financing Agreement and the ancillary documents or otherwise exist against the Agent.

**14.2**    The Agent may execute any of its duties under this Financing Agreement and all ancillary documents by or through agents or attorneys-in-fact and shall be entitled to the advice of counsel concerning all matters pertaining to such duties.

**14.3**    Neither the Agent nor any of its officers, directors, employees, agents, or attorneys-in-fact shall be (i) liable to any Lender for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Financing Agreement and all ancillary documents (except for its or such person's own gross negligence or willful misconduct), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Companies or any officer thereof contained in this Financing Agreement and all ancillary documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Financing Agreement and all ancillary documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Financing Agreement and all ancillary documents or for any failure of the Companies to perform their obligations thereunder. The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of this Financing Agreement and all ancillary documents or to inspect the properties, books or records of the Companies.

**14.4**    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Companies), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Financing Agreement and all ancillary documents unless it shall first receive such advice or concurrence of the Lenders, or the Required Lenders, as the case may be, as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Financing Agreement and all ancillary documents in accordance with a request of the Lenders, or the Required Lenders, as the case may be, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

B # 761460 v.5

**14.5**    The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received written notice from a Lender or the Companies describing such Default or Event of Default. In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Lenders, or Required Lenders, as the case may be; provided that unless and until the Agent shall have received such direction, the Agent may in the interim (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable and in the best interests of the Lenders. In the event the Agent in its sole discretion, or at the request of the Required Lenders, continues to make Revolving Loans and advances under this Financing Agreement upon the occurrence of a Default or Event of Default, any such Revolving Loans and advances may be in such amounts (subject to Paragraph 14.10 hereof) and on such additional terms and conditions as the Agent or the Required Lenders may deem appropriate.

**14.6**    Each Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it and that no act by the Agent hereinafter taken, including any review of the affairs of the Companies shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Companies and made its own decision to enter into this Financing Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under the Financing Agreement and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition or creditworthiness of the Companies. The Agent, however, shall provide the Lenders with copies of all financial statements, projections and business plans which come into the possession of the Agent or any of its officers, employees, agents or attorneys-in-fact.

**14.7**    (a)    The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Companies and without limiting the obligation of the Companies to do so), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements (including, without limitation, all Out-of-Pocket Expenses) of any kind whatsoever (including negligence on the part of the Agent) which may at any time be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Financing Agreement or any ancillary documents or any documents contemplated hereby or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the Agent's gross negligence or willful misconduct. The agreements in this paragraph shall survive the payment of the Obligations.

(b)    The Agent will use its reasonable business judgment in handling the collection of the Accounts, enforcement of its rights hereunder and realization upon the Collateral but shall not be liable to the Lenders for any action taken or omitted to be taken in good faith or on the written advice of counsel. The Lenders expressly release the Agent from any and all liability and responsibility (express or implied), for any loss, depreciation of or delay in collecting or failing to realize on any Collateral, the Obligations or any guaranties therefor and for any mistake, omission or error in judgment in passing upon or accepting any Collateral or in making (or in failing to make) examinations or audits or for granting indulgences or extensions to the Companies, any account debtor or any guarantor, other than resulting from the Agent's gross negligence or willful misconduct.

**14.8**    The Agent may make loans to, and generally engage in any kind of business with the Companies as though the Agent were not the Agent hereunder. With respect to its loans made or renewed by it or loan obligations hereunder as Lender, the Agent shall have the same rights and powers, duties and liabilities under this Financing Agreement as any Lender and may exercise the same as though it was not the Agent and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

B # 761460 v.5

**14.9**    The Agent may resign as the Agent upon 30 days' notice to the Lenders and such resignation shall be effective upon the appointment of a successor Agent. If the Agent shall resign as Agent, then the Lenders shall appoint a successor Agent for the Lenders whereupon such successor Agent shall succeed to the rights, powers and duties of the Agent and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Financing Agreement. After any retiring Agent's resignation hereunder as the Agent the provisions of this Section 14 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent.

**14.10**    Notwithstanding anything contained in this Financing Agreement to the contrary, the Agent will not, without the prior written consent of all Lenders: (a) amend the Financing Agreement to (i) increase the Line of Credit; (ii) reduce the interest rates; (iii) reduce or waive (x) any fees in which the Lenders share hereunder, or (y) the repayment of any Obligations due the Lenders; (iv) extend the maturity of the Obligations; or (v) alter or amend (x) this Paragraph 14.10 or (y) the definitions of Eligible Accounts Receivable, Eligible Inventory, Inventory Loan Cap, Collateral or Required Lenders, or (vi) increase the advance percentages against Eligible Accounts Receivable or Eligible Inventory or alter or amend the Agent's criteria for determining compliance with such definitions of Eligible Accounts Receivable and/or Eligible Inventory if the effect thereof is to increase Availability; (b) except as otherwise required in this Financing Agreement, release any guaranty or Collateral in excess of Two Hundred Fifty Thousand Dollars ($250,000.00) during any year, or (c) knowingly make any Revolving Loan or assist in opening any Letter of Credit or issuing a Letter of Credit Guaranty hereunder if after giving effect thereto the total of Revolving Loans and Letters of Credit would exceed one hundred and five percent (105%) of the maximum amount available under this Financing Agreement (the portion in excess of 100% of such maximum available amount shall be referred to herein as the "**Agent Permitted Overadvances**"), provided that the Agent shall not be entitled to continue to knowingly make such Agent Permitted Overadvances, which shall include advances by the Agent to preserve and protect Collateral for a period in excess of twenty (20) days without the Lenders' consent. Subject to the provisions of Section 12, Paragraph 12.22 and the provisions of this Paragraph 14.10 of Section 14 of this Financing Agreement, in all other respects the Agent is authorized by each of the Lenders to take such actions or fail to take such actions under this Financing Agreement if the Agent, in its reasonable discretion, deems such to be advisable and in the best interest of the Lenders. Notwithstanding any provision to the contrary contained in this Financing Agreement (including the provisions of Section 12, Paragraph 12.2 and Section 14, Paragraph 14.10 hereof) the Agent is authorized to take such actions or fail to take such actions in connection with (a) the exercise of (i) any and all rights and remedies under this Financing Agreement (including but not limited to the exercise of rights and remedies under Section 10, Paragraph 10.2 of this Financing Agreement) and (ii) its reasonable discretion in (x) determining compliance with the eligibility requirements of Eligible Accounts Receivable and/or Eligible Inventory and establishing reserves against Availability in connection therewith and/or (y) the making of Agent Permitted Overadvances, and/or (b) the release of Collateral not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate during any fiscal year, and/or (c) curing any ambiguity, defect or inconsistency in the terms of this Financing Agreement; provided that the Agent, in its reasonable discretion, deems such to be advisable and in the best interests of the Lenders. In the event the Agent terminates this Financing Agreement pursuant to the terms hereof the Agent will cease making any loans or advances upon the effective date of termination except for any loans or advances which the Agent may deem, in its sole discretion, are reasonably required to maintain, protect or realize upon the Collateral.

