MARK E. FELGER (MF9985)
JERROLD N. POSLUSNY, JR. (JP7140)
COZEN O'CONNOR
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

|  |  |
|---|---|
| In re:<br><br>SHAPES/ARCH HOLDINGS L.L.C., et al.,<br><br>Debtors. | : UNITED STATES BANKRUPTCY COURT<br>: FOR THE DISTRICT OF NEW JERSEY<br>:<br>: CHAPTER 11<br>:<br>: CASE NO. 08-14631 (GMB)<br>: (Jointly Administered) |

### VERIFIED MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO RETAIN, EMPLOY AND COMPENSATE PROFESSIONALS IN THE ORDINARY COURSE *NUNC PRO TUNC* TO MARCH 16, 2008

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors")[1] the debtors and debtors-in-possession, hereby move (the "Motion") for entry of an order authorizing the Debtors to retain, employ and compensate professionals in the ordinary course nunc pro tunc to March 16, 2008. In support of this Motion, the Debtors respectfully represent as follows:

#### Background

1.  On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of which are wholly owned subsidiaries or Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C. ("Accu-Weld"); and Ultra L.L.C. ("Ultra").

2. These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. No trustee or examiner has been appointed in these cases. No official committee of unsecured creditors has been appointed in these cases.

5. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

Description of Debtors and Their Businesses

6. *Shapes/Arch* is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra. The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows. By 1959, the business had expanded and began focusing on producing aluminum extrusions. The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines. On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue. The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

7. *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction. Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the

CHERRY_HILL\434161\1 220718.000

2

necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

8. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

9. *Delair* manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

10. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

11. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12. *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14. *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

15. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

The Bank Debt

17. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a

financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Corporation (the "Lender Group").

18.     Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit. The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

19.     As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

20.     As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

CHERRY_HILL\434161\1 220718.000

## Reasons for Filing

21. The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

22. With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

23. Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24. Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

CHERRY_HILL\434161\1 220718.000

25. The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presents a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

### The White Knight

26. With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

27. In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

28. Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

29. In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and

provide additional funding and an equity infusion to help the Debtors reorganize). As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

30. In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31. Contemporaneously with the filing of the petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims. An interim order authorizing the Debtors to obtain debtor-in-possession financing was entered on March 18, 2008.

32. The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the

amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

33. The Debtors have worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

## Relief Requested

34. By this Motion, the Debtors seek entry of an order pursuant to Sections 105(a) and 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to retain, employ and compensate professionals, nunc pro tunc to March 16, 2008, for specific services rendered to the Debtors in the ordinary course of business pursuant to the terms and conditions set forth herein.

## Basis For Relief Requested

35. In the ordinary course of operating their businesses, the Debtors retain and employ different professional firms that provide, among other things, legal, accounting and consulting services. In order to minimize any disruption to their operations, the Debtors seek authority to retain the professionals listed on Exhibit "A" (the "Ordinary Course Professionals") nunc pro tunc to March 16, 2008, and other professionals the Debtors may require from time to time during the pendency of these Chapter 11 cases, to render discrete services to the Debtors in a

variety of matters affecting their day-to-day business operations. The services of the Ordinary Course Professionals will not include the administration of the Debtors' Chapter 11 cases.

36. The Debtors seek authority to continue the employment of such Ordinary Course Professionals post-petition without requiring each Ordinary Course Professional to file formal applications for employment and compensation pursuant to Sections 327, 328, 329 and 330 of the Bankruptcy Code. Due to the number of the Ordinary Course Professionals that the Debtors wish to retain, it would be unwieldy and burdensome on both the Debtors and this Court to request each such Ordinary Course Professional to apply separately for approval of its employment and compensation. Consistent with the dimensions of these Chapter 11 cases, the Debtors request that they be permitted to employ and retain the Ordinary Course Professionals on terms substantially similar to those in effect prior to the Petition Date, but subject to the terms described below.

## Payment of Fees and Expenses

37. The Debtors propose that they be permitted to pay, without formal application to the Court by any Ordinary Course Professional, 100% of the interim fees and disbursements to each of the Ordinary Course Professionals upon the submission to the Debtors of reasonably detailed invoices setting forth the nature of the services rendered and calculated in accordance with such Ordinary Course Professional's standard billing practices; provided, however, that such interim fees and disbursements do not exceed a total of $5,000 per month per Ordinary Course Professional, and no more than $25,000 per month for all Ordinary Course Professional. The Debtors, however, reserve the right to make a motion to increase the aggregate amount per month authorized to be paid to all Ordinary Course Professionals.

CHERRY_HILL\434161\1 220718.000

10

38.  In the event that any single Ordinary Course Professional exceeds $25,000, such professional would be required to apply for approval by the Court of all fees and disbursements the professional incurred, but would be entitled to an interim payment up to the amount of $5,000 per month of services as a credit against the fees and disbursements ultimately allowed by the Court.

39.  In addition to professionals paid by the hour, the Debtors, in the ordinary course prior to the Petition Date, have retained attorneys to collect outstanding accounts receivable on a contingency basis (the "Contingency Fee Attorneys").  As part of this Motion, the Debtors seek authority to retain contingency Fee Attorneys in the ordinary course of their businesses without the Contingency Fee Attorneys being subject to the monthly limits proposed above.

### The Submission of Rule 2014 Affidavits

40.  In order to be retained and compensated by the Debtors, each Ordinary Course Professional must comply with Bankruptcy Rule 2014.  The Debtors propose that while the Debtors be permitted to continue to employ, retain and compensate all Ordinary Course Professionals identified in Exhibit "A", each Ordinary Course Professional nonetheless be required to file with the Court and serve upon: (a) counsel for the Lender Group, (b) counsel for Versa, (c) the Office of the United States Trustee, (d) counsel for the Committee, if appointed, and if none appointed, the Debtors' consolidated list of top 30 unsecured creditors (but no less than the five largest unsecured creditors from each case), (e) the undersigned counsel to the Debtors, and (f) all parties on the Master Service List the following: (i) an affidavit describing the nature of the professional's services and its billing procedures and practices and disclosing whether the professional holds any interests adverse to the Debtors or their estates, prior to such Professional receiving any post-petition payments from the Debtors (the "Affidavit") a form of

CHERRY_HILL\434161\1 220718.000