**GREENBERG TRAURIG, LLP**
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932-0677
Tel: (973) 360-7900
Fax: (973) 295-1333
Louis T. DeLucia, Esq. (LD-3879)
Alan J. Brody, Esq. (AB-4777)
Diane Vuocolo, Esq. (DV-9904)
Alyson M. Fiedler, Esq. (AF-9058)
Counsel for Arch Acquisition I, LLC

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>Shapes/Arch Holdings L.L.C., *et al.*<br><br>Debtors. | Case No.: 08-14631 (GMB)<br>(Jointly Administered)<br><br>Chapter 11<br><br>Hearing Date and Time:<br>April 3, 2008 at 10:00 a.m. |

**OBJECTION OF ARCH ACQUISITION I, LLC TO DEBTORS' MOTION FOR
ENTRY OF FINAL ORDER (I) AUTHORIZING AND APPROVING
POSTPETITION FINANCING; (II) GRANTING LIENS AND
SECURITY INTERESTS AND PROVIDING SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS; AND (III) MODIFYING AUTOMATIC
STAY, PURSUANT TO SECTIONS 105, 362, AND 363 OF THE
BANKRUPTCY CODE AND FEDERAL RULES OF
BANKRUPTCY PROCEDURE 2002 AND 4001(c) AND (d)**

Arch Acquisition I, LLC ("Arch"), by and through its counsel, Greenberg Traurig, LLP, hereby submits this objection to the motion (the "DIP Motion") of the above-captioned debtors and debtors-in-possession (the "Debtors") seeking the entry and approval of a final order: (a) authorizing and approving post-petition financing from Arcus ASI Funding, LLC ("Arcus"), as agent pursuant to the Term DIP Facility[1] (b) granting liens and security interests and providing superpriority administrative

---

[1] All terms not defined herein have the same meaning set forth in the DIP Motion.

expense status; and (c) modifying automatic stay to pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code, as amended (the "Bankruptcy Code") and Rules 2002 and 4001(c) and (d) of the Federal Rules of Bankruptcy procedure (the "Bankruptcy Rules"). In support of its objection, Arch respectfully represents and states that:

## Preliminary Statement

1. Arch is a creditor in these Chapter 11 cases and an affiliate of Signature Aluminum ("Signature"), a leading aluminum extrusion business in North America. Signature operates eight facilities in the U.S. and Canada which manufacture aluminum extruded products. Signature is a portfolio company of H.I.G. Capital ("HIG Capital"), a leading private equity investment firm that actively invests in the debt and equity of middle market companies that can benefit from operational enhancements, improved access to capital, or balance sheet realignments. HIG Capital has the experience and resources to help companies quickly resume growth initiatives and improve their strategic position. HIG Capital has in excess of $3.5 billion of committed equity capital available to support its investment activities and currently manages a portfolio of more than fifty companies.

2. Acting through Arch, Signature has an interest in acquiring the business or assets of the Debtors and is prepared to offer substantially more consideration to the Debtors' estates than the value provided in the Debtors' proposed Joint Chapter 11 Plan of Reorganization (the "Proposed Plan").

3. The current structure of these cases, which Arch believes to have been structured solely to benefit Arcus, the party controlling the Debtors, does not allow Arch

to have an opportunity to provide additional value to the Debtors' estates. The structure of these Chapter 11 cases does nothing more than allow Arcus to execute its pre-petition strategy to obtain 100% of the equity of the Reorganized Debtors (as defined in the Proposed Plan), without regard to the consequences to the Debtors' unsecured creditors.

4.    In the event these cases are structured to allow for a competitive process through either a competitive plan or a sale under Section 363 of the Bankruptcy Code, Arch is in a position to provide substantially more value to the Debtors' estates.

5.    To the extent the proposed post-petition financing is structured to prohibit or hinder a competitive process, Arch is prepared to offer the Debtors' debtor-in-possession financing (the "Arch DIP Facility"), as more fully described in the Term Sheet annexed hereto as **Exhibit A**, on more favorable terms. The Arch DIP Facility would require the Debtors to run a competitive process that should result in maximum value for the assets or business of the Debtors. Arch is prepared to fund the Arch DIP Facility immediately subject only to the conditions set forth on **Exhibit A**.

