UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN THE MATTER OF          )
                          )   Case No.:  08-14631(GMB)
SHAPES/ARCH HOLDINGS, LLC,)
ET AL.,                   )
                          )   Camden, New Jersey
              Debtor.     )   March 18, 2008
                          )

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE GLORIA M. BURNS,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Trustee:                JEFFREY SPONDER, ESQUIRE
                                PETER D'AURIA, ESQUIRE
                                Office of the
                                United States Trustee
                                1 Newark Center
                                Suite 2100
                                Newark, New Jersey     07102

For the Debtor:                 JERROLD N. POSLUSNY, JR., ESQUIRE
                                MARK E. FELGER, ESQUIRE
                                Cozen O'Connor
                                Suite 300
                                Libertyview
                                457 Haddonfield Road
                                Cherry Hill, New Jersey     08002

For Arcus ASI Funding,          JOEL C. SHAPIRO, ESQUIRE
LLC; Arcus ASI, Inc.:           c/o Matthew Rottenberg
                                Blank Rome, LLP
                                210 Lake Drive East
                                Cherry Hill, New Jersey

For CIT Group/Business          PAUL A. PATTERSON, ESQUIRE
Credit, Inc.:                   Stradley, Ronon, Stevens
                                & Young, LLP
                                2600 One Commerce Square
                                Philadelphia, Pennsylvania 19103

U.S. BANKRUPTCY COURT
FILED
CAMDEN, NJ
08 APR -1  AM 10:48
BY: JAMES J. WALDRON
DEPUTY CLERK

Audio Operator:                    MARY LAMPONE


Transcribed by:                    DIANA DOMAN TRANSCRIBING
                                   P. O. Box 129
                                   Gibbsboro, New Jersey   08026
                                   Off: (856) 435-7172
                                   Fax: (856) 435-7124
                                   Email:  dianadoman@comcast.net


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **FOR THE DEBTOR:** | | | | |
| Steven Grabell | 63(Fel) | 81(Pat) | | |
| | | 81(Sha) | | |
| Vincent Collistra | 84(Fel) | 106(Pat) | | |
| | | 109(Sha) | | |

| EXHIBITS: | Iden. |
|---|---|
| D-1  13-Week Cash Flow | 90 |

ARGUMENT:

By:  Mr. Felger        6, 13, 21, 22, 25, 29, 38, 39

By:  Mr. D'Auria       18, 24, 32, 36, 58

By:  Mr. Poslusny      23, 35

By:  Mr. Shapiro       44, 56

By:  Mr. Patterson     55, 59

THE COURT:

Ruling                 12, 22, 29, 36, 39, 138

Colloquy

1          CLERK:  -- the Honorable Gloria M. Burns presiding.

2          THE COURT:  Be seated.  (Pause).  Mr. Sponder?

3          MR. SPONDER:  Yes, Your Honor.

4          THE COURT:  Good morning.

5          MR. SPONDER:  Good morning.

6          THE COURT:  Mr. Sponder of the United States

7     Trustee's Office is appearing by telephone this morning.

8          MR. SPONDER:  As well as Mr. D'Auria.

9          THE COURT:  And Mr. D'Auria.  Good morning,

10    gentlemen.  Why don't you start, Mr. Sponder and Mr. D'Auria,

11    putting your appearance on the record, and then we'll go

12    through everybody else.  And, I'd also let you -- like you to

13    let me know if you have any questions or, if you have any

14    problem hearing, to shout out so we can make sure that the

15    speaker is speaking into the recording system so that you can

16    hear.

17         MR. SPONDER:  Great, Your Honor.  Thank you.  This is

18    Jeff Sponder from the Office of the United States Trustee.

19         MR. D'AURIA:  Good morning, Your Honor.  Peter

20    D'Auria from the same office, the United States Trustee.  Your

21    Honor, I'm available from 11:30.  If the Court would give the

22    Court's understanding now, I won't interrupt the proceeding, if

23    it lasts that long, to excuse myself.

24         THE COURT:  That's fine.

25         MR. D'AURIA:  Thank you.

1              THE COURT:  Is Mr. Sponder going to stay on the

2     phone?  Mr. Sponder?

3              MR. SPONDER:  Yes.

4              THE COURT:  You're going to stay on the phone af --

5     whatever time or --

6              MR. SPONDER:  Correct.

7              THE COURT:  -- or you're both going to leave at

8     11:30?

9              MR. SPONDER:  No, I will -- I will stay on the phone.

10             THE COURT:  All right.  That's fine, Mr. D'Auria.

11    You can -- you can be excused whenever you need to.

12             MR. D'AURIA:  Thank you, Your Honor.

13             MR. FELGER:  Good morning, Your Honor.  Mark Felger

14    of Cozen O'Connor appearing on behalf of the five debtors.

15             MR. POSLUSNY:  Good morning, Your Honor.  Jerrold

16    Poslusny, Cozen O'Connor, also on behalf of the debtors.

17             MR. SHAPIRO:  Good morning, Your Honor.  Joel

18    Shapiro, Blank Rome, on behalf of Arcus ASI, Inc. and Arcus ASI

19    Funding, LLC, as funders and plan funder.

20             MR. PATTERSON:  Good morning, Your Honor.  Paul

21    Patterson, Stradley, Ronon, Stevens & Young.  We are counsel to

22    the CIT Group, Business Credit, as pre-petition agent and

23    proposed post-petition agent as well.

24             MR. SHAPIRO:  Your Honor, with the Court's

25    permission, I'd like to move Mr. Patterson for today's

1    proceedings pro hac vice.  I'm familiar with Mr. Patterson from

2    the Stradley firm.  And, subsequent to today's hearing, he will

3    file the appropriate papers and pay the appropriate fee.

4            THE COURT:  Does anybody have an objection to Mr.

5    Patterson appearing today?  (Pause).  No objection.  You may

6    appear today, Mr. Patterson.  I'd ask that you file the

7    appropriate papers to be appointed for the future.  Thank you.

8            MR. PATTERSON:  We will do that, Your Honor.  Thank

9    you.

10           THE COURT:  Anybody else?  Mr. Felger?

11           MR. FELGER:  Good morning again, Your Honor.  At the

12   outset, I'd like to introduce some folks who are in the

13   courtroom with us today.  We have two members of senior

14   management of the debtors in the second row, Mr. Steve Grabell,

15   who is the CEO of Shapes/Arch, and Mr. Paul Sorenson

16   (phonetic), who is the Chief Financial Officer of the debtors.

17   We also have representatives of Versa in the courtroom today,

18   our -- one of our DIP lenders and hopefully ultimately our plan

19   funder.

20           Your Honor, we're -- we're very happy to report that

21   we've successfully moved heaven and earth over the past several

22   weeks to get to where we are today.  We've -- as Your Honor is

23   aware, we filed five petitions for five companies.  We filed 15

24   motions and applications, 10 of which are on for consideration

25   this morning.  We've also filed a plan and disclosure

1    statement, and we've also filed schedules and statements of

2    financial affairs for all of the debtors.  I must say, in my

3    experience, that is -- that is a first for a Chapter 11 of this

4    size.

5         I should point out, after making a reference to the

6    filing of the schedules and statements of financial affairs,

7    that it was a real struggle to pull all of that information

8    together on an accelerated time frame.  And, our expectation is

9    that those schedules and statements will need to be amended to

10   more perfectly reflect the state of the world as of Sunday

11   evening.  So, I just wanted to make that note for the record.

12        Preliminarily, I should point out the service that

13   we've provided -- we served the order setting this hearing on

14   the parties so ordered by Your Honor.  And, on Sunday night,

15   contemporaneously with filing the pleadings, we served copies

16   of the DIP financing motion without exhibits and the

17   application for expedited hearing on that same group of folks.

18   Service in both instances were by facsimile and, I believe,

19   e-mail, is that correct?

20        MR. POSLUSNY:  Yes, Your Honor.  We served the top 30

21   consolidated creditors by fax.  We serves no less than 5

22   creditors from each case by fax.  So, it ended up being about

23   35 parties of unsecured creditors.  Also, by fax we served the

24   IRS, the New Jersey Attorney General, as well as the

25   Pennsylvania Department of Revenue.

1          We e-mailed copies of all pleadings to Arcus, Arcus'

2     counsel, to CIT's counsel, as well as to the U.S. Trustee.

3     Upon receiving the order yesterday morning, we repeated that

4     process, Your Honor.  We also served the utilities -- to the

5     extent we had fax numbers, we served the utility motion by fax

6     on the utilities.  If we did not have fax numbers from the

7     utilities and couldn't get them from the utilities, we served

8     them by overnight mail for first delivery this morning, which I

9     believe was 8 a.m.

10         Also, there were a few of the fax numbers that did

11    not go through.  Most of those were to the Chinese Taiwanese

12    creditors.  Those we served also by overnight mail, Your Honor.

13    We tried several fax numbers, tried to find new fax numbers.

14    And, the fax numbers that we did use, Your Honor, were the fax

15    numbers we were able to pull either from our client or from

16    those companies' internet web pages.  So, as far as we knew, we

17    had the best or proper fax number, but they did not go through

18    nevertheless.

19         THE COURT:  Mr. Felger?

20         MR. FELGER:  Yes.  In addition, Your Honor, I should

21    note that we reached out to the U.S. Trustee -- I believe it

22    was last Wednesday afternoon -- and had a -- a conference call

23    with Mr. Sponder and Mr. D'Auria that explained the filing and

24    walked through the anticipated first day motions.  We followed

25    up by serving draft first day pleadings on the U.S. Trustee, I

1    believe, on Friday.

2         And, then we served all of the final first days on

3    the U.S. Trustee on Sunday night.  And, lastly, Mr. Poslusny

4    spoke with the U.S. Trustee yesterday to walk through comments

5    that -- at least preliminary comments that the U.S. Trustee had

6    with respect to the pleadings.  So, with that, we'll move on to

7    the -- the presentation.

8         The filings, Your Honor, memorialize a -- a global

9    restructuring of the debtor's businesses and places the company

10   on a path to emerge from Chapter 11, hopefully within 75 days,

11   as a viable company, maximizing the -- the return for

12   creditors, and savings other a thousand jobs and -- principally

13   in southern New Jersey.

14        There are three components of the presentation, Your

15   Honor.  And, I'm not sure how Your Honor would like to proceed.

16   Let me walk through the three components, give a suggestion,

17   and then obviously defer to Your Honor as to how you'd like to

18   proceed.

19        First is live testimony from two individuals, Mr.

20   Steve Grabell, who is the CEO of the companies, and Vince

21   Collistra, who is a partner with Phoenix Management, the

22   restructuring advisors for the company.  That would be the

23   testimony we would present.  And, I expect that would take less

24   than an hour to work through, subject, of course, to any

25   questions Your Honor or the U.S. Trustee may have.

1          And, then Mr. Shapiro, as counsel for one of the DIP

2     lenders and the plan funder, would like to address the Court to

3     describe the overall transaction and how the DIP financing fits

4     within the -- the overall plan for these cases.  And, lastly,

5     of course, we would propose walking through the motions and

6     addressing whatever concerns Your Honor or the U.S. Trustee may

7     have with respect to the motions that we've requested

8     consideration of today.

9          So, my suggestion would be that we start with the

10     testimony, and then allow Mr. Shapiro to make his short

11     presentation, and then proceed to move through the motions and

12     address concerns that you or the U.S. Trustee may have.  But,

13     we could --

14          THE COURT:  I -- I don't have a problem with it.  The

15     only thing I would suggest is perhaps we should go over a

16     little bit of what you're going to be presenting before the

17     testimony because you might want to address some of the issues

18     that are of concern to the U.S. Trustee or the Court by virtue

19     of the testimony.  So, while I would welcome the testimony to

20     start with, it may well be that you have other questions or

21     other -- other parties have other questions that you might be

22     able to -- to deal with in the testimony if we address some of

23     the other issues first.

24          MR. FELGER:  Certainly.  Certainly, Your Honor.  So,

25     perhaps what we ought to do then is walk through the motions.

1      And, then Your Honor can raise concerns that Your Honor has

2      with respect to those motions.  The U.S. Trustee can raise

3      concerns.  We can note them and then move to the testimony and

4      make sure we cover them to the extent that --

5              THE COURT:  I think that would be --

6              MR. FELGER:  -- it should be covered.

7              THE COURT:  -- the way to deal with them.  And, you

8      -- we can integrate Mr. Shapiro's presentation that he wants to

9      make as we get to the issue about the financing, because I'm

10     assuming that's what he's going to be presenting.

11             MR. FELGER:  Yes.  I've called it the eighties

12     version of a Power Point.

13             THE COURT:  I'm awaiting that.

14             MR. FELGER:  Okay, Your Honor.  I have the

15     application for expedited consideration of first day matters

16     that I'm going to work from.  Does Your Honor have a copy of

17     that?

18             THE COURT:  Yes.

19             MR. FELGER:  Okay.  The -- the first item is -- is a

20     fairly routine motion, a motion for joint administration and

21     procedural but not substantive consolidation of the debtors.

22     We believe that's a pretty straightforward motion.  The motion

23     sets forth the basis for it.  It's a verified motion, as are

24     all of the motions, they're all verified by the CEO of the

25     company.

1          I don't believe we've received any -- any comments to

2     that motion.  I'm not sure if Your Honor has any concerns with

3     respect to a joint administration of these related commonly

4     owned debtors.

5          THE COURT:  I do not.  Mr. Sponder or Mr. D'Auria, do

6     you have any comment on the joint administration motion?

7          MR. D'AURIA:  Mr. D'Auria here, Your Honor.  No

8     objection.

9          THE COURT:  All right.  And, I'm satisfied that

10    that's appropriate in this case, and I will grant that motion.

11         MR. FELGER:  Okay.  The next motion is the

12    application for designation as a complex Chapter 11 case.  We

13    filed -- or as complex Chapter 11 cases.  We filed the standard

14    form application with the Court setting out that five

15    substantial companies, thousands of creditors, over a thousand

16    employees, five collective bargaining agreements that we're

17    going to have to deal with in these cases, and debt structure

18    of upwards of $100M.

19         We certainly feel that these are complex cases which

20    will warrant establishing a case management order and having

21    hopefully regular hearings -- hearing dates over the next two

22    to three months before Your Honor so that we can plan

23    accordingly for what I expect will be a fairly active case.

24         THE COURT:  Mr. D'Auria?

25         MR. D'AURIA:  Mr. D'Auria.  No objection, Your Honor.

1        THE COURT:  And, I also have no objection.  I think

2   you meet the standards, and I will grant that motion.

3        MR. FELGER:  The next motion is the -- is the driver

4   of all of the rest of them.  And, that is the motion to approve

5   the -- the DIP financing agreements from the CIT lender group

6   and Arcus.  The majority of our testimony from the two

7   witnesses will really go to the essence of that motion and

8   attempt to set forth a factual record to support the entry of

9   an order approving those two DIP financing agreements.

10       THE COURT:  Well, let me ask you this.  Today is

11  basically the first day of the case -- second day of the case.

12  And, you're asking me for an interim -- an interim approval

13  subject to final approval in 15 days.

14       MR. FELGER:  Right.

15       THE COURT:  What is the aspect of what you're asking

16  me that is the -- necessary to prevent immediate and

17  irreparable harm that Rule 6004 says the Court looks for for

18  that two-week period?

19       MR. FELGER:  Right.  The issue for the debtors is

20  that the debtors cannot operate from a use of cash collateral.

21       THE COURT:  And, I think --

22       MR. FELGER:  And, they --

23       THE COURT:  -- Congress understood that.  That's why

24  you get the two ways.  You have the fir -- the interim order.

25  Congress recognized that the day of filing the debtor generally

Feiger -- Argument                                                14

1    needs either use of cash collateral or financing or both, but

2    that, because nobody gets notice other than the parties that

3    have, for the last three, four, five, ten weeks, been working

4    on this, nobody has an opportunity to get due process rights to

5    look at all of the terms and issues of consequences of the

6    financing.  And, I think that's why you have interim approval

7    and final approval.

8         So, I -- I guess I had a hard time in analyzing it,

9    breaking down what you -- you're seeking -- it appeared to me

10   you're seeking virtually everything on the interim basis and

11   then finalizing it in 15 days which, in essence, kind of makes

12   the other hearing almost irrelevant because you've already

13   approv -- if I've already approved everything today before

14   there's a Committee, before -- I don't know if you've had

15   negotiations with your labor unions, the utilities, all of the

16   other parties that -- and, with all due respect to Mr.

17   Poslusny's efforts here, getting overnight mail this morning

18   doesn't give you a lot of opportunity to read two 100-page

19   orders and all of the appropriate -- I can tell that I spent a

20   substantial amount of time on this yesterday.  And, it's a good

21   thing I'm not Irish, because I was able to spend my St.

22   Patrick's Day reviewing these things so I'd be prepared for

23   today.

24        But, even so, I'm still not comfortable that I

25   recognize everything that's in there.  And, I think that that's

1    why we've got the -- the dichotomy here of an interim order

2    that basically gets the -- lets the debtor finance what it

3    needs to get to the final hearing.  And, then we look at is

4    everything that -- is this good for the estate, which is going

5    to be the ultimate determination the Court makes.  And, I don't

6    know that I'm comfortable in making that full determination

7    today.

8         MR. FELGER:  Right, I -- I appreciate all of what

9    Your Honor has said.  This has been a -- a difficult

10   negotiation, a hard fought and extensive negotiation over the

11   last several weeks.  The -- and, I think the testimony will --

12   will flush out some of this, some of the need for --

13        THE COURT:  And, I appreciate that.  And, I

14   appreciate that, and I know that the debtor is in, I guess,

15   less than the -- I'll call it less than optimal bargaining

16   position.

17        MR. FELGER:  Right.

18        THE COURT:  And, that's not unusual to any Chapter 11

19   case, you know.  And, the debtor believes -- I -- I'm sure

20   you're going to present evidence to say the debtor believes

21   this is in the best interest of the case.  My concern is can we

22   go that far today?

23        Shouldn't we be doing something today basically to

24   protect the lenders for what they have to fund between now and

25   the 15-day period, and then -- which -- I mean, I looked at the

1    budget this morning, which is when I got it, and I look at --

2    and maybe I don't understand it correctly, and you can have

3    your, you know, witnesses testify with regard to it.  But, it

4    looks like, on the first three weeks, which is essentially what

5    we're talking about, --

6            MR. FELGER:  Right.

7            THE COURT:  -- give or take the collections -- the

8    cash receipts are not that far off from the cash disbursements

9    for -- you know, and there may be some things that aren't in

10   here that need to be done within the first three weeks, and I

11   don't have a -- and you can tell me what those things are.

12           MR. FELGER:  Right.  Our letters of credit, for

13   instance, Your Honor, is 2.5 million over --

14           THE COURT:  And, those may be things that need to be

15   done --

16           MR. FELGER:  Right.

17           THE COURT:  -- within this three weeks, and I'm not

18   saying they're not.  But, what I want to know is what does the

19   debtor need to get from point A to point B, and what security

20   can we give to the lenders to do that.  And, then we have the

21   final hearing.

22           And, then we say should we roll up all the pre-

23   petition debt, should we give them the avoidance things, all of

24   the things that are -- are controversial -- I'm going to say

25   that -- and whether that all works to the benefit of the

1     creditors -- when unsecured creditors have an opportunity to be

2     present and either respond or support and other parties who

3     aren't here today who haven't had the weeks of negotiation that

4     the lenders and your client have to -- to bring before the

5     Court.

6            And, I -- that's how I see this 15-day period.  This

7     is a period to let the debtor -- to protect the lenders in what

8     they need to be protected to the amount they need to lend and

9     not for the entire amount of what they ultimately want their

10    financing to be, which -- despite the fact that I may have

11    questions about it, I'm open to the fact that you're going to

12    try to convince me that this is in your best -- in the best

13    interest of the estate.  And, I'm going to hear what everybody

14    says, and I'm going to make a determination.

15           I'm very aware that this involves the livelihood of

16    thousands of people and all of the things that go into play.

17    But, on the first day, I think it's a -- there's an unfairness

18    to the parties who haven't had an opportunity to be adequately

19    noticed, despite all the efforts of your firm, to come in and

20    voice their opposition, if they have it, to what will

21    essentially tie up all of the debtors assets at the end of the

22    -- the short period of time that the Code requires that we give

23    in order to have a hearing to finance the debtor.

24           MR. FELGER:  And, perhaps the way to -- the way to

25    respond to Your Honor is that -- is to ask for the opportunity

1        to present the testimony, to have Mr. Shapiro present his

2        presentation.  And, then, once we've gotten beyond the

3        testimony and that presentation, perhaps come back to that

4        principle concern that Your Honor has as to the extent to which

5        we need relief under the DIP financing motion today.

6               MR. FELGER:  That's fair.  And, to be honest, if we

7        get past this one, I'm not that worried about the rest of them.

8        I do have -- I have questions about some of them -- some of

9        them, and when things should be done and whether they need to

10       be done right away or so on.  But, I think this is the main

11       question that --

12              MR. FELGER:  Right.

13              THE COURT:  -- we have.

14              MR. FELGER:  Right.

15              THE COURT:  So, I think we address this and resolve

16       what we're going to do with regard to this, and then we'll see

17       where we go from there.

18              MR. FELGER:  Right.

19              THE COURT:  Mr. D'Auria and Mr. Sponder, do you want

20       to say anything?

21              MR. D'AURIA:  Yes, Your Honor.  Mr. D'Auria.  Thank

22       you.  Your Honor, we're also mindful of the emergent needs of a

23       first day.  We're mindful that there's a thousand employees in

24       this case.  I'm not Irish either, Your Honor.  But, I have to

25       confess that I -- there's aspects of the 200 pages of the two

1       DIP orders that I question whether I still understand.  So,

2       Your Honor's concerns regarding service and the expedited

3       nature of this -- I don't need to restate it.

4              But, Your Honor, we have very highly aggressive DIP

5       orders, one by a secured creditor which is in control of

6       management.  Arcus -- one of the lending -- one of the DIP

7       orders addressing Arcus -- Arcus is in 79.9 percent control of

8       voting rights of the debtors.  We have a litany of aggressive

9       provisions, including liens on avoidance actions, very wide

10      sweeping descriptions of collateral which could only be

11      interpreted to include things like -- things like recoveries

12      under D&L policies.

13             We have secured creditors who, in this case, like I

14      said, are uniquely postured such that -- such that they could

15      be argued to be in control of management.  They're clearly

16      reaching for everything that we've historically seen secured

17      creditors to ever reach for.  And, they don't want to pay the

18      freight.  They want 506C waivers.

19             Both DIP orders have very broad releases -- again, to

20      two lenders, one of which very, very involved in the debtor.

21      Arcus' interim order has two pages of text discussing the

22      binding effect of that order.  I am very concerned -- and I

23      can't reserve rights enough -- that any order entered today

24      must be interim.

25             The roll up -- Your Honor has already said it.  I'll

1    limit my comment at this stage of the hearing to simply be that

2    we object to any roll up today.  We second Your Honor's

3    comments that -- that we only need to lend today what we need

4    to lend to get through the next 15-day period.

