**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

---

|  |  |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
|  | : FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., <u>et al.</u>, | : |
|  | : CHAPTER 11 |
| Debtors. | CASE NO. 08-14631 (GMB) |
|  | (Jointly Administered) |

---

### AMENDED MOTION FOR AN ORDER AUTHORIZING THE DEBTORS TO RETAIN, EMPLOY AND COMPENSATE PROFESSIONALS IN THE ORDINARY COURSE *NUNC PRO TUNC* TO MARCH 16, 2008[1]

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "<u>Debtors</u>")[2] the debtors and debtors-in-possession, hereby submit their amended motion (the "<u>Motion</u>") for entry of an order authorizing the Debtors to retain, employ and compensate professionals in the ordinary course <u>nunc pro tunc</u> to March 16, 2008. In support of this Motion, the Debtors respectfully represent as follows:

---

1 The Debtors have amended only paragraphs 37 and 38 of the Motion which pertain to the proposed payment procedures for the Ordinary Course Professionals (defined below).

2 In addition to Shapes/Arch Holdings L.L.C. ("<u>Shapes/Arch</u>"), the following entities, all of which are wholly owned subsidiaries or Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("<u>Shapes</u>"); Delair L.L.C. ("<u>Delair</u>"); Accu-Weld L.L.C. ("<u>Accu-Weld</u>"); and Ultra L.L.C. ("<u>Ultra</u>").

**<u>Background</u>**

1.       On March 16, 2008 (the "<u>Petition Date</u>"), the Debtors filed their respective

petitions for relief under Chapter 11, Title 11 of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>").

2.       These cases are being jointly administered pursuant to this Court's Order of

March 18, 2008 under the lead debtor "<u>Shapes/Arch Holdings L.L.C.</u>"

3.       The Debtors are operating their businesses and managing their properties as

debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.       No trustee or examiner has been appointed in these cases.  No official committee

of unsecured creditors has been appointed in these cases.

5.       The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue

is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28

U.S.C. § 157(b)(2).

<u>Description of Debtors and Their Businesses</u>

6.       *Shapes/Arch* is a holding company that owns each of the four operating

companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in

New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and

began focusing on producing aluminum extrusions.  The Debtors have consistently expanded

their businesses over the years by investing in new facilities and technology and by establishing

new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8

million, with Shapes generating approximately 65% of that revenue.  The Debtors have over

1000 employees, approximately 70% of whom are members of either the International

Brotherhood of Teamsters Local 837, or the United Independent Union.

7.      *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.  Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

8.      In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006.  This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

9.      *Delair* manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools.  Both product lines are sold through dealers, distributors and major retailers throughout the United States.

10.     Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey.  Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

11.     Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

12.     *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors.  Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States.  Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania.  Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

13.     Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006.  The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

14.     *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware.  Ultra has over 8,000 products sourced primarily from China.  Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

15.     Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

16.     Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

<u>The Bank Debt</u>

17.     Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("<u>CIT</u>"), as agent, and Bank One, National Association ("<u>Bank One</u>") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "<u>Financing Agreement</u>").  The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("<u>JP Morgan</u>") and Textron Corporation (the "<u>Lender Group</u>").

18.     Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit.  The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses.  The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "<u>PP&E Equity Borrowing Base Component</u>"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

19.     As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million.  Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group.  The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including,

without limitation, all accounts receivable, inventory, machinery and equipment and real

property, and the proceeds thereof.

20.    As of the Petition Date, the outstanding borrowings from the Lender Group were

as follows:  (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E

Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and

(iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the

Lender Group in the amount of $59.62 million (the "Bank Debt").

<u>Reasons for Filing</u>

21.    The Debtors' Chapter 11 filings were precipitated by a number of factors.  The

principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors

operate have experienced a downturn, which decline has affected the Debtors' revenues and

EBITDA beginning in late 2006 and continuing through the first quarter of 2008.  The Debtors'

revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in

2007, with projected revenue in 2008 of $262 million.  The Debtors' EBITDA plummeted from

about $21 million in 2006 to about $3.7 million in 2007.  The Debtors have been unable to

remain current with creditors, in particular, utilities and major suppliers, because of this

downturn.

22.    With the contraction in purchases by the Debtors' customer base and the Debtors'

overhead remaining largely static, the Debtors have been struggling to fund their operations

under their existing lending arrangement and find themselves in a situation in which they can not

repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of

$15 million.

