**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Proposed Attorneys for the Debtors

| | |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., <u>et al.</u>, | : CHAPTER 11 |
| Debtors. | : CASE NO. 08-14631 (GMB) |
| | : (Jointly Administered) |

**VERIFIED MOTION OF THE DEBTORS FOR AN ORDER PURSUANT
TO 11 U.S.C. §§ 105(a) AND 363 AUTHORIZING CONTINUATION
<u>OF CERTAIN CUSTOMER PRACTICES AND PROGRAMS</u>**

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "<u>Debtors</u>")[1] the debtors and debtors-in-possession, hereby move (the "<u>Motion</u>") for an order, pursuant to 11 U.S.C. §§ 105(a) and 363, authorizing the continuation of certain of the Debtors' customer practices and programs. In support of the Motion, the Debtors respectfully represent as follows:

**<u>Background</u>**

1.  On March 16, 2008 (the "<u>Petition Date</u>"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("<u>Shapes/Arch</u>"), the following entities, all of which are wholly owned subsidiaries or Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("<u>Shapes</u>"); Delair L.L.C. ("<u>Delair</u>"); Accu-Weld L.L.C. ("<u>Accu-Weld</u>"); and Ultra L.L.C. ("<u>Ultra</u>").

2. These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. No trustee or examiner has been appointed in these cases.

5. An official committee of unsecured creditors (the "Committee") was appointed on March 31, 2008, and has been active in these cases since that time.

6. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## Description of Debtors and Their Businesses

7. *Shapes/Arch* is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra. The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows. By 1959, the business had expanded and began focusing on producing aluminum extrusions. The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines. On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue. The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

8. *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.

Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

9. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

10. *Delair* manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

11. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

12. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

13. *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

14. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

15. *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

16. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

17. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

The Bank Debt

18. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Corporation (the "Lender Group").

19. Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), term loan, and letters of credit. The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

20. As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

5

21. As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

Reasons for Filing

22. The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

23. With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

24. Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional

6

financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

25. Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

26. The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presents a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

The White Knight

27. With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

28. In January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

29. Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

7

liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

30. In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of that agreement, Arcus became a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC retained 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

31. In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

32. Contemporaneously with the filing of the petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other

8

things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims.

33. The plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of approximately $25 million.

34. The Debtors have worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that will maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses will remain viable so that the Debtors can continue to be one of South Jersey's largest employers for the foreseeable future. The Debtors believe that the plan will achieve these objectives.

35. At the first day hearing in these cases, this Court entered thirteen (13) Orders granting first day motions on an interim or final basis, including interim orders approving debtor in possession financing from the Lender Group and Arcus.

**Relief Requested**

36. By this Motion, the Debtors respectfully request an order authorizing them to continue certain customer practices and programs that were in effect on the Petition Date, as more fully described below, pursuant to 11 U.S.C. §§ 105(a) and 363.

9

37. To maintain and preserve their carefully nurtured and long-standing relationships with customers, distributors and retailers and their well-established and respected names, the Debtors have adopted certain practices, policies and programs aimed at enhancing customer satisfaction (as further described below, the "<u>Customer Practices</u>").[2] It is essential that the Debtors be permitted to continue these Customer Practices to preserve their business relationships with this important constituency.

38. <u>Delair</u> provides replacement parts and services with a cost of approximately $35,000 per year to customers, distributors and retailers on account of customer warranties in the ordinary course of its business. It is common practice in the pool industry for homeowners to seek redress for product defects through the distributor or retailer rather than directly from the manufacturer, even though the warranty is provided by the manufacturer (in this case, Delair). Distributors and retailers commonly provide the necessary repair parts and services to the customer and seek reimbursement from Delair. Delair generally honors this arrangement and considers the replacement parts and services as being provided pursuant to the warranty. Delair seeks to maintain this current arrangement in order to protect its reputation in the marketplace and to ensure that distributors and retailers will continue to market and sell Delair's products. If the warranty program were altered, Delair's relationships with customers, distributors and retailers could be damaged which could, in turn, adversely affect Delair's efforts to maintain and grow its business. Delair believes that the actual cost to honor pre-petition claims under this program will not exceed $30,000.[3]

---

[2] nothing contained herein shall modify in any way the terms of any of the Debtors' the Customer Programs.

