**BROWN & CONNERY, LLP**
Joseph M. Garemore (JG 5790)
6 North Broad Street, Suite 100
Woodbury, NJ 08096
(856) 812-8900
(856) 853-9933
*Attorneys for Pollution Control Financing*
*Authority of Camden County*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE:<br><br>SHAPES/ARCH HOLDINGS, LLC, et al,<br><br>Debtors. | CHAPTER 11<br><br>Case No. 08-14631 (GMB)<br><br>Jointly Administered |

**OBJECTION BY POLLUTION CONTROL FINANCING AUTHORITY OF CAMDEN COUNTY TO DEBTORS' JOINT DISCLOSURE STATEMENT**

**PLEASE TAKE NOTICE** that Pollution Control Financing Authority of Camden County (the "Authority") hereby files its objection to the Debtors' Joint Disclosure Statement, and in support of its Objection, states the following:

**BACKGROUND**

1. The Authority is a public body corporate and politic and a political subdivision of the State pursuant to N.J.S.A. 40:37C-4.

2. The Authority is a successor in interest to the Pennsauken Solid Waste Management Authority and it owns and operates the Pennsauken Sanitary Landfill (the "Landfill") located at 9600 River Road, Pennsauken, New Jersey.

3. According to their schedules and other filings, Shapes, LLC and/or its co-debtors Delair LLC and Ultra LLC (each a "Neighboring Debtor" and collectively the "Neighboring Debtors") owned and operated plants located adjacent to the Landfill at which

1

the Neighboring Debtors manufactured a variety of products and utilized a variety of environmental pollutants in their industrial operations over several decades.[1] As noted in their schedules Shapes, LLC's plant is located at 9000 River Road, Delair (Pennsauken), New Jersey; Delair LLC's plant is located at 8600 River Road, Delair (Pennsauken), New Jersey; and Ultra, LLC's plant is located at 1777 Hylton Road, Pennsauken, New Jersey.

4.     As noted in Schedule 4.5 to the Debtors' proposed joint plan, Aluminum Shapes is a party to a Memorandum of Agreement dated June 23, 1993 pertaining to chromium contamination at the 9000 River Road, Pennsauken New Jersey site (the "MOA").  Pursuant to the 1993 MOA Aluminum Shapes agreed to submit a remedial action workplan and a remedial investigation report to the New Jersey Department of Environmental Protection (the "NJDEP") in connection with chromium contamination in groundwater at the Aluminum Shapes site at 9000 River Road, Pennsauken New Jersey.

5.     As a result of its investigation at the site, Roux Associates, Inc., environmental consultants for Aluminum Shapes, has confirmed that a groundwater divide exists in the center of the Aluminum Shapes facility.  West of the divide, groundwater flows to the west/ northwest.  East of the divide, groundwater flows southeast (i.e., towards the adjacent Landfill).

6.     As a result of the groundwater flow in a southeast direction, contaminants detected by the monitoring wells at the Landfill register the groundwater impact caused by Aluminum Shapes' onsite activities.

7.     In addition, Aluminum Shapes has been identified as a generator of wastes disposed of at the Landfill.

8.     On or about December 8, 1988, an Administrative Consent Order (the "ACO") was executed by the New Jersey Department of Environmental Protection (the "NJDEP") and

---

[1] While not spelled out specifically, it appears that Aluminum Shapes, the defendant in the Litigation (defined below) is a predecessor entity to Aluminum Shapes, LLC. Nor is Aluminum Shapes' relationship to the other Debtors clear.

2

the Pennsauken Solid Waste Management Authority regarding the remedial investigation and cleanup of the Landfill.

9. Pursuant to the terms and conditions of the ACO, the Pennsauken Solid Waste Management Authority agreed to perform testing and cleanup activities with respect to the Landfill.

10. In or about August, 1991, the Authority became the successor in interest to the Pennsauken Solid Waste Management Authority for purposes of the Landfill and the ACO. The Authority has conducted investigation and remediation work at the Landfill under the ACO since that time.

11. Under New Jersey statutory and common law, including but not limited to N.J.S.A. 58:10-23.11 et seq. (the "New Jersey Spill Act"), the Authority has the right to pursue money damages from any person, including but not limited to, all individuals, entities, companies, institutions, and municipalities that discharged a hazardous substance, or that are in any way responsible for any hazardous substances at the Landfill.

12. The Authority is one of the plaintiffs in an action titled Pennsauken Solid Waste Management Authority et al v. James D. Morrisey, Inc. et al., in the Superior Court of New Jersey, Camden County, Law Division, Docket No.CAM-L-13345-91 (the "Litigation").

13. Aluminum Shapes is one of the defendants named in the complaint in the Litigation.

14. On March 14, 2008, the Debtors filed voluntary chapter 11 petitions in this Court. By Order dated March 18, 2008 the cases were ordered to be jointly administered under case number 08-14631.

