**GREENBERG TRAURIG, LLP**
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932-0677
Tel: (973) 360-7900
Fax: (973) 295-1333
Louis T. DeLucia, Esq. (LD-3879)
Alan J. Brody, Esq. (AB-4777)
Diane Vuocolo, Esq. (DV-9904)
Alyson M. Fiedler, Esq. (AF-9058)
Counsel for Arch Acquisition I, LLC

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | Case No.: 08-14631 (GMB) |
| | (Jointly Administered) |
| Shapes/Arch Holdings L.L.C., *et al.*, | Chapter 11 |
| Debtors. | Hearing Date and Time: |
| | April 17, 2008 at 10:00 a.m. |

### OBJECTION OF ARCH ACQUISITION I, LLC
### TO DEBTORS' DISCLOSURE STATEMENT

Arch Acquisition I, LLC ("Arch"), a creditor, by and through its counsel, Greenberg Traurig, LLP, hereby submits this objection to the entry of an order approving the Disclosure Statement (the "Disclosure Statement") filed by the above-captioned debtors and debtors-in-possession (the "Debtors") in conjunction with their Joint Chapter 11 Plan of Reorganization (the "Proposed Plan").[1] In support of its objection, Arch respectfully represents and states that:

### PRELIMINARY STATEMENT

1. One of the fundamental principles of any bankruptcy case is that "a debtor-in-possession has all of the duties of a trustee in a Chapter 11 case, including the

---
[1] All capitalized terms not herein defined shall have the meanings given such terms in the Debtors' Proposed Plan.

duty to protect and conserve property in its possession for the benefit of creditors." In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990).

2. However, in these cases, the Debtors seem to be ignoring their fiduciary obligation to maximize value for the benefit of the creditors of the estates. Instead of working to find the best value for the assets, the Debtor are complicit in a scheme designed solely to benefit Arcus, ASI Funding, LLC and its affiliates ("Arcus"), the party controlling the Debtors. The Debtors' failure to insist on a open and competitive process benefits Arcus by allowing Arcus to execute its pre-petition strategy to obtain 100% of the equity of the Reorganized Debtors at a discounted price, without regard to the creditors and other parties-in-interest.

3. In certain Chapter 11 cases, the Debtors are forced to pursue a strategy that is less than optimal because they do not have the money or the time to maximize value. In this case, those reasons do not exist. Arch has provided the Debtors with a proposal for debtor-in-possession financing that is more attractive than the existing Arcus financing which can close virtually immediately. Arch has also provided the Debtors with an Asset Purchase Agreement and a draft Plan of Reorganization that embody an offer with limited conditions and substantially more value for the creditors and parties-in-interest than the Arcus proposal. Still, the Debtors have persisted in moving forward with the Disclosure Statement hearing on the Proposed Plan without regard to their clear fiduciary obligations. In this circumstance, the only rational conclusion is that the Debtors are controlled by an insider, Arcus, which is driving a process to benefit themselves rather than the estates.

4. The Proposed Plan violates fundamental policies of the Bankruptcy Code. If the Court permits this process to continue, the result is certain - the Debtors' will complete a process that will result in a benefit to Arcus but do nothing to maximize value for the estates. The Disclosure Statement should be denied and the expedited plan process halted until, at a minimum, a process is structured that will obtain the best available value for the creditors of these estates.

5. Arch is also considering filing a motion to terminate the Debtors' exclusive periods to file and solicit their Proposed Plan and submitting a plan which provides substantially more value to creditors (the "Arch Plan"). Accordingly, the Court should deny approval of the Disclosure Statement and direct the Debtors to engage in a fair and open process that truly seeks to maximize value for all constituencies and provides the opportunity to offer greater value to the estates.

