**LITCHFIELD CAVO LLP**
*An Illinois Limited Liability Partnership*
By:    Kelly A. Krail, Esquire
          Kathleen J. Collins, Esquire
1800 Chapel Avenue West
Suite 360
Cherry Hill, NJ 08002
(856) 854-3636
Attorneys for Creditor, Quick-way, Inc.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY (CAMDEN)

| | |
|---|---|
| IN RE: | Chapter 11 |
| SHAPES/ARCH HOLDINGS, L.L.C., | Case No. 08-14631-GMB |
| | Hearing: April 17, 2008 |
| Debtors. | Argument Requested |
| | Brief in Support of Objections to Disclosure Statement |

**CREDITOR, QUICK-WAY, INC.'S OBJECTIONS
TO THE DISCLOSURE STATEMENT TO ACCOMPANY THE
PLAN OF REORGANIZATION DATED MARCH 16, 2008**

Creditor, Quick-way, Inc. (hereinafter, "QWI") hereby files its objection (the "Objection") to approval of the Disclosure Statement to Accompany the Plan of Reorganization Dated March 16, 2008 Jointly Proposed By Shapes/Arch Holding LLC, Shapes LLC, Delair LLC, Accu-Weld LLC, and Ultra LLC (the "Disclosure Statement").[1] The Disclosure Statement fails to provide adequate information as required

---

[1] All capitalized terms not defined herein shall have the same meaning as in the Disclosure Statement or the Plan (as defined herein).

by Section 1125 of the Bankruptcy Code and, in some instances, is misleading. In support of its objections, QWI respectfully states as follows:

I. **PRELIMINARY STATEMENT OF OBJECTIONS**

On March 16, 2008, Shapes/Arch Holding LLC, Shapes LLC, Delair LLC, Accu-Weld LLC, and Ultra LLC (collectively, "Shapes" or "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code. It is the stated goal of Shapes' Plan of Reorganization ("Plan") to "enable the Creditors and Interest Holders to receive the maximum recovery possible in these cases." (*See* Disclosure Statement at 5).

The Plan includes the environmental claims with other general unsecured claims. (Disclosure Statement at 19). To pay these claims, the Plan establishes a $500,000 fund. (*See* Disclosure Statement at 19) Shapes anticipates that this $500,000 fund will be funded entirely by insurance proceeds. Shapes, however, has failed to identify any insurance policies which will create this fund. Shapes also has failed to identify its insurers, the dates of coverage, the amounts of coverage and the amounts of remaining coverage. *See* Disclosure Statement at 19 and Plan Schedule Exhibit)

Included among the environmental claims is *Pennsauken Solid Waste Mgt. Auth. v. Ward Sand Material Co., Inc., et al.*, N.J. Superior Ct., Camden County, Law Division, Docket L:13345-91, ("Pennsauken Landfill Litigation,"). The Pennsauken Landfill Litigation, which has been pending for seventeen years, is a cost recovery action under the New Jersey Spill Act Claim that arose as a result of an Administrative Consent Order reached between the owners of the Landfill ("Pennsauken Plaintiffs") and the New Jersey Department of Environmental Protection ("NJDEP"). As a defendant and indispensable

2

party, Shapes may be jointly and severally liable for the remediation costs. The Pennsauken Plaintiffs allege that its damages are between $80 and $106 million.

As part of its discovery obligations in the Pennsauken Landfill Litigation, Shapes produced a schedule of applicable insurance policies which revealed millions of dollars in potential insurance coverage. Shapes has never amended this disclosure to state that these millions of dollars of available insurance coverage has been exhausted or denied. In the Disclosure Statement, however, Shapes has failed to provide *any* information as to its applicable insurance policies. It also has not justified why claims such as QWI's claim should only receive a pro rated amount of $500,000 when there may be substantially more available in coverage Moreover, as currently drafted, the Plan would act to limit QWI's right to proceed against any additional insurance coverage.

The Pennsauken Plaintiffs allege that Shapes is both an on-site and off-site contributor to the contamination of the Pennsauken Landfill (the "Landfill"). Shapes has a facility that is adjacent to the Pennsauken Landfill ("Landfill"). Indeed, in 1993,, Shapes entered into a Memorandum of Agreement ("Agreement") with the NJDEP to remediate its adjacent facility at 9000 River Road ("River Road Facility"). As part of this Agreement, Shapes filed a work plan with the NJDEP, which set forth its plan to remediate the River Road Facility's chromium contamination and to prevent further contamination of the area ground water.

