**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York  10022
(212) 765-9100
(212)765-0964 Facsimile
Alan D. Halperin, Esq.
Donna Lieberman, Esq.
Proposed Co-Counsel for the Official
Committee of Unsecured Creditors

**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street, P. O. Box 800
Hackensack, New Jersey  07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Michael D. Sirota, Esq.
Ilana Volkov, Esq.
Warren A. Usatine, Esq.
Proposed Co-Counsel for the Official
Committee of Unsecured Creditors

| | |
|---|---|
| In the Matter of: : <br> : <br> SHAPES/ARCH HOLDINGS, L.L.C., et al., : <br> : <br> Debtors. : <br> : <br> : <br> : | UNITED STATES BANKRUPTCY COURT <br> FOR THE DISTRICT OF NEW JERSEY <br> HONORABLE GLORIA M. BURNS <br> CASE NO. 08-14631(GMB) <br><br> (Jointly Administered) <br><br> Chapter 11 <br><br> HEARING DATE AND TIME: <br> April 17 2008, 10:00 a.m. |

**ORAL ARGUMENT REQUESTED**

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
ENTRY OF FINAL ORDER AUTHORIZING THE DEBTORS TO OBTAIN POST-
PETITION FINANCING FROM ARCUS ASI FUNDING, LLC AND ARCUS ASI, INC.**

TO:   HONORABLE GLORIA M. BURNS
         United States Bankruptcy Judge

45765/0001-1516219v8

The Official Committee of Unsecured Creditors (the "Committee") of Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), Shapes L.L.C., Delair, L.L.C., Accu-Weld, L.L.C., and Ultra L.L.C., the within debtors and debtors-in-possession (each a "Debtor" and, together, the "Debtors"),[1] by and through its proposed attorneys, objects to the Debtors' Verified Motion for Entry of a Final Order (i) Authorizing and Approving Postpetition Financing; (ii) Granting Liens and Security Interest and Providing Superpriority Administrative Expense Status; and (iii) Modifying Automatic Stay Pursuant to Sections 105, 362, 363, and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d) (the "Motion"), and respectfully represents as follows:

## I. PRELIMINARY STATEMENT

1.      By virtue of exclusive pre-petition negotiations among the Debtors, The CIT Group/Business Credit, Inc., as agent for itself and for JP Morgan Chase Bank, N.A. and Textron Financial Corporation ("CIT"), and Arcus ASI Funding, LLC and Arcus ASI, Inc. (collectively, "Arcus"), affiliates of Versa Capital Management, Inc. ("Versa"), the Debtors and Arcus have devised an extraordinarily fast-paced and highly prejudicial program to deliver to Arcus a "free and clear" sale of assets and ownership of viable companies through questionable debtor-in-possession financing terms and a defective plan process, both of which expose the Debtors' and others' breach of their fiduciary duty to creditors. The Motion and Disclosure Statement and Plan of Reorganization filed on the same day reveal that these cases were commenced and are being manipulated solely for the benefit of Arcus, and contemplate virtually no distribution to unsecured creditors. Moreover, one the eve of the Debtors' bankruptcy filings and in furtherance of the goal of conveying the companies to Arcus without ever exposing either the DIP financing

---

[1] Shapes/Arch is a holding company that owns each of the other operating Debtors.

terms or the Debtors' assets to the market, the Debtors incredibly ceded control of Debtor Arch/Shapes to Arcus for unknown consideration, thereby rendering Arcus an "insider" of the Debtors.[2]

2. If the proposed DIP financing is approved in its current form, the Debtors and Arcus will have "locked up" the sale of the Debtors to Arcus through a closed, non-competitive process that failed to test the asset values in the marketplace or allowed any other party to outbid Arcus and provide a much more meaningful dividend to unsecured creditors. The Debtors' and Arcus' scheme is highly prejudicial to unsecured creditors and constitutes heresy.

