**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York  10022
(212) 765-9100
(212)765-0964 Facsimile
Alan D. Halperin, Esq.
Donna Lieberman, Esq.
Proposed Co-Counsel for the Official
Committee of Unsecured Creditors

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street, P. O. Box 800
Hackensack, New Jersey  07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Michael D. Sirota, Esq.
Ilana Volkov, Esq.
Warren A. Usatine, Esq.
Proposed Co-Counsel for the Official
Committee of Unsecured Creditors

|  |  |
|---|---|
| : | UNITED STATES BANKRUPTCY COURT |
| In the Matter of: : | FOR THE DISTRICT OF NEW JERSEY |
| : | HONORABLE GLORIA M. BURNS |
| SHAPES/ARCH HOLDINGS, L.L.C., et : | CASE NO. 08-14631(GMB) |
| al., : | |
| : | (Jointly Administered) |
| Debtors. : | |
| : | Chapter 11 |
| : | |
| : | HEARING DATE AND TIME: |
| | April 17 2008, 10:00 a.m. |

**ORAL ARGUMENT REQUESTED**

**OBJECTION OF THE OFFICIAL COMMITTEE**
**OF UNSECURED CREDITORS TO THE DEBTORS'**
**PROPOSED DISCLOSURE STATEMENT**

TO:  HONORABLE GLORIA M. BURNS,
       UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of Shapes/Arch

Holdings L.L.C., et al. (collectively, the "Debtors"), by and through its proposed counsel, hereby

objects to the Joint Disclosure Statement (the "Disclosure Statement"),[1] for the Debtors' Joint

Plan of Reorganization (the "Plan") filed by the Debtors on or about March 16, 2008, and

respectfully represents as follows:

<u>PRELIMINARY STATEMENT</u>

1.      Shortly before filing for bankruptcy protection, the Debtors entered into an

agreement with Versa Capital Management, Inc., pursuant to which Versa, either directly or

through two affiliates (collectively, "Versa"):

- took control of Debtor Shapes/Arch, the parent of the other Debtors;

- agreed to provide a DIP loan in the amount of $25 million, upon draconian terms that would, if approved by this Court, preclude the sale of the Debtors' businesses to any entity other than Versa and prevent any meaningful marketing process; and

- "negotiated" a plan of reorganization which would, if approved by this Court, deliver the Debtors' businesses and assets to Versa for minimal consideration, and provide releases to Versa and other insiders of the Debtors, while providing a distribution to unsecured creditors that is optimistically estimated at less than two cents on the dollar.

2.      It is undisputed that the Debtors did not hire an investment banker or any other

comparable professional competent to market their businesses and assets (either in whole or in

part) prior to entering into the Versa transaction, nor is there any evidence that they effectively

did so themselves.  In fact, since the Committee was formed, three other entities have conveyed

expressions of interest in a transaction on more favorable terms.  One of those three entities,

Arch Acquisition I, LLC, has filed an objection to the Disclosure Statement and has submitted to

---

[1] Capitalized terms used but not defined herein shall have the meanings assigned to them in the Disclosure Statement.

45765/0001-1518184v1

the Debtors and the Committee a proposed DIP financing agreement that would replace the

Versa DIP and a proposed plan that (while subject to the completion of expedited due diligence)

offers significantly more value to unsecured creditors than the Plan.  Yet the Debtors have

refused to provide Arch Acquisition with any information despite repeated requests and demands

from Arch Acquisition and the Committee, and are continuing to seek this Court's assistance in

forcing this privately negotiated transaction upon unsecured creditors, purportedly because it is

the only option available to the Debtors and their creditors.

3.      The Disclosure Statement and the Plan were filed as "first day" pleadings, and an

interim DIP financing order that strengthened Versa's control over these Debtors, and virtually

assured Versa's position as owner of these Debtors, was entered two days after the Filing Date,

on notice to almost no one.  Hearings on both the proposed final DIP financing order and the

Disclosure Statement are scheduled to occur approximately four weeks after the Filing Date and

two weeks after the formation of the Committee.[2]  The Disclosure Statement and the Plan,

together with the DIP loan referenced above, completely prohibit a competitive bidding process

that might result in higher and better offers, and a meaningful recovery for unsecured creditors.

4.      It is against this backdrop that the Committee has reviewed and attempted to

make sense of the Disclosure Statement.  In addition to the "lock up" sale process that provides

nominal consideration to unsecured creditors, if that, the Disclosure Statement fails in numerous

ways.  It fails to provide "adequate information" about these cases and the proposed Plan, as it

does not offer creditors enough information to evaluate the Plan and alternatives to the Plan, and

---

[2] The Versa DIP arrangements are the subject of a separate objection by the Committee, which is incorporated herein by reference.  Notably, absent the insistence of the Committee, a final DIP financing hearing would have occurred weeks ago, just days after the Committee's formation.

lacks basic information about asset values, claims, causes of action, contracts and leases,

transactions involving insiders, and environmental and labor issues.  In addition, the Disclosure

Statement directs readers to documents that were not filed as of the objection deadline for parties

other than the Committee, raising issues of notice and due process.[3]

5.      But perhaps the most troubling deficiency in the Disclosure Statement is that it

relates to a plan and a process, or more accurately, a lack of process, that violate the most

fundamental principles of bankruptcy law.  This Court is being asked to approve a transaction,

through the vehicle of a linked DIP loan and proposed Plan, which is not the result of an open

and fair process, does not maximize values, and is not in the best interests of creditors and the

bankruptcy estates.   Moreover, the proposed Plan releases all claims against Versa and other

insiders and their professionals, and vests causes of action in the Reorganized Debtors (which,

like the Debtors, will be controlled by Versa), denying creditors the ability to investigate and

pursue potentially valuable causes of action against Versa, the management of the Debtors and

others, for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and fraudulent

transfer.   For these reasons, and as more fully set forth below, the Committee respectfully

submits that the Disclosure Statement should not be approved.

---

[3] The Committee notes that after representing at the March 31st organizational meeting of the Committee that the Plan Supplement would be filed "shortly," the Debtors filed those additional documents on April 15, 2008, after the general Disclosure Statement objection deadline and less than twenty-four hours before the Committee's objection deadline, and at a time when the Committee's professionals were in Philadelphia for a meeting with the Debtors and Versa.

45765/0001-1518184v1

## DISCUSSION

**(i)    The Disclosure Statement Hearing Should Not Proceed Because
Creditors Have Not Been Provided with Adequate Notice and
Opportunity to Review Financial and Other Exhibits.**

6.    As a preliminary matter, consideration of the Disclosure Statement at this time

raises issues of notice and due process.  As of three days before the hearing, the date that

objections were due for parties other than the Committee, the "Plan Supplement," which are

critical documents in understanding the Plan, had not been served or filed with this Court.  Per

the Disclosure Statement and the Plan, the Plan Supplement is supposed to provide, among other

things, financial projections, a liquidation analysis,  plan funding debt commitments, plan

funding equity commitments, the operating agreement for the Reorganized Debtors, the

management equity incentive plan (about which the Committee knows only that it may result in

current management of the Debtors receiving up to five percent of the equity in the reorganized

parent company), and the plan administration agreement (collectively, the "Supplemental

Documents").  Disclosure Statement, pp. 3-4, 35.  Plan, p. 8.

7.    Section 1125 of the Bankruptcy Code requires that a disclosure statement provide

"adequate information" sufficient to enable a party in interest to make an informed judgment

about the proposed plan.  *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors*

*Corporation and General Motors Acceptance Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *Ryan*

*Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir.1996).  In addition,

Bankruptcy Rule 2002(b) requires twenty-five days' notice of a disclosure statement hearing to

provide sufficient notice and due process with respect to the disclosure statement.  The

Supplemental Documents, which had not been filed as of close of business on April 14th, are a

critical part of any disclosure statement, and more particularly this Disclosure Statement and

Plan.  Creditors and other parties in interest have a right to receive these documents sufficiently

in advance of the Disclosure Statement hearing to review, analyze, take discovery and if appropriate, object to them.

8.    The Debtors failed to provide the financial and other documents identified in paragraph 6 hereof and promised in the Plan and the Disclosure Statement by the general deadline for objecting to the Disclosure Statement.  Instead, the Debtors filed documents which require careful scrutiny after the general objection deadline, within twenty-four hours of the Committee's deadline and less than two days before the Disclosure Statement hearing itself. With the filing of the Supplemental Documents virtually on the eve of the hearing, creditors and other parties in interest do not have sufficient time to review carefully those documents and determine if the Disclosure Statement, as supplemented, provides adequate information about the Plan and the Debtors' situation.

9.    The Committee's numerous substantive objections to the adequacy of the Disclosure Statement cannot be cured by the late filing of exhibits.  However, the Committee's professionals would nonetheless like and are entitled to a reasonable amount of time in which to review the new filings, conduct discovery and brief the Committee about their contents.  The Committee therefore respectfully submits that the scheduled hearing to consider the adequacy of the Disclosure Statement should be adjourned for no less than two weeks with the Court to order the Debtor and Versa to produce documents and make witnesses available for depositions.

