| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **BLANK ROME LLP**<br>Joel C. Shapiro, Esquire<br>Shlomo B. Troodler, Esquire<br>Woodland Falls Corporate Park<br>210 Lake Drive East, Suite 200<br>Cherry Hill, NJ  08002<br>(856) 779-3600<br>Counsel for Arcus ASI Funding, LLC | |
| In re:<br><br>Shapes/Arch Holdings L.L.C.,<br>Shapes L.L.C., Delair L.L.C., Accu-Weld<br>L.L.C., and Ultra L.L.C. | Case No. 08-14631<br><br>Judge: Gloria M. Burns<br><br>Chapter: 11<br><br>Hearing Date and Time:<br>April 17, 2008 at 10:00 a.m. |

**OMNIBUS RESPONSE OF ARCUS ASI FUNDING, LLC TO OBJECTIONS
TO DEBTORS' JOINT DISCLOSURE STATEMENT**

Arcus ASI Funding, LLC ("Arcus") submits this Omnibus Response to the Objections to Debtors' Joint Disclosure Statement.  Of utmost concern to Arcus is the objection of Arch Acquisition I, LLC ("Arch") (the "Arch objection"), a claims purchaser and competitor of the Debtors, who Arcus fears may be primarily interested in derailing the Debtors' re-emergence from bankruptcy.[1]

**PRELIMINARY STATEMENT**

1. On March 16, 2008, Shapes/Arch Holdings L.L.C., and its subsidiaries, Shapes L.L.C., Delair L.L.C., Ultra L.L.C. and Accu-Weld L.L.C. (collectively, "Debtors"), filed

---

[1] Given the numerous timely and untimely objections filed with respect to this matter, Arcus reserves the right to amend and supplement this Response.

voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2. Immediately after the filing of its chapter 11 petitions, the Debtors filed a Joint Disclosure Statement (the "Disclosure Statement") and a Joint Plan of Reorganization (together with the Disclosure Statement, the "Proposed Plan and Disclosure Statement") setting forth a plan of reorganization that provides a fair and orderly allocation of the Debtors' assets, consistent with the mandates and policies of the Bankruptcy Code and other law, including payment in full of all Administrative Claims, Priority Tax Claims, Fee Claims, Allowed Secured Claims, the CIT-DIP Claim, the Arcus Holders DIP Claim and Allowed Other Priority Claims (each as defined in the Joint Plan of Reorganization).

3. Objections to the Disclosure Statement, notably the Arch objection and the objection filed by the Official Committee of Unsecured Creditors (the "Committee") (the "Committee objection"), revolve primarily around two issues: (i) alleged inadequate information; and (ii) an alleged "failure to insist on an open and competitive process" to benefit creditors (Arch Objection ¶2).[2]

4. These objections ignore the overall value offered by Arcus and the Proposed Plan and Disclosure Statement, focusing instead on discreet details of the Proposed Plan. Furthermore, the Arch objection and Committee objection, ignore the unclear motivations of Arch. Arcus worked diligently to assemble a series of transactions designed to save the Debtors and preserve value for a reorganization. When the Debtors were on the brink of ceasing operations due to the refusal of their pre-petition lenders to continue funding, and, after failing in

---

[2] To the extent the Objections raised issues related to inadequate information or insufficient disclosures are not addressed in this Response, the Supplement to the Debtors' Joint Chapter 11 Plan of Reorganization filed April 15, 2008 and the Joint Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization to be filed with this Court (the "Amended Proposed Plan") shall incorporate much of the relevant information raised in the Objections.

2

123285.01601/11770773v.2

diligent efforts to find alternative financing, Arcus came in as a "white knight," providing credibility and a transaction with much-needed liquidity to allow for continued operations and the preservation of value and over one thousand jobs. A shutdown would have caused a serious loss in asset value and resulted in liquidation by the Debtors' prepetition lenders. As the Court noted at the hearing of March 18, 2008: "I'm satisfied with the testimony that if I don't approve the financing that's been requested that the debtor will have to close its doors and … we're talking about a thousand employees." (Tr. of 3/18/08 at 133, lines 3-6).

