UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

IN THE MATTER OF                )
                                )   Case No.:   08-14631 (GMB)
SHAPES/ARCH HOLDINGS, LLC,      )
ET AL.,                         )
                                )   Camden, New Jersey
                Debtor.         )   April 17, 2008
                                )

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE GLORIA M. BURNS,
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Trustee:            PETER D'AURIA, ESQUIRE
                            Office of the
                            United States Trustee
                            1 Newark Center
                            Suite 2100
                            Newark, New Jersey    07102

For the Debtor:             MARK E. FELGER, ESQUIRE
                            Cozen O'Connor
                            Suite 300
                            Libertyview
                            457 Haddonfield Road
                            Cherry Hill, New Jersey    08002

For the Committee:          ALAN HALPERIN, ESQUIRE
                            Halperin, Battaglia, Raicht, LLP
                            555 Madison Avenue
                            9th Floor
                            New York, New York    10022

                            MICHAEL SIROTA, ESQUIRE
                            Cole Schotz
                            25 Main Street
                            Hackensack, New Jersey    07601

For Arch Acquisition I:     ALAN BRODY, ESQUIRE
                            DIANE VUOCOLO, ESQUIRE
                            Greenberg Traurig,
                            200 Park Avenue
                            Florham Park, New Jersey

APPEARANCES (continued):

For Arcus ASI Funding,     JOEL C. SHAPIRO, ESQUIRE
LLC; Arcus ASI, Inc.:     c/o Matthew Rottenberg
     Blank Rome, LLP
     210 Lake Drive East
     Cherry Hill, New Jersey

For Pennsauken Township:     OREN KLEIN, ESQUIRE
     Parker McCay, P.A.
     route 73 and Greentree Road
     Marlton, New Jersey  08053

For Quickway, Inc.:     KATHLEEN COLLINS, ESQUIRE
     Litchfield Cavo, LLP
     Commerce Center
     1800 West Chapel Avenue
     Suite 360
     Cherry Hill, New Jersey  08002

For Ward Sand & Materials     LOUIS GIANSANTE, ESQUIRE
Co., Inc.:     Giansante & Cobb, LLC
     23 East Main Street
     Moorestown, New Jersey  08057

For Pollution Control     JOSEPH M. GAREMORE, ESQUIRE
Financing Authority of     Brown & Connery, LLP
Camden County:     6 North Broad Street
     Woodbury, New Jersey  08096

For Avery Dennison, Prince     DEBORAH L. SHUFF, ESQUIRE
Foods, Crowley Corp., The     Drinker, Biddle & Reath, LLP
Glidden Court., Georgia-     One Logan Square
Pacific Court, SEPTA,     18th and Cherry Streets
Sears, Garrett-Buchanan:     Philadelphia, Pennsylvania 19103

For Wells Fargo Equipment     JOHN MORTON, ESQUIRE
and Jaguar Credit:     110 Marter Avenue
     Suite 301
     Moorestown, New Jersey  08057

For SL Industries, Inc.:     ROBYN F. POLLACK, ESQUIRE
     Saul Ewing, LLP
     1500 Market Street
     38th Floor
     Centre Square West
     Philadelphia, Pennsylvania 19102

Audio Operator:                    MARY LAMPONE

Transcribed by:                    DIANA DOMAN TRANSCRIBING
                                   P. O. Box 129
                                   Gibbsboro, New Jersey   08026
                                   Off: (856) 435-7172
                                   Fax: (856) 435-7124
                                   Email:   dianadoman@comcast.net

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

I N D E X

<u>ARGUMENT</u>:

By:  Mr. Felger              8, 12, 39

By:  Mr. Halperin           26

By:  Mr. Sirota             42

By:  Mr. Brody              47

By:  Mr. D'Auria            52

By:  Mr. Shapiro            53


<u>THE COURT</u>:

Ruling                      12, 56, 93

Colloquy                                                    5

1          CLERK:  -- the Honorable Gloria M. Burns presiding.

2          THE COURT:  Please be seated.  Good morning.

3          MR. FELGER:  Good morning, Your Honor.

4          THE COURT:  Good morning, Mr. Felger.

5          MR. FELGER:  Mark Felger of Cozen O'Connor on behalf

6     of the debtors.

7          THE COURT:  All right.  If you just want to hold on

8     for one minute before I get everybody's appearance.  There's --

9     I have somebody on the phone.  (Pause).  Mr. Drew?

10         MR. DREW:  Yes.

11         THE COURT:  This is Judge Burns, and you're on in the

12    courtroom in the matter of Shapes/Arch Holdings.  I would

13    appreciate it if you would put your appearance on the record.

14    And, then, if, during the course of the proceedings, you have

15    any difficulty in hearing, if you would just shout out.  I'll

16    try to get somebody to move closer to the microphone.

17         MR. DREW:  Okay.  Thank you, Your Honor.  James Drew

18    from Curtis Mallet on behalf of Glen Core (phonetic) Limited.

19    Also on the line I believe is Alyssa Golab (phonetic) from Glen

20    Core.

21         THE COURT:  Good morning.  Other appearances, please?

22         MR. HALPERIN:  Good morning, Your Honor.  Alan

23    Halperin, Halperin, Battaglia, Raicht, on behalf of the

24    Committee.

25         MR. SIROTA:  Judge, good morning.  Michael Sirota,

Colloquy                                    6

1    Cole Schotz, co-counsel for the Committee.

2              MR. BRODY:  Good morning, Your Honor.  Alan Brody and

3    Diane Vuocolo from Greenberg Traurig on behalf of Arch

4    Acquisition I, LLC.

5              MR. SHAPIRO:  Good morning, Your Honor.  Joel

6    Shapiro, Blank Rome, on behalf of Arcus ASI Funding, LLC.

7              MR. MORTON:  John Morton for Wells Fargo Equipment

8    Finance and Jaguar Credit.

9              MR. KLEIN:  Oren Klein of Parker McCay on behalf of

10   Pennsauken Township.

11             MR. D'AURIA:  Good morning, Your Honor.  Peter

12   D'Auria from the United States Trustee's Office.

13             THE COURT:  Good morning everyone.  Other

14   appearances?

15             MR. GIANSANTE:  Good morning, Your Honor.  Louis

16   Giansante on behalf of Ward Sand and Materials Company.

17             THE COURT:  Could you just slow down a little bit so

18   I can get your appearance again?

19             MR. GIANSANTE:  It's Louis Giansante on behalf of

20   Ward Sand and Materials Company.

21             THE COURT:  Thank you.

22             MR. POLLACK:  Good morning, Your Honor.  Robyn

23   Pollack, Saul Ewing, on behalf of SL Industries.

24             MS. SHUFF:  Good morning, Your Honor.  Deborah Shuff,

25   Drinker, Biddle & Reath, on behalf of Sears Holding Management

Colloquy                                                    7

1      Corporation, Georgia-Pacific, The Glidden Company, Avery

2      Dennison, Borden Foods, Crowley Corporation, Garrett Buchanan,

3      and SEPTA.

4              THE COURT:  Good morning.

5              MS. COLLINS:  Good morning, Your Honor.  Kathleen

6      Collins on behalf of Quickway, Inc. from Litchfield Cavo.

7              MR. GAREMORE:  Good morning, Your Honor.  Joseph

8      Garemore from the Brown & Connery firm on behalf of the

9      Pollution Control Financing Authority of Camden County.

10             THE COURT:  Good morning.

11             MR. D'AURIA:  Your Honor, may I make a disclosure,

12     please?

13             THE COURT:  Yes.

14             MR. D'AURIA:  I would like to inform the Court that

15     Mr. Garemore is from the Brown & Connery firm.  A partner of

16     that firm named Paul Mainardi is my second cousin.  For

17     whatever that's worth, I made the disclosure.

18             THE COURT:  Okay.  Thank you, --

19             MR. D'AURIA:  Thank you.

20             THE COURT:  -- Mr. D'Auria.  I'm not really -- unless

21     somebody has an objection right now, I'm not that concerned.

22     But, I appreciate your bringing it to the Court's attention.

23             MR. D'AURIA:  Thank you, Your Honor.

24             THE COURT:  Mr. Felger?

25             MR. FELGER:  The debtors have no concern about that,

Felger - Argument                                        8

1    Your Honor.  Good morning again, Your Honor.  It seems

2    appropriate just to take matters up in the order that they're

3    presented on the amended agenda.

4              THE COURT:  Okay.

5              MR. FELGER:  The first item is the -- an amended

6    motion by the debtors to employ and compensate certain

7    professionals in the ordinary course of business.  It's a

8    rather routine motion.  And, we had to amend it because there

9    were certain items that needed to be clarified from the motion

10   that was initially filed.  It was our intention to -- to

11   include this as a first day motion.  But, unfortunately we just

12   weren't able to -- to pull it together and identify all the

13   folks we needed or we thought we ought to identify in the

14   motion.

15             We've served this out on all parties.  No objections

16   have been filed.  We've spoken with counsel for the Committee,

17   and I believe they have no objection to the entry of the order

18   approving that motion.  I believe we filed a certificate of no

19   objection yesterday.  And, I'm not sure whether Your Honor has

20   had a chance to enter that order or -- if not, if Your Honor

21   has any questions with respect to that motion, we're happy to

22   address them this morning.

23             THE COURT:  Well, to be truthful, with everything

24   else I've been looking at, I didn't spend a lot of time because

25   I know it's uncontested.  They seem to be -- oh, did you have a

Felger - Argument                                              9

1    ques -- did you have an objection, Mr. D'Auria?

2                MR. D'AURIA:  No, not an objection, Your Honor.  I

3    just wanted to inform the Court that the -- the order attached

4    to the amended motion is different from the order to the first

5    motion.  And, some of the changes were in response to concerns

6    our office raised.

7                THE COURT:  Okay.  Well, make sure that, --

8                MR. D'AURIA:  So, --

9                THE COURT:  Chris, when you pull it out, that it's

10   the amended order.

11               MR. D'AURIA:  And, that amended order solves our

12   concerns.

13               THE COURT:  And, what were those concerns that you --

14   that have now been addressed?

15               MR. D'AURIA:  They were done by my colleague, Your

16   Honor.  But, I believe it -- it involved the ability to look

17   back at fees paid at the end of the day under 330.

18               THE COURT:  Is that your understanding?

19               MR. FELGER:  It was likewise done by a colleague of

20   mine.  So, -- that sounds right though, Your Honor.

21               MR. D'AURIA:  That was a crux of it, Your Honor.

22   There may have been another change in the middle of the

23   document, but that was the crux of it.

24               THE COURT:  Unfortunately, I don't have another

25   colleague that will look at things for me, so I have to look at

Felger - Argument                                    10

1    them myself.  And, if there's any question, we'll reach out to

2    you, Mr. Felger.  I just really kind of scanned what you were

3    looking at.  I didn't know that the U.S. Trustee had concerns.

4    I'm glad they were addressed.  But, perhaps, when I look at the

5    two orders, I'll be able to understand what the -- what the

6    differences were.

7              MR. D'AURIA:  If I remember correctly, Your Honor,

8    the last paragraph of the order on the amended motion --

9              THE COURT:  Uh-huh.

10             MR. D'AURIA:  -- was an addition that didn't appear

11   in the first one.

12             THE COURT:  All right.  Thank you, Mr. D'Auria.  I'll

13   look at it when I finish today.  And, if there's any question,

14   Mr. Felger, I'll have somebody reach out to you.

15             MR. FELGER:  That sounds right, Your Honor.  I'm

16   looking at the final order now -- I mean, the final paragraph

17   of the order now.  And, it provides that the final statement is

18   served upon notice parties, and they shall have 20 days to file

19   an objection.  So, that seems to address the concern that the

20   U.S. Trustee just raised.

21             The second matter on our amended agenda, Your Honor,

22   is a -- a motion for authority to continue certain customer

23   practices and programs.  Again, this is another motion that we

24   had hoped to pull together and include as a first day motion

25   given the issues that are raised in that motion with respect to

Felger - Argument                    11

1    the debtor's ability to continue to honor what are recognized

2    as standard customer programs and practices in the respective

3    industries of the debtors.

4         The facts are all pretty well set forth in the

5    motion, and the motion is verified.  I have spoken with counsel

6    for the Committee who has indicated to me they have no

7    objection to the entry of an order granting that relief.  And,

8    again, it's -- it's simply to authorize the debtors to continue

9    with its ordinary course customer practices and programs --

10        THE COURT:  Involving warranty claims, and --

11        MR. FELGER:  Exactly.

12        THE COURT:  -- repairs, and those kind of things.

13        MR. FELGER:  Replacement parts to retail -- to

14   distributors and customers.  And, also honoring -- to the

15   extent they're pre-petition claims, I think what we've set out

16   is that we believe the total among the various programs for un

17   -- for pre-petition unsecured claims would be less than

18   $110,000.

19        THE COURT:  And, the Committee is not --

20        MR. HALPERIN:  We have no objection, Your Honor.

21        THE COURT:  No problem with that?  Mr. D'Auria,

22   anything from the U.S. Trustee?

23        MR. D'AURIA:  I reviewed it myself.  No objection,

24   Your Honor.  It's purely the continuation of a warranty

25   program.  There's not a -- there's not a payment of a pre-

The Court - Ruling / Felger - Argument                    12

1       petition claim.   I didn't view it to be akin to a critical

2       vendor motion.

3                    THE COURT:  Okay.  All right.  There's been no

4       objection.  I'll look over the form of the order.  And, if

5       there's not any problem with it, the order will be entered.

6                    MR. FELGER:  And, that brings us to the reason why I

7       think everybody is here today, and that's items 3 and 4.  And,

8       I think it's -- given what -- where the debtors are and what

9       the debtor is requesting, it probably makes sense to take up

10      both matters together.

11                   What the debtors are requesting, Your Honor, is an

12      adjournment of both of these matters for a short time.  We've

13      talked with the parties about a date for the adjourned hearing,

14      and it's something we -- we need obviously to take up with Your

15      Honor.  But, we were looking at something relatively short into

16      the latter part of next week or perhaps the following Monday.

17      And, it could very well be that the following Monday works best

18      for the folks --

19                   THE COURT:  The problem with the following Monday

20      is --

21                   MR. FELGER:  Okay.

22                   THE COURT:  -- that that is the first day of the

23      Third Circuit Conference, and I will not be here.

24                   MR. FELGER:  Uh-huh.

25                   THE COURT:  So, -- I won't be here.  I'll only be

Felger - Argument                                    13

1    here -- the week after next I'm only going to be here one day.

2    And, I -- I don't know that this is what I can do in that one

3    day, to be honest, because I'm going to be in -- in Maryland

4    Monday through Wednesday, and I'm going to be at the bench bar

5    conference on Friday.  I guess, if I had to, I could miss that.

6    But, I'm already scheduled to be at the Circuit Conference.

7    So, --

8            MR. FELGER:  Well, it sounds like Mr. Sirota's

9    crystal ball was working yesterday, because he suspected that's

10   where you may be.  So, I guess we'll have to talk -- after we

11   get through what everybody wants to say on the record -- an

12   appropriate date to reschedule these two matters.  So, I guess

13   we can take that up at the end.

14           In light of the objections filed to the -- to the DIP

15   financing motion -- I think there were four or five -- and the

16   dozen or so objections that were filed to the disclosure

17   statement, we thought, in discussion with Versa and CIT, our

18   DIP lenders -- and Versa, our plan funder -- that it made sense

19   to adjourn both of those matters for a -- a short period of

20   time to hopefully address all of the objections and file an

21   amended plan and disclosure statement that, if not -- that

22   would, if not eliminate all objections, would certainly whittle

23   them down to a manageable few.

24           We've reached out to the Committee to indicate that

25   that was our intent to ask the Court for an adjournment.  And,

Felger - Argument                                      14

1      it was -- it was our desire to not only adjourn, but to perhaps

2      have a chambers conference with Your Honor with respect to sort

3      of where we are and what some of the critical issues are.

4              The -- the Committee's response to our request for

5      the adjournment was that they'd be fine with an adjournment

6      provided certain things happened before the adjourned hearing.

7      And, what I'd like to do is walk -- walk through those items

8      that the Committee wanted to see happen before -- before we got

9      to an adjourned hearing.

10             At the time when we approached them, we hadn't yet

11     decided whether we were going to adjourn the disclosure

12     statement hearing.  So, one of their points was that they would

13     want both the disclosure statement hearing and the DIP

14     financing motion adjourned to an acceptable date for all

15     parties.  And, that one we had no problem with.

16             The next point on their list was they wanted the

17     ability to depose three individuals before the adjourned

18     hearing.  From the debtor's side, the two individuals who

19     testified at the first day hearing, Steve Grabell the CEO, and

20     Vince Collistra, a principal of Phoenix.  And, the third person

21     was a representative -- or is a representative of Versa, Arcus,

22     and that's Paul Halpern (phonetic).

23             The -- in talking with Mr. Shapiro, counsel for

24     Versa, Versa and the debtors are fine with producing those

25     three witnesses at a -- at a mutually convenient time before

Felger - Argument                                    15

1    the adjourned hearing.  So, that one was acceptable to the

2    debtors and Versa.

3          The third point they -- they raised was that they

4    wanted a -- a full response to their 2004 subpoena that they

5    served, I guess, about ten days ago.  Over the course of the

6    last ten days, we've been sharing a great deal of information,

7    notwithstanding their allegation that we've given them a

8    handful of documents.  We've given them quite a bit of

9    information over the past ten days.

