25757

Law Office of John R. Morton, Jr., Esq.
110 Marter Ave.
Suite 301
Moorestown, NJ 08057
Telephone: (856)866-0100
Attorney for: Wells Fargo Equipment Finance, Inc.
JM-5630

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE:<br><br>SHAPES/ARCH HOLDINGS, LLC | Case No. 08-14631(GMB)<br><br>CHAPTER 11<br><br>Jointly Administered<br><br>Hearing Date:<br><br>CERTIFICATION IN SUPPORT OF<br><br>MOTION OF WELLS FARGO EQUIPMENT<br><br>FINANCE, INC. FOR RELIEF FROM<br><br>THE AUTOMATIC STAY *AND IN*<br><br>*SUPPORT OF APPLICATION TO*<br><br>*SHORTEN TIME* |

EVA KIRCH certifies as follows:

1. I am employed by Wells Fargo Equipment Finance, Inc. ("Wells Fargo") and am familiar with the facts of this case.

2. **Background:** Wells Fargo Equipment Finance, Inc., hereinafter "Wells Fargo" through an Assumption and Assignment Agreement and Bill of Sale dated June 29, 2007 acquired from CIT Group/Equipment Financing, Inc., (hereinafter "CIT") all of CIT's rights, titles and interests in certain "Assumed Contracts". The acquisition of this and other assumed contracts was related to a certain Asset Purchase Agreement by and between Wells Fargo Equipment Finance, Inc., CIT/Equipment

Page 1

25757

Financing, Inc., CIT Group, Inc. and Wells Fargo & Company dated June 21, 2007.

3. **The Aluminum Shapes Contract:** One of those "assumed contracts" was Security Agreement-Conditional Sale Contract (hereinafter "the contract) executed by Aluminum Shapes, Inc., d/b/a Aluminum Shapes, LLC (hereinafter" Aluminum Shapes") on 7-28-05 in connection with the purchase of one (1) JLG MDL 600S BOOM LIFT bearing serial number 0300087915 (hereinafter "the boom lift"). The contract was assigned to CIT. To secure payment of contract, Aluminum Shapes granted CIT a first purchase money security interest in the boom lift and there was filed with the State of New Jersey, Department of the Treasury, a UCC Financing Statement covering the boom lift, and attachments, replacements, substitutions, additions and accessions thereof, plus the proceeds of all of the foregoing. In executing the contract, Aluminum Shapes agreed to pay CIT $97,226.40 over 60 months at $1620.44 per month commencing 9-9-05. Wells Fargo now stands in the shoes of CIT by virtue of acquiring the contract.

4. **The value of the boom lift:** The boom lift has a quicksale value of $44000 and a resale value of $63000, as is more particularly set forth in the Green Guide for April 2008.

5. **The present status of the contract:** There is presently due to Wells Fargo under the contract the sum of $44789.00 plus interest. The loan is due for the 3-9-08 and 4-9-08 payments. Arrears are $3240.88. The loan is in default. As a result of the default, Wells Fargo is entitled to immediately repossess and sell the equipment and apply the.

25757

6. Wells Fargo Equipment Finance, Inc. requests relief from the automatic stay for the following reasons:
   a. The debtor is failing to make loan payments and is failing to provide Wells Fargo with adequate protection.
   b. The loan is in default.
   c. The debtor has filed a plan, which, on its face appears to strip all secured creditors of their liens at confirmation.
   d. The DIP Financing application is believed to seek to prime existing creditors, presumably because of a pre-petition financing agreement involving as agent, The CIT Group/Business Credit. However, the loan encumbering the boom lift was acquired under the assumption and assignment agreement with The CIT Group/Equipment Financing, Inc. as part of an asset purchase agreement between The CIT Group/Equipment Financing, Inc., Wells Fargo Equipment Finance, Inc., CIT Group, Inc. and Wells Fargo & Company.
   e. **Request to have hearing on shortened time:** Because of the nature of this case and the fact that all matters appear to be heard rapidly, Wells Fargo respectfully requests that its motion be heard on shortened time.

