UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
Attorneys for the Debtors

| In re: | Case No. 08-14631 |
| --- | --- |
| Shapes/Arch Holdings L.L.C., | Judge: Gloria M. Burns |
| Shapes L.L.C., Delair L.L.C., Accu-Weld | |
| L.L.C., and Ultra L.L.C. | Chapter: 11 |

## JOINT DISCLOSURE STATEMENT FOR THE
## DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION, WHICH THE DEBTORS FILED ON THE PETITION DATE. DEBTORS BELIEVE THAT THEIR PLAN OF REORGANIZATION IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. DEBTORS URGE THAT THE VOTER ACCEPT THE PLAN.

April 24, 2008

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION AND SUMMARY ..............................................................................3
    A.  Disclosure Statement Enclosures ...............................................................3
    B.  Only Impaired Classes Vote .......................................................................4
    C.  Confirmation Hearing .................................................................................5

II. OVERVIEW OF THE PLAN ......................................................................................5
    A.  Introduction ................................................................................................5
    B.  Summary of Distributions ...........................................................................5

III. OVERVIEW OF CHAPTER 11 ...............................................................................7

IV. DESCRIPTION OF THE DEBTORS' BUSINESS ....................................................7
    A.  The Debtors .................................................................................................7
    B.  The Pre-Petition Capital Structure ...........................................................9
    C.  Events Leading to Chapter 11 Filing ........................................................9

V. THE FILING ...........................................................................................................11
    A.  Significant "First Day" Motions ...............................................................11
    B.  DIP Financing and Use of Cash Collateral .............................................12
    C.  Claims Process ...........................................................................................13

VI. DESCRIPTION OF SIGNIFICANT LITIGATION ...............................................13
    A.  Preferences, Fraudulent Transfers and Other Avoidance Actions.................13
    B.  Other Causes of Action ..............................................................................14
    C.  Claims Concerning the Environmental Protection Agency and other Environmental
       Claims. ........................................................................................................16

VII. SUMMARY OF PLAN PROVISIONS ..................................................................23
    A.  Introduction ................................................................................................23
    B.  Method of Classification of Claims and Interests and General Provisions ...................23
    C.  Unclassified Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims
       and Fee Claims...........................................................................................24
    D.  Classification and Treatment of Claims and Interests ..............................26
    E.  Means For Implementation Of The Plan ..................................................30
    F.  Treatment Of Executory Contracts And Unexpired Leases .........................36
    G.  Effect of Confirmation of the Plan............................................................38
    H.  Retention of Jurisdiction ............................................................................40
    I.  Miscellaneous Provisions...........................................................................41
    J.  Effectiveness of the Plan............................................................................42
    K.  Confirmation Without Acceptance of All Impaired Classes: The "Cramdown"
       Alternative ..................................................................................................43
    L.  Provisions Regarding Corporate Governance and Management of the Reorganized
       Debtors .......................................................................................................44
    M.  Alternative Transaction...............................................................................44

i

VII.  CERTAIN RISK FACTORS TO BE CONSIDERED ............................................................45
   A.  Taxation ..........................................................................................................................46
   B.  Distributions to Holders of Claims ................................................................................46
   C.  Objections to Classification ...........................................................................................46
   D.  Inherent Uncertainty of Financial Projections ..............................................................46
   E.  Certain Bankruptcy Law Considerations .......................................................................47

VIII.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN....47
   A.  Liquidation Under Chapter 7 .........................................................................................47
   B.  Alternative Plan of Reorganization................................................................................48

IX.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .....................48
   A.  Federal Income Tax Consequences in General...............................................................48
   B.  Federal Income Tax Consequences of the Liquidation Trust ........................................49
   C.  Federal Income Tax Consequences to Holders of Allowed Claims in Class  5 ............50
   D.  Federal Income Tax Consequences to Holders of Allowed Class 6, 7 and 8 Interests..51
   E.  Importance of Obtaining Professional Tax Assistance ..................................................51

CHERRY_HILL\442102\1  220718.000

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS OR INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS AND INTERESTS HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN. SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," Article VIII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING

IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, ITS BUSINESS, AND EVENTS LEADING TO THE COMMENCEMENT OF THE CASE, HAS BEEN PREPARED AND OBTAINED BY THE DEBTORS AND ITS PROFESSIONALS FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTORS. NEITHER THE DEBTORS NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE SECTION VII. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE FINANCIAL PROJECTIONS ATTACHED HERETO WERE PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF ITS RESTRUCTURING ADVISOR BASED ON INFORMATION AVAILABLE TO THE DEBTORS AND NUMEROUS ASSUMPTIONS THAT ARE AN INTEGRAL PART OF THE FINANCIAL PROJECTIONS, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND SOME OR ALL OF WHICH MAY NOT MATERIALIZE. THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE

SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS.  CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON, THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

## I.     INTRODUCTION AND SUMMARY

Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C., the above-captioned Debtors (the "Debtors"), submits this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Debtors' First Amended Joint Plan of Reorganization dated April 24, 2008 [Docket No. ___], as such plan may be amended (the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the District of New Jersey (Camden Vicinage) (the "Bankruptcy Court") and (ii) the Confirmation Hearing scheduled for _____, 2008 at 10:00 a.m. (ET).  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement together with any relevant Exhibits and Appendices.

Concurrently with the filing of this Disclosure Statement, the Debtors filed the Plan which sets forth how Claims against and Interests in the Debtors will be treated in this chapter 11 case. This Disclosure Statement describes certain aspects of the Plan, the Debtors' prior operations, significant events occurring in the Debtors' chapter 11 case and other related matters. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

### A.     *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit A);

- The Order of the Bankruptcy Court (without exhibits) (the "Solicitation Procedures Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or to reject the Plan (Exhibit "B");

- Financial Projections (Exhibit "C");

- Liquidation Analysis (Exhibit "D");

3

- Schedule of Environmental Claims (Schedule D-1)

- Bid Procedures Regarding an Alternative Transaction (Exhibit "E")

- Current Financial Information (Exhibit "F")

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Impaired Claims and Interests that the Debtors believe are entitled to vote to accept or reject the Plan.

The Solicitation Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of an Impaired Claim or Interest entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Solicitation Procedures Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code and the Solicitation Procedures Order.

**B.    *Only Impaired Classes Vote***

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

In addition, if any Impaired Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Under the Plan, Claims in Classes 3, 4, 5, 8, 9, 10 and 11 are or may be Impaired and are entitled to vote on the Plan. Holders of Interests in Class 6 will receive no distribution and, accordingly, such holders are deemed to reject the Plan. Votes from holders of Interests in Class

4

7 are not being solicited.  Under the Plan, Claims in Classes 1, 2 and 7 are unimpaired, and the holders of Class 1, 2 and 7 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3, 4, 5, 8, 9, 10 and 11.

For a summary of the treatment of each Class of Claims and Interests, see "Overview of the Plan" below.

## C.    *Confirmation Hearing*

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2008 at 10:00 a.m. (ET) in the United States Bankruptcy Court for the District of New Jersey, 401 Market Street, Camden, New Jersey 08101.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before _____, 2008 at 4:00 p.m. (ET) in the manner described in the Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

## II.    OVERVIEW OF THE PLAN

### A.    *Introduction*

The Plan is the product of the effort by the Debtors' management and its professional advisors to develop a plan that will enable Creditors and Interest holders to receive the maximum recovery possible in these cases.  The valuation of the Debtors and the Reorganized Debtors, upon which certain distributions contemplated by the Plan are based, is derived in part from projections of the future performance of the Reorganized Debtors.  The financial projections, which were prepared by the Debtors with the assistance of its advisors, are attached as Exhibit C to this Disclosure Statement.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO MAXIMIZE THE RECOVERY TO THEIR CREDITORS AND INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND INTEREST HOLDERS.  THE DEBTORS THEREFORE URGE THOSE PARTIES ENTITLED TO CAST A BALLOT TO ACCEPT THE PLAN.

### B.    *Summary of Distributions*

Under the Plan, Claims against and Interests in the Debtors are divided into Classes and will receive the distributions and recoveries (if any) described in the table below.  The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan. The ranges of the Estimated Amount of Allowed Claims set forth in the following table reflect the amounts listed in the Debtors' Bankruptcy Schedules (low end of range) and the official claims' register maintained by Epiq Bankruptcy Solutions LLC which includes duplicate, amended and late filed claims (high end of range).  The Debtors have not completed the analysis or reconciliation of the Claims.

| Class | Type of Claim or Membership Interest | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Unclassified | Administrative Claims | $2,513,606[1] | 100% |
| Unclassified | Arcus DIP Claims | $22,000,000 | 100% |
| Unclassified | Fee Claims | $800,000[2] | 100% |
| Unclassified | Priority Tax Claims | $84,667 | 100% |
| 1 | Other Priority Claims | $1,514,113 | 100% |
| 2 | Miscellaneous Secured Claims | $ | 100% |
| 3 | CIT Claims | $55,000,000 | 100% |
| 4 | Collateralized Insurance Program Claims | | 100% |
| 5 | General Unsecured Claims | $38,121,413[3] | 2% |
| 6 | Ben Interests | N/A[4] | 0% |
| 7 | Class 7 Interests | N/A | 100% |
| 8 | Class 8 EPA/NJDEP Claims | $350,000 | 100% |
| 9 | Class 9 Secured Real Estate Claims | $747,939 | 100% |
| 10 | Class 10 Secured Claims Purchase Money Security Interests | $TBD | 100% |
| 11 | Class 11 Secured Claims of Warehousemen and Shippers | $200,000[5] | 100% |

ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERIES ARE REASONABLE AND WITHIN THE RANGE OF ASSUMED

---

[1] Debtors have received some reclamation demands and the same will be investigated for allowance. The Debtors have advised reclamation creditors that any alleged right of reclamation is subordinate to the claims of the CIT-DIP Lenders and Arcus under Section 546(c)(1) and may have no value but such creditors may have a claim under Section 503(b)(9). However, Debtors estimate that Section 503(b)(9) claims (for the value of unpaid goods received in the 20 days prior to the petition) is in the approximate amount of $1,014,053 for Shapes, $353,548.49 for Delair, $304,196.62 for Accu-Weld and $841,808.69 for Ultra. The 503(b)(9) claims will most likely subsume any and all reclamation demands and all other administrative claims will be paid in the ordinary course when due.

[2] This amount represents an estimate of the total amount of Fee Claims that may be requested through May 15, 2008.

[3] The above estimate is preliminary and includes all unsecured creditors in all of the Debtors' cases and no representations are being made with respect thereto as underlying this estimate are a number of assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors. The actual amount of claims in Class 5 may be materially higher based upon the ultimate allowed amount of any rejection damage claim, any environmental claims, any filed proofs of claim or any claims relating to the Debtors' multi employer pension plans.

[4] In consideration for the Plan Funders Debt Commitment and Plan Funders Equity Commitments, the Plan Funders shall receive 100% on the New L.L.C. Interests in Reorganized Shapes/Arch Holdings L.L.C.

[5] Debtors are currently analyzing the amount of claims in this class but estimate the same are in excess of $100,000.00 and less than $400,000.00.

RECOVERY, THERE IS NO ASSURANCE THAT THE FINAL AMOUNTS OF ALLOWED CLAIMS IN EACH CLASS WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNTS SHOWN IN THE TABLE ABOVE AND THEREFORE POSSIBLY DEPLETE THE ESTIMATED PERCENTAGE RECOVERY.    The actual recoveries under the Plan by the Debtors' creditors will be dependent upon a variety of factors including, but not limited to, whether, and to what extent, Disputed Claims are resolved in favor of the Debtors rather than the Creditors.  Accordingly, no representation can be or is being made with respect to whether each estimated recovery shown in the table above will be realized by the holder of an Allowed Claim or Interest.  The Debtors have filed the Plan for administrative convenience and each class referenced above shall apply to each of the Debtors' estates with the funding for each Class to be shared pro-rata amongst creditors in each estate as if the estates had been substantially consolidated.

## III.    OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders.  A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon, among others, a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

After a plan has been filed and a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan has been approved by the court, the holders of claims against or interests in a debtor may vote to accept or reject the plan under certain circumstances.

