**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York 10022
(212) 765-9100
(212) 765-0964 Facsimile
Alan D. Halperin, Esq.
Donna Lieberman, Esq.

**COLE SCHOTZ MEISEL FORMAN
& LEONARD, P.A.**
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael Sirota, Esq.
Ilana Volkov, Esq.
Warren A. Usatine, Esq.

Co-Counsel for the Official
Committee of Unsecured Creditors

|  |  |
|---|---|
| In the Matter of:<br><br>**SHAPES/ARCH HOLDINGS, L.L.C., *et al.,***<br><br>Debtors. | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY HONORABLE GLORIA M. BURNS LEAD CASE NO. 08-14631<br><br>(Jointly Administered)<br><br>Chapter 11<br><br>HEARING DATE AND TIME: May 1, 2008 at 10:00 a.m.<br><br>**ORAL ARGUMENT REQUESTED** |

## OBJECTION OF THE OFFICIAL COMMITTEE
## OF UNSECURED CREDITORS TO THE AMENDED
## PROPOSED DISCLOSURE STATEMENT

TO THE HONORABLE GLORIA M. BURNS,
UNITED STATES BANKRUPTCY JUDGE:

        The Official Committee of Unsecured Creditors (the "Committee") of

Shapes/Arch Holdings L.L.C., *et al.* (collectively, the "Debtors"), by and through its

undersigned counsel, hereby objects to the amended Joint Disclosure Statement (the

"Amended Disclosure Statement"),[1] for the amended Debtors' Joint Plan of

Reorganization (the "Amended Plan") each filed by the Debtors on April 24, 2008, and

respectfully represents as follows:

PRELIMINARY STATEMENT

1.    As the Court is aware, the Committee has already filed an Objection (the

"First Objection") to the Debtors' first disclosure statement filed on or about March 16,

2008.  The Committee will not burden the Court with a repetition of that entire objection,

which is incorporated herein by reference.  In the First Objection, the Committee noted

numerous problems, including lack of due process, inadequacy of disclosure, and the

facial non-confirmability of the proposed plan of reorganization.

2.    Following a hearing before this Court on April 17, 2008, and in response

to the First Objection and myriad other objections to the initial disclosure statement,

Versa Capital Management, Inc. ("Versa") and the Debtors prepared and filed the

Amended Disclosure Statement andAmended Plan.

3.    While the Amended Disclosure Statement does contain some additional

disclosure, as set forth in greater detail below, it is still fails to provide adequate

information.  More significantly, problems inherent in the underlying plan are not

corrected by the Amended Plan, which like its predecessor, is patently unconfirmable.

4.    The Committee is cognizant of the many disclosure statement objections

filed in other cases that reference unconfirmability in a half-hearted manner.

---

[1]    Capitalized terms used but not defined herein shall have the meanings
assigned to them in the Amended Disclosure Statement.

Respectfully, the instant plan of reorganization, supported by the disclosure statement at issue, if ever approved, is perhaps the most devious, bad faith plan that could be proposed under Chapter 11 of the Bankruptcy Code. The Debtors' sale of its business under the cover of night, in the face of a more favorable debtor-in-possession financing facility *and* a dramatically higher and better offer that includes a true competitive sale process, would create the fodder for which anti-bankruptcy commentators yearn. The proposed plan enjoys not only the distinction of being patently unconfirmable but also making a mockery of Third Circuit precedent and concepts such as fiduciary duty, good faith, due process and maximization of value for creditors.

5.     The Amended Plan barely makes a half-hearted gesture towards addressing the fundamental flaws in the plan process that the Debtors and Versa have created, installing a new bifurcated process that:

    a.    allows for a competitive bidding process *only* if the Class 5 creditors vote against the Amended Plan and the Court denies confirmation on the grounds that the treatment of Class 5 (unsecured creditors) is not fair and equitable and does not comport with the *LaSalle* decision;

    b.    leaves other interested parties in limbo and chills possible bidding;

    c.    provides inadequate time to conduct a proper sale process, and makes no allowance for the need to market the business or for competing bidders to conduct due diligence; and

    d.    creates absurdly onerous bidding procedures and a mammoth break-up fee for Versa that only further serve to chill bidding.

