**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York  10022
(212) 765-9100
(212) 765-0964 Facsimile
Alan D. Halperin, Esq.
Donna Lieberman, Esq.

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street, P.O. Box 800
Hackensack, New Jersey  07602-0800
(201) 489-3000
(201) 489-1536  Facsimile
Michael D. Sirota, Esq.
Ilana Volkov, Esq.
Warren A. Usatine, Esq.

Co-Counsel for the Official
Committee of Unsecured Creditors

|  |  |  |
|---|---|---|
| | | UNITED STATES BANKRUPTCY COURT<br>FOR THE DISTRICT OF NEW JERSEY<br>HONORABLE GLORIA M. BURNS<br>CASE NO. 08-14631(GMB) |
| _____ | : | |
| | : | (Jointly Administered) |
| In the Matter of: | : | |
| | : | Chapter 11 |
| SHAPES/ARCH HOLDINGS, L.L.C., et al., | : | **APPLICATION IN SUPPORT OF** |
| | : | **MOTION OF THE OFFICIAL** |
| | : | **COMMITTEE OF UNSECURED** |
| Debtors. | : | **CREDITORS FOR ENTRY OF AN ORDER** |
| | : | **APPOINTING A CHAPTER 11 TRUSTEE** |
| _____ | : | **PURSUANT TO 11 U.S.C. §§ 1104 AND** |
| | | **1106** |

HEARING DATE AND TIME:
May ___, 2008 at 10:00 a.m.

**ORAL ARGUMENT REQUESTED**

TO:     HONORABLE GLORIA M. BURNS
        UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Unsecured Creditors (the "Committee") of Shapes/Arch

Holdings L.L.C., *et al.* (collectively, the "Debtors"), by and through its co-counsel, submits this

Application in support of its motion (the "Motion") for entry of an order appointing a Chapter 11

trustee in these Chapter 11 cases pursuant to §§1104 and 1106 of Title 11 of the United States

Code (the "Bankruptcy Code"), and respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      It is customary, when describing the responsibilities of a debtor-in-possession

under Chapter 11 of the Bankruptcy Code, to speak of the obligations of the debtor to serve as a

fiduciary for creditors, and to maximize values for the benefit of those creditors and the

bankruptcy estates.  Put simply, "[T]he willingness of Congress to leave a debtor-in-possession

is premised on an expectation that current management can be depended upon to carry out the

fiduciary responsibilities of a trustee." *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463,

474 (3d Cir. 1998), *quoting In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524 (Bankr.

E.D.N.Y. 1989).

2.      Here, pursuant to a privately negotiated, pre-petition deal, the management of the

Debtors is controlled by Versa Capital Management, Inc. and its affiliates, Arcus ASI Funding

LLC and Arcus ASI, Inc. (together, "Versa").  Versa became the manager of Debtor

Shapes/Arch Holdings (the parent of the other Debtors) "ten minutes before the filing" and has

held 79.9% of the voting control of Shapes/Arch Holdings at all times since the commencement

of these bankruptcy cases. *See* Transcript of March 18, 2008 hearing, p. 47: lines 18-19,

attached as **Exhibit A**.  Versa (or an affiliate) is also the entity poised to emerge as the owner of

the Debtors and the future employer of the Debtors' management team pursuant to a plan of

2

reorganization filed with the bankruptcy petitions (the "Plan"), *and* is the DIP term lender under

a DIP financing agreement (the "Versa DIP") tied to, and designed to protect, the proposed Plan.

Failure to confirm the Versa Plan on an extremely aggressive schedule is an event of default

under the Versa DIP, and both the Versa DIP and the Plan contemplate broad releases for Versa

and the Debtors' management, and their recapture of any claims not released.

3.      Against this backdrop, it is perhaps unsurprising that the bankruptcy process

urged by the Debtors/Versa is one that violates fundamental bankruptcy principles and disregards

the fiduciary obligations of the Debtors and their management to all creditors.  Rather than

implementing a fair and open process which seeks to maximize value or subject the terms of the

plan to higher and better offers, the creditors have been dealt a "lock-up" under a pre-petition

agreement, an onerous DIP financing facility (laden with fees payable to the lender and its

professionals, and rife with trip wires and hair trigger default provisions) and a proposed plan

that completely disenfranchises unsecured creditors (many of whom, as it turns out, were

actually funding the Debtors' operations during the closed door negotiations between the Debtors

and Versa).  That "lock-up" would deliver the businesses to Versa without testing the value

offered by Versa -- or from the viewpoint of unsecured creditors, the lack of value offered by

Versa -- in the marketplace.  In fact, according to the Debtors and Versa, they are parties to a

pre-petition "no shop" agreement that *prohibits* the Debtors from soliciting competitive bids, or

even sharing information with third parties interested in conducting due diligence.

