# EXHIBIT E

*EXECUTION COPY*

# SHAPES/ARCH HOLDINGS L.L.C.

## AMENDED AND RESTATED OPERATING AGREEMENT

This amended and restated operating agreement of Shapes/Arch Holdings L.L.C., a New Jersey limited liability company (the "Amended and Restated Operating Agreement"), is entered into effective as of the 16th day of March, 2008, by BEN LLC, a New Jersey limited liability company ("Ben").

## B A C K G R O U N D:

A.   The Company was originally formed pursuant to a Limited Liability Company Agreement effective January 1, 1996 (the "Original Agreement").

B.   The Original Agreement was amended a number of times, and immediately prior to the creation of this Amended and Restated Operating Agreement, the Sixth Amended and Restated Limited Liability Company Agreement effective as of December 12, 2003 remains in full force and effect (the "Existing Agreement"). Further, the sole member of the Company is Ben.

C.   Effective on the date hereof, the parties hereto desire to amend and restate the Existing Agreement on the terms provided herein.

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1

## DEFINED TERMS; OPERATION OF COMPANY

**Section 1.01**  **Definitions.** Within the context of this Agreement, the following terms shall have the following meanings:

"**Act**" means the New Jersey Limited Liability Company Act.

"**Agreement**" means this operating agreement, as the same may be amended from time to time.

"**Arcus**" means Arcus ASI, Inc.

"**Bankruptcy**" means, with respect to any Person, (i) the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or

-1-

composition of such Person or such Person's debts under any law relating to bankruptcy, insolvency, or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian, or other similar official for such Person for any substantial part of its property, or (ii) without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or other similar relief under any bankruptcy, liquidation, dissolution, or other similar statute, law, or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

"**Capital Account**" means the account established and maintained for each Member in accordance with Section 2.04 of this Agreement.

"**Capital Contribution**" means the amount of money and the fair market value of any property contributed to the Company by a Member (net of any liabilities to which such property is subject or that are assumed by the Company in connection with such contribution).

"**Certificate**" means the certificate of organization for the Company, and any amendments thereto.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" means Shapes/Arch Holdings L.L.C.

"**Incapacity**" means (a) with respect to a natural Person, the Bankruptcy, death or determination of incompetency or insanity of such Person and (b) with respect to any other Person, the Bankruptcy, liquidation or dissolution of such Person.

"**Interest**" means an ownership interest in the Company, including all of the rights and obligations in connection therewith under this Agreement and the Act.

"**Managers**" means Ben and Arcus, serving as the managers of the Company in accordance with the terms of this Agreement.

"**Member**" means the Person designated as members on Exhibit "A" attached to this Agreement, and any Person subsequently admitted as a member in accordance with the terms of this Agreement.

"**Net Distributable Proceeds**" means gross cash or property received by the Company from all sources other than Capital Contributions, including reductions in Reserves, reduced by the portion used (i) to pay Company expenses, including debt service, (ii) to make investments and capital expenditures, and (ii) to fund Reserves.

-2-

"**Percentage Interest**" means the percentage interest set forth on Exhibit "A" hereto.

"**Person**" means any individual or any partnership, corporation, estate, trust, limited liability company or other legal entity.

"**Profits**" and "**Losses**" mean, for each year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with §703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to §703(a)(1) of the Code shall be included in taxable income or loss), adjusted in accordance with the Regulations under §704(b) of the Code.

"**Regulations**" means the income tax regulations promulgated under the Code, as such regulations may be amended from time to time.

"**Required Interest**" shall have the meaning set forth in Section 5.01 hereof.

"**Reserves**" means amounts set aside to pay future costs or expenses that are anticipated to exceed cash available to pay such costs or expenses when due, as determined in the discretion of the Managers, by a Required Interest.

"**Voting Percentage**" means the Manager voting percentage set forth on Exhibit "A" hereto.

Section 1.02 **Formation; Name.** The Company was formed under the Act and its members filed or caused to be filed a certificate of formation in accordance with the Act. Arcus shall file or cause to be filed an amendment to the certificate of formation in accordance with the Act as soon as reasonably possible after the execution of this Agreement if such amendment is required under the Act. The Member hereby agrees to operate the Company as a limited liability company under the terms of this Agreement and the Act. Whenever the terms of this Agreement conflict with the Act, the terms of this Agreement shall control, except with respect to any matters contained in the Act that cannot be modified or waived by a limited liability company operating agreement. The Company shall be operated under the name "Shapes/Arch Holdings L.L.C." The Member or an authorized Person shall file such other certificates and documents as are necessary to qualify the Company to conduct business in any jurisdiction in which the Company conducts business. A copy of the Certificate shall be provided to any Member on request.

