**HALPERIN BATTAGLIA RAICHT, LLP**
555 Madison Avenue, 9th Floor
New York, New York 10022
(212) 765-9100
(212) 765-0964 Facsimile
Alan D. Halperin, Esq.
Donna Lieberman, Esq.

**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street, P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
Ilana Volkov, Esq.
Warren A. Usatine, Esq.
Co-Counsel for the Official
Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
HONORABLE GLORIA M. BURNS
CASE NO. 08-14631(GMB)

(Jointly Administered)

Chapter 11

| | |
|---|---|
| In the Matter of: | **APPLICATION IN SUPPORT OF MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE FOR AN ORDER TERMINATING THE DEBTORS' EXCLUSIVE PERIODS TO FILE A PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES THERETO** |
| SHAPES/ARCH HOLDINGS, L.L.C., <u>et al</u>., | |
| Debtors. | |

HEARING DATE AND TIME:
May ___, 2008 at 10:00 a.m.

**ORAL ARGUMENT REQUESTED**

45765/0001-1519874v2

TO:   THE HONORABLE GLORIA M. BURNS
      UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Unsecured Creditors (the "Committee") of Shapes/Arch Holdings L.L.C., *et al.*, by and through its co-counsel, hereby submits this Application in support of its motion pursuant to section 1121(d) of Title 11 of the United States Code (the "Bankruptcy Code") for entry of an order terminating the exclusive periods of Shapes/Arch Holdings L.L.C. ("Shapes/Arch") and its above-captioned wholly owned subsidiaries (collectively, the "Debtors") to file a plan of reorganization and solicit acceptances thereto (the "Motion"), and respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1.     The Debtors have proposed and now amended a plan of reorganization that, if confirmed, transfers 100% of the equity of the Debtors' holding company to an insider of the Debtors – an entity that has held voting control of Shapes/Arch since prior to the Filing Date (defined below).[2]  That very same entity, Versa Capital Management, Inc., either directly or through wholly owned affiliates (collectively, "Versa"), also exercises control over the Debtors and these cases pursuant to an onerous DIP financing facility that is tied to the proposed plan and its attendant transfer of the parent company's equity to Versa.

2.     Though the Committee supports the sale of the Debtors' assets or equity to a third-party, be it the "Plan Funder" (*i.e.* Versa) under the Debtors' proposed plan or another party-in-interest, it is of paramount importance that such sale be conducted pursuant to an open

---

[1] Contemporaneously with the filing of this Motion, the Committee is also moving to appoint a Chapter 11 Trustee.  That motion is incorporated herein by reference.

[2] The plan and disclosure statement refer to a possible equity participation in the "reorganized debtor" of up to 5% for the Debtors' management.

2

process that permits genuine competitive bidding. Only through open, competitive bidding for the Debtors' assets and/or equity can the Committee, its constituents and other parties-in-interest be assured that the value of the Debtors' assets has been maximized for the benefit of the Debtors' estates and creditors.

3. The Debtors and Versa contend that they are anxious to move these cases forward, and the Committee shares their desire for speed and efficiency. Unlike the Debtors and Versa, however, the Committee believes that applicable laws must be obeyed and fiduciary duties met. The plan that would transfer ownership to Versa is purportedly time sensitive, as it is a condition to its effectiveness that a confirmation order for the Plan be entered by May 31, 2008. And as Versa provided the Debtors' DIP term financing, it built in defaults that entitle Versa to foreclose on the Debtors' assets, thus enabling Versa to do an end-run around an orderly and fair sale process by virtue of it being on all sides of this closed process. These arrangements, privately negotiated in advance of the Filing Date, are inconsistent with fundamental bankruptcy principles and in no way satisfy the Debtors' fiduciary responsibilities to creditors.

4. Under the circumstances at hand, the market testing of the value of the Debtors' assets/equity through termination of the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto is not optional, but is affirmatively required by Supreme Court precedent. *See Bank of America National Trust and Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999).

5. For these reasons and those set forth below, the Committee asserts that termination for cause of the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto is appropriate and necessary in order to maximize the value of the Debtors'

businesses for the benefit of the estates and their creditors, and not simply for the benefit of Versa and perhaps the Debtors' senior management.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## PROCEDURAL BACKGROUND

7. On March 16, 2008 (the "Filing Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Petitions") and have continued in the management of their businesses and properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

8. Contemporaneously with the filing of the Petitions, the Debtors filed their Joint Disclosure Statement for the Debtors' Joint Plan of Reorganization (the "Disclosure Statement") and their Joint Chapter 11 Plan of Reorganization dated March 14, 2008 (the "Plan").

9. On March 31, 2008, the Office of the United States Trustee for the District of New Jersey appointed the Committee.

10. In accordance with Section 1121 of the Bankruptcy Code, absent further order of this Court, the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto terminate on July 14, 2008 and September 12, 2008, respectively.

