Case 08-14631-GMB    Doc 240    Filed 04/29/08    Entered 04/29/08 18:29:47    Desc Main
Document    Page 1 of 7

**LOWENSTEIN SANDLER PC**
BRUCE BUECHLER (BB 0324)
65 Livingston Avenue
Roseland, NJ 07068
Phone: 973-597-2500
Facsimile: 973-597-2400
Attorneys for Sun Capital Partners Group IV, Inc.

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| In Re: | ) | Chapter 11 |
| | ) | |
| SHAPES/ARCH HOLDINGS L.L.C, et al., | ) | Case No. 08-14631 (GMB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | Hearing Date: May 1, 2008 at 10:00 a.m. |

**OBJECTION OF SUN CAPITAL PARTNERS GROUP IV, INC. TO DEBTORS' DIP FINANCING AND DISCLOSURE STATEMENT**

Sun Capital Partners Group IV, Inc. ("Sun Capital"), by and through its undersigned counsel, hereby submits this objection to the entry of an order approving (a) the DIP financing and (b) the disclosure statement for the Debtors' first amended joint plan of reorganization (the "plan"). In support of its objection, Sun Capital represents and states as follows:

**Background**

1. Sun Capital is a leading private investment firm with a reputation for completing transactions quickly and efficiently, many within thirty days. Sun Capital affiliates have invested in and managed more than 190 companies worldwide since Sun Capital's inception in 1995, with combined sales in excess of $40 billion and more than 150,000 employees. On a consolidated basis, Sun Capital's affiliated portfolio companies would rank in the top 100 of Fortune Magazine's listing of the 500 largest companies in the United States.

21723/2
04/29/2008 **6386537.1**

2. Sun Capital's familiarity with the Debtors began in late 2005 when Sun Capital was approached by Debtors' investment banker TM Capital regarding the potential acquisition of certain of the Debtors by Sun Capital. At that time, Sun Capital was in the process of acquiring Indalex Aluminum Solutions Group ("Indalex"), the second largest aluminum extruder in the United States and Canada. After completing its acquisition of Indalex, Sun Capital began to focus on the potential acquisition of the Debtors. Over the course of approximately two and a half years, Sun Capital conducted extensive due diligence regarding the Debtors' operations and met with the Debtors' management in-person and spoken with them on several occasions. During the course of this diligence, Sun Capital made several bona fide offers to acquire the Debtors. The Debtors chose not to accept any of these offers - the last of which was made on January 29, 2008. After the final rejection in early February, and a follow up conversation with Steve Grabell (Debtors CEO), there was no more communications from the Debtors.

3. Since the Debtors' filing for chapter 11 on March 16, 2008, Sun Capital has continued to express its interest in potentially consummating a transaction with the Debtors. Sun Capital has specifically requested certain limited due diligence and an inspection of the Debtors' Delair Facility so that Sun Capital might potentially provide the Debtors with another offer that might maximize the value of the Debtors' estates for the benefit of unsecured creditors. In particular, Sun Capital has requested that it be provided updated financial information, including the Debtors' year-to-date balance sheet, income statement (including volume figures), statement of cash flows, and borrowing base certificate, as well as an opportunity to inspect the Debtors' Delair facility. Sun Capital understands that most of this information already has been provided to HIG Capital, another party interested in bidding on the Debtors' assets. The Debtors have not provided Sun Capital this information – even though this Court made clear that such information

should be provided to potential bidders that would be willing to enter an appropriate confidentiality agreement with the Debtors, as Sun Capital had explicitly stated it was willing to do.[1]  Transcript of hearing held on April 17, 2008 at 70: 14-25.  Based on the Debtors' refusal to provide Sun Capital the requested materials, Sun Capital objects to the Debtors' proposed DIP facility and disclosure statement.

## OBJECTIONS

**A.     The Proposed DIP Facility Was Not Properly Shopped.**

4. The Debtors' DIP financing motion implies that the DIP was properly shopped because there were no other options.  Indeed the motion anoints Arcus ASI Funding, LLC ("Arcus") as the "white knight" that saved it from a liquidation.  This is insincere at best.  As noted, Sun Capital had a long history with the Debtors prior to their chapter 11 filing and had made several bona fide offers to acquire the Debtors, and its final offer in January 2008 made it clear that a more refined offer would be available so long as Sun Capital would be allowed to visit the plant and obtain the remaining information it has requested.  However, Sun Capital – a leading private equity firm with a demonstrated interest in the Debtors' industry – was never approached by the Debtors about potentially providing a DIP facility.  Although Sun Capital cannot say whether it would have ultimately been able to offer a DIP facility given its pending due diligence needs (due diligence that Sun Capital was never given the opportunity to conduct), the only reason why Arcus was the only game in town was because the Debtors did not talk to anyone else. In re Phase-I Molecular Toxicology Inc., 285 B.R. 494, 496 (Bankr. D.N.M. 2002) (debtor must show that there are "no better offers, bids, or timely proposals" in order to secure

---

[1] By this Objection Sun Capital requests that this Court require the Debtors to make the requested information available to Sun Capital and allow Sun Capital to inspect the Delair Facility.  The due diligence and inspection of the Delair Facility that Sun Capital requests is not a burden on the Debtors.  Moreover, a tour of the Delair facility should be a simple undertaking, given the Debtors' retention of Phoenix Management Services, Inc., in these cases.  Sun Captial executed a confidentiality agreement with the Debtors pre-petition.

approval of post-petition financing)(citing In re Western Pacific Airlines, Inc., 223 B.R. 567, 572 (Bankr. D. Colo. 1997)).  The Debtors cannot satisfy section 364(c)(1) of the Bankruptcy Code simply by saying they had no other choice, when other potential options whom the Debtors never approached were obviously there.

