UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**BLANK ROME LLP**
Joel C. Shapiro, Esquire
Shlomo B. Troodler, Esquire
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
(856) 779-3600
Counsel for Arcus ASI Funding, LLC

| | |
|---|---|
| In re: | Case No. 08-14631 |
| Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C. | Judge: Gloria M. Burns<br><br>Chapter: 11<br><br>Hearing Date and Time:<br>May 1, 2008 at 10:00 a.m. and<br>May 9, 2008 at 10:00 a.m. |

**ARCUS ASI FUNDING, LLC'S (i) OMNIBUS RESPONSE TO
OBJECTIONS TO DEBTORS' JOINT DISCLOSURE STATEMENT
TO FIRST AMENDED JOINT PLAN OF REORGANIZATION; (ii) OMNIBUS
RESPONSE TO MOTIONS FOR ORDER TERMINATING DEBTOR'S
EXCLUSIVE PERIODS TO FILE A PLAN OF REORGANIZATION AND
SOLICIT ACCEPTANCES THERETO; AND (iii) CROSS-MOTION
TO STRIKE PROPOSED CHAPTER 11 PLAN OF ARCH ACQUISITION I, LLC
AS VIOLATIVE OF 11 U.S.C. §§ 1121 AND 1125**

Arcus ASI Funding, LLC ("Arcus") submits this Omnibus Response to the Objections to

the Debtors' Amended Disclosure Statement and this Omnibus Response to the Motion of Arch

Acquisition I, LLC ("Arch"), Pursuant to 11 U.S.C. § 1121(d), For Order (i) Terminating

Debtors' Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereto; (2)

Adjourning the Hearing on the Adequacy of the Disclosure Statement; and (3) Providing for a

Joint Balloting Process (the "Arch Motion") and the Motion of the Unsecured Creditors'

Committee to Terminate Debtors' Exclusive Periods to File a Plan (the "Committee Motion" and

together with the Arch Motion, the "Motions to Terminate"), and further moves to strike the proposed chapter 11 plan filed by Arch Acquisition I, LLC ("Arch") attached to the Arch Motion.[1]

## BACKGROUND OF DEBTORS' BANKRUPTCY CASES

1.      On March 16, 2008 (the "Petition Date"), Shapes/Arch Holdings L.L.C. ("Parent), and its subsidiaries, Shapes L.L.C., Delair L.L.C., Ultra L.L.C. and Accu-Weld L.L.C. (together with Parent, collectively, "Debtors"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

2.      Immediately after the filing of its chapter 11 petitions, on the Petition Date, the Debtors filed a Joint Disclosure Statement [Dkt. No. 16] (the "Proposed Disclosure Statement") and a Joint Plan of Reorganization [Dkt. No. 15] (the "Proposed Plan" and together with the Proposed Disclosure Statement, the "Proposed Plan and Disclosure Statement") setting forth a plan of reorganization that provides a fair and orderly allocation of the Debtors' assets, consistent with the mandates and policies of the Bankruptcy Code and other law, including payment in full of all Administrative Claims, Priority Tax Claims, Fee Claims, Allowed Secured Claims, the CIT-DIP Claim, the Arcus Holders DIP Claim and Allowed Other Priority Claims (each as defined in the Proposed Plan).

3.      On April 24, 2008, the Debtors filed the First Amended Joint Plan of Reorganization [Dkt. No. 209] (the "First Amended Plan") and the Joint Disclosure Statement to the First Amended Plan [Dkt. No. 208], modifying the Proposed Plan and Disclosure Statement to respond to objections filed by with the Unsecured Creditors' Committee (the "Committee"),

---

[1] Given the ongoing outstanding discovery disputes with the Committee and Arch, Arcus reserves the right to amend and supplement this Response and to file further amendments or modifications to the First Amended Plan of Reorganization and Disclosure Statement.

2

concerns raised by the Court and various other objections filed to the Proposed Plan and Disclosure Statement.

4.       Prior to the filing of the voluntary petitions by Debtors, all of the managers of the Parent consented in writing (the "Written Consent") to (i) execute, verify and file and for its subsidiaries to each execute, verify and file a voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), (ii) execute, verify and file a Joint Plan of Reorganization and the disclosure statement related thereto, (iii) enter into a Secured Superpriority Debtor-In-Possession Term Loan Financing Agreement (the "DIP Facility") with Arcus ASI Funding, LLC ("Arcus"), (iv) enter into a Secured Superpriority Debtor-In-Possession Revolving Credit Financing Agreement with The CIT Group/Business Credit Inc. ("CIT") and (v) take other such actions related to the chapter 11 petitions.

5.       Only after the managers of Shapes/Arch Holdings L.L.C. consented to all of the authorizations set forth in the Written Consent, Ben L.L.C. (holder of 100% of the equity interests in Shapes/Arch Holdings L.L.C.) executed the Amended and Restated Operating Agreement of Shapes/Arch Holdings L.L.C., dated March 16, 2008, whereby an affiliate of Arcus and Ben L.L.C. are named the sole managers of the Shapes/Arch Holdings L.L.C., with manager voting percentages of 79.9% and 20.1%, respectively.  Accordingly, the prepetition management of Debtors only gave the Arcus affiliate a voting right once management saw there was indeed a "white knight" to save the Debtors and only immediately just prior to the filing date.

6.       On March 18, 2008, the Court entered an Order authorizing the Debtors' post-petition financing with (i) Arcus in the form of a Twenty Five Million Dollars ($25,000,000)

term loan facility (the "Arcus DIP Facility") and (ii) The CIT Group/Business Credit, Inc.

("CIT"), as agent for itself and JPMorgan Chase Bank, N.A. and Textron Financial Corporation

(the "Pre-Petition Lenders") in the form of a Sixty Million Dollar ($60,000,000) revolving credit

facility (the "CIT DIP Facility"), in part based upon testimony at the hearing about the efforts of

Arcus to keep CIT and the prepetition lenders as part of the financing package.

7.        Accordingly, Debtors have filed a plan of reorganization of record which was

filed within the exclusivity period to which Debtors have a right under the Bankruptcy Code and

sponsored by and to be funded by an Arcus affiliate, the benefit of debtor-in-possession credit

facilities provided by Arcus and CIT (such financing having been arranged by Arcus and

provided by CIT only as a result of Arcus' commitment and negotiations with CIT) and a

commitment for exit financing upon confirmation of the Proposed Plan, all of which is designed

to facilitate a process which would steady Debtors' ship, taking it from the rocky waters of the

period prepetition and during bankruptcy to the calm seas of post-confirmation operating entities.

**A.        OMNIBUS RESPONSE TO THE OBJECTIONS TO AMENDED DISCLOSURE
STATEMENT AND TO THE MOTIONS TO TERMINATE EXCLUSIVITY**

**PRELIMINARY STATEMENT – OBJECTIONS TO THE DISCLOSURE STATEMENT**

8.        The Objections make several allegations regarding the lack of process employed

by the First Amended Plan.  However, despite the tenor of the Objections, such allegations

ignore a primary concern of the Bankruptcy Code as articulated by case law and as intended by

Congress – the ability of a Debtor to reorganize.  The First Amended Plan is an integral

component of a larger process introduced by the Debtors and Arcus which would facilitate the

reorganization of a family of entities which were on the brink of shutting down prior to the

4

decision of Arcus to enter into a transaction with the Debtors when no one else, including Arch, was willing to do the same.

9.      Arcus worked diligently to assemble a series of transactions designed to save the Debtors and preserve value for a reorganization.  When the Debtors were on the brink of ceasing operations due to the refusal of their pre-petition lenders to continue funding, and, after failing in diligent efforts to find alternative financing, Arcus came in as a "white knight," providing credibility and a transaction with much-needed liquidity to allow for continued operations and the preservation of value and over one thousand jobs.  A shutdown would have caused a serious loss in asset value and resulted in liquidation by the Pre-Petition Lenders.  As the Court noted at the hearing of March 18, 2008:  "I'm satisfied with the testimony that if I don't approve the financing that's been requested that the debtor will have to close its doors and … we're talking about a thousand employees."  (Tr. of 3/18/08 at 133: 3-6).

