GREENBERG TRAURIG, LLP
Alan J. Brody, Esquire
Diane E. Vuocolo, Esquire
200 Park Avenue
Post Office Box 677
Florham Park, New Jersey 07932 (973) 360-7900

Counsel for Arch Acquisition I, LLC

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| In re: | : | Case No. 08-14631 |
| | : | (Jointly Administered) |
| Shapes/Arch Holdings L.L.C. | : | |
| Shapes L.L.C., Delair L.L.C., Accu-Weld | : | Judge:  Gloria M. Burns |
| L.L.C., and Ultra L.L.C., | : | |
| | : | Chapter 11 |
| Debtors. | : | |
| | : | |

## FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e); (II) MODIFYING THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (III) GRANTING OTHER RELIEF

The relief set forth on the following pages numbered 2 through 48 is hereby ORDERED

AND GRANTED.

**DATED: 5/6/2008**

_____
Honorable Gloria M Burns
United States Bankruptcy Court Judge

This matter is before this Court upon the motion (the "**Motion**"), dated March 16, 2008, of Shapes/Arch Holdings, L.L.C. ("**Holdings**"), Shapes L.L.C. ("**Shapes**"), Delair L.L.C. ("**Delair**"), Accu-Weld L.L.C. ("**Accu-Weld**") and Ultra L.L.C. ("**Ultra**" and, together with Holdings, Shapes, Delair and Accu-Weld, collectively, the "**Debtors**" and each individually a "**Debtor**"), each as a debtor and debtor-in-possession in the above-captioned Chapter 11 cases (collectively, the "**Cases**"), pursuant to Sections 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), which Motion sought, among other things:

(1)    authorization and approval for the Debtors to obtain post-petition loans, advances and other financial accommodations (the "**Post-Petition Financing**") under or in connection with (a) a debtor-in-possession term loan facility (the "**Post-Petition Term Loan Facility**") in an amount up to the aggregate principal amount of $25 million at any time outstanding (the "**Post-Petition Term Loans**") (the actual available principal amount at any time being subject to those conditions set forth in the Post-Petition Term Loan Agreement (as defined below)) from Arcus ASI Funding, LLC (together with Arcus ASI, Inc. and Arcus ASI, LLC, "**Arcus**"), as agent (in such capacity, the "**Term Loan Agent**") for itself and a syndicate of financial institutions (together with Arcus, the "**Term Loan Lenders**") to be arranged by Arcus or affiliates thereof, and (b) a debtor-in-possession revolving credit facility (the "**Post-Petition Revolving Credit Facility**" and, together with the Post-Petition Term Loan Facility, the "**Post-Petition Facilities**") in an amount up to the aggregate principal amount of $60 million at any time outstanding (the "**Post-Petition Revolving Credit Loans**" and, together with the Post-Petition Term Loans, the "**Post-Petition Loans**") (the actual available principal amount at any time being subject to those conditions set forth in the DIP Revolving Credit Agreement and the

other Financing Agreements (in each case, as defined in the Final Revolving Credit Order (as defined below)) (collectively, the "**Post-Petition Revolving Credit Documents**") from The CIT Group/Business Credit, Inc. ("**CIT**"), as agent (in such capacity, the "**Revolving Credit Agent**" and, together with the Term Loan Agent, the "**Agents**"), for itself and lenders currently consisting of JPMorgan Chase Bank, N.A. and Textron Financial Corporation (together with CIT, the "**Revolving Credit Lenders**" and, together with the Term Loan Lenders, the "**Lenders**");

(2)     authorization and approval for the Debtors to execute and enter into the Post-Petition Financing Documents (as defined below) and to perform such other and further acts as may be required in connection with the Post-Petition Financing Documents;

(3)     the grant to each Agent, for the benefit of itself and the Lenders for which it acts as agent, of valid and perfected security interests and liens in and upon the Collateral (as defined below) pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code in accordance with the terms hereof and the terms of the Final Revolving Credit Order, with the priorities set forth herein and in the Final Revolving Credit Order;

(4)     the grant to each Agent, for the benefit of itself and the Lenders for which it acts as agent, of superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in accordance with the terms hereof and the terms of the Final Revolving Credit Order;

(5)     modification of the automatic stay to the extent set forth herein and in the Final Revolving Credit Order;

(6)     pursuant to Bankruptcy Rule 4001(c), that an interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of:

*Approved by Judge Gloria M. Burns May  06, 2008*

(a) the Interim Order (as defined below) (a) authorizing and granting approval for the Debtors, on an interim basis, to forthwith execute the Post-Petition Term Loan Documents (as defined below) and borrow from the Term Loan Lenders up to an aggregate principal amount at any time outstanding not to exceed $25 million to be used (i) to refinance the outstanding principal balance of the term loan under the Financing Agreement, dated as of December 30, 2003 (as amended, supplemented, extended or otherwise modified from time to time, the "**Pre-Petition Loan Agreement**"), by and among the Debtors (other than Holdings), the Revolving Credit Agent and the Revolving Credit Lenders, (ii) to refinance the balance of the PP&E Equity Collateral Borrowing Base Component under (and as defined in) the Pre-Petition Loan Agreement, and (iii) for working capital and other general corporate purposes of the Debtors (subject to any limitations of borrowings under the Post-Petition Term Loan Documents), and (b) granting the other relief described in the Interim Order; and

(b) an order (the "**Interim Revolving Credit Order**") (a) authorizing and granting approval for the Debtors, on an interim basis, to forthwith execute the Post-Petition Revolving Credit Documents and borrow or obtain letters of credit from the Revolving Credit Lenders under the Post-Petition Revolving Credit Documents up to an aggregate principal or face amount at any time outstanding not to exceed $60 million to be used (i) to refinance all amounts outstanding as of the Petition Date (as defined below) under the Pre-Petition Loan Agreement, to the extent not refinanced with the proceeds of the Post-Petition Term Loans as described above, and (ii) for working capital and other general corporate purposes of the Debtors (subject to any limitations of borrowings and issuances of letters of credit under the Post-Petition Revolving Credit Documents), including the deeming of all outstanding letters of credit issued under the Pre-Petition Loan Agreement (as defined below) to

constitute letters of credit issued under the Post-Petition Revolving Credit Agreement, and (b) granting the other relief described in the Interim Revolving Credit Order; and

(7)    that this Court schedule a final hearing (the "**Final Hearing**") to consider entry of:

(a)    this final order (the "**Final Order**") (a) authorizing and granting approval for the Post-Petition Term Loan Documents and the balance of the borrowings under the Post-Petition Term Loan Documents on a final basis, as set forth in the Motion and the Post-Petition Term Loan Documents, and (b) granting the other relief described in the Final Order; and

(b)    a final order (the "**Final Revolving Credit Order**") authorizing and approving (a) the Post-Petition Revolving Credit Documents and the balance of the borrowings and letter of credit issuances under the Post-Petition Revolving Credit Documents on a final basis, as set forth in the Motion and the Post-Petition Revolving Credit Documents, and (b) granting the other relief described in the Final Revolving Credit Order.

This Court having found that due and appropriate notice, under the circumstances, of the Motion, the relief requested therein, and the Final Hearing (the "**Notice**") has been served by the Debtors in accordance with Bankruptcy Rule 4001(c) on (i) the Agents and the Lenders, (ii) the United States Trustee for the District of New Jersey (the "**U.S. Trustee**"), (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates on a consolidated basis (but no less than the holders of the five (5) largest unsecured claims in each Case), (v) Halperin Battaglia Raicht, LLP and Cole, Schotz, Meisel, Forman & Leonard, P.A., co-counsel to the Creditors' Committee (as defined below); (iv) the Internal Revenue Service, (v) the New Jersey Attorney General, (vi) the Commonwealth of Pennsylvania Department of Revenue, (vii) all landlords and warehousemen of the Debtors, (viii) all parties who have filed UCC-1 financing statements

5

against the Debtors, or who, to the Debtors' knowledge, have asserted any liens on any of the

Debtors' assets, (ix) to any other party that has filed a request for notices with this court and (x)

certain other parties identified in the certificate of service filed with this Court (collectively, the

"**Noticed Parties**").

This Court having held the Interim Hearing on the Motion on March 18, 2008 and the

Final Hearing on May 1, 2008.

Upon the record made by the Debtors at the Interim Hearing and the Final Hearing,

including the Motion, and the filings and pleadings in the Cases, and pursuant to the agreement

of the parties, as set forth on the record at the Final Hearing, and good and sufficient cause

appearing therefor;

THIS COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

CONCLUSIONS OF LAW:

A.    <u>Petition</u>.  On March 16, 2008 (the "**Petition Date**"), each Debtor filed a

voluntary petition (the "**Petition**") under Chapter 11 of the Bankruptcy Code.  The

Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction of this proceeding and

the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The

Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).

Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408

and 1409.

C.    <u>Notice</u>.  Notice of the Motion, the relief requested therein, the Final

Hearing and proposed entry of this Final Order has been provided to the Noticed Parties.

Requisite notice of the Motion and the relief requested thereby and this Final Order has

been provided in accordance with Bankruptcy Rules 4001(c) and 9014, which notice is

sufficient for all purposes under the Bankruptcy Code, including, without limitation,

Sections 102(1) and 364 of the Bankruptcy Code, and no further notice of, or hearing on,

the Motion or this Final Order is necessary or required.

    D.  <u>Findings Regarding the Post- Petition Financing</u>.

    (i)  <u>Postpetition Financing</u>.   The Debtors have requested from the

Term Loan Agent and the Term Loan Lenders, and the Term Loan Agent and the Term Loan

Lenders are willing to continue to extend, the Post-Petition Term Loan Facility, as more

particularly described, and on the terms and conditions set forth, in the Interim Order, this Final

Order and the Post-Petition Term Loan Documents.

    (ii)  <u>Need for Post-Petition Financing</u>.   The Debtors do not have

sufficient available sources of working capital and liquidity to operate their businesses in the

ordinary course without the Post-Petition Financing, including the Post-Petition Term Loan

Facility.   The Debtors' ability to maintain business relationships with their vendors, suppliers

and customers, to pay their employees, to make capital expenditures and to otherwise fund their

operations is essential to the Debtors' continued viability.   The ability of the Debtors to obtain

sufficient working capital and liquidity through the Post-Petition Financing on the terms set forth

in the Post-Petition Financing Documents, this Final Order and the Final Revolving Credit Order

is vital to the preservation and maintenance of the going concern value of the Debtors and to a

successful reorganization of the Debtors.   Accordingly, the Debtors have an immediate need to

obtain the Post-Petition Financing, including the Post-Petition Term Loan Facility, in order to,

among other things, permit the orderly continuation of the operation of their businesses,

minimize the disruption of their business operations, manage and preserve the assets of the

*Approved by Judge Gloria M. Burns May  06, 2008*

Debtors' bankruptcy estates (as defined under Section 541 of the Bankruptcy Code, the "**Estates**") in order to maximize the recovery to all stakeholders of the Estates.

(iii)  <u>Interim Financing Order</u>.  On March 18, 2008, this Court entered the Interim Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) to Refinancing Certain Pre-Petition Secured Indebtedness; (ii) Modifying the Automatic Stay pursuant to 11 U.S.C. § 362; (III) Granting Other Relief; and (IV) Scheduling a Final Hearing pursuant to Bankruptcy Rule 4001(c) (the "**Interim Order**"), pursuant to which, among other things, (a) this Court originally scheduled the Final Hearing for April 3, 2008, (b) the Debtors were authorized to obtain post-petition loans and other financial accommodations from the Term Loan Agent and the Term Loan Lenders, in accordance with the terms and conditions of the Post-Petition Term Loan Documents, during the period commencing on March 18, 2008 through and including the originally scheduled date of the Final Hearing (the "**Interim Financing Period**"), (c) the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, was granted liens and security interests upon and in the Collateral (as defined in the Interim Order), with the priorities set forth therein and in the Interim Revolving Credit Order, as security for the Post-Petition Term Loan Obligations, and (d) the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, was granted a super-priority administrative claim as further security for the Post-Petition Term Loan Obligations as and to the extent set forth in the Interim Order.  Subsequent to entry of the Interim Order, this Court adjourned and continued the Final Hearing to May 1, 2008.  In connection with the adjournment and continuance of the Final Hearing, on request of the Debtors, and such request having been agreed to by the Term Loan Agent, this Court extended the Interim Financing Period to May 5, 2008 at 5:00 p.m. (Eastern Time) by entry of certain

bridge orders dated April 9, 2008, April 10, 2008 and April 23, 2008, and the "So Ordered" record of the Final Hearing of May 1, 2008, respectively.

(iv)    <u>No Credit Available on More Favorable Terms</u>. The Debtors are unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on all or substantially all of the Debtors' assets pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code. The Debtors have been unable to procure the necessary financing on terms more favorable than the financing offered by the Agents and the Lenders pursuant to the Post-Petition Financing Documents, this Final Order and the Final Revolving Credit Order.

(v)    <u>Budget</u>. The Debtors have prepared and delivered to the Term Loan Agent and the Term Loan Lenders the Budget (as defined in the Post-Petition Term Loan Agreement and including any amendments to the Budget). The Budget has been thoroughly reviewed by the Debtors and their management and sets forth, among other things, the projected cash receipts and disbursements for the periods covered thereby. The parties are amending the Budget and anticipate finalizing the amended Budget by May 9, 2008. The Debtors believe in good faith that the Budget is achievable and will allow the Debtors to operate in Chapter 11 without the accrual of unpaid administrative expenses during the term of the Budget. The Term Loan Agent and the Term Loan Lenders have relied, and are continuing to rely, upon the Debtors' compliance with the Budget, as will be amended, in determining to enter into the Post-Petition Term Loan Documents and to provide the Post-Petition Term Loan Facility.

(vi)    <u>Good Faith Pursuant to Section 364(e)</u>. Based on the record before the Court, the Term Loan Agent and the Term Loan Lenders are extending financing to the

Debtors in good faith and, therefore, each of the Term Loan Agent and the Term Loan Lenders are entitled to the benefits of the provisions of Section 364(e) of the Bankruptcy Code.  Based on the record before the Court, the terms of the Post-Petition Term Loan Documents (as defined below) by and between the Debtors, the Term Loan Agent and the Term Loan Lenders, as applicable, pursuant to which the post-petition loans, advances or other financial and credit accommodations have been and will be made, extended and provided by the Term Loan Agent and Term Loan Lenders for all purposes in good faith, as that term is defined in Section 364(e) of the Bankruptcy Code, and are in the best interest of the Debtors, their estates and their creditors, and provide each of the Debtors with reasonably equivalent value and fair consideration for all purposes under the Bankruptcy Code and other applicable law.

(vii)    <u>Good Cause</u>.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (a) minimize disruption to the Debtors' businesses and on-going operations, (b) preserve and maximize the value of the Debtors' Estates for the benefit of all of the Debtors' creditors, and (c) avoid immediate and irreparable harm to the Debtors, their stakeholders, their businesses, their employees, and their assets.

(viii)    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).  The objections to the relief sought in the Motion or the entry of this Final Order by the Committee and Arch (as defined below) are resolved by the terms of this Final Order and other objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

*Approved by Judge Gloria M. Burns May  06, 2008*

E.    <u>Creditors' Committee</u>.  On March 31, 2008, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "**<u>Creditors' Committee</u>**") in accordance with Section 1102 of the Bankruptcy Code.

F.    <u>Final Hearing</u>.  Prior to the Final Hearing, objections to the relief requested were filed by the Creditors' Committee, the U.S. Trustee, Arch (as defined below) and other parties, and responses to all the same were filed by Arcus disputing and denying the allegations contained therein in their entirety. At the Final Hearing, the parties, without ceding their respective positions, advised the Court of their intention to resolve all matters raised in such objections, such resolution being embodied in the provisions of this Final Order.

G.    <u>Assignment Agreement</u>.  Subject to the entry of this Final Order and subject to the satisfaction of the conditions set forth in the Assignment Agreement, Arcus, in its capacities as a Term Loan Lender and Term Loan Agent, has agreed, against payment of the purchase price described in the Assignment Agreement (as defined below), to irrevocably delegate and assign (the "**<u>Assignment</u>**") to Arch Acquisition I, LLC ("**<u>Arch</u>**"), and Arch has agreed to irrevocably assume, all of Arcus' Commitments (as defined in the Post-Petition Term Loan Agreement) and all of Arcus' rights, duties and obligations under and in connection with the Post-Petition Term Loan Documents and the Intercreditor Agreement (as defined in the Post-Petition Term Loan Agreement).  The Assignment will be effective pursuant to the Assignment and Acceptance Agreement in the form attached as **<u>Exhibit 1</u>** to this Final Order, dated the date hereof, by and among Arcus (in its various capacities), Arch and the Debtors (the "**<u>Assignment Agreement</u>**"), upon satisfaction of the conditions set forth therein.

H.    <u>Amended and Restated Agreement</u>.  After the effectiveness of the Assignment Agreement, Arch has agreed to amend and restate the Post-Petition Term Loan Agreement into the form attached as **<u>Exhibit 2</u>** to this Final Order with such other material

11

*Approved by Judge Gloria M. Burns May  06, 2008*

changes as are agreed to by the Debtors, Arch, the Revolving Credit Agent and the Creditors'

Committee (the "**Revised Post-Petition Term Loan Agreement**").  Upon effectiveness of the

Revised Post-Petition Term Loan Agreement, all references to Post-Petition Term Loan

Agreement contained herein shall be deemed to refer to the Revised Post-Petition Term Loan

Agreement and, without limiting the rights and protections in favor of Arcus referred to in

Section 1.1 of this Final Order, all references to Term Loan Agent and Term Loan Lenders

contained herein shall be deemed to refer to Arch, as Arcus' assignee in such capacities.

I.      Plan.   On or prior to May 12, 2008, the Debtors shall file a Plan of

Reorganization with Arch as the plan funder (the "**Plan**") substantially in the form attached as

**Exhibit 3** to this Final Order (provided, however, that the Debtors have not agreed to the

provisions of the plan that provides the Creditor's Committee with certain consent rights with the

parties expressly reserving all rights with respect to such provisions).

J.      Nature of Findings and Conclusions.  If any of the foregoing findings of

fact are more properly characterized as conclusions of law, such purported findings of fact shall

be deemed to be conclusions of law, and if any of the foregoing conclusions of law are more

properly characterized as findings of fact, such purported conclusions of law shall be deemed to

be findings of fact.  Any findings of fact or conclusions of law contained in the Interim Order or

this Final Order are hereby incorporated herein by reference.

Based upon the foregoing, and after due consideration and good cause appearing

therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.      Authorization and Conditions to Financing.

1.1      Motion Granted.  The Motion is granted in accordance with Bankruptcy

Rule 4001(c)(2) to the extent provided in this Final Order and the Final Revolving Credit Order.

This Final Order shall immediately become effective upon its entry.  Upon satisfaction of the conditions precedent set forth in the Assignment Agreement, Arch shall be substituted in place of Arcus in all capacities under the Post-Petition Term Loan Agreement, the Post-Petition Term Loan Documents and this Final Order, except that Arcus shall continue to benefit from (a) all findings of fact and conclusions of law contained in this Final Order, and (b) the following provisions of this Final Order shall hereafter continue to benefit Arcus:  Section 1.3.5, Section 4.3, Section 4.5, Section 5.1, Section 5.6.1, Section 5.6.3, Section 6 and Section 8 (it being agreed that both Arcus and Arch shall hereafter continue to benefit from Section 1.3.5, Section 4.3, Section 4.5, Section 5.1, Section 5.6.1, Section 5.6.3 and Section 6).  Thereafter, except as set forth in the preceding sentence, all protections of the Final Order and the Post-Petition Term Loan Documents shall be in favor of Arch.  For avoidance of doubt, (i) all the releases and other protections granted pursuant to the Interim Order shall continue to be in favor of Arcus and the Releasees (as defined therein) and are not being assigned pursuant to the Assignment Agreement, and (ii) notwithstanding anything to the contrary contained herein, in no circumstances shall Arcus or its affiliates have any obligation to provide any financing to the Debtors upon or after entry of this Final Order (or be bound by any modifications to its rights and remedies or obligations set forth in the Interim Order, including, without limitation, in respect of the Carve-Out Expenses, in the event that Arch fails to pay the purchase price under the Assignment Agreement).  The Assignment Agreement is approved in all respects and the Debtors are hereby authorized and empowered to enter into and perform their obligations under the Assignment Agreement.

      1.2    Authorization to Borrow and Use of Loan Proceeds.  The Debtors are hereby authorized and empowered to continue to borrow and obtain loans and to incur indebtedness and obligations (including, without limitation, the "Obligations" under (and as

*Approved by Judge Gloria M. Burns May  06, 2008*

defined in) the Post-Petition Term Loan Agreement) owing to the Term Loan Agent and the Term Loan Lenders (collectively, the "**Post-Petition Term Loan Obligations**"), on a joint and several basis, on the terms and subject to the conditions set forth in the Post-Petition Term Loan Documents and this Final Order, in such amounts as may be made available to the Debtors by the Term Loan Agent and the Term Loan Lenders in accordance with all of the terms and conditions set forth in the Post-Petition Term Loan Documents.  Subject to the terms and conditions contained in the Post-Petition Term Loan Documents and this Final Order, the Debtors shall use the proceeds of the loans and any other financial accommodations provided pursuant to the Post-Petition Term Loan Documents solely for the purposes set forth in the Post-Petition Term Loan Documents, the Intercreditor Agreement and this Final Order.[1]  The Post-Petition Term Loan Obligations and the Revolving Credit Obligations (as defined in the Final Revolving Credit Order) are sometimes collectively referred to herein as the "**Obligations**".

      1.3     _Financing Agreements_.

      1.3.1    _Authorization_.  The Debtors are hereby authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the Debtor-in-Possession Term Loan Financing Agreement, dated as of March 18, 2008 (as amended, supplemented, extended or otherwise modified from time to time, including, but not limited to the Revised Post-Petition Term Loan Agreement, the "**Post-Petition Term Loan Agreement**"), the Revised Post-Petition Term Loan Agreement, and all other agreements, documents and instruments executed or delivered with, to, or in favor of the Term Loan Agent

---

[1] Notwithstanding any approval by the Term Loan Agent and the Term Loan Lenders of the Budget (or, in their sole discretion, any amended Budget(s)), the Term Loan Agent and the Term Loan Lenders will not, and shall not be required to, provide any loans or other financial accommodations pursuant to the Budget or to fund any specific expenses or disbursements set forth in the Budget, but shall only provide loans and other financial accommodations pursuant to the terms and conditions set forth in the Post-Petition Term Loan Documents and this Final Order.  The inclusion of this provision in this Final Order is not intended to affect any applicable rights of the Revolving Credit Agent under the Intercreditor Agreement (as defined below).

*Approved by Judge Gloria M. Burns May  06, 2008*

and the Term Loan Lenders from time to time, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Post-Petition Term Loan Agreement, as amended, supplemented, extended or otherwise modified from time to time, collectively, the "**Post-Petition Term Loan Documents**" and, together with the Post-Petition Revolving Credit Documents, collectively, the "**Post-Petition Financing Documents**"), each of which shall constitute valid, binding, enforceable and non-avoidable obligation of the Debtors and their Estates in accordance with its terms for all purposes during the Cases, any subsequently converted case of any Debtor under Chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of any Case.  The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of all additional agreements, instruments and documents, as the Term Loan Agent may reasonably require from time to time as evidence of and for the protection of the Post-Petition Term Loan Obligations and the Collateral or which may be otherwise deemed necessary by the Term Loan Agent to effectuate the terms and conditions of this Final Order and the Post-Petition Term Loan Documents.

      1.3.2    <u>Approval</u>.  The Post-Petition Term Loan Documents and each term set forth therein are approved, and the terms of the Post-Petition Term Loan Agreement and Revised Post-Petition Term Loan Agreement, are incorporated into this Final Order by this reference as if more fully set forth herein.  All of the terms, conditions and covenants set forth in the Post-Petition Term Loan Documents shall be sufficient and conclusive evidence of the financing arrangements by and among the Debtors, the Term Loan Agent and the Term Loan Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the Post-Petition Term Loan Documents for all purposes, including, without

*Approved by Judge Gloria M. Burns May  06, 2008*

limitation, to the extent applicable, the payment of all Post-Petition Term Loan Obligations, including, without limitation, all principal, interest, fees set forth in <u>Section 9</u> of the Post-Petition Term Loan Agreement, indemnities, reasonable costs and expenses, including, without limitation, all of the Term Loan Agent's and the Term Loan Lenders' reasonable attorneys' and other professionals' fees and expenses, in each case, in accordance with and as more fully set forth in the Post-Petition Term Loan Documents, subject to the limitations and conditions set forth in this Final Order.  Without limiting the generality of the foregoing, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse the Term Loan Agent and the Term Loan Lenders, in accordance with and as more fully set forth in the Post-Petition Term Loan Documents, for all costs and expenses paid or incurred by the Term Loan Agent and the Term Loan Lenders in connection with the Post-Petition Financing (subject to the effectuation of the Assignment set forth in <u>Section G</u> of this Final Order), all of which shall be and are included as part of the principal amount of the applicable Post-Petition Term Loan Obligations and secured by the Collateral.

        1.3.3   <u>Amendment</u>.   Subject to the terms and conditions of the Post-Petition Term Loan Documents and the Intercreditor Agreement (as defined below), the Debtors and the Term Loan Agent and the Term Loan Lenders may amend, modify, supplement or waive any provision of the such Post-Petition Term Loan Documents (an "**<u>Amendment</u>**") without further approval or order of this Court; <u>provided</u> that (a) any such Amendment must be in writing and served upon (i) the Revolving Credit Agent, (ii) the U.S. Trustee and (iii) counsel to the Creditors' Committee; and (b) any such Amendment that operates to increase the interest rate (other than as currently provided in the Post-Petition Term Loan Agreement), increase the aggregate loan commitment amounts available under the Post-Petition Term Loan Documents, shorten the scheduled maturity date under the Post-Petition Term Loan Documents, add specific

new events of default or enlarge the nature and extent of default remedies available to the Term

Loan Agent and the Term Loan Lenders following an event of default must be filed with this

Court and served upon the parties described in the preceding clause (a), and such parties shall

have 5 days to object to such Amendment (and if no such party objects to such Amendment

within such time frame, it shall immediately become effective).

       1.3.4   <u>Increased Availability</u>.   Arch, as Post-Petition Term Lender, has

agreed to increase the Term Loan Facility Amount (as defined in the Post-Petition Term Loan

Agreement) up to $30,000,000 aggregate principal amount (the "**Commitment Increase**").   In

the event any party in interest has any objection to such Commitment Increase, such party in

interest shall serve and file written objections, which objections shall be served upon (i) counsel

for the Debtors, Cozen O'Conner, LLP, Liberty View, Suite 300, 457 Haddonfield Road, Cherry

Hill, New Jersey 08002, Attention: Mark E. Felger, Esquire; (ii) counsel for the Revolving Credit

Agent, Stradley Ronen Stevens & Young, LLP, 2600 One Commerce Square, Philadelphia,

Pennsylvania 19103, Attention:  Paul A. Patterson, Esquire; (iii) counsel for Arch, Greenberg

Traurig, LLP, Met Life Building, 200 Park Avenue, New York, New York 10186, Attention:

Nancy A. Mitchell, Esquire; (iv) counsel for the Creditors' Committee, Halperin Battaglia

Raicht, LLP 555 Madison Avenue, 9th Floor, New York, New York 10022, Attention:  Alan D.

Halperin, Esq. and Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main

Street, P.O. Box 800, Hackensack, NJ 07602-0800 Attention: Michael Sirota, Esq.; and (v) the

U.S. Trustee; and shall file with the Clerk of the United States Bankruptcy Court for the District

of New Jersey, in each case, to allow receipt of the foregoing, no later than May 12, 2008 at 4:00

p.m. prevailing Eastern time.

       In the event an objection is timely served and filed as set forth above, the

Court shall hold a hearing to consider the objection and the Commitment Increase on May 19,

*Approved by Judge Gloria M. Burns May  06, 2008*

2008 at 2:00 p.m.   In the event no objections are timely served and filed, the Commitment

Increase is approved in full.

        1.3.5   <u>Interim Order</u>.  Unless expressly modified by this Final Order, the

findings, authorizations, protections and provisions contained in the Interim Order remain in full

force and effect.

        1.3.6   In the event the Term Loan Agent and the Term Loan Lenders are

required to provide funding or other financial accommodations to the Debtors subsequent to the

entry of this Final Order and the effectiveness of the Assignment but prior to the closing of the

Post-Petition Loan Documents, as amended by the Revised Post-Petition Loan Agreement, then

the Term Loan Agent and Term Loan Lenders will be providing such funding or other financial

accommodations under the Post-Petition Term Loan Documents and the Final Order and, in such

event, the Revolver Agent and the Revolver Lenders shall also be deemed to be governed by the

Post-Petition Loan Documents and Final Order without effect of the Revised Post-Petition Loan

Agreement.

**Section 2.**      <u>Collateral and Superpriority Administrative Claim Status</u>.

      2.1    <u>Collateral</u>.

        2.1.1   <u>Lien Grant</u>.

         a.    For purposes hereof, (i) the "**Revolver Senior Collateral**"

and the "**Term Senior Collateral**" shall have the meanings set forth in Exhibit 2 to the

Final Revolving Credit Order, and (ii) "**Collateral**" shall mean, collectively, the Revolver

Senior Collateral and the Term Senior Collateral.

         b.    To secure the prompt payment and performance of any and

all Post-Petition Term Loan Obligations of whatever kind, nature or description, absolute

or contingent, now existing or hereafter arising, the Term Loan Agent, for the benefit of

*Approved by Judge Gloria M. Burns May  06, 2008*

itself and the Term Loan Lenders, shall continue to have and is granted, effective as of the Petition Date, (i) valid and perfected first priority security interests and liens in and upon all of the Term Senior Collateral, superior to all other presently existing and future liens, security interests, claims or interests in property that any creditor of any Debtor's Estate may have in and upon any such Collateral pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, but subject in the case of priority only to the applicable Permitted Liens and Claims (as defined below), as and to the extent expressly provided in <u>Section 2.1.2</u> below, and (ii) valid and perfected second priority security interests and liens in and upon all of the Revolver Senior Collateral, superior to all other presently existing and future liens, security interests, claims or interests in property that any creditor of any Debtor's Estate may have in and upon any such Collateral pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, but subject in the case of priority only to (y) the first priority security interests and liens in and upon the Revolver Senior Collateral in favor of the Revolving Credit Agent, for the benefit of itself and the Revolving Credit Lenders, granted pursuant to the Final Revolving Credit Order as security for the Revolving Credit Obligations (the "**<u>Revolving Credit Facility Liens</u>**"), and (z) the other applicable Permitted Liens and Claims (as defined below), as and to the extent expressly provided in <u>Section 2.1.2</u> below.

2.1.2    <u>Lien Priority</u>.  The post-petition liens and security interests of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, granted under the Post-Petition Term Loan Documents, the Interim Order and this Final Order in the Collateral shall be and shall continue to be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of this Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction

with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law;

provided, however, that the liens on and security interests in the Collateral of the Term Loan

Agent, for the benefit of itself and the Term Loan Lenders, shall be subject in the case of priority

only to (a) the Permitted Encumbrances (as defined in the Post-Petition Term Loan Agreement),

including in the case of the Revolver Senior Collateral only, the Revolving Credit Facility Liens,

(b) the Carve Out Expenses (as defined below) solely to the extent provided for in Sections 2.3,

2.4 and 2.5 of this Final Order, and (c) any valid, duly perfected and non-avoidable purchase

money security interest liens or real estate tax liens that existed as of the Petition Date, but only

to the extent of (and the value of any collateral securing) any such liens (the items described in

foregoing clauses (a), (b) and (c) are sometimes collectively referred to in this Final Order as the

"**Permitted Liens and Claims**").  Without limiting the generality of the foregoing, the post-

petition liens and security interests of the Term Loan Agent, for the benefit of itself and the Term

Loan Lenders, granted under the Post-Petition Term Loan Documents, the Interim Order and this

Final Order in the Collateral shall not be subject or subordinate to any lien or security interest

that is avoided and preserved for the benefit of the Debtors and their Estates pursuant to Section

551 of the Bankruptcy Code.

      2.1.3   Post-Petition Lien Perfection.  This Final Order shall be sufficient

and conclusive evidence of the priority, perfection and validity of the post-petition liens and

security interests granted herein, effective as of the Petition Date, without any further act and

without regard to any other federal, state or local requirements or law requiring notice, filing,

registration, recording or possession of the Collateral, or other act to validate or perfect such

security interest or lien, including without limitation, control agreements with any financial

institution(s) holding any deposit account of any Debtor (a "**Perfection Act**").  Notwithstanding

the foregoing, if the Term Loan Agent shall, in its sole discretion, elect for any reason to file,

record or otherwise effectuate any Perfection Act, the Term Loan Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by the Term Loan Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Final Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. The Term Loan Agent may choose to file, record or present a certified copy of this Final Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Final Order in accordance with applicable law.  Should the Term Loan Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Final Order.

2.1.4   Nullifying     Restrictions     to     Post-Petition     Financing. Notwithstanding anything to the contrary contained in any agreement, contract, lease, document, note or instrument to which any Debtor is or becomes a party or under which any Debtor is or becomes obligated, any provision that restricts, limits or impairs in any way any Debtor from granting the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party), or otherwise entering into and complying with all of the terms, conditions and provisions hereof or the Post-Petition Term Loan Documents (all such provisions being collectively referred to as the "**Restrictive Clauses**") shall not (i) be effective or

enforceable against any such Debtors, the Term Loan Agent or the Term Loan Lenders, or (ii) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, pursuant to this Final Order, the Post-Petition Term Loan Documents or otherwise, to the maximum extent permitted under the Bankruptcy Code and other applicable law. Such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by any Debtor (or by the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, pursuant to the provisions contained in this Final Order), or in any way impair or limit the ability or right of any Debtor (or by the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, on behalf of any Debtor, pursuant to the provisions contained in this Final Order) to assume and/or assign any contract or lease under Sections 365 or 1123 of the Bankruptcy Code.

      2.1.5   <u>After-Acquired Property</u>.   Pursuant to Section 552(a) of the Bankruptcy Code, no property acquired by the Debtors after the Petition Date is or will be subject to any security interest or lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date, except (a) to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable security interest or lien as of the Petition Date which is not subject to subordination under Section 510(c) of the Bankruptcy Code or other provisions or principles of applicable law, or (b) as set forth in the Final Revolving Credit Order.

      2.1.6   <u>Insurance Policies</u>.   Upon entry of this Final Order, the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall be, and shall be deemed to be, without any further action or notice, named as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the Collateral. The

*Approved by Judge Gloria M. Burns May 06, 2008*

Debtors are authorized and directed to take any action necessary to have the Term Loan Agent added as an additional insured and loss payee on each insurance policy.

      2.2   <u>Superpriority Administrative Expense</u>.  To secure the prompt payment and performance of any and all Post-Petition Term Loan Obligations of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall continue to have and is granted an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, whether now in existence or hereafter incurred by the Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, <u>inter alia</u>, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code (the "**Superpriority Claim**"), whether or not such administrative expenses or priority claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claim shall be payable from and have recourse to all pre and post-petition property of the Debtors or their Estates and all proceeds thereof, except the Avoidance Actions and proceeds thereof; <u>provided</u>, <u>however</u>, that, the Superpriority Claim shall be subject only to the Carve Out Expenses to the extent expressly set forth in this Final Order and shall not extend to Avoidance Actions and the proceeds thereof. The Superpriority Claim of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, shall be <u>pari passu</u> with the superpriority claim of the Revolving Credit Agent, for the benefit of itself and the Revolving Credit Lenders, granted pursuant to the Final Revolving Credit Order (both such Superpriority Claims, collectively, the "**Superpriority Claims**").

      2.3   <u>Carve Out Expenses</u>.

*Approved by Judge Gloria M. Burns May  06, 2008*

2.3.1   <u>Carve Out Expenses</u>.  The liens, claims and security interests in the Collateral in favor of the Agents and the Lenders and the Superpriority Claims, shall be subject only to the right of payment of the following expenses (the "**Carve Out Expenses**"):

a.      statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

b.      fees payable to the Clerk of this Court; and

c.      subject to the terms and conditions of this Final Order, the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of this Court pursuant to Sections 326, 328, 330, or 331 of the Bankruptcy Code (collectively, the "**Allowed Professional Fees**"), by attorneys, accountants and other professionals retained by the Debtors and the Creditors' Committee under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**"), in a cumulative, aggregate sum not to exceed: (a) prior to the occurrence of an Event of Default that has not been waived in writing by the Term Loan Agent and the Term Loan Lenders, the Allowed Professional Fees incurred prior to the occurrence of an Event of Default (whether then or subsequently allowed) to the extent such Allowed Professional Fees were provided for in the Budget (the "**Pre-Default Professional Fee Carve Out**") and (b) after the occurrence of an Event of Default that has not been waived in writing by the Term Loan Agent and the Term Loan Lenders, $1,000,000 (including a Chapter 7 Trustee and his professionals in the event the cases are converted to Chapter 7)(the "**Post-Default Professional Fee Carve Out**" and, together with the Pre-Default Professional Fee Carve-Out, collectively, "**Professional Fee Carve Out**").

*Approved by Judge Gloria M. Burns May  06, 2008*

Effective on a retroactive basis to the date of entry of the Interim Order, in exchange for the Professional Fee Carve Out, all parties entitled to be paid therefrom shall not be entitled, directly or indirectly, to charge the Collateral whether by operation of Sections 105, 506(c) or 552(b) of the Bankruptcy Code or otherwise.

2.3.2   <u>Excluded Professional Fees</u>.   Notwithstanding anything to the contrary in this Final Order, neither the Carve Out Expenses nor the proceeds of any loans or Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:  (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations or the Agents' and the Lenders' liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations or the Agents' and the Lenders' liens on and security interests in the Collateral, or (iii) preventing, hindering or delaying the Agents' or the Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Final Order or the Final Revolving Credit Order, (b) a request to use the Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code), (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than the Post-Petition Financing, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against either Agent, any Lender or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from such Agent or any Lender under Chapter 5 of the Bankruptcy Code, or (e) any act

which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of either Agent or any Lender, or which is contrary, in a manner that is material and adverse to either Agent or any Lender, to any term or condition set forth in or acknowledged by the Post-Petition Financing Documents, the Interim Order, the Interim Revolving Credit Order, this Final Order or the Final Revolving Credit Order or which results in the occurrence of an Event of Default; provided, however, that an amount not to exceed $50,000 in the aggregate of the Post-Petition Facilities may be used to pay the Allowed Professional Fees of the Creditors' Committee to investigate claims against and objections with respect to the Pre-Petition Debt (as defined in the Final Revolving Credit Order) and pre-petition liens and security interests of the Revolving Credit Agent and the Revolving Credit Lenders (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Revolving Credit Agent and the Revolving Lenders), including formal discovery proceedings in connection therewith.

