**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

| | | |
|---|---|---|
| In re: | : | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY |
| SHAPES/ARCH HOLDINGS L.L.C., et al., | : | CHAPTER 11 |
| Debtors. | : | CASE NO. 08-14631 (GMB) |
| | : | |

### DEBTORS' VERIFIED MOTION FOR AN ORDER AUTHORIZING BUT NOT DIRECTING PAYMENT OF PREPETITION SALES COMMISSIONS PURSUANT TO 11 U.S.C. §§ 105(a), 507(a)(4) AND (5)

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors"),[1] the debtors and debtors-in-possession, hereby move (the "Motion") for an order authorizing but not directing payment of prepetition sales commissions, and in support thereof submit as follows:

### Background

1. On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C. ("Accu-Weld"); and Ultra L.L.C. ("Ultra").

CHERRY_HILL\435987\5 220718.000

2.  These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3.  The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.  No trustee or examiner has been appointed in these cases.

5.  An official committee of unsecured creditors (the "Committee") was appointed on March 31, 2008, and has been active in these cases since that time.

6.  The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.  *Shapes/Arch* is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

8.  *Shapes* is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction. Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to

create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

9. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

10. *Delair* manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

11. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

12. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

13. *Accu-Weld* is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

14. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

15. *Ultra* is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

16. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

17. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

18. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Corporation (the "Lender Group").

19. Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), a term loan, and letters of credit. The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

20. As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

CHERRY_HILL\435987\5 220718.000

21. As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

22. The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

23. With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors have been struggling to fund their operations under their existing lending arrangement and find themselves in a situation in which they can not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

24. Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional

financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

25. Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

26. The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presented a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

27. With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

28. In late January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

29. Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

7

liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

30. In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of the agreement, Arcus was to become a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC would retain 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions, including Versa's ability to reach an agreement with the Lender Group with respect to the terms and conditions of Versa's investment in the Debtors' businesses as part of a plan of reorganization, as well as obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

31. In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

32. Contemporaneously with the filing of the petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provide, among other

8

things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims (the "Arcus Plan").

33. The Arcus Plan reflected a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of more than $25 million.

34. The Debtors worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that would present an opportunity to maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses would remain viable so that the Debtors could continue to be one of South Jersey's largest employers for the foreseeable future.

35. At the first day hearing in these cases, this Court entered thirteen (13) Orders granting first day motions on an interim or final basis, including interim orders approving debtor-in-possession financing from the Lender Group and Arcus.

36. Approximately two weeks after the Petition Date, on or about April 1, 2008, Arch Acquisition I, LLC ("Arch"), an affiliate of Signature Aluminum and H.I.G. Capital Partners ("H.I.G."), filed an objection to the Debtors' financing motion in which it expressed an interest in providing an alternative financing arrangement on better terms and participating in a sale process pursuant to 11 U.S.C. § 363 or through a revised plan.

37. On May 1, 2008, after Arch completed its due diligence and provided a form of asset purchase agreement and a form of plan of reorganization to the Debtors and after extensive discovery propounded by the Committee and Arcus and several days of depositions of the parties, Arch provided the Debtors with commitment letters for financing the alternative transaction and CIT advised the Debtors that it would continue funding the Debtors' operations if Arch replaced Arcus. At this point, it was the Debtors' understanding that Arch's alternative DIP financing package and alternative plan (the "Arch Alternative Proposal") was free of any due diligence contingencies and any financing contingencies with respect to the debtor-in-possession financing and the exit financing under the alternative plan; provided for CIT's continued funding under its debtor-in-possession revolver facility; included more favorable (less restrictive) covenants and lower interest and fees; provided a higher return for unsecured creditors; and included a more full and open process for the submission of competing proposals.

38. Upon becoming aware that Arch had financing commitments and CIT's agreement to continue funding under its DIP revolver, the Debtors determined that the Arch Alternative Proposal was higher and better than the Arcus Plan. The Debtors then advised Arcus that the Debtors were not prepared to proceed with the hearing on the Arcus Plan's disclosure statement and that the Debtors believed it was in the best interests of the estates to proceed with the Arch Alternative Proposal.

