**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

_____

In re:

SHAPES/ARCH HOLDINGS L.L.C., et
al.,

          Debtors.

_____

: UNITED STATES BANKRUPTCY COURT
: FOR THE DISTRICT OF NEW JERSEY
: CHAPTER 11
:
: CASE NO. 08-14631 (GMB)
:
:
:

**DEBTORS' VERIFIED MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 1123 AND 1129
AND BANKRUPTCY RULE 2002 FOR AN ORDER APPROVING:  (A) THE
COMPETITIVE PROCESS FOR THE SALE OF THE REORGANIZED DEBTORS'
EQUITY PURSUANT TO THE DEBTORS' SECOND AMENDED PLAN OF
REORGANIZATION AND (B) APPROVING A BREAK-UP FEE
AND EXPENSE REIMBURSEMENT**

      Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors"),[1]

the debtors and debtors-in-possession, hereby move (the "Motion") pursuant to 11 U.S.C. §§

105(a), 1123 and 1129 and Bankruptcy Rule 2002 for an order approving: (a) the Competitive

Process (defined below) for the sale of the reorganized Debtors' equity under the terms and

conditions of the Debtors' Second Amended Plan of Reorganization; and (b) approving a Break-

Up Fee (defined below) and an Expense Reimbursement (defined below).  Acquisition I, LLC

("Arch").  In support of the Motion, the Debtors submit as follows:

_____

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of
which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date
(defined below):  Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C.
("Accu-Weld"); and Ultra L.L.C. ("Ultra").

## Background[2]

1.     On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

2.     These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3.     The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.     No trustee or examiner has been appointed in these cases.

5.     An official committee of unsecured creditors (the "Committee") was appointed on March 31, 2008, and has been active in these cases since that time.

6.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

### A.     Background of Debtors' Business Operations

7.     Shapes/Arch is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing

---

[2] As described in various pleadings filed by the Committee to date, the Committee does not agree with the portrayal of certain facts and characterizations of certain events leading up to the Debtors' bankruptcy filing.  Therefore, nothing contained herein regarding same should be binding on the Committee or its successors-in-interest.

new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8

million, with Shapes generating approximately 65% of that revenue.  The Debtors have over

1000 employees, approximately 70% of whom are members of either the International

Brotherhood of Teamsters Local 837, or the United Independent Union.

8.      Shapes is the largest operating Debtor with 2007 revenue over $179 million and

over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety

of industries, including road and rail transportation and commercial and residential construction.

Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to

create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the

necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press

capacity and because all of its casting, extruding, fabricating and finishing is completed in one

facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates

twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be

pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a

variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of

extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World

Records" for the largest free standing aluminum structure ever created in connection with the

restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in

connection with the restoration of the Washington Monument.

9.      In 2007 Shapes' revenues decreased by approximately $35 million compared to

2006.  This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to

the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

10.     Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

11.     Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey.  Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

12.     Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

13.     Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors.  Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States.  Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

14.     Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006.  The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

4

15.     Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China.  Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

16.     Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

17.     Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

18.     Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement").  The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Financial Corporation (the "Lender Group").

**B.      The Debtors' Pre-petition Financing**

19.     Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), a term loan, and letters of credit.  The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to

borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

20.     As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

21.     As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

22.     The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from

about $21 million in 2006 to about $3.7 million in 2007.  The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

23.     With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors were struggling to fund their operations under their existing lending arrangement and found themselves in a situation in which they could not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

24.     Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution.  In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business.  Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

25.     Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties.  The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

26.     The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presented a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

27.     With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period

7

shortly after the Petition Date, without factoring in any payment to restructuring professionals or

to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund

any additional overadvance, the Debtors' continued ability to operate was in substantial doubt

without a quick and efficient transaction.

**C.**    **Versa Capital Management**

28.    In late January, 2008, the Debtors began a dialogue with Versa Capital

Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest

in a possible transaction.  Versa expressed interest and conducted extensive due diligence with

respect to the Debtors' businesses in late January.

