UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES TRUSTEE
ROBERTA A. DeANGELIS
ACTING UNITED STATES TRUSTEE
Donald F. MacMaster, Esquire (DM 0977)
One Newark Center, Suite 2100
Newark, NJ 07102
Telephone: (973) 645-3014
Fax: (973) 645-5993

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| SHAPES/ARCH HOLDINGS, L.L.C., *et al.* | Case No. 08-14631 (GMB) |
| | |
| Debtor(s) | Hearing Date: May 19, 2008 at 2:00 p.m. |

**LIMITED OBJECTION OF THE UNITED STATES TRUSTEE TO PROPOSED BREAK-UP FEE IN CONNECTION WITH THE DEBTORS' VERIFIED MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 1123 AND 1129 AND BANKRUPTCY RULE 2002 FOR AN ORDER APPROVING: (A) THE COMPETITIVE PROCESS FOR THE SALE OF THE REORGANIZED DEBTORS' EQUITY PURSUANT TO THE DEBTORS' SECOND AMENDED PLAN OF REORGANIZATION AND (B) APPROVING A BREAK-UP FEE AND EXPENSE REIMBURSEMENT**

The Acting United States Trustee, by and through counsel, in furtherance of her duties and responsibilities under 28 U.S.C. § 586(a)(3) and (5), hereby respectfully submits this Limited Objection to the Debtors' Verified Motion Pursuant to 11 U.S.C. §§ 105(a), 1123 and 1129 and Bankruptcy Rule 2002 for an Order Approving: (A) the Competitive Process for the Sale of the Reorganized Debtors' Equity Pursuant to the Debtors' Second Amended Plan of Reorganization and (B) Approving a Break-up Fee and Expense Reimbursement (the "Motion")

proposed by the above-captioned debtor s (the "Debtors"). The grounds for this Objection are as follows:

## Background

1. On March 16, 2008, the Debtors filed separate voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have remained in possession of their property and management of their affairs since that date.

2. An official committee of unsecured creditors (the "Committee") was formed by the United States Trustee on or about March 31, 2008.

3. On May 12, 2008, the Debtors filed the Motion, which, among other things, seeks authority to pay Arch Acquisition I, LLC ("Arch") as the stalking horse bidder, a "break-up fee" of $1,000,000 if Arch is not the successful purchaser of the equity interests of the reorganized Debtors. The Motion also seeks allowance an additional expense reimbursement of up to $500,000 to reimburse Arch for its out of pocket fees and expenses.

4. The Motion asserts that the break-up fee and the expense reimbursement should be considered administrative expenses pursuant to section 503(b) of the Bankruptcy Code. Motion at 22.

## The Break-Up Fee and Expense Reimbursement Must Be Scrutinized in Accordance With Third Circuit Law

5. In *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Third Circuit established the

standard that this Court must apply in determining whether to approve a break-up fee and expense reimbursement.  In *O'Brien*, the Third Circuit expressly rejected the application of the "business judgment rule" to the issue of break-up fees in the bankruptcy context.  *Id*. at 535.

6.  Rather than applying the deferential "business judgment rule," the Third Circuit in *O'Brien* held that break-up fees must be treated as administrative expense claims under 11 U.S.C. § 503(b)(1)(A), "which requires that an expense provide some benefit to the debtor's estate."  *Id*. at 536.  Thus, anyone seeking a break-up fee in the Third Circuit bears the significant burden of proving that the break-up fee was "actually necessary to **preserve the value of the estate**."  *Id*. at 535 (emphasis added).

7.  In *O'Brien*, the sale in question resulted in a 100% recovery for unsecured creditors, and was supported by the unsecured creditors' committee.  *Id*. at 529, 536.  Indeed, the *O'Brien* bankruptcy court had noted that the break-up fee would not injure unsecured creditors "who will be paid in full in any event."  *Id*. at 536.  Nevertheless, the Third Circuit affirmed the denial of a break-up fee on the grounds that it did not confer a benefit to the estate.  Thus, there is absolutely no reason to believe that the Third Circuit would approve a break-up fee where, as in the instant case, where unsecured creditors, in all likelihood, will not be paid in full.

8.  In *O'Brien*, the Third Circuit was presented with the familiar litany of arguments imported from non-bankruptcy cases to support the allowance of break-up fees in bankruptcy cases.  For example, the applicant argued that break-up fees serve "to provide a prospective acquirer with some assurance that it will be compensated for the time and expense it has spent in putting together its offer" and to "encourage a prospective bidder to do the due diligence that is

the prerequisite to any bid." *Id*. at 535.  The Third Circuit was unmoved, however, flatly stating in response to these arguments that "[n]ot all of the purposes that break-up fees serve in corporate transactions are permissible in bankruptcy." *Id*.  The Third Circuit did not accept the applicant's suggestion to consider the applicant's interests in determining whether a break-up fee is appropriate.  Instead, the Third Circuit placed the emphasis squarely where it belongs – on the estate to which the debtor in possession owes a fiduciary duty.

9.  The Debtor's arguments in favor of a break-up fee have similarly been rejected by courts and commentators addressing break-up fees in bankruptcy cases.  For example, in *In re America West Airlines, Inc*., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994), the court was presented with the argument that a break-up fee was necessary to induce bidders.  The court rejected this assumption, finding that the company "has been ***thoroughly marketed*** and that the proposed break-up fee will not induce further bidding or bidding generally."  *Id*. at 913 (emphasis added).

