**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

| | |
|---|---|
| In re: <br> SHAPES/ARCH HOLDINGS L.L.C., <u>et al.</u>, <br> Debtors. | : UNITED STATES BANKRUPTCY COURT <br> : FOR THE DISTRICT OF NEW JERSEY <br> : CHAPTER 11 <br> : <br> : CASE NO. 08-14631 (GMB) <br> : <br> : |

**DEBTORS' MOTION FOR AN ORDER ESTABLISHING DEADLINE
FOR FILING REQUESTS FOR ALLOWANCE OF ADMINISTRATIVE
EXPENSES AND APPROVING NOTICE WITH RESPECT THERETO**

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "<u>Debtors</u>"),[1] the debtors and debtors-in-possession, hereby move (the "<u>Motion</u>") for entry of an order establishing June 30, 2008, as the deadline for parties to file requests for allowance of administrative expenses incurred prior to June 15, 2008, and to approving notice with respect thereto. In support of the Motion the Debtors represent as follows:

**Background**

1. On March 16, 2008 (the "<u>Petition Date</u>"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("<u>Shapes/Arch</u>"), the following entities, all of which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("<u>Shapes</u>"); Delair L.L.C. ("<u>Delair</u>"); Accu-Weld L.L.C. ("<u>Accu-Weld</u>"); and Ultra L.L.C. ("<u>Ultra</u>").

2. These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. No trustee or examiner has been appointed in these cases.

5. An official committee of unsecured creditors (the "Committee") was appointed on March 31, 2008, and has been active in these cases since that time.

6. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

A. **Background of Debtors' Business Operations**

7. Shapes/Arch is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra. The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows. By 1959, the business had expanded and began focusing on producing aluminum extrusions. The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines. On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue. The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

8. Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety

of industries, including road and rail transportation and commercial and residential construction. Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

9. In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

10. Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

11. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

12. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

13. Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

14. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

15. Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

16. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

17. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

18. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement").  The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Financial Corporation (the "Lender Group").

B. **The Debtors' Pre-petition Financing**

19. Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), a term loan, and letters of credit.  The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses.  The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

5

20. As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

21. As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

22. The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

23. With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors were struggling to fund their operations under

6

their existing lending arrangement and found themselves in a situation in which they could not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

24. Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

25. Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

26. The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presented a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

27. With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

C.      **Versa Capital Management**

28.     In late January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

29.     Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

30.     In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of the agreement, Arcus was to become a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC would retain 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions including, obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors

(and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

**D.     The Debtors' Bankruptcy Filing**

31.     In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

32.     Contemporaneously with the filing of the bankruptcy petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provided, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims (the "Arcus Plan").

33.     The Arcus Plan reflected a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of more than $25 million.

34.     The Debtors worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that would present an opportunity to maximize a return

9

for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses would remain viable so that the Debtors could continue to be one of South Jersey's largest employers for the foreseeable future.

35. At the first day hearing in these cases, this Court entered thirteen (13) Orders granting first day motions on an interim or final basis, including interim orders approving debtor-in-possession financing from the Lender Group and Arcus (the "Arcus DIP Loan").

### E. Arch Provides DIP Financing and Sale Proposals on Better Terms

36. Approximately two weeks after the Petition Date, on or about April 1, 2008, Arch, an affiliate of Signature Aluminum and H.I.G. Capital Partners, filed an objection to the Debtors' financing motion in which it expressed an interest in providing an alternative financing arrangement on better terms and participating in a sale process pursuant to 11 U.S.C. § 363 or through a revised plan. As further evidence of its commitment to an open and competitive sales process, Arch provided the Debtors and the Committee with, *inter alia*, a Debtor-in-Possession Financing Agreement on better terms than the Arcus DIP Loan, a proposed Order approving such financing from Arch, and an asset purchase agreement providing for a purchase price in excess of the value provided by Arcus in the Arcus Plan. Upon the request of the Committee, Arch converted their asset purchase agreement to a plan of reorganization on better terms than the Arcus Plan, including but not limited to a pool of funds for general unsecured creditors of $5,000,000 (the "Class 10 Distribution") (as opposed to the $500,000 unsecured pool provided in the Arcus Plan).

