**BROWN & CONNERY, LLP**
Joseph M. Garemore (JG 5790)
6 North Broad Street, Suite 100
Woodbury, NJ 08096
(856) 812-8900
(856) 853-9933
*Attorneys for Pollution Control Financing*
*Authority of Camden County*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE:<br><br>SHAPES/ARCH HOLDINGS, LLC, et al,<br><br>Debtors. | CHAPTER 11<br><br>Case No. 08-14631 (GMB)<br><br>Jointly Administered |

**OBJECTION BY POLLUTION CONTROL FINANCING AUTHORITY OF CAMDEN COUNTY TO DEBTORS' JOINT DISCLOSURE STATEMENT FOR THE DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**

**PLEASE TAKE NOTICE** that Pollution Control Financing Authority of Camden County (the "Authority") hereby files its objection to the Debtors' Joint Disclosure Statement for the Debtors' Second Amended Joint Plan of Reorganization, and in support of its Objection, states the following:

**BACKGROUND**

1. The Authority is a public body corporate and politic and a political subdivision of the State pursuant to N.J.S.A. 40:37C-4.

2. The Authority is a successor in interest to the Pennsauken Solid Waste Management Authority and it owns and operates the Pennsauken Sanitary Landfill (the "Landfill") located at 9600 River Road, Pennsauken, New Jersey.

3. According to their schedules and other filings, Shapes, LLC and/or its co-debtors Delair LLC and Ultra LLC (each a "Neighboring Debtor" and collectively with

1

Shapes/Arch Holdings, LLC and Accu-Weld, LLC the "Debtors") owned and operated plants located adjacent to the Landfill at which the Neighboring Debtors manufactured a variety of products and utilized a variety of environmental pollutants in their industrial operations over several decades.[1] As noted in their schedules Shapes, LLC's plant is located at 9000 River Road, Delair (Pennsauken), New Jersey; Delair LLC's plant is located at 8600 River Road, Delair (Pennsauken), New Jersey; and Ultra, LLC's plant is located at 1777 Hylton Road, Pennsauken, New Jersey.

4.      As noted in Schedule 4.5 to the Debtors' proposed joint plan, "Aluminum Shapes"[2] is a party to a Memorandum of Agreement dated June 23, 1993, as amended in July 2007, pertaining to chromium contamination at the 9000 River Road, Pennsauken New Jersey site (the "MOA"). Pursuant to the 1993 MOA Aluminum Shapes agreed to submit a remedial action workplan and a remedial investigation report to the New Jersey Department of Environmental Protection (the "NJDEP") in connection with chromium contamination in groundwater at the Aluminum Shapes site at 9000 River Road, Pennsauken New Jersey.

5.      As a result of its investigation at the site, Roux Associates, Inc., environmental consultants for Aluminum Shapes, has confirmed that a groundwater divide exists in the center of the Aluminum Shapes facility. West of the divide, groundwater flows to the west/ northwest. East of the divide, groundwater flows southeast (i.e., towards the adjacent Landfill).

6.      As a result of the groundwater flow in a southeast direction, contaminants detected by the monitoring wells at the Landfill register the groundwater impact caused by Aluminum Shapes' onsite activities.

---

[1]    Information gleaned from the Debtors' schedules and that developed at Debtors' first meeting of creditors pursuant to 11 U.S.C. §341(a) regarding the relationship between Aluminum Shapes, the defendant in the Litigation (defined below) and the present Debtors and their parents is less than consistent. Absent its receipt of competent evidence to the contrary the Authority intends to prosecute claims in each of these administratively consolidated cases.

[2]    See footnote 1.

2

7. In addition, Aluminum Shapes has been identified as a generator of wastes disposed of at the Landfill.

8. On or about December 8, 1988, an Administrative Consent Order (the "ACO") was executed by the New Jersey Department of Environmental Protection (the "NJDEP") and the Pennsauken Solid Waste Management Authority regarding the remedial investigation and cleanup of the Landfill.

