**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

|  |  |
|---|---|
| | : UNITED STATES BANKRUPTCY COURT |
| | FOR THE DISTRICT OF NEW JERSEY |
| In re: | : |
| | CHAPTER 11 |
| SHAPES/ARCH HOLDINGS L.L.C., <u>et</u> <u>al.</u>, | : |
| | : |
| Debtors. | : CASE NO. 08-14631 (GMB) |
| | : |

## JOINT DISCLOSURE STATEMENT FOR THE DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION

PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS' THIRD AMENDED PLAN OF REORGANIZATION. THE DEBTORS BELIEVE THAT THEIR PLAN OF REORGANIZATION IS IN THE BEST INTERESTS OF CREDITORS AND THAT THE PLAN IS FAIR AND EQUITABLE. THE DEBTORS URGE THAT CREDITORS VOTE TO ACCEPT THE PLAN.

Dated: May 23, 2008

## TABLE OF CONTENTS

**PAGE**

I.      INTRODUCTION AND SUMMARY ..................................................................3
    A.      Disclosure Statement Enclosures .................................................3
    B.      Only Impaired Classes Vote .........................................................4
    C.      Confirmation Hearing ...................................................................5
II.     OVERVIEW OF THE PLAN .........................................................................5
    A.      Introduction ..................................................................................5
    B.      Summary of Distributions .............................................................6
III.    OVERVIEW OF CHAPTER 11 ....................................................................7
IV.     DESCRIPTION OF THE DEBTORS' BUSINESS .............................................8
    A.      The Debtors ..................................................................................8
    B.      The Pre-Petition Capital Structure ...............................................9
    C.      Events Leading to Chapter 11 Filing ..........................................10
V.      THE FILING ..........................................................................................12
    A.      Significant "First Day" Motions ................................................12
    B.      Formation and Participation of Committee..................................13
    C.      Arch's Replacement of Arcus ....................................................13
    D.      Competitive Process....................................................................14
    E.      DIP Financing and Use of Cash Collateral ................................15
    F.      Claims Process ...........................................................................16
VI.     DESCRIPTION OF SIGNIFICANT LITIGATION ...........................................16
    A.      Preferences, Fraudulent Transfers and Other Avoidance Actions........................16
    B.      Other Causes of Action ..............................................................17
    C.      Claims Concerning the Environmental Protection Agency and Other
        Environmental Claims. ...............................................................19
VII.    SUMMARY OF PLAN PROVISIONS ...........................................................26
    A.      Introduction ................................................................................26
    B.      Method of Classification of Claims and Interests and General Provisions...........26
    C.      Unclassified Administrative Claims, Priority Tax Claims, Arcus Holders DIP
        Claims and Fee Claims ...............................................................28
    D.      Classification and Treatment of Unimpaired Claims and Interests .....................30
    E.      Classification of Impaired Claims and Interests .........................32
    F.      Means For Implementation Of The Plan ....................................34
    G.      Treatment Of Executory Contracts And Unexpired Leases................................40
    H.      Effect of Confirmation of the Plan.............................................42
    I.      Retention of Jurisdiction ............................................................45
    J.      Miscellaneous Provisions...........................................................46
    K.      Effectiveness of the Plan............................................................47
    L.      Confirmation Without Acceptance of All Impaired Classes: The "Cramdown"
        Alternative..................................................................................49
    M.      Provisions Regarding Corporate Governance and Management of the
        Reorganized Debtors...................................................................50
VIII.   CERTAIN RISK FACTORS TO BE CONSIDERED ......................................50

|  | A. | Taxation ................................................................................................51 |
|  | B. | Distributions to Holders of Claims ......................................................51 |
|  | C. | Objections to Classification .................................................................52 |
|  | D. | Inherent Uncertainty of Financial Projections ....................................52 |
|  | E. | Certain Bankruptcy Law Considerations .............................................52 |
| IX. | | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .53 |
|  | A. | Liquidation Under Chapter 7 ...............................................................53 |
|  | B. | Alternative Plan of Reorganization......................................................53 |
| X. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................53 |
|  | A. | Federal Income Tax Consequences in General......................................53 |
|  | B. | Federal Income Tax Consequences of the Liquidation Trust ................55 |
|  | C. | Federal Income Tax Consequences to Holders of Allowed Claims in Class 10...55 |
|  | D. | Federal Income Tax Consequences to Holders of Allowed Class 11 and 12 Interests ................................................................................................57 |
|  | E. | Importance of Obtaining Professional Tax Assistance .........................57 |
| CONCLUSION................................................................................................58 |

CHERRY_HILL\444634\5

ALL CREDITORS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS OR INTERESTS CONTAINED IN THIS DISCLOSURE STATEMENT.

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, OTHER EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALL CREDITORS AND INTERESTS HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING FOR OR AGAINST THE PLAN.  SEE "CERTAIN RISK FACTORS TO BE CONSIDERED," Article VIII.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

CERTAIN STATEMENTS CONTAINED HEREIN, INCLUDING PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN.  NOTHING

IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, THEIR BUSINESSES, AND EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES, HAS BEEN PREPARED AND OBTAINED BY THE DEBTORS AND THEIR PROFESSIONALS FROM VARIOUS DOCUMENTS, AGREEMENTS, AND OTHER WRITINGS RELATING TO THE DEBTORS. NEITHER THE DEBTORS NOR ANY OTHER PARTY MAKES ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, OR OTHERWISE HAVE ANY PRECLUSIVE EFFECT, BUT RATHER SHALL CONSTITUTE AND BE CONSTRUED AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING, ADVERSARY PROCEEDING OR OTHER ACTION INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. SEE SECTION VII OF THIS DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE FINANCIAL PROJECTIONS ATTACHED HERETO WERE PREPARED BY THE DEBTORS WITH THE ASSISTANCE OF ITS RESTRUCTURING ADVISOR BASED ON INFORMATION AVAILABLE TO THE DEBTORS AND NUMEROUS ASSUMPTIONS THAT ARE AN INTEGRAL PART OF THE FINANCIAL PROJECTIONS, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS AND SOME OR ALL OF WHICH MAY NOT MATERIALIZE. THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC REGARDING FINANCIAL PROJECTIONS. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED BY THE DEBTORS' INDEPENDENT CERTIFIED ACCOUNTANTS. ALTHOUGH PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME

2

OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE REALIZED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, LITIGATION, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY, IF NOT ALL, OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS OR ANY OTHER PERSON, THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.  ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS.

ANY CAPITALIZED TERMS NOT DEFINED HEREIN SHALL HAVE THE DEFINITION ASCRIBED TO SUCH TERM IN THE PLAN.

## I.    INTRODUCTION AND SUMMARY

Shapes/Arch Holdings L.L.C., Shapes L.L.C., Delair L.L.C., Accu-Weld L.L.C., and Ultra L.L.C., the above-captioned Debtors (the "Debtors"), submits this disclosure statement (the "Disclosure Statement"), pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code"), to holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances of the Debtors' Second Amended Joint Plan of Reorganization dated May 12, 2008 [Docket No. 273], as such plan may be amended (the "Plan"), filed by the Debtors with the United States Bankruptcy Court for the District of New Jersey (Camden Vicinage) (the "Bankruptcy Court"), and (ii) the Confirmation Hearing scheduled for July 8, 2008 at 10:00 a.m. (ET).  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement together with any relevant Exhibits and Appendices.

Concurrently with the filing of this Disclosure Statement, the Debtors filed the Plan which sets forth how Claims against and Interests in the Debtors will be treated in these Chapter 11 Cases.  This Disclosure Statement describes certain aspects of the Plan, the Debtors' prior operations, significant events occurring in the Debtors' Chapter 11 Cases and other related matters.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY.

### A.    *Disclosure Statement Enclosures*

Attached as exhibits to this Disclosure Statement are copies of the following:

- The Plan (Exhibit "A");

- The Order of the Bankruptcy Court (without exhibits) (the "Solicitation Procedures Order"), which, among other things, approves the Disclosure Statement and establishes certain procedures with respect to the solicitation and tabulation of votes to accept or to reject the Plan (Exhibit "B");

3

- Financial Projections (Exhibit "C");

- Liquidation Analysis (Exhibit "D");

- Schedule of Environmental Claims (Exhibit "E");

- Current Financial Information (Exhibit "F");

- Schedule of Insurance (Exhibit "G"); and

- Order Approving Competitive Process (Exhibit "H").

In addition, a Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to the holders of Impaired Claims and Interests that the Debtors believe are entitled to vote to accept or reject the Plan.

The Solicitation Procedures Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of an Impaired Claim or Interest entitled to vote on the Plan should read in their entirety the Disclosure Statement, the Plan, the Solicitation Procedures Order and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code and the Solicitation Procedures Order.

## B.    *Only Impaired Classes Vote*

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of claims in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.

Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or interests. Under that section, a plan may be confirmed by a court if (i) at least one class of impaired claims accepts the plan and (ii) the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class.

In addition, if any Impaired Class of Claims or Interests entitled to vote shall not accept the Plan by the requisite majorities provided in section 1126(c) of the Bankruptcy Code, the

4

Debtors reserve the right to seek to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

Under the Plan, Claims in Classes 5, 6, 7, 9 and 10 are or may be Impaired and are entitled to vote on the Plan. Holders of Interests in Class 11 will receive no distribution and, accordingly, such holders are deemed to reject the Plan. Under the Plan, Claims in Classes 1, 2, 3, 4 and 8, and Interests in Class 12 are unimpaired, and the holders of Class 1, 2, 3, 4 and 8 Claims and Class 12 Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 5, 6, 7, 9 and 10.

For a summary of the treatment of each Class of Claims and Interests, see "Overview of the Plan" below.

## C.   *Confirmation Hearing*

The Bankruptcy Court has scheduled the Confirmation Hearing for July 8, 2008 at 10:00 a.m. (ET) in the United States Bankruptcy Court for the District of New Jersey, 400 Cooper Street, Camden, New Jersey 08101. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed on or before June 30, 2008 at 4:00 p.m. (ET) in the manner described in the Notice accompanying this Disclosure Statement. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing of the date and time as to which the Confirmation Hearing has been adjourned.

## II.   OVERVIEW OF THE PLAN

## A.   *Introduction*

The Plan is the product of the effort by the Debtors' management and their professional advisors working with the Committee and Arch Acquisition to develop a plan that will enable Creditors and Interest holders to receive the maximum recovery possible in these Chapter 11 Cases. The valuation of the Debtors and the Reorganized Debtors, upon which certain distributions contemplated by the Plan are based, is derived in part from projections of the future performance of the Reorganized Debtors and the market test of value under the Competitive Process (as defined herein below). The financial projections, which were prepared by the Debtors with the assistance of their advisors, are attached as Exhibit C to this Disclosure Statement.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO MAXIMIZE THE RECOVERY TO THEIR CREDITORS AND INTEREST HOLDERS AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND INTEREST HOLDERS. THE DEBTORS THEREFORE URGE THOSE PARTIES ENTITLED TO CAST A BALLOT TO ACCEPT THE PLAN.

**B.**    ***Summary of Distributions***

Under the Plan, Claims against and Interests in the Debtors are divided into Classes and will receive the distributions and recoveries (if any) described in the table below.  The following table briefly summarizes the classification and treatment of Claims and Interests under the Plan.  The estimated amounts of Allowed Claims set forth in the following table reflect the amounts listed in the Debtors' Schedules.  The bar date for filing claims was May 15, 2008.  The Debtors have not begun their analysis of the official claims' register maintained by Epiq Bankruptcy Solutions LLC ("Epiq"), but the Debtors understand that claims have been filed totaling several billion dollars.

| Class | Type of Claim or Membership Interest | Estimated Amount of Allowed Claims | Estimated Recovery |
|---|---|---|---|
| Unclassified | Administrative Claims | $2,513,606[1] | 100% |
| Unclassified | Fee Claims | $1,500,000[2] | 100% |
| Unclassified | Priority Tax Claims | $84,667 | 100% |
| 1 | Other Priority Claims | $1,514,113 | 100% |
| 2 | Secured Real Estate Claims | $747,939[3] | 100% |
| 3 | Arch Acquisition DIP Claim | $26,700,000 | 100% |
| 4 | CIT DIP Claim | $54,600,000 | 100% |
| 5 | Secured Claims Purchase Money Security Interests | $TBD | 100% |
| 6 | Secured Claims of Warehousemen and Shippers | $200,000[4] | 100% |
| 7 | Collateralized Insurance Program Claims | TBD | 100% |
| 8 | Miscellaneous Secured Claims | $75,000 | 100% |
| 9 | Environmental Claims | Unknown[5] | TBD |

---

[1] This amount is the estimation of the Debtors' liability for section 503(b)(9) claims, subject to further review and investigation.  All Allowed Administrative Claims other than those arising under Section 503(b)(9) will be paid in the ordinary course when due after confirmation of the Plan.

[2] This amount represents a rough estimate of the total amount of unpaid Fee Claims through the date for the Confirmation Hearing (July 8, 2008).  This amount is shown separately for presentation purposes (and will be paid on the Effective Date), but is included in the Arch Acquisition DIP Claim and/or the CIT DIP Claim amounts in this chart.

[3] On or about May 13, 2008, the Township of Pennsauken, New Jersey, the principal location of the Debtors' facilities, filed a Proof of Claim in the amount of $837,905.30.  The Debtors believe that the tax obligation is $747,989.00 and are in discussions with the Township to address this Claim and a possible reduction of the real estate taxes going forward.

[4] The Debtors are currently analyzing the amount of claims in this class but estimate the same are in excess of $100,000.00 and less than $400,000.00.

[5] The Debtors are unable to determine at this time the amount of the Environmental Claims against the estates. Prior to the Petition Date, Environmental Claims have been paid through applicable insurance policies.  The Debtors note that numerous claims have been filed with Epiq asserting Environmental Claims of several billion dollars, which the Debtors believe are grossly overstated and objectionable.

6

| 10 | General Unsecured Claims | $38,121,413[6] | TBD |
| 11 | Ben Interests | N/A[7] | 0% |
| 12 | Class 12 Interests | N/A | 100% |

ALTHOUGH THE DEBTORS BELIEVE THAT THE ESTIMATED PERCENTAGE RECOVERY FOR CLASS 10 CREDITORS MAY BE 7-14% BASED UPON THE AMOUNTS REFLECTED IN THEIR BANKRUPTCY SCHEDULE F AND THE CLASS 10 POOL BEING $5,000,000, THERE IS NO ASSURANCE THAT THE FINAL AMOUNTS OF ALLOWED CLAIMS IN CLASS 10 WILL NOT MATERIALLY EXCEED THE ESTIMATED AGGREGATE AMOUNT SHOWN IN THE TABLE ABOVE AND THEREFORE POSSIBLY DEPLETE THE ESTIMATED PERCENTAGE RECOVERY.  The actual recoveries under the Plan by the Debtors' creditors will be dependent upon a variety of factors including, but not limited to, whether, and to what extent, Disputed Claims are resolved in favor of the Debtors rather than the Creditors.  Accordingly, no representation can be or is being made with respect to whether the estimated recovery shown in the table above for Class 10 Creditors will be realized by the holder of an Allowed Claim in such class.

The Debtors have filed the Plan for administrative convenience and each class referenced above shall apply to each of the Debtors' estates with the funding for each Class to be shared pro-rata amongst creditors in each estate as if the estates had been substantially consolidated.

### III.    OVERVIEW OF CHAPTER 11

Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and interest holders.  A goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon, among others, a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or interest holder of a debtor.

---

[6]  The above estimate is preliminary and includes all general unsecured claims listed in the Debtors' bankruptcy schedules and no representations are being made with respect thereto as underlying this estimate are a number of assumptions that are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors.  The actual amount of claims in Class 10 may be materially higher based upon the ultimate Allowed amount of any rejection damage claims, any Deficiency Claim arising out of Environmental Claims, any filed proofs of claim or any claims relating to the Debtors' multi employer pension plans.

[7]  In consideration for the Plan Funders Funding Commitment and additional consideration set forth in the Plan, the Plan Funder shall receive 100% of the New L.L.C. Interests in the Reorganized Shapes/Arch Holdings L.L.C.

CHERRY_HILL\444634\5

After a plan has been filed and a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan has been approved by the court, the holders of claims against or interests in a debtor may vote to accept or reject the plan under certain circumstances.