**14.11**    In the event any Lender's consent is required pursuant to the provisions of this Financing Agreement and such Lender does not respond to any request by the Agent for such consent within ten (10) Business Days after such request is made to the contact Person (whose name and contact information shall have been provided to Agent in writing by such Lender) at such Lender, such failure to respond shall be deemed a consent. In addition, in the event that any Lender declines to give its consent to any such request, it is hereby mutually agreed that the Agent and/or any other Lender shall have the right (but not the obligation) to purchase such Lender's share of the Loans for the full amount thereof together with accrued interest thereon to the date of such purchase.

**14.12**    Each Lender agrees that notwithstanding, the provisions of Section 11 of this Financing Agreement any Lender may terminate this Financing Agreement and the Line of Credit only on the Anniversary Date. Termination of this Financing Agreement by any of the Lenders as herein provided shall not affect the Lenders' respective rights and obligations under this Financing Agreement incurred prior to the effective date of termination as set forth in the preceding sentence.

B # 761460 v.5

**14.13**    If the Agent is required at any time to return to the Companies or to a trustee, receiver, liquidator, custodian or other similar official any portion of the payments made by the Companies to the Agent as result of a bankruptcy or similar proceeding with respect to the Companies, any guarantor or any other person or entity or otherwise, then each Lender shall, on demand of the Agent, forthwith return to the Agent its ratable share of any such payments made to such Lender by the Agent, together with its ratable share of interest and/or penalties, if any, payable by the Lenders; this provision shall survive the termination of this Financing Agreement.

**14.14**    The Lenders agree to maintain the confidentiality of any non-public information provided by the Companies to them, in the ordinary course of their business, provided that the foregoing confidentiality provision shall terminate one (1) year after the termination date of this Financing Agreement, and provided further that any such Lenders may disclose such information (i) to any applicable bank regulatory and auditor personnel, (ii) upon the advice of their counsel and (iii) to the applicable Office of the United States Trustee.

[Signatures appear on the following page]

B # 761460 v.5

**IN WITNESS WHEREOF**, the parties hereto have caused this Financing Agreement to be effective, executed, accepted and delivered at Philadelphia, Pennsylvania, by their proper and duly authorized officers as of the date set forth above.

**SHAPES/ARCH HOLDINGS L.L.C.**

By:_____
Name:  Steven S. Grabell, CEO


**SHAPES L.L.C.**
A New Jersey limited liability company


By:_____
Name:  Steven S. Grabell, CEO


**DELAIR L.L.C.**
A New Jersey limited liability company


By:_____
Name:  Steven S. Grabell, VP


**ACCU-WELD L.L.C.**
A Pennsylvania limited liability company


By:_____
Name:  Steven S. Grabell, VP


**ULTRA L.L.C.**
A New Jersey limited liability company


By:_____
Name:  Steven S. Grabell, VP


**THE CIT GROUP/BUSINESS CREDIT, INC.**
(as Agent and a Lender)


By:_____
    Julianne Low, Vice President

Commitment Percentage: 47.6592405%

B # 761460 v.5

**JPMORGAN CHASE BANK, N.A., successor by merger
to Bank One, NA**
(as Co-Agent, Documentation Agent and a Lender)


By:_____
    Michael F. McCullough, Senior Vice President

Commitment Percentage: 39.6825316%

**TEXTRON FINANCIAL CORPORATION**
(a Lender)


By:_____
    Norbert Schmidt, Senior Account Executive

Commitment Percentage: 12.6582279%

B # 761460 v.5

## EXHIBIT A

## REVOLVING CREDIT NOTE

$60,000,000.00                                                                      March_, 2008

FOR VALUE RECEIVED, the undersigned, SHAPES/ARCH HOLDINGS L.L.C., a New Jersey limited liability company, SHAPES L.L.C., a New Jersey limited liability company, DELAIR L.L.C., a New Jersey limited liability company, ACCU-WELD L.L.C., a Pennsylvania limited liability company, and ULTRA L.L.C., a New Jersey limited liability company (herein the "**Companies**"), hereby, absolutely and unconditionally promise to pay to the order of The CIT Group/Business Credit, Inc. as agent for the Lenders (the "**Agent**"), for the pro-rata benefit of the Lenders, and any other party which now or hereafter becomes a lender hereunder pursuant to Section 13 of the Financing Agreement, in lawful money of the United States of America and in immediately available funds, the principal amount of Sixty Million Dollars ($60,000,000.00), or such other principal amount advanced pursuant to Section 3 and Section 5 of the Financing Agreement (as herein defined), such Revolving Loan advances shall be repaid on a daily basis as a result of the application the proceeds of collections of the Accounts and the making of additional Revolving Loans as described in Section 3.  Subject to the terms of the Financing Agreement, the Revolving Loans may be borrowed, repaid and reborrowed by the Companies.  A final balloon payment in an amount equal to the outstanding aggregate balance of principal and interest remaining unpaid, if any, under this Note as shown on the books and records of the Agent shall be due and payable on the termination of the Financing Agreement as set forth in Section 11 thereof.