6.    Arch respectfully submits that such a competitive process is required by the Bankruptcy Code. This Court should not allow the Debtors and Arcus to abuse the Chapter 11 process by using its proposed post-petition financing to strip the estates' rights of the protections afforded by the Bankruptcy Code through otherwise competitive bidding, particularly where alternative financing is available that will allow for a competitive process.

### Background of Debtors' Bankruptcy Cases

7.    According to the Debtors, Shapes/Arch Holdings L.L.C. ("Shapes/Arch") is the parent company and sole shareholder of each of the remaining Debtors: Shapes

3

L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C. In February of 2008, the Debtors, Ben L.L.C., which owns 100% of the equity of Shapes/Arch, and Versa Capital Management, Inc. ("Versa"), an affiliate of Arcus, entered into an agreement whereby, *inter alia*, Arcus agreed to lend up to $25 million to the Debtors during their Chapter 11 proceedings and Arcus became a manager of Shapes/Arch. Moreover, Ben L.L.C. assigned to Arcus, 79.9% of Ben L.L.C.'s voting rights with respect to its interests in Shapes/Arch.[2] The entire transaction that was negotiated and agreed to pre-petition is subject to certain material terms and conditions, including the ability of Arcus to obtain 100% of the equity in the Reorganized Debtors as part of a plan of reorganization (the "Commitment Agreement"). Essentially, pre-petition, through the Commitment Agreement, the Debtors agreed to a Plan which would transfer all of their equity to Arcus.

8. On March 16, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petitions"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and properties as debtors-in-possession. No trustee or examiner has been appointed in these cases.

9. On the Petition Date, the Debtors filed various "first day" motions, including a Verified Motion for Entry of an Interim and Final Orders (i) Authorizing and Approving Post-petition Financing; (ii) Granting Liens and Security Interest and Providing Superpriority Administrative Expense Status; (iii) Modifying Automatic Stay; and (iv) Scheduling Final Hearing, pursuant to Sections 105, 362, 363 and 364 of the

---

[2] Pursuant to 11 U.S.C. §101(31), Arcus controls (through its 79.9% voting rights) the Debtors and may, therefore, be an "insider" of the Debtors.

Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d) (the "DIP Motion").

10. Contemporaneously with the filing of the Petitions, the Debtors filed the Proposed Plan and related Disclosure Statement that provide, *inter alia*, for Arcus to obtain all of the equity in the Reorganized Debtors for little or no additional cash and a deminimus two percent (2%) dividend to holders of general unsecured creditors.

### The Interim DIP Order

11. On March 18, 2008, a hearing was held (the "Interim Hearing") to consider, *inter alia*, the Debtors' request for entry of an interim order approving the DIP Motion. On March 18, 2008, an Order was entered by the Court granting interim approval of the relief sought in the DIP Motion (the "Interim DIP Order") in a form substantially similar to that which was submitted by the Debtors and the DIP Lenders only two (2) days prior to the Interim Hearing. An official committee of unsecured creditors (the "Creditors Committee") is not scheduled to be appointed until March 31, 2008, the date on which objections to the Final Order are due.[3]

12. Pursuant to the Interim DIP Order, the Debtors are authorized to, *inter alia*, (a) immediately rollup more than $50 million of the Debtor's Pre-petition Indebtedness into post-petition debt, (b) borrow from Arcus up to an aggregate principal amount of $25,000,000 in order to, primarily, pay down the pre-petition Revolver DIP Facility, and (c) grant liens in all assets of the Debtors to the DIP lenders, on an interim basis. Upon information and belief and according to the Budget filed with the Court as Exhibit 1 to the proposed Final Order, the Revolver DIP Facility has been paid down and

---

[3] Accordingly, it is respectfully submitted that the Final Hearing on approval of the Term DIP Facility should be adjourned to afford the Debtors and the Committee the opportunity to consider the proposed financing.

the Revolver DIP Lenders have advanced certain funds to cover the Debtors' operating expenses.