5            And, if Your Honor is ultimately going to consider a

6    roll up after hearing the testimony and the rest of the

7    hearing, then we have to further insist that the Court consider

8    building in the buttressing provisions of the Court's -- this

9    Court's general order which allow the roll ups to be unwound in

10   the future, if appropriate.  Those protective unwinding

11   provisions are not in the orders.

12           These two orders, Your Honor, in many -- in many

13   instances refer to each other which further complicates the

14   understanding of what is being proposed.  The objection time

15   lines for the Committee and in the context of it not being --

16   of there not being a Committee -- which I can only imagine that

17   there would be in this case -- are shortened.  We want the time

18   lines as per the general order.

19           In sum and substance, Your Honor, that's -- that's

20   the bullet of our concerns based on having -- we did speak with

21   counsel last week.  We did get draft motions last week.  But,

22   we got the DIP ord -- the 200 pages of DIP orders upon arriving

23   to work yesterday.  And, I understand why they couldn't give

24   them in advance.  But, we've had only a day, as Your Honor.

25   And, frankly, we're still trying to digest this ourselves.

1          THE COURT:  Thank you, Mr. D'Auria.  Mr. Felger?

2          MR. FELGER:  And, all of those issues we intended to

3    address through the testimony and through the balance of the

4    presentation.  And, hopefully we'll -- we'll be able to get to

5    an accommodation that Your Honor is comfortable with with

6    respect to that motion.

7          You indicated that -- Your Honor indicated that this

8    is the motion where -- that gave Your Honor the most concern.

9    But, I think we should continue to work through it just to make

10   sure that, if Your Honor has other issues and they're issues

11   that we should address through testimony, that we --

12         THE COURT:  Let's --

13         MR. FELGER:  -- call witnesses once rather than

14   twice.

15         THE COURT:  I agree.  Let's just go through the other

16   things, and we'll come back to that.

17         MR. FELGER:  Okay.  The fourth item is another rather

18   routine motion to maintain the debtor's current bank accounts

19   and cash management system and to continue to use its existing

20   business forms until they are fully depleted.  It's a pretty

21   standard cash management system for companies related as they

22   are.  We haven't received -- I don't think we received any

23   comments from the U.S. Trustee on this.  But, they'll tell me

24   if -- if my recollection is off.

25         THE COURT:  Mr. D'Auria?

1          MR. D'AURIA:  Mr. D'Auria.  No objection, Your Honor.

2     We only note that there is a 60-day provision to review the

3     cash management system in the order.  And, that naturally

4     relies upon the providing of information and such.

5          But, the order allows for it to be extended, if

6     necessary.  And, the order does, Your Honor, expressly require

7     the debtor to put debtor-in-possession on their check, even

8     though it allows them to use their existing business forms.

9     So, with those two things, we have no objection.

10          THE COURT:  All right.  Then I'm satisfied that the

11     motion to use the bank accounts to maintain the current cash

12     management system may be granted.

13          MR. FELGER:  The next item, Your Honor, is, again, a

14     pretty standard motion for first day consideration.  And, that

15     is, some would argue, the most important motion for first day

16     consideration.   And, that's to honor the pre-petition wages

17     and benefits for perhaps the most important constituency here,

18     our thousand plus employees.

19          The order is -- the motion is, again, pretty standard

20     looking to honor the pre-petition wages and benefits and

21     related taxes for all of the debtor's employees.  It also

22     requests the continuation of the workers compensation program

23     that the debtors have in place.  The -- the motion does request

24     approval of amounts in excess of $10,950 for approximately 15

25     individuals.

1          But, in calculating the amount, the amount by which

2     the relief exceeds $10,950 is due to honoring vacation and sick

3     time for these individuals.  And, that was something that I

4     intended to ask one of the witnesses about because I expected

5     Your Honor to have some concern over payments to individuals

6     over the statutory cap.

7          THE COURT:  Maybe you can address it.  My -- when I

8     read it, I thought that -- and, maybe I misunderstood -- that

9     the cash payment to these individuals, the 15, was still going

10    to be within the 10,950, but their other accrued benefits

11    weren't going to be cash benefits.  So, they weren't actually

12    getting cash, they were getting vacation or whatever.  I'm --

13          MR. POSLUSNY:  That's correct, Your Honor.  The 15

14    individuals whose grand total, let's say, amounted to more than

15    the statutory cap are looking at -- the highest would be a

16    gross one we pay of just over $5,500.  So, that's the actual

17    cash out for that individual.  Some of these people have

18    multiple weeks of vacation stored up.

19          To the extent they wanted to use those weeks, we --

20    and sick time, Your Honor.  And, to the extent they wanted to

21    use that time, we wanted to, like you said, honor the time.

22    But, if someone were to come in tomorrow and say, I quit and

23    you owe me three weeks of vacation, no, you have to file your

24    claim for the vacation time.  But, we want to honor the payroll

25    and honor actual days off.

1              THE COURT:  If you want -- and, that's how I

2      understood it, --

3              MR. POSLUSNY:  Yes, Your Honor.  That's exactly --

4              THE COURT:  -- which is different than actually

5      cashing out over --

6              MR. POSLUSNY:  That's right.  We don't intend to

7      write checks --

8              MR. FELGER:  Right.

9              MR. POSLUSNY:  -- to those folks --

10             MR. FELGER:  Right.

11             MR. POSLUSNY:  -- in any amount greater than the

12     statutory cap.

13             THE COURT:  Mr. D'Auria?

14             MR. D'AURIA:  Thank you, Your Honor.  Your Honor, our

15     -- we've said this speech about employees at first day hearings

16     many times, that we do not object to employees being paid in a

17     first day hearing, and we appreciate the importance of keeping

18     the thousand employees on board.

19             Our concern with the -- with the extra is that it's

20     undefined and we don't know what it means.  And, at this first

21     hearing, Your Honor, it's our preference to keep the relief

22     limited to the priority claims in 507 because it's -- we don't

23     want a scenario where -- where high priced employees, highly

24     paid employees, or executive types have a scenario where they

25     can effectively have a no-show job while they collect on their

1   vacation time.  And, that may be a scenario that's unfair to

2   the estate.

3              Our reaction is absolutely, payroll goes out on

4   Wednesday to these debtors, and employees should be paid.  But,

5   to the extent they're going to go over the cap for -- for a

6   small amount of people that the motion defines as being

7   critical -- maybe that can be done at a later date or maybe

8   it's more appropriate for -- for a different type motion and to

9   not be included in a wages motion.

10             That's our reaction to it at this time, Your Honor.

11  And, we shared language informally with debtor's counsel last

12  night and kind of had this discussion last night as well.

13             THE COURT:  Mr. Felger?

14             MR. FELGER:  Well, that -- again, that's -- that's an

15  issue that we anticipated, Your Honor, the U.S. Trustee having,

16  and I intended to flush it out through testimony.  And, perhaps

17  we can revisit it after we've walked through the testimony.

18             THE COURT:  And, it seems to me that I think this is

19  something that can be fixed by the language or the way that you

20  -- you fix the order because it doesn't appear to -- I don't

21  know that we even need to approve all of that time at this

22  time.

23             You know, if we limit it and we fix, I guess, a time

24  line of how this vacation and other benefits are going to be --

25  if the highest payment is going to be essentially 5 or $6,000

1     and there's still, like, a $4,000 gap, I'm not sure that we're

2     going to be reaching that issue, you know, unless somebody is,

3     as Mr. Poslusny said, wanting to take all their vacation

4     immediately, in which -- which wasn't what was intended here.

5            So, perhaps, with the testimony that's going to be

6     presented and language in the order, we can deal with this

7     order.  I wasn't -- when I read the details, I wasn't as

8     concerned about it.  I'm a little concerned about how the

9     benefits are being defined because, you know, you quantified

10    the non-union salaries, and the union salaries, and the

11    business expenses, and so on.  But, you just attached a bunch

12    of papers about the different types of benefits they get, which

13    I was unable to figure out what that meant.

14           And, I'm not sure, as far as a priority claim would

15    be, that employ -- what employees would have for those -- what

16    that would -- what that would mean in a cash amount.  What does

17    it mean that you get your health insurance paid or some of the

18    other benefits that you have in there, contributions to 401K?

19           I guess perhaps in your testim -- your witnesses'

20    testimony, you can go into how you -- how you contemplate and

21    what the -- what the extent of that benefits is going to be,

22    how that will affect the debtor, at least during the 15-day

23    period we're talking here on an interim basis.

24           MR. FELGER:  Okay.  I may -- I may actually -- I may

25    have to take a short break to talk with the debtor's

1    representatives about the extent of that testimony because I

2    may need to call Mr. Sorenson, the Chief Financial Officer, on

3    some of that detail.

4             THE COURT:  Well, I think it would probably be a good

5    idea, once we go through this and I hear the presentation, that

6    you take some time to talk about it to discuss some of the

7    issues that the U.S. Trustee has, that the Court has, and --

8             MR. FELGER:  Right.

9             THE COURT:  -- how you think you can address those by

10   virtue of the testimony.  So, I think that'll be a good idea.

11   All right.

12            MR. FELGER:  All right.  The next -- the next time,

13   again, is a fairly routine motion.  It's the 366 motion to

14   address deposits for utility companies.  What we're seeking

15   today is simply an interim order to protect the estate under

16   the sort of rigid time line set by Congress under 366.

17            We've proposed a two-week deposit for the various

18   utility companies.  And, again, what we've asked for is an

19   interim order setting up a procedure where utilities can object

20   to that proposal by the debtors. And, the debtors can have a

21   negotiation with them and hopefully resolve any issues raised

22   by the utilities so that this motion never has to appear before

23   Your Honor again.

24            THE COURT:  Have you had any negotiations with PSE&G

25   or discussions with them, --

1          MR. FELGER:  No.

2          THE COURT:  -- our largest utility?

3          MR. FELGER:  No.  No, we have -- we have not.  I

4    will --

5          THE COURT:  I mean, quite frankly, the -- the proof

6    of service that said overnight mail yesterday for today's

7    delivery didn't really give them a lot of opportunity to

8    respond.

9          MR. FELGER:  Right.  We recognize that.  We recognize

10   we're going to have to have discussions with PSE&G.  I should

11   state for the record that I did have discussions with PECO

12   after they sent me an e-mail saying that we represent them and

13   we need a conflict waiver.  I had discussions with them about

14   that issue.

15         They are actually a small utility with a small claim.

16   And, they indicated, you know, as long as they have an

17   opportunity to look at this and -- and set out any objection

18   they have, they didn't have an issue with the interim order

19   being entered.  I wanted to state that for the record.  And, if

20   we can't work it out with PECO, we'll need to have conflicts

21   counsel deal with that.

22         THE COURT:  All right.  At first review, I thought

23   the two weeks probably wasn't enough.  But, since we're only

24   talking about 15 days, which is essentially two weeks, in my

25   mind, on an interim basis, that seemed to be fair as long as

1    the utilities have enough time -- have an opportunity to come

2    in and -- and have a process where they can come in on a short

3    -- short term basis and get a hearing in the event that, for

4    some unexpected reason, that security doesn't become enough for

5    them or at the final hearing.  Mr. D'Auria?

6         MR. D'AURIA:  Your Honor, we have nothing to add.  No

7    objection beyond Your Honor's comments.

8         THE COURT:  All right.  And, again, -- so, on the

9    interim basis, I think the order -- I think the application and

10   the order are fine, and I will grant them.

11        MR. FELGER:  Thank you, Your Honor.  Number 7 is the

12   -- the motion to pay pre-petition sales and use taxes.  Again,

13   a pretty standard motion.  The justification is two-fold.  One,

14   it's otherwise a -- a 507 administrative -- I'm sorry -- a 507

15   priority claim -- not administrative claim -- and also, in all

16   likelihood, trust fund taxes so that the funds wouldn't

17   constitute property of the estate.

18        I think the total that we're looking at is about

19   $100,000.  So, in the scheme of the case, it's not a

20   significant outlay.  But, we think it's important that these

21   taxes get paid early in the case for a whole host of reasons as

22   set forth in the motion.  We didn't -- I don't think we

23   received any comments from the U.S. Trustee on that one.  I'm

24   not sure --

25        THE COURT:  My --

1          MR. FELGER:  -- if Your Honor has.

2          THE COURT:  -- question is whether you need that on

3     the first day.  That was my only -- my only issue.  Yes,

4     they're important to be paid.  But, I'm not certain that the

5     debtor can't operate without that.

6          MR. FELGER:  I guess my reaction to that is --

7          THE COURT:  I mean, it is a small amount compared to

8     the other --

9          MR. FELGER:  I --

10         THE COURT:  -- bills.  But, what I'm saying is I --

11    I'm not -- yes, it's a trust fund tax.  Yes, it's going to have

12    to be paid in some manner.  We haven't really had a chance to

13    look at all of the aspects of the case.  I don't know that it

14    has the same kind of urgent need that salaries and utilities

15    and those kind of benefits have.  That was my -- you know, if

16    you want to address it when we're --

17         MR. FELGER:  Yes.  Our concern certainly was that it

18    -- it's not our money.  And, so we felt, when it comes due, it

19    ought to -- it ought to be paid rather than risk interest or

20    whatever might accrue on it, if it's -- if it's paid in an

21    untimely fashion.  But, first and foremost, we dispute it as

22    it's -- it's not the debtor's money.  So, we ought to -- ought

23    to pay them.

24         THE COURT:  Mr. D'Auria?  Mr. D'Auria, do you have

25    any comment?

1          MR. D'AURIA:  Yes.  Nothing to add other than the

2    colloquy between Your Honor and the debtor.

3          THE COURT:  All right.  Let's hold that.

4          MR. FELGER:  Okay.  The next item sort of dovetails

5    with 9.  The -- item 8 is a -- is an application to retain our

6    balloting and claims agent.  We've solicited bids pre-petition

7    and decided to go with Epiq Bankruptcy Solutions.  We thought

8    that their proposal was very good for the estate.  And, we

9    wanted to have this on first day because of the posture of the

10   case.

11         We are hoping to move forward quickly with a

12   disclosure statement, hearing, and confirmation.  And, as such,

13   we're going to need to move forward with balloting very quickly

14   and certainly the setting of a bar date and delivery of the

15   notice of bar date to several thousand -- several thousand

16   entities.

17         So, I think 8 is -- is a pretty standard application.

18   The terms and conditions are standard.  I think they were

19   vetted with the U.S. Trustee.  I believe any concerns the U.S.

20   Trustee had were addressed.  But, if not, we can address them

21   now.

22         And, item 9, of course, is the bar date motion.  And,

23   we're looking to set a bar date.  I think the date we proposed

24   was May 12th.  I understand that -- which is -- what's the quick

25   math -- 55 days or so from now.  And, I believe the U.S.

1     Trustee might have been looking for a little bit of relief from

2     that date.  But, --

3           THE COURT:  Let's start -- let's go back to the

4     appointment of Epiq --

5           MR. FELGER:  Sure.

6           THE COURT:  -- because, as I see it, I can't really

7     enter the order for the bar date unless we know who is going to

8     do the noticing because that includes addresses in there

9     that, --

10          MR. FELGER:  Right.

11          THE COURT:  -- if they're not collecting the -- the

12    ballots would be a problem.  So, Mr. D'Auria, do you have any

13    comment about the approval of Epiq Bankruptcy Solutions for

14    noticing, claim solicitations, and balloting?

15          MR. D'AURIA:  No, Your Honor, I don't.  And, if I

16    could -- if I could note one thing now, Your Honor, it might be

17    efficient to do so.  The new Rule 6003 suggests that retention

18    applications shouldn't be granted within 20 days.

19          THE COURT:  Right.

20          MR. D'AURIA:  So, that kind of impact on our

21    district's local tradition about the general five-day process

22    that we usually have.  So, our thought would be, regarding the

23    other retention papers that are on the docket, if we could

24    calendar a hearing date -- the 20th day is Saturday, April 5th.

25    If we could calendar a hearing date of Monday, the 7th on those

1      other matters -- which are not on today, Your Honor -- they're

2      not on today.  The only reason why I'm raising this is because

3      sometimes orders get entered under -- under our generic five-

4      day process.

5              THE COURT:  Well, they're not going to be entered

6      here because we're -- I am aware of that.

7              MR. D'AURIA:  Okay, great.  And, with regard to Epiq,

8      we recognize that Epiq is different and there's an emergent

9      need for it.  We reviewed the application, Judge.  There --

10     there's clear certification about a lack of conflict and a

11     presence of disinterestedness, and we have no objection.

12             THE COURT:  All right.  I did -- I'm not certain -- I

13     didn't really look in detail whether Rule 6003 applies if you

14     the appointment is under 28 U.S. Code 156, which is what the

15     debtor is suggesting, that this is not really a professional.

16             MR. FELGER:  Right.  Right, Your Honor.

17             THE COURT:  I think Rule 6003 deals with professional

18     appointments.

19             MR. FELGER:  Exactly.

20             THE COURT:  And, I don't know that we need to address

21     it because -- even though 6003 says that, if you can show

22     immediate irreparable harm, you can still consider that issue.

23     And, I believe, from what you're saying, Mr. D'Auria, you're

24     satisfied that, under either scenario, you would not be opposed

25     to Epiq's appointment, correct?

1          MR. D'AURIA:  That's correct, Your Honor.  I was

2   merely using this as an opportunity to raise -- preventing

3   another problem.  That order is being entered without a full

4   time period to review on the other retention papers that

5   admittedly are not on today.

6          THE COURT:  Right.  I -- I mean, I'm aware of the

7   change in the rule.  I think it's really a difficult situation

8   for debtor's counsel.  But, unless you -- they can satisfy me

9   that it -- that it's immediate and irreparable harm, I -- I'm

10  bound by what the rule says.  So, -- but, we're not onto that

11  issue.

12         But, in my mind, this appointment is probably not

13  really in the nature of a professional appointment.  But, even

14  if it is, it would meet the standards.  And, I think that

15  whether I would allow it under 128 U.S. Code 156 or under 327,

16  Rule 6003 allows it when it is necessary to show immediate and

17  irreparable harm.

18         I think, in this case, based on what I'm going to

19  hear -- which I haven't heard yet -- but, based on what I

20  believe I'm going to hear is that the debtors need to have the

21  balloting completed in less than 20 days.  And, therefore,

22  their need makes it imperative that they go forward with this

23  at this time.  Mr. Poslusny?

24         MR. D'AURIA:  For the sake of cleaning the record,

25  Your Honor, I'll say, for the circumstances of this case, we

1      agree and we have no objection.

2              THE COURT:  Okay.

3              MR. POSLUSNY:  Your Honor, I have more a logistical

4      question while we're still on the Epiq matter.  In a recent --

5      another recent case, <u>Trenton Convalescent</u>, we had issues which

6      were leading up to with the bar date being earlier and the

7      clerk's office sending out an initial notice.  Should we have

8      Epiq directly contact Ms. Shashaty to make sure that there's no

9      similar hiccups in this case?  Is that the best method to go?

10             THE COURT:  I think that --

11             MR. POSLUSNY:  They had asked me, assuming they were

12     going to be approved, Your Honor.  I figured this was as good a

13     time as any --

14             THE COURT:  I think that would be --

15             MR. POSLUSNY:  -- to raise that.

16             THE COURT:  -- a good idea, administratively, to

17     touch base with the clerk's office.  You want them to do the

18     noticing and not the clerk's office?

19             MR. POSLUSNY:  Correct, Your Honor, --

20             MR. FELGER:  Right.

21             MR. POSLUSNY:  -- to make sure we get the bar date

22     right and -- et cetera.

23             THE COURT:  Chris will make sure that the clerk's

24     office knows about that.  And, if you would then have them

25     contact Mrs. Shashaty or Margie McGettigan or Lisa Davis, the

1       two people that work with Mary Shashaty -- talk to one -- have

2       them talk to one of them, and they can work out the parameters.

3       But, Chris will bring to their attention that that's going to

4       occur.

5                MR. FELGER:  Yes.  We certainly don't want the

6       confusion or the cost of two bar date notices.  Okay.  So, on

7       Epiq, again, we filed this as a 28 U.S.C. 156 application, not

8       as a professional retention.

9                THE COURT:  I'm satisfied that this is the type of --

10      of employment that meets that standard.  And, it appears as if

11      they would meet the professional standard anyway.

12               MR. FELGER:  Right.

13               THE COURT:  But, I think that they can be approved,

14      and I don't think that they're barred by Rule 6003.  So, I will

15      approve the appointment of Epiq as the official noticing claims

16      and solicitation and balloting agent, which then brings us to

17      the bar date.

18               MR. FELGER:  Yes.

19               THE COURT:  Mr. D'Auria, did you want to be heard on

20      that?

21               MR. D'AURIA:  Your Honor, I wouldn't call it an

22      objection.  I'd call it a reaction.  And, here's my thought.

23      We understand that this case is going to need to fix a bar

24      date.  We don't want a bar date to go out more than once,

25      because that would create confusion.  And, we agree with the

1          debtor that it should go out as soon as possible.

2                  Our only question is how much time is reasonable in

3          the context of a given case.  They -- the debtor is proposing a

4          rather fast procedure.  If Your Honor is comfortable that a

5          month is long -- is long enough for creditors, regardless of

6          how the case unfolds over the next couple of months, then I --

7          then I suppose the application could be granted.

8                  But, a 75-day time line for the case is a rather

9          aggressive time line.  And, my only thought is, if that's -- if

10         that's an aspirational goal and not a reasonable goal, then

11         let's not hold creditors to a shorter time line on filing their

12         claims.  And, I don't know how we get our hands around that

13         prior to hearing the testimony from the other parties who we're

14         going to hear in a moment, but --

15                 THE COURT:  Well, we can hold the -- we can hold this

16         particular order and wait -- and await the testimony, which

17         probably would be a good idea.  I looked at it.  And,

18         basically, if the notice is given this week, --

19                 MR. FELGER:  Right, that's what we expect.

20                 THE COURT:  -- we're talking about six weeks of time

21         to file a claim, --

22                 MR. FELGER:  Yes.

23                 THE COURT:  -- which I don't really think -- I mean,

24         I would venture to guess that most creditors are most active in

25         the case in the first six weeks.  So, I don't think, on a --

1          you know, in an abstract view, that it's unreasonable.  But, I

2          think we can hold that and have the testimony come through, and

3          then we'll see where we are.  Okay, Mr. D'Auria?

4                    MR. D'AURIA:  Thank you, Your Honor.

5                    MR. FELGER:  Yes.  Our view, Your Honor, was we saw

6          it as about 50 days for creditors, assuming it goes out this

7          week.  And, the deadlines are -- are deadlines in the DIP

8          financing agreements, so they are events of default.  So, we

9          certainly took them seriously.

10                   THE COURT:  Well, I -- I mean, if you came in and

11         said we need this to be done in two or three weeks, I -- I'd

12         probably agree with the U.S. Trustee.  I think six weeks is --

13         is pretty fair notice.  It is shorter than you might have

14         otherwise.  But, if everybody is listed on the schedules and

15         everybody is noticed and gets fair time, I don't think six

16         weeks seems unreasonable to me.  But, let's hear what your

17         witnesses have to say and see if it addresses some of the

18         concerns that the U.S. Trustee has.