23.    Over the course of the four months prior to the Petition Date, the Lender Group

worked with the Debtors to attempt to find a solution.  In late 2007, CIT Capital Securities LLC,

an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional

financing for the business.  Despite their efforts, they were unable to identify any lender willing

to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

24.    Closer to the Petition Date, the Debtors explored a possible sale/leaseback

transaction with certain third parties.  The Debtors, however, were not successful in negotiating a

transaction that would adequately address the Debtors' needs going forward.

25.    The Debtors also explored potential sale opportunities with existing management

and third parties, but elected not to pursue these potential opportunities in favor of the Versa

transaction (described hereinbelow) because the Versa transaction presents a better opportunity

to preserve the going concern and maximize a recovery for all creditor constituencies.

<u>The White Knight</u>

26.    With the Debtors' need for borrowings in excess of the borrowing base provided

for in the Financing Agreement projected to increase to over $7.4 million during the period

shortly after the Petition Date, without factoring in any payment to restructuring professionals or

to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund

any additional overadvance, the Debtors' continued ability to operate was in substantial doubt

without a quick and efficient transaction.

27.    In January, 2008, the Debtors began a dialogue with Versa Capital Management,

Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible

transaction.  Versa expressed interest and conducted extensive due diligence with respect to the

Debtors' businesses in late January.

28.    Also during this time frame, the Debtors retained Phoenix Management Services,

Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working

with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

29.    In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize).  As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights.  This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment  in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

30.    In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

31.    Contemporaneously with the filing of the petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing

for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.  An interim order authorizing the Debtors to obtain debtor-in-possession financing was entered on March 18, 2008.

32.    The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

33.    The Debtors have worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future.  The Debtors believe that the plan will achieve these objectives.

## Relief Requested

34.    By this Motion, the Debtors seek entry of an order pursuant to Sections 105(a) and 327 of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtors to retain, employ and compensate professionals, nunc pro tunc to March 16, 2008, for specific services rendered to the Debtors in the ordinary course of business pursuant to the terms and conditions set forth herein.

**Basis For Relief Requested**

35.     In the ordinary course of operating their businesses, the Debtors retain and employ different professional firms that provide, among other things, legal, accounting and consulting services.  In order to minimize any disruption to their operations, the Debtors seek authority to retain the professionals listed on Exhibit "A" (the "Ordinary Course Professionals") nunc pro tunc to March 16, 2008, and other professionals the Debtors may require from time to time during the pendency of these Chapter 11 cases, to render discrete services to the Debtors in a variety of matters affecting their day-to-day business operations.  The services of the Ordinary Course Professionals will not include the administration of the Debtors' Chapter 11 cases.

36.     The Debtors seek authority to continue the employment of such Ordinary Course Professionals post-petition without requiring each Ordinary Course Professional to file formal applications for employment and compensation pursuant to Sections 327, 328, 329 and 330 of the Bankruptcy Code.  Due to the number of the Ordinary Course Professionals that the Debtors wish to retain, it would be unwieldy and burdensome on both the Debtors and this Court to request each such Ordinary Course Professional to apply separately for approval of its employment and compensation.  Consistent with the dimensions of these Chapter 11 cases, the Debtors request that they be permitted to employ and retain the Ordinary Course Professionals on terms substantially similar to those in effect prior to the Petition Date, but subject to the terms described below.

Payment of Fees and Expenses

37.     The Debtors propose that they be permitted to pay, without formal application to the Court by any Ordinary Course Professional, 100% of the interim fees and disbursements to each of the Ordinary Course Professionals upon the submission to the Debtors of reasonably

detailed invoices setting forth the nature of the services rendered and calculated in accordance with such Ordinary Course Professional's standard billing practices; provided, however, that no Ordinary Course Professional receives interim fees and reimbursements that exceed an average of $5,000 per month, and no more than $25,000 per Ordinary Course Professional during the pendency of these cases.  The Debtors, however, reserve the right to make a motion to increase the aggregate amount per month authorized to be paid to all Ordinary Course Professionals.

38.     In the event that any single Ordinary Course Professional's fees exceed $25,000, during the course of these cases, such professional would be required to apply for approval by the Court of all fees and disbursements the professional incurred, but would be entitled to an interim payment up to the amount of $5,000 per month of service as a credit against the fees and disbursements ultimately allowed by the Court.

39.     In addition to professionals paid by the hour, the Debtors, in the ordinary course prior to the Petition Date, have retained attorneys to collect outstanding accounts receivable on a contingency basis (the "Contingency Fee Attorneys").  As part of this Motion, the Debtors seek authority to retain contingency Fee Attorneys in the ordinary course of their businesses without the Contingency Fee Attorneys being subject to the monthly limits proposed above.