[3] Delair historically has found that the vast majority of warranty claims are made in the late-Spring through the end of the Summer each year. As such Delair believes that the $30,000 estimate for prepetition warranty claims is accurate.

39. <u>Accu-Weld's</u> warranty program costs approximately $210,000 per year and is quite similar to Delair's program set forth above. Although the warranty is between the customer and Accu-Weld, homeowners typically contact and seek redress through the distributor or retailer when they have issues with their replacement windows. Distributors and retailers, in turn, rely upon Accu-Weld to reimburse them for their costs for repair parts or services. This is standard practice in the replacement window industry, and distributors and retailers expect this treatment from all manufacturers. If Accu-Weld were not able to continue in this fashion, Accu-Weld believes that distributors and retailers may lose faith in the Accu-Weld brand and may push homeowners to Accu-Weld's competitors. As a result, Accu-Weld would experience a significant disadvantage in the marketplace, and like Delair, its ability to maintain and grow its business would be impaired. Accu-Weld believes that the actual cost to honor pre-petition claims under this policy will not exceed $60,000.

40. <u>Ultra</u>'s customer service department is regularly contacted by customers who assert that their orders were not properly or completely filled, or that some of the goods were damaged. Ultra investigates these claims and to the extent that it cannot verify that the order was correct, it typically issues a credit memo for the missing or damaged goods. If the customer requires replacement goods, Ultra typically sends them and invoices for them separately. If the customer had already remitted payment for the goods, Ultra adjusts its books accordingly to ensure that both Ultra and the customer are in agreement over the proper amount of the invoice and payment. This practice is prevalent in Ultra's industry, and in order to remain competitive in the hardware industry, Ultra needs to continue this practice. Ultra estimates that the total cost of this program is under $200,000 per year. However, because the majority of shortages are

11

reported within one month of receipt of a shipment, Ultra believes that the actual cost to honor pre-petition claims under this policy will be under $20,000.

41.     The Debtors believe that the Customer Practices they offer are important to the ongoing relationships with their customers, distributors and retailers; and these programs are standard in the Debtors' industries.  If these Customer Programs are not impacted by the Debtors' Chapter 11 filings, it will serve to promote the Debtors' goodwill in their industries and provide an incentive for customers, distributors and retailers to continue their business relationships with the Debtors during and after these Chapter 11 cases.  Failing to maintain these Customer Practices may irreparably damage the Debtors' relationship with their valued customers, distributors and retailers, resulting in a significant loss of revenue.  Therefore, the Debtors believe, given the damage that may be done through the abrupt discontinuation of these programs and given the relatively small cost of maintaining the Customer Practices, that the continuation of these programs is in the best interests of the Debtors, their estates and creditors.

42.     The aforementioned Customer Practices promote confidence in the Debtors' products and the Debtors' commitment to stand behind their products.  The Customer Practices, as they relate to the prepetition orders and sales of the Debtors' products and services, represent an obligation of the Debtors and evidence a claim against them – the total amount of which appears to be less than $110,000.  The continuation of the Customer Practices is necessary for the Debtors and is vital to the success of their reorganization efforts.  In the highly competitive markets in which the Debtors operate, the failure to honor the Customer Practices for even a brief period of time will jeopardize their efforts to successfully operate in Chapter 11 and maintain the value and integrity of their businesses, and could cause customers, distributors and retailers to lose confidence in, and perhaps cease doing business with, the Debtors, which would

jeopardize the Debtors' prospects for reorganization at this early and critical state of these Chapter 11 cases.