15. On the petition date Debtors filed a joint chapter 11 plan and a joint disclosure statement.

3

16. In short order, Debtors secured an April 17, 2008 hearing date on the adequacy of the disclosure statement, and also secured an order setting a May 15, 2008 bar date for the filing of claims against the Debtors.

17. As of April 13, 2008 a total of three (3) separate claims have been filed in these jointly administered bankruptcy cases.[2]

18. It is against this background, in the nascent stages of these bankruptcy cases, that the Debtors seek approval of their joint disclosure statement.

## **LEGAL ARGUMENT**

19. A disclosure statement must be approved by the Court before it can be used to solicit votes for the plan. 11 U.S.C. § 1125(b). The Court may not approve a disclosure statement unless it finds that the disclosure statement contains adequate information. 11 U.S.C. § 1125(b). The Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan....

11 U.S.C. § 1125(a)(1).

20. Bankruptcy Code §1125(a)(1) does not specifically describe what constitutes "adequate information." The legislative history reflects that "precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis." H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977).

21. A disclosure statement must contain "adequate information" so that impaired creditors can make rational decisions as to the risks and benefits of the proposed plan. See, e.g.,

---

2    A duplicate claim was filed on behalf of Steven Battel in each of the five cases.

4

In re Phoenix Petroleum Co., 278 B.R. 385, 392-93 (Bankr. E.D. Pa. 2001); In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

22. In considering disclosure statements, courts have developed a list of criteria to consider, including: (1) the circumstances leading to the filing of the chapter 11 petition; (2) a description of available assets and their value; (3) the debtor's business future; (4) the source of information contained in the disclosure statement; (5) a disclaimer; (6) the condition of the debtor while in chapter 11; (7) scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the debtor's future management; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including professional fees; (13) whether accounts receivable may be collected; (14) financial information, data, evaluations or projections relevant to a creditor's decision to accept or reject the plan; (15) information relevant to the risk to creditors under the plan; (16) projected preference recoveries; (17) non-bankruptcy litigation; (18) tax attributes of the debtor; and (19) the relationship of the debtor with its affiliates. See Phoenix Petroleum, 278 B.R. at 393; Cardinal Congregate I, 121 B.R. at 765; In re Scioto Valley Mortgage, 88 B.R. 168 (Bankr. S.D. Ohio 1988); In re Metrocraft Publishing Servs., Inc., 39 B.R. 567 (Bankr. N.D. Ga. 1984).

23. The required level of disclosure generally is dependent on the size, complexity and nature of the chapter 11 case; in a large complex case (such as the case at bar) substantial disclosures in the above categories (and perhaps others) will often be mandated. Phoenix Petroleum, 278 B.R. at 393; In re Monroe Well Service, Inc., 80 B.R. 324, 330 (Bankr. E.D.Pa. 1987).

24. As detailed below, the Debtors' disclosure statement omits material information necessary to any creditor's assessment of what the plan proposes to pay. Moreover, as detailed

below, the plan may not be confirmable as proposed. Under these circumstances, approval of the disclosure statement should be denied.

**I.    The Disclosure Statement Provides Inadequate and Untimely Notice to Creditors.**

25. Federal Rule of Bankruptcy Procedure 3017(a) requires that the Court hold a hearing "on at least 25 days' notice to the debtor, creditors, equity security holders and other parties in interest…". While the notice of the hearing on disclosure statement was filed on March 20, 2008 (exactly 25 days prior to the objection deadline) the filed disclosure statement is materially incomplete.

26. In particular, the disclosure statement makes reference to financial projections and a liquidation analysis which it notes are to be provided in a "Plan Supplement." That Plan Supplement has yet to be filed; thus creditors are left to speculate as to the feasibility of the plan and as to the liquidation analysis.

27. It is respectfully submitted that such disclosure is facially insufficient and that the hearing on the adequacy of the disclosure statement must be postponed until sufficient notice of the complete disclosure statement, with all supporting data, has been filed and served.

**II.    The Disclosure Statement Provides Insufficient Information Regarding Intended Claim Objections.**

28. Local Bankruptcy Rule 3016-2(a) requires the plan proponent to "review all claims prior to filing a disclosure statement." Local Bankruptcy Rule 3016-2(b) requires that the disclosure statement "state the number and amount of claims of each class to which the proponent intends to object."

29. The Debtors' filing of the joint plan on the petition date rendered L.B.R. 3016-2(a) a practical nullity.

30. Nowhere in the disclosure statement do the Debtors indicate the number or amount of claims of each class to which they intend to object, in violation of L.B.R. 3016-2(b).

6

These deficiencies may perhaps relate to the haste with which the Debtors seek to present their disclosure statement and plan to the Court.

### III. The Disclosure Statement Contains Inadequate Information Regarding Insurance.

31. The disclosure statement contains insufficient information regarding the Debtors' insurance that may be available to satisfy claims of creditors in accordance with section 11.10 of the plan. At a minimum, the disclosure statement should include the following information pertaining to each of the Debtors' insurance policies: named of insurance company; name of insured, policy number, policy type, applicable limits, available and remaining coverage.