## BACKGROUND OF DEBTORS' BANKRUPTCY CASES

### A. Arcus/Versa Control The Debtors

6. According to the Debtors, Shapes/Arch Holdings L.L.C. ("Shapes/Arch") is the parent company and sole shareholder of each of the remaining Debtors: Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C. In February of 2008, the Debtors, Ben L.L.C., which owns 100% of the equity of Shapes/Arch, and Versa Capital Management, Inc. ("Versa"), an affiliate of Arcus, entered into an agreement whereby, *inter alia*, Arcus agreed to lend up to $25 million to the Debtors during their Chapter 11 proceedings and Arcus became a manager of Shapes/Arch. Moreover, Ben L.L.C. assigned to Arcus, 79.9% of Ben L.L.C.'s voting rights with respect to its interests in

Shapes/Arch.[2] The entire transaction that was negotiated and agreed to pre-petition is subject to certain material terms and conditions, including the ability of Arcus to obtain 100% of the equity in the Reorganized Debtors as part of a plan of reorganization (the "Commitment Agreement"). Essentially, pre-petition, through the Commitment Agreement, the Debtors agreed to a Plan which would transfer all of their equity to Arcus.

7. On March 16, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petitions"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, the Debtors are continuing to operate their businesses and properties as debtors-in-possession. No trustee or examiner has been appointed in these cases.

8. On March 18, 2008, an Order was entered by the Court, authorizing the Debtors to, *inter alia*, (a) immediately rollup more than $50 million of the Debtor's pre-petition indebtedness into post-petition debt (the "Revolver DIP Facility"), (b) borrow from Arcus up to an aggregate principal amount of $25 million in order to, primarily, pay down the pre-petition indebtedness (the "Arcus DIP Facility"), and (c) grant liens in all assets of the Debtors to the Arcus and CIT, on an interim basis (the "Interim Order"). Upon information and belief and according to the Budget filed with the Court as <u>Exhibit 1</u> to the Interim Order, the Revolver DIP Facility has been paid down and CIT has advanced certain funds to cover the Debtors' operating expenses.

---

[2] Pursuant to 11 U.S.C. §101(31), Arcus controls (through its 79.9% voting rights) the Debtors and may, therefore, be an "insider" of the Debtors.

**B.    The Debtors' Proposed Plan**

9.    Contemporaneously with the filing of the Petitions, the Debtors filed the Proposed Plan and related Disclosure Statement that provide, *inter alia*, for Arcus to obtain all of the equity in the Reorganized Debtors for little or no additional cash and a deminimus two percent (2%) dividend to holders of general unsecured creditors. Specifically, the Plan provides, in significant part, the following:

- Unsecured Creditors will receive their pro rata of only $500,000. Plan §4.3

- Arcus will contribute an unidentified amount of value, in cash or credit, in exchange for which Arcus will receive 100% of the equity interests in the Reorganized Debtors. Plan §5.4.

- The Debtors and Arcus, among others, will be released from claims of third parties. Article VI.

- The Arcus DIP Facility will continue post-confirmation. Plan §§3.4 and 5.4.

**C.    Arch Offered Debtors DIP Financing And To
Purchase Debtors' Assets On Considerably Better Terms**

10.    On April 1, 2008, Arch provided the Debtors with a written offer to refinance the entire Arcus DIP Facility on significantly more favorable terms than those offered by Arcus. That proposal allowed for the establishment of a competitive process through either a plan or sale under Section 363 of the Bankruptcy Code, thereby creating an opportunity to maximize the value of the Debtors' assets or business. Immediately thereafter, Arch provided the Debtors with a draft Asset Purchase Agreement that offered substantially more consideration to the Debtors' estates than the alleged value currently provided in the Debtors' Proposed Plan. The draft Asset Purchase Agreement contained very limited conditions so as to avoid creating delay in the process.

5

11. In addition, Arch requested certain limited due diligence information from the Debtors. The Debtors have not provided that information. In fact, the Debtors seem to largely ignore the Arch offer probably because they are controlled by Arcus, an insider, and are proceeding down a single path, to the detriment of these estates.

12. It is clear that the Debtors and Arcus, together, are pursuing an extremely expeditious course so that no one else has any opportunity to properly evaluate Arcus' offer and make a competitive bid. Competitive bidding would only inure to the benefit of the unsecured creditors of the Debtors' estates, who, under the Proposed Plan, will only receive a distribution of approximately 2% of their claims. Clearly, the creditors of these estates should be entitled to obtain the greatest value, which can only be done through the establishment of a competitive process, as mandated by the Bankruptcy Code.