Shapes' Plan and Disclosure Statement fail to address this issue in any meaningful detail. The Plan and Disclosure Statement do not state whether the "$25,000" payment to the NJDEP described in the Class 8 Claims is to address Shapes' obligations at the River Road Facility. (*See* Disclosure Statement at 20).

Moreover, the Pennsauken Plaintiffs allege that Shapes deposited effluent containing chromium directly into the Landfill and that Shapes generated waste which was disposed of at the Landfill.

QWI has expended money to remediate the Landfill. Pursuant to an agreement with the Pennsauken Plaintiffs, QWI, as part of the Transporter Liaison Group, has funded integral parts of the remediation process required by the NJDEP. It is undeniable that, under the framework and thrust of Shapes' bankruptcy proceeding and proposed Plan, QWI has a "sufficient stake" in these proceedings that entitles it to participate fully in these bankruptcy proceedings.

Having used and received the benefits of the Pennsauken Landfill and Shapes' insurance policies, Shapes has now concocted new theories of limiting its insurance obligations, thereby limiting its own insurers' obligations and increasing the obligations of other Pennsauken parties:

- The proposed Plan seeks to discharge Shapes for its environmental liability related to the Pennsauken Landfill Litigation.

- The Proposed Plan seeks to assign rights to insurance policies without the consent of the insurers, thereby potentially voiding any coverage.

- The Plan provided incomplete and insufficient information regarding applicable insurance policies.

These issues- involve state contract law regarding the insurance policies, as well as New Jersey Spill Act, contribution and indemnification claims. This Court should not, and indeed cannot, decide these disputed issues. This Objection is filed, in part, to ensure that the Plan confirmation process does not in any way prejudice or disadvantage QWI or other Pennsauken-related parties as to issues that should be decided in a competent forum at another time.

QWI also objects to the Disclosure Statement on the following grounds:

1. The Disclosure Statement fails to disclose that the Plan may vitiate insurance coverage by violating provisions in the contracts of insurance, which bar the assignment of policy rights and interests without the insurers' consent.

2. The Disclosure Statement fails to disclose that the Plan may vitiate insurance coverage by violating Insurers' contractual rights, including but not limited to, an insurers' rights to control or associate in the defense, investigation and settlement of the Pennsauken claims.

3. The Disclosure Statement fails to disclose that the Plan may vitiate insurance coverage by violating the insured's continuing contractual obligations and duties under the policies.

4. The Disclosure Statement fails to identify the insurance policies at issue for each site or litigation. At minimum, the Disclosure Statement should identify: the applicable policies at issue, the available coverage under each policy, whether any reservation of rights have been issues under the applicable policies; whether there has been a buy-back of any policies, whether there are any long-tail policies; whether any insurers of he applicable policies have gone bankrupt; what the Debtor did with any buy-back proceeds; and other potential claims as to the applicable policies and their proceeds.

5. The Disclosure Statement fails to adequately quantify the extent of Shapes' environmental liabilities. Indeed, in Schedule 4.5 to the Plan, Shapes does not attempt to value its liability for any of the identified sites or litigations.

6. To the extent that defects in the Plan are not corrected, the Plan cannot be confirmed.

## II.   QWI IS A PARTY IN INTEREST AND HAS STANDING TO OBJECT

Section 1109(b) of the Bankruptcy Code provides that a "party in interest … may appear and be heard on any issue in a case under [chapter 11]." The Third Circuit has held that the term "party in interest," is not limited to the small "list of examples" identified in the Code, such as trustees, creditors, committees, equity holders and indenture trustees. *In re Amatex Corp*, 755 F.2d 1034, 1042 (3d Cir. 1985). Instead, a "party in interest" includes anyone with a "sufficient stake [in the proceedings] to require

5

representation." *Unofficial Comm. of Zero Coupon Noteholders v. The Gran Union Co. (In re Grand Union Co.)*, 179 B.R. 56, 59 (D. Del. 1995).

The term "party in interest must be construed broadly to permit parties *affected* by a chapter 11 proceeding to appear and be heard." *In re Amatex*, at 1042. As indicated above, this bankruptcy proceeding, as defined under the proposed Plan of Reorganization, revolves around Shapes' alleged desire to "enable the Creditors and Interest Holders to receive the maximum recovery possible in these cases." (Disclosure Statement at 5). As an unsecured creditor, QWI is a party of interest.