3. As evidenced by the objection of Arch Acquisition I, LLC ("Arch") to the Motion [Docket No. 81] and by expressions of interest of at least two entities besides Arch, there are parties interested in providing replacement DIP financing on more favorable terms than Arcus and bidding on the Debtors' assets in amounts that will yield a greater recovery than what is presently offered to unsecured creditors.[3] Yet instead of implementing a process that will allow

---

[2] The Debtors NEVER disclosed to the Court in their "first day" submissions or testimony when the issue of handing over control to Versa first was discussed. The Debtors owed this Court the duty of candor to advise that, presumably, the Debtors' management was negotiating a DIP facility and sale of the company to the very lender/buyer to which it had already agreed to give control and work for. Discovery on this issue is necessary to determine how misleading the Debtors were in obtaining the interim financing orders from this Court, and the Committee reserves all its rights with respect to those orders.

[3] Arch is an affiliate of Signature Aluminum, a portfolio company of H.I.G. Capital. On April 7, 2008, Arch submitted to the Debtors and the Committee a proposed Asset Purchase Agreement for the purchase of substantially all the Debtors' assets. At the Committee's suggestion to facilitate an "apples to apples" comparison of the Arcus and Arch proposals, on Saturday, April 12, 2008, Arch submitted a redlined version of a Joint Plan of Reorganization which contemplates Arch as the funder of a plan that significantly improves unsecured creditor recoveries. In addition, on April 13, 2008, Arch submitted a written Debtor-in-Possession Term Loan Agreement to the Debtors and Committee, the proceeds of which would be used to take out Arcus and provide the Debtors with financing on much more favorable terms, as more particularly described below. Pursuant to the Arch DIP loan and plan of reorganization proposals, it is contemplated that the Debtors will effectuate a competitive process for the "sale" (continued…)

3

45765/0001-1516219v8

those parties to move forward, the Debtors, under the control of Arcus, arrogantly have chosen to embark on a "speed of lightening" track which provides a phantom 2% dividend to unsecured creditors and is unacceptable to the Committee. This so-called "process" must be stopped. Rather than approve terms of a DIP facility that are extremely prejudicial to the unsecured creditors and entrench Versa/Arcus as the presumptive owner of the Debtors' businesses for questionable consideration, the Court should, as the Bankruptcy Code requires, expose the process to a competitive environment for maximizing value and assuring the Committee of a meaningful seat at the bargaining table. Only through such a competitive and inclusive process – as mandated by Chapter 11 - can the true value of the Debtors' businesses be tested and maximum value realized for the benefit of all creditors.

## II. FACTUAL BACKGROUND

4. On March 16, 2006 (the "Filing Date"), the Debtors each filed voluntary petitions for relief pursuant to Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"). Since the Filing Date, the Debtors have remained in possession of their assets and continued in the management of their businesses as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

---

(…continued)
of their assets in the context of a plan of reorganization. Incredibly, to date, the Debtors have not responded to Arch's proposals, nor provided any due diligence materials requested by Arch in connection with their DIP financing proposal. The Debtors erroneously have posited that the Arcus DIP Loan Agreement and Interim DIP Order preclude the Debtors from considering the Arch proposal, but that contention cannot be farther from the truth. In fact, the Arcus DIP Loan Agreement squarely contemplates the Debtors' ability to seek and obtain replacement DIP financing, and only imposes on the Debtors to provide Arcus with a "right of first refusal." See Arcus DIP Loan Agreement, § 8.23. The Debtors' blatant refusal to consider the Arch proposal further underscores the utter abrogation of their fiduciary duties, and Arcus' complicity thereto.

4

45765/0001-1516219v8

5. On March 31, 2008, the Office of the United States Trustee for the District of New Jersey appointed a nine (9)-member creditors' committee.

6. The Debtors estimate that the principal amount of their pre-petition indebtedness to CIT totals approximately $59.62 million as of the Filing Date: The Debtors also believe that they have approximately $31 million in trade debt.