**(ii)    The Disclosure Statement Should Not Be Approved Because the Plan
is Unconfirmable.**

10.    It is well-settled that a disclosure statement related to a plan that is facially unconfirmable cannot be approved as containing "adequate information" within the meaning of section 1125 of the Bankruptcy Code.  As one court has observed, "[i]f the disclosure statement describes a plan that is so 'fatally flawed' that confirmation is 'impossible' the court should

exercise its discretion to refuse to consider the adequacy of disclosures." *In re E. Maine Elec. Coop.*, 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also In re Allied Gamin Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("[N]otwithstanding adequate disclosure of information required by section required by section 1125(b), a disclosure statement should not be approved if the proposed plan, as a matter of law, cannot be confirmed."); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement will not be approved, where, as here, it describes a plan which is fatally flawed and thus incapable of confirmation.").

11.    The evaluation of a plan in this manner, at the disclosure statement stage, has become "standard chapter 11 practice [.]" *In re Felicity Assoc., Inc.*, 197 B.R. 12, 14 (Bankr. D. R.I. 1996). *See also In re Phoenix Petroleum Co.*, 278 B.R. 385, 394 (Bankr. E.D. Pa. 2001) (where plan is fatally flawed, court should exercise its discretion and refuse to consider the adequacy of the disclosure statement). The point of conducting the evaluation at this juncture is to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on a plan which is unconfirmable on its face. Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta W. VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

12.    The Disclosure Statement before this Court is inadequate for many reasons, which are set forth in Section (iii) hereof. But perhaps the most substantive failing of the Disclosure Statement is a failing of the Plan which it purports to describe. The Plan as presently constituted is unconfirmable as a matter of law. Specifically, and as set forth below in greater detail, the Committee submits that:

- The Plan and the Plan proponents (the Debtors) do not comply with the applicable provisions of Title 11, a violation of sections 1129(a)(1) and (2) of the Bankruptcy Code.

7

- The Plan has not been proposed in good faith, a violation of section 1129(a)(3).

- The Plan does not satisfy the "best interests" test with respect to unsecured creditors, a violation of section 1129(a)7.

- In the event that any class of Claims rejects the Plan (an extremely likely scenario), the Plan cannot satisfy the "fair and equitable" standard enunciated in section 1129(b) of the Bankruptcy Code, because, among other things, numerous classes of Claims are being impaired while at least one class of Interests (Interests below Shapes/Arch parent) is unimpaired.

**(a)    Violations of 11 U.S.C. 1129(a)(1), (2) and (3)**

13.    The Bankruptcy Code generally, and Chapter 11 in particular, embody certain basic principles, irrespective of whether a debtor is attempting a true reorganization or an orderly liquidation. The bankruptcy process is intended to be a fair and open one, conducted under the watchful eye of a federal judge, with the goal of maximizing value for the benefit of creditors and the estates. *In re Big Rivers Electric Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky. 1998) ("It is beyond dispute that a Chapter 11 DIP owes a fiduciary duty to all of the creditors and other interest holders of its bankruptcy estate to maximize the value of the bankruptcy estate.") *See also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985).

14.    Here, the Committee is faced with a Plan that is designed to give effect to a pre-petition deal between the Debtors and Versa, with no opportunity for the marketing of the assets or equity of the Debtors to others in a competitive process. Versa obtained control of the Debtors prior to the Filing Date, through a transfer of 79.99% of the voting rights in Shapes/Arch (the parent of all of the other Debtors) to Versa, and would, upon consummation of the Plan, receive all of the equity in Shapes/Arch. (The Plan and Disclosure Statement make passing reference to a "Management Equity Incentive Plan" that might distribute up to five percent of the equity, but offer no more information than that.) The Plan contemplates that the Versa DIP loan

will be converted to exit financing upon Plan confirmation, and continue as a secured loan, with a maximum of $1.5 million of that loan potentially being converted to an equity contribution.[4]

15.    The Debtors would have this Court assist them in bypassing the rights and myriad objections of unsecured creditors, by permitting this private sale to an insider that currently controls the Debtors to be completed on an expedited basis, with no opportunity for any other party to bid on the Debtors' equity or assets.  The Court should not approve a Disclosure Statement that describes (however poorly) such a process, as the process itself contravenes the core bankruptcy concept of soliciting higher and better bids.

16.    Not surprisingly, the Plan also insulates the management of the Debtors and Versa from scrutiny and claims, by providing for extremely broad releases of third parties, including Versa, its affiliates, and other insiders, and by vesting all potential avoidance actions in the Reorganized Debtors.  (If the Plan is approved, the Reorganized Debtors will be controlled by Versa.)  The releases are to be the "default" choice on the ballots of unsecured creditors; if an unsecured creditor does not choose to affirmatively accept or reject the proposed releases, it is deemed to have accepted the releases.  The so-called consideration for the releases is a pro rata share of $100,000 – or, with an unsecured creditor pool conservatively estimated at $31 million, less than one half of one penny on the dollar. The Disclosure Statement lacks any explanation as to how those releases were "priced," or the nature or extent of the investigation (if any) of the claims that would be released.   The Committee plans to conduct a thorough investigation into what appears to be an engineered scheme to transfer these businesses, without regard to due process, fundamental bankruptcy principles, or the fiduciary duties of the parties.

---

[4] The Committee notes that a preliminary review of the Supplemental Documents suggests a different number for the possible equity contribution, making the Disclosure Statement more, rather than less, confusing.

45765/0001-1518184v1

17.    Third party releases are viewed with considerable skepticism, and have been held to be violative of sections 1129(a)(1) and 524(e) of the Bankruptcy Code by numerous courts. *See* e.g., *Star Phoenix Mining Co. v. West One Bank*, 147 F.3d 1145, 1147 (9th Cir. 1998); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (D.Del. 2004) (release of third party claims against a non-debtor under a plan impermissible); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997).  And while the Third Circuit has not held that all third party releases are impermissible, it rejected such releases in In re Continental Airlines, 203 F.3d 203, 214 (3d Cir. 2000), finding that the elements of a permissible release – fairness and necessity to the reorganization – were absent.

18.    Granting third party releases here is neither fair nor necessary to the reorganization and raises questions about the good faith of the Debtors and Versa.  The proposed releases, together with the vesting of causes of action in the Reorganized Debtors, serve the improper purpose of preventing creditors from asking appropriate questions about the actions of insiders, whether in respect of the Versa transaction and fiduciary responsibilities and self-dealing, or in connection with the more than $5.1 million in payments to insiders in the year prior to the Filing Date.  The Plan surrenders potential claims against Versa and other insiders for, among other things, breach of fiduciary duty and aiding and abetting breach of fiduciary duty, which claims may constitute valuable assets of these estates.

19.    The Committee notes that caselaw arising in the context of section 363 sales offers useful guidance in this area.  Courts addressing the issue have recognized that a fair and open process and the absence of insider releases are key to a finding of "good faith."  *See*, e.g., *In re Summit Global Logistics, Inc., et. al*, Slip Copy, 2008 WL 819934, p. 11 (Bankr. D. N.J. March 26, 2008)(copy attached).

10

**(b)    Violations of Section 1129(a)(7)**

20.    The Plan proposed by the Debtors cannot satisfy the "best interest test of creditors" test pursuant to section 1129(a)(7) of the Bankruptcy Code.  Pursuant to section 1129(a)(7), the Debtor must show that every dissenting creditor would receive as much or more under the Plan than such creditor would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  *See In re WorldCom, Inc.* 2003 WL 23861928 at *55 (Bankr. S.D.N.Y. Oct. 31, 2003).

21.    Courts have held that a detailed liquidation analysis is one of the categories of information that must be examined in determining whether a disclosure statement contains adequate information, *see*, e.g., *In re United States Brass Corp.*, 194 B.R. 420, 423 (Bankr. E.D. Tex. 1996); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300-01 (Bankr. S.D.N.Y. 1990) (stating that '[d]isclosure statements are required to contain liquidation analyses that enable creditors to make their own judgment as to whether a plan is in their best interests and to vote and object to a plan if they so desire").  Although courts have acknowledged that the valuation of a hypothetical liquidation is inherently speculative, they have nevertheless stressed that any such valuation must be based on "evidence, not assumptions."  Crowthers, 120 B.R. at 297 (citation omitted); *see also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

22.    These Debtors have avoided any possible criticism of their liquidation analysis by simply not providing one until less than one day prior to the Committee's objection deadline and *after* the objection deadline for all other parties.[5]  This lack of adequate notice makes it

---

[5] Certain financial information has been provided to Committee professionals on a confidential basis.  The Committee's financial advisors have reviewed the information provided and disagree with many of the assumption made therein, as well as the Debtors' conclusions.

45765/0001-1518184v1

impossible for creditors to evaluate the information provided, ask for more detail or challenge the Debtors' assumptions.  In fact, the Committee believes that a reasoned assessment of liquidation values supports the view that creditors will do better in a chapter 7 liquidation than they will under the Plan.  Thus, the Debtors' Plan cannot satisfy the best interests of creditors test.

      (c)     **Violations of Section 1129(b)**

23.     The Committee notes that if even one class of Claims rejects the Plan, as is entirely likely here, the Debtors must ask the Court to "cramdown" the Plan, requiring a finding that the Plan is fair and equitable with respect to each rejecting class.  11 U.S.C. §1129(b). With respect to unsecured creditors, a finding that a plan is fair and equitable would, as stated unequivocally in the statute, require a determination that (i) holders of unsecured claims receive property equal in value to the allowed amount of their claims (i.e. a 100% distribution), or (ii) holders of claims and interests junior to the unsecured class do not receive or retain anything on account of such claims or interests.