5. Arcus not only provided debtor-in-possession financing and arranged a transaction which would allow the Debtors' prepetition lenders to do the same, but affiliates of Arcus committed to fund the Proposed Plan and Disclosure Statement, creating value for creditors that would have been non-existent had Arcus not come to the rescue. The transaction arranged by Arcus with the prepetition lenders not only allowed the Debtors to operate in bankruptcy and maintain their business, but went a step farther by committing to provide financing to the Debtors upon reorganization, even though just a few weeks earlier the Debtors' prepetition lenders were unwilling to provide any additional financing. While Arch has allegedly offered to replace the Arcus financing, they have been silent about the financing provided by the Debtors' prepetition lenders, which such financing is part of the complete package negotiated and arranged by Arcus to allow for continued operations, increased value and preservation of jobs.

6. The Arch objection and the Committee objection are largely inflammatory. While Arch and the Committee each alleges that the Debtors are precluding a process that would maximize value for the creditors and that the "Debtors have persisted in moving forward . . . without regard to their clear fiduciary obligations" (Arch Objection at ¶ 3), to the contrary, the

Proposed Plan and Disclosure Statements are clearly part of a process undertaken with a great degree of consideration of the Debtors' fiduciary duties. The question that should be asked is not whether the Proposed Plan and Disclosure Statement and the Debtors' efforts in general indicate a lack of process, but rather whether, under the totality of the circumstances, the proposed process complies with the policies and requirements of the Bankruptcy Code and other applicable law and maximizes value for creditors. Acrus submits that the answer to this question is a resounding "yes." Moreover, while Arcus offers commitment and certainty to the Debtors and their creditors and employees, Arch offers delay, doubt and uncertainty.

7.      Arcus also has serious questions about Arch's motivation. Arch is an affiliate of Signature Aluminum ("Signature"), an aluminum extruder that competes directly with the Debtors across North America. Signature operates eight facilities in the United States and Canada. Arcus is informed (subsequent to the petition date) that Signature discussed the possibility of purchasing the Debtors several months ago, but did nothing to commit to a transaction, nor did it make any serious effort to follow up with Debtors in the months leading up to this chapter 11 case. Upon information and belief, Signature and its affiliates had more than opportunities to enter into a transaction with Debtors and did not act beyond signing a confidentiality agreement and obtaining information from the Debtors, their competitor. It appears that Arch may have purchased a claim for the sole purpose of creating a platform to attack and hinder the re-emergence of a major competitor. Moreover, it is highly unlikely that with Signature's existing capacity, it has any intention to integrate one thousand more employees and several locations into its existing operations. Rather, contraction and consolidation would be far more likely, resulting in wasted effort by Arcus and one thousand lost jobs. Arch is more likely to create a default, liquidate, take the desirous assets for itself and leave the Debtors'

estates depleted of any value.  While Arcus has exhibited continued good faith to work with Debtors through prompt reorganization to enhance value with a clear path to reorganization, at this juncture, Arch offers only delay, hindrance and uncertainty.

8. Arch has presented the Debtors with an apparently enticing proposal for financing at lower "teaser" rates in order to lure the Debtors and the creditors into halting the present reorganization process quite possibly for its own competitive reasons.  Neither the Debtors, the creditors, nor the Court should be so easily lulled, particularly given the current precarious nature of the Debtors' business operations.  Due to the inherent risk in a long term commitment issued in the current state of the credit markets, most lenders are reluctant to commit to any transaction, and certainly exhibit even greater hesitation to lend to a borrower in bankruptcy or exiting from bankruptcy.  It is significant that Arcus has not only accepted that risk by agreeing to provide exit financing, but was successful in arranging for a commitment from Debtors' revolving credit lenders to Arcus to provide sixty million dollars worth of exit financing.

9. While Arch objects to the Debtors' Disclosure Statement under the guise of protecting the creditors from the Debtors' failure to comply with their fiduciary duties, Arch utterly fails to disclose its own motivations or long-term intentions.  Nowhere has Arch committed to operating the Debtors and preserving value and jobs into the future.  Arch has already failed once to proceed forward with the Debtors pre-petition.  Why the sudden interest now?  Clearly, Arch may now see an opportunity to derail the Debtors' reorganization process through the manipulation of this bankruptcy case.  Arch's mere objections, alleged proposals and claims are a far cry from Arcus' established track record of involvement and commitment to reorganize the Debtors on a clear and manageable time table.  Litigation, delay and further

5

expense, the natural result of Arch's last-minute and questionable tactics, will do nothing to help the Debtors to reorganize, to preserve value for creditors or to protect jobs going forward.