10         But, admittedly, we haven't fully responded to that

11   subpoena.  So, what I have said to them is we will endeavor to

12   produce the documents that have been requested.  I indicated

13   that some of the requests are extremely broad and that we need

14   to put our heads together to try to get to a meeting of the

15   minds as to exactly what the Committee is looking for with

16   respect to some of the items.

17         For instance, one of the items was give us everything

18   you have in support of every allegation in your DIP financing

19   motion.  There's a hundred paragraphs in that motion.  So, we

20   need to -- we need to talk and --

21         THE COURT:  Try to sit down and -- and --

22         MR. FELGER:  Yeah, I've spoken --

23         THE COURT:  -- tone down the -- what the scope of

24   that area is.

25         MR. FELGER:  We had a -- I spoke with Ilana Volkov,

Felger - Argument                                        16

1    Mr. Sirota's partner, last week.  And, we went through them one

2    by one.  And, there was an acknowledgment by Ms. Volkov that

3    there were a couple of them that she needed to get back to me

4    on to try to focus in on what -- what we're -- what they're

5    looking for.

6              So, we've -- we've agreed to -- to work diligently to

7    get them the additional information they'll need in response to

8    their subpoena, recognizing we're not waiving any privilege,

9    work product, that sort of thing.  And, if we need to raise

10   those issues, we'll raise them, and Your Honor will decide.

11             So, I don't believe that one is going to be an issue.

12   Again, we're going to -- we're going to work with them and

13   endeavor to get them everything -- everything they need.  And,

14   if we don't, I'm sure they'll be reaching out to Your Honor on

15   that one.

16             The fourth point was that they wanted to have us file

17   an amended plan and amended disclosure statement and any

18   response to their objections by this Friday.  As Your Honor is

19   aware, Arcus has already filed their response to their -- to

20   their objections.  And, unfortunately, standing here today, I

21   have not read their response.  But, at least in that respect,

22   Arcus has already gone on record with their response.

23             We are fine with filing an amended plan and amended

24   disclosure statement and the debtor's response -- and there

25   will be a response -- to the objections reasonably in advance

Felger - Argument                                      17

1     of the adjourned hearing date.  Friday would be fine if we were

2     looking a hearing next Tuesday or Wednesday.  But, depending on

3     where -- where we come out, if it's a later hearing, we'd

4     probably want until Monday or Tuesday of next week.  So, I

5     think it's all going to track off of what the adjourned hearing

6     date is in terms of filing our amended plan and disclosure

7     statement.

8          We had an amended plan and disclosure statement with

9     some pretty significant changes ready to go.  But, in light of

10    all of the objections that have come in over the last couple of

11    days, including a very comprehensive objection by the Committee

12    just yesterday, additional changes to the plan and disclosure

13    statement will be made.  And, --

14         THE COURT:  To mean that we adjourn -- I want to --

15    I'm going to bring up a few things that I think you need to

16    address in your disclosure statement, some of which were

17    addressed and some of which weren't.  And, we might as well at

18    least get into some of that now because, if I'm going to be

19    looking at an amended disclosure statement, we might as well

20    take into account as many of the things that are of concern to

21    the Court as possible.

22         MR. FELGER:  Absolutely.  The last item that the

23    Committee wanted to see happen -- and, it was -- and, it's an

24    item that the debtors did not agree to and Versa did not agree

25    to, and that's to provide HIG or Arch Acquisition I documents

Felger - Argument                                    18

1   that they have requested as due diligence for an alternative

2   DIP and their proposed alternative plan.  And, -- so, I think

3   the reason we're here today is that issue.

4          They've asked us to produce those documents.  Mr.

5   Halperin has asked me a half a dozen times to produce those

6   documents and has indicated that I may be breaching my

7   fiduciary duties if I'm not producing those documents.  And, I

8   have Arcus saying the exact opposite.

9          I know I'm in a difficult spot when Mr. Shapiro is

10  telling me it's a no brainer, and Mr. Halperin is telling me

11  it's a no brainer.  So, I'd like to give a little flavor on

12  where we are on that issue and then let Mr. Halperin or Mr.

13  Sirota and Shapiro give their views.

14         THE COURT:  You could -- if you would start by

15  telling me the essence of what it is that they're looking for

16  that you -- and why you have a problem with supplying it.

17         MR. FELGER:  Okay.

18         THE COURT:  Assuming that -- I did read somewhere

19  that Arch at one time had signed a confidentiality agreement.

20  So, I'm assuming that any disclosure now would be subject to

21  the same dis -- same confidentiality agreements --

22         MR. FELGER:  The --

23         THE COURT:  -- or is that the question?

24         MR. FELGER:  They did -- I guess I'll start with --

25  start -- I wasn't going to start there, but we'll start there.

Felger - Argument                                    19

1      HIG, Arch Acquisition I, has a portfolio company that is a --

2      or HIG has a portfolio company that is a competitor of the

3      debtor.

4              And, I -- I guess it was about a year to a year and a

5      half ago -- it was about a year and a half ago that debtors

6      went through a process and hired an investment banker and went

7      out to the market and talked with a lot of people about a

8      transaction.  And, one of the folks they talked with was HIG.

9      And, HIG did due diligence, there were discussions, and no deal

10     was reached.

11             So, in answer to your question, I believe a

12     confidentiality agreement was signed.  Personally I have not

13     seen it.  I don't know if it's still in effect.  It was with

14     the debtor and not the debtor-in-possession, so I think a new

15     -- on that basis alone, a new confidentiality would have to be

16     signed.  But, there were discussions, there were negotiations.

17     The parties know each other.  And, that didn't result in a

18     transaction.

19             Just to complete that thought, the debtor, before

20     filing, reached out again to HIG.  And, HIG indicated they

21     weren't interested in that time in going forward with a

22     transaction.  This was back in mid January.  That was through

23     Mr. Grabell.

24             So, to sort of back track and -- and give Your Honor

25     sort of our view on the HIG document request, they've --

Felger - Argument                                    20

1    they've asked for -- and, admittedly, it's a -- it's a rather

2    limited list.  I've seen due diligence lists that are entirely

3    too burdensome and certainly more burdensome than the request

4    made by HIG.  But, what they've done is they've broken it into

5    two pieces.  They've asked for documents relative to the

6    alternative DIP financing, and they've asked for documents

7    relative to the alternative plan.

8         The discussions we had yesterday went to providing

9    them with the documents relative to the DIP financing.  And, --

10   and, I think where the Committee came out on the plan documents

11   was -- I think Mr. Sirota used the word place holder -- let's

12   deal with that after we provide the first wave of documents on

13   the DIP financing.  So, those are the documents they're looking

14   for.

15        What we've done is we've -- you know, first and

16   foremost, Your Honor heard it at the first day, how we got to

17   where we were on March 16th.  It was a very difficult, very

18   intensive two-month process where we had a lender group that

19   was squeezing us hard and indicating to us that they weren't

20   prepared to do any lengthy process because a lengthy process

21   would -- would involve almost tripling where the company was in

22   their over advance.  And, they did not have an appetite to do

23   that.

24        The company had discussions with a lot of folks, and

25   they -- including they reached out to HIG at that point.  And,

Felger - Argument                                                21

1    quite frankly, the only party that stepped up with expressing

2    an interest in doing something quickly, which is what the

3    debtor had -- had to accomplish, was Versa.  They stepped up,

4    they had a battalion of people at the company's operations for

5    two weeks, invested thousands of hours -- of man hours of time,

6    and put a proposal on the table very quickly.

7              That proposal was enough to get our lenders to agree

8    to continue to talk with Versa, which they did, and we did.

9    And, we continued to work hard to get to a point where there

10   would be an acceptable arrangement among the debtors, the

11   lender group, and Versa.

12             And, -- so, where we found ourselves on the 16th was a

13   situation where we weren't pulling the plug and sending a

14   thousand people home.  We were keeping a business alive.  We

15   had -- we had DIP financing in place from our existing lender

16   group and Versa.  We had exit facilities committed to from both

17   groups.

18             We had a plan committed to that provided for payment

19   of secured debt, payment of the freight of the case, payment of

20   all the priority claims, a small dividend to unsecured

21   creditors -- and, admittedly, I asked for more, and the

22   response was that's the Committee's job.  So, there was a

23   recognition there would be a negotiation with the Committee to

24   make that a better deal for the unsecured creditors.

25             In addition, we were saving a thousand jobs, keeping

Felger - Argument                                    22

1   a business that's been in the community for 50 years alive, and

2   we're keeping a customer for the unsecured creditors.  And, I

3   have to tell you, I represent a lot of committees.  And, future

4   profits sometimes is more important than dividend.  So, we were

5   -- we thought keeping a customer alive, saving a thousand jobs

6   is very important.

7          So, we agreed to go forward with that.  We agreed to

8   support their debtor-in-possession financing.  We agreed to

9   support their plan -- the debtors and the owners agreed to

10  support their deal.  So, that's where we were on the 16th.

11         We now have HIG coming back into the fold.  And, God

12  bless them, they've been very vigilant.  Mr. Brody has been

13  very diligent, very responsive.  And, they started with a DIP

14  financing agreement.  They then added an asset purchase

15  agreement to that.  The Committee expressed a lot of concerns

16  with the asset purchase agreement, as we had concerns with an

17  asset purchase agreement.  And, they've changed it now to a

18  plan.  So, they -- they're now out there with a -- an

19  alternative DIP financing arrangement and an alternative plan.

20         A couple of nights ago I reached out to Mr. Halperin,

21  and I raised a number of concerns in an e-mail.  And, I think

22  they are valid concerns for any fiduciary in considering

23  providing these documents to HIG and perhaps switching horses

24  at this point.  And, that's why I wanted a chambers conference,

25  because these are valid concerns, Your Honor should know about

Felger - Argument                                    23

1     these concerns, and I'm not entirely comfortable vetting them

2     at this point, because a couple of them go to information that

3     isn't public at this point.

4                I have my e-mail to Mr. Halperin, and I'm happy to

5     share it with Your Honor because it expresses the debtor's

6     concerns with respect to where the HIG folks are at this point.

7     If I could approach and hand it up?

8                THE COURT:  All right.  Well, why don't we just hold

9     for -- that for a minute, because we'll see where we're going

10    to go, whether we're going to have a chambers conference, what

11    we're going to do here, hear what everybody has to say, and

12    then we'll decide how we're going to go from there.

13               MR. FELGER:  Okay.  So, --

14               THE COURT:  But, I -- but, I --

15               MR. FELGER:  -- the backdrop --

16               THE COURT:  -- recognize you're telling me you had

17    confidentiality concerns.

18               MR. FELGER:  So, the backdrop is we worked hard, and

19    Versa worked very hard.  And, they stepped up when no one else

20    stepped up.  And, we agreed as part of that deal to support

21    them, and we're bound to support them through the papers.  We

22    have issues with where HIG is at this point, not only on their

23    papers and the items expressed in my e-mail.  They're a

24    strategic buyer, they are a competitor of ours, and it's always

25    dangerous giving confidential proprietary information in this

Felger - Argument                                24

1      setting to a -- a competitor.

2            My third point on providing documents to HIG is

3      process.  We don't have a process approved by Your Honor to

4      provide information to anyone.  And, what does it mean when I

5      give documents to HIG?  Does that then mean that, when another

6      competitor shows up tomorrow, we need to do the same thing?

7            So, process is an issue for us.  And, procedurally,

8      you know, where are we?  We don't have a motion to compel

9      documents from HIG.  So, procedurally, before we -- I hate this

10     expression -- but, willy-nilly give somebody documents, we need

11     to know where that ends, where it begins.  So, I wanted to give

12     Your Honor that backdrop before you hear from the Committee and

13     before you hear from Versa.

14           Again, I'm going to -- you know, I'm going to finish

15     where I started and say that the debtor is in a -- in a

16     difficult spot based upon what we're hearing from both sides,

17     and certainly we hope to get some guidance from Your Honor

18     today.

19           THE COURT:  All right.  With regard to the last one

20     thing you brought up, the procedural thing, I'm not as

21     concerned about that because of the very expedited situation

22     that we're in.  I mean, you know, we'll address it.  But, if it

23     can be taken care of in an expeditious manner, I'm not going to

24     have form over substance and worry about getting a motion in

25     when everybody, I think, agrees that this has to be quick --

Felger - Argument                                    25

1    done quickly.

2              And, that's one of the issues that I probably will

3    want to hear from you, once we hear everything else, as to

4    what's going on with the debtor between the -- we had our first

5    hearing today and going forward.

6              MR. FELGER:   That's one of the issues I didn't want

7    to -- that on the record.   But, --

8              THE COURT:   Right.   I'm saying that that -- that's a

9    concern that I -- you know, I see under -- I mean, we spent a

10   long time the first day.   And, I recognize that the Committee

11   wasn't here, the U.S. Trustee brought up a few things.   But,

12   neither of us really knew everything that was -- that had

13   happened over the last months and weeks, but got a sense of it

14   from the testimony that was given.

15             And, I did make the rulings that I did based on what

16   I said -- I mean, on -- basically on two reasons.   One, that

17   this was basically the only game in town at the time and the

18   debtor would close that day if not for the financing.   And,

19   that's -- that was the bottom line that led to the interim

20   order that was entered.

21             And, fully recognizing that the Committee was going

22   to come into the case and we were going to -- and, I expected

23   and -- I expect and I did expect that it would be a

24   negotiation, and we would hear from all of the other issues --

25   hear all the other issues, and we would go from there.   And, I

Halperin - Argument                                    26

1     -- just to say that I did have a very short time to review Mr.

2     Shapiro's late filed response.

3              And, if I can summarize the essence of it, it was --

4     it kind of focused on, you know, the debtor's rights as having

5     exclusivity to file a plan and use its business judgment.  And,

6     I'm very sensitive to that, and I think that is true.  But, on

7     the other hand, this is not just an in the market business

8     transaction.  You want the Court's approval.  The Court has to

9     be satisfied that it is appropriate to approve it and hear from

10    everybody else.

11             And, I don't think you're saying that we shouldn't

12    hear from everybody else, Mr. Shapiro.  But, there's a lot more

13    to it than just the debtor's business judgment.  And, I think,

14    bottom line, if we -- if you don't resolve some of these issues

15    when you're coming into court, that's what you're going to have

16    to satisfy the Court that it was a good business judgment and

17    it continues to be a good business judgment, notwithstanding

18    whatever else is out there.  So, with that in mind, Mr.

19    Halperin?

20             MR. HALPERIN:  Thank you, Your Honor.  Alan Halperin,

21    Halperin, Battaglia, Raicht, on behalf of the Committee.  As we

22    indicated earlier, Your Honor, I'm joined by Michael Sirota, my

23    co-counsel of Cole Schotz.  I'd like to initially address the

24    adjournment request to Your Honor.  And, then I'd ask Mr.

25    Sirota to talk about certain aspects of the document turnover

1   to HIG and scheduling issues, as he's going to be primarily

2   responsible for trial work.

3          THE COURT:  Can we just back up one -- the orders for

4   your appointment haven't been entered yet because they're

5   waiting the 20-day period.  But, I wanted to have a sense of

6   how -- why the Committee needs two -- two counsel and how

7   you're dividing up the services, if you wouldn't mind.

8          MR. HALPERIN:  Absolutely, Your Honor.  First and

9   foremost, there is a rule in New Jersey, as you're better

10  familiar than I am, that we are required to have a local

11  counsel.  And, in addition, we had certain limited conflicts,

12  one of which could be very significant with respect to CIT.

13  So, in addition to needing local counsel, we were going to need

14  a conflicts counsel.

15         And, we've worked with Cole Schotz in the past.  We

16  have a good rapport with them.  I've had cases specifically

17  with Michael and his partner Ilana in the past.  And, it was a

18  good working relationship, and so it made perfect sense.  It

19  was a good overlay and a good fit for the two of us.  They

20  didn't have conflict with people that we did, we didn't have

21  conflicts with people that they did.

22         In addition, there are -- there's no -- there's no

23  ego involved here, so to speak.  So, to the extent there are

24  certain individual issues or things, we're happy to say to

25  them, to the extent they have time or manpower to do it, here,

1      take this and deal with it.  We're not enmeshed in the same

2      things; we're not duplicating each other.

3              The only time that there is some duplication, I

4      suppose, is now, because you've got so many big ticket items

5      that are enmeshed with each other.  If we had just had the

6      disclosure statement standing discreetly and the financing

7      standing discreetly, it would be very easy.  I'm going to let

8      you deal with the financing, we'll deal with the disclosure

9      statement.

10             It would be just -- but, he can't.  It's all

11     intertwined and meshed.  So, there's a little bit of an overlap

12     right now.  But, we envision, as we always did at the

13     beginning, when we go forward, that there will be no overlap

14     and no duplication.  And, we recognize that our fee

15     applications are going to be submitted to scrutiny on that

16     point.

17             And, we have discussed this with the U.S. Trustee who

18     has indicated he has some comfort on that because, in fact,

19     there is a good fit.  We do fit together well with respect to

20     this case and the conflict issues.  Okay.

21             Given the flurry of filings, the supplemental

22     amendments that -- to the disclosure statement that were filed

23     within the last -- I think it was less than 48 hours ago -- we

24     recognize the common sense appeal of an adjournment of the DIP

25     and the disclosure statement.  The problem that the Committee

Halperin - Argument                                    29

1    has is that we have a broken process here.