I CERTIFY THAT THE FOREGOING STATEMENTS MADE BY ME ARE TRUE. I AM AWARE THAT IF ANY OF THE FOREGOING STATEMENTS MADE BY ME ARE WILLFULLY FALSE, I AM SUBJECT TO PUNISHMENT.

Dated:

TEMPE, AZ

_____
EVA KIRCH

## Security Agreement - Conditional Sale Contract

This form is subject to Federal and State legal requirements. See Page 5 for list of States in which to use this form.

1. Describe Collateral fully including make, kind of unit, model and serial numbers and any other pertinent information.

One (1) JLG Model 600S Boom Lift, S/N: 0300087915

All of the above to include attachments, replacements, substitutions, additions and accessions thereof, plus the proceeds of all the foregoing.

2. Buyer warrants and agrees that the Collateral is to be used primarily for:
   ☒ business or commercial purposes (other than agricultural),
   ☐ agricultural purposes (see definition on the final page), or
   ☐ both agricultural and business or commercial purposes.

| 9000 River Road | Delair |  | NJ | 08110 |
|---|---|---|---|---|
| Address | City | County | State | Zip Code |

Buyer and Seller agree that regardless of the manner of affixation, the Collateral shall remain personal property and not become part of the real estate. Buyer agrees to keep the Collateral at the location set forth above, and will notify Seller promptly in writing of any change in the location of the Collateral within such State, but will not remove the Collateral from such State without the prior written consent of Seller (except that in the State of Pennsylvania, the Collateral will not be moved from the above location without such prior written consent).

3. Buyer agrees to pay Seller the Contract Time Price Balance (Item 8) on the terms shown below:

   1. Cash Sale Price including installation costs and applicable taxes ............... $ 81,000.00

   2. (a) Cash Down Payment........................................................................... $ 0.00

      (b) Allowance for Trade-In ..................................................................... $ 0.00

      Description of Trade-In (Make, kind of unit, year, model and serial no.):
      _____
      _____

      (c) Total of Cash Down Payment and Trade-In (a+b) ................................ $ 0.00

   3. Unpaid Balance of Cash Price (Item 1 minus Item 2).................................. $ 81,000.00

   4. Official Fees and Licenses........................................................................ $ _____

      (Specify): _____

   5. INSURANCE:    NEITHER LIABILITY INSURANCE COVERAGE FOR BODILY INJURY
                    AND PROPERTY DAMAGE CAUSED TO OTHERS NOR ANY OTHER
                    TYPE OF INSURANCE IS INCLUDED HEREIN................................. $ NONE

   6. Unpaid Principal Cash Balance (Base Time Price) (sum of Items 3 & 4) ..... $ 81,000.00

   7. Time Price Differential (Finance Charge) ................................................ $ 16,226.40

   8. Contract Time Price Balance owed by Buyer (sum of Items 6 & 7) ............... $ 97,226.40

9. Buyer promises to pay Seller the Contract Time Price Balance in 60 (total number) payments as follows:

   **Equal Successive Monthly Payments**

   $ 1,620.44 on 9-9-05, and a like sum on the like date of each month thereafter until fully paid, provided, however, that the final payment shall be in the amount of the then unpaid balance.