## IV.    DESCRIPTION OF THE DEBTORS' BUSINESS

### A.    The Debtors

Shapes/Arch Holdings L.L.C. ("Shapes/Arch") was created to integrate the operations and management of the company's four business units.  Shapes L.L.C. ("Shapes") is a manufacturer, fabricator and distributor of a broad array of customized, large profile aluminum extrusions.  Delair L.L.C. ("Delair") offers a wide variety of maintenance free aluminum fence systems and has one of America's most recognized brands of above ground pools.  Accu-Weld L.L.C. ("Accu-Weld") designs, manufactures and distributes high quality made to order vinyl, residential windows and steel entry doors.  Ultra L.L.C. ("Ultra") is a leading supplier of value priced, globally sourced hardware products. The membership interest of Shapes/Arch is held

100% by Ben LLC while the voting rights of the managers, under the Company's operating agreement, are held by Arcus ASI, Inc. (79.9% of the vote of all managers) and by Ben LLC (20.1% of the vote of all managers). Ben, L.L.C. is controlled by various family members who are related to the founder of the company (which was formed in 1952). Shapes/Arch owns 100% of the membership interests in each of the operating entities.

The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows. By 1959, the business had expanded and began focusing on producing aluminum extrusions. The Debtors have consistently expanded their business over the years by investing in new facilities and technology and by establishing new product lines. On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue. The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction. Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of 100,000 square foot facility in Bensalem, Pennsylvania. Unlike

8

many of its competitors, Accu-Weld extrudes its own final profiles, which results in faster production and delivery to the customer. Accu-Welds' net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufactures. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey with two million cubic feet of storage space. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

## B.    The Pre-Petition Capital Structure

Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and/or co-guarantors) were indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, JP Morgan Chase Bank, N.A. (successor to Bank One, National Association) and Textron Financial Corporation (collectively, the "Lender Group") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Pre-Petition Financing Agreement,"). Pursuant to the Pre-Petition Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory, eligible accounts receivable and, during specific periods, assets comprised of property, plant and equipment (the "PP&E Equity Borrowing Base Component"), term loan, and letters of credit ("Loan"). The Pre-Petition Financing Agreement has been amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the additional funding needs of the Debtors in light of the cyclical nature of the Debtors' businesses and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008. The Pre-Petition Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum revolving line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, were guarantors of the debt to the Lender Group pursuant to the Pre-Petition Financing Agreement. The Lender Group maintained a first priority lien on and security interest in substantially all of Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof. As of the Petition Date, the outstanding borrowings from the Lender Group were: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) a term loan totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $58,630,849 (the "Bank Debt").

## C.    Events Leading to Chapter 11 Filing

Prior to the filing of these Chapter 11 cases, the Debtors had attempted to sell the companies and had engaged TM Capital in May of 2006 to explore selling all of the entities. Those efforts which went on through the first half of 2007 did not result in a sale of the entities. The Debtors then attempted to raise significant additional capital in the fourth quarter of 2007

9

with the assistance of an affiliate of its principal lender, The CIT Group. Their efforts failed to uncover any alternative or additional lending source. During the weeks leading up to the filing the Debtors had discussions with potential buyers and potential sale/leaseback prospects, but their efforts failed to uncover any alternative or additional lending source. Aside from the Plan Funders' proposal, no other timely and viable opportunities presented themselves. Phoenix Management Services, Inc. ("Phoenix") was engaged by the Debtors to review the Debtors' current financial situation and to review the 2008 business plan and financial forecast and otherwise assist the Debtors in exploring their strategic alternatives.

The Debtors filed these cases as a result of serious liquidity issues. The Debtors consolidated statements for year ending 2007 showed a decline in net revenue by $48.5 million dollars from $322.3 million dollars to $273.8 million dollars. EBITDA declined by almost $17 million from $20.6 million in 2006 to less than $4 million dollars in 2007. The majority of the loss related primarily to the depressed results that were obtained by Shapes. Although the net revenue of Ultra increased slightly in 2007 from $45.5 million dollars in 2006 to $46.1 million dollars in 2007, its EBITDA decreased from $3.3 million in 2006 to $1.1 million in 2007. Both Delair and Accu-Weld had significant declines in net revenue during 2007 as well as significant declines in EBITDA.

A substantial portion of the Debtors' revenue has been impacted by various contractions in various industries throughout the United States. By way of example, Shapes' sales are primarily to trailer, truck body and rail car sector customers that are all experiencing declines in their own industry. Delair's customer base is strongly associated with consumer confidence in the economy and housing industry and as such, has been affected by the spending habits of consumers. Ultra and Accu-Weld are likewise significantly affected by consumer spending in the construction industry and home remodeling sectors and have been adversely affected by the same. Lastly, due to the seasonality of their businesses, the Debtors faced a significant liquidity crises under the Pre-Petition Financing Agreement with the Lender Group. In brief summary, the significant decline in revenue and seasonal liquidity position compelled the Debtors to seek an alternative to its current position which included, without limitation, seeking relief under Chapter 11 of the United States Bankruptcy Code.

In early January of 2008, with the Debtors' inability to identify additional or alternative financing notwithstanding the efforts of CIT Capital, and their need for borrowing in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million over the next several weeks, without factoring in any payments to restructuring professionals or to vendors on the past due trade debt, and the Lender Group's unwillingness to fund additional loans in excess of the availability under the borrowing base, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction. In mid January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence on an expedited basis with respect to the Debtors' businesses in late January. Also during this time frame, and as set forth above, the Debtors retained Phoenix.

In February of 2008, Versa (with certain affiliates), the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement

10

whereby Arcus ASI Funding, LLC ("Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during its Chapter 11 proceeding (and provide additional funding and an equity infusion to help reorganize the Debtors (through another affiliate, Arcus ASI, LLC "Arcus I"). As part of this agreement, Arcus ASI, Inc. would become a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) in Shapes/Arch and Ben LLC would retain 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions including the Lender Group's commitment to provide DIP financing to the Debtors, and the Lenders Group Commitment to Arcus to provide exit financing for the companies. The Debtors, Versa and the Lender Group engaged in extensive negotiations and ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the term loan was repaid and the PP&E Equity Borrowing Base Component would be eliminated) during any chapter 11 process as well as provide an exit facility for the Debtors.

This Plan reflects a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million, and (ii) Arcus to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Arcus of approximately $25 million (plus an additional equity infusion by Arcus I not to exceed five million five hundred thousand dollars).

Attached hereto as Exhibit "F" is a schedule setting forth the Debtors' operating performance for the first two months of 2008. The Debtors shall file monthly operating reports for the post petition periods as and when due in accordance with the U.S. Trustee's guidelines.

## V.      THE FILING

On March 16, 2008 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue in the possession of their property and the management of their businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have, with the Bankruptcy Court's approval, employed and retained (a) Cozen O'Connor, as its bankruptcy counsel; (b) Steven & Lee as special labor and conflicts counsel; (c) Phoenix, as its restructuring advisor; and (d) various other ordinary course professionals.

### A.      Significant "First Day" Motions

Immediately after the filing of its chapter 11 petition, the Debtors filed numerous "first day" motions seeking orders from the Bankruptcy Court authorizing the Debtors to retain professionals and providing the Debtors certain relief from certain administrative requirements imposed by the Bankruptcy Code. These orders were requested to ease the strain on the Debtors' relationships with customers, employees and others as a consequence of the filing. In particular, the Debtors obtained orders approving the following motions and applications:

Verified Motion for an Order Directing Joint Administration and Procedural Consolidation [Docket No. 3];

Verified Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Modifying Automatic Stay; and (IV) Scheduling Final Hearing, Pursuant to §§ 105, 362, 363 and 364 of the Bankruptcy code and Federal Rules of Bankruptcy Procedures 2002 and 4001(c) and (d) [Docket No. 18];

Verified Motion for an Order Authorizing the Debtors to Maintain Current Bank Accounts, Maintain Their Pre-Petition Cash Management System, and Use Existing Business Forms [Docket No. 4];

Debtors' Verified Motion for an Order Authorizing But Not Directing Payment of Pre-Petition Wages, Salaries, Compensation, Employee Benefits, Business Reimbursement Expenses, Certain Union Payments, and the Continuation of the Debtors' Workers' Compensation Program and Policies Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and (5) [Docket No. 5];

Verified Motion for Interim and Final Orders: (I) Prohibiting Utility Companies form Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies to Have Adequate Assurance of Payment; and (III) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366 [Docket No. 6];

Verified Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales and Use Taxes [Docket No. 7];

Application for Retention of Epiq Bankruptcy Solutions, LLC, as Official Noticing Claims and/or Solicitation and Balloting Agent for the Debtors [Docket No. 10];

Debtors' Verified Motion for an Order Establishing a Bar Date Pursuant to Fed. R. Bankr. P. 2002(a)(7) and 3003(c)(3) [Docket No. 9];

Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 11]; and

Debtors' Motion to:   (I) to Confirm Grant of Administrative Expense Status to Obligations Arising from Postpetition Delivery of Goods; (II) Establish Authority to Pay Certain Expenses in the Ordinary Course of Business and (III) Prohibit Third Parties from Interfering with Delivery of Good [Docket No. 18].

**B.**     ***DIP Financing and Use of Cash Collateral***

1.     <u>*DIP Financing*</u>

Essential to the Debtors' efforts to reorganize was obtaining a source of post-petition funding.  To that end, on March 16, 2008, the Debtors filed the Debtors' Motion for Order (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (II) Granting Related Relief [Docket No. ____] (the "DIP Motion").  Interim Orders were entered on March 18 (followed by three bridge orders) granting the relief requested in the DIP

12

Motion, subject to a final hearing on the same.  By Orders of the Bankruptcy Court dated
_____, 2008 [Docket Nos. ____] (the "Final DIP Order"), the Bankruptcy Court
approved the DIP Motion and authorized the Debtors to enter that certain Debtors-in-Possession
Loan and Security Agreement by and between the Debtors and Arcus (the "DIP Agreement").
Pursuant to the terms of the DIP Agreement, Arcus has made $25,000,000 available to the
Debtors.  As of the anticipated date of the Confirmation Hearing, the Debtors estimate that it will
have drawn approximately $22,000,000.00 on the DIP Agreement.  The Obligations (as defined
in the Final DIP Order) are secured by valid and perfected priming liens and security interests
granted to Arcus Funding on all of the Debtors' assets and properties (subject to first lien in
favor of The Lender Group on the Inventory and Accounts Receivable) and as more fully set
forth in certain Intercreditor Agreement dated March 18, 2008).  The Lender Group had also
agreed to provide the Debtors with additional availability under a new Sixty Million Dollar
Debtor-in-Possession Revolving Credit Agreement ("DIP Revolver Agreement") to fund
operations pending confirmation of the Plan.  Debtors' obligations to The Lender Group have
been reduced by utilizing a portion of the proceeds of the DIP Loan from Arcus to repay the
Term Loan and the loans due with respect to PP&E Equity Borrowing Base Component due and
owing to CIT.

## C.      *Claims Process*

### 1.      <u>*Last Date to File Proofs of Claim*</u>

On March 18, 2008, the Bankruptcy Court entered an order (the "Bar Date Order")
[Docket No. 35] generally requiring any Person holding or asserting a Claim against the Debtors
to file a written proof of claim with Debtors, c/o Epiq Bankruptcy Solutions, 757 Third Avenue,
New York New York 10017 on or before 5:00 p.m., prevailing Eastern Time on **May 15, 2008**.
The Bar Date Order provided that any person or entity failing to timely file a proof of claim will
be forever barred, estopped and enjoined from (a) asserting a timely filed claim against the
Debtors that the entity has that (i) is in an amount that exceeds the amount, if any, that is
identified in the Schedules of Assets and Liabilities on behalf of such entity as undisputed,
noncontingent and liquidated (if no amount is identified therein for that entity then the entity
shall be forever barred, estopped and enjoined from asserting any claim at all against the
Debtors) or (ii) is of a different nature or a different classification than any claim identified in the
Schedules of Assets and Liabilities on behalf of such entity; or (b) voting upon, or receiving
distributions under, any plan or plans of reorganization in this case in respect of a Claim.  The
Bar Date Order provides other bar dates in other circumstances as set forth in that order.