5.     In short, the so-called process is a farce – lip service to this Court and the Bankruptcy Code, so that Versa and the Debtors can proclaim they have addressed the Committee's concerns. The Amended Plan, like the original plan, is an implementation of a pre-petition, private deal pursuant to which the Debtors assigned

3

their fiduciary duties to Versa as the buyer and are now sitting back and watching as the

proverbial fox guards and then sells to itself the hen house.

      6.     The failure of the Debtors and Versa to address the Committee's

fundamental concerns about a fair and open process is all the more problematic in light of

discovery provided by the Debtors.  The documents produced show that prior to the

bankruptcy filing -- at a time when the Debtors were admittedly in the zone of insolvency

and likely insolvent, and owed a fiduciary obligation to their creditors -- their efforts to

find a buyer were guided solely by the best interests of equity holders and with complete

disregard for the interests of creditors.  Worse, as the Debtors negotiated this hideous

deal, they incurred enormous unsecured debt (at least $38 million, by the Debtors'

estimate) with the intention of "flushing" it in the devious Versa Chapter 11 plan.

Accordingly, the Committee objects to the Amended Disclosure Statement, and

respectfully requests that the Court deny its approval.

<strong><u>DISCUSSION</u></strong>

**(i)**     **The Amended Disclosure Statement Should Not Be
Approved Because the Plan is Unconfirmable.**

      7.     As discussed in the First Objection, it is well-settled law that a disclosure

statement related to a plan that is facially unconfirmable cannot be approved as

containing "adequate information" within the meaning of section 1125 of the Bankruptcy

Code.  *In re E. Maine Elec. Coop.,* 125 B.R. 329, 333 (Bankr. D. Me. 1991); *see also In

re Allied Gamin Mgmt., Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997); *In re 266

Washington Assocs.,* 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("A disclosure statement

will not be approved, where, as here, it describes a plan which is fatally flawed and thus

incapable of confirmation.").

4

8.     The point of conducting the evaluation at this juncture is to "avoid engaging in a wasteful and fruitless exercise of sending the disclosure statement to creditors and soliciting votes on a plan which is unconfirmable on its face.  Such an exercise in futility only serves to further delay a debtor's attempts to reorganize." *In re Atlanta W. VI*, 91 B.R. 620, 622 (Bankr. N.D. Ga. 1988).

9.     The Amended Disclosure Statement before this Court is inadequate for many reasons relating to lack of disclosure, misleading and/or confusing information and inconsistencies between the Amended Disclosure Statement and the Amended Plan, which are set forth below.  But as with the Debtors' original disclosure statement, the most substantive flaw of the Amended Disclosure Statement is a failing of the Amended Plan which it purports to describe.  The Amended Plan as presently constituted is unconfirmable as a matter of law, and as was the case with the original plan and disclosure statement:

- The Amended Plan and the Amended Plan proponents (the Debtors) do not comply with the applicable provisions of Title 11, a violation of sections 1129(a)(1) and (2) of the Bankruptcy Code.

- The Amended Plan has not been proposed in good faith, a violation of section 1129(a)(3).

- The Amended Plan does not satisfy the "best interests" test with respect to unsecured creditors, a violation of section 1129(a)(7).

- The Amended Plan does not comply with section 1123(a)(4) and (7) of the Bankruptcy Code.

- In the event that any class of Claims rejects the Amended Plan (an extremely likely scenario), the Amended Plan cannot satisfy the "fair and equitable" standard enunciated in section 1129(b) of the Bankruptcy Code, because, among other things, numerous classes of Claims are being impaired while at least one class of Interests (Interests below Shapes/Arch parent) is unimpaired.

5

(a)    **Violations of 11 U.S.C. 1129(a)(1), (2) and (3)**

10.    The Bankruptcy Code generally, and Chapter 11 in particular, embody

certain basic principles, irrespective of whether a debtor is attempting a true

reorganization or an orderly liquidation.  The bankruptcy process is intended to be a fair

and open one, conducted under the watchful eye of a federal judge, with the goal of

maximizing value for the benefit of creditors and the estates.  *In re Big Rivers Electric*

*Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky. 1998) ("It is beyond dispute that a Chapter

11 DIP owes a fiduciary duty to all of the creditors and other interest holders of its

bankruptcy estate to maximize the value of the bankruptcy estate.")  *See also Commodity*

*Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985).

11.    Here, the Committee is faced with an Amended Plan that is still designed

to give effect to a pre-petition deal between the Debtors and Versa, with no opportunity

for the marketing of the assets or equity of the Debtors to others in a competitive process.