4.      To date, not one but several potential competing bidders for the Debtors'

businesses have emerged, unsolicited.  H.I.G. Capital, through its affiliate Arch Acquisition I,

LLC ("HIG"), has filed pleadings with this Court indicating its interest in replacing Versa as

both DIP lender and plan funder, on terms significantly more favorable to the Debtors than those

3

offered by Versa.  The Debtors categorically refused to cooperate with HIG in any way until

directed to do so by the Court at an April 17, 2008 hearing.  Sun Capital Partners Group IV Inc.

("Sun Capital") has sent letters to the Committee dated April 2, 2008 and April 10, 2008, and

most recently, a letter to each of counsel to the Committee and the Debtors, expressing interest in

entering into a transaction with the Debtors and asking for the opportunity to complete due

diligence.  Sun Capital, which apparently signed a confidentiality agreement in 2006 and made

past offers to acquire the Debtors, also provided the Committee with a copy of a letter dated

January 29, 2008 from Sun to the Debtors (the same time frame as the Debtors commenced

exclusive negotiations with Versa).   Sun Capital's requests have likewise been ignored by the

Debtors.  And two other parties have contacted the Committee to express interest in conducting

due diligence and participating in a competitive process.

   5.      The Committee does not make this motion to replace the Debtors' management

with a Chapter 11 trustee lightly.  However, the Debtors' management, whether because it is

controlled by Versa or for other reasons, has assigned its fiduciary responsibilities to Versa (as

lender/buyer and controller of the companies) and, as a result, is woefully unable to fulfill its

fiduciary duties to the Debtors' creditors and estates.  The Debtors are conducting these cases for

the benefit of Versa, as evidenced by the terms of the Versa DIP and the Plan, and even the

supposed improved, amended plan, and are actively opposing the legitimate efforts of the

Committee and third parties to open the process in accordance with the mandates of the

Bankruptcy Code and Supreme Court and Third Circuit precedent.  *See Bank of Am. Nat'l Trust

& Sav. Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999); *In re Abbotts Dairies of

Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).  These facts and others, more fully

discussed below (and in other pleadings filed by the Committee to date), have led the Committee

4

to the unwelcome conclusion that "cause" exists for the appointment of a trustee, pursuant to section 1104(a)(1) of the Bankruptcy Code, and that such an appointment is in the best interests of creditors and other parties, as contemplated in section 1104(a)(2) of the Bankruptcy Code.

## STATEMENT OF FACTS

**(a)    The Pre-Petition Versa Deal**

6.      Pleadings filed by the Debtors state that these cases were filed "as a result of serious liquidity issues" and note significant declines in net revenue and EBITDA from 2006 to 2007 –$322.3 million to $273.8 million for net revenue and $20.6 million to less than $4 million for EBITDA.  Disclosure Statement, pp. 9-10.  Pre-petition amendments to their financing agreement with The CIT Group/Business Credit, Inc. and others (the "Pre-Petition Lenders") permitted the Debtors to borrow up to $4.4 million beyond their available borrowing base, but the Debtors were nonetheless unable to remain current with suppliers, utility companies and others.  *See* First Day Motions, "Reasons for Filing."

7.      The Debtors allege that in the face of a worsening financial situation, they attempted to market their businesses, but the record contains no evidence of a comprehensive marketing process at any time during 2007.  Rather, the Debtors describe a half-hearted attempt to find some new financing in late 2007 in response to the Pre-Petition Lenders' refusal to provide additional financing (but not a complete refinancing of the pre-petition debt), followed by exclusive negotiations with Versa, a hedge fund known to the Debtors' management.  The Debtors have provided no evidence to the Court or the Committee to suggest that they solicited bids or responded to due diligence requests from any other party in the months leading up to the bankruptcy filings.

8.      The discussions with Versa allegedly began in January of 2008, effectively simultaneously with the Debtors' engagement of Phoenix Management Services, Inc.

5

("Phoenix") to review the Debtors' financial situation, at the insistence of the Pre-Petition

Lenders.  By letter dated February 6, 2008, Versa provided the Debtors with an "Indication of

Interest" that contemplated Versa's acquisition (through a subsidiary or subsidiaries created for

that purpose) of at least an 85% ownership interest in Shapes/Arch Holdings, the parent Debtor,

and a secured term loan from Versa to the Debtors of up to $15 million.[1]  A copy of that letter is

attached as **Exhibit B**.  The February 6th letter, which contemplated an out-of-court

restructuring, explicitly stated that it was not binding upon Versa, but purported to be binding

upon the Debtors insofar as it: (i) granted Versa an exclusive period to negotiate, enter into and

close a definitive agreement, (ii) provided that the Debtors would treat the letter as confidential,

and (iii) provided that the Debtors would pay a "break-up" fee of $500,000 plus expenses to

Versa in the event of a breach of (i) or (ii).