Section 1.03 **Registered Agent and Office; Principal Office.** The registered agent and office of the Company required under the Act shall be as designated in the Certificate, and may be changed by the Managers, by a Required Interest, in accordance with the Act. The principal business office of the Company shall be located at 9000 River Road, P.O. Box 397 Delair, New Jersey 08110, or such other location (which need not be a place of business of the Company) as is designated from time to time by the Managers, by a Required Interest.

-3-

**Section 1.04  Purpose.** The purpose and business of the Company is to engage in any activity in which limited liability companies may engage under the Act. The Company is authorized to engage in any business or activity that may be engaged in by a limited liability company under the Act, and do any and all acts and things necessary, appropriate, incidental to, or convenient for the furtherance and accomplishment of its purposes.

**Section 1.05  Term.** The term of the Company shall continue in perpetuity until the Company is terminated in accordance with this Agreement.

**Section 1.06  Title to Property.** All real and personal property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in the Member's individual name or right, and the Member's Interest shall be personal property for all purposes. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

**Section 1.07  Waiver of Partition.** No Member shall either directly or indirectly take any action to require partition or appraisement of the Company or of any of its assets or properties or cause the sale of any Company property, and notwithstanding any provisions of applicable law to the contrary, the Member hereby irrevocably waives any and all right to maintain any action for partition or to compel any sale with respect to such Member's Interest, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

**Section 1.08  Liability to Third Parties.** No Member will be liable for the debts, obligations or liabilities of the Company beyond such Member's capital contribution, including under a judgment, decree or order of a court, except to the extent required under the Act with respect to amounts distributed to the Member at a time when the Company was insolvent or was rendered insolvent by virtue of such distribution.

**Section 1.09  Status of Arcus.** Arcus has not, and is not, acquiring an economic interest in the Company and is not intended to become a partner of the Company for federal income tax purposes. The Member will not treat Arcus as a partner of the Company for federal income tax purposes and Arcus will not assert that it is a partner of the Company for federal income tax purposes.

# ARTICLE 2

## CAPITAL CONTRIBUTIONS; INTERESTS; CAPITAL ACCOUNTS

**Section 2.01  Capital Contributions.** Ben has made the Capital Contributions to the Company as set forth on the books and records of the Company.

-4-

**Section 2.02  Additional Capital Contributions.** The Member shall not be obligated to make any additional Capital Contributions to the Company.

**Section 2.03  Percentage Interests.** The Member shall have the Percentage Interest in the Company set forth next to such Member's name on Exhibit "A" attached hereto.

**Section 2.04  Capital Accounts.** A Capital Account shall be maintained and adjusted for the Member in accordance with §704(b) of the Code and the Regulations issued thereunder. Upon the happening of an event specified in Regulation §1.704-1(b)(2)(iv)(f)(5), Capital Accounts shall be adjusted in accordance with Regulation §1.704-1(b)(2)(iv)(g), unless the Managers, by a Required Interest, determine that such adjustment is not necessary to reflect the economic arrangement of the Member.

**Section 2.05  No Interest.** No interest shall be paid on any Capital Contributions or Capital Account balance of any Member.

**Section 2.06  No Deficit Make-Up.** No Member shall be obligated to the Company or to any other Member or to any other Person solely because of a deficit balance in such Member's Capital Account nor shall a Member have an obligation to restore a deficit balance in such Member's Capital Account at any time.

## ARTICLE 3

## DISTRIBUTIONS

**Section 3.01  Distributions of Net Distributable Proceeds.** Subject to Section 9.02, Net Distributable Proceeds shall be distributed to the Member at such times and in such amounts as shall be determined by the vote of a Required Interest by the Managers.

**Section 3.02  Amounts Withheld.** The Company is authorized to withhold from distributions or with respect to allocations and pay over to any federal, state, local or foreign government any amounts required to be withheld with respect to the Member pursuant to any provisions of federal, state, local or foreign law. All amounts so withheld shall be treated as amounts distributed to the Member pursuant to Section 3.01 of this Agreement. To the extent any amount withheld with respect to the Member pursuant to this Section 3.02 for any year exceeds the amount distributable to such Member for such year, such Member shall repay such excess to the Company within ten (10) days after such Member receives written notice from the Company of the amount of such excess.