## FACTUAL BACKGROUND

11. The four operating Debtors are wholly-owned by Shapes/Arch. Historically, Shapes/Arch was, in turn, wholly owned and controlled by Ben LLC, which, according to the Disclosure Statement, is controlled by various family members related to the Debtors' founder.

12. Prior to the Filing Date, by letter dated February 6, 2008, Versa provided the Debtors with an "Indication of Interest" that contemplated Versa's acquisition of at least an 85% ownership interest in Shapes/Arch Holdings, the parent Debtor, and a secured term loan from Versa to the Debtors of up to $15 million. The February 6th letter explicitly stated that it was not binding upon Versa, but purported to be binding upon the Debtors insofar as it: (i) granted Versa a 60-day exclusive period to negotiate, enter into and close a definitive agreement, (ii) provided that the Debtors would treat the letter as confidential, and (iii) provided that the Debtors would pay a "break-up" fee of $500,000 plus expenses to Versa in the event of a breach of (i) or (ii).

13. Between February 6, 2008 and the Filing Date, the strategy for Versa's acquisition of the Debtors appears to have been fine-tuned. As of the Filing Date, Versa was an insider of the Debtors, as it had become the manager of parent Debtor Shapes/Arch Holdings, and held voting control of 79.9% in that company. Versa also agreed to provide a secured DIP financing facility of up to $25 million upon terms that were highly unfavorable to the Debtors and designed to protect and solidify Versa's acquisition of the Debtors.

14. Under the Plan, if confirmed, Versa (an "insider" of the Debtors in accordance with Section 101(31) of the Bankruptcy Code) will receive 100% (or slightly less, if Versa chooses to provide management with an equity participation) of the equity of Shapes/Arch, which, in turn, wholly owns and will continue to own post-confirmation all the equity of the other Debtors.

15. The Plan as originally proposed is not subject to competitive bidding for the Debtors' assets or equity, and the Debtors' marketing efforts, if any, are not meaningfully

5

detailed anywhere in the record of these cases.[3] Despite this apparent failure of the Debtors to adequately market their businesses adequately and timely, there is real interest in those businesses; indeed, since its appointment on March 31, 2008, the Committee has been contacted by no less than four parties that have expressed an interest in acquiring the Debtors' businesses. The Committee, therefore, is increasingly concerned with the Debtors' unwavering fealty to Versa (which the Committee believes highlights the Debtors' abrogation of their fiduciary duties) and believes that, with appropriate marketing, other parties may prove interested in participating in a competitive sale process.

16.     The need for appropriate marketing and an open sale process is highlighted by the rebuffed attempts of H.I.G. Capital, through its affiliate Arch Acquisition I, LLC ("Arch Acquisition"), to conduct due diligence and negotiate with the Debtors, as well as Arch Acquisition's serious interest in the assets, which is evidenced by its Motion for Order Terminating Debtors' Exclusive Periods, dated April 18, 2008, as well as the funding and acquisition proposals made repeatedly by Arch Acquisition both to the Debtors and the Committee.

17.     Additionally, Sun Capital Partners Group IV Inc. ("Sun") has sent letters to the Committee dated April 2, 2008 and April 10, 2008, and most recently, a letter to each of counsel to the Committee and the Debtors, expressing interest in entering into a transaction with the Debtors and asking for the opportunity to complete due diligence. Sun Capital, which apparently

---

[3] The Plan has just been amended to provide that if creditors reject the Plan and the Court finds that competitive bidding is warranted, the Plan may be subject to competitive bidding. The rationale for starting with a closed process and delaying the appropriate administration of these cases has not been disclosed to the Committee and none exists. In addition, the Committee notes that if the Debtors' representations about their funding needs are accurate, the cash will run out before this delayed process can be completed.

6

signed a confidentiality agreement in 2006 and made past offers to acquire the Debtors, also provided the Committee with a copy of a letter dated January 29, 2008 from Sun to the Debtors (the same time frame during which the Debtors determined to enter into exclusive negotiations with Versa). Sun's requests have, likewise, been ignored by the Debtors.

18. Further, the Committee is aware of at least [two (2)] other parties that have expressed interest in conducting due diligence and participating in a competitive process despite the lack of marketing of the Debtors' assets. (Such marketing, of course, would be designed to and might reveal additional parties-in-interest.) The Debtors' lack of interest in opening up this process or to modify the existing Plan to comport with their fiduciary duties has led the Committee to conclude that the plan process cannot be left wholly in the Debtors' hands.