**B.      The Disclosure Statement Lacks Adequate Information.**

5.  Under 11 U.S.C. § 1125(b) a chapter 11 debtor must provide its creditors with a disclosure statement containing adequate information to "enable a creditor to make 'an informed judgment about the plan."  11 U.S.C. § 1125(a)(1); Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 321 (3rd Cir. 2003).  The test of adequacy of information provided in the disclosure statement is a facts and circumstances test.  In re Sugarhouse Realty, Inc., 192 B.R. 355, 366 n.20 (E.D. Pa. 1998) (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 409 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 6365).

6.  Moreover, the information provided in the disclosure statement must not only be adequate, but it must also be accurate.  In re Jandous Elec. Const. Corp., 115 B.R. 46 (Bankr. S.D.N.Y. 1990) (denying confirmation to a plan because debtors operating statements and disclosure statement contained inaccurate financial information.); In re Scott, 77 B.R. 636, 638 (Bankr. N.D. Ohio 1987) ("The information provided by a debtor in the several petition documents should not only be complete but truthful so that the court and other parties in interest can reasonably rely upon the date contained therein.").

7.  Here, the disclosure statement does not provide adequate information sufficient for creditors to make an informed decision on whether to accept or reject the Debtors' proposed plan.  The disclosure statement states only that when the Debtors' financial situation worsened in the months leading to their chapter 11 filing, they reached out to Arcus for help.  While the

amended disclosure statement refers to Arch Acquisition I, LLC's offer and proposed plan, the disclosure statement provides that there were only two alternatives available to the Debtors. There is no mention of Sun Capital, its prior dealings with the Debtors, or its bona fide offers. Simply put, unsecured creditors, which are projected to recover almost nothing in these cases, should know that other potential suitors, who could maximize value and improve upon the recovery floor set by the Debtors' current plan, have been rebuffed by the Debtors. Before creditors can accept this outcome, creditors need to know that the Debtors actually sought alternatives and there were none available. Moreover, this disclosure statement provides inaccurate information when it states that "no other timely and viable opportunities," other than Arcus's agreement were available. This statement ignores that over approximately two and a half years, as recently even as January 29, 2008, Sun Capital made several bona fide offers to consummate a potential transaction with the Debtors. Creditors cannot make an informed decision based on a document that provides inaccurate information. Thus, the disclosure statement contains inadequate information.

C.   **The Debtors' Proposed Plan Is Fatally Flawed**

8. Finally, the Debtors' failure to provide for an open process to market the Debtors' assets for the highest and best offer makes their proposed plan fatally flawed. In re Quigly, Co., Inc., 377 B.R. 110 (Bankr. S.D.N.Y. 2007); In re Beyond.com Corp., 289 B.R. 138 (Bankr. N.D. Cal. 2003); In re Phoenix Petroleum Co., 278 B.R. 385 (Bankr. E.D. Pa. 2001); See Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. Partnership, 526 U.S. 434, 456 (1999) (the sale of assets to an insider without "the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals" violates the absolute priority rule). The Debtors attempt to cure this flaw by building an optional marketing process into their amended

plan in the event that unsecured creditors in Class 5 reject their plan and this Court denies confirmation for a specified reason. This purported process is a sham that hardly cures the plan's fatal defect. Only after this Court presumably denies confirmation will this feature become operative. And that denial would likely not officially happen until some time in early June -- given the Bankruptcy Rules dictates on solicitation periods (Bankruptcy Rule 2002(b) requires the Debtors to give at least 25 days notice of the confirmation hearing from the approval of the disclosure statement) -- even though it is abundantly clear that creditors standing to recover almost nothing under the Debtors' proposed plan likely will vote to reject it. As a result, potential bidders on the Debtors' assets will have to "twiddle their thumbs" for more than a month with no access to any diligence until the inevitable denial of confirmation occurs. And when that likely event occurs, potential bidders will have to acquiesce to onerous bidding procedures proposed by the Debtors (with Arcus as controlling member likely calling the shots) that, among other things, require bidders to make an offer in an unreasonably short time frame (i.e., potentially less than a week) with a significant deposit. Putting off the process for a date in the future and subjecting that process to limited time constraints is an obvious attempt to chill bidding. The bottom line is that the marketing process should be opened now, rather than when the Debtors' plan inevitably fails.

WHEREFORE, Sun Capital respectfully requests that this Court enter an order (i) finding that the DIP facility was not properly shopped and that the Debtors' disclosure statement is inadequate, and (ii) granting such other and further relief as the Court deems just and proper.

Date:  April 29, 2008

Respectfully submitted,

LOWENSTEIN SANDLER PC

By: */s/ Bruce Buechler*
Bruce Buechler, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
Telephone:  973.597.2500
Facsimile:  973.597.2400
Counsel for Sun Capital Partners Group IV, Inc.