10.      Arcus not only provided debtor-in-possession financing and arranged a transaction which would allow the Pre-Petition Lenders to do the same, but affiliates of Arcus committed to fund the First Amended Plan, creating value for creditors that would have been non-existent had Arcus not come to the rescue.  The transaction arranged by Arcus with the Pre-Petition Lenders not only allowed the Debtors to operate in bankruptcy and maintain their business, but went a step farther by committing to provide financing to the Debtors upon reorganization, even though just a few weeks earlier the Pre-Petition Lenders were unwilling to provide any additional financing.  While Arch has allegedly offered to replace the Arcus financing, they have been silent about the financing provided by the Pre-Petition Lenders, which such financing is part of the complete package negotiated and arranged by Arcus to allow for continued operations, increased value and preservation of jobs.

123285.01601/11774135v.5

11.     The process proposed by Arcus and the Debtors accomplishes what the Bankruptcy Code sets forth as a goal for a chapter 11 debtor – successful reorganization and exit. The committed financing and clear vision for reorganization which accompany the First Amended Plan are unmatched.

12.     Arcus also notes that to the extent confirmation issues are raised in the Objections, this Court should address them at confirmation, comporting to the process set forth in section 1129 of the Bankruptcy Code.

## PRELIMINARY STATEMENT – MOTIONS TO TERMINATE EXCLUSIVITY

13.     "In the 22 years since the exclusivity provision was promulgated in the Bankruptcy Reform Act of 1978, there have been only two reported cases that permitted shortening the exclusivity period." In re Lehigh Valley Professional Sports Club, Inc. ("Lehigh Valley"), 2000 WL 290187, at *4 (Bankr. E.D. Pa. 2000). This situation should not be the third.[2] The Motions to Terminate essentially ask this Court to take actions which no other court has been willing to do absent the extreme circumstances of the two cases referred to in Lehigh Valley.

14.     Sections 1121(b) and (c) are an integral part of the Bankruptcy Code for a reason. Granting either of the Motions to Terminate would equate to undermining the congressional intent of and significant case law interpreting Section 1121 of the Bankruptcy Code.  In stark contrast to the two cases referred to in Lehigh Valley shortening the exclusivity period, each of which had egregious circumstances leading the respective courts to shorten the exclusivity period, the Debtors have been operating in good faith within the framework created by and set

---

[2] While other cases have also permitted termination of a debtor's exclusivity, each other reported decision terminating exclusivity followed at least one, if not multiple extensions of the original exclusivity period. Furthermore, as discussed in this Response, the majority of reported decisions related to the exclusivity provisions allowed the debtors to retain exclusivity, rather than granting motions to terminate.

forth in the Bankruptcy Code, a framework which encourages reorganization of the Debtors and allows the Debtors an opportunity to negotiate an acceptable plan without the pressures of competing plans in order to facilitate the continued survival and viability of the Debtors upon reorganization.

15.    Controlling case law which sets forth the extremely high threshold for "cause" to terminate exclusivity and places a "heavy burden" to meet that threshold on the party requesting the termination of exclusivity, a threshold and burden Arch and the Committee are both unable to meet.

16.    The premises upon which Arch and the Committee claim there is "cause" to terminate exclusivity are arbitrary and are merely employed to mask the real reason behind the Motions to Terminate – creditor discontent.   In this district, the law is clear that creditor discontent or the potential of a "superior plan" are not a sufficient basis upon which to terminate exclusivity.   In re Geriatrics Nursing Home, Inc., 187 B.R. 128 (D.N.J. 1995).  While Arch lists four reasons why this Court should terminate exclusivity, none of the reasons proffered accurately reflect the facts of these Cases or meet the high threshold for "cause", nor do any of the reasons address the nine point test set forth in case law addressing termination / reduction or extension of exclusivity.

17.    Even if, assuming arguendo, either of the Motions to Terminate is not simply indicative of creditor dissatisfaction and an attempt to make up for a missed opportunity, the factors typically evaluated by a court in analyzing a motion to terminate / reduce or extend exclusivity all are in favor denying the Motions to Terminate and the retention of exclusivity.

18.    The Debtors and Arcus have exercised prudent and independent business judgment in establishing the reorganization process currently before the Court.  That exercise of

7

judgment has brought real and committed financing to the table and a clear reorganization process on a defined time table.  The Motions to Terminate and the Objections both in essence seek to have the Court uproot basic principles of chapter 11 of the Bankruptcy Code, to substitute its business judgment for that of the Debtors, and to thwart the Proposed Plan and Disclosure Statement and the First Amended Plan filed promptly and in good faith and well within the exclusivity period given to Debtors under the Bankruptcy Code within the very framework established by the Bankruptcy Code.

19.     The progress made in the negotiations by the filing, less than forty days after the Petition Date, by the Debtors of the First Amended Plan enhancing the value remaining for creditors due to increased commitments from Arcus is indicative of the Debtors fulfilling precisely what Congress had hoped for in drafting chapter 11 of the Bankruptcy Code – good faith efforts toward reorganization and reasonable prospects for filing a viable plan within a time period that would not otherwise unjustly prejudice creditors.

## LEGAL STANDARDS

20.     Section 1121 of the Bankruptcy Code specifically provides that the debtor has the exclusive rights to file a plan for 120 days after the date of an order for relief under chapter 11. As such, section 1121 of the Bankruptcy Code provides in relevant part:

> (a)     The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case of an involuntary case.
>
> (b)     Except as otherwise provided in this section, *only the debtor* may file a plan until after 120 days after the date of the order for relief under this chapter.
>
> (c)     Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if –

8

(1)     the trustee has been appointed under this chapter;

(2)     the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3)     the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter...

(d)(1)  Subject to paragraph (2), on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may *for cause* reduce or increase the 120-day period of the 180-day period referred to in this section.

11 U.S.C. § 1121(a), (b), (c) and (d)(1) (emphasis added).

21.    "A party requesting an immediate termination of the exclusive period as originally authorized by statute or as it may have been extended by the Court, bears a *heavy burden*." <u>In re Interco Incorporated</u>, 137 B.R. 999, 1000 (Bankr. E.D. Mo. 1992) (emphasis added); <u>In re Texaco, Inc.</u>, 76 B.R. 322, 32 (Bankr. S.D.N.Y. 1988).

22.    Controlling case law in this District states:

"This Court is not satisfied that statement made by creditors and parties in interest that they were prepared to offer more favorable plans if the court were to terminate the exclusivity period constitutes sufficient cause to cut short the debtor's window of opportunity opened by Congress.  Likewise, the Court is not satisfied that the Bankruptcy Court's view that the creditors' interests are paramount in Chapter 11 – at least during the exclusivity period – comports with Congressional intent.  Further, the Court cannot conclude, based on the reasoning of the Bankruptcy cases treating of "cause" under 11 U.S.C. § 1121(d), that the fact that one creditor constituency is not happy with the debtor's plan constitutes cause to undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period.

<u>In re Geriatrics Nursing Home, Inc.</u>, 187 B.R. at 134 (reversing a bankruptcy court decision terminating exclusivity). <u>See also</u> <u>In re Adelphia Communications Corp.</u> ("<u>Adelphia Arahova</u>"), 336 B.R. 610, 676 and n. 183 (Bankr. S.D.N.Y. 2006) *aff'd* 342 B.R. 122 (S.D.N.Y. 2006) ("the notion that creditor constituency unhappiness, without more, constitutes cause undermine the debtor's chances of winning final confirmation of its plan during the exclusivity period has been

9

judicially rejected");   In re Adelphia Communications Corp. ("Adelphia Bondholders"), 352
B.R. 578, 586-587 (Bankr. S.D.N.Y. 2006) ("I note that displeasure with a plan on file is not one
of the enumerated factors, and is not a basis for terminating exclusivity.  Nor, without more, is
creditor constituency unhappiness with a debtor's plan proposals, with or without a formal plan
on file.").

     23.    Several cases have set forth the following nine factors as the relevant topics for
analysis in evaluating whether to terminate / reduce or otherwise extend exclusivity:

(a)    the size and complexity of the case;

(b)    the necessity for sufficient time to permit the debtor to negotiate a plan of
reorganization and prepare adequate information;

(c)    the existence of good faith progress toward reorganization;

(d)    the fact that the debtor is paying its bills as they become due;

(e)    whether the debtor has demonstrated reasonable prospects for filing a
viable plan;

(f)    whether the debtor has made progress in negotiations with its creditors;

(g)    the amount of time which has elapsed in the case;

(h)    whether the debtor is seeking an extension of exclusivity in order to
pressure creditors to submit to the debtor's reorganization demands; and

(i)    whether an unresolved contingency exists.