2.4    Carve Out Reserve.  At the Term Loan Agent's sole discretion, the Term Loan Agent may at any time establish (and adjust) a reserve against the amount of loans or other credit accommodations that would otherwise be made available to the Debtors pursuant to the Post-Petition Term Loan Agreement in respect of the Pre-Default Professional Fee Carve Out and the other Carve Out Expenses.  Without duplication, in its sole discretion, the Term Loan Agent may elect from time to time to fund, from the proceeds of loans under the Post-Petition Term Loan Agreement, a cash reserve in respect of the Pre-Default Professional Fee Carve Out and the other Carve Out Expenses (and, upon any such election, the Debtors shall be deemed to have made one or more loan requests from time to time in the amount necessary to fund such cash reserve).

*Approved by Judge Gloria M. Burns May  06, 2008*

2.5    Payment of Carve Out Expenses.

2.5.1    The Debtors shall be permitted to pay to the Professionals compensation and reimbursement of expenses that accrued prior to the occurrence of an Event of Default and in the ordinary course of the Debtors' business, and that are otherwise allowed and payable under Section 328, 330 and 331 of the Bankruptcy Code and any interim procedures order, as the same may be due and payable, but subject in any event to the amounts specified therefor in the Budget.

2.5.2    To the extent that the Term Loan Agent and the Term Loan Lenders elect to directly fund or otherwise pay the Pre-Default Professional Fee Carve Out or the other Carve Out Expenses, such amounts shall be added to and made a part of the Post-Petition Term Loan Obligations, secured by the Collateral, and entitle the Term Loan Agent and the Term Loan Lenders to all of the rights, claims, liens, priorities and protections under this Final Order, the Post-Petition Term Loan Documents, the Bankruptcy Code or applicable law.  To the extent that the Term Loan Agent and the Term Loan Lenders fund or otherwise pay the Post-Default Professional Fee Carve Out and other Carve Out Expenses post-Event of Default, such amounts shall be added to and made a part of the Term Loan Agent's and Term Loan Lenders' Superpriority Claim.  Payment of any Carve Out Expenses, whether by or on behalf of the Term Loan Agent or any Term Loan Lender, shall not and shall not be deemed to reduce the Post-Petition Term Loan Obligations, and shall not and shall not be deemed to subordinate any of the Term Loan Agent's and the Term Loan Lenders' liens and security interests in the Collateral or their Superpriority Claim to any pre- or post-petition lien, interest or claim in favor of any other party.  The Term Loan Agent and the Term Loan Lenders shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Cases or under any chapter of the Bankruptcy Code

27

(other than to turnover proceeds of the Collateral or the Superpriority Claim actually received by the Term Loan Agent or any Term Loan Lender following an Event of Default), and nothing in Section 2.3, 2.4, 2.5 or 2.6 of this Final Order shall, or shall be construed to, obligate the Term Loan Agent or any Term Loan Lenders in any way, to pay compensation to or to reimburse expenses of any Professional (other than as set forth in the preceding parenthetical), or to ensure that the Debtors have sufficient funds to pay such compensation or reimbursement other than with respect to the Post-Default Professional Fee Carve Out.

2.5.3    For avoidance of doubt, it is understood that the Professional Fee Carve Out referred to in this Final Order is the only "professional fee carve out" available in the Cases, i.e., no "professional fee carve out" is or will be available under the Final Revolving Credit Order and the Revolving Credit Facility Liens in the Revolver Senior Collateral are not and will not be subject to any "professional fee carve out".

Section 3.    Default; Rights and Remedies; Relief from Stay.

3.1    Events of Default.  The occurrence of any of the following events shall constitute an "**Event of Default**" under this Final Order:

a.    Any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under this Final Order; or

b.    Any "Event of Default" under (and as defined in) the Final Revolving Credit Order; or

c.    Any "Event of Default" under (and as defined in) any of the Post-Petition Term Loan Documents.

3.2    Rights and Remedies Upon Event of Default.  Upon the occurrence of and during the continuance of an Event of Default, (i) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Final Order and the Post-Petition Term Loan

Documents, and (ii) the Term Loan Agent shall be entitled to take any act or exercise any right or remedy as provided in this Final Order and the Post-Petition Term Loan Documents, including, without limitation, (v) declaring all Post-Petition Term Loan Obligations immediately due and payable, (w) accelerating the Post-Petition Term Loan Obligations, (x) ceasing to extend loans or other financial accommodations to or on behalf of the Debtors, (y) subject to <u>Section 3.4</u> below, setting off any Post-Petition Term Loan Obligations under the Post-Petition Term Loan Documents with Collateral or proceeds in the Term Loan Agent's or any Term Loan Lender's possession, and (z) subject to <u>Section 3.4</u> below, enforcing any and all rights with respect to the Collateral.   Upon the occurrence and during the continuance of an Event of Default and the exercise by the Term Loan Agent of its rights and remedies under the Post-Petition Term Loan Documents, the Debtors shall assist the Term Loan Agent in effecting any sale or other disposition of the Collateral required by the Term Loan Agent, including any sale of Collateral pursuant to Section 363 of the Bankruptcy Code or assumption and assignment of Collateral consisting of contracts and leases pursuant to Section 365 of the Bankruptcy Code, in each case, upon such terms that are designed to maximize the proceeds obtainable from such sale or other disposition and otherwise acceptable to the Term Loan Agent.   The Term Loan Agent and the Term Loan Lenders shall have no obligation to lend or advance any additional funds to or on behalf of the Debtors, or provide any other financial accommodations to the Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

   3.3  <u>Expiration of Commitment</u>.   Upon the expiration of the Debtors' authority to borrow and obtain other financial accommodations from the Term Loan Agent and the Term Loan Lenders pursuant to the terms of this Final Order and the Post-Petition Term Loan

*Approved by Judge Gloria M. Burns May  06, 2008*

Documents (except if such authority shall be extended with the prior written consent of the Term

Loan Agent, which consent shall not be implied or construed from any action, inaction or

acquiescence by the Term Loan Agent or any Term Loan Lender), unless an Event of Default set

forth in <u>Section 3.1</u> above occurs sooner and the automatic stay has been lifted or modified

pursuant to <u>Section 3.4</u> of this Final Order, all of the Post-Petition Term Loan Obligations shall

immediately become due and payable and the Term Loan Agent and the Term Loan Lenders

shall be automatically and completely relieved from the effect of any stay under Section 362 of

the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security

interests in the Collateral or any other rights granted to the Term Loan Agent and the Term Loan

Lenders pursuant to the terms and conditions of the Post-Petition Term Loan Documents or this

Final Order, and the Term Loan Agent, acting on behalf of itself and the Term Loan Lenders,

shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies

provided to it in this Final Order, the Post-Petition Term Loan Documents or applicable law

which the Term Loan Agent may deem appropriate and to proceed against and realize upon the

Collateral or any other property of the Debtors' Estates.

   3.4 <u>Relief from Automatic Stay</u>.  The automatic stay provisions of Section 362

of the Bankruptcy Code and any other restriction imposed by an order of this Court or applicable

law are hereby modified and vacated without further notice, application or order of this Court to

the extent necessary to permit the Term Loan Agent and the Term Loan Lenders to perform any

act authorized or permitted under or by virtue of this Final Order or the Post-Petition Term Loan

Documents, including, without limitation, (a) to implement the Post-Petition Financing

arrangements authorized by this Final Order and pursuant to the terms of the Post-Petition Term

Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien,

security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance,

*Approved by Judge Gloria M. Burns May  06, 2008*

deduct and receive payments with respect to the Post-Petition Term Loan Obligations under the Post-Petition Term Loan Documents, including, without limitation, all interests, fees, costs and expenses under such Post-Petition Term Loan Documents, and apply such payments to such Post-Petition Term Loan Obligations pursuant to the Post-Petition Term Loan Documents and this Final Order.   In addition and without limiting the foregoing, without further notice, application or order of this Court, upon the occurrence and during the continuance of an Event of Default, and after providing five (5) business days' prior written notice thereof (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Revolving Credit Agent, counsel for the Creditors' Committee, and the U.S. Trustee, the Term Loan Agent, acting on behalf of itself and the Term Loan Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Final Order, the Post-Petition Term Loan Documents or applicable law as the Term Loan Agent may deem appropriate in its sole discretion to, among other things, proceed against and realize upon the Collateral or any other assets or properties of the Debtors' Estates upon which the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible payment of all Post-Petition Term Loan Obligations under the Post-Petition Term Loan Documents.

Section 4.      Representations; Covenants; and Waivers.

4.1      Objections to Pre-Petition Obligations.  Section 6 of the Final Revolving Credit Order is incorporated into this Final Order as if more fully set forth in this Final Order. Section 6 of the Final Revolving Credit Order shall not be modified without the prior written consent of the Term Loan Agent (and no such consent shall be implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

31

4.2    <u>Debtors' Waivers</u>.    Irrespective of whether an Event of Default has occurred, unless otherwise consented to by the Term Loan Agent in writing in advance (and no such consent shall be implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender), the Debtors irrevocably waive (a) any right to seek any modifications or extensions of this Final Order; and (b) any right that they may have to seek authority (i) to use Cash Collateral (as such term is defined in Section 363 of the Bankruptcy Code) of the Term Loan Agent and the Term Loan Lenders under Section 363 of the Bankruptcy Code; (ii) to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than the Post-Petition Financing; (iii) to challenge the use of proceeds or the application of any payments authorized by the Interim Order, the Interim Revolving Credit Order, this Final Order and the Final Revolving Credit Order; (iv) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full and satisfaction of all Post-Petition Term Loan Obligations on the effective date of such plan; or (v) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the Term Loan Agent and the Term Loan Lenders as provided in this Final Order or the Post-Petition Term Loan Documents or the Term Loan Agent's and the Term Loan Lenders' exercise of such rights or remedies.

4.3    <u>Section 506(c) Claims</u>.    Effective on a retroactive basis to the date of entry of the Interim Order, no costs or expenses of administration which have or may be incurred in any Case or in any subsequently converted case under Chapter 7 of the Bankruptcy Code at any time shall be charged or asserted against the Term Loan Agent or any Term Loan Lender, their respective claims or the Collateral pursuant to Section 506(c) of the Bankruptcy Code without

*Approved by Judge Gloria M. Burns May  06, 2008*

the prior written consent of the Term Loan Agent (and no such consent shall be implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

4.4    Collateral Rights.  Until all of the Post-Petition Term Loan Obligations shall have been indefeasibly paid and satisfied in full:

4.4.1    subject to the Intercreditor Agreement, no other party shall foreclose or otherwise seek to enforce any junior lien or claim in any Collateral;

4.4.2    in the event that any party who holds a lien or security interest in any of the Collateral that is junior and/or subordinate to the liens and claims of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, in such Collateral receives or is paid proceeds of the Collateral prior to the indefeasible payment and satisfaction in full of all Post-Petition Term Loan Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, such Collateral proceeds in trust for the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, and, subject to the Intercreditor Agreement, shall immediately turnover to the Term Loan Agent such proceeds for application to the Petition Term Loan Obligations in accordance with the Post-Petition Term Loan Documents; and

4.4.3    upon and after the occurrence of an Event of Default, and subject to the Term Loan Agent obtaining relief from the automatic stay as provided for herein, in connection with a liquidation of any of the Collateral, the Term Loan Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of the Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by the Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses.  The Term Loan Agent and the Term Loan

33

Lenders will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property (other than the Debtors) for the period of time that the Term Loan Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that the Term Loan Agent actually occupies or uses such assets or properties).

      4.5     <u>Releases and Indemnification</u>.

      4.5.1   Upon the entry of this Final Order and the effectiveness of the assignment and assumption transaction contemplated by the Assignment Agreement (the "**Release Effective Date**") (and without limiting the releases contained in <u>Section 4.5</u> of the Interim Order in favor of the Releasees (as defined therein), which releases became effective immediately upon entry of the Interim Order and shall remain effective), as a condition to and in consideration for Arcus entering into the Assignment Agreement, each Debtor, their respective Estates, the Creditors' Committee, Arch, the Revolving Credit Agent, and the Revolving Credit Lenders, in each case, on behalf of each of themselves and their respective affiliates and their respective successors and assigns (collectively, the "**Arcus Releasors**"), shall be deemed to have forever released, discharged and acquitted Arcus and its affiliates, and their respective officers, directors, agents, partners, members, employees and attorneys (collectively, the "**Arcus Releasees**") of and from any and all Claims (as defined below) that the Arcus Releasors had, have or hereafter can or may have against any of the Arcus Releasees as of the Release Effective Date, in respect of (a) events occurring on or prior to the date hereof, whether arising from or in connection with or related to (i) the Post-Petition Financing, (ii) the Cases, or (iii) any related transaction or matter, or (b) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Arcus Releasee is a party thereto.  Without limiting the generality

34

of the foregoing, as of the Release Effective Date, the Arcus Releasees shall be deemed to have been forever released, discharged and acquitted from any Claim in respect of the Carve Out Expenses and any Claim under the Intercreditor Agreement.  Notwithstanding the foregoing, this Section 4.5.1 shall not apply to (i) any Claim in respect of the Arcus Exit Commitment (as defined below) arising after the Release Effective Date, or (ii) any Claim in respect of Arcus' obligations under the Assignment Agreement and this Final Order.

4.5.2    As of the Release Effective Date, as a condition to and in consideration for Arch entering into the Assignment Agreement and as a condition to Arch, in its capacity as the Term Loan Agent and the Term Loan Lenders, making post-petition loans and providing other financial accommodations to the Debtors pursuant to the provisions of the Post-Petition Term Loan Documents and this Final Order, each Debtor, their respective Estates, the Creditors' Committee, Arcus, the Revolving Credit Agent, and the Revolving Credit Lenders, in each case, on behalf of each of themselves and their respective affiliates and their respective successors and assigns (collectively, the "**Arch Releasors**"), shall be deemed to have forever released, discharged and acquitted Arch and its affiliates, and their respective officers, directors, agents, partners, members, employees and attorneys (collectively, the "**Arch Releasees**") of and from any and all Claims that the Arch Releasors had, have or hereafter can or may have against any of the Arch Releasees as of the Release Effective Date, in respect of (a) events occurring on or prior to the date hereof, whether arising from or in connection with or related to (i) the Post-Petition Financing, (ii) the Cases, (iii) any related transaction or matter, or (b) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Arch Releasee is a party thereto.  Notwithstanding the foregoing, this Section 4.5.2 shall not apply to any Claim in respect of Arch's obligations under the Assignment Agreement, this Final Order or any Claim

in respect of Arch's obligations under the Post-Petition Term Loan Documents or the Intercreditor Agreement.  In addition, upon the payment in full of all Post-Petition Term Loan Obligations owed to the Term Loan Agent and the Term Loan Lenders by the Debtors and termination of the rights and obligations arising under the Post-Petition Term Loan Documents and this Final Order (which payment and termination shall be on terms and conditions acceptable to the Term Loan Agent), the Term Loan Agent and the Term Loan Lenders and their respective affiliates, officers, directors, agents and attorneys shall be released by each Debtor, their respective Estates and the Creditors' Committee from any and all Claims, whether arising from or in connection with or related to the transactions contemplated by this Final Order and the Post-Petition Term Loan Documents or any related or unrelated transaction, including without limitation any Claim in respect of the Carve Out Expenses, on terms and conditions acceptable to the Term Loan Agent.

4.5.3    As of the Release Effective Date, each Debtor, their respective Estates, the Creditors' Committee, Arcus, and Arch, in each case, on behalf of each of themselves and their respective affiliates and their respective successors and assigns (collectively, the "**Revolving Credit Lender Releasors**"), shall be deemed to have forever released, discharged and acquitted the Revolving Credit Agent, the Revolving Credit Lenders and their respective affiliates, and their respective officers, directors, agents, partners, members, employees and attorneys (collectively, the "**Revolving Credit Releasees**") of and from any and all Claims that the Revolving Credit Releasors had, have or hereafter can or may have against any of the Revolving Credit Releasees as of the Release Effective Date, in respect of (a) events occurring on or prior to the date hereof, whether arising from or in connection with or related to (i) the Post-Petition Financing, (ii) the Cases, (iii) any related transaction or matter, or (b) any actual or prospective claim, litigation, investigation or proceeding relating to any of the

36

foregoing, whether based on contract, tort or any other theory and regardless of whether any

Revolving Credit Releasee is a party thereto, including, without limitation, any Claims of Arcus

in respect of the commitment letter, dated as of March 18, 2008 (the "**Arcus Exit**

**Commitment**"), by the Revolving Credit Agent and the Revolving Credit Lenders in favor of

Arcus, but only to the extent that such Claim arose on or prior to the date of entry of this Final

Order.  Notwithstanding the foregoing, this Section 4.5.3 shall not apply to (i) any Claim in

respect of the obligations of the Revolving Credit Agent or the Revolving Credit Lenders under

the Post-Petition Revolving Credit Documents or the Intercreditor Agreement arising after the

Release Effective Date, or (ii) any Claim in respect of the obligations of the Revolving Credit

Agent or the Revolving Credit Lenders under the Final Revolving Credit Order, or (iii) any

Claim in respect of the Arcus Exit Commitment arising after the Release Effective Date.  The

foregoing release in this Section 4.5.3 is subject only to the Creditors' Committee's rights, as and

to the extent set forth in paragraph 6 of the Final Revolving Credit Order, with respect to pre-

Petition Date challenges and Claims referred to in paragraph 6 of the Final Revolving Credit

Order.  Notwithstanding the foregoing rights of the Creditors' Committee, any and all challenges

or other Claims (whether pre-Petition Date or post-Petition Date) arising out of or related in any

way to transactions or any other matters, directly or indirectly, pertaining to and/or between or

among the Arcus Releasees, the Debtors (and/or any of their members, managers and officers)

and the Revolving Credit Releasees (the "**Arcus Related Matters**") shall be and, as of the

Release Effective Date, are immediately released pursuant to the foregoing releases.  For

avoidance of doubt, as of the Release Effective Date, the releases and other benefits provided to

the Revolving Credit Releasees with respect to the Arcus Related Matters are effective

immediately as to all parties, including, without limitation, the Creditors' Committee.

37

4.5.4    For the sake of clarity, <u>Section 4.5</u> of this Final Order is not intended to terminate, confirm, affirm or disaffirm the validity and/or enforceability of the Arcus Exit Commitment, either prior to or following the Release Effective Date.  All Claims, if any, of Arcus, the Revolving Credit Agent, and the Revolving Credit Lenders in respect of the Arcus Exit Commitment arising after the Release Effective Date are hereby preserved.  All rights, options, defenses and remedies of the parties to the Arcus Exit Commitment in respect of any such Claim are hereby reserved.

4.5.5    If, within 20 business days after the Release Effective Date (as such period may be extended in writing by Arcus, Arch and the Revolving Credit Agent), any member, manager or officer of any Debtor, in each case, on behalf of himself/herself (each an **"Insider"**) and his/her respective affiliates and their respective successors, assigns, heirs and legal representatives (as to each Insider, collectively, his/her "**Insider Group**"), executes and delivers to the Arcus Releasees, the Arch Releasees and the Revolving Credit Releasees, releases, in form and substance substantially similar to <u>Section 4.5.1</u>, <u>4.5.2</u>, and <u>4.5.3</u> above, as applicable, then Arcus (on behalf of itself and the Arcus Releasees, Arch (on behalf of itself and the Arch Releasees) and the Revolving Credit Agent and the Revolving Credit Lenders (on behalf of themselves and the Revolving Credit Releasees) will promptly provide reciprocal releases on substantially similar terms to such Insider Group.

4.5.6    For purposes of this <u>Section 4.5</u>, "**Claims**" means any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action and obligations, of every kind, nature and description.

4.5.7    <u>Indemnification</u>.    Notwithstanding the terms of the Assignment Agreement, Arcus Releasees shall be entitled to the benefit of the indemnification provisions provided in the Post-Petition Term Loan Documents (as if direct parties thereto) and the Interim

*Approved by Judge Gloria M. Burns May  06, 2008*

Order.  Effective as of the Release Effective Date, solely in the event that, notwithstanding the releases contained in the Interim Order or this Final Order, any Arcus Releasee incurs or suffers any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses), in each case arising out of or in connection with or by reason of any aspect of (a) the transactions contemplated by the Post-Petition Term Loan Documents, (b) the Cases, (c) any related transaction or matter, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether such Arcus Releasee is a party thereto (including, without limitation, any Claim on the part of any Insider), then the Debtors (jointly and severally) shall indemnify, defend, and hold such Arcus Releasee harmless from and against (and, subject to the court approval described in clause (iii) of the proviso below, shall reimburse such Arcus Releasee for) such liability, claim, cost, loss, judgment, damage or expense; provided that (i) such indemnity shall not, as to any Arcus Releasee, be available to the extent that such liability, claim, cost, loss, judgment, damage or expense is finally determined by a court of competent jurisdiction to have resulted directly from the gross negligence or willful misconduct of such Arcus Releasee, (ii) for avoidance of doubt, such indemnity is not secured by the Collateral (without limiting the right of any Arcus Releasee to obtain and enforce any judgment lien obtained in connection with such indemnity), (iii) the amount of any claim under such indemnity, and whether such claim is covered by such indemnity, will be subject to the approval of a court of competent jurisdiction, (iv) notwithstanding the release contained in Section 4.5.1 above, the Debtors, their Estates, the Creditors' Committee and any of their successors or assigns may defend any claim under such indemnity under clause (i) of this proviso (but, for avoidance of doubt, no such party may seek any Claim, counterclaim or other relief in contravention of Section 4.5.1 above), and (v) such indemnity shall not cover the costs and expenses incurred by

*Approved by Judge Gloria M. Burns May  06, 2008*

any Arcus Releasee arising from either the monitoring of the Cases, or the filing of (or

defending) any contingent claim or contingent request for administrative payment, in any case,

prior to any Claim having been made or asserted in writing against, or any discovery request

having been served on, any Arcus Releasee (in the case of any discovery request, irrespective of

whether any Arcus Releasee is a party to the subject proceeding).  This Court shall retain the

jurisdiction to interpret and enforce the provisions of this <u>Section 4.5.7</u>.

Section 5.      <u>Other Rights and Obligations</u>.

     5.1      <u>No Modification or Stay of this Final Order</u>.  Notwithstanding (i) any stay,

modification, amendment, supplement, vacating, revocation or reversal of this Final Order, the

Post-Petition Term Loan Documents or any term hereunder or thereunder, or (ii) the dismissal or

conversion of one or more of the Cases (each, a "**<u>Subject Event</u>**"), (x) the acts taken by the Term

Loan Agent and the Term Loan Lenders in accordance with this Final Order, including, without

limitation, the Assignment, and (y) the Post-Petition Term Loan Obligations incurred or arising

prior to the Term Loan Agent's actual receipt of written notice from the Debtors expressly

describing the occurrence of such Subject Event shall, in each instance, be governed in all

respects by the original provisions of this Final Order, and the acts taken by the Term Loan

Agent and the Term Loan Lenders in accordance with this Final Order, including, without

limitation, the Assignment, and the liens and security interests granted to the Term Loan Agent

and the Term Loan Lenders in the Collateral, and all other rights, remedies, privileges, and

benefits in favor of the Term Loan Agent and the Term Loan Lenders pursuant to this Final

Order and the Post-Petition Term Loan Documents shall remain valid and in full force and effect

pursuant to Section 364(e) of the Bankruptcy Code.  For purposes of this Final Order, the term

"appeal", as used in Section 364(e) of the Bankruptcy Code, shall be construed to mean any

*Approved by Judge Gloria M. Burns May  06, 2008*

proceeding for reconsideration, amending, rehearing, or re-evaluating this Final Order by this Court or any other tribunal.

5.2    Non-Dischargeability.  The Post-Petition Term Loan Obligations shall not be discharged by the entry of an order confirming a plan of reorganization in the Cases pursuant to Section 1141(d)(4) of the Bankruptcy Code or otherwise, unless and until all Post-Petition Term Loan Obligations are indefeasibly paid in full in accordance with the terms and conditions of the Post-Petition Term Loan Documents prior to or concurrently with the entry of such order.

5.3     Power to Waive Rights; Duties to Third Parties.  The Term Loan Agent and the Term Loan Lenders shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Final Order in respect of the Term Loan Agent and the Term Loan Lenders (the "**Lender Rights**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s), except the obligation to provide notice as set forth herein and in the documents.  Any waiver by the Term Loan Agent or the Term Loan Lenders of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject the Term Loan Agent or the Term Loan Lenders to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to the Term Loan Agent or the Term Loan Lenders.

5.4     Disposition of Collateral   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of the Term Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender), except for sales of the Debtors' inventory in the ordinary course of their business.

5.5     <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Final

Order are in addition to and without prejudice to the rights of the Term Loan Agent and the Term

Loan Lenders to pursue any and all rights and remedies under the Bankruptcy Code, the Post-

Petition Term Loan Documents or any other applicable agreement or law, including, without

limitation, rights to seek adequate protection and/or additional or different adequate protection,

to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash

collateral or granting of any interest in the Collateral or priority in favor of any other party, to

object to any sale of assets, and to object to applications for allowance and/or payment of

compensation of Professionals or other parties seeking compensation or reimbursement from the

Estates.  Without limiting the generality of the foregoing, entry of this Final Order is without

prejudice to any rights that the Term Loan Agent and the Term Loan Lenders have or may

acquire against any third party, except as limited by the releases set forth herein.

5.6     <u>Binding Effect</u>.

5.6.1    The provisions of this Final Order and the Post-Petition Term Loan

Documents, the Post-Petition Term Loan Obligations, the Superpriority Claim and any and all

rights, remedies, privileges and benefits in favor of the Term Loan Agent and the Term Loan

Lender provided or acknowledged in this Final Order, and any actions taken pursuant thereto,

shall be effective immediately upon entry of this Final Order pursuant to Bankruptcy Rules

6004(h) and 7062, shall continue in full force and effect, shall survive entry of any other order

(including without limitation any order which may be entered confirming any plan of

reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy

Code, or dismissing one or more of the Cases), and shall continue in this or any superseding case

under the Bankruptcy Code (and all priorities in payment, liens and security interests in favor of

the Term Loan Agent and the Term Loan Lenders shall maintain their priority as provided by

this Final Order until all Post-Petition Term Loan Obligations are indefeasibly paid and satisfied in full).

5.6.2    Any order dismissing one or more of the Cases under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the Superpriority Claim and the Term Loan Agent's and the Term Loan Lenders' liens on and security interests in the Collateral shall continue in full force and effect notwithstanding such dismissal until the Post-Petition Term Loan Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and such liens and security interests in the Collateral.

5.6.3    This Final Order shall be binding upon the Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Final Order shall also inure to the benefit of the Term Loan Agent, the Term Loan Lenders, the Debtors, the Creditors' Committee, the Revolving Credit Agent, the Revolving Credit Lenders and their respective successors and assigns.  For avoidance of doubt, the Term Loan Agent and the Term Loan Lenders shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible person appointed for the Debtors' Estates, except for the Post-Default Professional Fee Carve Out.

5.6.4    Other than the Carve Out Expenses to the extent expressly set forth in this Final Order and the pari passu superpriority claim of the Revolving Credit Agent, no claim having a priority superior or pari passu with those granted by this Final Order to the Term Loan Agent and the Term Loan Lenders shall be granted or permitted by any order of the Court heretofore or hereafter entered in any Case, while any portion of the Post-Petition Term Loan

43

*Approved by Judge Gloria M. Burns May  06, 2008*

Obligations (or any refinancing thereof) or the commitment thereunder remains outstanding without the prior written consent of the Term Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

5.7    Marshalling.  In no event shall the Term Loan Agent or any Term Loan Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

5.8    Term; Termination.  Notwithstanding any provision of this Final Order to the contrary, the term of the financing arrangements among the Debtors, the Term Loan Agent and the Term Loan Lenders authorized by this Final Order may be terminated pursuant to the terms of the Post-Petition Term Loan Documents.

5.9    Limited Effect.  Unless this Final Order specifically provides otherwise, in the event of a conflict between the terms and provisions of any of the Post-Petition Term Loan Documents and this Final Order, the terms and provisions of this Final Order shall govern and control, interpreted as most consistent with the terms and provisions of the Post-Petition Term Loan Documents.

5.10    Objections Overruled.  All objections to the entry of this Final Order are, to the extent not withdrawn or resolved, hereby overruled.

5.11    Restrictions on Use of Cash Collateral, Additional Financing.  All post-petition loans and other financial accommodations under the Post-Petition Term Loan Documents are made in reliance on this Final Order and in the event that any order is entered at any time in any Case or in any subsequently converted case under Chapter 7 of the Bankruptcy Code (other than the Final Order) which (a) authorizes the use of Cash Collateral of the Debtors or the sale, lease, or other disposition of any Collateral, except as expressly permitted under the

*Approved by Judge Gloria M. Burns May  06, 2008*

Post-Petition Term Loan Documents, or (b) authorizes, under Section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness (other than the Post-Petition Financing) secured by a lien or security interest in the Collateral which is equal or senior to the Term Loan Agent's liens and security interests in the Collateral, or which is entitled to priority administrative claim status which is equal or superior to the Superpriority Claim; then, in each instance described in clauses (a) and (b) above, such other order shall require that all Post-Petition Term Loan Obligations first shall be indefeasibly paid in full in immediately available funds, unless the Term Loan Agent shall first have given its prior written consent thereto (no such consent being implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).  The liens and security interests granted to or for the benefit of the Term Loan Agent, for the benefit of itself and the Term Loan Lenders, hereunder and the rights of the Term Loan Agent and the Term Loan Lenders pursuant to this Final Order and the Post-Petition Term Loan Documents with respect to the Post-Petition Term Loan Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors, unless the Term Loan Agent shall first have given its prior written consent thereto (no such consent being implied from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender), and shall continue after confirmation and effectiveness of any such plan.

      5.12    <u>Limitation of Liability</u>.  Nothing in this Final Order or the Post-Petition Term Loan Documents shall in any way be construed or interpreted to impose, or allow the imposition upon the Term Loan Agent or any Term Loan Lender of, any liability for any claims arising from the pre-petition or post-petition activities by the Debtors in the operation of their businesses or in connection with their restructuring efforts.

Section 6.      <u>Good Faith</u>.

*Approved by Judge Gloria M. Burns May  06, 2008*

Any loans or other financial accommodations which are made or caused to be made to the Debtors by the Term Loan Agent and the Term Loan Lenders pursuant to the Post-Petition Term Loan Documents are deemed to have been made extended and provided in good faith, as the term "good faith" is used in Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Final Order or the Post-Petition Term Loan Documents or any provisions are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the prior written consent of the Term Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the Term Loan Agent or any Term Loan Lender).

Section 7.     <u>Intercreditor Agreement</u>.

Notwithstanding anything to the contrary contained in this Final Order, the rights and obligations of the Agents and the Lenders to one another, and with respect to the Collateral, are subject to the terms of the Intercreditor Agreement, as amended and restated on or about the date hereof (as amended, supplemented, extended or otherwise modified from time to time, the "**<u>Intercreditor Agreement</u>**") among the Agents and the Lenders.  With respect to such rights and obligations, and with respect to the Collateral, in the event of a conflict between the terms and provisions of the Intercreditor Agreement and this Final Order, the terms and provisions of the Intercreditor Agreement shall govern and control.  Pursuant to the Intercreditor Agreement, each of the Revolving Credit Agent, for itself and the Revolving Credit Lenders, and the Term Loan Agent, for itself and the Term Loan Lenders, has consented to the liens on its security interest in the Collateral of the other Agent, for the benefit of itself and the Lenders for which it acts as agent, and the priority of such liens and security interests, all as more fully defined, described and set forth in the Intercreditor Agreement.

Section 8.     <u>Assignment by Arcus</u>.

*Approved by Judge Gloria M. Burns May 06, 2008*

8.1    As part of the consideration for entering the Assignment Agreement (and without limiting the provisions of the Assignment Agreement), Arcus is receiving the releases and indemnification provided for under Section 4.5 of this Final Order.  In addition, Arcus shall be entitled to the "Assigned Amount" (as defined in the Assignment Agreement) and the following payments upon execution and delivery of the Assignment Agreement (all such amounts, other than the amount described in <u>Section 8.1(b)</u>, to constitute part of the Term Loan Advances following payment thereof to Arcus), none of which shall be subject to review, objection, avoidance or disgorgement for any reason whatsoever:

a.    A fee in the amount of $600,000 (the "**<u>In Lieu of Termination Fee</u>**") payable by the Debtors in lieu of the Termination Fee in the amount of $500,000 provided in Arcus' Post-Petition Term Loan Documents.

b.    An assignment fee in the amount of $50,000 (the "**<u>Assignment Fee</u>**") payable by Arch, with the Debtors and their estates to have no liability or obligation whatsoever with respect to the Assignment Fee.

c.    Payment to Blank Rome LLP, counsel to Arcus and its affiliates, by or on behalf of the Debtors of $675,000.00 in full satisfaction of the Debtors' and their Estates obligations in respect of all accrued and unpaid fees and expenses of Blank Rome LLP, in each case arising out of or in connection with or by reason of any aspect of (i) the transactions contemplated by the Post-Petition Term Loan Documents, (ii) the Cases (including, without limitation, all matters related to the formulation, drafting, preparation and prosecution of all reorganization plans and disclosure statements filed in the Cases with Arcus as the proposed plan funder) or (iii) any related transaction or matter.

*Approved by Judge Gloria M. Burns May  06, 2008*

8.2     Following execution and delivery of the Assignment Agreement, Arcus, Arch and the Debtors, in each case, at the expense of the Debtors, agree to reasonably cooperate with the reasonable requests of one another in order to effectuate the assignment and assumption transaction contemplated by the Assignment Agreement, including, but not limited to the Assignment and the execution of all documents reasonably required by the Debtors or Arch in connection therewith.   In addition, upon the execution and delivery of the Assignment Agreement and the effectiveness of the Assignment contemplated thereby, Arcus shall be deemed to have resigned as a manager of Shapes/Arch Holdings L.L.C. pursuant to Section 5.01 of the Amended and Restated Operating Agreement of Shapes/Arch Holdings L.L.C., dated as of March 16, 2008.  The Court shall retain the jurisdiction to interpret and enforce the provisions of this Section 8.2.

*NJ 226,399,809v4*

*Approved by Judge Gloria M. Burns May  06, 2008*

# EXHIBIT 1

*Approved by Judge Gloria M. Burns May  06, 2008*

<u>ASSIGNMENT AND ACCEPTANCE AGREEMENT</u>

This Assignment and Acceptance Agreement (this "<u>Agreement</u>") is made as of May 6, 2008, among the Assignor, the Assignee and the Borrower (in each case, as defined below).

Reference is made to the Debtor-in-Possession Term Loan Financing Agreement dated as of March 18, 2008 (as amended, supplemented or otherwise modified from time to time, the "<u>Loan Agreement</u>"; terms defined therein and not otherwise defined herein are used herein as therein defined), among Shapes/Arch Holdings, L.L.C., Shapes L.L.C., Delair L.L.C., Ultra L.L.C. and Accu-Weld L.L.C. (collectively, the "<u>Borrower</u>"), and Arcus ASI Funding, LLC, as the lender (the "<u>Lender</u>") and in its capacity as agent for the lenders (in such capacity, the "<u>Agent</u>").

The Agent and the Lender (collectively and individually, the "<u>Assignor</u>"), Arch Acquisition I, LLC (the "<u>Assignee</u>") and the Borrower agree as follows:

1.    <u>Assignment, Delegation and Acceptance</u>.

(a)    The Assignor hereby irrevocably transfers and assigns to the Assignee without recourse and without representation or warranties of any kind (except as expressly set forth in paragraph 3 below), all of Assignor's right, title and interest (including all claims and causes of action against the Borrower) in and to the Term Loans, the Loan Documents (including, without limitation, the Intercreditor Agreement, as defined in the Loan Agreement) and Collateral (as defined in the Loan Agreement) (collectively, the "<u>Assigned Interest</u>"). Notwithstanding anything to the contrary contained herein, the Assigned Interest shall not include (i) any of releases or other protections granted pursuant to the Interim Financing Order; (ii) any of the releases or other protections granted pursuant to the Final Order, to the extent that the Final Order provides that such releases or other protections continue in favor of the Assignor or the Arcus Releasees (as defined in the Final Order), or (iii) the Arcus Exit Commitment (as defined in the Final Order).

(b)    Assignor hereby irrevocably delegates and assigns to Assignee all of its Commitments and its other duties and obligations as Lender under the Loan Documents equivalent to 100% of the Commitments. Assignor also hereby irrevocably delegates and assigns to Assignee all of its duties and obligations as Agent under the Loan Documents. All such duties, obligations and Commitments are collectively referred to herein as the "<u>Assumed Obligations</u>".

(c)    Assignee hereby irrevocably purchases, assumes and accepts the Assigned Interest and the Assumed Obligations and agrees to be bound by the terms and conditions of the Loan Documents. Assignor agrees to relinquish its rights under the Assigned Interest and be released from the Assumed Obligations.

(d)    The assignment and delegation by Assignor and acceptance by Assignee contemplated by this Section 1(a), (b) and (c) will be effective upon satisfaction of the following conditions precedent: (i) the execution and delivery of this Agreement by the Assignor, the Assignee and the Borrower, (ii) entry of the final financing order by the Bankruptcy Court in the form approved by the Assignor, the Assignee and the Borrower (the "<u>Final Order</u>" and, together with the Interim Financing Order (as defined in the

*Approved by Judge Gloria M. Burns May  06, 2008*

Loan Agreement), collectively, the "Orders"), and (iii) payment of the Purchase Price (as defined below). The date on which the conditions precedent described in the preceding clauses (i) through (iii) are satisfied is referred to herein as the "Effective Date".  Notwithstanding anything to the contrary contained herein, (A) the Assignee shall be absolutely and unconditionally obligated to pay the Assignor the Purchase Price (as defined below) on the date the conditions contained in the preceding clauses (i) and (ii) are met without setoff, defense or counterclaim of any kind or nature (the date on which such conditions are met, the "Payment Date") and (B) if the conditions contained in the preceding clauses (i) and (ii) are not satisfied on or before May 6, 2008, then, unless such date is extended in writing by mutual agreement of the Assignor and the Assignee, neither the Assignor nor the Assignee shall be obligated to consummate the assignment and delegation, and acceptance contemplated by Sections 1(a) through (c) above and this Agreement shall be of no further force and effect..