39. After intense negotiations between and among the Debtors, the Committee, Arcus, the Lender Group, and Arch throughout the day on May 1, 2008, including a Chambers conference with the Court, the parties reached an agreement whereby, among other things, Arcus would assign to Arch its rights under its debtor in possession financing agreement with the Debtors, and Arch would become the plan sponsor under an amended plan and disclosure statement to be filed by May 12, 2008.

40. The Debtors' decision to proceed with the Arch Alternative Proposal was announced to the Court late in the day on May 1, 2008 and the parties agreed to submit final orders approving the debtor-in-possession financing and the settlement among the parties.

41. By orders entered on April 9, April 10 and April 23, 2008, and the "So Ordered" record of the Final Hearing of May 1, 2008, respectively, the interim financing was extended on an interim basis through May 5, 2008 at 5:00 p.m. On May 6, 2008 (after extensive negotiations among the parties over a four day period, and after another Chambers conference and a telephonic hearing among the parties), the Court entered orders granting final approval of the debtor in possession financing from the Lender Group and Arcus (which was immediately assigned to Arch) to the Debtors.

## Relief Requested

42. By and through this Motion, the Debtors request that the Court authorize but not direct the Debtors to pay and/or honor certain prepetition sales commissions owed to employees, and independent sales representatives.

43. The Debtors are not hereby seeking the approval of any executive severance package or incentive program, but reserve the right to do so at a later date. In addition, the Debtors <u>are</u> <u>not</u> seeking to assume or reject any executory contract through this Motion.

44. <u>Accu-Weld's</u> sales are handled by an in-house sales team; all of Accu-Weld's sales people are Accu-Weld employees. The commissions earned by each sales person are paid at the end of each year, and are in addition to the salaries they receive. Five of Accu-Weld's sales people are owed prepetition commissions totaling $56,769.20. Four of these employees received wages and other payments pursuant to the Court's interim and final orders authorizing the payment of prepetition payroll and benefits (the "<u>Wage Orders</u>"). None of those employees received more than $10,950 under the Wage Orders. Certain of the Accu-Weld sales people have threatened to resign if their commissions are not paid in full. As a result, Accu-Weld would have little or no ability to sell products and would experience a significant disadvantage in the marketplace. Moreover, its ability to maintain and grow its business would be impaired.

45. <u>Delair's</u> sales are substantially handled by independent sales representatives. The prepetition sales commissions earned by these sales representatives totals $4,838.41. Certain of the sales representatives have threatened to stop selling Delair products and to begin to push customers towards Delair's competitors if their prepetition commissions are not paid in full. Delair would suffer irreparable harm if its independent sales representatives stopped selling Delair products. Moreover, Delair would be at a significant disadvantage in the marketplace if it lost its independent sales representatives and they were to stop selling Delair products.

46. <u>Ultra's</u> sales, like Delair's, are substantially handled by independent sales representatives. There are twenty-six independent representatives that are owed prepetition sales commissions totaling $61,688.39. Three of the sales representatives are individuals that receive at least 75% of their annual income from Ultra. Each of those three individuals would receive less than $10,950 if the relief requested in this Motion were granted. Certain of the sales representatives have threatened to stop selling Ultra products and to push the sales of competitors' products if their prepetition commissions are not paid in full. Ultra would suffer

12

irreparable harm if it lost the significant portion of sales attributable to the independent sales representatives. Moreover, Ultra would be at a significant disadvantage in the marketplace if its independent sales representatives were to stop selling Ultra's products.

47. The Debtors believe that paying the prepetition commissions as set forth above (in the total amount of approximately $122,000) is important to the ongoing relationships with their sales representatives; would provide the Debtors with ongoing avenues to effectively market and sell their products and preserve the Debtors' market share in their industries; will promote the Debtors' goodwill with their sales representatives; and will provide an incentive for sales representatives to continue their relationships with the Debtors during and after these Chapter 11 cases. Failing to honor the prepetition commissions may irreparably damage the Debtors' relationship with their valued sales representatives, resulting in a significant loss of revenue. Therefore, the Debtors believe, given the damage that may be done through the abrupt departure of the sales representatives and given the relatively small cost of honoring the prepetition commissions, that honoring the prepetition commissions is in the best interests of the Debtors, their estates and creditors.