29.    Also during this time frame, the Debtors retained Phoenix Management Services,

Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working

with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

liquidity issues were and would become over the following weeks and months; and (iii) explore

the Debtors' alternatives.

30.    In February, Versa, the Debtors and representatives of the owners of Ben LLC

engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI

Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other

things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and

provide additional funding and an equity infusion to help the Debtors reorganize).  As part of the

agreement, Arcus was to become a manager of (but not a member of) Shapes/Arch (with 79.9%

of the voting rights) and Ben LLC would retain 100% of the ownership rights and 20.1% of the

voting rights.  This transaction was made subject to many terms and conditions, including

8

obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for

the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on

the terms and conditions upon which Arcus would provide additional financing to the Debtors

(and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11

process, as well as provide an exit facility for the Debtors.

**D.**      **The Debtors' Bankruptcy Filing**

31.      In light of the available financing from the Lender Group and Versa, and the dire

state of the Debtors' businesses and financial affairs, the Debtors, their management,

representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek

bankruptcy protection in order to effectuate the transaction.

32.      Contemporaneously with the filing of the bankruptcy petitions, the Debtors filed a

debtor-in-possession financing motion and a plan and disclosure statement that provided, among

other things, for the financing of the Debtors' operations during the Chapter 11 process, exit

financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of

all administrative and priority unsecured claims in full, and a dividend to holders of general

unsecured claims (the "Arcus Plan").

33.      The Arcus Plan reflected a commitment by (i) the Lender Group to provide the

Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting

bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in

the applicable documents to be executed in favor of the Lender Group, and (ii) Arcus to pay off

the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to

9

provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of more than $25 million.

34.    The Debtors worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that would present an opportunity to maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses would remain viable so that the Debtors could continue to be one of South Jersey's largest employers for the foreseeable future.

35.    At the first day hearing in these cases, this Court entered thirteen (13) Orders granting first day motions on an interim or final basis, including interim orders approving debtor-in-possession financing from the Lender Group and Arcus (the "Arcus DIP Loan").

**E.    Arch Provides DIP Financing and Sale Proposals on Better Terms**

36.    Approximately two weeks after the Petition Date, on or about April 1, 2008, Arch, an affiliate of Signature Aluminum and H.I.G. Capital Partners, filed an objection to the Debtors' financing motion in which it expressed an interest in providing an alternative financing arrangement on better terms and participating in a sale process pursuant to 11 U.S.C. § 363 or through a revised plan.  As further evidence of its commitment to an open and competitive sales process, Arch provided the Debtors and the Committee with, *inter alia*, a Debtor-in-Possession Financing Agreement on better terms than the Arcus DIP Loan, a proposed Order approving such financing from Arch, and an asset purchase agreement providing for a purchase price in excess of the value provided by Arcus in the Arcus Plan.  Upon the request of the Committee, Arch converted their asset purchase agreement to a plan of reorganization on better terms than the Arcus Plan, including but not limited to a pool of funds for general unsecured creditors of

10

$5,000,000 (the "Class 10 Distribution") (as opposed to the $500,000 unsecured pool provided in the Arcus Plan).

37.    On May 1, 2008, after Arch completed its due diligence, and after extensive discovery propounded by the Committee and Arcus and several days of depositions of the parties, Arch provided the Debtors with commitment letters for financing the alternative transaction and the Lender Group advised the Debtors that it would continue funding the Debtors' operations if Arch replaced Arcus.  Arch's alternative DIP financing package and the alternative plan (the "Arch Alternative Proposal") was now free of any due diligence contingencies and any financing contingencies with respect to the debtor-in-possession financing and the exit financing under the alternative plan; provided for the Lender Group's continued funding under its debtor-in-possession revolver facility; included more favorable (less restrictive) covenants and lower interest and fees; provided a higher return for unsecured creditors; and included a full and open competitive process, to ensure that the value of the Debtors' estates would be maximized.