10.  In addition, the costs incurred by potential purchasers of the Debtors' equity in performing their due diligence should not be compensable in a chapter 11 case.  As one court has stated:

> The ultimate question becomes, who pays the costs of investigating the potential subject of an auction?  If Debtor agrees to reimburse a bidder or to pay the opportunity cost of bidding, then the creditors are paying these costs.  The goal of a bankruptcy auction, however, is to maximize the return to the estate.  The costs of bidding should be borne by those who are best able to bear them – the bidders who have voluntarily entered the bidding process, and who are bidding for a company with title free and clear of liens and with all the advantages provided by the Bankruptcy Code.

*In re S.N.A. Nut Co.*, 186 B.R. 98, 106 (Bankr. N.D. Ill. 1995).  The *S.N.A. Nut Co.* court also

noted that "the bulk of the costs incident to the initial bid are incurred far in advance of the motion seeking approval of the breakup fee. Those due diligence costs are incurred for the benefit of the bidder, enabling the bidder to make an informed bid, irrespective and independent of the consideration of whether that bid should be an initial bid." *Id*. at 104.

11. The Third Circuit also addressed this argument in *O'Brien*, where the bidder argued that it had performed research in preparing its bid that "increas[ed] the likelihood that the price at which the debtor is sold will reflect its true worth." *O'Brien*, 181 F.3d at 537. According to the Third Circuit, this "ignores the fact that much of the information bidders needed to evaluate O'Brien was gathered by O'Brien itself at its own expense." *Id*. Just as in the instant case, it was the debtor, not the bidder, that had put the company into a "sales configuration mode," and before the bidder emerged as a serious bidder the debtor had solicited bids from other companies. *Id*. at 536.

12. Even if a break-up fee of some amount might be warranted, it is obviously premature for the Court to make a determination of the proper amount at this time. The Debtor appears to acknowledge that the break-up fee and expense reimbursement of up to $1,500,000 is governed by section 503(b) of the Bankruptcy Code. Motion at 22. To receive the break-up fee as a 11 U.S.C. § 503(b) claim, the unsuccessful purchaser will have to disclose its costs and expenses in putting together the bid, and the break-up fee will have to be shown to have conferred a benefit to the estate in some verifiable amount. *Cf. In re America West Airlines, Inc.*, 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) ("the proposed break-up fee does not meet the standard of [11 U.S.C. §] 503 because it is not correlated to any transactional cost or expense incurred by the

negotiating bidder"); *In re Hupp Industries, Inc.*, 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992) (denying break-up fee where "assertion of unforeseen and unspecified liquidated damages . . . is insufficient to establish" that a benefit was conferred on estate). These facts obviously cannot be discerned until *after* a sale to another bidder at a price more beneficial to the estate has been approved by the Court. Just like the bankruptcy court in *O'Brien*, which was ultimately affirmed by the Third Circuit, this Court should hold off consideration of the break-up fee until after the sale.

13. Here, Arch is seeking a break-up fee of $1,000,000, which is not tied in any way to its actual expenses. The second component of the fee, in the amount of $500,000, is tied to Arch's actual costs in becoming the stalking horse bidder. If Arch intends to make an application under section 503(b) for reimbursement of its actual costs if it is not the successful purchaser, with the court ultimately determining the reasonableness of any such request, such a procedure would appear to comply with applicable Third Circuit law.

14. It is not until after the sale that this Court can determine whether the existence of the break-up fee encouraged bidding or chilled bidding. Of course, this Court must guard against any bidding procedure or break-up fee that will chill bidding, because the goal is to obtain the highest possible price for the Debtor's assets. Here, the initial overbid, after accounting for the break-up fee and expense reimbursement, must be $1,950,000 higher than the Arch bid. As one court has stated: "In bankruptcy pre-plan confirmation sales of assets . . . an allowance of [break-up] fees is to be highly scrutinized in view of the uncertainty of dividends, if any, to be received by claimants of the debtor's estate. This concern is of particular relevance as it applies

to the fate of unsecured claimants." *In re Hupp Industries, Inc.*, 140 B.R. 191, 195 (Bankr. N.D. Ohio 1992). Until it can be seen whether a higher and better offer that benefits unsecured creditors is made that could not have been obtained absent the prospective stalking horse bid, there is no way for this Court to complete its scrutiny of the break-up fee.

15. Finally, as the court is aware, Arch is not the initial bidder in these cases. The Debtors contemplated a transaction with Arcus ASI, Inc. ("Arcus"), pursuant to which Arcus was the original plan proponent. After concerns were raised by the Committee, the UST, Arch and at least one other potential purchaser about whether the Arcus transaction was open to competitive bidding, Arch effectively was substituted for Arcus with, among other things, an improved dividend to unsecured creditors and with the sale being subject to higher and better offers. As a result of the failed transaction with Arcus, Arcus received approximately $790,000 from the Debtors' estates to compensate Arcus' professionals, as well as a termination fee for not going forward with the Arcus transaction. Now Arch is seeking fees of potentially $1,500,000 if it is not the successful purchaser. Because the Debtors have already paid one potential purchaser such a significant expense reimbursement, the Debtors' estates should not now be required to bear such expenses a second time.

[SPACE LEFT INTENTIONALLY BLANK]

WHEREFORE, in light of the foregoing the United States Trustee respectfully requests that the Debtors' proposed order approving bidding procedures not be entered, and that this Court grant such further relief as is just.

                          Respectfully submitted,

                          ROBERTA A. DeANGELIS
                          ACTING UNITED STATES TRUSTEE
                          REGION 3

By:   */s/ Donald F. MacMaster*
        Donald F. MacMaster
        Trial Attorney

Dated: May 15, 2008