37. On May 1, 2008, after Arch completed its due diligence, and after extensive discovery propounded by the Committee and Arcus and several days of depositions of the

10

parties, Arch provided the Debtors with commitment letters for financing the alternative transaction and the Lender Group advised the Debtors that it would continue funding the Debtors' operations if Arch replaced Arcus. Arch's alternative DIP financing package and the alternative plan (the "Arch Alternative Proposal") was now free of any due diligence contingencies and any financing contingencies with respect to the debtor-in-possession financing and the exit financing under the alternative plan; provided for the Lender Group's continued funding under its debtor-in-possession revolver facility; included more favorable (less restrictive) covenants and lower interest and fees; provided a higher return for unsecured creditors; and included a full and open competitive process, thereby maximizing the value of the Debtors' estates.

38. Upon becoming aware that Arch had financing commitments and CIT's agreement to continue funding under its DIP revolver, the Debtors determined that the Arch Alternative Proposal was higher and better than the Arcus Plan. The Debtors then advised Arcus that the Debtors were not prepared to proceed with the hearing on the Arcus Plan's disclosure statement and that the Debtors believed it was in the best interests of the estates to proceed with the Arch Alternative Proposal.

39. After intense negotiations between and among the Debtors, the Committee, Arcus, the Lender Group, and Arch in the Courthouse on May 1, 2008, including a Chambers conference with the Court, the parties reached an agreement whereby, among other things, Arcus would assign to Arch its rights under the Arcus DIP Loan and Arch would become the plan sponsor under an amended plan (in form substantially similar to the Arch Plan) to be filed by May 12, 2008 (the "Amended Plan").

11

40.     The Debtors' decision to proceed with the Arch Alternative Proposal was announced to the Court late in the day on May 1, 2008 and the parties agreed to submit final orders approving the debtor-in-possession financing and the settlement among the parties.

41.     On May 6, 2008, the Court entered Orders, *inter alia*, granting final approval of the debtor in possession financing from the Lender Group and Arch, as assignee of the Arcus DIP Loan (the "Final DIP Orders").  Among other things, the Final DIP Order (with respect to Arch) approved the assignment of the Arcus DIP Loan to Arch and the Amended and Restated Debtor-in-Possession Term Loan Financing Agreement entered into by and between Arch and the Debtors, dated May 6, 2008 (the "Arch Amended DIP Agreement").  The Arch Amended DIP Agreement provides, inter alia, that Arch's obligations are conditioned upon the approval of a competitive process set forth on Exhibit C to the DIP Loan Agreement.

## Relief Requested

42.     By this Motion, the Debtors request that the Court:  (a) establish June 30, 2008 (the "Administrative Expense Bar Date") as the last date and time by which all persons or entities ("Administrative Creditors") must file requests for allowance of administrative expenses pursuant to 11 U.S.C. § 503(b), except for those included under 11 U.S.C. § 503(b)(2) (the "Administrative Expenses") incurred by the Debtors prior to June 15, 2008,[2] and (b) approve the form of notice of the Administrative Expense Bar Date attached as Exhibit "A" (the "Notice"); and (c) authorize the Debtors to serve the Notice on all known Administrative Creditors, all parties who have filed pending requests for allowance of an Administrative Expense, and all parties having requested notice pursuant to Bankruptcy Rule 2002.

---

[2] The relief requested in this Motion specifically includes any alleged Administrative Expenses pursuant to 11 U.S.C. § 503(b)(9).

12

43. The Debtors request that each person or entity that asserts an Administrative Expense against the Debtors that arises prior to June 15, 2008, must file with the Court and serve on the Debtors' attorneys, a Request for Payment of Administrative Expenses on or before the Administrative Expense Bar Date or forever be barred from asserting claims for such Administrative Expenses.

**Basis for Relief**

44. Section 105(a) of the Bankruptcy Code provides in part: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105 essentially codifies the Bankruptcy Court's inherent equitable powers. See In re Allegheny Int'l Inc., 118 B.R. 276, 302 (Bankr. W.D.Pa. 1990) (court's equitable power derived from section 105 constitutes "extremely broad grant of authority"), Browning v. Navarro, 37 B.R. 201, 208 (N.D.Tex. 1983) ("Through section 105(a), Congress grants the bankruptcy court sweeping authority to tailor its orders to meet the needs of bankruptcy proceedings."), rev'd on other grounds, 743 F.2d 1069, 1084 (5th Cir. 1984).