9. Pursuant to the terms and conditions of the ACO, the Pennsauken Solid Waste Management Authority agreed to perform testing and cleanup activities with respect to the Landfill.

10. In or about August, 1991, the Authority became the successor in interest to the Pennsauken Solid Waste Management Authority for purposes of the Landfill and the ACO. The Authority has conducted investigation and remediation work at the Landfill under the ACO since that time.

11. Under New Jersey statutory and common law, including but not limited to N.J.S.A. 58:10-23.11et seq. (the "New Jersey Spill Act"), the Authority has the right to pursue money damages from any person, including but not limited to, all individuals, entities, companies, institutions, and municipalities that discharged a hazardous substance, or that are in any way responsible for any hazardous substances at the Landfill. Under the New Jersey Spill Act and other applicable law, all responsible parties are jointly and severally liable.

12. The Authority is one of the plaintiffs in an action titled Pennsauken Solid Waste Management Authority et al v. James D. Morrisey, Inc. et al., in the Superior Court of New Jersey, Camden County, Law Division, Docket No.CAM-L-13345-91 (the "Litigation").

13. Aluminum Shapes is one of the defendants named in the complaint in the Litigation.

14. The Litigation has been given a trial date of September 2, 2008.

**THE BANKRUPTCY**

15. On March 14, 2008, the Debtors filed voluntary chapter 11 petitions in this Court. By Order dated March 18, 2008 the cases were ordered to be jointly administered under case number 08-14631.

16. On the petition date Debtors filed a joint chapter 11 plan and a joint disclosure statement.

17. In short order, Debtors secured an April 17, 2008 hearing date on the adequacy of the disclosure statement, and also secured an order setting a May 15, 2008 bar date for the filing of claims against the Debtors.

18. On April 14, 2008 the Authority filed its objection to the Debtors' initial disclosure statement, and attended two lengthy hearings, on April 17, 2008 and May 1, 2008, at which none of their substantive objections were addressed by the Debtors.

19. This lack of progress is especially troublesome as the Court, in a colloquy at the close of the April 17th hearing, specifically expressed some of the same concerns as those which had been raised by the Authority and by other interested creditors who are parties to the Litigation. Several of those objections are repeated herein.

20. While the Authority understands that much of the Debtors' focus at the prior hearings was directed towards issues of financing and battles relating to the <u>de facto</u> control of the Debtors by their prepetition investor/lender, at this juncture the Debtors need to address the substantive objections by the Authority and many other interested creditors who are parties to the Litigation.

**LEGAL ARGUMENT**

21. A disclosure statement must be approved by the Court before it can be used to solicit votes for the plan. 11 U.S.C. § 1125(b). The Court may not approve a disclosure

4

statement unless it finds that the disclosure statement contains adequate information. 11 U.S.C. § 1125(b). The Bankruptcy Code defines "adequate information" as follows:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan....

11 U.S.C. § 1125(a)(1).

22. Bankruptcy Code §1125(a)(1) does not specifically describe what constitutes "adequate information." The legislative history reflects that "precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis." H.R. Rep. No. 595, 95th Cong., 1st Sess. 408 (1977).

23. A disclosure statement must contain "adequate information" so that impaired creditors can make rational decisions as to the risks and benefits of the proposed plan. See, e.g., In re Phoenix Petroleum Co., 278 B.R. 385, 392-93 (Bankr. E.D. Pa. 2001); In re Cardinal Congregate I, 121 B.R. 760, 765 (Bankr. S.D. Ohio 1990).