## IV.   DESCRIPTION OF THE DEBTORS' BUSINESS

### A.    The Debtors

Shapes/Arch Holdings L.L.C. ("Shapes/Arch") was created to integrate the operations and management of the company's four business units.  Shapes L.L.C. ("Shapes") is a manufacturer, fabricator and distributor of a broad array of customized, large profile aluminum extrusions.  Delair L.L.C. ("Delair") offers a wide variety of maintenance free aluminum fence systems and has one of America's most recognized brands of above ground pools.  Accu-Weld L.L.C. ("Accu-Weld") designs, manufactures and distributes high quality made-to-order vinyl, residential windows and steel entry doors.  Ultra L.L.C. ("Ultra") is a leading supplier of value priced, globally sourced hardware products. The membership interest of Shapes/Arch is held 100% by Ben LLC.  Ben LLC is controlled by various family members who are related to Ben Corson, the founder of the company (which was formed in 1952).  Shapes/Arch owns 100% of the membership interests in each of the operating entities.

The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1,000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.  Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment.  Shapes can produce and ship over 400,000 pounds of extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty.  Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.  In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006.  This decrease is, at least in part,

8

attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own final profiles, which results in faster production and delivery to the customer. Accu-Welds' net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufactures. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey with two million cubic feet of storage space. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

## B.    The Pre-Petition Capital Structure

Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and/or co-guarantors) were indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), for itself and as agent, JP Morgan Chase Bank, N.A. (successor to Bank One, National Association) and Textron Financial Corporation (collectively, the "Lender Group" or the "CIT Lenders") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Pre-Petition Financing Agreement,"). Pursuant to the Pre-Petition Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory, eligible accounts receivable and, during specific periods, assets comprised of property, plant and equipment (the "PP&E Equity Borrowing Base Component"), a term loan, and letters of credit. The Pre-Petition Financing Agreement was amended on fifteen occasions (most recently on or about March 6, 2008), principally to address the additional funding needs of the Debtors in light of the cyclical nature of the Debtors' businesses. The Pre-Petition Financing Agreement, as amended, required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

9

The Pre-Petition Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum revolving line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, were guarantors of the debt to the Lender Group pursuant to the Pre-Petition Financing Agreement. The Lender Group maintained a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof. As of the Petition Date, the outstanding borrowings from the Lender Group were: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) a term loan totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $58,630,849 (the "Pre-Petition Bank Debt").

## C.    *Events Leading to Chapter 11 Filing*[8]

Prior to the filing of these Chapter 11 Cases, the Debtors had attempted to sell the companies and had engaged TM Capital in May of 2006 to explore selling all of the entities. Those efforts which went on in earnest through the first half of 2007 did not result in a sale of the entities. The Debtors then attempted to raise significant additional capital and financing in the fourth quarter of 2007 with the assistance of CIT Capital Markets, an affiliate of its principal lender, CIT. These efforts failed to uncover any alternative or additional lending source. During the weeks leading up to the filing the Debtors had discussions with potential buyers and potential sale/leaseback prospects, but their efforts failed to uncover any alternative or additional lending source. Phoenix Management Services, Inc. ("Phoenix") was engaged by the Debtors on or about January 15, 2008, to review the Debtors' current financial situation, to review the 2008 business plan and financial forecast and otherwise assist the Debtors in exploring their strategic alternatives.

The Debtors filed these Chapter 11 Cases as a result of serious liquidity issues. The Debtors consolidated statements for year ending 2007 showed a decline in net revenue by $48.5 million dollars from $322.3 million dollars to $273.8 million dollars. EBITDA declined by almost $17 million from $20.6 million in 2006 to less than $4 million dollars in 2007. The majority of the loss related primarily to the depressed results that were obtained by Shapes. Although the net revenue of Ultra increased slightly in 2007 from $45.5 million dollars in 2006 to $46.1 million dollars in 2007, its EBITDA decreased from $3.3 million in 2006 to $1.1 million in 2007. Both Delair and Accu-Weld had significant declines in net revenue during 2007 as well as significant declines in EBITDA.

A substantial portion of the Debtors' revenue has been impacted by various contractions in various industries throughout the United States. By way of example, Shapes' sales are primarily to trailer, truck body and rail car sector customers that are all experiencing declines in their own industry. Delair's customer base is strongly associated with consumer confidence in the economy and housing industry and as such, has been affected by the spending habits of

---

[8]  As described in various pleadings filed by the Committee to date, the Committee does not agree with the portrayal of certain facts and characterizations of certain events leading up to the Debtors' bankruptcy filing. Therefore, nothing contained in Section C should be binding on the Committee or its successors-in-interest.

consumers.  Ultra and Accu-Weld are likewise significantly affected by consumer spending in the construction industry and home remodeling sectors and have been adversely affected by the same.  Lastly, due to the seasonality of their businesses, the Debtors faced a significant liquidity crises under the Pre-Petition Financing Agreement with the Lender Group.  In brief summary, the significant decline in revenue and seasonal liquidity position compelled the Debtors to seek an alternative to their then current position which included, without limitation, seeking relief under Chapter 11 of the United States Bankruptcy Code.

In early January of 2008, with the Debtors' inability to identify additional or alternative financing notwithstanding the efforts of CIT Capital Markets, and their need for borrowing in excess of the borrowing base provided for in the Pre-Petition Financing Agreement projected to increase to over $7.4 million over the next several weeks (without factoring in any payments to restructuring professionals or to vendors on the past due trade debt), and the unwillingness to fund additional loans in excess of the then-existing PP&E Equity Borrowing Base Component, the Debtors' continued ability to fund their operations was in substantial doubt without a quick and efficient transaction.  In mid-January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm to discuss Versa's interest in a possible transaction.  Versa expressed interest and conducted extensive due diligence on an expedited basis with respect to the Debtors' businesses in late January.  Also during this time frame, and as set forth above, the Debtors retained Phoenix.

In February of 2008, Versa (with certain affiliates), the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC ("Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during their Chapter 11 proceedings (and provide additional funding and an equity infusion to help reorganize the Debtors (through another affiliate, Arcus ASI, LLC "Arcus I")).  As part of this agreement, Arcus ASI, Inc. would become a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC would retain 100% of the ownership rights and 20.1% of the voting rights.  This transaction was made subject to many terms and conditions including the Lender Group's commitment to provide DIP financing to the Debtors, and the Lender Group's Commitment to Arcus to provide exit financing for the Debtors.  The Debtors, Versa and the Lender Group engaged in extensive negotiations and ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (pursuant to which the Lender Group's term loan could be repaid and the PP&E Equity Borrowing Base Component would be eliminated) during any chapter 11 process, as well as provide an exit facility for the Debtors.

On March 16, 2008 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases and filed a plan with Arcus as the Plan Funder which included a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million, and (ii) Arcus to provide additional working capital for the Debtors, and to fund a small dividend to creditors, requiring a total commitment by Arcus of approximately $25 million plus a plan funding equity commitment in an aggregate amount of no less than $1.5 million (which could be paid in cash or by way of conversion of Arcus' DIP Loan).  As described herein below the Arcus plan has been replaced by the Plan that has been filed contemporaneously with this Disclosure Statement.

Attached hereto as Exhibit "E" is a schedule setting forth the Debtors' operating performance for the first two months of 2008.  The Debtors shall file monthly operating reports for the post petition periods as and when due in accordance with the U.S. Trustee's guidelines.

## V.    THE FILING

On the Petition Date, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.   The Debtors continue in the possession of their property and the management of their businesses pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have, with the Bankruptcy Court's approval, employed and retained (a) Cozen O'Connor as their bankruptcy counsel; (b) Stevens & Lee as special labor and conflicts counsel; (c) Phoenix, as their restructuring advisor; and (d) various other ordinary course professionals.

### A.    Significant "First Day" Motions

Immediately after the filing of their chapter 11 petitions, the Debtors filed numerous "first day" motions seeking orders from the Bankruptcy Court authorizing the Debtors to retain professionals, provide the Debtors certain relief from certain administrative requirements imposed by the Bankruptcy Code, provide for the payment of certain Claims, provide for the approval of debtor-in-possession financing, and seek other relief to ensure a smooth transition into bankruptcy.   These orders were requested to ease the strain on the Debtors' relationships with customers, employees and others as a consequence of the filing.   In particular, the Debtors obtained orders approving the following motions and applications:

Verified Motion for an Order Directing Joint Administration and Procedural Consolidation [Docket No. 3];

Verified Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Modifying Automatic Stay; and (IV) Scheduling Final Hearing, Pursuant to §§ 105, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedures 2002 and 4001(c) and (d) [Docket No. 18] (the "DIP Motion");

Verified Motion for an Order Authorizing the Debtors to Maintain Current Bank Accounts, Maintain Their Pre-Petition Cash Management System, and Use Existing Business Forms [Docket No. 4];

Debtors' Verified Motion for an Order Authorizing But Not Directing Payment of Pre-Petition Wages, Salaries, Compensation, Employee Benefits, Business Reimbursement Expenses, Certain Union Payments, and the Continuation of the Debtors' Workers' Compensation Program and Policies Pursuant to 11 U.S.C. §§ 105(a), 507(a)(4) and (5) [Docket No. 5];

Verified Motion for Interim and Final Orders: (I) Prohibiting Utility Companies form Discontinuing, Altering or Refusing Services; (II) Deeming Utility Companies to Have Adequate Assurance of Payment; and (III) Establishing Procedures for Determining Requests for Additional Assurance Pursuant to 11 U.S.C. § 366 [Docket No. 6];

Verified Motion for an Order Authorizing the Debtors to Pay Pre-Petition Sales and Use Taxes [Docket No. 7];

Application for Retention of Epiq Bankruptcy Solutions, LLC, as Official Noticing Claims and/or Solicitation and Balloting Agent for the Debtors [Docket No. 10];

Debtors' Verified Motion for an Order Establishing a Bar Date Pursuant to Fed. R. Bankr. P. 2002(a)(7) and 3003(c)(3) [Docket No. 9];

Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals [Docket No. 11]; and

Debtors' Motion to:    (I) to Confirm Grant of Administrative Expense Status to Obligations Arising from Postpetition Delivery of Goods; (II) Establish Authority to Pay Certain Expenses in the Ordinary Course of Business and (III) Prohibit Third Parties from Interfering with Delivery of Good [Docket No. 8].

### B.    Formation and Participation of Committee

On March 31, 2008, the Office of the United States Trustee formed the Official Committee of Unsecured Creditors (the "Committee") comprised of the following creditors: Alcan, Inc.; RUSAL America Corp.; PSE&G; Glencore Ltd.; Coil Plus PA, Inc.; Perfect Trade Development Co./Kotech Industry and Co. Ltd.; UPS; Acme Corrugated Box Co.;  and Colorworks Graphic Services, Inc.  At the Committee's first meeting, it retained Halpern Battaglia Raicht, LLP and Cole, Schotz, Meisel, Forman & Leonard, P.A. as its co-counsel, and J.H. Cohn as its financial advisor.  The Committee has been an active participant in all aspects of these Chapter 11 Cases and championed the process by which Arch Acquisition was installed as the DIP term lender and Plan Funder in replacement of Arcus (as more fully described below).

### C.    Arch Acquisition's Replacement of Arcus

Approximately two weeks after the Petition Date, on or about April 1, 2008, Arch Acquisition I, LLC ("Arch Acquisition"), an affiliate of Signature Aluminum and H.I.G. Capital Partners ("H.I.G."), filed an objection to the Debtors' DIP Motion in which it expressed an interest in providing an alternative debtor in possession financing arrangement on better terms and participating in a sale process pursuant to Section 363 of the Bankruptcy Code or through a revised plan.  As further evidence of it commitment to an open and competitive process, Arch Acquisition provided the Debtors and the Committee with, inter alia, a Debtor-in-Possession Financing Agreement which Arch Acquisition believed was on better terms than the financing proposed by Arcus, a proposed order approving such financing from Arch Acquisition, and an asset purchase agreement providing for a purchase price which Arch Acquisition believed was in excess of the value provided in the Arcus plan.  Upon request of the Committee, Arch Acquisition converted its asset purchase agreement to a plan of reorganization which Arch Acquisition believed was better than the Arcus plan, including but not limited to a pool of funds for general unsecured creditors of $5 million (as opposed to the $500,000 unsecured pool provided in the Arcus sponsored plan).

13

On May 1, 2008, after Arch Acquisition completed its due diligence and extensive discovery propounded by the Committee and Arcus and several days of depositions, Arch Acquisition provided the Debtors with a commitment letter for financing the alternative transaction and CIT advised the Debtors that the CIT Lenders would continue funding the Debtors' operations if Arch Acquisition replaced Arcus.  Arch Acquisition's alternative DIP financing package and alternative plan (the "Arch Acquisition Alternative Proposal") was now free of any due diligence contingencies and any financing contingencies with respect to the debtor-in-possession financing and the exit financing under the alternative plan; provided for the CIT Lenders' continued funding under its debtor-in-possession revolver facility; included more favorable (less restrictive) covenants and lower interest and fees; provided a higher return for unsecured creditors; and included a more full and open process for the submission of competing proposals, to ensure that the value of the Debtors' estates would be maximized.

Upon becoming aware that Arch Acquisition had financing commitments and the CIT Lenders' agreement to continue funding under its DIP Revolver Agreement (defined hereinafter), the Debtors determined that the Arch Acquisition Alternative Proposal was higher and better than the Arcus plan.  The Debtors then advised Arcus that the Debtors were not prepared to proceed with the hearing on the Arcus plan's disclosure statement and that the Debtors believed it was in the best interests of the estates to proceed with the Arch Acquisition Alternative Proposal.

After intense negotiations between and among the Debtors, the Committee, Arcus, the CIT Lenders, and Arch Acquisition throughout the day on May 1, 2008, including a Chambers conference with the Bankruptcy Court, the parties reached an agreement whereby, among other things, Arcus would assign to Arch Acquisition its rights under its debtor in possession financing agreement with the Debtors, and Arch Acquisition would become the plan sponsor under an amended plan and disclosure statement to be filed by May 12, 2008.

The Debtors' decision to proceed with the Arch Acquisition Alternative Proposal was announced to the Bankruptcy Court late in the day on May 1, 2008 and the parties agreed to submit final orders approving the debtor-in-possession financing and the settlement among the parties.

On May 6, 2008 (after extensive negotiations among the parties over a four day period, and after another Chambers conference and a telephonic hearing among the parties), the Bankruptcy Court entered orders granting final approval of the debtor in possession financing facilities from the CIT Lenders and Arcus (which was immediately assigned to Arch Acquisition) to the Debtors (the "Final DIP Orders").

## D.     Competitive Process

Confirmation of the Plan, as filed, is subject to a Competitive Process that has been put in place pursuant to a separate motion filed by the Debtors on May 12, 2008 (the "Competitive Process Motion"), which motion is incorporated in its entirety herein by reference.  On May 19, 2008, the Bankruptcy Court entered an order, a copy of which is attached as Exhibit "H" approving the competitive process.

14

Under the Competitive Process, Arch Acquisition will serve as the stalking horse bidder for the equity of Reorganized Shapes/Arch pursuant to the Plan.  The Competitive Process will be conducted through a Sales Consultant who will solicit higher and better offers in the form of the Plan proposed by Arch Acquisition in consideration for the equity of Reorganized Shapes/Arch.  If one or more Qualified Bids are received by the Bid Deadline (as defined in the Competitive Process Motion) then an auction will be held on June 27, 2008 at 10:00 a.m. (Eastern Time).

Any party wishing to obtain information with respect to submitting a competing bid should contact the Sales Consultant as follows:

J. Scott Victor
NatCity Investments, Inc.
300 Barr Harbor Drive
West Conshohocken, PA  19428
Phone:  610-940-5802
Email:  JScott.Victor@NationalCity.com

The Debtors believe that the Competitive Process will both maximize the return for all creditors of these estates, and provide an adequate market test to ensure that fair value is paid and received for the equity in the Reorganized Debtors.