The Companies further absolutely and unconditionally promise to pay to the order of the Agent at said office, interest, in like money, on the unpaid principal amount owing hereunder from time to time from the date hereof on the dates and at the rates specified in Section 8, of the Financing Agreement.

If any payment on this Note becomes due and payable on a day other than a Business Day, the maturity' thereof shall be extended to the next succeeding Business Day, and with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

This Note is the Revolving Credit Note referred to in the Financing Agreement, dated as of March ___, 2008, between the undersigned, the Lenders and the Agent, as the same may be amended and/or restated and in effect from time to time, among the Companies, the Agent, and the Lenders thereto from time to time (as so amended, the "**Financing Agreement**"), and is subject to, and entitled to, all of the terms, provisions and benefits thereof and is subject to optional and mandatory prepayment, in whole or in part, as provided therein.  All capitalized terms used herein shall have the meaning provided therefor in the Financing Agreement, unless otherwise defined herein.

The date and amount of the advance(s) made hereunder may be recorded on the grid page or pages which are attached hereto and hereby made part of this Note or the separate ledgers maintained by the Agent.  The aggregate unpaid principal amount of all advances made pursuant hereto may be set forth in the balance column on said grid page or such ledgers maintained by the Agent.  All such advances, whether or not so recorded, shall be due as part of this Note.

The Companies confirm that any amount received by or paid to the Agent in connection with the Financing Agreement and/or any balances standing to its credit on any of its or their accounts on the Agent's books under the Financing Agreement may in accordance with the terms of the Financing Agreement be applied in reduction of this Note, but no balance or amounts shall be deemed to effect payment in whole or in part of this Note unless the Agent shall have actually charged such account or accounts for the purposes of such reduction or payment of this Note.

Upon the occurrence of any one or more of the Events of Default specified in the Financing Agreement or upon termination of the Financing Agreement, all amounts then remaining unpaid on this Note may become, or be declared to be, immediately due and payable as provided in the Financing Agreement.

The undersigned hereby waive diligence, notice of intent to accelerate, notice of acceleration, demand, presentment and protest and any notices thereof as well as notice of nonpayment other than notices agreed to be delivered pursuant to the Financing Agreement.

**IN WITNESS WHEREOF**, the due execution of this Revolving Credit Note as of the date first written above.

SHAPES/ARCH HOLDINGS L.L.C.

By: EXHIBIT ONLY
    Steven S. Grabell, CEO

SHAPES L.L.C.
A New Jersey limited liability company

By: EXHIBIT ONLY
    Steven S. Grabell, CEO

DELAIR L.L.C.
A New Jersey limited liability company

By: EXHIBIT ONLY
    Steven S. Grabell, VP

ACCU-WELD L.L.C.
A New Jersey limited liability company

By: EXHIBIT ONLY
    Steven S. Grabell, VP

ULTRA L.L.C.
A New Jersey limited liability company

By: EXHIBIT ONLY
    Steven S. Grabell, VP

B # 761460 v.5

EXHIBIT B TO
FINANCING AGREEMENT

## ASSIGNMENT AND TRANSFER AGREEMENT

Dated::  _____, 20____

Reference is made to the Debtor in Possession Revolving Credit Financing Agreement dated as of March ___, 2008 (as amended, modified, replaced, renewed, extended, restated and/or supplemented and in effect from time to time, the "Financing Agreement"), among Shapes/Arch Holdings L.L.C., a New Jersey limited liability company ("SAH"), Shapes L.L.C., a New Jersey limited liability company ("Shapes"), Delair L.L.C., a New Jersey limited liability company ("Delair"), Ultra L.L.C., a New Jersey limited liability company ("Ultra"), and Accu-Weld L.L.C., a Pennsylvania limited liability company ("Accu-Weld"; together with SAH, Shapes, Delair and Ultra, the "Companies"), the lenders signatory thereto, and The CIT Group/Business Credit, Inc., as agent and lender (the "Agent").  Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Financing Agreement.  This Assignment and Transfer Agreement, between The CIT Group/Business Credit, Inc. (herein the "Assignor," as further defined and set forth on Schedule 1 hereto and made a part hereof) and _____ (herein the "Assignee," as further defined and set forth on Schedule 1 hereto and made a part hereof) is dated as of Effective Date (as set forth on Schedule 1 hereto and made a part hereof).

1.      The Assignor hereby irrevocably sells and assigns to the Assignee without recourse to the Assignor, and the Assignee hereby irrevocably purchases and assumes from the Assignor without recourse to the Assignor, as of the Effective Date, an undivided interest in and to all the Assignor's rights and obligations under the Financing Agreement respecting only that percentage Commitment of the Revolving Line of Credit set forth on **Schedule 1** attached hereto (the "Assigned Interest").

2.      The Assignor (i) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Financing Agreement or any other Loan Documents, or the execution, legality, validity, enforceability, genuiness, sufficiency or value of the Financing Agreement, any Collateral thereunder or any of the Loan Documents, other than that it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim and (ii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of the Companies or any guarantor or the performance or observance by the Companies or any guarantor of any of its respective obligations under the Financing Agreement or any of the other Loan Documents.