13. Under the expedited plan process and the proposed Term DIP Facility, Arcus will receive all of the equity of the Reorganized Debtors within less than three (3) months from the Petition Date without having to subject the transaction to a competitive process. Such a process does not maximize value for the Debtors' estates.

### Arch's Objections to the Approval of the Proposed DIP Facility

14. The Debtors and Arcus should not be permitted to eradicate any chance of a fair recovery for general unsecured creditors by forcing the Court to approve an expedited plan process and financing facility for the sole purpose of transferring 100% of the equity in the Reorganized Debtors to Arcus, without the opportunity for the estates to entertain competing offers.

15. In order for a debtor to prevail on a motion under Section 364(c) of the Bankruptcy Code, a debtor must show, *inter alia*, that the credit transaction is necessary to preserve the assets of the estate. In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987). Given the alternative facility offered by Arch, the Arcus Term DIP Facility cannot be found to be "necessary" to preserve the Debtors' estates. Moreover, the financing provided by the Arcus Term DIP Facility does nothing more than simply finance the transfer of the assets to the party controlling the Debtors' equity. In fact, in this case, Arch believes that the sale process (commenced pre-petition by the Debtors and Arcus) should be open to competitive bidding, which will have the effect of maximizing recoveries to creditors and is willing to provide financing to allow for a competitive alternative.

A.   **Debtors Have Failed to Consider Appropriate Alternative Financing**

16.   It is clear that the Debtors' efforts to obtain alternative financing were inadequate. Although case law does indicate that there is no duty to seek credit from every possible lender, an effort is required and one attempt is not sufficient. See In re Reading Tube Industries, 72 B.R. 329 (Bankr. E.D. Pa. 1987). Proof of an actual credit search is required, not simply a presumption that more favorable credit is unavailable. In re Secured Storage Systems II, 1992 WL 109064 (Bankr. E.D. Pa. 1992). In this case, Signature had previously explored the possibility of purchasing the Debtors in a pre-petition transaction. As a result, the Debtors certainly knew of Signature's interest in the assets or business of the Debtors. However, the Debtors never contacted Signature to determine if they would be prepared to provide an alternative financing to Arcus.

17.   In fact, Arch, or its designee, is willing to provide the Debtors with post-petition financing on far more favorable terms than those offered by Arcus in the Term DIP Facility (See **Exhibit A** annexed hereto). It is respectfully submitted that the Court should, at a minimum, require Arcus to provide financing that does not preclude a competitive process and/or carry the DIP Motion to another date to allow the Debtors (in the exercise of their fiduciary duties) and the Committee to consider alternative financing options.

B.   **Arcus DIP Facility Prohibits the Debtors From Entertaining Competing Offers**

18.   The Arcus Term DIP Facility, requires that, *inter alia*, the Debtors file and confirm the proposed Plan on or before June 10, 2008. See DIP Term Credit Agreement at Paragraph 8.24. The Plan, provides, *inter alia*, for Arcus to receive 100% of the New LLC Interests in the Reorganized Shapes/Arch for an amount no less then $1,500,000

(which may be paid in cash <u>or by way of conversion of Arcus' claims under its Term DIP Facility</u>). <u>See</u> Plan at 5.41. Moreover, the mere filing of a motion by the Debtors or anyone in these cases to "sell all or substantially all the assets of the company, of the sale of any business unit of company, without agent's prior written consent" will constitute an event of default under the Arcus Term DIP Facility (<u>See</u> DIP Term Credit Agreement at §11.1(s)(iv)). Similarly, pursuant to Paragraph 4.2 of the Arcus Interim DIP Order, the Debtors have irrevocably <u>waived</u> any right to seek alternative or better financing. Thus, Arcus is attempting to "lock up" the Debtors' estates, thereby preventing any competitive bidding for the equity therein.