19                   MR. FELGER:  The next item is item 10.  That's the

20         motion to establish procedures for interim compensation and

21         reimbursement of the debtor's and the Committee's

22         professionals.  It's -- we used the standard procedures

23         previously approved by Your Honor in other cases.  And, I don't

24         believe the U.S. Trustee had any concerns on this particular

25         application.

1          MR. D'AURIA:  No objection, Your Honor.

2          THE COURT:  All right.  And, I'm -- I have no

3    objection either, and I will grant the motion.

4          MR. FELGER:  And, the last item, Your Honor, item 11,

5    is perhaps not a motion you see in every case.  But, when

6    you're dealing with vendors from around the world who can

7    impact your business by a decision not to follow through with a

8    shipment of goods, we thought that we needed to have this

9    motion considered by Your Honor to provide for -- to provide us

10   with an order that hopefully we can use to give folks comfort

11   that, if they ship pursuant to a pre-petition purchase order,

12   they will be paid as an administrative claimant by the debtors.

13         THE COURT:  That basically is what the code says.

14         MR. FELGER:  Yes.  Yes.

15         THE COURT:  I guess I -- I wasn't sure if you're --

16   if you're asking me here to deal with pre-petition reclamation

17   claims because you had some -- some issue that -- get

18   administrative status and have the right to reclaim their

19   goods.  And, some of the language in there talked about, you

20   know, a bar on creditors being able to make reclamation claims

21   which --

22         MR. FELGER:  There is --

23         THE COURT:  -- the changes in the Code give them

24   certain rights.  And, that was what I was concerned about.  I

25   think the Code says that, if you -- if a creditor delivers

1     post-petition their administrative creditor, and all that

2     you're asking for in that aspect is what you're allowed in the

3     Code.  And, if you think it helps to have it in the form of an

4     order, I'm not opposed to it.

5          MR. FELGER:  Right.

6          THE COURT:  What I was concerned about, when I read

7     some of the language of the order, is whether your expectation

8     is some of those creditors who may have had pre-petition

9     reclamation rights would be barred in being able to seek those

10    rights that they're entitled to under the Code.  I mean, you

11    know, it's going to depend, you know, when it's -- when it got

12    ordered, when it got shipped, when it got delivered, did it get

13    here the day before you filed, --

14         MR. FELGER:  Right.  Right.

15         THE COURT:  -- did it get here the day after you

16    filed.

17         MR. FELGER:  Right.  We were -- we're really, I

18    think, focusing in on precluding self help remedies without

19    coming in to the Court to seek the sort of relief that Your

20    Honor has -- has raised, the reclamation principally.  That's,

21    I think, what we were -- what we were worried about in that

22    aspect of it.  And, perhaps we need to clean up that language

23    in the order.

24         THE COURT:  You're not seeking to change the rights

25    of the -- of suppliers who supplied within the 20-day period

1    before filing -- or actually the 45-day reclamation rights that

2    they have now?

3          MR. FELGER:  Right.  In terms of a reclamation, it's

4    our view they'd have to come in and file a complaint with the

5    Court in order to exercise those rights, not exercise them

6    through a self help mechanism.

7          THE COURT:  Well, I don't know that they have to file

8    a complaint.  But, you can -- but, it says that the complaint

9    -- the reclamation demand must be in writing and made within 45

10   days of receipt of the goods by the debtor.  And, if it's -- if

11   the 45 days is after the filing, it has to be made within 20

12   days of the filing.

13         So, with those creditors, we're going to know what

14   their claims are within -- within 20 days.  I don't know that

15   the -- maybe we need to address this a little further because

16   this is the first instance that I've really had to deal with it

17   in these changes in a case where it's become an issue.  And, I

18   just want to be certain that the order that I entered is in

19   conformance with what the Code provides.

20         MR. FELGER:  Right.  Right.

21         THE COURT:  At the same time, giving the debtor the

22   protection that it needs pursuant to the Code.

23         MR. FELGER:  Okay.

24         THE COURT:  I don't think there's any question that

25   post-petition delivery of goods gives the -- the creditor an

1      administrative priority.  So, to the extent that the order

2      deals with that, I don't have a problem with it.  My question

3      is the issue of the parties who deliver and seek reclamation.

4      They get a 20-day period after the filing to be able to reclaim

5      their goods as long as they give notice in writing.  Now, does

6      that mean they have to come in and file a complaint?  I don't

7      think so.  What does that mean?  I don't know.

8                   MR. FELGER:  I've been there a lot of times, Your

9      Honor.  I think -- I think that's what it means, but --

10                  THE COURT:  Okay.  Well, then convince me of that,

11     and then maybe I'll enter the order.  But, I haven't seen

12     enough of it to be able to -- and, to be honest, after I went

13     through the other thousand pages that I read last night, I

14     really didn't have time to research it.

15                  MR. FELGER:  Right.

16                  THE COURT:  So, --

17                  MR. FELGER:  Right.

18                  THE COURT:  -- and be ready for today.  But, I did

19     know enough to -- that it was an issue that I was concerned

20     about.

21                  MR. FELGER:  Well, perhaps what we can do is address

22     it through a modification of the order to set out that we're

23     not looking to -- to modify the rights that the creditors would

24     have under 546 of the Bankruptcy Code.  Okay.  And, I think

25     that's -- that's the end of our agenda.

1          We've also -- I would just not that we also filed

2     retention applications for Cozen as bankruptcy counsel, Phoenix

3     Management as restructuring advisor, and Stevens & Lee as

4     special labor counsel and conflicts counsel.  And, those will

5     be sent out on a A notice tract.  I guess we need to determine

6     whether it will be 5-day or a 20-day notice track.  But, maybe

7     we can --

8          THE COURT:  I will say that --

9          MR. FELGER:  -- take that up at the end.

10         THE COURT:  Well, we can discuss that.  But, my --

11    our standard order provides that, in the event that those --

12    those retentions are approved, it's effective as of the day

13    they were filed.  So, --

14         MR. FELGER:  Right.

15         THE COURT:  -- if there's no issue or problem with

16    them, then the 5 days or the 20 days probably isn't going to

17    make all that much of a difference.  You know, the difference

18    comes up if it -- if there's an objection.

19         MR. FELGER:  Right.

20         THE COURT:  And, there's a gap period that's there,

21    and I -- I do recognize that.  And, I'm not sure how that can

22    be remedied.  But, I'm more than willing to hear from you as to

23    what you think is the appropriate way to deal with that.

24         MR. FELGER:  Okay.  We'll -- perhaps we can take that

25    up at the end.

1          THE COURT:  Fine.  I know you wanted to take an

2     opportunity to discuss some of the matters with your client.  I

3     would urge, during the time that we break here, that you also

4     talk to the lenders about addressing some of the concerns that

5     the Court has.  I -- I'll be happy to hear Mr. Shapiro's --

6     maybe I should hear that before I take my break.

7          MR. SHAPIRO:  If you could, Your Honor.

8          THE COURT:  Your non-technological presentation.

9          MR. SHAPIRO:  Old school version.  Your Honor, the

10    only other thing I -- I don't know that it's on today, and I --

11    maybe I'm jumping ahead obviously -- is we have filed a plan

12    and disclosure statement.  If the Court gets comfortable with

13    today's hearing to go forward, we would be looking for a date.

14    So, while Epiq is sending out all the notices to try and save

15    money, they can all maybe go in an envelope.  And, we would ask

16    the Court to pick a date for that.  May I approach?

17         THE COURT:  You can bring that up when we get --

18         MR. SHAPIRO:  Yes, absolutely.

19         THE COURT:  I'll try to make sure we address it.

20    And, let me ask you this.  Are the parties looking for a plan

21    and disclosure statement jointly together or one and the other?

22         MR. FELGER:  No, normal track, --

23         THE COURT:  Normal.

24         MR. FELGER:  -- Your Honor, --

25         THE COURT:  Okay.

1          MR. FELGER:  -- a disclosure statement and

2    confirmation.

3          THE COURT:  Okay.

4          MR. SHAPIRO:  May I approach, Your Honor?

5          THE COURT:  Certainly.  (Pause).

6          MR. SHAPIRO:  My apologies to the U.S. Trustee.  I

7    will try and explain what we're going to go through, which is

8    a --

9          THE COURT:  Unfortunately, Mr. D'Auria and Mr.

10   Sponder, you don't the opportunity to review the -- the fancy

11   displays that Mr. Shapiro has brought to court today.  But,

12   hopefully he can explain it in a manner that will -- will

13   assist you.  And, perhaps there's some way to -- if you need

14   this, some way that it can be faxed to your office or something

15   and looked at for later today.

16         MR. SHAPIRO:  Your Honor, during the break, if the

17   Trustee would provide us with an e-mail, we can forward it,

18   because it was in a slide and we can forward it to him.  I

19   don't know if he'll have it as I'm speaking.  But, certainly,

20   during the break, he can take a look at it and reserve his

21   rights to come back -- if he has any questions on the chart, we

22   will try and send it to him now as we speak.

23         THE COURT:  All right.  Do you want to ask him now

24   for his e-mail address or --

25         MR. SHAPIRO:  Hold on.  I --

 1                 MR. POSLUSNY:  I have his -- I have your e-mail, Mr.

 2     D'Auria.  I'll pass it on.

 3                 MR. D'AURIA:  Please include Mr. Sponder's, Jerry.

 4                 THE COURT:  All right.  Yes, Mr. Shapiro?

 5                 MR. SHAPIRO:  Okay.  Your Honor, what I wanted to do

 6     today obviously is we are asking this Court to do a lot on the

 7     first day.  And, I wanted to try and explain -- obviously the

 8     testimony will be much broader -- but, to give you a -- an

 9     overview of what we're trying to accomplish today and the end

10     game as to why today becomes so important.

11                 On page one of the slide, we have the existing

12     corporate structure.  This is existing as of the filing date on

13     Sunday.  The concept is you have Ben, LLC -- and I know the

14     Trustee has not gotten this -- at the top of the pyramid.  That

15     is the owner of all the entities.  The Arcus entities do not

16     have an interest in Ben, they're not an owner, they're not

17     anything.

18                 What they are -- and, this occurred ten minutes

19     before the filing -- was they became a manager with 79.9

20     percent of the voting rights.  In other words, the debtor was

21     not giving up management.  It did not and has not given up

22     ownership unless and until it saw "the deal".  And, that's what

23     we'll be -- we have been doing, and I'll take you through the

24     slides.

25                 So, yes, the Trustee is concerned that Arcus is a

1    manager, and that's part of the DIP loan.  But, I just want to

2    emphasize it became that manager ten minutes before we went

3    into bankruptcy.

4         On slide two, Your Honor, we have before we do

5    anything today.  This represents only CIT currently, and

6    Textron and J.P. Morgan Chase are the lenders.  And, from this

7    chart, you can see Ben, Shapes, and the operating entities at

8    the bottom.

9         The current facility is consisted to on the left

10   where you have a revolving credit line, inventory receivables,

11   your standard type of thing.  You have a letter of credit

12   facility which has been raised that has to -- ongoing,

13   especially with foreign suppliers.

14        And, the third part is a term loan.  They've been in

15   existence since 2003.  So, it's not a new loan that's been put

16   on.  All the borrowers have been borrowing for years, and they

17   have a lien on all of the assets of the estate.

18        Now, slide three.  Slide three is what we are getting

19   to today to ask you what we are to do for today.  And, we are

20   asking you to do a lot today.  But, it goes with slide four.

21   We have the debtors which are in the middle of the slide

22   essentially for the U.S. Trustee, which is all of them.  And,

23   we're going to have two facilities on either side of the

24   debtor, and they have to read together.

25        You've got the CIT facility, which we are requesting

1    Your Honor -- excuse me -- CIT is requesting, but we are also.

2    It's part of the deal -- that CIT rolls up.  We now have a

3    post-petition facility which will be based on a formula, which

4    will allow the debtor to have the ability to borrow on its

5    inventory and its receivables.

6         At the same time, Arcus ASI Funding is going to

7    provide a term loan.  And, the intercreditor issues on who has

8    what on first and who's first and who's second and all of

9    those, that's what took a long time to work out.  But, the

10   concept is -- and the debtor did not allow the managers to come

11   into play until it saw this deal done.

12        In other words, it wanted to make sure that the roll

13   up occurs, Arcus then comes in with a term, and you couple them

14   together.  You need each other.  You can't have enough

15   availability with CIT by itself.  And, if we just gave them the

16   term loan without the CIT, who has the first lien today on the

17   receivables and the inventory, that would not be enough for the

18   debtor to survive.  So, we need each other to couple, and that

19   takes quote, unquote, the train out of the station to the end

20   game, which is slide four.

21        Slide four, Your Honor, is a summary of the plan and

22   disclosure statement, the concept being is that we're not just

23   asking you for a roll up on the first day because we want to

24   make everybody nervous and then give CIT an issue where their

25   lien and loan becomes good on day one and, therefore, you can't

1   get out of bankruptcy.  This was thought through that we only

2   are agreeing to let them roll up and to couple with Arcus

3   because of this slide four.

4          In other words, they've agreed as well, which is

5   signed and an escrow as of this morning, to an exist facility.

6   So, the concept is we're letting them roll up and couple on

7   with the term loan because they've agreed, as Arcus has agreed,

8   that, when we go through hopefully 75 days from now and we have

9   a plan of reorganization which is confirmed, that you will then

10  have both pieces of the exit facility in place.

11         So, in order to get to the plan, we've got to start

12  today to do that.  And, so, in the traditional sense, you

13  usually have a lender coming in saying, okay, I want to roll up

14  on day one, and then I need to have it.  And, they do, because

15  it's mutual nuclear holocaust.  We're not going to give them

16  the $25M term loan unless CIT is in to do the inventory and

17  receivables.  So, we need both pieces in order to do it.

18         So, I know Your Honor has expressed some

19  reservations, and we hope to allay those reservations.  But,

20  again, this is unique -- because I've never done this in

21  practicing in 25 years -- to be able to have the plan and

22  disclosure statement filed which anticipates rolling through

23  the loans that we're doing in order to assuage the Court and

24  other people that we're not just doing it because we want it.

25  We're doing it for an end.

1          And, the end is slide four.  And, in order to get to

2     slide four, we've got to get through slide three today.  And,

3     so that's why we are asking you for the roll up.  We are asking

4     you for the term loan.  I agree, as 79.9 percent voting, that

5     there is some issues that the Court will look at as a, quote,

6     insider doing it.  But, Arcus had nothing to do with this

7     company except as a manager ten minutes before we went in.

8          This is not the classic case of equity trying to

9     retain their rights to the detriment of somebody else.  This is

10    a debtor reorganizing saying I'm not giving up anything until I

11    see the end game.  And, the end game is slide four.  And, we

12    ask you today, when you're listening to the testimony, to look

13    and allow us to do slide three.  Otherwise, we have a problem

14    getting to slide four.

15          THE COURT:  All right.  Before you finish, why don't

16    you give me a little bit of more detail about how this

17    transaction goes about.  The CIT Group is agent -- I know you

18    don't represent them -- agent for CIT --

19          MR. SHAPIRO:  Textron, and J.P. Morgan Chase.

20          THE COURT:  Are there any other investors in that

21    group?

22          MR. SHAPIRO:  No.  No, we are not an investor in that

23    group either.

24          THE COURT:  All right.  And, -- okay.

25          MR. FELGER:  That's correct.

1          THE COURT:  Now, your -- your client --

2          MR. SHAPIRO:  Is Arcus ASI Funding, LLC.

3          THE COURT:  And, --

4          MR. SHAPIRO:  We are providing the term loan.

5          THE COURT:  All right.  So, let me understand -- the

6     day that this -- that this gets approved -- today or whatever

7     day -- what happens cash wise?  I mean, is it -- is this mostly

8     paper transaction or is there actually going to be some cash

9     that actually moves from someplace to someplace?

10         MR. SHAPIRO:  Yes.  What is moved is, in order to get

11    CIT comfortable after the roll up occurs, is that cash, about

12    15 million and change, will come from my client and is

13    essentially going to go to pay down the term loan so that we

14    have the assets that we're going to be first on.

15         THE COURT:  And, then your client will just have a

16    term loan.

17         MR. SHAPIRO:  That's correct.  And, CIT stays in

18    place over here.  So, there will be cash, there are fees that

19    are disclosed in the chart, and there is payroll and things

20    that the debtor is going to draw down.  So that, once the 15

21    point something million dollars would go out today on the term

22    loan, you would then have -- the two loans would then be in a

23    position to go onto the 13-week budget and work together where

24    the debtor has availability under its line with CIT, and it has

25    availability under the term to take us through to slide four.

1    THE COURT:  Well, again, explain to me -- your client

2    is going to fund $15M to pay down the revolver, correct?

3    MR. SHAPIRO:  Not -- it's not to pay down the

4    revolver, Your Honor.  It's to take out the term loan portion

5    of their debt, which then moves up --

6    THE COURT:  How much --

7    MR. SHAPIRO:  -- which is -- no, about 9 --

8    MR. PATTERSON:  The term loan face, Your Honor, is

9    approximately 8.3  There is also a proposed pay down on the

10   revolver piece as well, which is roughly 4.4.  So that, at the

11   end of the day, -- and I didn't want to interrupt --

12   MR. SHAPIRO:  That's okay.

13   MR. PATTERSON:  -- counsel's presentation -- at the

14   end of the day, what our client is hoping to end up with is a

15   traditional inventory and receivable asset based loan to these

16   post-petition debtors-in-possession.

17   THE COURT:  In what amount?

18   MR. PATTERSON:  60 million, subject to a borrowing

19   base, 50 percent on inventory, 85 percent on accounts

20   receivable.  And, the borrowing base is a joint borrowing base

21   combining all the assets of all the debtors.

22   THE COURT:  And, which is your client going to end up

23   with?

24   MR. SHAPIRO:  My client is going to end up with a

25   first lien on the assets other than the inventory and the

1    receivables.  It's going to have a first lien on the real

2    estate, it's going to have a first lien on the equipment, the

3    machinery.  We do not and are agreeing in the DIP order that

4    the lien on the avoidance actions is subject to the final

5    hearing, so nobody took that today.

6              The 506C waiver is not today.  That is in both

7    orders.  That comes at the final hearing.  So, both of those

8    provisions in connection with the order are deferred until the

9    final hearing.

10             THE COURT:  All right.

11             MR. SHAPIRO:  But, we need the roll up.

12             THE COURT:  So, your client is advancing 25 million

13   -- $15M to --

14             MR. SHAPIRO:  Now.

15             THE COURT:  Now.

16             MR. SHAPIRO:  Correct.

17             THE COURT:  And, then they're going to advance

18   another 10 million?

19             MR. SHAPIRO:  No.  We hope, Your Honor, the whole 10

20   isn't -- it's a term loan for 25 based upon the budget that

21   you've seen.  If it works out right, the debtor will not borrow

22   the whole 25 now.  Rather, the tail end of it is going to be

23   used for the exist facility to fund the plan fees and expenses

24   that are required to -- on slide four to get out of bankruptcy.

25   So, today we need the $15.8M as a must in order to bring CIT

1    back into where both work together.  If we can't get that, then

2    we're not out of the gate.

3              THE COURT:  Anything else?

4              MR. SHAPIRO:  Excuse me, Your Honor.  (Pause).  Your

5    Honor, again, to -- one last comment.  When I talk about the

6    coupling, as in, if you have a train hopefully going to

7    confirmation, and you have Arcus here, and we have CIT down

8    here, we have to get the coupling here.

9              If we do this and the 15.8 goes in, the concept is

10   that, under -- Mr. Patterson, as he said -- the traditional

11   inventory and receivables, you're then creating $10M in

12   availability on day one, so that the suppliers, employees, and

13   everybody can be comfortable that there is availability to get

14   us through the next 75 days.

15             THE COURT:  And, what you're talking about is money

16   that would be available from CIT from --

17             MR. SHAPIRO:  Under their line, once the payment is

18   made from Arcus to -- as we just discussed, over to take out

19   the term and the PP&E, to bring that down into formula.

20             THE COURT:  Thank you.  Mr. Patterson?

21             MR. PATTERSON:  Your Honor, may I -- just a few

22   points.  Would you like me at the podium?

23             THE COURT:  Whatever makes you more comfortable.

24             MR. PATTERSON:  I don't want to break tradition.

25   Just a couple of points, Your Honor.  I know you're going to

1       hear testimony on this, so I just wanted to address a few

2       points that were raised by the U.S. Trustee so the Court can

3       think about this as you hear testimony.

4               I think one of the things that is important to take a

5       look at, I would respectfully suggest, is the issue -- and I

6       think it's addressed in the Court's standing order in terms of,

7       you know, what is the equity cushion that's available to the

8       existing lender.  And, I think, when you hear testimony and you

9       can look at the debtor's schedules that have been filed, I

10      think -- I think you will be satisfied that there is a -- a

11      significant or sufficient equity cushion that, at least with

12      respect to that issue, the Court and the U.S. Trustee's Office

13      should not be overly concerned.

14              I did want to also address the releases briefly.

15      And, again, I know the Court and the U.S. Trustee has had a lot

16      to look at in a very short period of time.  But, I think at

17      least our order is -- and they can -- Arcus can speak to it --

18      the release that we're asking for is clearly subject to the

19      investigation period.  So, we understand that.

20              We have shortened up the investigation period because

21      of the -- the fast track that this appears to be on in terms of

22      the possible plan confirmation.  And, frankly, I'm wondering,

23      when I look at the -- the time frame, whether I've shortened it

24      enough because obviously I think, if there's going to be any

25      objection period from CIT's perspective, we'd like to know

1        before we vote on the plan whether or not --

2                THE COURT:  You had 45 days in --

3                MR. PATTERSON:  I put in 45 days from the appointment

4        of a committee or, if there is no committee, -- highly unlikely

5        -- but, if there is no committee, 60 days for a party in

6        interest from the commencement of the case.  I guess, just as a

7        point of clarification, I would like to have -- if we're going

8        to have -- have to vote before then, I think I would like to

9        have a short -- a little bit shorter period of time for --

10               THE COURT:  Well, we need -- we need to have a little

11       bit longer time on the voting then.  You're going to have to

12       discuss that with debtor's counsel and come up with something

13       that --

14               MR. PATTERSON:  But, that was -- that was the reason

15       we shortened that, Your Honor, was -- was the expedited track

16       that we were on.  And, I think the rest -- the Court obviously

17       would need to hear testimony, and those were the points I

18       wanted to make.

19               THE COURT:  Thank you.

20               MR. SHAPIRO:  Your Honor, one last thing.  I know

21       when we're talking about allowing a committee to investigate

22       CIT's lien as -- again, Arcus does not have a pre-petition

23       lien.  We're only getting the lien today, to the extent you do

24       it, so there's no investigation of a pre-petition lien.  You

25       approve it today or you don't.

1          With respect to CIT, let's take comfort in the fact

2     that the two people from my office behind me, if they miss

3     something, then there's going to be hell to pay.  But,

4     obviously we spent all this time with CIT, after we got

5     comfortable that we had to spend all that time with CIT, that

6     they are properly perfected.  Otherwise, --

7               THE COURT:  Well, I -- to be honest --

8               MR. SHAPIRO:  -- we wouldn't have done this.

9               THE COURT:  I mean, I recognize that that right has

10    to be -- has to be preserved, and the Committee has to look at

11    it.  But, there's not a high likelihood that that's going to

12    come to fruition.  I mean, you know, mistakes do happen, issues

13    come up.  It's a possibility.  I don't think it's a high

14    likelihood that there's going to be a perfection issue in the

15    majority of cases.