<u>The Submission of Rule 2014 Affidavits</u>

40.     In order to be retained and compensated by the Debtors, each Ordinary Course Professional must comply with Bankruptcy Rule 2014.  The Debtors propose that while the Debtors be permitted to continue to employ, retain and compensate all Ordinary Course Professionals identified in <u>Exhibit "A"</u>, each Ordinary Course Professional nonetheless be required to file with the Court and serve upon:  (a) counsel for the Lender Group, (b) counsel for Versa, (c) the Office of the United States Trustee, (d) counsel for the Committee, if appointed,

and if none appointed, the Debtors' consolidated list of top 30 unsecured creditors (but no less than the five largest unsecured creditors from each case), (e) the undersigned counsel to the Debtors, and (f) all parties on the Master Service List the following:  (i) an affidavit describing the nature of the professional's services and its billing procedures and practices and disclosing whether the professional holds any interests adverse to the Debtors or their estates, prior to such Professional receiving any post-petition payments from the Debtors (the "Affidavit") a form of which is annexed hereto as Exhibit "B", and (ii) a completed retention questionnaire (the "Retention Questionnaire") a form of which is annexed hereto as Exhibit "C".

41.    During the pendency of these Chapter 11 cases, the Debtors may identify other professionals whose services are needed to consummate certain transactions or address other matters that may arise in the ordinary course of the Debtors' businesses.  Accordingly, the Debtors also request that they be authorized and empowered to employ and retain additional Ordinary Course Professionals from time to time, as necessary, in the ordinary course of their businesses without the need to file individual retention applications.  In such event, the Debtors propose to file a supplement to Exhibit "A" (the "Supplement") with this Court and serve it upon: (a) counsel for the Lender Group, (b) counsel for Versa, (c) the Office of the United States Trustee, (d) counsel for the Committee, if appointed, and if none appointed, the Debtors' consolidated list of top 30 unsecured creditors (but no less than the five largest unsecured creditors from each case) and (e) parties on the Master Service List.  An Ordinary Course Professional that is listed on a Supplement must file its Affidavit and Retention Questionnaire with the Court and serve it upon those parties listed in the preceding sentence contemporaneously with the filing of the Supplement with the Court.

42.    The Debtors further propose the following procedures for parties in interest to object to the retention of a particular Ordinary Course Professional whether listed on Exhibit "A"

to this Motion or a Supplement.  The Debtors propose that the parties listed in paragraph 40 and

any other party-in-interest served with the Affidavit and Retention Questionnaire shall have ten

days after the receipt of each Ordinary Course Professional's Affidavit and Retention

Questionnaire (the "Objection Deadline") to object to the retention of such Professional.  The

parties listed in paragraph 40 and any other party-in-interest shall file their objection with the

Court and serve it upon the Debtors' counsel, the Ordinary Course Professional and the United

States Trustee on or before the Objection Deadline.  If any such objection cannot be resolved

within ten days after it is filed, the matter shall be scheduled for a hearing before the Court at the

next regularly scheduled hearing date or other date otherwise agreeable to the Ordinary Course

Professional, the Debtors and the objecting party.  If no objection is filed within ten days after an

Ordinary Course Professional has filed its Affidavit and Retention Questionnaire, the Debtors

shall be authorized to retain such Ordinary Course Professional as a final matter without further

order of the Court.

Retention of the Ordinary Course Professionals<br>is in the Best Interests of the Debtors' Estates

43.     The Debtors submit that the continued employment and compensation of the

Ordinary Course Professionals is in the best interests of their estates, creditors and other parties-

in-interest.  While the Ordinary Course Professionals may wish to continue to represent the

Debtors on an ongoing basis, many may be unwilling to do so if they are unable to be paid on a

regular basis.  Given the discrete nature of the services the Ordinary Course Professionals will

provide, it is more efficient and cost-effective for the Debtors' estates to forego the requirement

that each such professional file a retention application.

44.     Moreover, the Debtors would likely incur expenses related to the Ordinary Course

Professionals preparing and obtaining approval of fee applications which cost can largely be

avoided under the procedure proposed in this Motion.  If the Debtors are unable to retain and

compensate these Ordinary Course Professionals with respect to the particular areas and matters

for which they were responsible prior to the Petition Date, the Debtors' estates will undoubtedly

incur additional and unnecessary expenses, as the Debtors will have to retain other professionals

who lack the background in the Debtors' operations or the expertise in particular matters.  It is in

the best interests of the Debtors' estates and their creditors that the Debtors avoid any disruption

in the professional services required by the day-to-day operation of their business.

45.     Relief similar to that sought herein has been granted in comparable Chapter 11

cases in this District.  See, e.g., In re THCR/LP Corporation, Case No. 04-46898 (JHW) (Bankr.