### Basis for Relief

43. Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). The purpose of Section 105(a) is to assure the Court's power to take whatever action "is appropriate or necessary in aid of the exercise of its jurisdiction." 1 Collier on Bankruptcy ¶ 105.01 at 105-6 (15 th. ed. Rev. 2001). The Debtors submit that the relief requested in the Motion is critical to both preserving their value and successfully reorganizing and is justified under Section 105(a) of the Bankruptcy Code.

44. To the extent the relief requested herein includes payments of prepetition claims, such relief is warranted under the "necessity of payment" doctrine. That doctrine provides for payment of prepetition claims as is necessary to maintain the continuity of a debtor's business. See In re Lehigh & New England Ry., 657 F.2d 570, 581 (3rd Cir. 1981) (payment of creditors' claims authorized under "necessity of payment" doctrine), In re NVR L.P., 147 B.R. 126, 127 (Bankr. E.D.Va. 1992), In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) (necessity of payment rule applies to chapter 11 debtors) (citing Dudley v. Mealey, 147 F.2d 268 (2d. Cir.), cert. denied, 325 U.S. 873 (1945)).

45. Courts in this district have recognized that in certain instances prepetition amounts must be paid to critical parties to maintain and enhance the overall value of the debtor's operations and business. Relief similar to that sought herein has been granted in comparable Chapter 11 cases in this district. See, e.g., In re Congoleum Corporation, Case No. 03-51524 (KCF) (Bankr. D.N.J. January 13, 2004) (order granting authority to honor and continue

customer programs), In re Today's Man, Inc., Case No. 03-16677 (GMB) (Bankr. D.N.J. March 4, 2003) (order pursuant to Section 105 of the Bankruptcy Code authorizing debtors/debtors in possession to honor certain pre-petition obligations to customers).

46.     Continuing the Debtors' Customer Practices in the ordinary course of their businesses is crucial to the future of the Debtors' operations and to the preservation of their businesses. The Debtors' ability to successfully operate in Chapter 11 and confirm the Plan depends in large measure on their reputation as a reliable manufacturer, product provider and business partner, holding their customers' interests as paramount. Failing to continue the Customer Practices could harm the Debtors' reputation irreparably and could result in customers, distributors and retailers terminating their relationships with the Debtors and conducting business with their competitors. Such consequences would severely damage the Debtors' market share and consequently the value of their businesses.

47.     The Debtors' estates will also benefit from the relief sought herein. The Debtors believe that the damage to their businesses that would result if they were prohibited from maintaining their Customer Practices consistent with past business practices would far exceed the costs associated with continuing such practices.

48.     The Debtors submit that nothing in this Motion is intended or should be construed: (a) as a waiver of the Debtors' right to dispute any claim, including, but not limited to, any claim relating to the Customer Practices described herein, (b) as an approval, assumption or adoption of any agreement or contract pursuant to Section 365 of the Bankruptcy Code, or (c) to prejudice the Debtors' right to seek relief under any section of the Bankruptcy Code on account of any amounts owed in respect of the Customer Practices described herein.

49. Based on the foregoing, it is the Debtors' business judgment that continuing the Customer Practices and honoring the pre-petition claims thereunder will best preserve the value of the Debtors' business and, thus, is in the best interests of the Debtors and their creditors and estates.

**Notice**

50. Notice of this Motion has been provided to: (a) counsel for the Lender Group, (b) counsel for Versa, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) counsel to the Creditors' Committee and (h) all parties on the Master Service List. In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion and such other and further relief as is just and proper.

Dated: April 4, 2008                                  COZEN O'CONNOR

                                                      By:   /s/ Jerrold N. Poslusny, Jr.
                                                            Mark E. Felger
                                                            Jerrold N. Poslusny, Jr.

                                                      Proposed Attorneys for the Debtors

Steven Grabell certifies and states as follows:

1. I am the Chief Executive Officer of Shapes/Arch Holdings L.L.C. and Shapes L.L.C.[3], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2. I have read the foregoing Motion and I hereby certify and verify that all of the statements contained therein are true.

3. I hereby verify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

_____
Steven Grabell

Dated: April 4, 2008

---

[3] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.