### IV. The Disclosure Statement Fails to Clearly Disclose Whether It Purports to Bar Future Suits Seeking Insurance Proceeds.

32. While section 11.10 of the proposed plan provides that the plan "shall not diminish or impair the enforceability of any insurance policy…" sections 11.8 and 11.9 of the proposed plan would broadly bar the assertion of any claims against the reorganized debtors after the effective date. The disclosure statement and plan should clearly permit nominal post-discharge claims against the Debtors solely for the purpose of collecting on any available insurance. See First Fidelity Bank v. McAteer, 985 F.2d 114, 118 (3d Cir. 1993) ("the protection from liability afforded under the Code does not affect the liability of the debtor's insurers."). Thus the disclosure statement lacks clarity on this important issue.

### V. The Disclosure Statement Improperly Designates Classes of Claims as Impaired in Violation of Bankruptcy Code §1124.

33. Bankruptcy Code §1124 provides that a class of claims or interests is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." Based on the description of such claims and their treatment in the disclosure statement, it is submitted that Class 3, 4, 9, 10, and

7

11, all of which are secured claims being paid in full plus contract interest, plus a retention of their collateral until each receives payment in full, are at best artificially impaired classes. See, e.g. In re PTI Enterprises (U.S.), Inc., 324 F. 3d. 197, 206-07 (3d Cir. 2003). Such a plan cannot be confirmed, see In re Curtis Center Ltd. Partnership, 195 B.R. 631, 643 (Bankr.E.D.Pa. 1996).

### VI. The Disclosure Statement Attempts to Gerrymander Classes of Claims to Achieve Cramdown Confirmation.

34. The summary of distributions contained on page 6 of the disclosure statement reveals the creation of a class of claims (secured claims of Crown Credit Company) worth just over $30,000.

35. It is submitted that a $30,000 class of claims lacks sufficient weightiness to merit a separate voice in these consolidated, complex chapter 11 cases, and that such a class is designed merely to serve as a path towards a cramdown confirmation. See John Hancock Mut, Life Ins. Co. v. Route 37 Business Park Assoc., 987 F.2d 154, 159 (3d Cir. 1993).

### VII. Debtors' Plan is Not Proposed in Good Faith and Therefore Cannot Be Confirmed.

36. To the extent that Debtors have sought to artificially impair classes of claims, such efforts implicate the Debtors' good faith and therefore the feasibility of the plan under Bankruptcy Code §1129(a)(3). Where a plan is patently unconfirmable, courts will not approve a disclosure statement. See In re Monroe Well Service, Inc., 80 B.R. 324, 332-33 (Bankr. E.D.Pa. 1987); In re Phoenix Petroleum Co., 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001).

### VIII. The Disclosure Statement Fails to Accurately Quantify the Extent of Environmental Liability.

37. The disclosure statement and plan would limit all of Debtors' liabilities under multiple disclosed environmental cases and administrative proceedings to a sum total of $325,000 in insurance funds, none of which would come from the Debtors.

8

38. The disclosure statement provides not one shred of information explaining how the Debtors' environmental liabilities are calculated.

39. It is submitted that neither this Court nor the creditors can accept Debtors' estimate at face value, and that such ipse dixit statements are inadequate disclosures. See Phoenix Petroleum, 278 B.R. at 393 (criteria (4) and (14)).

### IX. Debtors' Liabilities Under the MOA May Not Be Subject to Discharge.

40. In In re Torwico Electronics, Inc., 8 F.3d 146 (3d Cir. 1993), the Third Circuit Court of Appeals held that an order requiring ongoing cleanup of an environmental hazard was not a claim that is subject to discharge.

41. To the extent that there are substantive differences between the Debtors' various environmental obligations under the MOA and otherwise, Debtors' allocation of plan funds to ongoing cleanups of environmental hazards to which it contributed must be independent of its responsibilities under the MOA, not lumped together.

### X. Debtors' Environmental Liabilities Cannot Be Fixed at an Unrealistically Low Amount.

42. The United States Supreme Court in Midlantic Nat'l Bank v. New Jersey Department of Environmental Protection, et al, 474 U.S. 494 (1986) held that a trustee cannot abandon estate property in contravention of state laws protecting public health and safety from "identified hazards." Midlantic, 474 U.S. at 507 (footnote omitted). The Debtors are debtors in possession and their efforts to relegate their combined obligations under: (a) the MOA; (b) the Litigation; and (c) all other environmental claims to $325,000 of insurance company money are tantamount to an abrogation of responsibility forbidden under Midlantic.

### RESERVATION

43. Pollution Control Financing Authority of Camden County reserves the right to file amended or supplemental objections as information becomes available to it, and reserves the right to join other objections that may be filed.

WHEREFORE, the Pollution Control Financing Authority of Camden County submits that the Debtors' joint disclosure statement be disapproved.

        **BROWN & CONNERY, LLP**
        Attorneys for Pollution Control Financing
        Authority of Camden County

Dated: April 14, 2008          By: /s/ Joseph M. Garemore
                                           Joseph M. Garemore