## ARCH'S OBJECTIONS TO THE APPROVAL OF THE PROPOSED DISCLOSURE STATEMENT

### A. The Disclosure Statement Should Not Be Approved Because It Lacks Adequate Information

13. The Debtors and Arcus should not be permitted to eradicate any chance of a fair recovery for general unsecured creditors by forcing the Court to approve an expedited plan process for the sole purpose of transferring 100% of the equity in the Reorganized Debtors to Arcus, without the opportunity for creditors to obtain proper disclosure.

14. Before a debtor can solicit votes on a plan, it must provide holders of claims or interests with a disclosure statement approved by the court as containing adequate information to enable "a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. §§ 1125(a)(1) and (b). Therefore, a disclosure statement should contain "all those factors presently known to the plan

proponent that bear upon the success or failure of the proposals contained in the Plan." In re Beltrami Enters., Inc., 191 B.R. 303, 304 (Bankr. M.D. Pa. 1995) (quoting In re Stanley Hotel, Inc., 13 B.R. 926, 929 (Bankr. D. Colo. 1981)). Here, however, the Debtors' Disclosure Statement lacks information necessary to evaluate the Proposed Plan, including, *inter alia*, a host of missing or misleading details regarding Arcus' contributions to the Reorganized Debtor. See 11 U.S.C. §§ 1125(a) and (b); see also In re Copycrafters, 92 B.R. at 979-80 (Bankr. N.D. N.Y. 1988); In re Scioto Valley Mortgage Co., 88 B.R. 168, 170-71 (Bankr. S.D. Ohio 1988). See 11 U.S.C. § 1125(b). "Adequate information" is defined by section 1125(a)(1) as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan ....

11 U.S.C. § 1125(a)(1).

15. The Bankruptcy Code requires that a disclosure statement contain all pertinent information bearing upon the success or failure of the proposals contained in a plan of reorganization and should set forth all material information relating to the risks posed to creditors. See, e.g., In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990). A disclosure statement does not meet the "adequate information" standard of Section 1125 when such statement does not contain simple and clear language delineating the consequences of the proposed plan. In re Copy Crafters Quickprint, Inc., 92 B.R. 973 (Bankr. N.D.N.Y. 1988).

7

16. It is respectfully submitted that, for the following reasons, the Debtors' Disclosure Statement fails to satisfy the requirement of "adequate information" and to meet even the minimum requirements of Section 1125 of the Bankruptcy Code.

17. The Debtors have omitted important information and documents from the Proposed Plan and Disclosure Statement, some of which are allegedly to be provided in Plan Supplement (as such term is defined in Section 1.86 of the Proposed Plan), which are essential for creditors to make an informed decision on the Proposed Plan, including, *inter alia*:

    (i)    Financial Projections (Disclosure Statement § I.A.).

    (ii)    Liquidation Analysis (Disclosure Statement § I.A.). The Proposed Plan proponents' knowing failure to file and distribute the required liquidation analysis patently exemplifies their complete disregard for adequate disclosure. Accordingly, it is impossible for the Court or the creditors of these estates to determine whether the Proposed Plan is in the best interest of creditors, as required by Section 1129(a)(7) of the Bankruptcy Code.

    (iii)    Schedule of Environmental Claims (Disclosure Statement § I.A.).

    (iv)    Solicitation Procedures Order and related "detailed voting instructions" accompanying each Ballot (Disclosure Statement § I.A.). Nor is the form of Ballot provided or affixed to the Disclosure Statement.

    (v)    Commitment Agreement entered into by and between Versa, the Debtors, Ben LLC and others that, amongst other things, transferred majority control of the Debtors to Arcus, and is the foundation for the Debtors' Proposed Plan (Disclosure Statement § IV.C.).

    (vi)    Plan Funding Debt Commitments (Disclosure Statement § VII.F.), which provide terms and provisions relevant to the Debtors' exit financing. Nor has the Exit Facility or the Amended and Restated Loan and Security Agreement memorializing the exit financing been disclosed to the Court or any other party in interest, despite reference to it in Section VII.H.4 of the Disclosure Statement.