### III.  OBJECTIONS TO DISCLOSURE STATEMENT

The Disclosure Statement should not be approved because: (a) it fails to provide adequate information in accordance with the standards set forth in Section 1125 of the Bankruptcy Code and (b) the Plan contains defects which, if not corrected, will at the least delay and potentially block confirmation under Sections 1129(a) and 524(g) of the Bankruptcy Code.

#### A.    The Disclosure Statement Fails to Provide Adequate Information

Section 1125 of the Bankruptcy Code, which governs the requirements for disclosure statements in chapter 11 cases, provides, in relevant part:

> An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing *adequate information*.

11 U.S.C. § 1125(b) (emphasis added). "Adequate information" is defined in Section 1125 as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible proposed plan.

11 U.S.C. § 1125(a)(1); *see also In re Scott*, 172 F.3d 959 (7th Cir. 1999); *In re Bloomingdale Partners*, 155 B.R. 961 (Bankr. N.D. Ill. 1993); *In re Texas Extrusion Corp.*, 844 F.2d 1142 (5th Cir. 1988). There is no precise standard for determining adequate information as set forth in Bankruptcy Code section 1125. Disclosure statements are reviewed on a case-by-case basis. The Bankruptcy Code's disclosure requirements, according to the legislative history, are intended to be flexible:

> Precisely what constitutes adequate information in any particular instance will develop on a case by case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case, such as the costs of preparation of the statements, the need for relative speed and solicitation and confirmation, and, of course, the need for investor protection. There will be a balancing of interests in each case. In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.

H.R. Rep. No. 595, 95th Cong. 1st Sess. 409, reprinted in 1978 U.S. Code Cong. & Ad. News 5963, 6365; *In re Diversified Investors Fund XVII*, 91 B.R. 559 (Bankr. C.D. Cal. 1988) (recognizing that the parameters of what constitutes adequate information are intended to be flexible). While adequate information for making an informed judgment is tailored to the particular situation, there is nevertheless, an irreducible minimum.

Thus, a disclosure statement must provide, a description of the debtor's business, a summary of the debtor's pre-petition history, financial information about the debtor's operations, a description of the proposed plan and how it will be implemented, a liquidation analysis, identification of any management to be retained by the debtor and a

description of such management's compensation, tax consequences of reorganization, and projected operations which should include pending litigation and transactions with insiders.[2] Id.

Here, the Disclosure Statement does not satisfy this bare minimum. In some instances, it provides no information of the required topics, while in other instances, the information provided is misleading and incomplete. As a result, the Disclosure Statement does not contain "adequate information" to comply with the standards mandated by Section 1125 of the Bankruptcy Code and this Court should refuse to approve the Disclosure Statement. *See, e.g., Krystal Cadillac-Oldsmobile GMC Truck, Inv. v. General Motors Corporation*, 337 F.3d 314, 322 (3d Cir. 2003) ("[W]e cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information"); *In re Bob Grissett Golf Shoppes, Inc.*, 50 B.R. 598, 610 (Bankr. E.D. Va. 1985); *In re Cardinal Congregate I*, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (disclosure statement should not be approved if it fails to provide sufficient information about risks regarding the means by which a plan is to be funded); *see also In re CRIIMI MAE, Inc.*, 251 B.R. 796, 799 (Bankr. D. Md. 2000) ("'[i]t is now

---

[2] Other courts have set forth similar "laundry lists" of items that should be included in a disclosure statement in order to meet the "adequate information" standard. In *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567 (Bankr. N.D. Ga. 1984), the court listed the following nineteen factors as pertinent to an analysis of the adequacy of a disclosure statement: (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting methods utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the chapter 11 plan or summary thereof; (12) the estimated administrative expenses, including attorneys' fees and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data valuations or projections relevant to the creditor's decision to accept or reject the Chapter 11 plan; (15) projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates. *See also In re Cardinal Congregate I*, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990); and *In re Scioto Valley Mort. Co.*, 88 B.R. 168 (Bankr. S.D. Ohio 1988).

well accepted that a court may disapprove of a disclosure statement, even it provides adequate information about a proposed plan, if the plan could not possibly be confirmed'") (quoting *In re Main St. AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D.Cal. 1999)); *In re Phoenix Petroleum, Inc.*, 278 B.R. 385, 393-94 (Bankr. E.D. Pa. 2001).

### 1. The Disclosure Statement Fails to Disclose that the Plan May Vitiate Insurance Coverage by Violating Provisions in the Contracts of Insurance, which Expressly Bar the Assignment of Policy Interests Without the Insurers' Consent.