7. According to the Debtors, before the Filing Date, they encountered a severe liquidity crisis which CIT was unwilling to fund pursuant to an overadvance.[4] As a result, they turned to Versa, a hedge fund based in Philadelphia and known to the Debtors' management, to discuss Versa's interest in providing financing for the Debtors' business and operations.[5] In exchange for a commitment from Arcus, a Versa affiliate, to lend $25,000,000 to the Debtors during a chapter 11 proceeding, a very small part of which would be converted to equity upon emergence from bankruptcy, Arcus became managers of Shapes/Arch with 79.9% of the voting rights. At the time the Debtors negotiated the DIP financing with Arcus, they knew that Arcus would condition the loan on gaining control of the Debtors. The Committee doubts whether those negotiations took place at arms'-length and in good faith, and will insist that those

---

[4] The Committee and its professionals have not yet had an opportunity to ascertain exactly when the Debtors began encountering financial difficulties. The Debtors testified at the "First Day" hearings that the cash "crunch" that caused them to engage in discussions with Versa and commence these Chapter 11 proceedings did not occur until some time in the beginning of 2008. A preliminary review of the Debtors' financial affairs by the Committee's financial advisors suggests, however, that the Debtors commenced experiencing financial difficulties long before that time.

[5] On or about February 6, 2008, the Debtors signed a non-binding expression of interest with Versa, agreeing to deal exclusively with Versa for 60 days in connection with Versa's interest in providing financing to the Debtors in an out-of-court restructuring context. It is unclear how the Versa expression of interest transformed into the transaction presented to the Court today because the Debtors have failed to respond to the Committee's Rule 2004 Subpoena seeking information on that very issue. At the Final Hearing, the Debtors should be required to reveal comprehensively all the facts and circumstances surrounding those negotiations.

elements of debtor-in-possession financing approval be the subject of discovery and, ultimately, rigorous proofs at the final hearing on the Motion (the "Final Hearing").

8. On the Filing Date, the Debtors filed various "first day" motions, a Disclosure Statement and Plan of Reorganization pursuant to which Arcus serves as the plan funder (the "Debtors/Arcus Plan"). Notably, the Debtors did not file the so-called "Plan Supplement" which, according to the Plan, contains the documents related to the proposed exit financing with Arcus and other critical documents relating to the Plan and the Debtors' emergence from Chapter 11.[6] On March 18, 2008, the Court entered two Orders – one each for the CIT and Arcus DIP loans- granting interim approval of the DIP Financing Motion (the "Interim DIP Orders"). Since then, the Court has entered Bridge Orders extending the DIP financing approved in the Interim DIP Orders to the new hearing date of April 17, 2008.

9. Pursuant to the Interim DIP Orders, the Debtors were authorized to, among other things, (a) immediately "roll up" approximately $60 million of pre-petition debt to CIT into post-petition indebtedness; (b) borrow from Arcus up to a total principal amount of $25 million, approximately one-half of which would be used to pay down the pre-petition term loan and overadvance to CIT; (c) grant liens and super-priority claims on all assets of the Debtors, with the expectation that in the Final Orders granting the Motion, such liens and super-priority claims

---

[6] The Debtors, in fact, did not file their Plan Supplement until the afternoon of April 15, 2008, almost one month after the Filing Date, after the general deadline to file objections to the disclosure statement and while the Committee's counsel was attending a meeting with the Debtors and Versa. This is especially egregious when Debtors' counsel represented at the Creditors' Committee formation meeting on March 31, 2008 that the Plan Supplement and an Amended Disclosure Statement and Plan would be filed "shortly." The Debtors and Arcus cannot possibly expect the Court, the Committee or other parties-in-interest to have adequately digested the voluminous information before the April 17, 2008 Final Hearing.

6

would extend to avoidance actions and all other claims and causes of action of the Debtors and their estates.