24.     The Plan as presently constituted offers unsecured creditors less than two cents on the dollar for their claims, while allowing holders of interests in four of the five Debtors (all of the Debtors below the parent Shapes/Arch)  to retain their Interests.   Therefore, the Debtors are urging this Court to allow them to proceed with a plan that cannot satisfy the "fair and equitable" standard of section 1129(b).

25.     In sum, the Disclosure Statement describes a Plan that is facially unconfirmable. The Committee respectfully submits that this Court should not approve the Disclosure Statement, where, as here, allowing the disclosure and solicitation process to proceed in would add unnecessarily to the administrative expenses of these cases and waste the time of the Court, the Debtors and all other parties in interest.

**(iii)   The Disclosure Statement Does Not Provide "Adequate Information"
To Permit Creditors To Make An Informed Decision On The Plan.**

26.     A plan proponent may solicit votes upon a proposed plan only in conjunction with

the dissemination of a disclosure statement that contains adequate information.  11 U.S.C.

§ 1125(b).  The Bankruptcy Code defines "adequate information" as "information of a kind, and

in sufficient detail . . . that would enable a hypothetical reasonable investor typical of holders of

claims or interests in the relevant class to make an informed judgment about the plan." 11 U.S.C.

§ 1125(a)(1).

27.     It is critical that the plan proponent includes adequate information in its disclosure

statement not only to enable creditors to determine how to vote on a plan, but also to enable the

Court to judge the plan:

> The Bankruptcy Code requires disclosure to protect creditors from
> a debtor who may try to hide assets and maximizes judicial
> efficiency.  'The importance of full disclosure is underlaid by the
> reliance placed upon the disclosure statement by the creditors and
> the court.  Given this reliance, we cannot overemphasize the
> debtor's obligation to provide sufficient data to satisfy the Code
> standard of adequate information.'

*Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999)(citations omitted).

28.     In determining whether a plan proponent has provided "adequate information" to

creditors and parties in interest, the standard is not whether the failure to disclose information

would harm the creditors but whether "hypothetical reasonable investors receive such

information as will enable them to evaluate for themselves what impact the information might

have on their claims and on the outcome of the case, and to decide for themselves what course of

action to take."  *In re Applegate Prop., Ltd.*, 133 B.R. 827, 831 (Bankr. W.D. Tex. 1991)

(emphasis in original); *see also In re United States Brass Corp.*, 194 BR. at 423 ("The purpose of

the disclosure statement is not to assure acceptance or rejection of a plan, but to provide enough

45765/0001-1518184v1

information to interested persons so they may make an informed choice between two alternatives").

29.     In these cases, the Disclosure Statement failed to timely include the Plan Supplement and so denied creditors sufficient notice of and time to evaluate such critical information and documents as financial projections, a liquidation analysis, plan funding debt commitments, plan funding equity commitments, the operating agreement for the Reorganized Debtors, the management equity incentive plan, and the plan administration agreement.  There is also insufficient discussion in the Disclosure Statement of the changes in the Debtors' financial situation in the time leading up to the Filing Date (such as the increase in the borrowing base by $4.4 million) or the Debtors' alleged efforts to market their businesses or find alternative sources of funding.

30.     Moreover, the Disclosure Statement omits or is unclear about most of the basic information of primary concern to creditors.   In addition to the fundamental flaws described in the prior section of this Objection, the Committee offer the following examples of some but not all of the Disclosure Statement's deficiencies:

a)     <u>Insufficient information about claims</u>. The claims chart at page 6 contains no numbers for five classes of claims, and estimates claims in advance of both the general and the governmental bar dates and any professional fee statements.

b)     <u>Labor Issues</u>.  General unsecured claims are estimated at $31 million, with no meaningful disclosure about the Debtors' five labor contracts, the requirements of section 1113 of the Bankruptcy Code with respect to the treatment of them, or the potential for withdrawal liability or rejection damage claims if the contracts are terminated or rejected.

The Disclosure Statement at page 27 fails to state that execution of a new collective bargaining agreement is a condition to confirmation of the Plan (Plan section 9.1), and there is no disclosure concerning what steps the Debtors have taken or plan to take to effect consensual modification or rejection under section 1113.

45765/0001-1518184v1

c)      Environmental Disclosure.  The Debtors separate environmental claims into two
classes, placing certain liquidated EPA/NJDEP claims in one class and lumping
other unliquidated environmental claims with general unsecured claims.  No basis
for the separate classification is provided, nor does the Disclosure Statement
adequately disclose whether the liquidated amounts have been agreed to by
counter-parties, or the nature and scope of the unliquidated claims.

The Liquidation Analysis shows $1,350,000 for "estimated environmental
remediation," a number significantly higher than the amounts shown in the
Disclosure Statement for environmental claims.  This difference must be
explained.

In addition, there is passing reference to environmental claims being covered by
insurance, but no information is provided about the insurance policies (terms,
deductibles, limits, whether claims have been filed and approved)  .

d)      Insurance.  There is no disclosure concerning which insurance companies are
holding collateralized insurance claims, the nature and extent of the claims, or the
extent of their deposits or terms of the letters of credit.  There is also no
discussion of the effect the Plan treatment will have on the insurance policies.

e)      The holders of "Miscellaneous Secured Claims" and "Secured Claims of
Warehousemen and Shippers" are not identified and there is no disclosure
regarding the nature and extent of their collateral.  Unsecured creditors must also
know if the value of the collateral these parties hold exceeds their claims, or if
there will be deficiency claims.

f)      Causes of Action. The Disclosure Statement fails to disclose whether the Debtors
ever reviewed or analyzed the validity of the lenders' liens.  There is likewise
insufficient information about the analysis of claims against insiders, including
Versa, and others.  Instead of disclosing all material Causes of Action, the
Debtors generically describe some of the types of actions they could bring (page
15).

g)      Several classes are shown as receiving 100% distributions yet subsequently
described as impaired.

h)      The Role of the Committee.  There is no information about the existence of the
Committee, and no monitoring or approval role for the Committee in respect of
protecting the rights of and asserting claims on behalf of unsecured creditors.  For
example, requests for administrative and fee claims by lenders and professionals
should be served upon counsel for the Committee (page 16).

i)      There is no explanation as to why the aggregate amount of administrative claims
is subject to Court approval.

j)      The Disclosure Statement must be amended to accurately describe all first and
second day orders and what has already been paid pursuant to those orders.

45765/0001-1518184v1

k)   The Debtors fail to disclose whether they were served with any reclamation demands and if they have, how reclamation claims will be treated.

l)   The documents are misleading and confusing in that they suggest that the Plan Funder and Versa/Arcus are separate entities when, in fact, they are one and the same.  And as a general note, the Debtors fail to adequately address the fact that Versa is not only the DIP Lender and Plan Funder but has been in full control of the Debtors since prior to the Filing Date.

m)   The Disclosure Statement fails to note that the Plan Funder's liens attach to the Reserves for distributions to creditors or to explain when and under what terms Versa can invade the already paltry Reserves for unsecured creditors.

n)   The Disclosure Statement does not explain why CIT is being given 101% cash collateral if CIT's claims are being paid in full.  Also, the document fails to address the effect the draw down on letters of credit will have on the CIT secured debt.

o)   There should be a discussion at page 19 of the extent of the unsecured claims, including the potential impact of environmental, labor and rejection damage claims on that class and the anticipated recovery for unsecured creditors.

p)   The Disclosure Statement should explain why the Plan Administration Agreement deals with obligations that properly belong to the Reorganized Debtors, such as cure amounts, U.S. Trustee fees and post-confirmation reporting.  (pages 20-21).

q)   Inconsistencies between the Disclosure Statement, the Plan and the Bankruptcy Code must be reconciled  For example, any claim filed after the Bar Date, not the Confirmation Date, should be automatically disallowed as late.

r)   The Disclosure Statement and the Plan are inconsistent with each other as to how the assumption/rejection of contracts is being handled.

s)   The description of Class 7 Interests section at page 20 must disclose that the interest holders  are unimpaired, as they will retain the full amount of its interests.

t)   <u>Substantive Consolidation</u>.  The Plan contemplates substantive consolidation of the Debtors, yet the Disclosure Statement is totally devoid of any discussion of the basis for such consolidation.

## **<u>RESERVATION OF RIGHTS</u>**

31.   Unfortunately, there are so many failures of disclosure that the Committee must

reserve its rights to supplement and amend this Objection and/or seek discovery with respect to

the same, and submits this Objection without in any way limiting any rights the Committee may

16

have.  Moreover, the Committee has had time to only conduct a preliminary review of the

Supplemental Documents which have just been filed by the Debtors.  The Committee therefore

expressly reserves its rights to object to the Disclosure Statement and/or confirmation of the Plan

on any other grounds, as may be appropriate.

## **<u>CONCLUSION</u>**

WHEREFORE, the Committee respectfully requests that this Court (a) adjourn the

hearing to consider the adequacy of the Disclosure Statement for a reasonable period of time and

direct the Debtors to provide further disclosures, or enter an Order declining to approve the

Disclosure Statement and (b) grant the Committee such other and further relief as may be

appropriate under the circumstances of these cases.

Dated:  April 16, 2008

<div style="margin-left: 40%">

**HALPERIN BATTAGLIA RAICHT, LLP**
Proposed Co-counsel to the Official Committee
of Unsecured Creditors


By:____*/s/ Alan D. Halperin*_____
        Alan D. Halperin, Esq.
        Donna H. Lieberman, Esq.