10. The longer the Debtors remain in bankruptcy and if Arch succeeds in dragging out the process, the greater will be the diminution in value of the Debtors' assets and a drop in the return to creditors and the greater will be the threat to the Debtors' ability to emerge and compete with Arch. Under this scenario, Arch benefits perhaps more from a forced liquidation than it does from a reorganization of the Debtors.

11. The Debtors and Arcus have exercised prudent and independent business judgment in establishing the reorganization process currently before the Court. That exercise of judgment has brought real and committed financing to the table and a clear reorganization process on a defined time table. The objections of Arch, the Committee and the other parties which question this process, in essence seek to have the Court substitute its business judgment for that of the Debtors, to remove the Debtors' chosen and approved debtor-in-possession lenders and to thwart the Proposed Plan and Disclosure Statement filed promptly and in good faith and well within the exclusivity period given to Debtors under the Bankruptcy Code.

## BACKGROUND OF DEBTORS' BANKRUPTCY CASES

12. Prior to the filing of the voluntary petitions by Debtors, all of the managers of Shapes/Arch Holdings L.L.C. consented in writing (the "Written Consent") to (i) execute, verify and file and for its subsidiaries to each execute, verify and file a voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), (ii) execute, verify and file a Joint Plan of Reorganization and the disclosure statement related thereto, (iii) enter into a Secured Superpriority Debtor-In-Possession Term Loan Financing Agreement (the "DIP Facility") with Arcus ASI Funding, LLC ("Arcus"), (iv) enter

6

into a Secured Superpriority Debtor-In-Possession Revolving Credit Financing Agreement with The CIT Group/Business Credit Inc. ("CIT") and (v) take other such actions related to the chapter 11 petitions.

13. Only after the managers of Shapes/Arch Holdings L.L.C. consented to all of the authorizations set forth in the Written Consent, Ben L.L.C. (holder of 100% of the equity interests in Shapes/Arch Holdings L.L.C.) executed the Amended and Restated Operating Agreement of Shapes/Arch Holdings L.L.C., dated March 16, 2008, whereby an affiliate of Arcus and Ben L.L.C. are named the sole managers of the Shapes/Arch Holdings L.L.C., with manager voting percentages of 79.9% and 20.1%, respectively. Accordingly, the prepetition management of Debtors only gave the Arcus affiliate a voting right once management saw there was indeed a "white knight" to save the Debtors.

14. Immediately after the filing of its chapter 11 petitions, Debtors filed the Proposed Plan and Disclosure Statement.

15. On March 18, 2008, this Court entered an Interim Order (i) Authorizing Debtors (a) to Obtain Post-Petition Financing And Grant Security Interests And Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (b) to Refinance Certain Pre-Petition Secured Indebtedness; (ii) Modifying The Automatic Stay Pursuant to 11 U.S.C. § 362; (iii) Granting Other Relief; and (iv) Scheduling A Final Hearing Pursuant To Bankruptcy Rule 4001(c) (the "Interim DIP Order") approving, on an interim basis, the DIP Facility.

16. On March 18, 2008, this Court also entered in Interim Order approving, on an interim basis, the senior secured revolving credit debtor-in-possession financing provided by CIT

to the Debtors, in part based upon testimony at the hearing about the efforts of Arcus to keep CIT and the prepetition lenders as part of the financing package.

17. Accordingly, Debtors have filed a plan of reorganization of record which was filed within the exclusivity period to which Debtors have a right under the Bankruptcy Code and sponsored by and to be funded by an Arcus affiliate, the benefit of debtor-in-possession credit facilities provided by Arcus and CIT (such financing having being arranged by Arcus and provided by CIT only as a result of Arcus' commitment and negotiations with CIT) and a commitment for exit financing upon confirmation of the Proposed Plan, all of which is designed to facilitate a process which would steady Debtors' ship, taking it from the rocky waters of the period prepetition and during bankruptcy to the calm seas of post-confirmation operating entities.

18. Upon information and belief, Debtors are woefully below budget and expected to bleed additional cash during the pendency of the case. Arcus has committed to financing the Debtors beyond the working capital liquidity provided by CIT and has agreed to consider financing in excess of the amounts originally proposed to be needed under Debtors' budget as provided in a proposed First Amended Joint Plan of Reorganization to be filed with the Court in the near future.