2         And, we've made requests of the debtor in connection

3    with the adjournment of a very limited list of things that we'd

4    like to see happen in order to fix that process so that we

5    would be able to move forward in terms of presenting our case

6    to the extent we have to.  But, even better, that we actually

7    could maybe fix the process a little bit and not have a fight

8    and move forward consentually.

9         As Mr. Felger represented -- and he represented

10   accurately -- most of the issues were addressed.  But, the two,

11   I would say, most fundamental to fixing what we perceive as a

12   broken process remain open.  And, that is getting information

13   immediately to Arch Acquisition, the HIG subsidiary, so that it

14   can conduct the due diligence that it needs to be able to

15   finish up and conclude that, yes, we're prepared to provide a

16   replacement DIP.

17        I would roll the disclosure statement into that.

18   But, in order to make it in bite size chunks and make it a

19   little easier, because the debtor did express some concerns, we

20   did say break it out, bifurcate it, and we'll deal with the

21   second tranche later.

22        And, the second was more procedural.  And, Your Honor

23   kind of addressed that just a few moments ago, that, at the

24   adjourned hearing, if a suitable replacement DIP term loan

25   lender were available, that we would be able to at least

Halperin - Argument                                    30

1    present it to the Court and that we wouldn't be facing any

2    procedural gamesmanship, because time is short.    We don't have

3    a lot here.

4            I -- I like to think I'm not prone to hyperbole, and

5    I don't think I'm giving you any here.    But, this is perhaps

6    the most egregious plan I've seen in practice.    It's very

7    complicated, it's very thick, there's a lot of paperwork, and

8    the plan and the DIP are tied together.    And, they're

9    choreographed to basically deliver a business to a buyer on a

10   private deal that was negotiated before the bankruptcy when

11   there were no creditors and anybody else involved in the

12   process to sort of keep an eye out for what was maybe in their

13   best interest.

14           The process provides control to Versa.    They hold a

15   79.9 percent equity vote of the parent debtor.    And, it has

16   very restrictive DIP loan terms that are designed to protect

17   that plan to prevent anybody from coming in and maybe

18   presenting some sort of competition to get the assets.    From

19   our perspective, as a result, we have a debtor that's refusing

20   an open process and won't provide information to parties that

21   are interested in making competing offers or, alternatively,

22   and specifically with respect to the HIG subsidiary, a

23   competing DIP loan on much better terms.

24           There are several parties that have reached out to

25   the Committee, we believe the debtor as well, and, in fact,

1    even to the Court, pleadings that have been filed, to express

2    their interest and their frustration with the process.  As we

3    noted in particular, Arch Acquisition, which is a subsidiary of

4    HIG, has committed substantial resources to get themselves up

5    to speed, to prepare an alternative DIP loan, to prepare an

6    alternative plan, first an asset aqui -- an APA, and then we

7    said, no, that doesn't really work.

8         It's really got to be apples to apples, and we don't

9    want to see something fall through the cracks.  We need to see

10   -- if you really want to do this, show us, prepare a plan.

11   And, they committed the resources to do all of this in face of

12   the fact that all of these documents were out there, and there

13   was a lock up for Versa.  Yet, they still committed the

14   resources, and they're still here.  And, they're still filing

15   papers with the Court, and they're represented today.

16        They have indicated that they have due diligence

17   requests.  As Mr. Felger accurately represented, it's a very

18   limited due diligence request with respect to the DIP loan and,

19   again, short with respect to their plan process, although it is

20   somewhat longer.  And, despite repeated requests from both HIG

21   and from the Committee, -- and, you know, Mr. Felger

22   acknowledged that I have been harping with him of this -- the

23   debtors and Versa have re -- provided HIG with nothing, and

24   they have refused to provide HIG documents.

25        From our perspective, the debtor has a fiduciary

Halperin - Argument                                   32

1    obligation to its creditors and to the estate, and it's

2    consistent with bankruptcy law, to seek the highest and best

3    value for the businesses and the assets.  Yet, the debtors and

4    Versa, who control the debtors, take the position that even

5    providing due diligence to HIG would be effectively a default

6    under the DIP loan.  There's nothing in the DIP loan that says

7    that.

8         But, to the extent HIG says, listen, we're not doing

9    this because we're a lending institution, we're prepared to

10   substitute in for them because we want to make a run of these

11   assets, that would bring it within the realm of a default --

12   and, -- default -- I'm sorry -- under the DIP loan and the

13   interim order.

14        So, two days after the case files, they're before

15   Your Honor.  Quite frankly, from my perspective, they're

16   presenting you with a very difficult task because I saw the

17   volume of papers that were filed.  There's, like, no notice.

18   And, that is a mound of papers to go through.  You know, we

19   didn't get through it in two days.  That's why we had requested

20   adjournment initially and said we need time, we've got to get

21   our arms around this.  We're not even sure exactly what you're

22   proposing or asking for.

23        But, in two days, Your Honor is presented with

24   uncontested testimony and a record that says this is what we

25   gotta do, only game in town, we're gonna shut down.  There's no

Halperin - Argument                                                33

1    creditors there to provide any counter -- counter balance.

2    There's no -- virtually no notice.  It's two days after, and

3    it's very difficult for people to come in.

4            And, so, the order is entered.  And, now they're

5    using that order effectively as a weapon to hijack the process.

6    Effectively what we're going told is, you know, someone is

7    going to compete with us on this plan, we're not giving them

8    due diligence and you shouldn't, because that's a default and

9    we just may pull the plug and not fund.  That's pretty

10   outrageous from the Committee's perspective.

11           The Arcus DIP loan is replete with overbearing and

12   egregious provisions that are designed to defend the transfer

13   of the business to Arcus without any competition.  I mean, for

14   example, the EBITDA and other covenants that were in the

15   document -- most -- many of them -- some of them -- let me not

16   over -- overstate.  Some of them were in default virtually from

17   inception which provides Arcus a position of leverage further;

18   I'll waive or, if I get concerned, I won't waive.  And, then

19   I've got greater leverage over the process.

20           There's a deadline of May 30th for confirmation of the

21   Arcus plan, -- not a plan that pays them out, but the Arcus

22   plan and substantial confirmation of the Arcus plan by June

23   30th, the failure of which are more defaults.  There's no time

24   for a proper process in this bankruptcy.

25           Even though they're arguing that they can't -- that

1    no one can shop and no one can provide an alternative DIP,

2    there's a right of first refusal in the DIP that, if someone

3    else comes up, that they have a right to -- to match that.

4    And, again, as I noted earlier, there would be a breach of

5    effectively a no shop provision if you start providing

6    information to these entities.

7           The debtors released Arcus and its affiliates and its

8    principals upon entry of the interim order of everything, which

9    would include if there were any breaches of fiduciary duty and

10   the like -- just remember they are in a position of control --

11   arising before the date of interim order, whether it related to

12   the DIP or not.   It's very broad.   I think that's in Section

13   4.5.

14          They're trying to exclude the Committee monetarily

15   from the process, so the Committee will not be able to put up

16   an argument, because in the budget they put line items that are

17   so draconianly small -- in fact they're dwarfed by the payment

18   of fees for the two DIP lenders which are, between the two of

19   them, total almost $1M under the loan.   And, so that, if the

20   debtor were even to pay those fees, that would be another

21   default under the DIP loan.   You can't pay them.   They're

22   trying to lock it up that way.

23          And, that's on top of the liens on avoidance actions,

24   the 506C waiver, coupled with the vesting of actions, whether

25   avoidance actions or fiduciary duty actions, or anything else,

1   back in the reorganized debtor under the plan.  And, under the

2   plan, it goes to Arcus, so those never see the light of day if

3   there are any issues.

4           From our perspective, the fundamental principles that

5   underlie Chapter 11 mandate a fair and open process.  Maximize

6   value for unsecured creditors.  From our perspective,

7   management and ownership has fiduciary duties to the creditors.

8   But, the process they've set up tramples all over those duties,

9   it just does.  The process is broken, and we think it needs to

10  be fixed here and now.

11          What we want to see is the process opened up so that

12  other people can come in and kick the tires.  With respect to

13  who gets what information, I'm going to -- I'm going to Mr.

14  Sirota on that because he's going to be dealing with it.  But,

15  I would say this.  I do think it rings a little hollow to say,

16  well, you know, who did we give information to.

17          I think there's a vast difference between someone

18  that has stepped up, put in the hours to put in replacement

19  documents -- it's not like you're just jotting down a note.  I

20  mean, this is a replacement plan or a replacement DIP loan.

21  There's a difference between someone like that and someone who

22  sends a note, hey, I'd like to see your information.

23          And, as I've also told them repeatedly, we can

24  address those issues.  We can address who gets what

25  information, when.  We'd like to engage in discussions to set

1   that up.  But, there is no discussion to set that up.  All we

2   keep hearing is why it can't be done, and we have a problem

3   with that.

4              THE COURT:  Let me just ask you the one question as

5   far as the confidentiality information that was in Mr. Felger's

6   e-mail to you.  How do you respond to that as far as concern --

7   I mean, it has to be a concern of the Committee.  I mean, you

8   are talking with competitors and -- how -- how do you propose

9   that that is addressed -- that issue can be addressed?

10             MR. HALPERIN:  There are a couple of things.  And,

11  these are just off the top of my head, Your Honor.  First, I

12  think that also rings a little hollow because, as Mr. Felger

13  indicated, they had some sort of a process.  And, we take issue

14  whether it was anything like what they're dealing with now.

15             It's very different when you're a year and a half ago

16  and you're talking about a different spectrum of dollars that

17  you're looking for a business than what you're looking for in a

18  bankruptcy, especially when it's compared to the Versa plan.

19  But, that --

20             THE COURT:  If you're going to -- the debtor's

21  position that, you know, they weren't there and they're here

22  now kind of thing -- I'm not getting into that.

23             MR. HALPERIN:  Okay.

24             THE COURT:  I'm just -- I'm just talking about

25  basically -- I'm hearing what you're saying --

1          MR. HALPERIN:  The confidentiality issues.

2          THE COURT:  -- about the -- about the debtor's

3     responsibility and fiduciary --

4          MR. HALPERIN:  Yes.

5          THE COURT:  -- duty.  I want to know --

6          MR. HALPERIN:  How you --

7          THE COURT:  -- how you -- if you think that -- or how

8     you think you can protect the debtor's information so that we

9     can have this full and fair hearing.

10          MR. HALPERIN:  Okay.  And, there are two points to

11     that.  The first one -- and I apologize if I wasn't clear in

12     getting to it.  But, I think the complaint itself rings a

13     little hollow because they indicated they've already done this,

14     and they've already signed confidentiality agreements, and

15     they've already provided information to other people to do

16     this.

17          So, I don't know why all of a sudden now, when it was

18     okay back then, now it's not okay, because they're competitors.

19     They were competitors back then too, as was everybody else that

20     was involved.  If that confidentiality agreement doesn't work,

21     then we sign a new one.  If there are provisions that need to

22     be corrected in it or fixed, absolutely, you deal with that.

23          We signed a confidentiality agreement, as did Arcus

24     and, I believe, CIT.  I was told they did.  We actually worked

25     off their form.  So, I don't see why another one can't be

Halperin - Argument                                          38

1   done --

2              THE COURT:  Was there anything --

3              MR. HALPERIN:   -- for somebody else.

4              THE COURT:   -- in Mr. Felger's e-mail to you that you

5   felt couldn't be addressed by confidentiality agreement,

6   without being specific.  I know he --

7              MR. HALPERIN:  I pers --

8              THE COURT:   -- doesn't want to get specific on the

9   record, but --

10             MR. HALPERIN:   I personally don't, whether it's

11  confidentiality agreement or perhaps tweaking of the

12  information.  I mean, for example, there may be certain

13  discreet pieces of information that would make it very easy for

14  a competitor to then, you know, target some of your customer

15  base.

16             But, there's ways of doing blinds of stuff like that

17  or putting intermediaries in to water things down or mask them

18  so that certain information isn't provided.  Those are things

19  that can be addressed.  And, I don't pretend to have all the

20  answers sitting here.

21             But, the point is we're in a bankruptcy.  This is not

22  a private transaction.  This is not a -- you know, oh, my

23  goodness, we shouldn't allow the competitor to come in.  Your

24  Honor, you know better than I do that constantly there are

25  asset sales in bankruptcy.  And, who are the most likely

Halperin / Felger - Argument                    39

1    suitors that bid on these things?  Strategics, because it's

2    worth the most to them or it can be worth the most to them.

3              And, so, while I agree there are issues -- and, I

4    said to Mr. Felger at least once or twice, you know, certain of

5    the specifics that you've raised, lets try and address them.

6    I'm not saying they're illegitimate concerns.  But, you can't

7    shut people out.  We need an open process.  I'd like to hand it

8    over to Mr. Sirota, if I may.

9              MR. FELGER:  Can I just interject one comment on my

10   e-mail.  The confidentiality was just one small piece of my

11   e-mail.  There were a number of concerns raised.  For instance,

12   an alternative DIP to take out Arcus is 25 of the 85.  Do they

13   have someone to step in and do the other 60 because I don't

14   know, standing here today, whether CIT will do that.  That I

15   can say on the record.

16             THE COURT:  But, --

17             MR. FELGER:  But, that's one of the concerns I

18   raised.

19             THE COURT:  But, what I'm -- but, that really goes to

20   you've got to give the information so you see if they're going

21   to step up.  I mean, --

22             MR. FELGER:  Well, -- but, also --

23             THE COURT:  -- truthfully, Mr. Felger, I -- you know,

24   I do -- I know that your client was in -- was in and still is

25   in a very difficult position.  And, I'm not unmindful of the

Felger - Argument                                          40

1   fact that Arcus stepped up, and they were there, and it was a

2   difficult situation.  So, I'm not drawing any conclusions or

3   making any determinations.  I'm not getting into good faith and

4   bad faith that everybody threw around in the papers that I've

5   seen.

6         But, -- because, if that's still an issue, I'll be

7   hearing that when we get to the fin -- whether it's today or

8   some other day -- the final approval for the financing and the

9   final approval for a plan.  All those issues will come out

10  unless they all et resolved.

11        MR. FELGER:  Right.

12        THE COURT:  But, -- so, for today's purposes,

13  considering the everybody was trying to go forward in good

14  faith, --

15        MR. FELGER:  Right.

16        THE COURT:  -- that still doesn't mean that other

17  parties to the case don't have a right to know what's going on

18  because we're -- we're doing everything on a very expedited

19  basis, which I'm making the assumption is still necessary

20  because of whatever I -- what I heard at the least hearing --

21  and, I haven't heard anything differently -- that you have to

22  at least give enough information to the Committee and the

23  parties that want to proceed this for you then to come back and

24  say, well, notwithstanding that, this is still the best offer

25  because -- and -- which you may do, you may not do.

1          I -- you know, I know you've got responsibilities

2     under the agreement and it ties up the debtor at certain times.

3     And, that was a lot of the reason that the U.S. Trustee

4     requested and the Court approved certain things in -- that were

5     not finalized in the original financing which tied the debtor

6     up, but still left the Committee with that responsibility to

7     look into the -- the liens, to look into whether there are

8     causes of action, to address the avoidance action position, and

9     all of the other things that, by intention, were left open for

10    the Committee to have a chance to do -- they have to be able to

11    do their job.

12         MR. FELGER:  Right.  No, I -- I simply -- simply to

13    clarify if I misspoke about my e-mail, it wasn't only limited

14    to --

15         THE COURT:  Well, --

16         MR. FELGER:  -- confidentiality issues.

17         THE COURT:  But, -- and, if it was -- and, if it went

18    in detail to whether -- whether this will work or not -- I

19    mean, time will tell.  And, it's going to be a short time.  So,

20    I don't believe, from what I've heard, that the debtor can go

21    for a long time and still make any of this work.

22         So, that being -- that being said, I'm concerned

23    about -- I am concerned about confidentiality.  To the extent

24    that this doesn't end up being the best deal, I don't want

25    there to be a problem with the deal that exists now or the

Sirota - Argument                                        42

1    continuing operation of whatever ends up being the reorganized

2    debtor when we get there.

3                And, I don't think the Committee wants that either,

4    because I have to assume that their constituency wants a

5    reorganized debtor that's still going to do business with them,

6    and so on.  So, I think that everybody wants that same result.

7    And, I'm trying to find if there's a way that we can get there.

8                MR. FELGER:  Right.

9                MR. SIROTA:  Judge, good morning, --

10               THE COURT:  Good morning.

11               MR. SIROTA:  -- if the Court please.  What's so

12   obvious -- what is so obvious to this Court apparently is not

13   so obvious to this debtor that is in a very difficult

14   predicament.  But, unlike the difficult spot that Mr. Felger

15   addressed twice, we're not in a difficult spot.

16               We have not taken this case and assigned our

17   fiduciary duty to a buyer or anyone else.  The fact that Mr.

18   Felger has to go to Mr. Shapiro and ask him whether or not

19   documents can be produced that would run a spirited process,

20   from our perspective, is where all of this drama lies.

21               And, that is, how are we ever going to get to the

22   core issue of whether there are higher or better offers under

23   this very hideous process that's been presented to the Court?

24   If I were to come to Your Honor with a closely held company and

25   individuals and present the first day an application that said

1      my clients are going to be the DIP lender, they're going to be

2      the buyer and the debtor-in-possession, I would expect to be

3      driving back to Hackensack, New Jersey with a Trustee

4      appointed.