**Other Than Equal Successive Monthly Payments**

10. Time Sale Price (sum of Items 1, 4 and 7)............................................... $ _____ 97,226.40

4. The Seller has offered the Buyer a choice of buying the personal property described in Paragraph 1 for a stated cash sale price payable immediately or within a limited number of days, or of buying such property for a contract time price which permits the Buyer to purchase it now but pay in installments over an extended period of time. The contract time price is more than the cash sale price because it includes charges by the Seller to compensate the Seller for having to wait a period of time before collecting its full purchase price and for taking a risk in waiting such period of time. The Seller hereby sells and the Buyer hereby purchases the property from the Seller and elects to pay the contract time price set forth in Paragraph 3. Any payment not made when due shall, at the option of Secured Party, bear late charges thereon calculated at the rate of 1 1/2% per month, but in no event greater than the highest rate permitted by relevant law. Buyer shall be responsible for and pay to Seller a returned check fee, not to exceed the maximum permitted by law, which fee will be equal to the sum of (i) the actual bank charges incurred by Seller plus (ii) all other actual costs and expenses incurred by Seller. The returned check fee is payable upon demand as indebtedness secured by the Collateral under this Security Agreement.

5. As security for its obligation to pay the contract time price and its other obligations under this Security Agreement, the Buyer hereby grants to the Seller a security interest in the personal property described in Paragraph 1, together with all attachments, replacements, substitutions, additions and proceeds, including amounts payable under any insurance policy, all hereinafter referred to as "Collateral."

6. Seller may hold this Security Agreement or it may assign it for value to The CIT Group/Equipment Financing, Inc. ("CIT"). If Seller does in fact assign this Security Agreement to CIT, then after such assignment: (a) CIT as assignee, shall have all the rights and remedies of Seller hereunder and all of Buyer's agreements, representations and warranties shall be deemed to have been made to CIT with the same force and effect as if CIT were an original party hereto; (b) Seller shall not be CIT's agent for any purposes; (c) Seller shall not have any power or authority to change or modify this Security Agreement or any related document or instrument in any way (except any relevant warranty or service agreement which is exclusively between Seller and Buyer and shall not bind CIT or affect any of Buyer's or CIT's rights or obligations under this Security Agreement); and (d) Buyer will settle all claims, defenses, setoffs and counterclaims of any nature, it may have against Seller, including but not limited to delivery of Collateral, defects in the Collateral and the like, directly with Seller, and not setup any such claim, defense, setoff or counterclaim against CIT, Seller hereby agreeing to remain responsible therefore.

7. Buyer acknowledges that: CIT is in no way related to or connected with Seller; CIT has no knowledge or information as to the condition or suitability of the Collateral for Buyer's purposes; and CIT's decision to purchase this Security Agreement from Seller, if so offered, will be made in reliance on Buyer's warranties, agreements and covenants herein, including Buyer's express agreement not to assert against CIT any claims, defenses, setoffs or counterclaims it may now or in the future have against Seller named below. If this Security Agreement is assigned to CIT, then after assignment to CIT, Buyer will make all payments directly to CIT at such places as CIT may from time to time designate in writing to Buyer.

8. Buyer warrants and represents: (a) that Buyer is justly indebted to Seller for the full amount of the foregoing indebtedness; (b) that, except for the security interest granted hereby, the Collateral is free from and will be kept free from all liens, claims, security interests and encumbrances; (c) that no financing statement covering the Collateral or any proceeds is on file in favor of anyone other than Seller but if such other financing statement is on file, it will be terminated or subordinated; (d) that all information supplied and statements made by Buyer in any financial, credit or accounting statement or application for credit prior to, contemporaneously with or subsequent to the execution of this Security Agreement with respect to this transaction are and shall be true, correct, valid and genuine; (e) Buyer has full authority to enter into this Security Agreement and in so doing it is not violating any law or regulation or agreement with third parties, and it has taken all such action as may be necessary or appropriate to make this Security Agreement binding upon it; and (f) if Buyer is an organization, Buyer (i) is the type of organization, (ii) is organized under the laws of the jurisdiction, (iii) has its chief executive office, and (iv) if it is a "registered organization" as defined in Article 9 of the Uniform Commercial Code (i.e., organized solely under the laws of a single State and as to which the State must maintain a public record showing the organization to have been organized), has the organizational identification number (or, if none, has been assigned no such number by the State of organization), all as set forth under Buyer's name (which is its exact and complete legal name) at the signature line of this Security Agreement. If Buyer is an individual, Buyer's exact and complete legal name and principal residence are as set forth at and under Buyer's name at the signature line of this Security Agreement. Buyer agrees to notify Seller immediately in the event of a change in any of the foregoing facts and information.