## VI.      DESCRIPTION OF SIGNIFICANT LITIGATION

## A.      *Preferences, Fraudulent Transfers and Other Avoidance Actions*

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential
transfers of property, including Cash, made while insolvent during the ninety (90) days
immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the
extent the transferee received more than it would have in respect of the pre-existing debt had the
transferee not received the payment and had the debtor been liquidated under chapter 7 of the

13

Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to the ordinary business terms are not recoverable.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a preferential transfer were recovered by the debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

The Debtors estimate that it made payments in the approximate amount of $61,122,757 to various creditors within the ninety-day period preceding the Petition Date and payments of $5,035,451.00 to insiders within the one-year period preceding the Petition Date.  The Debtors have not yet analyzed whether any of these payments are preferences (within the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a defense to a preference action, if commenced.  However, it is anticipated that the Plan Administrator will conduct such an analysis and commence appropriate actions which may ultimately increase the net dividend to Class 5 Unsecured Creditors but the amount of such increase, if any, is difficult to determine at this time.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the Debtors received less than fair value for such property.  In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property.  As of the date of the distribution of this Disclosure Statement, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions.  Under the Plan, the Avoidance Actions will be transferred to the Liquidation Trust which will have the authority to investigate and prosecute all such Avoidance Actions to do the same in their discretion.

**B.      Other Causes of Action**

1.      <u>Investigation of Causes of Action</u>

The Reorganized Debtors have not, but will, investigate causes of action against a number of Persons, relating to, among other things, the following (collectively, the "Causes of Action"):

•      Any lawsuits for, or in any way involving, the collection of accounts receivable or any matter related to the Plan;

•      Any actions against landlords, lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;

14

•       Any litigation or lawsuit initiated by the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association or any other court or tribunal;

•       Any and all potential Causes of Action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and

•       Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' business operations.

Debtors are not aware of any causes of action against any officers or directors (without prejudice to the Committee's right to investigate the same prior to the Confirmation Date). Debtors currently have a directors' and officers insurance policy which expires on April 30, 2008 in an amount not to exceed three million dollars and Debtors are in the process of binding/obtaining coverage through April 30, 2009.

In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and as a result, cannot be raised during the pendency of the case (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtors, to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors and Reorganized Debtors.

2.       *Preservation of All Causes of Action Not Expressly Settled or Released*

The Debtors have attempted to disclose all material Causes of Action, including Avoidance Actions and other actions that it may hold against third parties. However, the Debtors have not performed an extensive investigation or analysis of potential claims and Causes of Action against third parties. It is the contemplation of the Debtors, that such investigation and analysis will occur post-Confirmation by the Reorganized Debtors, as applicable. You should not rely on the omission of the disclosure of a claim or Cause of Action to assume that the Debtors holds no claim or Cause of Action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot. In addition, the Debtors have no knowledge or information as to whether the Liquidation Trust will or will not pursue the Avoidance Actions.

Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or Causes of Action against third parties are specifically reserved and will be transferred to the Reorganized Debtors.

The Debtors' failure to identify a claim or Cause of Action herein is specifically not a waiver of any claim or Cause of Action. The Debtors will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or Causes of Action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtors' failure to identify a claim or Cause of Action herein shall not give rise to any defense of any preclusion

15

doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or Causes of Action which could be asserted against third parties, including Creditors of the Debtors which may be reading this Disclosure Statement and/or casting a Ballot except where such claims or Causes of Action have been released in the Plan or the Confirmation Order or other order of the Bankruptcy Court.

**C.**    ***Claims Concerning the Environmental Protection Agency and other Environmental Claims.***

Numerous environmental claims have been asserted against one or more Debtors as more fully set forth in Schedule 4.5 to the Plan.  The Debtors believe that most if not all of the claims are covered by applicable insurance policies.  Without effecting the obligations of any third parties (i.e. insurance companies), and except for the Claims of EPA/NJDEP, all other environmental claims (or claims of third parties relating to environmental claims and including those set forth in Sections III and IV of Schedule 4.5 of the Plan) are treated as Class 5 General Unsecured Claims and will be discharged. A brief description of the environmental claims is set forth below.

### Ewan Superfund Site, Shamong Township, New Jersey

The Ewan Superfund Site is an Environmental Protection Agency ("EPA")  National Priorities List ("NPL") site and the identification number is EPA ID# NJD980761365/NJD0200791.    Aluminum Shapes, Inc., (a predecessor to Shapes, LLC) (hereinafter "Shapes") and other parties have been identified as  potentially responsible parties ("PRP") and have received Section 106 Orders pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). The Orders  were effective in June 1990 and May 1995.  The June 1990 Section 106 Order required Shapes and other PRPs to undertake and complete all response actions for the  Operable Unit. 1 at the NPL site.  The May 1995 Section 106 Order requires Shapes, in addition to other PRPs to undertake and complete all response actions required for remediation of the groundwater (which is designated as "Operable Unit 2").  Shapes' liability is premised upon the allegation that it arranged for the transport of hazardous substances which were allegedly released at the Ewan Superfund Site.  Groundwater at the site has been actively remediated since 1999.

Future operations and maintenance activities may take less time  than originally anticipated depending upon groundwater sampling results being analyzed at this time (the 2.5 year sampling data was collected in March 2008).  The EPA has approved limited shut downs of parts of the treatment systems based upon the sampling results.

 Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date.   These insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation and The PMA Group. There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have

16

not made any payment(s) in this matter.  There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

The New Jersey Department of Environmental Protection ("NJDEP") filed a complaint alleging that certain parties were liable for Natural Resource Damages("NRD").  Shapes was named as a defendant in an amended complaint that was filed on February 12, 2008.  The State also seeks compensation for damages to wetlands that were allegedly damaged during the remediation activities that have occurred to date.

Shapes' liability as to CERCLA response costs and NRD have not been determined.

### D'Imperio Superfund Site, Hamilton Township, New Jersey

The D'Imperio Superfund Site is an EPA NPL site and has the following site identification number:  EPA ID# NJD980529416.  Shapes and other parties were identified as PRPs and received Section 106 Administrative Orders pursuant to CERCLA which were effective in August 1993 and in 2003.  The Orders require the PRPs to implement the remedial design for the remediation of groundwater and require the PRPs to conduct additional response costs as specified in the Statement of Work.  The basis for CERCLA liability for Shapes is the allegation that  it arranged for the disposal of hazardous substances which were allegedly released at the D'Imperio Superfund Site.

Groundwater has been actively remediated at the Site for approximately 10 years.  Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date.  The insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation and The PMA Group,  There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.   There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

Shapes was a party to an October 1, 2002 settlement agreement with the NJDEP regarding Natural Resource Damages claims and oversight costs.  The settlement amount totaled $495,000.

Shapes' liability as to CERCLA response costs have not been determined.

### Swope Oil and Chemical Company Superfund Site, Pennsauken, New Jersey

The Swope Oil and Chemical Company Superfund Site is an EPA NPL Site and has the following identification number:  EPA ID# NJD041743220.  The ongoing remediation of this Site involves the remediation of three operable units:  Operable Unit 1 (surficial contamination), Operable Unit 2 (contaminated subsurface soils which serve as a source for the groundwater contamination) and Operable Unit 3 (groundwater contamination).  EPA has indicated that there may also be a vapor intrusion issue although this particular issue has not been delineated at this

time.  Nevertheless, EPA is requiring the PRPs to evaluate the existence of a vapor intrusion pathway into buildings that are adjacent to the Superfund Site.

Shapes and other parties received a Section 106 Administrative Order pursuant to CERCLA which was effective on August 16, 1986.  The Order requires the submission of a Statement of Work based upon the sampling results, the submission of a Final Design and Operations Plan and the implementation of remedial work.  The Order also requires the PRPs to remove the drums and the contents of onsite tanks and vessels as well as, all structures and requires the sampling and removal of onsite soils.

Shapes and other parties are also subject to an Administrative Settlement Agreement and Order on Consent, for the Supplemental Remedial Investigation and Focused Feasibility Study dated September 27, 2006 for Operable Unit 3 (groundwater contamination) pursuant to Sections 104, 107 and 122 of CERCLA.  This particular Order also requires reimbursement of all future response costs that are incurred by EPA in connection with this Superfund Site.  A claim has not been made by EPA or NJDEP for Natural Resource Damages.

A judicial Consent Decree was executed for this Superfund Site in 1993 but Shapes was not a party to the Consent Decree.  The Consent Decree pertained to remedial design and action for Operable Unit 2.

According to EPA/Region II, the final response costs have not been estimated for this Superfund Site.  Although EPA has performed some removal actions at this Superfund Site, it has been reimbursed for these costs by the PRPs.  EPA is billing the PRPs for all oversight costs at an approximate amount of $10,000 per year depending upon the remedial work that is undertaken for any given year.

Shapes' general liability insurance carriers from the late 1960's through the early 1980's, have paid the indemnity and/or defense costs to date.  These insurance carriers include the following:  Liberty Mutual Insurance Company, New Jersey P&L Insurance Guarantee Association on behalf of Reliance Insurance Company in Liquidation, and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America,. There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.  There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.  Shapes' liability for CERCLA response costs have not been determined.

**Puchack Wellfield, Pennsauken Township, New Jersey**

The Puchack Wellfield Superfund Site is an EPA NPL site:  The EPA site identification number is:  EPA ID# NJD981084767.  The EPA issued a Record of Decision on September 28, 2006.  The EPA has not identified Shapes as a PRP for chromium at this site.  According to EPA/Region II, the site is contaminated with chromium and other hazardous substances and there are two operable units.  Operable Unit 1 pertains to the remediation of groundwater and Operable Unit 2 pertains to the remediation of the source areas.  The investigation and remediation of this NPL site is ongoing.

18

Shapes received an information request from EPA pursuant to Section 104(e) of CERCLA on December 15, 1999.  Shapes responded to the Section 104(e) information request but, as noted, has not been identified as a PRP for this NPL site.  EPA believes that chlorinated solvents are ubiquitous in this area of New Jersey and has deferred all investigations and remediation oversight to NJDEP.

Shapes received a Directive and Notice to Insurers dated October 31, 1997 and Supplemental Directives and Notice to Insurers issued by NJDEP on May 7, 1992, October 27, 1995 and May 17, 1996.  The Directives were issued based upon the premise that Shapes, along with other parties, had allegedly discharged chromium and other hazardous substances unlawfully to groundwater.  The Directives required Shapes to pay costs associated with the construction of a potable water treatment system and for remedial investigation work.

According to EPA/Region II, past response costs total approximately $11.4 million and future response costs total approximately $13 million although the remedial costs may be higher.

Shapes' general liability insurance carriers from the late 1960's through the early 1980's, have paid defense and/or indemnity costs to date.   These insurance carriers include the following:   Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.  There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.   There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.  There has been no formal claim by EPA or the State of New Jersey for Natural Resource Damages.

Shapes liability for CERCLA response costs and costs owed to the State of New Jersey have not been determined.[6]

## Lightman Drum Company Superfund Site, Winslow Township, New Jersey

The Lightman Drum Company Superfund Site is an EPA NPL site and the EPA site identification number is EPA ID# 02-2000-2034.

In November 2000, the EPA issued an Administrative Order on Consent for Remedial Investigation and Feasibility Study.  Shapes did not consent to the Order and is not a party to it.

---

[6]   In 2002, Shapes and others were sued in a private action, Harris et al. v. Advance Process Supply Co., et al., (Docket No.: L-03815-02, Superior Court, Camden County, NJ).  This was a proposed class action which allegedly emanates from the Puchack Wellfield.  Class certification was denied on June 30, 2006 and a Summary Judgment was granted to the defendants after the plaintiffs proceeded individually on their alleged claims on the following dates:  January 27, 2007, February 27, 2007 and July 31, 2007.  On April 8, 2008, the Appellate Division dismissed Shapes without prejudice due to the Automatic Bankruptcy Stay.  Shapes' general liability insurance carriers have paid defense costs to date.  These insurance carriers include Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.

19

Shapes remains involved at the Site as a participating party.  The Order requires the preparation and performance of the remedial investigation and feasibility study and further requires the reimbursement of response costs incurred by EPA.