Versa obtained control of the Debtors prior to the Filing Date, when it became the

manager of and the entity with voting control of 79.99% of Shapes/Arch (the parent of all

of the other Debtors).  That transfer of control was part of a larger transaction pursuant to

which Versa would provide DIP financing to the Debtors, and the Debtors would

negotiate with no one but Versa and propose a Chapter 11 plan that transferred

substantially all of the equity in Shapes/Arch to Versa.  ("Substantially all" because the

pre-petition documents and the disclosure statement and Amended Disclosure Statement

contemplate that the Debtors' existing owners and management may have an equity

participation.)

12.    The Amended Plan contemplates that the Versa DIP loan will be

converted to exit financing upon plan confirmation, and continue as a secured loan—with

6

liens on the reserves for distributions to creditors under the Amended Plan.  It appears

from the Amended Disclosure Statement, although it is far from clear, that anywhere

from $0 to $5.5 million of that loan may be converted to an equity contribution.

13.     Knowing that they had failed to address the lack of any process (pre- or

post-petition) to ensure that the highest and best value is received for the Debtors' assets,

Versa and the Debtors have tried their best to make their deal a "lock-up" and insulate it

from challenge or higher or better offers.  Nonetheless, this Court expressed concerns at

"first-day" hearings concerning the Versa DIP financing facility, and a few weeks later,

after the Committee was appointed, the Committee brought its concerns and objections to

the Court's attention.

14.     Versa and the Debtors have now modified the Plan, but in reality, have

changed very little.  The Amended Plan still offers a *de minimis* distribution to unsecured

creditors, conveys the Debtors' businesses and grants broad third party releases to Versa

and other insiders of the Debtors.  The Amended Plan's "improvement" over the original

plan is in making it theoretically possible for others to bid on the Debtors' equity, but

Versa and the Debtors make it difficult for that alternative process to even become

effective, penalize creditors if it does, and then make the bidding process so onerous and

time constrained as to eliminate any chance of a fair and truly competitive bidding

process.

15.     First, the Amended Plan provides for a period of time in which creditors

may vote, and denies potential bidders the ability to conduct due diligence and leaves

them in limbo as to whether there will even be a process.  Then, if Class 5 rejects the

Amended Plan *and* this Court denies confirmation for reasons including the unfairness of

7

the Amended Plan to Class 5 *and* the Court determines that values must be tested in the

marketplace, pursuant to the Supreme Court's holding in the *LaSalle* case, then and only

then can the phantom "sale process" provided for in the Amended Plan occur.  The

Amended Disclosure Statement does not explain exactly how this process will work, as

the Debtors and Versa are apparently not interested in providing anyone outside of their

charmed circle with such basic information.

16.    Moreover, although the Amended Disclosure Statement does not so

disclose in its discussion of the alternative transaction (page 44-45), the Debtors and

Versa may elect to seek confirmation of the Amended Plan without an "alternative

transaction" and without any bidding process even if Class 5 rejects the Amended Plan.

This would seem to be the purpose of the gerrymandered and artificially impaired classes

included in the Amended Disclosure Statement and Amended Plan – insuring that there

will be voting, accepting classes even if Class 5 rejects.  There is no other apparent

explanation for why classes of secured claims that are not impaired are described as

impaired and entitled to vote.

17.    Of course, while the parties count votes and argue about "cram-down" and

Versa presumably argues that it is not an insider, the clock will be ticking away and the

deadlines set in the DIP financing facility provided by Versa will pass.  And while other

interested parties are closed out of the process and watching from the sidelines, the

Debtors will be marching toward that point in time when, by their own admission, they

can no longer afford to fund operations.[2]

---

[2]    It is also worth noting that all of these hurdles must be overcome against
the backdrop of an absurdly low Committee carve-out and inadequate funding for
(continued…)

18.     Nevertheless, hypothetically assuming all of these hurdles could be overcome (and the list of hurdles begins to sound like the checklist given to Cinderella by her evil stepmother), the so-called sale process that would come into being would be guided by proposed bidding procedures (the "Proposed Bid Procedures") attached as Exhibit E to the Amended Disclosure Statement.  The Proposed Bid Procedures appear to be designed to prevent competitive bidding, and provide, among other things:

- The process would not start until some time after May 25, 2008, and bids would be due by June 13, 2008 – at best, a mere 19 days later;[3]