9.      Between February 6, 2008 and the Debtors' March 16, 2008 bankruptcy filings,

the strategy for Versa's acquisition of the Debtors appears to have been fine-tuned.  A letter of

intent dated February 22, 2008 from Versa to Steven Fleischer, Steven Grabell, A. Jerome

Grossman and Frank Kessler (the "LOI") superseded the February 6th letter, and set forth

Versa's offer to acquire 79.9% of the equity of Shapes/Arch Holdings, with existing equity

holders having the right to co-invest in up to 10% of Versa's investment.  A copy of the LOI is

attached as **Exhibit C**.  The LOI also explicitly contemplated a bankruptcy filing by the Debtors

and provided that (i) the existing equity holders that were parties to the LOI (the "Existing

Holders") would retain any claims they held against the companies and that so long as the plan

of reorganization supported by Versa gave those claims *para passu* treatment with other

---

[1] The remaining 15% of ownership would be held by certain existing equity holders and the senior management of the Debtors.

unsecured claims, the Existing Holders would grant "to the maximum extent permitted by law, an irrevocable proxy and power of attorney to Versa to vote the Existing Claims with respect to such Plan."  LOI, paragraph 4.  The LOI further provided that "the Existing Holders agree not to support or vote in favor of any Plan that is not supported by Versa, [and] not advocate against any Plan supported by Versa."

10.    The formal transfer of control to Versa occurred on the eve of the bankruptcy filings, as evidenced by a Supplemental Agreement between the Parties and an Amended and Restated Operating Agreement for Shapes/Arch Holdings, both of which are dated as of March 16, 2008.  Pursuant to those documents, Versa (through its affiliate Arcus) took voting control of 79.9% of Shapes/Arch Holdings.  Copies of the Supplemental Agreement and the Amended and Restated Operating Agreement are attached as **Exhibits D and E**, respectively.  The Supplemental Agreement also formalized the LOI's co-investment rights for Existing Holders and the treatment of the claims held by Existing Holders, but expanded upon the Existing Holders' abdication of rights and responsibilities to Versa.  The Supplemental Agreement provided in pertinent part:

> 6.2    For a period of one (1) year following the date of this Agreement, the Existing Holders, for themselves and on behalf of the members of BLLC [Ben LLC, the owner of Shapes/Arch Holdings and not a debtor], and BLLC shall not, directly or indirectly:  (i) support, vote in favor of, or participate in any plan of reorganization or other restructuring relating to any bankruptcy filing by the Company [Shapes/Arch Holdings] and/or the Subsidiaries (a "*Plan*") that is not supported by Versa or its affiliates, (ii) advocate against any Plan supported by Versa or its affiliates in connection with any bankruptcy filing by the Company and/or the Subsidiaries, or (iii) unless consented to by Arcus in writing, participate in any sale process under Section 363 of the Bankruptcy Code relating to the Company and/or the Subsidiaries.

> 6.3    The Existing Holders, for themselves and on behalf of the members of BLLC, shall not take any action in any bankruptcy, insolvency or other similar judicial proceeding or restructuring

relating to the Company and/or the Subsidiaries other than in connection with proving any [E]xisting [C]laims and defending any and all actions that may be brought against the Existing Holders by third parties.

6.4    Each Existing Holder hereby constitutes and appoints Versa, and any affiliate of Versa, as his true and lawful agent and attorney-in-fact of the Existing Holders, with full power of substitution and resubstitution, in whole or in part, in the name of each such Existing Holder, but on behalf of and for the benefit of Versa and its affiliates and its successors and assigns, and grants to Versa an irrevocable proxy to vote or otherwise act with respect to the voting rights of the Existing Holder to the same extent and with the same effect as such Existing Holder might or could do to the extent allowed by applicable law, relating to the approval of any Plan and authorizes Versa to vote, as a proxy for the Existing Holders, in favor of any Plan supported by Versa or its affiliates, provided that such Plan treats any and all [E]xisting [C]laims no less favorably than similarly situated unsecured claims.

Supplemental Agreement, sections 6.2—6.4.  The Supplemental Agreement acknowledged that the Existing Holders were all of the voting trustees for the members of Ben LLC (the owner of Shapes/Arch Holdings under the Amended and Restated Operating Agreement) and incredibly provided for a payment of $60,000 to two of the Existing Holders, for the fees and expenses they incurred in connection with the transaction.  Supplemental Agreement, sections 7.2 and 4.

11.    As of the Filing Date (defined below), Versa was an insider of the Debtors, as it had become the manager of parent Debtor Shapes/Arch Holdings, and held voting control of 79.9% in that company.  It also held voting rights with respect to the Plan and the promise of the members of Ben LLC, the owner of Shapes/Arch Holdings, to support the Versa Plan and no other.  Moreover, Versa had agreed to provide a secured DIP financing facility of up to $25 million upon terms that were highly unfavorable to the Debtors and inexorably linked to Versa's acquisition of the Debtors under the Versa Plan.

45765/0001-1519872v2

**(b)**     **The Bankruptcy Cases**

12.     On March 16, 2008 (the "Filing Date"), each of the Debtors filed a voluntary

petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtors have since continued

in the management and operation of their businesses and property as debtors-in-possession

pursuant to §§1107 and 1108 of the Bankruptcy Code.