**Section 3.03  Tax Distributions.** To the extent Net Distributable Proceeds are available, the Company shall distribute to the Member for each fiscal year of the Company an amount of cash which equals (i) the amount of taxable income allocable to the Member for such year, multiplied by (ii) the combined maximum individual federal and state income tax rate attributable to such taxable income (determined as if the Member was a resident of the State of

New Jersey and taking into account the deductibility of state income taxes for federal income tax purposes). Any such distributions shall be made no later than ninety (90) days after the end of the fiscal year, and may be made quarterly or on any other basis during the year based upon estimates of the taxable income for the year. All amounts so distributed shall be treated as amounts distributed to the Member pursuant to Section 3.01, and shall be reduced by any other amounts distributed pursuant to Section 3.01 and any amounts withheld with respect to the Member pursuant to Section 3.02.

**Section 3.04** **Property Distributions.** The Managers, by a Required Interest, may authorize the distribution to the Member of property other than cash. All such distributions shall be included in Net Distributable Proceeds based upon the fair market value of such property at the time of distribution.

## ARTICLE 4

## PROFITS AND LOSSES

**Section 4.01** **General Allocation of Profits and Losses.** After taking into account any special allocations pursuant to Section 4.02 and subject to any limitations contained therein, all Profits and Losses for any year or portion thereof shall be allocated to the Member.

## ARTICLE 5

## MANAGEMENT OF COMPANY.

**Section 5.01** **General Provisions Concerning Management.** The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managers. The Member hereby irrevocably appoints each of Ben and Arcus ASI, Inc. ("Arcus") as the Managers of the Company, with each such Manager having the Voting Percentage in the Company set forth next to such Manager's name on Exhibit "A" attached hereto. The Managers shall not be required to obtain any approvals or consents from the Member. All actions by the Managers permitted or required hereby, or otherwise on behalf of the Company shall require the consent of the holders of a majority of Voting Percentages of the Managers (such majority voting consent being referred to as a "Required Interest"), provided however that the Managers may delegate to any Person authority to act on behalf of the Company with respect to specific matters, consistent with the terms of Sections 5.02 and 5.05 hereof. A Manager may resign from being a manager of the Company upon written notice to the Member, in which case the Voting Percentage of such resigning Manager shall be zero and the Voting Percentage of the remaining Manager shall be 100% and the remaining Manager is authorized to reflect such change on a revised Exhibit "A"; but notwithstanding the foregoing, so long as Ben is the Member of the Company, Ben agrees to remain as a Manager of the Company with a Voting Percentage of not less than 20.1%.

Section 5.02    **Authority.**  Subject to obtaining the approval of a Required Interest, as described in Section 5.01 and except as otherwise specifically provided in this Agreement, Arcus or any duly authorized officer of the Company (pursuant to Section 5.05) shall have the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to incur any expenditures on behalf of the Company.  Further, except as otherwise specifically provided in this Agreement, Ben (and any successor or assign of Ben) shall not have the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to incur any expenditures on behalf of the Company.

Section 5.03    **Written Consents.**  Any action required or permitted to be taken at a meeting of Managers may be taken without a meeting and without prior notice, if a consent, in writing, setting forth the action so taken shall be signed by a Manager or Managers constituting a Required Interest.

Section 5.04    **Company Expenses.**  All expenses of the Company shall be billed directly to and be paid by the Company.  The Manager entitled to incur expenditures on behalf of the Company shall be reimbursed for all such expenses.

Section 5.05    **Officers.**  The Managers, by a Required Interest, shall have the authority to establish such officers of the Company as they shall determine in their sole discretion, and to appoint individuals to serve as such officers, including chairman, chief executive officers, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer.  Each such officer shall serve for a period of time as shall be determined by the Managers, by a Required Interest, and shall have such management powers and authorities as the Managers, by a Required Interest, shall from time to time delegate to such officer.  An individual may hold more than one office at any time.

## ARTICLE 6

## BOOKS AND RECORDS; TAX AND FINANCIAL MATTERS

Section 6.01    **Books and Records.**  Proper and complete records and books of account of the Company shall be maintained at the principal place of business of the Company.  The Company books shall be closed and balanced at the end of each fiscal year.  The Member or duly authorized representative of a Member shall have access and the right to inspect such books and records during normal business hours, provided any information obtained thereby may be used solely for purposes related to the business of the Company.