## **RELIEF REQUESTED AND BASIS THEREFOR**

19. Section 1121 of the Bankruptcy Code provides, in relevant part:

(b)     Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c)     Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if –

(1)     a trustee has been appointed under this chapter;

(2)     the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3)     the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class of claims or interests that is impaired under the plan.

(d)     …on request of a party in interest…and after notice and hearing, the court may for cause reduce…the 120-day period or the 180-day period referred to in this section.

7

11 U.S.C. § 1121.

**I.    "Cause" to Terminate the Debtors' Exclusive Periods Exists
in Accordance with Section 1121(d) of the Bankruptcy Code**

    **A    Lack of Market Testing for Conveyance of the Debtors' Assets
Under the Plan is "Cause" to Terminate the Debtors' Exclusive
Periods**

20.    The Committee requests that the Court terminate the Debtors' exclusivity "for cause" in accordance with Section 1121(d) of the Bankruptcy Code.  Though the Bankruptcy Code does not define what constitutes "cause," the case law, including United States Supreme Court precedent, supports termination of the Debtors' exclusivity in order to foster competitive bidding and maximize the value of the Debtors' assets for the benefit of the estates and creditors. *See Bank of America National Trust and Savings Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999) (hereinafter "LaSalle") (market valuation required for plan confirmation when equity holders benefit from the plan); *see also, In re Dow Corning*, 208 B.R. 661 (Bankr. E.D. Mich. 1997) (moving the case forward can be "cause" for terminating exclusivity).

21.    Here, the Plan was negotiated and drafted pre-petition, by the Debtors and an insider/funder/acquirer, and filed on the Filing Date.  Unsecured creditors (who effectively funded the Debtors' operations while the closed-door negotiations were taking place) were not part of the process and unsurprisingly, they will receive a *de minimis* distribution in the event the Plan is confirmed.  There is no evidence of a meaningful pre-petition marketing process, and since the Filing Date, the Debtors have actively opposed an open and competitive process in derogation of their fiduciary duty to maximize value.

22.    Moreover, the Plan and related documents contemplate that an insider will acquire all or almost all of the equity of parent company Shapes/Arch (with the possibility of some equity participation for current management), which, in turn, will retain its equity interest in the

8

operating Debtors. A debtor is not permitted to confirm a plan over creditor objection when those in control of the debtor retain ownership in the reorganized entity without allowing others to compete for that equity or to propose a competing reorganization plan. *LaSalle* at 435.

23. In *LaSalle*, the debtor proposed a plan under which certain of its former partners were to make new capital contributions in exchange for 100% ownership in the reorganized debtor. The debtor unsuccessfully attempted to cram down its secured lender, who was under-secured. The Supreme Court held that the plan was not fair and equitable and could not be confirmed because junior claims (i.e. the equity interests of the partners) received ownership when the senior unsecured claim of the bank was not paid in full. Though the partners proposed to contribute new capital in exchange for the new equity, these contributions were not subject to market testing or consideration of other alternatives and the Supreme Court held:

> In this case, the proposed plan is doomed by its provision for vesting equity in the reorganized business in the Debtor's partners without extending an opportunity to anyone else either to compete for that equity or to propose a competing reorganization plan. The exclusiveness of the opportunity, with its protection against the market's scrutiny of the stated purchase price, renders the partners' right a property interest extended "on account of" the old equity position and therefore subject to an unpaid senior creditor class's objection. Under a plan granting old equity an exclusive right, any determination that the purchase price was top dollar would necessarily be made by the bankruptcy judge, whereas the best way to determine value is exposure to a market.

*Id.* at 436.

24. Though Versa does not yet own the equity of Shapes/Arch Holdings, it holds the majority voting rights with respect to such equity and is the manager of Shapes/Arch Holdings. This is precisely the type of insider control that requires exposure to a market test should a plan be proposed under which such insider will retain control in the reorganized debtor, such as Versa proposes to do with the Debtors. A market test of the value of the Debtors' assets or equity

9

through a competitive bidding process is required in order to ensure that value is maximized for the benefit of the estates and creditors, and not simply for the benefit of Versa and other insiders.

25. The need for market testing and an open plan process is further evidenced by the fact that Shapes/Arch Holdings agreed to allow Versa a "no shop" period during the pre-petition period and continuing post-petition, to afford Versa the exclusive ability to negotiate, enter into and close a definitive agreement for conveyance of the Debtors' assets. Moreover, the Debtors (through counsel) advised this Court of their belief that the "no shop" provision prohibits them from responding to the due diligence requests of other parties during these Chapter 11 cases. (At the hearing which took place on April 17, 2008, this Court rejected that argument.) Of course, it is the Debtors' affirmative obligation, as debtors-in-possession, to maximize the value of the estates for creditors and all parties-in-interest. *See In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) (debtor has a duty to act on behalf of all parties-in-interest).