In re Central Jersey Airport Services, LLC, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); In re Dow
Corning Corp., 208 B.R. 661, 664-665 (Bankr. E.D. Mich. 1997); Adelphia Arahova, 336 B.R. at
674; Adelphia Bondholders, 352 B.R. at 587; In re Interco Incorporated, 137 B.R. at 1001.

     24.    It is noteworthy that in many, if not most, of the cases cited by Arch which
address exclusivity, the applicable court determined to either extend exclusivity or otherwise to
deny a motion to reduce or terminate exclusivity.[3]  See In re Texaco, Inc., 81 B.R. 806 (Bankr.
S.D.N.Y. 1988); In re Public Serv. Co. of New Hampshire, 88 B.R. 521 (Bankr. D. N.H. 1988)
("the debtor's exclusivity period, with regard to confirmation of plan, can be considered more
leniently than extensions of exclusivity when a plan has not yet been filed") (citing In re Perkins,

---

[3] The cases cited by Arch which did not extend or otherwise reduce / terminate exclusivity were denials of
extensions of exclusivity following the 120 day statutorily granted period and any extensions thereof.

71 B.R. 294, 299 (W.D.Tenn.1987) ("Accordingly, cause may be measured by a more lenient standard in the determination to grant an enlargement of time in which to gain acceptances to a filed plan.")); In re Standard Mill Ltd. Partnership, 1996 WL 521190 (Bankr. D. Minn. Sept. 12, 1996) (order denying motion for a reduction of the exclusivity period).

## ARGUMENT

I.    **THE MOTIONS TO TERMINATE SHOULD BE DENIED BECAUSE THE "CAUSE" SET FORTH IN THE MOTIONS TO TERMINATE DOES NOT CONSTITUTE "CAUSE" UNDER THE BANKRUPTCY CODE.**

25.    The two reported cases discussed Lehigh Valley shortening the exclusivity period had egregious circumstances leading the respective courts to shorten the exclusivity period – in one, a trustee had been appointed; the other, the acrimonious feuding among the principals of the debtor had become so extreme that the sole shareholder moved to dismiss the bankruptcy petition.  See In re Crescent Beach Inn, Inc., 22 B.R. 155 (Bankr. D. Me. 1982) and Pickens Industries, Inc. v. Palmer, Palmer & Coffee (In re Texas Extrusion Corp.), 68 B.R. 712 (Bankr. N.D. Tex. 1986).  Clearly, the exigent circumstances of gross mismanagement and acrimonious feuding which led to the shortening of the exclusivity period in each of those cases are not present here.  See, e.g., In re Texaco, 76 B.R. at 327 ("factors such as gross mismanagement of the debtor's operations as in In re Crescent Beach or acrimonious feuding between the debtor's principals, as in In re Texas Extrusion Corp., were *major* obstacles to a successful reorganization" (citations omitted) (emphasis added)); In re Geriatrics Nursing Home, 187 B.R. at 132.

26.    Nonetheless, despite statutory standards, common law precedent, strong policy arguments and a heavy burden, both Arch and the Committee have asked the Court to find "cause" one month into a complex case where the Debtors have demonstrated a concerted effort

11

to reorganize as encouraged by the Bankruptcy Code.  The audacious request by Arch and the Committee must be summarily denied by the Court.

**i.     (1) THE ARCH PLAN IS NOT SUPERIOR, AND, EVEN IF IT WAS, AN ALTERNATIVE VIABLE PLAN IS NOT "CAUSE", (2) THE PROPOSED PLAN IS CONFIRMABLE, AND (3) DEBTORS ARE ENTITLED TO EXCLUSIVITY UNDER THE BANKRUPTCY CODE AS THEY FULFILLED THEIR FIDUCIARY DUTIES AND UTILIZED THEIR BUSINESS JUDGMENT IN ENTERING INTO THE DIP FACILITY AND FILING THE PROPOSED PLAN AND DISCLOSURE STATEMENT.**

**a.     The Court should not and does not need to analyze the alleged merits of the plan proposed by Arch is determining whether to terminate exclusivity.  Even if the Court did the analysis, the First Amended Plan is superior.**

27.     Controlling case law unequivocally states that the potential of a "superior plan" is not "cause" under Section 1121(d): "While the aim of expediting the process of reorganization is commendable, and the prospect of not getting confirmation of debtor's plan might make the potential for other plans appear inviting, this Court is not satisfied that such justifications rise to the level of "cause" for terminating the debtor's exclusivity period."  In re Geriatrics Nursing Home, 187 B.R. at 134.

28.     The allegations of Arch in the Arch Motion and the Committee in the Committee Motion with respect to the wonders of the Arch Plan and the potential other parties interested in the Debtors' assets, particularly when compared to the Proposed Plan, are irrelevant and wasteful.  In In re Geriatrics Nursing Home, the bankruptcy court had found that the potential of a competing plan was sufficient basis to terminate exclusivity.  However, the United States District Court for the District of New Jersey found that the bankruptcy court had erred in terminating exclusivity and reinstated the exclusivity period of the debtor.  As displeasure with a particular plan or the anticipation that a competing plan would be better received has been judicially rejected in this district, the Motions to Terminate should be summarily denied.

12

29.     By filing with the Court as exhibits to the Arch Motion its own unsolicited financing package, purchase agreement and plan of reorganization, the efforts by Arch to hijack the process set forth by the Debtors are clearly no more than a thinly veiled guise to eradicate the applicability of Section 1121 to these cases.[4]  The Bankruptcy Code allows the Debtors to first take a reasonable amount of time to reorganize in accordance with its business judgment, continuously bound to its fiduciary duties to creditors and the rights of creditors under Section 1129 of the Bankruptcy Code.

30.     Arcus also notes the claims of Arch and the Committee that simply because the process Arcus and the Debtors have taken is not a "competitive process", it is not fair and favors the Debtors' insiders.  However, in evaluating fairness, the argument of the Committee and Arch attempts to flip the Interco Incorporated decision on its head.   While Interco Incorporated acknowledges that "in appropriate circumstances, simultaneous consideration of competing plan may be an efficient procedure," the court concludes that "the concept of fairness requires that *the Debtors be permitted to submit their proposed plan according to the scheme and timetable provided for in the Code*."  In re Interco Incorporated, 137 B.R. at 1001 (noting, in addition, that "the interests of … all parties are *provided for and protected* by the scheme and procedure that anticipates submission of a single plan [during the exclusivity period]") (emphasis added).   See also In re Eagle Picher Industries, Inc., 176 B.R. 143, 148 (Bankr. S.D. Ohio 1994) ("the concept of an exclusivity period in favor of a debtor, a consideration *at the heart* of the Bankruptcy Code, on its face contradicts the notion that parties in a Chapter 11 bankruptcy case be given an equal opportunity to seek confirmation of a plan.") (emphasis added).

---

[4] Arcus notes that any alleged proposed plan provided by Arch may not be filed by a party other than the Debtor under Section 1121 and any attempt to do so would be to effectively rewrite the Bankruptcy Code.

123285.01601/11774135v.5

31.    To effectuate Debtors' reorganization, Debtors needed financing to allow business operations to continue in bankruptcy.  Based on the testimony of Steven Grabell, chief executive officer of Debtors, despite diligent efforts, Debtors were unable to find financing until Arcus was willing to provide financing in a package with an exit strategy and difficult negotiations which resulted in the Pre-Petition Lenders being willing to continue lending to Debtors. (Tr. of 3/18/08 at 70-77).  The allegations set forth in the Motions to Terminate that the Proposed Plan would not maximize the value to the creditors disregards the added value of a clearly articulated exit strategy and the efforts by Arcus to work in good faith to reorganize.