2.    Payment and Delivery of Loan Documents.

(a)    On the Payment Date, the Assignee agrees to pay to Assignor the Purchase Price in immediately available funds in accordance with the wire instructions set forth on Schedule; provided, that if the conditions to the Payment Date are satisfied after 2:00 p.m. (New York time) on any day, such payment shall be made on the next Business Day (prior to 12:00 pm New York time) and the Effective Date shall be deemed to have occurred on the date such payment is made.  The "Purchase Price" shall be an amount equal to the sum of (i) the Assigned Amount (as defined on Schedule 1 hereto) plus, to the extent the conditions to the Payment Date are satisfied after 2:00 pm (New York time) on May 6, 2008, a per diem amount of interest equal to $6,102.44, (ii) $600,000 representing the fee to which the Assignor is entitled pursuant to Section 8.1 of the Final Order, (iii) $675,000 representing a portion of the fees and expenses of Blank Rome LLP, counsel to the Assignor and its affiliates, and (iv) $50,000 (representing an assignment fee from the Assignee).  For avoidance of doubt, the Assignor shall not be entitled to any additional payments for fees, costs, expenses or otherwise on account of the Assigned Interest after payment of the Purchase Price except to the extent of the indemnities specifically provided herein.  In the event the Payment Date occurs after 2:00 pm on any day, the per diem amount referred to in clause (i) above shall be due for such date.

(b)    The Borrower and the Assignee agree that, in addition to the Assigned Amount, the amounts set forth in clause (ii) and $375,000 of the amounts set forth in clause (iii) of the definition of Purchase Price are being paid on behalf of the Borrower and shall be added to the Obligations under and as defined in the Loan Agreement.  The Borrower and the Assignee further agree that the remaining amounts funded under clause (iii) shall be added to the consideration being provided by the Assignee under the Plan (as defined in the Final Order).

(c)    Following payment of the Purchase Price, Assignor shall deliver to Agent the Term Loan Promissory Note and the other Loan Documents previously delivered to Assignor.

3.    Representations, Warranties, and Covenants.

(a)    The Assignor represents and warrants that: (i) it is legally authorized to enter into this Agreement; (ii) this Agreement is a legal, valid, and binding agreement of Assignor, enforceable according to its terms; (iii) the execution and performance by Assignor of its duties

2

Error! Unknown document property name.

*Approved by Judge Gloria M. Burns May  06, 2008*

and obligations under this Agreement will not require any registration with, notice to, or consent or approval by any governmental authority; and (iv) it is the legal and beneficial owner of the Assigned Interest, it has not created any lien or security interest upon the Assigned Interest and the Assigned Interest is free and clear of all such liens or security interests.

(b)     Assignee represents and warrants that (i) it is legally authorized to enter into this Agreement, (ii) this Agreement is a legal, valid and binding agreement of Assignee, enforceable according to its terms, (iii) the execution and performance by Assignee of its duties and obligations under this Agreement and the Loan Documents will not require any registration with, notice to, or consent or approval by any governmental authority, (iv) it is familiar with transactions of the kind and scope reflected in the Loan Documents and in this Agreement, (v) it has had adequate opportunity to review the Loan Agreement and the other Loan Documents and has made its own independent investigation and appraisal of the financial condition and affairs of Borrower without reliance upon the Assignor, (vi) it has conducted its own evaluation of the Assigned Interest, and of the creditworthiness of Borrower and has made its decision to become a Lender to Borrower under the Loan Agreement independently and without reliance upon Assignor, (vii) it is entering into this Agreement in the ordinary course of its business and, without characterizing the Assigned Interest as a "security" within the meaning of the federal or state securities laws, it is acquiring the Assigned Interest for its own account and not with a view to or for sale in connection with any subsequent distribution; provided, however, that at all times the distribution of Assignee's property shall, subject to the terms of the Loan Documents, be and remain within its control, and (viii) except as set forth in Section 2(c) above, the Assignee has not relied and will not rely on the Assignor to furnish or make available any documents (except to the extent of documents required to be provided as part of its reasonable cooperation obligations as set forth in the Final Order) or other information regarding the Assigned Interest or the credit, affairs, financial condition or business of the Borrower, or any other matter concerning the Borrower or the Assignor or its affiliates.

(c)     All representations and warranties contained in this Section 3 shall survive the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.

4.     <u>Limitations of Liability</u>.  Assignor makes no representations or warranties of any kind (except as specifically provided in Paragraph 3 above), and assumes no responsibility or liability whatsoever, with regard to (a) the Loan Documents or any other document or instrument furnished pursuant thereto, the Term Loans or other Obligations, (b) any statements, warranties or representations made in or in connection with the Loan Agreement or the other Loan Documents, (c) the creation, execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Agreement or any of the other Loan Documents or any document furnished pursuant thereto, (d) the amount, value or existence of any of the Collateral, (e) the perfection or priority of any liens or security interests, (f) the collectibility of Obligations, (g) the financial condition of Borrower or any other obligor or the performance or observance by Borrower of its obligations under any of the Loan Documents, or (h) the performance or observance by the Borrower or any other Person of any of their respective obligations under any Loan Documents. Assignor has and will have no duty, either initially or on a continuing basis, to make any investigation, evaluation, appraisal of, or any responsibility or liability with respect to the accuracy or completeness of, any information or documentation provided to Assignee, nor will the Assignor have any duty to provide any information or documentation to the Assignee except

3

Error! Unknown document property name.

*Approved by Judge Gloria M. Burns May  06, 2008*

as set forth in Section 2(c) above and documentation within the scope of the reasonable cooperation obligations in the Final Order.  Nothing in this Agreement or in the Loan Documents shall impose upon the Assignor any fiduciary relationship in respect of the Assignee.

5.    <u>Indemnification</u>.

(a)    The Assignee shall indemnify, defend, and hold the Assignor and its affiliates and their respective officers, directors, agents, partners, members, employees and attorneys (collectively, the "<u>Indemnitees</u>") harmless from and against (and shall reimburse each Indemnitee as the same are incurred for) any liability, claim, cost, loss, judgment, damage or expense (including reasonable attorneys' fees and expenses) that any Indemnitee incurs or suffers, in each case arising out of or in connection with or by reason of (a) any breach of any of the Assignee's representations, warranties, covenants or agreements in this Agreement, (b) any act or omission to act on the part of the Assignee or its affiliates or their respective officers, directors, agents, partners, members, employees and attorneys under or in connection with the Assigned Interest or the Assumed Obligations after the Effective Date, or (c) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such liability, claim, cost, loss, judgment, damage or expense is finally determined by a court of competent jurisdiction to have resulted directly from the gross negligence of willful misconduct of such Indemnitee.

(b)    The Borrower hereby agrees that to the extent the Final Order provides for indemnity in favor of the Assignor and the Arcus Releasees (as defined in the Final Order), such indemnity is incorporated herein by reference and the Borrower agree to such indemnity.

(c)    For avoidance of doubt, the obligations of the Assignee and the Borrower under this Section 5 may not be revoked or terminated.

6.    <u>Miscellaneous</u>.

(a)    This Agreement shall become effective as of the Payment Date.  From and after the Effective Date: (i) the Assignee shall be a party to the Loan Agreement and, to the extent provided in this Agreement, have the rights and obligations of a Lender thereunder and under the other Loan Documents and shall be bound by the provisions thereof; and (ii) the Assignor shall, to the extent provided in this Agreement, relinquish its rights and be released from its obligations under the Loan Agreement.

(b)    Any notice or other communication required or permitted to be given will be in writing and addressed to the respective party as set forth below its signature hereunder.

(c)    No failure or delay on the part of the Assignee or Assignor in the exercise of any power, right, or privilege hereunder will impair such power, right, or privilege or be construed to be a waiver of any default or acquiesence therein.  No single or partial exercise of any such power, right, or privilege will preclude further exercise thereof or of any other right, power, or privilege.  All rights and remedies existing under this Agreement are cumulative with, and not exclusive of, any rights or remedies otherwise available.

4

Error! Unknown document property name.

(d)      This Agreement may be executed in any number of counterparts, each of which, when taken together, shall be deemed to be one and the same document.  Delivery of an executed counterpart of a signature page of this document by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart of this document.

**(e)      THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

5

*Approved by Judge Gloria M. Burns May  06, 2008*

IN WITNESS WHEREOF, the parties hereto have caused this Assignment and Acceptance to be executed as of May 6, 2008 by their respective duly authorized officers.

ARCUS ASI FUNDING, LLC, as Agent              ARCUS ASI FUNDING, LLC, as Assignor

By: _____          By: _____
    Name:                                         Name:
    Title:                                        Title:
Address for notices:                          Address for notices:

Arcus ASI Funding, Inc.                       Arcus ASI Funding, Inc.
2929 Arch Street                              2929 Arch Street
Philadelphia PA 19104                         Philadelphia PA 19104
Attn:  Paul Halpern, Esq., General Counsel    Attn:  Paul Halpern, Esq., General Counsel
Fax No.:  (215) 609-3433                       Fax No.:  (215) 609-3433

ARCH ACQUISITION I, LLC, as Assignee

By: _____
    Name:
    Title:

Address for notices:

Arch Acquisition I, LLC
1001 Brickell Bay Drive, 27th Floor
Miami, Florida 33131
Attn:  Sean Ozbolt
Fax No.:  (305) 379-2013

SHAPES L.L.C.                                 SHAPES/ARCH HOLDINGS, LLC

By: _____          By: _____
    Name:                                         Name:
    Title:                                        Title:

DELAIR L.L.C.                                 ULTRA L.L.C.

By: _____          By: _____
    Name:                                         Name:
    Title:                                        Title:

**Error! Unknown document property name.**

123285.01601/21687909v.2

*Approved by Judge Gloria M. Burns May  06, 2008*

ACCU-WELD L.L.C.


By: _____

    Name:

    Title:

Address for notices:

c/o Shapes/Arch Holdings L.L.C.
9000 River Road
Delair, New Jersey 08110
Attn:  Mr. Steven S. Grabell
Fax No.:

*Approved by Judge Gloria M. Burns May  06, 2008*

SCHEDULE 1 to
Assignment and Acceptance Agreement

**Assignment and Acceptance Agreement relating
to the Debtor-In-Possession Term Loan Financing Agreement,**
dated as of March 18, 2008, among
Shapes/Arch Holdings, L.L.C., Shapes L.L.C., Delair L.L.C.,
Ultra L.L.C. and Accu-Weld L.L.C. (collectively, the "Borrower"),
and Arcus ASI Funding, LLC, as the lender and the agent

Name of Assignor:    Arcus ASI Funding, LLC

Name of Assignee:    Arch Acquisition I, LLC

<u>Amount of Assigned Loans</u>

Total Outstanding

| | | |
|---|---|---|
| Principal Amount: | $16,717,347.24 |
| Accrued Interest: | $207,328.25 |
| Fees | $80,000.00 |
| Expenses (other than Blank Rome) | $94,862.00 |

Total "Assigned Amount"    <u>$17,099,537.49</u>

All determined as of the Effective Date.

Wire instructions:

$17,749,537.49 (plus any per diem owed) to be wired to:

    Arcus ASI Funding, LLC
    ABA #036076150
    Account #62-14636991

$675,000 to be wired to:
    Blank Rome LLP
    ABA #031201467
    Account #2000030361050
    Reference:  123285/01601

*NY 238769690v9 5/5/2008*

*Approved by Judge Gloria M. Burns May  06, 2008*

# EXHIBIT 2

**AMENDED AND RESTATED**
**DEBTOR-IN-POSSESSION TERM LOAN FINANCING AGREEMENT**

**ARCH ACQUISITION I, LLC**
**(as Lead Arranger, Agent and a Lender),**

**the lenders party hereto from time to time**
**(as Lenders),**

**and**

**Shapes/Arch Holdings L.L.C.,**
**Shapes L.L.C.,**
**Delair L.L.C.,**
**Ultra L.L.C.**
**and**
**Accu-Weld L.L.C.**
**(the Companies which are borrowers hereunder)**

**Dated:  May 5, 2008**

# TABLE OF CONTENTS

Page

SECTION 1          Definitions.......................................................................................... 1

SECTION 2          Conditions Precedent ........................................................................ 12

SECTION 3          RESERVED ........................................................................................ 16

SECTION 4          Term Loans ........................................................................................ 16

SECTION 5          RESERVED ........................................................................................ 18

SECTION 6          Collateral............................................................................................ 18

SECTION 7          Superpriority Claims, Collateral Security, Etc. ............................... 23

SECTION 8          Representations, Warranties and Covenants..................................... 25

SECTION 9          Interest, Fees and Expenses .............................................................. 34

SECTION 10         Powers................................................................................................ 37

SECTION 11         Events of Default and Remedies........................................................ 38

SECTION 12         Termination........................................................................................ 43

SECTION 13         Miscellaneous ................................................................................... 44

SECTION 14         Agreement between the Lenders........................................................ 47

SECTION 15         Agency ............................................................................................... 49

EXHIBIT

Exhibit A — Form of Term Loan Promissory Note
Exhibit B — Form of Budget
Exhibit C --  Outline of Competitive Process

SCHEDULES

Schedule IR — Real Estate
Schedule 2.1 — Collateral Information
Schedule 7.1 — Senior Claims
Schedule 8.1 — Organization

NY 238747640v9 5/1/2008

*Approved by Judge Gloria M. Burns May  06, 2008*

**ARCH ACQUISITION I, LLC,** a Delaware limited liability company (hereinafter "Arch"), with offices located at 1001 Brickell Bay Drive, 26th Floor, Miami, Florida 33131, and Arch in its capacity as agent (the "Agent"), for itself and any other party which now or hereafter becomes a lender hereunder pursuant to Section 14 hereof (individually a "Lender" and collectively the "Lenders") is pleased to confirm the terms and conditions under which Lenders shall make a Term Loan Facility and other financial accommodations available to **Shapes/Arch Holdings L.L.C.,** a New Jersey limited liability company, as debtor and debtor-in-possession ("Shapes/Arch"), with a principal place of business at 9000 River Road, Delair, New Jersey 08110, **Shapes L.L.C.,** a New Jersey limited liability company, as debtor and debtor-in-possession ("Shapes"), with a principal place of business located at 9000 River Road, Delair, New Jersey 08110, **Delair L.L.C.,** a New Jersey limited liability company, as debtor and debtor-in-possession ("Delair"), with a principal place of business at 8600 River Road, Delair, New Jersey 08110, **Ultra L.L.C.,** a New Jersey limited liability company, as debtor and debtor-in-possession ("Ultra"), with a principal place of business at 1777 Hylton Road, Pennsauken, New Jersey 08110, and **Accu-Weld L.L.C.,** a Pennsylvania limited liability company, as debtor and debtor-in-possession ("Accu-Weld"), with a principal place of business at 1211 Ford Road, Bensalem, Pennsylvania 19020 (in this Agreement, Shapes/Arch, Shapes, Delair, Ultra and Accu-Weld are referred to collectively, jointly and severally as the "Companies" and individually, each as a "Company" and sometimes referred to as "Borrowers" and individually, each as a "Borrower").

## SECTION 1   Definitions

**363 Sale** shall mean the sale of all or substantially all of Borrowers' assets or business pursuant to Section 363 of the Bankruptcy Code.

**Accounts** shall mean all of each of the Companies' now existing and future: (a) accounts (as defined in the UCC), and any and all other receivables (whether or not specifically listed on schedules furnished to the Agent), including, without limitation, all accounts created by, or arising from, all of the Companies' sales, leases, rentals of goods or renditions of services to their customers, including but not limited to, those accounts arising under any of the Companies' trade names or styles, or through any of the Companies' divisions; (b) any and all instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing, including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant hereto; (f) guarantees, supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any and all of the foregoing (including all rights to payment, including any and all Intercompany Debt and other liabilities and those arising in connection with bank and non-bank credit cards), and including books and records and any electronic media and software thereto; (i) notes, deposits or property of account debtors securing the obligations of any such account debtors to the Companies; and (j) cash and non-cash proceeds (as defined in the UCC) of any and all of the foregoing.

**Applicable Margin** shall mean four percent (4%).

*Approved by Judge Gloria M. Burns May 06, 2008*

**Agreement** shall mean this Debtor-In-Possession Term Loan Financing Agreement.

**Arcus Loan Documents** shall mean the Debtor-In-Possession Term Loan Financing Agreement, dated as of March 18, 2008, between Arcus ASI Funding, LLC and the Companies, as amended, and the Loan Documents as defined therein.

**Assignment Agreement** shall mean an Assignment and Acceptance Agreement, dated the date hereof, between Arcus in its various capacities and Arch, pursuant to which Arcus assigns to Arch, and Arch assumes from Arcus, all of its rights duties and obligations under the Arcus Loan Documents.

**Assignment and Transfer Agreement** shall mean an Assignment and Transfer Agreement in form and substance satisfactory to Agent.

**Availability** shall have the meaning specified thereunder in the Revolver Agreement in effect as of the date hereof.

**Avoidance Actions** shall mean any and all claims and causes of action of a Company or its estate under Chapter 5 or Section 724(a) of the Bankruptcy Code and proceeds thereof and any claims and causes of action arising under state, federal or other non-bankruptcy law against insiders of the Debtors and any avoidance, recovery, subordination or other actions against insiders of the Debtors, provided, however, Avoidance Actions shall not include property or assets of the Debtors and their Estates which constitute Collateral of the Lenders under this Agreement.

**Bankruptcy Code** shall mean Title 11 of the United States Code entitled "Bankruptcy," as the same may be amended, modified or supplemented from time to time and any successor statute thereto.

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of New Jersey, or such other court having jurisdiction over the Case.

**Base Rate** shall mean the rate of interest per annum announced by JPMorgan Chase Bank from time to time as its prime rate in effect at its principal office in New York City; provided, however, that the "Base Rate," for the purposes hereof, shall in no event be deemed to be lower than 6%. (The prime rate is not intended to be the lowest rate of interest charged by JPMorgan Chase Bank to its borrowers).

**Books and Records** shall mean books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral or otherwise necessary or helpful in the collection thereof or realization thereon.

**Borrowing Base** shall have the meaning specified thereunder in the Revolver Agreement in effect as of the date hereof.

**Borrowing Base Assets** shall mean Revolver Senior Collateral (as defined in the Intercreditor Agreement).

**Budget** shall mean a budget prepared in good faith based upon assumptions which the Companies believe to be reasonable setting forth, inter alia, a thirteen (13) week cash flow forecast in reasonable detail satisfactory to Agent including receipts, disbursements and such line item detail as satisfactory to Agent, as well as projected borrowings and availability under the Revolver Agreement and the Term Loan Facility, in the form attached hereto as Exhibit B, as updated weekly with Agent's consent.

**Business Day** shall mean any day on which the Agent, JPMorgan Chase Bank, N.A., and, in the case of settlements among the Lenders or the making of advances by the Lenders, the Lenders are open for business.

**Capital Expenditures** shall mean, for any period, the aggregate expenditures of the Companies during such period on account of property, plant, Equipment or similar fixed assets that, in conformity with GAAP, are required to be reflected in the balance sheet of the Companies.

**Capital Improvements** shall mean operating Equipment and facilities (other than land) acquired or installed for use in the Companies' business operations.

**Capital Lease** shall mean any lease of property (whether real, personal or mixed) which, in conformity with GAAP, is accounted for as a capital lease or a Capital Expenditure in the balance sheet of the Companies.

**Cargo Insurance** shall mean a policy or policies of insurance which (i) provide warehouse-to-warehouse coverage for all of the Companies' in-transit Inventory; (ii) insuring against loss and casualty, as a result of any and all perils (including perils on the sea and of the sea) and misfortunes; (iii) include a marine extension clause; (iv) are for the full insured value of such Inventory (that is invoice cost, guaranteed freight, other costs, and insurance premiums, plus ten percent (10%)); (v) are issued by one or more insurance carriers which are acceptable to the Agent in its reasonable discretion, and (vi) name the Agent, for the benefit of the Lenders as a loss payee.

**Carve-Out** shall have the meaning given to the term "Carve-Out Expenses" in the Final Order; provided, however, that in no case shall the Carve-Out be used for purposes other than permitted in the Final Order and in the final order approving the Revolver Agreement.

**Case** shall mean collectively, the Companies' reorganization cases under Chapter 11 of the Bankruptcy Code pending in the Bankruptcy Court.

**CIT** shall mean The CIT Group/Business Credit, Inc.

**Closing Date** shall mean the date that this Agreement has been duly executed by the parties hereto and delivered to the Agent and the conditions to effectiveness of this Agreement have been satisfied.

**Collateral** shall mean all present and future real and personal property of the Companies, including, without limitation, Accounts, Equipment, Inventory, Documents of Title, General Intangibles, Real Estate, pledged stock or membership interests of the Companies' subsidiaries

and Other Collateral and the proceeds and products thereof, including but not limited to the Companies' cash, deposit accounts (whether or not comprised solely of proceeds), certificates of deposit, insurance proceeds (including, without limitation, hazard, flood, environmental and credit insurance and cargo insurance), negotiable instruments and other instruments for the payment of money (including without limitation all instruments evidencing Intercompany Debt), chattel paper, security agreements, documents, eminent domain proceeds, condemnation proceeds and commercial tort claims.  Collateral shall not include Avoidance Actions.

**Commitment** shall mean each Lender's Term Loan Commitment, in the amount of its respective pro rata share set forth in schedules prepared by the Agent or the Assignment and Transfer Agreement executed by each such Lender.

**Commitment Fee** shall mean the fee due to Agent at the end of each month for the Term Loan Facility determined by multiplying the difference between (i) the Term Loan Facility Amount, and (ii) the sum, for said month, of the average daily balance of Term Loan Advances outstanding by one and one-half percent (1.5%) per annum for the number of days in said month.

**Competitive Process** shall have the meaning provided for such term in Section 2.1(z).

**Consolidated Balance Sheet** shall mean a consolidated or combined, as applicable, balance sheet for Shapes/Arch and the Companies, eliminating all inter-company transactions and prepared in accordance with GAAP.

**Consolidating Balance Sheet** shall mean a Consolidated Balance Sheet plus individual balance sheets for Shapes/Arch and each of the Companies, showing all eliminations of intercompany transactions, all prepared in accordance with GAAP.

**Controlled Group** shall mean all members of a controlled group of corporations and all trades or businesses (whether or not incorporated) under common control which, together with any Company, are treated as a single employer under Section 414 of the Internal Revenue Code.

**Copyrights** shall mean all of each of the Companies' present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, goodwill, any and all general intangibles, intellectual property and rights pertaining thereto, and all cash and non-cash proceeds thereof.

**Creditors' Committee** shall mean the official unsecured creditors' committee appointed in the Case.

**Cumulative Period** shall mean the period from the Filing Date through the Friday of the most recent weekly period then ended.

**Default** shall mean any event specified in Section 11 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act, has been satisfied.

**Default Rate of Interest** shall mean a rate of interest per annum on any Obligations hereunder, equal to the sum of: (a) two percent (2%), plus (b) the Applicable Margin, plus (c) the

Base Rate, which the Agent shall be entitled to charge the Companies on all Obligations due the Agent on behalf of the Lenders, as further set forth in Paragraph 11.2 of Section 11 of this Agreement.

**Depository Accounts** shall mean the collection accounts, which are subject to the Agent's instructions, as specified in Paragraph 6.14 of Section 6 of this Agreement.

**Documentation Fee** shall mean (a) to the extent incurred after entry of the Final Order, all reasonable fees and expenses incurred in connection with or by the Agent's external legal counsel in negotiating, documenting, preparing for and attending a closing with respect to this Agreement, the Collateral, and/or the Obligations (all exclusive of Out-of-Pocket Expenses), plus (b) subsequent to the Closing Date, the fees of the Agent's outside legal counsel relating to any and all modifications, waivers, releases, amendments or additional collateral with respect to this Agreement, the Collateral and/or the Obligations (all exclusive of Out-of-Pocket Expenses); provided, that the Documentation Fee shall not include fees incurred by Arch in connection with the Competitive Process.

**Documents of Title** shall mean all of each of the Companies' present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or not and all goods and Inventory relating thereto and all cash and non-cash proceeds of the foregoing.

**Equipment** shall mean all of each of the Companies' present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto and all proceeds thereof of whatever sort.

**ERISA** shall mean the Employee Retirement Income Security Act or 1974, as amended from time to time and the rules and regulations promulgated thereunder from time to time.

**Event(s) of Default** shall have the meaning provided for in Section 11 of this Agreement.

**Filing Date** shall mean March 16, 2008.

**Final Order** shall mean a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to Agent and Lenders.

**Fiscal Year** shall mean each twelve (12) month period commencing on January 1 of each year and ending on the following December 31.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply, provided that in the event Shapes/Arch or any other Company modify their accounting principles and procedures as applied as of the Original Closing Date, the Companies

shall provide to the Agent and the Lenders such statements of reconciliation as shall be in form and substance reasonably acceptable to the Agent.

**General Intangibles** shall mean all of each of the Companies' present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all Trademarks, corporate names, business names, and any other designs or sources of business identities, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) inventions, (g) all applications with respect to the foregoing, (h) all right, title and interest in and to any and all extensions and renewals, (i) all goodwill with respect to any of the foregoing, (j) any other forms of similar intellectual property, (k) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, together with all monies and claims for monies now or hereafter due and payable in connection with any of the foregoing or otherwise, (l) all choses in action, causes of action, corporate and business records, and (m) all cash and non-cash proceeds thereof including, without limitation, the proceeds or royalties of any licensing agreements between the Companies and any licensee of any of the Companies' General Intangibles.

**Indebtedness** shall mean, without duplication, all liabilities, contingent or otherwise, which are any of the following: (a) obligations in respect of borrowed money or for the deferred purchase price of property, services or assets, other than Inventory, or (b) Capital Lease obligations.

**Insurance Proceeds** shall mean proceeds or payments from an insurance carrier with respect to any loss, casualty or damage to Collateral.

**Intercompany Debt** shall mean all Indebtedness outstanding from any one of the Companies to any other of the Companies.

**Intercreditor Agreement** shall mean the Intercreditor Agreement dated March 18, 2008 between the Revolving Agent, the Agent (as successor-in-interest, by assignment, of Arcus) and the Companies, as amended and restated in its entirety on the date hereof by that certain Amended and Restated Intercreditor Agreement dated hereof, between the Revolver Agent, the Agent and the Companies, as the same may hereafter be amended, restated, supplemented or otherwise modified from time to time.

**Interim Financing Order** means the order of the Bankruptcy Court in the Case authorizing and approving the Arcus Loan Documents on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code entered on March 18, 2008.

**Inventory** shall mean all of each of the Companies' present and hereafter acquired inventory (as defined in the UCC) and including, without limitation, all merchandise, inventory and goods, and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging or shipping same in all stages of production from raw materials through work-in-process to finished goods and all proceeds thereof of whatever sort.

**Investment Property** shall mean all now owned and hereafter acquired investment property (as defined in the UCC) and all proceeds thereof.

**Lead Arranger** shall mean Arch in its capacity as lead arranger of the Term Loan Credit Facility.

**Loan Accounts** shall mean the accounts on the Agent's books, in names of each of the Companies, in which each Company will be charged with all applicable Obligations under this Agreement.

**Loan Documents** shall mean this Agreement, the Final Order, the Term Loan Promissory Notes, the Assignment Agreement, the Mortgages, the other closing documents and any other ancillary loan and security agreements executed from time to time in connection with this Agreement, all as may be renewed, amended, extended, increased, restated or supplemented from time to time.

**Mandatory Prepayment** shall mean a Proceeds-Based Prepayment.

**Maturity Date** shall mean September 30, 2008 as may be extended by Agent, in its sole discretion, for additional periods in one or more weekly or monthly increments.

**Non-Borrowing Base Assets** shall mean the existing and future assets of the Companies and the proceeds thereof other than the Borrowing Base Assets (whether or not in the possession, custody or control of the Agent and/or any Lender), and all accessions thereto, substitutions for or replacements of and rents and profits from any and all of the foregoing. The Non-Borrowing Base Assets shall include all title insurance policies of Revolver Agent with respect to the Real Estate.

**Non-Borrowing Base Asset Proceeds** shall mean the collections, payments and proceeds (including without limitation insurance proceeds covering Non-Borrowing Base Assets and any condemnation awards and payments in lieu thereof) received by any Company from, or corresponding to, the Non-Borrowing Base Assets, which shall include, without limitation, all amounts corresponding to claims under any and all title insurance policies relating to the Real Estate.

**Obligations** shall mean all loans, advances and extensions of credit made or to be made by the Agent and/or the Lenders to the Companies or any one of them or to others for the account of any Company (including, without limitation, the Term Loans) under or pursuant to this Agreement, the Final Order, or any other Loan Document, which may at any time be owing by the Companies or any one of them to the Agent and/or the Lenders howsoever arising, whether now in existence or incurred by the Companies or any one of them from time to time hereafter under or pursuant to the Loan Documents, whether principal, interest, fees, costs, expenses or otherwise (including reasonable attorneys' fees); whether secured by pledge, lien upon or security interest in any of the Companies' Collateral, assets or property or the assets or property of any other Person; whether such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect and whether the Companies or any one of them are liable to the Agent and/or the Lenders for such indebtedness as principal, surety, endorser,

guarantor or otherwise. Obligations shall also include indebtedness owing to the Agent and/or the Lenders by the Companies or any one of them under any Loan Document, indebtedness or obligations incurred by, or imposed on, the Agent and/or the Lenders as a result of environmental claims arising out of any of the Companies' operations, premises or waste disposal practices or sites in accordance with paragraph 8.7 hereof; the Companies' liability to the Agent and/or the Lenders as maker or endorser of any promissory note or other instrument for the payment of money; the Companies' liability for Out-of-Pocket Expenses; the Companies' liability to the Agent and/or the Lenders under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which the Agent and/or the Lenders may make or issue to others for the Companies' account as contemplated by the Loan Documents, including the Agent's and/or Lenders' acceptance of drafts or the Agent's and/or Lenders' endorsement of notes or other instruments for the Companies' account and benefit.

**Operating Leases** shall mean all leases of property (whether real, personal or mixed) other than Capital Leases.

**Original Closing Date** shall mean March 18, 2008.

**Other Collateral** shall mean all of each of the Companies' now owned and hereafter acquired lockbox, blocked account and any other deposit accounts maintained with any bank or financial institutions into which the proceeds of Collateral are or may be deposited; all other deposit accounts and all Investment Property; all cash and other monies and property in the possession or control of the Agent and/or any of the Lenders; all books, records, ledger cards, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; and all cash and non-cash proceeds of the foregoing.

**Out-of-Pocket Expenses** shall mean all of the Agent's and Lenders' and their respective affiliates' costs and expenses incurred after entry of the Final Order, in connection with the transactions contemplated by this Agreement and the other Loan Documents or the Case, on one hand, and any Borrower or any of its affiliates, on the other hand, related to the transactions contemplated by this Agreement and the other Loan Documents or the Case, in each case, whether such costs and expenses were heretofore or are hereafter incurred, which costs and expenses shall include, without being limited to: all costs and expenses incurred in the monitoring of and participation in the Case; all costs and expenses incurred by the Agent in opening bank accounts, depositing checks, receiving and transferring funds, and wire transfer charges; all charges imposed on the Agent due to returned items and "insufficient funds" of deposited checks and the Agent's standard fees relating thereto; all travel, lodging, appraisal, consulting, accounting and auditing fees and any other expenses of the Agent's and Lenders' personnel, agents or representatives in connection with inspecting and monitoring the Collateral from time to time hereunder; all legal, accounting, consultant and other professional fees and costs; all fees and taxes relative to the filing of financing statements and other lien perfection documents; all expenses, costs and fees set forth in Paragraphs 11.2 and 11.3 of Section 11 of this Agreement; and all title insurance premiums, real estate survey costs, and costs of preparing and recording mortgages/deeds of trust against the Real Estate (including taxes). Notwithstanding the foregoing, Out-of-Pocket Expenses will not include expenses of Arch incurred in connection with the Competitive Process.

**Parent** shall mean Ben LLC, a New Jersey limited liability company.

**Patents** shall mean all of each of the Companies' present and hereafter acquired patents, patent applications, registrations, any reissues or renewals thereof licenses, any inventions and improvements claimed thereunder, and all general intangible, intellectual property and patent rights with respect thereto of the Companies or any one of them, and all income, royalties, cash and non-cash proceeds thereof.

**Permitted Encumbrances** shall mean: (a) liens existing on the date hereof on specific items of Equipment, liens arising after the date hereof on the same specific items of Equipment for the refinance of purchase-money Indebtedness, and other liens expressly permitted, or consented to in writing by the Agent and/or the Required Lenders; (b) Purchase Money Liens; (c) deposits made (and the liens thereon) in the ordinary course of business of the Companies (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations arising under applicable non-bankruptcy law, and other similar obligations arising as a result of progress payments under government contracts; (d) easements (including, without limitation, reciprocal easement agreements and utility agreements), encroachments, minor defects or irregularities in title, variation and other restrictions, charges or encumbrances (whether or not recorded) affecting the Real Estate, if applicable, and which in the aggregate (A) do not materially interfere with the occupation, use or enjoyment by any of the Companies or their business or the property so encumbered and (B) in the reasonable business judgment of the Agent do not materially and adversely affect the value of such Real Estate; (e) liens granted to the Agent by the Companies or any one of them; (f) consignment purchases not to exceed, in the aggregate, the sum of Three Million Dollars ($3,000,000.00) outstanding at any time, (g) subject to the Intercreditor Agreement, liens granted to Revolver Agent by the Company or to any one of them, under the Revolver Agreement and the "Loan Documents" (as defined therein), and (h) tax liens which are not yet due and payable or which are being diligently contested in good faith by the Companies by appropriate proceedings, and which liens are not (1) filed on any public records, or (2) senior to the liens of the Agent.

**Permitted Indebtedness** shall mean: (a) current Indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, Taxes or labor; (b) Indebtedness secured by Purchase Money Liens; (c) Indebtedness arising under this Agreement and the other Loan Documents; (d) deferred Taxes and other expenses incurred in the ordinary course of business; (e) Capital Lease Obligations having aggregate annual payments up to but not exceeding Four Hundred Thousand Dollars ($400,000.00); (f) insurance premiums financed by the insurance carrier; (g) Intercompany Debt; (h) unsecured Indebtedness incurred prior to the Filing Date and listed on Companies' schedule filed with the Bankruptcy Court in connection with the Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); (1) administrative priority unsecured Indebtedness approved by the Bankruptcy Court in the Case (but only if such Indebtedness is subordinate to the Superpriority Claim status of the Obligations as confirmed in an order of the Bankruptcy Court in form and substance acceptable to Agent); and (j)

*Approved by Judge Gloria M. Burns May  06, 2008*

Indebtedness evidenced by the Revolver Agreement and the other "Loan Documents" (as defined therein).

**Person** shall mean any individual, partnership, business entity, corporation, limited liability company, limited partnership, limited liability partnership, or other entity, including without limitation any governmental entity or the department thereof.

**Plan** shall mean any employee benefit plan within the meaning of Section 3(3) of ERISA, maintained for employees of the Companies or any member of the Controlled Group or any such Plan to which any Company or any member of the Controlled Group is required to contribute on behalf of any of its employees.

**Pre-Petition Financing Agreement** shall mean that certain Financing Agreement dated as of December 30, 2003 among CIT as agent, the lenders party thereto and Shapes, Ultra, Delair and Accu-Weld as borrowers, as amended through the Filing Date.

**Pre-Petition Payments** shall mean a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or trade payables or other pre-petition claims against a Company.

**Proceeds-Based Prepayment** shall have the meaning provided for in Paragraph 4.6 of this Agreement.

**Purchase Money Liens** shall mean liens on any item of Equipment acquired after the date of this Agreement provided that (a) each such lien shall attach only to the Equipment to be acquired, (b) a description of the Equipment so acquired is furnished to the Agent, and (c) Indebtedness incurred in connection with such acquisitions shall not exceed, in the aggregate, Three Hundred Fifty Thousand Dollars ($350,000) in any Fiscal Year.

**Real Estate** shall mean all of each Company's leasehold or fee interests in real property, including any such real property which has been, or will be, encumbered, mortgaged or pledged or assigned to the Agent or its designee as set forth on Schedule 1R.

**Reorganization Plan** shall mean a plan or plans of reorganization in the Case.

**Required Lenders** shall mean the Lenders holding greater than fifty percent (50%) of the outstanding Term Loans.

**Revolver Agent** shall mean CIT or any successor agent under the Revolver Agreement.

**Revolver Agreement** shall mean the Amended and Restated Debtor-In-Possession Revolving Credit Financing Agreement dated as of the date hereof, by and among Revolver Agent, Revolver Lenders and Companies, as amended.

**Revolver Commitment** shall have the meaning given to the term "Commitment" in Revolver Agreement.

**Revolver Lenders** shall mean the lenders under the Revolver Agreement.

**Revolving Loans** shall have the meaning specified thereto in the Revolver Agreement.

**Senior Claims** shall have the meaning provided for in Paragraph 7.1 of this Agreement.

**Settlement Date** shall mean the date, weekly, and more frequently, at the discretion of the Agent, upon the occurrence of an Event of Default that the Agent and the Lenders shall settle amongst themselves so that (a) the Agent shall not have, as the Agent, any money at risk and (b) on such Settlement Date the Lenders shall have a pro rata amount of all outstanding Term Loans, provided that each Settlement Date for a Lender shall be a Business Day on which such Lender and its bank are open for business.

**Shapes/Arch** shall mean Shapes/Arch Holdings L.L.C., a New Jersey Limited Liability Company.

**Superpriority Claim** shall mean an allowed claim against a Company or its estate in the Case, which is an administrative expense claim having priority over (a) any and all allowed administrative expenses, and (b) unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code.

**Taxes** shall mean all federal, state, municipal and other governmental taxes, levies, charges, claims and assessments which are or may be due from the Companies with respect to their business, operations, Collateral or otherwise.

**Term Loan Advance(s)** shall mean any monies advanced to or for the benefit of Borrowers, or any of them, by Lenders, under the Term Loan Facility.

**Term Loan Facility** shall mean the Superpriority Senior Secured Debtor-In-Possession term loan facility as more fully discussed in Section 4 below.

**Term Loan Facility Amount** shall mean the aggregate amount permitted to be outstanding at any time under the Term Loan Facility, which amount shall initially be $30,000,000.

**Term Loan Promissory Notes** shall mean the promissory notes in the form of Exhibit A hereto executed by the Companies to evidence the Term Loans made by the Lenders under Section 4 hereof.

**Term Loan(s)** shall mean each Term Loan Advance made by the Lenders pursuant to and repayable in accordance with the provisions of Section 4 of this Agreement which shall be advanced to the Companies.

**Term Loan Commitment** shall mean each Lender's commitment in accordance with this Agreement to make the Term Loans.

**Termination Date** shall mean the earliest to occur of (a) the Maturity Date, (b) the effective date of a plan of reorganization where Arch is the plan funder, (c) the date of

confirmation of a Reorganization Plan which does not pay the Obligations in full, in cash on the effective date of such  Reorganization Plan, (d) the date of proposal of a Reorganization Plan that does not provide for the payment of Obligations in full, in cash on the effective date thereof, (e) the date of the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, (f) the date of the dismissal of the Case, (g) the date of the cessation of material business operations of the Companies, (h) the last termination date set forth in the Final Order, or (i) such earlier date on which the Term Loans shall become due and payable, in whole, in accordance with the terms of this Agreement.