## Basis for Relief

48. This Court has a number of legal bases on which to grant the requested relief and permit the Debtors to honor the prepetition commissions. First, to the extent the Motion pertains to employees or corporations with only one employee that earn at least 75% of its income from one of the Debtors, 11 U.S.C. § 507(a)(4) affords priority to commissions claims of up to $10,950.

49. Each Accu-Weld employee that would be effected by this Motion received less than the statutory maximum pursuant to the Wage Orders. In fact, approximately $25,000 of the amount that the Debtors propose to pay to the Accu-Weld employees would be entitled to

13

priority status pursuant to 11 U.S.C. § 507(a)(4), which amount would have to be paid in full under any plan of reorganization. See 11 U.S.C. § 1129(a)(9)(B). Moreover, three of Ultra's sales representatives would qualify for a priority claim under 11 U.S.C. § 507(a)(4)(B). Each of those sales representatives would receive less that the $10,950 statutory cap.

50. Thus, the payment of approximately $25,000 to Accu-Weld's employee sales force and $8,000 of the proposed payments to Ultra's sales representatives at this time would not prejudice the rights of other creditors, but would merely accelerate payments that would otherwise need to be paid in full under the Debtors' plan of reorganization, while at the same time help to preserve morale of the employees and sales representatives who are necessary to the Debtors' reorganization.

51. In addition, 11 U.S.C. § 105(a) provides in part: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105 essentially codifies the Bankruptcy Court's inherent equitable powers. See In re Allegheny Int'l Inc., 118 B.R. 276, 302 (Bankr. W.D.Pa. 1990) (court's equitable power derived from section 105 constitutes "extremely broad grant of authority"), Browning v. Navarro, 37 B.R. 201, 208 (N.D.Tex. 1983) ("Through section 105(a), Congress grants the bankruptcy court sweeping authority to tailor its orders to meet the needs of bankruptcy proceedings."), rev'd on other grounds, 743 F.2d 1069, 1084 (5th Cir. 1984).

52. The Court thus has ample authority to permit the payment of these prepetition obligations to their sales representatives. In a long line of well-established cases, beginning with railroad reorganizations dating back to the turn of the century, the courts have consistently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. See, e.g., Miltenberger v. Logansport Ry. Co., 106 U.S. 286, 311-12 (1882) (payment of pre-receivership claim prior to

reorganization permitted to prevent "stoppage of . . . [crucial] business relations . . . ."), Gregg v. Metro. Trust Co., 197 U.S. 183, 187 (1905) ("the payment of the employees of the [rail]road is more certain to be necessary in order to keep it running than the payment of any other class of previously incurred debt"), In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987) (approving lower court order authorizing debtor prior to plan stage of case to pay prepetition wages, salaries, expenses and benefits), In re Sharon Steel Corp., 159 B.R. 730, 736-37 (Bankr. W.D.Pa 1993) (allowing immediate payment of prepetition wage claims under necessity of payment doctrine), In re Gulf Air, Inc., 112 B.R. 152 (Bankr. W.D.La. 1989) (allowing payment of prepetition employee wage and benefit claims). Courts have also determined that it is appropriate to allow payments beyond the statutory cap. See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989) ("Ionosphere III").

53. These decisions to permit the payment of prepetition obligations postpetition have been supported by the "doctrine of necessity," also referred to as the "necessity of payment" principle. See In re Columbia Gas Sys., Inc., 171 B.R. 189, 192 (Bankr. D.Del. 1994) (necessity of payment doctrine applies where payment is essential to continued operation of business). In discussing the principle at length in the railroad reorganization decision of In re Lehigh and New England Ry. Co., 657 F.2d 570 (3d Cir. 1981), the Third Circuit stated:

> [T]he "necessity of payment" doctrine, as it has developed since its original enunciation in Miltenberger, teaches no more than, if payment of claim which arose prior to reorganization is essential to the continued operation of the railroad during reorganization, payment may be authorized even if it is made out of corpus.