38.    Upon becoming aware that Arch had financing commitments and the Lender Group's agreement to continue funding under its DIP revolver, the Debtors determined that the Arch Alternative Proposal was higher and better than the Arcus Plan.  The Debtors then advised Arcus that the Debtors were not prepared to proceed with the hearing on the Arcus Plan's disclosure statement and that the Debtors believed it was in the best interests of the estates to proceed with the Arch Alternative Proposal.

39.    After intense negotiations between and among the Debtors, the Committee, Arcus, the Lender Group, and Arch in the Courthouse on May 1, 2008, including a Chambers

conference with the Court, the parties reached an agreement in principle whereby, among other things, Arcus would assign to Arch its rights under the Arcus DIP Loan and Arch would become the plan sponsor under an amended plan (in form substantially similar to the Arch Plan) to be filed by May 12, 2008 (the "Amended Plan").

40.    The Debtors' decision to proceed with the Arch Alternative Proposal was announced to the Court late in the day on May 1, 2008 and the parties agreed to submit final orders approving the debtor-in-possession financing and the settlement among the parties.

41.    On May 6, 2008, the Court entered Orders, *inter alia*, granting final approval of the debtor in possession financing from the Lender Group and Arch, as assignee of the Arcus DIP Loan (the "Final DIP Orders").  Among other things, the Final DIP Order (with respect to Arch) approved the assignment of the Arcus DIP Loan to Arch and the Amended and Restated Debtor-in-Possession Term Loan Financing Agreement entered into by and between Arch and the Debtors, dated May 6, 2008 (the "Arch Amended DIP Agreement").  The Arch Amended DIP Agreement provides, *inter alia*, that Arch's obligations are conditioned upon the approval of the competitive process set forth on Exhibit C to the DIP Loan Agreement a copy of which is annexed hereto as Exhibit A.

**Relief Requested**

42.    By this Motion, the Debtors respectfully request that the Court enter an order approving:  (a) the Competitive Process for the sale of the Debtors' equity through the Amended Plan filed on May 12, 2008; and (b) the Break-Up Fee and the Expense Reimbursement to Arch if an Alternative Plan (as defined below) is chosen by the Debtors and is consummated.

**Basis for Relief**

A.      **The Proposed Sale**

43.      Pursuant to Section 1123(b)(4) of the Bankruptcy Code, a plan of reorganization

may provide for the sale of all or substantially all of the property of the estate.  11 U.S.C. §

1123(b)(4).  In exchange for the consideration provided by Arch under the Amended Plan, Arch

will receive one hundred percent (100%) of the equity interests in the reorganized Debtors.

44.      Under the Competitive Process, Arch will serve as the stalking horse bidder

pursuant to the Amended Plan.  The Amended Plan complies with the requirements of 11 U.S.C.

§ 1123(a)(5)(D) in that it proposes to transfer the Debtors' equity to Arch, subject to the

Competitive Process proposed herein.

45.      As set forth above, the Debtors believe that approval of the Competitive Process,

including the bid procedures, is appropriate under the circumstances and will maximize the value

of the Debtors' estates.  The Competitive Process satisfies the requirements of 11 U.S.C. §

1129(b)(2)(B)(ii) and, to the extent applicable, is consistent with the Supreme Court's holding in

Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 North LaSalle St. P'Ship, 526 U.S. 434, 119 S.Ct.

1411 (1999).  The Amended Plan and Competitive Process provide an opportunity for other

entities to participate in an open auction process to determine the market value of the Debtors'

equity.  See id. at 458, 119 S.Ct. at 1424.  See also In re Global Ocean Carriers, Ltd., 251 B.R.

31, 48-49 (Bankr. D.Del. 2000).

46.      The Debtors intend to conduct the Competitive Process through a sales

consultant/investment banker (the "Sales Consultant") that will be retained pursuant to 11 U.S.C.

§§ 327 and 328(a), in full and transparent consultation with the Committee.  The Sales

Consultant will be in charge of marketing, managing due diligence and overseeing the Competitive Process.