45. The Debtors submit that setting a deadline for the filing of Administrative Expenses and approving the form and extent of the Notice will provide adequate notice of the Administrative Expense Bar Date to persons or entities who assert or may assert Administrative Expenses, while enabling the Debtors, the Committee, Arch and other parties in interest to receive, review and evaluate Administrative Expenses in a timely and efficient manner prior to the confirmation hearing to consider the Amended Plan, which is scheduled for July 8, 2008 (the "Confirmation Hearing"). Moreover, knowing the amount of alleged Administrative Expenses

13

through June 15, 2008, in advance of the Confirmation Hearing will assist the Debtors and other parties in interest in determining whether the Amended Plan is feasible.

46. The Debtors note that they have remained current with known obligations since the Petition Date. The Administrative Expense Bar Date will apprise them of potential Administrative Creditors of which they are not aware, or which they believe may not be due, and will assist the Debtors and other parties in interest in determining which alleged Administrative Expenses might be objectionable.

47. Therefore, the Debtors submit that it is appropriate to establish June 30, 2008 as the Administrative Expense Bar Date for all Administrative Expenses incurred on or prior to June 15, 2008.

48. The Debtors further request approval of the Notice, substantially in the form of Notice attached hereto as <u>Exhibit "A"</u>, and request Court authority to mail it to: (a) all creditors identified by the Debtors as potentially being Administrative Creditors; (b) all parties who have filed pending requests for allowance and/or payment of Administrative Expenses, and (c) all parties having filed a request for Notice pursuant to Bankruptcy Rule 2002.

## **Notice**

49. Notice of this Motion has been provided to: (a) counsel for the Lender Group, (b) counsel for Arch, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) counsel to the Creditors' Committee, and (h) all parties on the Master Service List. In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court grant the Motion, and such other and further relief as is just and proper.

Dated: May 19, 2008						COZEN O'CONNOR

								By:	*/s/ Jerrold N. Poslusny, Jr.*
									Mark E. Felger
									Jerrold N. Poslusny, Jr.

									Attorneys for the Debtors

# EXHIBIT "A"

CHERRY_HILL\444317\1 220718.000

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| **MARK E. FELGER (MF9985)**<br>**JERROLD N. POSLUSNY (JP7140)**<br>**COZEN O'CONNOR**<br>LibertyView, Suite 300<br>457 Haddonfield Road<br>Cherry Hill, NJ  08002<br>(856) 910-5000<br>Attorneys for the Debtors | |
| In re:<br><br>SHAPES/ARCH HOLDINGS L.L.C., <u>et al.</u>,<br><br>Debtors. | Case No. 08-14631(GMB)<br>(Jointly Administered)<br><br>Judge: Gloria M. Burns<br><br>Chapter:  11 |

## NOTICE OF DEADLINE TO FILE REQUESTS FOR ALLOWANCE OF <u>ADMINISTRATIVE EXPENSE INCURRED PRIOR TO JUNE 15, 2008</u>

TO: ALL PERSONS OR ENTITIES ASSERTING ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS

Please take notice that the Bankruptcy Court for the District of New Jersey has entered an Order in the above-captioned cases (the "<u>Administrative Expense Bar Date Order</u>") establishing **June 30, 2008**, as the administrative expense bar date (the "<u>Administrative Expense Bar Date</u>"). Except as described below, the Administrative Expense Bar Date Order requires that any claims against the Debtors, **arising on or prior to June 15, 2008**, must be filed by submitting a request for administrative expense (the "<u>Administrative Expense Claim Request</u>") with the Debtors' claims agent, Epiq Bankruptcy Solutions, LLC ("Epiq"), Grand Central Station, P.O. Box 4601, New York, NY  10163-4601 (for regular mail) or 757 Third Avenue, Third Floor, New York, NY 10017 (for overnight mail), so that such Administrative Expense Claim Request is actually received on or before the Administrative Expense Bar Date.

An Administrative Expense Claim Request is deemed filed only when it is actually received by Epiq and facsimile submissions will not be accepted.  Form Administrative Expense Claim Request is attached hereto.  A copy of the Administrative Expense Claim Request must also be served upon the Debtors' counsel at the following address: Cozen O'Connor, LibertyView, Suite 300, 457 Haddonfield Road, Cherry Hill, NJ,  08002, Attn: Jerrold N. Poslusny, Jr., Esq.

**Epiq may be contacted at (866) 890-1550 if there are questions with respect to this Notice.**

Pursuant to the Administrative Expense Bar Date Order, all persons or entities who assert any Administrative Expense allowable under 11 U.S.C. §503, except for claims arising under §503(b)(2), arising on or prior to June 15, 2008, must file with the Bankruptcy Court and serve an Administrative Expense Claim Request for allowance of an Administrative Expenses.