24. In considering disclosure statements, courts have developed a list of criteria to consider, including: (1) the circumstances leading to the filing of the chapter 11 petition; (2) a description of available assets and their value; (3) the debtor's business future; (4) the source of information contained in the disclosure statement; (5) a disclaimer; (6) the condition of the debtor while in chapter 11; (7) scheduled claims; (8) the estimated return to creditors under a chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the debtor's future management; (11) the chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including professional fees; (13) whether accounts receivable may be collected; (14) financial information, data, evaluations or projections relevant to a creditor's decision to accept or reject the plan; (15) information relevant to the risk to creditors under the plan; (16)

5

projected preference recoveries; (17) non-bankruptcy litigation; (18) tax attributes of the debtor; and (19) the relationship of the debtor with its affiliates. See Phoenix Petroleum, 278 B.R. at 393; Cardinal Congregate I, 121 B.R. at 765; In re Scioto Valley Mortgage, 88 B.R. 168 (Bankr. S.D. Ohio 1988); In re Metrocraft Publishing Servs., Inc., 39 B.R. 567 (Bankr. N.D. Ga. 1984).

25. The required level of disclosure generally is dependent on the size, complexity and nature of the chapter 11 case; in a large complex case (such as the case at bar) substantial disclosures in the above categories (and perhaps others) will often be mandated. Phoenix Petroleum, 278 B.R. at 393; In re Monroe Well Service, Inc., 80 B.R. 324, 330 (Bankr. E.D.Pa. 1987).

26. As detailed below, the Debtors' disclosure statement omits material information necessary to any creditor's assessment of what the plan proposes to pay. Moreover, as detailed below, the plan may not be confirmable as proposed. Under these circumstances, approval of the disclosure statement should be denied.

**I.     The Disclosure Statement Provides Insufficient Information Regarding Intended Claim Objections.**

27. Local Bankruptcy Rule 3016-2(a) requires the plan proponent to "review all claims prior to filing a disclosure statement." Local Bankruptcy Rule 3016-2(b) requires that the disclosure statement "state the number and amount of claims of each class to which the proponent intends to object." See In re Congoleum Corp., 362 B.R. 198, 203 (Bankr. D.N.J. 2007).

28. The Debtors' filing of the second amended joint plan prior to the claims deadline renders L.B.R. 3016-2(a) a practical nullity.

29. Nowhere in the disclosure statement do the Debtors indicate the number or amount of claims of each class to which they intend to object, in violation of L.B.R. 3016-2(b).

6

These deficiencies may perhaps relate to the haste[3] with which the Debtors seek to present their disclosure statement and plan to the Court.

**II.     The Disclosure Statement Contains Inadequate Information Regarding Insurance.**

30.     The disclosure statement contains insufficient information regarding the Debtors' insurance that may be available to satisfy claims of creditors in accordance with the plan. The plan purports to fix all of the Debtors' various environmental liabilities, described in schedule 4.5 to the plan and consisting of several Superfund sites and state environmental lawsuits (including the Litigation), at $350,000[4] and asserts that all payments will be funded by insurance. Yet the Debtors provide no information about the ***amount*** of insurance available to pay these claims.

31.     The Debtors proposed the plan; thus they should be required to identify the source of funds for a class of claims under the plan. See Phoenix Petroleum, 278 B.R. at 393 (criteria 14). Despite requests, the Debtors have failed to provide the necessary information so that creditors and investors can evaluate the proposed plan.

32.     At a minimum, the disclosure statement should include the following information pertaining to each of the Debtors' insurance policies: name of insurance company; name of insured, policy number, policy type, applicable limits, available and remaining coverage; and whether the policy contains an absolute pollution exclusion.

---

[3] The Authority notes that the disclosure statement contains references which appear to relate to prior drafts of that document. See, e.g., page 6, footnote 4 (footnote refers to class 5 unsecured claims, which are now in class 10). The Authority assumes that such errors are clerical in nature and will be corrected, but reserves all rights if that is not the case.