## E.    *DIP Financing and Use of Cash Collateral*

1.    *DIP Financing*

Essential to the Debtors' efforts to reorganize was obtaining a source of post-petition funding.  To that end, on March 16, 2008, the Debtors filed the DIP Motion.  Interim Orders were entered on March 18 granting the relief requested in the DIP Motion, subject to a final hearing on the same.  By Orders entered on April 9, April 10 and April 23, 2008, and the "So Ordered" record of the Final Hearing of May 1, 2008, respectively, the interim financing was extended on an interim basis through May 5, 2008 at 5:00 p.m.  On May 6, 2008, the Bankruptcy Court entered the Final DIP Orders.  By and through the Final DIP Orders the Bankruptcy Court approved the DIP Motion and authorized the Debtors to enter that certain Debtor-in-Possession Loan and Security Agreement by and between the Debtors and Arch Acquisition (the "DIP Agreement").  Pursuant to the terms of the DIP Agreement, Arch Acquisition has made $30,000,000 available to the Debtors.  As of the anticipated date of the Confirmation Hearing, the Debtors estimate that they will have drawn approximately $26,700,000.00 under the DIP Agreement.  The Obligations (as defined in the Final DIP Order) are secured by valid and perfected priming liens and security interests granted to Arcus Funding (and now assigned to Arch Acquisition) on all of the Debtors' assets and properties (subject to a first lien in favor of the CIT Lenders on the Inventory and Accounts Receivable and such other property as more fully set forth in certain Amended Intercreditor Agreement dated May 6, 2008).  By and through the Final DIP Orders, the Bankruptcy Court also approved a $60,000,000.00 Debtor-in-Possession Revolving Credit Agreement with the CIT Lenders ("DIP Revolver Agreement") to fund operations pending confirmation of the Plan.  The Debtors expect that the balance due

15

under the DIP Revolving Agreement as of the anticipated date of the Confirmation Hearing will be approximately $54,600,000 (including outstanding letters of credit).

**F.**     **Claims Process**

1.     <u>Last Date to File Proofs of Claim</u>

On March 18, 2008, the Bankruptcy Court entered an order (the "Bar Date Order") [Docket No. 35] generally requiring any Person holding or asserting a Claim against the Debtors to file a written proof of claim with Debtors, c/o Epiq Bankruptcy Solutions, LLC, 757 Third Avenue, New York New York 10017 on or before 5:00 p.m., prevailing Eastern Time on **May 15, 2008**.  The Bar Date Order provided that any person or entity failing to timely file a proof of claim will be forever barred, estopped and enjoined from (a) asserting a timely filed claim against the Debtors that the entity has that (i) is in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, noncontingent and liquidated (if no amount is identified therein for that entity then the entity shall be forever barred, estopped and enjoined from asserting any claim at all against the Debtors) or (ii) is of a different nature or a different classification than any claim identified in the Schedules of Assets and Liabilities on behalf of such entity; or (b) voting upon, or receiving distributions under, any plan or plans of reorganization in this case in respect of a Claim.  The Bar Date Order provides other bar dates in other circumstances as set forth in that order.

On May 19, 2008, the Debtors filed a motion to fix a date for the filing of Administrative Claims that arose on or prior to June 15, 2008, including, without limitation, Claims arising under section 503(b)(9) of the Bankruptcy Code, but specifically not including Fee Claims.  The Debtors requested an Administrative Claims bar date of June 30, 2008.

## VI.     DESCRIPTION OF SIGNIFICANT LITIGATION

**A.**     **Preferences, Fraudulent Transfers and Other Avoidance Actions**

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts to the extent the transferee received more than it would have in respect of the pre-existing debt had the transferee not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code.  In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to the ordinary business terms are not recoverable.  Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property.  If a preferential transfer were recovered by the debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

The Debtors estimate that they made payments in the approximate amount of $61,122,757.00 to various creditors within the ninety-day period preceding the Petition Date and payments of $5,035,451.00 to insiders within the one-year period preceding the Petition Date. The Debtors have not yet analyzed whether any of these payments are preferences (within the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a defense to a preference action, if commenced. However, it is anticipated that the Class 10 Liquidation Trustee will conduct such an analysis and commence appropriate actions which may ultimately increase the net dividend to Class 10 Unsecured Creditors but the amount of such increase, if any, is difficult to determine at this time.

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the Debtors received less than fair value for such property. In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. As of the date of the distribution of this Disclosure Statement, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions. Under the Plan, the Avoidance Actions will be transferred to the Liquidation Trust, and a Class 10 Liquidation Trustee will have the authority to investigate and prosecute all such Avoidance Actions.

**B.      *Other Causes of Action***

1.      <u>*Investigation of Causes of Action*</u>

The Debtors have not, but may, investigate causes of action against a number of Persons, relating to, among other things, the following:

•      Any lawsuits for, or in any way involving, the collection of accounts receivable or any matter related to the Plan;

•      Any actions against landlords, lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;

•      Any litigation or lawsuit initiated by the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association or any other court or tribunal;

•      Any and all potential causes of action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and

•      Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' business operations.

Estate Actions shall be transferred to the Liquidation Trust upon the Effective Date. The Debtors do not believe there are any causes of action against any of their current managers and officers (without prejudice to the Committee's right to investigate and pursue the same prior to

17

the Effective Date and the Class 10 Liquidation Trustee's right to investigate and pursue such claims thereafter). The Debtors currently have a directors' and officers' insurance policy which expires on April 30, 2009 in the amount of $3,000,000.00. The Committee is in the process of investigating the extent to which causes of action may exist against managers and officers and has delivered a notice apprising the Debtors' insurance carrier of potential claims against managers and officers. The Debtors investigated the extent, validity and priority of the CIT Lenders' claims and liens and have determined there is no basis to challenge the same (subject only to the Committee's rights to investigate the same under and subject to applicable orders of the Bankruptcy Court). The Committee is in the process of investigating the extent, validity and priority of the CIT Lenders' liens and has until June 16, 2008 to challenge the CIT Lenders' liens and assert any claims against the CIT Lenders under and subject to the terms of the Final DIP Orders.

In addition, there may be other causes of action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such causes of action are based are not fully or currently known by the Debtors and as a result, cannot be raised during the pendency of the case (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Reorganized Debtors, to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors and Reorganized Debtors.

2.    *Preservation of All Causes of Action Not Expressly Settled or Released*

The Debtors have attempted to disclose all material Estate Actions, including Avoidance Actions and other actions that they may hold against third parties. However, the Debtors have not performed an extensive investigation or analysis of potential claims and Estate Actions against third parties. The Debtors contemplate that such investigation and analysis will occur post-Confirmation by the Reorganized Debtors or the Class 10 Liquidation Trustee, as applicable. You should not rely on the omission of the disclosure of a claim or cause of action to assume that the Debtors hold no claim or cause of action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot. In addition, the Debtors have no knowledge or information as to whether the Liquidation Trust will or will not pursue the Avoidance Actions or Estate Actions after the Effective Date.

Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all Avoidance Actions or Estate Actions against third parties are specifically reserved and will be transferred to the Liquidation Trust.

The Debtors' failure to identify a claim or cause of action herein is specifically not a waiver of any claim or cause of action. The Debtors will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any cause of action or the value of the entirety of the Estate at the Confirmation Hearing; accordingly, except claims or causes of action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtors' failure to identify a claim or cause of action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with

18

respect to claims or causes of action which could be asserted against third parties, including Creditors of the Debtors which may be reading this Disclosure Statement and/or casting a Ballot except where such claims or causes of action have been released in the Plan or the Confirmation Order or other order of the Bankruptcy Court.

**C.**     ***Claims Concerning the Environmental Protection Agency and other Environmental Claims.***

Numerous Environmental Claims have been asserted against one or more Debtors as more fully set forth in Schedule 4.4 to the Plan.  The Debtors believe that most if not all of the claims are covered by applicable insurance policies.  A schedule of the Debtors' insurance coverage is attached hereto as Exhibit "G."  Without effecting the obligations of any third parties (i.e. insurance companies), Environmental Claims are treated as Class 9 Claims and shall be paid from proceeds of applicable insurance policies.  Based upon Exhibit G, and subject to the following summary, Shapes believes that it has available general liability insurance coverage totaling approximately $10-$11 million, and excess insurance coverage of approximately $145 million to fund these Environmental Claims.  Any Deficiency Claims relating to Environmental Claims shall be treated as Class 10 General Unsecured Claims and will be discharged. A brief description of the Environmental Claims is set forth below.

## Ewan Superfund Site, Shamong Township, New Jersey

The Ewan Superfund Site is an Environmental Protection Agency ("EPA")  National Priorities List ("NPL") site and the identification number is EPA ID# NJD980761365/NJD0200791.  Aluminum Shapes, Inc., (a predecessor to Shapes and to Ben LLC) ("Aluminum Shapes") and other parties have been identified as  potentially responsible parties ("PRP") and have received Section 106 Orders pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA").  The Orders were effective in June 1990 and May 1995.  The June 1990 Section 106 Order required Aluminum Shapes and other PRPs to undertake and complete all response actions for the Operable Unit 1 at the NPL site.  The May 1995 Section 106 Order requires Aluminum Shapes, in addition to other PRPs to undertake and complete all response actions required for remediation of the groundwater (which is designated as "Operable Unit 2").  Shapes' liability is premised upon the allegation that it arranged for the transport of hazardous substances which were allegedly released at the Ewan Superfund Site.  Groundwater at the site has been actively remediated since 1999.

Future operations and maintenance activities may take less time  than originally anticipated depending upon groundwater sampling results being analyzed at this time (the 2.5 year sampling data was collected in March 2008).  The EPA has approved limited shut downs of parts of the treatment systems based upon the sampling results.

Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date.  These insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation and The PMA Group.  There are insurance policies for excess/umbrella coverage.   To the best of the Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess

19

carriers have not made any payment(s) in this matter.  There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

The New Jersey Department of Environmental Protection ("NJDEP") filed a complaint alleging that certain parties were liable for Natural Resource Damages ("NRD").  Shapes was named as a defendant in an amended complaint that was filed on February 12, 2008.  The State also seeks compensation for damages to wetlands that were allegedly damaged during the remediation activities that have occurred to date.

Aluminum Shapes' liability as to CERCLA response costs and NRD have not been determined.

## D'Imperio Superfund Site, Hamilton Township, New Jersey

The D'Imperio Superfund Site is an EPA NPL site and has the following site identification number:  EPA ID# NJD980529416.  Shapes and other parties were identified as PRPs and received Section 106 Administrative Orders pursuant to CERCLA which were effective in August 1993 and in 2003.  The Orders require the PRPs to implement the remedial design for the remediation of groundwater and require the PRPs to conduct additional response costs as specified in the Statement of Work.  The basis for CERCLA liability for Aluminum Shapes is the allegation that it arranged for the disposal of hazardous substances which were allegedly released at the D'Imperio Superfund Site.

Groundwater has been actively remediated at the Site for approximately 10 years.  Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date.  The insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation and The PMA Group,  There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.  There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

Shapes was a party to an October 1, 2002 settlement agreement with the NJDEP regarding Natural Resource Damages claims and oversight costs.  The settlement amount totaled $495,000.

Aluminum Shapes' liability as to CERCLA response costs have not been determined.

## Swope Oil and Chemical Company Superfund Site, Pennsauken, New Jersey

The Swope Oil and Chemical Company Superfund Site is an EPA NPL Site and has the following identification number:  EPA ID# NJD041743220.  The ongoing remediation of this Site involves the remediation of three operable units:  Operable Unit 1 (surficial contamination), Operable Unit 2 (contaminated subsurface soils which serve as a source for the groundwater contamination) and Operable Unit 3 (groundwater contamination).  EPA has indicated that there may also be a vapor intrusion issue although this particular issue has not been delineated at this

20

time.   Nevertheless, EPA is requiring the PRPs to evaluate the existence of a vapor intrusion pathway into buildings that are adjacent to the Superfund Site.

Aluminum Shapes and other parties received a Section 106 Administrative Order pursuant to CERCLA which was effective on August 16, 1986.   The Order requires the submission of a Statement of Work based upon the sampling results, the submission of a Final Design and Operations Plan and the implementation of remedial work.   The Order also requires the PRPs to remove the drums and the contents of onsite tanks and vessels as well as, all structures and requires the sampling and removal of onsite soils.

Shapes and other parties are also subject to an Administrative Settlement Agreement and Order on Consent, for the Supplemental Remedial Investigation and Focused Feasibility Study dated September 27, 2006 for Operable Unit 3 (groundwater contamination) pursuant to Sections 104, 107 and 122 of CERCLA.   This particular Order also requires reimbursement of all future response costs that are incurred by EPA in connection with this Superfund Site.   A claim has not been made by EPA or NJDEP for Natural Resource Damages.

A judicial Consent Decree was executed for this Superfund Site in 1993 but Shapes was not a party to the Consent Decree.   The Consent Decree pertained to remedial design and action for Operable Unit 2.

According to EPA/Region II, the final response costs have not been estimated for this Superfund Site.   Although EPA has performed some removal actions at this Superfund Site, it has been reimbursed for these costs by the PRPs.   EPA is billing the PRPs for all oversight costs at an approximate amount of $10,000 per year depending upon the remedial work that is undertaken for any given year.

Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's, have paid the indemnity and/or defense costs to date.   These insurance carriers include the following:   Liberty Mutual Insurance Company, New Jersey P&L Insurance Guarantee Association on behalf of Reliance Insurance Company in Liquidation, and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America,. There are insurance policies for excess/umbrella coverage.   To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.   To date, the excess carriers have not made any payment(s) in this matter.   There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.   Shapes' liability for CERCLA response costs have not been determined.

## Puchack Wellfield, Pennsauken Township, New Jersey

There are two distinct issues related to the Puchack Wellfield.

First, the Puchack Wellfield Superfund Site is an EPA NPL site:   The EPA site identification number is:   EPA ID# NJD981084767.   The EPA issued a Record of Decision on September 28, 2006.   The EPA has not identified Shapes as a PRP for chromium at this site. According to EPA/Region II, the site is contaminated with chromium and other hazardous substances and there are two operable units.   Operable Unit 1 pertains to the remediation of

21

groundwater and Operable Unit 2 pertains to the remediation of the source areas.   The investigation and remediation of this NPL site is ongoing.

Shapes received an information request from EPA pursuant to Section 104(e) of CERCLA on December 15, 1999.   Shapes responded to the Section 104(e) information request but, as noted, has not been identified as a PRP for this NPL site.   EPA believes that chlorinated solvents are ubiquitous in this area of New Jersey and has deferred all investigations and remediation oversight to NJDEP.

According to EPA/Region II, past response costs total approximately $11.4 million and future response costs total approximately $17.1 million although the remedial costs may be higher.

Second, Shapes received a Directive and Notice to Insurers dated October 31, 1997 and Supplemental Directives and Notice to Insurers issued by NJDEP on May 7, 1992, October 27, 1995 and May 17, 1996.   The Directives were issued based upon the premise that Shapes, along with other parties, had allegedly discharged chromium and other hazardous substances unlawfully to groundwater.   The Directives required Shapes to pay costs associated with the construction of a potable water treatment system and for remedial investigation work.   Other than the issuance of the Directives, the NJDEP has taken no action or role in the Puchack Wellfield investigation.

Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's, have paid defense and/or indemnity costs to date.   These insurance carriers include the following:   Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.   There are insurance policies for excess/umbrella coverage.   To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.   To date, the excess carriers have not made any payment(s) in this matter.   There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.   There has been no formal claim by EPA or the State of New Jersey for Natural Resource Damages.

Shapes liability for CERCLA response costs and costs owed to the State of New Jersey have not been determined.[9]

---

[9]   In 2002, Shapes and others were sued in a private action, Harris et al. v. Advance Process Supply Co., et al., (Docket No.: L-03815-02, Superior Court, Camden County, NJ).   This was a proposed class action which allegedly emanates from the Puchack Wellfield.   Class certification was denied on June 30, 2006 and a Summary Judgment was granted to the defendants after the plaintiffs proceeded individually on their alleged claims on the following dates:  January 27, 2007, February 27, 2007 and July 31, 2007.   On April 8, 2008, the Appellate Division dismissed Shapes without prejudice due to the automatic stay.   Shapes' general liability insurance carriers have paid defense costs to date.   These insurance carriers include Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America.

22

**Lightman Drum Company Superfund Site, Winslow Township, New Jersey**

The Lightman Drum Company Superfund Site is an EPA NPL site and the EPA site identification number is EPA ID# 02-2000-2034.