3.      The Assignee (i) represents and warrants that it is legally authorized to enter into this Assignment and Transfer Agreement; (ii) confirms that it has received a copy of the Financing Agreement, together with the copies of the most recent financial statements of the Companies, and such other documents and information as it has deemed appropriate to make its own credit analysis; (iii) agrees that it will, independently and without reliance upon the Agent, the Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Financing Agreement; (iv) appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Financing Agreement as are delegated to the Agent by the terms thereof together with such powers as are reasonably incidental thereto; (v) agrees that it will be bound by the provisions of the Financing Agreement and will perform in accordance with its terms all the obligations which by the terms of the Financing Agreement are required to be performed by it as Lender; and (vi) if the Assignee is organized under the laws of a jurisdiction outside the United States, attaches the forms prescribed by the Internal Revenue Service of

the United States certifying as to the Assignee's exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Financing Agreement or such other documents as are necessary to indicate that all such payments are subject to such tax at a rate reduced by an applicable tax treaty.

4.     Following the execution of this Assignment and Transfer Agreement, such agreement will be delivered to the Agent for acceptance by it and the Companies, effective as of the Effective Date.

5.     Upon such acceptance, from and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignee, whether such amounts have accrued prior to the Effective Date or accrue subsequent to the Effective Date.  The Assignor and Assignee shall make all appropriate adjustments in payments for periods prior to the Effective Date made by the Agent or with respect to the making of this assignment directly between themselves.

6.     From and after the Effective Date, (i) the Assignee shall be a party to the Financing Agreement and, to the extent provided in this Assignment and Transfer Agreement, have the rights and obligations of a Lender thereunder, and (ii) the Assignor shall, to the extent provided in this Assignment and Transfer Agreement, relinquish its rights and be released from its obligations under the Financing Agreement.

7.     **THIS ASSIGNMENT AND TRANSFER AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

*[Signatures appear on following page]*

B # 762917 v.2

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment and Acceptance to be executed by their respective duly authorized officers.

ASSIGNOR:

THE CIT GROUP/BUSINESS CREDIT, INC.,
as Agent and Assignor

By:_____
Name:
Title:

ASSIGNEE:

_____, as
Assignee

By:_____
Print Name:
Print Title:

Acknowledged:

SHAPES/ARCH HOLDINGS L.L.C.


By:_____
Name:
Title:

SHAPES L.L.C.


By:_____
Name:
Title:

DELAIR L.L.C.


By:_____
Name:
Title:

ACCU-WELD L.L.C.


By:_____
Name:
Title:

B # 762917 v.2

ULTRA L.L.C.

By:_____
Name:
Title:

B # 762917 v.2

## SCHEDULE 1 TO ASSIGNMENT AND TRANSFER AGREEMENT

Name of Assignor: The CIT Group/Business Credit, Inc.

Name of Assignee: _____

Effective Date of Assignment: _____, 20___

Percentage of Revolving Line of Credit comprising Assigned Interest (Shown as a percentage of aggregate original principal amount, assigned face amount)

| Facilities | Commitment Amounts | Commitment Percentages | Total |
|---|---|---|---|
| **Revolving Loans:** | | | |
| CIT | $[           ] | [           ]% | |
| [           ] | $[           ] | [           ]% | |
| [           ] | $[           ] | [           ]% | |
| | $60,000,000.00 | 100.00% | $60,000,000.00 |

| | | |
|---|---|---|
| Total Commitments for CIT: | | $[        ].00 |
| Total Commitments for [           ]: | | $[        ].00 |
| Total Commitments for [           ] | | $[        ].00 |
| **TOTAL** | | **$60,000,000.00** |

**Schedule 1P**

**PERMITTED INDEBTEDNESS**

None.

**Schedule 1R**

**<u>REAL ESTATE</u>**

Each Company's leasehold or fee interests in the following real property will be encumbered, mortgaged, pledged or assigned to the Agent or its designee:

1211 Ford Road, Bensalem, Pennsylvania, 19020
8600/9000 River Road, Delair, New Jersey, 08110
1777 Hylton Road, Pennsauken, New Jersey, 08110

2

**Schedule 2.1(s)**

## COLLATERAL INFORMATION

(a)    (i)    The Companies' Trademarks are set forth on Exhibit 2.1(r)(a)(i) attached hereto.

        (ii)    The Companies' Patents are set forth on Exhibit 2.1(r)(a)(ii) attached hereto.

        (iii)    None.

(b)    See Schedule 7.1(C).

(c)    See Schedule 7.1(B).

(d)    See Schedule 4.1(b).

PHILADELPHIA\3586504\3  077771.000

**Schedule 4.1(b)**

**<u>SENIOR CLAIMS</u>**

Upon entry by the Bankruptcy Court of the Final Order, the Obligations of the Companies that are secured by a first priority perfected lien in all of the assets (including, without limitation, any Avoidance Actions and Avoidance Action Recoveries) will be subject, as to priority, to the Carve-Out, Permitted Encumbrances securing those valid, perfected, non-avoidable secured claims existing on the Filing Date as set forth on Exhibits 4.1(b)(i) through (vi) attached hereto, to the extent such Permitted Encumbrances securing those valid, perfected, non-avoidable secured claims existed on the Filing Date.