19. The DIP Term Credit Agreement provides aggressive deadlines for confirmation of the Plan, along with modification of all collective bargaining agreements and remediation requirement matters. It is clear that the Debtors and Arcus, together, are pursuing an extremely expeditious course so that no one else has any opportunity to properly evaluate Arcus' offer and make a competitive bid. Competitive bidding would only inure to the benefit of the unsecured creditors of the Debtors' estates, who will only receive a distribution of approximately 2% of their claims under the Arcus Plan. In fact, Section 8.23 of the Arcus DIP Term Credit Agreement (which conflicts with Paragraph 4.2 of the Arcus Interim DIP Order) provides Arcus with the <u>right of first refusal</u> to match any proposed alternative financing (not beat or improve on such financing) on fifteen (15) days notice of receipt of such competitive financing offer. As such, entry of the Final Order as currently proposed will essentially close the door to any potential bidder who may be willing to fund the Debtors on better terms or purchase the Debtors on terms more beneficial to the Debtors, their estates, and creditors. Clearly, the creditors

of these estates should be entitled to obtain the greatest value for the Debtors, which can only be done through the allowance of competitive bidding, as mandated by the Bankruptcy Code. Accordingly, all provisions of the Arcus Term DIP Facility which prohibit or could be construed as prohibiting competitive bidding for the Debtors' assets or the equity in the Reorganized Debtors should be stricken.

20.    Arch reserves the right to interpose any additional objections to the DIP Motion at the Final Hearing, if and when applicable.

**WHEREFORE**, Arch respectfully requests that this Court enter an order (i) denying the Debtors' DIP Motion or modifying the proposed Final Order as set forth herein, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: March 31, 2008

        **GREENBERG TRAURIG, LLP**
*Counsel for Arch Acquisition I, LLC*

By: /s/ Louis T. DeLucia
    Louis T. DeLucia (LD-3879)
    Alan J. Brody (AB-4777)
    Diane Vuocolo (DV-9904)
    Alyson M. Fiedler (AF-9058)
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932-0677
Tel: (973) 360-7900
Fax: (973) 295-1333

-and-

**GREENBERG TRAURIG, LLP**
*Counsel for Arch Acquisition I, LLC*

By: /s/ Nancy A. Mitchell
    Nancy A. Mitchell
MetLife Building
200 Park Avenue
New York, New York 10166
Tel: (212) 801-9200
Fax: (212) 801-6400

NJ 226,381,648v1

# EXHIBIT A

$25,000,000 Secured DIP Term Loan
Summary of Terms
March 31, 2008

**AGGREGATE CREDIT LIMIT:**    $25,000,000 Debtor-in Possession (DIP) financing.

**FACILITY**

**Borrowers:**    Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C. and Ultra L.L.C.

**Lender:**    Arch Acquisition I, LLC or its designee

**Facility:**    $25,000,000 committed, secured DIP term loan facility (the "Facility"). The Facility shall be available to the Borrowers upon (a) either (i) assignment of the Arcus DIP Agreement (as defined herein) and related Loan Documents (as defined therein) to the Lender (which documents may be subsequently amended to provided for the Permitted Amendments) or (ii) execution and delivery by the Borrowers of new loan documents in substantially the same form as the Arcus DIP Agreement and related Loan Documents with such Permitted Amendments (as defined below) as are agreed to by the Borrowers and the Lender (in either case, the "New Loan Documents") and (b) (1) the entry of an Order of the Bankruptcy Court approving the Facility (or, if the Facility has already been approved, confirming that the Lender is the lender under the order approving such Facility and subject to all protections provided for therein), and (2) the receipt, review and approval by Lender of those documents reasonably requested by Lender, including but not limited to the Intercreditor Agreement and the Arcus Commitment Agreement. (Arch expects that any such review can be completed before the scheduled hearing on April 3, 2008 assuming the documents are provided to Arch by Tuesday, April 1, 2008). Any capitalized terms contained in this term sheet which are not otherwise defined shall have the meaning ascribed in the Arcus DIP Agreement.

**Permitted Amendments:**    The Arcus DIP Agreement shall be amended to provide the amendments or modifications to the Arcus DIP Documents which are provided for herein (the "Permitted Amendments").

**Use of Proceeds:**    The Facility shall be used (i) to refinance the outstanding balance of the term loan and any other obligations due under the Debtor-in-Possession Term Loan Financing Agreement by and between Arcus ASI Funding, LLC and the Borrowers, a copy of which is annexed hereto as Exhibit A (the "Arcus DIP Agreement") and (ii) to provide for the payment of ordinary course working capital support for Borrowers' operations and bankruptcy costs, and Bankruptcy Court approved expenses.