16         So, although I think it's important, I'm more

17    concerned about how this affects the Committee and other

18    creditors once they come into the case, if they're not

19    satisfied with -- I guess I'm -- I'm concerned -- and, you

20    know, Mr. Felger can have his witnesses address these things.

21    I'm concerned about how this impacts negatively, if it does in

22    some ways, on creditors' ability to assert their concerns about

23    the financing in general.

24         Yes, we're not getting to the avoidance issue or the

25    waivers.  So, we'll have opportunity to deal with those.  But,

1    just as it's being structured today, what are the benefits to

2    the debtor, what are the benefits to these other creditors, and

3    what are the detriments?  That's what I want to look at and why

4    the benefits outweigh the detriments.

5              MR. SHAPIRO:  Okay.  We'll see if we can accomplish

6    that.  Do you want to have a time when you'd like to come back,

7    Your Honor?

8              THE COURT:  Sure.  Mr. D'Auria, anything else that

9    you want to express?  I don't know if you're going to be here

10   for the rest of it.  But, --

11             MR. D'AURIA:  I pretty much said it all before, Your

12   Honor.  The only clarifying comment I'd make is -- is on the

13   releases.  Counsel for CIT mentioned that the releases are

14   buttressed by the time period to review their pre-petition

15   liens.  And, sometimes those things are apples and oranges.

16             You know, the -- it looks to me, when I read the

17   order, that both Arcus and CIT both want wide global releases.

18   But, then CIT is carving out the right for a Committee to

19   review the nature, extent, and validity of their proof of

20   claims against the case.  If there are other causes of action,

21   they're getting released.

22             And, they need to be -- and, our position -- our

23   argument would be that it needs to be an exchange for valid

24   consideration if they want that today.  There may be other

25   lender liability claims that are yet to have been uncovered.

1          THE COURT:  So, your -- that is your problem with

2    CIT, not Arcus, is that what you're saying, or with Arcus as

3    well?

4          MR. D'AURIA:  It's a problem with both.

5          THE COURT:  Okay.

6          MR. D'AURIA:  And, it applies -- and, my argument,

7    Your Honor, is it would apply to CIT even though they carved

8    out the Committee time frame to review the nature, extent, and

9    validity of CIT's proof of claim against the case.

10         THE COURT:  I think --

11         MR. D'AURIA:  Even though they carve out the

12   Committee's right to review CIT's liens, CIT is still getting a

13   blanket release of any other claims that the estate may have

14   against CIT.  So, we can address that as the hearing proceeds,

15   I guess.  That would be the only one thing I'd add after my

16   other comments earlier this morning, Your Honor.  Thank you.

17         THE COURT:  Mr. Patterson wants to say something.

18         MR. PATTERSON:  Yeah.  I just want to be clear for

19   the record and be candid with the Court.  We are looking for a

20   broader release.  It's not just validity, priority, and extent.

21   I think we want to know, in whatever the time period is, if

22   someone thinks that there's a claim to be brought, that either

23   the claim is brought and we've dealt with it or the time period

24   is passed and --

25         THE COURT:  So, you're saying that --

1          MR. PATTERSON:   -- we can move on.

2          THE COURT:   -- the -- the review investigation period

3    would be to any claims or causes of action against your client.

4          MR. PATTERSON:   That is what we're asking for, Your

5    Honor, correct.   And, I just want to be --

6          THE COURT:   How about you, Mr. Shapiro?

7          MR. SHAPIRO:   Well, I guess, Your Honor, I --

8          THE COURT:   Well, you aren't a pre-petition lender.

9    But, say --

10          MR. SHAPIRO:   For ten minutes before the bankruptcy.

11          THE COURT:   No, but -- no, but say that -- and, I'm

12   not suggesting that this is true.   I'm just saying that -- that

13   some creditor says, oh, well, Arcus didn't disclose that

14   there's something involved here and, if we had known that, we

15   would have objected.

16          I -- I'm just -- I think that the -- that that

17   limited ability of creditors committee or creditors who aren't

18   here and haven't had notice should have the ability to do that.

19   I'm not suggesting that that -- that's a fact.   But, I think

20   what the Trustee is saying is that, if you're going to ask to

21   do this on day one, you need to give creditors an opportunity

22   to have that kind of review, at least for a -- at least until

23   the final hearing or some period of time to be able to analyze

24   whether these releases are appropriate in light of the finality

25   that they'll be -- some today and some in 15 days.

1          So, why don't you consider that while -- how much

2     time do you want, I guess, is the question?  Do you want a half

3     hour, do you want an hour, do you want -- (Pause).

4               MR. SHAPIRO:  Your Honor, would 11:45 be okay?

5               THE COURT:  That's fine.

6               MR. SHAPIRO:  Okay.

7               THE COURT:  Mr. D'Auria, I know you said you had to

8     go.  But, -- well, I'll have my court -- my courtroom deputy

9     call Mr. Sponder around 11:45, whenever we're ready to go.  Do

10    you have his num -- the number, Chris?  All right?

11              MR. SPONDER:  That's fine, Your Honor.

12              THE COURT:  All right.  Thank you.

13              MR. D'AURIA:  Thank you, Your Honor, for the courtesy

14    over the phone today.

15              THE COURT:  All right.  Well, I know it's short time,

16    and it's not always possible for everybody to get here.  So, I

17    hope this worked for you.

18              MR. D'AURIA:  Yes.  Thank you.

19              THE COURT:  Thank you.  All right.  Thank you.  We'll

20    resume at 11:45.  If that's not the correct time, just let

21    Chris know, and we'll -- we'll adjust.

22              COUNSEL:  Thank you, Your Honor.

23              (Recess from 10:58 a.m. to 11:45 a.m.)

24              THE COURT:  Be seated.  Mr. Felger?

25              MR. FELGER:  Yes, Your Honor.  For the record

1   again, --

2           THE COURT:  Can you call the --

3           MR. FELGER:  -- Mark Felger of Cozen O'Connor.

4           THE COURT:  -- U.S. Trustee?  (Pause).

5           MR. FELGER:  I had a great Arthur Abramowitz joke,

6   but I've decided to leave it for another day.

7           THE COURT:  Even off the record, right?

8           COUNSEL:  You may want it on the record, Your Honor.

9           MR. FELGER:  I was going to make a reference to how

10  lean we staff our cases, and that's no reference to Mr.

11  Abramowitz's waistline.

12          THE COURT:  Okay.  All right.  I just want to tell

13  the parties I'm going to need to take a short break around

14  12:15.  So, we'll see where we get, and then I'll take a break,

15  and then we'll come back.

16          MR. FELGER:  Okay.

17          THE COURT:  Hello, Mr. Sponder?

18          MR. SPONDER:  Yes, Your Honor.

19          THE COURT:  All right.  You're on in the -- on the

20  record.  And, please let me know if you have any problem with

21  hearing anything that goes on.

22          MR. SPONDER:  Thank you, Judge.

23          MR. FELGER:  Good af -- good morning again, Your

24  Honor.  Mark Felger of Cozen O'Connor again for the debtors.

25  What we would propose to do at this point is put on the -- the

1    testimony or our two witnesses.  And, the first witness that we

2    would call is Steven Grabell, CEO of the company.

3              CLERK:  Place your left hand on the Bible and raise

4    your right hand.

5              STEVEN GRABELL, DEBTOR'S WITNESS, SWORN

6              CLERK:  Please state your name for the record and

7    spell your last name.

8              MR. GRABELL:  Steve Grabell, G-R-A-B-E-L-L.

9                        DIRECT EXAMINATION

10   BY MR. FELGER:

11   Q    Good morning, Mr. Grabell.  Can you tell the Court your

12   title with the debtors?

13   A    I am CEO of Aluminum Shapes, and I'm also CEO of

14   Shapes/Arch Holdings, a holding company for the four operating

15   subsidiaries.

16   Q    Okay.  And, are you an owner of any of the debtors?

17   A    I am owner of 5 percent interest in the parent company,

18   which is Ben, LLC, not a party to this case, but is a company

19   that, in turn, owns Shapes/Arch Holdings.

20   Q    And, how long have you been with the company?

21   A    Since 1992.

22   Q    And, generally speaking, what are some of your duties and

23   responsibilities for the debtors?

24   A    Well, ultimately, I would make any kind of ultimate

25   financial decisions.  But, clearly, on a day to day, I oversee

Grabelle - Direct (Fel)                                                    64

1     the operations at Aluminum Shapes and have the presidents of

2     all the other operating divisions report to me and ultimately

3     make the sort of final decisions, whether it be for major

4     expenditures, major business decisions, and certainly anything

5     that involves a lot of cash.

6     Q    So, the -- the proverbial buck stops with you?

7     A    I would say so, yes.

8     Q    Okay.  And, were you intimately involved in the

9     transactions that are being discussed here today?

10    A    Absolutely.

11    Q    Okay.  And, what is it you did -- that you did before

12    joining Shapes?

13    A    I was a transactional attorney at Wolf Block for six

14    years.

15    Q    Can you explain for the Court the nature of each of the

16    debtors' businesses --

17    A    Sure.

18    Q    -- and where each of them is located?

19    A    Sure.  Well, first and foremost, all businesses are

20    located in -- in Pennsauken, New Jersey, with the exception of

21    Accu-Weld, the window company, which is located in Bensalem,

22    Pennsylvania, although some of its operations actually take

23    place in New Jersey as well, a small portion of the

24    manufacturing.

25            Aluminum Shapes, which is the largest subsidiary,

1    represents roughly 60, 65 percent of our revenue source, is in

2    the business of providing aluminum extrusions, aluminum

3    profiles for truck trailer applications, rail car applications,

4    architectural scaffolding, things like that.  We have a variety

5    -- we've done some high profile jobs, things like the

6    scaffolding for the Statute of Liberty and the Washington

7    Monument.

8              Accu-Weld is in the business of producing vinyl

9    replacement windows and steel security doors for residential

10   uses.  Delair is in the business of -- one of the leading

11   producers of ornamental fence for -- mostly for residential

12   applications.  And, they also are the sellers of above-ground

13   swimming pools under the Esther Williams and Johnny Weismuller

14   trade names.  Then, last, Ultra Hardware is in the business of

15   importing product -- hardware product from the Far East and

16   distributing it throughout North America.

17   Q    Can you walk through -- I think you may have already --

18   the current ownership structure of the debtors?

19   A    The -- Shapes/Arch Holdings is a holding company that owns

20   the four other operating debtors.  Ben, LLC is the entity which

21   owns Shapes/Arch Holdings.

22   Q    Okay.  And, how long have these companies been in

23   existence?

24   A    The operating companies or --

25   Q    Why don't you walk through each of them?  Take us back to

1    the roots --

2    A    Yeah.  Aluminum Shapes --

3    Q    -- and move us forward.

4    A    -- was founded in the earlier fifties, founded as actually

5    a window company which started to get into the extrusion

6    business, moved its present location in the late fifties, and

7    has expanded over the years to a much -- obviously to a much

8    larger company than it was back then.

9         The pool company was founded in the late seventies,

10   early eighties and expanded into -- in the early nineties into

11   the fence business.  Accu-Weld, while founded at an earlier

12   date, was actually acquired in the early nineties by -- by

13   these companies.  And, Ultra Hardware was founded in the early

14   nineties.

15   Q    Okay.  And, how many employees does the company have?

16   A    We have a little over a thousand employees, of which

17   approximately 700 are union and the balance obviously non-

18   union.  And, that number can vary through some seasonal needs,

19   both at Delair and at Accu-Weld.

20   Q    Picking up on the seasonal reference, are these businesses

21   seasonal or cyclical in nature?

22   A    Yeah, the -- the most pronounced impact on the businesses

23   comes from the cyclicality of the aluminum business.  And, that

24   turns largely with the cyclicality that's inherent in the

25   transportation business.  Approximately 60 percent of our

1     business comes through transportation type customers.  And,

2     those businesses have had significant cyclical trends over the

3     years.

4              And, in terms of seasonality, the only thing I would

5     -- I would point to probably two items.  Over at the window

6     company, there is some seasonality that has to do with just the

7     time of year that they can install windows.  And, the --

8     certainly the first few months of the year tend to be very,

9     very slow.

10             And, in the pool business, there's a seasonal need

11    for the company to have a significant amount of cash because we

12    have to ship a lot of product that cannot get paid for until --

13    by the customers until typically early June when they're able

14    to install pools.  And, the fence business probably has some of

15    that cyclical trend also since about 50 percent of the products

16    -- fence products that are sold are probably installed around

17    pools.

18    Q    So, how does that cyclical and seasonal nature of the

19    business affect the company's cash flow annually?

20    A    Well, certainly the cyclical nature of the aluminum

21    business is not, you know, allocated to any particular months

22    necessarily.  But, obviously, in the -- we've had a significant

23    down turn in volume -- a 20 or 30 percent down turn in volume

24    year over year which obviously creates a real challenge in the

25    aluminum business.

1          The cyclical nature of the other businesses -- the --

2     I'm sorry -- the seasonal nature is what creates a

3     significantly higher demand for cash the first half of the

4     calendar year compared to the second half.

5     Q    Can you describe of the Court just generally the current

6     debt structure of the company?

7     A    Sure.  We currently have a facility of -- and current

8     meaning as of this moment in time --

9     Q    Let's say as of --

10    A    -- or as the --

11    Q    -- as of the petition date.

12    A    As of the petition date, about a $75M facility, although

13    our borrowing capacity doesn't reach that $70M level.  We're

14    currently borrowing something a little shy of $60M, eight and a

15    half -- a little less than eight and a half is pursuant to a

16    term loan, and the balance is pursuant to a revolver and some

17    letters of credit that are outstanding as well.  But, the total

18    balance is in the 58, $59M range on that -- that facility.

19    Q    And, that -- and, that facility is collateralized by all

20    assets of all debtors?

21    A    All assets, all debtors.

22    Q    Okay.  How about unsecured debt?

23    A    We currently have about $35M of unsecured debt, and that's

24    a total figure across all the companies.

25    Q    Right.  So, all in, it's -- it's a little under $100M of

Grabell - Direct (Fel)                                          69

1     debt?

2     A     Correct.

3     Q     When was it that you first perceived that the companies

4     were experiencing financial difficulties?

5     A     Well, it was the -- the business in '06 was certainly

6     projected to perform at a reasonably high level, and we were

7     projecting EBITDA levels in the low twenties.  And, in the

8     fourth quarter of '06, some of our industries began to

9     experience some issues.  But, we managed to get through '06

10    with performance -- EBITDA levels in the aggregate of about

11    $20M.  But, we certainly began to see the signs.

12          And, we got further into '07, business conditions

13    continued to deteriorate.  And, certainly we saw significant

14    cash flow strains as we entered into the second half of '07,

15    and it certainly became more pronounced as we got to the fourth

16    quarter of '07.

17    Q     And, as the CEO of the debtors, what -- what did you do at

18    that time?

19    A     And, that time referring to the --

20    Q     The --

21    A     -- fourth quarter?

22    Q     Yes.  Exactly.

23    A     Well, in the beginning of the fourth quarter, we began

24    speaking with our lenders and tried to explore alternatives to

25    -- to make sure that we would have adequate financing to get

1    through what we anticipate to be a significant downturn both in

2    our business performance and obviously our increased borrowing

3    needs that we experienced in the beginning of the calendar year

4    each and every year.

5         So, we began to explore what other financing

6    alternatives there would be out there.  And, it was at the end

7    of November -- well, actually we started interviewing and, at

8    the end November, very early in December began a process with

9    CIT Capital Markets, which is a group different from the -- the

10   lender group, but folks that were interested in exploring on

11   our behalf, the opportunity to obtain some other form of

12   financing or at least some kind of replacement term loan and

13   expanded term loan which would give us more liquidity to get

14   through the tough times.

15        At the same time we started to explore with them, we

16   tried on our own to -- to talk to some potential lenders that

17   they weren't reaching out to, lenders with -- you know, lenders

18   slash equity players and folks that were interested in maybe

19   doing sale lease backs of equipment or sale lease backs of real

20   estate as well.

21   Q    So, there was a recognition at that time that the current

22   facility was no longer adequate to support the needs of the

23   company?

24   A    That's correct.  That's correct.  And, I think that was

25   confirmed by the -- the bankers as well.

1    Q    All right.  And, -- so, walk us through the next step.

2    You've engaged CIT Capital to attempt to locate additional

3    financing.  Tell us what happened through that process.

4    A    We engaged CIT Capital, and they were not able to locate

5    anyone that was interested in providing any additional

6    financing, even with equity kickers and other kinds of things,

7    that there was just nobody that was interested in light of the

8    rapidly deteriorating economic performance of the company.

9         And, the -- the fact that we were walking into a time

10   period in -- where performance would continue to deteriorate,

11   the economy didn't present a rosy outlook, and this was

12   combined with the fact that we were going to have increasing

13   borrowing needs.  And, folks didn't feel that they could --

14   were willing to lend to -- for a long enough time period and

15   fund enough to weather the storm.

16        So, we -- we had no luck with anybody that CIT was

17   able to present to us.  In fact, they couldn't -- they were not

18   able to get anybody to take any kind of real serious look.  We

19   did pursue a couple of sale lease back alternatives in light of

20   the fact that folks saw some M&E (phonetic) that they could

21   lend against in a sale lease back transaction.

22        Unfortunately, in most cases, when they looked at the

23   anticipated cash flow of the business, while we thought we were

24   going to attempt to -- we thought we were going to close

25   something before the year end, we were unable to.  And, in

1       fact, all those folks walked as well.  And, in terms of the

2       real estate sale lease back, there was not an opportunity to

3       get -- to develop enough cash that would make a difference.

4       The -- there was not an interest in -- from any perspectives to

5       do a sale lease back on the largest piece of real estate we

6       have, which is the Shapes and Delair buildings which happen to

7       fairly complicated from an environmental perspective.

8       Q    So, you had a situation -- you were confronted with a

9       situation at your end where CIT Capital was unable to find

10      additional financing for you, the sale lease back transactions

11      weren't bearing fruit for you, and your existing lender wasn't

12      prepared to further support the additional borrowing needs of

13      the company.  What did you do when faced with that -- that

14      situation?

15      A    What we did was, besides speaking with the CIT Bank Group

16      in terms of talking about any kind of flexibility that they

17      might have, we engaged Phoenix Capital.  Phoenix Capital is a

18      consulting firm that was going to help model our cash flow and

19      our cash flow needs to give us an everyone, quite frankly, a

20      better picture of -- you know, a picture beyond what we would

21      -- may have created on our own, a third party taking a look at

22      the picture and seeing if there was more -- if there was

23      something different that we should be exploring.

24      Q    And, were there sale opportunities that were considered

25      during this time period?

1    A     We -- we attempted, as we had always attempted, to explore

2    any possible sale alternatives.  Unfortunately, there was

3    nothing presented that would have presented -- would have

4    indicated any opportunity to even get the -- create an

5    opportunity to pay anything more than -- or even necessarily

6    achieve a successful result in paying off even the bank debt.

7          The bottom line was that most of the buyers look at

8    the cash flow needs and look at multiples of, you know, four to

9    five times earnings -- EBITDA levels on business like this.

10   And, that yielded a result that was far, far less than even our

11   secured debt.

12   Q     How was it and when was it that you were introduced to the

13   current plan funder?

14   A     We started talk about seven or eight weeks ago.  And, --

15   and, the interest was in talking -- you know, at some point

16   when we realized that any kind of financing was -- was not

17   available and that we needed somebody to -- to, in effect, work

18   with us to see if there was exit strategy that was best for all

19   parties involved and we began to convince the -- the ownership

20   group that there had --

21   Q     Of which you're a part of.

22   A     Of which I am a part of -- convince the ownership group

23   that there was nothing left for them to pursue, we began to

24   talk to -- try to talk to folks that were very interested in

25   dealing -- were experienced in the restructuring environment.

1    And, we began to talk to Versa both because of their experience

2    in this environment and, quite frankly, the fact that they were

3    local and willing to jump into a diligence effort on a very,

4    very expedited basis in light of the fact that we were running

5    out of cash rapidly.

6    Q     Okay.  And, walk us through what happened after the

7    initial discussions with Versa.

8    A     We continued to negotiate with Versa with an effort to --

9    just to gauge their interest.  They continued to pursue.  They

10   did extensive diligence and ultimately concluded that they were

11   willing to fund money into this business in a way that provided

12   both as a -- as a lender, but with the ultimate result that

13   they would be a plan we could confirm whereby the existing

14   ownership group would be gone and they would be the ultimate

15   owner of the business.

16   Q     And, can you describe in general terms -- and, we've

17   heard, I think, at least some of it today.  But, can you

18   describe in general terms the overall deal structure with --

19   with Versa?

20   A     Sure.  Well, we -- we went through an exercise to

21   determine -- well, immediately prior to this moment in time,

22   Versa became devel -- obtained the right -- the management

23   control of Shapes/Arch Holdings.

24         Having said -- beyond that, the negotiations began to

25   negotiate what the terms would be of the financing arrangement

1      and that they would provide -- would be a financing source

2      along with -- with the CIT Bank Group.  And, we always knew all

3      along that the CIT Bank Group had a desire to turn their

4      facility into a performing loan.  And, we're looking to Versa

5      to cover any cash needs beyond that.

6              So, we negotiated with both parties ultimately the

7      resolution to -- to have a facility that consisted of, in the

8      aggregate, an $85M facility, 60 of which would be a facility

9      from the existing bank group that would be, in effect, the

10     revolver as it exist -- as it previously existed, and the $25M

11     beyond that from Versa.  And, the -- obviously the revolver

12     would be secured by the inventory and AR primarily, and the

13     fixed assets would support the -- the Versa deal.

14     Q     And, in broad strokes, that's -- that's essentially the --

15     the transaction?

16     A     Correct.

17     Q     Now, in your own words, why -- why is it that you felt

18     this -- this transaction was in the best interests of the

19     creditor constituencies of these companies?

20     A     From our perspective, it was simple.  Once we -- once we

21     concluded, appropriately, so that there was nothing for the

22     ownership group, our goal was to focus on the creditors and --

23     and all the constituents, including our workforce.  So, our

24     number one goal was to keep the business in -- in operational

25     capacity.

1          If this business is not operating, the -- and

2     certainly liquidation value of this business is something that

3     professionals can -- can point to.  But, we're talking about a

4     business that, in a down economy, has equipment that has less

5     value than we would all like, as opposed to what this equipment

6     would have in value in an up economy when there's need for the

7     equipment.

8          We have a very challenging piece of real estate to

9     deal with in a liquidation mode.  And, obviously all of our --

10    the current assets in a liquidation mode would have their value

11    compromised.  We've accomplished a lot at the business over the

12    years, notwithstanding these challenging times and feel that we

13    have a pretty talented workforce that has created some

14    opportunities and would be hopeful that we can keep those folks

15    employed.