D.N.J. November 22, 2004) (order authorizing employment of professionals utilized in the

ordinary course of business).

Retention of The Ordinary Course Professionals Listed on
Exhibit A Nunc Pro Tunc to March 16, 2008 is Appropriate

46.     Since the inception of these Chapter 11 cases, the Debtors' management and their

retained professionals have been consumed with exigent administrative and operational matters

typically encountered in a Chapter 11 case.  Specifically, the Debtors have been primarily

focused on stabilizing their day-to-day operations, finalizing the debtor-in-possession financing

arrangements with their secured lenders, complying with the initial reporting requirements of the

Office of the United States Trustee, determining adequate assurance of certain utility providers in

addition to attending to the day-to-day operation of the Debtors' businesses.  Therefore, the

Debtors were not able to immediately identify the ordinary course professionals whose services

they would require during the course of these Chapter 11 cases.

47.     Certain of the Ordinary Course Professionals have continued to provide necessary

services to the Debtors since the Petition Date and the Debtors have now determined that they

require the services of the Ordinary Course Professionals listed on Exhibit "A" in order to continue to operate their businesses in the ordinary course without disruption.  Accordingly, the Debtors believe that it is necessary and appropriate to retain the Ordinary Course Professionals nunc pro tunc to March 16, 2008.

## Notice

48.      Notice of this Motion has been provided to: (a) counsel for the Lender Group, (b) counsel for Versa, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) the Debtors' consolidated list of top 30 unsecured creditors (but no less than the five largest unsecured creditors from each case), and (h) all parties on the Master Service List.  In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter an order authorizing the Debtors to retain, employ and compensation professionals in the ordinary course nunc pro tunc to March 16, 2008; and grant such other and further relief as is just and proper.


Dated: April 3, 2008                    COZEN O'CONNOR

                                        By:   /s/ Jerrold N. Poslusny, Jr.
                                            Mark E. Felger
                                            Jerrold N. Poslusny, Jr.

                                            Proposed Attorneys for the Debtors

## EXHIBIT A

| | Name of Professional | Services Provided |
|---|---|---|
| 1. | Panitch Schwarze Belisario & Nadel, LLP<br>One Commerce square<br>2005 Market Street, Suite 2200<br>Philadelphia, PA  19103<br><br>Contacts: Ronald Panitch, Esq. and Martin Belisario, Esq. | Legal Services – Intellectual Property |
| 2. | Manko, Gold & Katcher<br>Cherry Tree Corp. Center<br>535 Route 38, Suite 320<br>Cherry Hill, NJ  08002<br><br>Contact: Bruce Katcher, Esq. | Legal Service – Environmental Law (Counseling and Compliance) |
| 3. | Borges & Associates LLC<br>575 Underhill Blvd.<br>Syosset, NY 11791<br><br>Contact: Wanda Borges, Esq. | Legal Services – Collections (Accu-Weld) |
| 4. | ROUX Associates Inc.<br>1222 Forest Parkway, Suite 190<br>West Deptford, NJ 08066<br><br>Contact: Greg Martin | Environmental Consulting |
| 5. | Ballard Spahr Andrews & Ingersoll, LLP<br>Plaza 1000, Suite 500<br>Main Street<br>Voorhees, NJ  08043-4636<br><br>Contact: Glenn Harris, Esq. | Legal Services – Insurance Coverage for Environmental Litigation |
| 6. | Latsha, Davis, Yohe and McKenna, P.C.<br>350 Eagleview Boulevard, Suite 100<br>Exton, PA 19341<br><br>Contact:  Kevin McKenna, Esq. | Legal Services – Environmental Litigation |

| 7. | McCarter and English<br>100 Mulberry Street<br>Newark, NJ  07102<br><br>Contact:  Frank E. Ferrugia | Legal Services –  Appeal Real Estate Tax Assessment |
| --- | --- | --- |

## EXHIBIT "B"

**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

---

|  |  |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
|  | : FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., <u>et</u> | : |
| <u>al.</u>, | : CHAPTER 11 |
|  | |
| Debtors. | CASE NO. 08-14631 (GMB) |
|  | (Jointly Administered) |

---

## AFFIDAVIT IN SUPPORT OF ORDINARY COURSE RETENTION

STATE OF _____ )
                                        )   ss:
COUNTY OF _____ )

    **[NAME]** declares as follows:

    1.    I am a _____ of the firm of _____ (the "<u>Firm</u>"), which maintains

offices at [address].