 (vii) Plan Administration Agreement has also not been filed for consideration by the Court or parties in interest even though that document effectuates and controls the creation and administration of the Plan's Liquidation Trust (Disclosure Statement § VII.H.2).

 (viii) Reorganized Debtors' Operating Agreements (Disclosure Statement § VII.H.1.) has also not been filed or disclosed by the Debtors;

 (ix) Management Equity Inventive Plan, defined at Section 1.66 of the Proposed Plan and which appears to provide controlling terms through which the Debtors' management will receive equity in the Reorganized Debtors, has also not been filed or provided to parties in interest.

18. It is essential that parties should have time to review the above-referenced documents before the objection deadline for the Confirmation Hearing. Therefore, all required disclosure, including the Plan Supplement, should be filed at least ten (10) days before the <u>objection deadline</u> for the Confirmation Hearing, not simply prior to the hearing itself, as set forth in the Proposed Plan. <u>See</u> Plan §1.86.

19. Similarly, additional material information required by Section 1125 of the Bankruptcy Code is <u>not</u> provided in the Disclosure Statement. As such, creditors entitled to vote on the Proposed Plan will <u>not</u> have inadequate information upon which to rely. Clearly, the Bankruptcy Code specifically mandates the disclosure of such critical information, which the Disclosure Statement unequivocally fails to do:

 (i) Neither the Disclosure Statement nor the Proposed Plan provide any information on the amount of estimated or allowed Administrative Claims, Fee Claims, Priority Tax Claims, Miscellaneous Secured Claims or Collateral Insurance Claims and only give a wide ranging estimate of the Class II Warehouse and Shippers claims (Disclosure Statement § II.B.). Without such information, it is impossible for any creditor or "hypothetical investor" to assess the feasibility of the Proposed Plan, and the prospects of payment on its claim.

 (ii) The Debtors allege they engaged in a pre-bankruptcy marketing effort (and retained TM Capital) to sell the Debtors' assets and

business, which did not produce any "other timely and variable opportunities," aside from the Plan Funders. (Disclosure Statement § IV.B.). Upon information and belief, the Debtors and/or TM Capital (on the Debtors' behalf) received other offers or statements to interest. The creditors are entitled to know if the Debtors' pre-petition "lock-up" agreement with Arcus to purchase the Debtors' assets and its business is, in fact, the "highest and best" offer available to the estates.

(iii)   The Debtors have failed to estimate preferential payments or avoidance actions as required by Section 1125 of the Bankruptcy Code (Disclosure Statement § VI.A.).

(iv)   Section 1125 of the Bankruptcy Code requires an informed disclosure of all anticipated or prospective litigation by the estates. The Debtors' disclosures at Section VI.B. of the Disclosure Statement fall far short of "adequate disclosure" of those prospective causes of action.

(v)   The Debtors fail to identify post-confirmation management and the individuals in actual control of the Reorganized Debtors as required by Sections 1125 and 1129(a)(5)(A)(i) of the Bankruptcy Code. Similarly, the Plan Administrator should be specifically identified so that a determination may be made by the Court and those voting on the Plan as to whether or not the Plan Administrators holds or represents interest adverse to the Estates, or is otherwise in a conflict of interest. (Disclosure Statement §§ VII.H.3 and VII.N).[3]

(vii)   The 2005 amendments to section 1125(a)(1) of the bankruptcy Code <u>requires</u> a full discussion of the tax implications of the Plan "as to the debtor and any successor to the debtor." The Debtors' Plan, however, only addresses these tax implications to the holders of claims against and interests in the Debtors. Accordingly, the Disclosure Statement fails to comply with the mandates of section 1125(a)(1) of the Bankruptcy Code. (Disclosure Statement § IX).

(viii)   The amount of the various "Reserves" established under the Plan should be disclosed in order to enable creditors and any "hypothetical investor" to adequately assess the feasibility and cash requirements of the Plan.

---

[3] The Disclosure Statement has two section VIIs (one at page 15 and one at page 33).