Because Shapes has failed to provide copies of applicable policies or applicable policy language for the policies impacted by the Plan, it is impossible to determine whether the policies contain language prohibiting the assignment of the policies without the insurers' consent. Many standard form policies, however, prohibit the assignment of policies unless the insurer consents. Despite this prohibition, the proposed Plan contemplates an assignment of policy rights and proceeds. The Disclosure Statement must disclose that the contemplated assignment may be invalid and unenforceable under the controlling state law and that insurance coverage may be vitiated. *See, Counties Contracting & Constr. V. Constitution Life Ins. Co.*, 855 F.2d 1054, 1061 (3d Cir. 1988); *Allied Corporation v. Frola*, 1992 WL 281114 (D.N.J. 1992) (Wolin, J.).

The Disclosure Statement also is inaccurate and misleading to the extent it attempts to characterize the assignment as merely an assignment of insurance "proceeds." As part of the contemplated assignment, Shapes is not retaining any rights under the policies but is attempting to relieve itself of all obligations with respect to the policies. Thus, the only entity with rights to the policies would be the Plan Administrator, who is a stranger to the insurance policies, the claimants, the actions at issue and whose obligation is to pro rate payment to as many parties as possible, not fulfill Shapes' equitable

environmental obligations. The Plan Administrator will determine what little insurance proceeds will be made. Accordingly, any assertion by the Plan Proponents that "insurance policies" are not being assigned is misleading and, in fact, inaccurate.

The possible vitiation of the applicable insurance policies presents the potential that the parties in the Pennsauken Litigation would be precluded from pursing applicable coverage. and thus would be prejudiced.

> 2. **The Disclosure Statement Fails to Disclose That the Plan may Vitiate Insurance Coverage by Violating Contractual Rights, Including but not Limited to, Rights to Control or Associate in the Defense, Investigation and Settlement of Environmental Claims.**

Insurers have express rights to control and/or associate in the defense, investigation, and settlement of claims under their policies of insurance. The Plan abrogates those rights and may violate the terms of the undisclosed insurance contracts. The Plan affords the insurers no rights to oversee the settlement process or participate in any manner in the liquidation of claims. Accordingly, there will be "nothing left for the insurer to do but issue a check." *Augat v. Liberty Mutual Ins. Co.*, 571 N.E. 2d 357, 361 (Mass 1991).

This Court should deny confirmation of a proposed plan of reorganization that purports to eliminate the insurers' rights to control and/or associate in the defense, investigation, and settlement of environmental claims for which coverage was sought. *See, e.g., Wallace & Gale, In re The Wallace & Gale Co.*, No. 85-4-0092 (chapter 11), Transcript of Oral Ruling (Bankr. D. Md. July 22, 1998) (insurer has a right to make certain that claims are properly defended, and court does not have the power to alter the terms giving the insurer right to control the defense); *ACandS Inc. v. Aetna Cas. & Sur.*

10

*Co.*, 764 F.2d 968 (3d Cir. 1985) (recognizing the enforceability of an insurer's right to control the defense and settlement of claims in asbestos bodily injury context).

### 3. The Disclosure Statement Fails to Disclose That the Plan May Vitiate Insurance Coverage by Violating the Insured's Continuing Contractual Obligations and Duties Under the Policies.

It is not only insurers who have obligations under the insurance contracts; the policyholders owe continuing obligations as well. Those obligations include the duty to cooperate in the defense of claims and to mitigate damages. It is a well-founded principle of insurance law that:

> [The insured's duty to cooperate and assist] in the defense of the action brought against him by the injured party is one of great importance. Without the presence of the assured and his aid in preparing the case for trial, the insurance company is handicapped, and such lack of cooperation must result in making the action incapable of defense.

*Schneider v. Autoist Mutual Ins. Co.*, 346 Ill. 137, 178 N.E. 466 (1931); *General Ins. Co. of America v. Gross*, No. Civ. A.97-0220, 1997 WL 230800, at *7 (E.D.Pa. May 1, 1997) (cooperation clause protects the insurer and is a condition precedent to the liability of the insurer); *Cameron v. Berger*, 132 Pa. Super 484, 492 1 A.2d 529, 533 (Pa. Super. Ct. 1938) (where the insured refuses to give any information, so that the insurer is unable to make a defense, it cannot be said there is cooperation, and in that case, a recovery should be denied); *Prudential Property and Cas. Co. v. Erie Ins. Co.*, 660 F. Supp. 79, 81 (E.D. Pa. 1986) (cooperation clause is a material condition to the liability of the insurer); *See* 14 Couch on Ins. § 199:13 (2003) ("As a general rule, an insured's breach of a cooperation clause precludes coverage and releases the insurer from its responsibilities . . . ."); *Latronica rel. DeVres v. Royal Indem. Co.*, 8 Ill. App.2d 337, 132 N.E.2d 16 (1st Dist.