## II.  RELIEF REQUESTED AND BASIS THEREFOR

10. The Debtors, presumably at the direction of Arcus, their manager/lender/buyer, have submitted to this Court a proposed DIP financing order and Debtor-in-Possession Term Loan Financing Agreement with Arcus (the "Arcus DIP Loan Agreement") that violate every conceivable notion of fairness and due process, and, in a flagrant breach of fiduciary duty, "lock-up" the sale of the Debtors to the exclusion of legitimate third parties interested in and willing to fund a plan of reorganization on terms much better than those to which the Debtors agreed before the Filing Date.  For the reasons set forth herein, as well as in the Committee's objection to the Disclosure Statement filed on the date hereof (the "Disclosure Statement Objection"), the proposed DIP financing with Arcus should not be approved in its current form.  While the Committee is mindful of the Debtors' financial condition and cash needs, it appears that Arcus extorted considerable protections and unfair advantage for itself and left the unsecured creditors with nothing more than a *de minimus*, almost illusory distribution.  Arcus has elected to force this hideous process down the throat of the Court and stakeholders on the threat that if approval is not granted 1,000 jobs will be lost.  What Arcus never contemplated was the fact that the (i) Court cannot ignore the mandate of the Bankruptcy Code and binding Third Circuit authority requiring that fair value for a debtor's assets be achieved, see In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 149-50 (3d Cir. 1986) (interpreted Section 363(b) of the Bankruptcy Code to require a finding by the Bankruptcy Court that the acquirer of a debtor's assets be a good faith purchaser and construing the "good faith purchaser" standard to mean one who purchases "in good faith" and for "value"), and (ii) unsecured creditors, unlike the Debtors, will not abandon their fiduciary duties.  Arcus also underestimated the Court's ability to insist

upon the continuation of the DIP financing and implementation of an orderly sale process - all while preserving the 1,000 jobs.

### *The Proposed DIP Financing Does Not Satisfy the Standards of Section 364 of the Bankruptcy Code and Is Not in the Best Interests of the Debtors' Estates*

11. Section 364 of the Bankruptcy Code governs a debtor's ability to obtain post-petition credit and provides, in pertinent part, as follows:

> (c) If the trustee [debtor-in-possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt --
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.
>
> (d) (1) The Court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(c) and (d).

12. Generally, the factors to be considered in connection with a request for approval of debtor-in-possession financing include:

> 1) That the proposed financing is an exercise of sound and reasonable business judgment;
>
> 2) That the financing is in the best interests of the estate and its creditors;

8

> 3) That the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses;
>
> 4) That the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and
>
> 5) That the financing agreement was negotiated in good faith and at arm's length between the Debtors, on the one hand, and the … Lenders, on the other hand.

*In re Mid-State Raceway, Inc.*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005) (citing *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003)).

13. The Arcus DIP financing fails on multiple grounds. First, the Motion is disconcertingly silent and the testimony at the "first day" hearings insufficient on the Debtors' efforts to solicit alternative debtor-in-possession financing.[7] Mr. Vincent Collistra of Phoenix Management Services, Inc. testified that he approached "probably the four largest lending institutions, that we have done business with in the past…" See Transcript of March 18, 2008 hearings ("Tr."), page 98, lines 18-20 (attached hereto as **Exhibit A**). Mr. Collistra did not identify, however, who those lending institutions were, nor did he testify as to whether a loan of this nature should have been "shopped" to a non-traditional lending source (like Versa, their lender of choice).

14. Although case law does not impose a duty to seek credit from every possible lender, some effort on the debtor's part is required. See In re Reading Tube Indus., 72 B.R. 329

---

[7] In that regard, on April 4, 2008, the Committee served the Debtors with a Rule 2004 Subpoena requesting the production of numerous documents relating to the relief requested in the Motion, including the efforts the Debtors made before the Filing Date to solicit other debtor-in-possession financing. On April 11, 2008, the Debtors produced a handful of documents presumably in response to this particular request, none of which directly address the specific allegation that the Debtors sought but could not procure DIP financing on terms better than those offered by Arcus.

45765/0001-1516219v8

(Bankr. E.D. Pa. 1987). Proof of an actual credit search is required, not simply a presumption that more favorable credit is unavailable. In re Secured Storage Systems II, 1992 WL 109064 (Bankr. E.D. Pa. 1992). The Debtors nakedly contend in the Motion that they are "unable to obtain credit for borrowed money without the Debtors granting: (a) to the DIP Lenders [Arcus and CIT], liens on all of the assets of the Debtors pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code; and (b) to the DIP Lenders superpriority administrative expense claim status as provided in section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than as set forth in the Interim Order." See Motion, ¶ 40. Such a conclusory assertion does not come close to satisfying the requirements of the case law and the Bankruptcy Code, and given the written proposal from Arch, appears to be inaccurate. Even if the Debtors legitimately were unsuccessful in their pre-petition search for better DIP financing terms, they now have been presented with a more favorable offer that they have a fiduciary obligation to pursue, and certainly not altogether ignore.