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
Proposed Co-Counsel to the Official Committee
of Unsecured Creditors of Shapes/Arch
Holdings L.L.C., et al.


By:____*/s/ Michael D. Sirota*_____
        Michael D. Sirota
        Ilana Volkov
        Warren A. Usatine

</div>

17

Westlaw.

Slip Copy                                                                                          Page 1

Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy, 2008 WL 819934)**

In re Summit Global Logistics, Inc.
Bkrtcy.D.N.J.,2008.
Only the Westlaw citation is currently available.NOT FOR PUBLICATION
United States Bankruptcy Court,D. New Jersey.
In re SUMMIT GLOBAL LOGISTICS, INC., et al.,
Debtors.
**Nos. 08-11566, 08-11568, 08-11573, 08-11574,
08-11577, 08-11579, 08-11580, 08-11581,
08-11584, 08-11588, 08-11591, 08-11593,
08-11595, 08-11597, 08-11599, 08-11600,
08-11601.**

March 26, 2008.

Lowenstein Sandler PC, Kenneth A. Rosen, Esq.,
Sharon L. Levine, Esq., Bruce Buechler, Esq.,
Sheila Sadighi, Esq., Michael Savetsky, Esq., Rose-
land, NJ, for the Debtors and Debtors in Possession.
Holland & Knight, LLP, Sandra E. Mayerson, Esq.,
New York, NY, for the Independent Board of Dir-
ectors of the Debtors.
Goodwin Procter LLP, Emanuel C. Grillo, Esq.,
New York, NY, for TriDec Acquisition Co., Inc.
Morrison & Foerster LLP, Brett H. Miller, Esq.,
James M. Bergin, Esq., Melissa A. Hager, Esq.,
Todd Goren, Esq., New York, NY, for Fortress
Credit Corporation.
Gibbons P.C., Geraldine E. Ponto, Esq., Newark,
NJ, for TriDec Acquisition Co., Inc.
Sills Cummis & Gross, P.C., Andrew H. Sherman,
Esq., Boris I Mankovetskiy, Esq., Newark, NJ, for
Fortress Credit Corporation.
Paul, Weiss, Rifkind, Wharton & Garrison LLP,
Kelley A. Cornish, Esq., New York, NY, for Jointly
Represented Holders of Secured Convertible Notes.
Cole, Schotz, Meisel, Forman & Leonard, P.A., Mi-
chael D. Sirota, Esq., Kenneth L. Baum, Esq.,
Hackensack, NJ, for Jointly Represented Holders of
Secured Convertible Notes.
United States Department of Justice, Office of the
United States Trustee, Kelly Beaudin Stapleton,
United States Trustee, Donald F. McMaster, Esq.,

Saiber LLC, Nancy A. Washington, Esq., Mark A
Roney, Esq., Newark, NJ, for Hecny Transportation
Limited and Hecny Shipping Limited.
Fleischer, Fleischer & Suglia, Nicola G. Suglia,
Esq., Voorhees, NJ, for VFS Leasing Company.
Dechert LLP, Ronald Hewitt, Esq., Princeton, NJ,
for Port LA Distribution Center II, L.P.
Okin, Hollander & DeLuca, L.L.P., Paul S. Hol-
lander, Esq., Fort Lee, NJ, for the Examiner, Perry
M. Mandarino, CPA.
Bell, Boyd & Lloyd LLP, Irving B. Levinson, John
S. Delnero, Chicago, IL, for Hecny Transportation
Limited and Hecny Shipping Limited.
Forman, Holt, Eliades & Ravin, LLC, Daniel M.
Eliades, Esq., Paramus, NJ, Counsel for Inter-Tel
Leasing, Inc.
Schnader Harrison Segal & Lewis LLP, Richard A.
Barksay, Esq., Michael J. Barrie, Esq., Cherry Hill,
NJ, for 800 Federal Blvd, LLC and its parent entit-
ies AMB Property Corp. & AMB Institutional Alli-
ance Fund III, L.P.
Law Offices of Andrew Sklar, P.C., Andrew Sklar,
Esq., Cherry Hill, NJ, for Center Capital Corpora-
tion.
Dressler & Perters, LLC, Dennis A. Dressler, Esq.,
Christian A. Jorgensen, Esq., Chicago, IL, for Cen-
ter Capital Corporation.
Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart, &
Olstein, P.C., Jeffrey A. Cooper, Esq., Marc D.
Miseli, Esq., Roseland, NJ, for Flagler Develop-
ment Corp.
Peretore & Peretore, P.C., Frank Peretore, Esq.,
Sparta, NJ, for General Electric Capital.
Latham & Watkins LLP, Alan Kraus, Esq., Ne-
wark, NJ, for Gordian Group, LLC.
Duane Morris LLP, Margery Reed, Esq., Phil-
adelphia, PA, for The ACE Companies'.
Brown Rudnick Berlack Israels LLP, Andrew Dash,
Esq., Raymer McQuiston, Esq., New York, NY,
Special Corporate Counsel to the Debtors.

***OPINION***

DONALD H. STECKROTH, Bankruptcy Judge.

Slip Copy                                                                                                    Page 2
Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy, 2008 WL 819934)**

**\*1** Before the Court is a motion filed by Summit Global Logistics, Inc. and its jointly administered affiliates [FN1] (hereinafter collectively referred to as "SGL" or "Debtors") pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, seeking approval to sell substantially all of the Debtors' assets ("Assets") to TriDec Acquisition Company (hereinafter "TriDec" or "Purchaser") [FN2] under the terms as set forth in the Asset Purchase Agreement ("APA") and described below. Opposition was filed initially by the United States Trustee, the Jointly Represented Holders of Secured Convertible Notes [FN3] ("CNs"), and Hecny Transportation Limited and Hecny Shipping Limited (hereinafter collectively referred to as "Hecny").

> FN1. The jointly administered Debtors are: (1) Summit Global Logistics, Inc.; (2) AmeRussia Shipping Company, Inc., (3) AMR Investments, Inc.; (4) Clare Freight Los Angeles, Inc.; (5) Fashion Marketing, Inc.; (6) FMI Express Corp.; (7) FMI Holdco I, LLC; (8) FMI International Corp.; (9) FMI International Corp. (West); (10) FMI International LLC; (11) FMI Trucking, Inc.; (12) Freight Management LLC; (13) Maritime Logistics U.S. Holdings Inc.; (14) SeaMaster Logistics, Inc.; (15) Summit Logistics International Inc.; (16) TUG New York, Inc.; and (17) TUG USA, Inc.

> FN2. The assets and stock of AmeRussia Shipping Company, Inc. and AMR Investments, Inc. are excluded from the Asset Purchase Agreement between TriDec and the Debtors and are currently not at issue before this Court.

> FN3. The CNs are: (1) Alexandra Global Master Fund Ltd.; (2) Bay Harbour Master Ltd. and certain affiliates; (3) CAMOFI Master LDC; (4) Dorset Management Corporation (an affiliate of Knott Partners, L.P and other entities); (5) Evolution Master Fund Ltd. SPC, Segregated Portfolio M;

(6) Gottbetter Capital Master, Ltd.; (7) Harvest Capital LP and certain affiliates; (8) JMG Capital Partners and JMG Triton Offshore Fund; (8) Radcliffe SPC, Ltd. for and on behalf of the Class A Segregated Portfolio; and (9) Silver Oak Capital, L.L.C., who hold in aggregate approximately ninety-percent (90%) of the face amount of the Secured Notes (excluding the Secured Notes held by members of the Debtors' management).

The Debtors also move to assume and assign certain executory contracts and unexpired leases pursuant to Section 365 in conjunction with the instant sale motion. Opposition was filed by eight lessors of real property, equipment, and insurance holders ("Objectors"). The Debtors, TriDec, and the individual Objectors reached consensual arrangements to resolve such objections to cure amounts and adequate assurance of future performance. Any remaining objections will be resolved at a later date after which the Debtors will report the results to the Court or file a motion by April 11, 2008 to reject executory contracts or unexpired leases.

The Court has jurisdiction pursuant to 28 U.S.C. § 1334, and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984. These matters are core proceedings pursuant to 28 U.S.C. §§ 157(b)(2)(A), (D), (M), (N) and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409. For any and all reasons stated hereafter, the Debtors' motion for approval for the sale of substantially all of its assets to TriDec is hereby granted.

### *Statement of Facts and Procedural History*

**A. Introduction** [FN4]

> FN4. The background information in the Introduction is stated in *Certification in Support of First Day Applications and Mo-*

*tions,* by Robert Agresti, Chief Executive Officer of Summit Global Logistics, Inc., Maritime and affiliated subsidiaries ("*Agresti Certification* ").

Each of the jointly administered Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 30, 2008 ("Petition Date"). The Debtors continue to operate their businesses as debtors in possession pursuant to Sections 1107 and 1108. A creditors' committee was not formed in the instant matter due to insufficient interest.