**ARGUMENT**

I. **THE OBJECTIONS RELATED TO THE DEBTORS' PROCESS SHOULD BE OVERRULED BECAUSE THE PROPOSED PLAN IS CONFIRMABLE AS DEBTORS ARE ENTITLED TO EXCLUSIVITY UNDER THE BANKRUPTCY CODE AND UTILIZED THEIR BUSINESS JUDGMENT IN ENTERING INTO THE DIP FACILITY AND FILING THE PROPOSED PLAN AND DISCLOSURE STATEMENT.**

19. The Objections imply that as an insider, Arcus is attempting to maximize its value at the expense of the creditors and Debtors therefore could not possibly have exercised its business judgment in executing, verifying and filing the Proposed Plan and Disclosure

8

Statement.  This implication ignores the fact that the managers of Shapes/Arch Holdings L.L.C. executed and resolved the Written Consent prior to Arcus being an insider.  Any reasonably prudent manager would have similarly executed, verified and filed the Proposed Plan and Disclosure Statement under such circumstances and would have considered himself fortunate to even have such an opportunity to engage in a process of reorganization.

20. Section 1121 of the Bankruptcy Code specifically provides that the debtor has the exclusive rights to file a plan for 120 days after the date of an order for relief under chapter 11.  As such, section 1121 of the Bankruptcy Code provides in relevant part:

> (a) The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case of an involuntary case.
>
> (b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.
>
> (c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if –
>
>> (1) the trustee has been appointed under this chapter;
>>
>> (2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or
>>
>> (3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter...

11 U.S.C. § 1121(a), (b) and (c).

21. By providing Debtors and Committee with its own unsolicited financing package and purchase agreement and its own alleged plan of reorganization, the efforts by Arch to hijack the process set forth by the Debtors are merely a guise to eradicate the applicability of Section

9

1121 to these cases.[3]  The Bankruptcy Code allows the Debtors to first take a reasonable amount of time to reorganize in accordance with its business judgment, continuously bound to its fiduciary duties to creditors and the rights of creditors under Section 1129 of the Bankruptcy Code.

22.  Entering into the transactions contemplated by the Written Consent, including execution and verification of the Proposed Plan and Disclosure Statement were, and continue to be, in the best interest of the creditors and exercised in accordance with Debtors' business judgment.  By filing the Proposed Plan and Disclosure Statement, all of Debtors' schedules and Debtors' statement of financial affairs immediately after filing the chapter 11 petitions, Debtors indicated a desire for a efficient and expeditious reorganization which would maximize value and be in the best interests of the creditors.  It is certainly significant that the Proposed Plan and Disclosure Statement were filed immediately after the filing of the chapter 11 petitions and Debtors are not asking for an extension of exclusivity at this time, only the ability to enjoy the exclusivity granted under Section 1121.  Arcus notes "that displeasure with a plan on file is not one of the enumerated factors [to terminate exclusivity], and is not a basis for terminating exclusivity.  Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan on file."  In re Adelphia Communications Corp., 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006).  "The notion that creditor unhappiness, without more, constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been judicially rejected."  In re Adelphia Communications

---

[3] Arcus notes that any alleged proposed plan provided by Arch may not be filed by a party other than the Debtor under Section 1121 and any attempt to do so would be to effectively rewrite the Bankruptcy Code.  As indicated in the Committee objection, it is also of note that the alleged proposed plan of Arch is subject to the completion of due diligence, adding an additional layer of uncertainty to the process.

Corp., 336 B.R. 610, 676 (Bankr. S.D.N.Y. 2006), *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) (citing In re Geriatrics Nursing Home, Inc., 187 B.R. 128, 134 (D.N.J. 1995)).

23. To effectuate Debtors' reorganization, Debtors needed financing to allow business operations to continue in bankruptcy. Based on the testimony of Steven Grabell, chief executive officer of Debtors, despite diligent efforts, Debtors were unable to find financing until Arcus was willing to provide financing in a package with an exit strategy and difficult negotiations which resulted in Debtors' prepetition lenders being willing to continue lending to Debtors. (Tr. of 3/18/08 at 70-77).[4] The allegations set forth in the various Objections that the Proposed Plan would not maximize the value to the creditors disregards the added value of a clearly articulated exit strategy and the efforts by Arcus to work in good faith to reorganize.