5              Now, this process is equally hideous.  And, in fact,

6      it's more hideous because it has the debtor locked up so many

7      different ways that poor Mr. Felger can't even, without

8      worrying about Versa threatening law suits and other things,

9      get us some basic information.  We were dead set against this

10     adjournment today because, frankly, we thought adjourning it to

11     another day would be a complete waste of time.

12             Any adjournment of a process that freezes out the

13     market in a bankruptcy proceeding, to us, is simply so

14     antithetical to the Bankruptcy Code that it didn't deserve to

15     be kicked off a week or a day.  But, Mr. Felger came back and

16     addressed most of our concerns, leaving the most important one

17     open for debate today.

18             And, so, Judge, I think that it's fundamental --

19     whether it's a protective order, the Court does it all day

20     long, the parties do it all day long -- that we get to HIG what

21     they need to tell us whether it's a $25M deal, $85M deal,

22     whether CIT is in or out.

23             But, those requests and those discussions should not

24     go through Versa who's sitting there pre -- telling us that

25     their answer to everything is, don't worry, we're going to file

1    an amended plan and disclosure statement, pat your Committee on

2    the head, throw them another nickel, and everything is going to

3    be fine because the debtor's business judgment is going to

4    control.   We should address today head on that that is a dead

5    end road because a lot of money is going to be spent.

6            Your Honor asked about the Committee representation

7    and duplication.   We are investing a fortune in addressing a

8    defective process when, if the process were open, we could all

9    be on our way to what's done in this court every day, invite

10   HIG or whoever else is out there to participate.   Versa is more

11   than welcome to put more money into this equation and move on.

12           This is not a simple negotiation over a dividend, a

13   506C waiver.   No one on this side of the table is selling out a

14   client because they're going to expand the carve out.   We could

15   care less.   The process needs to be open.   This is the first

16   phase.

17           I will suggest, Judge, that even in giving HIG the

18   documents is not going to avoid the traffic accident on the

19   return date.   We have spent time preparing for today, several

20   witnesses, both cross-examination of the witnesses they

21   produced to you on the first day, as well as other witnesses to

22   talk about this hideous process.

23           And, I respectfully suggest to this Court Your Honor

24   will not be happy with the representations made upon which you

25   relied in entering in these interim orders.   And, we plan to

1   establish to this Court that Your Honor was given, at best, a

2   very, very incomplete story.  And, I'm not going to burden the

3   Court or the record with some of that, at best, incompleteness.

4   But, it's critical that this process be open.

5        And, Judge, I'm not aware of any statutory provision

6   that says, if you hit a certain level of employees, the rest of

7   the provisions of the Bankruptcy Code go out the window.  We're

8   very sensitive to the future of this business.  We're very

9   sensitive to the fact that there are a thousand employees.

10  But, that shouldn't be an excuse for Versa to steal this

11  company under the cover of night with no open and notorious

12  process.

13       The Committee is not going to sell out its fiduciary

14  duties for the prospect that some people do business with this

15  debtor in the future.  They've been guided very carefully.

16  And, they understand that the objective is to maximize value.

17  And, they hear from their lawyers loud and clear that the

18  process presented at this point is exactly contrary to what

19  should be happening.

20       I heard Mr. Felger say he's bound to support Versa.

21  Very troublesome.  He's bound to support the Code and a

22  process, not blindly support Versa.  And, if it's a problem,

23  then I think, at the next hearing, we should talk about who may

24  be free from that binding of Versa and move forward in a much

25  more even keeled fashion.

Sirota - Argument                                    46

1          So, very simply, Judge, we think the documents should

2     be produced.  If we can't agree, as professionals doing this

3     every day, on a protective order to get those documents

4     produced today, then we should stay here and be guided by Your

5     Honor under what conditions they should be produced.  It should

6     be open.  And, then we'll be back here suggesting to the Court

7     hopefully that we have a competitor, somebody who stepped up

8     already prepared to offer more money, but more importantly --

9     not more money, more money in an open process.

10          HIG has said whatever we give to the Committee,

11     that's the base line.  Versa comes in, HIG comes in, and we're

12     off to the races.  We can't have this locked up, Judge.  Thank

13     you.

14          THE COURT:  Let me ask you this one question.

15     Assuming that I order that -- or you work out an arrangement,

16     one or the other -- to get these other documents, which were

17     the four and five of the list that Mr. Felger presented, do you

18     think that an adjournment would be valuable?

19          MR. SIROTA:  I do, Judge, because it would allow HIG

20     to quickly analyze the situation.  And, then we would be back

21     here, assuming things go well, taking out Versa, putting HIG in

22     the DIP seat.  I understand the CIT complexity.  I would like

23     to hear CIT say we'll do a deal with Versa, but not with HIG.

24     I don't believe that will happen.

25          And, if it does happen, HIG will have to evaluate

Brody - Argument                                    47

1      whether they have to write a check for $85M.  And, then we

2      would dispute some of the fees, and tricked up and booby-

3      trapped DIP things that are in there with respect to

4      termination fees and the rest of it.

5               THE COURT:  Mr. Brody?

6               MR. BRODY:  Thank you, Your Honor.  Good morning,

7      Your Honor.

8               THE COURT:  Good morning.

9               MR. BRODY:  Your Honor, at the outset, I'm just

10     confused.  I was always taught that the fiduciary duty of a

11     debtor is to maximize the value of the estate.  You've heard

12     that from both counsel from the Committee who were very hard to

13     follow because they laid it out.

14               Your Honor, HIG came in at the beginning of this case

15     and provided the debtor and the Creditors Committee with a

16     commitment letter to loan the debtor money, $25M, the same loan

17     that Arcus was going to have -- to take Arcus out, but on

18     better terms and, what was most important to us, to open up the

19     process to a competitive bidding, whether it be through a sale

20     under Section 363 or plan -- an open bidding process.

21               And, we were willing to lend the money as long as

22     there was an open process.  If, at the end of the process, we

23     won, that's fine.  If Arcus won or somebody else won, all it

24     does it maximize value.

25               We sent that in, and we didn't hear much from the

Brody - Argument                                          48

1      debtor.  We immediately followed up in days with a full asset

2      purchase agreement -- a full asset purchase agreement, not just

3      a term sheet.  We wanted to show how committed HIG is.  And,

4      the full asset purchase agreement had a purchase price of

5      approximately $83M plus the assumption of various liabilities.

6                 I personally took the plan that they had and tried to

7      make it was comparable with the claims that was set forth in

8      the disclosure statement and the schedules.  And, part of that

9      83 million was a fully pay off or Arcus' DIP and a full pay off

10     of CIT.  So, the question of would HIG come here with 85

11     million -- we've already said that we would.

12                We didn't hear from the debtor.  We heard from the

13     Committee.  The Committee asked us we really want to makes this

14     apples to apples.  Can you do it as a plan?  We want to make

15     sure that nothing falls through the cracks with respect to

16     payment of claims because, from the Committee's perspective,

17     they wanted to make sure that all the claims were paid.

18                And, by the way, as a side note, Your Honor, among

19     the other differences in our proposal, in addition to paying

20     two DIP lenders, was to provide a pot of money for unsecured

21     creditors of $5M -- not 500,000 that the debtor is proposing

22     with a two percent distribution, but 5 million.

23                And, Your Honor, I do -- I do -- absolutely do take

24     to heart what debtor's counsel had said, that the future profit

25     is more important than dividends.  Your Honor, I think that's

Brody - Argument                                     49

1      flipping the cart around somehow because the future profit goes

2      to the owner which, in this case, is Versa slash Arcus.

3              But, we were asked to do it as a plan.  Your Honor,

4      we committed the resources.  We committed the resources, we

5      took the Arcus plan, and we put -- we changed it so that it

6      would -- they could compare the apples to apples, it would

7      create the pot of 5 million, it would do what was being done

8      under Arcus, but better.

9              It allowed for additional payments, for example, to

10     the real estate secured cred -- the real estate taxes, which is

11     represented here by Mr. Klein, and he filed an objection.  It

12     allowed for all the other payments.  And, Your Honor, we had

13     discussions with the Committee.  And, we said, what we want,

14     again, is to have an open process.

15             If this plan is not the most value to this estate,

16     let Arcus or anybody else come forward with more.  Whatever

17     process -- we want to talk process as to how to make this an

18     open competitive bidding.  Again, we'll lend the money so he

19     debtor can survive through either a sale or plan process.

20             If, at the end of the day, we're not the highest and

21     best off, so be it.  That's fine.  But, right now, we are, and

22     we want to have this process.  Again, we didn't hear anything

23     from the debtor.

24             We were asked to submit our due diligence list with

25     respect to both the plan and the DIP.  And, we provided what I

Brody - Argument                                          50

1    think is a short list of documents, documents that should be

2    available to any purchaser.  We got no response from the

3    debtor.  There's a theme here, Your Honor.  And, I apologize I

4    have to say it, but that's what's going on.

5             The Committee came back and said, can you pare down

6    the list for what you need to fund?  If we go forward today on

7    a DIP, what do you need to fund?  Your Honor, we gave them five

8    items.  Five items.  Five items.

9             One, we'd like to talk to CIT.  We'd like permission

10   to talk to CIT.  They haven't responded.  We want to make sure

11   that CIT just doesn't go above their $60M availability, which I

12   don't believe they can under your order anyway.  But, we want

13   to talk to them.

14            Two is we want a competitive process.  Three is we'd

15   like confirmation that the assets actually exist.  And, what we

16   asked for -- and we actually said in my e-mail to Mr. Felger --

17   is the easiest thing is give us a borrowing base certificate.

18   That would do it.

19            We want a revised budget because we'd like to see the

20   actual -- what actually occurred, something they should be

21   putting in to this court anyway.  And, we want an order at the

22   end of the day, if we are the DIP lender, that gives us the

23   rights as a DIP lender.  That's our list.  We never heard from

24   the debtor.

25            Today you hear confidentiality.  Your Honor, it's the

Brody - Argument                                        51

1    first I'm hearing from Mr. Felger that there's any issue of

2    confidentiality.  HIG signed a confidentiality agreement on

3    July 12th, 2007.  It's a three-year confidentiality agreement.

4    So, even if there is any confidentiality issue, we're bound by

5    a confidentiality agreement.

6           The debtor says, well, we're not a debtor-in-

7    possession, so maybe this confidentiality agreement doesn't

8    stand.  They never asked us for a new one.  We'll sign a new

9    one.  That's fine.  It's not an issue.  Certainly the documents

10   we're asking for are not so egregious.  Even if we are a

11   competitor, we haven't asked for customer lists.  We haven't

12   asked for anything that a competitor could somehow twist and

13   use against them.  Your Honor, we've shown our commitment.

14          To add to this, Your Honor, the Committee asked us --

15   we have your letter of commit -- we have your letter of

16   commitment with respect to the DIP.  We have your APA which

17   converted to a plan.  All these have been provided to the

18   debtors as well.  Can you give us other documents with respect

19   to the DIP?  No problem.

20          We provided the debtor and the Committees with a full

21   DIP agreement and a full proposed DIP final order.  We're real,

22   we're ready.  We're committed, we have the funds.  They won't

23   turn over the smallest documents that should be turned over to

24   anybody that walked into this Court in a bankruptcy process.

25          They are tied to Arcus.  They claim they're bound.

D'Auria - Argument                                52

1    And, therefore, they've breached any duty that they have to

2    maximize the value of this estate.  And, as Mr. Sirota

3    correctly stated, perhaps at the return date of the next

4    hearing, we determine who is not bound and who truly can comply

5    with the duties of a debtor -- a debtor-in-possession under the

6    Bankruptcy Code to maximize the value.  A competitive process

7    is the only way, Your Honor.

8            THE COURT:  Thank you.  Mr. D'Auria?

9            MR. D'AURIA:  Thank you, Your Honor.  I'd like to

10   make three quick points, if I could, Judge.  Thank you.  A

11   thousand employees, Your Honor.  If we can get past the hurdle

12   that is being debated involving getting due diligence

13   information to HIG and an adjournment keeps the case alive, and

14   a thousand employees have somewhere to go to work tomorrow, I

15   have no objection to an adjournment.

16           But, secondly, getting the documents to HIG.  We

17   respectfully assert that must happen.  But, more than that, the

18   next step is any document given to HIG for the purpose of doing

19   due diligence, whether it's in the guise of doing a competing

20   DIP or in the guise of doing a competing plan slash sale -- any

21   such information has to be put in some sort of depository.

22           Whether it's a binder, a box of documents, or a room

23   of documents, it's got to be preserved, because the concept

24   that it should be available to the market is one that we are

25   not going to forget to remember at a final hearing on the DIP

D'Auria / Shapiro - Argument                    53

1   or a final hearing of confirmation.  We respectfully assert

2   that -- that any such information has to be preserved in some

3   sort of third copy depository.  And, the only reason why I mean

4   third copy is I'm assuming HIG number one, Committee number

5   two, or whatever, Your Honor.

6           And, my third and last point, Your Honor, is this

7   whole conversation revolves around one point.  Arcus is in

8   control of the debtor and of this process.  And, what I'll call

9   Felger's dilemma -- Mr. Felger is a gentleman.  But, his

10  precarious position is the product of how this case entered

11  into Chapter 11.  But, it's in Chapter 11 now.

12          And, the developments from the first day hearing on

13  March 18th through today have only fueled the concerns that I

14  made at the very outset of that -- of that hearing.  Without

15  belaboring the points, I'll leave it at that.  But, if we're

16  going to get past the hurdle of HIG's documents, my number one

17  point for today on that issue is that the documents should be

18  preserved in some sort of depository so they're available to

19  the market at some other time.  Thank you.

20          THE COURT:  Mr. Shapiro?

21          MR. SHAPIRO:  My apologies for giving the Committee a

22  continuance last time, because apparently they're not

23  interested in giving continuances this time.  They're ready to

24  go forward and beat me up and kill me, and that's fine.  So, I

25  won't make that mistake again.  But, putting that aside, we are

1     here today --

2          THE COURT:  That doesn't mean that the Court

3     wouldn't have granted them -- granted you the adjournment or

4     grant them the adjournment.  I -- I noticed, I did see a lot

5     of little language in there that this wouldn't agree to it.

6     But, I mean, the Court is going to make the final call on

7     whether a case should be -- a matter should be adjourned or

8     not.  And if there's -- if either side doesn't have enough

9     time to respond to something, that's going to be grounds for

10    an adjournment.

11         MR. SHAPIRO:  I appreciate that, Your Honor.

12         THE COURT:  Assuming that the status of the case

13    allows it.

14         MR. SHAPIRO:  Agreed.  Agreed.  Status quo is

15    maintained, at least to today.  And, obviously, we're having a

16    hearing on the continuance that's turning into something very

17    different.

18         I -- I guess, Your Honor, everybody's concerned with

19    the process, and I -- I guess I'm confused myself.  Because

20    every time I see a 363 sale -- and the case is going back when

21    I had a full head of hair and a thin waist -- said, "We like

22    plans because plans give people all the bells and whistles and

23    the rights to beat me up, to depose me, to ask for more money,

24    to prove feasibility, to prove it's fair and equitable.

25    That's what this was designed for.

1        So we're not fighting over a process, we're fighting

2    over which process.  To come here and say that a person that

3    makes a loan, that's providing for it, that has a debtor that

4    is defaulting under an agreement, and then that's a bad thing

5    that they're in there -- we are asking for this process.

6    They're asking for a different process.  If the process is

7    that 1121 doesn't exist anymore, that no debtor is allowed to

8    go forward and try to convince Your Honor through that process

9    with all the bells and whistles that the Committees have and

10   that other parties in interest have, then I don't know what it

11   means anymore.

12       We filed a plan the first day to do that, to start

13   that process, and they're saying, no, we don't want that

14   process.  Well, then, tell me what it means.  We're here, we

15   provided the funding and certainty of completing that process.

16   They're saying, open it, throw that out, and maybe -- maybe

17   they'll convince CIT to come in and stay with them.  Because

18   doing 25 million without the 60 is not going to get you to a

19   process.  And, by the way, Versa, I want you to stay in and

20   fund that -- whatever this new process is.  We appreciate that

21   concept.  What I guess we're saying is, we bought the package

22   before you and we're asking you to look at effectuating a

23   process.

24       Now, there's a lot of fiduciary duty thrown about

25   that Mr. Felger's client shouldn't have done what he did

1    before, and we did something nefarious.  If I were to tell

2    Toyota Motor that I was going to let General Motors make a

3    lien on their assets while they're in a bankruptcy proceeding,

4    you're worried about Versa being in alleged control and

5    pulling a trigger.  You want a competitor who can say today,

6    hmm, there's a great way to get rid of a competitor.  I just

7    won't waive it, there's a default, the assets are liquidated,

8    and I didn't pay a thing to anybody to get rid of my

9    competitor.

10            Do you feel comfortable installing them as the

11   person that's going to run the process?  You think that's

12   better than Arch being there?  I hope not.