9. Buyer agrees: (a) to defend at Buyer's own cost any action, proceeding or claim affecting or arising from the Collateral; (b) to pay reasonable attorneys' fees (at least 15% of the unpaid balance if not prohibited by law) and other expenses incurred by Seller in enforcing its rights after Buyer's default; (c) to pay promptly all taxes, assessments, license fees and other public or private charges when levied or assessed against the Collateral or this Security Agreement and this obligation shall survive the termination of this Security Agreement; (d) that if a certificate of title is required or permitted by law, Buyer shall obtain such certificate with respect to the Collateral, showing the security interest of Seller thereon, and in any event do everything

necessary or expedient to preserve or perfect the security interest of Seller; (e) that Buyer will not misuse, fail to keep in good repair, secrete, or without the prior written consent of Seller, and notwithstanding Seller's claim to proceeds, sell, rent, lend, encumber or transfer any of the Collateral; (f) that Seller may enter upon Buyer's premises or wherever the Collateral may be located at any reasonable time to inspect the Collateral and Buyer's books and records pertaining to the Collateral, and Buyer shall assist Seller in making such inspection; and (g) upon the request of Seller, if any of the Collateral consists of software, to inform Seller of the name of the licensor of such software and to provide Seller with a copy of the license agreement.

10. All risk of loss, damage to, destruction of or arising from the Collateral shall, at all times, be on Buyer. Buyer will procure and maintain throughout the term of this Security Agreement, all-risk physical damage insurance in form, amount and underwritten with insurers satisfactory to Seller including Seller as loss payee and provide Seller with breach of warranty coverage and 30 days prior written notice of cancellation or material change. Seller is under no duty or obligation to verify the existence or adequacy of coverage and Seller's acceptance of lesser coverage shall not be a waiver's of Buyer's obligations.

Buyer hereby assigns to Seller any monies which may become payable under any such policy of insurance and irrevocably constitutes and appoints Seller as Buyer's attorney in fact (a) to hold each original insurance policy, (b) to make, settle and adjust claims under each policy of insurance, (c) to make claims for any monies which may become payable under such and other insurance on the Collateral, and (d) to endorse Buyer's name on any check, draft or other instrument received in payment of claims or returned or unearned premiums under each policy and to apply the funds to the payment of the indebtedness owing to Seller; provided, however, Seller is under no obligation to do any of the foregoing.

Should Buyer fail to furnish such insurance policy to Seller, or to maintain such policy in full force, or to pay any premium in whole or in part relating thereto, then Seller, without waiving or releasing any default or obligation by Buyer, may (but shall be under no obligation to) obtain and maintain insurance and pay the premium and any administrative costs therefor on behalf of Buyer and charge the premium and any administrative costs to Buyer's indebtedness under this Security Agreement. The full amount of any such premium and any administrative costs paid by Seller shall be payable by Buyer upon demand, and failure to pay same shall constitute an event of default under this Security Agreement.