EPA also issued an Administrative Order on Consent for a Removal Action in 2007. Shapes is not a party to that Order but remains a participating PRP.  The Removal Action Order is limited to excavation of certain contaminated soils on the Lightman Site which were believed to be contributing to the source of one of the groundwater plumes.  The 2007 Order requires the parties to conduct removal actions and to reimburse EPA for response costs incurred for all removal actions and all future response costs.

According to the EPA/Region II, a feasibility study was submitted to the Agency in December 2007 and soil excavation was undertaken in the vicinity of the former waste storage tank area. The December 2007 Feasibility Study lists several technologies for remediation of soils and groundwater onsite and for remediation of offsite, downgradient groundwater. According to the Feasibility Study, the most expensive combination of the technological alternatives is estimated to cost $14,860,000 for all of these components.

According to the EPA/Region II, the Agency has not estimated the response costs associated with the final remedy for the site.  EPA is billing the PRPs for oversight costs at approximately $10,000 per year depending upon the remedial work implemented for that year. In February 2008, EPA expressed a preference for an Air Sparging, Soil Vapor Extraction remedy as the on site soil and groundwater component.  This component was estimated as $5,680,000 of the above cited $14,860,000 estimated by the site consultant.  EPA has not decided on a remedy for the downgradient groundwater remediation component.

Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date.   These insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation and The PMA Group. There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.   There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

Shapes' liability for CERCLA response costs have not been determined.

### 9000 River Road, Pennsauken, New Jersey

Shapes currently owns and operates at 9000 River Road, Pennsauken, New Jersey. NJDEP issued a Directive and Notice to Shapes and insurers on June 2, 1992 requiring Shapes to address alleged violations of:   discharge limits for process wastewater, stormwater runoff and contact cooling water.  The alleged contaminant of concern is chromium.  A Supplemental Directive No. 1 was issued on July 16, 1992 to Shapes and the insurers directing Shapes to address alleged chromium discharges onto the property and into groundwater.  The Directive also required Shapes to identify and address all sources contributing to the alleged chromium contamination in the soils and the groundwater at the facility and to prevent the migration of the

20

alleged chromium contamination.  Shapes has conducted investigations at this facility to date and has been cooperating with NJDEP.  At present, Shapes is waiting for a response from the Agency as to its proposed work plans.

A Memorandum of Agreement ("MOA") was executed between NJDEP and Shapes on July 1, 1993 and an Amendment to the MOA was executed on July 7, 2007 for chromium only.

The Agreements require Shapes to conduct investigation, remediation and to cooperate with the State of New Jersey in connection with its review of the proposed investigations and remediation of the facility.  Shapes has submitted two (2) Remedial Investigation Work Plans to NJDEP and a response is pending.  Shapes' environmental consultant (Roux Associates) has estimated that the response costs will range from $1.3 million to 1.8 million including any costs for Natural Resource Damages.  Shapes will continue to perform the obligations set forth in the MOA and the Amendment to the MOA for this facility

Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date.  The insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company, in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.  There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.  There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

### Pennsauken Solid Waste Management Authority, et al. v. Ward Sand Materials Co., Inc., et al., Superior Court of New Jersey, Camden County, Law Division, Docket No.: L-13345-91.

This case was filed by Pennsauken Township and the Authority that owns and operates the Pennsauken Landfill on December 4, 1991 as a contribution action under the New Jersey Spill Compensation and Control Act (N.J.S.A. 58.10-23.11 et. seq. and the Water Pollution Control Act N.J.S.A. 58:10 A-1 et.seq., Chapter 151 of the Pennsauken Township Ordinance entitled "Garbage, Rubbish and Refuse" Code, and Chapter 270 of the Pennsauken Township Ordinance entitled "Nuisance, Public Health" Code of the Public Health Nuisance Code of New Jersey (1953) N.J.S.A. 26:3-69 to 3-69.6)  The plaintiffs sued numerous defendants and alleged` that these defendants deposited various types of wastes in the landfill during the period from 1970 to June 30, 1982.  Shapes is among those defendants sued by the plaintiffs.  Hundreds of additional defendants were joined in the matter based on the alleged arrangement of transportation of their wastes to the landfill.  The case is currently pending in the New Jersey Superior Court, Law Division, Camden County.  The plaintiffs allege that any or all of the defendants are responsible for clean up and removal costs associated with groundwater contamination caused by the wastes in the landfill.  Plaintiffs have made a claim for approximately $28 Million for past clean up and removal costs under the Spill Act.  Plaintiffs have submitted expert reports claiming $41 Million in future clean-up and removal costs.  This case is in active litigation and a trial date is scheduled for September 2, 2008.  Expert discovery is underway and concludes on July 31, 2008.  Shapes' potential liability for this site, has not been

21

determined.  Shapes' alleged liability is premised upon its waste contaminating the groundwater underneath the Landfill.  At this time, the groundwater flow direction is currently under investigation.

Shapes' general liability insurance carriers from the late 1960's through the early 1980's , have paid defense and/or indemnity costs to date.  These insurance carriers include the following:  Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.  There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.  There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

Some of the Objectors to the Joint Disclosure Statement (mostly those involved in the Pennsauken Solid Waste Management Authority matter), premised their objections upon their alleged lack of information regarding any potential insurance that may be applicable to Debtors' environmental matters.  It should be noted that a schedule of Insurance was provided as part of a discovery response dated August 8, 1998 in that matter.  Shapes responded to requests for discovery regarding insurance in accordance with the Case Management Orders governing the case, as well as the New Jersey Rules of Court.

## Chemical Control Corporation, Elizabeth, New Jersey

The Chemical Control Corporation Superfund Site is an EPA NPL site and the EPA site identification number is EPA ID# NJD000607481.  Shapes' estimated percentage share of costs as a de minimis contributor was less that .0467 percent.   Shapes' liability with the EPA was settled.

## Buzby Brothers landfill Superfund Site, Voorhees New Jersey

Buzby Brothers Landfill Superfund Site is an EPA NPL site and the EPA identification number is:  EPA ID# NJD000305524.  According to  NJDEP, the remediation is essentially complete and the site continues to be monitored by General Electric.  Shapes' estimated percentage share was $40,000 and Shapes was dismissed from liability pursuant to a February 10, 1995 Release, Indemnification and Settlement Agreement between General Electric and Settling Companies.  The Settlement Agreement addressed past and future response costs but did not include costs associated with potential Natural Resource Damages.  Accordingly, Shapes' potential liability for natural resource damage claims has not been determined..

A complaint was filed by the State of New Jersey against General Electric and Buzby Brothers Materials on June 27, 2007 in connection with Natural Resource Damages.  The State is in settlement discussions with General Electric.  Shapes has not been identified as a party to this matter.

It is unknown as to whether Shapes' insurance carriers will pay any additional response costs or Natural Resource Damages for this Superfund Site.

## VII.  SUMMARY OF PLAN PROVISIONS

### A.    *Introduction*

The Plan is the product of diligent efforts by the Debtors to formulate a plan that provides for a fair allocation of the Debtors' assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.  The liquidation analysis prepared by the Debtors with the assistance of Phoenix  reflects an aggregate value for the Debtors as more fully set forth in Exhibit "D" attached hereto.  The aggregate Secured Claims of CIT and Arcus will be in the approximate amount of seventy eight million dollars ($78,000,000.00) on the Confirmation Date.

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtors' creditors and interest holders.  The Debtors believe, and will demonstrate to the Bankruptcy Court, that the Debtors' creditors will receive significantly more value under the Plan than any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

### B.    *Method of Classification of Claims and Interests and General Provisions*

1.    *General Rules of Classification.*

Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class or Classes.  Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

2.    *Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims.*

Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims, and Fee Claims have not been classified and are excluded from the Classes set forth in Article III of the Plan in accordance with section 1 l23(a)(1) of the Bankruptcy Code.

3.    *Bar Date for Administrative Claims.*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, no later than thirty (30) days after the Effective Date (the "Administrative Claim Bar Date").  Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or

23

participating in distributions under the Plan on account thereof. Objections to requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, and the party requesting payment of an Administrative Claim within twenty (20) days after the filing of such request for payment.

4.      *Bar Date for Fee Claims.*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date, must be filed and served on the Plan Administrator and its counsel no later than thirty (30) days after the Effective Date (the "Fee Claim Bar Date"). Any Professional that is required to file and serve a request for payment of a Fee Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Fee Claim or participating in distributions under the Plan on account thereof. Objections to Fee Claims must be filed and served on the Plan Administrator, its counsel, and the requesting party by twenty (20) days after the filing of the applicable request for payment of the Fee Claim.

5.      *Intercompany Claims.*

Each of the Debtor entities have historically borrowed based on availability. Funds are lent or borrowed by each entity based on cash flow and/or cash needs. Due to the manner in which the companies have historically accounted for intercompany transactions, it is virtually impossible to identify how much Shapes and Accu-Weld owe to each entity as well as how much Delair and Ultra are owed by each entity. Entities owe money, or are owed money, from a "pool". The entities share certain services including, (i) commercial insurance; (ii) health insurance, dental, life, etc.; (iii) workers compensation; and (iv) minor incidental purchases – supplies, etc. Shapes charges a management fee of $2,000 per month to Delair, Ultra and Accu-Weld. The entities have intercompany transactions relating to the following activities:

(a)      Delair purchases the majority of its material requirements from Shapes;

(b)      Accu-Weld rents space in Delair's building to manufacture doors;

(c)      Delair invoices Accu-Weld for labor, utilities and supplies;

(d)      Shapes owns Ultra's building; Shapes charges rent to Ultra;

(e)      Shapes owns Delair's building; Shapes charges rent to Delair.

Given the complexities involved in trying to unravel the intercompany claims as well as the benefits derived from and for each of the Debtors' estates to the other, given the blanket liens on all of the assets, and further given the deminimus net effect on Class 5 Creditors as of the Effective Date, Intercompany Claims shall be extinguished. No distributions on account of Intercompany Claims will be made.

**C.      Unclassified Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims**

24

Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims are not classified in the Plan.  The treatment of and consideration to be received by holders of Allowed Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims shall be in full and complete satisfaction, settlement, release and discharge of such Claims.  The Debtors' obligations in respect of such Allowed Administrative Claims, Priority Tax Claims, Arcus Holders DIP Claims and Fee Claims shall be satisfied in accordance with the terms of the Plan.

Administrative Consolidation.  For purposes of this joint plan and for the administrative convenience of the parties, holders of Claims in each Debtor case shall receive the identical treatment referenced below and each unimpaired class and impaired class shall be deemed to automatically apply in each case as if there were separate plans of reorganization filed in each case (provided that all Class 5 Claimants of all Debtors shall receive their Pro-Rata Share of the Class 5 Pool Escrow).  Holders of Interests in each case shall be treated as more fully set forth below.  THIS PLAN DOES NOT PROVIDE FOR THE SUBSTANTIVE CONSOLIDATION OF THE DEBTORS ON THE EFFECTIVE DATE but the holders of Claims in Class 5 shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against or obligation of the consolidated Debtors and shall receive one distribution in accordance with Section 4.3 of the Plan.  Based upon the liquidation analysis attached hereto and based upon the fact that each of the Debtors are liable for CIT-DIP Claims and Arcus DIP Claims, the Debtors believe the impact of the administrative (but not substantive) consolidation of the treatment of Class 5 Creditors will be nominal.

Administrative Claims.  Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree.  The total amount of unpaid Allowed Administrative Claims shall be subject to approval by the Bankruptcy Court.

Priority Tax Claims.  Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree, or (at the election of the Debtors or the Reorganized Debtors) (b) over a period of five (5) years from the Petition Date in equal monthly installments of principal plus interest at the rate of six percent per annum.