- Bidders would have to qualify with lightning speed – a mere two (2) days after entry of an Order denying confirmation of a plan;

- In order to qualify, bidders would have to provide, among other things, audited financial statements, and would have to agree that they have no right to enforce the bid procedures;

- Versa's opening "bid" that others must top is inexplicably over-valued at $85,500,000;[4]

---

(…continued)
Committee professionals under the "revised budget" for the Versa DIP.  The Committee's requests for amendment of the budget and the carve-out have all but fallen on deaf ears.  By virtue of their current structure, the Amended Plan and the Versa DIP effectively tell Committee professionals to allow this obscene process to go forward and they will be paid, or else.

[3]     The exact start of the process is unclear as it seems to hinge on an entry of an Order denying confirmation.  However, per the Proposed Bid Procedures, the start date appears to be some time after May 25, 2008.

[4]     Versa is only rolling over the CIT loan estimated to total $55 million, and has funding commitments of only $25 million.  The chart of claims contained in the Amended Disclosure Statement indicates that the Debtors project that only $22 million of the latter will be drawn by confirmation.

9

- Appears to require an initial overbid of $8,000,000 -- $8.5MM as compared to the $500,000 Versa would have to fund to Class 5 in the event of a sale process;

- Of the $8,500,000:  (a) Versa would receive the princely sum of $2,500,000 as a break-up fee, particularly princely given that Versa is receiving fees and professional fees from the Debtors pursuant to the Versa DIP financing facility; (b) $5,500,000 would be "used to buy the New LLC Interests" but  there is no specification as to how these "funds" will be allocated;[5] and (c) $500,000 for Class 5 (despite the Amended Disclosure Statement indicating that $1.5MM would go to Class 5);

- Versa may credit bid its DIP obligations (which are fluctuating, not fixed in amount, and projected to be below the $25,000,000 represented in the Proposed Bid Procedures) as well as its $2,500,000 break-up fee;

- Any conflicts between bid procedures and any plan are resolved in favor of the plan, creating the possibility of an unconfirmed plan undoing whatever the bid procedures provide;

- Requires submission by bidders of a clean version of the Amended Plan to which the Bidders will be bound, which would have to be analyzed by bidders within the compressed time frame provided; and

- Bidders are required to provide a $9,000,000 deposit, nearly 40% of Versa's total funding commitment.

There is no marketing or due diligence process established by the Proposed Bid

Procedures, and no independent entity running this process.  The fiduciary challenged

Debtors, who have wholeheartedly committed to support a Versa sale, are anointed with

---

[5]    The New LLC Interests are those interests to be issued under the Plan to Versa and its affiliates and options to be given to management.  If these funds are not going to Class 5 creditors, the question of where they are going (Versa and current management?) goes unanswered.  The Amended Disclosure Statement references up to $5,500,000 of equity infusion by Versa, but it is to be achieved primarily, if not totally, by way of conversion of a portion of the Versa DIP to equity.  So this would be a double count and, as noted, there is no explanation of where these monies will go.

10

the task of leading this process.  This will undoubtedly further chill participation,

notwithstanding the Committee's "consultation rights."  The bid procedures are unclear,

unduly burdensome, and unfairly biased towards Versa, while the timeframe for other

bidders is wholly inadequate.  Presumably, the Bid Procedures are approved if the

Amended Disclosure Statement is approved, although like numerous other points in these

documents, that is not clearly stated.

19.     The Amended Plan does not provide for a fair and open sale process, and

does not comply with the requirements of the Bankruptcy Code.  The Debtors and Versa

are attempting to persuade the Committee and more importantly, this Court, that their

lock-up of the plan process is no longer a "lock-up," but the process described in the

Amended Disclosure Statement and the Amended Plan, to the extent that it can even be

understood, is simply more of the same deception.  The Debtors and Versa continue to

ask this Court to assist them in bypassing the rights and myriad objections of unsecured

creditors, by protecting this private sale – albeit with lip-service to an "open" process --

to an insider that currently controls the Debtors to be completed on an expedited basis,

with no realistic opportunity for any other party to bid on the Debtors' equity or assets.

The Court should not approve a Disclosure Statement that describes such a process, as

the process itself contravenes the core bankruptcy concepts of the Debtors' fiduciary duty

to creditors, and their obligations to maximize value and solicit higher and better bids.