13.     Among the Debtors' "first day" filings were a motion for approval of DIP

financings with both the Pre-Petition Lenders and Versa, and the Plan and related disclosure

statement.  Interim orders authorizing both DIP financing proposals were entered on March 18,

2008, two days after the Filing Date and without the involvement of the Committee, which was

appointed approximately two weeks later, on March 31, 2008.

14.     The Committee has now filed objections dated as of April 16, 2008 to the entry of

a final order authorizing the Debtors to obtain DIP financing from Versa (the "DIP Objection"),

and to the approval of the disclosure statement related to the Plan (the "Original Disclosure

Statement Objection") [Docket Nos. 164 and 167], as well as an objection to the Amended

Disclosure Statement on April 29, 2008 [Docket No. 230] (the "Amended Disclosure Statement

Objection" and, together with the Original Disclosure Statement Objection, the "Disclosure

Statement Objections").  The DIP Objection and Disclosure Statement Objections are

incorporated herein by reference.

**(i)**     **The Versa DIP**

15.     At the hearing to consider interim approval of the Versa DIP and as discussed in

the DIP Objection, the Debtors made an inadequate (and, in fact, misleading) record as to their

efforts to solicit alternative debtor-in-possession financing, presented no credible evidence that

the proposed financing was an exercise of reasonable business judgment, in the best interests of

the estates and creditors, or that the terms were fair and reasonable, and failed to demonstrate that Versa was extending credit in good faith.

16.    A review of the transcript of the March 18th hearing to consider interim approval of the Versa DIP facility demonstrates the following omissions and misleading statements:

- The Court was advised that Versa did not become an insider of the Debtors until the deal between Versa and the Debtors was approved, but no information was provided about when the idea of transferring control was formulated.  Through discovery conducted by the Committee, it appears that notion surfaced in early February 2008.

- The Debtors' chief executive officer testified that he did not have an agreement with Versa to manage the companies after the acquisition and that he did not have an interest in the transaction. However, the Plan Supplement filed on April 15, 2008 (almost one month after the Filing Date and on the eve of the Disclosure Statement hearing) identifies Mr. Grabell as central to the management team of the Reorganized Debtors.  Additionally, the February 6th Versa letter and the Plan mention an equity participation for senior management.

- The Court was not informed that the Debtors had agreed to a "no shop" provision with Versa, or that third parties had expressed interest in doing a transaction with the Debtors, which the Debtors declined to pursue at a time when they owed the fiduciary duty to creditors to do so.

[Docket No. 88].

17.    The seriousness of these flaws in the record is magnified upon examination of the Versa DIP facility, which contains terms designed to even more squarely place control of the Chapter 11 process in Versa's hands, inextricably link the Versa DIP to the Versa Plan and prevent an alternative plan or competitive bidding on the Debtors' businesses.  For example, the Versa DIP and the interim order provide that the Plan which transfers ownership to Versa must be confirmed by May 30, 2008 and substantially consummated by June 30, 2008, and failure to meet these deadlines is an event of default under the Versa DIP.

18.     The Versa DIP also contains EBITDA covenants which it now appears were violated from the inception of the DIP facility, and a budget as to which the Debtors were likewise in default almost from inception, thus giving Versa the ability to call a default under the Versa DIP at any time.[2]  *See* Versa DIP, section 11.1.  The failure of the Debtors, Phoenix or Versa (in its capacity as manager of the parent Debtor) to recognize that these covenants and budget could not be met, or worse, to knowingly include such provisions as events of default, raise serious questions about the intentions and good faith of the parties.  Moreover, the Debtors advocated and Versa - an insider of the Debtors - obtained general releases for Versa in the context of an interim DIP financing order.

19.     The problematic nature and structure of the Versa DIP is further demonstrated by a review of the uses to which that facility has been put in the five weeks following entry of the interim approval order.  As of April 24, 2008, the Versa facility has been used to (i) retire the Pre-Petition Lenders term loan ($8.4 million), (ii) retire the Pre-Petition Lenders' over-advance ($4.4 million), (iii) pay fees to Versa ($1.3 million) and (iv) pay fees to Versa's professionals ($1.1 million).  Hence, the Debtors have drawn on the Versa DIP in the amount of $15.2 million, none of which has gone to the costs of operating the Debtors' businesses or conducting these Chapter 11 cases.

20.     The Committee recognizes that the Debtors had to retire the amount of the over-advance under the Pre-Petition Lenders' facility in order to make additional borrowings under that facility possible.  And Committee professionals are advised that the Debtors have in fact borrowed under the Pre-Petition Lenders' facility since the Filing Date.  However, it is inescapable that of the more than $15 million drawn under the *Versa* DIP, $12.8 million has gone

---

[2] Upon information and belief, for the time being, Versa has waived those defaults.

to the Pre-Petition Lenders and $2.4 million has gone to Versa itself.  The Debtors appear to have paid an extraordinarily high price for and thus far gotten limited benefit from the Versa DIP term loan.