Section 6.02    **Fiscal Year.**  The year of the Company shall end on the last day of the month of December each year.

**Section 6.03** <u>Reports and Tax Returns</u>. Within ninety (90) days after the end of each fiscal year (subject to reasonable delays in the event of difficulty in obtaining or compiling of tax information), the Company shall transmit to each Person who was a Member at any time during the fiscal year the Schedule K-1 (IRS Form 1065) for the Person for such year. The "tax matters partner" as set forth in Section 6.04 shall cause to be prepared and filed all tax returns for the Company, and all tax elections concerning the Company shall be made at the direction of Ben. The Member agrees that it shall not take on any of its original or amended income tax returns or claims for refund any position with respect to any Company item of income, gain, loss, deduction, or credit that is inconsistent with the treatment of such item by the Company on the Schedule K-1, unless the tax matters partner has agreed to or adopted a different reporting of such item in connection with an examination, audit, or the filing of an amended return.

**Section 6.04** <u>Tax Matters Partner</u>. The Member hereby designates Ben to be the "tax matters partner" under §6231(a)(7) of the Code. The Member may designate a different Member to serve as the tax matters partner at any time.

**Section 6.05** <u>Banking</u>. All funds of the Company shall be deposited in the name of the Company in such checking account or accounts as shall be designated by the Managers, by a Required Interest. All withdrawals therefrom are to be made upon checks signed by a Person or Persons authorized by the Managers, by a Required Interest.

## ARTICLE 7

## <u>TRANSFERS, ADMISSIONS, AND WITHDRAWALS</u>

**Section 7.01** <u>Transfers</u>. The Member shall not transfer, sell, assign, encumber, or otherwise dispose of all or any portion of the Member's Interest without the written consent of a Manager or Managers constituting a Required Interest. Any purported transfer, sale, assignment, encumbrance, or other disposition in violation of this Agreement shall be null and void.

**Section 7.02** <u>Admissions</u>. No transferee of an Interest shall be admitted as a Member of the Company without the written consent of a Manager or Managers constituting a Required Interest, and only if the transferee agrees to be legally bound by this Agreement as a Member and executes and delivers to the Company such documents and instruments as are necessary or appropriate in connection with the transferee becoming a Member. The transferee shall pay all costs and expenses incurred by the Company in connection with such admission. Any transferee of an Interest who is not admitted as a Member shall have the rights of an assignee with respect to distributions and Profits, Losses, and other allocations attributable to the transferred Interest, but shall have no rights as a Member under this Agreement or the Act. Notwithstanding the foregoing, the Interest of the assignee shall be subject to the restrictions contained in this Agreement applicable to Interests held by a Member.

**Section 7.03** <u>No Withdrawal</u>. The Member shall have no right to withdraw from the Company prior to the dissolution and winding up of the Company.

Section 7.04  **Incapacity of Member.**  The Incapacity of a Member shall not dissolve or terminate the Company. In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Member affected by such Incapacity shall be deemed to be the assignee of such Member's Interest and may, subject to Section 7.02, become a substituted Member.

Section 7.05  **Pledge of Interest.**  Notwithstanding any provision to the contrary in this Agreement, the Interest of the Member issued hereunder or covered hereby may be pledged to any lender or lenders as collateral for the indebtedness, liabilities and obligations of the Company to such lender or lenders, and any such pledged Interests shall be subject to such lender's or lenders' rights under any collateral documentation governing or pertaining to such pledge. The pledge of such Interests shall not, except as otherwise provided in such collateral documentation, cause the Member to cease to be a Member or to have the power to exercise any rights or powers of a Member and, except as provided in such collateral documentation, such lender or lenders shall not have any liability solely as a result of such pledge. Without limiting the foregoing, the right of such lender or lenders to enforce their rights and remedies under such collateral documentation hereby is acknowledged and any such action taken in accordance therewith shall be valid and effective for all purposes under this Agreement (regardless of any restrictions herein contained) and any assignment, sale or other disposition of the Interests by such lender or lenders pursuant to any such collateral documentation in connection with the exercise of any such lender's or lenders' rights and powers shall be valid and effective for all purposes, including, without limitation, under Sections 42:2B-44 and 42:2B-46 of the Act and this Agreement, to transfer all right, title and interest of the Member hereunder to such lender or lenders, any other lender or any other person (upon such transfer, each a "Collateral Assignee") in accordance with such collateral documentation and applicable law (including, without limitation, the rights to participate in the management of the business and the business affairs of the Company (in accordance with the Voting Percentages), to share profits and losses, to receive distributions and to receive allocation of income, gain, loss, deduction, credit or similar item), and such Collateral Assignee shall be a Member of the Company with all rights and powers of a Member. Such assignment shall not constitute an event of dissolution under the Agreement. Further, no lender or any such Collateral Assignee shall be liable for the obligations, if any, of the Member assignor to make contributions. The Member approves all of the foregoing and the Member agrees that no further approval shall be required for the exercise of any rights or remedies under such collateral documentation.