26. The Debtors cannot meet their obligations without a market test of the value of the assets proposed to be purchased by an insider such as Versa. Other potential acquirers have expressed interest in the Debtors' assets, both to the Debtors and to the Committee, yet it was only upon the insistence by the Committee and direction of the Court that the Debtors responded to the due diligence requests of Arch Acquisition.[4] Though the door to an open process has been cracked, Versa is still fighting to keep the process closed and roadblocks to a fair and open process in place, and the Debtors appear to be complicit in Versa's endeavor. The door to an open process must now be pushed open so that full-scale marketing and an open sale process can

---

[4] The Committee has requested that due diligence information be provided to other interested parties, but as of the date hereof, to the Committee's knowledge, the Debtors' have not done so.

10

be implemented immediately to maximize the value of the assets for the estates and creditors, as the Bankruptcy Code and Debtors' fiduciary duties mandate.

**B    Interest in the Debtors' Assets Expressed by Third Parties is "Cause" to Terminate the Debtors' Exclusive Periods**

27.    As discussed above, the Debtors have an affirmative duty to maximize the value of the assets of the estates through a market test of the value of those assets, as they are proposed to be distributed under the Plan.  Thus, even absent known competing interest in the assets, the Debtors would have to meet the standard set forth in *LaSalle*.  Yet, the Debtors' unrelenting refusal to open the plan process up to competitive bidding is even more egregious, given that the Debtors and the Committee have been contacted by other parties who are interested in a transaction involving the Debtors' assets and businesses.

28.    As the Court is aware, Arch Acquisition has moved to terminate the Debtors' exclusive periods and has provided a proposal for acquisition of the Debtors' assets that appears to provide value significantly in excess of that to be provided by Versa under the Plan.  Notably, Arch Acquisition is only one of four parties-in-interest that have expressed repeated interest to the Committee in competing for the Debtors' assets and businesses.

29.    Though the Committee is cognizant of Versa's advanced-stage proposal under the Plan, the Committee believes that it is necessary and appropriate to foster competitive bidding in order to ensure the most favorable recovery to the estates and creditors.  Given the facts before this Court – Versa's plan to acquire 100% of the Debtors' equity in the face of its current (and pre-petition) voting control of the parent Debtor, the "no shop" of the assets in favor of Versa, the provisions of the Versa DIP financing that forestall any competitive bidding -- creditors require assurance that proper value for estate assets is being received even independent of

45765/0001-1519874v2

management's duties under *LaSalle*.[5]  *See also, In re All Seasons Indus., Inc.*, 121 BR 1002 (Bankr. N.D. Ind. 1990) (creditors' loss of faith in management can be a factor of "cause" to terminate exclusivity).  Here, where the Debtors' support of a closed and unbalanced process raises questions about the independence of the Debtors' management, termination of the Debtors' exclusive periods to afford proper marketing of and competition for the businesses and the proposal of a competing plan is a necessity.[6]

30. No previous application for the relief sought herein has been made to this or any other Court.

[page intentionally left blank]

---

[5] Ironically, in many instances, when a debtor proposes a plan under which an insider retains equity in exchange for new capital contributions, the debtor affirmatively moves to terminate its own exclusivity in order to satisfy the LaSalle standards.  See, e.g., In re Davis, 262 B.R. 791, 793 (Bankr. D. Ariz. 2001) (discussion of satisfying the LaSalle standard by the debtor providing an opportunity to offer competing plans); In re CGE Shattuck, LLC, 1999 WL 33457789, *6 (Bankr. D.N.H. 1999) ("a plan of reorganization that provides pre-petition equity holders the exclusive right to acquire equity in the reorganized debtor without providing the opportunity for anyone else to either compete for that equity or to propose a competing reorganization plan is not confirmable"). The Debtors' categorical unwillingness to subject the sale of their assets to a market test is, accordingly, of the utmost concern to the Committee.

[6] On April 28 and 29, 2008, the Committee is conducting depositions of representatives of the Debtors, Phoenix Capital Management, Inc. and Versa.  The Committee reserves the right to supplement the record with facts uncovered during those depositions.

45765/0001-1519874v2

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (a) enter an order terminating the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto and (b) grant the Committee such other and further relief as the Court deems just and appropriate under the circumstances.

**HALPERIN BATTAGLIA RAICHT, LLP**
Co-Counsel to the Official Committee of
Unsecured Creditors


By:  */s/ Alan D. Halperin*
     Alan D. Halperin, Esq.
     Donna H. Lieberman, Esq.
     Julie D. Dyas, Esq.

**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
Co-Counsel to the Official Committee of
Unsecured Creditors


By:  */s/ Michael D. Sirota*
     Michael D. Sirota
     Ilana Volkov
     Warren A. Usatine

DATED: April 29, 2008