32.    Arcus notes that by enhancing the Proposed Plan and Disclosure Statement with the First Amended Plan, it is attempting to be responsive to the requests and objections of the Court and all creditor constituencies.  The First Amended Plan is part of a larger transaction which saved the Debtors from near-certain liquidation and minimal value left in the Estates, if any.  Discounting the value which Arcus has brought to the Debtors would ignore the value of the transaction that only Arcus was willing to enter into with the Debtors while no other parties, including Arch, were willing to do the same which, in essence, preserved value and saved jobs.

**b.    The Motions to Terminate should be denied because not only was the Proposed Plan confirmable, but the modifications in the First Amended Plan enhance the likelihood that the First Amended Plan will in fact be confirmed, and, even if the First Amended Plan is not confirmed, the exclusivity period should be retained to facilitate the Debtors' reorganization.**

33.    Significant parts of both of the Motions to Terminate and the Objections focus on a small handful of confirmation issues.  These points are not properly raised in evaluating a motion to terminate exclusivity, but should (at best) be reserved for the confirmation hearing.

34.    Section 1129 of the Bankruptcy Code sets forth a process for confirmation of a plan under chapter 11.  To the extent Arch and the Committee have expressed discontent with the Proposed Plan or the First Amended Plan, they have the right and ability, under Section

1129, to solicit rejection of the Proposed Plan or the First Amended Plan. Although a process of soliciting rejection may not be the process that Arch or the Committee would prefer, it most assuredly is the preferred process under the Bankruptcy Code. "If, as has been suggested here, conflicts of interest are shown to exist with respect to certain insiders of the Debtors, and if these conflicts are determined to be adverse to the interests of these estates, a plan of reorganization should not, and will not be confirmed." In re Interco Incorporated, 137 B.R. at 1001. See also In re Eagle Picher Industries, Inc., 176 B.R. at 148 ("If debtors' plan fails of confirmation, then it may be appropriate for there constituencies to present their own plan or plans"). The mere fact that discussion with creditors have not produced a plan which Arch or the Committee feels is in the best interest of the creditors should not "lead this Court to any conclusion that there was unfairness in the process." Id. at 147.

35.    Arcus and the Debtors have taken steps to provide a process under Section 1129 that affords creditors all of the protections intended to be given to creditors under the Bankruptcy Code, including disclosure, an opportunity to vote and other related protections. The Bankruptcy Code encourages reorganization as a primary means of exiting from bankruptcy. "The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern." Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel., 330 F.3d 548, 573 (3d Cir. 2003). See also In re Interco Incorporated, 137 B.R. at 1001 ("In the Bankruptcy Code, Congress has established a scheme for the orderly submission, consideration and confirmation of a plan of reorganization.").

36.    Arch and the Committee specifically allege that under Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999) ("LaSalle"), as an insider, Arcus is unfairly favored in the Proposed Plan (and in the First

Amended Plan).  Arcus does not acknowledge nor agree that <u>LaSalle</u> applies to this case (which could then require that the process be opened up in some fashion to the non-insiders).  Arcus has no equity ownership in Debtors and <u>LaSalle</u> addressed the case where new value was being made by the original owners of the Debtor to retain their prior equity interests on account of their prior equity position.  Arch and the Committee are once again requesting this Court to tread into new territory and expand <u>LaSalle</u> beyond its parameters, something this Court should not do.

37.    In <u>Beal Bank, S.S.B. v. Waters Edge Limited Partnership</u>, 248 B.R. 668 (D. Mass. 2000), an insider who was not an original equity holder was allowed to purchase the equity of the debtor in a plan of reorganization and the Court found that <u>LaSalle</u> does not apply to that situation.  Arcus was not a manager nor an equity holder at the time of the Written Consent and is not currently an equity holder of any of the Debtors.  While Arcus may be deemed an insider, the Bankruptcy Code does not bar the sale of equity to an insider (if the Court concluded the same).  <u>See also</u> <u>Penn Mutual Life Insurance Company v. Woodscape Limited Partnership</u>, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction"); <u>Troy Savings Bank v. Travelers Motor Inn, Inc.</u>, 215 B.R. 485, 494-495 (N.D.N.Y. 1997). [5]

38.    Arch cites to <u>In re Situation Management Systems, Inc.</u>, 252 B.R. 859 (Bankr. D. Mass., 2000) as support that a "new value" plan constitutes "cause" for terminating exclusivity. The creditors' committee had moved to terminate exclusivity due to improper classification of claims, unreasonable delay by the debtor in filing the plan and the use by the debtor of the exclusivity period as a tactical devise to force creditors to accept an unsatisfactory plan.  <u>In re Situation Management Systems, Inc.</u>, 252 B.R. at 859.  The plan in <u>Situation Management</u>

---

[5] The Debtors do not believe that <u>LaSalle</u> applies to the First Amended Plan and nothing contained herein shall constitute an admission of the same.

Systems allowed that a prepetition equity holder (who was also president, treasurer, clerk and director of the debtor) would purchase 100% of the shares in the reorganized debtor for a minimal cash contribution of $100,000, subject to certain bidding procedures.  As set forth in the discussion regarding Beal Bank, the Proposed Plan and First Amended Plan are not "new value" plans being proposed wherein the existing equity holder would receive the equity in the reorganized Debtors.  Furthermore, it is significant to note that an affiliate of Arcus was a manager (not an equity holder) for mere minutes prior to the filing of the chapter 11 petitions, rather than an active shareholder and officer of the prepetition debtor like in Situation Management Systems.  Employing the standard set forth in Beal Bank, a district court opinion decided in the same district as the bankruptcy court in Situation Management Systems, the Proposed Plan and First Amended Plan are substantially different from the plan offered in Situation Management Systems.  It is also significant that the Arch Motion fails to note that exclusivity in Situation Management Systems had been extended five time (nearly three full years after the petition date) prior to the decision to terminate exclusivity and the first plan filed by the debtor was filed over two and one half years after the petition date.

39.    "While some have argued that the mere filing of a new value plan should be grounds for shortening the debtor's exclusivity period, these arguments are usually made in the context of a need for amendment of the Bankruptcy Code.  See, e.g,, Kenneth N. Klee, Adjusting Chapter 11: Fine Tuning the Plan Process, 69 Am.Bankr.L.J. 551, 554-55 (1995).  Irrespective of the merits of such an amendment, however, *the Code does not now so provide*, *the legislative history of § 1121 does not express such an intent*, and at least one court has rejected that argument. See Matter of Homestead Partners, Ltd., 197 B.R. 706, 717-19 (Bankr.N.D.Ga.1996)."  In re Standard Mill Limited Partnership, 1996 WL at *2 (emphasis added).

123285.01601/11774135v.5

**c.      Contrary to the allegations contained in the Motions to Terminate and the Objections, Debtors have fulfilled and continue to fulfill their fiduciary duties to the creditors and have utilized and continue to utilize their business judgment in pursuing their reorganization via the Proposed Plan and the First Amended Plan.**

40.      Entering into the transactions contemplated by the Written Consent, including execution and verification of the Proposed Plan and Disclosure Statement were, and continue to be, in the best interest of the creditors and exercised in accordance with Debtors' business judgment.  By filing the Proposed Plan and Disclosure Statement, all of Debtors' schedules and Debtors' statement of financial affairs immediately after filing the chapter 11 petitions and then further modifying the Proposed Plan with the First Amended Plan, Debtors indicated a desire for an efficient and expeditious reorganization which would maximize value and be in the best interests of the creditors.   It is certainly significant that the Proposed Plan and Disclosure Statement were filed immediately after the filing of the chapter 11 petitions and that the Debtors have exhibited a willingness to be responsive to the creditors in the First Amended Plan. Debtors are not asking for an extension of exclusivity at this time, only the ability to enjoy the exclusivity granted under Section 1121.

41.      Debtors, in this case, have exercised their business judgment in an effort to meet the very premise of a reorganization.   "The premise of a reorganization is to ensure that the debtor emerges from bankruptcy as a viable concern." Cybergenics, 330 F.3d at 573.   Debtors have every right under the Bankruptcy Code to exercise their business judgment in a chapter 11 proceeding.  See Id. at 577 ("there is a corresponding 'strong presumption' that the debtor should be permitted to remain in possession… the idea that existing management is best positioned to rescue a debtor from bankruptcy is precisely the reason why the appointment of a trustee is exceptional in Chapter 11 reorganizations").