**Termination Event** shall mean the date (a) on which the Companies terminate this Agreement and the Term Loans are prepaid in full following notice of termination  as set forth herein, which date is prior to the Maturity Date; (b) the date of confirmation of a Reorganization Plan or plan of liquidation other than such plan proposed, funded and/or sponsored by Arch or other plan of reorganization that provides for payment of the Obligations in full, in cash on the effective date of such plan, or (c) entry of an order authorizing a 363 sale of a material portion of the assets of the Companies to a purchaser other than Arch.  Notice of termination as aforesaid in clause (a) above, by an manager or officer of Shapes/Arch on behalf of the Companies, shall be deemed to be notice by all of the Companies for the purposes hereof.

**Trade Accounts Receivable** shall mean that portion of the Companies' Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of the Companies' businesses.

**Trademarks** shall mean all of each of the Companies' present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, service marks, logos, prints and labels (on which any of the foregoing may appear), licenses, reissues, renewals, and any other intellectual property and trademark rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all cash and non-cash proceeds thereof.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York.

**Waived In Writing By Agent** shall mean the written waiver of an Event of Default by the Agent either acting in its discretion or acting at the direction of the Required Lenders, in the case of the waiver of Events of Default which require such consent.

## SECTION 2   Conditions Precedent

**2.1**    The obligation of the Agent and the Lenders to make the initial loans hereunder is subject to the satisfaction of, or extension or waiver of in writing, on or prior to, the Closing Date, the following conditions precedent:

(a)    **Loan Documents**. The Agent shall have received executed copies of  (a) the Arcus Loan Documents delivered on the Original Closing Date, as amended or modified through the date hereof and (b) the Assignment Agreement.  All documents provided by the Debtors to the Arch pursuant to this Agreement shall constitute confidential information and

shall not be used for any purpose except as contemplated under this Agreement and to enforce any and all of the Agent's or Lender's rights or remedies hereunder.

(b)    **Casualty Insurance.** Each of the Companies shall have delivered to the Agent evidence satisfactory to the Agent that casualty insurance policies listing the Agent as additional insured, lender loss payee or mortgagee, as the case may be, are in full force and effect, all as set forth in Paragraph 8.5 of Section 8 of this Agreement.

(c)    [Intentionally Omitted].

(d)    [Intentionally Omitted].

(e)    **Company/Corporate Organization.** The Agent shall have received (i) a copy of the Amended and Restated Certificate of Formation or Certificate of Incorporation, as applicable, of the Companies which are not individual Persons certified by the Secretaries of State of the state of their formation or incorporation, and (ii) a copy of the Operating Agreement, Limited Liability Company Agreement, or By-Laws, as applicable, of the Companies certified by the Manager or Secretary or Assistant Secretary thereof all as amended through the date hereof, in each case as amended as necessary to provide the changes in corporate governance of the Debtors provided for in the Final Order.

(f)    **Member's/Manager's/Officer's Certificate.** The Agent shall have received an executed Member's, Manager's or Officer's Certificate of the Companies, satisfactory in form and substance to the Agent, certifying on behalf of the Companies that: (i) the representations and warranties contained herein and in the other Loan Documents are true and correct in all material respects on and as of the Closing Date; (ii) the Companies are in material compliance with all of the terms and provisions set forth herein and in the other Loan Documents, except for Defaults or Event of Defaults that have been waived.

(g)    [Intentionally Omitted]

(h)    [Intentionally Omitted]

(i)    [Intentionally Omitted]

(j)    **Intercreditor Agreement.** Revolver Agent, the Companies and Agent shall have entered into the Intercreditor Agreement which Intercreditor Agreement shall be in full force and effect.

(k)    **Additional Documents.** Each of the Companies shall have executed and delivered to the Agent all Loan Documents necessary to consummate the lending arrangement contemplated between the Companies, the Agent and the Lenders.

(l)    [Intentionally Omitted]

(m)    [Intentionally Omitted]

(n)   **Depository Accounts**. Each of the Companies shall have established a system of lockbox and bank accounts with respect to the collection of Accounts and the deposit of proceeds of Collateral as shall be acceptable to the Agent in all respects.

(o)   **Fees**. Agent shall have received any fees due and payable on or prior to the Closing Date.

(p)   [Intentionally Omitted]

(q)   [Intentionally Omitted]

(r)   **Schedules.** The Companies shall provide the Agent with updated schedules of (a) any of the Companies' and their subsidiaries' (i) Trademarks, (ii) Patents, and (iii) Copyrights, as applicable and all in such detail as to provide appropriate recording information with respect thereto, (b) any tradenames, (c) Collateral locations, and (d) Permitted Encumbrances, all of the foregoing in form and substance satisfactory to the Agent as listed on Schedule 2.1.

(s)   [Intentionally Omitted]

(t)   [Intentionally Omitted]

(u)   [Intentionally Omitted]

(v)   **Budget.** The Agent and each Lender shall have received the Budget; provided, that in the event the Debtor hasn't provide an updated Budget acceptable to the Agent, the Agent agrees that the initial Budget shall be the Budget attached hereto as Exhibit B.

(w)   [Intentionally Omitted]

(x)   **Revolver Agreement.** The Agent shall have received executed copies of the Revolver Agreement and the "Loan Documents" (as defined therein) in form and substance satisfactory to Agent.

(y)   **Funding of Revolving Loans.** The initial Revolving Loans shall have been funded.

(z)   **Competitive Process**.  The Debtors shall have agreed to proceed with the process set forth on Exhibit C or such other competitive process as is acceptable to the Lender (the "Competitive Process").  Until the entry of an order approving the Competitive Process acceptable to Arch, the Debtors shall be prohibited from soliciting, negotiating and/or discussing with any entity other than Arch, the sale of substantially all of the Debtors' assets or equity or a plan of reorganization other than the Plan filed as Exhibit 3 to the Final Order.  The Debtors and the Committee may provide potentially interested parties the same due diligence materials previously provided to Arch, subject to the execution of a confidentiality agreement, in form and substance the same as the confidentiality agreement executed by Arch.

(aa)   **Assignment Agreement.** The Agent and Arcus shall have entered into the Assignment Agreement, which Assignment Agreement shall be in full force and effect and the assignment provided for thereunder shall have become effective.

**2.2**   **Conditions to Each Extension of Credit**

Subject to the terms of this Agreement, including, without limitation, the Agent's rights pursuant to Paragraph 11.2 of Section 11 hereof, the agreement of the Agent on behalf of the Lenders to make any Term Loan Advance requested to be made by it to any of the Companies on any date (including without limitation, the initial extension of credit and any subsequent Term Loan Advance) is subject to the satisfaction of the following conditions precedent:

(a)   **Representations and Warranties**. Each of the representations and warranties made by each of the Companies in or pursuant to this Agreement or any other Loan Document shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified by materiality or the like in the text thereof) on and as of such date as if made on and as of such date except if limited to an earlier date.

(b)   **No Default.** No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extension of credit requested to be made on such date.

(c)   **Budget Variance.**   The Debtors shall be in compliance with the provisions of Section 8.20.

(d)   **Compliance with Final Order.** The extension of credit requested shall not cause the aggregate outstanding amount of the Term Loan Facility to exceed the amount then authorized by the Final Order or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

(e)   [Intentionally Omitted]

(f)   **Final Order.** The Final Order shall (i) have been entered in form and substance to Agent and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Agent; (ii) be in full force and effect and shall not have been amended, modified or stayed without the written consent of Agent or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. Companies, Agent and Lenders shall be entitled to rely in good faith upon the applicable Order notwithstanding any such objection, appeal or motion for reconsideration. Agent and Lenders shall be permitted and Companies shall be required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Order has been stayed by a court of competent jurisdiction.

(g)   **Revolver Agreement Order**. Entry by the Bankruptcy Court of an order approving the transactions contemplated by the Revolver Agreement in form and substance satisfactory to Agent and substantially similar to the Final Order.

(h) **Revolver Funding**. Revolver Agent and Revolver Lenders shall have funded, to the extent of any Availability, any and all Revolving Loans requested by Borrowers.

(i) **Disbursement Authorization.** The Companies shall have delivered to the Agent all information necessary for the Agent and the Lenders to issue wire transfer instructions on behalf of the Companies for the initial and subsequent loans and/or advances to be made under this Agreement including, but not limited to, disbursement authorizations in form acceptable to the Agent..

Each request for a Term Loan Advance hereunder shall constitute a representation and warranty by all of the Companies as of the date of such request that each of the representations, warranties and covenants contained in this Agreement have been satisfied and are true and correct, except as the Companies and the Agent and/or the Required Lenders shall otherwise agree herein or in a separate writing.

## SECTION 3   RESERVED

## SECTION 4   Term Loans

**4.1**     The Companies hereby agree to execute and deliver to the Agent, on behalf of the Lenders, the Term Loan Promissory Notes, to evidence the Term Loan to be extended under the Term Loan Facility and this Agreement.

**4.2**     Upon receipt of such Term Loan Promissory Notes, the Lenders each hereby agree severally and not jointly to extend the initial Term Loan Advance to the Companies, pro rata according to the Commitment of each Lender. The Term Loan Facility may be funded in multiple Term Loan Advances, but no Term Loan Advances under the Term Loans shall be made within one (1) Business Day of the Maturity Date. Borrowers shall deliver to Agent no later than 3:00 PM (Eastern Time) one (1) Business Day prior to such proposed Term Loan Advance, a written request to make a Term Loan Advance along with an updated Budget satisfactory to Agent and calculation of the remaining availability under the Term Loan Facility and the Availability under the Revolver Agreement. Borrower shall have the right to reborrow any portion of the Term Loan which is repaid or prepaid (including, without limitation, pursuant to a Mandatory Prepayment) from time to time prior to the Termination Date, provided however that no Term Loan Advances under the Term Loans shall be made within one (1) Business Day of the Maturity Date.

**4.3**     The principal amount of the Term Loans shall be due and payable and shall be repaid by the Companies to the Agent on behalf of Lenders in full on the Termination Date together with all accrued and unpaid interest and all other Obligations.

**4.4**     In the event this Agreement is terminated by either the Agent in accordance with this Agreement or the Companies for any reason whatsoever, the Term Loans shall become due and payable, in full, on the effective date of such termination notwithstanding any provision to the contrary in the Term Loan Promissory Notes or this Agreement.

**4.5**     The Companies may prepay at any time, at their option, in whole or in part, the Term Loans, provided that on each such prepayment, the Companies shall pay accrued interest

on the principal so prepaid to the date of such prepayment. Any such prepayment shall be applied to the Term Loan, as determined by Agent in its sole discretion, in the inverse order of maturity.

**4.6**    Immediately upon the receipt by any of the Companies of (i) any Non-Borrowing Base Asset Proceeds, Companies shall pre-pay the outstanding principal amount of the Obligations in an amount equal to 100% of such Non-Borrowing Base Asset Proceeds; provided that, so long as (a) no Default or Event of Default shall have occurred, (b) Borrowers shall have given Agent prior written notice of such Borrower's intention to apply such monies to the cost of replacement of the properties or assets that are the subject of such sale or disposition, (c) Agent has given prior written consent and (d) Companies complete such replacement purchase or construction within 90 days after the initial receipt of such monies, Companies shall have the option to apply such monies to the cost of replacement of the Non-Borrowing Base Asset that is the source of such Non-Borrowing Base Asset Proceeds unless and to the extent that such applicable period shall have expired without such replacement, purchase or construction being made or completed, in which case, the amount of such Non-Borrowing Base Asset Proceeds shall be paid to Agent; and (ii) the proceeds of the issuance or incurrence of any Indebtedness (other than Permitted Indebtedness), Companies shall prepay the outstanding principal amount of the Obligations in an amount equal to 100% of the net cash proceeds received by such Person in connection with such issuance or incurrence (each Mandatory Prepayment set forth in clauses (i) and (ii) above, a "Proceeds-Based Prepayment"). Such Mandatory Prepayment shall be applied to the outstanding balance of the Term Loans or any of them, as the Agent shall elect, however, the Term Loan Facility Amount shall not be reduced by the amount of such Mandatory Prepayment and shall remain available for borrowing as set forth in Paragraph 4.2 above.

**4.7**    [Intentionally Omitted]

**4.8**    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lenders shall be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.

**4.9**    (a)  The Agent shall maintain a Loan Account on its books in which each of the Companies will be charged with all loans and advances made by the Agent and the Lenders to such Company or for its account, and with any other Obligations, including any and all costs, expenses and reasonable attorney's fees which the Agent may incur in connection with the exercise by or for the Agent of any of the rights or powers herein conferred upon the Agent, or in the prosecution or defense of any action or proceeding to enforce or protect any rights of the Agent in connection with this Agreement, the other Loan Documents or the Collateral assigned hereunder, or any Obligations owing by such Company. The Companies will be credited with all amounts received by the Agent and/or the Lenders from the Companies or from others for the Companies' account, and such amounts will be applied to payment of the Obligations as set forth herein.

(b)    Each of the Companies acknowledges and agrees that: (i) the Agent shall have no responsibility to inquire into the correctness of the apportionment, allocation, or disposition of (x) any loans and advances made to any of the Companies or (y) any of the

Agent's expenses and charges relating thereto; (ii) each of the Companies jointly and severally unconditionally guarantee to the Agent and Lenders the prompt payment in full of all loans and advances made and to be made by the Agent and Lenders to any of them under this Agreement, as well as all other Obligations of the Companies to Agent and Lenders; (iii) all Accounts assigned to the Agent by any of the Companies and all other Collateral and any other collateral security now or hereafter given to the Agent by any of the Companies (be it Accounts or otherwise), shall secure all loans and advances made by the Agent and Lenders to any of the Companies, and shall be deemed to be pledged to the Agent as security for any and all other Obligations of the Companies as set forth under this Agreement or any other agreements between the Agent and any of the Companies; and (iv) to induce the Agent and Lenders to extend financial accommodations hereunder, and in consideration thereof, each of the Companies hereby agrees to indemnify the Agent and the Lenders and hold the Agent and the Lenders harmless against any and all liability, expense, loss or claim of damage or injury, made against the Agent or the Lenders by any of the Companies or by any third party whosoever, arising from or incurred solely by reason of (A) the method of handling the accounts of the Companies as herein provided, (B) Agent's relying on any instructions of any of the Companies, or (C) any other action taken by the Agent in accordance with this subparagraph (b) of this Paragraph 4.9, except to the extent arising from the gross negligence or willful misconduct of the Agent and/or Lenders.

4.10    The Term Loan Advances shall be used to fund general corporate purposes and ongoing working capital needs of Borrowers as set forth in the Budget to the extent such general corporate purposes and working capital needs exceed Availability under the Borrowing Base provided for in the Revolver Agreement.

4.11    Nothing contained herein shall constitute a novation of any Obligation(s) under the Arcus Loan Documents, as amended by this Agreement.

## SECTION 5    RESERVED

## SECTION 6    Collateral

6.1    As security for the prompt payment in full of all Obligations, each of the Companies hereby pledges and grants to the Agent, on behalf of the Lenders, a first priority continuing general lien upon, and security interest in, all of their now owned and hereafter acquired real and personal property, including, without limitation, the Collateral and Other Collateral.

6.2    The security interests granted hereunder shall extend and attach to:

(a)    All Collateral which is owned by any of the Companies or in which the Companies have any interest, whether held by the Companies or others for their account, and, if any Collateral is Equipment, whether the Companies' interest in such Equipment is as owner, finance lessee or conditional vendee;

(b)    All Equipment, whether the same constitutes personal property or fixtures, including, but without limiting the generality of the foregoing, all dies, jigs, tools, benches,

molds, tables, accretions, component parts thereof and additions thereto, as well as all accessories, motors, engines and auxiliary parts used in connection with, or attached to, the Equipment; and

(c)    All Inventory and any portion thereof which may be returned, rejected, reclaimed or repossessed by either the Agent or the Companies from the Companies' customers, as well as to all supplies, goods, incidentals, packaging materials, labels and any other items which contribute to the finished goods or products manufactured or processed by the Companies, or to the sale, promotion or shipment thereof.

6.3    The Companies agree to safeguard, protect and hold all Inventory for the Agent's account and make no disposition thereof except in the ordinary course of the business of the Companies, as herein provided. Upon the sale, exchange, or other disposition of Inventory, as herein provided, the security interest in the Inventory provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds, including any instruments for the payment of money, Trade Accounts Receivable, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sale, exchange or disposition. As to any such sale, exchange or other disposition, the Agent shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation. The Companies hereby agree to immediately forward any and all proceeds of Collateral to the Depository Account, and to hold any such proceeds (including any notes and instruments), in trust for the Agent, on behalf of the Lenders, pending delivery to the Agent. Irrespective of the Agent's perfection status in any and all of the General Intangibles, including, without limitations, any Patents, Trademarks, Copyrights or licenses with respect thereto, the Companies hereby irrevocably grant the Agent a royalty free license to sell, or otherwise dispose or transfer, in accordance with Paragraph 11.3 of Section 11 of this Agreement, and the applicable terms hereof of any of the Inventory upon the occurrence of an Event of Default which has not been Waived In Writing By Agent. Notwithstanding anything to the contrary, each of the provisions of this Paragraph 6.3 shall be subject to the Intercreditor Agreement.

6.4    The Companies agree at their own cost and expense to keep the Equipment in as good and substantial repair and condition as the same is now or at the time the lien and security interest granted herein shall attach thereto, reasonable wear and tear and casualty excepted, making any and all repairs and replacements when and where necessary. The Companies also agree to safeguard, protect and hold all Equipment in accordance with the terms hereof and subject to the Agent's security interest. The Companies may not, without prior written consent of Agent, such consent not to be unreasonably withheld, in the ordinary course of their business, sell, exchange or otherwise dispose of Equipment; provided, that, subject to Paragraph 4.6 above, the proceeds of any such sales or dispositions consented to by Agent shall be held in trust by the Companies for the Agent and shall be immediately delivered to the Agent, except that, subject to the prior written consent of Agent, the Companies may retain and use such proceeds to purchase forthwith replacement Equipment which the Companies determine in their reasonable judgment to have a collateral value at least equal to the Equipment so disposed of or sold; provided, however, that the aforesaid right shall automatically cease upon the occurrence of an Event of Default which is not Waived In Writing By Agent. Upon the sale, exchange, or other disposition of the Equipment, as herein provided, the security interest provided for herein shall, without break in continuity and without further formality or act, continue in, and attach to, all proceeds,

including any instruments for the payment of money, Accounts, documents of title, shipping documents, chattel paper and all other cash and non-cash proceeds of such sales, exchange or disposition. As to any such sale, exchange or other disposition, the Agent and the Lenders shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

6.5     The rights and security interests granted to the Agent and the Lenders hereunder are to continue in full force and effect, notwithstanding the termination of this Agreement, until the final indefeasible payment in full in cash to the Agent of all Obligations and the termination of this Agreement. Any delay, or omission by the Agent to exercise any right hereunder shall not be deemed a waiver thereof, or be deemed a waiver of any other right, unless such waiver shall be in writing and signed by the Agent. A waiver on any one occasion shall not be construed as a bar to, or waiver of any right or remedy on any future occasion.

6.6     Notwithstanding the Agent's security interest in the Collateral and to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral or by the guarantee, endorsement, assets or property of any other person, the Agent shall have the right in its sole discretion to determine which rights, liens, security interests or remedies the Agent shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of them, or any of the Agent's and/or the Lenders' rights hereunder.

6.7     Any balances to the credit of the Companies and any other property or assets of the Companies in the possession or control of the Agent and/or the Lenders may be held by the Agent as security for any Obligations and applied in whole or partial satisfaction of such Obligations when due. The liens and security interests granted herein, and any other lien or security interest the Agent and/or the Lenders may have in any other assets of the Companies, shall secure payment and performance of all now existing and future Obligations. The Agent may, in its discretion, charge any or all of the Obligations to the Loan Account when due.

6.8     Each of the Companies possesses all General Intangibles and rights thereto necessary to conduct their business as conducted as of the Closing Date and the Companies shall maintain their rights in, and the value of, the foregoing in the ordinary course of their business, including, without limitation, by making timely payment with respect to any applicable licensed rights. The Companies shall deliver to the Agent, and/or shall cause the appropriate party to deliver to the Agent, from time to time such pledge or security agreements with respect to General Intangibles (now or hereafter acquired) of the Companies and their subsidiaries as the Agent shall require to obtain valid first liens thereon. In furtherance of the foregoing, the Companies shall provide timely notice to the Agent of any additional Patents, Trademarks, Copyrights, brand names, and other trade designations acquired or applied for subsequent to the Original Closing Date and the Companies shall execute such documentation as the Agent may reasonably require to obtain and perfect its lien thereon. The Companies hereby confirm that they shall deliver to the Agent each note or other instrument evidencing indebtedness owed to them including without limitation all intercompany indebtedness among the Companies, whether such note or other instrument now exists or arises or is issued at any time hereafter, in each case endorsed to the Agent pursuant to an endorsement in form and substance acceptable to the Agent. The Companies hereby confirm that they shall deliver, or cause to be delivered, any

pledged stock or membership interests (if certificated) issued subsequent to the Original Closing Date to the Agent in accordance with the applicable terms of the Pledge Agreement and prior to such delivery, shall hold any such stock or membership interests (if certificated) in trust for the Agent. The Companies hereby irrevocably grant to the Agent a royalty-free, non-exclusive license in the General Intangibles, including Trademarks, Copyrights, Patents, licenses, and any other proprietary and intellectual property rights and any and all right, title and interest in any of the foregoing, for the sole purpose, upon the occurrence of an Event of Default which is not Waived In Writing By Agent, of the right to: (i) advertise for sale and sell or transfer any Inventory bearing any of the General Intangibles, and (ii) make, assemble, prepare for sale or complete, or cause others to do so, any applicable raw materials or Inventory bearing any of the General Intangibles, including use of the Equipment and Real Estate for the purpose of completing the manufacture of unfinished goods, raw materials or work-in-process comprising Inventory, and apply the proceeds thereof to the Obligations hereunder, all as further set forth in this Agreement and irrespective of the Agent's lien and perfection in any General Intangibles. Notwithstanding anything to the contrary, each of the provisions of this Paragraph 6.8 shall be subject to the Intercreditor Agreement.

**6.9**     The Companies confirm to the Agent that any and all Taxes or fees relating to their business, their sales, the Accounts or Inventory relating thereto, are their sole responsibility and that same will be paid by the Companies when due, subject to Paragraph 8.6 of Section 8 of this Agreement, and that none of said Taxes or fees represent a lien (other than Permitted Encumbrances) on or claim against the Accounts. The Companies hereby further represent and warrant that they shall not acquire any Inventory on a consignment basis (except Inventory not exceeding Three Million Dollars ($3,000,000) in aggregate value which is not commingled with other Inventory and which is specifically identified on each Inventory report as ineligible Inventory consigned to such Company), nor co-mingle their Inventory with any of their customers or any other person, including pursuant to any bill and hold sale or otherwise, and that their Inventory is marketable to their customers in the ordinary course of business of the Companies, except as a Company may otherwise report in writing to the Agent from time to time. Each of the Companies also warrants and represents it is a duly and validly existing limited liability company and qualified in all states where the failure to so qualify would have a material adverse effect on either the business of the Companies or the ability of the Companies to enforce collection of Accounts due from customers residing in that state. The Companies agree to maintain such books and records regarding Accounts and Inventory as the Agent may reasonably require and agree that the books and records of the Companies will reflect the Agent's interest in the Accounts and Inventory. All of the books and records of each of the Companies will be available to the Agent during normal business hours, including any records handled or maintained for the Companies by any other company or entity.

**6.10**     In furtherance of the continuing assignment and security interest in each of the Companies' Accounts and Inventory, each of the Companies will, upon the creation of Accounts and purchase or acquisition of Inventory, execute and deliver to the Agent in such form and manner as the Agent may reasonably require, solely for the Agent's convenience in maintaining records of Collateral, such confirmatory schedules of Accounts and Inventory as the Agent may reasonably request, including, without limitation, weekly schedules of Accounts and monthly schedules of Inventory, all in form and substance satisfactory to the Agent, and such other appropriate reports designating, identifying and describing the Accounts and Inventory as the

Agent may reasonably request, and provided further that the Agent may request any such information more frequently, from time to time, upon its reasonable prior request. In addition, upon the Agent's request, each of the Companies shall provide the Agent with copies of agreements with, or purchase orders from, such Company's customers, and copies of invoices to customers, proof of shipment or delivery, access to its computers, electronic media and software programs associated therewith (including any electronic records, contracts and signatures) and such other documentation and information relating to said Accounts and other Collateral as the Agent may reasonably require. Failure to provide the Agent with any of the foregoing shall in no way affect, diminish, modify or otherwise limit the security interests granted herein. Each of the Companies hereby authorizes the Agent to regard such Company's printed name or rubber stamp signature on assignment schedules or invoices as the equivalent of a manual signature by one of such Company's authorized officers or agents.

**6.11**    This Agreement and the obligation of the Companies to perform all of their covenants and obligations hereunder are further secured by mortgages and assignments of leases and rents on the Real Estate.

**6.12**    The Companies shall give to the Agent from time to time such mortgage(s), deed(s) of trust or assignment(s) on the Real Estate or real estate acquired after the date hereof as the Agent shall require to obtain a valid first lien thereon subject only to those exceptions of title as set forth in future title insurance policies that are satisfactory to the Agent.

**6.13**    In the event the Companies form a subsidiary, or acquire a subsidiary, the Companies shall cause and direct such subsidiary to: (a) join as a Borrower hereunder and become liable for, jointly and severally with the Companies, all Obligations, and (b) deliver to the Agent for the benefit of the Agent and the Lenders, a security interest or mortgage on or in all assets, including real estate, of such subsidiary.

**6.14**    (a)    Until the Agent has advised the Companies to the contrary after the occurrence of an Event of Default which has not been Waived In Writing By Agent, the Companies, at their expense, will enforce, collect and receive all amounts owing on their respective Accounts in the ordinary course of their business and any proceeds they so receive shall be subject to the terms hereof and held on behalf of and in trust for the Agent, on behalf of the Lenders. Such privilege shall terminate at the election of the Agent, upon the occurrence of an Event of Default, until such Event of Default is Waived In Writing By Agent. Any checks, cash, credit card sales and receipts, notes or other instruments or property received by a Company with respect to any Collateral, including Accounts, shall be held by such Company in trust for the Agent on behalf of the Lenders, separate from such Company's own property and funds, and promptly turned over to the Agent with proper assignments or endorsements by deposit to the Depository Accounts. Each of the Companies shall: (i) irrevocably authorize and direct any banks which maintain the Companies' initial receipt of cash, checks and other items to promptly wire transfer all available funds to a Depository Account; and (ii) advise all such banks of the Agent's security interest in such funds. The Companies shall provide the Agent with prior written notice of any and all deposit accounts opened or to be opened subsequent to the Original Closing Date. No checks, drafts or other instrument received by the Agent shall constitute final payment to the Agent and/or the Lenders unless and until such instruments have actually been

collected. Notwithstanding anything to the contrary, each of the provisions of this Paragraph 6.14(a) shall be subject to the Intercreditor Agreement.

(b)      Subject to the Intercreditor Agreement, the Companies shall establish and maintain, in their name and at their expense, deposit accounts with such banks as are acceptable to the Agent (the "Blocked Accounts") into which the Companies shall promptly cause to be deposited: (i) all proceeds of Collateral received by the Companies, including all amounts payable to the Companies from credit card issuers and credit card processors, and (ii) all amounts on deposit in deposit accounts used by the Companies at each of their locations, all as further provided in Paragraph 6.14(a) above. At such time as the Agent and Lenders are entitled to a first lien on the Blocked Accounts, in accordance with the Intercreditor Agreement, the banks at which the Blocked Accounts are established shall enter into an agreement, in form and substance satisfactory to the Agent (the "Blocked Account Agreements"), providing that all cash, checks and items received or deposited in the Blocked Accounts are the property of the Agent, that the depository bank has no lien upon, or right of set off against, the Blocked Accounts and any cash, checks, items, wires or other funds from time to time on deposit therein, except as otherwise provided in the Blocked Account Agreements, and that, subject to the Intercreditor Agreement, automatically, on a daily basis the depository bank will wire, or otherwise transfer, in immediately available funds, all funds received or deposited into the Blocked Accounts to such bank account as the Agent may from time to time designate for such purpose. The Companies hereby confirm and agree that all amounts deposited in such Blocked Accounts and any other funds received and collected by the Agent, whether as proceeds of Inventory or other Collateral or otherwise, shall be, subject to the Intercreditor Agreement, the property of the Agent.

## SECTION 7    Superpriority Claims, Collateral Security, Etc.

7.1      **Superpriority Claims and Collateral Security.** Companies hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Final Order, all of the Obligations:

(a)      shall at all times constitute a Superpriority Claim having priority, pursuant to Section 364(c)(1) of the Bankruptcy Code, over any claims of any Person (other than Revolver Agent, which claims shall be pari passu), whether now existing or hereafter arising, including any claims under Sections 105(a), 326, 330, 328, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out and excluding any Avoidance Actions; and

(b)      pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code, shall at all times be secured by a first priority perfected lien in all of the assets (excluding, any Avoidance Actions), subject to the Intercreditor Agreement, whether now owned or hereafter acquired, of each Company and its estate, subject, as to priority, only to the Carve-Out and Permitted Encumbrances securing those valid, perfected, non-avoidable secured claims existing on the Filing Date and listed on Schedule 7.1 (collectively, "Senior Claims"). The liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

The agreement of Agent and Lenders to provide post-petition financing to Borrowers will not prohibit Agent or Lenders from moving in the Bankruptcy Court for any

other and further relief which Agent or Lenders believes in good faith to be reasonably and immediately necessary to protect their rights with respect to the Collateral (including a request for Company to abandon any part of the Collateral) or otherwise.

**7.2**   **No Filings Required.** Notwithstanding Section 6, the liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Final Order. Agent shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the lien granted by or pursuant to the Final Order or this Agreement or any other Loan Document.

**7.3**   **Grants, Rights and Remedies.** The lien and administrative priority granted by or pursuant to the Final Order or this Agreement or any other Loan Document are independently granted. The Final Order and this Agreement and the other Loan Documents supplement each other, and the grants, priorities, rights and remedies of Agent and Lenders hereunder and thereunder are cumulative.

**7.4**   [Intentionally Omitted]

**7.5**   **Survival.** The liens, lien priority, administrative priorities and other rights and remedies granted to Agent and Lenders pursuant to the Final Order, this Agreement and the other Loan Documents (specifically including, without limitation, the existence, perfection and priority of the liens provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by any Company (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Case, or by any other act or omission whatsoever. Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)     except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code, are or will be prior to or on a parity with any claim of Agent or any Lender against the Companies in respect of any Obligation;

(b)     the liens securing the Obligations shall constitute valid and perfected liens and, subject only to the Carve-Out and Permitted Encumbrances securing Senior Claims, shall be prior to all other liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever; and

(c)     the liens securing the Obligations shall continue to be valid and perfected without the necessity that Agent file financing statements, mortgages or otherwise perfect its lien under applicable non-bankruptcy law.

**7.6**   [Intentionally Omitted]

**7.7**   **Exclusive Remedy For Any Alleged Post-Petition Claim.** If any Company asserts that it has any adverse claims against Agent or Lenders, with respect to this Agreement

and the transactions contemplated hereby, each Company agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (the "Damage Lawsuit").

**7.8**   **Prohibition on Surcharge; Etc.** No Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out. The prohibition on surcharging or priming of the liens of Agent on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a lien or rights (through any means, at law or in equity) which in any case is equal or senior to the liens of Agent on the Collateral. Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this Paragraph 7.8.

**7.9**   **Marshalling Obligations.** The right of Agent to seek the equitable remedy of marshalling is expressly preserved, and Companies will cooperate fully with any effort by Agent to exercise its equitable remedy of marshalling.

## SECTION 8   Representations, Warranties and Covenants

**8.1**   Each of the Companies hereby warrants, represents and covenants that: (i) Schedule 8.1 hereto correctly and completely sets forth the Companies' (A) chief executive office, (B) Collateral locations and (C) tradenames; (ii) except for the Permitted Encumbrances, upon entry of the Final Order, this Agreement creates a valid, perfected and first priority security interest in and to the Collateral and the security interests granted herein constitute and shall at all times constitute the first and only liens on the Collateral; (iii) except for the Permitted Encumbrances, the Companies are, or will be, at the time additional Collateral is acquired by them, the absolute owners of the Collateral with full right to pledge, sell, consign, transfer and create a security interest therein, free and clear of any and all claims or liens in favor of others except for the Carve-Out; (iv) the Companies will, at their expense, at all times warrant and, at the Agent's request, defend the same from any and all claims and demands of any other Person other than a holder of a Permitted Encumbrance and except for the Carve-Out; (v) the Companies will not grant, create or permit to exist, any lien upon, or security interest in, the Collateral, or any proceeds thereof in favor of any other person other than the holders of the Permitted Encumbrances; (vi) the Equipment does not comprise a part of the Inventory of any of the Companies; and (vii) the Equipment is and will only be used by the Companies in their business and will not be held for sale or lease, or removed from their premises, or otherwise disposed of by the Companies except as otherwise permitted in this Agreement.

**8.2**   Each of the Companies agrees to maintain books and records pertaining to the Collateral in accordance with GAAP and in such additional detail, form and scope as the Agent shall reasonably require. The Companies agree that the Agent or its agents at the Companies' cost and expense, and any of the Lenders who may wish to accompany the Agent at their own cost and expense, may enter upon the Companies' premises at any time during normal business hours, and from time to time in its reasonable business judgment, for the purpose of inspecting the Collateral and any and all records pertaining thereto. The Companies agree to afford the Agent thirty (30) days prior written notice of any change in the location of any Collateral. The

Companies are also to advise the Agent promptly, in sufficient detail, of any material adverse change relating to the type, quantity or quality of the Collateral or on the security interests granted to the Agent therein.

**8.3**     Each of the Companies agrees to: (a) execute and deliver to the Agent, from time to time, solely for the Agent's convenience in maintaining a record of the Collateral, such written statements and schedules as the Agent may reasonably require, designating, identifying or describing the Collateral; and (b) provide the Agent, on request, with an appraisal of the Equipment, Inventory, and/or Real Estate. During (i) each calendar year, the Companies shall pay for not more than one (1) appraisal for Inventory and (ii) each calendar year, the Companies shall pay for not more than one (1) appraisal for each of Equipment and Real Estate, all conducted at a time when no Event of Default exists. The Companies shall pay for each appraisal performed when any Event of Default has occurred which has not been Waived In Writing By Agent. All appraisers and appraisals shall be acceptable to Agent in all respects. The Companies' failure, however, to promptly give the Agent such statements or schedules shall not affect, diminish, modify or otherwise limit the Agent's and/or the Lenders' security interests in the Collateral.

**8.4**     Each of the Companies agrees to comply with the requirements of the Bankruptcy Code and all state and federal laws in order to grant to the Agent valid and perfected first security interests in the Collateral, subject only to the Permitted Encumbrances and the Carve-Out. The Agent is hereby authorized by the Companies to file (including pursuant to the applicable terms of the UCC) from time to time any financing statements, continuations or amendments covering the Collateral. Such financing statements may indicate that the Collateral consists of "all assets" and/or "all personal property" of Companies (or any collateral description of lesser scope and/or more specificity). The Companies hereby consent to and ratify any and all execution and/or filing of financing statements on the Closing Date by the Agent. The Companies agree to do whatever the Agent may reasonably request, from time to time, by way of (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof; (b) cooperating with the Agent's agents and employees; (c) keeping Collateral records; (d) subject to the Intercreditor Agreement, transferring proceeds of Collateral to the Agent's possession; and (e) performing such further acts as the Agent and/or the Lenders may reasonably require in order to effect the purposes of this Agreement including but not limited to obtaining control agreements with respect to deposit accounts and/or Investment Property.

**8.5**     (a)   Each of the Companies agrees to maintain insurance on their Real Estate, Equipment and Inventory under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times reasonably satisfactory to the Agent. All policies covering the Real Estate, Equipment and Inventory are, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, to be made payable to the Agent, on behalf of the Lenders, in case of loss, under a standard non-contributory "mortgagee", "lender" or "secured party" clause and are to contain such other provisions as the Agent may require to fully protect the Agent's interest in the Real Estate, Inventory and Equipment and to any payments to be made under such policies. All original policies or true copies thereof are to be delivered to the Agent, premium paid to date as billed, with the loss payable endorsement in the Agent's favor, and shall provide for not less than thirty (30) days prior written notice to the Agent of the exercise of any right of cancellation. At

the Companies' request, or if the Companies fail to maintain such insurance, the Agent may arrange for such insurance, but at the Companies' expense and without any responsibility on the Agent's part for: (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims. Upon the occurrence of an Event of Default which is not Waived In Writing By Agent, the Agent shall, subject to the rights of any holders of Permitted Encumbrances holding claims senior to the Agent, have the sole right and at its option, in the name of the Agent or the Companies, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(b)      Subject to Paragraph 4.6, in the event any part of any of the Non-Borrowing Base Assets is damaged by fire or other casualty, the Agent shall promptly apply such Insurance Proceeds to the Obligations in such order as Agent may elect in its sole discretion.

(c)      In the event the Companies or any one of them fail to provide the Agent with timely evidence, acceptable to the Agent, of their maintenance of insurance coverage required pursuant to Paragraph 8.5(a) above, the Agent may purchase, at the Companies' expense, insurance to protect the Agent's interests in the Collateral. The insurance acquired by the Agent may, but need not, protect the Companies' interest in the Collateral, and therefore such insurance may not pay claims which the Companies may have with respect to the Collateral or pay any claim which may be made against the Companies in connection with the Collateral. In the event the Agent purchases, obtains or acquires insurance covering all or any portion of the Collateral, the Companies shall be responsible for all of the applicable costs of such insurance, including premiums, interest (at the applicable Base Rate set forth in paragraph 9.1 of Section 9 hereof), fees and any other charges with respect thereto, until the effective date of the cancellation or the expiration of such insurance. The Agent may charge all of such premiums, fees, costs, interest and other charges to the Companies' Loan Accounts. The Companies hereby acknowledge that the costs of the premiums of any insurance acquired by the Agent may exceed the costs of insurance which the Companies may be able to purchase on their own. In the event that the Agent purchases such insurance, the Agent will notify the Companies of said purchase within thirty (30) days of the date of such purchase. If within thirty (30) days after the date of such notice, the Companies provide the Agent with proof that the Companies had the insurance coverage required pursuant to 8.5(a) above (in form and substance satisfactory to the Agent) as of the date on which the Agent purchased insurance and the Companies continued at all times to have such insurance, then the Agent agrees to cancel the insurance purchased by the Agent and credit the Companies' Loan Account with the amount of all costs, interest and other charges associated with any insurance purchased by the Agent, including with any amounts previously charged to the Loan Account.