Id. at 581 (citation omitted).

54. A thorough discussion of the "doctrine of necessity" is contained in Ionosphere III. In that case, the Court had granted Eastern Air Lines' motion to pay certain prepetition wage, salary, medical benefit and business expense claims of its active employees. Eastern's

15

labor unions then applied to the Court for an order extending that relief to all Eastern employees, including primarily those union-represented employees who were then on strike. While rejecting the request extension, the Court explained the basis for the original order. The court concluded that Eastern had "clearly demonstrated sound business reasons to justify such payments," and that on the basis of that demonstration the Court was legally authorized to permit payment of the prepetition claims:

> The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of Debtor is not a novel concept. It was first articulated by the United States Supreme Court in Miltenberger v. Logansport, C. & S.W.R. Co. . . . and is commonly referred to as either the "doctrine of necessity" or the "necessity of payment" rule. This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential to the continued operation of Debtor.

Id. at 175-76.

55. The Ionosphere III court noted that the doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid." 98 B.R. at 176 (quoting In re Lehigh & New England Ry. Co., 657 F.2d at 581 (3d Cir. 1981)). Rejecting union claims that the principle of equality among creditors prevented the court from authorizing Eastern's payment of prepetition employee claims unless such claims of striking employees were also paid, the Court held:

> The policy of equality among creditors as articulated by IAM may be of significance in liquidation cases under Chapter 7, however, the paramount policy and goal of Chapter 11, to which all other bankruptcy policies are subordinated, is the rehabilitation of Debtor. This policy was clearly articulated by the United States Supreme Court in NLRB v. Bildisco & Bildisco, which stated "[t]he fundamental policy of reorganization is to prevent Debtor

16

>from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources."

Id. at 176-77 (citation omitted).

56. The relief the Debtors seek by and through this Motion is fully justified under the "doctrine of necessity." The Debtors risk collapse of its sales force, an inability to generate sales, loss of goodwill, adverse publicity, and a resulting disruption of their businesses if they do not honor these prepetition commission payments. Thus, prompt payment of these prepetition obligations is crucial not only to protection of the Debtors' businesses and ultimate reorganization, but also to their very survival. Indeed, "retention of skills, organizations, and reputation for performance must be considered valuable assets contributing to going-concern value and aiding rehabilitation where that is possible." Gulf Air, 112 B.R. at 154. The obligations the Debtors wish to pay represent a small percentage of their total prepetition debts, and satisfaction of these claims contributes mightily to the Debtors' revenue-generating capability.

57. The Debtors believe that authorizing but not directing the payments that the Debtors are requesting in this Motion is in the best interest of the Debtors, their estates and their creditors.

## Notice

58. Notice of this Motion has been provided to: (a) counsel for the Lender Group, (b) counsel for Arch, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) counsel to the Creditors' Committee and (h) all parties on the Master Service List. In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors request that the attached order be entered authorizing but not directing them to pay and/or honor prepetition sales commissions owed to employees and independent sales representatives, as previously described herein, and that the Court grant to Debtors such other and further relief as is just and proper.

Dated: May 9, 2008                                COZEN O'CONNOR

                                                          By:   */s/ Jerrold N. Poslusny, Jr.*
                                                                   Mark E. Felger
                                                                   Jerrold N. Poslusny, Jr.

                                                                   Attorneys for the Debtors

## VERIFICATION

Paul Sorensen, Jr. of full age, certifies and states as follows:

1. I am the Chief Financial Officer of Shapes/Arch Holdings L.L.C. and Shapes L.L.C.[3], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2. I have read the foregoing Motion and I hereby certify and verify that all of the statements contained therein are true.

3. I hereby verify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me is willfully false, I am subject to punishment.

_____
Paul Sorensen, Jr.

Dated: May __, 2008

---

[3] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.