47.      The Debtors request approval of the following sales process, deadlines and bidding procedures (the "<u>Competitive Process</u>").  The Debtors submit that the Competitive Process affords a reasonable opportunity for potentially interested parties to complete due diligence and submit competing bids, while at the same time allowing the Debtors to exit bankruptcy in a reasonable time so that the Debtors can continue as viable entities.

a.      Prior to the entry of the order approving this Motion, the Debtors and the Sales Consultant may not negotiate and/or discuss the potential equity sale with any third party beyond executing a confidentiality agreement and providing the same due diligence materials as produced to Arch on or before May 1, 2008 (the "<u>Arch Due Diligence Materials</u>") (upon receipt by the Debtors or the Sales Consultant of a confidentiality agreement in substantially the same form as was executed by Arch).

b.      Upon entry of an order approving this Motion, the Debtors, through the Sales Consultant, will begin the formal sales process, including the coordination with the Debtors' personnel of due diligence requests from prospective bidders, arranging for advertising as appropriate, disseminating teasers and arranging for management meetings.

c.      To be considered by the Sales Consultant, an offer for the purchase of all the reorganized Debtors' equity must be a qualified bid as provided herein (a "<u>Qualified Bid</u>").  A Qualified Bid must be in writing and submitted so as to be actually received by the Notice Parties listed below no later than June 25, 2008, at 12:00 noon (eastern time) (the "<u>Bid Deadline</u>").  A Qualified Bid must contain a mark-up of such bidder's proposed plan to show all

14

modifications from the Amended Plan.  The only material modifications to the Plan may be to (i)

replace Arch as the Plan Funder (as defined in the Amended Plan); (ii) provide for the payment

in full on the Effective Date of the Class 3 Arch Acquisition DIP Claim; (iii) increase or

eliminate the caps on the amount of the Allowed Claims in Class 1, Class 2 and/or Priority Tax

Claims; and (iv) increase the Class 10 distribution to general unsecured creditors (the "Class 10

Distribution") (an "Alternative Plan").  The mark-up must include the bidder's proposed

Schedule 8.1 of executory contracts and unexpired leases to be assumed.  The Alternative Plan

may also include non-economic, non-material modifications provided that such modifications do

not cause the Alternative Plan (in the Debtors' discretion after consultation with the Committee)

to require re-solicitation under Section 1127 of the Bankruptcy Code.

       d.       To be considered a Qualified Bid, a person interested in purchasing the

Debtors' equity must, no later than the Bid Deadline, provide the following additional

information to the Notice Parties:

       i.       Identification of the potential bidder, its principals, and the

representatives thereof who are authorized to appear on the potential bidder's behalf for all

purposes, and an explanation of any affiliation with a competitor of any of the Debtors.

       ii.       An executed binding, and irrevocable minimum Qualified Bid and

identify any potential, non-material modifications to the Amended Plan, which Qualified Bid

will be irrevocable until at least two days after conclusion of the Confirmation Hearing.

       iii.       Written evidence, satisfactory to the Sales Consultant, the Debtors

and the Committee, that the potential bidder has the financial wherewithal and ability to fully

fund and consummate the Alternative Plan upon an Effective Date (as defined in the Amended

Plan) not later than July 31, 2008, which shall include the following:  (a) current financial

statements, (b) contact information for parties that can confirm financing availability, (c) proof

of debt or equity funding commitments, and (d) other information that would show the potential

bidder's financial ability to fund and consummate the Alternative Plan.

        iv.     Provide a good faith deposit of $4,5000.000 in the form of a

certified check or wire transfer to be held in escrow by the Debtors' counsel (the "Deposit").

        v.     Written confirmation that the potential bidder's offer is not subject

to financing or any contingencies other than any contingencies included in the Amended Plan.