Any person or entity that is required to but fails to file and serve an Administrative Expense Claim Request in accordance with the Administrative Expense Bar Date Order on or before the Administrative Expense Bar Date shall be forever barred and estopped and enjoined from asserting an Administrative Expense Claim against the Debtors or the Debtors' Estates.

Each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, and trust) that asserts an Administrative Expense against the Debtors that arose on or prior to June 15, 2008, must file with the Bankruptcy Court and serve on the Debtors a request for payment of Administrative Expenses on or before June 30, 2008, the Administrative Expense Bar Date or forever be barred from asserting claims for such Administrative Expenses.

Dated: March 19, 2008                    COZEN O'CONNOR


                                         By:    /s/ Jerrold N. Poslusny, Jr.
                                             Mark E. Felger
                                             Jerrold N. Poslusny, Jr.

                                             Attorneys for the Debtors

| **Debtor** | **Address** | **Case No.** |
|---|---|---|
| Shapes/Arch Holdings L.L.C. | 9000 River Road<br>Delair, NJ  08110 | 08-14631(GMB) |
| Shapes L.L.C. | 9000 River Road<br>Delair, NJ  08110 | 08-14632(GMB) |
| Ultra L.L.C. | 1777 Hylton Rd.<br>Pennsauken, NJ  08110 | 08-14633(GMB) |
| Delair L.L.C. | 8600 River Road<br>Delair, NJ  08110 | 08-14634(GMB) |
| Accu-Weld L.L.C. | 1211 Ford Rd.<br>Bensalem, PA  19020 | 08-14635 (GMB) |

| UNITED STATES BANKRUPTCY COURT DISTRICT OF NEW JERSEY | | **REQUEST FOR PAYMENT OF ADMINISTRATIVE EXPENSE** |
|---|---|---|
| In re | Chapter 11 Case Number | |

NOTE: This form should not be used for an unsecured claim arising prior to the commencement of the case. In such cases, a proof of claim should be filed in accordance with Official Form 10.

| Name of Creditor (The person or other entity to whom the debtor owed money or property.) _____ Name and Addresses Where Notices Should Be Sent: | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. ☐ Check box if you have never received any notices from the bankruptcy court in this case. ☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|
| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this request: ☐ replaces a previously filed request, dated: ☐ amends a previously filed request, dated: | |

| 1. BASIS FOR CLAIM ☐ Goods Sold ☐ Services performed ☐ Money loaned ☐ Personal injury/wrongful death ☐ Taxes ☐ Other (Describe briefly) | ☐ Retiree benefits as defined in 11 U.S.C. §1114(a) ☐ Wages, salaries and compensations (Fill out below) Provide last four digits of your social security number _____ |
|---|---|

2. DATE DEBT WAS INCURRED:

3. TOTAL AMOUNT OF REQUEST AS OF ABOVE DATE: _____

☐ Check this box if the request includes interest or other charges in addition to the principal amount of the request. Attach itemized statement of all interest or additional charges.

| 4. Secured Claim ☐ Check this box if your claim is secured by collateral (including a right of setoff). Brief Description of Collateral: ☐ Real Estate    ☐ Motor Vehicle ☐ Other (Describe briefly)_____ Value of Collateral: $_____ ☐ Check this box if there is no collateral or lien securing your claim. | |
|---|---|
| 5. **Credits**: The amount of all payments have been credited and deducted for the purposes of making this request for payment of administrative expenses. | THIS SPACE IS FOR COURT USE ONLY |
| 6. **Supporting Documents**: *Attach copies of supporting documents*, such as purchase orders, invoices, itemized statements of running accounts, contracts as well as any evidence of perfection of a lien.    DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. | |
| 7. **Date-Stamped Copy**: To receive an acknowledgment of the filing of your request, enclose a self-addressed envelope and copy of this request. | |
| **Date:** | **Sign and print below the name and title, if any, of the creditor or other person authorized to file this request (attach copy of power of attorney, if any).** _____ |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

NOTE: The filing of this request will not result in the scheduling of a hearing to consider payment of your administrative claim but will result in the registry of your administrative claim with the Bankruptcy Court. If you wish to have a hearing scheduled on your claim, you must file a motion in accordance with Bankruptcy Rule 9013.

*Local Form 24, new. 8/1/06.jml*