[4] The Debtors' treatment of environmental claims in this case rests on two faulty assumptions: (1) that the United States EPA and the New Jersey DEP are the only "true creditors" with environmental claims; and (2) that those claims are worth, in the aggregate, $350,000. Reasoning from those faulty premises, the Debtors would relegate all claims "related to environmental claims" that exceed the paltry $350,000 cap into class 10 as general unsecured claims.

### III. The Disclosure Statement Fails to Accurately Quantify the Extent of Environmental Liability.

33. The disclosure statement and plan would limit all of Debtors' liabilities under multiple disclosed environmental cases and administrative proceedings to a sum total of $350,000 in insurance funds, none of which would come from the Debtors.

34. The disclosure statement provides not one shred of information explaining how the Debtors' environmental liabilities are calculated.

35. The New Jersey Department of Environmental Protection recently filed a proof of claim in excess of $7 million related to natural resource damages at one of the Debtors' sites, and the Authority recently filed claims against the Debtors in excess of $77 million related to the Litigation. Thus it is fair to question the accuracy of Debtors' projections of environmental liability.

36. It is submitted that neither this Court nor the creditors can accept Debtors' estimate at face value, and that such ipse dixit statements are inadequate disclosures. See Phoenix Petroleum, 278 B.R. at 393 (criteria (4) and (14)). The United States Supreme Court in Midlantic Nat'l Bank v. New Jersey Department of Environmental Protection, et al, 474 U.S. 494 (1986) held that a trustee cannot abandon estate property in contravention of state laws protecting public health and safety from "identified hazards." Midlantic, 474 U.S. at 507 (footnote omitted). The Debtors are debtors in possession and their efforts to relegate their combined obligations under: (a) the MOA; (b) the Litigation; and (c) all other environmental claims to $350,000 of insurance company money are tantamount to an abrogation of responsibility forbidden under Midlantic.

### IV. Debtors' Liabilities Under the MOA May Not Be Subject to Discharge.

37. In In re Torwico Electronics, Inc., 8 F.3d 146 (3d Cir. 1993), the Third Circuit Court of Appeals held that an order requiring ongoing cleanup of an environmental hazard was not a claim that is subject to discharge.

38. To the extent that there are substantive differences between the Debtors' various environmental obligations under the MOA and otherwise, Debtors' blanket allocation of plan funds to ongoing cleanups of environmental hazards to which it contributed must be independent of its responsibilities under the MOA, not lumped together.

### V. **The Disclosure Statement Fails to Clearly Disclose Whether It Purports to Bar Future Suits Seeking Insurance Proceeds.**

39. While section 11.11 of the proposed plan provides that the plan "shall not diminish or impair the enforceability of any insurance policy…" sections 11.9 and 11.10 of the proposed plan would broadly bar the assertion of any claims against the reorganized debtors (or affiliates) after the effective date. The disclosure statement and plan should permit, in plain language, nominal post-discharge claims against the Debtors solely for the purpose of collecting on any available insurance. See First Fidelity Bank v. McAteer, 985 F.2d 114, 118 (3d Cir. 1993) ("the protection from liability afforded under the Code does not affect the liability of the debtor's insurers."). Thus the disclosure statement lacks clarity on this important issue.

### VI. **Debtors Impermissibly Seek To Enjoin Future Claims.**

40. Section 11.10 of the plan, entitled "Confirmation Injunction" provides that after the confirmation date "all Persons or Entities who held, hold, or may hold any claim against or Interest in the Debtors are… permanently enjoined from [any suits or actions against the Debtors or others].

41. A plan provision that purports to bar future claims is inconsistent with Third Circuit precedent, see Matter of M. Frenville, Co., Inc., 744 F.2d 332, 337-38 (3d Cir. 1985); see also Bankruptcy Code §1141(d)(1)(A)(confirmation of plan discharges "any debt that arose before the date of such confirmation…"). Such a plan cannot be confirmed.