In November 2000, the EPA issued an Administrative Order on Consent for Remedial Investigation and Feasibility Study.  Shapes did not consent to the Order and is not a party to it.  Shapes remains involved at the Site as a participating party.  The Order requires the preparation and performance of the remedial investigation and feasibility study and further requires the reimbursement of response costs incurred by EPA.

EPA also issued an Administrative Order on Consent for a Removal Action in 2007.  Shapes is not a party to that Order but remains a participating PRP.  The Removal Action Order is limited to excavation of certain contaminated soils on the Lightman Site which were believed to be contributing to the source of one of the groundwater plumes.  The 2007 Order requires the parties to conduct removal actions and to reimburse EPA for response costs incurred for all removal actions and all future response costs.

According to the EPA/Region II, a feasibility study was submitted to the Agency in December 2007 and soil excavation was undertaken in the vicinity of the former waste storage tank area. The December 2007 Feasibility Study lists several technologies for remediation of soils and groundwater onsite and for remediation of offsite, downgradient groundwater. According to the Feasibility Study, the most expensive combination of the technological alternatives is estimated to cost $14,860,000 for all of these components.

According to the EPA/Region II, the Agency has not estimated the response costs associated with the final remedy for the site.  EPA is billing the PRPs for oversight costs at approximately $10,000 per year depending upon the remedial work implemented for that year.  In February 2008, EPA expressed a preference for an Air Sparging, Soil Vapor Extraction remedy as the on site soil and groundwater component.  This component was estimated as $5,680,000 of the above cited $14,860,000 estimated by the site consultant.  EPA has not decided on a remedy for the downgradient groundwater remediation component.

Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's  have paid defense and/or indemnity costs to date.  These insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation and The PMA Group. There are insurance policies for excess/umbrella coverage.  To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter.  To date, the excess carriers have not made any payment(s) in this matter.   There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

Shapes' liability for CERCLA response costs have not been determined.

**9000 River Road, Pennsauken, New Jersey**

Shapes currently owns and operates at 9000 River Road, Pennsauken, New Jersey. NJDEP issued a Directive and Notice to Shapes and insurers on June 2, 1992 requiring Aluminum Shapes to address alleged violations of: discharge limits for process wastewater, stormwater runoff and contact cooling water. The alleged contaminant of concern is chromium. A Supplemental Directive No. 1 was issued on July 16, 1992, to Aluminum Shapes and the insurers directing Aluminum Shapes to address alleged chromium discharges onto the property and into groundwater. The Directive also required Aluminum Shapes to identify and address all sources contributing to the alleged chromium contamination in the soils and the groundwater at the facility and to prevent the migration of the alleged chromium contamination. Shapes has conducted investigations at this facility to date and has been cooperating with NJDEP. At present, Shapes is waiting for a response from the Agency as to its proposed work plans.

A Memorandum of Agreement ("MOA") was executed between NJDEP and Aluminum Shapes on July 1, 1993 and an Amendment to the MOA was executed on July 7, 2007 for chromium only.

The agreements require Shapes to conduct investigation, remediation and to cooperate with the State of New Jersey in connection with its review of the proposed investigations and remediation of the facility. Shapes has submitted two (2) Remedial Investigation Work Plans to NJDEP and a response is pending. Shapes' environmental consultant (Roux Associates) has estimated that the response costs will range from $1.3 million to $1.8 million including any costs for Natural Resource Damages. Shapes will continue to perform the obligations set forth in the MOA and the Amendment to the MOA for this facility to the extent insurance coverage exists. This amount reflects estimates for remediation efforts and does not include natural resources damages, which potential Claims are being addressed in Class 9.

Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's have paid defense and/or indemnity costs to date. The insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company, in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America. There are insurance policies for excess/umbrella coverage. To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter. To date, the excess carriers have not made any payment(s) in this matter. There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

**Pennsauken Solid Waste Management Authority, et al. v. Ward Sand Materials Co., Inc., et al., Superior Court of New Jersey, Camden County, Law Division, Docket No.: L-13345-91.**

This case was filed by Pennsauken Township and the Authority that owns and operates the Pennsauken Landfill on December 4, 1991 as a contribution action under the New Jersey Spill Compensation and Control Act (N.J.S.A. 58.10-23.11 et. seq. and the Water Pollution Control Act N.J.S.A. 58:10 A-1 et.seq., Chapter 151 of the Pennsauken Township Ordinance

entitled "Garbage, Rubbish and Refuse" Code, and Chapter 270 of the Pennsauken Township Ordinance entitled "Nuisance, Public Health" Code of the Public Health Nuisance Code of New Jersey (1953) N.J.S.A. 26:3-69 to 3-69.6). The plaintiffs sued numerous defendants and alleged` that these defendants deposited various types of wastes in the landfill during the period from 1970 to June 30, 1982. Aluminum Shapes was among those defendants sued by the plaintiffs. Hundreds of additional defendants were joined in the matter based on the alleged arrangement of transportation of their wastes to the landfill. The case is currently pending in the New Jersey Superior Court, Law Division, Camden County. The plaintiffs allege that any or all of the defendants are responsible for clean up and removal costs associated with groundwater contamination caused by the wastes in the landfill. Plaintiffs have made a claim for approximately $28 million for past clean up and removal costs under the Spill Act. Plaintiffs have submitted expert reports claiming $41 million in future clean-up and removal costs. This case is in active litigation and a trial date is scheduled for September 2, 2008. Expert discovery is underway and concludes on July 31, 2008. Shapes' potential liability for this site, has not been determined. Shapes' alleged liability is premised upon its waste contaminating the groundwater underneath the Landfill. At this time, the groundwater flow direction is currently under investigation.

Aluminum Shapes' general liability insurance carriers from the late 1960's through the early 1980's , have paid defense and/or indemnity costs to date. These insurance carriers include the following: Liberty Mutual Insurance Company, New Jersey P&L Insurance Guaranty Association on behalf of Reliance Insurance Company in Liquidation, The PMA Group and Century Indemnity Company, as successor to CCI Insurance Company, as successor to Insurance Company of North America. There are insurance policies for excess/umbrella coverage. To the best of Debtors' knowledge, these excess carriers have been placed on notice of this matter. To date, the excess carriers have not made any payment(s) in this matter. There is no guarantee that the insurance carriers will pay or continue to pay the defense and/or indemnity costs in the future.

Some of the objectors to the first disclosure statement filed by the Debtors (many of which are involved in the Pennsauken Solid Waste Management Authority matter), premised their objections upon their alleged lack of information regarding any potential insurance that may be applicable to the Debtors' environmental matters. A schedule of Insurance was provided as part of a discovery response dated August 8, 1998 in that matter, a copy of which is annexed hereto as Exhibit "G." Shapes responded to requests for discovery regarding insurance in accordance with the Case Management Orders governing the case, as well as the New Jersey Rules of Court.

## Chemical Control Corporation, Elizabeth, New Jersey

The Chemical Control Corporation Superfund Site is an EPA NPL site and the EPA site identification number is EPA ID# NJD000607481. Shapes' estimated percentage share of costs as a de minimis contributor was less that .0467 percent. Shapes' liability with the EPA was settled.

**Buzby Brothers Landfill Superfund Site, Voorhees New Jersey**

Buzby Brothers Landfill Superfund Site is an EPA NPL site and the EPA identification number is:  EPA ID# NJD000305524.  According to  NJDEP, the remediation is essentially complete and the site continues to be monitored by General Electric.  Aluminum Shapes' estimated percentage share was $40,000 and Aluminum Shapes was dismissed from liability pursuant to a February 10, 1995 Release, Indemnification and Settlement Agreement between General Electric and Settling Companies.  The Settlement Agreement addressed past and future response costs but did not include costs associated with potential Natural Resource Damages.  Accordingly, Shapes' potential liability for natural resource damage claims has not been determined.

A complaint was filed by the State of New Jersey against General Electric and Buzby Brothers Materials on June 27, 2007 in connection with Natural Resource Damages.  The State is in settlement discussions with General Electric.  Shapes has not been identified as a party to this matter.

It is unknown as to whether Shapes' insurance carriers will pay any additional response costs or Natural Resource Damages for this Superfund Site.

## VII.    SUMMARY OF PLAN PROVISIONS

### A.    *Introduction*

The Plan is the product of diligent efforts by the Debtors to formulate a plan that provides for a fair allocation of the Debtors' assets in an orderly manner, consistent with the mandates of the Bankruptcy Code and other applicable law.  The liquidation analysis prepared by the Debtors with the assistance of Phoenix reflects an aggregate value for the Debtors as more fully set forth in Exhibit "D" attached hereto.  The aggregate Secured Claims of the CIT Lenders and Arch Acquisition will be in the approximate amount of eighty one million three hundred thousand dollars ($81,300,000.00) on the Confirmation Date.

The Debtors believe that confirmation of the Plan provides the best opportunity for maximum recoveries to the Debtors' Creditors and Interest holders.  The Debtors believe, and will demonstrate to the Bankruptcy Court, that the Debtors' Creditors will receive significantly more value under the Plan than any available alternative.

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.

### B.    *Method of Classification of Claims and Interests and General Provisions*

1.    <u>*General Rules of Classification*</u>

Generally, a Claim is classified in a particular Class for voting and distribution purposes only to the extent the Claim qualifies within the description of that Class, and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description

26

of such other Class or Classes.  Unless otherwise provided, to the extent a Claim qualifies for inclusion in a more specifically defined Class and a more generally-defined Class, it shall be included in the more specifically defined Class.

### 2. *Administrative Claims, Priority Tax Claims, DIP Claims, and Fee Claims*

Administrative Claims, Priority Tax Claims and Fee Claims have not been classified and are excluded from the Classes set forth in Articles III and IV of the Plan in accordance with section 1123(a)(1) of the Bankruptcy Code.

### 3. *Bar Date for Administrative Claims*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims (except for Fee Claims and reasonable out of pocket expenses for Committee members) arising between June 16, 2008 and the Effective Date (Administrative Claims arising between the Petition Date and June 15, 2008 (including Administrative Claims under section 503(b)(9), but not including Fee Claims are to be filed by June 30, 2008, pursuant to a separate order of the Bankruptcy Court entered on or about May 23, 2008 the "First Administrative Claims Bar Date")) must be filed and served on the Reorganized Debtors c/o Epiq, their claims agent, and the Class 10 Liquidation Trustee, and their respective counsel, no later than thirty (30) days after the Effective Date (the "Second Administrative Claim Bar Date").  Any Person that is required to file and serve a request for payment of an Administrative Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.  Objections to requests for payment of Administrative Claims (except for Fee Claims and reasonable out of pocket expenses for Committee members) must be filed and served on the Reorganized Debtors and Plan Administrator, and their respective counsel, and the party requesting payment of an Administrative Claim within twenty (20) days after the Second Administrative Claims Bar Date, or as otherwise fixed by the Bankruptcy Court.

### 4. *Bar Date for Fee Claims*

Unless otherwise ordered by the Bankruptcy Court, requests for payment of Fee Claims incurred through the Effective Date, must be filed and served on the Reorganized Debtors and the Class 10 Liquidation Trustee and their respective counsel no later than thirty (30) days after the Effective Date (the "Fee Claim Bar Date").  Any Professional that is required to file and serve a request for payment of a Fee Claim and fails to timely file and serve such request, shall be forever barred, estopped and enjoined from asserting such Fee Claim or participating in distributions under the Plan on account thereof. Objections to Fee Claims must be filed and served on the Plan Administrator, its counsel, and the requesting party by twenty (20) days after the filing of the applicable request for payment of the Fee Claim or as otherwise fixed by the Bankruptcy Court.

### 5. *Intercompany Claims*

Each of the Debtor entities have historically borrowed based on availability.  Funds are lent or borrowed by each entity based on cash flow and/or cash needs.  Due to the manner in which the companies have historically accounted for intercompany transactions, it is virtually

impossible to identify how much Shapes and Accu-Weld owe to each entity as well as how much Delair and Ultra are owed by each entity. Entities owe money, or are owed money, from a "pool". The entities share certain services including, (i) commercial insurance; (ii) health insurance, dental, life, etc.; (iii) workers compensation; and (iv) minor incidental purchases – supplies, etc. Shapes charges a management fee of $2,000 per month to Delair, Ultra and Accu-Weld. The entities have intercompany transactions relating to the following activities:

   (a)   Delair purchases the majority of its material requirements from Shapes;

   (b)   Accu-Weld rents space in Delair's building to manufacture doors;

   (c)   Delair invoices Accu-Weld for labor, utilities and supplies;

   (d)   Shapes owns Ultra's building; Shapes charges rent to Ultra;

   (e)   Shapes owns Delair's building; Shapes charges rent to Delair.

Given the complexities involved in trying to unravel the Intercompany Claims as well as the benefits derived from and for each of the Debtors' estates to the other, given the blanket liens on all of the assets in favor of the CIT Lenders and Arch Acquisition, and further given the de minimus net effect on Class 10 Creditors as of the Effective Date, Intercompany Claims shall be extinguished. No distributions on account of Intercompany Claims will be made.

## C.   *Unclassified Administrative Claims, Priority Tax Claims and Fee Claims*

Administrative Claims, Priority Tax Claims, and Fee Claims are not classified in the Plan. The treatment of and consideration to be received by holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Fee Claims shall be in full and complete satisfaction, settlement, release and discharge of such Claims. The Debtors' obligations in respect of such Allowed Administrative Claims, Allowed Priority Tax Claims, and Fee Claims shall be satisfied in accordance with the terms of the Plan.

   1.   *Administrative Consolidation*

For purposes of the Plan and for the administrative convenience of the parties, holders of Claims in each Debtor case shall receive the identical treatment referenced below and each unimpaired class and Impaired class shall be deemed to automatically apply in each case as if there were separate plans of reorganization filed in each case (provided that all Class 10 Creditors of all Debtors shall receive their Pro-Rata Share of the Class 10 Pool Escrow). Holders of Interests in each case shall be treated as more fully set forth below. THIS PLAN DOES NOT PROVIDE FOR THE SUBSTANTIVE CONSOLIDATION OF THE DEBTORS ON THE EFFECTIVE DATE but the holders of Claims in Class 10 shall be deemed filed against the consolidated Debtors and shall be deemed one Claim against or obligation of the Debtors as if they were consolidated and shall receive one distribution in accordance with Section 4.5 of the Plan. Based upon the liquidation analysis attached hereto and based upon the fact that each of the Debtors are liable for the CIT DIP Claim and the Arch Acquisition DIP Claim, the Debtors believe the impact of the administrative (but not substantive) consolidation of the treatment of Class 10 Creditors will be nominal. Following the Effective Date of the Plan, creditors and

28

parties-in-interest shall continue to do business with each of the separate Reorganized Debtor entities as such creditors may elect.

2.    *Administrative Claims*

Except to the extent the holder of an Allowed Administrative Claim agrees otherwise, each holder of an Allowed Administrative Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Administrative Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree.  The total amount of unpaid Allowed Administrative Claims shall be subject to approval by the Bankruptcy Court.  To be clear, administrative expenses incurred in the ordinary course of business shall be paid by the Reorganized Debtors in the ordinary course of business after the Effective Date.

3.    *Fee Claims*

Each holder of an Allowed Fee Claim shall receive 100% of the unpaid amount of such Allowed Fee Claim in Cash on the Effective Date or as soon as practicable after such Fee Claim becomes an Allowed Claim.

The law firm of Cozen O'Connor shall serve as the professional fee disbursing agent (the "Disbursing Agent") for the purpose of receipt and distribution of all funds required to be disbursed on account of Allowed Fee Claims.  The Debtors shall deposit in an escrow account with the Disbursing Agent, within one (1) day before the Confirmation Hearing, an amount in Cash equal to the amount of the estimated incurred and unpaid Fee Claims.  At least three (3) days before the Confirmation Date, each Professional asserting a Fee Claim shall serve on the Disbursing Agent an estimate of the maximum amount of unpaid compensation and reimbursement of expenses to be asserted in the Chapter 11 Cases from the Petition Date through the Effective Date.