4

# EXHIBIT 2.1(s)(a)(i)
## Trademark List

| Trademark | Status Class(es) | Application Number/Date | Registration Number/Date |
|---|---|---|---|
| HIGH PERFORMANCE GLASS WITH A MEMORY ACCU-GLAZE & Design<br>United States of America | REGISTERED<br>19 Int. | 75/118,355<br>13-Jun-1996 | 2,148,244<br>31-Mar-1998 |
| ACCU-GLAZE Z-GLASS<br>United States of America | REGISTERED<br>19 Int. | 75/107,583<br>21-May-1996 | 2,221,921<br>02-Feb-1999 |
| ACCURA<br>United States of America | REGISTERED<br>19 Int. | 75/312,195<br>20-Jun-1997 | 2,286,971<br>19-Oct-1999 |
| ACCU-WELD<br>United States of America | REGISTERED<br>19 Int. | 73/703,306<br>28-Dec-1987 | 1,530,873<br>21-Mar-1989 |
| DELGARD<br>United States of America | REGISTERED<br>06 Int. | 78/339,246<br>11-Dec-2003 | 2,913,225<br>21-Dec-2004 |
| ETERNITY FINISH<br>United States of America | REGISTERED<br>06 Int. | 76/144,018<br>10-Oct-2000 | 2,759,463<br>2-Sep-2003 |
| JOHNNY WEISSMULLER<br>United States of America | Registered<br>06 Int. | 78/339,252<br>11-Dec-2003 | 2,962,285<br>14-Jun-2005 |
| PATRIOT POOLS<br>United States of America | Registered<br>06 Int. | 76/603,080<br>20-Jul-2004 | 3,061,680<br>28-Feb-2006 |
| ROCKLAND<br>United States of America | Registered<br>06 Int. | 76/569,952<br>09-Jan-2004 | 3,015,986<br>15-Nov-2005 |
| SHIELD SECURITY & Design<br>United States of America | REGISTERED<br>06 Int. | 76/539,567<br>22-Aug-2003 | 2,949,257<br>10-May-2005 |
| TOTAL COMFORT<br>United States of America | REGISTERED<br>06 Int., 19 Int. | 74/262,393<br>03-Apr-1992 | 1,842,200<br>28-Jun-1994 |
| W. WESTMORE CLASSIC HARDWARE FOR FINE HOMES AND DESIGN<br>United States of America | REGISTERED<br>06 Int. | 76/497,107<br>13-Mar-2003 | 2,900,433<br>02-Nov-2004 |
| WESTMORE<br>United States of America | REGISTERED<br>06 Int. | 76/497,108<br>13-Mar-2003 | 2,913,666<br>21-Dec-2004 |

8

## EXHIBIT 2.1(s)(a)(ii)

### Patents

| Country Name | | Application Number/Date | Publication Number/Date | Patent Number/Date | Status Expiration Da |
|---|---|---|---|---|---|
| United States of America | | 07/899,836 17-Jun-1992 | | 5,216,810 08-Jun-1993 | Granted 11-Jan-2011 |
| | | *Title:* ALUMINUM EXTRUSION WITH MULTIPLE THERMAL BRAKE AND METHOD OF MAKING SAME | | | |
| United States of America | | 08/671,538 27-Jun-1996 | | 5,660,378 26-Aug-1997 | Granted 27-Jun-2016 |
| | | *Title:* FENCE ASSEMBLY | | | |
| United States of America | | 10/609,412 1-Jul-2003 | 2004-0026932 12-Feb-2004 | 6,871,886 29-Mar-2005 | Granted 01-Jul-2023 |
| | | *Title:* SASH LOCK | | | |
| United States of America | | 29/066,188 06-Feb-1997 | | D402,043 01-Dec-1998 | Granted 01-Dec-2012 |
| | | *Title:* POOL SUPPORT MEMBER | | | |
| 680144.0004/ United States of America | PRI | 09/535,124 24-Mar-2000 | | 6,375,166 23-Apr-2002 | Granted 24-Mar-2020 |
| | | AG Matter: 680144.0004 | | | |
| | | *Title:* FENCE WHICH ELIMINATES THE NEED FOR CONVENTIONAL FASTENERS | | | |
| 680144.0006/ United States of America | PRI | 08/384,017 06-Feb-1995 | | 5,649,780 22-Jul-1997 | GRANTED 06-Feb-2015 |
| | | AG Matter: 680144.0006 | | | |
| | | *Title:* COLLET FOR TELESCOPING ASSEMBLY | | | |
| 680144.0007/ United States of America | PRI | 08/617,420 18-Mar-1996 | | 5,715,574 10-Feb-1998 | GRANTED 18-Mar-2016 |
| | | AG Matter: 680144.0007 | | | |
| | | *Title:* ADJUSTABLE SELF-CLOSING HINGE ASSEMBLY | | | |
| 210603.0010/ United States of America | PRO | 60/944,925 19-Jun-2007 | | | Pending 19-Jun-2008 |
| | | Atty. 10603-10US | | AG Matter: 210603.0010 | |

9

*Title:* CASEMENT OPERATOR WITH BALL BEARING

| | | | | |
|---|---|---|---|---|
| 210603.0012/1<br>United States of America | ORD | 11/774,623<br>09-Jul-2007<br>**Atty.** 10603-12U1 | US-2008-0005970-A1<br>10-Jan-2008<br>**AG Matter:** 210603.0014 | Published |

*Title:* CASEMENT OPERATOR WITH MOVABLE COVER

| | | | | |
|---|---|---|---|---|
| 210603.0013/<br>United States of America | PRO | 60/943,082<br>11-Jun-2007<br>**Atty.** 10603-13US | **AG Matter:** 210603.0013 | Pending<br>11-Jun-2008 |

*Title:* FRICTION CASEMENT HINGE

| | | | | |
|---|---|---|---|---|
| 210603.0015/<br>United States of America | PRI | 11/964,771<br>27-Dec-2007<br>**Atty.** 10603-15US | **AG Matter:** 210603.0015 | Pending |