**Interest Rate:**    Equal to the prime rate (but in no event less than 6%) plus the Applicable Margin of 4%. Default Rate of Interest is an additional 2%.

**Collateral:**    All loans and advances shall be secured by a perfected first priority security interest and lien in all of the Borrowers' assets, and, as to priority,

the Carve-Out and Permitted Encumbrances pursuant to section 364(c) and Section 364(d) of the Bankruptcy Code. Moreover, all loans and advances shall at all times constitute a superpriority claim, having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any claims of any person (other than CIT Group/Business Credit, Inc. ("CIT"), as agent, and JPMorgan Chase Bank, N.A. and Textron Financial Corporation (together with CIT, the "Revolving Credit Lenders"), which superpriority claims shall be *pari passu*), subject, as to priority, only to the Carve-Out.

**Revolving Credit Facility:** Subject to review of the Intercreditor Agreement, Arch anticipates that no changes will be made to the proposed status or treatment of the Revolving Credit Lenders under its facility.

**Permitted Amendments:** The Arcus DIP Agreement shall be amended following assignment to the Lender as follows:

(i) The term "Versa" shall be replaced with "Lender and its subsidiaries, affiliates and designee".
(ii) "Collateral" shall not include Avoidance Actions (as such term is defined in the Arcus DIP Agreement) or the proceeds thereof.
(iii) The term "Agent" shall be replaced with "Lender".
(iv) The Final Order shall be entered no later than April 4, 2008.
(v) 1.5% nonrefundable Arrangement Fee set forth in Paragraph 9.4 of the Arcus DIP Agreement shall be waived as to any portion previously paid to Arcus.
(vi) Reimbursement of Lender's out-of-pocket expenses set forth in Paragraph 9.5 of the Arcus DIP Agreement shall be waived for expenses incurred before execution and Court approval of the Facility, but not for those incurred following approval of the Facility.
(vii) The Fee for Lender's personnel reviewing the Debtors' books and records set forth in Paragraph 9.9 of the Arcus DIP Agreement shall be waived for expenses incurred before execution and Court approval of the Facility, but not for those incurred following approval of the Facility.
(viii) The interest rates shall be modified as provided above.
(ix) The Monthly Commitment Fee shall be reduced from 2% (per annum) to 1.5% (per annum).
(x) The Termination Fee of 2% of the Term Loan Facility Amount shall be reduced to 1.5%.
(xi) The Agent/facility fee of $40,000 per month and a collateral monitoring and service fee (¶9.8) of $40,000 per month shall each be deleted.
(xii) ¶8.21 shall be amended to delete the provision that states that the Debtors may not extend the exclusivity period except "upon the consent of the Lender."
(xiii) ¶11.2 shall be amended to provide that upon 5 business days written notice, without application to or order of the Court, the Lenders may take any action they deem appropriate to realize upon the Collateral.
(xiv) Addition of the covenants described in "Conditions" set forth below.
(xv) Any and all other provisions of the Arcus DIP Agreement or the Interim Order approving same on an interim basis that restrict or may be construed so as to restrict competitive bidding for the assets of or equity in the Debtors (as determined by the Lender) shall be deleted, including but not necessarily limited to ¶4.2 of the Interim Order approving the Arcus DIP Agreement on an interim basis.

**Conditions:** The Facility shall be subject to (a) the terms and conditions contained in the Arcus DIP Agreement (subject to the Permitted Amendments), (b) review of and approval by the Lender of the other Loan Documents (including, without limitation, the Intercreditor Agreement) as provided herein and prior to the April 3, 2008 hearing (assuming such documents are timely provided by the Debtors), and (c) the agreement by the Debtors (which shall be covenants in the Facility) to (i) establish a sale process pursuant to 11 U.S.C. Section 363 and acceptable to the Lender with the Lender as a stalking horse bidder for all or substantially all of the Debtors' assets or (ii) establish a competitive plan process acceptable to the Lender. The Lender believes that the establishment of such process can be done quickly so as to avoid delay in the cases.

**Other Terms:** As provided in the Arcus DIP Agreement.

*NJ 226,381,641v1*