16         So, really our goal -- we concluded that the number

17    one priority was to save a thousand jobs and to keep everybody

18    working towards something that could realize the best value,

19    and that was clearly as an operating entity.  And, quite

20    frankly, this was the only financing alternatives that we --

21    that we were able to bring to the table.

22    Q    Do you or any other member of management have any

23    agreements in place for future employment with the plan funder?

24    A    None whatsoever, as much as we've -- would love to, I

25    guess.  The fact of life is the goal here was to deal with the

1    -- the constituents involved.  We've seen in the plan -- you

2    know, in reviewing the plan and talking about the plan, there's

3    some concept of some kind of management incentives at some date

4    in the future.  We haven't discussed it at all, nor has it been

5    a -- a principle concern.  Our only assumption is that, as we

6    emerge from the bankruptcy, we will be paid market competitive

7    rates with market competitive incentives, but it hasn't been

8    discussed to date.

9    Q    Okay.  And, as far as you're aware, none of the debtors or

10   the insiders have any interest in the plan funder?

11   A    No.  No.  In fact, the -- I guess the only thing that

12   folks have is a chance to co-invest if they'd like.  But, other

13   than that, there's been -- there's no -- no relationship.

14   Q    All right.  Okay.  Let's -- let's talk about the -- the

15   wages and benefits.  Were you in the courtroom earlier today

16   when the Court expressed some concerns over the -- the wage and

17   benefit motion?

18   A    Yes.

19   Q    Okay.  Now, the benefits -- let's try to get a better

20   understanding of -- of what's -- what we're looking at in terms

21   of pre-petition wages and benefits.  Do you have an

22   understanding of what -- of the extent of the benefits that the

23   debtors are looking to have honored or paid post-petition that

24   would be a pre-petition claim?

25   A    I think the preponderance of the benefits they were

1      talking about is accrued vacation and sick time.  My -- at this

2      moment in time, the principle benefit we offer above and beyond

3      vacation and sick time is health insurance.  And, our health

4      insurance for the union per -- the non-union personnel is

5      actually paid through the month of March.  For our union

6      personnel, I think there's been some discussion as to whether

7      there needs to be some payment for those benefits, although we

8      are in arrears in payment on account of those benefits.

9               I think, with respect to this -- the motion at hand,

10     it largely relates to just employees that are non-union.  So,

11     my understanding is that what we're speaking to is -- for the

12     pre-petition wages and benefits, we're speaking to largely

13     wages for -- the pre-petition wages that have accrued and

14     haven't been paid, plus, more significantly, in terms of dollar

15     amount, is accrued vacation time.

16     Q    And, as we indicated this morning, there are about 15

17     individuals where, when you add the accrued vacation and the

18     wages, they would be entitled to an amount in excess of

19     $10,950, is that correct?

20     A    Correct.

21     Q    And, how would you break down those individuals in terms

22     of whether they're management or non-management individuals?

23     A    Most of the individuals are largely management and -- you

24     know, based on their level of pay, the more senior management

25     -- managers that we have.  It doesn't mean that they're

Case 08-14631-GMB   Doc 88   Filed 04/01/08   Entered 04/01/08 15:15:54   Desc Main
Document   Page 79 of 154
Grabelle - Direct (Fel)

79

1    strictly, I would say, executives in nature.  It could be that,

2    you know, there are individuals that are, you know, reasonably

3    highly compensated, sales professionals, as well as reasonably

4    high comp -- highly compensated engineers, types like that.

5         So, these are individuals that are highly critical to

6    our business and, quite frankly, individuals that we've

7    managed, in these distressed times, to keep with our

8    organization, but not without its challenges, individuals that

9    have not received bonuses, raises, and certainly anything extra

10   for an extended period of time.  And, it's our hope that all

11   these individuals have the opportunity to at least maintain the

12   current benefits and current pay like they have in the past,

13   because I think they were on relatively precarious ground.

14        And, it's the last thing we want to lose, for

15   example, in this moment in time, is folks that are critical to

16   us generating sales, for example, critical to running our

17   business, and critical to keeping the business physically

18   operating.  And, that -- the senior maintenance people, for

19   example.  That's pretty important.

20        So, from our perspective, it's very important that

21   these folks see business as usual.  You know, my sense is that

22   there's not an issue -- that wage level is not a problem in

23   terms of getting them paid that wage, and the main issue is

24   dealing with this vacation accrual.

25        I will tell you that we've asked people to forego

1    lots of vacation in light of the efforts we've been putting

2    forth in recent months.  And, people do tend to scheduled

3    vacations around some level of convenience for the company, and

4    we appreciate them doing that.

5           I would also tell you that it is very, very rare, if

6    ever, that we allow people to take more than one week of

7    vacation at any given point in time.  So that, typically,

8    there's not a situation where people are going to get a -- sort

9    of a -- you know, a run on vacation pay in the near future.

10   Q    And, it is not your intent, through the motion, to cash

11   out vacation time to folks that are being terminated from the

12   company?

13   A    That's correct.

14   Q    And, with respect to the 15 individuals that would be

15   entitled to an amount in excess of the statutory cap, are those

16   folks -- I think you've described them all as critical.  But, I

17   just want to confirm that -- picking up on a comment by the

18   United States Trustee -- that all of these folks are indeed

19   full time employees and do fall within your characterization of

20   a critical employee.

21   A    Oh, absolutely.  Absolutely.

22           MR. FELGER:  That's all I have for this witness.

23           THE COURT:  Anybody else?

24           MR. PATTERSON:  Your Honor, just a few, if I may?

25                          CROSS-EXAMINATION

1      BY MR. PATTERSON:

2      Q     Good afternoon, Mr. Grabell.  Just a question or two, if I

3      may, to follow up.  You mentioned -- you spoke in terms of CIT

4      having a performing loan in terms of what its desire was.  Did

5      you mean by that essentially that CIT said they want to have a

6      borrowing base, inventory, and accounts receivable, the

7      standard asset based lending type of loan available to the

8      company?

9      A     That's correct.

10     Q     But, they were not to prepared to extend credit above and

11     beyond --

12     A     That's correct.

13     Q     -- that amount.  Okay.  And, would it be a fair statement

14     to say -- and, certainly I understood from your testimony that,

15     at this point in time, the company's biggest need is liquidity.

16     And, it's liquidity that is not available solely under the CIT

17     facility, is that correct?

18     A     That's correct.  And, without that liquidity, we -- we

19     can't operate after we walk out of this courtroom.

20     Q     Okay.  Thank you.

21              MR. SHAPIRO:  Your Honor, just -- just two questions.

22                            CROSS-EXAMINATION

23     BY MR. SHAPIRO:

24     Q     Prior to March 16th, you referenced the fact that you and

25     the other members of Ben were the managers of all of the

1    debtors, correct?

2    A    Correct.

3    Q    Correct.  And, I'm assuming you can confirm that, during

4    that time period and during the time of the negotiations of

5    both DIP facilities, you remained the managers and it was not

6    Versa or anybody else in there?

7    A    That's absolutely correct.  I mean, the -- the --

8    obviously the exiting ownership group which had control of

9    appointing the managers were not prepared to do anything until

10   such time as they thought that there was truly a -- a deal to

11   be had which kept the business alive.

12   Q    And, in fact, they didn't resign in that position until

13   immediately prior to the bankruptcy, correct?

14   A    Absolutely correct.

15   Q    Thank you.

16        THE COURT:  Anything else?  Anybody else?  Mr.

17   Grabell, so the plan that's been filed -- I haven't reviewed it

18   in detail.  What would -- who would own the restructured debtor

19   when -- when and if that plan is approved?

20        MR. GRABELL:  It would be a -- a Versa affiliate.

21        THE COURT:  Okay.  So, the owners now would have no

22   ownership anymore?

23        MR. GRABELL:  Correct.

24        THE COURT:  Any other questions?  Anybody else?

25   Thank you, Mr. Grabell.

1        MR. GRABELL:  Thank you.

2        THE COURT:  All right.  I need to take a short break.

3   I guess my question is do you want me just to take -- I need

4   probably a half hour, but I could take, like, an hour.  And,

5   then that would give you time to have lunch or discuss things

6   or whatever, and then we could finish up.

7        MR. FELGER:  It would probably make sense to take the

8   hour.

9        THE COURT:  Okay.  Do you want to come back at 1:15,

10  1:30 -- what do you --

11       MR. FELGER:  1:30?  Mr. Shapiro wants 1:30.

12       THE COURT:  Okay.  He wants a chance to get the full

13  meal.  Oh, Mr. Sponder, --

14       MR. SPONDER:  Yes.

15       THE COURT:  -- we'll get in touch with you -- call

16  you when we start the hearing.

17       MR. SPONDER:  Thank you, Your Honor.

18       THE COURT:  Thank you.

19          (Recess from 12:15 p.m. until 1:44 p.m.)

20       THE COURT:  Please be seated.  Mr. Sponder?

21       MR. SPONDER:  Yes.

22       THE COURT:  Yes, you're on again in the courtroom.

23       MR. SPONDER:  Thank you.

24       THE COURT:  I was delayed a little bit.  I'm trying

25  to check with the Clerk's Office with regard to the noticing

1    issue with the immediate notice and whether there's any problem

2    with having the noticing agent do that and somebody's supposed

3    to get back to me.  So hopefully, I'll have an answer to you

4    before we finish today.

5         MR. FELGER:  Terrific.  Okay, Your Honor, we're

6    prepared to call our next witness, if that's how you'd like to

7    proceed.

8         THE COURT:  That would be fine.

9         MR. FELGER:  I call Vince Collistra.

10        VINCENT COLLISTRA, DEBTOR'S WITNESS, SWORN

11        COURTROOM DEPUTY:  Please state your name for the

12   record and spell your last name.

13        THE WITNESS:  Vincent Collistra, C-O-L-L-I-S-T-R-A.

14                     DIRECT EXAMINATION

15   BY MR. FELGER:

16   Q   Good afternoon, Mr. Collistra.  With whom are you employed?

17   A   Phoenix Management Services, Inc.

18   Q   And how long have you been with the firm?

19   A   11-and-a-half years.

20   Q   Okay.  And what did you do before joining Phoenix?

21   A   I was a commercial banker, an investment banker and I was

22   on the corporate side for five years as a CEO and a CFO.

23   Q   Okay.  And were you involved in restructuring at that

24   point?

25   A   Primarily restructurings and LBOs.

1    Q    Okay.  And what is it that you do for Phoenix?

2    A    I am one of five shareholders with the firm.  We have 25

3    employees in total.  We have offices in Boston, Providence, New

4    York, Chadds Ford, Atlanta and Ft. Lauderdale.  I'm involved

5    with the restructurings and turnaround and I also run our

6    firm's Investment Banking Division, which is Phoenix Capital

7    Resources.

8    Q    And have you been involved in the restructuring and

9    investment banking side for all of the 12 years you've been

10   with Phoenix?

11   A    All -- yes.  Either it's been a restructuring, a

12   turnaround, or an investment banking situation, in many

13   situations in the context of a bankruptcy.

14   Q    And have you -- just in terms of order of magnitude, how

15   many other situations like the one we're presented with today

16   have you been involved in over those 12 years?

17   A    Well, our firm's done over 800 cases and I've probably been

18   involved with over 50 cases in the 11 years that I've been with

19   Phoenix.  Some of the bankruptcies I've been involved with have

20   lasted a year to a year-and-a-half and I was involved with four

21   of those.

22   Q    When was Phoenix first retained by the debtors?

23   A    On my birthday, January 15th --

24   Q    Happy birthday.

25   A    -- 2008.

1    Q    And what was it that Phoenix was retained to do at that

2    point?

3    A    We were brought in and hired by the company and the scope

4    of our engagement was to perform an analysis on the 13-week

5    cash flow, determine what the company's needs were relative to

6    the next 13 weeks, and also, look at the viability of the

7    business and determine what the company's options were at that

8    point.

9    Q    Okay.  And so that was your charge.  What is it that you in

10   fact did when you arrived on the scene?

11   A    Well, we quickly determined that the company was made up of

12   four separate entities, which required us to develop and put

13   together four separate cash flows.  It was a little more than

14   what we had counted on but clearly, there were -- we determined

15   very quickly that there were four distinct business so we

16   developed the cash flows, rolled those four cash -- individual

17   cash flows into one consolidated cash flow, rolled it through

18   the borrowing base that was in place at that time with the CIT

19   Bank Group and come up with a report as to where the company

20   was and where the company was going in the next 13 weeks.

21   Q    So did you -- did you in fact prepare a 13-week cash flow

22   model?

23   A    We did.

24   Q    And is that sort of the standard in the industry, a 13-week

25   --

1   A   Yes.

2   Q   -- cash flow?

3   A   Okay.  And it looked at the company's receipts,

4   disbursements based on historical data and based on the

5   company's best estimate of where they were in the business

6   cycle right now.

7   Q   And what did you learn about the company after -- or during

8   the process and after completing your 13-week model?

9   A   Well, the 13-week model showed that the company was going

10   to be out of formula with their current borrowing relationship

11   to the tune of approximately $7-and-a-half million, over and

12   above the traditional borrowing base, based on a formula

13   against receivables and inventory.

14   Q   So over that 13-week period, they were going to get to 7.4

15   out of formula.  Where were they at the time?

16   A   Approximately $2-and-a-half million.

17   Q   Did you have discussions with the bank group about the

18   debtor's situation at that time?

19   A   At the end of the four weeks, which was what our initial

20   scope was, we made a presentation to the management of the

21   company and to the owners and then we made a presentation to

22   the bank group on a Friday.

23   Q   This out of formula situation, is that what's referred to

24   as the PP and E equity borrowing base component?

25   A   That is correct.

1   Q    Okay.  And so the PP and E equity borrowing base component

2   was slated to go to $7.4 million during this --

3   A    Let me --

4   Q    -- 13-week period, is that correct?

5   A    -- yeah, let me just explain it because it's confusing,

6   Your Honor.  The bank's financing arrangement at the time when

7   we got there was a traditional revolver, based on receivables

8   and inventory.  The company needed additional cash over and

9   above that formula so the banks provided them with the $3

10   million property, plant -- PP and E borrowing component and the

11   collateral for that was based on the fixed assets.

12          They also had a term loan -- an amortizing term loan

13   which currently is $8.3 million.  Now, most asset based

14   lenders, in their revolver, they only want it to be against the

15   current assets, the receivables and inventory.  But given the

16   company's need for cash, the banks advanced a $3 million

17   facility within their revolver, based on the excess collateral

18   with the fixed assets.

19          So, at the time when we got there, that was a $3

20   million facility.  It was a temporary facility.  And based on

21   our cash flow analysis, we showed that that number was going to

22   go to $7-and-a-half million, at which point -- at which point

23   the banks, based on that meeting, said the company would have

24   to do something else because they weren't prepared to fund up

25   to the $7-and-a-half million.

1    Q    So just to be clear, the bank group indicated that they

2    weren't prepared to increase the PP and E equity borrowing base

3    component from 3 million to the $7.4 million the debtors would

4    need to get through the 13-week period.

5    A    That is correct.

6    Q    Okay.  And what time frame was this that you made this

7    presentation and -- and that you made this presentation to the

8    bank group and the debtors?

9    A    It was the second week of February.

10   Q    Mr. Collistra, have you prepared a 13 -- a revised 13-week

11   model in connection with this hearing today?

12   A    Yes, we have.

13          MR. FELGER:  May I approach the witness, Your Honor?

14   BY MR. FELGER:

15   Q    Mr. Collistra, I've handed you a document that's been

16   premarked as Debtor's Exhibit D-1.  Are you familiar with this

17   document?

18   A    Yes, I am.

19   Q    And what is this document?

20   A    This is a traditional 13-week cash flow projection.  It

21   starts out with total sales and then it shows the total cash

22   receipts projected for the business, basically collecting the

23   receivables that are on the books.  It shows the cash

24   disbursements basically to operate the business.

25   Q    Okay, let's stop there.  Did you prepare this 13-week

1    model?

2    A    Yes, I did, with some of my associates.

3    Q    Okay.  Now, does this model contemplate a closing of the

4    two proposed DIP facilities?

5    A    Yes, and -- yes.

6    Q    Why don't we take a moment to have you describe for the

7    Court the two DIP facilities, in general terms, that are

8    proposed through the debtor's motion today?

9    A    And, Mr. Felger, I think it would be helpful to discuss the

10   starting point of this cash flow before we get into the two DIP

11   models, because, Your Honor, I think that's where some of the

12   confusion was this morning.  If someone just looks at this,

13   they don't know how we got to that point and I'd like to, for

14   the Court, explain that and I think it will become a little

15   clearer as to the situation of the business.

16            THE COURT:   Thank you.

17            THE WITNESS:   I would refer everyone and the Court to

18   the number where it -- on the bottom where it says "DIP Term

19   Loan Facility, $25 million" and the opening balance of 15

20   million-four-eighty-nine.  I would then also refer to the

21   revolving -- revolver DIP borrowing base availability and DIP

22   revolver funding, which is 47-million-one-seventy-one, and I'd

23   like to explain how we got to that number.

24            That contemplated, Your Honor, that the two DIP

25   facilities that you're considering right now were approved and

1    funded.  So as we sit here today, unfortunately, the company

2    does not have a credit facility.  It expired on Monday.

3    Actually, it expired on Friday --

4              MR. FELGER:  Right.

5              THE WITNESS:  -- when we filed.  But at the time of

6    filing, Sunday night at 9:00, the bank had funded approximately

7    $50 million under their revolver.  $4.4 million of that was

8    under the property, plant and equipment borrowing base

9    component, supported by fixed assets so that the revolver of 50

10   million was supported by $46 million of receivables and

11   inventory based on a formula and $4.4 million, which the bank

12   had increased from 3 to 4.4 to "get us to the finish line."

13             And then there was an $8.3 million term loan so on

14   Sunday night, that's what the company currently had,

15   approximately $58.6 million from the CIT Banking Group.

16             THE COURT:  4.4 is part of the $50 million loan.

17             THE WITNESS:  That is correct.  But again, that part

18   is supported by fixed assets --

19             THE COURT:  Right.

20             THE WITNESS:  -- whereas the 46 million is supported

21   by the traditional revolver of receivables and inventory.  At

22   the time, what this deal contemplates is that on a going

23   forward basis -- and this was the essence of Mr. Shapiro's deal

24   that we referred -- that he referred to --

25             THE COURT:  And his pictures.

1        THE WITNESS:  And his pictures.  But so now I'm here

2   to explain the numbers behind the pictures.  What the deal

3   contemplated is that when we closed, the bank would fund up to

4   their formula, based on receivables and inventory.  So in the

5   industry, they would have what's referred to a conforming loan,

6   okay?  So and then that loan would go up and down based on

7   receivables going up and down and the inventory going up and

8   down.

9        It's the most favorable loan an asset lender likes to

10  make because it's based on the fixed -- on the current assets.

11  So that's where the bank contemplated being at within formula.

12  So now if you refer to this sheet here and you look at the

13  opening balance under the DIP revolver of 41 million-nine-

14  eighty-four, plus the LCs at the time we closed, the bank had

15  assets to support that loan, okay?

16       The balance, the 4.4 million, which I referred to

17  before, and their existing term loan of 8.3 million was then

18  contemplated to be funded by the Versa term loan.

19       THE COURT:  That would leave the debtors -- from what

20  your explanation is, they have a -- what would be their line,

21  the revolver line, 50 still?

22       THE WITNESS:  They are contemplating a $60 million

23  revolver, and Your Honor, that's important because the DIP loan

24  starts out at 41 million-nine-eighty-four --

25       THE COURT:  Right.

1          THE WITNESS:  -- do you see that number?  And if you

2    go to the end, under "Total DIP Revolver Funding," it gets to

3    53 million-five-eighty-seven.  Do you see that number?

4          MR. FELGER:  "Total DIP Funding Requirement" --

5          THE WITNESS:  "Total DIP" --

6          THE COURT:  Okay.

7          MR. FELGER:  -- under week 13.

8          THE WITNESS:  -- "Revolver Funding."

9          THE COURT:  Are you on the line with the opening

10   balance -- now you're on the dark line?

11         THE WITNESS:  That's correct.

12         MR. FELGER:  Correct.

13         THE COURT:  Okay.

14         THE WITNESS:  So during the 13 weeks, the bank's --

15   the Bank Group's revolver goes up approximately 11 to $12

16   million, and at the end of the 13 weeks, that's supported by an

17   increase of receivables and inventory.  So at the end of the 13

18   weeks, the bank has a conforming revolver.  Now, what makes

19   this deal work is the fact that Versa came in and said we will

20   provide a term loan which will fund essentially the company's

21   losses during the 13 weeks and the bankruptcy expenses during

22   the 13 weeks.

23         So in essence, at the time this deal is effectuated,

24   if the DIP is approved, we will then go from a position where

25   we had no availability under the CIT arrangement to having over

1       $10 million of availability under the Versa term loan,  and

2       they are committed to fund the shortfalls during the 13-week

3       period.  So in essence, the company obtained $10 million of

4       liquidity as a result of the Versa loan.

5               I'm sorry for the long explanation but I think it's

6       important to know where we're starting from with this position

7       because when we look at this and say what do you need this DIP

8       for, well, we needed the DIP Sunday night because we were out

9       of formula $4-and-a-half million and we were staring at a

10      situation where we needed another $7-and-half million over the

11      next 13 weeks and we needed to get that from someone or the

12      company would shut down.

13              THE COURT:  And but for this financing, the company

14      would shut down.  That's what you're saying.

15              THE WITNESS:  That's what I'm saying.  Particularly

16      now.

17              THE COURT:  And there are no alternatives to that.

18      You're also saying that --

19              THE WITNESS:  I --

20              THE COURT:  -- based on what you --

21              THE WITNESS:  -- I'm prepared to address that --

22              THE COURT:  Okay.

23              THE WITNESS:  -- through the questions --

24              MR. FELGER:  He's already answered six of my

25      questions and those were like the next eight.

1          THE COURT: He's making your job hard.

2          THE WITNESS: I'm sorry. I'm on a roll. I didn't

3     mean to. I'm sorry, Mr. Felger.

4          THE COURT: Let's flip to the next page.

5          THE WITNESS: So, Your Honor, I just wanted to get to

6     the starting point.

7          MR. FELGER: I lost my place.

8          THE WITNESS: I'm sorry.

9          MR. FELGER: Thank you, Mr. Collistra. But now I've

10    lost my place so bear with me a moment.

11         THE WITNESS: So I think we were now going to talk

12    about the facilities that we're asking for.

13    BY MR. FELGER:

14    Q  Let's talk about the budget a little more before we move to

15    alternatives.  The -- you've included certain disbursements

16    during each of the three weeks of the budgets.  Are these all

17    for post-petitions goods and services plus any pre-petition

18    services that are sought for approval through our first day

19    motions?

20    A    That is correct.

21    Q    Okay.  And in your view, what would happen if these

22    disbursements weren't made during this initial two to three

23    week period?

24    A    The company would shut down.  Management would have no

25    choice but to send the people home because there's no means to

1    pay them.

2    Q    But in terms of the expenses themselves, would you

3    characterize -- how would you characterize these obligations

4    that are being paid during those three --

5    A    They're essential and they're critical and they're at the

6    minimum of what the company needs to stay in existence to meet

7    the backlog of orders that's currently on the books.