    2.    This Affidavit is submitted in connection with an order of the United States

Bankruptcy Court for the District of New Jersey dated_____, 2008

authorizing Shapes/Arch Holdings L.L.C, Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C. and

Ultra L.L.C. (the "<u>Debtors</u>") to retain certain professionals in the ordinary course of business

during the pendency of the Debtors' Chapter 11 cases.  The Debtors have requested, and the

Firm has agreed, to continue to represent and advise the Debtors pursuant to Section 327(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

3.　　　　The Firm has provided, and/or intends to provide, the following services to the Debtors from and after the Petition Date:＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿.

4.　　　　To the best of my knowledge, information and belief, formed after due inquiry, (i) the Firm does not currently provide services to any party in any matter related to the Debtors, and (ii) the Firm does not represent or hold an interest adverse to the Debtors.

5.　　　　The Firm may now, or in the future, provide services to certain creditors of the Debtors or other parties in matters to the Debtors and their estates, but in this regard, the Firm's work for these clients will not include representation on any matters relating to the Debtors' Chapter 11 cases.

6.　　　　The Firm further states that it has not shared, nor agreed to share any compensation received in connection with these Chapter 11 cases with another party or person, other than as permitted by Section 504(b) of the Bankruptcy Code and Bankruptcy Rule 2016.

7.　　　　The foregoing constitutes the statement of the Firm pursuant to Sections 329 and 504 of the Bankruptcy Code and Bankruptcy Rules 2014 and 2016(b).

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
[Name]
[Title]
[Address and phone number]

Sworn to before me
this ＿＿ day of ＿＿＿＿＿, 2008

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Notary Public

## EXHIBIT "C"

**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

|  |  |  |
|---|---|---|
| In re: | : | UNITED STATES BANKRUPTCY COURT |
|  | : | FOR THE DISTRICT OF NEW JERSEY |
|  | : |  |
| SHAPES/ARCH HOLDINGS L.L.C., <u>et al.</u>, | : | CHAPTER 11 |
|  |  | CASE NO. 08-14631 (GMB) |
| Debtors. |  | (Jointly Administered) |

## RETENTION QUESTIONNAIRE

**TO BE COMPLETED BY PROFESSIONALS EMPLOYED BY**
Shapes/Arch Holdings L.L.C, Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C. and/or Ultra L.L.C. (the "<u>Debtors</u>")

**FILE THIS QUESTIONNAIRE WITH THE COURT.**
**RETURN A COPY OF IT TO**:

1.    Shapes/Arch Holdings L.L.C.
      9000 River Road
      Delair, NJ  08110
      Attn: David Gollin, Esq.

2.    Cozen O'Connor
      Chase Manhattan Centre
      1201 North Market St.
      Suite 140
      Wilmington, DE 19801
      Attn: Mark E. Felger, Esq.

3.      Cozen O'Connor
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ  08002
Attn: Jerrold N. Poslusny, Jr., Esq.

4.      Office of the United States Trustee
One Newark Center
Suite 2100
Newark, NJ 07102
Attn: Peter J. D'Auria, Esq.
Attn: Jeffrey M. Sponder, Esq.

5.      Blank Rome LLP
One Logan Square
130 North 18th Street
Philadelphia, PA 19103-6998
Attn: Joel Shapiro, Esq.

6.      Blank Rome LLP
The Chrysler Building
405 Lexington Ave.
New York, NY  10174
Attn: Lawrence Flick, Esq.

7.      Stradley Ronon
2600 One Commerce Square
Philadelphia, PA 19103
Attn: Paul A. Patterson, Esq.
Attn: Gary P. Scharmett , Esq.

If more space is needed, please complete on a separate page and attach.

1.      Name and address of firm:

_____
_____
_____

2.      Date of Retention: _____

3.      Type of Service Provided (accounting, legal, etc.):

_____
_____
_____

4.      Brief description of services to be provided:

        _____

        _____

        _____


5.      Arrangements for compensation (hourly, contingent, etc.):

        _____

        (a)      Average hourly rate (if applicable): _____

        (b)      Estimated average monthly compensation based on pre-
                 petition retention (if firm was employed pre-petition):

        _____


6.      Pre-petition claims against any of the Debtors held by the firm:
        Amount of claim:  $_____
        Date claim arose:_____
        Source of claim:_____


7.      Pre-petition claims against any of the Debtors held individually by
        any member, associate or professional employee of the firm:

        Name:_____
        Status:_____
        Amount of claim:  $_____
        Date claim arose:_____
        Source of claim:_____

        _____

        _____


8.      Disclose the nature and provide a brief description of any interest
        adverse to the Debtors or to their estates with respect to the matters
        on which the above-named firm is to be employed:

        _____

        _____

        _____