**B. The Disclosure Statement Should Not Be Approved Because The Proposed Plan Is Patently Unconfirmable**

20. Approval of the Disclosure Statement should be denied because its seeks to solicit votes in favor of confirmation of a plan that is patently unconfirmable. In re Main Street AC, Inc.; 234 B.R. 771, 775 (Bankr. N.D. Ca. 1999); In re 266 Washington Associates, 141 B.R. 275, 281 (Bankr. E.D.N.Y. 1992); In re Bjolmes Realty Trust, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991); In re Filex, 116 B.R. 37, 40 (Bankr. S.D.N.Y. 1990); In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 980 (Bankr. N.D.N.Y. 1988); In re Atlanta West VI, 91 B.R. 620, 621 (and cases cited therein) (Bankr. N.D. Ga. 1988); In re Weiss-Wolf Inc., 59 B.R. 653, 655 (Bankr. S.D.N.Y. 1986); In re Pecht, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). The preliminary inquiry is a prerequisite to the consideration of the adequacy of a proposed disclosure statement. Valrico Square, 119 B.R. at 795.

21. Where, as here, the Proposed Plan on its face does not comply with the basic requirements of the Bankruptcy Code, courts refuse to approve the disclosure statement that describes it rather than engage in the futile exercise of pursuant confirmation of a patently unconfirmable plan. In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr. E.D. Pa 2001) ("If the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible,' the court should exercise its discretion to refuse to consider the adequacy of disclosures. Such an exercise of discretion is appropriate because undertaking the burden and expense of plan distribution and vote solicitation is unwise and inappropriate if the proposed plan could never legally be confirmed."). See also In re Beyond.com Corp., 289 B.R. 138, 143-46 (Bankr. N.D. Cal. 2003) (denying approval of disclosure statement where "plan and disclosure statement

11

are as freewheeling with the Bankruptcy Code and Rules as Enron's accountants were with the tax laws in the 1990's"); In re Mahoney Hawkes, LLP, 289 B.R. 285, 304 (Bankr. D. Mass. 2002) (refusing to approve disclosure statement because plan that did not provide sufficient justification for permanent injunction and releases in favor of non-debtors was unconfirmable as a matter of law). Atlanta West VI, 91 B.R. at 622 (rejecting a disclosure statement relating to an unconfirmable plan is to prevent a debtor from "engaging in [the] wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes...when the plan is unconfirmable on its face.") In re McCall, 44 B.R. 242, 243 (Bankr. E.D. Pa. 1984). It is simply a waste of time for all parties in interest to solicit votes on an unconfirmable plan. In re Valrico Square Ltd. Partnership, 113 B.R. 794, 796 (Bankr. S.D. Fla. 1990).

22. Therefore, the consideration of confirmation issues is necessary in connection with the adequacy of the disclosure statement where, as here, it is clear that the Proposed Plan cannot be confirmed because of its obvious and fatal flaws. See, e.g., In re Monroe Well Serv., Inc., 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987); Bjolmes Realty Trust, 134 B.R. at 1002; accord In re Main Road Properties, Inc., 144 B.R. 217, 219 (Bankr. D. R.I. 1992); In re Unichem Corp., 72 B.R. 95, 98 (Bankr. N.D. Ill.), aff'd, 80 B.R. 448 (N.D. Ill. 1987).

23. Among other things, the Debtors' Proposed Plan is patently unconfirmable because it impermissibly proposes to distribute all of the equity in the Reorganized Debtors to Arcus, an insider of the Debtor, through its control of 79.99% of the voting rights of Shapes/Arch's outstanding equity securities and restricts any form of competitive bidding for the Debtors' businesses. Moreover, the Disclosure Statement

should, at the very least, disclose that Arch has, in fact, offered to pay the Debtors' estates (for the benefit of its creditor constituencies) $4.4 million more than offered in the Debtors' Proposed Plan. In the absence of such disclosures, the creditors may be misled to believe that no alternative exists to the Debtors' Proposed Plan.

### (i) The Plan Unfairly Favors Insiders.

24. The Proposed Plan permits Arcus to obtain 100% of the interest in the Reorganized Debtor by contributing alleged "value"[4] to the Reorganized Debtors. Plan §5.4. In Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999), the United States Supreme Court squarely recognized that giving insiders an opportunity to "buy in" to the Reorganized Debtors through capital contributions is a distribution under the plan on account of an insiders existing interests. Id. at 454-55. See also In re Global Ocean Carries Ltd., 251 B.R. 31, 49 (Bankr. D. Del. 2000) (holding that controlling shareholder's "control of [the Debtor] is a right which he holds 'on account of' his current position as a controlling shareholder of [the Debtor]," and refusing confirmation of the plan permitting relative of controlling shareholder to obtain equity in Reorganized Debtor as violative of the absolute priority rule).