1956) (the cooperation clause imposes an important obligation in order to procure the insured's helpful participation, a critical element in an insurer's property investigation of an occurrence or successful defense of a claim). The Plan relieves Shapes of its contractual obligations under the policies. The Disclosure Statement must disclose that this arrangement may vitiate coverage under the policies.

### 4. The Disclosure Statement Fails to Disclose Applicable Insurance Policy and Coverage Information or How Insurance Payments are to be Determined

The Disclosure Statement provides that environmental claims, such as those related to the Pennsauken Landfill Litigation, will receive a pro rata proportion of a $500,000 fund. (*See* Disclosure Statement at 19.) Shapes anticipates that this $500,000 fund will be funded entirely by insurance proceeds. Shapes, however, has failed to identify any insurance policies which will create this fund. Shapes also has failed to identify its insurers, the dates of coverage, the amounts of coverage and the amounts of remaining coverage.

In addition to the basic information, Shapes has failed to disclose important details, such as whether there are any applicable insurance policies for the currently litigated claim; Shapes was self-insured at any point; or there are any declaratory judgments regarding policies.

### 5. The Disclosure Statement Does Not Adequately Quantify the Extent of Shapes' Environmental Liability

The Disclosure Statement also fails to adequately quantify the extent of Shapes' environmental liabilities. The Disclosure Statement estimates that the amount of allowed claims for Class 5 general unsecured claims will be approximately $31 million.

(Disclosure Statement at 6). It also provides that these claimants will receive a pro rata proportion of a $500,000 fund.

Neither the Disclosure Statement nor the Plan attempts to quantify the amount of Shapes' environmental liability included in Class 5 general unsecured claims. The Disclosure Statement identifies eleven separate sites or litigations in which Shapes has been directed to remediate, named as a defendant or identified as a potentially responsible party. Shapes does not state the costs of remediation at the sites. It also does not disclose the amounts of damages sought in each litigation. In the Pennsauken Landfill Litigation alone, the Pennsauken Plaintiffs are seeking between $80 and $106 million in damages. Without adequate disclosure about the other litigations and sites, it is not clear that $31 million is a proper estimate of all Class 5 claims.

6. **The Plan Vitiates a Claimants' Right to Pursue a Post-Discharge Suit Against the Debtor's Insurer for a Contribution or Indemnification Claim When Such Suits Are Limited to Available Insurance Proceeds**

The Plan's vitiation of any applicable insurance policies precludes Claimants from bringing post-discharge suits against the Debtors' insurers for contribution and indemnification related to the Pennsauken Landfill Litigation. Suits post-discharge are permitted to be brought against the Debtor so long as such suits seek the proceeds from the Debtor's insurers. *First Fidelity Bank v. McAteer*, 985 F2d 114, 118 (3rd Cir. 1993). Absent more specific information regarding the potential applicable policies or the Plan's impact on said policies, the present Plan would remove QWI's ability to proceed against the applicable policies related to the Pennsauken Landfill Litigation to the extent of the policies' obligations to indemnify.

B.  **The Plan Cannot Be Confirmed Without Significant Revision With Respect to the Rights of QWI and Similarly Situated Creditors**

This Court should not approve the Debtor's Disclosure Statement because the Plan is, as a matter of law, unconfirmable due to its proposed treatment of QWI and similarly situated creditors and the failure to provide the proper information and assurances regarding applicable insurance policies. Many courts have held that, in the interest of judicial economy, objections to a plan which go to the issue of the confirmability of the plan may be raised at the disclosure statement hearing. *See In re Weiss-Wolf, Inc.*, 59 Bankr. 563 (Bankr. S.D.N.Y. 1986); *In re Monrue Well Service, Inc.*, 80 Bankr. 234 (E.D. Pa. 1987); *In re Pecht*, 57 Bankr. 137 (E.D. Va. 1986); *In re Unichem Corp.*, 72 Bankr. 95 (Bankr. N.D. Ill. 1987); *In re Kehn Ranch, Inc.*, 41 Bankr. 832 (Bankr. D. S.D. 1984).