15.     Second, the Debtors have presented no credible evidence that the proposed DIP financing is an exercise of sound and reasonable business judgment, that the financing is in the best interests of the Debtors' estates and creditors or that the terms of the transaction are fair, reasonable and adequate. Indeed, the DIP financing transaction with Arcus requires greater scrutiny because, as manager of Shapes/Arch with 79.9% of the voting rights, Arcus is an "insider" of the Debtors within the meaning of §101(31) of the Bankruptcy Code. Moreover, because the proposed financing is the mechanism for Arcus ultimately to receive complete ownership and/or control over the Debtors for consideration the Debtors have not shown to be

10

adequate - essentially making any other plan funder or purchaser an impossibility - the Debtors should be held to a higher burden of proof in seeking approval of the DIP financing with Arcus.[8]

16. The proposed DIP financing arrangement and proposed Plan manifest that Arcus, in its role as both manager and lender of the Debtors, seeks to control the Debtors and the bankruptcy process for its sole benefit and circumvent the mandates of the Bankruptcy Code by effectively disenfranchising the unsecured creditors and other parties in interest. Thus, the Motion should be denied absent more transparency regarding the *bona fides* and merits of the transactions, the value of the Debtors' assets and more protections of the interests of the unsecured creditors. See, e.g., In re Tenney Village Co., Inc., 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (denying motion to approve post-petition financing agreement where agreement "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank"); In re Ames Department Stores, Inc., 115 B.R. 34, 38-39 (Bankr. S.D.N.Y. 1990) (a proposed financing will not be approved where its apparent purpose is to benefit a creditor rather than the estate; absent protections, including a carve-out for creditors' committee counsel, the bankruptcy case would be skewed, the adversary process destroyed and the collective rights and expectations of all parties in interest sorely prejudiced); In re Plabell Rubber Prod., Inc., 137 B.R. 897 (Bankr.N.D.Ohio. 1992).

17. In addition, because the Debtors and Arcus have not demonstrated that Arcus extended credit in good faith, it is not entitled to the protections of a good faith lender under Section 364(e) of the Bankruptcy Code. That statute provides that:

---

[8] The Committee has not ruled out the filing of a motion for the appointment of a Chapter 11 Trustee or other fiduciary given the Debtors' decision to turn over the "keys to the car" to a secured lender/buyer.

11

> "[t]he reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

18. An express finding of good faith is required before the protections of Section 364(e) are applicable. In re Revco D.S., Inc., 901 F.2d 1359 (6th Cir. 1990) The Bankruptcy Code, however, does not define good faith. The concept of good faith is derived from former Bankruptcy Rule 805. 3 Collier on Bankruptcy ¶ 364.06[2] (15th Ed. Revised 2007) (citing In re Suchy, 786 F.2d 900 (9th Cir. 1985) (good faith requirement under Rule 805 speaks to integrity of the parties' conduct during the course of the proceeding)). Factors such as the parties' subjective beliefs that the financing agreement was negotiated at arms'-length and that the financing would be in the best interest of the estate and its creditors are considered in connection with a good faith finding. See, e.g., In re Cooper Commons, LLC, 430 F.3d 1215, 1220 (9th Cir. 2005). Significantly, a DIP lender fails to act in good faith where it acts with an ulterior, economically "interested" purpose. See In the Matter of EDC Holding Company, 676 F.2d 945, 949 (7th Cir. 1982) (holding that the DIP lender was not a disinterested lender but a settling litigant that saw an opportunity to reduce the cost of settlement). Given the fact that the Debtors agreed to turn over control to Versa, who is acting as the lender/buyer/fiduciary of the Debtors, this Court cannot make a finding of good faith without allowing the Committee to conduct discovery as to who was responsible for orchestrating this destructive process.