Summit Global Logistics, Inc. ("SGL") is a publicly held Delaware corporation with a number of wholly-owned, autonomous subsidiaries operating as single business units providing ocean transportation, freight, customs brokerage, warehouse, rail, and trucking services across the United States and internationally. SGL's stock is quoted on the NASD's Over-the-Counter Bulletin Board. SGL was formed as a Nevada corporation in February 2004, under the name "Aerobic Creations, Inc.," and was reincorporated as a Delaware corporation in August 2006 through a migratory merger. On February 6, 2006, Maritime Logistics U.S. Holdings, Inc. ("Maritime"), also a Delaware corporation, was formed. During 2006, Maritime acquired AmeRussia Shipping Company, Inc., AmeRussia Ltd., SeaMaster Logistics (Holding) Ltd., FMI Holdco I, LLC, and TUG and established Summit Logistics International, Inc. The merger with Maritime turned the public shell of SGL into a meaningful business operation.

**\*2** Summit Logistics International, Inc. is located in East Rutherford, New Jersey. In November 2007, the government of the People's Republic of China authorized the SeaMaster operations to provide logistics services at most hubs in China. The Debtors operate four principal places of business: East Rutherford, New Jersey, Los Angeles, California, Hong Kong, and St. Petersburg, Russia. They have agency relationships in various countries across the globe, which expands their operations.

The logistics industry is highly regulated and susceptible to seasonal trends. The Debtors' business structure provides logistics requirements to the entire supply chain with a focus on the development of global accounts. The Debtors face increased competition from small international firms that provide global services and logistics solutions.

**B. Relevant Events Prior to Petition Date** [FN5]

> [FN5]. The information regarding the prepetition financing and timeline of events prior to the Petition Date are gleaned from the *Agresti Certification* and the *Initial Report of Perry M. Mandarino, CPA, Examiner.*

On November 6, 2006, the Debtors entered into a Loan Agreement with Fortress Credit Corporation [FN6] ("Fortress") whereby Fortress extended a loan to the Debtors totaling $65 million, including $10 million in revolving credit and for letters of credit, and $55 million in term loans. Fortress provided the Senior Secured Credit Facility with a lien on SGL's assets. In addition, to finance the Maritime 2006 acquisitions, Maritime entered into a securities purchase agreement by which buyers purchased secured notes totaling $65 million where the notes are convertible to SGL common stock shares at $11.00 per share and warrants to acquire forty percent (40%) of the number of shares upon the conversion of the notes exercisable on November 6, 2011, also at $11.00 per share. This financing was secured by a second lien on SGL's assets.

> [FN6]. Fortress Credit Corporation is the administrative and collateral agent for and on behalf of the following Lenders: Fortress Credit Opportunities I LP, Fortress Credit Opportunities II LP, Fortress Partners Fund LP, Fortress CLO GP LLC, Fortress Credit Funding III LP, Fortress Credit Funding IV LP, Ableco Finance LLC, and Plainfield Direct LLC.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Prior to the Petition Date, the Debtors suffered from a severe liquidity crisis due to changed market conditions and a loss of certain customers' business. The Debtors integrated various businesses, but achieving the desired efficiencies took longer than anticipated. In April 2007, the Debtors and Fortress entered into a Forbearance Agreement due to the Debtors' defaults including failure to timely provide monthly financial statements and compliance certificates for December 2006 and January 2007.

In May 2007, the Debtors restructured their financing including: (i) an Amendment of the Debtors' existing $65 million credit facility; (ii) restructuring of the $65 million convertible notes and warrants; (iii) private placement of senior secured convertible notes totaling $15 million in new money from the existing convertible note holders ($12.5 million) and certain management members ($2.5 million); and (iv) a waiver of certain accrued registration rights penalties. This restructuring sought to realign the Debtors' financial obligations with their intended revenue and reporting requirements. Fortress waived all of the events of default and the Debtors paid $265,000 and increased the interest rate on their Senior Secured Credit Facility.

**\*3** The Debtors also negotiated a restructuring of the convertible notes for amended and reinstated notes to align with their expected future performance by accepting additional notes and a deferral of $8 million in interest payments for five consecutive quarters. While this May 2007 restructuring provided temporary relief from the liquidity crisis, it resulted in a more highly leveraged capital structure with even less room for error in the execution of the Debtors' business plan.

After the May 2007 restructuring, the Debtors' Board of Directors instructed Raymond James & Associates to seek out a replacement for the Senior Secured Lienholders, but those efforts were unsuccessful. Thereafter, in June and July 2007, two other financial advisory institutions, Alvarez & Marshal LLC and RAS Management, were retained to assist with financial modeling. Those relationships were terminated in July 2007 and November 2007, respectively.

In July 2007, the Board of Directors retained Lowenstein Sandler PC ("Lowenstein") to explore the possibility of a prepackaged bankruptcy and other restructuring options. As of July 30, 2007, the Debtors breached the financial covenants agreed to under the May 2007 restructuring. As it became apparent that a refinancing or replacement of the Senior Secured Credit Facility was unlikely, the Debtors began discussions for an asset sale in August 2007, particularly with CMA CGN ("CMA") as a potential purchaser. At this time, an Independent Committee of the Board of Directors was formed to oversee the sale process and liquidity crisis. The Independent Committee retained Holland & Knight in November 2007 as its counsel.

Additionally, in the Fall of 2007, the Debtors explored a restructuring plan with the CNs and a conversion of the term loan to a revolver with Fortress. These negotiations did not materialize into a restructuring plan particularly because SGL was unable to agree with the CNs as to the appointment of a Chief Restructuring Officer, and the granting of a substantial percentage of the company to the CNs alone with two Board of Director seats. The Debtors' outstanding debt with the CNs totaled approximately $85 million and held a junior position to Fortress's senior debt.

On October 29, 2007, the Board of Directors retained Gordian Group, LLC ("Gordian") to advise on maximizing SGL's value through restructuring, recapitalization, sale or merger both in and outside of bankruptcy. During the hearing before the Court, David Herman, of Gordian, testified to two proposed transactions-one with a strategic investor and one with a financial institution, neither of which materialized. On October 8, 2007, SGL received a letter of intent from CMA, the strategic investor, with a proposed purchase price of $110-$120 million in cash. However, upon further due diligence through the Fourth Quarter of 2007, the indicated purchase price was reduced to $65 million plus

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

management compensation. Finally, on January 22, 2008, CMA notified SGL that it was unable to continue with the acquisition due to current market conditions and the distressed financial situation of SGL.

**\*4** In December 2007, while the CMA negotiations were still ongoing, certain members of SGL's Management[FN7] approached EOS, a private equity fund with logistics industry experience, about a potential buyout with Management's participation. EOS's letter of intent proposed a sale for $55-$60 million. However, once again after further due diligence, EOS advised that it would only act as a stalking horse if it were able to acquire the Senior Secured Credit Facility for $25-$30 million, a proposition to which Fortress objected. After the bankruptcy filing, EOS declined further participation.

> FN7. "Management" consists of Gregory DeSaye, Joseph DeSaye, Robert Agresti, Robert O'Neill and Neil Devine, along with others.

In December 2007, TriDec was formed consisting of Management including Gregory DeSaye, Michael DeSaye, Joseph DeSaye, Robert Agresti, Robert O'Neill, Robert Wu, Robert Lee, and Jerry Huang. At this time, SGL began negotiating with TriDec and the CNs to develop an "internal plan of reorganization" whereby the CNs and Management would infuse capital, the Senior Secured Credit Facility would be paid down, and the CNs would acquire majority ownership of SGL. Several proposals transpired throughout December 2007 and January 2008, but the parties were unable to reach an accord.

In early January 2008, Gordian approached Fortress to determine if it would finance TriDec as a stalking horse bidder. Term sheets and related Debtor in Possession Financing ("DIP Financing") were negotiated resulting in the proposed Asset Purchase Agreement filed with the instant sale motion on January 30, 2008 at the time of the petition filing. The TriDec acquisition initially proposed: (i) repay-

ment of pre-petition debt of $2 million held by Fortress, (ii) repayment of Fortress's DIP loan of up to $5 million, (iii) assumption of the $2 million SeaMaster note, (iv) assumption of the $6.7 million in critical vendor payments, (v) assumption of the cure costs on executory contracts and unexpired leases, and (vi) a cash infusion of from Management.

## C. Post-Petition Events

After the bankruptcy filing on January 30, 2008, the Debtors filed various "first day motions" including motions to approve "critical vendor" payments, DIP financing, and the instant sale motion. At the First Day hearing on February 1, 2008, the objections to the DIP financing were resolved and Fortress extended $2 million immediately and up to $3 million post-sale closing to be repaid through the sale proceeds. This DIP financing was necessary as existing cash collateral was insufficient for the Debtors' operations. The $3 million is to be used as a wind-down budget by the Debtors.

As a result of the failure to form a creditors' committee, the United States Trustee moved for the appointment of an Examiner to investigate and evaluate the Debtors' sales and marketing efforts that resulted in the proposed asset sale to TriDec. The United States Trustee's concerns stemmed from the proposed sale to members of Management and the expedited basis for such sale. Hecny supported the United States Trustee's motion while the Debtors opposed the appointment of an examiner. The Court authorized the appointment of an examiner and the United States Trustee's office selected Perry Mandarino, CPA ("Examiner").

## 1. Findings of the Examiner[FN8]

> FN8. The information in this section is located in the Examiner's Report and stated on the record during the hearings on March 20, 2008 and March 24, 2008.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy, 2008 WL 819934)**

**\*5** On March 17, 2008, the Examiner filed his approximately forty-page report analyzing SGL's relevant timeline to date, the Debtors' sale and marketing efforts, and Fortress's liens. The Court hereby incorporates by reference the entirety of the Examiner's Report.