24. Debtors, in this case, have exercised their business judgment in an effort to meet the very premise of a reorganization. "The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern." Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel., 330 F.3d 548, 573 (3rd Cir. 2003). Debtors have every right under the Bankruptcy Code to exercise their business judgment in a chapter 11 proceeding. See Cybergenics, 330 F.3d at 577 ("there is a corresponding 'strong presumption' that the debtor should be permitted to remain in possession… the idea that existing management is best positioned to rescue a debtor from bankruptcy is precisely the reason why the appointment of a trustee is exceptional in Chapter 11 reorganizations").

25. The attempt to usurp Debtors' business judgment and the value attributed by Debtor to a Proposed Plan and Disclosure Statement, which, together with the DIP Facility, presents a clearly articulated exit strategy to which Arcus has exhibited a commitment, asks this

---

[4] It should be noted that Grabell's testimony also stands in stark contrast to allegations made in the Committee's objection regarding the efforts to find alternative financing and market the business and assets of the Debtor, claims that the Committee believes are "undisputed" (Committee objection ¶2).

11

Court to take actions which would lead to uncertainty and leave Debtors at the whim of a competitor with unclear intentions or motivation.

26. Under the "business judgment" rule, the management of a limited liability company's affairs is placed in the hands of its members or managers, and the Court should interfere with their decisions *only if* it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the managers' and members' fiduciary duty to the company, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code. In re Farmland Indus., Inc., 294 B.R. 855, 881-82 (Bankr. W.D. Mo. 2003). See also In re United Artists Theatre Company v. Walton, 315 F.3d 217, 233 (3rd Cir. 2003); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985); In re Defender Drug Stores, Inc., 145 B.R. 312, 317 (9th Cir. BAP 1992). "*Business judgments should be left to the board room and not to this Court*. (Citation omitted) Only in circumstances where there are allegations of, and a real potential for, abuse by corporate insiders, should the Court scrutinize the actions of the corporation." In re Simasko Production Co., 47 B.R. 444, 449 (Bankr. D. Colo.1985) (emphasis added). See also In re DeLuca Distributing Company, 38 B.R. 588, 591 (Bankr. N.D. Ohio 1984) ("The authority to operate the [Chapter 11] debtor's business necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters.").

27. The Arch objection and the Committee objection question Debtors' business judgment in alleging that the Proposed Plan is unconfirmable, particularly because of alleged better terms offered by Arch, a competitor. Arcus disagrees with that contention and believes that the Arch objection and the Committee objection ignore the complete package provided by Arcus, including the willingness of Debtor's prepetition lenders to continue to fund directly as a

12

result of the DIP Facility and the start-to-finish exit strategy which is an essential component of the Arcus package, and the uncertainty of the Arch offer.  Even assuming arguendo that there was an offer which contained arguably better terms, the Arch objection and Committee objection equate to a request of this Court to determine the appropriate business judgment of the Debtors, despite the deference to Debtors' business judgment in chapter 11.  See Cybergenics, 330 F.3d at 575.  However, "it is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor."  In re Trans World Airlines, 2001 WL 1820326, 10 (Bankr. D. Del. 2001).  Arch and the Committee ignore that such a business determination is not for the Court or a competitor of the Debtors to make but rather, it is for the Debtors and their management.[5]

28.     Simply because a competitor of the Debtors believes that a better deal is being offered by it, which Arcus in no way concedes, does not mean that it can substitute its business judgment for the Debtors' business judgment.  As the underlying Farmland Court explained with respect to debtor-in-possession financing, "a reasonable business judgment, based at the time on adequate information, becomes no less reasonable merely by contrary insights gained through hindsight."  In re Farmland, 24 B.R. at 884.  The Farmland decision is instructive here.[6]  Neither Arch nor the Committee has shown that the selection of Arcus was a "breach of the officers' and directors' fiduciary duty to the corporation [made] on the basis of inadequate information or study, [or made] in bad faith."  See In re Farmland, 294 B.R. at 881.  Indeed, this Court has

---

[5] It is important and critical to note that the Written Consent, authorizing the decision to accept the terms of the DIP Facility from Arcus, the financing proposal from CIT and the terms and conditions of the Proposed Plan and Disclosure Statement were all made PRIOR TO the time when an affiliate of Arcus was given 79.9% of the voting rights of Shapes/Arch Holdings LLC.  The Debtors, their attorneys (including Cozen and O'Connor) and their financial advisor (Phoenix Management Services, Inc.) negotiated and analyzed all of the Debtors' options prior to the time period when the Arcus entity was granted voting rights (and at all times ownership of the Debtors remains with the pre-petition owners).