13            THE COURT:  Mr. Shapiro?

14            MR. SHAPIRO:  Yes.

15            THE COURT:  I don't -- you know, without all the

16   embellishment, yes, you're right, the process is, the debtor

17   has exclusive right to file a plan.  But there is disclosure

18   information that should be available to parties.  Because the

19   debtor still has to satisfy the Court that what's being

20   proposed is in the best interest of the creditors.  And if

21   that is opposed by the Committee or other -- others, who we'll

22   find out when we get to that point, if we get to that point --

23            MR. SHAPIRO:  If we get to that point.

24            THE COURT:  -- the debtor has to be able to come in

25   and say, we've considered these other options, we see these

1      other options, but this is better because -- and -- and you

2      may be right that, that is what will end up happening, and the

3      Court may approve that.  But I can't do that in a vacuum

4      because there are other interested parties to the process.

5      And I'm not going to cast any dispersions on your client.  At

6      the time -- you know, without getting any -- any other

7      evidence besides what I have before me, I'm not going to say

8      there was bad faith or -- or unfair dealing.

9            Your client wants to make money and get a good deal

10     for themselves, and the debtor was in a difficult position and

11     they felt -- they feel this is the best.  That's what was

12     represented to me.  Your client feels it was the best.  CIT

13     feels it was the best.  But, now, once you get into the

14     bankruptcy, you have other entities that have an interest in

15     there.  And, unfortunately, on day one or two, when you were

16     all here before, we didn't have the opportunity to give all

17     those parties a chance to have all their input, and for -- for

18     very valid reasons, in -- in my estimation.

19           The US Trustee wasn't happy with everything that was

20     in your proposal.  The Court wasn't happy with everything that

21     was in your proposal.  But on that day, based on what the

22     evidence was presented to the Court, that was what this Court

23     saw as being in the best interest of -- of the case.  And, end

24     result, that may be what's happened.

25           I'm not going to be able to -- to prognosticate on

1   what's going to be the best long term.  I hate to see 1,000

2   people out of work, and I don't think there's anybody in here

3   who doesn't think that that's something that's important.  I'd

4   hope that your client feels the same way.  But I -- I don't

5   know -- I don't know, from what I've heard so far, who's going

6   to be the better one to keep those people employed afterwards.

7              And -- and, you know, if we get to the point in the

8   process where the debtor's proposing this plan and wants to go

9   forward with it and -- and presents it, that's going to be

10  something that the Court's going to want to hear.  But, at

11  this point, what's being asked is to provide information.  And

12  the debtor has an obligation to provide information.

13             MR. SHAPIRO:  The debtor has an obligation to

14  provide information to the Committee, which it is doing.

15  That's not what's being asked here.  You're saying to a third

16  party, other than the Committee, who exercises fiduciary

17  duty --

18             THE COURT:  But --

19             MR. SHAPIRO:  -- who is a competitor to --

20             THE COURT:  I understand that.

21             MR. SHAPIRO:  -- to analyze a process -- a process

22  which, unless I missed you say something, you haven't broken

23  yet, or ask you to start a process, then that means breaking

24  it today.  So tell me what process you're doing.

25             THE COURT:  Well, I'm not sure what process that you

1   think I'm breaking.  What I'm saying is --

2       MR. SHAPIRO:  Okay.  We have a plan and disclosure

3   statement coming up.  The Committee has asked for information,

4   depositions, we're giving them that so they can defend against

5   that.  That's the process under 1121.

6       THE COURT:  I understand that.

7       MR. SHAPIRO:  Okay.

8       THE COURT:  But how can the Committee, I guess,

9   assert a position that this is not the -- that there's better

10  offers out there?  Because that is something that was

11  represented by the debtor on day one, that there was -- this

12  was it.

13      MS. SHAPIRO:  Correct.

14      THE COURT:  And this was the best thing for the

15  debtor.  It was the best for the -- it was best for everybody.

16  That was what was asserted and it needed to be decided day

17  one.  And that's what the Court relied on.

18      The Committee's position now, from what they've

19  heard, is that there are better opportunities out there that

20  should be considered.  And they wanted to pursue that, and

21  they need the debtor's information to do that.  I don't think

22  anything that I've heard of that's been asked for is unusual,

23  especially, in light of the fact that they provided

24  information to this potential buyer.  And I recognize that

25  it's a competitor, but, unfortunately, that's what happens in

1      -- in the marketplace.

2            And your client -- you did what you felt was best

3      for your client.  They want the best opportunity to make their

4      -- their investment work.  In the broad spectrum, I don't have

5      a problem with that.  But I'm not going to -- not going to

6      hamstring the Committee's ability to look at this and to

7      assert a position at a hearing that we're going to probably be

8      having very soon on the confirmation of the plan, just based

9      on the limited time frames that are set up here,

10     to --

11            MR. SHAPIRO:  I guess --

12            THE COURT:  -- to refute the debtor's position that

13     this is in the best interest of the estate.  That is basically

14     what they're asking me to allow them to do.  I think they're

15     entitled to have their right to do that.

16            MR. SIROTA:  Judge, can I -- can I just clarify one

17     thing, please?

18            THE COURT:  Yes, Mr. Sirota.

19            MR. SIROTA:  Mr. Shapiro is going to the ultimate

20     the process and Your Honor addressed the confirmation process.

21     The hearing that was on for today that will be adjourned has

22     to do with whether or not this Court can make a finding, at

23     lease initially, of good faith on the debt.  And so the debtor

24     has to come forward -- forget the ultimate confirmation.  And

25     what Mr. Shapiro's client is trying to do is hide the two

1    together to prevent them from replacing the DIP.  It may be

2    that the upshot is that we replace the DIP next week.  And if

3    his client wants to stay in as a plan participant, they can do

4    that.  But the DIP here, and in good faith, comes first.

5           THE COURT:  I mean, we're also here on disclosure,

6    and there were some issues about the viability of the plan, so

7    they do kind of run together.  But, yes, you're right.  I

8    mean, that is a separate issue in and of itself whether the

9    final hearing on the financing should be approved.

10          MR. SHAPIRO:  But the financing provides for the

11   ultimate 1121 and 1129 finding.  I appreciate that you're

12   saying we're going to separate them, but you can't because we

13   didn't come in here as just the DIP lender.  We came in here

14   with a process under exclusivity.

15          If -- if you -- I guess what I'm saying, Your Honor,

16   is, so my client, if you're going to rule the way it appears

17   you're going to rule -- I'm not sure what you're ruling.  I

18   shouldn't take where it's headed.  Your mouth, my apologies.

19   If -- if you're allowing something to happen between now and

20   the final date hearing, then you have to say exactly with whom

21   and what.  And then we have to understand that --

22          THE COURT:  I'm not sure what you're -- what you're

23   suggesting that I'm allowing.  I'm being asked to order that

24   certain documentation be provided to the Committee in order to

25   provide --

1          MR. SHAPIRO: No, but the --

2          THE COURT: -- and to provide to the --

3          MR. SHAPIRO: Okay. Because it's clearly being

4      provided to the Committee. Like, nobody say that we're

5      sitting here saying if they don't have the documents to

6      exercise their duty. They're getting everything that they

7      want. That's not what's being asked. They're saying for you

8      to go outside the Committee and outside their fiduciary to a

9      competitor. That's what's being asked today.

10         THE COURT: But it's not being asked to be given to

11     a --

12         MR. SHAPIRO: That's all --

13         THE COURT: -- competitor. It was asked to be

14     given, I guess, to a competitive bidder, which is a -- which

15     is different. I mean, if it was another lending institution,

16     investment -- investment company, would you have -- take a

17     different position, oh, that was okay because it's not a

18     competitor? I don't think so.

19         I mean, I understand what your position is, but it's

20     not really based on the fact they're a competitor. Your

21     client made a deal they like, and they wanted to go forward.

22     And, absent anything else I've heard, that's -- that's fine.

23     If the debtor wants to pursue that, that's fine. But we're

24     talking about a discovery process that really is inherent in

25     the bankruptcy process. If -- if you want this Court to

1    approve to it, the debtor is going to have to satisfy me that

2    this financing meets its requirements under the code and

3    ultimately the plaintiffs.

4        And I know they are tied together, but there are

5    separate requirements, and -- and a lot of it has to do with

6    -- especially, with a lot of the -- I want to say -- describe

7    it as tie-ups that are in this -- in your financing, which the

8    debtors consented to.  And we -- we specifically left open for

9    the Committee and the US Trustee and the Court to review

10   further.  That's why we had interim and a final.  Parties have

11   a right to look at that and see if that is in the best

12   interest.

13       I mean, quite frankly, when we were here on the

14   first day, I wouldn't have been -- I mean, I expected the

15   Committee to have issues with certain things, but I -- there

16   may -- I fully expected there may not have been anybody else

17   stepping up and we'd be here today just on some of the issues

18   about compensation and distribution and dividend and those

19   things and that was the only thing.

20       But that's not what has happened in the --  in these

21   last two weeks.  And I think the Committee is entitled to

22   explore the position they want to take with regard to approval

23   of the financing and ultimately the plaintiff.  And it's not

24   lost on the Court that in this case and in many cases in --

25   especially in our market today, that the debtor -- I mean, I

1    happen to think the debtor still has a fiduciary duty, but

2    they are in a difficult position, based on what they've --

3              MR. SHAPIRO:  But Your -- okay.  I agree, the debtor

4    is exercising its fiduciary duty now by saying the proverbial

5    bird in the hand.

6              THE COURT:  Well, and -- and, you know -- you're

7    going to have --

8              MR. SHAPIRO:  And -- and we have the go -- all we're

9    asking you is the opportunity to go forward with that.

10             THE COURT:  Today?

11             MR. SHAPIRO:  No.

12             THE COURT:  Okay.  Well, what I'm saying is, I -- I

13   think Mr. Felger is going to have an opportunity to convince

14   me that that is in the best interest of the estate, that it

15   meets the requirements of the code, that it is -- the bird in

16   the hand is the best thing.  And sometimes it is, but the

17   process needs to be open enough for the parties to get -- for

18   the Committee, in particular, because, basically, the debtor's

19   already given up whatever they -- they're going to do in this

20   case.  And it's really burdened -- and the burden is going to

21   be on the Committee.  And I think you recognized that from our

22   first hearing, and it's certainly clear now.  And --

23             MR. SHAPIRO:  I agree.

24             THE COURT:  Right.

25             MR. SHAPIRO:  I'm prepared to deal with it.  And

1    what I'm concerned about is that I have exclusivity, nobody

2    has filed a motion to terminate it yet.  And now you've

3    started -- I'm -- I'm just trying to understand what was --

4            THE COURT:  I'm not -- I'm not -- I'm not saying

5    that they can file a plan or I'm going to consider a plan.  I

6    am looking now at providing the -- for the debtor providing me

7    information that they believe that Mr. Felger believes would

8    violate some of the debtor's requirements to your client,

9    provide information that is necessary for the Committee to

10   make their determination.  I realize that information is going

11   to go to a third party who --

12           MR. SHAPIRO:  That's what I'm --

13           THE COURT:  -- is either they're bound --

14           MR. SHAPIRO:  -- I want to understand.  Who the --

15           THE COURT:  -- by a confidentiality agreement or

16   will be bound by a confidentiality agreement, which I'm very

17   confident that counsel that is before me is completely

18   prepared --

19           MR. SHAPIRO:  Capable of doing that, if that's what

20   Your Honor is instructing?

21           THE COURT:  Yes, without any question.  I have no

22   question that that -- that can be accomplished.  And that is

23   something that is important to the Committee for it to be able

24   to do its job, and I think it's appropriate to allow it.

25           That doesn't mean that Mr. Felger can't argue that

1 notwithstanding that other potential offer, this is better.

2 I'm -- that's what I assume I'm going to hear when we get to

3 the -- to the hearing, unless everybody resolves these things,

4 which I don't foresee that right now.  But I've been surprised

5 before.

6    MR. SHAPIRO:  Never know.

7    THE COURT:  So today I -- I think the Committee is

8 entitled to what they need.  And this is something they need

9 to have accomplished in order for them to their point.

10    MR. SHAPIRO:  I have no issue, I am not arguing

11 before you and trying to stop the Committee from getting

12 anything.  I'm asking you to focus on the piece, when they to

13 whom, for what purpose and why, between now and the --

14    THE COURT:  Well, today -- today they're asking it

15 to go to HIG.  And I realize they're a competitor, and you can

16 put whatever requirements you need to in the confidentiality

17 agreement.  As Mr. Halperin suggested, there's some ways you

18 can -- they're not asking for a customer list or some -- I

19 mean, what's being asked for, I don't think is -- seems to be

20 that, I guess --

21    MR. SHAPIRO:  Troublesome as to what they can do

22 with it.

23    THE COURT:  Overwhelm --

24    MR. SHAPIRO:  Understood.

25    THE COURT:  Right.  Right.  But, you know, if you

1    think there's something in there -- that list that was asked

2    for today that -- that jeopardizes the -- the integrity of

3    your client's interest or of the debtor's interest, Mr.

4    Felger's concern, put some -- some restrictions on with

5    required to it.  I'm more than willing to have a telephone

6    conference.  We can go over anything we want, as long as it's

7    before I'm not here.  But --

8              MR. SHAPIRO:  Well, we would.

9              THE COURT:  And even then, you know, if you really

10   need me, I will be available and I can be available by

11   telephone conference, if you really need me at that time.

12             MR. SHAPIRO:  I --

13             THE COURT:  What I'm saying is, it's incumbent upon

14   the debtor and, I think, to the debtor's advantage to provide

15   as much as possible.  Because when we come back here, if it's

16   still disputed, I'm going to be looking at that.  And if the

17   other side says, well, Judge, if we had this, it would -- you

18   know, it might be different.  I want to know what the

19   difference is.  And then Mr. Felger is in a better position to

20   say why this is a better deal for the debtor.

21             MR. SHAPIRO:  A bird in the hand is better, I

22   understand.  Again, I'm -- I don't mean to harp on it.  I'm

23   still trying to make sure we don't have to come back to you

24   and bother you.  I'm assuming professionals can get through

25   the confidentiality agreement, if that's what you're requiring

1    that I do.  That's not the issue.  Once the Committee gets and

2    HIG gets it, if Sun or somebody else is coming in between now

3    and that hearing, are you starting some process?

4              THE COURT:  Well, I don't know is what -- is my

5    answer to that.

6              MR. SHAPIRO:  But -- but we -- that --

7              THE COURT:  Well, then --

8              MR. SHAPIRO:  That's what they're asking for.

9              THE COURT:  If -- if somebody else comes in, then

10   I'm sure the Committee will say, we want to give this to

11   somebody else.  And you'll say yes or no and you'll work it

12   out, or you'll ask me.

13             MR. SHAPIRO:  But --

14             THE COURT:  And if -- if it's under probably the

15   same terms as this and it involves the similar thing and the

16   same protections can be granted, it may well be that I -- that

17   I will.  I -- I mean, I don't want --

18             MR. SHAPIRO:  I'm just asking, you're not ruling now

19   that they have that right to do that, is all I'm saying.

20             THE COURT:  Well, I'm not -- that wasn't what I was

21   asked to do today, and so I'm not ruling that.

22             MR. SHAPIRO:  Thank you.  That's -- then we don't

23   have to --

24             THE COURT:  But, I mean, I think you can get the

25   gist of where I'm going with it in the general terms.  I don't

1    want to see the debtor harmed.  I -- that's the last thing

2    that I want to see happen.  But, on the other hand, I need to

3    know -- I need to allow the Committee to be able to assert

4    their position adequately on behalf of their constituency, and

5    -- and I believe that that helps Mr. Felger to make his case

6    for the debtor because --

7         MR. SHAPIRO:  He has to make it with me, Your Honor.

8    I'm not -- I'm not arguing that point.

9         THE COURT:  Well -- but I'm saying that Mr. Felger,

10   if he is going to convince the Court that this is in the best

11   interest of the estate -- that this financing is in the best

12   interest that -- ultimately, that the plan proposed is, he

13   needs to be able to convince the Court that nothing else there

14   is better, this is the best.

15        I mean, yes, the debtor has the right to go forward

16   and the debtor has exclusivity and nobody has terminated it at

17   this time.  But that still doesn't mean it's a -- it is a done

18   deal and that the plan will get confirmed that way or the

19   financing will be approved that way, if the Court make --

20   can't make the findings that it needs to, to support that.

21   And supplying information and giving the Committee the

22   opportunity in a very short period of time -- I mean, I -- you

23   know, it's unfortunate, to me, that the Committee couldn't get

24   set up further.  I'm not, you know -- I mean, but it didn't

25   happen until April 1st.

1        MR. SHAPIRO:  That wasn't our --

2        THE COURT:  I know, but I'm just saying, that's --

3        MR. SHAPIRO:  Okay.  Or they're fault either, that's

4  correct.

5        THE COURT:  -- that's -- right, that's where we are

6  today.  They have limited time.  They're spending a lot of

7  their time and effort for maybe little compensation.  As

8  things stand in their mind, they don't know whether they're

9  going to be compensated fully by what money will be available.

10  I -- I'm confident they don't want to see the debtor close up.

11  But if that ends up being what the position the Committee

12  takes, I don't -- you know, that that's as good as what there

13  is, they can take the position.

14        All I'm saying for today's hearing is, they have

15  asked to make these documents available for the potential

16  offer that -- that has been put on the table, and I think

17  they're entitled to get that.