11. A very important element of this Security Agreement is that Buyer make all its payments promptly as agreed upon. Also essential is that the Collateral continue to be in good condition and adequate security for the indebtedness. The following are events of default under this Security Agreement which will allow Seller to take such action under this Paragraph and under Paragraph 12 as it deems necessary: (a) any of Buyer's obligations to Seller under any agreement with Seller is not paid promptly when due; (b) Buyer breaches any warranty or provision hereof, or of any other instrument or agreement delivered by Buyer to Seller in connection with this or any other transaction; (c) Buyer dies, becomes insolvent or ceases to do business as a going concern; (d) it is determined that Buyer has given Seller materially misleading information regarding its financial condition; (e) any of the Collateral is lost or destroyed; (f) a petition or complaint in bankruptcy or for arrangement or reorganization or for relief under any insolvency law is filed by or against Buyer or Buyer admits its inability to pay its debts as they mature; (g) property of Buyer is attached or a receiver is appointed for Buyer; (h) whenever Seller in good faith believes the prospect of payment or performance is impaired or in good faith believes the Collateral is insecure; (i) any guarantor, surety or endorser for Buyer dies or defaults in any obligation or liability to Seller or any guaranty obtained in connection with this transaction is terminated or breached; or (j) a third party takes any action to foreclose on, obtain possession or control of, collect, sell or otherwise dispose of, or exercise any rights with respect to, any of the Collateral without the express written consent of Seller.

**If Buyer shall be in default hereunder, the indebtedness herein described and all other debts then owing by Buyer to Seller under this or any other present or future agreement shall, if Seller shall so elect, become immediately due and payable.** This acceleration of all indebtedness, if elected by Seller, shall be subject to all applicable laws, including laws as to rebates and refunds of unearned charges.

12. So long as any obligations are owed by Buyer to Seller hereunder, Seller shall have all the rights and remedies provided by this Security Agreement and provided a secured party under the Uniform Commercial Code and any other applicable law. After default by Buyer, Seller's rights and remedies include but are not limited to a number of choices. Buyer acknowledges that if it defaults, Seller is justly entitled to do whatever the law allows to avoid loss to itself and also to obtain for itself the benefit of the bargain under this Security Agreement. Consequently, Buyer agrees that Seller, among its other rights and remedies, may by itself or its agent enter the premises or upon the land where the Collateral is located and without removing the Collateral render any equipment which is part of the Collateral unusable and/or take possession of the Collateral without notice to anyone and without judicial process of any kind, provided such self-help is done without breach of the peace (meaning actual or threatened violence to a person at the time of repossession). In order to afford itself these and related remedies, Seller must be able to enter the premises or land in or upon which the Collateral is located. Buyer, therefore, **agrees that Seller by itself or its agent, may without notice to any person and without judicial process of any kind, enter into any premises or upon any land (including access roads and rights of way) owned, leased or otherwise under the real or apparent control of Buyer or any agent of Buyer where the Collateral may be or where Seller**

believes the Collateral may be, and using any reasonable force with respect to the Collateral and any property connected to the Collateral, disassemble, render unusable, disconnect and separate all Collateral from any other property and/or repossess and remove all or any item of the Collateral. Buyer will not hinder or delay Seller or its agent in any way and will, if requested, assist Seller or its agent in disassembling and/or removing the Collateral. Seller may require Buyer to assemble the Collateral and return it to Seller at a place to be designated by Seller which is reasonably convenient to both parties. Buyer expressly waives all further rights to possession of the Collateral after default and all claims for damages related to such removal, disassembling, entering and/or repossession. The security interest granted hereby shall continue effective irrespective of any retaking and redelivery of the Collateral to Buyer until all amounts secured hereby are fully paid in money.

Seller may sell or lease the Collateral at a time and location of its choosing provided that the Seller acts in good faith and in a commercially reasonable manner. Unless otherwise provided by law, the requirement of reasonable notice of sale or other intended disposition of the Collateral shall be met if such notice is mailed, postage prepaid, to the address of Buyer shown herein at least ten days before the time of the sale or disposition. Expenses of retaking, holding, preparing for sale, selling and the like shall include reasonable attorneys' fees (at least 15% of the unpaid balance if not prohibited by law) and other legal expenses. Buyer understands that Seller's rights are cumulative and not alternative and that Buyer will remain fully liable for any deficiency remaining after disposition of the Collateral.