Arcus Holders DIP Claims.  To the extent not otherwise paid prior to Confirmation and conditioned upon the New LLC Interests being received by the Plan Funders, on the Effective Date, all Obligations then due and owing under the DIP Agreement shall be satisfied pursuant to the terms of new Exit Facility being provided by Arcus  Funding as set forth in the Exit Facility

25

Letter attached to the Plan Supplement. At any time on or before the Effective Date, the Arcus Holders DIP Claims and Liens may be assigned (in whole or in part at election of Arcus Funding) to the Plan Funders. If such an assignment is made, then the Plan Funding Equity Commitments shall be adjusted to an amount equal to the amount of the Arcus Holders DIP Claims assigned to Plan Funders. Subject to the terms and conditions of the Plan Funding Debt Commitments, on or before the Effective Date, Arcus Funding shall fund their Plan Funding Debt Commitments (or assign such commitment to Plan Funders), or a portion thereof, and such amount shall be sufficient to satisfy in full the Obligations remaining due under the DIP Agreement as of the Effective Date, including, without limitation, all accrued and unpaid interest, costs and fees (including, without limitation, all costs, expenses and fees, including attorneys' fees incurred in connection with the administration of the Chapter 11 Case and the Plan) shall be capitalized and added to the restated principal balance of the Exit Facility as of the Effective Date. The terms of the Exit Facility shall be set forth in the Plan Supplement. The Exit Facility shall be secured by an assignment of the Liens securing the DIP Facility and a first priority lien on all Property of the Reorganized Debtors (but subject to the liens and priorities in favor of CIT and The CIT-DIP Lenders that are acceptable to the Plan Funders as more fully set forth in the CIT Revolving Lenders Exit Commitment). Arcus Funding's Lien shall attach to the Reserves, and Reserves Balances. The Liens and property interests of Arcus Funding shall remain perfected from and after the date of the Confirmation Order without the need of Arcus Funding to take any or further action or file or record any notes with respect thereto. The Confirmation Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of Arcus Funding's Liens without the necessity of filing or recording the Confirmation Order (other than as docketed in the Chapter 11 Case) or any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Arcus Funding's Liens, or to entitle Arcus Funding to the priorities granted under the DIP Facility or herein (including, in respect of cash or deposits or investment property, any requirement that Arcus Funding have possession of or dominion and control over, any such cash in order to perfect an interest therein); provided that the Debtors or Reorganized Debtors shall execute and deliver to Arcus Funding and they may file or record financing statements or other instruments further to evidence or further to perfect the Arcus Funding's Liens authorized, granted and perfected under the DIP Facility and hereby; and provided further that no such fling or recordation shall be necessary or required in order to create or perfect any such Lien.

Fee Claims. Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash on the Effective Date or as soon as practicable after such Fee Claim becomes an Allowed Claim.

## D.    *Classification and Treatment of Claims and Interests*

### 1.    *Class 1 Other Priority Claims*

Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Other Priority Claim and the Debtors prior to the Effective Date and the

Reorganized Debtors following the Effective Date might otherwise agree. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote.  Any Allowed Claim in this Class 1 for paid time off shall be satisfied in the ordinary course of business consistent with Debtors' employment policies and practices.

2.      *Class 2 Miscellaneous Secured Claims*

To the extent there are any Allowed Secured Claims in this Class (and excluding any Secured Claims that are subject of a different treatment as provided in a separate Secured Class), each such Claim shall be deemed to be a separate subclass. At the option of the Debtors or the Reorganized Debtors, holders of Class 2 Claims shall receive (a) the return of the collateral securing such Allowed Secured Claim or (b) the Net Proceeds realized by the Debtors or Reorganized Debtors from the disposition of the collateral securing such Allowed Secured Claim up to the amount of their Secured Claim. The holder of a Claim in this Class is not impaired and, therefore, not entitled to vote.

3.      *Class 3 CIT-DIP Claim*

Class 3 CIT-DIP Claim.   CIT (and, as applicable, the DIP Lenders) shall retain their liens on Property of the Estate of each Debtor and the terms and conditions of the CIT Revolving Loan DIP Agreements, the Interim Orders, and Final DIP Orders shall remain in full force and effect with the consent of the CIT-DIP Lenders.  In the alternative at the election of the Plan Funders, to the extent not already paid in full, in Cash (by wire transfer of immediately available funds) prior to Confirmation, on the Effective Date, the CIT Revolving Credit Obligations shall be paid in full in Cash (by wire transfer of immediately available funds), with interest at the contract rate set forth in the CIT Revolving Loan DIP Agreements.  Reorganized Debtors shall also post cash collateral with CIT in the amount of 105% on or before the Effective Date as described in the preceding sentence of the amounts outstanding under any undrawn letters of credit in the event Debtors elect to satisfy the CIT-DIP Claims.  CIT and the CIT-DIP Lenders are impaired and, therefore, are entitled to vote.  The Liens and property interests of The CIT-DIP Lenders shall remain perfected from and after the date of the Confirmation Order without the need of the CIT-DIP Lenders to take any or further action or file or record any noted with respect thereto.  The Confirmation Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of CIT-DIP Lenders' Liens without the necessity of filing or recording the Confirmation Order (other than as docketed in the Chapter 11 Case) or any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the CIT-DIP Lenders' Liens, or to entitle CIT-DIP Lenders to the priorities granted under the CIT Revolving Loan DIP Agreements (as amended by the CIT Revolving Lenders Exit commitment) including, in respect of cash or deposits or investment property, any requirement that CIT or the CIT-DIP Lenders have possession of or dominion and control over, any such cash in order to perfect an interest therein); provided that the Debtors or Reorganized Debtors shall execute and deliver to CIT-DIP Lenders and they may file or record financing statements or other instruments further to evidence or further to perfect the CIT-DIP Lenders' Liens authorized, granted and perfected under the CIT Revolving Loan DIP Agreements and hereby; and provided further that no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.

27

4.      *Class 4 Collateralized Insurance Program Claims*

This Class shall consist of the Allowed Secured Claims of those entities holding cash deposits or letters of credit which are acting as collateral security for the workers compensation insurance policies of the Debtors, each such Claim shall be deemed a separate subclass.  Each holder of a Class 4 Claim shall retain on account of its Allowed Secured Claim the cash deposit or Letter of Credit securing the same; provided, however, that such entities shall, on the Effective Date, return to the Reorganized Debtors all collateral being held in excess of their Allowed Secured Claims (as determined by agreement of the parties or further Order of the Bankruptcy Court in the event Debtors or holders request an estimation of any holders' claims under Section 502(c) of the Bankruptcy Code).  The holders of Claims in this Class are Impaired and therefore entitled to vote.

5.      *Class 5 General Unsecured Claims*

This Class shall consist of General Unsecured Claims. Unless otherwise agreed to by the holder of an Allowed General Unsecured Claim and the Plan Administrator, each holder of a General Unsecured Claim shall receive their Pro Rata share of the Class 5 Pool as follows: (i) on the Effective Date or as soon as practicable thereafter, each such holder shall receive its Pro Rata share of the Class 5 Pool on account of the amount of such Allowed Claim from the Class 5 Pool Escrow; (ii) from time to time each such holder shall receive its Pro Rata share of the Reserves Balances; and (iii) from time to time, each holder shall receive its Pro Rata Share of recoveries on account of the Avoidance Actions.  In the event of the occurrence of an Alternative Transaction then, the additional consideration received upon the sale of the New LLC Interests in accordance with Bid Procedures attached to the Disclosure Statement as Exhibit "E" shall be added to the Class 5 Pool.  On the Effective Date, all Class 5 Claims shall be transferred to and assumed by the Liquidation Trust and the Debtors and their Property, and the Reorganized Debtors and their property shall be free and clear of all Class 5 Claims, and be deemed released and discharged from all Class 5 Claims.  All environmental claims set forth in Sections III and IV of Schedule 4.5 shall be treated as Class 5 general unsecured claims.  The holders of Claims in this Class are impaired and therefore entitled to vote.

6.      *Class 6 Ben Claims*

This Class shall consist of the Ben Interests. On the Effective Date, all Class 6 Interests shall be deemed cancelled, null and void and of no force and effect.  Accordingly, Class 6 Interests are deemed to reject the Plan and, therefore, are not entitled to vote.

7.      *Class 7 Interests*

On the Effective Date, all Class 7 Interests shall remain unaffected, valid and binding such that 100% of the membership interests of Shapes L.L.C., Delair L.L.C., Accu-Weld, L.L.C. and Ultra L.L.C. shall continue to be owned by Shapes/Arch Holdings L.L.C.

8.      *Class 8 Claims*

On the Effective Date, the EPA shall receive the sum of $300,000.00 in full and complete satisfaction of their claims set forth in Section I of Schedule 4.5 attached hereto and the sum of

$25,000.00 in full and complete satisfaction of their claims set forth in Section II of Schedule 4.5 attached hereto.   The NJDEP shall receive the sum of $25,000.00 in full and complete satisfaction of their claims set forth in Section II, III and IV of Schedule 4.5 attached hereto. Funding for the distributions to this class will be made solely from proceeds of applicable insurance policies.   Any other environmental claims set forth in Sections III and IV of Schedule 4.5 (or as may be otherwise asserted by any Person, hereinafter, "Additional Environmental Claims") shall be treated as General Unsecured Class 5 Claims.   Accordingly, Class 8 is impaired and is entitled to vote.

9.    *Class 9 Claims*

This Class shall consist of the holders of Allowed Secured Real Estate tax claims relating to the Delair Real Estate, Accu-Weld Real Estate, Shapes Real Estate and Ultra Real Estate. Each holder shall be deemed to be a separate subclass.   Each member of the subclass shall have an allowed secured claim in the amount of Real Estate taxes due and owing as of the Petition Date (including any interest due and owing but excluding any late charges or penalties in the amount as set forth in the Debtors' Schedules and Statement of Financial Affairs) and such claims shall be paid (at the election of the Debtors) (i) in full, in cash on the Effective Date or (ii) in equal monthly installments of principal commencing on the first day of the first month following the Effective Date and continuing until the date which is sixty months from the Petition Date, with interest at the rate of six percent per annum.   Reorganized Debtors shall have the right to prepay one or more of the Class 9 holders at any time without penalty.   Class 9 claims are impaired and entitled to vote.

10.    *Class 10 Claims*

This Class shall consist of the Allowed Secured Claims of the holders of purchase money security interests (which shall include lease agreements for equipment which contains a nominal or $1.00 purchase option) in the Debtors' equipment which is being retained by the Reorganized Debtors and each such Claim shall be treated as a separate subclass.   Each holder of a Claim in this Class shall continue to receive the monthly amortized payments set forth in the pre-petition agreements (at the non-default interest rate and without the allowance of any late payments or penalties) with any pre-petition arrearages to be added at the end of the contract and paid in one-lump payment on the thirtieth day following the natural un-accelerated due date under the applicable contract.   Any holder of a purchase money security interest in equipment or a lessor of equipment (whose contract contains a nominal or $1.00 purchase option) who has not properly perfected their interest under the Uniform Commercial Code shall be treated as a Class 5 unsecured creditor.   The holder of Claims in this Class are impaired and, therefore, are entitled to vote.

11.    *Class 11 Claims*

Class 11 shall consist of holders of Allowed Secured Claims of the Debtors' Shippers and Warehousemen (who are in possession of Property).   Each holder shall be deemed to be a separate subclass.   Each member of the subclass shall have an Allowed Secured Claim in the amount of the charges due and owing to them (by agreement of the parties or as allowed by Order of the Bankruptcy Court) and such claims shall be paid (at the election of the Debtors) (i)

29

in full (without interest) on the Effective Date or (ii) in 24 equal monthly installments of principal (commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter) with interest at the rate of six percent (6%) per annum.  On the Effective Date any Property then in the possession of a Class 11 holder shall be released to the Reorganized Debtors. Class 11 claims are impaired and entitled to vote.

### E.      Means For Implementation Of The Plan

1.      *Corporate Action*

On the Effective Date and automatically and without further action, (i) each existing member (or manager of each operating entity) of the Debtors will be deemed to have resigned, (ii) the new board members/managers of the Reorganized Debtors shall be those identified in the Plan Supplement, and (iii) the Plan Administrator and Reorganized Debtors shall be authorized and empowered to take all such actions and measures necessary to implement and administer the terms and conditions of the Plan. Each Debtors' Operating Agreement will be amended as of the Effective Date to the extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code.  The rights and interests of the New LLC Interests shall be governed by and controlled pursuant to the terms and conditions of the Reorganized Debtors' Operating Agreements, which shall be included in and filed with the Plan Supplement.