20.     Not surprisingly, the Plan continues to insulate the management and

ownership of the Debtors and Versa from scrutiny and claims, by providing for extremely

broad releases of third parties, including Versa, its affiliates, and other insiders, and by

(in an example of "belt and suspenders" protection) vesting all actions other than

traditional avoidance actions in the Reorganized Debtors, which will likely be owned by

Versa and operated by current management.  The releases continue to be the "default"

choice on the ballots of unsecured creditors; if an unsecured creditor does not choose to

affirmatively accept or reject the proposed releases, it is deemed to have accepted the

releases.  In what appears to be an acknowledgement that their offer of a pro rata share of

$100,000, less than one half of one penny on the dollar, was grossly inadequate, the

Debtors and Versa now attempt to justify the releases by citing (in the Amended Plan

itself) payments to be made under the Amended Plan as well as Versa's $25 million DIP

commitment.[6]  However, while the Amended Disclosure Statement and the Amended

Plan go to great lengths to describe these overbroad releases in great detail, they provide

no explanation whatsoever as to how those releases were "priced," or the nature or extent

of the investigation (if any) of the claims that would be released.  The sum total of that

particular disclosure is a statement on page 15 of the Amended Disclosure Statement,

which says "Debtors are not aware of any causes of action against any officers or

directors (without prejudice to the Committee's right to investigate the same prior to the

Confirmation Date)."  Moreover, the Debtors' self-serving statement that indicates that

the Committee may investigate does not negate the releases that are contained in the

Amended Plan.  Indeed, the Committee already has reason to believe, based upon

discovery from the Debtors, that the Debtors, Versa and their advisors are aware that both

the Debtors and Versa may have breached their fiduciary duties, and, hence, the

---

[6]        Interestingly, nowhere in the Amended Plan or Amended Disclosure
Statement is there even a facial attempt to cite any consideration provided by the
Debtors' officers, directors or ownership.  Yet, they are to receive very broad releases
and, as noted below, exculpations, as well as possible equity interests in the reorganized
parent company.

statement that the Debtors' are not aware of any causes of action is inaccurate and misleading.

21.     Third party releases are viewed with considerable skepticism, and have been held to be violative of sections 1129(a)(1) and 524(e) of the Bankruptcy Code by numerous courts.  *See e.g., Star Phoenix Mining Co. v. West One Bank, 147 F.3d 1145, 1147 (9th Cir. 1998); In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (D. Del. 2004)(release of third party claims against a non-debtor under a plan impermissible); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997).  And while the Third Circuit has not held that all third party releases are impermissible, it rejected such releases in *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000), finding that the elements of a permissible release – fairness and necessity to the reorganization – were absent.  Here, as in *Continental Airlines*, there is no basis for third party releases, and the insistence of Versa and the Debtors that they must have the releases is sufficient to satisfy the *Continental* standard.

22.     Granting third party releases is neither fair nor necessary to this reorganization and raises questions about the good faith of the Debtors and Versa.  The proposed releases, together with the vesting of causes of action in the Reorganized Debtors, serve the improper purpose of preventing creditors from asking appropriate questions about the actions of insiders, whether in respect of the Versa transaction and fiduciary responsibilities and self-dealing, or in connection with the more than $5.1 million in payments to insiders in the year prior to the Filing Date.  Moreover, the Amended Plan surrenders potential claims against Versa and other insiders for, among

13

other things, breach of fiduciary duty and aiding and abetting breach of fiduciary duty,

which claims may constitute valuable assets of these estates.

23.    The Committee notes that caselaw arising in the context of section 363

sales offers useful guidance in this area.  Courts addressing the issue have recognized that

a fair and open process and the *absence* of insider releases are key to a finding of "good

faith."  *See, e.g., In re Summit Global Logistics, Inc., et. al*, Slip Copy, 2008 WL 819934,

p. 11 (Bankr. D. N.J. March 26, 2008) (copy attached to the First Objection).

24.    It is also important to note that the Plan also builds in *de facto* releases via

exculpation provisions.  Indeed, the section specifically states as much after a recitation

that Versa, the Debtors and their officers, directors, partners, professionals, etc. shall be

deemed released by all holders of Claims.  *See* Amended Plan, §11.7.  The Debtors and

Versa may call it a release, call it an exculpation, call it whatever they like, but there is no

basis in these cases or law for shielding these parties from liability, and the Amended

Plan is facially unconfirmable on this basis alone.