       **(ii)**     **The Versa Plan**

21.     The Plan[3] that has been filed with the Court is nominally titled the "Debtors' Joint Plan of Reorganization," but like the Versa DIP agreement, the Plan seems to have been drafted with the interests of Versa and not these bankruptcy estates or creditors in mind.  The Plan is designed to implement the pre-petition deal between the Debtors and Versa, without marketing the Debtors' businesses and without the possibility of an open and competitive bidding process. The Plan converts a small piece of the Versa DIP to equity, secures the balance of the loan with liens on everything from existing assets to the reserves for distributions to creditors, makes a *de minimis* amount available for distribution to unsecured creditors and places caps on cure amounts and certain environmental claims without any explanation for the basis thereof.  The sole purpose of the Plan is to deliver the Debtors' businesses to Versa minus all liabilities other than the obligations to the Pre-Petition Lenders and to Versa itself, for a modest infusion of capital.

22.     The Plan expands the releases provided under the Versa DIP, providing broad releases and exculpation for everyone connected with the deal between Versa and the Debtors,[4] and further insulates the Debtors' managers, officers and directors from charges of breach of fiduciary duty and scrutiny of their pre-petition transactions with the Debtors by vesting all

---

[3] As discussed later in this motion, an amended plan was filed on April 24th, but makes few meaningful improvements to the process.

[4] The Debtors have also proposed a balloting process under which the third-party releases of Versa, *et al*. are a default option.  If a creditor does not indicate acceptance or rejection of the releases, it has accepted them.  *See* Debtors' Disclosure Statement [Docket No. 16].

12

avoidance actions in the Reorganized Debtors.  The Reorganized Debtors will, of course, be

owned and managed by Versa and current senior management.  *See* Plan and Plan Supplement.

[Docket Nos. 15, 159]

23.     The Committee notes that in response to the numerous objections filed in

connection with the Plan and Disclosure Statement, including the Original Disclosure Statement

Objection, and in response to the comments of the Court at the April 17th hearing, Versa and the

Debtors have just amended their Plan and Disclosure Statement.  [Docket Nos. 209, 208]  The

amended plan establishes a fund of $2 million (rather than $500,000) for unsecured claims, and

make a half-hearted gesture towards addressing the fundamental flaws in the process that the

Debtors and Versa devised, by providing that the plan may be subject to competitive bidding *if it

is first rejected by creditors and if this Court rules that the businesses must be marketed*.

However, if the plan is rejected and competitive bidding becomes a possibility, the amount

reserved by Versa for unsecured claims decreases to the $500,000 level, and the time frame

provided for the competitive "process" is so inadequate that it is transparently designed to

discourage other bidders and chill bidding.   In addition, if the budget provided by the Debtors is

to be believed, the Debtors may run out of money before the still-flawed sale process-- now

providing lip-service to due process, but still falling well-short of a fair and open process --is

completed.

**(iii)     Other Post-Petition Developments**

24.     Since the entry of the interim orders on March 18, 2008, the Debtors have

steadfastly held to the path they embraced pre-petition, defending their closed, non-competitive

process against all challenges.  They have done so in the face of opposition from the Committee,

and requests from interested parties for the opportunity to conduct due diligence and participate

in the plan and bankruptcy process.

13

25.     One of those interested parties, H.I.G., through its affiliate Arch Acquisition I,

LLC ("Arch Acquisition"), has repeatedly requested the opportunity to conduct due diligence,

and submitted a proposed replacement term loan DIP facility and a proposed plan (subject to the

satisfactory completion of due diligence) to the Debtors and the Committee.  Both of the Arch

Acquisition proposals offer terms significantly more favorable to the estates and their unsecured

creditors than the Versa/Debtors' DIP facility and Plan.  The Debtors nonetheless refused to

cooperate with Arch Acquisition in any way, citing a "no shop" agreement as the reason for their

fealty to Versa and, as a result, Arch Acquisition filed pleadings with this Court objecting to the

process, or lack of process.  At the conclusion of a contentious April 17th hearing before this

Court, the Debtors were directed to provide Arch Acquisition with the requested due diligence.

26.     While the other interested parties have not filed pleadings with the Court, Sun

Capital has sent multiple letters to the Committee and more recently to the Debtors and the

Committee, stating its interest in a transaction with the Debtors and need to complete due

diligence.  Sun Capital also provided the Committee with a copy of a letter dated January 29,

2008 from Sun to the Debtors, and a 2006 confidentiality agreement with the Debtors.  Upon

information and belief, Sun made offers for some or all the Debtors' assets in 2006 and early

2007.

27.     The Committee is troubled by the Debtors' refusal to deal with at least two

interested and motivated parties.[5]  This concern is heightened by the fact that Arch Acquisition

and Sun Capital have expressed interest in the Debtors because of potential synergies with

businesses already owned by those two equity funds.  Thus, while Arch Acquisition and Sun

---

[5] The Debtors' attitude seems to be softening slightly in the face of the Committee's demands and
objections, and the criticisms and concerns voiced by this Court.  However, the Committee notes that
cooperation that must be compelled hardly qualifies as cooperation.