## ARTICLE 8

## LIABILITIES OF MEMBERS; INDEMNIFICATION

Section 8.01  **Liability of Parties.**

(a)  No Member or Manager, and no member, manager, officer, director or shareholder of a Member or Manager, will be liable to the Company or to any other Member for (i) the performance of, or the omission to perform, any act or duty on behalf of the

-9-

Company if, in conformance herewith and in good faith, the Member or Manager, or member, manager, officer, director or shareholder of a Member or Manager, determined that such conduct was in the best interest of the Company and such conduct did not constitute fraud, gross negligence or reckless or intentional misconduct and (ii) the performance of, or the omission to perform, on behalf of the Company, any act in good faith reliance on advice of legal counsel, accountants or other professional advisors to the Company.

(b)     Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager (or a member, manager, officer, director or shareholder of a Member or Manager) shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being or acting as a Member or Manager (or a member, manager, officer, director or shareholder of a Member or Manager).

Section 8.02    **Indemnification.** The Company, its receiver or its trustee shall indemnify, defend and hold each officer of the Company, the Member, the Managers, and the members, managers, officers, directors and shareholders of the Member and Managers (and their respective heirs, personal representatives and successors) (the "Indemnified Persons") harmless from and against any expense, loss, damage or liability incurred or connected with, or any claim, suit, demand, loss, judgment, liability, cost or expense (including reasonable attorneys' fees) arising from or related to, the Company or any act or omission of any Indemnified Person on behalf of the Company, and amounts paid in settlement of any of the foregoing, provided that the same were not the result of fraud, gross negligence, or reckless or intentional misconduct on the part of the Indemnified Person(s) against whom a claim is asserted. The Company shall advance to any Indemnified Person the costs of defending any claim, suit or action against such person if the person undertakes to repay the funds advanced, with interest, if such person is determined not to be entitled to indemnification under this Section 8.02.

## ARTICLE 9

## TERMINATION AND DISSOLUTION

Section 9.01    **Dissolution Events.** The Company shall be terminated and dissolved upon the election of all of the Managers to dissolve the Company.

Section 9.02    **Liquidation.**

(a)     **Winding Up.** Upon the dissolution of the Company, the Company's business shall be liquidated in an orderly manner. The Managers, by a Required Interest, shall determine which Company property shall be distributed in-kind and which Company property shall be liquidated. The liquidation of Company property shall be carried out as promptly as is consistent with obtaining the fair value thereof.

-10-

(b) **Payments and Distributions.** Company property or the proceeds therefrom, to the extent sufficient therefor, shall be applied and distributed in the following order of priority, with no distribution being made in any category set forth below until each preceding category has been satisfied in full:

(i) To the payment and discharge of all of the Company's debts and liabilities, including any debts and liabilities owed to any Member, and to the expenses of liquidation;

(ii) To the establishment of Reserves (which Reserves, to the extent determined by the Managers (by a Required Interest) to be no longer needed by the Company, shall be distributed in accordance with the order of priority set forth in Section (c) hereof);

(iii) To the Member.

# ARTICLE 10

## MISCELLANEOUS

**Section 10.01 Notices.** All notices, approvals, consents, requests, instructions, and other communications (collectively "Communications") required to be given in writing pursuant to this Agreement shall be validly given, made or served only when delivered personally or by registered or certified mail, return receipt requested, postage prepaid, or by a reputable overnight or same day courier, addressed to the Company or the Member at the address that is on record at the principal office of the Company. Any such Communication shall be treated as given under this Agreement when the Communication is delivered to such address. The designation of the Person to receive such Communication on behalf of a Member or the address of any such Person for the purposes of such Communication may be changed from time to time by written notice given to the Company pursuant to this Section.