123285.01601/11774135v.5

42.     The attempt by Arch and the Committee to usurp Debtors' business judgment and the value contributed by Arcus to the First Amended Plan, which, together with the DIP Facilities, presents a clearly articulated exit strategy to which Arcus has exhibited a commitment, asks this Court to take actions which would lead to uncertainty and leave Debtors at the whim of a competitor with unclear intentions or motivation.

43.     Arcus notes that while Arch alleges that the Proposed Plan will result in little or no cash left in the Debtors' estates to cover the Debtors' unsecured liabilities, as explained above, in absence of the Arcus DIP Facility and the transactions entered into by the Debtors pursuant to the Written Consent, the unsecured creditors would have likely faced no recovery following liquidation by the Pre-Petition Lenders.  The First Amended Plan further enhanced the recovery for the unsecured creditors due to the commitment by Arcus to provide additional funds.  While Arch and the Committee claim that the Debtors did not market their assets and businesses, neither acknowledge in the Motions to Terminate or in their respective Objections that when faced with the possibility of entering into a transaction with the Debtors only months before the Debtors entered into the transactions with Arcus and its affiliates when the Debtors were in fact marketing their assets and businesses prior to the Petition Date, Arch and several others declined the opportunity.

### ii.     THE MOTIONS TO TERMINATE SHOULD BE DENIED SINCE THE LAW IS CLEAR THAT CREDITOR DISCONTENT IS NOT SUFFICIENT "CAUSE" TO TERMINATE EXCLUSIVITY.

44.     <u>In re Geriatrics Nursing Home</u> is particularly dispositive in this case.  The United States District Court for the District of New Jersey unequivocally stated that discontent of creditors and the prospects of an alternative "more favorable" plan are *not* reasons to terminate exclusivity or to "undermine the debtor's chances of winning final confirmation of its plan" during the exclusivity period.  187 B.R. at 132-34.

19

45.    Arch did not follow through on opportunities to enter into a transaction with Debtors prior to the Petition Date and is now dissatisfied with the transaction the Debtors did enter into with Arcus in order to provide additional liquidity and credibility and facilitate the Debtors' reorganization process.  Arch is an affiliate of Signature Aluminum ("Signature"), an aluminum extruder that competes directly with the Debtors across North America.  Signature operates eight facilities in the United States and Canada.  Arcus is informed (subsequent to the petition date) that Signature discussed the possibility of purchasing the Debtors several months ago, but did nothing to commit to a transaction, nor did it make any serious effort to follow up with Debtors in the months leading up to this chapter 11 case.  Upon information and belief, Signature and its affiliates had multiple opportunities to enter into a transaction with Debtors and did not act beyond signing a confidentiality agreement and obtaining information from the Debtors, their competitor.  Upon information and belief, Signature and its affiliates were even approached by the Debtors in the months immediately preceding the discussions between the Debtors and Arcus and its affiliates.  It appears that Arch may have purchased a claim for the sole purpose of creating a platform to attack and hinder the re-emergence of a major competitor and recapture the opportunity that it had passed on previously.  The remorse of Arch that it did not enter into the transaction previously and its desire to now seeks this Court to sanction its attempt to recapture that opportunity is not ample "cause" to terminate exclusivity.  Any explanation to the contrary is inapposite in light of In re Geriatrics Nursing Homes.

123285.01601/11774135v.5

II.   **THE MOTIONS TO TERMINATE SHOULD BE DENIED BECAUSE WHEN APPLIED TO THESE CASES, NONE OF THE FACTORS THAT COURTS HAVE HELD SHOULD BE CONSIDERED WHEN DETERMINING WHETHER "CAUSE" EXISTS TO TERMINATE DEBTOR'S STATUTORY PERIOD OF EXCLUSIVITY SUPPORT THE TERMINATION OF THE EXCLUSIVE PERIODS.**

i.     **THE CASES ARE LARGE AND COMPLEX.**

46.     As indicated at the hearing of March 18, 2008, the Debtors are five substantial companies, with thousands of creditors, over a thousand employees, five collective bargaining agreements, and a debt structure of upwards of one hundred million dollars.  (Tr. of 3/18/08 at 12: 11-18).  The Cases have been very active and have seen a great amount of activity.  In such a situation where the Debtors have a litany of issues to deal with in order to facilitate a reorganization process that has been moving along fairly nicely (with the exception of certain interruptions raised by various filings with this Court attempting to derail the Debtors' process), the first factor is decidedly favorable to the continuation of exclusivity.

ii.     **THERE HAS NOT YET BEEN SUFFICIENT TIME TO PERMIT THE DEBTORS TO NEGOTIATE A PLAN OF REORGANIZATION AND PREPARE ADEQUATE INFORMATION.**

47.     The second factor also favors the Debtors' retention of exclusivity.  The Debtors took the extraordinary and unusual step of filing the Proposed Plan and Disclosure Statement (together with all schedules and the statement of financial affairs) on the Petition Date, that, subject to the hearing scheduled for May 1, 2008, can (and should) be quickly solicited.  As the Adelphia Bondholders decision states, "[w]e aren't talking about the time to negotiate and file a plan; we're talking about the time to solicit acceptances to it, and we'll quickly learn in this plan gets the acceptances."  352 B.R. at 588.  The Arch Motion was filed only one month after the "first day" hearings and prior to the Disclosure Statement hearing and the Committee Motion less than two weeks after that.  Neither Arch nor the Committee wants to even afford the Debtors

21

the opportunity to solicit acceptances to a plan filed in good faith and in accordance with the terms of the Bankruptcy Code. Congress gave debtors 120 days to file a plan and 180 days to solicit approval of the plan for a reason, evidence that Congress did not think that one month is not nearly enough time to solicit the necessary acceptances. Clearly, there has not been sufficient time elapsed in the Cases to find "cause" under the second factor.

### iii. THE DEBTORS HAVE EXHIBITED GOOD FAITH PROGRESS TOWARD REORGANIZATION.

48.     The unique steps taken by the Debtors to have filed the Proposed Plan and Disclosure Statement, all schedules and the statement of financial affairs and the modifications included in the First Amended Plan are indicative of good faith progress toward reorganization. It is noteworthy for the Court's assessment of this factor that Arch does not allege that Debtors are not trying to reorganize. Arch merely alleges that it could provide a superior plan (which such argument would vitiate the protections given to a debtor and its business judgment under the Bankruptcy Code and run contrary to the decision in Geriatrics Nursing Home, among others) and that the process the Debtors have employed to reorganize is flawed. Debtors have agreed to continue the hearings for a final order on the Arcus DIP Facility and the CIT DIP Facility to work with the Committee to resolve various concerns of the Committee and facilitate the very reorganization with which the third factor is concerned. As the court in Dow Corning was swayed by the fact that, "[f]or the most part, the Debtor [had] met [all of the] deadlines", the Debtors have proceeded unequivocally toward the goal of reorganization, meeting the deadlines it set at the beginning of the Cases, delaying only to facilitate negotiations with the Committee and further enable reorganization. 208 B.R. at 665. Arcus and the Debtors have negotiated in good faith with the various creditors and will continue to do so in an effort to reorganize. The third factor therefore also militates toward retention of exclusivity.

123285.01601/11774135v.5

**iv.   THERE HAS BEEN NO SUGGESTION THAT DEBTORS ARE NOT PAYING THEIR BILLS AS THEY BECOME DUE.**

49.   As the Debtors have been paying their bills as they become due with the help of the Arcus DIP Facility and the CIT DIP Facility, the fourth factor is clearly favorable to the Debtors' retaining exclusivity.

**v.   BY FILING THE PROPOSED PLAN AND DISCLOSURE STATEMENT ON THE PETITION DATE AND SUBSEQUENTLY FILING THE FIRST AMENDED PLAN, DEBTORS HAVE DEMONSTRATED REASONABLE PROSPECTS FOR FILING A VIABLE PLAN.**

50.   "This factor requires only that a debtor will be able to attain confirmation of at least *some* viable plan, not necessarily the plan currently proposed." Adelphia Bondholders, 352 B.R. at 588 (citing Dow Corning, 208 B.R. at 665).   If the Disclosure Statement to the First Amended Plan is approved by the Court, there will be ample opportunity to see if it is viable. See Adelphia Bondholders, 352 B.R. at 588 (analyzing a situation where there was a "plan that's about to be solicited").   The First Amended Plan clearly reflects negotiations with the creditors to enhance the viability of the Proposed Plan.   The Debtors have demonstrated a desire to reorganize by filing a plan that can be confirmed.