8.6      Each of the Companies agrees to pay, when due, all Taxes, including sales taxes, assessments, claims and other charges lawfully levied or assessed upon the Companies or the Collateral unless such Taxes are being diligently contested in good faith by the Companies by appropriate proceedings and adequate reserves are established in accordance with GAAP. Notwithstanding the foregoing, if any lien shall be filed or claimed thereunder (a) for Taxes due to the United States of America, or (b) which in the Agent's opinion might create a valid

obligation having priority over the rights granted to the Agent herein (exclusive of Real Estate), such lien shall not be deemed to be a Permitted Encumbrance hereunder and the Companies shall immediately pay such tax and remove the lien of record. If the Companies or any one of them fail to do so promptly, then at the Agent's election, the Agent may, upon the occurrence of a Default or Event of Default, imminent risk of seizure, filing of any priority lien, forfeiture, or sale of the Collateral, pay Taxes on the Companies' behalf and the amount thereof shall be an Obligation secured hereby and due on demand.

     **8.7**     Each of the Companies: (a) agrees to comply with all acts, rules, regulations and orders of any legislative, administrative or judicial body or official, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the business or operations of the Companies or any one of them, provided that the Companies may contest any acts, rules, regulations, orders and directions of such bodies or officials in any reasonable manner which will not, in the Agent's reasonable opinion, materially and adversely effect the Agent's and/or the Lenders' rights or priority in the Collateral; (b) agrees to comply with all environmental statutes, acts, rules, regulations or orders as presently existing or as adopted or amended in the future, applicable to the Collateral, the ownership and/or use of the Real Estate and operation of their business, which the failure to comply with would have a material and adverse impact on the Collateral, or any material part thereof, or on the operation of the business of the Companies or any one of them; and (c) shall not be deemed to have breached any provision of this Paragraph 8.7 if (i) the failure to comply with the requirements of this Paragraph 8.7 resulted from good faith error or innocent omission, (ii) the Companies promptly commence and diligently pursue a cure of such breach, and (iii) such failure is cured within (30) days following the Companies' receipt of notice of such failure, or if such cannot in good faith be cured within thirty (30) days, then such breach is cured within a reasonable time frame based upon the extent and nature of the breach and the necessary remediation, and in conformity with any applicable consent order, consensual agreement and applicable law.

     **8.8**     Until termination of this Agreement and payment and satisfaction of all Obligations due hereunder, the Companies agree that, unless the Agent shall have otherwise consented in writing, the Companies will furnish to the Agent and each Lender: (a) [Intentionally Omitted]; (b) within thirty (30) days after the end of each month a Consolidated Balance Sheet with a Consolidating Balance Sheet attached thereto as at the end of such period and statements of profit and loss, cash flow and surplus of the Companies and all subsidiaries for such period, certified on behalf of the Companies by an authorized financial or accounting officer of the Companies; (c) monthly financial covenant compliance certificates certified as fairly and accurately reflecting the statements contained therein on behalf of the Companies' by the Chief Financial Officer of Shapes; (d) contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers and documents filed by or on behalf of Companies, or any of them, in the Case or otherwise provided by Companies to the Bankruptcy Court, the United States Trustee, any Chapter 11 Trustee and any other statutorily appointed or ad hoc committee in the Case, with copies of all such papers and documents also provided to or served on Agent's counsel; (e) [Intentionally Omitted]; (f) not less than three (3) Business Days prior to any Company assuming or rejecting any lease or contract or making any motion to assume or reject any lease or contract, Companies shall notify Agent in writing setting forth in detail such Company's reason why such assumption or rejection (A) will be in the best interest of such Company and (B) could not reasonably be expected to have a material adverse

effect; (g) on or before 6:00 p.m. on Tuesday of each week, an updated Budget in form and substance satisfactory to Agent, including a comparison of actual cash funds and revenues received by Companies and cash disbursements and expenses made by Companies for the prior week and the Cumulative Period to the Budget previously delivered to Agent, and (h) from time to time, such further information regarding the business affairs and financial condition of the Companies and/or any subsidiaries thereof as the Agent or any Lender may reasonably request. Each financial statement which the Companies are required to submit hereunder must be accompanied by a manager's or an officer's certificate, signed by the Manager, Chairman, Chief Executive Officer, Chief Financial Officer, President, Vice President, Controller, or Treasurer, pursuant to which any one such manager or officer must certify on behalf of the Companies that: (x) the financial statement(s) fairly and accurately represent(s) each of the Companies' financial condition at the end of the particular accounting period, as well as the Companies' operating results during such accounting period, subject to year-end audit adjustments; and (y) during the particular accounting period: (A) there has been no Default or Event of Default under this Agreement, provided, however, that if any such manager or officer has knowledge that any such Default or Event of Default, has occurred during such period, the existence of and a detailed description of same shall be set forth in such officer's certificate; (B) the Companies have not received any notice of cancellation with respect to property insurance policies which have not been replaced by policies which comply with the requirements of this Agreement; (C) the Companies have not received any notice that would reasonably be expected to result in a material adverse effect on the value of the Collateral taken as a whole; and (D) the exhibits attached to such financial statement(s) constitute detailed calculations showing compliance with all financial covenants contained in this Agreement.

     **8.9**    Until termination of this Agreement and payment and satisfaction of all Obligations hereunder, each of the Companies agrees that, without the prior written consent of the Agent, except as otherwise herein provided, the Companies or any one of them will not:

     (a)    Mortgage, assign, pledge, or otherwise permit any lien, charge, security interest, encumbrance or judgment (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise), to exist on any of the Companies' Collateral or any other assets, whether now owned or hereafter acquired, except for the Permitted Encumbrances;

     (b)    Incur, create or suffer to exist any Indebtedness, off balance sheet liabilities, rate management obligations, or sale leasebacks, other than the Permitted Indebtedness;

     (c)    Sell, lease, assign, transfer or otherwise dispose of (i) Collateral, except Inventory in the ordinary course of business and as otherwise specifically permitted by this Agreement, or (ii) either all or any material portion of the Companies' assets which do not constitute Collateral (with material being assets being sold for or having a fair market value in excess of $500,000); provided however, if the Companies desire to sell a business or line of business or Shapes/Arch desires to sell all or a controlling portion of the membership interests in one or more of the Companies, then such sale may be consummated only upon: (u) approval of the Bankruptcy Court, (v) such sale being an arm's length transaction for fair market value, (w) not less than fourteen (14) days' prior written notice to Agent, which notice shall include copies

of all then current drafts of the relevant documents and instruments evidencing the terms of such transaction, (x) Agent's determination, in its sole discretion, that the terms and conditions of such transaction and such documents and instruments are acceptable as to form and substance, (y) Agent's giving its prior written consent, and (z) subject to the Intercreditor Agreement, Agent's receipt of the proceeds of such sale for application to the Obligations in such order as Agent shall elect.

(d)     Merge, consolidate or otherwise alter or modify their respective registered names, principal places of business, formation as limited liability companies, or existence, re-incorporate or re-organize, or enter into or engage in any operation or activity materially different from that presently being conducted by the Companies or any one of them, except that any of the Companies may change its registered name or its address; provided that: (i) such Company shall give the Agent thirty (30) days prior written notice thereof and (ii) such Company shall execute and deliver, prior to or simultaneously with any such action, any and all documents and agreements requested by the Agent to confirm the continuation and preservation of all security interests and liens granted to the Agent hereunder;

(e)     Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

(f)     Declare or pay any dividend or distributions of any kind on, or purchase, acquire, redeem or retire, any of the capital stock or equity interest, of any class whatsoever, whether now or hereafter outstanding;

(g)     Directly or indirectly, amend, modify, alter, increase or change any of the terms or conditions of the Revolver Agreement or any of the "Loan Documents" (as defined therein), except as permitted under the Intercreditor Agreement;

(h)     Make any advance or loan to, or any investment in, any Person, or purchase or acquire all or substantially all of the stock or assets of any Person, except that the Companies may: (i) incur Inter-Company Debt; and (ii) make advances to employees in the ordinary course of business for travel and related expenses; or

(i)     Pay any management, consulting or other similar fees to any Person, except (i) payments among the Companies, and (ii) payments to independent third parties retained in the ordinary course of business pursuant to approval of the Bankruptcy Court (subject to Agent's right to object thereto).

**8.10**     Until termination of Agreement and payment and satisfaction in full of all Obligations hereunder, the Companies shall:

(a)     [Intentionally Omitted]

(b)     [Intentionally Omitted]

(c)     without the prior written consent of the Agent, no Company will contract for, purchase, make expenditures for, lease pursuant to a Capital Lease or otherwise incur

obligations with respect to Capital Expenditures (whether subject to a security interest or otherwise) which would cause the aggregate amount expended by all Companies for Capital Expenditures to exceed (i) $2,000,000 from the Original Closing Date through July 15, 2008 and (ii) an amount (for the applicable period of time satisfactory to Agent) to be mutually agreed upon between Companies and Agent on or before July 1, 2008; provided, however, that the failure of the parties to reach agreement on the foregoing by such date will be an Event of Default hereunder.

    **8.11**    The Companies agree to advise the Agent in writing of: (a) all expenditures (actual or anticipated) in excess of One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate from the budgeted amount therefor in any Fiscal Year for (i) environmental clean-up, (ii) environmental compliance or (iii) environmental testing and the impact of said expenses on the Companies' working capital; and (b) any notices the Companies receives from any local, state or federal authority advising the Companies of any environmental liability (real or potential) stemming from the Companies' operations, their premises, their waste disposal. practices, or waste disposal sites used by the Companies and to provide the Agent with copies of all such notices if so required.

    **8.12**    Each of the Companies hereby agrees to indemnify and hold harmless the Agent and Lenders and their respective officers, directors, employees, attorneys and agents (each an "Indemnified Party") from, and holds each of them harmless against, any and all losses, liabilities, obligations, claims, actions, damages, costs and expenses (including attorney's fees) and any payments made by the Agent pursuant to any indemnity provided by the Agent with respect to or to which any Indemnified Party could be subject insofar as such losses, liabilities, obligations, claims, actions, damages, costs, fees or expenses with respect to the Loan Documents, including without limitation those which may arise from or relate to: (a) the Depository Account, the Blocked Accounts, the lockbox and/or any other depository account and/or the agreements executed in connection therewith; and (b) any and all claims or expenses asserted against the Agent as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate; or any asserted claim or expense which results from the any of the Companies' operations (including, but not limited to, any of the Companies' off-site disposal practices) and use of the Real Estate, which the Agent may sustain or incur (other than solely as a result of the physical actions of the Agent on the Companies' premises which are determined to constitute gross negligence or willful misconduct by a court of competent jurisdiction), all whether through the alleged or actual negligence of such person or otherwise, except and to the extent that the same results solely and directly from the gross negligence or willful misconduct of such Indemnified Party as finally determined by a court of competent jurisdiction. The Companies hereby agree that this indemnity shall survive termination of this Agreement, as well as payments of Obligations which may be due hereunder.

    **8.13**    Without the prior written consent of the Agent, the Companies agree that they will not enter into any transaction (except transactions among the Companies), including, without limitation, any purchase, sale, lease, loan or exchange of property, with any subsidiary or affiliate of any of the Companies, provided that, except as otherwise set forth in this Agreement, the Companies, or any one of them, may enter into sale and service transactions among the Companies or with any subsidiary or affiliate of any of the Companies in the ordinary course of their business and pursuant to the reasonable requirements of the Companies, and upon standard

terms and conditions and fair and reasonable terms, no less favorable to the Companies than the Companies could obtain in a comparable arms-length transaction with an unrelated third party, provided further that no Default or Event of Default exists or will occur hereunder prior to and after giving effect to any such transaction.

**8.14**    [Intentionally Omitted]

**8.15**    [Intentionally Omitted]

**8.16**    The Companies covenant and agree to provide the Agent, promptly upon Agent's demand, a statement, in writing, of the then current status of the Companies' union negotiations or union contracts in such form and in such detail as the Agent shall require.

**8.17**    The Companies represent, warrant and covenant, that:

(a)    Subject to the entry by the Bankruptcy Court of the Final Order and subject to the Intercreditor Agreement, (i) the Obligations will constitute a Superpriority Claim, subject, as to priority, only to the Carve-Out, the claims of Revolver Agent (which shall be pari passu) and Permitted Encumbrances securing Senior Claims, and (ii) the liens of Agent, for the benefit of Agent and Lenders, securing the Obligations are valid and perfected first priority liens subject, as to priority only, to the Carve-Out, Avoidance Actions and proceeds thereof, and Permitted Encumbrances securing Senior Claims;

(b)    The Companies are not transferring the Collateral nor incurring any obligation with any intent to hinder, delay or defraud any of its respective present or future creditors;

(c)    The Final Order has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended, modified or stayed, or reversed; and

(d)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Final Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court.

**8.18**    (a)  Companies will not, directly or indirectly, seek, consent to, suffer to exist or permit (i) any modification, stay, vacation or amendment to the Final Order, unless the Agent has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of the Agent and the Lenders in respect to the Obligations, except for the Carve-Out and the claims of Revolver Agent (which shall be pari passu); or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of the Agent in respect of the Obligations, except for the Carve-Out, Avoidance Actions and proceeds thereof, and Permitted Encumbrances securing Senior Claims.

(b)      Prior to the date on which the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated, Companies shall not pay any administrative expense claims except (i) the Carve-Out, (ii) any Obligations due and payable hereunder or under the Revolver Agreement, and (iii) other administrative expense claims incurred in the ordinary course of business of Companies (including professional fees) subject to compliance with the Budget and not prohibited by the terms of this Agreement.

**8.19**    The Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of the Loan Documents and the Final Order, and (b) the hearing for the approval of the Final Order, has been given. The Companies shall give, on a timely basis as specified in the Final Order, all notices required to be given to all parties specified in such Final Order.

**8.20**    (a)  Except to the extent there is a more restrictive corresponding covenant in the Revolver Agreement in which case such more restrictive corresponding covenant shall be incorporated herein by reference, as of each week, for the Cumulative Period, the actual cash receipts received by Companies shall not be less than 85% of the cash receipts for the corresponding period in the Budget.

(b)      Except to the extent there is a more restrictive corresponding covenant in the Revolver Agreement in which case such more restrictive corresponding covenant shall be incorporated herein by reference, as of each week, for the weekly period and the Cumulative Period, the actual cash disbursements of the Companies shall be no more than 15% more than the cash disbursements for the corresponding period as set forth in the Budget; provided, that the line items for disbursements identified as "material purchases", "professional expenses" and "DIP interest and fees" on the Budget will not be included in the weekly tests on disbursements and shall only be tested on a Cumulative Period basis.

(c)      [Except to the extent there is a more restrictive corresponding covenant in the Revolver Agreement in which case such more restrictive corresponding covenant shall be incorporated herein by reference, as of each week, for the Cumulative Period, the actual DIP Term Loan Facility (as defined in the Budget) of the Companies, shall not exceed 110% of the DIP Term Loan Facility for the corresponding period as set forth in the Budget, excluding overadvances made by the Revolver Lenders in accordance with the Revolver Loan and Intercreditor Agreement.]

(d)      [Intentionally Omitted].

**8.21**    Without the written consent of the Agent (which shall not be unreasonably withheld) Companies shall not request any extension of the period of time within which the Companies have exclusive rights to file a plan under Section 1121 of the Bankruptcy Code.

**8.22**    Companies shall not assume or reject any lease or contract without the prior written consent of Agent.

**8.23**    [Intentionally Omitted].

**8.24**    The Companies covenant and agree, in each case, unless extended by Agent in sole and absolute discretion, (a) the Final Order shall be entered no later than May 5, 2008; (b) in the event the Companies seek confirmation of a plan of reorganization funded by Arch, all collective bargaining agreements and other labor or union contracts shall be modified in form and substance acceptable to Agent (including modifications which may give rise to withdrawal liability under Section 4202 of ERISA or otherwise under MEPPA) or such agreements or contracts shall be rejected by Companies in the Case no later than the day prior to any confirmation hearing related to a Reorganization Plan; (c) the Companies will use their best efforts to move forward with the Competitive Process and will meet all deadlines contained therein; and (d) in the event the Companies seek confirmation of a plan of reorganization funded by Arch, Companies shall address and take all other actions necessary related to all environmental matters satisfactory to Agent no later than the day prior to any confirmation hearing related to such plan unless otherwise agreed to by Arch.

**8.25**    Companies shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Sect 1930 (a)(6).

**8.26**    Companies shall, in writing, promptly after becoming aware thereof, notify Agent of any application or motion of any Person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application motion or pleading filed in the Case that, either immediately or with the passage of time, might result in an Event of Default hereunder.

**SECTION 9    Interest, Fees and Expenses**

**9.1**    (a)  Interest on the Term Loan Advances shall be payable monthly in arrears as of the end of each month. Term Loans shall accrue interest at a rate equal to the Base Rate plus the Applicable Margin per annum on the aggregate net balances owing by the Companies to the Agent in the Loan Account at the close of each day during such month. In the event of any change in said Base Rate, the rate hereunder for Term Loan Advances shall change, as of the date of such change, so as to remain equal to the new Base Rate plus the Applicable Margin. The rate hereunder for Term Loan Advances shall be calculated on the basis of a 360-day year and based on the actual number of days elapsed.

(b)    Upon and after the occurrence and during the continuance of an Event of Default and in accordance with the provisions of Section 11, Paragraph 11.2 hereof, all Obligations shall bear interest at the Default Rate of Interest.

**9.2**    [Intentionally Omitted]

**9.3**    [Intentionally Omitted]

**9.4**    [Intentionally Omitted]

**9.5**    The Companies, jointly and severally, shall reimburse or pay (a) the Agent for: (i) all Out-of-Pocket Expenses and (ii) any applicable Documentation Fee and (b) the Lenders for all Out-of Pocket Expenses incurred after the occurrence of an Event of Default which is not Waived In Writing By Agent, in each case to the extent incurred after entry of the Final Order.

**9.6**    Upon the last Business Day of each month, commencing on March 31, 2008, the Companies shall pay to the Agent for the benefit of the Agent and the other Lenders the Commitment Fee; such Commitment Fee to be nonrefundable and payable in arrears on the basis of a 360 day year and based on the actual number of days elapsed on the last Business Day of each month and the Termination Date.

**9.7**    [Intentionally Omitted].

**9.8**    [Intentionally Omitted]

**9.9**    For periods after the entry of the Final Order, the Companies shall pay the Agent's standard charges and fees for the Agent's personnel used by the Agent for reviewing the books and records of the Companies and for verifying, testing, protecting, safeguarding, preserving or disposing of all or any part of the Collateral (which fees shall be in addition to any other fees described herein and any Out-of Pocket Expenses). During each 360-day period (with the initial 360-day period beginning on January 1, 2008), the Companies shall pay for not more than one (1) field examination conducted at a time when no Event of Default exists, <u>provided</u>, <u>however</u>, the Companies shall pay for each field examination performed when an Event of Default has occurred which has not been waived in writing by Agent.

**9.10**    Each of the Companies hereby authorizes Agent to charge their respective Loan Account(s) with the amount of all their Obligations due hereunder as such payments become due. The Companies hereby confirm and agree that they shall, jointly and severally, promptly pay any Obligations, including, without limitation, all of the fee obligations to Agent upon its request therefor.

**9.11**    In the event that the Agent or any Lender (or any financial institution which may from time to time become a Lender hereunder) shall have determined in the exercise of its reasonable business judgment that, subsequent to the Original Closing Date, any change in applicable law, rule, regulation or guideline regarding capital adequacy, or any change in the interpretation or administration thereof, or compliance by the Agent or Lender with any new request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the Agent's or such Lender's capital as a consequence of its obligations hereunder to a level below that which the Agent or such Lender could have achieved but for such adoption, change or compliance (taking into consideration the Agent or such Lender's policies with respect to capital adequacy) by an amount reasonably deemed by the Agent or such Lender to be material, then, from time to time, the Companies shall pay no later than five (5) days following demand to the Agent or such Lender such additional amount or amounts as will compensate the Agent's or such Lender's for such reduction. In determining such amount or amounts, the Agent or such Lender may use any reasonable averaging or attribution methods. The protection of this Paragraph 9.11 shall be available to the Agent or such Lender regardless of any possible contention of invalidity or inapplicability with respect to the applicable law, regulation or condition. A certificate of the Agent or such Lender setting forth such amount or amounts as shall be necessary to compensate the Agent or such Lender with respect to this Section 9 and the calculation thereof when delivered to the Companies shall be conclusive on the Companies absent manifest error. Notwithstanding anything in this paragraph to the contrary, in

the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determines that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required to be made whole, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

**9.12**    In the event that any applicable law, treaty or governmental regulation, or any change therein or in the interpretation or application thereof, or compliance by the Agent or such Lender with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject the Agent or such Lender to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to the Agent or such Lender of principal, fees, interest or any other amount payable hereunder or under any other documents (except for changes in the rate of tax on the overall net income of the Agent or such Lender by the federal government or the jurisdiction in which it maintains its principal office);

(b)    impose, modify or hold applicable any reserve, special deposit, assessment or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by the Agent or such Lender by reason of or in respect to this Agreement and the Loan Documents, including (without limitation) pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on the Agent or such Lender any other condition with respect to this Agreement or any other document, and the result of any of the foregoing is to increase the cost to the Agent or such Lender of making, renewing or maintaining its loans hereunder by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the loans by an amount that the Agent or such Lender deems to be material in the exercise of its reasonable business judgment, then, in any case the Companies shall pay the Agent or such Lender, within five (5) days following its demand, such additional cost or such reduction, as the case may be. The Agent or such Lender shall certify the amount of such additional cost or reduced amount to the Companies and the calculation thereof and such certification shall be conclusive upon the Companies absent manifest error. Notwithstanding anything in this paragraph to the contrary, in the event the Agent or such Lender has exercised its rights pursuant to this paragraph, and subsequent thereto determine that the additional amounts paid by the Companies in whole or in part exceed the amount which the Agent or such Lender actually required pursuant hereto, the excess, if any, shall be returned to the Companies by the Agent or such Lender.

**9.13**    [Intentionally Omitted]

**9.14**    [Intentionally Omitted]

**9.15**    [Intentionally Omitted]

**9.16**    [Intentionally Omitted]

**9.17**    [Intentionally Omitted]

**9.18**    [Intentionally Omitted]

**9.19**    Notwithstanding anything to the contrary contained herein, the Agent shall apply all proceeds of Collateral and all other amounts received by it from or on behalf of the Companies to the Obligations in such order as the Required Lenders shall reasonably elect; provided, however, upon the occurrence of an Event of Default which is not Waived in Writing By Agent, the Agent may apply all proceeds of Collateral first to the fees and expenses due to Agent, second to accrued interest with respect to the Obligations, third to the outstanding principal balance of the Obligations, in such order as the Required Lenders may elect, and fourth to any other Obligations in such order as the Required Lenders may elect.

**9.20**    [Intentionally Omitted]

**9.21**    For purposes of each of the indemnity provisions contained in this Agreement, any reference to the Agent shall include all Lenders and any financial institution which may become a Lender subsequent to the Original Closing Date.

## SECTION 10 Powers

Each of the Companies hereby constitutes the Agent, or any person or agent the Agent may designate, as its attorney-in-fact, at such Company's cost and expense, to exercise all of the following powers, which being coupled with an interest, shall be irrevocable until all Obligations to the Agent have been paid in full in cash:

(a)    To receive, take, endorse, sign, assign and deliver, all in the name of the Agent or the Companies or any one of them, any and all checks, notes, drafts, and other documents or instruments relating to the Collateral;

(b)    To receive, open and dispose of all mail addressed to the Companies or any one of them and to notify postal authorities to change the address for delivery thereof to such address as the Agent may designate;

(c)    To request from customers indebted on Accounts at any time, in the name of the Agent information concerning the amounts owing on the Accounts;

(d)    To request from customers indebted on Accounts at any time, in the name of the Companies or any one of them, in the name of certified public accountant designated by the Agent or in the name of the Agent's designee, information concerning the amounts owing on the Accounts;

(e)    To transmit to customers indebted on Accounts notice of the Agent's interest therein and to notify customers indebted on Accounts to make payment directly to the Agent for the Companies' account; and

(f)    To take or bring, in the name of the Agent or the Companies or any one of them, all steps, actions, suits or proceedings deemed by the Agent necessary or desirable to enforce or effect collection of the Accounts.

Notwithstanding anything hereinabove contained to the contrary, the powers set forth above may only be exercised subject to the Intercreditor Agreement and after the occurrence of an Event of Default and until such time as such Event of Default is Waived In Writing By Agent.

**SECTION 11** **Events of Default and Remedies**

**11.1**    Notwithstanding anything hereinabove to the contrary, the Agent may, and at the direction of the Required Lenders shall terminate, this Agreement immediately upon the occurrence of any of the following Events of Default:

(a)    cessation of the business of any Company (except as the result of (i) the sale of substantially all of the assets of such Company and the application of the proceeds of such sale to the Obligations, all in accordance with the terms and conditions of this Agreement and the Intercreditor Agreement or (ii) the contribution of substantially all of the assets of such Company to another Company);

(b)    [Intentionally Omitted];

(c)    [Intentionally Omitted];

(d)    breach by any Company of any warranty, representation or covenant contained herein (other than those referred to in sub-paragraph (e) below) or in any other written agreement between any Company or the Agent, provided that such Default of any of the warranties, representations or covenants referred in this clause (d) shall not be deemed to be an Event of Default unless and until such Default shall remain unremedied to the Agent's satisfaction for a period of fifteen (15) days from the date of such breach;

(e)    breach by any Company of any warranty, representation or covenant of; Paragraphs 6.3, 6.4 (other than the first sentence of Paragraph 6.4) and 6.14 of Section 6 hereof; Section 7 hereof; or Paragraphs 8.1, 8.5, 8.6, and 8.8 through 8.26 hereof;

(f)    failure of the Companies or any one of them to pay any of the Obligations within five (5) Business Days of the due date thereof provided that nothing contained herein shall prohibit the Agent from charging such amounts to the Loan Accounts on the due date thereof;

(g)    with respect to any Plan other than a "multiemployer plan," as defined in Section 3(37) of ERISA, and other than a defined contribution plan (solely for the purposes of clauses (ii), (iii), (iv) and (v)), any Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) have any "accumulated funding deficiency" as defined in ERISA, (iii) have any "reportable event" as defined in ERISA, for which the requirement to provide notice has not, within the regulations issued under ERISA, been waived, (iv) terminate any Plan, or (v) be engaged in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of such Plan, and with respect to this sub-paragraph (g) such event or condition (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in the reasonable opinion of the Agent, subject such Company to any tax, penalty or other liability material to the business, operations or financial condition of such Company;

*Approved by Judge Gloria M. Burns May  06, 2008*

(h)    [Intentionally Omitted];

(i)    [Intentionally Omitted];

(j)    the occurrence of any default or event of default (after giving effect to any applicable grace or cure periods) under any instrument or agreement evidencing any pre-petition Indebtedness (which is affirmed after the Filing Date) (except for defaults occasioned by the filing of the Case and defaults resulting from obligations with respect to which the Bankruptcy Code prohibits Companies from complying or permits Companies not to comply) and any post-petition Indebtedness of the Companies or any one of them, in each case where such indebtedness exceeds $100,000 in principal amount.

(k)    Steven S. Grabell, as Chief Executive Officer, ceases for any reason whatsoever to be Chief Executive Officer and actively engaged in the management of the Companies unless a successor acceptable to Agent is appointed within thirty (30) days;

(l)    if any of the Loan Documents shall be cancelled, terminated, revoked or rescinded; or any action at law, suit or in equity or other legal proceeding to cancel, revoke, rescind or otherwise challenge any of the Loan Documents or the liens securing the Obligations shall be commenced by any Person; or any court or any other governmental or regulatory authority or agency of competent jurisdiction shall make a determination that, or issue a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof;

(m)    the Bankruptcy Court shall enter any order (i) revoking, reversing, staying, vacating, rescinding, modifying, superseding, supplementing or amending the Final Order, this Agreement or any other Loan Document (except as otherwise approved by Agent in writing) or the Revolver Agreement or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Company equal or superior to the priority of Agent or the Lenders in respect of the Obligations, or there shall arise any such Superpriority Claim, except for the Carve-Out or the Obligations (as defined in the Revolver Agreement) or (iii) to grant or permit the grant of a lien on the Collateral other than Permitted Encumbrances;

(n)    the Bankruptcy Court shall enter any order (i) appointing an interim or permanent Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) substantively consolidating the estate of Companies with the estate of any other Person, (iv) dismissing the Case or (v) converting the Case to a Chapter 7 case;

(o)    the Bankruptcy Court shall enter any order granting relief for the automatic stay to any creditor holding or asserting a lien or reclamation claim, in each case in excess of $100,000.

(p)    any application for any of the orders described in clauses (m) or (o) above shall be made and, if made by a Person other than a Company, such application is not being diligently contested by Companies in good faith;

(q)    except as permitted by the Final Order or the "first day orders" or as otherwise agreed to by Agent, Companies shall make any Pre-Petition Payment following the Original Closing Date other than Pre-Petition Payments authorized by the Bankruptcy Court in connection with the assumption of executory contracts and unexpired leases or otherwise contemplated in the Budget;

(r)    Companies shall be unable to pay their postpetition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make such payments, as and when such payments become due;

(s)    Other than in connection with the Competitive Process, Companies or any other Person shall file a motion in the Case, execute a written agreement or file any plan of reorganization or disclosure statement attendant thereto (i) to use cash collateral under Section 363(c) of the Bankruptcy Code without Agent's prior written consent, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (iii) to grant any lien other than Permitted Encumbrances upon or affecting the Collateral, (iv) to sell all or substantially all of the assets of Company, or the sale of any business unit of a Company without Agent's prior written consent, or (v) to recover from any portions of the Collateral any cost or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code;

(t)    The Company fails to comply with the provisions of the Competitive Process or meet any of the deadlines contained in the Competitive Process;

(u)    the commencement of a suit or action against the Agent or any Lender and, as to any suit or action brought by any Person other than a Company or a subsidiary, officer or employee of a Company, the continuation thereof without dismissal for thirty (30) days after service thereof on Agent or such Lender, that asserts or seeks by or on behalf of any Company, the Environmental Protection Agency, any state environmental protection or health and safety agency, and official committee in the Case or any other party in interest in the Case, a claim or any legal or equitable remedy that would (i) have the effect of subordinating any or all of the Obligations or liens of Agent or any Lender under the Loan Documents to any other claim, or (ii) have a material adverse effect on the rights and remedies of Agent or any Lender under any Loan Document or the collectability or all or any portion of the Obligations;

(v)    the entry of an order in the Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(w)    [Intentionally Omitted]

(x)    [Intentionally Omitted]

(y)    [Intentionally Omitted]

(z)    the failure of any Revolver Lender to fund a Revolving Loan under the terms of the Revolver Agreement;

(aa)    any lien or security interest created by this Agreement or the Final Order shall, for any reason, cease to be valid;

(bb)    any action is commenced which contests any provision of the Final Order or the validity, perfection, priority or enforceability of any of the liens and security interest of Agent;

(cc)    Final Order is not entered immediately following the expiration of the Interim Financing Order and, in any case, not later than May 5, 2008; or

(dd)    a default or event of default occurs under the Final Order or under the Revolver Agreement.

**11.2**    Upon the occurrence of an Event of Default, unless such Event of Default has been Waived In Writing By Agent, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, the Agent in its sole discretion may, or upon the written direction of the Required Lenders the Agent shall, declare that, all loans, advances and extensions of credit provided for in Section 4 of this Agreement shall be thereafter in the Agent's or the Required Lenders' sole discretion, and the obligation of the Agent and/or the Lenders to make Term Loans, shall cease unless such Event of Default is Waived In Writing By Agent. Upon the occurrence of any Event of Default not Waived In Writing By Agent, the rate of interest applicable to the Term Loans and the other Obligations may, in Agent's discretion, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, be increased as of the date of such Event of Default or notice, as applicable, as provided in Paragraph 9.1(b) of Section 9 hereof. Upon the occurrence of any Event of Default not Waived In Writing By Agent, the Agent in its sole and absolute discretion may, or upon the written direction of the Required Lenders the Agent shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or order from, the Bankruptcy Court, without prior notice, take any one or more of the following actions: (a) terminate the Commitment whereupon Agent's and Lenders' obligation to make further Term Loans shall terminate; (b) declare that all Obligations shall become immediately due and payable; (c) Agent may immediately terminate this Agreement upon notice to the Companies; and/or (d) Agent may exercise any rights and remedies provided to Agent or Lenders under the Loan Documents or at law or equity, including all remedies provided under the UCC; and, pursuant to the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated (at Agent's election) to permit Agent to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, Agent shall be permitted to exercise any remedy in a nature of a liquidation of, or foreclosure on, any interest of Companies in the Collateral only upon five (5) Business Days prior written notice to Borrowers, the United States Trustee for the District of New Jersey, and

any counsel approved by the Bankruptcy Court for the Creditors' Committee (the "Remedies Notice Period"); provided, however, that during such Remedies Notice Period, (i) the Borrowers may not challenge or object to or file any motions attempting to limit the remedies of Agent and Lenders hereunder, and (ii) Borrowers shall have no right to use or seek to use the Collateral; provided, further if the Bankruptcy Court does not determine that an Event of Default has not occurred, and the Event of Default has not been Waived In Writing By Agent, upon the expiration of such Remedies Notice Period, Agent shall have relief from the automatic stay without further notice or order as set forth herein. Upon the occurrence of an Event of Default and the exercise by Agent of its rights and remedies under this Agreement and the other Loan Documents, Borrowers shall assist Agent and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition; such assistance shall include, without limitation (if so requested), notwithstanding any relief from the automatic stay under Section 362 of the Bankruptcy Code, filing any motions under Sections 363 or 365 or any other applicable provisions of the Bankruptcy Code to authorize the transfer of all or any portion of the Collateral or otherwise assume and assign any lease or executory contract included therein. The exercise of any option is not exclusive of any other option, which may be exercised at any time by the Agent.

**11.3**     Immediately upon the occurrence of any Event of Default, unless such Event of Default has been Waived In Writing By Agent, Agent may, to the extent permitted by law and subject to the Intercreditor Agreement: (a) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including any electronic records, contracts and signatures pertaining thereto), documents, instruments, files and records, and any receptacles or cabinets containing same, relating to the Accounts, or the Agent may use, at the Companies' expense, such of the Companies' personnel, supplies or space at the Companies' places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) bring suit, in the name of the Companies or the Agent, and generally shall have all other rights respecting said Accounts, including without limitation the right to: accelerate or extend the time of payment, settle, compromise, release in whole or in part any amounts owing on any Accounts and issue credits in the name of the Companies or the Agent; (c) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed Inventory, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at Agent's sole option and discretion, and Agent may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Companies and, in furtherance of the foregoing, the Companies shall seek authorization from the Bankruptcy Court to conduct, on any of the Companies' owned or leased premises, one or more sales of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code; (d) foreclose the security interests in the Collateral created herein or by the Loan Documents by any available judicial procedure, or to take possession of any or all of the Collateral, including any Inventory, Equipment and/or Other Collateral without judicial process, and to enter any premises where any Inventory and Equipment and/or Other Collateral may be located for the purpose of taking possession of or removing the same; and (e) exercise any other rights and remedies provided in law, in equity, by contract or otherwise. Agent shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral, whether in its then condition or after further preparation or processing, in the name of Companies or Agent, or in the name of such other party as Agent may designate, either at public or private sale or at

any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including but not limited to warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as Agent in its sole discretion may deem advisable, and Agent shall have the right to purchase at any such sale. Subject to the Intercreditor Agreement, if any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, Agent shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as Agent shall deem appropriate and any such costs shall be deemed an Obligation hereunder. Any action taken by Agent pursuant to this paragraph shall not affect commercial reasonableness of the sale. Companies agree, at the request of Agent, to assemble the Inventory and Equipment and, subject to the Intercreditor Agreement, to make it available to Agent at premises of Companies or elsewhere and to make available to Agent the premises and facilities of Companies for the purpose of Agent's taking possession of removing or putting the Inventory and Equipment in saleable form. If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law. The net cash proceeds resulting from Agent's exercise of any of the foregoing rights, (after deducting all charges, costs and expenses, including reasonable attorneys' fees) shall be applied by Agent to the payment of the Obligations, whether due or to become due, in such order as Agent may elect, and Companies shall remain liable to Agent for any deficiencies, and Agent in turn agrees to remit to Companies or its successors or assigns, any surplus resulting therefrom. The enumeration of the rights set forth in Paragraph 11.2 above or in this Paragraph 11.3 is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other rights, all of which shall be cumulative. Companies hereby indemnify Agent and hold Agent harmless from any and all costs, expenses, claims, liabilities, Out-of-Pocket Expenses or otherwise, incurred or imposed on Agent by reason of the exercise of any of its rights, remedies and interests hereunder, including, without limitation, from any sale or transfer of Collateral, preserving, maintaining or securing the Collateral, defending its interests in Collateral (including pursuant to any claims brought by Companies, Companies as debtors-in-possession, any secured or unsecured creditors of Companies, any trustee or receiver in bankruptcy, or otherwise), and Companies hereby agree to so indemnify and hold Agent harmless, absent Agent's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. The foregoing indemnification shall survive termination of this Agreement until such time as all Obligations (including the foregoing) have been finally and indefeasibly paid in full in cash. In furtherance thereof Agent, may establish such reserves for Obligations hereunder (including any contingent Obligations) as it may deem advisable in its reasonable business judgment. Any applicable mortgage(s), deed(s) of trust or assignment(s) issued to Agent on the Real Estate shall govern the rights and remedies of Agent thereto.

      **11.4**    Companies hereby acknowledge and agree that Agent shall have no duty to marshal the Collateral and that Agent make take and dispose of any or all of the Collateral in such order and at such time or times as Agent, acting in its discretion, may elect.

## SECTION 12 <u>Termination</u>

      This Agreement shall terminate on the Termination Date. The Companies may terminate this Agreement at any time upon not less than twenty (20) days' prior written notice of the date of termination (the "<u>Noticed Termination Date</u>") given to the Agent by a Manager or an officer

of Shapes/Arch, provided that the Companies shall have up to ten (10) additional days after the Noticed Termination Date in which to repay the Obligations in full in cash. Notice of termination as aforesaid by any one Company shall be deemed to be a notice by all of the Companies for purposes hereof. All Obligations shall become due and payable as of any termination hereunder or under Section 11 hereof and, pending a final accounting, the Agent may withhold any balances in the Companies' accounts (unless supplied with an indemnity satisfactory to the Agent) to cover all of the Obligations, whether absolute or contingent, including, but not limited to, cash reserves for any contingent Obligations, provided however, as to reserves for environmental claims, the amount to be held shall be limited to an amount for which a claim has been asserted against Agent or any Lender. All of the Agent's rights, liens and security interests shall continue after any termination until all Obligations have been paid and satisfied in full.