Bidders shall have until 7:00 p.m. (eastern time) on June 26, 2008 to definitively satisfy any

financing contingencies contained in its otherwise Qualified Bid.  If the financing contingency is

not eliminated by 7:00 p.m. on June 26, 2008, then such bid shall not be deemed a Qualified Bid

and such bidder may not participate in the Auction.

        e.     Any party wishing to participate in the Competitive Process must submit a

Qualified Bid no later that June 25, 2008, at 12:00 p.m. (the "Bid Deadline") to the following

notice parties (the "Notice Parties"):

| | | |
|---|---|---|
| Mark E. Felger | Jerrold N. Poslusny, Jr. | J. Scott Victor |
| Cozen O'Connor | Cozen O'Connor | National City Capital Markets |
| 1201 North Market Street | LibertyView, Suite 300 | Five Tower Bridge, Suite 420 |
| Suite 1400 | 457 Haddonfield Road | West Conshohocken, |
| Wilmington, DE 19801 | Cherry Hill, NJ 08002 | PA   19428 |
| mfelger@cozen.com | jposlusny@cozen.com | jscott.victor@nationalcity.com |
| Counsel for the Debtors | | |
| | Counsel for the Debtors | Sales Consultant to the |
| | | Debtors |

Nancy A. Mitchell
Greenberg Traurig
200 Park Avenue
New York, NY 10166
nmitchell@gtlaw.com

Counsel for Arch

Michael D. Sirota
Cole, Schotz, Meisel, Forman
& Leonard
Court Plaza North
25 Main Street
Hackensack NJ 07601
msirota@coleschotz.com

Co-counsel for the Committee

Alan J. Brody
Greenberg Traurig
200 Park Avenue
Florham Park, NJ 07932-
0677
brodya@gtlaw.com

Counsel for Arch
Paul A. Patterson
Stradley, Ronon, Stevens &
Young
2600 One Commerce Square
Philadelphia, PA 19103
ppatterson@stradley.com

Counsel for the Lender Group

Alan Halperin
Halperin Battaglia Raicht
555 Madison Avenue
9th Floor
New York, NY 10022
ahalperin@halperinlaw.net

Co-counsel for the Committee

Any bid received after the Bid Deadline (unless extended by the Debtors in consultation with the Committee) shall not constitute a Qualified Bid (defined below), and will not be considered by the Debtors or the Sales Consultant.

    f.  In the event a Qualified Bid is timely received by the Notice Parties, the Debtors, through the Sales Consultant and in consultation with the Committee, will conduct an "auction" for competitive plans on June 27, 2008, at 10:00 a.m. at the offices of Cozen O'Connor, 1900 Market Street, Philadelphia, Pennsylvania (the "Auction").

    g.  The Effective Date of the Amended Plan or the Alternative Plan shall be no later than July 31, 2008.

    h.  The reorganized Debtors' equity will be sold to a single bidder, in a single sale. As set forth above, all bidders must submit the Amended Plan, revised only: (i) to replace Arch as the Plan Funder, (ii) to provide for payment in full on the Effective Date of the Class 3

Arch Acquisition DIP Claim; (iii) to increase and eliminate the caps on the amount of the

Allowed Claims in Class 1, Class 2 and/or Priority Tax Claim; and (iv) to increase the Class 10

Distribution by a minimum of $150,000.  The initial overbid shall be a minimum of $6,950,000

(consisting of a break-up fee of $1,000,000 to Arch (the "Break-Up Fee"), an expense

reimbursement of up to $500,000 to Arch (the "Expense Reimbursement"), the $300,000

contribution by Arch to fund in part the In Lieu of Termination Fee to Arcus (as defined in the

Final DIP Orders), and a minimum $150,000 increase to Arch's proposed $5,000,000 Class 10

Distribution) (the "Initial Overbid").

       i.      After the Initial Overbid, successive bids at the Auction shall be in

increments of no less than $150,000.