**VII.     Debtors Impermissibly Seek To Enjoin Claims Against Third Parties.**

42.     Section 11.10 of the plan further provides that the confirmation injunction applies, not only to claims against the Debtors and their property, but to claims against

> any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities and all of their respective direct and indirect parents, subsidiaries and affiliates, or any property of any of the foregoing (collectively, the "Protected Parties")

43.     The Third Circuit Court of Appeals in In re Combustion Engineering, Inc., 391 F.3d 190 (3d Cir. 2004) held that a Bankruptcy Code §105(a) injunction modeled after the asbestos channeling injunction provided for in Bankruptcy Code §524(g) cannot extend injunctive relief to non-debtors. Id. at 234. See also In re Congoleum Corp., 362 B.R. 198, 202 (Bankr. D.N.J. 2007)(plan filed by insurer, which sought to enjoin claims against it, violates holding of Combustion Engineering and renders plan "unconfirmable as a matter of law").

44.     The case at bar is not an asbestos case, and Combustion Engineering teaches that Bankruptcy Code §105(a) cannot be invoked to allow the discharge of third party claims. See also Bankruptcy Code §524(e)("… discharge of a debt of the debtor does not affect the liability of any other entity on… such debt").

**VIII.     The Disclosure Statement Improperly Designates Classes of Claims as Impaired in Violation of Bankruptcy Code §1124.**

45.     Bankruptcy Code §1124 provides that a class of claims or interests is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." Based on the description of such claims and their treatment in the disclosure statement, it is submitted that Class 5, 6, and 7, all of which are secured claims being paid in full, are at best artificially impaired classes. See, e.g. In re PTI Enterprises (U.S.), Inc., 324 F. 3d. 197, 206-07 (3d Cir 2003); Combustion

10

Engineering, 391 F.3d at 243. Such a plan cannot be confirmed, see In re Curtis Center Ltd. Partnership, 195 B.R. 631, 643 (Bankr.E.D.Pa. 1996).

### IX. The Disclosure Statement Attempts to Gerrymander Classes of Claims to Achieve Cramdown Confirmation.

46. The summary of distributions contained on page 6 of the disclosure statement reveals the creation of a class of claims (secured claims of warehousemen and shippers) worth approximately $150,000.

47. It is submitted that a $150,000 class of claims lacks sufficient weightiness to merit a separate voice in these consolidated, complex chapter 11 cases, and that such a class is designed merely to serve as a path towards a cramdown confirmation. See John Hancock Mut. Life Ins. Co. v. Route 37 Business Park Assoc., 987 F.2d 154, 159 (3d Cir. 1993).

### X. Debtors' Plan is Not Proposed in Good Faith and Therefore Cannot Be Confirmed.

48. In the case at bar, the plan cannot be confirmed because of: (1) violation of L.B.R. 3016-2(a); (2) the attempted extension of the confirmation injunction to future claims; (3) the attempted extension of the confirmation injunction to third parties; (4) artificial impairment of claims; and (5) gerrymandered classes of claims. These efforts implicate the Debtors' good faith and therefore the feasibility of the plan under Bankruptcy Code §1129(a)(3). Where a plan is patently unconfirmable, courts will not approve a disclosure statement. See In re Phoenix Petroleum Co., 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001); In re Monroe Well Service, Inc., 80 B.R. 324, 332-33 (Bankr. E.D.Pa. 1987).

### RESERVATION

49. The Authority reserves the right to file amended or supplemental objections as information becomes available to it, and reserves the right to join other objections that may be filed. The Authority also reserves the right to object to the plan, for the same reasons asserted herein or for other reasons, should the disclosure statement be approved.

WHEREFORE, the Pollution Control Financing Authority of Camden County submits that the Debtors' joint disclosure statement supporting its second amended joint plan of reorganization be disapproved.

                                              **BROWN & CONNERY, LLP**
Attorneys for Pollution Control Financing
Authority of Camden County

Dated: May 21, 2008        By: /s/ Joseph M. Garemore
                                         Joseph M. Garemore