4.    *Priority Tax Claims*

Except as provided herein, each holder of an Allowed Priority Tax Claim shall be paid in respect of such Allowed Claim either (a) the full amount thereof, without post-petition interest or penalty, in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim or upon such other terms as may be agreed upon by the holder of such Allowed Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree, or (at the election of the Debtors or the Reorganized Debtors) (b) over a period of five (5) years from the Petition Date in equal monthly installments of principal plus interest at the rate of six percent (6%) per annum provided, however, that the aggregate amount of Priority Tax Claims is not in excess of eighty four thousand six hundred sixty seven dollars ($84,667.00).

    5.      *Reclamation and Section 503(b)(9)Claims*

The Debtors have received certain reclamation demand letters and the same will be investigated for allowance. The Debtors have advised reclamation creditors that any alleged right of reclamation is subordinate to the claims of the CIT DIP Lenders and Arch Acquisition under Section 546(c)(1) and may have no value, but such creditors may have a claim under Section 503(b)(9). The Debtors estimate that Section 503(b)(9) claims (for the value of unpaid goods received during the 20 days prior to the Petition Date) is in the approximate amount of $1,014,053 for Shapes; $353,548.49 for Delair; $304,196.62 for Accu-Weld; and $841,808.69 for Ultra. These estimates are preliminary and are subject to further review and investigation. The 503(b)(9) claims will most likely subsume any and all reclamation demands and all Allowed Section 503(b)(9) claims will be paid in the same manner as Administrative Claims set forth in subsection (C)(2) above.

**D.    Classification and Treatment of Unimpaired Claims and Interests**

    1.      *Class 1 Other Priority Claims*

Each holder of an Allowed Other Priority Claim shall be paid in respect of such Allowed Claim (a) the full amount thereof in Cash, as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, or upon such other terms as may be agreed upon by the holder of such Allowed Claim, or (b) such lesser amount as the holder of such Allowed Other Priority Claim and the Debtors prior to the Effective Date and the Reorganized Debtors following the Effective Date might otherwise agree, provided, however that the aggregate amount of the Other Priority Claims are not in excess of two million dollars ($2,000,000.00). Any Allowed Claim in this Class 1 for paid time off shall be satisfied in the ordinary course of business consistent with the Debtors' employment policies and practices and shall not be included in the preceding cap. The holders of Claims in this Class are not impaired and, therefore, are not entitled to vote.

    2.      *Class 2 Secured Real Estate Claims*

This Class shall consist of the holders of Allowed Secured Real Estate tax claims relating to the Delair Real Estate, Accu-Weld Real Estate, Shapes Real Estate and Ultra Real Estate. Each holder shall be deemed to be a separate subclass. Each member of the subclass shall have an allowed secured claim in the amount of real estate taxes due and owing as of the Petition Date (including any interest due and owing but excluding any late charges or penalties in the amount as set forth in the Debtors' Schedules and Statement of Financial Affairs), provided, however, that the aggregate amount of the Secured Real Estate tax claims are not in excess of one million one hundred eleven thousand eight hundred seventy nine dollars eighty two cents ($1,111,879.82). At the option of the Plan Funder, upon the Effective Date, either (i) holders of Class 2 Claims shall be paid in full, in cash, or (ii) the collateral securing such Allowed Secured Real Estate Claim shall be turned over to the holder of such Claim. The Claims in Class 2 are not Impaired and, therefore, the holders of Claims in this Class are not entitled to vote.

3.      *Class 3 Arch Acquisition DIP Claim*

On the Effective Date, at the election of the Plan Funder, the Arch Acquisition DIP Claim shall be (a) rolled over and the Arch Acquisition DIP Agreement shall be amended and restated as the Exit Facility, or (b) repaid in full from the proceeds of the Exit Facility, provided, however, that if for any reason Arch Acquisition or its designee is not the Plan Funder under a plan of reorganization confirmed by the Bankruptcy Court, the Arch Acquisition DIP Claim shall be repaid in full.  The holder of Claims in this Class is not Impaired and, therefore, is not entitled to vote.

4.      *Class 4 CIT DIP Claim*

On the Effective Date, (i) the CIT DIP Claim shall be paid in cash (by wire transfer of immediately available funds) in full, including, without limitation, all accrued and unpaid interest at the contract rate and all costs, fees and expenses set forth in the CIT Revolving Loan DIP Agreements and (ii) to the extent that all or any portion of any letters of credit remain outstanding, the Reorganized Debtors shall also post cash collateral with CIT in the amount of 105% of any such amounts with respect to such letters of credit, or such other treatment as is agreed to by CIT and the CIT Lenders.  All terms, provisions, rights and benefits set forth in any or all of the CIT Revolving Loan DIP Agreements, which, by their respective terms, survive the termination of any such CIT Revolving Loan DIP Agreement and/or the payment of all Obligations (as defined in any of the CIT Revolving Loan Agreements), including, without limitation, all such indemnification, hold-harmless, exculpation and similar provisions (including, without limitation, the provisions of Sections 5.3, 7.12, 10.3, 14.7 (a) and 14.13 of the Amended and Restated Debtor-in-Possession Revolving Credit Agreement dated May 6, 2008, as well as any similar provisions in other Financing Agreements) (the "Surviving Provisions"), shall not be discharged, terminated, limited or otherwise affected in a manner adverse to the CIT Lenders, by virtue of or pursuant to the Plan, the Confirmation Order, or otherwise, but rather all such Surviving Provisions shall remain in full force and effect and shall be and remain binding upon and enforceable against the Debtors and the Estates, the Reorganized Debtors, the Liquidation Trust and the Class 10 Liquidation Trustee, in the same manner as such Surviving Provisions may be enforced pursuant to the CIT Revolving Loan DIP Agreements.  The holders of Claims in this Class are not Impaired and, therefore, are not entitled to vote.

5.      *Class 8 Miscellaneous Secured Claims*

To the extent there are any Allowed Secured Claims in this Class (and excluding any Secured Claims that are the subject of a different treatment as provided in a separate Secured Class), each such Claim shall be deemed to be a separate subclass.  At the option of the Debtors prior to the Effective Date or the Reorganized Debtors after the Effective Date, holders of Class 8 Claims shall receive either the return of the collateral securing such Allowed Secured Claim or the Net Proceeds realized by the Debtors or Reorganized Debtors from the disposition of the collateral securing such Allowed Secured Claim up to the amount of their Secured Claim. The claims in this class relate to miscellaneous equipment owned by the Debtors which will not be needed for reorganization.  The Debtors believe that any deficiency claims after return/sale of collateral will be de minimus and will not exceed an estimated amount of $75,000.00.  Any such

31

deficiency Claim shall be treated as a General Unsecured Class 10 Claim. The holders of Claims in this Class are not Impaired and, therefore, are holders of Claims in this Class are not entitled to vote.

      6.      *Class 12 Interests*

On the Effective Date, all Class 12 Interests shall remain unaffected, valid and binding such that 100% of the membership interests of Shapes, Delair, Accu-Weld and Ultra shall continue to be owned by Shapes/Arch. The holders of Interests in this Class are not Impaired and therefore are not entitled to vote.

**E.      Classification of Impaired Claims and Interests**

      1.      *Class 5 PMSI Claims*

This Class shall consist of the PMSI Claims (which shall include lease agreements for equipment which contains a nominal or $1.00 purchase option), provided that the equipment as to which the claimant holds a PMSI Claim is being retained by the Reorganized Debtors, and each such Claim shall be treated as a separate subclass. Each holder of an Allowed Claim in this Class shall continue to receive the monthly amortized payments set forth in the pre-petition agreements (at the non-default interest rate and without the allowance of any late payments or penalties) with any pre-petition arrearages to be added at the end of the contract and paid in one-lump payment on the thirtieth day following the natural un-accelerated due date under the applicable contract. Any holder of a purchase money security interest in equipment or a lessor of equipment (whose contract contains a nominal or $1.00 purchase option) who has not properly perfected its interest under the Uniform Commercial Code shall be treated as a Class 10 unsecured creditor. The Reorganized Debtors shall have the right to prepay the Class 5 Claims in whole or in part without penalty. If the Reorganized Debtors prepay in part, the Reorganized Debtors shall remain responsible for the balance of the Allowed Claim as set forth herein. Properly perfected Class 5 PMSI Claims shall retain the Liens on their collateral after Confirmation and until they are paid in full, in which event such Liens shall be deemed terminated. The Claims in this Class are Impaired and, therefore, the holders of Allowed Claims in this Class are entitled to vote.

      2.      *Class 6 Shippers and Warehousemen Claims*

Class 6 shall consist of holders of Allowed Secured Claims of the Debtors' Shippers and Warehousemen (who are in possession of Property). Each holder shall be deemed to be a separate subclass. Each member of the subclass shall have an Allowed Secured Claim in the amount of the charges due and owing to them (by agreement of the parties with the consent of Arch Acquisition, or as allowed by Order of the Bankruptcy Court) and such claims shall be paid (at the election of the Debtors) (i) in full (without interest) on the Effective Date or (ii) in 24 equal monthly installments of principal (commencing on the first day of the first month following the Effective Date and continuing on the first day of each month thereafter) with interest at the rate of six percent (6%) per annum. On the Effective Date any Property then in the possession of a Class 6 holder shall be released to the Reorganized Debtors. The Debtors estimate that the maximum deficiency Claims for the holders of Class 6 Claims would be in the

approximate amount of $200,000.00.  Any such deficiency Claim shall be treated as General Unsecured Class 10 Claims.  Class 6 Claims are Impaired and the holders of Allowed Claims in this Class are entitled to vote.

3.      _Class 7 Collateralized Insurance Program Claims_

This Class shall consist of the Allowed Secured Claims of those entities holding cash deposits or letters of credit which are acting as collateral security for the workers compensation insurance policies of the Debtors, each such Claim shall be deemed a separate subclass.  Each holder of a Class 7 Claim shall retain on account of its Allowed Secured Claim the cash deposit or Letter of Credit securing the same; provided, however, that such entities shall, on the Effective Date, return to the Reorganized Debtors all collateral being held in excess of their Allowed Secured Claims (as determined by agreement of the parties with the consent of Arch Acquisition, or further Order of the Bankruptcy Court in the event Debtors or holders request an estimation of any holders' claims under Section 502(c) of the Bankruptcy Code).  The Claims in this Class relate primarily to workers compensation policies and Debtors estimate there will be no deficiency Claims arising from this Class.  The Claims in this Class are Impaired and therefore the holders of Allowed Claims in this Class are entitled to vote.

4.      _Class 9 Environmental Claims_

This Class shall consist of all Environmental Claims exclusive of Deficiency Claims.  On the Effective Date, the EPA shall receive the sum of three hundred thousand dollars ($300,000.00) in full and complete satisfaction of its claims set forth in Section I of Exhibit "E" attached hereto which amount the EPA shall allocate accordingly, and the sum of twenty five thousand dollars ($25,000.00) in full and complete satisfaction of its claims set forth in Section II of Exhibit "E" attached hereto which amount the EPA shall allocate accordingly.  The NJDEP shall receive the sum of twenty five thousand dollars ($25,000.00) in full and complete satisfaction of its claims set forth in Section II, III and IV of Exhibit "E" hereto, which amount the NJDEP shall allocate accordingly  Funding for these distributions and other distributions to holders of Environmental Claims shall be made solely from proceeds of applicable insurance policies.  Any Deficiency Claims relating to Environmental Claims shall be treated as General Unsecured Class 10 Claims.  The holders of Claims in Class 9 are Impaired and, therefore, are entitled to vote.

5.      _Class 10 General Unsecured Claims_

This Class shall consist of General Unsecured Claims.  Unless otherwise agreed to by the holder of an Allowed General Unsecured Claim and the Class 10 Liquidation Trustee, each holder of an Allowed General Unsecured Claim shall receive, in accordance with the Plan Administration Agreement, its Pro Rata share of (i) the sum of the Class 10 Pool Escrow and the distributions under the Plan Note; (ii) the Reserves Balances; and (iii) net recoveries on account of the Avoidance Actions and Estate Actions.  On the Effective Date, all holders of Allowed Class 10 Claims shall become beneficiaries of the Liquidation Trust; all Class 10 Claims shall be transferred to and assumed by the Liquidation Trust; and the Debtors and their Property, and the Reorganized Debtors and their property shall be free and clear of all Class 10 Claims and be deemed released and discharged from all Class 10 Claims.  All Deficiency Claims shall be

33

treated as Class 10 General Unsecured Claims. The holders of Claims in this Class are Impaired and, therefore, entitled to vote.

6. *Class 11 Ben Interests*

This Class shall consist of the Ben Interests. On the Effective Date, all Class 11 Interests shall be deemed cancelled, null and void and of no force and effect. Accordingly, Class 11 Interests are deemed to reject the Plan and, therefore, are not entitled to vote.

**F.    *Means For Implementation Of The Plan***

1. *Corporate Action*

On the Effective Date and automatically and without further action, (i) each existing member (or manager of each operating entity) of the Debtors will be deemed to have resigned, (ii) the new members, managers and officers of the Reorganized Debtors shall be those identified in the Plan Supplement, and (iii) the Class 10 Liquidation Trustee and Reorganized Debtors shall be authorized and empowered to take all such actions and measures necessary to implement and administer the terms and conditions of the Plan. Each Debtor's Operating Agreement will be amended as of the Effective Date to the extent necessary to incorporate the provisions of the Plan and to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code. The rights and interests of the New LLC Interests shall be governed by and controlled pursuant to the terms and conditions of the Reorganized Debtors' Operating Agreements, which shall be included in and filed with the Plan Supplement.

2. *Liquidation Trust*

On the Effective Date the Reorganized Debtors shall execute and deliver the Plan Administration Agreement, which shall create a trust; provide for holders of Allowed Class 10 Claims to become beneficiaries of the Liquidation Trust; convey all Avoidance Actions and Estate Actions to the Liquidation Trust; appoint the Class 10 Liquidation Trustee and authorize the Class 10 Liquidation Trustee to bring such actions, provide for the acceptance of the Avoidance Actions and Estate Actions, the proceeds thereof, and the Reserves provided for in the Plan, and set forth the terms and conditions for distributions from such Reserves.

From and after the Effective Date, the Liquidation Trust and the Class 10 Liquidation Trustee shall hold and administer the Avoidance Actions, the Estate Actions and the Reserves. All of the Reserves shall vest with the Class 10 Liquidation Trustee on the Effective Date.

3. *Class 10 Liquidation Trustee*

On or before the Effective Date, the Committee, with the consent of the Plan Funder, which consent shall not be unreasonably withheld, shall appoint one Class 10 Liquidation Trustee to serve as such pursuant to the Plan Administration Agreement (the "Plan Administration Agreement"). The Plan Administration Agreement is attached as an exhibit to the Plan Supplement. The Class 10 Liquidation Trustee shall administer the Plan subject to the foregoing duties and powers, which shall include the following:

CHERRY_HILL\444634\5

(a) To commence, prosecute, compromise and/or settle the Avoidance Actions and Estate Actions, and objections to General Unsecured Claims and the Reorganized Debtors shall reasonably cooperate with the Class 10 Liquidation Trustee with respect to same;

(b) To make decisions regarding the retention or engagement of professionals and to pay, without court order, all reasonable fees and expenses incurred after the Effective Date;

(c) To make or direct distributions to holders of Allowed Class 10 Claims and to otherwise implement and administer the Reserves and the Plan with respect to General Unsecured Claims;

(d) To set off amounts owed to the Debtors prior to the Petition Date against any and all amounts otherwise due to be distributed to the holder of an Allowed Class 10 Claim under the Plan; and

(e) To take all other actions not inconsistent with the provisions of the Plan deemed necessary or desirable in connection with its rights and duties hereunder and under the Plan Administration Agreement.