*Title:* WINDOW LOCK AND METHOD OF USE

PHILADELPHIA\3586504\3 077771.000

**Exhibit 4.1(b)(i) - Creditors Holding Secured Claims Worker's Compensation Claims**

| Carrier | Policy Year | Name | Outstanding | Debtor Company |
|---|---|---|---|---|
| Zurich | 5/1/98-5/1/01 | No Open Claims | - | |
| | | L/C's | - | |
| | | Loss Res | - | |
| | | | | |
| Royal/Arrowpoint Captial | 5/1/01-5/1/02 | No Open Claims | | |
| Royal/Arrowpoint Captial | 5/1/02-5/1/03 | Slater | 20,000 | Ultra |
| | | Class | 7,113 | Shapes |
| | | Owens | 9,260 | Shapes |
| Royal/Arrowpoint Captial | 5/1/03-5/1/04 | Vannockay | 22,925 | Shapes |
| | | | | |
| | | Royal Arrowpoint Capital Totals | 59,298 | |
| | | CIT Group Business Credit, Inc. L/ | 475,000 | |
| | | Loss Res | 40,000 | |
| | | | | |
| Argonaut | 5/1/04-5/1/05 | Hidalgo | 26,480 | Ultra |
| | | Wekerle | 92,506 | Shapes |
| Argonaut | 5/1/05-5/1/06 | Hernandez | 21,616 | Shapes |
| | | Nunez | 108,910 | Ultra |
| | | Owens | 37,743 | Shapes |
| | | Perez | 122,348 | Shapes |
| | | Tran | 8,179 | Shapes |
| | | Washington | 1,149 | Shapes |
| | | Argonaut Totals | 418,931 | |
| | | CIT Group Business Credit, Inc. L/ | 1,380,000 | |
| | | Loss Res | 170,000 | |
| | | | | |
| Sentry | 5/1/06-5/1/07 | 24 Open (Sentry Totals) | 414,406 | |
| | | Shapes | 334,882 | |
| | | Delair | 9,000 | |
| | | Ultra | - | |
| | | AW | 70,524 | |
| | | | | |
| Sentry | 5/1/07-5/1/08 | 27 Open (Sentry Totals) | 46,491 | |
| | | Shapes | 37,905 | |
| | | Delair | 1,829 | |
| | | Ultra | 825 | |
| | | AW | 5,932 | |
| | | | | |
| | | CIT Group Business Credit, Inc. L/ | 1,525,000 | |
| | | Loss Res | 71,000 | |
| | | | | |
| | | All Totals | 939,126 | |
| | | All L/C's | 3,380,000 | |
| | | All Loss Res | 281,000 | |
| | | | | |
| | | Shapes | 695,626 | |
| | | Delair | 10,829 | |
| | | Ultra | 156,215 | |
| | | AW | 76,456 | |
| | | | 939,126 | |
| | | | | |
| | | Shapes Balance Sheet Reserve | 800,000 | |
| | | Accu-Weld Balance Sheet Reserv | 75,000 | |
| | | Total | 875,000 | |
| | | Potential Shortfall | (64,126) | |

## Exhibit 4.1(b)(ii) - Creditors Holding Secured Claims

| Company | Address | Type of Product Possessed | Approx. Amount Owed (Debtor Company) |
|---|---|---|---|
| Grafco | 20 Regina Road Woodbridge, Ontario CA L4L 8L6 | Vinyl Extrusions | $0.00 Accu-Weld L.L.C. |

## Exhibit 4.1(b)(iii) - Creditors Holding Secured Claims Shapes, LLC

| Company | Address | Type of Product Possessed | Approx. Amount Owed |
|---|---|---|---|
| Custom Manufacturing | 2542 State Road, Bensalem, PA 19020 | Fabricated Extrusions | $ - |
| KVI | 1458 County Line Rd, Huntington Valley, PA 19006 | Aluminum Extrusions (to be fabricated) | $ - |
| Eagle Engineering Corp. | 8869 Citation Rd. Baltimore, MD 21221 | Picket Fabricating Machine | $86,700.00 |
| Willier Electric Motor Co. | P.O. Box 98        Gibbsboro, NJ 08026 | Electric Motors: repairs & new | $ 26,500.00 |
| Advanced Fluid Systems | 3rd & Green St.    Royersford, PA 19468 | Hydraulic Pump & repairs | $ 7,922.00 |
| Anchor Sales Associates | 9 Humphreys Drive, Warminster, PA 18974 | Pumps & repairs | $ 20,784.00 |
| SMS Meer Service Inc. | 234 South Potter St. Bellefonte, PA 16823 | Extrusion press components | $ 12,100.00 |
| | | TOTAL | $154,006.00 |

## Exhibit 4.1(b)(iv) - Creditors Holding Secured Claims - Taxes Due Shapes, LLC

| Property Address | Building Owner | Taxing Authority Name and Address (payee) | Due Date | Total Amount Due |
|---|---|---|---|---|
| | | | | |
| 9000 River Road | | Pennsauken Township | 8/1/07 | $ 148,328.06 |
| Pennsauken, NJ 08110 | Shapes | 5605 N. Crescent Blv. | 11/1/07 | 148,328.06 |
| | | Pennsauken NJ 08110 | 2/1/08 | 140,588.67 |
| | | | | |
| 8600 River Road | Shapes | Pennsauken Township | 8/1/07 | 80,142.71 |
| Pennsauken, NJ 08110 | | 5605 N. Crescent Blv. | 11/1/07 | 80,142.71 |
| | | Pennsauken NJ 08110 | 2/1/08 | 75,961.06 |
| | | | | |
| 1777 Hylton Road | Shapes | Pennsauken Township | 8/1/07 | 25,255.07 |
| Pennsauken, NJ 08110 | | 5605 N. Crescent Blv. | 11/1/07 | 25,255.06 |
| | | Pennsauken NJ 08110 | 2/1/08 | 23,937.32 |
| TOTALS | | | | 747,938.72 |