8    Q    And in addition to the disbursements that you have slotted

9    for the first three weeks, are there also additional letters of

10   credit that would need to be issued during this period?

11   A    Yes.  We have projected that as Mr. Grabell mentioned

12   earlier, one of the companies, Ultra, imports all their goods

13   from China and as a result of perhaps owing a lot to these

14   people, some money pre-petition, we believe that we are going

15   to have to open up letters of credit to continue the flow of

16   goods coming in from China.  So we have budgeted $2-and-a-half

17   million in the first three weeks and in fact, an Evergreen

18   letter of credit of about $3 million throughout this 13-week

19   period.

20   Q    And being a turnaround professional for many years, you're

21   familiar with the concept of cash collateral, is that correct?

22   A    Yes, I am.

23   Q    And is it your view that the company couldn't survive over

24   this two to three week period through -- exclusively through

25   the use cash collateral?

1    A    They could not.

2    Q    As you understand the -- have you -- strike that.

3         Have you reviewed the debtor's DIP financing motion?

4    A    Yes, I have.

5    Q    Okay.  Are you familiar with the chart at the outset of

6    that motion that sets out the material terms of the DIP

7    financing agreements?

8    A    Yes, I am.

9    Q    Okay.  And as you understand the two DIP financing

10   arrangements, are the terms as set forth in the motion the

11   terms set forth in the agreements?

12   A    Yes.

13   Q    Okay.  Okay.  As the debtor's restructuring advisor, did

14   you attempt to submit proposals from other lenders to provide

15   financing on terms more advantageous to the debtors than the

16   terms of the CIT and Versa DIP agreements?

17   A    Yes, I did.

18   Q    Okay.  And when did you do this?

19   A    Over the last two and a half weeks.

20   Q    And how many -- how many lenders did you speak with?

21   A    Well, when I'm normally in this situation, I would go and

22   approach six or seven but given the current credit markets, I

23   discovered that there are a select group of banks that are

24   still offering DIP facilities, given the credit markets right

25   now.

1   Q   Okay.  And how would you describe the credit markets today?

2   A   The level of uncertainty and the instability, it is in a

3   situation that I've never witnessed it.  You can have a

4   commitment one day and it goes away the next.  People don't ask

5   about pricing anymore.  The key is just getting a deal approved

6   and that's a monumental task these days.

7   Q   So would you say it's a difficult setting for a borrower

8   these days?

9   A   That's putting it mildly, yes.

10   Q   Okay.  So the lenders that you did approach, were they

11   folks that you would characterize as regular participants in

12   the DIP financing market?

13   A   I would not only characterize them as normal participants

14   but one of the -- some of the few remaining participants in

15   this market right now.

16   Q   And walk us through what -- what you found as a result of

17   these calls with potential alternative lenders.

18   A   I approached probably the four largest lending institutions

19   that we have done business with in the past, ones that I have

20   experience in providing DIP facilities.  With regard to the

21   revolver, the $60 million revolver which is somewhat of an

22   attractive facility to a lender post-petition, it's one of the

23   more secure facilities, the pricing that I was told that I

24   could expect was Libor plus 2.75 to 4 -- 400.

25           And right now, the bank -- the CIT facility is

1    offering Libor plus 2 for prime plus a quarter.  Relative to

2    the fees associated with the revolver, most banks were in the

3    one-and-a-half to three points up front range.  Our revolver

4    from the CIT Group has not up front fee.  Every bank always has

5    admin fees and collateral fees ranging anywhere from a half-a-

6    point to a point.

7        In this case, our admin fee is 125,625 at closing and

8    our administrative fee is 40,000, 20,000 at closing.  So it

9    became quickly apparent that the pricing that we have on the

10   revolver is under market, clearly, and I defy anyone else to

11   try to go out there and get a facility that's cheaper.  Now,

12   that's a direct function of the fact of the Versa loan that

13   backs it up.

14       The other interesting think I found out from talking

15   to the banks was that none of them could -- and I've been in

16   situations where banks could turn on a dime and be in there and

17   give you a commitment within a week -- they all said within two

18   to three weeks we wouldn't even start.  Their credit -- their

19   credit process was increased, they're under additional

20   scrutiny, so not one said that they could step up and provide

21   the revolver in the period of time that we needed it, and if

22   they did, we were looking at considerably higher pricing.

23       Relative to the term loan, two out of the four banks

24   said they wouldn't even touch it.  The other two banks that I

25   talked to were essentially when I described the situation of

1     the company, which is while the term loan would be

2     collateralized by the fixed assets, I had no free cash flow to

3     support or to service that loan.  That turned off two of the

4     banks completely.

5           Their policy was they would not fund into a situation

6     where they couldn't show positive cash flow because our DIP

7     model basically shows that the term loan is funding the losses

8     for the next 13 weeks.  The banks that said well, if we got out

9     hands around the credit and we could talk to the revolver bank

10    and if we provided that, their pricing was more like Libor plus

11    four-and-a-half to five.  In this case, the pricing for the

12    term loan is prime plus six.

13          So, it's a little in the high range but basically

14    right there with what I was hearing from the other banks.  The

15    fees were two to three points on the term loan and in the case

16    of our term loan, it's one-and-a-half percent on the total

17    facility of $85 million.  The collateral fees and the agent

18    fees are 40,000 respectfully a month and that's about what the

19    market is charging now to monitor a company this size with the

20    collateral package that we have.  So I quickly concluded and

21    reported back to you that not only is this a competitive

22    package, it's under market right now, particularly for the

23    revolver.

24          And from a credit point of view and given the

25    company's credit situation as we stand now in a cash-negative

1       position, I think we'd have a hard time even if we had more

2       time to find another lender.   It really does someone like a

3       Versa that's looking longer term in the situation to come in

4       and really agree to give us this term loan, in my humble

5       opinion.

6       Q    So if we can summarize, it sounds like your efforts

7       resulted in the following.    There were certain folks that

8       wouldn't do it at all --

9       A    Correct.

10      Q    -- and there were folks who would do it but they would need

11      more time and overall, the interest and the fees would be

12      higher.

13      A    Correct.   And there was no guarantee that they would get to

14      the finish line, even if the two that said that they would come

15      in and look at it.

16      Q    So we've walked through the fact that the debtor can't

17      operate on cash collateral loan, correct?

18      A    Correct.

19      Q    And that you've explored the market place to find better

20      financing --

21      A    Better or alternative financing.

22      Q    -- and you couldn't find financing on better terms.

23      A    Correct.

24      Q    Are there any other options available to the debtor at this

25      point to fund its operations?

1    A    Given the situation we're currently in where our credit

2    facility had expired Sunday night, no.

3    Q    And if these -- if these facilities are not approved today,

4    what is your view as to -- or what would you recommend to the

5    debtor as to what it ought to do in light of the fact that it

6    wouldn't have financing?

7    A    Well, as you know, I'd be obligated to advise management

8    that they have a high degree of liability associated with

9    allowing employees to come in tomorrow without a means for

10   paying them.  So, I think they'd have no choice but to call the

11   office this afternoon and tell everyone not to come in

12   tomorrow.

13   Q    So you'd have a situation where the business would be shut

14   down, employees would be -- at least temporarily put out of

15   work and did you have a view as to what would happen upon a

16   liquidation of these companies?

17   A    We've started out preliminary analysis on a liquidation

18   analysis and in our preliminary analysis, we believe that the

19   senior lender doesn't even get out at a hundred cents on the

20   dollar at this point.

21   Q    Okay.

22          MR. FELGER:  I have no further questions.

23          THE COURT:  Before we go to other questions by

24   others, Mr. Collistra, did you -- it's been represented that

25   although this is the interim financing, that ultimately there's

Colloquy

1    going to be financing that's going to take the debtor through

2    confirmation.   That's what's being proposed here.   Are you

3    familiar with that?

4              THE WITNESS:  Yes, I am.

5              THE COURT:  All right.   Without going into a lot of

6    detail about that, because I'm not here to approve that, how do

7    you see getting from here to there based on this?   I guess what

8    I'm saying is that you've already painted the bleak picture and

9    I understand what you're saying, so from the Court's view, this

10   has to view -- if this is approved, how it benefits the estate,

11   how it benefits the creditors and so on.   So --

12             THE WITNESS:   I understand.

13             THE COURT:   -- in my mind, I'm looking at do we get

14   to the end and how do we do that.   Does this have -- without

15   any guarantees on your part, do you see this as being able to

16   make it to that point by virtue of the financing that's been

17   proposed here?

18             THE WITNESS:  Let me answer that, Your Honor.   I feel

19   very comfortable with the numbers here.   These are conservative

20   estimates for this 13-week period.   You always have to factor

21   in the effects of bankruptcy on a business and we've done that

22   numerous times.   Given historical numbers that we looked at and

23   where the company performed this time last year and the year

24   before, we believe these numbers are attainable.

25             What's interesting here is, as my Italian grandmother

1   would say, you push in a button and you see what the end result

2   is.  And this result showed that the term loan is drawn down by

3   about $20 million.  Their commitment is for $25 million.  That

4   leaves a cushion of $5 million for -- to take care of the case,

5   all of the issues.

6          It's not a rich case by any stretch of the

7   imagination but it gets you to the finish line and shows that

8   there is enough financing under Versa's $25 million commitment

9   and the commitment on the part of the revolver bank to keep it

10  -- to keep in a revolver, so the financing's in place and

11  that's somewhat unique when you file day one.

12         We already have the emergence financing lined up so

13  it's in everybody's best interest to make this a quick case and

14  not let it drag on because -- you know, there will be more

15  professional fees and -- you know, we have factored in a level

16  of professional fees for an intense 13 weeks.  So but given

17  what we have here, we believe this is a real formula for an

18  emergence and a company to emerge versus already committed to

19  capitalize the business as it emerges.  They've got CIT

20  committed to do the revolver.  Those things are somewhat unique

21  on the first day.

22         THE COURT:  Did you have an opportunity in the rest

23  of your analysis to also look at the debtor's business

24  operations?  Is the debtor generating business that you believe

25  will support the numbers that are here and as you said, this is

1    a time when the debtor has to draw down in its loans for future

2    income that's going to be coming.  Do you see that from what

3    you --

4                THE WITNESS:  Yes, and let me speak to that.  Every

5    year that we looked at the past three or four years, the

6    company is able to obtain an additional facility under the

7    revolver for just this period to cover the seasonality.  And

8    over the last three and four years, that then comes down in

9    July, August, September and October when they start collecting

10   money, particularly on the pool side, on the fence side and on

11   the vinyl window side.

12               That's their season.  So they're generating cash, at

13   least historically, the next three months after this 13-week

14   period.  When Versa looked at this investment, they looked at

15   not just the snapshot of 13 weeks, clearly they looked at what

16   does it take to get me out of the case, but what has this

17   company done for the whole 12 months.  This is a long term

18   deal.  This isn't just a loan for 13 weeks and over time, this

19   could be a very good investment for them, in our opinion.  But

20   right now, their ability to move quickly, they've done tons of

21   due diligence.

22               They've been in there for four weeks and have spent

23   an awful lot of money to get to this point to make this

24   decision to provide $25 million and it's somewhat unique to

25   have the term loan cover the losses and bankruptcy expenses.

1    So, it's a somewhat unique transaction that I think bodes well

2    for the company emerging.

3              THE COURT:  Mr. Felger, anything else that my

4    questions --

5              MR. FELGER:  I think Mr. Collistra covered it.

6              THE COURT:  Anybody else?

7              MR. PATTERSON:  Just a few, Your Honor, if I may.

8              THE COURT:  Sure.

9                        CROSS EXAMINATION

10   BY MR. PATTERSON:

11   Q   Mr. Collistra, just to square off a couple of points if we

12   can, you talked about when you started to work at the company

13   in the middle of February and you mentioned there was a $3

14   million PP and E equity borrowing base component in place,

15   correct?

16   A   Correct.

17   Q   And that was ultimately increased by the CIT Group of

18   lenders to 4.4 million during that time period?

19   A   That is correct.

20   Q   And was part of the reason that was done to allow the

21   company some additional time to operate while they could try to

22   find other financing alternatives?

23   A   That is absolutely correct.

24   Q   All right.  And then you explained what you did to try to

25   find the alternatives during that time period.  Also, you

1    mentioned that as of the close of business I guess Friday or

2    Sunday, whichever day you wanted to pick there, that the

3    company did not have a credit facility and just for purposes of

4    being clear with the Judge and clear with the record, actually,

5    isn't it more correct to say that at the close of business on

6    Friday the 4.4 million property, plant and equipment borrowing

7    base collateral component was no longer available so that while

8    technically the company did still have a facility, you had no

9    ability to borrow?

10   A    Well, stated another way, they were in default because the

11   $4.4 million facility -- special facility expired under --

12   Q    It went away.

13   A    -- the fifteenth amendment so it went away.

14   Q    So --

15   A    So absent getting something to replace that, we were 4.4

16   million out of formula and in default.

17   Q    Right.

18   A    That's correct.

19   Q    And no borrowing availability based on inventory and

20   receivables --

21   A    That's correct.

22   Q    -- which is what's being proposed for the Court's approval

23   today?

24   A    That is correct.

25   Q    You also mentioned that during the first couple of weeks

1    there will be a need for approximately $2-and-a-half million in

2    documentary letters of credit?

3    A    That is correct.

4    Q    And obviously, that you don't have without a DIP revolver

5    facility, correct?

6    A    Correct.

7    Q    In terms of the CIT deal, very briefly, Mr. Collistra, is

8    it correct for me to state that the Libor pricing that is being

9    offered which is Libor plus 200 basis points is not a current

10   option in the CIT agreement?  Isn't is correct to say that it's

11   only prime plus a quarter and the Libor has been added back?

12   A    That is correct, during the DIP, which is unusual because

13   usually it's taken away.

14   Q    Okay.  And is it also correct to state that in terms of the

15   DIP facility agreement that was ultimately negotiated there was

16   financial covenants including a fixed-charged coverage ratio

17   that the company was in default of that had been removed as

18   financial covenants in the DIP facility agreement?

19   A    That is correct.  As stated, it's a very attractive

20   facility.

21                  MR. PATTERSON:  Nothing else, Your Honor.  Thank you.

22                  THE COURT:  Mr. Shapiro?

23                          CROSS-EXAMINATION

24   BY MR. SHAPIRO:

25   Q    I just have one question.  Based on your discussions with

1   CIT and the Arcus Versa people, is it your understanding that

2   the accommodations that CIT made on their financing are a

3   direct and sole result of the Arcus term loan being made

4   available?

5   A   Absolutely.

6   Q   And so without that term loan, they would not have this

7   generous, below-market pricing, correct?

8   A   It's clear the two are tied.

9   Q   Thank you.

10          MR. SHAPIRO:  Sorry.

11          MR. FELGER:  He's got me doing it, Your Honor.  I'm

12   sorry.

13          THE COURT:  He's a very -- I don't know what --

14   artistic lawyer, I guess that's what I would say.  He's got his

15   PowerPoint and everything going.  Anything else, Mr. Felger?

16          MR. FELGER:  No, that's it, Your Honor.

17          THE COURT:  Thank you, sir, you may step down.

18          THE WITNESS:  Thank you, Your Honor.

19          (Witness excused.)

20          THE COURT:  Mr. Felger -- I have one question that

21   maybe Mr. Shapiro can answer.  You go back and forth with Arcus

22   Versa.  What is the I guess relationship?  Is Arcus just a

23   funding agent for Versa?  Is that -- is it separate companies?

24          MR. SHAPIRO:  Yeah, these are affiliates of -- Versa

25   is the entity that's most known to people that makes

1    investments in companies.  They have formed the Arcus entities,

2    which are on your four pages, Your Honor, and you have Arcus

3    ASI, Inc., which is the manager, and then you have the Arcus

4    Funding entity, which is going to provide the 25 million.

5              And then if you look at the plan, actually, Your

6    Honor, the plan funder is yet a third Arcus entity that's going

7    to be hopefully, with the Court's permission and we get there,

8    old equity will be wiped out and then new equity will be issued

9    to the new Arcus in consideration for the equity infusion and

10   the DIP loan, which will be turned into the exit loan

11   simultaneously with the CIT exit loan.

12             THE COURT:  Thank you.

13             MR. SHAPIRO:  So we're requesting today for the liens

14   to be granted to the Arcus entity and not Versa.

15             MR. FELGER:  That's all we have, Your Honor, in terms

16   of testimony in support of motions.  Unless Your Honor would

17   like to proceed otherwise, perhaps we could go back through the

18   motions that had open issues.

19             THE COURT:  Okay.

20             MR. FELGER:  Perhaps work backwards this time.

21             THE COURT:  Whatever you would like.  What do you

22   want to start with?

23             MR. FELGER:  Starting with number 11, the issue Your

24   Honor raised with reclamation, I think our thought would be to

25   add a line to the order that provides that nothing contained in

1      the order would affect parties' rights under 546 of the

2      Bankruptcy Code.  It seems to us that probably covers Your

3      Honor's issue.

4              THE COURT:  Any objection, Mr. Sponder?

5              MR. SPONDER:  No, Your Honor.

6              THE COURT:  All right.  And can I -- did you want me

7      to add that language or did you want to submit an order that

8      had that language?

9              MR. FELGER:  I'm easy, Your Honor, whatever is more -

10     - whatever is easy -- whatever's easier for you.

11             THE COURT:  Let me see if I can just do that without

12     -- can you print out the order?  Do you have the order there,

13     Mr. Felger, so you can tell me where you want this to be

14     inserted?

15             MR. FELGER:  Sure.  Probably a new paragraph five.

16             THE COURT:  Okay.  And the language would be?

17             MR. FELGER:  "Nothing contained herein shall affect

18     parties' rights under Section 546 of the Bankruptcy Code."

19             THE COURT:  Affect party's rights under --

20             MR. FELGER:  -- under Section 546 of the Bankruptcy

21     Code.

22             THE COURT:  Any objection, Mr. Sponder?

23             MR. SPONDER:  No, Your Honor, that's fine.

24             THE COURT:  Okay.  We can probably do that.  So that

25     takes care of number 11 and that can be granted with that

1        change.

2                MR. FELGER:  I think Your Honor already granted

3        number ten --

4                THE COURT:  Yes.

5                MR. FELGER:  -- so number nine is the bar date motion

6        and we had suggested a May 12th bar date, which if the expected

7        track stays on track would be about three weeks before

8        confirmation and it seems to me we'd have -- we have some

9        flexibility to perhaps move that out a few days but I don't

10       know if I'd want it to go into the following week if we can

11       avoid it because then we're getting close to where we think --

12               THE COURT:  Well --

13               MR. FELGER:  -- you know, ballots would be due

14       and --

15               THE COURT:  -- it was Mr. Patterson's concern, I

16       believe, about the timing for objecting --

17               MR. PATTERSON:  It was, Your Honor, yeah.  As we

18       looked at the time frames here I suggested that in terms of any

19       investigation period, I thought we ought to have a period of

20       five days before we were entitled to cast our vote to know

21       whether or not someone was objecting to our claim.  We

22       obviously don't expect any but if there is an objection, it

23       might change the way we look at the plan.

24               THE COURT:  Well, did you figure out how long 45 days

25       is on there or 60 days so we can --

1          MR. FELGER:  I think it depends on when the committee

2     is formed.  If the committee is formed -- I don't know if the

3     U.S. Trustee --

4          THE COURT:  Well, it's 45 days when the committee is

5     formed and 60 days --

6          MR. FELGER:  So that's mid -- mid-May.

7          MR. PATTERSON:  For filing of the case.

8          THE COURT:  -- there's no committee.

9          MR. PATTERSON:  Yeah.

10          MR. FELGER:  45 days would be mid -- assuming the

11     committee is formed at the end of next week, you're looking at

12     April --

13          THE COURT:  Mr. Sponder, do you have any idea when

14     you're going to set up a meeting to consider a committee?

15          MR. SPONDER:  I can assure you, as soon as possible,

16     Your Honor.

17          THE COURT:  I know that but can you --

18          MR. SPONDER:  I can't -- I can't give you a definite.

19     We did get the filings, reviewing the top 20 to get the

20     solicitation out and what not.  I don't have a set date as of

21     now, right now, but I have my staff working on one.

22          THE COURT:  Would you think by the beginning of next

23     week?

24          MR. SPONDER:  That I would have the meeting or that I

25     would know?

1          THE COURT:  Well, either.

2          MR. SPONDER:  I would know -- I definitely would hope

3    to know by the end of this week what that date is.

4          THE COURT:  All right.  Well, if you know by the end

5    of the week, I mean, would you anticipate it would be something

6    next week then?  Is that what you're --

7          MR. SPONDER:  I don't know.  I can't say for sure

8    when --

9          THE COURT:  I'm not trying to pin you down.  I'm just

10   trying to --

11         MR. SPONDER:  -- other people's schedules.

12         THE COURT:  Okay.

13         MR. SPONDER:  That's what we're hoping for.

14         THE COURT:  Okay.  That's all I asked.

15         MR. FELGER:  So if we assume the end of March -- the

16   end of March we have a committee formed and 45 days would put

17   it at May 15th, which is probably the date I would have

18   suggested for bar date if we're going to push it at all from

19   the 12th.

20         THE COURT:  Could that work?

21         MR. PATTERSON:  That sounds like we would be okay in

22   terms of at least five days before.  We would have to vote --

23         MR. FELGER:  Probably, probably.

24         THE COURT:  You know what, Mr. Patterson, if

25   something comes up at the end of -- you know, you get close to

1    the end of the time and the committee says well, you know what,

2    we've got a problem with this, then contact the Court and we'll

3    try to work with maybe an extension of your time or something

4    like that.

5          MR. PATTERSON:  Okay.  That's --

6          THE COURT:  That's -- I mean, we're anticipating what

7    might happen.  I mean, if there's a problem with the issues

8    that the committee has, I'm sure you're going to hear about it

9    before the end of May -- I mean the middle of May, I would

10   think.

11         MR. PATTERSON:  I would think so too, Your Honor.  I

12   would think so too.

13         THE COURT:  So --

14         MR. PATTERSON:  I guess the other way -- I'm sorry.

15         THE COURT:  -- and what I'm saying is if that becomes

16   an issue that this is still -- you know, unclear and you're

17   near your -- the time for your -- that you have to vote on the

18   plan or file an objection or something, then either you'll file

19   an objection with alternatives to make the time that these are

20   your issues and subject to whatever rights you want to reserve

21   or you'll contact the Court and we'll see about possibly an

22   extension of time for that one objection to be filed later

23   because of these other circumstances.

24         MR. PATTERSON:  That's fine.  The other alternative

25   that occurred to me, Your Honor, is if by the time a final

1      order hopefully is entered approving the financing, if we know

2      when the committee has in fact been formed, the dates will

3      become more clear and perhaps if we need to adjust it in that

4      order, we could do it. So, I think we have a couple of ways to

5      do it.