25. By providing for a distribution to insiders on account of their existing interest (79.9% of the voting rights) and not any other party, the Proposed Plan blatantly violates Section 1129(b) of the Bankruptcy Code. See In re Courtside Village, LLC, No. 03-10105, 2003 WL 22764541, at *3 (Bankr. N.D. Cal. Oct. 29, 2003) ("When a plan is proposed solely to favor insiders, it is not fair as to a dissenting class of non-insiders").

---

[4] As discussed herein, the Debtors fail to disclose the actual "value" allegedly being contributed by Arcus in exchange for the Reorganized Debtors' equity.

The fatal defect can only be cured by affording other parties the opportunity to provide more value to the Reorganized Debtors. Accordingly, the Court should deny approval of the Disclosure Statement.

### (ii) The Plan Impermissibly Releases Non-Debtor Parties From Liability On Account Of Claims Held By Third Parties.

26. Sections 6.2 and 11.7 of the Proposed Plan entitled "General Release" and "Exculpation," respectively, release claims held by third parties against certain non-debtor parties, including, but not limited to Arcus and its affiliates (which would include Versa). Moreover, Section 2.5 of the Proposed Plan provides for impermissible third-party releases, in favor of Arcus (and each of its affiliates, officers, directors, etc.) and Ben LLC, a non-debtor affiliate of the Debtors, which provides for the extinguishment of all "Intercompany Claims," defined at Section 1.62 of the Proposed Plan as "...any Claim held by any Debtors against another Debtor or Ben LLC." Ben LLC is not a Debtor or plan proponent. Nevertheless, the Proposed Plan effectively releases and discharges Ben LLC from any claims the Debtors or their estates may have against it. Such third party releases are impermissible under the Bankruptcy Code.

27. Contrary to the provisions of Sections 1129(a)(1) and 524(e) of the Bankruptcy Code, Sections 2.5, 6.2 and 11.7 of the Debtors' Proposed Plan attempt to require creditors and equity security holders to release and/or discharge the non-debtors from liability and/or claims. 11 U.S.C. §§ 1129(a)(1) and 524(e); see also Star Phoenix Mining Co. v. West One Bank, 147 F.3d 1145, 1147 (9th Cir. 1998); In re Lowenschuss, 67 F.3d 1394, 1401-1402 (9th Cir. 1995) (finding that a plan of reorganization that releases claims against non-debtors violated Section 524(e) and could not be confirmed).

28. In In re Continental Airlines, 203 F.3d 203 (3d Cir. 2000), the Third Circuit Court of Appeals declined to define when non-debtor releases are permissible, but found that the "hallmarks of permissible non-consensual releases - fairness, necessity to the reorganization, and specific factual findings to support these conclusions" were absent. Id. at 214. The Third Circuit found that the plan provided no consideration to plaintiffs in exchange for having their prepetition claims against officers and directors under the securities laws permanently enjoined and rejected the idea that the releases granted to such parties were necessary to the debtor's reorganization. Id. at 215.

29. Courts in the Third Circuit frequently apply the five factor test set forth in In re Master Mortgage Inv. Fund, Inc., 168 B.R. 930 (Bankr. W.D. Mo. 1994), and adopted in In re Zenith Elecs. Corp., 241 B.R. 92 (Bankr. D. Del. 1999), for the purpose of determining the permissibility of release and exculpation provisions in a Plan. The five factors are (i) an identity of interest between the released party and the debtor such that a suit against the released party is essentially a suit against the debtor and would deplete estate assets; (ii) whether the released party made a substantial contribution of assets to the reorganization; (iii) the essential nature of the release to the reorganization to the extent that without the release there is little likelihood of success; (iv) an agreement by a substantial majority of creditors to support to release, specifically if the impacted classes vote overwhelmingly to accept the plan; and (v) payment of all or substantially all of the claims of the class affected by the release. Id. at 110 (citing Master Mortgage, 168 B.R. at 937).