At a minimum, QWI must be afforded its day in court to contest each and every point set forth above. Some of these points, including the breach of contract allegations and declaratory judgments as to rights of claimants under Shapes' applicable insurance policies only can be resolved in an Article III court with the right to have facts determined by a jury. In this instance, the Plan is not neutral; it specifically requires findings of fact and conclusions of law that prejudice certain creditors' rights.

To the extent the Plan Proponents seek to avoid this significant litigation, they must strive to truly make the Plan more specific as insurance issues and the rights of creditors to proceed against applicable insurance policies without vitiating the policies at issue. The Debtor must show the Court and interested parties how they plan to obtain confirmation of a plan that, on its present terms may vitiate insurance coverage. This would deny parties their right to seek contribution and indemnification against Shapes for

14

Shapes' environmental liabilities. QWI's rights that relate to, arise from, or are in any way connected with any insurance contract implicated in or affected by the Plan, should be adjudicated in an appropriate forum in accordance with the applicable non-bankruptcy law. The jury rights of QWI concerning policy contract issues must be specifically preserved.

The Plan and any findings of fact or conclusions of law reached by the Bankruptcy Court in connection therewith should not operate to deny QWI and the other parties in the Pennsauken Landfill Litigation the right to proceed against Shapes' insurers or preclude Shapes' insurers from continuing its defense in the Pennsauken Landfill Litigation. All provisions and obligations set forth in the Plan should be read to effectuate the continuation of the claims against Shapes in the Pennsauken Landfill Litigation. To allow the Debtor to disseminate the Plan as it stands and to solicit votes thereon, prior to the determination of the issues raised herein and by other Pennsauken parties, would work a substantial inequity.

It is incumbent upon this Court to decline approval of the Disclosure Statement because the Debtor's plan of reorganization is fatally flawed such that the plan cannot be confirmed under Section 1129 of the Bankruptcy Code. *See, e.g., In re Allied Gaming Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("[A] disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed."); *In re Main Street AC, Inc.*, 234 B.R. 771, 775 (Bankr. N.D. Cal. 1999) ("It is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a debtor's plan, if the plan could not possibly be confirmed."); *In re Curtis Center Ltd. Partnership*, 195 B.R. 631, 638 (Bankr. E.D. Pa.

15

1996); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992); *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D. Mass. 1991); *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986). By rejecting a disclosure statement and plan that are unconfirmable, the Court preserves the valuable resources of the estate and the judicial system.

### C.    Reservation of Rights by QWI

QWI expressly reserves all of its legal, equitable rights and defenses, limitations and/or exclusions in connection with its rights (contractual and otherwise), applicable law or otherwise, together with their rights to assert any and all such rights, defenses, limitations and/or exclusions in any appropriate manner or forum whatsoever (including, without limitation, any of their rights to have any non-core matter relating to the interpretation of their rights adjudicated by the United States District Court). Nothing contained in these Objections shall be deemed as an admission or limitation of a right.

QWI further reserves their right to raise the issues contained in these Objections and any other related issues in any procedural manner or forum including, without limitation, objections to the confirmation of the Plan or a separate adversary proceeding requesting any declaratory and/or injunctive relief with respect to any rights that may be adversely affected by confirmation of the Plan.

QWI further reserves all jury trial rights and that nothing in these Objections should be construed as a waiver of any such rights.

QWI reserves its right to join in or adopt objections to the Disclosure Statement made by other parties in interest and to amend and supplement this objection to the

Disclosure Statement in response to filings made by the Debtor or other parties in interest.

IV. **CONCLUSION**

For the above and foregoing reasons, QWI requests that the Court deny approval of the Disclosure Statement because it is wholly inadequate. The Disclosure Statement fails to provide QWI with sufficient information to make an informed decision about the Plan, and, furthermore, the Plan itself is fatally flawed and therefore not confirmable. This Court cannot be pressured by the alleged need for a swift confirmation to overlook the clear mandate of section 524(g) and the requirement of adequate information under section 1125. The picture of imminent financial ruin that is painted by the Debtor is insufficient to overlook the numerous flaws in the Disclosure Statement and the inherent risk to the parties in interest that will otherwise come to fruition if a rush to confirmation is endorsed by the Court. QWI further requests that this Court grant such other relief as it deems just and equitable under the circumstances.

**LITCHFIELD CAVO LLP**

_/s/ Kelly A. Krail_
Kelly A. Krail, Esquire


//s//
Kathleen J. Collins, Esquire
1800 West Chapel Ave.
Ste 360
Cherry Hill New Jersey 08002
856-854-3636

Attorneys for Quick-way, Inc.