***Liens in Avoidance Actions and All Other Claims and Causes of Action are Inappropriate***

19. By the Motion, the Debtors seek to grant to Arcus on a final basis liens and super-priority administrative expense claims on "all claims, rights, interests, assets and properties" of

12

the Debtors, including all avoidance actions under Chapter 5 of the Bankruptcy Code and proceeds therefrom (collectively, the "Unencumbered Assets"). The Arcus DIP facility provides no seeming benefit to the unsecured creditors and is intended solely to ensure the sale of the companies to Arcus for questionable consideration and negligible benefit to the unsecured creditors. It is, therefore, completely inequitable and unjustified for the Debtors to grant Arcus a lien or superpriority administrative expense claim on the Unencumbered Assets. It is well established that avoidance actions are designed to ensure equality of payment among unsecured creditors; they should not be used to improve the position of secured creditors. See, e.g., In re Qualtech Steel Corp., 276 F.3d 245, 248 (7th Cir. 2001); Mellon Bank v. Glick, 69 B.R. 901, 905 (D.N.J. 1987) (even if security interest attached to preference action, allowing secured creditor the right to recovery would "frustrate the policy of equal treatment of creditors under the Code and would contradict the plain meaning of section 551 of the Bankruptcy Code"). Because avoidance actions and other claims the Debtors' estates might have properly belong to, and should be preserved for, the estates' creditors, they should be carved-out specifically from the Arcus' collateral.[9] By way of stark contrast, Arch has not insisted on a lien or super-priority administrative expense claim on the Unencumbered Assets.

---

[9] The absurdity of Arcus' overreaching request with respect to the Unencumbered Assets and Debtors' acquiescence thereto is underscored by the Debtors' liquidation analysis, included as Exhibit F to the Plan Supplement, stating that the Debtors estimate they have made in excess of $50 million in payments during the 90-day period preceding the Filing Date. The Debtors then inexplicably assign only a 5% recovery to those payments, for a total amount of approximately $2.54 million. Even assuming the Debtors' bleak estimates are reasonable, the potential non-insider avoidance recoveries completely overshadow the offensive $500,000.00 offered to creditors under the Debtors' "tricked-up" Plan. In addition, based on the Committee's financial advisor's preliminary analysis, there may be substantial avoidance causes of action against the Debtors' insiders. Moreover, given the Committee's recent appointment, it has not yet had an opportunity to evaluate whether there might be other causes of action that should be
(continued…)

45765/0001-1516219v8

### *The Waiver of Section 506(c) Is Unwarranted*

20. Section 506(c) of the Bankruptcy Code provides that a debtor may charge a secured creditor's collateral for the reasonable and necessary costs and expenses of preserving or disposing of such collateral to the extent of any benefit to the secured creditor. 11 U.S.C. §506(c). The Debtors have agreed to a waiver of all Section 506(c) rights against Arcus. This Court should not approve such 506(c) waiver on a final basis because a wholesale waiver of surcharge rights is inappropriate in these cases where the process is being run precisely for the exclusive benefit of Arcus, at great expense to unsecured creditors.

21. In a typical Chapter 11 case, a carve-out from a proposed DIP lenders' collateral is provided for professional fees as a *quid pro quo* for the estates' waiver of Section 506(c) surcharge rights. Here, however, the "carve-out" referred to in the Arcus DIP Order is not a "true" carve-out, as the Arcus DIP Order provides that the "carve-out" is reduced as professional fees are paid until it finally disappears. Rather, there appears to be only a line item for professional fees in the Debtors' budget (substantially skewed in favor of the Debtors' professionals) with absolutely no protection for the estates to satisfy that administrative expense liability.[10]

---

(…continued)
pursued, and the Debtors have been remiss in responding to the Committee's request for a copy of any directors & officers insurance policy.

[10] In addition, the proposed $25,000.00 line item in the budget for professional fees to investigate any potential claims against CIT is wholly inadequate and should be increased to $100,000.00. Not only does the Committee need to review the extent, validity and priority of CIT's liens, but given CIT's insistence that it be given a broad release of all claims and causes of action in advance of plan confirmation, a much more exhaustive and intensive investigation is required.

14

22.   Likewise, the Arcus DIP Order is silent on and provides no carve-out for budgeted items that are not timely paid, raising the risk that if Arcus calls a default, these estates will be left with numerous unpaid bills and no unencumbered assets from which to pay them. In short, the "carve-out" is illusory, and in the case of a trailing carve-out for budgeted operating expenses, non-existent, and does not warrant a Section 506(c) waiver.