The Examiner reported that Gordian contacted approximately fifty-six (56) firms pre-petition, including strategic and financial institutions, regarding acquisition of the Debtors' assets. Additionally, Gordian approached approximately ten to fifteen institutions that specialize in refinancing or investing in distressed debt. Of these institutions, twenty-three (23) entered into confidentiality agreements and five (5) conducted further due diligence. To facilitate the due diligence requirements of the potential purchasers, the Debtors established a data room containing business, financial and legal information. The Examiner noted that although TriDec consisted of Management, TriDec was not privy to information different from that contained in the data room available to all potential purchasers or investors.

Post-petition, Gordian contacted twenty-two (22) additional entities with one strategic and one financial institution conducting further due diligence. Bison Capital (including its portfolio company, Performance Team Freight Systems, Inc.) (hereinafter "Bison") conducted extensive due diligence and negotiations with Management and the CNs. On March 13, 2008, Bison and TriDec reached an agreement by which TriDec would complete the proposed APA transaction, Bison would invest in TriDec, and facilitate the refinancing of TriDec's senior secured debt and merger of TriDec with another entity. In conjunction, as part of the resolution reached between the Debtors and the CNs, as discussed below, the CNs would receive twenty-five percent (25%) of the common equity in TriDec. The CNs stated at the sale hearing that completion of the Bison transaction within Section 363 would have been preferred, but time restraints prevented significant due diligence from being completed by both Bison and TriDec providing reason for Bison to withhold participation in an auction process.

Although Gordian approached approximately seventy-eight (78) potential investors pre- and post-petition, the Examiner submits that the following four factors may have acted as deterrents to potential purchasers: (1) the Debtors' performance issues leading to the liquidity crisis; (2) the "headwinds" impacting the industry including increased competition and margin compression; (3) the Debtors' pre-petition debt and the CNs' ability to credit bid their claim; and (4) the limitations that Management posed on potential buyers due to their customer, supplier, and employee relationships vital to the business. On March 18, 2008, the deadline for bid submissions, the only remaining open bid was that of the Stalking Horse, TriDec; all other potential bidders withdrew from negotiations.

In analyzing the sale, the Examiner reviewed and evaluated the role of Fortress, Management, and the CNs. The relationship between Fortress and the Debtors had become strained due to the Debtors' defaults. Thus, when the proposals of CMA and EOS did not materialize, Fortress entertained a Management based deal. Fortress, as the senior secured lender, was concerned with the full repayment of its outstanding debt and recognized management to be an integral component to any proposed transaction due to its expertise and relationships in the industry.

**\*6** The CNs have held a crucial position in this case from the outset. During the First Day Matters' hearing, the CNs argued strident objections to the Debtors' proposed DIP financing and proposed sale as the $85 million due and owing to the CNs would not be satisfied through the proposed APA. The primary interested parties in this case at all times operated under the realization that a sale was unlikely to generate proceeds to satisfy the total amount owed to secured lenders. Thus, the CNs negotiated the resolution discussed below.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                  Page 7
Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy, 2008 WL 819934)**

**2. Stipulation Between the Debtors and the Convertible Noteholders**

Due to the approximately $85 million in outstanding debt owed to the CNs, from the outset of the case, the CNs and the Debtors engaged in negotiations to reach a consensual agreement allowing endorsement by the CNs of the Debtors' proposed sale to TriDec. A consensual resolution between these parties was integral to a successful asset sale by the Debtors since the original proposed APA did not provide any recovery to the CNs and a sale without their consent or payment of their loans was legally impermissible.

Specifically, the CNs, the Debtors, and Fortress have agreed that the potential purchasers, TriDec and Fortress, will fund the resolution with the CNs with no change to the proposed purchase price. The CNs (now calling themselves the Junior Secured Noteholders) will receive 25% of TriDec's common stock, Management will receive 50.1%, Fortress will receive 15% and an employee and management option pool will be 9.9%. Additionally, at closing of the sale, TriDec will pay the CNs' professional fees and costs not to exceed $990,000.00 with $600,000.00 to be paid by Management and the remainder to be paid from the Fortress loans to be made in conjunction with the sale. The CNs agree to withdraw their objections to the DIP financing and the proposed sale with prejudice and now support the TriDec acquisition. The resolution also proposes the exchange of general releases among the Debtors, Fortress, and the CNs. However, at the request of the United States Trustee, such releases do not include directors, officers, shareholders, members, partners, affiliates, attorneys, and advisors. The resolution also provides that upon the approval of the TriDec transaction, the parties will enter into a "Follow-Up Transaction" whereby a third-party will commence an additional acquisition subject to the Term Sheet filed under seal in conjunction with this Stipulation and Order. This stipulation further provides that this Court will retain jurisdiction over any resulting dispute arising out of this stipulation.

**3. Summary of Proposed APA**

The following summarizes the critical terms of the proposed sale for which the Debtors seek approval:

(a) TriDec will acquire, *inter alia,* all right, title and interest of the Debtors' properties and assets; all cash and cash equivalents; all Accounts Receivable; all "Critical Vendor" contracts; all acquired shares of the Purchased Entity, SeaMaster Hong Kong; and all goodwill and other intangible assets associated with the Business or the Purchased Assets.

**\*7** (b) Management will provide a cash infusion of $8 million whereby $5 million will pay down the DIP Financing provided by Fortress and $3 million will become working capital for TriDec.

(c) The Bison deal will go forward after the TriDec acquisition as discussed above.

(d) The CNs will receive compensation in the form of common stock and payment of professional fees and costs as outlined above.

(e) The secured debt owed to Fortress will be satisfied from the sale proceeds.

(f) TriDec will not acquire any potential avoidance actions in this case or causes of action against, *inter alia,* directors, officers, shareholders and members.

(g) All assumed contracts as listed in Schedule 2.1(a)(v).

**D. Hecny's Objection to the Debtors' Substantial Sale of Assets** [FN9]

FN9. The information in this section is gleaned from Hecny's various objections to the Debtors motions to date and the testimony of Bernard So, Corporate Vice Pres-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 8
Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy, 2008 WL 819934)**

ident of Hecny, heard on March 20, 2008.

Throughout the progression of this case, Hecny, a direct competitor and an unsecured creditor of the Debtors, has put forth ardent objections to the Debtors' efforts to sell their assets. Hecny alleges that the Debtors misappropriated Hecny's assets in the Spring of 2007 facilitated by the departure of Jerry Huang from Hecny to the Debtors and the creation of a shell company with Huang's wife, Han Huy Ling, as the Managing Director. Based on these actions and the supposed misappropriation of assets, Hecny instituted actions against Huang in Hong Kong and in the United States District Court for the District of New Jersey seeking monetary damages prior to the Petition Date. Hecny failed to seek injunctive relief in either of those actions.

Hecny's allegations against Huang stem from prior relationship with the SeaMaster Logistics (Hong Kong) entity. SGL acquired SeaMaster Logistics (Hong Kong) through its wholly-owned subsidiary, SeaMaster Logistics (Shanghai) Ltd. SeaMaster Logistics (Hong Kong) and SeaMaster Logistics (Shanghai) Ltd. are non-debtor subsidiaries of SGL through the Debtor subsidiary SeaMaster Logistics, Inc. *Hearing Exs. H-P & H-R.*One of the assets being sold in the instant sale is the stock of the non Debtor SeaMaster Logistics (Hong Kong) with all assets and liabilities being assumed by the purchaser. *See APA Section 2.1(b).* Hecny alleges Huang and Ling are greatly benefitting from the sale but, pursuant to the APA, Huang and Ling only receive a potential incentive earnout of up to $10 million achieved upon certain benchmarks being met. This potential earnout has been fully disclosed as the proposed APA has been an exhibit to the instant motion as well as the Debtors' 8-K since the outset of this case.

Throughout the Debtors' bankruptcy case, Hecny has repeatedly argued that the Debtors misappropriated assets, without identifying those assets or property. Bernard So, Vice President of Hecny, testified that the Misappropriated Assets include Hecny's employees, business relationships, and trade secrets. He could not identify any specific property or asset. Through the cross-examination of Robert Agresti, Hecny finally alleged that Hecny's customer list (the only tangible asset raised) was misappropriated, however, that asset at best is held by a non-debtor entity and is not being sold. As stated previously, the Debtors are only selling Sea-Master China's stock free and clear with the purchaser assuming assets and liabilities. Thus, Hecny's rights as to any specific asset related to such stock are preserved.

**\*8** In opposition to the proposed sale, Hecny contends the following: (i) the Debtor proposes to sell assets belonging to Hecny, thus, assets that are not property of the estate; (ii) Hecny's claims cannot be reduced to monetary judgments; (iii) Hecny has been denied due process in the sale process and its day in court on its allegations; (iv) Hecny's claims against TriDec cannot be enjoined; (v) TriDec as insiders are not purchasing the assets in good faith pursuant to Section 363(m); (vi) the proposed sale provides no recovery for administrative claimants or unsecured creditors; (vii) the sale motion constitutes a *sub rosa* plan in violation of Section 1129; (viii) the proposed sale is a mere loan modification and an improper use of the Bankruptcy Code; (ix) there is no business justification for the insider sale; and (x) if the sale were approved, then the proceeds should be placed in escrow until the resolution of Hecny's allegations regarding the Misappropriated Assets.