[6] While Farmland addresses debtor-in-possession financing rather than a plan of reorganization and disclosure statement, debtor-in-possession financing is an integral component of the proposal of Arch to undermine and hijack the Debtors' process.

13

already made findings based upon the compelling testimony at the hearing of March 18 and made the finding that the Debtors acted in their reasonable business judgment in obtaining the financing, in part due to the fluidity of the plan process and exit strategy of the Debtors.[7]

29. Many courts have articulated that it is not the place of a court to insert its opinion on a debtor's business judgment. See, e.g., United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.), 315 F.3d 217, 233 (3rd Cir. 2003) (articulating that the business judgment standard acknowledges, among other things, that "the management of a corporation's affairs is placed by law in the hands of its board of directors."); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). As the court in Farmland explained, the court should not "substitute its judgment for the judgment of the Debtors when that judgment has been reasonably and properly exercised." Id.

30. Arch and the Committee are asking this Court to do just what courts have expressly found to be impermissible – to hold that its judgment is better than the Debtors.

II. **THE OBJECTIONS TO THE DISCLOSURE STATEMENTS SHOULD BE OVERRULED BECAUSE THE OBJECTIONS ARE APPROPRIATE AT THE CONFIRMATION STAGE, RATHER THAN THE DISCLOSURE STATEMENT HEARING.**

31. Many of the Objections boil down to a small handful of confirmation issues. These points of objection are not properly raised at this point in the proceedings, and should (at best) be reserved for the confirmation hearing. Indeed, a court may deny approval of a disclosure statement based on confirmation objection points only where the plan it describes is "patently unconfirmable" or, stated differently, "unconfirmable on its face". See In re Phoenix Petroleum Co., 278 B.R. 385, 394 (Bankr E.D.Pa. 2001) (a disclosure statement should be

---

[7] See footnote 4 above related to the allegations of the Committee on this point.

disapproved only if the plan it describes displays *facial* deficiencies or the *stark* absence of good faith and the plan is "so 'fatally flawed' that confirmation is 'impossible'"); In re Eastern Maine Elec. Co-op., Inc., 125 B.R. 329, 333 (Bankr. D. Maine 1991). None of the objection points rest on such a basis and, therefore, the Objections should be overruled.

32. While the Objections address an alleged lack of process, Section 1129 of the Bankruptcy Code sets forth a process for confirmation of a plan under chapter 11. Each person that submitted an Objection to the Disclosure Statement has the right and ability, under Section 1129, to solicit rejection of the Proposed Plan. Although a process of soliciting rejection may not be the process each person that submitted an Objection would prefer, it most assuredly is the preferred process under the Bankruptcy Code.

33. Arcus and the Debtors have taken steps to provide a process under Section 1129 that affords creditors all of the protections intended to be given to creditors under the Bankruptcy Code, including disclosure, an opportunity to vote and other related protection. The Bankruptcy Code encourages reorganization as a primary means of exiting from bankruptcy. "The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern." Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel., 330 F.3d at 573. While Arch has allegedly provided the Debtors with a draft purchase agreement, such efforts would turn the Bankruptcy Code on its head due to the lack of the protections to the creditors that are otherwise provided to creditors under Section 1129. Although the Committee objection cites to cases related to Section 363 sales, the cites are inappropriate since courts have taken the measure to apply additional protections in 363 sales primarily because the Section 1129 protection are otherwise absent. See In re Iridium Operating LLC., 478 F.3d 452 (2d Cir. 2007) ("The trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization.

15

The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan'") (citing In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983). Debtors have engaged in a good faith plan process and Arch and the Committee are claiming Debtors are avoiding an appropriate process under the code. That is the indignity of their objections.