18        MR. SHAPIRO:  For HIG?

19        THE COURT:  For HIG.  If somebody else comes down

20  the pike, I'm sure that, you know, Mr. Sirota or Mr. Halperin

21  will be in touch with Mr. Felger and yourself with regard to

22  that.  And if you think that the terms are similar and that

23  you think that I would probably approve it, you can agree to

24  that, and that's fine.  And if you don't, I will be bothered

25  and I will --

1          MR. SHAPIRO:  Then we'll come back.

2          THE COURT:  -- jump in and do what I have to do.

3     I'm always available by a telephone conference.  I never want

4     attorneys to have to travel more than they have to, to come --

5     I mean, in a way, I'm glad that we actually are having this

6     hearing, even though --

7          MR. SHAPIRO:  There's no hearing, understood.

8          THE COURT:  -- I think everybody wants to have an

9     adjournment ultimately, because in this expedited process, the

10    Court needs to know what's going on as well as everybody else.

11    And I was -- and even though I don't want to drag everybody in

12    here for more times than is necessary, when it came to my

13    attention that there was a request for an adjournment that was

14    going to be forthcoming, I still wanted to have something go

15    forward so that the Court knows where they are.  I don't want

16    to be in a position where we finally come to hearing date,

17    everybody shows up and I'm not sure what's on.

18         MR. SHAPIRO:  Understood.

19         THE COURT:  So I've heard what you have to say.  I

20    understand what you have to say, and I understand your

21    client's position.  But, ultimately, I believe the debtor has

22    a responsibility to provide information that's being -- has

23    been requested by the Committee.

24         MR. SHAPIRO:  I understood.  Thank you, Your Honor.

25         THE COURT:  And if you need an order to that effect,

1    you can submit that, Mr. Sirota and Mr. Halperin.

2              MR. HALPERIN:  I don't think an order will be

3    necessary.  We'll work out something with a confidentiality,

4    unless --

5              SPEAKER:  Your Honor, if you can just so order the

6    record, that's fine.

7              THE COURT:  So order the record.

8              SPEAKER:  Thank you.

9              SPEAKER:  Thank you, Your Honor.

10             MR. FELGER:  I guess it's -- that's all we have on

11   the agenda.  I guess it's time to address a new date before

12   Your Honor.

13             THE COURT:  All right.  Well, I also want to go over

14   a little bit with the objections to the disclosure statement.

15   But since we're -- but I'm not opposed to adjourning because I

16   think the Committee needs more time.  You need to supply

17   information.  I'd urge you to get that as quickly as possible,

18   Mr. Felger.

19             Because, again, if you want to take the position

20   -- if the debtor's position is at the end of, you know, this

21   process or whatever, that this is the best deal and this works

22   best and it should be approved, this is the best financing for

23   the reasons that you've set forth before and whatever else you

24   want to present, you're more than welcome to bring that.

25             But I want to be certain that when that comes on,

1       that the parties have an opportunity to address all the issues

2       before the Court so they can all be met.

3               Mr. Brody?

4               MR. BRODY:  Your Honor, if I could just interject

5       with a suggestion.  So that we don't delay anymore with

6       respect to the documents, as we've said it before, it was our

7       belief -- it was HIG's belief that we were already under a --

8       a confidentiality agreement that was a three-year

9       confidentiality agreement, starting from July 12, 2007.

10              I would suggest that either, one, we continue with

11      this confidentiality agreement and the Court finds that this

12      applies to the debtor in possession, as well as the pre-

13      petition debtor in some way just move things along.

14              THE COURT:  Well, let me do this with regard to

15      that.

16              MR. FELGER:  I haven't seen it, Your Honor.  But I

17      -- I can't comment on that.  I haven't even seen it.

18              SPEAKER:  Nor -- nor have I, Your Honor.

19              THE COURT:  Okay.

20              SPEAKER:  I have copies.

21              THE COURT:  Well, what -- what I was going to say

22      is, when we finish here today, I'll give you the opportunity

23      to discuss it.  You can look it over.  You can -- if the

24      parties agree that that confidentiality will continue and they

25      want that to be approved by the Court and everybody is in

1      agreement, I don't have a problem with that.   If, instead, the

2      debtor wants a new confidentiality agreement, that's fine,

3      too.   Just get it done quickly, get it finalized, so that the

4      documents can be provided, hopefully, within the next day or

5      so.   I mean, that's what I'm hoping for.

6               MR. BRODY:   Your Honor, and that's exactly, exactly

7      my -- my concern.   What we've heard today is Arch arguing the

8      debtor's points.   And I was fearful that the delay in getting

9      a confidentiality agreement from the debtors because we

10     haven't had responses from anything from them.   And then to

11     get the documents --

12               THE COURT:   Well, let me -- let's pick a hearing

13     date that we're going to come back.   Then we'll back

14     everything up with when everything has to be provided.

15               MR. BRODY:   Thank you, Your Honor.

16               MR. FELGER:   Your Honor, can I just -- can I just

17     clarify the record.   We've had a conference call with HIG.

18     I've had a number of telephone conversations with Mr. Brody.

19     We've had email exchanges.   I -- I don't want the Court to --

20     to have the mis -- misconception, misperception that we

21     haven't spoken with them.   I've had a number of conversations

22     with Mr. -- Mr. Brody.

23               MR. BRODY:   Well, I'm not saying we hadn't spoke.

24     I'm sorry, Mr. Felger, if I -- I meant it that way.   Of course

25     we spoke because we never received any comments to any of our

1    documents or our document requests.

2    THE COURT: All right.  Let's get past that for

3    today.  I'm not taking testimony on anybody.  I'm confident,

4    my knowledge of the attorneys who appear before me and I --

5    I'm assuming the others that are appearing here for the first

6    time, that this can be worked out and it can be worked

7    expeditiously.  So what time frame are we looking at?

8    Mr. Sirota, what do you think the Committee would

9    look for?

10   MR. SIROTA:  Judge, I -- I think the problem, as we

11   were comparing calendars yesterday, is that Your Honor wasn't

12   available next Wednesday.  Mr. Felger wasn't available

13   Thursday.  I wasn't available Friday.  And I knew it would

14   then take us --

15   THE COURT:  Well, I am -- I'm available next

16   Wednesday, not the Wednesday after.  Next Wednesday the 23rd,

17   right?

18   SPEAKER:  Yes.

19   THE COURT:  I am available on next Wednesday.

20   MR. SIROTA:  Unless that's too soon for the parties

21   with depositions, then I think the next day would be May 1st,

22   which would be the Thursday after Your Honor returns from --

23   THE COURT:  The problem with that is that -- that's

24   really going to be difficult for me because, number one, I

25   won't have been here for three days and the next day is the

1    Bench Bar Conference.  Even if I were to miss the Bench Bar

2    Conference, which, if it was important enough, I would, it's

3    really going to be difficult for me to do that on the 1st.  I

4    would prefer to do it, if either the end of next week or the

5    week after that.  So --

6            MR. FELGER:  Well, I -- I have -- my problem is, I

7    have a mediation.  I'm the mediator of a matter involving a

8    lot of people next Thursday.  I can move it and I would be

9    prepared to move it if -- if we need to, although, it will

10    upset a lot of people.

11           THE COURT:  Well, you know --

12           MR. FELGER:  And I -- and I think Mr. Patterson --

13    I'm recalling everybody who will need to be there.  I believe

14    Mr. Patterson has a problem next Thursday, as well.  And I

15    believe Mr. Sirota had issues on Friday.

16           MR. SIROTA:  That -- yes, late --

17           THE COURT:  Friday the 25th?

18           MR. SIROTA:  Late Thursday and Friday.

19           THE COURT:  Well, I -- I do have the 23rd.

20    Actually, I -- I moved something else.  I had something else,

21    but I'm going to move that around to the -- or earlier or

22    whatever, so that I could have the 23rd available.  And I

23    guess after the 23rd, it would have to be the week of May 5th.

24           MR. SIROTA:  Judge, I -- I think that if we -- if we

25    said it was next Wednesday, we would all work like dogs, but

1    at the end of the day, we wouldn't get enough accomplish with

2    deposition and documents, Passover.

3            THE COURT:  All right.  Well, that's what I'm

4    thinking.  I -- you know, I -- I'm concerned about the

5    debtor's continued operation, which we really haven't had a

6    lot of time to go on that, so I want to do this as quickly as

7    possible, I'm just not sure --

8            SPEAKER:  Is Your Honor available Monday, May 5th,

9    or is that a motion?

10           THE COURT:  Well, it's a motion day.

11           MR. SIROTA:  We have -- I think we have hearings

12   that day.

13           THE COURT:  We have that week.

14           SPEAKER:  The following Friday is -- is the Bench

15   Bar Conference.

16           (Discussion amongst counsel about upcoming schedule.

17   Unable to determine who the speakers are, they are speaking

18   over one another.)

19           MR. BRODY:  I'm sorry, Judge, May -- does May 5th

20   work?

21           THE COURT:  I have motions that day.  It's my first

22   motion day after I've been away, so -- I don't have motions

23   the next -- the week of the 28th, so it makes that a very

24   tough day.  I mean, I have the afternoon available, but I -- I

25   don't think we're going to be able -- assuming we're as

1    contested as we are now, I just don't see us finishing in a

2    couple hours.  I -- I need a whole day.

3              MR. SIROTA:  I think -- I think more.

4              THE COURT:  Right.  I'm saying, I -- I need a whole

5    day and maybe more, so I -- you know, I -- I'm not

6    participating in the Bench Bar Conference myself.  I mean, I

7    would be going, but I'm not participating.  I -- I don't know

8    if anybody else is.  I don't want to tell --

9              SPEAKER:  I'm going to be speaking, Your Honor, and

10   the last thing I want to do is -- is annoy the President of

11   our Bar Association --

12             THE COURT:  Okay.

13             SPEAKER:  -- or --

14             THE COURT:  I'm just saying that, you know, in

15   urgency, I mean, maybe we could start and -- and do some time

16   then.  But I -- I -- I'm not -- I don't want to do then.  If

17   somebody -- if you're participating, then that doesn't work at

18   all.  So, like I said, I had the 23rd.  Nobody can do the

19   24th.  And the -- and then we've -- we've got the next week.

20             SPEAKER:  6th and 7th, I guess, it sounds like.

21             THE COURT:  I have a trial with a pro se debtor that

22   I have rescheduled and I have made a firm date on the 6th.  I

23   -- I mean, it's certainly not -- doesn't involve as many

24   people as this case, but I have made this -- I've had to move

25   this a couple times, and I've told the parties that it will

1    not be moved from that date.  I have a possibility that I

2    could do the 7th.  I have Chapter 13's, but if -- if I can

3    find another courtroom to have those go forward, it's possible

4    that I could have that date.

5              SPEAKER:  Mr. Brody was just gracious enough to say

6    that he could have someone fill in for him the day of the

7    Bench Bar.

8              THE COURT:  Ms. Vuocolo, I think, would

9    be --

10             SPEAKER:  She just got volunteered.

11             SPEAKER:  What -- what am I standing on?

12             (Discussion amongst counsel about scheduling.

13   Unable to determine who is speaking, they are speaking over

14   one another.)

15             SPEAKER:  What's the topic?

16             MR. BRODY:  Interesting enough, it's -- it's whether

17   a sale should be done through a plan or through a 363.

18             THE COURT:  So should we invite the Bench Bar here?

19             SPEAKER:  We could have it here, Your Honor.

20             MR. D'AURIA:  Your Honor, being the lowest ranking

21   member in the room, I -- I hesitate to mention my

22   participation at the Bench Bar.  I'll be here.

23             THE COURT:  All right.

24             MR. D'AURIA:  Judge Kaplan will not be unhappy with

25   me, but I'll deal with that.

1    THE COURT:  Well, we wouldn't want to do that, Mr.

2    D'Auria.  I -- I don't think the Bench Bar date is going to

3    work.  I don't think the 2nd is going to work.

4    SPEAKER:  Thank you, Your Honor.

5    THE COURT:  I get -- I mean, I could -- we could do

6    this on the 1st.  I'm -- I'm just telling you that it will be

7    difficult to -- to get everything.  I -- I mean, I probably

8    will not be able to give you my decision immediately.  That's

9    the only -- I guess it's the only day that I can find left is

10   the 1st.

11   MR. SIROTA:  That would be wonderful.  Even if we

12   had to wait for a decision, Judge, at least we'd get the

13   show --

14   THE COURT:  Because I -- you know, I'm sure that

15   you're going to be filing things between now and then, and I'm

16   not going to be here for a couple -- I mean, I do have a -- I

17   mean, I have access on my BlackBerry but I don't -- the size

18   of these documents will probably not fit on there.

19   MR. SIROTA:  One of the conditions was that we set a

20   time frame so that we're not getting submissions at 8:30 in

21   the morning before --

22   THE COURT:  All right.  Perhaps that would be the

23   way to do it.  Because that's the only day I -- I think is

24   available.  I really don't want to do that, but I'm going to

25   be forced to do that.  I -- I just don't see any other day

1    that we have.  And it is a day that I don't have anything

2    else, and it's the only -- and I don't have any other court

3    because I knew I was coming back and I would have things to

4    do, so this is going to be it.

5          What I'll say is, we're going to have to set the

6    deadline for filing before the -- before that week for

7    everything that we do.  So let's -- let's put it down for May

8    1st.  Let's backtrack.

9              MR. FELGER:  10:00, Your Honor?

10             THE COURT:  10:00.

11         Let's backtrack back to the confidentiality

12   agreement and the documents.  I'm going to -- I'm going to

13   order that either the parties work out an extension of what

14   was entered into before -- and, obviously, it has to be

15   reviewed and -- and everything.  Or -- or prepare a new one

16   and get that into place by tomorrow.  You can do it this

17   afternoon or tomorrow.  And that would then -- and in the

18   meantime, the debtor could start assembling the documents.

19         Is there any reason why you couldn't provide those

20   by Monday?

21             MR. FELGER:  I -- I don't think so.  I mean, there

22   are -- there are requests for customer information and we'll

23   need to talk about that, but --

24             THE COURT:  I think Mr. Brody said that wasn't

25   crucial for right --

1          MR. BRODY:  Your Honor, if I can make a suggestion.

2     We have taken from the list, which is about a page-and-a-

3     quarter and we parceled it out to the DIP, the DIP of the five

4     issue things that I asked for.  I think by Monday, we should

5     have the information we asked for for the DIP and the rest of

6     it prior to the hearing coming up.  But, I think there's no

7     reason why the limited things that we've asked for, including

8     the ability to talk to the CIT and the borrowing base

9     certificate, which is -- and the new budget basically --

10          MR. FELGER:  That -- that's not a problem.

11          THE COURT:  Those will be -- those should be

12    provided by Monday.  Let's say the balance of the documents --

13    and -- and you can work those out.  I will be here next week,

14    so if you need my input, you know, we could try to have a

15    phone conference or something if you can't work it out.  Let's

16    say by Thursday the 24th.  It still gives us Friday if we need

17    to do something afterwards or we need extension or whatever

18    else.  And any pleadings I also need to be filed by the 24th,

19    so at least I can get those and have those before I go away.

20          MR. SHAPIRO:  And concluding the amended -- excuse

21    me, the amended plan and disclosure statement?

22          THE COURT:  If you want to -- if you can do that by

23    that time, that would be fine.  But anything -- I know the

24    Committee wants to provide additional objections to the -- the

25    financing.

1          MR. SIROTA:  Judge, we -- we -- initially, when we

2     were talking about a Wednesday hearing, I think the

3     anticipation was that the amended plan and disclosure

4     statement would be filed today.  The reason I raise that is,

5     there's going to be documents produced by the debtor and Versa

6     to us and depositions taken.  And that give us --

7          THE COURT:  When are they scheduled, the deps?

8          MR. SIROTA:  Well, we're -- we're about to work that

9     through, but I --

10         MR. SHAPIRO:  We're going -- right, so I -- I wanted

11    to wait till after that was done.  No sense amending something

12    or have him file an objection, asking for another amendment

13    until --

14         THE COURT:  I just need you to do that before I go

15    away.  Because I want to see them before I go, so I can take

16    everything with me and --

17         MR. SIROTA:  I would ask that those pleadings be

18    filed, since one pleading has already been filed, by Monday

19    the 21st; their documents be produced by the 22nd.  We'll then

20    schedule depositions 23, 24, 25 or, if need be, 28 and 29.

21    We'll work that out.  But we were on a much faster track --

22         MR. SHAPIRO:  I don't -- I don't agree to fix what

23    Your Honor hasn't given me a list yet.  The 13 objections and

24    the objections of all the Committee by Monday, when we have a

25    May hearing on a disclosure statement.

1   MR. SIROTA:  Well, until -- until today, last night,

2   we were told that the amended plan and disclosure statements

3   would be submitted to day.

4   MR. SHAPIRO:  I -- I never said I would submit it.

5   MR. SIROTA:  I was actually talking to the debtor

6   about it.

7   MR. SHAPIRO:  Yes, well, I was drafting it so --

8   okay.

9   MR. SIROTA:  Right, until we saw 12 objections and

10  realized we had to adjourn here.

11  MR. SHAPIRO:  Until we saw 12 objections and we

12  stopped.

13  THE COURT:  All right.  Well, let's -- let's --

14  MR. SHAPIRO:  Okay.  Sorry.

15  THE COURT:  Have you had an opportunity to look over

16  the objections?

17  MR. SHAPIRO:  No.

18  THE COURT:  No?

19  MR. SHAPIRO:  No.  We were preparing --

20  MR. FELGER:  I -- I have not -- I certainly have not

21  perused them.  I flipped them.