13. Seller may in its sole discretion waive a default, or cure a default at Buyer's expense. Any such waiver in a particular instance or of a particular default shall not be a waiver of other defaults or the same kind of default at another time. No modification or change in this Security Agreement shall bind Seller (after assignment, "Seller," as stated above, means ("CIT") unless in writing signed by Seller. No oral agreement shall be binding.

14. Buyer authorizes Seller to file a financing statement with respect to the Collateral and ratifies the filing by Seller of any such financing statements previously filed. Buyer waives all exemptions. Seller may correct patent errors herein and fill in such blanks as serial numbers, date of first payment and the like. Any provisions hereof contrary to, prohibited by, or invalid under applicable laws or regulations shall be inapplicable and deemed omitted herefrom, but shall not invalidate the remaining provisions hereof. Buyer acknowledges receipt of a true copy and waives acceptance hereof. Except where the context otherwise requires, "Buyer" and "Seller" also mean "debtor" and "secured party" respectively and include the heirs, executors, or administrators, successors or assigns to those parties but nothing herein shall authorize Buyer to assign this Security Agreement or its rights in and to the Collateral. Except as otherwise provided herein or by applicable law, the Buyer shall have no right to a trial by jury in any action or proceeding with respect to, in connection with, or arising out of this Security Agreement, or any document delivered pursuant to this Security Agreement. If more than one Buyer executes this Security Agreement, their obligations under this Security Agreement shall be joint and several.

No oral agreement, guaranty, promise, representation or warranty shall be binding.

NOTICE TO THE BUYER. DO NOT SIGN THIS CONTRACT BEFORE YOU READ IT OR IF IT CONTAINS BLANK SPACES. YOU ARE ENTITLED TO A COPY OF THE CONTRACT YOU SIGN. KEEP IT TO PROTECT YOUR LEGAL RIGHTS.

Dated: 7-28-05

Buyer (Debtor):

ALUMINUM SHAPES, INC. dba ALUMINUM SHAPES, LLC

By _____ Title Senior Buyer
If corporation, have signed by President, Vice President or Treasurer, and give official title.
If owner or partner, state which.

9000 RIVER ROAD
Address

DELAIR                    NJ        08110
City                      State     Zip Code

If an organization, Type of organization: __Corp__

If an individual, Principal residence: __-__

Jurisdiction of organization: __NJ__

Organizational Identification Number (or "None"): __131543 0000__

Location of chief executive office: __Delair, NJ__

**Seller (Secured Party):**

__Modern Equipment Sales & Rental Co.__
Name of individual, corporation, or partnership.

By __[signature]__ Title __President__
If corporation, have signed by President, Vice President or Treasurer, and give official title.
If owner or partner, state which.

__1165 Matsonford Road__
Address

__West Conshohocken__                              __PA__        __19428__
City                                                State        Zip Code

If Debtor is a partnership, indicate:
Partners' names                    Home addresses

NOTICE:  Do not use this form for transactions for personal, family or household purposes.  For agricultural and other transactions subject to Federal or State regulations, consult legal counsel to determine documentation requirements.

Agricultural purposes generally means farming, including dairy farming, but it also includes the transportation, harvesting, and processing of farm, dairy, or forest products if what is transported, harvested, or processed is farm, dairy, or forest products grown or bred by the user of the Equipment itself.  It does not apply, for instance, to a logger who harvests someone else's forest, or a contractor who prepares land or harvests products on someone else's farm.

FOR USE IN COMMERCIAL OR BUSINESS TRANSACTIONS IN  Hawaii; in Oregon, except for motor vehicle transactions; in West Virginia for motor vehicle and special mobile equipment transactions.

## Without Recourse Seller's Assignment

To: The CIT Group/Equipment Financing, Inc.

1540 West Fountainhead Pkwy
Address

Tempe     AZ     85282
City     State     Zip Code

Contract between ALUMINUM SHAPES, INC. dba ALUMINUM SHAPES, LLC, as Buyer, and undersigned, dated 7·28·05

having a present unpaid balance of $ 97,226.40 .