2.      *Liquidation Trust*

On the Effective Date the Debtors shall execute and deliver the Plan Administration Agreement, which shall create a trust, appoint the Plan Administrator, provide for the acceptance of the Reserves provided for in the Plan, and set forth the terms and conditions for distributions from such Reserves.

From and after the Effective Date, the Liquidation Trust and the Plan Administrator shall hold and administer the following Reserves:

Class 5 Pool Escrow - $500,000 (or $2,000,000 in the event Class 5 votes to accept the Plan as determined under Section 11 U.S.C. § 1126(c))

Plan Expense Reserve - $100,000

All of the Reserves shall vest with the Plan Administrator on the Effective Date and any amounts remaining in the Reserves under Section 5.2 after distribution to Class 5 Creditors shall be donated to a charity of choice at the election of the Plan Administrator.

3.      *Plan Administrator*

On or before the Effective Date, the Plan Funders, with the consent of the Debtors shall appoint one Plan Administrator to serve as such pursuant to the Plan Administration Agreement (the "Plan Administration Agreement"). The Plan Administration Agreement is attached as an exhibit to the Plan Supplement. The Plan Administrator shall administer the Plan subject to the foregoing duties and powers, which shall include the following:

30

(a)     To prosecute, compromise or settle objections to Claims and/or Interests (disputed or otherwise) and to make or direct that distributions be made to holders of Allowed Claims;

(b)     To make decisions regarding the retention or engagement of Professionals and to pay, without court order, all reasonable fees and expenses incurred after the Effective Date;

(c)     To make or direct distributions to holders of Allowed Claims and to otherwise implement and administer the Reserves and the Plan;

(d)     To file with the Bankruptcy Court the reports and other documents and to pay any and all fees required by the Plan or otherwise required to close the Chapter 11 Case, including the preparation and filing of a motion for a final decree (subject to the rights of Reorganized Debtors for the case to remain open pending the completion of the prosecution of any Avoidance Actions);

(e)     To set off amounts owed to the Debtors against any and all amounts otherwise due to be distributed to the holder of an Allowed Claim under the Plan;

(f)     To take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with administering the Plan; and

(g)     To prosecute and settle all Avoidance Actions.

4.      _Exit Financing and Equity Commitments_

At any time or before the Effective Date, the DIP Facility and the Arcus Holders DIP Claims may be assigned (in whole or in part at the election of Arcus Funding) to the Plan Funders. The terms and conditions of the Exit Facility shall be as set forth in the Exit Facility Letter, which shall be included in and filed with the Plan Supplement. The material terms of the Exit Facility are described above in the treatment afforded to the Arcus Holders DIP Claims. The principal amount of the Exit Facility upon the Effective Date shall be $25 million plus any and all unpaid interest, costs and fees that accrued prior to the Effective Date. Except as expressly set forth in the Plan, or the Plan Funding Debt Commitment or the Plan Funding Equity Commitments, working capital of the Debtors and Reorganized Debtors together with the proceeds of the Plan Funding Debt Commitment and the Plan Funding Equity Commitments shall be used for general working capital and capital expenditures of the Reorganized Debtors, to fund the Reserves, to pay the Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority claims, and Allowed Other Priority Claims. In consideration for meeting its funding commitments under the Plan Funding Equity Commitments in the aggregate amount of no less than One Million Five Hundred Thousand Dollars ($1,500,000.00) and not more than five million five hundred thousand dollars ($5,500,000.00) (which will be paid in cash or by way of a conversion of the Arcus Holders DIP Claims assigned to the Plan Funders), each Plan Funder shall receive Pro Rata 100% of the New LLC Interests in the Reorganized Shapes/Arch Holdings

31

L.L.C. that are authorized and issued as of the Effective Date, subject to dilution from time to time upon the implementation of the Management Equity Incentive Plan, (at the election of the Plan Funders) which when fully implemented would result in the Plan Funders holding not less than [95]% of the equity interests of the Reorganized Shapes/Arch Holdings L.L.C. outstanding.

In addition, at the election of the Plan Funders, funding for the Reorganized Debtors will also be provided by the CIT-DIP Lenders in accordance with the terms and conditions set forth in the CIT Revolving Lenders Exit Commitment.  CIT's lien position on the Reorganized Debtors' Property shall be in accordance with the provisions set forth in the CIT Revolving Lenders Exit Commitment and a certain intercreditor agreement to be executed by the parties on or before the Effective Date.

     5.     *Alternative Transaction and Break-Up Fee.*

Upon the occurrence of an Alternative Transaction Trigger, the New LLC Interests will be subject to a market process (as described herein below and in Exhibit "E" attached hereto) and ultimately, the New LLC interests may be issued to a party other than Plan Funders.  In the event the Plan Funders are not the successful bidder upon the conclusion of that process then (i) Plan Funders shall receive the Break-Up Fee; and (ii) the Class 5 Pool shall be increased by the amount of at least $1,500,000.00 (as adjusted higher or lower) pursuant to the terms of the Bid Procedures set forth on Exhibit E to the Disclosure Statement.

     6.     *Revesting*

Revesting. Except as otherwise provided for in the Plan, the Confirmation Order, Interim Orders and Final Orders, as applicable (including, without limitation, the liens being granted and/or retained by Arcus Funding, CIT and the CIT-DIP Lenders), on the Effective Date, without any further action, each of the Reorganized Debtors will be vested with all of the Property of the Estate (excluding all Avoidance Actions), free and clear of all Claims, Liens and Interests, and shall have all of the powers of a limited liability company under applicable law. As of the Effective Date, the Reorganized Debtors may operate their business and use, acquire and dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court or Plan Administrator, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

     7.     *Transfer of Real Estate*

On the Effective Date, (a) Reorganized Shapes L.L.C. may (at its election but subject to the terms of the CIT Revolving Lenders Exit Commitment and the Class 9 Real Estate Taxes to the extent not satisfied) either retain all real estate or (i) convey the Shapes Real Estate to Shapes Realty New Jersey L.L.C., (ii) convey the Delair Real Estate to Delair Realty New Jersey L.L.C. (or Shapes Realty New Jersey LLC); and (iii) convey the Ultra Real Estate to Ultra Realty New Jersey L.L.C.; and (b) Reorganized Accu-Weld L.L.C. may (at its election but subject to the terms of the CIT Revolving Lenders Exit Commitment and the Class 9 Real Estate Taxes to the extent not satisfied) either retain all real estate or convey the Accu-Weld Real Estate to Accu-Weld Realty Pennsylvania L.L.C., free and clear of all liens, claims and encumbrances other than the Class 10 Real Estate Claims.

8.    *Distributions for Claims Allowed as of the Effective Date*

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

9.    *Reserve Accounts*

As soon as practicable after the Effective Date, the Plan Administrator will establish and maintain the following reserve accounts:

(a)    Reserve for Plan Expenses.  A reserve in an amount equal to the estimated Plan Expenses (the "Plan Expense Reserve"), which upon the closing of the Chapter 11 Case, the remainder, if any, will be released and distributed to Reorganized Debtors.  Other than the initial funding of the Reserve for Plan Expenses in the amount of $100,000.00 (or with respect to legal fees and other professional fees incurred by Reorganized Debtors' at the request of Plan Funders), Reorganized Debtors shall have no further liability for such expenses.

On or before the Effective Date, the Debtors will establish and maintain the following reserve accounts:

(b)    Reserve for Administrative Claims.  A reserve (the "Administrative Claims Reserve") for Administrative Claims that may be asserted prior to or on the Administrative Claims Bar Date; and

(c)    Reserve for Fee Claims.  A reserve for payment of estimated unpaid Fee Claims in an amount equal to the amount that the Debtors and Arcus Holders anticipate will be incurred for fees and expenses by Professionals retained in the Chapter 11 Case up to and including the Effective Date, and the balance of such Cash, if any, remaining after all Fee Claims have been resolved and paid, shall be released and distributed to the Reorganized Debtors.

10.    *Reserves for Disputed Administrative, Fee, Priority Tax and Other Priority Claims*

On or before the Effective Date, the Debtors shall establish and maintain a reserve in an amount equal to all Disputed Fee Claims, Disputed Administrative Claims, Disputed Priority Tax Claims and Disputed Other Priority Claims in an amount equal to what would be distributed to holders of Disputed Administrative, Disputed Fee, Disputed Priority Tax, and Disputed Other Priority Claims if their Disputed Claims had been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the

33

Bankruptcy Court upon motion of the Debtors; provided however, that the Debtors shall not be required to reserve funds on account of employee Claims for paid time off or vacation benefits of employees whose employment was continued by the Debtors or will be continued by the Reorganized Debtors. With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Reorganized Debtors to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Disputed Administrative, Disputed Fee, Disputed Priority Tax, and Disputed Other Priority Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed to the Reorganized Debtors. No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order

11.    _Reserves for Disputed General Unsecured Claims_

On or as soon as practicable after the Effective Date, the Plan Administrator shall establish and maintain a reserve for all Disputed General Unsecured Claims. For purposes of establishing a reserve for Disputed General Unsecured Claims, Cash will be set aside as soon as practicable after the Effective Date equal to the amount that would have been distributed to the holders of Disputed General Unsecured Claims had their Disputed General Unsecured Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court. With respect to such Disputed General Unsecured Claims, if, when, and to the extent any such Disputed General Unsecured Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Plan Administrator to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Disputed General Unsecured Claims have been resolved and distributions made in accordance with the Plan, shall be released and re-distributed to holders of Allowed Claims.  No payments or distributions shall be made with respect to a Claim that is a Disputed General Unsecured Claim pending the resolution of the dispute by Final Order. No payments or distributions shall be made with respect to post-Petition Date interest accruing on any Claim other than the Arcus Holders DIP Claims and CIT-DIP Claim. No payments or distributions shall be made with respect to Allowed Claims in an amount in excess of such Allowed Claims, except that the Class 5 Plan Funder Individual Release Consideration shall be distributed in addition to full payment of such Allowed Claims.

12.    _Claims Objection Deadline_

Notwithstanding D.N.J. LBR 3007-1, Objections to Claims shall be filed and served upon each affected Creditor no later than ninety (90) days after the Effective Date, provided however, that this deadline may be extended by the Bankruptcy Court upon motion of the Plan Administrator or Reorganized Debtors, with or without notice or hearing. Notwithstanding the foregoing, unless an order of the Bankruptcy Court specifically provides for a later date, any proof of, or other assertion of a Claim filed after the Confirmation Date shall be automatically disallowed as a late filed Claim, without any action by the Plan Administrator or the Reorganized Debtors, unless and until the party filing such Claim obtains the written consent of, the Plan Administrator or the Reorganized Debtors, as applicable, or obtains an order of the Bankruptcy Court upon notice to the Plan Administrator and Reorganized Debtors that permits the late filing

34

of the Claim, and the holder of such disallowed Claim shall be forever barred from asserting such Claim against the Liquidation Trust the Debtors, the Estate or Property, Reorganized Debtors or their property. In the event any proof of claim is permitted to be filed after the Confirmation Date pursuant to an order of the Bankruptcy Court, the Plan Administrator or Reorganized Debtors, as applicable, shall have sixty (60) days from the filing of such proof of claim or order to object to such Claim, which deadline maybe extended by the Bankruptcy Court upon motion of the Plan Administrator with or without notice or a hearing.  To the extent a creditor files a proof of claim in excess of the amounts set forth in the Debtors' Schedules and Statements of Financial Affairs (or seeking a different classification of the same or files a claim not set forth in the Debtors' Schedules), it is most probable that an objection to the same will be filed by the Plan Administrator.  However, the Plan provides that all claims in Class 5 will be transferred to the Liquidation Trust, and the Plan Administrator shall thereafter have the right to object to claims.  The Debtors are uncertain as to the parameters that will be utilized by the Plan Administrator in determining whether to file objections to claims.  As such, the ultimate distribution to Class 5 creditors is dependent upon the success of such objections and the ultimate recoveries on any Avoidance Actions.

13.    _Settlement of Disputed Claims_

Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in this section. After the Effective Date, and subject to the terms of this Plan, the Plan Administrator may settle any Disputed Claim where the result of the settlement or compromise is an Allowed Claim in an amount  of $100,000 or less without providing any notice or obtaining an order from the Bankruptcy Court. All proposed settlements of Disputed Claims where the amount to be settled or compromised exceeds $100,000 shall be subject to the approval of the Bankruptcy Court after notice and an opportunity for a hearing.