25.    .    In addition, other provisions of the Amended Plan are violative of

section 1129(a)(3) of the Bankruptcy Code in that they are forbidden by law.

Specifically, the Amended Plan provides that Versa's liens shall remain perfected after

confirmation without any need for Versa to take any other action or file any documents,

with the Confirmation Order serving as sufficient evidence of Versa's first priority,

perfected position.  See Amended Plan, §3.4.  While such provisions may pass muster

under Chapter 11, where the Debtors must advise others of their status as a debtor-in-

possession and the Bankruptcy Court oversees all that transpires, such is not the case

outside of bankruptcy.  In the non-bankruptcy realm, Article 9 of the U.C.C., State

mortgage laws and other relevant laws govern perfection.  The Amended Plan would give

Versa "secret liens," the very thing that Article 9 was created to help prevent in the

interests of fairness and notice.

      **b.**      **Violations of Section 1129(a)(7)**

     26.     The Amended Plan proposed by the Debtors cannot satisfy the "best

interest test of creditors" test pursuant to section 1129(a)(7) of the Bankruptcy Code.

Pursuant to section 1129(a)(7), the Debtor must show that every dissenting creditor

would receive as much or more under the Plan than such creditor would receive if the

Debtors were liquidated under chapter 7 of the Bankruptcy Code.  *See In re WorldCom,*

*Inc.* 2003 WL 23861928 at *55 (Bankr. S.D.N.Y. Oct. 31, 2003).

     27.     Courts have held that a detailed liquidation analysis is one of the

categories of information that must be examined in determining whether a disclosure

statement contains adequate information, *see, e.g., In re United States Brass Corp.*, 194

B.R. 420, 423 (Bankr. E.D. Tex. 1996); *In re Crowthers McCall Pattern, Inc.*, 120 B.R.

279, 300-01 (Bankr. S.D.N.Y. 1990) (stating that '[d]isclosure statements are required to

contain liquidation analyses that enable creditors to make their own judgment as to

whether a plan is in their best interests and to vote and object to a plan if they so desire").

Although courts have acknowledged that the valuation of a hypothetical liquidation is

inherently speculative, they have nevertheless stressed that any such valuation must be

based on "evidence, not assumptions."  *Crowthers*, 120 B.R. at 297 (citation omitted); *see*

*also In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

     28.     Initially, the Debtors avoided any possible criticism of their liquidation

analysis by simply not providing one until less than one day prior to the Committee's

objection deadline and *after* the objection deadline for all other parties.  However, since

then the Committee has analyzed the Debtors' liquidation analysis, and believes that a reasoned assessment of liquidation values supports the view that creditors will do better in a chapter 7 liquidation than they will under the Plan. Thus, the Debtors' Plan cannot satisfy the best interests of creditors test.

**(c)  Violations of Section 1129(b)**

29.     The Committee notes that if even one class of Claims rejects the Plan, as is entirely likely here, the Debtors must ask the Court to "cram down" the Plan, requiring a finding that the Plan is fair and equitable with respect to each rejecting class. 11 U.S.C. §1129(b). With respect to unsecured creditors, a finding that a plan is fair and equitable would, as stated unequivocally in the statute, require a determination that (i) holders of unsecured claims receive property equal in value to the allowed amount of their claims (i.e. a 100% distribution), or (ii) holders of claims and interests junior to the unsecured class do not receive or retain anything on account of such claims or interests.

30.     The Amended Plan as presently constituted offers unsecured creditors approximately 5 cents on the dollar if they vote away their due process rights and agree to a closed, unfair process, and approximately 1.3 cents on the dollar if they do not, while allowing holders of interests in four of the five Debtors (all of the Debtors below the parent Shapes/Arch) to retain their Interests. Therefore, the Debtors are urging this Court to allow them to proceed with a plan that cannot satisfy the "fair and equitable" standard of section 1129(b).

**(d)  Violations of Section 1123(a)(4) and (7)**

31.     The Amended Plan also provides that Versa shall have a lien against plan distribution reserves for its outstanding debt. Thus, to the extent Versa calls a default under its DIP loan/exit financing and acts against reserves, Class 5 creditors that have not

16

yet received their distributions under the Amended Plan never will, while other Class 5 creditors already will have received theirs. Thus, the liens in the reserves are not only offensive, they create a condition that violates the requirement of equal treatment of creditors in the same class of creditors.