14

Capital may be interested in acquiring the Debtors, they may not need the expertise of the

Debtors' senior management or current equity holders (hence, the likely reason for the lack of

cooperation).

<u>**JURISDICTION, VENUE AND STATUTORY PREDICATES**</u>

28.    The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§157 and

1334.

29.    Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

30.    The statutory predicates for the relief requested herein are sections 1104, 1106

and 105(a) of the Bankruptcy Code.

<u>**RELIEF REQUESTED AND BASIS THEREFOR**</u>

**(a)    The Applicable Legal Standards**

31.    The Committee reluctantly makes this motion because the facts of these cases

make the appointment of a Chapter 11 trustee a necessity if the interests of creditors, the value of

the Debtors' businesses and the integrity of the bankruptcy process are to be protected.  The

authority of the Court to appoint a trustee is set forth in Section 1104 of the Bankruptcy Code,

which provides in pertinent part that:

> (a)    At any time after the commencement of the case but
> before confirmation of a plan, on request of a party in interest or
> the United States trustee, and after notice and a hearing, the court
> shall order the appointment of a trustee--
>
> (1)    for cause, including fraud, dishonesty,
> incompetence, or gross mismanagement of the affairs of the debtor
> by current management, either before or after the commencement
> of the case, or similar cause, but not including the number of
> holders of securities of the debtor or the amount of assets or
> liabilities of the debtor; or
>
> (2)    if such appointment is in the interest of
> creditors, any equity security holders, and other interests of the

45765/0001-1519872v2

> estate, without regard to the number of holders of securities of the
> debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. §1104.

32.     Section 1104(a)(1) of the Bankruptcy Code is not an exclusive list of the "causes"

that mandate the appointment of a trustee, as evidenced by the inclusion of the phrase "or similar

cause." *See Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1988).  The

determination of what constitutes "cause" within the meaning of section 1104(a)(1) belongs to

the court before which the question arises, and courts have considerable discretion in making that

determination, based upon the particular facts and circumstances before them. *See Marvel

Entertainment*, 140 F.3d at 472-73 (acrimony between management of debtor and other parties

constituted cause compelling the appointment of Chapter 11 trustee). *See also In re Sharon Steel

Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989) (appointment of a trustee is mandatory upon a finding

of cause, but a determination of what constitutes cause is within the court's discretion).

33.     Section 1104(a)(2) of the Bankruptcy Code provides additional flexibility in

connection with the decision to appoint a trustee.  Even if no "cause" exists to compel the

appointment, a court may direct the appointment of a Chapter 11 trustee when such appointment

is in the best interests of creditors. *See In re Euro-American Lodging Corp.*, 365 B.R. 421, 427-

28 (Bankr. S.D.N.Y. 2007); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 167 (Bankr. S.D.N.Y.

1990).  Courts consider several factors in determining whether to appoint a trustee under

§1104(a)(2) of the Bankruptcy Code, including, but not limited to (a) the trustworthiness of the

debtor, (b) the debtor's past and present conduct and its potential to rehabilitate, (c) creditors'

lack of confidence in the debtor's current management, and (d) the relative costs and benefits of

the appointment of a trustee. *Ionosphere*, 113 B.R. at 167, *citing In re Evans*, 48 B.R. 46, 48

(Bankr. W.D.Tex. 1985); *In re Parker Grande Dev., Inc.*, 64 B.R. 557, 561 (Bankr. S.D.Ind.

16

1986); *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D.W.Va. 1981); *Microwave Products of America, Inc.*, 102 B.R. 666, 671 (Bankr.W.D.Tenn. 1989).

34.    While Chapter 11 contemplates that under normal circumstances, current management will remain in control of the debtor, courts have clearly articulated that the debtor-in-possession is a fiduciary for its creditors, and a trustee should replace management if management's conduct could damage the estate or hinder the reorganization efforts.  *See In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989); *see also Marvel Entertainment*, 140 F.3d at 471.  The standard for determining whether a Chapter 11 trustee is warranted is "clear and convincing evidence" and the burden of proof is upon the moving party. *In re G-I Holdings, Inc.*, 385 F.3d 313, 320 (3d Cir. 2004).

**(b)    The Appointment of a Chapter 11 Trustee is Warranted by the Facts of These Cases**

35.    The Debtors' cases making a compelling argument for the appointment of a Chapter 11 trustee under both the mandatory appointment provisions of section 1104(a)(1) *and* the discretionary appointment provisions of section 1104(a)(2) of the Bankruptcy Code.  The Committee submits that the management of the Debtors, conspiring with Versa, has breached and continues to breach its fiduciary responsibilities to creditors, both pre- and post-petition, and that it is not acting as a fiduciary for creditors and the estates pursuant to Chapter 11 of the Bankruptcy Code.  Moreover, as a result of the conduct of management and its apparent lack of independence from Versa, creditors do not trust or have confidence in the Debtors' current management.[6]

---

[6] Contemporaneously with the filing of this motion and for many of the reasons discussed herein, the Committee is also moving to terminate the Debtors' exclusive periods.  The Committee's motion to terminate exclusivity is incorporated herein by reference.