**Section 10.02 Parties Bound; Third Party Beneficiaries.** This Agreement shall inure to the benefit of and shall be binding upon all of the parties and their respective heirs, successors and assigns. No provision of this Agreement is intended to or shall be construed to grant or confer any right to enforce this Agreement or any remedy for breach of this Agreement to or upon any Person other than the parties hereto; provided however that Arcus shall be a third party beneficiary to the extent set forth in Section 10.10 hereunder.

**Section 10.03 Applicable Law.** This Agreement and the rights of the parties hereunder shall be interpreted in accordance with the laws of the State of New Jersey.

Section 10.04 **Amendment**. No change or modification to this Agreement shall be valid unless the same is in writing and signed by the Member and the holders of a majority of the Voting Percentages of the Managers.

Section 10.05 **Entire Agreement**. This Agreement contains the entire understanding among the parties and supersedes any prior understandings and agreements between them respecting the subject matter hereof. There are no representations, agreements, arrangements, or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein.

Section 10.06 **Severability**. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby but rather shall be enforced to the greatest extent permitted by law.

Section 10.07 **Construction**. When from the context it appears appropriate, each term stated either in the singular or the plural shall include the singular and the plural and pronouns stated either in the masculine, the feminine or the neuter shall include the masculine, the feminine and the neuter.

Section 10.08 **Headings and Captions**. The headings and captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of this Agreement or any provisions hereof.

Section 10.09 **No Waiver**. The failure of the Member to insist upon strict performance of a covenant hereunder or of any obligation hereunder or to exercise any right or remedy hereunder, regardless of how long such failure shall continue, shall not be a waiver of the Member's right to demand strict compliance therewith in the future unless such waiver is in writing and signed by the Member giving the same.

Section 10.10 **Restrictive Covenants**.

(a) **Agreements in the Ben Operating Agreement**. Ben acknowledges and agrees that the Company and Arcus are each an intended third party beneficiary of the restrictive covenant provisions set forth in the Second Amended and Restated Operating Agreement of Ben dated as of March 16, 2008.

(b) **Confidential Information**. The Member, on behalf of itself and its officers, managers and members acknowledges that it may become familiar with trade secrets and other confidential information, including but not limited to, operating methods and procedures, lists of actual and potential sources of supply, customers and employees, costs, profits, markets, sales, systems, methods, procedures and plans for future developments which are valuable assets and property rights of the Company or any entity in which the Company has

*EXECUTION COPY*

an interest (collectively, "Confidential Information"). Except to the extent that such information is available to the public not through its own actions or omissions, the Member, on behalf of itself and its officers, managers and members, hereby agrees not to disclose (except on behalf of the Company), either directly or indirectly, to any Person such Confidential Information. The Member, on behalf of itself and its officers, managers and members agrees to retain the Confidential Information for the sole benefit of the Company.

(c) **Remedies**. If the Member or any of its affiliates (collectively, the "Breaching Member") breaches or threatens to breach any of the provisions of this Section 10.10, the Company shall have the right (in addition to any other rights and remedies available to the Company at law or in equity) to equitable relief against such breach or threatened breach, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable harm to the Company and that money damages would not be an adequate remedy to the Company. The Breaching Member agrees not to seek, and hereby waives any requirement for, the securing or posting of a bond or proving actual damages in connection with the Non-Breaching Members' and/or the Company's seeking or obtaining such relief.

(d) **Enforceability**. If any portion of this Section 10.10 is held to be unenforceable because of the area covered, or its duration or scope, the Member agrees that the court making such determination shall have the power to reduce or limit the area, duration, and/or scope, and the covenant shall be enforceable in its reduced form.

**Section 10.11 Additional Instruments.** The Member agrees to execute and deliver such additional agreements, certificates, and other documents as may be necessary or appropriate to carry out the intent and purposes of this Agreement.

*EXECUTION COPY*

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

**MEMBER:**

BEN LLC

By: _____
Name: Steven Grabell
Title: Manager

By: _____
Name: Daniel Carpey
Title: Manager

*EXECUTION COPY*

# Shapes/Arch Holdings L.L.C.
## Operating Agreement
## Exhibit "A"

**MEMBER'S PERCENTAGE INTERESTS**

**AND**

**MANAGERS' VOTING PERCENTAGES**

As of March 16, 2008

### Member's Percentage Interests

| Member | Percentage Interest |
|---|---|
| Ben LLC | 100.00% |

### Managers' Voting Percentages

| Manager | Voting Percentage |
|---|---|
| Ben LLC | 20.1% |
| Arcus ASI, Inc. | 79.9% |