51.   Even assuming, arguendo, that the First Amended Plan is unconfirmable and not viable, Arch has not addressed the Debtors' inability to propose a viable plan.   See Dow Corning, 208 B.R. at 665 (deciding where a plan that the debtors intended to pursue to confirmation had not been filed that "since the burden was on the Committees, their failure to address evidence to the Debtor's inability to propose a viable plan means that this factor cannot be counted on either side of the ledger").   As the timeline proposed by the Debtors would include confirmation within ninety days of the Petition Date, even if the First Amended Plan (or any subsequent amendments or modifications thereto) failed to be confirmed, there would still remain sufficient time within the statutorily granted exclusivity period for the Debtors to propose

23

another plan which would address the issues which might be raised for confirmation.  Thus, as

the Debtors have filed the First Amended Plan in good faith that it believes can and will be

confirmed, this factor also favors retention of exclusivity.

### vi.    THE FIRST AMENDED PLAN IS INDICATIVE OF PROGRESS MADE BY THE DEBTORS IN NEGOTIATIONS WITH THEIR CREDITORS.

52.    The sixth factor overlaps materially with the factors listed above, and like those

factors, also strongly favors the retention of exclusivity by the Debtors.  In light of the

contentious nature of these Cases, the Debtors have demonstrated responsiveness to concerns of

creditors, incorporating many of the concerns raised in objections to the Proposed Plan and

Disclosure Statement in the modifications made in the First Amended Plan.  Arcus and the

Debtors have attempted to resolve many of the Committee's concerns.  Arcus and the Debtors

have been in constant discussions with the Pre-Petition Lenders to secure their support of the

First Amended Plan.  The Motions to Terminate make no allegations as to the nature of the

progress of the negotiations between the Debtors and the creditors, most likely because both

Arch and the Committee remain unsatisfied with the First Amended Plan and are unwilling to

concede that the Debtors have made such progress.

### vii.    BY FILING THE MOTIONS TO TERMINATE BARELY ONE MONTH INTO THE CASES, ARCH AND THE COMMITTEE HAVE BOTH SHOWN A BLATANT DISREGARD FOR THE TIME PERIOD SET FORTH IN THE BANKRUPTCY CODE.

53.    While this seventh factor overlaps materially with the second factor, it is

significant that Arch has not even allowed an opportunity for a material amount of time to elapse

in these Cases.  Notwithstanding the expedited timeline on upon which the Debtors are

progressing, moving to terminate exclusivity barely one month after the Petition Date is

extremely uncommon and brazen.  As the reported cases in which the statutorily granted

123285.01601/11774135v.5

exclusivity period has been terminated are quite scarce and only arise in extreme circumstances of acrimonious feuding where debtor's principals refuse to even talk with one another or gross mismanagement requiring the appointment of a trustee, the Motions to Terminate are asking the Court to take extreme measures which no other court has been willing to do.  See Lehigh Valley, 2000 WL at *4-*6.  Several courts, including in the Adelphia decisions, have found that despite several years of exclusivity, this factor would still favor retaining exclusivity.  Adelphia Bondholders, 352 B.R. at 589 ("spending a few more weeks with exclusivity would hardly be inappropriate in light of the complexity of this case").  Contrary to the Situation Management Systems decision cited by Arch, Debtors have certainly not delayed the process nor have the Debtors exhibited any indicia of interest in delaying the process.  This factor also favors retaining exclusivity.

### viii.    THE DEBTOR IS UTILIZING THE EXCLUSIVITY PERIOD IN THE TENOR SET FORTH IN THE BANKRUPTCY CODE.

54.    "The eighth factor is whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands."  Adelphia Bondholders, 352 B.R. at 589.  While the Arch Motion cites to In re All Seasons Industries, Inc., 121 B.R. 1002 and the legislative history in the House Report accompanying H.R. 8200, it ignores that the "[p]roposed chapter 11 recognizes the need for the debtor to remain in control to some degree, or else debtors will avoid the reorganization provisions of the bill until it would be too late for them to be an effective remedy."  H.R.Rep. No. 595, 95th Cong., 1st sess. 231-32 (1977);  see also Nelan, Barbara E., Multiple Plans 'On the Table' During the Chapter 11 Exclusivity Period, 6 Bankr. Dev. J. 451, 466 (Fall 1989) ("an underlying premise of Chapter 11 is that the debtor will retain control, and the plan will normally be the debtor's plan."); In re The Elder-Beerman Stores Corporation, et al., 1997 WL 1774880, at *4 (S.D. Ohio 1997) ("Congress

intended to create a balance so as to protect the right of a debtor in possession to propose and

obtain the requisite consents to its plan of reorganization while at the same time protecting

creditors from abuse of Chapter 11 by a debtor unwilling to negotiate in good faith with

creditors."); <u>In re Temple Retirement Community</u>, 80 B.R. 367, 369 (Bankr. W.D. Texas 1987)

("for better or worse, the bankruptcy code was designed to give the Debtor a clear advantage

early on in the case, unfettered by competing plans."). Congress' intent that a debtor be afforded

ample opportunity to negotiate is plainly evident from the 120 days set forth in section 1121 of

the Bankruptcy Code.

### ix.     THERE HAS BEEN NO SUGGESTION THAT AN UNRESOLVED CONTINGENCY EXITS.

55.     The ninth factor is not particularly relevant as it is too early in the case to assess

whether there is any unresolved contingency that would support terminating exclusivity or

retaining exclusivity.

### III.     THE OBJECTIONS RELATED TO THE DEBTORS' PROCESS SHOULD BE OVERRULED BECAUSE THE FIRST AMENDED PLAN IS CONFIRMABLE AS DEBTORS ARE ENTITLED TO EXCLUSIVITY UNDER THE BANKRUPTCY CODE AND ARE FOLLOWING THE PROCESS PREFERRED BY THE BANKRUPTCY CODE.

56.     The First Amended Plan, Proposed Plan and Disclosure Statements are clearly

part of a process undertaken with a great degree of consideration of the Debtors' fiduciary duties.

The question that should be asked is not whether the First Amended Plan and the Debtors' efforts

in general indicate a lack of process, but rather whether, under the totality of the circumstances,

the proposed process complies with the policies and requirements of the Bankruptcy Code and

other applicable law and maximizes value for creditors. Acrus submits that the answer to this

question is a resounding "yes." <u>See</u> <u>In re Interco Incorporated</u>, 137 B.R. at 1001 (noting, in

addition, that "the interests of … all parties are *provided for and protected* by the scheme and

26

procedure that anticipates submission of a single plan [during the exclusivity period]") (emphasis

added).  See also In re Eagle Picher Industries, Inc., 176 B.R. 143, 148 (Bankr. S.D. Ohio 1994).

The mere fact that discussion with creditors have not produced a plan which Arch or the

Committee feels is in the best interest of the creditors should not "lead this Court to any

conclusion that there was unfairness in the process."  Id. at 147.  See also In re Interco

Incorporated, 137 B.R. at 1001 ("In the Bankruptcy Code, Congress has established a scheme for

the orderly submission, consideration and confirmation of a plan of reorganization.").  Moreover,

while Arcus offers commitment and certainty to the Debtors and their creditors and employees,

Arch offers delay, doubt and uncertainty.

57.    Notwithstanding all of the alleged "improvements" of the Arch offer over the

First Amended Plan, as opposed to the transaction with Arcus which would allow smooth

reorganization and exit for the Debtors with committed financing and a clearly articulated vision,

there are several unresolved contingencies in the package offered by Arch.  As set forth in the

Disclosure Statement, the Debtors state

> [t]he Arch Plan purports to increase the distribution to Class 5 Unsecured
> Creditors to the amount of five million dollars.  However, no information has
> been provided regarding the funding of the same (which will require in excess of
> ninety million in cash) or any other requirements or conditions that may be
> applicable to obtain confirmation of that proposal and therefore no representations
> are being made as to whether that proposal can actually be consummated.  The
> current [First Amended] Plan has commitments for exit financing which Debtors
> believe offers more certainty and less risk than the Arch Plan although it offers
> Class 5 a potential lower recovery.  Debtors believe the certainty of the [First
> Amended] Plan outweighs the potential for a greater recovery under the Arch
> Plan.  Further, the [First Amended] Plan provides for a competitive process
> should Class 5 creditors decide to reject the [First Amended] Plan and if the Court
> determines that a competitive process is necessary under [LaSalle].