## SECTION 13 <u>Miscellaneous</u>

**13.1**    Each of the Companies hereby waives diligence, notice of intent to accelerate, notice of acceleration, demand, presentment and protest and any notices (other than those specifically provided for herein) hereof as well as notice of nonpayment. No delay or omission of the Agent, the Lenders or the Companies to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or shall operate as a waiver thereof or as a waiver of any such Event of Default. No single or partial exercise by the Agent of any right or remedy precludes any other or further exercise thereof or precludes any other right or remedy.

**13.2**    This Agreement and the other Loan Documents executed and delivered in connection therewith constitute the entire agreement among the Companies and the Agent and Lender; supersede any prior agreements; can be changed only by a writing signed by the Companies, the Agent and the Required Lenders (or by the Agent at the written request of the Required Lenders), unless the consent of all Lenders is required pursuant to Paragraph 15.10 herein below, and shall bind and benefit the Companies, the Lenders and the Agent and their respective successors and assigns, and any such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. This Agreement shall be binding upon and inure to the benefit of Companies and Agent and each Lender and their respective successors and permitted assigns (including, in the case of Companies, except for the right to request Term Loan Advances, any trustee or similar responsible Person succeeding to the rights of the Companies pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code).

**13.3**    In no event shall the Companies, upon demand by the Agent for payment of any Indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, the Agent and Lenders shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law. If the Agent ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such; and if principal is paid in full in cash, any remaining excess shall be refunded to the Companies. This paragraph shall control every other provision hereof, the Loan Documents and of any other agreement made in connection herewith.

**13.4**    If any provision hereof or of any other agreement made in connection herewith is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

**13.5    EACH OF THE COMPANIES, THE LENDERS AND THE AGENT HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREUNDER OR THEREUNDER. EACH OF THE COMPANIES HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL THE AGENT BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.**

**IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK. EACH OF THE COMPANIES HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE COMPANIES HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY COMPANY BY THE LENDERS IN ACCORDANCE WITH THIS SECTION.**

**13.6**    Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (provided that, any electronic communications from the Companies with respect to any request, transmission, document, electronic signature, electronic mail or facsimile transmission shall be deemed binding on the Companies for purposes of this Agreement, provided further that any such transmission shall not relieve the Companies from any other obligation hereunder to communicate further in writing), and shall be deemed to have

been validly served, given or delivered when hand delivered or sent by facsimile, or three (3) days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified or to such other address as any party hereto may designate for itself by like notice, as follows:

(A)    if to Arch, at:

      Arch Acquisition I, LLC
      1001 Brickell Bay Drive, 26th Floor
      Miami, Florida  33131
      Attn:  Sean Ozbolt
      Fax No.: (305) 379-2013
      :

With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to Agent's counsel at:

      Greenberg Traurig LLP
      200 Park Avenue
      New York, NY 10166
      Attn:  Nancy A. Mitchell
      Fax No.: (212) 805-9375

(B)    if to the Companies at:

      c/o Shapes L.L.C.
      9000 River Road
      Delair, New Jersey 08110
      Attn: Chief Executive Officer
      Fax No.: (856) 662-6069

With a courtesy copy of any material (by way of example, relating to the occurrence of an Event of Default) notice to the Companies' counsel at:

      Cozen O'Connor
      1900 Market Street
      Philadelphia, Pennsylvania 19103-3508
      Attn: Sandra A. Bloch, Esq.
      Fax No.: (215) 665-2013

provided, however, that the failure of any Person to provide another Person's counsel with a copy of such notice shall not invalidate such notice and shall not give such Person any rights, claims or defenses due to the failure to provide such additional notice.

    **13.7**    THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE

LAWS OF ANOTHER JURISDICTION AND EXCEPT TO THE EXTENT THAT THE APPLICATION OF THE BANKRUPTCY CODE IS MANDATORY.

**13.8**    Unless the Final Order specifically provides otherwise, in the event of a conflict between the terms and provisions of this Agreement or any of the Loan Documents and the Final Order, the terms and provisions of the Final Order shall govern and control, interpreted as most consistent with the terms and provisions of this Agreement and the other Loan Documents. Nothing set forth in this Agreement shall require the Companies to act or fail to act in a manner that would violate the Bankruptcy Code or any order of the Bankruptcy Court, without prejudice to the Agent's ability to declare the occurrence of an Event of Default based upon such action or failure to act. In the event of any inconsistency between this Agreement and any of the Loan Documents, this Agreement shall control.

## SECTION 14 <u>Agreement between the Lenders</u>

**14.1**    (a)    The Agent, for the account of the Lenders, shall disburse all loans and advances to the Companies and shall handle all collections of Collateral and repayment of Obligations. It is understood that for purposes of advances to the Companies and for purposes of this Section 14 the Agent is using the funds of the Agent.

(b)    Unless the Agent shall have been notified in writing by any Lender prior to any advance to the Companies that such Lender will not make the amount which would constitute its share of the borrowing on such date available to the Agent, the Agent may assume that such Lender shall make such amount available to the Agent on a Settlement Date, and the Agent may, in reliance upon such assumption, make available to the Companies a corresponding amount. A certificate of the Agent submitted to any Lender with respect to any amount owing under this Paragraph shall be conclusive, absent manifest error if no objection, in writing, is delivered to the Agent within ten (10) Business Days of receipt of such certificate. If such Lender's share of such borrowing is not in fact made available to the Agent by such Lender on the Settlement Date, the Agent shall be entitled to recover such amount with interest thereon at the rate per annum applicable to Term Loans hereunder, on demand, from the Companies without prejudice to any rights which the Agent may have against such Lender hereunder. Nothing contained in this Paragraph 14.1(b) shall relieve any Lender which has failed to make available its ratable portion of any borrowing hereunder from its obligation to do so in accordance with the terms hereof. Nothing contained herein shall be deemed to obligate the Agent to make available to the Companies the full amount of a requested advance when the Agent has any notice (written or otherwise) that any of the Lenders will not advance its ratable portion thereof.

**14.2**    On the Settlement Date, the Agent and the Lenders shall each remit to the other, in immediately available funds, all amounts necessary so as to ensure that, as of the Settlement Date, the Lenders shall have their proportionate share of all outstanding Obligations.

**14.3**    The Agent shall forward to each Lender, at the end of each month, a copy of the account statement rendered by the Agent to the Companies.

**14.4**    The Agent shall, after receipt of any interest and fees earned under this Agreement, promptly remit to the Lenders: (a) their pro rata portion of all fees, provided, however, that the Lenders (other than Arch in its role as the Agent) shall (i) not share in the fees set forth in Paragraphs 9.5 or the Documentation Fees; and (ii) receive their pro rata portion of the Commitment Fee; (b) interest computed at the rate and as provided for in Section 9 of this Agreement on all outstanding amounts advanced by the Lenders on each Settlement Date, prior to adjustment, that are subsequent to the last remittance by the Agent to the Lenders of the Companies' interest; and (c) its pro rata portion of all principal repaid on the Term Loans.

**14.5**    (a)  The Companies acknowledge that the Lenders, with the prior written consent of the Agent, which consent shall not be unreasonably withheld, may sell, only to an affiliate of such Lender, participation interests in the loans and extensions of credit made and to be made to the Companies hereunder.

(b)    The Companies authorize each Lender to disclose to any participant or purchasing lender (each, a "Transferee") and any prospective Transferee any and all financial information in such Lender's possession concerning the Companies and their affiliates which has been delivered to such Lender by or on behalf of the Companies pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Companies in connection with such Lender's credit evaluation of the Companies and their affiliates prior to entering into this Agreement, provided that such Transferee agrees to hold such information in confidence in the ordinary course of its business.

**14.6**    The Companies hereby agree that each Lender is solely responsible for its portion of the Term Loan Facility and that neither the Agent nor any Lender shall be responsible for, nor assume any obligations for the failure of any Lender to make available its portion of the Term Loan Facility. Further, should any Lender refuse to make available its portion of the Term Loan Facility, then the other Lenders may, but without obligation to do so, increase, unilaterally, its portion of the Term Loan Facility in which event the Companies are so obligated to that other Lender.

**14.7**    In the event that the Agent, the Lenders or any one of them is sued or threatened with suit by the Companies or any one of them, or by any receiver, trustee, creditor or any committee of creditors on account of any preference, voidable transfer or lender liability issue, alleged to have occurred or been received as a result of or during the transactions contemplated under this Agreement, then in such event any money paid in satisfaction or compromise of such suit, action, claim or demand and any expenses, costs and attorneys' fees paid or incurred in connection therewith, whether by the Agent, the Lenders or any one of them, shall be shared proportionately by the Lenders. In addition, any costs, expenses, fees or disbursements incurred by outside agencies or attorneys retained by the Agent to effect collection or enforcement of any rights in the Collateral, including enforcing, preserving or maintaining rights under this Agreement shall be shared proportionately between and among the Lenders to the extent not reimbursed by the Companies or from the proceeds of Collateral. The provisions of this paragraph shall not apply to any suits, actions, proceedings or claims that (x) predate the date of this Agreement or (y) are based on transactions, actions or omissions that predate the date of this Agreement.

**14.8**    Each of the Lenders agrees with each other Lender that any money or assets of the Companies held or received by such Lender, no matter how or when received, shall be applied to the reduction of the Obligations (to the extent permitted hereunder) after (x) the occurrence of an Event of Default and (y) the election by the Required Lenders to accelerate the Obligations. In addition, the Companies authorize, and the Lenders shall have the right, without notice, upon any amount becoming due and payable hereunder, to set-off and apply against any and all property held by, or in the possession of such Lender the Obligations due such Lenders.

**14.9**    The Agent shall, subject to, prior to the occurrence of an Event of Default, the prior written consent of Companies, which consent shall not be unreasonably withheld, have the right at any time to assign to one or more commercial banks, commercial finance lenders or other financial institutions all or a portion of its rights and obligations under this Agreement (including, without limitation, its obligations under the Term Loan Facility), provided the amount assigned to any one institution shall not be less than Two Million Dollars ($2,000,000.00); provided however, Companies' consent shall not be required if the proposed assignee or transferee is a Lender or an affiliate of Lender. Upon execution of an Assignment and Transfer Agreement, (a) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such assignment, have the rights and obligations of the Agent as the case may be hereunder and (b) the Agent shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such assignment, relinquish its rights and be released from its obligations under this Agreement. The Companies shall, if necessary, execute any documents reasonably required to effectuate the assignments. No other Lender may assign its interest in the loans and advances and extensions of credit hereunder without the prior written consent of the Agent, and, prior to the occurrence of an Event of Default, the prior written consent of Companies, which consent shall not be unreasonably withheld. In the event that the Agent consents to any such assignment by any other Lender (i) the amount being assigned shall in no event be less than the lesser of (x) Two Million Dollars ($2,000,000.00) or (y) the entire interest of such Lender hereunder, and (ii) the parties to such assignment shall execute and deliver to the Agent an Assignment and Transfer Agreement, and at Agent's election, a processing fee of Three Thousand Five Hundred Dollars ($3,500) payable by the assigning Lender for its own account.

## SECTION 15 <u>Agency</u>

**15.1**    Each Lender hereby irrevocably designates and appoints Arch as the Agent for the Lenders under this Agreement and any ancillary loan documents and irrevocably authorizes Arch as the Agent for such Lender, to take such action on its behalf under the provisions of this Agreement and all ancillary documents and to exercise such powers and perform such duties as are expressly delegated to the Agent by the terms of this Agreement and all ancillary documents together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement or any other Loan Documents, the Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement and the ancillary documents or otherwise exist against the Agent.

**15.2**    The Agent may execute any of its duties under this Agreement and all ancillary documents by or through agents or attorneys-in-fact and shall be entitled to the advice of counsel concerning all, matters pertaining to such duties.

**15.3**    Neither the Agent nor any of its officers, directors, employees, agents, or attorneys-in-fact shall be (i) liable to any Lender for any action lawfully taken or omitted to be taken by it or such person under or in connection with this Agreement and all ancillary documents (except for its or such person's own gross negligence or willful misconduct), or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Companies or any officer thereof contained in this Agreement and all ancillary documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement and all ancillary documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement and all ancillary documents or for any failure of the Companies to perform their obligations thereunder. The Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of this Agreement and all ancillary documents or to inspect the properties, books or records of the Companies.

**15.4**    The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Companies), independent accountants and other experts selected by the Agent. The Agent shall be fully justified in failing or refusing to take any action under this Agreement and all ancillary documents unless it shall first receive such advice or concurrence of the Lenders, or the Required Lenders, as the case may be, as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and all ancillary documents in accordance with a request of the Lenders, or the Required Lenders, as the case may be, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

**15.5**    The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received written notice from a Lender or the Companies describing such Default or Event of Default. In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by Required Lenders; provided that unless and until the Agent shall have received such direction, the Agent may in the interim (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable and in the best interests of the Lenders. In the event the Agent in its sole discretion, or at the request of the Required Lenders, continues to make Term Loans and advances under this Agreement upon the occurrence of a Default or Event of Default, any such Term Loans and advances may be in such amounts (subject to Paragraph 15.10 hereof) and on

such additional terms and conditions as the Agent or the Required Lenders may deem appropriate.

**15.6**    Each Lender expressly acknowledges that neither the Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it and that no act by the Agent hereinafter taken, including any review of the affairs of the Companies shall be deemed to constitute any representation or warranty by the Agent to any Lender. Each Lender represents to the Agent that it has, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Companies and made its own decision to enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition or creditworthiness of the Companies. The Agent, however, shall provide the Lenders with copies of all financial statements, projections and business plans which come into the possession of the Agent or any of its officers, employees, agents or attorneys-in-fact.

**15.7**    (a)    The Lenders agree to indemnify the Agent in its capacity as such (to the extent not reimbursed by the Companies and without limiting the obligation of the Companies to do so), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements (including, without limitation, all Out-of Pocket Expenses) of any kind whatsoever (including negligence on the part of the Agent) which may at any time be imposed on, incurred by or asserted against the Agent in any way relating to or arising out of this Agreement or any ancillary documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting solely from the Agent's gross negligence or willful misconduct. The agreements in this paragraph shall survive the payment of the Obligations.

(b)    The Agent will use, subject to the terms of the Intercreditor Agreement, its reasonable business judgment in handling the collection of the Accounts, enforcement of its rights hereunder and realization upon the Collateral but shall not be liable to the Lenders for any action taken or omitted to be taken in good faith or on the written advice of counsel. The Lenders expressly release the Agent from any and all liability and responsibility (express or implied), for any loss, depreciation of or delay in collecting or falling to realize on any Collateral, the Obligations or any guaranties therefor and for any mistake, omission or error in judgment in passing upon or accepting any Collateral or in making (or in failing to make) examinations or audits or for granting indulgences or extensions to the Companies, any account debtor or any guarantor, other than resulting from the Agent's gross negligence or willful misconduct.

**15.8** The Agent may make loans to, and generally engage in any kind of business with the Companies as though the Agent were not the Agent hereunder. With respect to its loans made or renewed by it or loan obligations hereunder as Lender, the Agent shall have the same rights and powers, duties and liabilities under this Agreement as any Lender and may exercise the same as though it was not the Agent and the terms "Lender" and "Lenders" shall include the Agent in its individual capacity.

**15.9** The Agent may resign as the Agent upon 30 days' notice to the Lenders and such resignation shall be effective upon the appointment of a successor Agent. If the Agent shall resign as Agent, then the Lenders shall appoint a successor Agent for the Lenders whereupon such successor Agent shall succeed to the rights, powers and duties of the Agent and the term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement. After any retiring Agent's resignation hereunder as the Agent the provisions of this Section 15 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent.

**15.10** Notwithstanding anything contained in this Agreement to the contrary, the Agent will not, without the prior written consent of all Lenders affected thereby: (a) amend this Agreement to (i) increase the Commitment of any Lender; (ii) reduce the interest rates; (iii) reduce or waive (x) any fees in which the Lender(s) are entitled to share hereunder, or (y) the repayment of any Obligations due the Lender(s); (iv) extend the maturity of the Obligations; or (v) alter or amend (x) this Paragraph 15.10 or (y) the definitions of Collateral or Required Lenders; or (b) knowingly make any Term Loans if after giving effect thereto the total of Term Loans Advances would exceed the applicable Term Loan Facility Amount or, if less, authorized under the Final Order. Subject to the provisions of Section 11, Paragraph 11.2 and the provisions of this Paragraph 15.10 of Section 15 of this Agreement, in all other respects the Agent is authorized by each of the Lenders to take such actions or fail to take such actions under this Agreement if the Agent, in its reasonable discretion, deems such to be advisable and in the best interest of the Lenders. Notwithstanding any provision to the contrary contained in this Agreement (including the provisions of Section 11, Paragraph 11.2 and Section 15, Paragraph 15.10 hereof) the Agent is authorized to take such actions or fail to take such actions in connection with (a) the exercise of any and all rights and remedies under this Agreement (including but not limited to the exercise of rights and remedies under Section 11, Paragraph 11.2 of this Agreement) and/or (b) curing any ambiguity, defect or inconsistency in the terms of this Agreement and/or (c) releasing its lien and security interest in any Collateral; provided that the Agent, in its reasonable discretion, deems such to be advisable and in the best interests of the Lenders. In the event the Agent terminates this Agreement pursuant to the terms hereof, the Agent will cease making any loans or advances upon the effective date of termination except for any loans or advances (which will be treated as Term Loan Advances) which the Agent may deem, in its sole discretion, are reasonably required to maintain, protect or realize upon the Collateral.

**15.11** In the event any Lender's consent is required pursuant to the provisions of this Agreement and such Lender does not respond to any request by the Agent for such consent within ten (10) Business Days after such request is made to the contact Person (whose name and contact information shall have been provided to Agent in writing by such Lender) at such

Lender, such failure to respond shall be deemed a consent. In addition, in the event that any Lender declines to give its consent to any such request, it is hereby mutually agreed that the Agent and/or any other Lender shall have the right (but not the obligation) to purchase such Lender's share of the Loans for the full amount thereof together with accrued interest thereon to the date of such purchase.

**15.12**  Each Lender agrees that notwithstanding the provisions of Section 12 of this Agreement any Lender may terminate this Agreement and the Term Loan Facility only on the Termination Date. Termination of this Agreement by any of the Lenders as herein provided shall not affect the Lenders' respective rights and obligations under this Agreement incurred prior to the effective date of termination as set forth in the preceding sentence.

**15.13**  If the Agent is required at any time to return to the Companies or to a trustee, receiver, liquidator, custodian or other similar official any portion of the payments made by the Companies to the Agent as result of a bankruptcy or similar proceeding with respect to the Companies, any guarantor or any other person or entity or otherwise, then each Lender shall, on demand of the Agent, forthwith return to the Agent its ratable share of any such payments made to such Lender by the Agent, together with its ratable share of interest and/or penalties, if any, payable by the Lenders; this provision shall survive the termination of this Agreement.

**15.14**  The Lenders agree to maintain the confidentiality of any non-public information provided by the Companies to them, in the ordinary course of their business, provided that the foregoing confidentiality provision shall terminate one (1) year after the termination date of this Agreement, and provided further that any such Lenders may disclose such information (i) to any applicable bank regulatory and auditor personnel and (ii) upon the advice of their counsel.

*Approved by Judge Gloria M. Burns May  06, 2008*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be effective, executed, accepted and delivered, by their proper and duly authorized officers as of the date set forth above.

<u>**COMPANIES**</u>:

**SHAPES/ARCH HOLDINGS L.L.C.,**
a New Jersey limited liability company

By:_____
Name:   Steven S. Grabell
Title:   Chief Executive Officer

**SHAPES L.L.C.,**
a New Jersey limited liability company

By:_____
Name:   Steven S. Grabell
Title:   Chief Executive Officer

**DELAIR L.L.C.,**
a New Jersey limited liability company

By:_____
Name:   Steven S. Grabell
Title:   Vice President

**ACCU-WELD L.L.C.,**
a Pennsylvania limited liability company

By:_____
Name:   Steven S. Grabell
Title:   Vice President

**ULTRA L.L.C.**
a New Jersey limited liability company

By:_____
Name:   Steven S. Grabell
Title:   Vice President

**[SIGNATURES CONTINUE ON FOLLOWING PAGE(S)]**

*Approved by Judge Gloria M. Burns May  06, 2008*

**<u>AGENT:</u>**

**ARCH ACQUISITION I, LLC**

By:_____

Name:

Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION TERM LOAN
FINANCING AGREEMENT]**

*Approved by Judge Gloria M. Burns May  06, 2008*

## <u>EXHIBIT A</u>

### TERM LOAN PROMISSORY NOTE

$30,000,000                                                              May ___, 2008

FOR VALUE RECEIVED, each of the undersigned (collectively, "Borrowers"), intending to be legally bound hereby, unconditionally and jointly and severally, promises to pay to the order of ARCH ACQUISITION I, LLC, a Delaware limited liability company ("Agent"), for the benefit of Arch Acquisition I, LLC ("Lender"), at its principal office located at 1001 Brickell Bay Drive, 26th Floor, Miami, Florida 33131, or at such other place as Agent may from time to time designate in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of Twenty-Five Million Dollars ($30,000,000.00) or such lesser sum which represents the Lender's pro-rata share of the principal balance outstanding from time to time under the terms of the Financing Agreement (as defined below), together with interest thereon at the rate or rates hereafter specified until paid in full and any and all other sums which may be owing to the holder of this Note by Borrowers, or any of them, pursuant to this Note or the Financing Agreement. The actual amount due and owing from time to time hereunder shall be evidenced by the Lender's records of disbursements and receipts with respect to the Term Loan Facility which shall be conclusive evidence of such amount, absent manifest error. Capitalized terms used herein but not defined herein shall have the respective meanings assigned to such terms in the Financing Agreement.

This Term Loan Promissory Note ("Note") is issued under, and secured in accordance with the terms of, the Debtor-in-Possession Term Loan Financing Agreement dated as of even date herewith among Borrowers, Agent and Lender and the other lenders from time to time a party thereto (as from time to time amended, restated, supplemented or otherwise modified, the "Financing Agreement").

Interest on the outstanding principal amount of each Term Loan Advance evidenced by this Note shall accrue at the rate or rates specified in, and be payable in accordance with the terms of, the Financing Agreement.

The Financing Agreement provides for the acceleration of the payment of principal of and interest on the Term Loans upon the happening of certain Events of Default as defined in the Financing Agreement.

Borrowers waive presentment, demand for payment, notice of dishonor or acceleration, protest and notice of protest, and any and all other notices or demands in connection with this Note, except any notice expressly required by the Financing Agreement.

This Note shall be governed by and construed in accordance with the laws of the State of New York.

### [SIGNATURES ON FOLLOWING PAGE]

*Approved by Judge Gloria M. Burns May  06, 2008*

**SHAPES/ARCH HOLDINGS L.L.C.**,
a New Jersey limited liability company

By:_____
Name:
Title:


**SHAPES L.L.C.**,
a New Jersey limited liability company

By:_____
Name:
Title:


**DELAIR L.L.C.**,
a New Jersey limited liability company

By:_____
Name:
Title:


**ULTRA L.L.C.**,
a New Jersey limited liability company

By:_____
Name:
Title:


**ACCU-WELD L.L.C.**, a Pennsylvania limited
liability company

By:_____
Name:
Title:


**[SIGNATURE PAGE TO TERM LOAN PROMISSORY NOTE]**

NY 238747640v9 5/1/2008

*Approved by Judge Gloria M. Burns May  06, 2008*

EXHIBIT B

Budget

[See Attached]

*Approved by Judge Gloria M. Burns May  06, 2008*

**Exhibit B**
**Shapes/Arch Holdings, LLC**
*Summary Consolidated DIP Cash Flow*

| | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 | Week 16 | Week 17 | Week 18 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Post-Petition Week:* | | | | | | | | | | | | | | |
| *Week Ending:* | 4/27/2008 | 5/4/2008 | 5/11/2008 | 5/18/2008 | 5/25/2008 | 6/1/2008 | 6/8/2008 | 6/15/2008 | 6/22/2008 | 6/29/2008 | 7/6/2008 | 7/13/2008 | 7/20/2008 | |
| **Beginning Cash Balance** | 21,391 | - | - | - | - | - | - | - | - | - | - | - | - | 21,391 |
| **Revenues** | | | | | | | | | | | | | | |
| Net Revenues | 4,684,965 | 5,246,390 | 5,246,390 | 5,246,390 | 5,266,951 | 5,266,951 | 4,967,112 | 4,967,112 | 4,967,112 | 4,967,112 | 5,160,805 | 5,160,805 | 5,160,805 | 66,308,898 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| A/R Collections | 4,216,065 | 4,625,355 | 4,134,182 | 4,521,978 | 4,337,219 | 4,524,868 | 4,639,265 | 4,910,574 | 5,012,874 | 4,791,530 | 5,102,576 | 5,114,713 | 5,099,848 | 61,031,049 |
| **Total Cash Receipts** | 4,216,065 | 4,625,355 | 4,134,182 | 4,521,978 | 4,337,219 | 4,524,868 | 4,639,265 | 4,910,574 | 5,012,874 | 4,791,530 | 5,102,576 | 5,114,713 | 5,099,848 | 61,031,049 |
| **Cash Disbursements** | | | | | | | | | | | | | | |
| Material | 3,029,192 | 3,224,303 | 3,265,911 | 3,265,911 | 2,906,819 | 2,906,819 | 2,816,624 | 2,816,624 | 2,816,624 | 2,816,624 | 3,031,047 | 3,031,047 | 3,031,047 | 38,958,590 |
| Manufacturing & Warehouse | 889,589 | 324,621 | 343,621 | 813,621 | 332,058 | 1,208,558 | 202,356 | 742,356 | 327,356 | 823,856 | 194,502 | 324,502 | 709,502 | 7,236,500 |
| Payroll and Benefit Expenses | 1,262,749 | 668,523 | 1,838,231 | 483,523 | 1,262,749 | 668,523 | 1,262,749 | 1,059,005 | 1,262,749 | 668,523 | 1,262,749 | 1,059,005 | 1,262,749 | 14,021,826 |
| Delivery Expenses | 133,773 | 133,212 | 133,212 | 133,212 | 92,309 | 92,309 | 91,988 | 91,988 | 91,988 | 91,988 | 95,266 | 95,266 | 95,266 | 1,371,776 |
| Selling Expenses | 257,527 | 192,163 | 160,163 | 155,163 | 282,607 | 114,748 | 72,955 | 77,955 | 308,051 | 109,955 | 79,587 | 79,587 | 239,214 | 2,129,677 |
| G&A Expenses | 234,535 | 456,507 | 308,507 | 395,007 | 48,000 | 240,612 | 106,000 | 156,500 | 36,000 | 242,104 | 106,000 | 63,000 | 49,500 | 2,441,773 |
| CAPEX | 154,967 | 154,967 | 169,967 | 154,967 | 105,000 | 105,000 | 120,000 | 105,000 | 105,000 | 105,000 | 120,000 | 105,000 | 105,000 | 1,609,866 |
| Change in Float | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Expenses | - | 2,784,960 | 305,000 | - | - | 1,130,000 | - | - | - | 1,015,000 | 410,000 | - | - | 5,644,960 |
| Utility Deposits | 1,055,000 | - | - | - | - | - | - | - | - | - | - | - | - | 1,055,000 |
| Senior Lender Amortization | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Independent Sales Consultant | - | 125,000 | - | - | - | 125,000 | - | - | - | - | - | - | - | 250,000 |
| DIP Facility Interest & Fees & L/C | - | 715,718 | - | - | - | - | 488,956 | - | - | - | 504,454 | - | - | 1,709,127 |
| **Total Cash Disbursements** | 7,017,332 | 8,779,473 | 6,524,611 | 5,401,403 | 5,029,543 | 6,591,569 | 5,161,628 | 5,049,428 | 4,947,768 | 5,873,050 | 5,803,604 | 4,757,407 | 5,492,278 | 76,429,095 |
| **Net Cash Change** | (2,779,875) | (4,154,118) | (2,390,429) | (879,425) | (692,324) | (2,066,701) | (522,363) | (138,854) | 65,106 | (1,081,520) | (701,029) | 357,307 | (392,430) | (15,376,655) |
| **Cumulative Cash Change** | (4,062,303) | (8,216,420) | (10,606,850) | (11,486,274) | (12,178,598) | (14,245,299) | (14,767,662) | (14,906,516) | (14,841,411) | (15,922,930) | (16,623,959) | (16,266,652) | (16,659,083) | (15,376,655) |
| **DIP Facility Draws** | 2,779,875 | 4,154,118 | 2,390,429 | 879,425 | 692,324 | 2,066,701 | 522,363 | 138,854 | (65,106) | 1,081,520 | 701,029 | (357,307) | 392,430 | 15,376,655 |
| **Ending Cash Balance** | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **DIP Revolver Facility - $60 Million** | | | | | | | | | | | | | | |
| Opening Balance | 43,723,971 | 44,829,357 | 44,599,409 | 45,456,090 | 45,981,596 | 46,673,920 | 47,703,341 | 47,891,767 | 47,849,581 | 47,720,439 | 47,711,948 | 47,671,199 | 47,313,893 | 43,723,971 |
| DIP Facility Draws | 2,779,875 | 4,154,118 | 2,390,429 | 879,425 | 692,324 | 2,066,701 | 522,363 | 138,854 | (65,106) | 1,081,520 | 701,029 | (357,307) | 392,430 | 15,376,655 |
| Collections | | | | | | | | | | | | | | |
| Letters of Credit: Pre-Petition | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 | 3,555,000 |
| Letters of Credit: Post-Petition | 2,875,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 | 3,500,000 |
| Reserved Termination Interest Rate Swap | | | | | | | | | | | | | | |
| **Total DIP Funding Requirement** | 52,933,846 | 56,038,475 | 54,044,838 | 53,390,514 | 53,728,920 | 55,795,621 | 55,280,704 | 55,085,621 | 54,839,475 | 55,856,959 | 55,467,976 | 54,368,893 | 54,761,323 | 66,155,626 |
| **Revolver DIP Borrowing Base Availability** | 51,259,357 | 51,654,409 | 52,511,090 | 53,036,596 | 54,256,064 | 54,758,341 | 54,946,767 | 54,904,581 | 54,775,439 | 54,766,948 | 54,726,199 | 54,675,134 | 54,636,704 | 54,636,704 |
| Senior Term Loan Funding | (1,674,488) | (4,384,067) | (1,533,748) | (353,918) | - | (1,037,280) | (333,937) | (181,041) | (64,036) | (1,090,011) | (741,777) | - | (124,619) | (11,518,922) |
| **Total DIP Revolver Funding** | 51,259,357 | 51,654,409 | 52,511,090 | 53,036,596 | 53,728,920 | 54,758,341 | 54,946,767 | 54,904,581 | 54,775,439 | 54,766,948 | 54,726,199 | 54,368,893 | 54,636,704 | 54,636,704 |
| **DIP Term Loan Facility - $25 Million** | | | | | | | | | | | | | | |
| Opening Balance | 15,192,347 | 16,866,836 | 21,250,902 | 22,784,651 | 23,138,569 | 23,138,569 | 24,175,849 | 24,509,786 | 24,690,826 | 24,754,862 | 25,844,873 | 26,586,650 | 26,586,650 | 15,192,347 |
| Plus: Senior Term Loan Funding | 1,674,488 | 4,384,067 | 1,533,748 | 353,918 | - | 1,037,280 | 333,937 | 181,041 | 64,036 | 1,090,011 | 741,777 | - | 124,619 | 11,518,922 |
| **Total Ending DIP Term Loan** | 16,866,836 | 21,250,902 | 22,784,651 | 23,138,569 | 23,138,569 | 24,175,849 | 24,509,786 | 24,690,826 | 24,754,862 | 25,844,873 | 26,586,650 | 26,586,650 | 26,711,269 | 26,711,269 |
| Total DIP Term Loan Facility | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 | 30,000,000 |
| **Total DIP Term Loan Availability** | 13,133,164 | 8,749,098 | 7,215,349 | 6,861,431 | 6,861,431 | 5,824,151 | 5,490,214 | 5,309,174 | 5,245,138 | 4,155,127 | 3,413,350 | 3,413,350 | 3,288,731 | 3,288,731 |

*Approved by Judge Gloria M. Burns May  06, 2008*

EXHIBIT C

Competitive Process

<u>Designated Plan</u>.  Arch would serve as the "stalking horse" bidder pursuant to the Plan of Reorganization substantially in the form attached as Exhibit 3 to the Final Order (the "Arch POR").

<u>Bid Protections</u>.  In the event the Debtors, in consultation with the Committee, select a different Plan after the process below, Arch would be entitled to a break-up fee in an amount equal to one million dollars ($1,000,000.00) plus expense reimbursement equal to the reasonable actual costs and reasonable actual out-of-pocket fees and expenses of counsel, accountants, financial and other advisors incurred by Arch in connection with their legal, financial and business due diligence and the preparation and negotiation of the Plan and related agreement, not to exceed five hundred thousand dollars ($500,000.00).  The break-up fee and expense reimbursement would be payable on the Effective Date of a plan of reorganization other than the Arch POR and, in the case of the expense reimbursement, such later date as the Court approves the amount of the expense reimbursement upon motion and notice.  In addition, the bidding shall be subject to a minimum overbid amount $150,000 and successive incremental bids of $150,000.

<u>Process</u>

Competitive Plan Procedures acceptable to Arch, the Debtors and the Committee, the final drafts of the Arch POR (on terms to be no worse than those in Plan attached to the Final Order) and the related Disclosure Statement filed by May 12, 2008.

Hearing on the Competitive Plan Procedures shall be held on May 19, 2008 at 2:00 p.m. and the Disclosure Statement for the Arch POR shall be held on May 23, 2008 at 10:00 a.m..

Process to be run by the Debtors, through a sales consultant employed under Section 327 of the Bankruptcy Code that is acceptable to the Committee (the "Sales Consultant"), in full transparent consultation with the Committee.  The Sales Consultant will be in charge of marketing, managing due diligence and overseeing the competitive plan process.

Bidders will be subject to qualifications as to financial wherewithal (including agreed-upon deposit) and other customary qualification requirements as provided in the Competitive Plan Procedures.

The schedule will be as follows, subject to input from the Sales Consultant:

- No later than May 12, 2008, Debtors (or such other party as the Court may authorize), in consultation with the Committee, shall file a Competitive Plan Motion and the Disclosure Statement Motion with the Bankruptcy Court in form and substance acceptable to Arch.
- The Competitive Plan Order shall be entered on or prior to May 20, 2008 and the Disclosure Statement Order shall be entered no later than May 24, 2008.

- Formal sale process and solicitation for Disclosure Statement to be commenced immediately after entry of the above orders, provided that Committee and Debtors/Sales Consultant may contact potentially interested parties and the Debtors/Sales Consultant may provide the same due diligence materials previously provided to Arch to those parties, subject to execution of a confidentiality agreement the same, in substance, as that signed by Arch; provided, however, until the entry of an order approving the Competitive Process acceptable to Arch, the Debtors and the Sales Consultant shall be prohibited from soliciting, negotiating and/or discussing with any entity other than Arch, the sale of substantially all of the Debtors' assets or equity or a plan of reorganization other than the Plan filed as Exhibit 3 to the Final Order.
- Parties wishing to submit plans for consideration shall do so by June 25, 2008 (including marked copy of proposed plan of reorganization against Arch POR).
- Ballots on Plan due June 27, 2008.
- The Debtors, through the Sales Consultant, and in consultation with the Committee, shall hold an "auction" for competitive plans on June 27, 2008; bids must not be subject to financing contingencies prior to the auction for bidders to participate.
- Confirmation hearing shall be held week of July 7, 2008
- The Effective Date shall occur ten days after entry of the Confirmation Order, but not later than July 31, 2008.