      48.      In the event Qualified Bids are timely submitted, the Debtors, through the Sales

Consultant, and in consultation with the Committee, will conduct the Auction.  In the event that

no Qualified Bids are submitted by the Bid Deadline, then Arch will be deemed the Successful

Bidder and the Debtors shall proceed with confirmation of the Amended Plan.  Parties that have

submitted a Qualified Bid may improve their bids at the Auction (after the Initial Overbid) in

minimum increments of $150,000.  The parties shall take into account Arch's entitlement to the

Break-Up and Expense Reimbursement in conducting the Auction and at all times in determining

which bid is the higher and better bid and ultimately which bid is the highest and best bid.

Should overbidding occur, Arch will have the right, but not the obligation, to participate in the

bidding and to be approved as the successful bidder based on any such subsequent overbid.  The

bidding will be continuous and competitive and will not end until all Qualified Bidders have

submitted their last and best offers.

49.    At the conclusion of the Auction, the Debtors, through the Sales Consultant, and after consultation with the Committee, will announce the highest and best bid (the "Successful Bidder") and the second place bidder.

50.    The Debtors will then seek confirmation of the Amended Plan with Arch or, in the event Arch is not the Successful Bidder, the Alternative Plan with the Successful Bidder at the Confirmation Hearing.

51.    Ballots accepting or rejecting the Plan will be due June 27, 2008.  The Debtors submit that because the only material changes to the Amended Plan will be to:  (i) replace Arch as the Plan Funder, (ii) to provide for payment in full on the Effective Date of the Class 3 Arch Acquisition DIP Claim; (iii) to increase or eliminate the caps on the amount of the Allowed Claims in Class 1, Class 2 and/or Priority Tax Claims; and (iv) increase the Class 10 Distribution.  There will be no material changes in the Amended Plan if Arch is not the plan funder that will negatively impact any class of creditors.  Therefore, the Court should not require re-balloting if the Debtors determine to seek confirmation of the Amended Plan with a different plan funder.

52.    A confirmation hearing will be held on July 8, 2008, at 10:00 a.m. (the "Confirmation Hearing").

53.    As soon as practicable after the conclusion of the Auction, Deposits (plus accrued interest, if any) will be returned to all bidders except the Successful Bidder and the second place bidder.  If the Successful Bidder's plan is confirmed and becomes effective, the Successful Bidder's Deposit (plus accrued interest, if any) will be applied at closing and the second place

bidder's deposit will be returned promptly after the Effective Date of the Amended Plan or the Alternative Plan.

54.     Any dispute as to any bidder's intent or ability to close will be resolved by the Court at the Confirmation Hearing.

55.     The Competitive Process, proposed schedule and Bidding Procedures set forth above are the result of arm's length, good faith negotiations by, *inter alia*, the Debtors, the Committee and Arch.  The Debtors believe that the Competitive Process will encourage third parties to bid for the Debtors' equity, and is therefore, in the best interests of the Debtors, their estates and creditors.  The Competitive Process provides a structure and format to place all interested, potential bidders on equal footing, and to participate fairly in the Auction.

56.     Therefore, the Debtors respectfully request that the Court approve the Competitive Process.

**B.     The Break-Up Fee and Expense Reimbursement Are Appropriate**

57.     The Debtors further request that the Court approve the Break-Up Fee and the Expense Reimbursement.  Arch, on a post-petition basis, has expended considerable time, money and energy pursuing a purchase of the equity and has engaged in extended arm's-length and good faith negotiations with the Debtors.

58.     Arch's interest in the Debtors, and its efforts that ultimately led to it replacing Arcus has resulted in, among other things, the floor for a distribution to holders of general unsecured claims increasing from $500,000 to $5 million, and for a more fulsome competitive process than that proposed by Arcus.

20

59.    In recognition of the time, energy and resources expended, and the benefit to creditors, the Debtors have agreed to provide Arch the Break-Up Fee and Expense Reimbursement, which will reimburse Arch for its out of pocket fees and expenses of their attorneys, accountants, financial and other advisors, incurred in connections with Arch's legal, financial and business due diligence and the preparation and negotiation of the Plan and disclosure statement, and agreement on the Competitive Process if the bid included in the Amended Plan is not the Successful Bid for any reason other than a material breach by Arch.