4.    _Exit Facility_

Upon the Effective Date, and subject to Section 3.6 of the Plan, the Plan Funder shall either (a) amend and restate the Arch Acquisition DIP Agreement or (b) enter into a new loan as part of the Plan Funding Commitment (the "Exit Facility"). The principal amount of the Exit Facility outstanding on the Effective Date will be approximately $26,700,000.00 (prior to funding the Effective Date Funding Requirements (as defined below)) plus any and all unpaid interest, costs and fees that accrued prior to the Effective Date on the Arch Acquisition DIP Loan, less any amount converted for purposes of the Plan Funding Commitment. The Plan Funder's Liens shall not attach to the Reserves, Reserves Balances, the Avoidance Actions or Estate Actions or proceeds of the same. The Liens and property interests of the Plan Funder shall remain perfected from and after the date of the Confirmation Order without the need of the Plan Funder to take any or further action or file or record any notes with respect thereto. The Confirmation Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of the Plan Funder's Liens without the necessity of filing or recording the Confirmation Order (other than as docketed in the Chapter 11 Cases) or any financing statement, mortgage or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Plan Funder's Liens, or to entitle the Plan Funder to the same priorities granted to the agent under the Arch Acquisition DIP Loan or herein (including, in respect of cash or deposits or investment property, any requirement that the Plan Funder have possession of or dominion and control over, any such cash in order to perfect an interest therein); provided that the Debtors or Reorganized Debtors shall execute and deliver to the Plan Funder and the Plan Funder may file or record financing statements or other instruments further to evidence or further to perfect the Plan Funder's Liens authorized, granted and perfected under the Exit Facility and hereby; and provided further that

35

no such filing or recordation shall be necessary or required in order to create or perfect any such Lien.

5.    *Plan Funding Commitment*

Except as expressly set forth in the Plan or the Plan Funding Commitment, working capital of the Debtors and Reorganized Debtors together with the proceeds of the Plan Funding Commitment shall be used for general working capital and capital expenditures of the Reorganized Debtors, to fund on the Effective Date or make provision for payment after the Effective Date of the distributions required under the Plan including, without limitation, the Plan Expense Reserve, the Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Claims, Allowed Other Priority Claims, Allowed Cure Claims up to an aggregate amount of $878,000, Allowed Secured Real Estate Claims, the CIT DIP Claim (which, pursuant to the Plan, shall be paid in full, in cash, on or before the Effective Date), and the Class 10 Pool Escrow. In the event that the cash portion of the Plan Funding Commitment is insufficient to fund and pay the Class 10 Pool Escrow on the Effective Date, and the Plan Funder does not agree to increase the cash portion of the Plan Funding Commitment, then the payments on the Effective Date to the Class 10 Pool Escrow will be satisfied by issuance of the Plan Note. In consideration for meeting its funding commitments under the Plan Funding Commitment and otherwise in the aggregate amount necessary to effectuate the terms of this Plan (which will be paid in cash and/or in part by way of a conversion of the Arch Acquisition DIP Claim), the Plan Funder shall receive one hundred percent (100%) of the New LLC Interests in the Reorganized Shapes/Arch Holdings L.L.C. that are authorized and issued as of the Effective Date (the "New LLC Interests").

6.    *Alternative Transaction and Break-Up Fee*

The New LLC Interests will be subject to the Competitive Process (as described hereinabove and in the Competitive Process Motion) and ultimately, the New LLC interests may be issued to a party other than Arch Acquisition. In the event that Arch Acquisition is not the successful bidder upon the conclusion of that process then Arch Acquisition shall receive the break-up fee and expense reimbursement approved by the Bankruptcy Court pursuant to the terms of the Competitive Process Motion.

7.    *Revesting*

Except as otherwise provided for in the Plan, the Confirmation Order, the Final Orders, as applicable (including, without limitation, the liens being granted and/or retained by Arch Acquisition), on the Effective Date, without any further action, each of the Reorganized Debtors will be vested with all of the Property of the Estates (excluding all Avoidance Actions and Estate Actions), free and clear of all Claims, Liens and Interests, and shall have all of the powers of a limited liability company under applicable law. As of the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire and dispose of property and settle and compromise claims or interests without the supervision of the Bankruptcy Court or the Class 10 Liquidation Trustee, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

36

8. _Transfer of Real Estate_

On the Effective Date, but subject to the Class 2 Secured Real Estate Claims to the extent not satisfied, (a) Reorganized Shapes L.L.C. may (at its election) either retain all real estate or (i) convey the Shapes Real Estate to Shapes Realty New Jersey L.L.C., (ii) convey the Delair Real Estate to Delair Realty New Jersey L.L.C. (or Shapes Realty New Jersey L.L.C.); and (iii) convey the Ultra Real Estate to Ultra Realty New Jersey L.L.C.; and (b) Reorganized Accu-Weld L.L.C. may (at its election) either retain all real estate or convey the Accu-Weld Real Estate to Accu-Weld Realty Pennsylvania L.L.C., free and clear of all liens, claims and encumbrances other than the Class 2 Real Estate Claims.

9. _Distributions for Claims Allowed as of the Effective Date_

Except as otherwise provided herein or as ordered by the Bankruptcy Court, distributions to be made on account of Claims that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable.  Any distribution to be made on the Effective Date pursuant to the Plan shall be deemed as having been made on the Effective Date if such distribution is made on the Effective Date or as soon thereafter as is practicable.  Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

10. _Reserve Accounts_

As soon as practicable after the Effective Date, the Class 10 Liquidation Trustee will establish and maintain the following reserve accounts:

(a) Reserve for Plan Expenses.  A reserve in an amount equal to the estimated Plan Expenses (the "Plan Expense Reserve"), which upon the closing of the Chapter 11 Cases, the remainder, if any, will be released and distributed to Reorganized Debtors; other than the initial funding of the Plan Expense Reserve in the amount of two hundred thousand ($200,000.00) (or with respect to legal fees and other professional fees incurred by the Reorganized Debtors at the request of the Plan Funder), the Reorganized Debtors shall have no further liability for such expenses, and

(b) Disputed Claims Reserve for Class 10 Claims.

11. _Reserves for Disputed Administrative, Fee, Priority Tax and Other Priority Claims_

On or before the Effective Date, or shortly after the applicable bar date, the Reorganized Debtors shall establish and maintain reserves for all other Disputed Claims in (i) amount equal to what would be distributed to holders of Disputed Administrative, Fee, Priority Tax, Other Priority Tax and Cure Claims in the event that their Disputed Claims were deemed Allowed Claims on the Effective Date, or such applicable bar date, or (ii) such other lesser amount as may be agreed by the parties or approved by the Bankruptcy Court upon motion of the Reorganized Debtors; provided, however, that the Reorganized Debtors shall not be required to reserve funds

37

on account of employee Claims for paid time off or vacation benefits of employees whose employment was continued by the Debtors or will be continued by the Reorganized Debtors (the "Disputed Administrative, Fee, Priority Tax, Other Priority Tax and Cure Claims Reserve"). With respect to such Disputed Claims, if, when, and to the extent any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Reorganized Debtors to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all such Disputed Claims, which shall not include Disputed Class 10 General Unsecured Claims, have been resolved and distributions made in accordance with the Plan, shall be released and distributed to the Reorganized Debtors. No payments or distributions shall be made with respect to a Claim that is a Disputed Claim pending the resolution of the dispute by Final Order.

12.    _Reserves for Disputed General Unsecured Claims_

On or shortly after the Rejection Claims Bar Date, the Class 10 Liquidation Trustee shall establish and maintain a reserve for all Disputed General Unsecured Claims in an amount equal to what would be distributed to holders of Disputed General Unsecured Claims (the "Disputed General Unsecured Claims Reserve"). For purposes of establishing a reserve for Disputed General Unsecured Claims, Cash will be set aside as soon as practicable after the Effective Date equal to the amount that would have been distributed to the holders of Disputed General Unsecured Claims had their Disputed General Unsecured Claims been deemed Allowed Claims on the Effective Date or (ii) such other lesser amount as may be agreed by the parties or approved by the Bankruptcy Court. With respect to such Disputed General Unsecured Claims, if, when, and to the extent any such Disputed General Unsecured Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefore shall be distributed by the Class 10 Liquidation Trustee to the Claimant in a manner consistent with distributions to similarly situated Allowed Claims. The balance of such Cash, if any, remaining after all Disputed General Unsecured Claims have been resolved and distributions made in accordance with the Plan, shall be released and re-distributed to holders of Allowed Claims. No payments or distributions shall be made with respect to a Claim that is a Disputed General Unsecured Claim pending the resolution of the dispute by Final Order.

13.    _Claims Objection Deadline_

Notwithstanding D.N.J. LBR 3007-1, Objections to Claims shall be filed and served upon each affected Creditor no later than ninety (90) days after the Effective Date, provided however, that this deadline may be extended by the Bankruptcy Court upon motion of the Class 10 Liquidation Trustee or Reorganized Debtors, with or without notice or hearing. Notwithstanding the foregoing, unless the Plan or an order of the Bankruptcy Court specifically provides for a later date, any proof of, or other assertion of a Claim filed after the deadline established for filing Claims of that type shall be automatically disallowed as a late filed Claim, without any action by the Class 10 Liquidation Trustee or the Reorganized Debtors, unless and until the party filing such Claim obtains the written consent of, the Class 10 Liquidation Trustee or the Reorganized Debtors, as applicable, or obtains an order of the Bankruptcy Court upon notice to the Class 10 Liquidation Trustee and Reorganized Debtors that permits the late filing of the Claim. Moreover, the holder of such disallowed late-filed Claim shall be forever barred from asserting

38

such Claim against the Liquidation Trust the Debtors, the Estates or their Property, Reorganized Debtors or their property. In the event any proof of claim is permitted to be filed after the Confirmation Date pursuant to an order of the Bankruptcy Court or the Plan, the Class 10 Liquidation Trustee or Reorganized Debtors, as applicable, shall have sixty (60) days from that bar date or the filing of such proof of claim or order to object to such Claim, which deadline may be extended by the Bankruptcy Court upon motion of the Class 10 Liquidation Trustee or the Reorganized Debtors with or without notice or a hearing. To the extent that a Creditor files a proof of claim in excess of the amounts set forth in the Debtors' Schedules and Statement of Financial Affairs (or seeking a different classification of the same or files a Claim not set forth in the Debtors' Schedules), it is most probable that an objection to the same will be filed. However, the Plan provides that all Claims in Class 10 will be transferred to the Liquidation Trust and the Class 10 Liquidation Trustee shall thereafter have the right to object to Claims, but most likely will do so for the same reasons set forth above as if the Debtors were commencing Claim objections. As such, the ultimate dividend percentage to Allowed Class 10 Creditors is dependent upon the success of such objections. Upon a preliminary review of the Claims' register, the Debtors believe that objections will be filed prior to confirmation with respect to all Claims that have been filed asserting Environmental Claims.

14.     *Settlement of Disputed Claims*

Objections to Claims may be litigated to judgment or withdrawn, and may be settled with the approval of the Bankruptcy Court, except to the extent such approval is not necessary as provided in this section. After the Effective Date, and subject to the terms of the Plan, the Class 10 Liquidation Trustee or the Reorganized Debtors, as applicable, may settle any Disputed Claim where the result of the settlement or compromise is an Allowed Claim in an amount of $100,000 or less without providing any notice or obtaining an order from the Bankruptcy Court. All proposed settlements of Disputed Claims where the amount to be settled or compromised exceeds $100,000 shall be subject to the approval of the Bankruptcy Court after notice and an opportunity for a hearing.

15.     *Unclaimed Property*

If any distribution remains unclaimed for a period of ninety (90) days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder of an Allowed Claim or Interest entitled thereto, such unclaimed property shall be forfeited by such holder, whereupon all right, title and interest in and to the unclaimed property shall (i) with respect to such unclaimed distributions to Allowed Clams in Class 10, be held in reserve by the Class 10 Liquidation Trustee to be distributed Pro Rata to holders of Allowed Claims in Class 10 in accordance with this Plan, and (ii) with respect to other Classes and types of Claims, revert to the Reorganized Debtors.

16.     *Release and Preservation of Certain Liens*

Except as otherwise provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, including, without limitation, the Liens securing the Exit Facility and any Liens of Holders of Allowed Claims in Class 5 that are paid over time (which shall survive Confirmation and shall remain valid, enforceable and

39

perfected Liens against property of the Reorganized Debtors, respectively), on the Effective Date, all other mortgages, deeds of trust, Liens or other security interests against the Property of the Debtors' estates shall be released, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests shall revert to Reorganized Debtors and their successors and assigns.

17.    _Withholding Taxes_

Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder.  All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.

18.    _Fractional Cents_

Any other provision of this Plan to the contrary notwithstanding, no payment of fractions of cents will be made. Whenever any payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole cent.

19.    _Payments of Less than Twenty-Five Dollars_

If a cash payment otherwise provided for by this Plan with respect to an Allowed Claim would be less than twenty-five ($25.00) dollars (whether in the aggregate or on any payment date provided in this Plan), notwithstanding any contrary provision of this Plan, the Class 10 Liquidation Trustee shall not be required to make such payment and such funds shall be otherwise distributed to holders of Allowed Claims in such Class in accordance with the Plan, or if all Allowed Claims in such Class have been satisfied or reserved for in accordance with the Plan, then such excess fractional dollars will be distributed to the Reorganized Debtors.

**G.    _Treatment Of Executory Contracts And Unexpired Leases_**

1.    _Rejection of All Agreements_

Any and all pre-petition leases or executory contracts included on the Debtors' Schedule G and not (i) previously assumed by the Debtors or the subject of a pending motion to assume of the Bankruptcy Court pending on the Confirmation Date, (ii) previously rejected or the subject of a pending motion to reject pending on the Confirmation Date, or (iii) designated on Schedule 8.1 to this Plan, shall be deemed rejected by the Debtors effective as of the Confirmation Date, but subject to the occurrence of the Effective Date.  Schedule 8.1 to the Plan shall be filed at least fifteen (15) days prior to the Confirmation Hearing and served upon the non-Debtor parties to the contracts and leases, and shall include the Cure Claim that the Debtors believe will be payable as of the Effective Date for each contract and lease thereon.  The Debtors shall have the right to modify Schedule 8.1 to the Plan  up to two (2) days prior to the Confirmation Hearing, by filing a modified schedule with the Bankruptcy Court and serving the modified Schedule 8.1 upon any counter-party that is added to or deleted from the schedule.

Unless otherwise ordered by the Bankruptcy Court, if a non-Debtor party to an executory contract or unexpired lease listed on Schedule 8.1 to the Plan disagrees with the Cure Claim shown thereon for its executory contract or unexpired lease, a Cure Claim must be filed with the

Bankruptcy Court and served on the Debtors and their counsel so as to be received at least five (5) days prior to the Confirmation Hearing (the "Cure Claims Bar Date").  Any Person that is a non-Debtor party to an executory contract or unexpired lease on Schedule 8.1 to the Plan that fails to timely file and serve a Cure Claim shall be bound by the amount shown by the Debtors and shall be forever barred, estopped and enjoined from asserting any other or additional Cure Claim and no objection to a late claim shall be necessary.  Within ten (10) days after the Effective Date, all undisputed Cure Claims due and owing under any assumed contracts or leases shall be paid, and all Cure Claims that are the subject of dispute shall be paid upon further agreement of the parties or upon entry of an order of the Bankruptcy Court allowing such Cure Claims.  No portion of any disputed Cure Claims shall be paid unless and until the amount of such Claim is fixed by agreement of the parties or order of the Bankruptcy Court.

Notwithstanding the foregoing, on the Effective Date, all insurance policies (regardless of the inception date of coverage) for any one or more Debtors which provide for any and all Claims made or occurred arising from or related to any environmental laws of any Federal, State or local governmental entity or any claim asserted by a non-governmental entity for environmental claims (directly or by way of indemnity and whether under contract or tort law) shall be deemed assumed by the Reorganized Debtors.  Any motion filed to assume contracts or the Schedule 8.1 shall contain the Cure Claims required to be paid upon assumption and all contracting parties shall have ten (10) days from the filing of the motion to assume, or in the case of policies included on Schedule 8.1, until the Cure Claims Bar within which to object to the stated Cure Claims or thereafter be deemed to have waived the right to object to the same.

2.    _Collective Bargaining Agreements_

The Debtors are party to the following collective bargaining agreements (each a "CBA"): (a) one CBA between Shapes and Delair, on the one hand, and Teamsters – Local 837 ("Local 837"), on the other hand; (b) one CBA between Ultra and Local 837; and (c) three CBAs between Accu-Weld and the United Independent Union ("UIU") each covering separate groups of employees.

Since the Petition Date, the Debtors (a) have submitted proposals to Local 837 and to the UIU for modifications to the CBAs with each of the Debtors, and (b) have met with Local 837 three times regarding the Shapes/Delair CBA and with the UIU four times regarding the Accu-Weld CBAs. To date, no final agreements have been reached with either Local 837 or the UIU regarding the Debtors' proposed modifications. Negotiations with both Unions are continuing. The proposals include discussions regarding overtime, vacation, health and welfare obligations, pension obligations, wage adjustments, seniority rules, grievance procedures and other issues.