## Exhibit 4.1(b)(v) - Creditors Holding Secured Claims
## Delair, LLC

| Company | Address | Type of Product Possessed | Approx Amount Owed |
|---|---|---|---|
| Celadon | 1830 Momentum Place  Chicago,IL  60689-5318  317 972 7000 | Pool & Fence Finished Goods | $1,014.60 |
| CCT Transport | 107 Green St  Hulmeville, PA  19047-5543  800 642 8138 | Pool & Fence Finished Goods | $12,208.12 |
| Fedex | 4103 Collection Center Dr  Chicago,IL 60693 | Pool & Fence Finished Goods | $1,038.71 |
| Gray Trucking | 735 Broad Street  Beverly, NJ 08010 | Pool & Fence Finished Goods | $622.50 |
| Jevic Transport | PO Box 13031          Newark,NJ  07188 | Pool & Fence Finished Goods | $2,631.03 |
| Rockwell Transport | PO Box 803          Perkasie,PA  18944-0803 | Pool & Fence Finished Goods | $6,710.38 |
| UPS | PO Box 7247-0244  Philadelphia,PA 19170-0001 | Pool & Fence Finished Goods | $1,872.96 |
| DDI | PO Box 81150        Cleveland,OH  44181 | Pool & Fence Finished Goods | $25,000.00 |
| MSC | 120 Enterprise Ave        Morrisville,PA  19067 | metal coil for pool parts | $4,000.00 |
| Metal Koting | 1430 Martin Grove Rd  Rexdale,Ontario CA  M9W 4Y1 | metal coil for pool parts | $74,000.00 |
| Gill | 1384 Byberry Rd  Bensalem,PA 19020 | pool & fence parts to be painted | $24,000.00 |
| Malber | 2115 Byberry Rd          Huntingdon Valley,PA 19006 | metal coil for pool parts | $43,000.00 |
| CFM(Precoat) | 6754 Santa Barbara Court        Elkridge, MD 21075-5886 | metal coil for pool parts | $20,000.00 |
| **VENDORS WITH TOOLING** | | | |
| Malber | 2115 Byberry Rd          Huntingdon Valley,PA 19006 | tooling/molds for parts | |
| MSC | 120 Enterprise Ave        Morrisville,PA  19067 | tooling/molds for parts | |
| Metal Koting | 1430 Martin Grove Rd  Rexdale,Ontario CA  M9W 4Y1 | tooling/molds for parts | |
| CFM(Precoat) | 6754 Santa Barbara Court        Elkridge, MD 21075-5886 | tooling/molds for parts | |
| Bardot Plastics Inc | 10 McFadden Rd Palmer Industrial Park  Easton,PA 18045-7817 | tooling/molds for parts | $50,000.00 |
| Toco Products | 1129 West River Drive  Mays Landing NJ 08330 | tooling/molds for parts | $75,000.00 |
| Acme Corrugated | 2700 Turnpike Drive        Hatboro,PA  19040 | tooling for corrugated | $112,000.00 |
| Fitzpatrick Container | 800 East Walnut Street        North Wales,PA 19454 | tooling for corrugated | $29,000.00 |
| | | TOTALS | $482,098.30 |

## Exhibit 4.1(b)(vi) - Creditors Holding Secured Claims  Vendors Holding Inventory
## Ultra, LLC

| Company | Address | Type of Product Possessed | Approx. Amount Owed |
|---|---|---|---|
| A DUIE PYLE INC | PO BOX 564 WEST CHESTER PA 19381 | Builders' Hardware | 12,000 |
| BAY CITIES WAREHOUSE CO INC | 31474 HAYMAN ST HAYWARD CA 94544 | Builders' Hardware | 1,813 |
| CON-WAY TRANSPORTATION INC | PO BOX 642080 PITTSBURGH PA 15264-2080 | Builders' Hardware | 572 |
| DALLAS TRANSFER & TERMINAL WAREHOUSE | PO BOX 224301 DALLAS TX 75222-4301 | Builders' Hardware | 282 |
| ESTES EXPRESS LINES | PO BOX 25612 RICHMOND, VA 23260-5612 | Builders' Hardware | 2,550 |
| FEDERAL EXPRESS CORPORATION | PO BOX 1140 MEMPHIS, TN 38101-1140 | Builders' Hardware | 85 |
| FEDERAL EXPRESS ERS | PO BOX 371461 PITTSBURGH, PA 15250-7461 | Builders' Hardware | 167 |
| GILCO TRUCKING COMPANY INC | PO BOX 27474 SALT LAKE CITY UT 84127 | Builders' Hardware | 14,718 |
| NEW ENGLAND MOTOR FREIGHT INC | 1-71 NORTH AVE, EAST PO BOX 6031 ELIZABETH, NJ 07207-6031 | Builders' Hardware | 1,000 |
| NORTHSTAR SERVICES LTD | PO BOX 23148  PHILADELPHIA, PA 19124 | Builders' Hardware | 455 |

Exhibit 4.1(b)(vi) - Creditors Holding Secured Claims  Vendors Holding Inventory
Ultra, LLC

| Company | Address | Type of Product Possessed | Approx. Amount Owed |
|---|---|---|---|
| OLD DOMINION FREIGHT LINE | 1300 SUCKLE HWY PENNSAUKEN, NJ 08110 | Builders' Hardware | 22,600 |
| PITT OHIO EXPRESS LLC | PO BOX 643271 PITTSBURGH, PA 15264-3271 | Builders' Hardware | 167 |
| STANDARD WHSE & DIST CO INC | PO BOX 308 PENNSAUKEN, NJ 08110 | Builders' Hardware | 4,171 |
| UNITED PARCEL SERVICE | PO BOX 7247-0244 PHILADELPHIA, PA 191700001 | Builders' Hardware | 78,600 |
| UPS SUPPLY CHAIN SOLUTIONS INC | 28013 NETWORK PLACE CHICAGO, IL 60673-1280 | Builders' Hardware | 4,102 |
| WILLIAM PARKER ASSOCIATES INC | 2845 E WESTMORELAND ST PHILADELPHIA, PA 19134 | Builders' Hardware | 2,942 |
| YELLOW TRANSPORTATION INC | PO BOX 13850 NEWARK, NJ 07188-0850 | Builders' Hardware | 20,700 |
| | | TOTALS | 166,926 |

**Schedule 7.1**

**ORGANIZATION**

(A)    The Companies' chief executive office is located at 9000 River Road, Delair, New Jersey, 08110.