6              THE COURT: All right. Do you want to make it the

7      15th of May? That gives a little more --

8              MR. PATTERSON: Okay.

9              THE COURT: -- rather than the 12th? It goes from

10     Monday to Thursday. Mr. Felger suggested that and that I think

11     makes it more likely that they'll be less of a problem, those

12     couple of days, and then we'll see what happens once we get

13     back to our final hearings and hopefully, a committee's formed

14     by that point and the committee can have input on what we need

15     to do at that point.

16             MR. FELGER: They'll hit the ground running because I

17     have a UCC search that I will hand them when they're formed.

18             THE COURT: All right, let's say we'll put a bar date

19     of I think we want to put May 15th of that.

20             MR. SPONDER: Your Honor, and how soon does notice

21     have to go out? I'd like to -- you know, the secured creditors

22     to definitely get as much time as they -- as they need here --

23             THE COURT: When did --

24             MR. SPONDER: -- as this time is being reduced.

25             THE COURT: Thank you, Mr. Sponder.

1          What time did you anticipate to have that out, Mr.

2     Felger?

3          MR. FELGER:  Yeah, it's -- unfortunately, I don't

4     have a hard answer from Epiq.  There's certainly a very

5     extensive list of creditors and potential creditors out there.

6     I think it's in excess of 10,000 folks.  I know they're in the

7     process of uploading all of the names so I'm hopeful it will

8     get out by Friday but we may want to build in a little cushion

9     and give us until Monday to get out the bar date notice.

10          THE COURT:  How's that, Mr. Sponder?

11          MR. SPONDER:  Although I'd like it sooner, I

12     understand 10,000 creditors and -- you know, that's the best he

13     can do --

14          THE COURT:  Well, let's --

15          MR. SPONDER:  -- that's the best he can do.

16          THE COURT:  -- let's suggest that when Mr. Felger

17     contacts Epiq, he'll urge them to do it as quickly as possible

18     but let's say no later than Monday.

19          MR. FELGER:  Monday would still give us 52 days until

20     the bar date.

21          THE COURT:  So it will be 52 days until the bar date

22     and they may be able to get it out by the end of this week.

23          MR. FELGER:  I expect they will but I'd like to have

24     that -- the weekend cushion.

25          THE COURT:  All right, Mr. Sponder?  Is that --

1        MR. SPONDER:  Yes, Your Honor.

2        THE COURT:  All right.  So I'm not sure if there's

3   language -- is there language about service in the order?

4        MR. FELGER:  That's a good question, Your Honor.

5   We've also proposed the form of publication notice and the

6   outlets, the Inquirer and the Courier Post and the Wall Street

7   Journal -- we said that that will be within ten days of entry

8   of the order.

9        MR. SPONDER:  Paragraph two just states that the

10  notice of bar date shall be mailed to the Court --

11       MR. FELGER:  No later than five calendar days after

12  entry of this order, so I think that's Monday.  Well --

13       MR. SHAPIRO:  Sunday.

14       MR. FELGER:  -- that would be Sunday.

15       MR. SHAPIRO:  Okay, next business day.

16       MR. FELGER:  I would ask that that be six calendar

17  days rather than five calendar days.

18       THE COURT:  We'll change that to six calendar days.

19  Are we on number two?  At least five calendar days or we could

20  say five business -- no, it would be only four business days.

21  All right, any other problems with that, Mr. Sponder?

22       MR. SPONDER:  No, Your Honor.

23       THE COURT:  All right, then that should do that for

24  that order.  All right, I think we already dealt with Epiq's

25  appointment --

1          MR. FELGER:   Right.

2          THE COURT:   -- pension.

3          MR. FELGER:   And we had the sales and use taxes that

4    Your Honor had some hesitation about.   We didn't have any

5    testimony on those -- on that motion.   Our view -- the debtor's

6    view is again, that these monies are not the debtor's.   They're

7    not subject to the liens of the lenders.   The only thing delay

8    will do is cause interest and perhaps penalties to accrue on

9    trust fund obligations where you had officer exposure and it

10   just seems to us that the likelihood of the committee having

11   any issue with the payment of trust funds is highly remote.

12          THE COURT:   Mr. Sponder, any objection to that

13   motion?

14          MR. SPONDER:   We don't have an issue with that

15   motion, Your Honor.

16          THE COURT:   All right.   All right, I'm satisfied.

17   Now that I've heard more about the information about the

18   operation, about the financing and what's going to -- what the

19   debtor's proposing to do, I'm more comfortable.   So, I will

20   grant that motion.

21          MR. FELGER:   Thank you, Your Honor.

22          THE COURT:   I think we dealt with the utility

23   companies, right?

24          MR. FELGER:   Yes, we dealt with utilities.   Hopefully

25   we have -- the next one is -- working backwards again -- is the

1    wage motion and hopefully we've provided a little more

2    clarification on the issue raised by Your Honor with respect to

3    the benefits and the -- what the debtor intends to do vis-a-vis

4    the accrued vacation and sick time.  I'm not sure if Your Honor

5    still has continuing concerns over that.

6         THE COURT:  Well, I know the U.S. Trustee had an

7    objection.  Mr. Sponder?

8         MR. SPONDER:  Yes.  We would prefer that the language

9    be amended in the order of paragraph 12 to provide

10   notwithstanding anything here to the contrary, the relief

11   granted herein to or for the benefit of any employees, of

12   course limited to the Bankruptcy Code Section 507(a)(4) and

13   (a)(5) and I think that takes care of it.

14        MR. FELGER:  So the U.S. Trustee's position is to

15   limit it to the --

16        THE COURT:  Well --

17        MR. SPONDER:  To the Bankruptcy Code.

18        MR. FELGER:  -- to the cap.

19        THE COURT:  -- if you limit it to (a)(4) and (5),

20   wouldn't that give them benefit as well as their salary?

21        MR. SPONDER:  Up to the cap.

22        MR. FELGER:  Up to the cap.  And unfortunately, the

23   cash component is less but when you wrap in the accrued

24   vacation and sick time, that's what -- that's what causes the

25   problem, puts -- as I said, about 15 folks out of -- over a

1     thousand, over the cap and they're not all management.  There's

2     some higher paid union employees that are in there as well.

3     It's not a cash issue and it's not -- and it's not a situation

4     where we're looking to provide any benefit to somebody who's no

5     longer with the business.  As Mr. Grabell will testify, these

6     were all critical people who are working hard to make this

7     reorganization work.

8           THE COURT:  And how much would you anticipate that

9     they're over the $10,950 cap?  Do you have any idea?  I mean,

10    there's only 15 people over a thousand so are we talking about

11    -- I mean, what are we talking about?

12          MR. FELGER:  Can you --

13          THE COURT:  Are we talking about maybe a total of

14    five or $10,000?

15          MR. FELGER:  Can you indulge me for one minute?

16    Thank you.

17          (Pause in proceedings.)

18          MR. FELGER:  If I do some quick addition, Your Honor,

19    it looks like the -- let me see, two, four, six, eight, ten,

20    twelve -- sixteen individuals are on this sheet.  It looks like

21    the grand total would be just under $100,000 and what I'm told

22    is that we're talking about ordinary course vacation and sick

23    time so that over the course of the next three months, which is

24    what we expect to be the Chapter 11 period, we're looking at

25    probably no more than $50,000 worth of vacation time and sick

1    time for these 16 individuals.

2             THE COURT:  So what you're asking me is to fund their

3    salaries, which are under the cap, and then to allow the

4    company to pay them their vacation and sick time which they've

5    earned already but haven't used.

6             MR. FELGER:  Right, as incurred in the ordinary

7    course of business.

8             MR. SPONDER:  Pre-petition.

9             THE COURT:  Mr. Sponder, does that make a difference

10   to you?

11            MR. SPONDER:  No, Your Honor.  I still have to stick

12   with the Bankruptcy Code and what the Bankruptcy Code provides

13   for.

14            THE COURT:  Well, the Bankruptcy Code provides for a

15   priority of certain amounts but that's not really the issue

16   today.  The issue isn't whether they're a priority claim or

17   not.  I mean, it is to a certain extent if everything were

18   liquidated but based on the testimony that's been provided,

19   it's anticipated that the debtors are going to operate at least

20   for some period of time.

21            They need the employees.  The amount of money we're

22   talking about isn't actually cash coming out of the debtors,

23   it's just allowing employees who have worked for the debtor for

24   time and will continue to operate and benefit the estate to

25   utilize their sick and vacation time as opposed to --

1      MR. SPONDER:  Well, why, may I ask, is that necessary

2   today on the first day?

3      THE COURT:  Excuse me?

4      MR. SPONDER:  Why, may I ask, is it that that's

5   necessary on the first day?  I mean, it sounds kind of like --

6   I mean, you know, a type of KERP motion of something different

7   other than what we're asking for here.

8      THE COURT:  Well, what's your -- I guess what is your

9   concern about if it's today or we do it in 15 days when we come

10   back on the other hearing?

11      MR. SPONDER:  Well, I mean, if we --

12      MR. FELGER:  Indulge me for one moment.  You asked me

13   that question, not the U.S. --

14      THE COURT:  I'm asking him --

15      MR. FELGER:  Oh.

16      THE COURT:  -- but I would also like to know what you

17   have to say.  I was asking both sides.  Mr. Sponder?

18      MR. SPONDER:  Yeah, the --

19      THE COURT:  How do think that that is something

20   advantageous for the creditors?  I assume that you want it so

21   that the committee can look at it?

22      MR. SPONDER:  Correct.  And, I mean, if it's vacation

23   and other time -- I mean, as was set forth earlier in the

24   hearing, that they don't believe that people are going to take

25   that time for only one week, it might not be that much of a

1      problem.  So I'm just trying to figure out why -- I mean, it's

2      necessary at this time, you know, to do that.  Maybe it's

3      better when that -- when it in fact comes up or a little bit

4      later when a committee is formed.

5                MR. SHAPIRO:  Your Honor, obviously from a lender's

6      point of view, since indirectly we're funding it, I really

7      don't understand the Trustee's position.  We're going back

8      today, we're telling everybody it's business as usual.  The

9      necessity doctrine looks at the priority but it's not the cap.

10     It's enveloped and part of analyzing whether it's necessary to

11     go in and tell 15 key people who we don't have a severance

12     package for, we don't have a KERP plan.

13                All we're asking is for pre-petition -- I'm not

14     asking, excuse me, Mr. Felger is, sorry -- to continue.  So you

15     say to these people we're not highlighting and choosing you to

16     treat you worse than other people, we're just asking to treat

17     you similar to everybody else.  There's no reason why they

18     should be distinguished in a bad way from all of the other

19     employees who are helping make this work.

20                THE COURT:  Mr. Felger?

21                MR. FELGER:  That's almost precisely what I was about

22     to say but the -- the company is very concerned for those

23     reasons.  We don't have any bonus programs in place, we have

24     folks that have been working real hard over the last several

25     weeks to pull this all together and we're trying --

1          THE COURT: Let me -- you don't anticipate that

2    you're going to utilize all those funds in the next 15 days,

3    right?  This is an interim -- this is an interim application

4    anyway.  If I approve it, you can come back at the final

5    hearing and the U.S. Trustee and the Creditor's Committee can -

6    - and it doesn't seem to me like the horse will be out of the

7    barn because the vast majority of those vacation times won't be

8    used in the next two weeks, correct?

9          MR. FELGER:  Correct.

10          THE COURT: So I think it's a benefit to the estate.

11    I think that the debtor has shown why it's necessary for its

12    employees to get this and the numbers that we're talking about

13    that would not come into that are so small, I don't see that

14    it's -- that it's giving something special to these creditors

15    that -- I mean to these employees, who are creditors, but these

16    employees that they would not -- or that everybody else isn't

17    getting and I agree with the debtor.

18          However, I'm going to order it on the interim basis.

19    Based on the testimony, Mr. Sponder, it's not going to probably

20    exceed those -- the 10,950 cap between now and the final

21    hearing on the matter.  And I would be happy to hear you, the

22    committee or anybody else as to whether I should make that

23    order final.

24          MR. SPONDER:  Thank you, Your Honor.

25          MR. FELGER:  Thank you, Your Honor.

1          THE COURT:  Well, let me look at it.  I might be able

2     to just adjust this.  I'll just make it an interim order and

3     we'll just have the same date that we come back for the final

4     order.  So I'll approve it, I'll approve the order as you

5     submitted it as an interim order, Mr. Felger, subject to a

6     final hearing and if there's no objections then the interim

7     order will become the final order.

8          MR. FELGER:  Okay.  Thank you, Your Honor.

9          THE COURT:  All right.  Are we up to financing now?

10          MR. FELGER:  Yes.  I think that's the last one that's

11     still open.

12          THE COURT:  Anything you want to add, Mr. Felger?

13          MR. FELGER:  Very briefly, Your Honor.  I think the

14     testimony of the two witnesses was pretty compelling in setting

15     out the extremes that the company was in when the company filed

16     on Sunday night and in setting out the exploration of available

17     options and the fact that there really were no available

18     options.

19          I think what this does, Your Honor, is this provides

20     an opportunity to save five companies, saved over a thousand

21     jobs in this community.  It provides an opportunity for

22     unsecured creditors to obtain a dividend in a situation where

23     if the companies had to shut down and liquidate, there would be

24     no dividend, and also an opportunity to keep the customer.

25          The options as we've set out through the testimony,

Colloquy

1   cash collateral, I think it's pretty clear from Mr. Collistra's

2   testimony that cash collateral is not an option.  We could not

3   provide adequate protection to the lender under the

4   circumstances and the receipts would not be enough to give

5   anyone comfort that we can continue for any period of time on

6   collections.  Mr. Collistra's testimony was very clear that he

7   explored options and given a variety of factors, including the

8   terms of these loans, that there were no better options out

9   there and in many cases, other lenders wouldn't even make a

10   proposal.

11          It's clear to us that Versa and CIT will not proceed

12   on any basis other than what's set forth in the motion papers

13   and in their agreements.  These agreements were negotiated

14   very, very hard over the past several weeks, extraordinarily

15   hard.  Some of the more typical issues that we have, the

16   avoidance action, a lien on avoidance actions, the 506(c)

17   waiver.  Two very hot buttons are being held in abeyance until

18   a final hearing so no liens --

19          THE COURT:  To mention that, I did go -- I didn't go

20   over -- I didn't finish the Arcus order but I did go -- I did

21   do most of the CIT order while we were at the lunch break and

22   it does appear that the avoidance actions are in this interim

23   order.  I thought that that was --

24          MR. PATTERSON:  Your Honor, if they are in and not

25   carved out pending a final hearing --

1           THE COURT:  Well --

2           MR. PATTERSON:  -- that's an oversight on my part --

3           THE COURT:  -- okay.  I know that the --

4           MR. PATTERSON:  -- and it should be corrected.

5           THE COURT:  -- motion clearly says that they're not

6    included but under paragraph 7-I, which I think is the

7    collateral that's considered --

8           MR. PATTERSON:  Yeah, that is collateral and, Your

9    Honor, I --

10          THE COURT:  -- and if you look at (paragraph) I,

11   you'll see that it includes avoidance claims.

12          MR. PATTERSON:  It does and I thought that we carved

13   that out somewhere later until the final hearing but if we

14   didn't, we're happy to do that.  The other thing I would point

15   out for purposes of clarity in terms of the lien priority on

16   that particular category of assets, CIT is second and Arcus is

17   first.

18          MR. SHAPIRO:  And, Your Honor, with respect to -- I

19   know you said you didn't get to go through our order -- in page

20   14 of our order it says upon the entry of the final order the

21   term senior collateral shall include the avoidance action so in

22   our order, we specifically provided that this is

23   subject --

24          THE COURT:  All right.  I --

25          MR. SHAPIRO:  -- to the final hearing.  I know you

1    did not get to our order but to the extent his order should be

2    consistent with ours, we had two orders, ours should control

3    because he's -- we're first, he's second, to the extent it's

4    granted at the final hearing.

5              MR. PATTERSON:  And we have no disagreement with

6    that, Your Honor.  We're happy to defer that as the 506(c) --

7              THE COURT:  Well, perhaps you can just add some

8    language into the form, even handwritten into it, indicating

9    that it's only part of the final.

10             MR. PATTERSON:  That's fine.

11             THE COURT:  I did also look at paragraph six in which

12   you set forth the time for objecting to your claim.  I know the

13   U.S. Trustee had an objection.  It seems pretty comprehensive

14   to me that it was "for any claims or causes of action of any

15   nature in any way arising out of or related to the pre-petition

16   debtor existing finance agreements or assert or allege any

17   other matters in any way arising out of or related to the pre-

18   petition debt or existing financing arrangements or challenge

19   the extent or validity."

20             So, I thought that language was of concern for the

21   U.S. Trustee and I did find that language in there.

22             MR. PATTERSON:  And it is intended to be read

23   broadly, Your Honor, and I think when the U.S. Trustee raised

24   that issue before, I responded in candor that that is what we

25   intend, subject of course to your approval.

1      THE COURT:  All right.  Mr. Sponder, what is the U.S.

2   Trustee's position at this point?

3      MR. SPONDER:  With respect to that or with respect to

4   the whole thing, Your Honor?

5      THE COURT:  Well, I guess with respect to the whole

6   thing --

7      MR. SPONDER:  Okay.

8      THE COURT:  -- and anything in particular.

9      MR. SPONDER:  Okay.  As you know, I mean, I've heard

10   the testimony of the witnesses, they explained the availability

11   -- all of the available options, the need for financing, but

12   the facts remain the same here.  There's limited notice, no

13   Creditor's Committee in place, the debtors and the lenders or

14   just the lenders seek extraordinary relief here including a

15   roll up, general releases, 506(c) waivers, as Your Honor has

16   already gone through, the liens on avoidance actions, a

17   disparate carve out --

18      THE COURT:  Well, but the liens on avoidance actions

19   aren't going to happen until the final hearing.  Mr. Sponder?

20      MR. SPONDER:  -- to review the validity of pre-

21   petition loan documents.  I went through the general order that

22   the Court has and they pretty much hit everything.

23      THE COURT:  Well but there's going to be a correction

24   on that.  The avoidance actions are not going to go until the

25   final hearing.

1          MR. SPONDER:  Right.  That would be one of the many,

2     many issues that we would raise.  If you start with the roll

3     up, we don't agree that the roll up should occur.  If Your

4     Honor feels otherwise, we would at least request the language

5     in the general order that reserving the right of the Court to

6     unwind the pay-down during the interim period.

7          THE COURT:  What is the position of the parties with

8     regard to that?  I'm not sure what language that is exactly.

9          MR. SHAPIRO:  Your Honor, I hate to use this thing

10    again but obviously, if you roll up so that we can then fund

11    the term to pay down their term and then you try to unroll it

12    after we've already funded the $15 million on day one, I

13    don't --

14         THE COURT:  Well, I don't think that once you -- once

15    you roll up you can unwind.  That's why I'm --

16         MR. SHAPIRO:  Right.  That's why I don't -- to us,

17    unfortunately --

18         THE COURT:  I mean, I'm very concerned.  Let me just

19    say that I -- I find it very difficult to approve such a final

20    action, despite the things that are carved out for the final,

21    on the second day of the case with four committees involved.

22    But I'm not sure in this particular case with the facts and

23    circumstances I have before me, Mr. Sponder, what alternatives

24    do I have?

25         MR. SPONDER:  I mean, Your Honor, we're stuck --

1   you're right, we're stuck in a position where neither of us

2   have had the opportunity to review these documents to the

3   length that would be required, the committee is not in place,

4   there should be some protection.  If the creditor -- if the

5   lenders feel that their liens are perfected then there

6   shouldn't be any problem with putting in that provision that it

7   should be unwound.  I mean --

8          THE COURT:  But as a practical --

9          MR. SPONDER:  -- then it's really nothing.

10          THE COURT:  But as a practical matter, Mr. Sponder,

11   how would I unwind what's been approved here --

12          MR. SPONDER:  Your Honor, I'm just going --

13          THE COURT:  -- no matter what language is in there?

14          MR. SPONDER:  -- in all honesty, I'm just going off

15   the Court.

16          THE COURT:  Well, I understand that but -- you know,

17   it --

18          MR. SPONDER:  I mean, it is --

19          THE COURT:  -- despite the general rules and all of

20   the issues, it comes down to each individual case and the facts

21   and circumstances of that case.

22          MR. SPONDER:  I agree with you.

23          THE COURT:  If this was somebody coming in that was a

24   lender lending a revolver and it was a DIP financing and that's

25   all they were doing, I mean, I've done it many times before,

Colloquy

1    I've limited them to what is necessary to keep the debtor going

2    and we come back and look at it.  But unfortunately, this case

3    has different perspectives and I'm satisfied with the testimony

4    that if I don't approve the financing that's been requested

5    that the debtor will have to close its doors and -- you know,

6    we're talking a thousand employees.

7         We're talking other contract rights, we're talking

8    unions' contracts and a lot of other -- a lot of other losses.

9    I'm not saying that the lenders have not negotiated for what

10   they think is in their best interest and I know the debtor

11   doesn't -- didn't have a lot of -- before I started, I knew the

12   debtor didn't have a lot of options.  Now I know the debtor had

13   less options.

14        But I -- but I'm not -- other than allowing this

15   financing today, basically the testimony has been the debtor

16   will close up and is that what -- is that in the interest of

17   the committee, if there would even ever be a committee then or

18   the employees or any of the other creditors or parties in

19   interest?  Mr. Sponder, that was directed to you.

20        MR. SPONDER:  Of course not, Your Honor.

21        THE COURT:  Well, what I'm saying is I have every

22   concern that you have about those things.  I started out by

23   saying that that was my biggest concern.  But I think that the

24   testimony has shown the Court that there are no other options

25   in this -- in this case.  Mr. D'Auria has happened to appear

1    here magically as we're discussing it and perhaps -- I don't

2    know, Mr. D'Auria, if I'm putting you on the spot, if you want

3    to get involved, we're talking about the financing.  You missed

4    all the testimony so Mr. Sponder has been dealing with it but

5    I'm satisfied from the testimony that the debtor cannot operate

6    beyond now without this financing that's been offered and there

7    are no other options.

8         And I know Mr. Sponder is concerned, the Court is

9    concerned, I'm sure you are too.  But I have to look at the

10    realities of this, even though in nine out of ten other cases,

11    that wouldn't be the way that I would like to go.  I certainly

12    -- I don't like to do this on the first day.  I just don't see

13    that the Court has any other option in this particular case.

14    We're not talking about a case where the principals were the

15    -- where management is getting some special deals here.

16         I mean, they don't have any deal here.  They're not

17    even going to own the company if we get to reorganization.  So

18    the only beneficiaries would be other creditors and the

19    employees of the company and the ability of the company to go

20    forward, from what the testimony is that's been presented to

21    the Court.

22         So, with all those concerns that I voiced early in

23    the case and then I agree with you, Mr. Sponder, I think that

24    unless -- unless I'm prepared to allow the debtor to close up

25    and liquidate, this is the only game in town today.  That's not

Colloquy

1      -- with all due respect to you, bringing up what I believe are

2      important issues, I just don't think that in this particular

3      case at this particular time there's any other alternatives.

4              MR. SPONDER:  Well, Your Honor, if I may, just as to

5      the testimony that was brought -- that was set forth.  This all

6      came about relatively quickly, especially with Phoenix

7      Management, and I believe he testified that -- you know, it was

8      only over the last two-and-a-half weeks that he sought and

9      discussed with lenders.  I mean, is that enough time -- you

10     know, to really -- I mean, to base this on, that that was

11     enough done?