30. In Zenith, the Court allowed releases of non-debtors with respect to claims held by the debtor and creditors who voted to accept the plan, but not with respect to

claims held by parties who did not vote in favor of the plan. Zenith Elecs. Corp., 241 B.R. at 110 (emphasis provided). Under the five factor Master Mortgage test, the Court found that all of the releases, as either officers and directors of the debtor or instrumental parties in the creation of the plan, shared an identity of interest with the debtor. Id. at 111. It also found that they all made a substantial contribution to the reorganization by designing, implementing, negotiating or funding the restructuring and plan, and that the releases were necessary to the reorganization as an integral part of the agreement to fund the plan and to avoid distraction of management. Id. Finally, the overwhelming majority of creditors accepted the plan, and the plan provided distributions to them in exchange for the releases. Id. Notwithstanding these findings, demonstrating a high level of compliance with the five factors, the Zenith court did not allow the plan to release claims that were held by third parties who did not vote in favor of the plan because those parties did not consent to the release. Id. See also In re Coram Healthcare Corp., 315 B.R. 321, 335 (Bankr. D. Del. 2004), ("the provision of a plan of reorganization which purports to grant a release of claims by third parties against a non-debtor cannot be approved."); In re Exide Technologies, 303 B.R. 48, 73-75 (Bankr. D. Del. 2003) (refusing to allow release and exculpation provisions in the absence of consideration to and consent of claimholders); In re Arrowmill Dev. Corp., 211 B.R. 497, 506 (Bankr. D. N.J. 1997) (predating Zenith, but finding that reorganization plans may not contain provisions discharging non-debtors because such provisions violate section 524(e) of the Bankruptcy Code).

31. The Proposed Plan specifically seeks to grant an overly broad release to non-debtor third parties, including Ben LLC, Arcus and their affiliates, beyond that

which is allowed by the Bankruptcy Code. 11 U.S.C. § 524(e); see also Star Phoenix Mining Co. v. West One Bank, 147 F. 3d 1145, 1147 (9th Cir. 1998); In re Lowenschuss, 67 F. 3d 1394, 1401-02 (9th Cir. 1995) (finding that a plan of reorganization that releases claims against non-debtors violated section 524(e) and could not be confirmed). Based upon the foregoing, this Court should not allow the inclusion of non-consensual releases of non-debtor third parties under the Proposed Plan.

## CONCLUSION

32. Based upon all of the foregoing, the Disclosure Statement should not be approved at this time. Specifically, the Disclosure Statement contains inadequate information and the Plan is unconfirmable on its face and therefore blatantly violates basic tenets of the Bankruptcy Code. Unfortunately, this chapter 11 case is a classic example of insiders attempting to obtain complete ownership and control of an allegedly insolvent company -- a result that is antithetical to the dictates of the Bankruptcy Code. This Court should not countenance the total denial of a competitive process in violation of creditors' rights under the Bankruptcy Code.

33. Arch reserves the right to interpose any additional objections to the Disclosure Statement at the Disclosure Statement Hearing, if and when applicable.

**WHEREFORE**, Arch respectfully requests that this Court enter an order (i) finding the Debtors' Disclosure Statement inadequate, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: April 17, 2008

**GREENBERG TRAURIG, LLP**
*Counsel for Arch Acquisition I, LLC*

By: /s/ Alan J. Brody
    Louis T. DeLucia (LD-3879)
    Alan J. Brody (AB-4777)
    Diane Vuocolo (DV-9904)
    Alyson M. Fiedler (AF-9058)
200 Park Avenue
P.O. Box 677
Florham Park, New Jersey 07932-0677
Tel: (973) 360-7900
Fax: (973) 295-1333

-and-

**GREENBERG TRAURIG, LLP**
*Counsel for Arch Acquisition I, LLC*

Nancy A. Mitchell
MetLife Building
200 Park Avenue
New York, New York 10166
Tel: (212) 801-9200
Fax: (212) 801-6400

NJ 226,387,412v1