### *The Releases Are Overly Broad and Inappropriate*

23.   The Arcus DIP Order provides, and by the Motion the Debtors seek, on a final basis authority to provide a general release to Arcus as well as their "respective affiliates, officers, directors, agents and attorneys." In the first instance, such a broad release is inappropriate in the context of approving DIP financing. The proposed releases are especially offensive here, where Arcus is in complete control of the Debtors, and the Committee believes it has viable causes of action against Versa for breach of fiduciary duty, aiding and abetting breach of fiduciary duty and fraudulent transfers, all as more particularly described herein and in the Disclosure Statement Objection. See, e.g., In re Scott Acquisition Corp., 344 B.R. 283 (Bankr. D. Del. 2006) (properly stating claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty in connection with the sale and lease back transaction of real property to an insider and an insider loan while in the zone of insolvency without soliciting or considering third party offers); In re Mid-Am. Waste Systems, Inc., 284 B.R. 53, 70 (Bankr. D. Del. 2002) ("To qualify as inequitable conduct the insider or fiduciary credit must have actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment."); In re High Strength Steel, Inc., 269 B.R. 560, 569 (Bankr. D. Del. 2001) (once a corporation becomes insolvent, its officers and directors owe unsecured creditors a fiduciary duty including maximizing value of assets for payment of unsecured creditors) (citations omitted).

15

24. If full releases are warranted at the end of the day, which the Committee does not believe is the case, they could be given pursuant to a confirmed plan of reorganization. In addition, given the Debtors have released Arcus from any claims they might have, it goes without saying that the Final Arcus DIP Order should confer standing on the Committee to pursue any and all claims and causes of action against Arcus.

### *The Arcus DIP Facility is Extremely Expensive; Arch Willing to Reduce or Altogether Eliminate Excessive Fees*

25. The Arcus DIP financing is extremely expensive, calling into question the exercise of the Debtors' fiduciary duties in agreeing to the exorbitant fees and whether the DIP facility was negotiated at arm's length.[11] For example, the "Commitment Fee" was two percent (2%), whereas Arch is willing to charge only a one and a half percent (1.5%) commitment fee, which would be waived if the commitment fee was already paid to Arcus.[12] The Default Rate of Interest in the Arcus DIP Loan Agreement is three percent (3%) over the Applicable Margin and Base Rate. Arch is willing to reduce the three percent (3%) to two percent (2%). Arcus is charging the Debtors a Termination Fee of two percent (2%), whereas Arch has agreed to waive that fee. Finally, the Arcus Loan Agreement (§ 9.8) provides for an agent/facility fee equal to $40,000 per month and a collateral monitoring and servicing fee equal to $40,000 per month, for a total of $80,000 per month payable to Arcus.[13] Arch has agreed to waive those fees entirely.

---

[11] Even Mr. Collistra admitted that the pricing of the Arcus DIP Facility is "a little in the high range." See Tr., p. 100, line 13 (attached hereto as **Exhibit B**).

[12] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Arcus DIP Loan Agreement.

[13] It is totally unclear why pursuant to a term loan, a "collateral monitor fee" is even required.

45765/0001-1516219v8

### *Certain Default Provisions Should Be Excised or Modified*

26. The default provisions of the Arcus DIP Loan Agreement are inappropriately tied to the flawed plan confirmation process launched by the Debtors and Arcus. For example, pursuant to Section 11.1(w), the Debtors' failure to confirm the Debtors/Arcus Plan by May 30, 2008 and to substantially consummate the Plan by June 30, 2008 constitutes a default under the Arcus DIP Loan Agreement. Those dates, in the first instance, are unrealistic under the facts of these cases. More importantly, they woefully fail to address the need to open up the process to competitive bidding so that maximum value can be realized for creditors. The Debtors' agreement to such outrageous terms further underscores the need to exhaustively scrutinize the Debtors' intentions and good faith. Importantly, these provisions have been deleted from the Arch DIP Financing proposal.

27. Additionally, under the Arcus DIP Loan Agreement (§11.1(k)), a default occurs if Steven S. Grabell ceases for any reason whatsoever to be the Chief Executive Officer and actively engaged in the management of the Debtors unless a successor acceptable to Arcus is appointed within ten (10) days. Given that a search for a competent CEO likely will take more than ten (10) days, and that Arcus' acceptance of a successor CEO should not be unreasonably withheld, that provisions is particularly harsh and prejudicial.