### Discussion

The Debtors filed the instant motion seeking approval to sell substantially all of its assets pursuant to Sections 363(b)(1) and 363(f). In pertinent part, Section 363(b)(1) provides: "The trustee, [or debtor in possession] after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate...."11 U.S.C. § 363(b)(1) (2008); 11 U.S.C. § 1107 (2008).Section 363(f) states:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The trustee [or debtor in possession] may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if-

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (2008). In addition, Section 363(m) articulates the "good faith" requirement of a Section 363 asset sale whereby:

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m) (2008). A finding of good faith is also required under the substantive law of the Third Circuit found in *In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143, 149-50 (3d Cir .1986) ("[W]hen a bankruptcy court authorizes a sale of assets pursuant to *section 363(b)(1),* it is required to make a finding with respect to the "good faith" of the purchaser.").

**\*9** From the outset of these bankruptcy proceedings, the Debtors acknowledged the insider nature of the proposed transaction. The Debtors bear the burden of proving that they have satisfied the requirements of Section 363(f), the good faith finding

under Section 363(m), and the heightened scrutiny required by non-bankruptcy law for insider transactions. *See In re Univ. Heights Ass'n,* 2007 Bankr.LEXIS 2000, at \* 13 (Bankr.N.D.N.Y. January 22, 2007) (recognizing the insider nature of a transaction requires heightened scrutiny); *In re Medical Software Solutions,* 286 B.R. 431, 455 (Bankr.D.Utah 2002) ("[W]hen a pre-confirmation [Section] 363(b) sale is of all, or substantially all, of the Debtor's property, and is proposed during the beginning stages of the case, the sale transaction should be 'closely scrutinized, and the proponent bears a heightened burden of proving the elements necessary for authorization.' "). Furthermore, since the proposed transaction is outside the ordinary course and prior to chapter 11 plan confirmation, the Debtor must also prove that there is a sound business justification for the transaction pursuant to the seminal case of *In re Lionel Corporation* allowing a bankruptcy court to make findings of fact as to the sale. *See In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir.1983); *see also In re Exaeris, Inc.,* 380 B.R 741, 744 (Bankr.D.Del. January 15, 2008) (articulating that substantial sale of assets outside of a chapter 11 plan is not unusual but requires careful bankruptcy court scrutiny as to business judgment).

In accordance with *Lionel* and subsequent precedent within the Third Circuit, Debtors must prove the following: (1) a sound business purpose for the sale; (2) the proposed sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the buyer has acted in good faith. *In re Exaeris, Inc.,* 380 B.R. at 744; *accord In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr.E.D.Pa.1989).*Lionel* provides the following factors for the Court to consider:

[T]he proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be

obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel Corp.,* 722 F.2d at 1071. In the instant matter, in the absence of a creditors' committee, the Examiner's Report provides the analysis on which the Court bases much of its findings. Furthermore, as Fortress noted at the hearing to determine the necessity and scope of the proposed Examiner, the Examiner's Report also assisted the Debtors in satisfying their burden as to the merits of the proposed Section 363 sale.

**A. Sound Business Justification**

*10 As to the sound business purpose requirement, the Debtors, from the inception of their chapter 11 case, have demonstrated the liquidity crisis they presently still experience. The Examiner's Report provides evidence of the Debtors pre-petition liquidity crisis resulting in the defaults on the Fortress Loan Agreement. *Examiner's Report,* 14-18. Robert Agresti testified to the Debtors' continued liquidity problems at the sale hearing noting that the Debtors have exhausted their DIP loan of $2 million leaving an asset sale or capital infusion as the only remaining solutions. *March 20, 2008 Hrg. Tr.* at _____.

The Debtors, the Senior Lenders, and the CNs have all acknowledged that the failure to consummate a sale at this juncture will result in a complete shut down of the Debtors' operations. Courts have recognized that a going concern sale proves more lucrative than a sale of a nonoperational entity. *See, e.g., In re Cummins Utility, L.P.,* 279 B.R. 195, 198 (Bankr.N.D.Tex.2002) ("It was the hope of the parties that more might be realized through a sale of assets in an operating configuration than if the business were shut down and the assets sold through a traditional liquidation. Though the Court had serious concerns about the use of Chapter 11 to

effect a sale of all assets pursuant to 11 U.S.C. § 363, it was persuaded by the parties that Debtor's business was rapidly deteriorating."). As the *Lionel* Court stated, an important factor is whether the assets are increasing or decreasing in value. *See In re Lionel Corp.,* 722 F.2d at 1071. Here, the Debtors maintained in the instant motion that there is much uncertainty as to their future performance due to loss of customer and vendor confidence and competition in the industry. David Herman of Gordian testified at the sale hearing that SGL is a "melting ice cube" and that a "stake in the ground" was vital to maintaining its customer base. *March 20, 2008 Hearing Tr.* at _____. Herman also submitted that a sale would result in a less onerous capital structure whereby the acquiring company will be able to move forward under an operating plan led by Management and financially capable institutions. *March 20, 2008 Hearing Tr.* at _____. The Debtor has no real alternative but to complete a sale as a going concern. To ignore the liquidity crisis would be irresponsible.

**B. Fairness of Proposed Sale Price**

The Debtors must also prove that the proposed sale price is fair. The Examiner explored the reasonableness of TriDec's proposed purchase price and concluded that TriDec's bid of approximately $65-$70 million represented a fair valuation of the assets. *Examiner's Report,* at 38. The Third Circuit has recognized "an auction may be sufficient to establish that one has paid "value" for the assets of the [debtor]." *In re Abbotts Dairies,* 788 F.2d at 149. In this case, particularly because the Debtors are a public company, a market-based valuation is proper. The Third Circuit promotes market-based valuations and reliance upon stock price reasoning that "[e]quity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate ... further not[ing] that market capitalization reflects all the information that is publicly available about a company at the relevant time of valuation." *Statutory Comm. of Unsecured Creditors of Iridium Corp. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Motorola, Inc. (In re Iridium Operating LLC et al.),* 373 B.R. 283, 347 (Bankr.S.D.N.Y.2007) (citing *VFB LLC v. Campbell Soup Co.,* 482 F.3d 624, 631 (3d Cir.2007) and *Basic Inc. v. Levinson,* 485 U.S. 224, 245 (1988)). Here, the Examiner's Report and Herman's testimony established that the Debtors and Gordian engaged in negotiations with several proposed purchasers all of whom either reduced substantially their initial proposals or withdrew their offers after conducting extensive due diligence through March 2008. No additional bids were submitted prior to the bidding deadline on March 18, 2008 and no auction occurred, reflecting the market's view of SGL. Thus, the bid of TriDec of approximately $65-$75 million proved to be the highest and best economic offer received for the Debtors' assets according to the testimony of Herman and the conclusion reached in the Examiner's Report.

**C. Adequate and Reasonable Notice**

**\*11** Particularly given the insider nature and the expedited basis for the Debtors' proposed sale, adequate and reasonable notice are imperative here. The Debtors filed the instant motion for bidding procedures and approval of its Section 363 sale on January 30, 2008. The sale approval hearings occurred on March 20 and 24, 2008, approximately six weeks later. In addition, the Debtors issued an immediate press release following the First Day Hearings on February 1, 2008 indicating their desire to sell assets to TriDec. David Herman of Gordian also testified that the Debtors filed an 8-K with the Securities and Exchange Commission notifying its investors and the public of the proposed sale transaction. All of this, coupled with the extensive marketing of the Debtors within the industry, satisfied the Court that any proposed bidders and objectors to the sale process have received ample notice and opportunity to be heard.

**D. Good Faith Requirement**

*In re Abbotts Dairies,* as well as Lionel, require a showing of the proposed purchaser's good faith. It is this good faith finding that Hecny opposes as it fears that it may have a preclusive effect on its pending actions in Hong Kong, the United States District Court, and the adversary proceeding in this case. Clearly, this Court cannot approve a Section 363 sale without a finding of good faith. *In re Abbotts Dairies,* 788 F.2d at 149-50. It is the crucial element of this sale motion and much of the testimony heard and the Examiner's Report establish the basis on which this Court must make its finding. A good faith finding establishes the "integrity of [a purchaser's] conduct in the course of the sale proceedings." *Id.* at 147. A court may not find good faith if fraud, collusion or unfair advantages are determined. *Id.*

**1. Heightened Scrutiny Required for Insider Transaction**

The Debtors have clearly recognized their burden to prove with heightened scrutiny the propriety of the proposed insider transaction to TriDec. The Debtors were required to meet the requirements of applicable Delaware non-bankruptcy law in the instant motion as SGL is a Delaware corporation. The Examiner also noted this heightened burden in his report providing that the Debtors' duty to obtain a fair and adequate price was in conflict with Management's interest in maximizing its $8 million investment in TriDec. *Examiner's Report,* at 36 (citing *In re Biderman Indus. U.S.A., Inc.,* 203 B.R. 547, 551 (Bankr.S.D.N.Y.1997) ("[S]ales to fiduciaries in chapter 11 cases are not *per se* prohibited, 'but [they] are necessarily subject to heightened scrutiny because they are rife with the possibility of abuse.' ")).