34.     Arch and the Committee specifically allege that under Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999) ("LaSalle"), as an insider, Arcus is unfairly favored in the Proposed Plan. Arcus does not acknowledge nor agree that LaSalle applies to this case (which could then require that the process be opened up in some fashion to the non-insiders). Arcus has no equity ownership in Debtors and LaSalle addressed the case where new value was being made by the original owners of the Debtor to retain their prior equity interests on account of their prior equity position. The Committee and Arch is requiring this Court to tread into new territory and expand LaSalle beyond its parameters, something this Court should not do.

35.     In Beal Bank, S.S.B. v. Waters Edge Limited Partnership, 248 B.R. 668 (D. Mass. 2000), an insider who was not an original equity holder was allowed to purchase the equity of the debtor in a plan of reorganization and the Court found that LaSalle does not apply to that situation. Arcus was not a manager nor an equity holder at the time of the Written Consent and is not currently an equity holder of any of the Debtors. While Arcus may be deemed an insider, the Bankruptcy Code does not bar the sale of equity to an insider (if the Court concluded the same). See also Penn Mutual Life Insurance Company v. Woodscape Limited Partnership, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale or against a

123285.01601/11770773v.2

sale to insiders; and there is no requirement that the sale be by public auction"); Troy Savings Bank v. Travelers Motor Inn, Inc., 215 B.R. 485, 494-495 (N.D.N.Y. 1997). [8]

36.     Arch cites to In re Global Ocean Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000) and In re Courtside Village, LLC, No. 03-10105, 2003 WL 22764541 (Bankr. N.D. Cal. Oct. 29, 2003) to further support its argument that the Proposed Plan unfairly favors insiders.  However, both of these cases are not pertinent in evaluating whether the Proposed Plan can be confirmed in light of the transfer of equity to an affiliate of Arcus.  Both of those cases involve plans in which the transfer of equity was to be made to an insider of the debtor that was an insider prior to bankruptcy and who held (or was a family member of the holder of) an actual economic interest in the debtor immediately prior to the transfer.

37.     The Objection of Pollution Control Financing Authority of Camden County includes several objections based upon the premise that the Proposed Plan is not proposed in good faith, including the alleged artificial impairment of certain classes and an allegedly gerrymandered class.  This aspect of the Objections must be, at this stage of the proceedings, summarily rejected.  A "good faith" determination under Section 1129(a)(3) "must be a fact-intensive, case-by-case inquiry."  In re PPI Enter. (US), Inc., 324 F.3d 197, 211 (3d Cir. 2003).  The inquiry is directed towards "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  In re Madison Hotel Assoc., 749 F.2d 410, 425 (7th Cir. 1984).

---

[8] The Debtors do not believe that LaSalle applies to the Amended Proposed Plan and nothing contained herein shall constitute an admission of the same.

III. **THE OBJECTIONS RELATED TO THE POTENTIAL PACKAGE THAT ARCH COULD ALLEGEDLY OFFER DEBTORS SHOULD BE OVERRULED DUE TO POLICY RAMIFICATIONS.**

38. Even assuming arguendo that the process that Arch has alleged to have offered to Debtors referred to in the Arch objection and the Committee objection would facilitate a process that reaches confirmation rather than liquidation, this Court should overrule the Objections. Allowing a competitor to purchase a claim in bankruptcy, file various pleadings with the Court, usurp a debtor's business judgment in obtaining financing and filing a plan of reorganization and possibly sell off the assets of the estate (likely cherry-picking the assets valuable to the Signature business) would present a road map to businesses in all industries looking to eradicate competition. Every entity suffering from a liquidity crunch would be ill-advised to attempt a reorganization in bankruptcy for fear that an aggressive competitor would purchase a claim and attempt to hijack the process.

## CONCLUSION

WHEREFORE, Arcus ASI Funding, LLC respectfully requests that this Court (i) overrule the Objections to the Disclosure Statement; (ii) enter final orders approving the Disclosure Statement; and (iii) granting such other further relief as is just and proper.

April 17, 2008                                    BLANK ROME LLP

                                                  */s/ Joel C. Shapiro, Esquire*
                                                  Joel C. Shapiro, Esquire
                                                  Shlomo B. Troodler, Esquire
                                                  Woodland Falls Corporate Park
                                                  210 Lake Drive East, Suite 200
                                                  Cherry Hill, NJ  08002
                                                  (856) 779-3600

123285.01601/11770773v.2