22  THE COURT:  How about the ones -- I mean, there's a

23  -- there's a bunch of them, I'm going to say, that involve

24  environmental issues.  You haven't looked at those, really,

25  and --

1          MR. SHAPIRO:  No.

2          THE COURT:  -- and analyzed whether those -- well,

3     let me ask you, when do you think you can have the -- the

4     amended disclosure statement and plan finished?

5          MR. SHAPIRO:  When are the depositions being taken,

6     next week?

7          THE COURT:  Well, you're going to work that out.

8          MR. SHAPIRO:  Okay.  I apologize, Your Honor.  Do

9     you want to give me your list?  I didn't -- you said you had a

10     list of disclosure statement --

11          THE COURT:  I will -- I will --

12          MR. SHAPIRO:  Okay.

13          THE COURT:  I will give you that.

14          MR. SHAPIRO:  I understand.  So --

15          THE COURT:  Some of mine are -- are the same as some

16     of the others.

17          MR. SHAPIRO:  Understood.  I'd like till Friday the

18     -- April 25th.

19          MR. SIROTA:  For the disclosure statement hearing

20     then to be on the 1st?

21          THE COURT:  Yes.

22          MR. SIROTA:  I think it should be before, Judge.

23          THE COURT:  Well, I'm going to say the 24th anyway,

24     because I need to have it.  And if it comes in at the end of

25     the day on the 25th -- and then I would ask --

1          MR. FELGER:  The 24th is fine, Your Honor.

2          THE COURT:  -- the 24th.  And I would ask that you

3     deliver a hard copy version to chambers, because, you know, I

4     -- I just -- I want to be able to get my hands on it, take it

5     with me, and --

6          MR. SHAPIRO:  Understood.

7          THE COURT:  You can electronically file it, but I --

8     I need to get --

9          MR. SHAPIRO:  We mail the copy.  Okay.

10          THE COURT:  And you can come anytime towards the end

11     of the day, because I -- we can get it actually -- even if you

12     have to deliver it after hours, I'm not concerned about that.

13     I won't look at until the -- until the 25th.  But I need it to

14     be available by then.  And then if there's an issue, I'm still

15     here on the 25th if the parties need me for anything.

16          MR. SIROTA:  What about the production of documents,

17     which are needed pre-depositions?

18          THE COURT:  Which ones are those?

19          MR. SIROTA:  The documents?  This --

20          THE COURT:  Well, are these the five things that Mr.

21     Brody asked for or other things?

22          MR. SIROTA:  These are -- these are the subpoenas

23     and the documents that Mr. Felger referred to that --

24          THE COURT:  That he was getting ready and he --

25          SPEAKER:  For him, correct.

1          SPEAKER:  That's right.

2          THE COURT:  -- had just about ready?  Was that --

3    are those -- is that what I'm talking about -- we're talking

4    about?  You said that --

5          MR. FELGER:  Yeah, there's a rule of 2004, a

6    subpoena issued by the Committee.

7          THE COURT:  Right.  And you said that there were

8    many areas and you were trying to work them out with Mr.

9    Sirota, but most of it was things that you were going to be

10   able to do, right?

11         MR. FLEGER:  Yeah, we've given a lot of it to them.

12   I'll -- I'll get on the phone with Ms. Vuocolo this afternoon

13   and we can go through it again and --

14         THE COURT:  Well, let's see that by Monday you

15   provide all that.  Because they do need that information for

16   their depositions.  You know, I realize this is burdensome for

17   everybody, but if you need this to be done quickly, it just

18   has to be the way it is.

19         MR. SIROTA:  And then we will schedule the

20   depositions -- we'll work with the parties -- probably that

21   week, if not, no later than the Monday after.

22         MR. SHAPIRO:  I'm sorry, are we talking about the

23   week of the 21st?

24         MR. SIROTA:  Yes.

25         MR. SHAPIRO:  Okay.  Okay.  And that would include

1    HIG as well, Your Honor.

2              THE COURT:  Include them as far as what?

3              MR. SHAPIRO:  Depositions.

4              THE COURT:  Okay.  Whatever the parties think --

5              MR. SHAPIRO:  And we'll -- we'll talk about that.

6    They're all to be completed during that time period.

7              MR. BRODY:  Your Honor, I don't know why the DIP

8    lender needs to take the deposition, but we'll talk about

9    that.

10             THE COURT:  Well, work it out, or let me know what

11   -- what the problem is.

12             MR. BRODY:  Your Honor, one last date.  The -- we

13   have prepared a motion to terminate exclusivity on short

14   notice.  We'd like to have the return date on May 1st.  We can

15   have it filed by the end of business today.  Mr. Shapiro

16   believes, on behalf of himself and apparently the debtor as

17   well, that the process of exclusivity is so important and it

18   should never be broken unless pursuant to the bankruptcy code.

19   Therefore, Your Honor, we would like to put before you a

20   motion to terminate exclusivity.

21             MR. SHAPIRO:  I'm sorry, Your Honor, HIG is doing

22   that?  They are what again?  I competitive --

23             MR. BRODY:  Your Honor, we are also a creditor.

24             MS. SHAPIRO:  And they bought a claim.

25             MR. BRODY:  And Mr. Shapiro is aware of that.

1            THE COURT:  You know what, file it, I'll look at it.

2       I think it --

3            MR. BRODY:  Thank you.

4            THE COURT:  You know, if I think your paper is

5       warranted to be and I will consider it, it may be a good thing

6       to get this out at the time that we're here and -- and deal

7       with the issue.

8            MR. BRODY:  Thank you, Your Honor.

9            THE COURT:  Because that would kind of hone on that

10      issue that you brought up, Mr. Shapiro.  If the Court denies

11      that, then the issue of the exclusivity continues.  I mean,

12      you know, it's -- it's unusual to -- to terminate exclusivity

13      so soon, so I -- I'll need to see what they say about.  I -- I

14      wouldn't --

15           MR. SHAPIRO:  As long as there's --

16           THE COURT:  I'll be honest with you, Mr. Brody, even

17      if I -- if I reduce it to the -- to the 1st, I don't know that

18      I'll be able to decide it on the 1st.  I might hear it on the

19      1st, but I'm not going to have a lot of time to go over this

20      with my law clerk and get -- and get it ready for the 1st.

21           MR. BRODY:  Your Honor, we understand --

22           THE COURT:  But I'm -- I'm just -- I want the

23      parties to understand, I will do my best to be prepared for

24      whatever we have to do on the 1st, but it's -- if things

25      change and they come in late and there's a lot of other

1    issues, they may be taken under advisement because I'm just

2    not going to be able to handle it.

3            MR. BRODY:  Your Honor, all we're trying to do is

4    create an open and competitive process.

5            THE COURT:  I understand.  But what I'm saying is --

6            MR. BRODY:  But I understand.  Thank you.

7            THE COURT:  -- if you make your application and I

8    grant it and I put it on for the 1st, I may consider it, but

9    I'll take it up at the time as to whether I can actually

10   decide it at that time or whether it's appropriate.  You know,

11   all of those issues will still be open.

12           Mr. Sirota?

13           MR. SIROTA:  Judge, when should parties submit a

14   disclosure of witnesses and documents they plan to introduce

15   at the hearing?

16           THE COURT:  When do you feel you could do that?

17           MR. SIROTA:  We're -- we're at a little bit of a

18   disadvantage because our depositions --

19           THE COURT:  I mean, personally, I don't care, you

20   can do that on the 30th, as far as I'm concerned, because

21   other than trying to -- I mean, you know, we may not be able

22   to finish on the 1st, I don't know.  But --

23           MR. SIROTA:  I would just ask one thing, Judge.

24   That should be okay with a final list, but if there are

25   surprises -- for example, we know who they've produced during

1    the first day.  There should be a disclosure next week,

2    subject to amendment, as to who they intend to call.

3           THE COURT:  Do you have an idea, Mr. Felger, what

4    you're planning to present?

5           MR. FELGER:  Well, I -- I haven't seen the motion to

6    terminate exclusivity.  I mean, that could change --

7           THE COURT:  Well, I --

8           MR. FELGER:  -- change everything, so --

9           THE COURT:  I don't -- let me say this.  If I

10   shorten that to that day, I don't plan to do it on testimony.

11   I mean, if I have to have -- take testimony, there's no way I

12   can finish -- I can do that on the 1st, if that's what the

13   issue is.  If there's legal issues, I can consider them.

14   So --

15          MR. SHAPIRO:  Your Honor, I'm sorry, terminating

16   1121 is for cause, so you're going to have to have facts.

17          THE COURT:  Right, I --

18          MR. SHAPIRO:  So if you want to add another hearing

19   now, then that's -- we hope not, so we can --

20          THE COURT:  I just don't know -- Mr. Brody,

21   honestly, I just don't know that I could -- that I'll have

22   time to do that on the 1st.

23          MR. BRODY:  We understand, Your Honor.  We're just

24   trying to create the process.

25          THE COURT:  I -- I understand that, but I'm probably

1   going to have to put your motion on another day, even if it's

2   after the 1st.  You can make your argument, but I -- I don't

3   think the parties can get ready for that and do the, you know,

4   due diligence, if you want to call it that, to be ready for

5   that -- that contested motion with --

6          MR. SHAPIRO:  With a discovery statement and a DIP

7   hearing.

8          THE COURT:  Right.  With the -- with the disclosure

9   statement.  And the -- and the financing, which I think will

10  take the bulk of the time that we're there.  I mean, I look at

11  the disclosure statement hearing as whether it's adequate.

12  And we're going to get into a little bit of that now, too.

13         But, you know, unless something so overwhelms me in

14  the evidence that I find that it's patently unconfirmable, I'm

15  just going to look at whether it has enough information to get

16  to the next step, which is confirmation of the plan.  I know

17  some of the objections had to do with confirmability of the

18  plan, and I don't know if that's going to happen with -- I

19  mean, there's not testimony that's really that necessary with

20  regard to that, but with the post-petition financing and

21  parties' position, I know that's going to take a lengthy

22  period of time.

23         And so in -- in reconsideration, I think it's better

24  if we put your motion on another day.  But you certainly can

25  assert that you've made that motion, if -- if that's the way

1    it comes out.  Okay?

2              MR. BRODY:  Thank you, Your Honor.

3              THE COURT:  All right.  Back to the -- the question

4    of filing the list of -- we're taking the motion to limit and

5    terminate exclusivity out, Mr. Felger.  So when can you have

6    your list of witnesses on the two -- well, on the one issue?

7    Really, adequacy of disclosure statement, I don't really feel

8    that that's going to require a witness list.  But, I do --

9    but, the approval of post-petition findings, do you know

10   already who you'll be calling for that?

11             MR. FELGER:  I suspect we can give that list --

12             THE COURT:  Well, let's say this, the parties will

13   exchange their lists, as they anticipated, on Monday the 21st,

14   and may be supplemented up until Friday the 25th, if

15   necessary.

16             MR. FELGER:  That -- that's fine.

17             THE COURT:  If something happens in one of the

18   depositions or in some of the information --

19             SPEAKER:  Thank you, Judge.

20             THE COURT:  -- you can add a witness, if you think

21   it's necessary.  I mean, I only have so much time on the 1st.

22   I'd ask you to try to be --

23             SPEAKER:  Kind.

24             THE COURT:  -- as cognizant as you can of that.  I

25   mean, if you want me to try to finish this on the 1st.  So I

1    mean, if it's -- there's 20 witnesses, it's just not going to

2    happen.  So -- but if something comes up that really, you

3    know, says to the Committee or the debtor or Arch or HIG that

4    there's something else that's needed, and if some other

5    witness really needs to be heard, then supplement by the

6    plaintiff.

7         Anything else that -- time-wise that we need to do?

8    You're going to have to set up your own discovery -- your own

9    deposition schedule.

10        All right.  Let's spend a few minutes, Mr. Felger,

11   just going over the objections that have been filed to the

12   disclosure statement.  And let me just indicate a few of the

13   issues that I noted myself that have been either brought up by

14   other parties or I felt are something that you need to -- to

15   address.  And I would -- will say that I did see the

16   supplement to the plan, and I really didn't have enough time

17   to really analyze it.  I tried to have my law clerk look at

18   how some of the documents may have changed.

19        Let me ask you a -- a substantive question here.  In

20   reviewing the financing agreement that Arch presented as part

21   of the supplement, I didn't see as part of the secure --

22   security interest that -- a security incident in avoidance

23   actions.  Is that a change from the original, or did I miss

24   that?

25        MR. FELGER:  In the -- in the exit?  You mean the

1      exit commitment?

2           THE COURT:  The -- the financing -- yes, the

3      commitment --

4           MR. FELGER:  Yeah, there were --

5           MR. SHAPIRO:  The commitment is for exit.

6           MR. FELGER:  Right.

7           MR. SHAPIRO:  So at that point --

8           THE COURT:  Okay.

9           MR. SHAPIRO:  -- we're not -- there would be no

10     liens --

11          THE COURT:  You haven't changed your position,

12     that's only as to exit.  Okay.

13          MR. SHAPIRO:  Correct.

14          MR. FELGER:  Right exactly.

15          THE COURT:  There were -- were a number of

16     objections that dealt with the debtor's requirements to meet

17     the absolute priority rule in the event that 1129(b) comes

18     into play, and I -- I'm not sure if you addressed that

19     sufficiently, but I think you should keep that in mind to

20     address that if it isn't.

21          There was also a provision in the disclosure

22     statement and plan that provide for the extinguishment of the

23     inner company claims, and I don't think that you adequately

24     described the inner company claim and indicated why it's

25     advantageous to extinguish those claims, and if there -- and

1     if there's reason or not reason to kind of merge those claims

2     together, which is, essentially, what the debtor is doing.

3     Are there -- are the claims of one entity significantly

4     greater than others?  Are they all the same?  Do they have the

5     same creditor -- creditor claimants, any of those things.  I

6     think somebody referred to it -- one of the objections

7     referred to it as kind of a substantive consolidation without

8     explanation.

9              MR. FELGER:  Yeah, we're -- we're not substantively

10     consolidating the entities.

11             THE COURT:  Well -- but -- but I think that you need

12     to --

13             MR. FELGER:  But I -- I understand your point.

14             THE COURT:  -- specifically address, as far as

15     disclosure, as to why that -- that is an appropriate procedure

16     and information as to what those claims are and -- and why

17     they're addressed the way they are.

18             MR. FELGER:  Okay.  Understood.

19             THE COURT:  Class 8 I'm going to call environmental

20     class.  It involves the DEP and EPA.  I didn't find any

21     detailed explanation about, number one, what the basis of the

22     environmental liability of the debtors is; why the amount

23     that's being proposed is appropriate to deal with that.  Does

24     that pay it in full?  Does it pay it in part?  Does the debtor

25     have any continuing liability?  Will those regulatory

1    authorities have any ability to proceed in the future and what

2    their claims are.   And what about the other parties that have

3    filed a slue of objections that I assume are related to those

4    environmental issues, but I can't tell because I don't think

5    the debtor has disclosed enough about those.

6              Okay.   What is the interest of Crown Credit?   They

7    are -- they're a class --

8              MR. FELGER:   Purchase money security interest

9    holder.

10              THE COURT:   For certain particular equipment?

11              MR. FELGER:   Yes.

12              THE COURT:   All right.   Again, I shouldn't have to

13   ask you that question because it should be explained as to

14   what -- what that entity is.   Each class should -- should be

15   clear -- that was one that I didn't really know what they

16   were.   You need to explain the claim -- each claim class and

17   -- and what it encompasses.   I noted on the docket, there was

18   one notice of reclamation filed, and I didn't see anything in

19   the plan that dealt with reclamation claims, if there are any,

20   if they're valid, how the debtor will deal with them, if --

21   and so on.

22              So I think you need to deal with that.   I also

23   didn't see any list -- there's a section that deals with

24   disputed claims but nothing that designates which claims are

25   disputed and the amounts of those claims and --

1          MR. FELGER:  Yeah, we have that issue under the

2     local rule because we're --

3          THE COURT:  Right.

4          MR. FELGER:  -- proceeding in -- in advance of the

5     Bar date.

6          THE COURT:  Well, I understand that, but -- but

7     here's the reason for that local rule, so I can explain why --

8     why we Judges felt that that was important.  It's hard for

9     somebody to vote if they don't know if they're claim is

10    disputed or not.  You know, a creditor may have a million

11    dollar claim and say, okay, I'm -- I'm happy with 10 percent

12    or 2 percent or whatever it is.  But if they don't know what

13    they're claim is, then there's no way they can -- they can

14    make an adequate determination of whether their claim is

15    potentially substantially less than it was.

16         So I think that the debtor, even though all the

17    claims haven't been filed, since you've got the debtor's list

18    of claims, needs to at least give their best estimate of -- of

19    what the claims are, of what the validity is, and of the -- of

20    the basis for objecting to claims that they believe are

21    disputed.  Since you may not know what they are, you can make

22    it, I guess, an estimate.  We expect the claim to be X, even

23    though they haven't filed a claim yet.  This is how we

24    scheduled them, and since they haven't disputed that, we're

25    going to go by what we believe it is, but it's disputed

1    because or it's disputed in this amount, so that that creditor

2    at least has notice that their claim is going to be disputed,

3    and they can take that into consideration when they make a

4    determination of how to vote on the plan.

5         I know there's -- there's a lot of issues which I

6    noted down about the releases.  I'm not sure it needs more

7    disclosure.  I guess maybe perhaps why the debtor believes

8    that this negative notice -- which is the way I'm going to

9    call it -- is in the best way to deal with the current case

10   law dealing with, without making a legal conclusion, but just

11   factually why you believe that this, I guess, meets what the

12   debtor needs to show, and this is a fair way to proceed to --

13   to get to that point.