For value received undersigned ("Assignor") hereby sells and assigns to The CIT Group/Equipment Financing, Inc., its successors and assigns ("Assignee"), WITHOUT RECOURSE as to the financial ability of the Buyer to pay, the annexed above-named contract ("contract"), together with all of Assignor's right, title and interest in the property covered by and described in the contract, and all of Assignor's rights and remedies thereunder and under any guaranty or endorsement thereof, including the right to collect any and all installments due and to become due on the contract and to take, in Assignor's or Assignee's name, any and all proceedings Assignor might otherwise take.

Assignor warrants that: the contract and any accompanying notes, guaranties, waivers and/or other instruments (collectively "contract") are true, valid and genuine and represent existing valid and enforceable obligations in accordance with their terms; all signatures, names, addresses, amounts and other statements and facts contained therein are true and correct; the contract (including its form and substance and the computation of all charges) and the transaction underlying the obligation (including any sale and delivery) conforms to all applicable laws, rules, regulations, ordinances and orders; the present unpaid balance shown above is correct; the property has been delivered to the Buyer under the contract on the date set forth below in satisfactory condition and has been accepted by the Buyer; the contract is not and will not at any time be subject to any defense, claim, counterclaim or set-off and Assignor will comply with all its obligations under the contract; the contract constitutes and will continue to constitute a perfected first priority security interest or lien upon the property covered thereby, effective against all persons and any filing, recordation or any other action or procedure permitted or required by law to perfect such security interest or lien has been or will be accomplished; and all down payments received have been made in cash except down payments represented by equipment trade-ins.

In the event that Assignee reasonably determines that (i) Assignor has or may have breached any of the terms hereof or any of its warranties with respect to the contract or, (ii) Buyer has failed to pay or perform any obligation for any reason other than the Buyer's financial inability to pay, Assignor will, upon Assignee's request, promptly repurchase the contract for an amount equal to the sum of (a) the Unpaid Balance discounted to present value using the discount rate which was used to compute the purchase price of the contract; (b) all of Assignee's expenses of collection, repossession, transportation and storage, including attorneys' fees and costs; and (c) all accrued and unpaid interest or finance charges and late charges. "Unpaid Balance" shall mean the aggregate unpaid balance of such Contract, including interest or finance charges, and, in the case of a lease in which the purchase option price was used in computing the purchase price, the amount of such purchase option price. In addition, Assignor shall indemnify and save Assignee harmless from any loss, damage or expense, including attorneys' fees, incurred by Assignee as a result of Assignor's breach of any of the terms of this assignment or any of the warranties, obligations or undertakings described herein.

Assignor agrees that Assignee may in Assignor's name endorse all accompanying notes and all remittances received. Assignor waives notice of acceptance hereof as well as presentment, demand, protest and notice of non-payment and protest as to all contracts heretofore, now, or hereafter signed, accepted, endorsed or assigned to Assignee. Assignor waives all exemptions and homestead laws and any other demands and notices required by law, and Assignor waives all set-offs and counterclaims. Assignor also waives any and all defenses based on suretyship or any other applicable law, including without limitation all rights and defenses arising out of (i) an election of remedies by Assignee even though that election of remedies may have destroyed rights of subrogation and reimbursement against the Buyer by operation of law or otherwise, (ii) protections afforded to the Buyer pursuant to antideficiency or similar laws limiting or discharging the Buyer's obligations to Assignee, (iii) the invalidity or unenforceability of this assignment, (iv) the failure to notify Assignor of the disposition of any property securing the obligations of

the Buyer, (v) the commercial reasonableness of such disposition or the impairment, however caused, of the value of such property, and (vi) any duty on Assignee's part (should such duty exist) to disclose to Assignor any matter, fact or thing related to the business operations or condition (financial or otherwise) of the Buyer or its affiliates or property, whether now or hereafter known by Assignee. Assignee may at any time, without consent of Assignor, without notice to Assignor and without affecting or impairing the obligations of Assignor hereunder, do any of the following:

(a) renew, extend (including extensions beyond the original term of the contract), modify (including changes in interest rates), release or discharge any obligation of a Buyer or any persons obligated on the contract or on any accompanying note or guaranty, ("the contract obligations");

(b) accept partial payments of the contract obligations;

(c) accept new or additional documents, instruments or agreements relating to or in substitution of the contract obligations;

(d) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of the contract obligations and the security therefor in any manner;

(e) consent to the transfer or return of security and take and hold additional security or guaranties for the contract obligations;

(f) amend, exchange, release or waive any security or guaranty; or

(g) bid and purchase at any sale of the contract or security and apply any proceeds and security and direct the order and manner of sale.

Assignor shall have no authority to, and will not, without Assignee's prior written consent, accept collections, repossess or consent to the return of the property described in the contract or modify the terms thereof or of any accompanying note or guaranty. Assignee's knowledge at any time of any breach of or non-compliance with any of the foregoing shall not constitute any waiver by Assignee.

Property covered by the contract was delivered to Buyer on __7-28-05__.

Dated: __7-28-05__

Seller - Assignor:

__Modern Equipment Sales & Rental Co.__
Name of Individual, corporation or partnership.

By _____ Title __President__
If corporation, have signed by President, Vice President or Treasurer, and give official title.
If owner or partner, state which.

Chris Parn
on desk Bod.
aw

426 (8/00) Without Reco                                                                                      Page 2 of 2

DATE 7-27-05

**THE CIT GROUP/EQUIPMENT FINANCING, INC.**
PO Box 27248
Tempe, AZ 85285-7248

Gentlemen:

You are irrevocably instructed to disburse the proceeds of your Conditional Sale Contract between Aluminum Shapes, Inc. dba Aluminum Shapes, LLC (Debtor) and Modern Equipment Sales & Rental Co. (Secured Party) dated 7-27-05 as follows:

| PAYEES NAMES AND ADDRESSES | AMOUNT |
|---|---|
| Modern Equipment Sales & Rental Co. | $ 80,231.60 |
| The CIT Group/Equipment Financing, Inc. *Documentation/Origination/Filing fees* | $ 350.00 |
| | TOTAL PROCEEDS $ 80,581.60 |

Very Truly Yours,

Modern Equipment Sales & Rental Co.
By: _[signature]_   Title: President

14223811
UCC 90136149
(79)

**STATE OF NEW JERSEY**
**DEPARTMENT OF TREASURY**
**PO BOX 308**
**TRENTON, NEW JERSEY 08646**
23106215

I, THE TREASURER OF NEW JERSEY, DO HEREBY CERTIFY THAT THE FOLLOWING DOCUMENTS HAVE BEEN FILED AND RECORDED IN THIS OFFICE ON THE DATES SET FORTH:

DEBTOR: ALUMINUM SHAPES INC.
9000 RIVER RD.
DELAIR, NJ  08110

SECURED PARTY: THE CIT GROUP EQUIPMENT FINANCING, INC.
PO BOX 27248
TEMPE, AZ  85285

DATE FILED: 08/02/2005 AT 5:00 P.M.

FILING NUMBER: 23106215

COLLATERAL: ONE (1) JLG MDL 600S MAN LIFT S/N 0300087925. ALL OF THE ABOVE TO INCLUDE ATTACHMENTS, REPLACEMENTS, SUBSTITUTIONS, ADDITIONS AND ACCESSIONS THEREOF, PLUS THE PROCEEDS OF ANY THE FOREGOING.

FILING HISTORY: 08/02/2005   UCC1

IN TESTIMONY WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY OFFICIAL SEAL AT TRENTON, THIS 3RD DAY OF AUGUST, 2005

John E. McCormac
State Treasurer