14.    _Unclaimed Property_

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Plan Administrator to be distributed Pro Rata to holders of Allowed Claims in such Class in accordance with this Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such unclaimed property (subject to Section 2 above) will be distributed to the Reorganized Shapes/Arch Holdings L.L.C.

15.    _Release of Liens_

Release and Preservation of Certain Liens.  Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, including, without limitation, the Liens securing the DIP Arcus Facility, the CIT-DIP Loan Facilities, the CIT Revolving Lenders Exit Commitment and the Exit Facility (which shall survive Confirmation and shall remain valid, enforceable and perfected Liens against property of the Reorganized Debtors, respectively) on the Effective Date, all other mortgages, deeds of trust,

Liens or other security interests against the Property of the Debtors' estate shall be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to Reorganized Debtors and their successors and assigns.

16.   _Withholding Taxes_

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

17.   _Fractional Cents_

Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

18.   _Payments of Less than Twenty-Five Dollars_

If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than twenty-five ($25.00) dollars (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, the Plan Administrator shall not be required to make such payment and such funds shall be otherwise distributed to holders of Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such excess fractional dollars will be distributed to the Reorganized Debtors.

**F.   _Treatment Of Executory Contracts And Unexpired Leases_**

1.   Rejection of All Agreements

Any and all pre-petition leases or executory contracts included on Debtors' Schedule G not previously assumed by the Debtors (and not otherwise previously rejected, the subject of a motion to assume pending on the Confirmation Date or designated on Schedule 8.1 to this Plan, which schedule may be filed and amended at any time up to three days prior to the Confirmation hearing), shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date. Any and all pre-petition leases and executory contracts not included on Debtors' Schedule G not previously assumed or rejected by the Debtors, shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date. The Debtors reserve the right to supplement any motion to assume or Schedule 8.1 to include or exclude additional contracts by way of a supplemental notice to parties to pre-petition leases and executory contracts at any time at least one (1) day prior to the confirmation hearing and the Debtors shall file the initial designation, without prejudice, at least two (2) business days prior to the deadline to file objections to confirmation of this Plan. Within ten days after the Effective Date, all cure amounts due and owing under any assumed contracts shall be paid and all cure amounts that are the subject of dispute shall be paid upon further agreement of the parties or upon entry of an order of the Court allowing such cure claims. No portion of any disputed cure claims shall be paid unless and until the amount of such claim is fixed by agreement of the parties or order of the Court.

36

Notwithstanding the foregoing, on the Effective Date, all insurance policies (regardless of the inception date of coverage) for any one or more Debtors which provide for any and all claims made or occurred arising from or related to any environmental laws of any Federal, State or local governmental entity or any claim asserted by a non-governmental entity for environmental claims (directly or by way of indemnity and whether under contract or tort law) shall be deemed assumed by Reorganized Debtors.

Any motion filed to assume contracts or the Schedule 8.1 shall contain the cure amounts required to be paid upon assumption and all counter parties shall have ten (10) days from the filing of such motion or schedule within which to object to the stated cure amount or thereafter be deemed to have waived the right to object to the same.

2.      Collective Bargaining Agreements

The Debtors are party to the following collective bargaining agreements (each a "CBA"): (a) one CBA between Shapes, LLC ("Shapes") and Delair, LLC ("Delair"), on the one hand, and Teamsters – Local 837 ("Local 837"), on the other hand; (b) one CBA between Ultra LLC ("Ultra") and Local 837; and (c) three CBAs between Accu-Weld ("Accu-Weld") and the United Independent Union ("UIU") each covering separate groups of employees.

Since the Petition Date, the Debtors (a) have submitted proposals to Local 837 and to the UIU for modifications to the CBAs with each of the Debtors, and (b) have met with Local 837 three times regarding the Shapes/Delair CBA and with the UIU four times regarding the Accu-Weld CBA. To date, no final agreements have been reached with either Local 837 or the UIU regarding the Debtors' proposed modifications. Negotiations with both Unions are continuing. The proposals include discussions regarding overtime, vacation, health and welfare obligations, pension obligations, wage adjustments, seniority rules, grievance procedures and other issues.

The Debtors have advised both Local 837 and the UIU that, absent consensual modifications to the CBAs, the Debtors may decide to seek rejection of one or more of the CBAs and, if such determination is made, the Debtors will submit proposals and information in conformity with the Section 1113 requirements and seek the appropriate supplemental relief from the Court.

3.      Claims for Damages

All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of Effective Date. All proofs of claim with respect to Claims arising from the rejection of executory contracts shall be treated as Class 5 General Unsecured Claims, as applicable, for purposes of a distribution pursuant to the Plan, unless and until the Person or Entity asserting such Claim obtains an order of the Bankruptcy Court upon notice to the Debtors, that allows the Claims in another Class under the Plan. Unless otherwise permitted by Final Order, any proof of claim that is not filed before the earlier of the Bar Date or the Confirmation Hearing (other than those Claims arising from the rejection of executory contracts or leases which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall

automatically be disallowed as a late filed Claim, without any action by the Plan Administrator, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, the Estate, the Reorganized Debtors or property of Reorganized Debtors.

## G.    *Effect of Confirmation of the Plan*

Without limiting any provision of the Plan, the Plan provides for the following release, exculpation, discharge and injunctions:

1.    *General Release and Injunction*

On the Effective Date, (i) the Debtors, the Estates, and their respective successors or assigns, including, without limitation, the Liquidation Trust, Class 5 General Unsecured Claims and any Person or Entity claiming a right in a derivative capacity on their behalf are deemed to, with respect to any and all derivative claims, whether or not asserted, the "Releasors"), will be deemed to have unconditionally and irrevocably released the Arcus Holders, Arcus Funding, the Plan Funders, CIT, CIT-DIP Lenders and the Debtors' directors, managers and board observers, and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (collectively, the "Released Parties"), as set forth more fully below, from any and all direct, indirect or derivative claims, obligations, suits, judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of contribution and indemnification, and all other controversies of every type, kind, nature, description or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place from the beginning of the world to the Effective Date arising from or relating in any way, directly or indirectly, to the Debtors, its Properties, assets, operations or liabilities, the Chapter 11 Case, the Plan, or the Disclosure Statement; *provided however*, that the Releasors shall not be deemed to have released any rights to enforce the terms of the Plan or their rights to distributions thereunder. The Releasors hereby waive any rights or benefits under California Civil Code Section 1542, which provides that:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with Debtors and any rights or benefits under similar laws. The Confirmation Order shall specifically provide for the foregoing releases.**

The Debtors do not believe there are any causes of action against the Released Parties but the same is necessary and essential to (i) induce the Plan Funders to provide the exit facilities, equity contributions and other funding obligations under the Plan for all classes of creditors, without which funding the Plan could and would not be confirmed; and (ii) allow current management to continue in their separate capacities (if so provided) without the distraction and costs associated with potential or actual litigation

38

**Injunction**.  On the Effective Date, the Debtors Claimants respecting the claims released above, and the Releasors shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place inconsistent with the releases granted to the Released Parties pursuant to the Plan. The Confirmation Order shall specifically provide for such injunction.

The Debtors do not believe and are not aware of any claims that may be asserted against the Released Parties.  The Debtors are not aware of any facts that would give rise to such claims, but the Committee will nonetheless conduct, or cause to be conducted, an investigation prior to confirmation regarding the existence of claims against the Released Parties, if any, and, if such claims exist, the extent to which such claims have merit (but subject to all limitations contained in the Final DIP Orders).

2.     *Exculpation*

Exculpation.  On the Effective Date, (a) the Debtors, and their direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) and (b) CIT-DIP Lenders, CIT, Arcus Funding, Arcus Holders and the Plan Funders and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other, and by all holders of Claims or Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring solely during the period from the Petition Date through the Effective Date, generally, including, without limitation, any act or omission occurring during the Chapter 11 Case, the DIP Facility, the Exit Facility, the Plan Funding Debt Commitment, the Plan Funding Equity Commitments, CIT Revolving Loan DIP Agreements, CIT Revolving Lenders Exit Commitment, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.

3.     *Discharge*

Except as otherwise provided for in this Plan, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, the Interim Orders and Final DIP Orders), in accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of all debts, Claims against, Liens on, and Interests in the Debtors, their assets and Property, which debts, Claims, Liens and Interests arose at any time before the entry of the Confirmation Order.  The discharge of the Debtors shall be effective as to each Claim and Interest, regardless of whether a proof of Claim or Interest was

39

filed or whether the Claim or Interest was Allowed or whether the holder of the Claim or Interest votes to accept the Plan. On the Effective Date, as to each and every discharged Claim and Interest, any holder of such Claim or Interest shall be precluded from asserting such Claim or Interest against the Debtors or Reorganized Debtors or their assets or properties.

4.      *Injunction*

On and after the Confirmation Date, except to enforce the terms and conditions of the Plan before the Bankruptcy Court (or as permitted under the Interim Orders, Final DIP Orders, CIT Revolving Lenders Exit Commitment and Exit Facility) and except to the extent the holders of Additional Environmental Claims are seeking to recover under any and all applicable insurance policies (and in all cases may not assert any Claims against Reorganized Debtors), all Persons or Entities who have held, hold or may hold any Claim against or Interest in the Debtors are, with respect to any such Claim or Interest, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Debtors or Reorganized Debtors or Plan Administrator or the Liquidation Trust or any of their properties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants, or any property of any of the foregoing (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

5.      *Insurance*

This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, its officers or directors) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

**H.      *Retention of Jurisdiction***

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the case, the Plan, and the Liquidation Trust to the fullest extent permitted by law pursuant to, and for the purposes of Section 105(a) and Section 1142 of the Bankruptcy Code and for the other purposes described in Article X of the Plan.

CHERRY_HILL\442102\1  220718.000

## I.    *Miscellaneous Provisions*

### 1.    *Pre-Confirmation Modification*

On notice to and opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders (and CIT-DIP Lenders to the extent the same is material to the CIT-DIP Lenders).

### 2.    *Post-Confirmation Immaterial Modification*

With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and without notice to holders of Claims and Interests, the Plan Administrator, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders (and CIT-DIP Lenders to the extent the same is material to the CIT-DIP Lenders).

### 3.    *Post-Confirmation Material Modification*

On notice to and an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Reorganized Debtors or the Plan Administrator in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funders (and CIT-DIP Lenders to the extent the same is material to the CIT-DIP Lenders).

### 4.    *Withdrawal or Revocation of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Effective Date does not occur, then, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, Debtors or any other Person, (ii) prejudice in any manner the rights of Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.  To the extent the Class 3 claim of CIT is satisfied on the Effective Date, all references to CIT in this Plan (other than those pertaining to interest and any release, injunctive, exculpation or similar or related provisions) shall be deemed null and void.

5.      *Payment of Statutory Fee*

All fees payable pursuant to Section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) or by the Plan Administrator when otherwise due out of the reserve set aside on the Effective Date by the Plan Administrator to fund Plan Expenses.

6.      *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

7.      *Exemption From Transfer Taxes*

Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, the transfers to be made under Section 5.7 of the Plan, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar tax by applicable law.

## J.      *Effectiveness of the Plan*

The Plan shall not become effective unless and until each of the following conditions has been satisfied in full or waived by the Debtors and the Plan Funders:

(a)      The Bankruptcy Court shall have entered the Confirmation Order by May 31, 2008 or June 20, 2008 in the event of the occurrence of an Alternative Transaction (or such other date as agreed to in the sole discretion of the Plan Funders) and such Order shall be in form and substance satisfactory to the Debtors, Arcus Funding, Arcus Holders and Plan Funders;

(b)      All escrow and reserve accounts described in the Plan have been adequately funded; and

(c)      The Confirmation Order shall have become a Final Order and the Effective Date shall be no later than June 10, 2008 (June 30, 2008 in the event of an Alternative Transaction).

(d)      Closing has occurred under the terms of the exit facilities being provided by Arcus Funding and CIT-DIP Lenders and the Plan Funding Equity Commitments have been provided and the aggregate funds available under the same are sufficient to satisfy the cash requirements necessary to fund this Plan in accordance with its terms.