32.     Additionally, among other things, the selection of the plan administrator -- a fiduciary to creditors -- by Versa is clearly not in compliance with §1123(a)(7) of the Bankruptcy Code. As noted above, Versa is to have liens in the creditors' reserves, and their interests are divergent from those of creditors under the proposed plan trust. As more that fully detailed in this objection and the First Objection, Versa has its own interests, not those of the creditors in mind in connection with these bankruptcy cases and the administration of the trust.

33.     In sum, the Amended Disclosure Statement describes an Amended Plan that is facially unconfirmable. Moreover, as noted above, allowing the Debtors to move forward with this process will waste precious time that is absolutely necessary if a fair and open process is to be had in these cases. The Committee respectfully submits that this Court should not approve the Amended Disclosure Statement, where, as here, allowing the disclosure and solicitation process to proceed would add unnecessarily to the administrative expenses of these cases and waste the time of the Court, the Debtors and all other parties in interest, and effectively achieve by way of the passage of time what the Debtors and Versa cannot legitimately accomplish by law.

**(ii)     The Disclosure Statement Does Not Provide "Adequate Information" To Permit Creditors To Make An Informed Decision On The Plan**.

34.     A plan proponent may solicit votes upon a proposed plan only in conjunction with the dissemination of a disclosure statement that contains adequate

45765/0001-1519789v1

information.  11 U.S.C. § 1125(b).  The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail . . . that would enable a hypothetical reasonable investor typical of holders of claims or interests in the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).

35.    As discussed in greater detail in the First Objection, it is critical that the plan proponent includes adequate information in its disclosure statement not only to enable creditors to determine how to vote on a plan, but also to enable the Court to judge the plan:

> The Bankruptcy Code requires disclosure to protect creditors from a debtor who may try to hide assets and maximizes judicial efficiency.  'The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court.  Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.'

*Kunica v. St. Jean Fin., Inc.,* 233 B.R. 46, 54 (S.D.N.Y. 1999)(citations omitted).

36.    The Debtors have attempted to address some, but far from all of the disclosure objections contained in the First Objection, and to that end, has provided some text about environmental claims and inter-company claims.  The additional information is insufficient, as is the Amended Disclosure Statement generally.  There continues to be insufficient discussion of the changes in the Debtors' financial situation in the time leading up to the Filing Date or the Debtors' alleged efforts to market their businesses or find alternative sources of funding, and the Amended Disclosure Statement, like the disclosure statement, is compelling reading for what it does **not** say about the pre-petition agreements with Versa and the deals between Versa and the Debtors' management and equity.

18

37.     Moreover, the Amended Disclosure Statement, like the original disclosure

statement, omits or is unclear about *most* of the basic information of primary concern to

creditors.   In addition to the fundamental flaws described in the prior section of this

Objection and many of the continuing omissions identified in the First Objection, the

Committee offers the following examples of some but not all of the Amended Disclosure

Statement's deficiencies:

a)    <u>Insufficient information about claims</u>. The claims chart now
dramatically revises the numbers shown for various classes of
claims, and increases the estimate for Class 5 from $31 million to
$38 million, but without any apparent inclusion of environmental
claims or rejection claims.  The Debtors continue to estimate
claims in advance of both the general and the governmental bar
dates.

b)    <u>Labor Issues</u>.  Again, there is no meaningful disclosure about the,
the requirements of section 1113 of the Bankruptcy Code with
respect to the treatment of the Debtors' labor contracts, the
potential for and scope of withdrawal liability or rejection damage
claims if the contracts are terminated or rejected.

c)    <u>Environmental Disclosure</u>.  In response to the First Objection, the
Debtors have added several pages of text about environmental
claims, but continue to obscure the potential liability and
likelihood of insurance coverage, and again fail to explain why the
environmental claims are not all in the same class, and if the
amounts of the liquidated claims have been agreed to by the
claimants.

d)    In addition, there is passing reference to environmental claims
being covered by insurance, but no information is provided about
the insurance policies (terms, deductibles, limits, whether claims
have been filed and approved).

e)    <u>Insurance</u>.  There is no disclosure concerning which insurance
companies are holding collateralized insurance claims, the nature
and extent of the claims, or the extent of their deposits or terms of
the letters of credit.  There is also no discussion of the effect the
Plan treatment will have on the insurance policies.