45765/0001-1519872v2

36.    Prior to the Filing Date, the Debtors entered into an agreement with Versa to transfer the businesses to Versa.  The record shows no efforts by the Debtors to seek other bids in the months prior to the Filing Date,[7] but rather, evidences the prompt agreement of the Debtors' management not to shop the Debtors' assets or businesses elsewhere.  The Debtors then, in short order and under circumstances which the Committee is still investigating, agreed to (i) convey control of the Debtors to Versa prior to the actual sale of the assets or stock, (ii) borrow money from Versa under terms designed to enrich Versa and preclude other bidders for the Debtors' businesses, and (iii) propose the Plan, which offers almost nothing to unsecured creditors, releases actions against Versa and the Debtors' management (and vests any remaining actions in the "Reorganized Debtors" -- i.e., Versa and the Debtors' management) and like the Versa DIP, prohibits bidding by third parties.  All of this was done when the Debtors were either insolvent or in the zone of insolvency, per the pleadings and testimony proffered by the Debtors.

37.    The actions of the Debtors' management in the weeks leading up to the Filing Date may well constitute breaches of fiduciary duty and aiding and abetting of breaches of fiduciary duty.  The fiduciary duties of the Debtors to all creditors were patently disregarded in favor of a privately negotiated deal that the Debtors thought to force on unsecured creditors, without including those creditors in the process in any way (and actually increasing the amount of trade debt owed to those creditors while negotiating a sweetheart deal with Versa).  And the structure of the deal between the Debtors and Versa puts Versa on every side of the transaction. As of the Filing Date, Versa was (i) an insider of the Debtors, with voting control of the parent company and the right to vote the claims of the owners of Shapes/Arch Holdings, (ii) a proposed

---

[7] And as discussed in the DIP Objection, the Debtors have also failed to demonstrate that they adequately shopped for a DIP facility.

18

DIP lender under terms that were highly favorable to Versa and gave it even more control over the Debtors and the bankruptcy process (e.g., excessive fees, the ability to call defaults at any time, links between the Versa DIP and the Plan), and (iii) the proposed acquirer of the Debtors' businesses, under a Plan that effectively ignores the interests of unsecured creditors in favor of Versa.[8]

38.    Incredibly, since the Filing Date, the Debtors' management has continued to disregard its duties to creditors, and done its utmost to side-step the fundamental requirements of the Chapter 11 process.  It is axiomatic that Chapter 11 requires a fair and open process, conducted with the goal of maximizing value for the benefit of creditors and the estates.  *In re Big Rivers Electric Corp.*, 233 B.R. 726, 734 (Bankr. W.D. Ky. 1998) ("It is beyond dispute that a Chapter 11 DIP owes a fiduciary duty to all of the creditors and other interest holders of its bankruptcy estate to maximize the value of the bankruptcy estate.")  *See also Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56 (1985).  To that end, it has become standard practice for a debtor that has decided to sell its business or assets to market the business and assets under procedures approved by the Bankruptcy Court and consistent with the Bankruptcy Code, and make any proposed sale (whether under a plan or pursuant to section 363) subject to "higher and better" offers.

---

[8] The Committee notes that the Plan (prior to the recent amendment) proposed a pro rata distribution of $500,000 (and the Amended Plan, under certain conditions, offers $2 million) to an unsecured creditors' class that the Debtors now conservatively estimate to be more than $38 million.  *See* Disclosure Statement for Amended Plan, page 6.  The Debtors have already paid **$2.4 million** to Versa and Versa's professionals under the Versa DIP, and are required to pay an additional $80,000 per month to Versa, plus professional fees, throughout the life of the Versa DIP.

Naturally, under the Versa DIP and the Plan, when Versa becomes the owner of the Reorganized Debtors, Versa will be "repaid" for loaning money to the Debtors to pay Versa.  It would perhaps have been more straightforward for Versa to keep the $2.4 million in its own pocket, and then simply have the Reorganized Debtors pay Versa an additional $2.4 million.

19

39.    Here, the Debtors have done their utmost to *avoid* precisely the kind of process that principles of bankruptcy law and fiduciary responsibilities thereunder require.  The Debtors have refused to provide due diligence to parties interested in these companies, and have consistently opposed any sort of marketing of their businesses and any competitive process that might maximize value by making the Versa transaction subject to higher and better offers.  It took objections by the Committee, a contentious hearing and a ruling by this Court before the Debtors would provide basic due diligence information to Arch Acquisition, a potential bidder that has expressed considerable interest in acquiring the Debtors' businesses and providing financing that would replace the harsh Versa DIP.  And, as of the date of this Motion, the Debtors have refused to provide access or information to two other prospective bidders that have sent written expressions of interest and requests for due diligence to the Debtors and the Committee.