(Joint Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization, p. 45).

123285.01601/11774135v.5

58.    Arch has presented the Debtors with an apparently enticing proposal for financing at lower "teaser" rates in order to lure the Debtors and the creditors into halting the present reorganization process quite possibly for its own competitive reasons.  Neither the Debtors, the creditors, nor the Court should be so easily lulled, particularly given the current precarious nature of the Debtors' business operations.  Due to the inherent risk in a long term commitment issued in the current state of the credit markets, most lenders are reluctant to commit to any transaction, and certainly exhibit even greater hesitation to lend to a borrower in bankruptcy or exiting from bankruptcy.  It is significant that Arcus has not only accepted that risk by agreeing to provide exit financing, but was successful in arranging for a commitment from the Pre-Petition Lenders to Arcus to provide sixty million dollars worth of exit financing.

59.    While Arch and the Committee object to the Disclosure Statement under the guise of protecting the creditors from the Debtors' failure to comply with their fiduciary duties, Arch utterly fails to disclose its own possible motivations or long-term intentions.  Nowhere has Arch committed to operating the Debtors and preserving value and jobs into the future.  Arch has already failed multiple times to proceed forward with the Debtors pre-petition. So why should the parties assume it will be any different this time?  Clearly, Arch may now see an opportunity to derail the Debtors' reorganization process through the manipulation of this bankruptcy case. Arch's objections, alleged proposals, expressed interest and claims are a far cry from Arcus' established track record of involvement and commitment to reorganize the Debtors on a clear and manageable time table.  Litigation, delay and further expense, the natural result of the Committee's and Arch's last-minute and questionable tactics, will do nothing to help the Debtors to reorganize, to preserve value for creditors or to protect jobs going forward.

123285.01601/11774135v.5

60.    The longer the Debtors remain in bankruptcy and if Arch and the Committee succeed in dragging out the process, the greater will be the diminution in value of the Debtors' assets and a drop in the return to creditors and the greater will be the threat to the Debtors' ability to emerge and compete with Arch.  Under this scenario, Arch benefits perhaps more from a forced liquidation than it does from a reorganization of the Debtors.  In fact, Arch's improper filing of a plan of reorganization with the Arch Motion, coupled with the Committee's recent motion to appoint a trustee, may have already done substantial damage to the value of the Debtors.

61.    The Debtors and Arcus have exercised prudent and independent business judgment in establishing the reorganization process currently before the Court.  That exercise of judgment has brought real and committed financing to the table and a clear reorganization process on a defined time table.  The objections of Arch, the Committee and the other parties which question this process, in essence seek to have the Court thwart the First Amended Plan which was filed promptly and in good faith and well within the exclusivity period given to Debtors under the Bankruptcy Code in order to allow the Debtors to reorganize as encouraged by the Bankruptcy Code.  The Debtors have complied with THE process favored by Congress, a plan of reorganization.  That process envisions statutory protections to creditors as laid out in section 1129 of the Bankruptcy Code.  The Committee and Arch seek to overrule and eradicate that process in favor of some other process.[6]  Exclusivity under section 1121 of the Bankruptcy Code during the first 120 days of this case does not warrant or require such a result.

62.    Incorporating into this Response to the Objections to the Disclosure Statement the substance of the arguments in paragraphs 33 through 39 above related to confirmation issues,

---

[6] Assuming Arch has complied with Arcus' request for production of documents pursuant to a subpoena, Arch's alleged promise to allow a competing process rings hollow.  Nowhere has Arch legally committed or bound to allow such a process.

Arcus further notes that while the Committee Objection cites to cases related to Section 363 sales, the citations are all inappropriate since courts have taken the measure to apply additional protections in 363 sales primarily because the protections afforded under Section 1129 of the Bankruptcy Code are otherwise absent.  See In re Iridium Operating LLC., 478 F.3d 452 (2d Cir. 2007) ("The trustee is prohibited from such use, sale or lease if it would amount to a *sub rosa* plan of reorganization.  The reason *sub rosa* plans are prohibited is based on a fear that a debtor-in-possession will enter into transactions that will, in effect, 'short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan'") (citing In re Braniff Airways, Inc., 700 F.2d 935 (5th Cir. 1983)).  Accordingly, the Objections should be overruled as the Debtors have engaged in a plan process as contemplated under the Bankruptcy Code, a process in which the creditors are afforded numerous rights, including the right to vote "no".  The right to vote on a plan does not, under any statutory construction, provide for a "higher and better" process as opposed to that which was and is contemplated for section 363 sales since, in section 363 sales, the protections and rights afforded creditors under the plan process are absent.

## B.    CROSS-MOTION TO STRIKE PROPOSED ARCH PLAN

### INTRODUCTION

Section 1121 of the Bankruptcy Code provides a debtor with the exclusive right to FILE a plan of reorganization during the first 120 days of the case (emphasis added).  Section 1125 dovetails the exclusivity right by prohibiting a party from soliciting acceptances of a plan that is not accompanied by an approved disclosure statement.  Here, Arch has violated both sections by publicly filing a plan for the purpose of soliciting acceptance of same during the exclusivity period.  The Proposed Arch Plan should be stricken from the record and Arcus and the Debtors

reserve the right to seek an award of its attorneys' fees in prosecuting this matter before the Court.

## BACKGROUND

63.     On March 16, 2008, the Debtors, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Immediately after the filing of their chapter 11 petitions, the Debtors filed a Joint Disclosure Statement [Dkt. No. 16] and a Joint Plan of Reorganization [Dkt. No. 15].

64.     On April 18, 2008, Arch – a competitor of the Debtors who had to purchase a claim to gain standing as a "creditor" of the estate – filed a motion to terminate the Debtors' exclusivity period [Dkt. No. 182] and attached to its motion a proposed chapter 11 plan of reorganization (the "Proposed Arch Plan").  As reflected on Arch's certificate of service, the Proposed Arch Plan was served on one or more creditors of the estate by mail.  Even more troubling, the Proposed Arch Plan was filed electronically with the Court without any protections, thereby making it immediately available to all creditors, claims traders and parties in interest.

65.     Ironically, Arch attended a lengthy hearing just one day earlier on April 17, 2008, during which it informed the Court it would be filing a motion to terminate exclusivity based on its desire to acquire the Debtors' assets, but made no request of the Court to file a proposed chapter 11 plan (under seal or otherwise), presumably because Arch knew it could not file a plan so long as the Debtor enjoyed exclusivity.

## ARGUMENT

66.     Section 1121(b) of the Bankruptcy Code states that "only the debtor may *file* a plan until after 120 days after the date of the order for relief under this chapter"  (emphasis

123285.01601/11774135v.5

added). Similarly, §1125(b) states that the "acceptance or rejection of a plan may not be solicited after the commencement of the case … unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."

67.     Arch has violated both of these sections of the Bankruptcy Code because it has filed a plan during the 120-day exclusivity period and, in so doing, has improperly solicited support for its plan without an approved disclosure statement.

68.     The case of In re Clamp-All Corp. is highly instructive, as it contains nearly identical facts as here.  233 B.R. 198 (Bkrtcy. D. Mass. 1999).  In Clamp-All, the debtor filed a plan and disclosure statement during the exclusivity period.  Id. at 202.  In response, two creditors filed an objection to the disclosure statement coupled with a motion to terminate exclusivity.  Id.  The creditors attached to their pleading an exhibit containing a draft plan and disclosure statement.  Id.  According to the court, the creditors' plan "offered far more attractive treatment of unsecured creditors than the plan proposed by the Debtor during its period of exclusivity."  233 B.R. at 203.