*Approved by Judge Gloria M. Burns May  06, 2008*

# EXHIBIT 3

*Approved by Judge Gloria M. Burns May  06, 2008*

Mark E. Felger Esquire
Jerrold N. Poslusny, Jr., Esquire
Cozen O'Connor
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, NJ  08002 (856) 910-5000

Attorneys for the Debtor and Debtors-in-Possession

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | Case No.:  08-14631 (GMB) |
| In re: | : | (Jointly Administered) |
| | : | |
| Shapes/Arch Holdings L.L.C., *et al*. | : | Chapter 11 |
| | : | |
| Debtors. | : | |
| | : | |

## <u>DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION</u>

COZEN O'CONNOR
Mark E. Felger Esquire
Jerrold N. Poslusny, Jr., Esquire
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, NJ  08002 (856) 910-5000

Attorneys for the Debtor and Debtors-in-Possession

Dated:  May __, 2008

# TABLE OF CONTENTS

**PAGE**

ARTICLE I DEFINITIONS ........................................................................................... 1
   1.1     Scope of Definitions .................................................................................. 1

ARTICLE II METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS AND
GENERAL PROVISIONS AND CLASSIFICATION OF CLAIMS AND INTERESTS .......... 11
   2.1     General Rules of Classification ................................................................ 11
   2.2     Classification of Claims and Interests ...................................................... 11
   2.3     Bar Date for Administrative Claims ......................................................... 11
   2.4     Bar Date for Fee Claims .......................................................................... 12
   2.5     Intercompany Claims ............................................................................... 12
   2.6     Administrative Consolidation .................................................................. 12

ARTICLE III TREATMENT OF CLAIMS NOT IMPAIRED UNDER THE PLAN ................ 12
   3.1     Administrative Claims ............................................................................. 12
   3.2     Fee Claims .............................................................................................. 13
   3.3     Priority Tax Claims ................................................................................. 13
   3.4     Class 1 Other Priority Claims .................................................................. 13
   3.5     Class 2 Miscellaneous Secured Claims .................................................... 13
   3.6     Class 3 Arch Acquisition DIP Claim ....................................................... 13
   3.7     Class 4 CIT DIP Claim ........................................................................... 14
   3.8     Class 7 Interests ..................................................................................... 14
   3.9     Class 9 Secured Real Estate Claims ........................................................ 14
   3.10   Reservation of Rights .............................................................................. 14

ARTICLE IV TREATMENT OF CLAIMS IMPAIRED UNDER THE PLAN ........................ 14
   4.1     Class 5 General Unsecured Claims .......................................................... 14
   4.2     Class 6 Ben Interests ............................................................................... 15
   4.3     Class 8 Claims ........................................................................................ 15
   4.4     Class 10 Claims ...................................................................................... 15
   4.5     Class 11 Claims ...................................................................................... 15
   4.6     Class 12 Collateralized Insurance Program Claims .................................. 16

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 16
   5.1     Corporate Action .................................................................................... 16
   5.2     Liquidation Trust .................................................................................... 16
   5.3     Plan Administrator .................................................................................. 16
   5.4     Exit Facility ............................................................................................ 17
   5.5     Equity Commitments ............................................................................... 18
   5.6     Permitted Investments ............................................................................. 18
   5.7     Revesting ................................................................................................ 18
   5.8     Transfer of Real Estate ........................................................................... 18
   5.9     Permitted Investments ............................................................................. 18

*Approved by Judge Gloria M. Burns May  06, 2008*

ARTICLE VI RELEASES............................................................................................... 19
  6.1    Application for Approval of Settlement ................................................... 19
  6.2    General Release ....................................................................................... 19
  6.3    Debtors Injunction .................................................................................. 19
  6.4    Release Consideration............................................................................. 20
  6.5    No Admissions ........................................................................................ 20

ARTICLE VII DISTRIBUTIONS UNDER THE PLAN ......................................... 20
  7.1    Distributions for Claims Allowed as of the Effective Date ..................... 20
  7.2    Delivery of Distributions ......................................................................... 20
  7.3    Reserve Accounts..................................................................................... 21
  7.4    Reserves for Disputed Administrative, Fee, Priority Tax and Other Priority Claims .. 21
  7.5    Reserves for Disputed General Unsecured Claims .................................. 21
  7.6    Claims Objection Deadline ...................................................................... 22
  7.7    Settlement of Disputed Claims ................................................................ 22
  7.8    Unclaimed Property ................................................................................. 22
  7.9    Release and Preservation of Certain Liens .............................................. 23
  7.10  Withholding Taxes ................................................................................... 23
  7.11  Fractional Cents ...................................................................................... 23
  7.12  Payments of Less than Twenty-Five Dollars .......................................... 23

ARTICLE VIII UNEXPIRED LEASES AND EXECUTORY CONTRACTS........................... 23
  8.1    Rejection of All Agreements ................................................................... 23
  8.2    Claims for Damages................................................................................. 24

ARTICLE IX CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE ................... 24
  9.1    Conditions to Confirmation of the Plan .................................................. 24
  9.2    Conditions to Effectiveness of the Plan .................................................. 25
  9.3    Waiver of Conditions to Confirmation or Effective Date........................ 25

ARTICLE X RETENTION OF JURISDICTION ................................................... 26

ARTICLE XI MISCELLANEOUS PROVISIONS ................................................ 28
  11.1  Pre-Confirmation Modification............................................................... 28
  11.2  Post-Confirmation Immaterial Modification ........................................... 28
  11.3  Post-Confirmation Material Modification ............................................... 28
  11.4  Withdrawal or Revocation of the Plan .................................................... 28
  11.5  Parties shall Use Best Efforts to Effectuate Plan .................................... 28
  11.6  Payment of Statutory Fees ....................................................................... 29
  11.7  Successors and Assigns............................................................................ 29
  11.8  Exculpation ............................................................................................. 29
  11.9  Discharge ................................................................................................. 29
  11.10 Confirmation Injunction.......................................................................... 29
  11.11 Preservation of Insurance........................................................................ 30
  11.12 Cramdown................................................................................................ 30
  11.13 Governing Law ........................................................................................ 30
  11.14 Notices ..................................................................................................... 30

ii

*Approved by Judge Gloria M. Burns May  06, 2008*

11.15   Saturday, Sunday or Legal Holiday .............................................................................. 32
11.16   Section 1146 Exemption ................................................................................................ 32
11.17   Severability .................................................................................................................... 32
11.18   Headings ........................................................................................................................ 32
11.19   Committee Survival ....................................................................................................... 33

*Approved by Judge Gloria M. Burns May  06, 2008*

## INTRODUCTION

Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C., the above-captioned debtors and debtors in possession (collectively "Shapes" or the "Debtors"), hereby propose this Amended Joint Chapter 11 Plan of Reorganization pursuant to section 1121 of the Bankruptcy Code.  Reference is made to the Disclosure Statement[1] for risk factors and a summary and analysis of the Plan and certain related matters.  The Debtors are the proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XI of this Plan, the Debtors expressly reserve the right to alter, amend or modify this Plan, one or more times, before its substantial consummation.

## ARTICLE I

## DEFINITIONS

1.1     <u>Scope of Definitions</u>.  As used in this Plan, the following terms shall have the respective meanings specified below.  Whenever the context requires, such terms shall include the plural as well as the singular number, the masculine gender shall include the feminine and the feminine gender shall include the masculine.

1.2     "**Accrued**" shall mean an expense incurred but not yet billed for nor paid.

1.3     "**Accu-Weld Real Estate**" shall mean the real estate and fixtures located at 1211 Ford Road, Bensalem, Pennsylvania, which is owned by Accu-Weld L.L.C.

1.4     "**Accu-Weld Realty Pennsylvania, L.L.C.**" shall mean the Pennsylvania limited liability company whose sole member shall be Accu-Weld L.L.C. as set forth in the Operating Agreement contained in the Plan Supplement.

1.5     "**Additional Environmental Claims**" shall have the meaning set forth in Section 4.5 of the Plan.

1.6     "**Administrative Claim**" shall mean a Claim under sections 503(b) and 1114(e)(2) of the Bankruptcy Code or determined to be an Allowed Administrative Claim by a Final Order that is entitled to priority under sections 507(a)(1) or 507(b) of the Bankruptcy Code, including any allowed Reclamation Claims or Claims allowed under Section 503(b)(9) of the Bankruptcy Code, for costs or expenses of administration of the Chapter 11 Cases including, without limitation, any actual and necessary expenses of operating the businesses of the Debtors or preserving the estates incurred after the Petition Date, and any and all fees and expenses of Professionals Filed under sections 330, 331 or 503 of the Bankruptcy Code.

---

[1]  All capitalized terms not defined in this introduction shall have the meanings set forth in Article I of this Plan.

1

1.7    "**Administrative Claims Bar Date**" shall have the meaning set forth in Section 2.3 of the Plan.

1.8    "**Allowed Claim**" or "**Allowed [    ] Claim**" shall mean:  (a) any Claim, proof of which is/was Filed with the Bankruptcy Court or the Debtors' court-appointed claims agent on or before the date designated by the Bankruptcy Court as of the last date(s) for filing proofs of claim with respect to such Claim, or which has been or hereafter is scheduled by the Debtors as liquidated in amount and not disputed or contingent and which, in either case, is a Claim as to which no objection to the allowance thereof has been Filed within the applicable period of limitation (if any) for objection to Claims fixed by the Bankruptcy Court, or as to which any objection has been determined by a Final Order of the Bankruptcy Court (allowing such Claim in whole or in part); (b) a Claim that is allowed (i) in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) in a Final Order or (iii) pursuant to the terms of the Plan; or (c) a request for payment of an Administrative Claim, which is made before the Administrative Claims Bar Date, or otherwise has been deemed timely asserted under applicable law, and is an Administrative Claim as to which no objection to allowance thereof has been Filed within the applicable deadline pursuant to sections 2.3 of the Plan.  Except as otherwise provided herein, in accordance with section 502(d) of the Bankruptcy Code, a Claim held by any party that is subject to an Avoidance Action shall not be an Allowed Claim until such time as a Final Order is entered by the Bankruptcy Court on the Avoidance Action.

1.9    "**Arch Acquisition**" shall mean Arch Acquisition I, LLC and its designees.

1.10    "**Arch Acquisition DIP Agreement**" means the Amended and Restated Debtor in Possession Term Loan Financing Agreement entered into by and between Arch Acquisition and the Debtors dated May [ ], 2008, as amended or modified in accordance with its terms.

1.11    "**Arch Acquisition DIP Claim**" shall mean the Allowed Secured Claim of Arch Acquisition arising under the Arch Acquisition DIP Loan.  For purposes of the Plan, the Arch Acquisition DIP Claim shall be deemed an Allowed Secured Claim.

1.12    "**Arch Acquisition DIP Loan**" means the post-petition term loan facility provided by Arch Acquisition to the Debtors in the initial principal amount of thirty million dollars ($30,000,000.00) and as increased in accordance with the terms of the Arch Acquisition DIP Agreement, as evidenced by the Arch Acquisition DIP Loan Agreement.

1.13    "**Avoidance Actions**" shall mean any and all claims and causes of action of the Debtors, arising under the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549 and 550 thereof, but not including any claim or cause of action against the Professionals or any claims or causes of action released under the terms of this Plan.

1.14    "**Ballot**" shall mean the form or forms that will be distributed along with the Disclosure Statement to holders of Allowed Claims in Classes that are Impaired under the Plan and entitled to vote, which the holders of Impaired Claims may use to vote to accept or reject the Plan.

1.15    "**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101, *et seq.*, as in effect on the Petition Date, and as amended effective as of the Petition Date.

1.16    "**Bankruptcy Court**" shall mean the United States Bankruptcy Court for the District of New Jersey (Camden Vicinage) or such other court as may hereafter be granted jurisdiction over the Debtors' Chapter 11 Cases.

1.17    "**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure effective August 1, 1996 in accordance with the provisions of 28 U.S.C. § 2075, and the local rules of the Bankruptcy Court, as in effect on the Petition Date, and is amended effective as of the Petition Date.

1.18    "**Bar Date**" shall mean 15, 2008, the date set by the Bankruptcy Court as the last day to file proofs of Claim.

1.19    "**Ben Interests**" shall mean one hundred percent (100%) of the limited liability company interests of Shapes/Arch Holdings L.L.C. which are owned by Ben LLC.

1.20    "**Business Day**" shall mean any day other than a Saturday, Sunday or legal holiday as such term is defined in Bankruptcy Rule 9006.

1.21    "**Cash**" shall mean cash and cash equivalents, including, but not limited to, wire transfers, checks and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.22    "**Chapter 11 Cases**" shall mean the above-captioned Chapter 11 cases pending for the Debtors.

1.23    "**CIT**" shall mean The CIT Group/Business Credit, Inc., in its individual capacity and as agent for JP Morgan Chase Bank and Textron Financial Corporation.

1.24    "**CIT Lenders**" shall mean CIT, JPMorgan Chase Bank, N.A. and Textron Financial Corporation and any other lenders under the CIT Loan and the CIT DIP Loan.

1.25    "**CIT Loan**" shall mean the term loan, revolver loan and letters of credit from the CIT Lenders in accordance with the terms of certain loan agreements dated December 30, 2003, as amended in the aggregate approximate amount of sixty million dollars ($60,000,000.00).

1.26    "**CIT DIP Claim**" shall mean the Allowed Secured Claim of the CIT Lenders arising under the CIT DIP Loan and including, without limitation, the Revolving Credit Obligations, as defined in the Interim DIP Orders and Final DIP Orders entered with respect to the CIT Lenders and the CIT DIP Loan.  For purposes of the Plan, the CIT DIP Claim shall be deemed an Allowed Secured Claim.

1.27    "**CIT DIP Loan**" shall mean the post-petition revolving credit loan facility provided by CIT to the Debtors in the principal amount of sixty million dollars ($60,000,000.00) as evidenced by the Debtor in Possession Revolving Credit Financing Agreement entered into by and between CIT and the Debtors dated March 18, 2008, as amended and restated from time to time including, without limitation, that certain Amended and Restated Revolving Credit Financing Agreement dated May __, 2008.

1.28    "**CIT Revolving Loan DIP Agreements**" shall mean those certain loan agreements dated March 18, 2008 between the CIT Lenders and the Debtors which provide for the CIT DIP Loan, as amended, and related agreements, documents, instruments, including, without limitation, the Financing Agreements, as amended, and as defined in the Interim DIP Orders and the Final DIP Orders entered with respect to CIT, the CIT Lenders and the CIT DIP Loan.

1.29    "**Claim**" shall mean a claim against any or all the Debtors, whether or not asserted, as defined in section 101(5) of the Bankruptcy Code.

1.30    "**Claims Agent**" shall mean Epiq Bankruptcy Solutions, LLC (formerly known as Bankruptcy Services, LLC) ("Epiq") appointed by the Bankruptcy Court.

1.31    "**Class**" shall mean a category of holders of Claims or Interests, as classified pursuant to Article II of the Plan.

1.32    "**Class 5 Pool**" shall mean the sum of five million dollars ($5,000,000.00) to be used to satisfy Allowed Class 5 General Unsecured Claims.

1.33    "**Class 5 Pool Escrow**" shall mean the escrow established by the Plan Funder in the amount of the Class 5 Pool for the purpose of making distributions to and satisfying the Allowed Claims of holders of Allowed Class 5 General Unsecured Claims.

1.34    "**Class 7 Interests**" shall mean one hundred percent (100%) of the Limited Liability Company Interests of the Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C. which are owned by Shapes/Arch Holdings L.L.C.

1.35    "**CBA**" or "**Collective Bargaining Agreement**" shall mean any collective bargaining agreement between any Debtor and any of its employees' representative labor organizations as defined by the National Labor Relations Act.

1.36    "**Committee**" shall mean the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee and as reconstituted from time to time and existing as of the Confirmation Date.

1.37    "**Confirmation**" shall mean the entry of the Confirmation Order on the docket of the Bankruptcy Court.

1.38    "**Confirmation Date**" shall mean the date of entry of an order of the Bankruptcy Court confirming the Plan in accordance with the provisions of the Bankruptcy Code.

1.39    "**Confirmation Hearing**" shall mean the hearing to confirm the Plan.

1.40    "**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.41    "**Creditor**" shall mean any person or entity having a Claim against any or all of the Debtors, including without limitation a Claim that arose on or before the Petition Date or a

*Approved by Judge Gloria M. Burns May  06, 2008*

Claim against the Debtors' estate of any kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code.

1.42    "**Debtors**" shall mean Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C.

1.43    "**Debtors-in-Possession**" shall mean the Debtors in the capacity, and with the status and rights, conferred by sections 1107 and 1108 of the Bankruptcy Code.

1.44    "**Debtors Claimants**" shall have the meaning set forth in Section 6.2 of the Plan.

1.45    "**Deficiency Claim**" shall mean, with respect to a Claim that is partially secured, the amount by which the Allowed amount of such Claim exceeds the value of the property owned or held by the Debtors that collateralizes the Claim.

1.46    "**Delair Real Estate**" shall mean the real property and fixtures located at 8600 River Road, Delair, New Jersey which is owned by Shapes L.L.C.

1.47    "**Delair Realty New Jersey L.L.C.**" shall mean the New Jersey limited liability company whose sole member shall be Delair L.L.C.  as set forth in the Operating Agreement contained in the Plan Supplement.

1.48    "**Disclosure Statement**" shall mean the disclosure statement respecting the Plan, as approved by the Bankruptcy Court as containing adequate information in accordance with section 1125 of the Bankruptcy Code, all exhibits and annexes thereto and any amendments or modifications thereof.

1.49    "**Disputed Claim**" or "**Disputed [      ] Claim**" shall mean any Claim, including any Administrative Claim, which has not become an Allowed Claim pursuant to the Plan or a Final Order.

1.50    "**Disputed Administrative, Fee, Priority, Tax and Other Priority Claims Reserve**" shall have the meaning set forth in Section 7.4 of the Plan.

1.51    "**Disputed Claims Resources**" shall mean the Disputed Administrative, Fee, Priority Tax and Other Priority Claims Reserve and the Disputed General Unsecured Claims Reserve, collectively.

1.52    "**Disputed General Unsecured Claims Reserve**" shall have the meaning set forth in Section 7.5 of the Plan.

1.53    "**Effective Date**" shall mean the first business day following the date on which each of the conditions set forth in Sections 9.1 and 9.2 of the Plan have been satisfied or waived.

1.54    "**EPA/NJDEP Claim**" shall mean all claims of Environmental Protection Agency ("EPA") under any 106 orders or otherwise or any claims of the New Jersey Department of Environmental Protection ("NJDEP") as may have been or could have been asserted against any of the Debtors including the Claims set forth on Sections I and II of Schedule 4.5.

5

1.55    "**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

1.56    "**Estate**" or "**Estates**" shall mean the estate of each or the estates of all of the Debtors.

1.57    "**Estate Actions**" shall mean all causes of action which belong to the Debtors' Estates, except Avoidance Actions, against insiders and other third parties who are not Released Parties

1.58    "**Exit Facility**" shall have the meaning set forth in Section 5.4 of the Plan.

1.59    "**Fee Claim**" shall mean a claim under sections 328, 330(a), 503 or 1103 of the Bankruptcy Code for the compensation of a Professional for services rendered or reimbursement of out-of-pocket expenses of the Committee members incurred in the Chapter 11 Case on or prior to the Effective Date which has been approved by a Final Order (including expenses of the members of the Committee).

1.60    "**Fee Claim Bar Date**" shall have the meaning set forth in section 2.4 of the Plan.

1.61    "**File**", "**Filed**", or "**Filing**" shall mean file, filed or filing with the United States Bankruptcy Court for the District of New Jersey, or with respect to proofs of claim, proofs timely and properly transmitted to Debtors' Claim Agent.

1.62    "**Final DIP Orders**" shall mean the Orders (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Super priority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c) and (d); (B) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; and (C) Authorizing Debtors to Enter into Credit Agreements with Arch Acquisition and the CIT Lenders.

1.63    "**Final Order**" shall mean an order entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties, as to which (i) no appeal, certiorari proceeding or other review reconsideration or rehearing has been requested or is still pending, and (ii) the time for filing a notice of appeal or petition for certiorari or further review reconsideration or rehearing has expired.

1.64    "**Financing Agreements**" shall have the meaning ascribed to such term in the Final DIP Order.

1.65    "**General Unsecured Claim**" shall mean any unsecured, non-priority Claim, including, without limitation, any Indemnification Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Fee Claim, Arch Acquisition DIP Claim, CIT DIP Claim or Secured Claim.

1.66    "**Impaired**" shall have the meaning ascribed to such term in section 1124 of the Bankruptcy Code.

1.67    "**Indemnification Claims**" means Claims for indemnification or advancement.

1.68    "**Intercompany Claims**" shall mean any Claim held by any Debtors against another Debtor or Ben LLC or any Claims of Ben LLC against any Debtor.

1.69    "**Interest**" shall mean, with respect to the Debtors, any equity security or any other security or agreement granting rights to convert to, purchase, hold or own any equity security in Debtors as defined in section 101(16) of the Bankruptcy Code.

1.70    "**Interim Orders**" shall mean the interim orders dated March 18, 2008, April 3, 2008, April 9, 2008 and all interim orders entered thereafter which approve, on an interim basis, among other things, the CIT DIP Loan.

1.71    "**Liens**" shall mean valid and enforceable liens, mortgages, security interests, pledges, charges, encumbrances, or other legally cognizable security devices of any kind.

1.72    "**Liquidation Trust**" shall mean the trust created pursuant to the Plan Administration Agreement.

1.73    "**Management Equity Incentive Plan**" shall mean the Management Equity Incentive Plan contemplating performance-based options to purchase or distributions of New LLC Interests, which plan shall be filed with and contained in the Plan Supplement (at the option of the Plan Funder) and shall provide that at least five percent (5%) of the fully-diluted New LLC Interests will be available for such options.

1.74    "**Miscellaneous Secured Claims**" shall mean any and all Secured Claims, but excluding the Secured Claims of the CIT Lenders, Arch Acquisition, Real Estate Tax Claims, Shipper and Warehousemen, and Class 10 Secured Claims of the holders of purchase money security interests.

1.75    "**Net Proceeds**" shall mean the cash received from the sale, transfer, or collection of Property or the conversion of such Property to cash in some other manner as contemplated in this Plan, less the reasonable, necessary and customary expenses attributable to such sale, transfer, collection or conversion, recordation and filing fees, property taxes, brokerage fees and commissions, collection costs and attorneys' and other professional fees and expenses.  In determining Net Proceeds, only costs or expenses related to the Property in question shall be charged against the Proceeds of such Property.

1.76    "**New LLC Interests**" shall mean the newly authorized membership interests of Shapes/Arch Holdings L.L.C., issued and distributed to the Plan Funder pursuant to the Plan and subject to options granted pursuant to the Management Equity Incentive Plan.

1.77    "**Other Priority Claim**" shall mean any Claim against the Debtors other than an Administrative Claim, Fee Claim or Priority Tax Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code.

1.78    "**Operating Agreement**" shall mean the amended and restated Limited Liability Company Operating Agreement for each Debtor that will be set forth in the Plan Supplement.

1.79    "**Person**" shall have the meaning ascribed to such term in section 101(41) of the Bankruptcy Code.

1.80    "**Petition Date**" shall mean March 16, 2008, the date upon which the Debtors filed their petitions under Chapter 11 of the Bankruptcy Code.

1.81    "**Plan**" shall mean this Debtors' Joint Chapter 11 Plan of Reorganization, all exhibits hereto and any amendments or modifications hereof.

1.82    "**Plan Administrator**" shall mean the Person designated pursuant to the Plan Administration Agreement to act in accordance with the terms and the authority granted in the Plan Administration Agreement and the Confirmation Order.

1.83    "**Plan Administration Agreement**" shall mean the agreement governing, among other things, the distributions to holders of Allowed Claims required by the Plan, which shall be in the form and substance reasonably satisfactory to the Debtors and the Plan Funder and substantially in the form contained in the Plan Supplement.

1.84    "**Plan Expenses**" shall mean all actual and necessary costs and expenses incurred after the Effective Date in connection with the administration of the Plan, including, but not limited to, (i) the Debtors', Reorganized Debtors' and the Plan Administrator's costs, expenses and legal fees incurred related to filing and prosecuting objections to Claims, (ii) all fees, costs or expenses of the Plan Administrator incurred pursuant to the Plan Administration Agreement, including, but not limited to any professionals retained by the Plan Administrator and (iii) all fees payable pursuant to section 1930 of Title 28 of the United States Code.

1.85    "**Plan Expense Reserve**" has the meaning ascribed to such term in Section 7.3(a) of the Plan.

1.86    "**Plan Funder**" shall mean Arch Acquisition or its designee.

1.87    "**Plan Funder Cash Contribution**" shall have the meaning set forth in Section 6.4 of the Plan.

1.88    "**Plan Funder Consideration**" shall have the meaning set forth in Section 6.4 of the Plan.

1.89    "**Plan Funding Debt Commitment**" shall mean the debt commitment executed by the Plan Funder in the aggregate committed amount of up to thirty million dollars ($30,000,000.00), the terms and conditions of which shall be more fully set forth in the Plan Supplement.  The Plan Funding Debt Commitment shall include the amount of the obligations due and owing as of the Effective Date under the Arch Acquisition DIP Loan.

1.90    "**Plan Funding Equity Commitments**" shall mean the equity commitments executed by the Plan Funder in the aggregate committed amount of not less than one million five hundred thousand dollars ($1,500,000.00), the terms and conditions of which shall be more fully set forth in the in the Plan Supplement and at the election of the Plan Funder.  The Plan Funding

8

Equity Commitments may be satisfied by way of a cash payment or a conversion of the Arch Acquisition DIP Claim that were assigned to the Plan Funder by Arch Acquisition.

1.91    "**Plan Supplement**" shall mean the supplemental appendix filed with the Bankruptcy Court prior to the Disclosure Statement hearing that will contain, among other things, Plan Funding Debt Commitments, Plan Funding Equity Commitments, Operating Agreement, Management Equity Incentive Plan, Plan Administration Agreement and notice of the selection of the Plan Administrator.

1.92    "**Priority Tax Claim**" shall mean any Claim for taxes against the Debtors entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

1.93    "**Proceeds**" shall mean the cash received from the sale, transfer, or collection of Property or the conversion of such Property to cash in some other manner as contemplated in this Plan, whether received before or after the Effective Date.

1.94    "**Professionals**" shall mean those Persons (i) employed pursuant to an order of the Bankruptcy Court in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered to the Debtors prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or (ii) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.95    "**Property**" means all property of the Debtors' Estates of any nature whatsoever, real or personal, tangible or intangible, previously or now owned by the Debtors, or acquired by the Debtors' Estates, as defined in section 541 of the Bankruptcy Code.

1.96    "**Pro Rata**" means, as of any distribution date, with respect to any Allowed Claim in any Class, the proportion that such Allowed Claim bears to the aggregate amount of all Allowed Claims and Disputed Claims, without duplication, in such Class.

1.97    "**Protected Parties**" shall have the meaning set forth in Section 11.9 of the Plan.

1.98    "**Reclamation Claims**" shall be they type of Claims set forth in Section 546(c)(1) of the Bankruptcy Code.

1.99    "**Released Parties**" shall have the meaning set forth in Section 6.2 of the Plan.

1.100    "**Releasors**" shall have the meaning set forth in Section 6.2 of the Plan.

1.101    "**Remaining Assets**" shall mean all assets of the Debtors of any nature whatsoever, including, without limitation, property of the estate pursuant to section 541 of the Bankruptcy Code, claims of right, interests and property, real and personal, tangible, and intangible, excluding the Claims released pursuant to this Plan and/or the Confirmation Order.

1.102    "**Reorganized Debtors**" shall mean Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C. from and after the Effective Date,

*Approved by Judge Gloria M. Burns May  06, 2008*

pursuant to the amended and restated Limited Liability Company Operating Agreements and other governance documents included in the Plan Supplement.

1.103   "**Reserves**" shall mean collectively the Class 5 Pool Escrow, Cure Escrow, and Plan Expense Reserve, together with any other escrow, or reserve established and funded on or before the Effective Date.

1.104   "**Reserves Balances**" shall mean the balance of any Reserve after payment of all Allowed Claims with respect to which such Reserve as specifically established.

1.105   "**Schedules**" shall mean the Debtors' Schedules of Assets and Liabilities Filed pursuant to Bankruptcy Rule 1007 as they may be amended from time to time.

1.106   "**Secured Claim**" shall mean all or a portion of a Claim existing on the Petition Date, as finally allowed and approved by the Bankruptcy Court, to the extent that such debt is not greater than the value of the Property securing such Claim.

1.107   "**Shapes Real Estate**" shall mean the real property and fixtures located at 9000 River Road, Delair, New Jersey which is owned by Shapes L.L.C.

1.108   "**Shapes Realty New Jersey L.L.C.**" shall mean the New Jersey limited liability company whose sole member shall be Shapes L.L.C. as set forth in the Operating Agreement contained in the Plan Supplement.

1.109   "**Ultra Realty New Jersey**" shall mean the New Jersey limited liability company whose sole member shall be Ultra L.L.C. as set forth in the Operating Agreement contained in the Plan Supplement.

1.110   "**Ultra Real Estate**" shall mean the real estate and fixtures located at 1777 Hylton Road, Pennsauken, New Jersey which is owned by Shapes L.L.C.

All terms not expressly defined herein shall have the respective meanings given to such terms in section 101 of the Bankruptcy Code or as otherwise defined in applicable provisions of the Bankruptcy Code.

Unless otherwise specified herein, any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors, assigns and affiliates.

The rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

*Approved by Judge Gloria M. Burns May  06, 2008*

## ARTICLE II

## METHOD OF CLASSIFICATION OF CLAIMS AND INTERESTS AND GENERAL PROVISIONS AND CLASSIFICATION OF CLAIMS AND INTERESTS

2.1     <u>General Rules of Classification</u>.  As required by the Bankruptcy Code, the Plan classifies Claims and Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code.  The Plan states whether each Class of Claims or Interests is impaired or unimpaired.  The Plan provides the treatment each Class will receive under the Plan. In accordance with the requirements of the Bankruptcy Code, Allowed Administrative Claims, Allowed Fee Claims and Allowed Priority Tax Claims are not set forth in Classes.

2.2     <u>Classification of Claims and Interests</u>.  The following is the designation of the Classes of Claims and Interests under the Plan:

（a)     Class 1 Claims shall consist of all Other Priority Claims.

(b)     Class 2 Claims shall consist of all Miscellaneous Secured Claims.

(c)     Class 3 Claims shall consist of the Arch Acquisition DIP Claim.

(d)     Class 4 Claims shall consist of the CIT DIP Claims.

(e)     Class 5 Claims shall consist of all General Unsecured Claims.

(f)     Class 6 Interests shall consist of the Ben Interests.

(g)     Class 7 Interests shall consist of all Limited Liability Membership Interests in Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C.

(h)     Class 8 Claims shall consist of the EPA/NJDEP Claims.

(i)     Class 9 Claims shall consist of all Secured Real Estate Claims.

(j)     Class 10 Claims shall consist all purchase money security interests in equipment.

(k)     Class 11 Claims shall consist of the Secured Claims of Warehousemen and Shippers.

(l)     Class 12 Claims shall consist of all Claims held by entities on account of Collateralized Insurance Programs.

2.3     <u>Bar Date for Administrative Claims</u>.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, no later than thirty (30) days after the Effective Date (the "<u>Administrative Claim Bar Date</u>").  Any Person

11

that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.  Objections to requests for payment of Administrative Claims (except for Fee Claims) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, and the party requesting payment of an Administrative Claim within twenty (20) days after the filing of such request for payment.

   2.4 <u>Bar Date for Fee Claims</u>.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date, must be filed and served on the Plan Administrator and its counsel no later than thirty (30) days after the Effective Date (the "<u>Fee Claim Bar Date</u>").  Any Professional that is required to file and serve a request for payment of a Fee Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Fee Claim or participating in distributions under the Plan on account thereof.  Objections to Fee Claims must be filed and served on the Plan Administrator, its counsel, and the requesting party by twenty (20) days after the filing of the applicable request for payment of the Fee Claim.

   2.5 <u>Intercompany Claims</u>.  As of the Effective Date, Intercompany Claims shall be extinguished.  No distributions on account of Intercompany Claims will be made, however, Shapes/Arch Holdings L.L.C.  shall retain the right and entitlement to receive final liquidating dividends from its subsidiaries.

   2.6 <u>Administrative Consolidation</u>.  For purposes of this joint plan and for the administrative convenience of the parties, holders of Claims in each Debtor case shall receive the identical treatment referenced below and each unimpaired class and impaired class shall be deemed to automatically apply in each case as if there were separate plans of reorganization filed in each case (provided that all Class 5 Claimants of all Debtors shall receive their Pro Rata share of the Class 5 Pool Escrow).  Holders of Interests in each case shall be treated as more fully set forth below.  This Plan does not provide for the substantive consolidation of the Debtors on the Effective Date but the holders of Claims in Class 5 shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against or obligations of the consolidated Debtors and shall receive one distribution from the Debtors' Estates in accordance with Section 4.2 hereunder.

## ARTICLE III

## TREATMENT OF CLAIMS NOT IMPAIRED UNDER THE PLAN

   3.1 <u>Administrative Claims</u>.  Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective

Date might otherwise agree.  The total amount of unpaid Allowed Administrative Claims shall be subject to approval by the Bankruptcy Court.

3.2     Fee Claims.  Each holder of an Allowed Fee Claim shall receive one hundred percent (100%) of the unpaid amount of such Allowed Fee Claim in Cash on the Effective Date or as soon as practicable after such Fee Claim becomes an Allowed Claim.

3.3     Priority Tax Claims.  Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree, or (b) (at the election of the Debtors or the Reorganized Debtors) over a period of five (5) years from the Petition Date in equal monthly installments of principal plus interest at the rate of six percent (6%) per annum, provided, however, that the aggregate amount of the Priority Tax Claims are not in excess of eighty four thousand, six hundred sixty seven dollars ($84,667.00).

3.4     Class 1 Other Priority Claims.  Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Other Priority Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree, provided, however, that the aggregate amount of the Other Priority Claims are not in excess of two million dollars ($2,000,000.00).  Any Allowed Claims in this Class 1 for paid time off shall be satisfied in the ordinary course of business consistent with the Debtors' employment policies and practices.  The holder of Claims in this Class are not impaired and, therefore, not entitled to vote.

3.5     Class 2 Miscellaneous Secured Claims.  To the extent there are any Allowed Secured Claims in this Class (and excluding any Secured Claims that are subject of a different treatment as provided in a separate Secured Class), each such Claim shall be deemed to be a separate subclass.  At the option of the Debtors prior to the Effective Date and the Reorganized Debtors after the Effective Date, holders of Class 2 Claims shall receive either the return of the collateral securing such Allowed Secured Claim or the Net Proceeds realized by the Debtors or Reorganized Debtors from the disposition of the collateral securing such Allowed Secured Claim up to the amount of their Secured Claim.  The holder of Claims in this Class are not impaired and, therefore, not entitled to vote.

3.6     Class 3 Arch Acquisition DIP Claim.  On the Effective Date, at the election of the Plan Funder, the Arch Acquisition DIP Claim shall be (a) rolled over and the Arch Acquisition DIP Agreement shall be amended and restated as the Exit Facility or (b) repaid in full from the proceeds of the Exit Facility.  The holder of Claims in this Class is not Impaired and, therefore, not entitled to vote.

13

*Approved by Judge Gloria M. Burns May  06, 2008*

3.7    <u>Class 4 CIT DIP Claim</u>.  On the Effective Date, (i) the CIT DIP Claim shall be paid in cash (by wire transfer of immediately available funds) in full, plus all accrued and unpaid interest at the contract rate set forth in the CIT Revolving Loan DIP Agreements and (ii) to the extent any undrawn letters of credit remain outstanding, the Reorganized Debtors shall also post cash collateral with CIT in the amount of 105% of the amounts outstanding under any such undrawn letter of credit, or such other treatment as is agreed to by CIT and the CIT Lenders.  The holder of Claims in this Class is not Impaired and, therefore, not entitled to vote.

3.8    <u>Class 7 Interests</u>.  On the Effective Date, all Class 7 Interests shall remain unaffected, valid and binding such that one hundred percent (100%) of the membership interests of Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C. and Ultra L.L.C.  shall continue to be owned by Shapes/Arch Holdings L.L.C.  The holders of Interests in this Class are not Impaired and, therefore, not entitled to vote.

3.9    <u>Class 9 Secured Real Estate Claims</u>.  This Class shall consist of the holders of Allowed Secured Real Estate tax claims relating to the Delair Real Estate, Accu-Weld Real Estate, Shapes Real Estate and Ultra Real Estate.  Each holder shall be deemed to be a separate subclass.  Each member of the subclass shall have an allowed secured claim in the amount of real estate taxes due and owing as of the Petition Date (including any interest due and owing but excluding any late charges or penalties in the amount as set forth in the Debtors' Schedules and Statement of Financial Affairs), <u>provided</u>, <u>however</u>, that the aggregate amount of the Secured Real Estate Tax Claims are not in excess of one million one hundred eleven thousand eight hundred seventy nine dollars eighty two cents ($1,111,879.82).  At the option of the Plan Funder, upon the Effective Date, either (i) holders of Class 9 Claims shall be paid in full, in cash, or (ii) the collateral securing such Allowed Secured Real Estate Claim shall be turned over to the holder of such Claim.  The holders of Claims in Class 9 are not Impaired and, therefore, not entitled to vote.

3.10    <u>Reservation of Rights</u>.  Nothing contained herein shall be deemed to limit the right of any party-in-interest to object to any Administrative Claims (including Fee Claims), Priority Claims, Other Priority Claims and Miscellaneous Secured Claims filed in the Debtors' Chapter 11 Cases.

# ARTICLE IV

## TREATMENT OF CLAIMS IMPAIRED UNDER THE PLAN

4.1    <u>Class 5 General Unsecured Claims</u>.  This Class shall consist of General Unsecured Claims.  Unless otherwise agreed to by the holder of an Allowed General Unsecured Claim and the Plan Administrator, each holder of a General Unsecured Claim shall receive their Pro Rata share of the sum of the Class 5 Pool Escrow as follows:  (i) on the Effective Date or as soon as practicable thereafter, each such holder shall receive its Pro Rata share of the Class 5 Pool on account of the amount of such Allowed Claim from the Class 5 Pool Escrow; (ii) from time to time each such holder shall receive its Pro Rata share of the Reserves Balances; and (iii) from time to time, each holder shall receive its Pro Rata share of recoveries on account of the Avoidance Actions and Estate Actions.  On the Effective Date, all Class 5 Claims shall be transferred to and assumed by the Liquidation Trust and the Debtors and their Property, and the

14

Reorganized Debtors and their property shall be free and clear of all Class 5 Claims, and be deemed released and discharged from all Class 5 Claims.  All environmental claims set forth in Sections III and IV of Schedule 4.5 shall be treated as Class 5 General Unsecured Claims.  The holders of Claims in Class 5 are Impaired and, therefore, entitled to vote.

4.2      Class 6 Ben Interests.  This Class shall consist of the Ben Interests.  On the Effective Date, all Class 6 Interests shall be deemed cancelled, null and void and of no force and effect.  Accordingly, Class 6 Interests are deemed to reject the Plan and, therefore, are not entitled to vote.

4.3      Class 8 Claims.  On the Effective Date, the EPA shall receive the sum of three hundred thousand dollars ($300,000.00) in full and complete satisfaction of their claims set forth in Section I of Schedule 4.5 attached hereto and the sum of twenty five thousand dollars ($25,000.00) in full and complete satisfaction of their claims set forth in Section II of Schedule 4.5 attached hereto.  The NJDEP shall receive the sum of twenty five thousand dollars ($25,000.00) in full and complete satisfaction of their claims set forth in Section II, III and IV of Schedule 4.5 attached hereto.  Funding for the distributions to this class will be made solely from proceeds of applicable insurance policies.  Any other environmental claims set forth in Sections III and IV of Schedule 4.5 (or as may asserted by any Person, hereinafter, "Additional Environmental Claims") shall be treated as General Unsecured Class 5 Claims.  The holders of Claims in Class 8 are Impaired and, therefore, entitled to vote.

4.4      Class 10 Claims.  This Class shall consist of the Allowed Secured Claims of the holders of purchase money security interests (which shall include lease agreements for equipment which contains a nominal or $1.00 purchase option) in the Debtors' equipment which is being retained by the Reorganized Debtors and each such Claim shall be treated as a separate subclass.  Each holder of a Claim in this Class shall continue to receive the monthly amortized payments set forth in the pre-petition agreements (at the non-default interest rate and without the allowance of any late payments or penalties) with any pre-petition arrearages to be added at the end of the contract and paid in one-lump payment on the thirtieth day following the natural un-accelerated due date under the applicable contract.  Any holder of a purchase money security interest in equipment or a lessor of equipment (whose contract contains a nominal or $1.00 purchase option) who has not properly perfected their interest under the Uniform Commercial Code shall be treated as a Class 5 unsecured creditor.  The Reorganized Debtors shall have the right to prepay the Class 10 claims in whole or in part without penalty.  The holders of Claims in Class 10 are Impaired and, therefore, entitled to vote.

4.5      Class 11 Claims.  Class 11 shall consist of holders of Allowed Secured Claims of the Debtors' Shippers and Warehousemen (who are in possession of Property).  Each holder shall be deemed to be a separate subclass.  Each member of the subclass shall have an Allowed Secured Claim in the amount of the charges due and owing to them (by agreement of the parties or as allowed by Order of the Bankruptcy Court) and such claims shall be paid (at the election of the Debtors) (i) in full (without interest) on the Effective Date or (ii) in twenty four (24) equal monthly installments of principal (commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter) with interest at the rate of six percent (6%) per annum.  On the Effective Date any Property then in the possession of a

15

Class 11 holder shall be released to the Reorganized Debtors.  The holders of Claims in Class 11 claims are Impaired and, therefore, entitled to vote.