60.    Pursuant to the Competitive Process, the Break-Up Fee and Expense Reimbursement will be paid on the Effective Date of the Alternative Plan with a replacement plan funder.

61.    The Break-Up Fee and Expense Reimbursement are material inducements for, and conditions of, Arch's agreeing to act as the stalking horse bidder under the Disclosure Statement and Amended Plan.  The Debtors believe that the Break-Up Fee and Expense Reimbursement are fair and reasonable in view of, among other things:  (a) the intensive post-petition analysis, due diligence investigation, and negotiation undertaken by the Arch, (b) the fact that Arch's efforts have significantly increased the Class 10 Distribution and may result in further increases if other entities participate in the Competitive Process, and (c) the fact that the Break-Up Fee and Expense Reimbursement total less than 2% of the estimated purchase price under the Amended Plan.

62.    The Debtors submit that the test established by the Third Circuit in In re O'Brien Envtl. Energy, Inc., 181 F.3d 527 (3d Cir. 1999), is met in this case.  The court in O'Brien identified at least two examples in which bidding incentives may provide benefit to the estate.

First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

63.    The Debtors believe that Arch satisfies both of these examples.  Arch would not have agreed to the Competitive Process or agreed to act as the stalking horse bidder if it was not provided a break-up fee and expense reimbursement.  Arch made this requirement clear from the time it submitted its first proposal for a competitive process, and although the Debtors and the Committee have negotiated with Arch and have been successful in reducing the amount of the Break-Up Fee and Expense Reimbursement, these protections remain a requirement to the Competitive Process.  With regard to the second example discussed in O'Brien, Arch's willingness to propose a significant increase in Class 10 Distribution provided significant value to the Debtors' estates and ensured that the Debtors' businesses will be sold at the maximum possible amount.  The Court should also consider that Arch did not begin their due diligence and did not propose a transaction until after the Petition Date.  Therefore, any value provided to the Debtors because of Arch's efforts should be considered an administrative expense under 11 U.S.C. § 503(b).  See O'Brien, 181 F.3d at 533.

64.    The Competitive Process, the Break-Up Fee and the Expense Reimbursement are the product of extended good faith, arm's-length negotiations between the Debtor, Arch and the Committee.  The Break-Up Fee and Expense Reimbursement are fair and reasonable in amount,

22

particularly in view of Arch's efforts to date, the risk to Arch of being used as a "stalking horse," and the stabilizing effect that the Competitive Process is expected to have on the Debtors' businesses (thereby increasing the likelihood of additional bidding).

65.    In sum, the Break-Up Fee and Expense Reimbursement will enable the Debtors to ensure the sale of equity at a price that the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to their estates.  Thus, the Break-Up Fee and the Expense Reimbursement should be approved.

## Notice

66.    Notice of this Motion has been provided to: (a) counsel for the Lender Group, (b) counsel for Arch, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) counsel to the Creditors' Committee, and (h) all parties on the Master Service List. In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors request that the Court grant the Motion, approve the proposed Competitive Process, and grant such other and further relief as is just and proper.

Dated: May 12, 2008                     COZEN O'CONNOR
                                        By: ___/s/ Jerrold N. Poslusny, Jr.___
                                           Mark E. Felger
                                           Jerrold N. Poslusny, Jr.

                                           Attorneys for the Debtors

## **VERIFICATION**

Steven Grabell of full age, certifies and states as follows:

1.      I am the Chief Executive Officer of Shapes/Arch Holdings L.L.C. and Shapes

L.L.C.[3], and I am fully authorized to make this Verification on all of the Debtors' behalf.

2.      I have read the foregoing Motion and I hereby certify and verify that all of the

statements contained therein are true.

3.      I hereby verify that the foregoing statements made by me are true.  I am aware

that if any of the foregoing statements made by me is willfully false, I am subject to punishment.


_____
Steven Grabell

---

[3] Unless otherwise defined capitalized terms shall have the same meaning ascribed to them in the Motion.