The Debtors have advised both Local 837 and the UIU that, absent consensual modifications to the CBAs, the Debtors may decide to seek rejection of one or more of the CBAs and, if such determination is made, the Debtors will submit proposals and information in conformity with the requirements of section 1113 of the Bankruptcy Code and seek the appropriate supplemental relief (by way of a motion under section 1113) from the Bankruptcy Court.  In connection with the filing of such motion, the Debtors will set forth the grounds and necessity for the relief being requested (which in part will be a function of the results of the negotiations).  In the event that the Debtors' obligations under their multi-employer pension

41

plans are terminated (by consent or further order of the Bankruptcy Court) then, withdrawal liability claims against the Debtors will arise which would be treated as Class 10 Claims. Estimating the amount of such claims is dependent upon actuarial factors and the funded status of the pension plans.  Each pension plan administrator files an annual Form 5500 with the Department of Labor which form sets forth a financial statement for each of the plans and the information contained therein is utilized in the calculation of any withdrawal liability claims. The last time such information was readily available was for the Form 5500s filed at the end of 2006 which would be utilized to calculate the withdrawal liability claims for calendar year 2007. Based upon that information, the aggregate amount of potential  withdrawal liability claims would be in the approximate amount of $5,219,831.00. Any withdrawal liability claims that may arise in 2008 may be higher or lower depending upon the information contained in the Form 5500's to be filed by the pension plan administrators.  In addition, the Debtors' withdrawal from the Local 837 multi-employee pension plan (the "MEPP") may have adverse consequences for that MEPP that generate forms of liability for the Debtors other than withdrawal liability.  For example, it is possible that the Debtors' withdrawal could generate a "mass withdrawal" from the MEPP and termination liability under ERISA.  Determining the nature and extent of this liability requires more information than the Debtors currently have available regarding the MEPP, including certain actuarial factors.

3.    *Claims for Damages*

All proofs of claim with respect to Claims arising from the rejection of executory contracts or unexpired leases shall, unless another order of the Bankruptcy Court provides for an earlier date, be filed with Epiq within thirty (30) days after the mailing of notice of Effective Date.  All proofs of claim with respect to Claims arising from the rejection of executory contracts shall be treated as Class 10 General Unsecured Claims, as applicable, for purposes of a distribution pursuant to the Plan, unless and until the Person or Entity asserting such Claim obtains an order of the Bankruptcy Court upon notice to the Debtors, that allows the Claims in another Class under the Plan.  Unless otherwise permitted by Final Order, any proof of claim that is not filed before the earlier of the Bar Date or the Confirmation Hearing (other than those Claims arising from the rejection of executory contracts or unexpired leases which may be filed within thirty (30) days after mailing of the notice of Effective Date as set forth above) shall automatically be disallowed as a late filed Claim, without any action by the Class 10 Liquidation Trustee, and the holder of such Claim shall be forever barred from asserting such Claim against the Debtors, the Estates, the Reorganized Debtors or property of Reorganized Debtors.  The Debtors have no ability to estimate the amount of rejection damage Claims as they have no way of predicting which executory contracts and unexpired leases the Plan Funder will ultimately decide to assume.

**H.    *Effect of Confirmation of the Plan***

Without limiting any provision of the Plan, the Plan provides for the following release, exculpation, discharge and injunctions:

1.    *General Release and Injunction*

42

On the Effective Date, (i) the Debtors, the Estates, and their respective successors or assigns, including, without limitation, the Liquidation Trust, the Class 10 Liquidation Trustee, and any Person or Entity claiming a right in a derivative capacity on their behalf and (ii) any holder of a Claim or Interest ((i), (ii) and any holder of a Claim classified under Class 10 General Unsecured Claims, together being the "Releasors") hereby unconditionally and irrevocably release Arch Acquisition, the Plan Funder, the Committee, CIT, and the CIT Lenders, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (collectively, the "Released Parties"), from any and all direct, indirect or derivative claims, obligations, suits, judgments, Liens, damages, rights, causes of action, liabilities, claims or rights of contribution and indemnification, and all other controversies of every type, kind, nature, description or character whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act or omission, transaction, event or other occurrence taking place from the beginning of the world to the Effective Date, arising from or relating in any way, directly or indirectly, to the Debtors, their Property, assets, operations or liabilities, the Arch Acquisition DIP Loan, the Arch Acquisition DIP Agreement, the CIT DIP Loan, the CIT Loan, the CIT Revolving Loan DIP Agreements, the Chapter 11 Cases, the Plan, or the Disclosure Statement; provided, however, that the Releasors shall not be deemed to have released any rights to enforce the terms of the Plan or their rights to distributions thereunder.   The Releasors hereby waive any rights or benefits under California Civil Code Section 1542, which provides that:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with Debtors and any rights or benefits under similar laws.

The Confirmation Order shall specifically provide for the foregoing releases.   The foregoing release shall not include Claims (other than their Claims against the Debtors as reflected in any proof of claim) of members, managers and officers of the Debtors against the Released Parties that did not enter into mutual releases with Arch Acquisition or the CIT Lenders pursuant to Article 4.5.5 of the Final DIP Orders entered with respect to Arch Acquisition.

The Debtors do not believe there are any causes of action against the Released Parties but the same is necessary and essential to induce the Plan Funder to provide the Exit Facility and the CIT Lenders to extend and continue extending credit under the DIP Revolver Agreement, and Plan Funding Commitment under the Plan for all classes of creditors, without which funding the Plan could and would not be confirmed.

On the Effective Date, the Releasors shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind, asserting any setoff, right of subrogation, contribution, indemnification or recoupment of any kind, directly or indirectly, or proceeding in any manner in any place inconsistent with the releases granted to the Released Parties pursuant to the Plan.   The Confirmation Order shall specifically provide for such injunction.

43

2.    *Release Consideration*

The consideration the Plan Funder shall provide, or has provided, in exchange for the releases described in the Plan and the receipt of the New LLC Interests, include the following (collectively, the "Plan Funder Consideration"):

(a)    The Exit Facility and Cash required under the Plan Funding Commitment and for the Plan Funding Commitment Excluded Items; and

(b)    The sum of three hundred thousand dollars ($300,000) previously paid on behalf of the Estates in accordance with the Final DIP Orders.

3.    *Exculpation*

On the Effective Date, CIT, the CIT Lenders, Arch Acquisition and the Plan Funder and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective present and former shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants (solely in their capacities as such) shall be deemed to release each of the other of and from any claims, obligations, rights, causes of action and liabilities for any act or omission occurring solely during the period prior to the Effective Date, generally, including, without limitation, any act or omission occurring during the Chapter 11 Cases, the Arch Acquisition DIP Loan**,** the Arch Acquisition DIP Agreement, the Exit Facility, the Plan Funding Commitment, the CIT DIP Loan, the CIT Revolving Loan DIP Agreements, the Disclosure Statement, the pursuit of approval of the Disclosure Statement, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which constitute willful misconduct or gross negligence, and all such Persons, in all respects, shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and under the Bankruptcy Code.  Nothing contained herein shall release any party from its obligations under the Plan and related documents.

4.    *Discharge*

Except as otherwise provided for in the Plan, the Confirmation Order or any other order of the Bankruptcy Court (including, without limitation, the Interim Orders and Final DIP Orders), in accordance with section 1141(d) of the Bankruptcy Code, entry of the Confirmation Order acts as a discharge effective as of the Effective Date of all debts, Claims against, Liens on, and Interests in the Debtors, their assets and Property, which debts, Claims, Liens and Interests arose at any time before the entry of the Confirmation Order.  The discharge of the Debtors shall be effective as to each Claim and Interest, regardless of whether a proof of Claim or Interest was filed or whether the Claim or Interest was Allowed or whether the holder of the Claim or Interest votes to accept the Plan. On the Effective Date, as to each and every discharged Claim and Interest, any holder of such Claim or Interest shall be precluded from asserting such Claim or Interest against the Debtors or Reorganized Debtors or their assets or properties.

44

5.    *Injunction*

On and after the Effective Date, except to enforce the terms and conditions of the Plan before the Bankruptcy Court or as permitted under the Final DIP Orders and Exit Facility, and except to the extent the holders of Environmental Claims are seeking to recover under any and all applicable insurance policies (and in all cases may not assert any Claims against the Reorganized Debtors but may name them nominally for purposes of seeking recovery solely against applicable insurance coverage), all Persons or Entities who have held, hold or may hold any Claim against or Interest in the Debtors are, with respect to any such Claim or Interest, permanently enjoined from and after the Effective Date from:  (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against the Reorganized Debtors or Class 10 Liquidation Trustee or the Liquidation Trust or any of their properties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or Entities and all of their respective direct and indirect parents, subsidiaries and affiliates, together with each of their respective shareholders, members, managers, general partners, limited partners, officers, directors, employees, agents, representatives, attorneys and advisors or consultants, or any property of any of the foregoing (collectively, the "Protected Parties"); (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, against any of the Protected Parties of any judgment, award, decree or order; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against any of the Protected Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due to any of the Protected Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan. Nothing in this section shall preclude CIT or the CIT Lenders from asserting and enforcing any rights, defenses or claims available to them, or the Committee or the Class 10 Liquidation Trustee, as applicable, from asserting Avoidance Actions or Estate Actions or continuing to pursue Avoidance Actions or Estate Actions commenced by the Committee prior to its termination under Section 11.19.

6.    *Insurance*

This Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtors (including, without limitation, its officers or directors) or any other person or entity. Likewise, the Plan and Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or the carriers.

## I.    *Retention of Jurisdiction*

The Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of, and related to, the case, the Plan, and the Liquidation Trust to the fullest extent permitted by law pursuant to, and for the purposes of Section 105(a) and Section 1142 of the Bankruptcy Code and for the other purposes described in Article X of the Plan.

**J.**     ***Miscellaneous Provisions***

1.     <u>*Pre-Confirmation Modification*</u>

On notice to and opportunity to be heard by the United States Trustee and the Committee, the Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by Arch Acquisition (and the CIT Lenders to the extent the same is material to the CIT Lenders).

2.     <u>*Post-Confirmation Immaterial Modification*</u>

With the approval of the Bankruptcy Court and on notice to and an opportunity to be heard by the United States Trustee and the Reorganized Debtors and without notice to holders of Claims and Interests, the Class 10 Liquidation Trustee, may, insofar as it does not materially and adversely affect the rights and interests of holders of Claims, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of this Plan; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funder (and CIT Lenders to the extent the same is material to the CIT Lenders).

3.     <u>*Post-Confirmation Material Modification*</u>

On notice to and an opportunity to be heard by the United States Trustee, the Plan may be altered or amended after the Confirmation Date by the Reorganized Debtors or the Class 10 Liquidation Trustee in a manner which, in the opinion of the Bankruptcy Court, materially and adversely affects holders of Claims, provided that such alteration or modification is made after notice and a hearing and otherwise meets the requirements of section 1127 of the Bankruptcy Code; provided, however, that any such amendment or modification of the Plan must be approved in writing by the Plan Funder (and CIT DIP to the extent the same is material to the CIT Lenders).

4.     <u>*Withdrawal or Revocation of the Plan*</u>

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and upon prior notice to the Committee, <u>provided</u>, <u>however</u>, that the Debtors may not revoke or withdraw the Plan without the written consent of Arch Acquisition.  If the Debtors revoke or withdraw the Plan, if Confirmation or the Effective Date does not occur, then, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in the Debtors or any other Person, (ii) prejudice in any manner the rights of the Debtors or any other Person, or (iii) constitute an admission of any sort by the Debtors or any other Person.

5.    *Payment of Statutory Fee*

All fees payable pursuant to section 1930 of title 28 of the United States Code (the "Quarterly Fees") (i) which accrued on or prior to the Confirmation Date shall be paid by the Debtors on the Effective Date or as soon thereafter as is practicable and (ii) which accrued after the Confirmation date shall be paid as follows:

(a)    For the period from the Effective Date through and including the date the Reorganized Debtors provide written notice to the Class 10 Liquidation Trustee that the Reorganized Debtors seek to close the Chapter 11 Cases because the Reorganized Debtors have performed all of their duties necessary to substantially consummate the Plan (the "Case Closing Notice"), the Reorganized Debtors and the Liquidation Trust shall pay their *pro rata* share of the Quarterly Fees based upon the disbursements actually made by each of (x) the Reorganized Debtors and (y) the Liquidation Trust and/or the Class 10 Liquidation Trustee for such period and through the date on which the Bankruptcy Court enters a Final Decree closing the Chapter 11 Cases; and

(b)    In the event the Class 10 Liquidation Trustee requires the Chapter 11 Cases to remain open after receipt of the Case Closing Notice, the Quarterly Fees shall be paid solely by the Class 10 Liquidation Trustee from the Liquidation Trust until such time as the Chapter 11 Cases are closed.

6.    *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person or Entities.

7.    *Exemption From Transfer Taxes*

Pursuant to Bankruptcy Code section 1146(a): (a) the issuance, transfer, or exchange of notes or equity securities under the Plan; (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest; (c) the making or assignment of any contract, lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in the furtherance of, or in connection with, the Plan, including, without limitation, the transfers to be made under Section 5.8 of the Plan, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, or dissolution, stock purchase agreements, stockholders agreements or stockholders rights agreements; deeds, bills of sale, or transfers of tangible property will not be subject to any stamp tax, or other similar tax or any tax held, to be a stamp tax or other similar tax by applicable law.

## K.    *Effectiveness of the Plan*

The Plan shall not be confirmed unless and until the following conditions have been satisfied in full or waived by (i) the Debtors, (ii) Arch Acquisition, and (iii) where applicable, the CIT Lenders:

CHERRY_HILL\444634\5

(a)    The Confirmation Order shall be in form and substance satisfactory to the Debtors, Arch Acquisition, and the CIT Lenders, which Confirmation Order shall approve all provisions, terms and conditions of the Plan;

(b)    No amendments, modifications, supplements or alterations shall have been made to the Plan or any document delivered in connection therewith, without the express written consent of the Debtors and Arch Acquisition (which consent may be granted, withheld, or conditioned in their respective sole discretion), and the consent of CIT to the extent that the same is material to the CIT Lenders;

(c)    Execution of new Collective Bargaining Agreements in form and substance satisfactory to the Debtors and Arch Acquisition; and

(d)    The funds available under the Plan Funding Commitment shall be sufficient to fund distributions under the Plan (including reasonable reserves).

In the event (i) new Collective Bargaining Agreements in form and substance satisfactory to Arch Acquisition are not fully executed or such condition is not waived by Arch Acquisition prior to June 16, 2008 and (ii) the Debtors and Arch Acquisition, jointly, agree to proceed with a sale under section 363 of the Bankruptcy Code, in lieu of proceeding with the Plan and filing a motion under section 1113, then, in such event, Arch Acquisition agrees to serve as the stalking horse bidder in any expedited sale process under section 363 of the Bankruptcy Code.  The section 363 sale process and the asset purchase agreement shall (i) be on terms, conditions and a timeline acceptable to Arch Acquisition, (ii) provide for a break-up fee and expense reimbursement to Arch Acquisition in the same amount as that approved in connection with the competitive process for this Plan, and (iii) provide for a purchase price (subject to adjustment based on the change from the Plan process to a section 363 sale) consistent with the Plan Funding Commitment (including the Exit Facility) contained herein.  Notwithstanding the foregoing, nothing in the Plan shall obligate Arch Acquisition to provide additional financing or waive any defaults under the Arch Acquisition DIP Agreement in connection with such section 363 sale process.

The Plan shall not become effective unless and until each of the following conditions has been satisfied in full or waived by the Debtors and the Plan Funder:

(a)    The Bankruptcy Court shall have entered the Confirmation Order by July 15, 2008 (or such other date as agreed to in the sole discretion of the Plan Funder) and such Order shall be in form and substance satisfactory to the Debtors and the Plan Funder;

(b)    All escrow and reserve accounts described in the Plan have been adequately funded;

(c)    The Confirmation Order shall have become a Final Order and the Effective Date shall be no later than July 31, 2008; and

(d)    The Plan Funding Commitment has been provided and shall be sufficient to fund distributions under the Plan (including reasonable reserves).