(B)    Collateral of the Companies is located at the addresses set forth below:

1211 Ford Road, Bensalem, Pennsylvania, 19020
8600/9000 River Road, Delair, New Jersey, 08110
1777 Hylton Road, Pennsauken, New Jersey, 08110

Certain Collateral of Shapes L.L.C. is located at the addresses set forth below:

| | |
|---|---|
| Custom Manufacturing | 2542 State Road, Bensalem, PA  19020 |
| KVI | 1458 County Line Rd, Huntington Valley, PA 19006 |
| Eagle Engineering Corp. | 8869 Citation Rd, Baltimore,  MD 21221 |
| Willier Electric Motor Co. | P.O. Box 98, Gibbsboro, NJ  08026 |
| Advanced Fluid Systems | 3rd & Green St., Royersford, PA 19468 |
| Anchor Sales Associates | 9 Humphreys Drive, Warminster, PA 18974 |
| SMS Meer Service Inc. | 234 South Potter St., Bellefonte, PA 16823 |

Certain Collateral of Ultra L.L.C.  is located at the addresses set forth below:

| | |
|---|---|
| A Duie Pyle Inc., | PO Box 564, West Chester, PA 19381 0564 |
| Bay Cities Warehouse Co. Inc. | 31474 Hayman St.,  Hayward, CA 94544 |
| Con-Way Transportation Inc. | PO Box 642080, Pittsburgh, PA 152642080 |
| Dallas Transfer & Terminal Warehouse | PO Box 224301, Dallas, TX 752224301 |
| Estes Express Lines | PO Box 25612, Richmond, VA 23260 5612 |
| Federal Express Corporation | PO Box 1140, Memphis, TN 38101-1140 |
| Federal Express Ers | PO Box 371461, Pittsburgh, PA 15250-7461 |
| Gilco Trucking Company Inc. | PO Box 27474,  Salt Lake City, UT 84127 |
| New England Motor Freight Inc. | 1-71 North Ave, East PO Box 6031, Elizabeth, NJ 072076031 |
| Northstar Services Ltd. | PO Box 23148, Philadelphia, PA 19124 |
| Old Dominion Freight Line | 1300 Suckle Hwy, Pennsauken, NJ 08110 |
| Pitt Ohio Express LLC | PO Box 643271, Pittsburgh, PA 15264 |
| Standard Whse. & Dist Co Inc. | PO Box 308, Pennsauken, NJ 08110 |
| United Parcel Service | PO Box 7247-0244, Philadelphia, PA 19170-0001 |
| UPS Supply Chain Solutions Inc. | 28013 Network Place, Chicago, IL 60673 |
| William Parker Associates Inc. | 2845 E. Westmoreland St., Philadelphia, PA 19134 |
| Yellow Transportation Inc. | PO Box 13850, Newark, NJ 07188 0850 |

PHILADELPHIA\3586504\3  077771.000

Certain Collateral of Accu-Weld L.L.C. is located at the addresses set forth below:

| | |
|---|---|
| Grafco | 20 Regina Road, Woodbridge, Ontario, CA L4L8L6 |

Certain Collateral of Delair L.L.C. is located at the addresses set forth below:

| | |
|---|---|
| Celadon | 1830 Momentum Place, Chicago, IL 60689-5318 |
| CCT Transport | 107 Green St., Hulmeville, PA 19047-5543 |
| FEDEX | 4103 Collection Center Dr., Chicago, IL 60693 |
| Gray Trucking | 735 Broad Street, Beverly, NJ 08010 |
| Jevic Transport | PO Box 13031, Newark, NJ 07188 |
| Rockwell Transport | PO Box 803, Perkasie, PA 18944-0803 |
| UPS | PO Box 7247-0244, Philadelphia, PA 19170-0001 |
| DDI | PO Box 81150, Cleveland, OH 44181 |
| MSC | 120 Enterprise Ave, Morrisville, PA 19067 |
| Metal Koting | 1430 Martin Grove Rd., Rexdale, Ontario CA M9W 4Y1 |
| Gill | 1384 Byberry Rd., Bensalem, PA 19020 |
| Malber | 2115 Byberry Rd., Huntingdon Valley, PA 19006 |
| CFM(Precoat) | 6754 Santa Barbara Court, Elkridge, MD 21075 |
| Bardot Plastics Inc. | 10 McFadden Road, Palmer Industrial Park, Easton, PA 18045-7817 |
| Toco Products | 1129 West River Drive, Mays Landing, NJ 08330 |
| Acme Corrugated | 2700 Turnpike Drive, Hatboro, PA 19040 |
| Fitzpatrick Container | 800 East Walnut Street, North Wales, PA 19454 |

(C) The Companies use the following trade names:

> Shapes/Arch Holdings, L.L.C.
> Aluminum Shapes, Inc.
> Shapes, L.L.C. t/a Aluminum Shapes, L.L.C.
> Shapes/Arch Holdings, L.L.C. t/a Arch America
> Arch Aluminum, L.L.C. (sold in 1998)
> Arch Aluminum & Glass Co., Inc. (sold in 1998)
> Aluminum Shapes, Inc. t/a Aluminum Smelters of New Jersey (Inactive)
> Aluminum Finishers Corp. (Inactive)
> Ultra, L.L.C. t/a Ultra Hardware Products, L.L.C.
> Ultra Hardware Products, Inc.
> Accu-Weld, Inc.
> Accu-Weld, L.L.C
> Accu-Weld, L.L.C. t/a Secura – Seal Corp.
> Delair, L.L.C. t/a Delair Group, L.L.C.
> Delair Group, Inc.
> Delgard Premier Fencing Co.
> Esther Williams Swimming Pools of Canada, Ltd.

PHILADELPHIA\3586504\3 077771.000

Delair Group, Inc. t/a Esther Williams Swimming Pools
Delair Group, Inc. t/a/ Johnny Weismuller Pools
Delair Group, Inc. t/a The Patriot Swimming Pool Company
Delair Group, Inc. t/a/ Argus Vinyl Pool Liners
Delair Group, Inc. t/a Life Style Spas
Delair Group, Inc. t/a Le Spa International
Delair Group, Inc. t/a Family Ties

7