12             THE COURT:  Well, if the debtor had money to operate

13     then the answer would probably be no.  But when the debtor has

14     no -- no borrowing at all and inability to operate on cash

15     collateral and that's been the uncontested testimony that I

16     heard today --

17             MR. SPONDER:  Right.

18             THE COURT:  -- I don't think the debtor has two more

19     weeks to do that.

20             MR. SPONDER:  No, I --

21             THE COURT:  The witness testified that he didn't know

22     that he would get financing -- other financing anyway but the

23     debtor can't even get to there.

24             MR. SPONDER:  Right.

25             MR. FELGER:  Your Honor, I would just like to remind

1    the Court of the testimony of Mr. Grabell where he indicated

2    CIT Capital had been engaged to go out and find alternative

3    financing three or four months ago --

4              THE COURT:  Right.  That's why they gave --

5              MR. FELGER:  -- and came up with nothing.

6              THE COURT:  -- gave additional -- three or four

7    months ago they raised their loan from three to 4.4 percent to

8    give the debtor the opportunity to try to find something else

9    and none of that -- none of that worked.

10             MR. PATTERSON:  Your Honor, that's the point I was

11   going to make and I was also going to say, as I know Your Honor

12   understood, that you can't ignore the State of the credit

13   markets.  I think Mr. Collistra testified that this --

14   unfortunately, they're very different times.  People that might

15   have been there six or nine months ago are not there anymore.

16   I think the question is did the debtor do the best that they

17   could to find another alternative and I think that the answer

18   is yes.

19             THE COURT:  Mr. Sponder, anything else?

20             MR. SPONDER:  No, unless Mr. D'Auria has something to

21   add.

22             THE COURT:  Mr. D'Auria?  I know you haven't been

23   here for the testimony so I don't want what you on the spot.

24             MR. D'AURIA:  I don't know if I've arrived by magic

25   or a buffoonery, Your Honor, to tell the truth.  I've had one

1    of those days and I thank you -- the Court -- for the

2    indulgence this morning with the telephone, and I'll allow the

3    record to rest as it is.

4              THE COURT:  Thank you.

5              MR. D'AURIA:  Thank you.

6              THE COURT:  Mr. Sponder has been holding up the fort

7    for you for the rest of the day.  I -- anything else, Mr.

8    Felger, that you want to add?

9              MR. SPONDER:  No, Your Honor.

10             THE COURT:  Mr. Felger or Mr. Shapiro?

11             MR. FELGER:  I'm sorry, Your Honor.  I thought there

12   were some tweaks to the order -- to clean up, to both orders,

13   that we may need to walk through, changes from what was

14   actually filed.  And I don't think it was anything material, I

15   think in scrubbing it for the 175th time, there were some

16   additional nits that were picked up.

17             THE COURT:  Let me finish ruling and then --

18             MR. FELGER:  I apologize.  I apologize, Your Honor.

19             THE COURT:  I know I've kind of tipped my hand here a

20   little bit but I listened -- spent a lot of time listening to

21   the testimony of the witnesses and it was compelling, as you've

22   indicated, Mr. Felger.  I'm satisfied that the debtor cannot

23   operate beyond 3:00 today without financing.  Cash collateral

24   is not sufficient, there are no other options.  The alternative

25   would be for the debtor to close up and basically I think

1    that's -- this Chapter 11 would be very short, very very short,

2    shorter than you anticipate.

3            And it's not a situation that brings -- I guess

4    additional concern to the Court where management is getting

5    certain advantages by this deal -- certain promises, better

6    conditions.  It's completely the opposite of that.  I mean,

7    quite frankly, management is pretty much doing this for the

8    benefit -- it appears to me from what I've heard so far, of

9    everybody else.

10           And the conditions are pretty onerous.  Some of the

11   more onerous parts of it are going to wait for the final

12   hearing.  I recognize that the debtor doesn't have a lot more

13   to give than avoidance powers, which are the only thing

14   probably that isn't secured when you walked in here -- when you

15   filed on Sunday night.

16           I do have some concerns about the fairness of that to

17   the creditor body but we'll be addressing that at a later time.

18   But despite the fact, I generally don't approve first day

19   orders that give this kind of roll up and so on.  I don't see

20   any other alternative for this debtor at this time.  It is the

21   only game in town for this debtor, the only way the debtor gets

22   to anyplace else.

23           And I did ask Mr. Collistra and he testified that he

24   believed that based on what's been proposed here, the debtor

25   can get reorganized by virtue of this, which is a benefit to

1     the continuing operation of this entity and all their creditors

2     and parties in interest.  So based on that, I believe that this

3     is in the best interest of the estate despite it having been so

4     quickly brought before the Court and I will approve the

5     financing as it's been proposed on a -- to take effect

6     immediately on an interim basis with the issues of the

7     avoidance actions and the releases -- I mean, the 506 -- the

8     506 waivers and the avoidance actions to await the final

9     hearing.

10          And to the extent the order doesn't -- the orders

11    don't say that or are consistent on that, they should be made

12    consistent.  All right, now you said there are some things you

13    need to change in the order?

14          MR. PATTERSON:  Your Honor, perhaps I can explain our

15    black lines -- and I do have black lines --

16          MR. FELGER:  Your Honor, I think we have copies if

17    you'd like us to hand them up.

18          MR. PATTERSON:  I've got copies actually, Mark.

19          MR. FELGER:  Do you have copies?

20          MR. PATTERSON:  Yeah.  Let me just explain what's in

21    here, Your Honor.  There were a couple of provisions that were

22    initially in the form of Arcus order that applied to both

23    agents, both Arcus as agent and CIT as agent that at the last

24    minute, got skinnied down, just applied to the term loan agent

25    so I included parallel provisions in here.  That's what's in

1    here, along with date changes and payoff information changes.

2    But if I can hand this up, you'll be able to see what we

3    changed.

4          MR. SHAPIRO:  Your Honor, the only thing we changed

5    in the Arcus order was in compliance with your order on

6    shortened time, we added the parties that you had required in

7    your notice scheduling today's hearings that were added.  Other

8    than that, there were no other changes to our order.  And I am

9    confirming again for the record that as I said before, the

10   506(c) and  the avoidance actions are both preserved until the

11   final hearing.

12         MR. PATTERSON:  As do I.

13         THE COURT:  Mr. Felger?

14         MR. FELGER:  Yes, we've cleaned them up to conform to

15   Your Honor's form of order --

16         THE COURT:  Okay.

17         MR. FELGER:  -- that we can email to Your Honor

18   within the next ten minutes, ten, 15 minutes.

19         THE COURT:  All right.  Well, let me just say that I

20   am not going to be here Wednesday and Thursday and Friday's a

21   holiday.  So, I mean, I actually was going to leave early today

22   but early is not so early.  But, I mean -- so I need to enter

23   -- whatever needs to get entered today needs to get entered

24   today because I won't be here again until Monday to enter

25   orders.

1      I mean, if something comes up that's an emergency,

2   contact my judicial assistant or Chris, my Courtroom Deputy and

3   we'll see if somebody else can hear it or if he can contact me

4   by phone or something.  I'm -- there's nothing that I'm

5   thinking from what I've heard today that I expect would be

6   anything that would need the Court between today and Monday,

7   but one never knows.

8      So to the extent that that comes up, you can contact

9   Chris and he can reach me.  But if you need me -- but for

10  orders that you need to have signed right away, they need to be

11  done today so I can sign them.

12      MR. POSLUSNY:  Your Honor, we'll -- we can have those

13  emailed as soon as -- as soon as I get outside the courtroom

14  and call --

15      THE COURT:  Okay.

16      MR. POSLUSNY:  -- the office and have them emailed

17  over.

18      MR. PATTERSON:  Your Honor, just one other thing I

19  wanted to keep on the record, I don't think we need to monkey

20  with the order any further, we talked about this issue of when

21  the investigation period will end.  Our order, as does I

22  believe the standing order of the Court, tracks the language in

23  terms of appointment of counsel.  It just occurred to me that

24  under the new Rule 6003, counsel can't be appointed until 20

25  days after the case so we may be sometime into that mid-May

1     deadline.

2          If we can just -- if we need to come back to the

3     Court to have some flexibility in terms of how we deal with the

4     plan or to counsel, we would just like to reserve the right to

5     do that and we'll stay with the dates that are in the  order,

6     if that's okay.

7          THE COURT:  That's -- I don't see a problem with

8     that.  As I said, if it becomes -- if it's an issue, then we'll

9     deal with it.  And --

10          MR. PATTERSON:  Yeah.  We don't expect it will be but

11     --

12          THE COURT:  And, you know, I expect that we can deal

13     with it even on some kind of telephone conference or a hearing

14     if we need to or whatever we have to do with regard to it to be

15     fair to all the parties.  Obviously, none of the intention here

16     is not to be fair.  So to the extent that there has to be some

17     adjustments, we can look at it when and if it becomes

18     necessary.

19          Yes, we need a final date.  And you also wanted a

20     date for the hearing on the disclosure statement.

21          MR. FELGER:  Disclosure statement, correct.  Final

22     hearing date and disclosure statement date, Your Honor.

23          THE COURT:  All right.  I have available April 3rd,

24     which would be just beyond the 15 days -- 16 days from today.

25     So how does that work for everybody?  That's a Thursday.

1        MR. FELGER:  That's fine, Your Honor.

2        MR. PATTERSON:  April 3rd is perfect.

3        MR. SHAPIRO:  What time, Your Honor?

4        THE COURT:  10:00.

5        MR. SHAPIRO:  Okay.

6        MR. SPONDER:  Your Honor, this is Jeff Sponder.

7        THE COURT:  Yes?

8        MR. SPONDER:  If we get the committee in place by the

9   end of next week, that only gives them a few days to get up to

10  speed, you know, and I'm not sure that it's going to happen

11  next week.  That's our goal --

12       THE COURT:  All right.  Well, you know what?  We'll

13  deal with it.  If committee -- if a committee gets set up and

14  counsel comes in and says I need more time, then I'll -- I

15  mean, he or she can talk to everybody else and the parties can

16  all agree to an extension of time for a short period of time or

17  they can come in and make that argument to me and I'm going to

18  be sensitive to the amount of time that they had.  So --

19       MR. SPONDER:  Okay, that's fair.  What time did you

20  say, Your Honor?

21       THE COURT:  10:00.

22       MR. SPONDER:  Okay.

23       THE COURT:  I happen to have that day free and it

24  works in so let's take that day and then if we need to do

25  something with regard to it, you know, I'm sure that once

1    counsel gets appointed, you know, everybody is going to be

2    happy to talk to counsel and try to get the committee on board.

3    So, but I'm going to be understanding and flexible if they need

4    any additional time.  We'll just have to deal with it at the

5    time --

6              MR. SPONDER:  Thank you, Your Honor.

7              THE COURT:  -- and see what's happening with the case

8    and everything else at that time.  All right.  And disclosure

9    statement hearing -- they just filed their disclosure

10   statement.  We need to do it the week of April 14th probably.

11             MR. SHAPIRO:  Our current agreement, Your Honor, says

12   it has to be no later than the 17th so that will work if you

13   can fit it in between the 14th and the 17th, at the Court's

14   pleasure, that would be fine.

15             THE COURT:  Okay, how about the 15th?

16             MR. SHAPIRO:  Okay.

17             THE COURT:  April 15th.

18             MR. SHAPIRO:  What time, Your Honor?  10:00?

19             THE COURT:  10:00.

20             MR. SPONDER:  What time, Your Honor?  I'm sorry.

21             THE COURT:  10:00.

22             MR. SPONDER:  Thank you.

23             THE COURT:  I'm trying to work with you, Mr. Sponder,

24   for this one.

25             MR. SPONDER:  Thank you.

Colloquy

1          THE COURT: Anything else?  Anything else we -- okay,

2     I'm told that there's not a problem with allowing Epiq to send

3     out the 341 notice so perhaps we should put that into the order

4     -- their appointment, and yeah, well, we'll need to get a date,

5     Mr. Sponder, from the U.S. Trustee's Office with regard to the

6     341.

7          MR. SPONDER:  Correct.

8          THE COURT: How do you -- do you want to have -- how

9     do you want to work that?  Do you just want to have somebody

10    from Epiq contact you?

11         MR. SPONDER:  Yeah, I mean, have someone from Epiq as

12    well as the debtor probably contact me to see their

13    availability and so that we are all available on that date.

14         THE COURT: All right, Mr. Felger, work with Epiq and

15    Mr. Sponder to come up with a date and let Epiq know what it

16    is, hopefully in the next couple of days so we can get it out

17    as quickly as possible and the order for Epiq -- we'll add

18    language that says they will send out the notice at the 341

19    meeting which will relieve the Clerk's Office of that

20    responsibility.

21         MR. FELGER:  Thank you, Your Honor.  Should we

22    address omnibus hearings going out into May at this point or do

23    you want to take that up --

24         SHAPIRO:  Wait until the final hearing.

25         MR. FELGER:  -- at the next hearing?

1          THE COURT:  Omnibus hearings on?

2          MR. FELGER:  To have -- to hopefully have regular

3     dates with Your Honor through perhaps mid-June.

4          THE COURT:  Well, why don't we -- why don't we set

5     them up when we come in on the 15th.

6          MR. SHAPIRO:  On the 3rd, at the final hearing, Your

7     Honor.

8          THE COURT:  Okay, on the 3rd.  Why don't we do them

9     on the 3rd and then maybe depending -- because then I think

10    we'll have a better idea.  We'll see -- hopefully we'll have a

11    committee, we'll know the committee's availability, counsel for

12    the committee's availability.  Everybody will have seen what's

13    happened from now until then, we'll know whether we have final

14    financing and we'll know what the -- the rest of the times are.

15         We may be able to do the omnibus hearings basically

16    when we have other things scheduled because if you're going to

17    get this through in 75 days, we're going to be here pretty much

18    every couple of weeks anyway --

19         MR. FELGER:  Right.

20         THE COURT:  -- so we can just carry those status

21    hearings when we have disclosure statement and other things as

22    they go along.

23         MR. FELGER:  Perfect.

24         THE COURT:  Okay.  Anything else?

25         MR. FELGER:  Last but not least, the retention

1    applications.  Unless Mr. Poslusny has something else.

2              MR. POSLUSNY:  Well, I just want to give Your Honor

3    an update.

4              MR. FELGER:  Okay.

5              MR. POSLUSNY:  Our office is forwarding the orders.

6    Blank Rome is scheduling their exhibits and we would ask

7    Stradley if they could send over their version of the exhibits

8    to you -- Judge Burns' chambers.

9              THE COURT:  The exhibits attached to the order?

10             MR. POSLUSNY:  To their order, yes, Your Honor.

11             MR. PATTERSON:  I do have hard copies here but I

12   assume -- I've got six hard copies of our financing agreement,

13   which I think is our only exhibit.

14             THE COURT:  Well, I think we're probably going to

15   need it electronic, right?

16             MR. PATTERSON:  Would you prefer electronic?

17             THE COURT:  I would because otherwise we'll have to

18   scan all that in, attach it to the order and scan it all in so

19   I'd prefer to have it electronically.

20             MR. PATTERSON:  That's fine, Your Honor.

21             THE COURT:  Just email it to chambers and we'll

22   attach it to the order, which you sent both orders or --

23             MR. POSLUSNY:  I just spoke to my paralegal, Your

24   Honor and she said she'd have them emailed in the next ten

25   minutes.

1          THE COURT:  Okay, so by the time I get there they

2    should be there.

3          MR. POSLUSNY:  I would hope so.

4          THE COURT:  Anything else?

5          MR. FELGER:  The last -- the last item, which is near

6    and dear to my heart, are the three retention applications.  We

7    talked earlier about what the appropriate notice period would

8    be and I must admit, I hadn't focused on the five versus 20-day

9    issue before Your Honor raised it or the U.S. Trustee raised

10   it.

11         THE COURT:  Well, the U.S. Trustee raised it.  I was

12   going -- that was going to be -- I was going to raise it when

13   we got to it, even though it's not really on today but I'm --

14   for right now, I have to hold it.  When I approve it if there's

15   no objection, I'll approve it, it will be subject to the day it

16   was filed.  It will be effective as of the day it was filed.

17   That's the way I did it with the five-day order, that's the way

18   I'll do it if it's 20 days.

19         I guess -- I don't know how -- how counsel dealing

20   with -- I haven't really had it come up as an issue so far, are

21   you familiar with that, Mr. D'Auria?  Are counsel making

22   applications for interim approval?

23         MR. D'AURIA:  Your Honor, what I've seen work in

24   other vicinages in our district is a docket entry that cites

25   the docket entry numbers for the retention papers and schedules

1    a hearing date on the 20th day or the next business day after

2    that, and then if people object, then their objection is filed

3    and there's already a hearing date.  If people don't, then

4    there are no objections and the orders just get entered, as we

5    used to do under our five-day rule.

6          THE COURT:  Well, I have no problem with doing

7    something like that.  Mr. Felger, I don't know if --

8          MR. D'AURIA:  And then there doesn't have to -- I'm

9    sorry, Your Honor -- and then there doesn't have to be

10    supplemental applications and there doesn't have to be a debate

11    over whether we can do an interim or not and we recognize that

12    it all dates back to when it was filed anyhow.

13          THE COURT:  Comment, Mr. Shapiro?

14          MR. SHAPIRO:  Yeah, again, I'm lender's counsel, not

15    debtor's counsel, but again, given the exigencies of the

16    circumstances in this case --

17          THE COURT:  Well --

18          MR. SHAPIRO:  -- given how quickly we are asking to

19    go forward -- this is not the normal case -- it would be unfair

20    for the debtor's professionals to not know whether they're in

21    or not and have to prepare for a disclosure statement.

22          THE COURT:  I agree with you.  I didn't change the

23    rule.

24          MR. SHAPIRO:  I understand.  But the concept was they

25    said there's nothing with interim.  If we've made everything

1    else --

2                    THE COURT:  Well --

3                    MR. SHAPIRO:  -- at the very least, interim, then why

4    can't we make an interim order at the very least --

5                    THE COURT:  Well --

6

7                    MR. SHAPIRO:  -- allowing them under the five-day --

8                    THE COURT:  That isn't actually --

9                    MR. SHAPIRO:  -- subject --

10                   THE COURT:  -- that isn't actually on today so let me

11   do this.  Let me give Mr. Felger an opportunity to see what's

12   going on with other jurisdictions.  I have heard through the

13   grapevine -- I haven't seen it -- that there are requests that

14   it be made interim --

15                   MR. SHAPIRO:  Right, right.

16                   THE COURT:  -- subject to final approval --

17                   MR. SHAPIRO:  To final, right.

18                   THE COURT:  -- and maybe that's the way you want to

19   go with it.  It's filed now.  I'm going to leave it to you to

20   do something because I don't think I can do that without having

21   at least notice and a hearing to do something different for the

22   U.S. Trustee and anybody else.

23                   MR. SHAPIRO:  Okay.

24                   MR. FELGER:  Right.

25                   THE COURT:  And I agree, I think it's very unfair,

1    especially in a case that comes in and out that's quick like

2    this but I -- there are certain determinations I have to make

3    about irreparable harm and things and maybe you can make a case

4    for that.  But it's got to be before the Court on notice for me

5    to make those kind of findings and if it needs to be on

6    application with a shortened time, I'll consider that too.

7          MR. FELGER:  Yeah, we'll take a look at it and

8    perhaps what we'll do is file one application on behalf of the

9    three professionals who are all up and running at this point,

10    including Stevens and Lee, who's meeting with the union.

11          THE COURT:  As I said, I'm not going to be here for

12    Wednesday, Thursday, and Friday.  Friday the Court's closed,

13    but if you want to file one of those on Wednesday or Thursday,

14    just email Chris and he can contact me and get my approval to

15    enter an order if it needs -- for shortening time or bring it

16    to Judge Wizmur or somebody else to enter it for the shortened

17    time provision to put it on if you want it on, say next week.

18    Otherwise, I will be here on Monday so if anything comes in on

19    Friday or the weekend --

20          MR. SHAPIRO:  The deadline is actually Monday.

21          THE COURT:  But the five-day deadline really doesn't

22    apply anymore under the rule.  But if you make an application

23    to shorten time, I will be happy to hear it in a reasonable

24    period of time to give you an opportunity.  As I said, I'm not

25    sure that all the issues were thought about and the differences

1    when the rule was changed which probably was a while ago and --

2    you know, when it actually -- at the time, it probably seemed

3    like a good idea because in some cases, it gives everybody a

4    chance to know what's going on.

5          And then on some cases it's difficult because

6    debtor's counsel -- particularly for debtor's counsel more than

7    anybody else.  Sometimes for accountants too, who have to get

8    involved in a case very early and other professionals.  But

9    that is the new rule and I haven't even really looked to see

10   whether I have the wiggle room to say that I can extend or

11   modify it under 105 or under the general rules that give Courts

12   abilities to make changes.

13         It does have language about whether there's immediate

14   and irreparable harm.  You know, I mean, maybe you can make

15   that argument.  I don't know.  I mean, maybe other law firms

16   have too.  But that's --

17         MR. FELGER:  Okay.  Fair enough.  We'll take a look

18   at it and --

19         THE COURT:  That's what I know of it and --

20         MR. FELGER:  Right.

21         THE COURT:  -- I'll leave it up to you to bring it to

22   my attention.  Otherwise, we'll probably -- I don't know, we

23   can talk about whether and you can consider -- rather you want

24   to ask to schedule a hearing on it on the 20th day or the 21st

25   day and do it that way.  But I'll wait to hear what you want.

1   Otherwise, I'm going to hold it in 20 days and then I'll grant

2   it and it will be effective as of the date of the final.

3            MR. FELGER:  Okay.

4            THE COURT:  Okay?

5            MR. FELGER:  Thank you, Your Honor.

6            THE COURT:  All right.

7            MR. SHAPIRO:  Thank you for today.

8            MR. SPONDER:  Thank you, Your Honor.

9            MR. POSLUSNY:  Thank you, Your Honor.

10           THE COURT:  Thank you all for making yourselves

11  available.  Thank you, Mr. Sponder.  If there's nothing else,

12  I'm going to disconnect the telephone line.

13           MR. SPONDER:  No, Your Honor.  Thank you for letting

14  me appear via telephone.

15           THE COURT:  That's not a problem.  Thank you.  All

16  right, I will be looking, Mr. Poslusny, for the orders and

17  Chris will be contacting your office if we don't have them

18  shortly.

19           (Proceedings concluded, 3:21 p.m.)

20                        *  *  *

21

22

23

24

25

1                              **C E R T I F I C A T I O N**

2

3

4              We, Fran Maristch and Diane Gallagher, court approved

5     transcribers, certify that the foregoing is a correct

6     transcript from the official electronic sound recording of the

7     proceedings in the above-entitled matter.

8

9     _____

10

11    FRAN MARISTCH

12

13    _____    March 31, 2008

14    DIANE GALLAGHER

15    DIANA DOMAN TRANSCRIBING

16

17

18

19

20

21

22

23

24

25