### *Multiple Other Provisions of the Interim Financing Order and Arcus DIP Loan Agreement Are Unfair And Inequitable to Unsecured Creditors*

28. Many other provisions of the Interim Financing Order and Arcus DIP Loan Agreement are patently unfair, disadvantageous to the Debtors and their estates and/or designed to bolster Arcus' ability to call a default and gain full control of the Debtors, while denying unsecured creditors a meaningful participation in these cases. Those provisions should be denied on a final basis.

45765/0001-1516219v8

29. In an effort to resolve these objectionable provisions, the Committee's counsel sent a bullet-point memorandum to counsel for Arcus on April 4, 2008, to which no response was received.[14] A summary of the additional material objections are as follows (and the Committee reserves its rights to highlight all the objectionable provisions at the Final Hearing):

### *Arcus DIP Order*

- Par 1.3.3 – Notice of material amendments to the DIP Loan Documents should be 5 business days and the Committee should receive notice of any non-material objections.

- Par 3.4. - Notice of default should be 5 business days.

- Par 5.4 – The Debtors should have unfettered rights to bring sale motions before the court and Arcus has section 363(f) to protect it.

### **Arcus DIP Loan Agreement**

- Maturity Date. The Debtors should have the ability to extend the maturity date of September 16, 2008 for an additional 90 days if there is no default, especially if it appears that the confirmation of a plan of reorganization is imminent.

- Budget Variance. The budget variance covenants are unrealistic, based on the Committee's financial advisor's preliminary assessment.

- EBITDA Targets. The EBITDA targets during 2008 do not appear achievable, based on the Committee's financial advisor's preliminary assessment.

- Audits. There is no need to provide audited balance sheets or financial statement to Arcus during the short term of the Arcus DIP facility.

- Review of Legal Fees. Arcus should agree to a mechanism whereby its attorneys' fees and costs are subject to review and objection by the Committee and United States Trustee.

- Right of First Refusal Should be Deleted. The right of first refusal on replacement debtor-in-possession financing contained in the Arcus DIP Loan Agreement is not enforceable and should be excised. Bankruptcy Courts have invalidated "rights of first refusal" because of the chilling effect such first refusal rights have on sales. See, e.g., In

---

[14] It should be noted that a brief meeting took place among the Debtors, Arcus and the Committee on April 15, 2008, which resulted in absolutely no concessions by the Debtors or Arcus to the Committee's serious concerns with the Arcus DIP financing.

18

re Mr. Grocer, Inc., 77 B.R. 349 (D.N.H. 1987); In re Adelphia Communications Corp., 359 B.R. 65, 86 (Bankr. S.D.N.Y. 2007) ("the rights of first refusal 'thwart the fundamental policy of maximizing estate assets for the benefit of all creditors,' and thus are unenforceable"); In re Rancourt, 153 B.R. 380 (D.N.H. 1993); Ramco-Gershon Properties L.P. v. Serv. Merchandise Co., 293 B.R. 169 (M.D.Tenn, 2003); Weaver v. Gould, 1191 WL 423972 (N.D.Ind. 1991), aff'd on other grounds, 977 F.2d 1038 (7th Cir. 1992)(right of first refusal's potential chilling effect on potential buyers was burdensome to debtor).

## CONCLUSION

30.     For all the reasons set forth herein, including most significantly the Committee's serious concern that the chapter 11 process has been hijacked by Arcus, the Committee respectfully requests that the Court: (i) deny the Motion as to Arcus be on a final basis unless the proposed Final DIP Order is modified to resolve the issues outlined above and (ii) grant such other relief as the Court deems just and appropriate under the circumstances.

Respectfully submitted,

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Proposed Co-Counsel to the Official Committee
of Unsecured Creditors of Shapes/Arch
Holdings L.L.C., et al.


By:  */s/ Michael D. Sirota*
    Michael D. Sirota
    Ilana Volkov
    Warren A. Usatine

DATED:  April 16, 2008

45765/0001-1516219v8