The Debtors contend that insider transactions can actually provide benefits to the corporation and its investors. *Debtors' Memorandum of Law in Support of Debtors' Motion to Sell Substantially All of Their Assets and In Response to Objections Thereto ("Debtors' Memo of Law"),* at 11 (citation omit-

ted). They rely upon a safe harbor under Delaware law, Section 144, which provides "a transaction will be sheltered from shareholder challenge if approved by either a committee of independent directors, the shareholders, or the courts."*Id.* at 12 (citing 8 Del. C. § 144(a) and *Oberly v. Kirby,* 592 A.2d 445, 467 (Del.1991)). Here, the public nature of an asset sale under Section 363 requiring Bankruptcy Court approval provides the necessary ratification of an insider transaction under Delaware law.

**\*12** Additionally, the Debtors established an Independent Committee with its own independent retained counsel to oversee the sale process as soon as a potential insider transaction was contemplated. *See Weinberger v. UOP, Inc.,* 457 A.2d 701, 709 n. 7 (Del.1983). The Examiner was unable to fully determine the role of the Committee as many of its communications were via email, which have not been provided to the Examiner. The Examiner submits that a truly disinterested fiduciary is ideal, but that was not possible in this case given the exigency of the Debtors' financial condition. However, the Debtors submit that the Independent Committee, with independent counsel, and Gordian's oversight of the sale process comports with their requirements under both Delaware law and the Bankruptcy Code. The Court finds that here the transparency of the sale process and the marketing efforts of the Debtors satisfy the Debtors' heightened burden with respect to the proposed Management led transaction with TriDec.

## 2. Fair and Open Sale Process

A fair and open sale process is crucial to a bankruptcy court's good faith finding. Section 363(m)'s good faith finding provides a proposed purchaser with a final sale preventing disruption of the transaction. *See In re Abbotts Dairies,* 788 F.2d 143, 147 (3d Cir.1986); *In re Summit Ventures, Inc.,* 161 B.R. 9, 11 (D.Vt.1993). In the instant matter, the Examiner specifically concluded "the sale of substantially all of the Debtors' assets has been conducted in a fair and open manner intended to max-

imize the value for the Debtors' assets."*Examiner's Report,* at 6. The Examiner reviewed the sale process and Gordian testified at the sale hearing as to its marketing efforts of the Debtors' assets. Summarily, Gordian contacted more than seventy (70) strategic and financial institutions pre- and postpetition as potential purchasers of the Debtors' assets. The Debtors maintained a data room available to all potential purchasers who executed confidentiality agreements allowing for the provision of the same information to all parties including TriDec. The Debtors' efforts to obtain a suitable purchaser, beginning in August 2007 and culminating with the instant sale hearings, transpired over the course of six months with one potential bidder withdrawing on the date bids were due.

Another element for consideration when looking at the good faith requirement with respect to an insider sale is whether the transaction insulates and provides releases to insiders. Here, the Debtors and TriDec have agreed, at the United States Trustee's insistence, that any potential avoidance actions will remain with the Debtors' estate and the releases negotiated between TriDec, Fortress, and the CNs as part of their Stipulation do not include directors, officers, shareholders, members, affiliates, and their attorneys. *See In re Exaeris, Inc.,* 380 B.R. 741, 747 (Bankr.D.Del. January 15, 2008) ("What is clear is that a court can and should consider whether an insider is receiving a release when evaluating the "good faith" criterion.") (citing *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 703-04 (Bankr.E.D.Pa.1989)). Thus, the absence of releases is another indication of good faith in this sale.

**\*13** The realities of the Debtors' financial crisis and the expansive amount of the secured debts of Fortress and the CNs resulted in the proposed transaction with TriDec. Although the Debtors and Gordian marketed the Debtors' assets reasonably and expensively given the circumstances, Fortress would not consent to a proposal that did not satisfy its liens and no proposal was ever sufficient to satisfy

the outstanding debt of both the senior and junior secured liens of approximately $140 million. Thus, absent consent, Section 363(b)(3) could never be satisfied. The only viable transaction was that proposed by TriDec and Fortress. The CNs objected stridently to the Debtors' proposed DIP financing and bidding procedures, but eventually recognized that the sale process would not provide full satisfaction of their liens. Thus, through their negotiations, the CNs prevented a bar to the sale process by entering into a transaction that provided them a certain recovery as described in the Stipulation between TriDec, Fortress, and the CNs. The parties with the largest financial stake in the case have all consented to the proposed sale of assets. Clearly, for the above reasons, the Debtors have satisfied the burden of proving a sale process executed in good faith.

### 3. The Debtors' Section 363 Sale Does Not Constitute a *Sub Rosa* Plan

Hecny submits that the Debtors' proposed insider sale transaction is an impermissible *sub rosa* plan. *Sub rosa* plans are prohibited because they violate the requirements of the Chapter 11 process. *Motorola Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase (In re Iridium Operating LLC),* 478 F.3d 452, 466 (2d Cir.2007)."[T]he sale of an asset of the estate under [Section] 363(b) is permissible if the 'judge determining [the] [Section] 363(b) application expressly find[s] from the evidence presented before [him] at the hearing [that there is] a good business reason to grant such an application."*Id.* (citing *In re Lionel Corp.,* 722 F.2d at 1071). Hecny also argues that the sale provides no recovery for administrative claimants. However, the Debtors have $3 million for a wind-down budget to satisfy such claims.

Hecny's reliance upon *In re Braniff Airways, Inc.* is misplaced. In that case, the Court focused upon the releases of claims by all parties as the basis for its finding of a *sub rosa* plan. *In re Braniff Airways, Inc.,* 700 F.2d 935, 939-940 (5th Cir.1983).

However, in the instant matter, the avoidance actions are preserved for the estate and the releases provided through the Stipulation reached between TriDec and the CNs do not include Management or, *inter alia,* directors and officers. *See In re Trans World Airlines, Inc.,* 2001 Bankr.LEXIS 980, at *38 (Bankr.D. Del. April 2, 2001) (noting *Braniff* addressed the debtor's releases of claims against the estate essentially determining the allowability of the claims through a Section 363 sale). Hecny also argues that the Stipulation reached between the parties impacts the ability to find good faith here. However, "compromises are a normal part of the process of reorganization, oftentimes desirable and wise methods of bringing to a close proceedings otherwise lengthy, complicated and costly" and that contention is rejected. *In re Condere Corp.,* 228 B.R. 615, 634 (Bankr.S.D.Miss.1998) (citing *Official Comm. Of Unsecured Creditors v. Cajun Electric Power Cooperative, Inc. (In re Cajun Electric Power Cooperative, Inc .),* 119 F.3d 349, 354 (5th Cir.1997)).

**\*14** Finally, Hecny was unable to articulate during the hearing what rights it was being deprived of through the proposed sale. Its argument centered around the allegation that the Debtors misappropriated Hecny's assets to establish the Debtors' Asia operations. However, the testimony of Bernard So, Hecny's Corporate Vice President, did not unearth tangible assets that were misappropriated as alleged in the adversary complaint. Instead, the allegations revolve around certain Hecny's customer and business relationships and former employees of Hecny moving to the Debtors. There are actions pending in both Hong Kong and the United States District Court for the District of New Jersey where a resolution of these allegations will result and Hecny may prove an unsecured claim at the time of such disposition. Nevertheless, an objector arguing that a proposed sale constitutes a *sub rosa* plan must clearly articulate the rights and benefits the unsecured creditor is being deprived of through the sale that it would gain through a Chapter 11 plan. *See In re Torch Offshore, Inc.,* 327 B.R. 254, 257

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 14
Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)
**(Cite as: Slip Copy, 2008 WL 819934)**

(Bankr.D.La.2005) (citing *In re Continental Air Lines, Inc.,* 780 F.2d 1223, 1228 (5th Cir.1986). Here, Hecny's inability to establish its detriment through the sale (except to possibly money damages) and the Debtors' satisfaction of the sound business judgment and good faith requirements given their severe liquidity crisis, mandate a finding that the proposed asset sale does not constitute a *sub rosa* plan.

### Conclusion

Although Hecny has maintained its strident objections throughout this process, Hecny has not provided a basis for this Court to deny the instant motion. Moreover, its rights are preserved through pending actions in Hong Kong, the United States District Court, and in its Adversary Proceeding in this Court. The Debtors satisfied their burden of proof under Sections 363(b) and (f) to warrant a sale to TriDec. The Debtors demonstrated sound business judgment in the formation of the proposed transaction given the severe liquidity crisis and the vast amount of secured indebtedness of Fortress and the CNs. The Debtors and the Secured Lenders have proposed a transaction that is the result of a fair and open sale process facilitated by their investment bankers that maximizes value and return to interested parties. The TriDec acquisition allows for a sale as a going concern, which maximizes the assets' value and constitutes the highest and best offer. Furthermore, the CNs have negotiated a resolution with TriDec and Fortress allowing the withdrawal of their objection in exchange for a recovery on their investment that could not otherwise be satisfied in full. The Examiner's Report and the testimony heard on March 20 and 24, 2008 provide the basis for this Court's good faith finding, the satisfaction of Section 363(f), and the tests articulated in *Abbotts Dairies* and *Lionel.*For the foregoing reasons, the Debtors' motion to sell substantially all of their assets to TriDec is hereby granted.

**\*15** An Order in conformance with this Opinion has been entered by the Court and a copy is attached

hereto.

Bkrtcy.D.N.J.,2008.
In re Summit Global Logistics, Inc.
Slip Copy, 2008 WL 819934 (Bkrtcy.D.N.J.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.