14        And -- and I think you could use a little more

15   disclosure with regard to the -- what you referred to as the

16   optional release provisions as to why you think that the

17   amount that's being offered there is sufficient consideration

18   for what's being asked the creditors to do with that, which

19   is, essentially, a consent to the releases to share $100,000,

20   if I understand correctly.  And --

21        MR. FELGER:  That's correct.

22        THE COURT:  -- you know, in my rough calculation, a

23   million dollar claim would get like one cent.  So, you know, I

24   -- you need to address why that -- why that's a good -- you

25   know, why creditors should believe that that's appropriate.

1        MR. FELGER:  Understood, Your Honor.

2        THE COURT:  I'm not going to get into all the -- the

3    issues, but I think when you're asking in the release section

4    in the exculpation, again, why the debtor believes that this

5    is in the -- in the benefit of the creditors, and they should

6    vote for it.  If the answer is, this is the only way it works,

7    well, maybe that's the answer.

8        But I think that that's -- that needs to be -- we're

9    talking about adequacy here.  We're talking about disclosure

10    and information for creditors to make an informed decision.  I

11    think you need to explain why the debtor believes this is

12    appropriate.

13        MR. FELGER:  Right.

14        THE COURT:  You filed the late -- you filed that

15    late supplement, which addresses some of the issues.  I didn't

16    really have time to go over all of it.  I think some of that

17    maybe should be part of the disclosure statement and not just

18    part of the plan.  So in your -- when you're going over this -

19    - for example, liquidation analysis, that should be part of

20    disclosure, not just a supplement to the plan.  And, although

21    you refer to it, I mean, a creditor should be able to hold

22    that disclosure statement as well as the plan --

23        MR. FELGER:  Right.

24        THE COURT:  -- and know exactly what the debtor is

25    offering, what's being asked and -- and be adequate in order

1    to make a determination based on that.  So I'd like you to

2    look that over and see if some of that documentation doesn't

3    belong in the disclosure statement.

4         MR. FELGER:  So what we -- what we would do is we'd

5    attach the plan as an exhibit to the disclosure statement and

6    the liquidation analysis would be --

7         THE COURT:  Okay.  And refer to --

8         MR. FELGER:  -- an exhibit to the -- and exhibit to

9    the exhibit.

10        THE COURT:  -- that exhibit in your -- in your plan

11   -- in your disclosure statement.  That would be fine, as long

12   as -- as long as it's easy to -- to put -- the creditor to put

13   their hands on it.

14        MR. FELGER:  Certainly.

15        THE COURT:  Collective bargaining agreements.  I

16   really didn't see much disclosure about that at all, and I

17   have concern about their -- I didn't hear anybody respond

18   today that they're here representing any of the unions.  I

19   know there's a lot of nonunion employees, but there's also

20   union employees.  It's kind of a vague assertion that we're

21   going to try to work this out, and if not, we're going to

22   reject.

23        Well, if you need to reject, can you meet the

24   standards that the codes requires in order to reject and why

25   you think that that's appropriate, and what the debtor's

1      position in a lot more detail that's there.  I think that

2      those creditors definitely need and require detailed

3      explanation so they can make a determination of whether they

4      can vote on this plan, whether they oppose the plan, and --

5      and how it affects them and the members of their -- their

6      union.

7                MR. FELGER:  We'll do that.  The -- the parties are

8      in negotiations, Your Honor.

9                THE COURT:  Well -- and if you're not at the point

10     where you've resolved your negotiations, I think you at least

11     have to give more of a disclosure than you have as to how

12     you're going to implement that.  And you -- it can be

13     alternatively.  We're going to work this out by -- I mean, I

14     don't know what the debtor's -- I can't tell from it what the

15     debtor's position is.

16               Does the debtor think they're going to keep these

17     collective bargaining agreements?  Are they going to modify

18     these collective bargaining agreements?  Are they going to

19     reject them?  And if they do one of those three things, how

20     does that affect that union, that -- that agreement and

21     whether it meets the code provisions.  I found it was -- your

22     disclosure statement was very lacking in that area.

23               Although this is part of the -- the avoidance action

24     lien that you're proposing to give to the creditor as part of

25     the -- the post-petition financing, I guess maybe by the time

1    they vote on the plan -- on the plan, that might be a done

2    deal, I don't know.  But I think that the fact that these

3    avoidance actions that would belong to the estate by virtue of

4    the filing of the bankruptcy that had been pledged by the

5    debtor to Arch's part of the financing, I think that needs to

6    be disclosed to the creditors that that's not going to be

7    there if the post-petition financing, as has been proposed, is

8    approved.  And the plan provides that they would not have this

9    asset.

10          Anybody that wants to add to what I mentioned?

11          MR. SIROTA:  Judge, I would just ask on your last

12   point that it be accompanied with some sort of economic

13   statement.  Do they know what the potential preferences are in

14   avoidances actions, and creditors should know that --

15          THE COURT:  To the best that the debtor can -- can

16   ascertain what they think that is.

17          MR. SIROTA:  But I think, most importantly, there

18   has to be an explanation that there's been a proposal made

19   that, in fact, a -- a plan --

20          THE COURT:  Oh, that was another -- that was -- that

21   was your issue, not mine.

22          MR. SIROTA:  -- a plan has been filed and HIG has

23   stepped forward, so creditors can see in black and white what

24   the debtor is suggesting and what the debtor prevented.

25          THE COURT:  Right, I -- I agree with Mr. Sirota that

1    that needs to be disclosed.  Certainly, the debtor can take

2    the position that it's not as good an offer, that it's better

3    to go with the -- the offer they have for the reasons they

4    think.  But that's -- this is disclosure of information that

5    creditors need to make a meaningful determination, Mr.

6    Shapiro.  And I think --

7         MR. SHAPIRO:  I -- I agree, but -- if you're saying

8    that if assuming for the moment you're not terminating

9    exclusivity, we're not going to have a solicitation of two

10   plans at the same time.  If you're attaching a competing plan

11   and then saying --

12        THE COURT:  No, I -- I don't say he --

13        MR. SHAPIRO:  Okay.

14        THE COURT:  -- has to attached a competing plan.  He

15   can just say that the debtor has received this offer to do

16   whatever it is.  And I'm not even sure what it is.  But -- but

17   the debtor has reviewed it and believes that it is not in the

18   -- is not as good a deal as the deal that's before.

19        MR. SHAPIRO:  Okay.

20        THE COURT:  I'm asking for -- this is -- the purpose

21   of this is disclosure.  If the debtor takes the position that

22   the proposal as it -- as it needs -- as it sees it is there, a

23   creditor then has the ability to then look forward, ask for

24   more information, go to the Committee, come to the debtor, do

25   whatever it needs to do.  They need to know it exists.  The

1    debtor can take the position this is their disclosure

2    statement and plan and this is not as good, but that is

3    information that I believe that a creditor needs to have in

4    order to make a determination.

5         MR. SIROTA:  To avoid, you know, a debate on that

6    issue at the hearing and to minimize debates, I'd be more than

7    glad -- we'd be more than glad if Mr. Felger would send us his

8    draft of what he plans to say, and we'll try to work on

9    something consensual.  If we can't resolve it, Your Honor

10   will.

11        MR. FELGER:  That's fine.

12        THE COURT:  Mr. D'Auria?

13        MR. D'AURIA:  Your Honor -- Your Honor inspired a

14   comment -- a thought on the collective bargaining agreements.

15   I learned that the 341, that the different operating different

16   operating debtors have different collective bargaining

17   agreements.  I just politely suggest that the debtor be

18   mindful when working through Your Honor's comments in the

19   collective bargaining agreements, keep the different operating

20   debtors in mind when you talk about which agreement.

21        MR. FELGER:  We'll do that.

22        THE COURT:  I really -- I really feel that for the

23   Court's knowledge, as well as the creditors, you really have

24   to explore a lot more detail about the different entities and

25   their creditor base and how they -- and their inter creditor

1    relationship in order for the Court to be able review and for

2    creditors to make a meaningful determination.

3            Mr. Brody?

4            MR. BRODY:  Your Honor, we would also ask in the

5    disclosure statement for the debtor to set forth how much Arch

6    is actually putting up in cash, because buried in the plan's

7    supplement is a limit to the amount of the -- and I may get

8    this one confused -- plan funder's equity contribution, which

9    is the first time a limit comes up.  And that is important to

10   how much money is coming in to pay the different classes of

11   creditors.  So how much actually is being put up by Arch, I

12   think, should be disclosed.

13           MR. FELGER:  Well, we have to satisfy feasibility,

14   so that information needs to be -- needs to be in there.

15           MR. BRODY:  Thank you.

16           THE COURT:  Anybody else?

17           MS. POLLACK:  Good morning, Your Honor.  Robyn

18   Pollack again for --

19           THE COURT:  Actually, afternoon by now.

20           MS. POLLACK:  Oh, we've been here quite a long time.

21   I just wanted to add to your list some disclosure about the

22   insurance, particularly for environmental claimants.  That's a

23   big issue --

24           THE COURT:  Right, since everybody brought that up,

25   I just assumed that Mr. Felger is going to deal with those.

1    But you're right, yes, the extent of insurance -- to be

2    honest, I don't even know the details.  And that was a big

3    concern I had about the environmental issues.  And I think

4    that besides whatever is pending -- and I think you have to

5    disclose all that -- anything that's not pending that's an

6    issue environmentally -- I don't really know the essence of

7    the litigation that's pending.  Is this a State of Federal

8    mandated cleanup?  Is that what this --

9         MS. POLLACK:  I mean, there are several pieces of

10   litigation and -- and cleanups that are pending.  There's a --

11   a list of them that the debtor has provided on Schedule 4.5.

12        THE COURT:  And is your client and some of the

13   others -- they're also defendants in those litigations?  Or is

14   that --

15        MS. POLLACK:  Yes, we are co-defendants with the

16   debtor on some pieces of litigation.  And there is another

17   piece of litigation, the Puchak (phonetic) site, which we are

18   the only defendant.  And, in fact, I've been informed by the

19   EPA that the debtor has not even been named.  They are still

20   completing their investigation, and I -- you know, we're a

21   little curious as to why it's even listed, because they

22   haven't even been named at all.  So we have an issue with that

23   that's separate from the other environmental claimants.

24        THE COURT:  What do you mean, why the debtor would

25   list them --

1         MS. POLLACK:   I mean, the EPA has informed us that

2    they have filed nothing.   They have -- they have not

3    completed --

4         THE COURT:   Well, but if the debtor -- if the debtor

5    believes there's a potential -- a potential cause of action

6    against them, whether it comes to fruition or not, they still

7    have an obligation to -- to notify EPA that they -- that they

8    filed, so that they know where that stands.

9         MS. POLLACK:   Right, and I understand that.   I guess

10   my point is, there is no reason for them believe that the EPA

11   is going to file something against them.   That -- that's my

12   point.

13        THE COURT:   Well, I'll just ask Mr. Felger to

14   provide disclosure of whatever environmental issues the debtor

15   is involved in, expects to be involved in, is concerned about

16   being involved in, and how that -- and whether there's

17   litigation or claims that have been in any of those cases, as

18   well as how that affects other parties that have filed

19   objections and have not filed objections.

20        Mr. Felger?

21        MR. FELGER:   I'm -- I'm sorry.

22        THE COURT:   I'm sorry, I said that --

23        MR. FELGER:   I apologize.

24        THE COURT:   -- the debtor has to disclose all the

25   environmental issues.

1          MR. FELGER:  Yes.

2          THE COURT:  The suits they're involved in, the

3     claims they anticipate could be filed against them, whatever

4     they know or anticipate or suppose or -- or deny that they're

5     involved in but could be out there, and -- and what they think

6     the -- I guess, liability that that would be to the debtor.

7          MR. FELGER:  We understand, Your Honor.  And --

8          THE COURT:  And -- and, also, disclose other parties

9     that are involved in those, so that, you know, everybody knows

10    those.  I mean, we haven't really had a lot to deal with that

11    so far in this court, but it could become a -- an issue.

12         MR. SHAPIRO:  With one issue that was replete in

13    each of the environmentals, some of the litigation has been

14    going on for 17 years.  They've had discovery requests for the

15    debtor well before this case started.  A lot of them are

16    asking for information on the insurance.  All I can say is,

17    the debtor will give them the information that they have on

18    the insurance.  But some of these legacy policies since this

19    company was formed in '52, we -- you can only disclose what

20    you know, and after that --

21         THE COURT:  Well, and that's -- that's what the

22    debtor has to do.

23         MR. SHAPIRO:  Okay.

24         THE COURT:  The debtor has to disclose what is

25    knows.

1    MR. SHAPIRO:  Right.

2    THE COURT:  That's what -- that's what I believe

3    that the disclosure system procedure mandates.

4    MS. POLLACK:  Right, if there is available

5    insurance, we need to know about it and have the ability to --

6    to go after it.

7    THE COURT:  And -- and that's part of the debtor's

8    obligation, to list whatever the policies are that they know

9    of.  Okay?

10    MS. POLLACK:  Thank you, Your Honor.

11    THE COURT:  Anybody else that wants to be heard?

12    MR. KLEIN:  Just briefly, Your Honor.  The Township

13    of Pennsauken filed an objection to the DIP financing and

14    disclosure statement.  The disclosure statement provides for a

15    6 percent interest, which is contrary to the bankruptcy code

16    and the New Jersey statutes which are applicable.  I would

17    also like the debtor to address that either prior to the

18    hearing or at the next hearing.

19    THE COURT:  Mr. Felger, this is real -- I mean, an

20    explanation of why they think it's appropriate to have the

21    plan the way it is, is that what you're asking?

22    MR. KLEIN:  Correct.  One of the things that they

23    indicate is they would like to transfer the property free and

24    clear of the Township's liens.  They're not going to be paying

25    penalties on outstanding taxes that the pre-petition imposed.

1    And, again, contrary to Section 511 and applicable New Jersey

2    statutes, they indicate it they'll pay 6 percent rather than

3    the mandatory 18 percent --

4                THE COURT:  But wouldn't that really be an objection

5    to confirmation?

6                MR. KLEIN:  Later on, but I'm just saying, if -- if

7    that could be addressed now --

8                THE COURT:  Well, I mean -- well, but it's not

9    really -- that's not an adequacy issue, I mean, for -- they've

10   disclosed already this is what they're going to do.  And if

11   you don't think that that's right, then you either need to

12   negotiate it with Mr. Felger --

13               MR. KLEIN:  Right.

14               THE COURT:  -- or object to confirmation, and then

15   the Court can determine whether that -- that can be part of

16   the confirmation if it's, you know -- but that's -- I don't

17   know that there's anything they need to disclose more than

18   what they've disclosed about that.

19               MR. KLEIN:  That's fine, Your Honor.  Maybe we can

20   resolve it prior to that.

21               THE COURT:  Anybody else?

22               Mr. D'Auria, anything else that the US Trustee wants

23   to add?

24               MR. D'AURIA:  Not at this time, Your Honor.  But

25   I've been in touch with everybody and I will continue to do so

1    if I have follow-ups.

2              THE COURT:  Mr. Drew, is there anything that you

3    want to add?

4              MR. DREW:  No, Your Honor.

5              THE COURT:  Okay.  Anything else, Mr. Felger, that

6    we need to address today?

7              Mr. Brody, is there something else?

8              MR. BRODY:  Your Honor, I'm just -- I apologize.  I

9    just want to go back to -- to the five items on our immediate

10   list.  One of them is not actually a document.  We just want

11   to make sure that we get -- immediately go and talk to CIT.

12   Certainly, that should not be an issue with respect to the --

13             THE COURT:  Was that a problem with you, Mr. Felger?

14             MR. FELGER:  CIT's counsel told me they already

15   spoke, so --

16             MR. BRODY:  I haven't spoke to them.

17             THE COURT:  I don't know any reason why -- I mean,

18   that's not really something the debtor has control over.

19             MR. BRODY:  I just wanted to make sure that -- that

20   it was never an issue, that the debtor could never -- never an

21   issue, Your Honor.

22             THE COURT:  The debtor is not opposing that,

23   correct, Mr. Felger?

24             MR. FELGER:  They can talk to Mr. Patterson.

25             MR. BRODY:  Thank you.

1      THE COURT:  Okay.  Anything else?  All right.  If

2  you need me -- you need to put any of this into the form of an

3  order and submit it.  If not, we'll go by what's on the

4  record.

5          SPEAKER:  So ordered.

6          SPEAKER:  I think -- I think we're comfortable with

7  the record.

8          SPEAKER:  So order the record, Your Honor.

9          THE COURT:  Thank you.

10          SPEAKER:  Judge, thank you.

11          SPEAKER:  Thank you, Your Honor.

12                  *  *  *  *  *

13

14                **C E R T I F I C A T I O N**

15          We, Frances Maristch and Brenda Boulden, court

16  approved transcribers, certify that the foregoing is a correct

17  transcript from the official electronic sound recording of the

18  proceedings in the above-entitled matter.

19

20

21   __04/21/08__                    _Frances L. Maristch_

22   DATE                            FRANCES L. MARISTCH

23                                   _Brenda Boulden_

24                                   BRENDA BOULDEN

25                                   DIANA DOMAN TRANSCRIBING