Except as set forth in Sections 9.1 and 9.2 of the Plan with respect to matters pertaining to the CIT-DIP Lenders, the conditions set forth in Article 9.1 and Article 9.2 of this Plan may be waived, in whole or in part, by the Debtors and Plan Funders without any notice to any other parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors and Plan Funders in their sole discretions regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors and Plan Funders in their sole discretion).  The failure of the Debtors and Plan Funders to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right which may be asserted at any time.

### K.   Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims has accepted it.  The Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to Section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest;

of (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of the Ben Interests (Class 6) in Shapes/Arch Holdings, LLC are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Interests.  Such Class therefore is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Class, and may seek confirmation pursuant thereto as to the other Classes if such other Classes vote to reject the Plan.  Notwithstanding the deemed rejection by such Class or the rejection by any other Class, the Debtors believe that all Classes are being treated fairly and equitably under the Bankruptcy Code.  The Debtor therefore believe the Plan may be confirmed despite its deemed rejection by these Classes.

**L.      *Provisions Regarding Corporate Governance and Management of the Reorganized Debtors***

   (a)      Officers and Managers of  Reorganized Shapes/Arch Holdings LLC.
            [as set forth in the Plan Supplement]

   (b)      Officers and Managers of  Reorganized Shapes L.L.C.
            [as set forth in the Plan Supplement]

   (c)      Officers and Managers of  Reorganized Delair L.L.C.
            [as set forth in the Plan Supplement]

   (d)      Officers and Managers of  Reorganized Accu-Weld L.L.C.
            [as set forth in the Plan Supplement]

   (e)      Officers and Managers of  Reorganized Ultra L.L.C.
            [as set forth in the Plan Supplement]

**M.      *Alternative Transaction***

In the event Class 5 votes to reject the Plan and the Bankruptcy Court denies confirmation of this Plan based on the fact that the treatment of Class 5 is not fair and equitable for purposes of 11 U.S.C. § 1129(b)(2)(B)(ii) and the holding in the Supreme Court case of Bank of Am. Nat'l Trust & Sav. Assoc. v 203 N. LaSalle St. Partnership ("LaSalle"), 526 U.S. 434 (1999) requires that the New LLC Interests to be vested in the Plan Funders be exposed to the market, then, the Plan contemplates an additional market test process to meet the requirements of the same (and a continuation of the Confirmation Hearing).

The Alternative Transaction contemplates a brief marketing period of the New LLC Interests being transferred under the Plan to the Plan Funders.  In the event that scenario results in someone other than the Plan Funder being entitled to the transfer of New LLC Interests under this Plan then, the treatment of Arcus Funding and CIT-DIP Lenders will be deemed amended by the terms of the bidding procedures contained and set forth in the Schedule attached hereto as Exhibit "E".  In addition, it is possible that the recovery to Class 5 Creditors could be enhanced

44

or decreased if such process occurs although, no guarantee of the same is being made hereby. For a complete description of the possible Alternate Transaction, see Schedule "E" attached hereto.

11 U.S.C. §1125(a)(1) provides in part that adequate information for purposes of a disclosure statement "need not include such information about any other possible or proposed plan . . . Without waiving their rights (including the right to request the deletion of this paragraph), Debtors advise that on or about April 18, 2008, Arch Acquisition I, LLC filed a Motion (1) Terminating Debtors' Exclusive Periods to File Plan and Solicit Acceptances (2) Adjourning Hearing (3) Providing for a Joint Balloting Process (Docket No. 182, "Arch Termination Motion").   Appended to the Arch Termination Motion was a draft Plan of Reorganization similar to, but not identical to, the Plan ("Arch Plan").   The Arch Plan purports to increase the distribution to Class 5 Unsecured Creditors to the amount of five million ($5,000,000.00) dollars.   However, no information has been provided regarding the funding of the same (which will require in excess of ninety million in cash) or any other requirements or conditions that may be applicable to obtain confirmation of that proposal and therefore no representations are being made as to whether that proposal can actually be consummated.   The current Plan has commitments for exit financing which Debtors believe offers more certainty and less risk than the Arch Plan although it also offers Class 5 a potential lower recovery.   Debtors believe the certainty of the Plan outweighs the potential for a greater recovery under the Arch Plan.   Further, the Plan provides for a competitive process should Class 5 creditors decide to reject the Plan and if the Court determines that a competitive process is necessary under *Bank of America National Trust and Savings Association v. 203 LaSalle St. Partnership,* 526 U.S. 434 (1999).

## VII.    CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934.   All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, and plans and objectives, including, but not limited to, statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.

The ultimate recoveries under the Plan to holders of Class 5 Claims depend, in part, upon the Plan Administrator's success in objecting to Disputed Claims.

45

### A.    Taxation

Pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the basis which the holder has in such Allowed Claim or Interest.  The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim or Interest and the period for which the Claim or Interest was held by the holder.  The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Interest in light of its particular circumstances and income tax situation.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

### B.    Distributions to Holders of Claims

The Plan is based on making Distributions as provided under the priority scheme set forth in the Bankruptcy Code.  To this end, the Plan provides that all Allowed Administrative Claims, Priority Claims and Secured Claims will be paid or satisfied in full prior to the making of Distributions to holders of Allowed Claims in Class 5.

The amount of Cash available for distribution to holders of Allowed Claims in Class 5 will depend upon a number of factors, including, but not limited to, the following: the cost of administering the Liquidation Trust; the success of any objections to claims and the recoveries on any Avoidance Actions.  The Debtors are unable at this time to estimate with any certainty the ultimate resolution of such factors, and thus, the amount of available cash that ultimately will be available for Distribution to holders of Allowed Claims in Class 5.

In addition, the payment of a Distribution to each holder of an Allowed Claim in Class 5 will depend upon the Claims reconciliation and resolution process implemented by the Plan Administrator.

### C.    Objections to Classification

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

### D.    Inherent Uncertainty of Financial Projections

The financial projections attached hereto as Exhibit "C" are based upon numerous assumptions that are an integral part of such financial projections, including Confirmation and

46

consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material contingent or unliquidated litigation or indemnity claims, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not occur.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations.  These variations may be material and may adversely affect the ability of the Reorganized Debtors to pay the obligations owing under the Plan and other post-Effective Date indebtedness.  Because the actual results achieved throughout the periods covered by the financial projections may differ from the projected results, the financial projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

### E.    *Certain Bankruptcy Law Considerations*

1.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

2.    *Risk of Non-Occurrence of the Effective Date*

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied.

3.    *Appeal of the Confirmation Order*

The Confirmation Order may be the subject of an appeal.  If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (ii) an alternative plan of reorganization.

### A.    *Liquidation Under Chapter 7*

If no plan is confirmed, the Debtors cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' property for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the

recoveries of holders of Claims and Interests is set forth in the Liquidation Analysis attached here as Exhibit "D". The Debtors believe that liquidation under Chapter 7 would result in no distributions being made to creditors other than Secured Creditors because (i) the Debtors' assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be incurred, and (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a termination of the Debtors' businesses. For a further analysis of this issue please refer to Exhibit "D" attached hereto.

### B.     *Alternative Plan of Reorganization*

If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan. The Plan is a reorganization of the Debtors' business and a different plan might involve some other form of reorganization or liquidation of the Debtors' assets. The Debtors believe that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances. The Debtors believe that any liquidation of the Debtors' assets or alternative form of Chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. The Debtors believe that their Plan provides the best recovery to their creditors by providing them with a distribution of cash rather than diminished recoveries following a liquidation of its assets or distribution of other property.

## IX.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.     *Federal Income Tax Consequences in General*

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of Allowed Claims in Class 2, 3, 4, 5, 9 and holders of Allowed Interests in Class 7 and 8. The summary is based upon the Debtors' interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all of which are subject to change, possibly with retroactive effect. Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect to their Claims and Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim in 5 or an Allowed Interest in Class 6 or 7.

The federal income tax consequences of the Plan and the formation and operation of the Reorganized Debtors and the Liquidation Trust, as well as distributions from the Liquidation Trust, are complex and subject to significant uncertainties. The Debtors' interpretation of the federal income tax consequences set forth herein are not binding on the IRS, and the Debtors have not requested, and do not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan. Consequently, there can be no

48

assurance that the treatment described in this Disclosure Statement will be acceptable to the IRS. No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan.   Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan or the formation or operation of the Reorganized Debtors or the Liquidation Trust could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, the Reorganized Debtors or the Liquidation Trust, nor does it purport to address all of the federal income tax consequences of the Plan, Reorganized Debtors or the Liquidation Trust.   This summary also does not purport to address the federal income tax consequences of the Plan, Reorganized Debtors or the Liquidation Trust to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual finds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST.  ANY U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING OR PROMOTION OF THE PLAN.  IT IS STRONGLY RECOMMENDED THAT EACH HOLDER OF A CLAIM OR INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.**     ***Federal Income Tax Consequences of the Liquidation Trust***

1.     <u>*Consequences of the Liquidation Trust*</u>

Pursuant to the Plan, certain holders of Allowed Claims will receive beneficial interests in the Liquidation Trust.  The Liquidation Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Thus, the Liquidation Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d).  The provisions of the Plan Administration Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45-, 1994-2 C.B. 684.  Under the Plan, all parties are required to treat the Liquidation Trust as a liquidating trust, subject to contrary definitive guidance from the IRS.

No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust.  If the IRS were to challenge successfully the classification of the Liquidation Trust as a grantor trust, the federal income tax consequences to the Liquidation Trust and the holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

       2.     *Creditor Trust Tax Reporting*

The Liquidation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the assets (*e.g.*, income, gain, loss, deduction and credit).

**C.     Federal Income Tax Consequences to Holders of Allowed Claims in Class 5**

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 5 will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States.  The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

       1.     *Receipt of Cash and Property by Holders of Allowed Claims in Class 5*

Generally, a holder of an Allowed Claim in Class 5 will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim.  In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

       2.     *Receipt of Interest*

Pursuant to the Plan (and except as set forth in the DIP Facilities in favor of the Lender Group and Arcus), consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.  Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest.  Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to

recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

3. *Character of Gain or Loss*

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

4. *Withholding*

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding.

**D.    *Federal Income Tax Consequences to Holders of Allowed Class 6, 7 and 8 Interests***

The transactions contemplated by the Plan may cause some holders of Interests in the Debtors to recognize income, including cancellation of indebtedness income, with no corresponding cash distribution.

HOLDERS OF ALLOWED INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX TREATMENT RELATED TO THEIR INTERESTS UNDER THE PLAN.

**E.    *Importance of Obtaining Professional Tax Assistance***

THE FOREGOING IS INTENDED AS A SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST.   ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR

51

MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.

**[The Remainder of the Page Intentionally Left Blank]**

CHERRY_HILL\442102\1  220718.000

## CONCLUSION

The Debtors believe the Plan is in best interest of all creditors and recommends those entitled to vote to accept the Plan.

DATED: April 24, 2008                    Respectfully submitted,

Shapes/Arch Holdings L.L.C.

By: _____
Name:
Title:


DATED: April 24, 2008

Shapes L.L.C.


By: _____
Name:
Title:


DATED: April 24, 2008

Delair L.L.C.


By: _____
Name:
Title:


DATED: April 24, 2008

Accu-Weld L.L.C.


By: _____
Name:
Title:


DATED: April 24, 2008

Ultra L.L.C.


By: _____
Name:
Title:

CHERRY_HILL\442102\1  220718.000

# **EXHIBIT A**

## **Plan**

54

CHERRY_HILL\442102\1  220718.000

## **EXHIBIT B**

**Solicitation Procedures Order**

# **EXHIBIT C**

## **Financial Projections**

CHERRY_HILL\442102\1  220718.000

## **EXHIBIT D**

**Liquidation Analysis**

CHERRY_HILL\442102\1  220718.000

# **EXHIBIT D-1**

## **Schedule 4.5**

### **Environmental Claims**

CHERRY_HILL\442102\1  220718.000

# **EXHIBIT E**

**Bid Procedures Regarding Alternative Transaction**

CHERRY_HILL\442102\1  220718.000

# EXHIBIT F

## Current Financial Information

CHERRY_HILL\442102\1  220718.000