f)    The holders of "Miscellaneous Secured Claims" and "Secured
Claims of Warehousemen and Shippers" are not identified and

45765/0001-1519789v1

there is no disclosure regarding the nature and extent of their collateral.  Unsecured creditors must also know if the value of the collateral these parties hold exceeds their claims, or if there will be deficiency claims.

g)      Causes of Action. The Disclosure Statement fails to disclose whether the Debtors ever reviewed or analyzed the validity of the lenders' liens.  There is likewise insufficient information about the analysis of claims against insiders, including Versa, and others.

h)      Several classes are shown as receiving 100% distributions yet subsequently described as impaired.

i)      The Role of the Committee.  There is no information about the existence of the Committee, and no monitoring or approval role for the Committee in respect of protecting the rights of and asserting claims on behalf of unsecured creditors.  For example, requests for administrative and fee claims by lenders and professionals should be served upon counsel for the Committee.

j)      The documents continue to be misleading and confusing in that they suggest that the Plan Funder and Versa/Arcus are separate entities when, in fact, they are one and the same.  And as a general note, the Debtors fail to adequately address the fact that Versa is not only the DIP Lender and Plan Funder but has been in full control of the Debtors since prior to the Filing Date.

k)      The Disclosure Statement fails to explain why the Plan Funder's liens attach to the Reserves for distributions to creditors or when and under what terms Versa can invade the already paltry Reserves for unsecured creditors.

l)      The Disclosure Statement does not explain why CIT is being given 101% cash collateral if CIT's claims are being paid in full.  Also, the document fails to address the effect the draw down on letters of credit will have on the CIT secured debt.

m)      The Amended Disclosure Statement should explain why the Plan Administration Agreement deals with obligations that properly belong to the Reorganized Debtors, such as U.S. Trustee fees and post-confirmation reporting.  There are also inconsistencies in the documents about precisely what will be the province of the Plan Administrator, and if its authority is limited to avoidance actions and unsecured claims, why the Plan Administrator is being selected by the Debtors and Versa.

n)    The Amended Disclosure Statement contains deadlines for the Debtors to make decisions about assumption and rejection that provide virtually no notice to others.

o)    The description of the "Alternative Transaction," how it will work and what it will change is incomplete and almost incomprehensible, as well as being violative of the Bankruptcy Code, as discussed in the prior section of this objection.

p)    The amount of the equity commitment that Versa is making is still a topic for conjecture.

q)    <u>Substantive Consolidation</u>.  In response to the Committee's question in the First Objection about substantive consolidation of the Debtors, the Amended Disclosure Statement explains that the Debtors are being administratively, not substantively consolidated. Since the Amended Plan makes no distinction between creditors of the different Debtors, the difference between "administrative" and "substantive" consolidation is likewise unclear.

r)    The description of the Arch Acquisition alternative transaction is incomplete and misleading, and fails to disclose that the Arch Acquisition proposal contemplates an open and competitive process.

## **RESERVATION OF RIGHTS**

38.    Unfortunately, there are so many failures of disclosure that the Committee must again reserve its rights to supplement and amend this objection and/or seek additional discovery with respect to the same, and submits this objection without in any way limiting any rights the Committee may have.  The Committee therefore expressly reserves its rights to object to the Amended Disclosure Statement and/or confirmation of the Amended Plan on any other grounds, as may be appropriate.

## **CONCLUSION**

WHEREFORE, the Committee respectfully requests that this Court (a) enter an Order declining to approve the Disclosure Statement and (b) grant the Committee such other and further relief as may be appropriate under the circumstances of these cases.

45765/0001-1519789v1

Dated:  April 29, 2008

**HALPERIN BATTAGLIA RAICHT, LLP**

By:     /s/ Alan D. Halpern
        Alan D. Halperin, Esq.
        Donna H. Lieberman, Esq.
        555 Madison Avenue, 9th Floor
        New York, New York 10022
        (212) 765-9100

**COLE, SCHOTZ, MEISEL, FORMAN &
LEONARD, P.A.**

By:     /s/ Michael Sirota
        Michael Sirota, Esq.
        Ilana Volkov, Esq.
        Warren Usatine, Esq.
        Court Plaza North
        25 Main Street
P. O. Box 800
Hackensack, NJ 07602-0800
(201) 489-3000

Co-counsel to the Official Committee of
Unsecured Creditors

45765/0001-1519789v1