40.    The Debtors' behavior, which flies directly in the face of their fiduciary duties, raises serious questions about the independence and loyalties of the Debtors' management.  The Debtors are apparently wedded to Versa per a private, pre-petition agreement, and are therefore persistently urging a closed, non-competitive process that is inconsistent with bankruptcy principles and in violation of the Debtors' fiduciary duties to creditors, including the duty to maximize value for the estates and creditors.  The multiple roles of Versa in these cases – controlling insider, DIP lender and proposed acquirer – may be at the root of the problem.  Or to paraphrase the Third Circuit's observation in *Marvel Entertainment*, an "unhealthy conflict of interest" such as the one before this Court inevitably results in animosity between the debtor and its creditors, and in a lack of creditor confidence in the ability of the debtor's management to act as a fiduciary.  *Marvel Entertainment*, 140 F.3d at 473.

20

41.    It is unknown to the Committee whether the inappropriate behavior of the
Debtors' management in proposing and protecting a closed process stems from Versa's control
of the parent Debtor, Versa's future role as the owner of the Debtors, or some other cause, but
whatever the cause of the problem, the result is the same.[9]  And the result - the Debtors' failure
to fulfill their fiduciary duties - is cause for the appointment of a Chapter 11 trustee under section
1104(a)(1) of the Bankruptcy Code.  *Marvel Entertainment*, 140 F.3d at 474.

42.    In addition, the Committee submits that the appointment of a Chapter 11 trustee is
warranted under section 1104(a)(2) of the Bankruptcy Code, as such an appointment is in the
best interests of creditors.  As discussed above, the criteria considered by the courts in
determining whether a trustee is warranted under 1104(a)(2) include (a) the trustworthiness of
the debtor, (b) the debtor's past and present conduct and its potential to rehabilitate, (c) creditors'
lack of confidence in the debtor's current management, and (d) the relative costs and benefits of
the appointment of a trustee.  *Ionosphere*, 113 B.R. at 167, *citing In re Evans*, 48 B.R. 46, 48
(Bankr. W.D.Tex. 1985).

43.    Here, at least three and likely all four of these factors militate in favor of the
appointment of a trustee.  The Committee represents the interests of general unsecured creditors,
and the fact and contents of this Motion evidence that creditors are alarmed by the past and

---

[9] It is perhaps noteworthy that the Plan and Plan Supplement that evidence the Versa deal
contemplate that the Debtors' senior management will remain, and that current management and current
equity may have an equity participation in the Reorganized Debtors.  By contrast, at least two of the
potential bidders that the Debtors, if left to their own devices, would exclude from the bankruptcy
process, are "strategic" bidders, in that they already own companies in the Debtors' industries.  Arch
Acquisition and Sun Capital might therefore be less interested than Versa in keeping current management
in place.  Counsel to the Debtors has tried to justify the Debtors' hostility to Arch Acquisition and other
potential bidders by referring to those entities as "competitors" at hearings before this Court.  While the
Committee offers no opinion as to whether this is an accurate characterization, it notes that it is hardly
unorthodox for a company to expand its business by purchasing a competing or complementary business
and that strategic buyers are frequently bidders in Chapter 11 cases.

present conduct of these Debtors, and have lost confidence in the independence and

trustworthiness of the Debtors' management.  And while the Committee is sensitive to the costs

related to the appointment of a trustee, those costs are unlikely to exceed the costs that are being

and will continue to be incurred if the only way to make the Debtors act responsibly is through

litigation.  Moreover, those costs must be outweighed by the need for an open bankruptcy

process and a fair and efficient due diligence and sale process.

       44.     Thus, the factors that the courts use in determining whether a trustee is warranted

under section 1104(a)(2) are all satisfied by the facts of these cases.  The benefit of a trustee

would be immediate, in that it would provide something that creditors have not yet seen in these

cases -- control of the Debtors in the hands of an independent party who is prepared to fulfill his

or her fiduciary responsibilities to all creditors.[10]

       45.     No prior application has been made to this or any other Court for the relief

requested herein.


[page intentionally left blank]

---

[10] On April 28 and 29, 2008, the Committee is conducting depositions of representatives of the
Debtors, Phoenix and Versa.  The Committee reserves the right to supplement the record with facts
uncovered during those depositions.

22

## CONCLUSION

**WHEREFORE,** the Committee respectfully requests that the Court enter an order

appointing a Chapter 11 Trustee and grant such other and further relief as the Court deems just

and appropriate under the circumstances.

**HALPERIN BATTAGLIA RAICHT, LLP**
Co-Counsel to the Official Committee of
Unsecured Creditors


By:    */s/ Alan D. Halperin*
       Alan D. Halperin, Esq.
       Donna H. Lieberman, Esq.

**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
Co-Counsel to the Official Committee of
Unsecured Creditors


By:    */s/ Michael D. Sirota*
       Michael D. Sirota
       Ilana Volkov
       Warren A. Usatine


DATED:  April 29, 2008