69.     As here, the creditors' pleading in Clamp-All sought to terminate exclusivity so that the creditors "could file and solicit acceptances for the proposed plan that was attached to their pleadings."  Id.  In response, "the Debtor argued that the inclusion of a proposed disclosure statement and reorganization plan in the opposition filed by [the two creditors] violated 11 U.S.C. §§1121(b) and 1125(b)" because it "promot[ed] their own plan during the Debtor's exclusivity period and before a disclosure statement had been approved by the Court."  Id. at 203-04.

32

70.    The two creditors countered by arguing that under § 1125(b) "the term 'solicitation' should be construed narrowly to mean nothing short of a specific request for an official vote." Id. at 204.

71.    The court rejected the two creditors' argument and held that they violated §§1121(b) and 1125(b) of the Bankruptcy Code because, by filing their competing plan of reorganization during the exclusivity period, they "undermined the Debtor's ability to propose a confirmable plan and circumvented the adequate disclosure requirements of the Bankruptcy Code." Id. at 210.

72.    The court went on to explain that, once a competing plan is filed, the proverbial horse is out of the barn because "unsecured creditors are unlikely to forget the unapproved plan and disclosure statement mailed to them by [the two creditors], albeit in purportedly draft form." Id.  The court concluded that the "appropriate remedy therefore ought be designed to undo that harm, above all.  It must be designed to make [their] offer to creditors no longer material."  Id.

73.    In so holding, the court distinguished an antiquated Third Circuit case that analyzed a creditor's efforts to file a competing plan but "fail[ed] to sufficiently recognize Congress' intention to allow the debtor a reasonable time to obtain confirmation of a plan without the threat of a competing plan."  233 B.R. at 207-08 (criticizing Century Glove, Inc. v. First Amer. Bank of New York, 860 F.2d 94 (3rd Cir. 1988)).

74.    In Century Glove, the court construed narrowly the term "solicitation" as referring "only to a specific request for an official vote."  860 F.2d at 101.  Yet, as Clamp-All explains, the jurisprudential trend has shifted away from such a narrow reading and has "applied the term solicitation more expansively."  Clamp-All, 233 B.R. at 206 (citing In re Apex Oil Co., 111 B.R. 245, 249 (Bkrtcy. E.D. Mo. 1990)); Colorado Mountain Express, Inc. v. Aspen Limousine Serv.,

Inc. (In re Aspen Limousine Serv., Inc.), 198 B.R. 341, 348-49 (D. Colo. 1996); In re Rook

Broadcasting of Idaho, 154 B.R. 970 (Bkrtcy. D. Idaho 1993); In re Gulph Woods Corp., 83 B.R.

339, 342 (Bkrtcy. E.D. Pa. 1988) (recognizing that there must be some limitation on

communications, or else the entire process of requiring court approval of disclosure statements

would be undermined). This trend recognizes that while "open negotiations by creditors is

imperative[,] those negotiations must be conducted in a manner consistent with the policy goals

intended by Congress to be effectuated through §§ 1121(b) and 1125(b) of the Bankruptcy

Code." Clamp-All, 233 B.R. at 206.[7]

75.      Here, Arch's actions are nearly identical to those of the two creditors in Clamp-

All. Arch filed a competing plan in "draft form" as an exhibit to a request to terminate

exclusivity, and did so during the exclusivity period while the Debtors already had a plan and

disclosure statement pending. Arch then served its competing Plan on certain creditors and

parties in interest, presumably in hopes of poisoning the well and currying favor for its

competing plan. Moreover, Arch filed its competing plan on the Court's ECF docket without

any confidentiality safeguards, thereby rendering the Proposed Arch Plan immediately available

to all creditors and parties in interest, not to mention claims traders, media outlets and the general

public. See, e.g., In re Kaiser Aluminum Corp., 327 B.R. 554 (D. Del. 2005) ("The problem that

Courts wrestle with electronic case filing is just that. Everything gets spread on the public

docket and that is not appropriate…"); In re Wingerter, 376 B.R. 221, 223 (Bkrtcy. N.D. Ohio

2007) ("Undoubtedly contributing to the extraordinary growth of an industry devoted to the

purchase and sale of claims … is the implementation of electronic case filing").

---

[7] Century Glove is likewise factually distinguishable because in that case, copies of the draft plan were sent to
creditors' counsel (and not publicly disseminated), while here, Arch deliberately filed the plan with the Court for all
to see and review (and stamping draft on the same does not protect the improper act).

76.     As a result of Arch's violation of §§ 1121(b) and 1125(b), an appropriate sanction should be imposed.  Again, Clamp-All is instructive on this point.  There, the court awarded the debtor, *inter alia*, its attorneys' fees in prosecuting the matter "as the best remedy which the Court can craft among those available."  Id. at 211.  In so doing, the court took very seriously its obligation to impose an appropriate sanction, stating:

> The bankruptcy court is obliged to give the Chapter 11 debtor every reasonable opportunity to present and confirm a plan reorganizing its financial affairs [because] … most important, the Court has a duty to safeguard the integrity of the negotiation process which is at the heart of Chapter 11.    [The two creditors] undermined that process by communicating to creditors information (right or wrong) which interfered with a negotiation between the Debtor and its creditors that Congress intended to be exclusive.  The Court's expression of disapproval of that behavior must be unequivocal.

233 B.R. at 211-12.  Arcus respectfully submits that this Court's disapproval of Arch's attempt to undermine the integrity of the Debtors' negotiation process should be no less unequivocal.

77.     At present, the parties are engaged in extensive discovery, which remains ongoing.  Accordingly, Arcus and the Debtors reserve their rights to suggest an appropriate sanction to the Court for Arch's conduct upon completion of discovery.  In the interim, Arcus respectfully requests that the Court strike the Proposed Arch Plan from the docket.

123285.01601/11774135v.5

## CONCLUSION

WHEREFORE, Arcus ASI Funding, LLC respectfully requests that this Court (a) overrule the Objections to the Disclosure Statement to the First Amended Plan and enter final orders approving the Disclosure Statement to the First Amended Plan, (b) strike the Proposed Arch Plan from the docket, (c) deny the Motions to Terminate, and (d) grant such other further relief as is just and proper.

April 30, 2008                     BLANK ROME LLP


                                   */s/ Joel C. Shapiro*
                                   Joel C. Shapiro, Esquire
                                   Shlomo B. Troodler, Esquire
                                   Woodland Falls Corporate Park
                                   210 Lake Drive East, Suite 200
                                   Cherry Hill, NJ  08002
                                   (856) 779-3600

                                   and

                                   Earl M. Forte (Pa. I.D. No. 48979)
                                   John E. Lucian (I.D. No. 92317)
                                   One Logan Square
                                   130 N. 18th Street
                                   Philadelphia, PA 19103
                                   (215) 569-5500
                                   (215) 569-5555 (fax)

**BLANK ROME LLP**
Joel C. Shapiro, Esquire
Shlomo Troodler, Esquire
Woodland Falls Corporate Park
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002
(856) 779-3600
Counsel for Arcus ASI Funding LLC

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**(CAMDEN VICINAGE)**

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ — X

In re:

Shapes/Arch Holdings L.L.C.,
Shapes L.L.C., Delair L.L.C., Accu-Weld
L.L.C., and Ultra L.L.C.,

                                Debtors.

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ — X

Case No. 08-14631
(Jointly Administered)

Chapter 11

Hearing Date and Time:
May 1, 2008 at 10:00 a.m. and
May 9, 2008 at 10:00 a.m.

**CERTIFICATE OF SERVICE**

I, Joel C. Shapiro, hereby certify that on 4/30/08 I caused a copy Arcus ASI Funding, LLC's (i)
Omnibus Response to the Objections to Debtors' Joint Disclosure Statement, (ii) Omnibus
Response to the Motions to Terminate Exclusivity, and (iii) Cross-Motion to Strike the Proposed
Plan of Arch Acquisition I, LLC to be served via First Class Mail upon the individuals listed
below.

                              _/s/ Joel C. Shapiro_____
                              Joel C. Shapiro, Esquire
                              Shlomo B. Troodler, Esquire
                              Woodland Falls Corporate Park
                              210 Lake Drive East, Suite 200
                              Cherry Hill, NJ  08002
                              (856) 779-3600
                              Counsel for Arcus ASI Funding LLC

123285.01601/11774135v.5

38

123285.01601/11774135v.5