       4.6    <u>Class 12 Collateralized Insurance Program Claims</u>.  This Class shall consist of the Allowed Secured Claims of those entities holding cash deposits or letters of credit which are acting as collateral security for the workers compensation insurance policies of the Debtors, each such Claim shall be deemed a separate subclass.  Each holder of a Class 4 Claim shall retain on account of their Allowed Secured Claim the cash deposit or Letter of Credit securing the same; <u>provided</u>, <u>however</u>, that such entities shall, on the Effective Date, return to the Reorganized Debtors all collateral being held in excess of their Allowed Secured Claims (as determined by agreement of the parties or further Order of the Bankruptcy Court in the event the Debtors or holders of such claims request an estimation of any holders' claims under section 502(c) of the Bankruptcy Code).  The holders of Claims in Class 12 are Impaired and, therefore, entitled to vote.

**ARTICLE V**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

       5.1    <u>Corporate Action</u>.  On the Effective Date and automatically and without further action, (i) each existing member (or manager of each operating entity) of the Debtors will be deemed to have resigned, (ii) the new board members/managers of the Reorganized Debtors shall be those identified in the Plan Supplement, and (iii) the Plan Administrator and Reorganized Debtors shall be authorized and empowered to take all such actions and measures necessary to implement and administer the terms and conditions of the Plan.  Each Debtors' Operating Agreement will be amended as of the Effective Date to the extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code.  The rights and interests of the New LLC Interests shall be governed by and controlled pursuant to the terms and conditions of the Reorganized Debtors' Operating Agreements, which shall be included in and filed with the Plan Supplement.

       5.2    <u>Liquidation Trust</u>.  On the Effective Date the Debtors shall execute and deliver the Plan Administration Agreement, which shall create a trust, convey all Avoidance Actions and Estate Actions to the Trust, appoint the Plan Administrator, provide for the acceptance of the Avoidance Actions and Estate Actions, the proceeds thereof, and the Reserves provided for in the Plan, and set forth the terms and conditions for distributions from such Reserves.

From and after the Effective Date, the Liquidation Trust and the Plan Administrator shall hold and administer the Avoidance Actions, the Estate Actions and the Reserves.  All of the Reserves shall vest with the Plan Administrator on the Effective Date and any amounts remaining in the Reserves under Section 5.2 after distribution to Class 5 Creditors shall be donated to a charity of choice at the election of the Plan Administrator.

       5.3    <u>Plan Administrator</u>.  On or before the Effective Date, the Committee, with the consent of the Plan Funder, shall appoint one Plan Administrator to serve as such pursuant to the Plan Administration Agreement (the "<u>Plan Administration Agreement</u>").  The Plan Administration Agreement is to be attached as an exhibit to the Plan Supplement.  The Plan

16

Administrator shall administer the Plan subject to the foregoing duties and powers, which shall include the following:

(a)    To prosecute, compromise or settle the Avoidance Actions and Estate Actions, objections to Claims and/or Interests (disputed or otherwise) and to make or direct that distributions be made to holders of Allowed Claims;

(b)    To make decisions regarding the retention or engagement of Professionals and to pay, without court order, all reasonable fees and expenses incurred after the Effective Date;

(c)    To make or direct distributions to holders of Allowed Claims and to otherwise implement and administer the Reserves and the Plan;

(d)    To file with the Bankruptcy Court the reports and other documents and to pay any and all fees required by the Plan or otherwise required to close the Chapter 11 Case, including the preparation and filing of a motion for a final decree (subject to the rights of Reorganized Debtors for the case to remain open pending the completion of the prosecution of any Avoidance Actions);

(e)    To set off amounts owed to the Debtors against any and all amounts otherwise due to be distributed to the holder of an Allowed Claim under the Plan; and

(f)    To take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with administering the Plan.

5.4    <u>Exit Facility</u>.  Upon the Effective Date, and subject to Section 3.6 of the Plan, the Plan Funder shall either (a) amend and restate the Arch Acquisition DIP Agreement or (b) enter into a new loan for the Plan Funding Debt Commitment (the "<u>Exit Facility</u>").  The principal amount of the Exit Facility upon the Effective Date shall be thirty million dollars ($30,000,000.00) plus any and all unpaid interest, costs and fees that accrued prior to the Effective Date on the Arch DIP Loan, less any amount converted for purposes of the Plan Funding Equity Commitment.  The Plan Funder's Liens shall not attach to the Reserves, Reserves Balances or the Avoidance Actions or Estate Actions or proceeds of the same.  The Liens and property interests of the Plan Funder shall remain perfected from and after the date of the Confirmation Order without the need of the Plan Funder to take any or further action or file or record any notes with respect thereto.  The Confirmation Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of the Plan Funder's Liens without the necessity of filing or recording the Confirmation Order (other than as docketed in the Chapter 11 Cases) or any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Plan Funder's Liens, or to entitle the Plan Funder to the same priorities granted to the agent under the Arch Acquisition DIP Loan or herein (including, in respect of cash or deposits or investment property, any requirement that the Plan Funder have possession of or dominion and control over, any such cash in order to perfect an interest therein);

provided that the Debtors or Reorganized Debtors shall execute and deliver to the Plan Funder and the Plan Funder may file or record financing statements or other instruments further to evidence or further to perfect the Plan Funder's Liens authorized, granted and perfected under the Exit Facility and hereby; and provided further that no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.

5.5    Equity Commitments.  Except as expressly set forth in the Plan, the Plan Funding Debt Commitment or the Plan Funding Equity Commitments, working capital of the Debtors and Reorganized Debtors together with the proceeds of the Plan Funding Debt Commitment and the Plan Funding Equity Commitments shall be used for general working capital and capital expenditures of the Reorganized Debtors, to fund the Reserves, to pay the Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority claims, and Allowed Other Priority Claims.  In consideration for meeting its funding commitments under the Plan Funding Equity Commitments in the aggregate amount necessary to effectuate the terms of this Plan (which will be paid in cash and/or by way of a conversion of the Arcus DIP Claim), but in no event shall such sum be less than one million five hundred thousand ($1,500,000.00), the Plan Funder shall receive one hundred percent (100%) of the New LLC Interests in the Reorganized Shapes/Arch Holdings L.L.C. that are authorized and issued as of the Effective Date (the "New LLC Interests"), subject to dilution from time to time upon the implementation of the Management Equity Incentive Plan (at the election of the Plan Funder).

5.6    Permitted Investments.  Cash held by the Plan Administrator, in any accounts or otherwise shall be invested in U.S. government backed securities or mutual funds investing in such securities.

5.7    Revesting.  Except as otherwise provided for in the Plan or the Confirmation Order, the Final Orders, as applicable (including, without limitation, the liens being granted and/or retained by Arch Acquisition), on the Effective Date, without any further action, each of the Reorganized Debtors will be vested with all of the Property of the Estates, free and clear of all Claims, Liens and Interests, and shall have all of the powers of a limited liability company under applicable law.  As of the Effective Date, the Reorganized Debtors may operate their business and use, acquire and dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court or Plan Administrator, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

5.8    Transfer of Real Estate.  On the Effective Date, but subject to the Class 9 Secured Real Estate Claims to the extent not satisfied, (a) Reorganized Shapes L.L.C. may (at its election), either retain all real estate or (i) convey the Shapes Real Estate to Shapes Realty New Jersey L.L.C., (ii) convey the Delair Real Estate to Delair Realty New Jersey L.L.C. (or Shapes Realty New Jersey LLC); and (iii) convey the Ultra Real Estate to Ultra Realty New Jersey L.L.C.; and (b) Reorganized Accu-Weld L.L.C. may (at its election), either retain all real estate or convey the Accu-Weld Real Estate to Accu-Weld Realty Pennsylvania L.L.C., free and clear of all liens, claims and encumbrances other than the Class 9 Real Estate Claims.

5.9    Permitted Investments.  Cash held by the Plan Administrator, in any accounts or otherwise, shall be invested in U.S. government backed securities or mutual funds investing in such securities.

18

# ARTICLE VI

# RELEASES

6.1     <u>Application for Approval of Settlement</u>.  Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes an application for approval of a compromise and settlement of any and all claims, suits and causes of action of the Debtors, the Estates, or their respective successors or assigns, including, without limitation, the Liquidation Trust, and any Person or Entity claiming a right in a derivative capacity on their behalf in accordance with the terms of the Plan.

6.2     **<u>General Release</u>.  On the Effective Date, (i) the Debtors, the Estates, and their respective successors or assigns, including, without limitation, the Liquidation Trust, and any Person or Entity claiming a right in a derivative capacity on their behalf (the "<u>Debtors Claimants</u>") are deemed to, with respect to any and all derivative claims, whether or not asserted, and (ii) the Debtors Claimants and any holder of a Claim classified under "Class 5 General Unsecured Claims" (and together with the Debtors Claimants, the "<u>Releasors</u>"), hereby unconditionally and irrevocably release Arch Acquisition, the Plan Funder, the Committee, CIT, and the CIT Lenders, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (collectively, the "<u>Released Parties</u>"), as set forth more fully below, from any and all direct, indirect or derivative claims, obligations, suits, judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of contribution and indemnification, and all other controversies of every type, kind, nature, description or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place from the beginning of the world to the Effective Date arising from or relating in any way, directly or indirectly, to the Debtors, its Properties, assets, operations or liabilities, the Chapter 11 Cases, the Plan, or the Disclosure Statement; provided however, that the Releasors shall not be deemed to have released any rights to enforce the terms of the Plan or their rights to distributions thereunder.  The Releasors hereby waive any rights or benefits under California Civil Code Section 1542, which provides that:**

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with Debtors and any rights or benefits under similar laws.  The Confirmation Order shall specifically provide for the foregoing releases.**

6.3     <u>Debtors Injunction</u>.  On the Effective Date, the Debtors Claimants respecting the claims released above, and the Releasors shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place

19

*Approved by Judge Gloria M. Burns May  06, 2008*

inconsistent with the releases granted to the Released Parties pursuant to the Plan.  The Confirmation Order shall specifically provide for such injunction.

6.4     Release Consideration.  The consideration the Plan Funder shall provide, or have provided, in exchange for the releases described in the Plan and the receipt of the New LLC Interests, include the following (collectively, the "Plan Funder Consideration"):

(a)     The Plan Funder, as part of the Plan Funding Equity Commitments and not in addition thereto, shall contribute Cash in an amount necessary to pay the Class 4 CIT DIP Claim in full and ensure that the holders of Allowed Administrative, Priority Tax and Fee Claims and Allowed Claims in Classes 1, 5, 8, 9, 10, 11 and 12 receive the distributions required under the Plan (the "Plan Funder Cash Contribution");

(b)     The Plan Funder, as part of the Plan Funding Debt Commitments and not in addition thereto, shall provide financing under the terms of the Exit Facility in the principal amount of up to thirty million dollars ($30,000,000.00), plus accrued interest, costs and fees (including the obligations of the Debtors under the Arch Acquisition DIP Loan prior to the Effective Date), and extend the term thereof to following the Effective Date as set forth in the Plan Supplement; and

(c)     The sum of three hundred thousand dollars ($300,000) previously paid on behalf of the Estates in accordance with the Final DIP Order.

6.5     No Admissions.  The releases and injunctions granted in favor of the Released Parties are integral parts of the Plan and are necessary to confirm the Plan.

## ARTICLE VII

## DISTRIBUTIONS UNDER THE PLAN

7.1     Distributions for Claims Allowed as of the Effective Date.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to this Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

7.2     Delivery of Distributions.  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Reorganized Debtors or its agents, unless the Debtors or the Plan Administrator, as applicable, have been notified in writing of a change of address, including by the filing of a proof of claim or Administrative Claim request

20

that contains an address for a holder of a Claim different from the address for such holder reflected on any Schedule.

      7.3    Reserve Accounts.  On or before the Effective Date, the Plan Administrator will establish and maintain the following reserve accounts:

        (a)    Reserve for Plan Expenses.  A reserve in an amount equal to the estimated Plan Expenses (the "Plan Expense Reserve"), which upon the closing of the Chapter 11 Cases, the remainder, if any, will be released and distributed to Reorganized Debtors; other than the initial funding of the Plan Expense Reserve in the amount of two hundred thousand ($200,000.00) (or with respect to legal fees and other professional fees incurred by the Reorganized Debtors at the request of the Plan Funder), the Reorganized Debtors shall have no further liability for such expenses, and

        (b)    Disputed Claims Reserves.

      7.4    Reserves for Disputed Administrative, Fee, Priority Tax and Other Priority Claims.  On or before the Effective Date, the Reorganized Debtors shall establish and maintain a reserve in an amount equal to all Disputed Administrative, Fee, Priority Tax Claims and Other Priority Claims in an amount equal to what would be distributed to holders of Disputed Administrative, Fee, Priority Tax, and Other Priority Claims if their Disputed Claims have been deemed Allowed Claims on the Effective Date or on the Administrative Claims Bar Date or such other amount as may be approved by the Bankruptcy Court upon motion of the Reorganized Debtors; provided however, that the Reorganized Debtors shall not be required to reserve funds on account of employee Claims for paid time off or vacation benefits of employees whose employment was continued by the Debtors or will be continued by the Reorganized Debtors (the "Disputed Administrative, Fee, Priority Tax and other Priority Claims Reserve").  With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Reorganized Debtors to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims.  The balance of such Cash, if any, remaining after all Disputed Administrative, Fee, Priority Tax, and Other Priority Claims have been resolved and distributions made in accordance with the Plan, shall be released and distributed to the Reorganized Debtors.  No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order.

      7.5    Reserves for Disputed General Unsecured Claims.  On or before the Effective Date, the Plan Administrator shall establish and maintain a reserve for all Disputed General Unsecured Claims  in an amount equal to what would be distributed to holders of Disputed General Unsecured Claims (the "Disputed General Unsecured Claims Reserve").  For purposes of establishing a reserve for Disputed General Unsecured Claims, Cash will be set aside as soon as practicable after the Effective Date equal to the amount that would have been distributed to the holders of Disputed General Unsecured Claims had their Disputed General Unsecured Claims been deemed Allowed Claims on the Effective Date or such other amount as may be approved by the Bankruptcy Court.  With respect to such Disputed General Unsecured Claims,

if, when, and to the extent any such Disputed General Unsecured Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Plan Administrator to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims.  The balance of such Cash, if any, remaining after all Disputed General Unsecured Claims have been resolved and distributions made in accordance with the Plan, shall be released and re-distributed to holders of Allowed Claims.  No payments or distributions shall be made with respect to a Claim that is a Disputed General Unsecured Claim pending the resolution of the dispute by Final Order.  No payments or distributions shall be made with respect to post-Petition Date interest accruing on any Claim other than the Arch Acquisition DIP Claim and CIT DIP Claim.  No payments or distributions shall be made with respect to Allowed Claims in an amount in excess of such Allowed Claims.

7.6     Claims Objection Deadline.  Notwithstanding D.N.J. LBR 3007-1, Objections to Claims shall be filed and served upon each affected Claim holder no later than ninety (90) days after the Effective Date, provided however, that this deadline may be extended by the Bankruptcy Court upon motion of the Plan Administrator or Reorganized Debtors, with or without notice or hearing.  Notwithstanding the foregoing, unless this Plan or order of the Bankruptcy Court specifically provides for a later date, any proof of, or other assertion of a Claim filed after the Confirmation Date shall be automatically disallowed as a late filed Claim, without any action by the Plan Administrator or the Reorganized Debtors, unless and until the party filing such Claim obtains the written consent of, the Plan Administrator or the Reorganized Debtors, as applicable, or obtains an order of the Bankruptcy Court upon notice to the Plan Administrator and Reorganized Debtors that permits the late filing of the Claim, and the holder of such disallowed Claim shall be forever barred from asserting such Claim against the Liquidation Trust, the Debtors, the Estates or its Property, Reorganized Debtors or their property. In the event any proof of claim is permitted to be filed after the Confirmation Date pursuant to an order of the Bankruptcy Court, the Plan Administrator or Reorganized Debtors, as applicable, shall have sixty (60) days from the filing of such proof of claim or order to object to such Claim, which deadline maybe extended by the Bankruptcy Court upon motion of the Plan Administrator with or without notice or a hearing.

7.7     Settlement of Disputed Claims.  Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in this section.  After the Effective Date, and subject to the terms of this Plan, the Plan Administrator may settle any Disputed Claim where the result of the settlement or compromise is an Allowed Claim in an amount of one hundred thousand dollars ($100,000.00) or less without providing any notice or obtaining an order from the Bankruptcy Court.  All proposed settlements of Disputed Claims where the amount to be settled or compromised exceeds one hundred thousand dollars ($100,000.00) shall be subject to the approval of the Bankruptcy Court after notice and an opportunity for a hearing.

7.8     Unclaimed Property.  If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall be held in reserve by the Plan Administrator to be distributed Pro Rata to holders of Allowed Claims in such Class in accordance with this Plan, or if all Allowed Claims in such

Class have been satisfied or reserved for in accordance with the Plan, then such unclaimed property will be distributed to the Reorganized Shapes/Arch Holdings L.L.C.

7.9    Release and Preservation of Certain Liens.  Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, including, without limitation, the Liens securing the Exit Facility (which shall survive Confirmation and shall remain valid, enforceable and perfected Liens against property of the Reorganized Debtors, respectively), on the Effective Date and except as expressly set forth in this Plan, all other mortgages, deeds of trust, Liens or other security interests against the Property of the Debtors' estate shall be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to Reorganized Debtors and their successors and assigns.

7.10    Withholding Taxes.  Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

7.11    Fractional Cents.  Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made.  Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

7.12    Payments of Less than Twenty-Five Dollars.  If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than twenty five dollars ($25.00) (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, the Plan Administrator shall not be required to make such payment and such funds shall be otherwise distributed to holders of Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such excess fractional dollars will be distributed to the Reorganized Debtors.

## ARTICLE VIII

## UNEXPIRED LEASES AND EXECUTORY CONTRACTS

8.1    Rejection of All Agreements.  Any and all pre-petition leases or executory contracts included on Debtors' Schedule G not previously assumed by the Debtors (and not otherwise previously rejected or the subject of a motion to assume pending on the Confirmation Date or designated on Schedule 8.1 to this Plan, which schedule may be filed and amended at any time up to three (3) days prior to the Confirmation Hearing), shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date.  Any and all pre-petition leases and executory contracts not included on Debtors' Schedule G not previously assumed or rejected by the Debtors, shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date.  The Debtors reserve the right to supplement any motion to assume or Schedule 8.1 to include or exclude additional contracts by way of a supplemental notice to parties to pre-petition leases and

23

executory contracts at any time at least one (1) day prior to the Confirmation Hearing and the Debtors shall file the initial designation of contracts to be assumed, without prejudice, at least two (2) days prior to the deadline to file objections to confirmation of this Plan.  Within ten (10) days after the Effective Date, all cure amounts due and owing under any assumed contracts shall be paid and all cure amounts that are the subject of dispute shall be paid upon further agreement of the parties or upon entry of an order of the Court allowing such cure claims.  No portion of any disputed cure claims shall be paid unless and until the amount of such claim is fixed by agreement of the parties or order of the Court.  Notwithstanding the foregoing, on the Effective Date, all insurance policies (regardless of the inception date of coverage) for any one or more Debtors which provide for any and all claims made or occurred arising from or related to any environmental laws of any Federal, State or local governmental entity or any claim asserted by a non-governmental entity for environmental claims (directly or by way of indemnity and whether under contract or tort law) shall be deemed assumed by the Reorganized Debtors.  Any motion filed to assume contracts or the Schedule 8.1 shall contain the cure amounts required to be paid upon assumption and all contracting parties shall have ten (10) days from the filing of such motion or schedule within which to object to the stated cure amount or thereafter be deemed to have waived the right to object to the same.

8.2    Claims for Damages.  All proofs of claim with respect to Claims arising from the rejection of executory contracts or leases shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with the Bankruptcy Court within thirty (30) days after the mailing of notice of Effective Date.  All proofs of claim with respect to Claims arising from the rejection of executory contracts shall be treated as Class 5 General Unsecured Claims, as applicable, for purposes of a distribution pursuant to the Plan, unless and until the Person or Entity asserting such Claim obtains an order of the Bankruptcy Court upon notice to the Debtors, that allows the Claims in another Class under the Plan.  Unless otherwise permitted by Final Order, any proof of claim that is not filed before the earlier of the Bar Date or the Confirmation Hearing (other than those Claims arising from the rejection of executory contracts or leases which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall automatically be disallowed as a late filed Claim, without any action by the Plan Administrator, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, the Estates, the Reorganized Debtors or property of the Reorganized Debtors.

## ARTICLE IX

## CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

9.1    Conditions to Confirmation of the Plan.  The Plan shall not be confirmed unless and until the following conditions have been satisfied in full or waived by (i) the Debtors or the Committee and (ii) Arch Acquisition:

(a)    The Confirmation Order shall be in form and substance satisfactory to the Debtors, Arch Acquisition, individually and as a post-petition agent and lender, the CIT Lenders, and the Plan Funder, which Confirmation Order shall approve all provisions, terms and conditions of the Plan;

24

(b)      No amendments, modifications, supplements or alterations shall have been made to the Plan or any document delivered in connection therewith, without the express written consent of the Debtors, Arch Acquisition, individually and as a post-petition, and the Plan Funder (which consent may be granted, withheld, or conditioned in their respective sole discretion and the consent of CIT to the extent that the same is material to the CIT Lenders); and

(c)      Execution of new Collective Bargaining Agreements in form and substance satisfactory to the Debtors and the Plan Funder.

(d)      The funds available under the Exit Facility, Plan Funding Equity Commitments and funds necessary to pay the CIT DIP Loan shall be sufficient to make all distributions and fund the Reserves required under the Plan on the Effective Date.

9.2      <u>Conditions to Effectiveness of the Plan</u>.  The Plan shall not become effective unless and until each of the following conditions has been satisfied in full or waived by (i) the Debtors or the Committee and (ii) the Plan Funder:

(a)      The Bankruptcy Court shall have entered the Confirmation Order by July 15, 2008 (or such other date as agreed to in the sole discretion of the Plan Funder) and such Order shall be in form and substance satisfactory to the Debtors and the Plan Funder;

(b)      All escrow and reserve accounts described in the Plan have been adequately funded;

(c)      The Confirmation Order shall have become a Final Order; and the Effective Date shall be no later than July 31, 2008; and

(d)      Closing has occurred under the terms of the Exit Facility and the Plan Funding Equity Commitments have been provided and the aggregate funds available under the same are sufficient to satisfy the cash requirements necessary to fund this Plan in accordance with its terms.

9.3      <u>Waiver of Conditions to Confirmation or Effective Date</u>.  Except as set forth in Sections 9.1 and 9.2 above with respect to matters pertaining to the CIT Lenders, the conditions set forth in Sections 9.1 and 9.2 of this Plan may be waived, in whole or in part, by (i) the Debtors or the Committee and (ii) the Plan Funder without any notice to any other parties in interest or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors, the Committee or the Plan Funder in their sole discretions regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors or the Plan Funder in their sole discretion).  The failure of the Debtors, the Committee or the Plan Funder to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right which may be asserted at any time.

*Approved by Judge Gloria M. Burns May  06, 2008*

# ARTICLE X

# RETENTION OF JURISDICTION

10.1    Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under this Plan have been made and performed by the Plan Administrator and the Reorganized Debtors, as the case may be, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the following purposes:

(a)    Claims.  To determine the allowance, extent, classification, or priority of Claims against the Debtors upon objection by the Plan Administrator, or any other party in interest, including any and all claims asserted under any Collective Bargaining Agreements, as amended;

(b)    Injunction, etc.  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

(c)    Professional Fees.  To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods before the Effective Date, and objections thereto, as provided for in the Plan;

(d)    Certain Priority Claims.  To determine the allowance, extent and classification of any Priority Tax Claims, Other Priority Claims, Administrative Claims or any request for payment of an Administrative Claim;

(e)    Dispute Resolution.  To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and/or Confirmation Order and the making of distributions hereunder and thereunder;

(f)    Executory Contracts and Unexpired Leases.  To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases, and to determine the allowance and extent of any Claims resulting from the rejection of executory contracts and unexpired leases;

26

(g)　　Actions.  To determine all applications, motions, adversary proceedings (including any Avoidance Actions and/or Estate Actions), contested matters, actions, and any other litigated matters instituted (either before or after the Effective Date) in the Chapter 11 Cases by or on behalf of the Debtors or the Plan Administrator;

(h)　　General Matters.  To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code or other applicable law;

(i)　　Plan Modification.  To modify the Plan under section 1127 of the Bankruptcy Code, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out its intent and purposes;

(j)　　Aid Consummation.  To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person or Entity, to the full extent authorized by the Bankruptcy Code, including, without limitations, resolve any disputes of a non-Debtor hereunder or the injunction against acts, employment of process or actions against such non-Debtor arising hereunder;

(k)　　Protect Property.  To protect the Property of the Debtors and Reorganized Debtors from adverse Claims or Liens or interference inconsistent with this Plan, including to hear actions to quiet or otherwise clear title to such property based upon the terms and provisions of this Plan or to determine a purchaser's exclusive ownership of claims and causes of actions retained under this Plan;

(l)　　Abandonment of Property.  To hear and determine matters pertaining to abandonment of Property of the Estates;

(m)　　Implementation of Confirmation Order.  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(n)　　Final Order.  To enter a final order closing the Chapter 11 Case; and

(o)　　Tax Liability.  To determine any tax liability pursuant to section 505 of the Bankruptcy Code.

*Approved by Judge Gloria M. Burns May  06, 2008*

# ARTICLE XI

## MISCELLANEOUS PROVISIONS

11.1    <u>Pre-Confirmation Modification</u>.  On notice to and opportunity to be heard by the United States Trustee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that any such amendment or modification of the Plan must be approved in writing by Arch Acquisition (and the CIT Lenders to the extent the same is material to the CIT Lenders).

11.2    <u>Post-Confirmation Immaterial Modification</u>.  With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and without notice to holders of Claims and Interests, the Plan Administrator, may, insofar as it does not materially and adversely affect the interest of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan; <u>provided</u>, <u>however</u>, that any such amendment or modification of the Plan must be approved in writing by the Plan Funder (and the CIT Lenders to the extent the same is material to the CIT Lenders).

11.3    <u>Post-Confirmation Material Modification</u>.  On notice to and an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Reorganized Debtors or the Plan Administrator in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that any such amendment or modification of the Plan must be approved in writing by the Plan Funder (and the CIT Lenders to the extent the same is material to the CIT Lenders).

11.4    <u>Withdrawal or Revocation of the Plan</u>.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date, <u>provided</u>, <u>however</u>, that the Debtors may not revoke or withdraw the Plan without (a) absent Bankruptcy Court approval, the written consent of the Committee, and (b) the written consent of Arch Acquisition.  If the Debtors revoke or withdraw the Plan, if Confirmation or the Effective Date does not occur, then, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.  To the extent the Class 4 claims of the CIT Lenders have been paid in full, in cash (by wire transfer of immediately available funds) on the Effective Date, all references to CIT and the CIT Lenders in this Plan (other than those pertaining to interest and any release, injunctive, exculpation or similar or related provisions) shall be deemed null and void.

11.5    <u>Parties shall Use Best Efforts to Effectuate Plan</u>. The Debtors, Committee and Arch Acquisition shall use there best efforts to effect the transactions contemplated in this Plan.

*Approved by Judge Gloria M. Burns May  06, 2008*

In the event the Confirmation Order is not entered pursuant to this Plan, Arch Acquisition will serve as a "stalking horse bidder" in a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code on economic terms as favorable as set forth in the Plan, subject to an asset purchase agreement acceptable to Arch Acquisition.

11.6    <u>Payment of Statutory Fees</u>.  All fees payable pursuant to section 1930 of Title 28 of the United States Code shall be paid on the Effective Date (if due) or by the Reorganized Debtors.

11.7    <u>Successors and Assigns</u>.  The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

**11.8    <u>Exculpation</u>.  On the Effective Date, CIT, the CIT Lenders, Arch Acquisition and the Plan Funder and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other, and by all holders of Claims or Interests, of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring solely during the period prior to the Effective Date, generally, including, without limitation, any act or omission occurring during the Chapter 11 Case, the Arch Acquisition DIP Loan, the Exit Facility, the Plan Funding Debt Commitment, the Plan Funding Equity Commitments, the CIT DIP Loan, the CIT Revolving Loan DIP Agreement, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.**

**11.9    <u>Discharge</u>.  Except as otherwise provided for in this Plan, the Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, the Final DIP Orders), in accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of all debts, Claims against, Liens on, and Interests in the Debtors, their assets and Property, which debts, Claims, Liens and Interests arose at any time before the entry of the Confirmation Order.  The discharge of the Debtors shall be effective as to each Claim and Interest, regardless of whether a proof of Claim or Interest was filed or whether the Claim or Interest was Allowed or whether the holder of the Claim or Interest votes to accept the Plan.  On the Effective Date, as to each and every discharged Claim and Interest, any holder of such Claim or Interest shall be precluded from asserting such Claim or Interest against the Debtors or Reorganized Debtors or their assets or properties.**

**11.10    <u>Confirmation Injunction</u>.  On and after the Confirmation Date, except to enforce the terms and conditions of the Plan before the Bankruptcy Court, (or as permitted under the Final DIP Orders and Exit Facility, and except to the extent the holders of**

29

**Additional Environmental Claims are seeking to recover under any and all applicable insurance policies (and in all cases may not assert any Claims against the Reorganized Debtors), all Persons or Entities who have held, hold or may hold any Claim against or Interest in the Debtors are, with respect to any such Claim or Interest, permanently enjoined from and after the Confirmation Date from:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Reorganized Debtors or Plan Administrator or the Liquidation Trust or any of their properties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants, or any property of any of the foregoing (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan. Nothing in this section shall preclude the Committee or the Plan Administrator, as applicable, from asserting or pursuing Estate Actions.**

11.11    <u>Preservation of Insurance</u>.  This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, their members, managers or officers) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

11.12    <u>Cramdown</u>.  To the extent any Impaired Class of Claims entitled to vote on the Plan votes to reject the Plan, the Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to such Class(es).

11.13    <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of New Jersey.

11.14    <u>Notices</u>.  Any notice required or permitted to be provided under the Plan shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight courier service, freight prepaid, to be addressed as follows:

*Approved by Judge Gloria M. Burns May  06, 2008*

If to the Debtors:               Steven Grabell CEO
                                 Shapes/Arch Holdings L.L.C.
                                 9000 River Road
                                 Delair, New Jersey  08110

with a copy to:                  Cozen O'Connor
                                 Liberty View, Suite 300
                                 457 Haddonfield Road
                                 Cherry Hill, New Jersey  08002
                                 Attention:  Mark E. Felger, Esquire

If to Reorganized Debtors:       Steven Grabell CEO
                                 Shapes/Arch Holdings L.L.C.
                                 9000 River Road
                                 Delair, New Jersey  08110

with a copy to:                  Cozen O'Connor
                                 LibertyView, Suite 300
                                 457 Haddonfield Road
                                 Cherry Hill, New Jersey  08002
                                 Attention:  Mark E. Felger, Esquire

If to Arch Acquisition           Arch Acquisition I, LLC
or the Plan Funder:              c/o HIG Bayside Capital
                                 1001 Brickell Bay Drive
                                 27th Floor
                                 Miami, Florida  33131
                                 Attention:  John P. Bolduc

with a copy to:                  Greenberg Traurig, LLP
                                 Met Life Building
                                 200 Park Avenue
                                 New York, New York  10186
                                 Attention:  Nancy A. Mitchell, Esq.

31

*Approved by Judge Gloria M. Burns May  06, 2008*

If to the Committee                        Halperin Battaglia Raicht, LLP
555 Madison Avenue, 9th Floor
New York, New York  10022
(212) 765-9100
Attention: Alan D. Halperin, Esq.

Cole, Schotz, Meisel,
Forman & Leonard, P.A**.**
Court Plaza North
25 Main Street, P. O. Box 800
Hackensack, New Jersey  07602-0800
(201) 489-3000
Attention: Michael D. Sirota, Esq.

      11.15   <u>Saturday, Sunday or Legal Holiday</u>.  If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

      11.16   <u>Section 1146 Exemption</u>:  Pursuant to Bankruptcy Code section 1146(a):  (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, the transfers to be made under Section 5.8 above, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar tax by applicable law.

      11.17   <u>Severability</u>.  If any term or provision of the Plan is held by the Bankruptcy Court prior to or at the time of Confirmation to be invalid, void or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  In the event of any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan may, at the Debtors' option, remain in full force and effect and not be deemed affected.  However, the Debtors and the Plan Funder each reserve the right not to proceed to Confirmation or consummation of the Plan if any such ruling occurs.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

      11.18   <u>Headings</u>.  The headings used in this Plan are inserted for convenience only and neither constitutes a portion of the Plan nor in any manner affect the provisions of the Plan.

*Approved by Judge Gloria M. Burns May  06, 2008*

11.19  <u>Committee Survival</u>.  The Committee and their respective counsel and professionals shall be deemed terminated ten (10) days following the Effective Date of this Plan (without prejudice for the same to serve in any capacity authorized under the Plan Administration Agreement).

*Approved by Judge Gloria M. Burns May  06, 2008*

## <u>CONFIRMATION REQUEST</u>

The Debtors hereby requests confirmation of the Plan pursuant sections 1129(a) and (b) of the Bankruptcy Code.

DATED:   May ___, 2008                    Respectfully submitted,

                                          Shapes/Arch Holdings L.L.C.

                                          By: _____
                                          Name:  Steven Grabell
                                          Title:   CEO

DATED:   May ___, 2008

                                          Shapes L.L.C.

                                          By: _____
                                          Name:  Steven Grabell
                                          Title:   CEO

DATED:   May ___, 2008

                                          Accu Weld L.L.C.

                                          By: _____
                                          Name:  Steven Grabell
                                          Title:   CEO

DATED:   May ___, 2008

                                          Arch Acquisition I, LLC

                                          By: _____
                                          Name:  John P. Bolduc
                                          Title:

*Approved by Judge Gloria M. Burns May  06, 2008*

## **SCHEDULE 4.5**

*Approved by Judge Gloria M. Burns May  06, 2008*

Schedule 4.5

**I.   Aluminum Shapes USEPA Lead Off-Site Environmental Liability CERCLA §106 Sites**

- <u>Ewan Superfund Site, Shamong Township, NJ</u>

o   National Priorities List Site; EPA ID #NJD98076 1365
   o   USEPA Estimated Costs:
   o   Aluminum Shapes Estimated Percentage Share of Costs: 2.42% cap
   o   Natural Resource Damages: (complaint filed)[*]

- <u>D'Imperio Superfund Site, Hamilton Township, NJ</u>

   o   National Priorities List Site; EPA ID #NJD980529416
   o   USEPA Estimated Costs:
   o   Aluminum Shapes Estimated Percentage Share of Costs: 1.86% cap
   o   Natural Resource Damages: (unknown at this time)

- <u>Swope Oil and Chemical Company Superfund Site, Pennsauken Township, NJ</u>

   o   National Priorities List Site; EPA ID #NJD04 1743220
   o   USEPA Estimated Costs:
   o   Aluminum Shapes Estimated Percentage Share of Costs:
   o   Natural Resource Damages: (unknown at this time)

---

[*] This claim is a NJDEP Claim.

36

Schedule 4.5

**II. Aluminum Shapes USEPA Lead Off-Site Environmental Liability Non-CERCLA §106 Sites**

- Puchack Wellfield, Pennsauken Township, New Jersey*

  - National Priorities List Site; EPA ID #NJD98 1084767
  - USEPA Estimated Costs – $17,000,000.00
  - Aluminum Shapes Estimated Percentage Share of Costs
  - Natural Resource Damages: (unknown at this time)

- Lightman Drum Company Site, Winslow Township, NJ

  - CERCLA ID #02-2000-2034
  - USEPA Estimated Costs:
  - Aluminum Shapes Estimated Percentage Share of Costs: 1.90%
  - Natural Resource Damages: (unknown at this time)

- Chemical Control Corporation, Elizabeth, NJ

  - National Priorities List Site; EPA ID #NJD000607481
  - USEPA Estimated Costs:
  - Aluminum Shapes Estimated Percentage Share of Costs: de minimis contributor; less than .0467% (believe Aluminum Shapes may have previously settled)
  - Natural Resource Damages: (unknown at this time)
  - (Liability may be resolved pursuant to a consent decree or settlement agreement and subject to confirmation)

- Berks Associates/Douglassville Disposal, Douglassville, PA

  - National Priorities List Site; CERCLIS ID #PAD002384865
  - USEPA Estimated Costs:
  - Aluminum Shapes Estimated Percentage Share of Costs: de minimis contributor; 0.15283% of past costs, 0.07803% future costs (Aluminum Shapes may have previously settled for $119,975.98 – awaiting confirmation)
  - Natural Resource Damages: (unknown at this time)
  - (Liability may be resolved pursuant to a consent decree or settlement agreement and subject to confirmation)

\*      This site is also subject to NJDEP directives.

*Approved by Judge Gloria M. Burns May  06, 2008*

Schedule 4.5

**III.    Aluminum Shapes New Jersey Department of Environmental Protection Lead Off-Site Environmental Liabilities**

**- NONE -**

*Approved by Judge Gloria M. Burns May  06, 2008*

Schedule 4.5

**IV.    State Environmental Claims and Environmental Litigation**

- 9000 River Road, NJDEP 1992 Directive and Notice to Insurers

  - Directed Aluminum Shapes to identify and address all sources contributing to chromium contamination in the soil and groundwater at Aluminum Shapes' facility and to prevent migration of chromium contamination.
  - Aluminum Shapes and NJDEP entered into a Memorandum of Agreement dated June 23, 1993 in which Aluminum Shapes agreed to undertake remedial activities and to pay 80% of the cost of performing those activities.  Remediation at the site is ongoing.

- Harris v. Advanced Supply Process Company, et al.; Superior Court of New Jersey, Camden County, Law Division, Docket No.: L-03815-02

  - Class action lawsuit in which Aluminum Shapes is identified as a defendant.
  - Plaintiffs allege that Aluminum Shapes was negligent in the operation of its metal plating business resulting in the discharge of hazardous substances to soil and groundwater.

- Pennsauken Solid Waste Management Authority, et al. v. Ward Sand Material Co., Inc., et al., Superior Court of New Jersey, Camden County, Law Division, Docket No.: L-13345-91

  - Aluminum Shapes is identified as a defendant.
  - Plaintiffs allege that defendants are responsible for the surface and groundwater contamination at the Pennsauken Landfill.

- Buzby Brothers Landfill, Voorhees, NJ

  - Not a National Priorities List Site: EPA ID #NJD000305524
  - USEPA Estimated Costs:
  - Aluminum Shapes Estimated Percentage Share of Costs: de minimis contributor (Aluminum Shapes may have previously settled for $60,000 subject to confirmation)
  - Natural Resource Damages: (yes, complaint filed)
  - (Liability may be resolved pursuant to a consent decree or settlement agreement, and subject to confirmation)

*Approved by Judge Gloria M. Burns May  06, 2008*

Schedule 8.1

**List of Executory Contracts to be Assumed**

1.      To be provided.

*NJ 226,396,125v1*

*Approved by Judge Gloria M. Burns May  06, 2008*