48

Except as set forth in Sections 9.1 and 9.2 of the Plan with respect to matters pertaining to the CIT Lenders, the conditions set forth in Article 9.1 and Article 9.2 of the Plan may be waived, in whole or in part, by the Debtors and Plan Funder without any notice to any other parties in interest (except the Committee) or the Bankruptcy Court and without a hearing.  The failure to satisfy or waive any condition to the Confirmation Date or the Effective Date may be asserted by the Debtors and Plan Funder in their sole discretions regardless of the circumstances giving rise to the failure of such condition to be satisfied (including any action or inaction by the Debtors and Plan Funder in their sole discretion).  The failure of the Debtors and Plan Funder to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right which may be asserted at any time.

## L.    *Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative*

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of Claims has accepted it.  The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of secured claims that rejects such plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (1) for each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest;

or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

The votes of holders of the Ben Interests in Shapes/Arch Holdings are not being solicited because such holders are not entitled to receive or retain under the Plan any interest in property on account of their Interests. Such Class therefore is deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Accordingly, the Debtors are seeking confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code with respect to such Class, and may seek confirmation pursuant thereto as to the other Classes if such other Classes vote to reject the Plan. Notwithstanding the deemed rejection by such Class or the rejection by any other Class, the Debtors believe that all Classes are being treated fairly and equitably under the Bankruptcy Code. The Debtors therefore believe the Plan may be confirmed despite its deemed rejection by these Classes.

### M.   *Provisions Regarding Corporate Governance and Management of the Reorganized Debtors*

    (a)    Officers and Managers of Reorganized Shapes/Arch Holdings L.L.C.
          [as set forth in the Plan Supplement]

    (b)    Officers and Managers of Reorganized Shapes L.L.C.
          [as set forth in the Plan Supplement]

    (c)    Officers and Managers of Reorganized Delair L.L.C.
          [as set forth in the Plan Supplement]

    (d)    Officers and Managers of Reorganized Accu-Weld L.L.C.
          [as set forth in the Plan Supplement]

    (e)    Officers and Managers of Reorganized Ultra L.L.C.
          [as set forth in the Plan Supplement]

### VIII.   CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AND INTERESTS AGAINST AND IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

The Disclosure Statement and the material incorporated by reference herein (the "Incorporated Materials") include "forward-looking statements" as defined in Section 27A of the Securities Act and Section 21E of the Securities Exchange Act of 1934. All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, and plans and objectives, including, but not

50

limited to, statements using words such as "anticipates," "expects," "estimates," "believes," and "likely" are forward-looking statements.

The Debtors believe that the ultimate recoveries under the Plan to holders of Class 10 Claims depend, in part, upon (i) the Plan Funding Commitment being adequate and sufficient to fund and pay all obligations under the Plan, and if not, whether the Plan Funder agrees to increase the amount of the Plan Funding Commitment, (ii) the Class 10 Liquidation Trustee's success in objecting to Disputed Claims, and (iii) the Class 10 Liquidation Trustee's success in recovering on Avoidance Actions and Estate Actions.

## A.    *Taxation*

Pursuant to the Plan, each Holder of an Allowed Claim or Interest receiving cash or property under the Plan will recognize gain or loss equal to the difference between the amount of any cash and the fair market value of any other property received by such holder and the basis which the holder has in such Allowed Claim or Interest.  The character of any recognized gain or loss will depend upon the status of the holder, the nature of the Claim or Interest and the period for which the Claim or Interest was held by the holder.  The basis of a holder in any property received under the Plan will be the fair market value of such property on the Effective Date of the Plan, and the holding period in such property received will begin on the Effective Date.

The federal, state and local tax consequences of the Plan are complex and, in some cases, uncertain.  In addition, the foregoing summary does not discuss all aspects of federal income taxation that may be relevant to a particular holder of an Allowed Claim or Interest in light of its particular circumstances and income tax situation.  Accordingly, each holder of a Claim or Interest is strongly urged to consult with its own tax advisor regarding the federal, state, and local tax consequences of the Plan.

## B.    *Distributions to Holders of Claims*

The Plan is based on making Distributions as provided under the priority scheme set forth in the Bankruptcy Code.  To this end, the Plan provides that all Allowed Administrative Claims, Priority Claims and Secured Claims will be paid or satisfied in full prior to the making of Distributions to holders of Allowed Claims in Class 10.

The amount of Cash available for distribution to holders of Allowed Claims in Class 10 will depend upon a number of factors, including, but not limited to, the following: the cost of administering the Liquidation Trust; the success of any objections to claims and the recoveries on any Avoidance Actions and Estate Actions.  The Debtors are unable at this time to estimate with any certainty the ultimate resolution of such factors, and thus, the amount of available cash that ultimately will be available for Distribution to holders of Allowed Claims in Class 10.

In addition, the payment of a Distribution to each holder of an Allowed Claim in Class 10 will depend upon the Claims reconciliation and resolution process implemented by the Plan Administrator.

CHERRY_HILL\444634\5

## C.    Objections to Classification

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.

## D.    Inherent Uncertainty of Financial Projections

The financial projections attached hereto as Exhibit "C" are based upon numerous assumptions that are an integral part of such financial projections, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material contingent or unliquidated litigation or indemnity claims, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not occur.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Reorganized Debtors' operations.  These variations may be material and may adversely affect the ability of the Reorganized Debtors to pay the obligations owing under the Plan and other post-Effective Date indebtedness.  Because the actual results achieved throughout the periods covered by the financial projections may differ from the projected results, the financial projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

## E.    Certain Bankruptcy Law Considerations

### 1.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

### 2.    Risk of Non-Occurrence of the Effective Date

Even if all Classes of Claims and Interests that are entitled to vote accept the Plan, the Plan may not become effective.  The Plan sets forth conditions to the occurrence of the Effective Date that could remain unsatisfied.

### 3.    Appeal of the Confirmation Order

The Confirmation Order may be the subject of an appeal.  If the Confirmation Order is vacated on appeal (assuming an appeal could be taken and such appeal would not be rendered moot due to substantial consummation of the Plan prior to prosecution), the Plan would fail.

## IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code or (ii) an alternative plan of reorganization.

### A.    *Liquidation Under Chapter 7*

If no plan is confirmed, the Debtors' Cases may be converted to cases under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtors' property for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code. A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of holders of Claims and Interests is set forth in the Liquidation Analysis attached here as Exhibit "D". The Debtors believe that liquidation under Chapter 7 would result in no distributions being made to creditors other than Secured Creditors because (i) the Debtors' assets would be sold or otherwise disposed of in a forced sale situation over a short period of time, (ii) additional administrative expenses would be incurred, and (iii) additional expenses and claims, some of which would be entitled to priority, would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a termination of the Debtors' businesses. For a further analysis of this issue please refer to Exhibit "D" attached hereto.

### B.    *Alternative Plan of Reorganization*

If the Plan is not confirmed, the Bankruptcy Court could confirm a different plan. The Plan is a reorganization of the Debtors' business and a different plan might involve some other form of reorganization or liquidation of the Debtors' assets. The Debtors believe that the Plan, as described herein, enables creditors to realize the highest and best value under the circumstances. The Debtors believe that any liquidation of the Debtors' assets or alternative form of Chapter 11 plan is a much less attractive alternative to creditors than the Plan because of the far greater returns and certainty provided by the Plan. Other alternatives could involve diminished recoveries, significant delay, uncertainty, and substantial additional administrative costs. Moreover, other alternatives may not provide the Debtors with the financing required to continue their business operations. The Debtors believe that their Plan provides the best recovery to their creditors by providing them with a distribution of cash rather than diminished recoveries following a liquidation of its assets or distribution of other property.

## X.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    *Federal Income Tax Consequences in General*

The following summary addresses certain material federal income tax consequences of the implementation of the Plan to holders of certain Allowed Claims and holders of Allowed Interests. The summary is based upon the Debtors' interpretation of the Internal Revenue Code of 1986, as amended (the "Tax Code"), applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all

53

of which are subject to change, possibly with retroactive effect.  Due to the complexity of certain aspects of the Plan and differences in the nature of the Claims and Interests of the various holders thereof, their taxpayer status, residence and methods of accounting and prior actions taken by such holders with respect to their Claims and Interests, the tax consequences described below are general in nature and are subject to significant considerations applicable to each holder of an Allowed Claim in Class 10 or an Allowed Interest in Class 11 or 12.

The federal income tax consequences of the Plan and the formation and operation of the Reorganized Debtors and the Liquidation Trust, as well as distributions from the Liquidation Trust, are complex and subject to significant uncertainties.  The Debtors' interpretation of the federal income tax consequences set forth herein are not binding on the IRS, and the Debtors have not requested, and do not intend to request, an administrative ruling from the IRS with respect to any of the federal income tax aspects of the Plan.  Consequently, there can be no assurance that the treatment described in this Disclosure Statement will be acceptable to the IRS.  No opinion of counsel has either been sought or obtained with respect to the federal, state, local or foreign tax aspects of the Plan.  Legislative, judicial or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein.  Additionally, changes in the facts or circumstances relating to the consummation or operation of the Plan or the formation or operation of the Reorganized Debtors or the Liquidation Trust could likewise affect the tax consequences to such parties.

This summary does not address foreign, state or local tax consequences of the Plan, the Reorganized Debtors or the Liquidation Trust, nor does it purport to address all of the federal income tax consequences of the Plan, Reorganized Debtors or the Liquidation Trust.  This summary also does not purport to address the federal income tax consequences of the Plan, Reorganized Debtors or the Liquidation Trust to taxpayers subject to special treatment under the federal income tax laws, such as banks, governmental authorities or agencies, pass-through entities, broker-dealers, tax-exempt entities, financial institutions, insurance companies, S corporations, small business investment companies, mutual finds, regulated investment companies, foreign corporations, and foreign persons.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF A HOLDER OF A CLAIM OR INTEREST.  ANY U.S. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (I) IS NOT INTENDED TO BE USED, AND CANNOT BE USED, BY ANY PERSON FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES IMPOSED ON SUCH PERSON AND (II) WAS WRITTEN IN CONNECTION WITH THE MARKETING AND PROMOTION OF THE PLAN.  IT IS STRONGLY RECOMMENDED THAT EACH HOLDER OF A CLAIM OR INTEREST CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

**B.**     ***Federal Income Tax Consequences of the Liquidation Trust***

    1.     <u>*Consequences of the Liquidation Trust*</u>

Pursuant to the Plan, certain holders of Allowed Claims will receive beneficial interests in the Liquidation Trust.  The Liquidation Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.  Thus, the Liquidation Trust is intended to be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d).  The provisions of the Plan Administration Agreement and the Plan are intended to satisfy the guidelines for classification as a liquidating trust that are set forth in Revenue Procedure 94-45-, 1994-2 C.B. 684.  Under the Plan, all parties are required to treat the Liquidation Trust as a liquidating trust, subject to contrary definitive guidance from the IRS.

No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust.  If the IRS were to challenge successfully the classification of the Liquidation Trust as a grantor trust, the federal income tax consequences to the Liquidation Trust and the holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

    2.     <u>*Creditor Trust Tax Reporting*</u>

The Liquidation Trust will file annual information tax returns with the IRS as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) that will include information concerning certain items relating to the holding or disposition (or deemed disposition) of the assets (*e.g.*, income, gain, loss, deduction and credit).

**C.**     ***Federal Income Tax Consequences to Holders of Allowed Claims in Class 10***

The tax consequences of the implementation of the Plan to a holder of an Allowed Claim in Class 10 will depend, in part, on the origin of such holder's Claim, whether the holder reports income on the accrual or cash basis, whether the holder receives consideration in more than one tax year of the holder, whether the holder has taken a bad debt deduction with respect to all or a portion of its Claim, and whether the holder is a resident of the United States.  The tax consequences of the receipt of cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

    1.     <u>*Receipt of Cash and Property by Holders of Allowed Claims in Class 10*</u>

Generally, a holder of an Allowed Claim in Class 10 will recognize gain or loss equal to the difference, if any, between the "amount realized" by such holder and such holder's adjusted tax basis in the Allowed Claim.  In general, the "amount realized" is equal to the sum of the Cash, the "issue price" of any debt instruments, and the fair market value of any other consideration received under the Plan in respect of the holder's Allowed Claim.

55

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR ALLOWED CLAIMS.

2.      *Receipt of Interest*

Pursuant to the Plan (and except as set forth in the DIP Facilities in favor of the Lender Group and Arch Acquisition), consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to accrued but unpaid interest.  However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.  Holders of Allowed Claims not previously required to include in their taxable income any accrued but unpaid interest on such Allowed Claims may be treated as receiving taxable interest, to the extent of any consideration they receive under the Plan that is allocable to such accrued but unpaid interest.  Holders previously required to include in their taxable income any accrued but unpaid interest on an Allowed Claim may be entitled to recognize a deductible loss, to the extent that such accrued but unpaid interest is not satisfied under the Plan.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION BETWEEN PRINCIPAL AND INTEREST OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR ALLOWED CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.

3.      *Character of Gain or Loss*

The character of any gain or loss as capital or ordinary and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes may attract differing treatment); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount.

HOLDERS OF ALLOWED CLAIMS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE AMOUNT AND CHARACTER OF GAIN OR LOSS, IF ANY, TO BE RECOGNIZED BY THEM UNDER THE PLAN.

4.      *Withholding*

All distributions to holders of Allowed Claims under the Plan are subject to any applicable withholding, including employment tax withholding.

**D.      Federal Income Tax Consequences to Holders of Allowed Class 11 and 12 Interests**

The transactions contemplated by the Plan may cause some holders of Interests in the Debtors or members of such Interest holders to recognize income, including cancellation of indebtedness income, with no corresponding cash distribution.

HOLDERS OF ALLOWED INTERESTS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE TAX TREATMENT RELATED TO THEIR INTERESTS UNDER THE PLAN.

**E.      Importance of Obtaining Professional Tax Assistance**

THE FOREGOING IS INTENDED AS A GENERIC SUMMARY ONLY, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE PARTICULAR CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST.   ACCORDINGLY, EACH HOLDER OF AN ALLOWED CLAIM OR MEMBERSHIP INTEREST IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR CONCERNING THE FEDERAL, FOREIGN, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

IN ACCORDANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE IN CIRCULAR 230, UNLESS EXPRESSLY STATED OTHERWISE IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS), ANY FEDERAL TAX ADVICE CONTAINED IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, FOR THE PURPOSE OF (A) AVOIDING PENALTIES UNDER THE TAX CODE OR (B) PROMOTING, MARKETING, OR RECOMMENDING TO ANOTHER PARTY ANY TRANSACTION OR OTHER MATTER ADDRESSED HEREIN.

**[The Remainder of the Page Intentionally Left Blank]**

57

## CONCLUSION

The Debtors believe the Plan is in best interest of all creditors and recommends that Impaired creditors vote to accept the Plan.

DATED: May 22, 2008

Respectfully submitted,

Shapes/Arch Holdings L.L.C.

By: _____
Name: Steven Grelly
Title: CEO

DATED: May 22, 2008

Shapes L.L.C.

By: _____
Name: Steven Grasell
Title: CEO

DATED: May 22, 2008

Delair L.L.C.

By: _____
Name: Gerry Herion
Title: PRES

DATED: May 22, 2008

Accu-Weld L.L.C.

By: _____
Name: Steven Grabell
Title: VP.

DATED: May 22, 2008

Ultra L.L.C.

By: _____
Name:
Title:

58

## CONCLUSION

The Debtors believe the Plan is in best interest of all creditors and recommends that Impaired creditors vote to accept the Plan.

DATED: May 22, 2008                          Respectfully submitted,

Shapes/Arch Holdings L.L.C.

By: _____
Name:
Title:

DATED: May 22, 2008

Shapes L.L.C.

By: _____
Name:
Title:

DATED: May 22, 2008

Delair L.L.C.

By: _____
Name:
Title:

DATED: May 22, 2008

Accu-Weld L.L.C.

By: _____
Name:
Title:

DATED: May 22, 2008

Ultra L.L.C.

By: _____
Name: Daniel Canary
Title: President

CHERRY_HILL\444634\4