IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

IN RE:                              .   No. 08-14631/GMB
                                    .
SHAPES/ARCH HOLDINGS, L.L.C.,       .
ET AL.                              .
                                    .   HEARING
                                    .
              Debtor.               .   MAY 19, 2008

. . . . . . . . . . . . . . .

Camden, New Jersey

- - - - -

BEFORE THE HONORABLE GLORIA M. BURNS
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              Mark Felger, Esq.
Shapes/Arch Holdings, LLC    COZEN O'CONNOR
                             457 Haddonfield Road, Suite 300
                             Cherry Hill, NJ  08002

For the U.S. Trustee:        Donald MacMaster
                             OFFICE OF THE U.S. TRUSTEE
                             One Newark Center
                             Newark, NJ  07102

For the Movant:              Paul A. Patterson, Esq.
The CIT Group                STRADLEY, RONON, STEVENS & YOUNG,
                             LLP
                             260 One Commerce Square
                             Philadelphia, PA 19103

Arcis ASI, Inc.              Joel C. Shapiro
                             BLANK ROME, LLP
                             210 Lake Drive East, Ste. 200
                             Cherry Hill, NJ  08002

Sun Capital Partners         Bruce Buechler, Esq.
                             LOWENSTEIN SANDLER, P.C.
                             65 Livingston Avenue
                             Roseland, NJ  07068

Arch Acquisitions I, LLC     Alan Brody, Esq.
                             Nancy Mitchell, Esq.
                             Joseph Davis, Esq.
                             GREENBERG TRAURIG, LLP
                             200 Park Avenue
                             Florham Park, NJ  07932

For the Creditors Committee:   Ilana Volkov, Esq.
COLE, SCHOTZ, MEISEL, FORMAN, &
LEONARD, P.A.

25 Main Street
Hackensack, NJ   07601

Donna Lieberman, Esq.
HALPERIN, BATTAGLIA & RAICHT, LLP
555 Madison Avenue
New York City, NY   10022

Audio Operator:          MARY LAMPONE

Transcriber:             DIANA DOMAN TRANSCRIBING
P. O. Box 129
Gibbsboro, NJ   08026-0129

Telephone: (856) 435-7172
Fax:       (856) 435-7124

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

3

1                           I N D E X

2

3    Argument by Mr. Felger...................................    5

4    Argument by Mr. MacMaster...............................   18

5    Argument by Ms. Lieberman...............................   25

6    Response by Mr. Felger..................................   27

7

8    <u>Witnesses</u>                 <u>Direct</u>     <u>Cross</u>     <u>Redirect</u>     <u>Recross</u>

9    <u>FOR THE DEBTOR</u>:

10   Mark Chesen                 29         35

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                    4

1        THE COURT:   Good afternoon.

2        IN UNISON:   Good afternoon, Your Honor.

3        MR. FELGER:   Good afternoon, Your Honor.   I was just

4    commenting that it's a slightly different din in the courtroom

5    today than it was a couple weeks ago.

6        THE COURT:   More smiles.

7        MR. FELGER:   More smiles.   Mark Felger of Cozen

8    O'Connor on behalf of the debtors, Your Honor.

9        MR. MACMASTER:   Donald MacMaster, Office of the

10   United States Trustee.   Good afternoon, Your Honor.

11       MS. VOLKOV:   Good afternoon, Your Honor.   Ilana

12   Volkov, Cole, Schotz, Meisel, Forman, & Leonard, co-counsel for

13   the committee.   With me today is Donna Lieberman from Halperin

14   Battaglia & Raicht.   We filed -- I said that wrong again,

15   Raicht.   We filed pro hac vice papers for Ms. Lieberman on May

16   13, 2008, and hopefully Your Honor will oblige Ms. Lieberman

17   today and allow her to participate in the hearing.

18       THE COURT:   Any objections?

19       IN UNISON:   No, Your Honor.

20       THE COURT:   You may appear today, Ms. Lieberman.

21   I'll look for your papers.   Thank you.

22       MS. LIEBERMAN:   Thank you, Your Honor.

23       MR. BUECHLER:   Bruce Buechler from Lowenstein Sandler

24   on behalf of Sun Capital Partners.

25       MR. BRODY:   Good afternoon, Your Honor.   Alan Brody

Colloquy                                          5

1    Greenberg Traurig on behalf of Arch Acquisition I, LLC, and

2    with me today are my partners Nancy Mitchell and Joseph Davis.

3    We have a pro hac vice motions that were filed with both of

4    them.   I believe the orders may have been entered but I'm not

5    sure.   So for purposes of today we would ask that if it hasn't

6    been entered you allow her --

7              THE COURT:   I'm pretty sure Ms. Mitchell's was.   I'm

8    not sure about the other one, but --

9              MR. BRODY:   You'll have to leave.

10             MR. DAVIS:   Yeah, I'm going home.

11             THE COURT:   They may have both been -- I know Ms.

12   Mitchell was here.   I thought that her application had been.

13   No?  All right, well, we'll look for them afterwards.   Does

14   anybody have any objection to their appearances?

15             IN UNISON:   No, You Honor.

16             THE COURT:   They may be here today.

17             MR. BRODY:   Thank you, Your Honor.

18             MR. DAVIS:   Thank you.

19             MR. PATTERSON:   Good afternoon, Your Honor.   Paul

20   Patterson, Stradley, Ronon, Stevens & Young for The CIT as

21   agent and the other revolving credit lender, JP Morgan Chase.

22             MR. SHAPIRO:   Joel Shapiro on behalf of the Arcis

23   (phonetic) from Blank Rome.

24             THE COURT:   Mr. Felger.

25             MR. FELGER:   Good afternoon, Your Honor.   We have two

Argument - Felger                                            6

1    matters on the agenda for this afternoon.  We have a motion to

2    approve the payment of certain commissions to certain sales

3    representatives for three of the five debtors, the Acuel

4    (phonetic) entity, the Ultra entity, and the Dell Air

5    (phonetic) entity.  No objections were filed to this motion.

6    I've had conversations with committee counsel regarding the

7    relief requested in this motion, and I don't believe the

8    committee has any objection to what the debtor's requesting

9    through the motion.

10           In sum, it's a motion for authority to pay certain

11   sales commissions due to its sales force.  It's approximately

12   35 individuals and entities that are bound up in this motion.

13   The total amount that the debtors are seeking to pay to this

14   group is about $122,000, approximately 25,000 of it would be

15   entitled to priority under 507A-3 of the code.

16           This is a motion that quite frankly we contemplated

17   filing on the first day of the case, and for whatever reason it

18   didn't get filed on the first day of the case.  We believe that

19   the relief request is critical to the debtors.  These are

20   important folks in the reorganization process, they're

21   responsible for, I can't give you a total number, but many

22   millions of dollars of sales by these various entities.  And

23   we've indicated to these folks since early on in the cases that

24   we would pursue this relief, and I believe in reliance upon our

25   indicating to this group that we would seek this relief from

1    the Court, folks have really stood by us and continued to work

2    for the debtors, again, in reliance upon our indication to them

3    that we would seek this relief from the Court.

4          So I'm not sure if Your Honor has any specific

5    questions with respect to the motion.  It is unopposed, and

6    we'd ask that Your Honor enter the form of order that was

7    attached to the motion.

8          THE COURT:  Anybody want to be heard on this

9    application?  Mr. MacMaster, anything?

10         MR. MACMASTER:  No opposition from the United States

11   Trustee, Your Honor.

12         MS. LIEBERMAN:  Your Honor, as Mr. Felger indicated,

13   the committee does not have any objection.  We would also add

14   that the debtors did provide us with some supplemental

15   information.  It's very clear for the approximately one-half of

16   the individuals who are not employees this is a very

17   significant portion of their yearly income, so we think the

18   debtors have a very legitimate concern that these people would

19   start looking elsewhere for work.

20         THE COURT:  I've reviewed the papers.  There has not

21   been any objection filed, and I'm satisfied that it meets the

22   requirements that are necessary to be approved, and I will

23   enter an order approving the motion.

24         MR. FELGER:  Thank you, Your Honor.

25         THE COURT:  Now we come to the motion regarding the

Argument - Felger                                          8

1    bid procedures?

2              MR. FELGER:  Yes, Your Honor.  To give Your Honor a

3    bit of an update  since we were last before Your Honor, I guess

4    the last time we were before Your Honor was telephonically, I

5    believe it was on May 6.  We presented orders to Your Honor

6    that day approving final debtor in possession financing

7    arrangements with Arcis, which was then immediately assigned to

8    Arch, and with CIT.

9              Pursuant to those orders the debtors were required to

10   file a motion to approve the competitive bidding process for

11   the plan in a manner consistent with a summary of the process

12   that was annexed to the final DIP order.  We were to file that

13   motion by May 12, which we did.  We were also required to file

14   amended plan, an amended disclosure statement by May 12, which

15   we did.

16             Your Honor scheduled the hearing on the bid

17   procedures motion for today, and a hearing on the disclosure

18   statement for this coming Friday.  We are in the process of

19   further revising the disclosure, which in all likelihood will

20   require some changes to the plan, as well.  And we're hopeful

21   of getting that filed over the next day or two, probably more

22   likely to be Wednesday than tomorrow, given the changes that

23   we're going to need to make.

24             And one of the issues that we're grappling with is

25   the issue of the amount of the plan funding commitment by the

1    Arch entity, and that hasn't quite been run to ground as yet.

2    The parties are working hard to get their arms around that

3    issue, and hopefully reach an accommodation among the parties

4    that will be reflected in the amended disclosure statement and

5    plan that we file over the next couple days.

6         But I wanted to give Your Honor that heads up, that

7    there are still some revisions that will be made to those

8    documents, still some issues that need to be vetted and bridged

9    by the parties.  And we remain optimistic that we'll be able to

10   do that and be in a position to present a disclosure statement

11   on Friday that all of the parties can support.

12        So with respect to the motion that's on for this

13   afternoon, it embodies pretty much the process that Your Honor

14   saw in that DIP financing order, that two page summary that was

15   annexed, I believe, as Exhibit C.  It sets out a process where

16   bids will be due by June 25.  We'll have an auction among

17   qualified bidders on June 27, and there will be a disclosure --

18   a confirmation hearing, excuse me, that I believe we've

19   reserved with Your Honor on July 8 at 10:00.

20        We've circulated an order among the parties, that was

21   the order that was submitted, I believe last Wednesday, it was

22   filed last Wednesday.  We've made one change, I believe there's

23   one change, to that order as a result of issues raised by the

24   committee with respect to the planned funding commitment issue

25   that I just raised.

1          We also had a couple of issues raised by Arcis, which

2     I believe we've resolved, but we resolved in a way where it

3     will be addressed in a disclosure statement order, as opposed

4     to the bid procedures order.  And of course we have the one

5     objection that was filed, one limited objection that was filed

6     by the Office of the United States Trustee, and that goes to

7     the breakup fee.

8          With respect to the issue raised by the creditors

9     committee, what we've agreed to do, we've agreed to revise the

10    order to include language in the sections that address how a

11    competing bidder can improve upon the plan.  And what we've

12    done is we've changed the provision to indicate that not only a

13    competing bidder increase the caps that are in the plan for

14    certain classes, but the competing bidder can also increase the

15    amount of the planned funding commitment, which currently is in

16    brackets in the plan as filed at $90 million.  And that's

17    acceptable to the parties.  So we've made that change I believe

18    in three places to the order that was submitted last week.

19         Counsel for Arcis raised an issue in connection with,

20    I guess notice to potential bidders, and there are two issues.

21    The first issue is notice to folks who have signed

22    confidentiality agreements, in the event that the debtors and

23    Arch decide that the collective bargaining agreement condition

24    will not be met, and decide to switch from a plan process to a

25    363 sale process.

1        And as the plan is currently drafted there's a date

2   of June 15 where the parties will decide whether the collective

3   bargaining agreement condition will be satisfied or waived, and

4   if not, then the parties have agreed to move to a mutually

5   acceptable 363 sale process.

6        What we've agreed to do in light of Arcis' comments

7   is to provide notice to anyone who's signed a confidentiality

8   agreement of that decision to move to a 363 process within one

9   business day after making that decision, so that competing

10  bidders don't continue to review due diligence, review a plan,

11  mark up a plan, while we've -- when we've decided that we're

12  going to transition to a different process.

13       THE COURT:  Well, I guess does that mean that you

14  won't go to a competitive bidding issue?  I mean, you're still

15  going to have to meet the higher and better --

16       MR. FELGER:  Yeah, what we imagine will happen is if

17  we can't come to closure on that one condition in the plan, we

18  would move to a 363, and we would file a motion to approve a

19  363 process installing Arch as the stalking horse bidder under

20  the 363 sale process, and including the same breakup fee and

21  expense reimbursements that Your Honor may or may not grant

22  today, and have -- I imagine have a more accelerated time frame

23  to get to an auction, and work for competing bids under that

24  363 motion, and for an auction, because we'll already be down

25  the path through the marketing efforts of our sales consultant.

Argument - Felger                                    12

1    So that's what I envision would happen.  If we can't meet that

2    condition we would, quote, unquote, I guess abandon the plan

3    process for the time being, file a 363 motion, and move for a

4    very accelerated competing bid deadline and auction under that

5    motion.

6              THE COURT:  Okay.

7              MR. FELGER:  But the second issue raised by Arcis,

8    which goes hand-in-glove with this issue is that if we are able

9    to satisfy that condition and it results in amendments to any

10   of the collective bargaining agreements, that we will provide

11   notice to anyone who has signed a confidentiality agreement as

12   to the material terms of the amendments to the collective

13   bargaining agreement, so these parties can factor that in to

14   their analysis in developing their competing offers.

15             THE COURT:  When do the competing bids have to be in?

16             MR. FELGER:  June 25.

17             THE COURT:  And I assume if you have -- if you decide

18   to go the 363 route they'll have new time periods for them to

19   submit competing bids for the sale -- for the sale process?

20             MR. FELGER:  That's correct.  We haven't discussed

21   what those time periods would be, but we'll -- we certainly

22   will want to do it in a way that doesn't create much, if any,

23   slippage from the current schedule.

24             THE COURT:  So the way you're anticipating it now,

25   the note -- you would give notice by the 16th?

1        MR. FELGER:  Correct.

2        THE COURT:  Or sooner.

3        MR. FELGER:  Correct.

4        THE COURT:  And they would have to the 25th to do the

5    bidding?

6        MR. FELGER:  That's correct, if -- under that, if --

7        THE COURT:  If --

8        MR. FELGER:  Right.

9        THE COURT:  -- you're still going with the plan?

10       MR. FELGER:  Exactly.

11       THE COURT:  And is that satisfactory, Mr. Shapiro,

12   for your concerns?

13       MR. SHAPIRO:  Well --

14       THE COURT:  Well, I was going to ask you and then I

15   was going to ask --

16       MR. SHAPIRO:  I guess so, yeah.

17       MR. BUECHLER:  Your Honor, my only -- on behalf of

18   Sun Capital, as a potential competing bidder, our concern is

19   that if they make changes to the union agreements, Mr. Felger

20   only stated they would provide notice of the material terms.

21   We would like to know what all of those terms would be to the

22   contract modifications because what they may view as material

23   or immaterial we may not, and the devil, especially with a

24   union agreement, can very much be in the details with a large

25   number.  So our only concern -- I haven't been able to consult

1    with my client, this the first we've heard of this, is that if

2    they make changes, whoever signs a confi should be told of all

3    the changes, not what the debtor may deem material.

4              THE COURT:  Mr. Felger, do you agree to that?  I

5    mean, it seems to me that whatever it is they need to know --

6              MR. FELGER:  Right.

7              THE COURT:  -- if they're going to purchase --

8              MR. FELGER:   We have no problem with that, Your

9    Honor.

10             THE COURT:  That resolves that issue.

11             MR. BUECHLER:  Thank you.

12             MR. SHAPIRO:  Thank you, Your Honor.

13             THE COURT:  So is the only left Mr. MacMaster's

14   objection to the -- do you have something else?

15             MR. BUECHLER:  I'll have another issue which I'll

16   reach after Ms. Lieberman is heard.

17             THE COURT:  Okay.

18             MR. FELGER:  And I just wanted to clarify that that,

19   what we just discussed, the two Arcis issues, will not be

20   imbedded in this order.  What we've agreed to do is to reflect

21   that in the disclosure statement order.

22             And last, but not least, we have the breakup fee

23   issue.  I'm not sure if you'd rather hear from Mr. MacMaster

24   first or --

25             THE COURT:  Well, let me hear a little bit from you

1    first and then I'll -- I mean, I've read his objection.  You

2    really haven't addressed that much because he's only made his

3    objection, it didn't really become relevant.  I guess, from my

4    perspective I find that -- generally, I almost without

5    exception deny breakup fees in advance.  However, the facts of

6    this case have been different in a lot of respects, and I

7    recognize that.  There's just a whole different plethora of

8    issues that have gone forward in this case that support the 503

9    application of Arch and what they've done in this case so far.

10         I guess, to a certain extent I'm satisfied that to

11   some extent they're going to be entitled to an administrative

12   expense.  They certainly have benefitted, the estate, by what

13   they've done in the process.  So my big question is, and I'll

14   pose this to you and I'll see what Mr. MacMaster has to say, as

15   well, was how do you -- how do I, how does one decide what the

16   amount of that should be?  You've asked for $1 million plus the

17   expenses.

18         I -- in my mind, I'll just put this up front, I don't

19   think there's going to be an issue with expenses as far as I'm

20   concerned.  It's how do I determine if, at this point, that the

21   $1 million is the appropriate breakup fee, understanding that

22   in addition to the expenses, there may be some basis in this

23   particular case, and under the particular facts of this case

24   that there's a benefit to the estate beyond just the expenses,

25   what the amount of that should be?

1       MR. FELGER:  Well, when we took a look at the breakup

2    fee amount, Your Honor, we frankly thought it was low in the

3    marketplace.  I mean, we're sort of accustomed to seeing a

4    range for breakup fees of, I guess, two to three percent.

5    Generally what I see is three percent in the marketplace.  And

6    I do have Mr. Chesen in the courtroom with me today.  Mr.

7    Chesen is a principle at Net City.  Net City has been retained,

8    subject to Your Honor's approval, to be our sales consultant in

9    the case.  And certainly if called to testify Mr. Chesen would

10   confirm that a two to three percent breakup fee is customary

11   and typical in the marketplace.

12       THE COURT:  Well, and you know that all the cases

13   today that, notwithstanding the marketplace, we're in

14   bankruptcy court --

15       MR. FELGER:  Right.

16       THE COURT:  -- so you we have to look at it a little

17   differently.

18       MR. FELGER:  Correct, correct.  And I guess I would

19   look at it -- I guess there's a number of ways of looking at

20   it.  One is the marketplace perspective of what's typical in

21   the marketplace.  And I -- and from my experience it's typical

22   in the Chapter 11 marketplace, as well, that you typically see

23   two to three percent.  I've seen them as high as five percent

24   in certain cases in Delaware.

25       But here, as Your Honor set out, we do have a very

1    unusual set of facts.  We have a situation where a benefit has

2    already been realized by this estate with Arch stepping up and

3    putting this amended plan before the Court.  We started with a

4    floor of $500,000.  We now have a floor of $5 million for the

5    unsecured credited.  So we already have a benefit that we can

6    sort of get our arms around that you don't have in a typical

7    setting where you have a stalking horse and you just don't know

8    what the process is going to reveal.  You also have --

9            THE COURT:  You actually have some other benefits by

10   the financing that was offered in this --

11           MR. FELGER:  Exactly.

12           THE COURT:  -- that weren't there before.

13           MR. FELGER:  Precisely, and you also have the issue,

14   and this shouldn't be overlooked, you have the issue of we

15   really had an impasse at May 1, and I really didn't think we

16   were going to get there May 1.  And HIG stepped up and helped,

17   from their pocketbook, helped to make this happen.  And they

18   contributed the $300,000 to help bridge the gap to deal with

19   the termination fee, or the in lieu of termination fee that we

20   paid to Arcis.  So they really did step up in a number of ways,

21   including those two ways that I've just articulated.

22           And if you sort of look at not only what we're paying

23   to Arch, but you wrap in the in lieu of termination fee that we

24   paid to Arcis when they passed the baton to Arch back on May 1,

25   or actually May 6, you add all of that together, you add up the

Argument - Felger                              18

1    fees that we're asking Your Honor to approve for Arch, you add

2    that with in lieu of termination fee, and you're still in that

3    two to three percent range, probably closer to two percent than

4    three percent, when you look at a deal that has a value north

5    of $90 million.

6             So you're looking at -- even wrapping in the in lieu

7    of termination fee, a fee that's about two to two and a half

8    percent, which again, in our experience, and I think if Mr.

9    Chesen were to testify in this issue, he would testify it's at

10   the low end of the range, inside or outside of bankruptcy.

11            So I guess I'd leave it there.  I'm not sure if the

12   committee wants to be heard on this, or HIG wants to be heard

13   on this.

14            THE COURT:  Let me hear Mr. MacMaster, and then I'll

15   give anybody else a chance to be heard.

16            MR. MACMASTER:  Good afternoon, Your Honor.

17            THE COURT:  Good afternoon.

18            MR. MACMASTER:  There's no doubt about the fact that

19   the deal that's now on the table is better than the deal that

20   Arcis had.  But, and you know, you're couching this benefit to

21   the estate in light of the fact that this deal is better than

22   the last deal.

23            You know, the question I think you also have to ask,

24   though, is was that last deal a real deal.  In other words,

25   Arcis came in here, they were trying to lock everybody else

Argument - MacMaster                                    19

1    out, they controlled the voting stock of the debtor.  So I

2    think when you say they had a $500,000 dividend unsecured,

3    which is now $5 million, and they're improved financing terms,

4    no doubt about it.  When you look at benefit to the estate, and

5    that is the key crux here under the O'Brien decision, you

6    really have to look at whether this is a -- you know, whether

7    that was a real deal in the first place.  And so I think --

8              THE COURT:  It was the real deal that was presented

9    to the Court.

10             MR. MACMASTER:  It was, it was, but --

11             THE COURT:  But what I'm saying is --

12             MR. MACMASTER:  But it was vociferously --

13             THE COURT:  -- but I --

14             MR. MACMASTER:  -- objected to by the committee --

15             THE COURT:  Right, and if --

16             MR. MACMASTER:  -- by the U.S. Trustee --

17             THE COURT:  Let me just say this, that say the

18   committee -- say I agreed with the committee and your office

19   and said no Arcis deal, and nobody else stepped up with money.

20   Then we'd be talking about a Chapter 7, and a lot of people out

21   of work, is what I'm saying is --

22             MR. MACMASTER:  Well, but that's -- you're right, but

23   we don't have that situation, and we had other --

24             THE COURT:  We don't have that situation.

25             MR. MACMASTER:  -- and we had other people sitting in

Argument - MacMaster                                    20

1    the wings all along, as it turns out, that were willing to

2    potentially bid --

3              THE COURT:  Right, but unfortunately --

4              MR. MACMASTER:  -- on this debtor.

5              THE COURT:  -- the testimony of the debtor on day one

6    was, "We can't operate past day one without money."

7              MR. MACMASTER:  I understand what you're saying, Your

8    Honor.

9              THE COURT:  Well, that's what I'm saying, is that in,

10   you know, if all these things had been out at the time, would

11   things had been different, yes, sir, they might be different.

12   And, I mean, I really did analyze a lot of what was in the

13   O'Brien decision where you had 100, or 50 interested bidders.

14   None of them were parties to the case.  None of them offered

15   financing.  None of them were related to the case, and so it

16   was just a question of which bidder would get it and, you know,

17   the Third Circuit said you have to look at the benefit to the

18   estate.  I mean, if this isn't a case with benefit to the

19   estate, I'm not sure what one is.

20             MR. MACMASTER:  Right.

21             THE COURT:  That being said, I'm still not sure with

22   regard to how I quantify --

23             MR. MACMASTER:  Well --

24             THE COURT:  -- or determine what should be allowed at

25   this --

Argument - MacMaster                                    21

1       MR. MACMASTER:  Okay.

2       THE COURT:  -- point in the case.

3       MR. MACMASTER:  Fine, I mean, as you've noted, there

4   are two components to this.  There's the expense reimbursement,

5   it's a $500,000 expense reimbursement for the, I guess, the

6   cost of putting this together.  Let's not forget that there

7   were also $790,000 in expense reimbursements that walked out to

8   Arcis' professionals.

9       THE COURT:  Again, still --

10      MR. MACMASTER:  -- for the previous deal.

11      THE COURT:  Right, but that's still overall, as was

12  represented by the debtor, was still a plus to the estate

13  because of the substantial -- there wasn't just the increased

14  amount to unsecured creditors in the plan.  There was also the

15  better terms of the deal, and the fact that avoidance actions

16  were not considered part of the collateral, and I don't know

17  what they're going to be worth, but they could be worth --

18      MR. MACMASTER:  Right.

19      THE COURT:  -- millions to the estate.  So when I

20  look at that, the deal was better in a whole variety of ways.

21  The distribution between --

22      MR. MACMASTER:  Correct, Your honor.  But I think you

23  al -- bottom line is there's an expense reimbursement of

24  $500,000.  Now they're seeking a separate breakup fee, which,

25  you know, they're talking two percent, three percent, whatever.

1     I mean, you know, you're right, you look at bankruptcy cases

2     here and then you look at non-bankruptcy cases.  The law is

3     pretty clear.

4              THE COURT:  There have been bankruptcy cases that

5     have allowed breakup fees.

6              MR. MACMASTER:  There have, but -- there have --

7              THE COURT:  And some of them are in the Third

8     Circuit.

9              MR. MACMASTER:  But here you have -- but here you're

10    in a unique position where you're actually approving the

11    breakup fee up front.  You know, we don't know who else can

12    step up to the table right now.  It would be a lot easier after

13    a sale hearing to say, "You know what, you absolutely are

14    entitled to that $1 million.  You made the market, you caused

15    other people to step up to the plate, and as a result of your

16    actions we got a bid from a" -- obviously it would be someone

17    that topped their bid ultimately.

18             THE COURT:  Well, what would be different then than

19    now?  Be honest.

20             MR. MACMASTER:  Well, I don't know --

21             THE COURT:  If they end up being the high bidder then

22    they're the high bidder because --

23             MR. MACMASTER:  Well, this is a non-issue.

24             THE COURT:  Right, this is a non-issue.

25             MR. MACMASTER:  This is a non-issue.  If they're not

Argument - MacMaster                                    23

1   the high bidder then the quest -- you know, the question is if

2   you approve a $1 million breakup fee up front, then you're

3   talking about an initial overbid with the $500,000 expense

4   reimbursement, then with another 300,000, or whatever.  You're

5   talking about $1.95 million as the initial overbid.

6              THE COURT:  Right.

7              MR. MACMASTER:  All right.

8              THE COURT:  Right, but we're talking about $90

9   million.  I mean, we're not talk -- if we were talking about $5

10  million I'd say yes.  If we were talking about $10 million or

11  $20 million, probably still --

12             MR. MACMASTER:  The point is I don't know whether

13  that $1 million is earned or not today, just like they don't

14  know whether it's going to benefit the estate today or not.  It

15  may be that after you see what happens at a sale hearing you

16  can say that $1 million absolutely was earned, they deserve it.

17  But I don't know how anybody can say that today.  I don't know

18  that they don't deserve it, I don't know that they do deserve

19  it.  But I sure as heck don't know the answer today.

20             THE COURT:  Well, what would you --

21             MR. MACMASTER:  So --

22             THE COURT:  -- what would you see at the hearing that

23  would make a difference?

24             MR. MACMASTER:  Spirited bidding that jacks up the

25  price substantially, where you can see that, you know, their

1    terms were the genesis of this whole process.  Then ultimately

2    the estate has a huge windfall as a result.  That to me, then I

3    would say, you know, they have a pretty good case to stand up

4    and say they made the market.  But to, you know -- what happens

5    if you have somebody that just bids $650,000 more at the

6    hearing, and you've pre-approved the one -- you know, a $1

7    million breakup fee and a $500,000 --

8            THE COURT:  Do you really feel that somebody who

9    wants the business for, say $95 million wouldn't pay $96

10   million?

11           MR. MACMASTER:  I don't know, that's the point.  So I

12   don't know, but I think -- I understand that they have

13   substantial expenses that they've put into it, and I -- you

14   know, I hear what you're saying, Your Honor, about giving them

15   something, which, frankly, then goes into the initial overbid

16   ultimately, but --

17           THE COURT:  As I said, you know, in a normal course I

18   almost never -- well, I've never -- I don't think I've ever

19   approved a -- not that we have a huge number of Chapter 11's,

20   but --

21           MR. MACMASTER:  Right.

22           THE COURT:  -- a breakup fee in advance.  I just find

23   the facts in this case somewhat different, and that's why I'm -

24   -

25           MR. MACMASTER:  I don't disagree that this is an

Argument - Lieberman                                          25

1    unusual case, Your Honor, but I still think that, you know, a

2    rose by any other name smells as sweet.  I mean, it's a 363

3    sale that we're going through, however they want to couch.  You

4    know, you have a company that's being sold, and it's subject to

5    higher and better offers.  But I still think we have to

6    recognize O'Brien and what it stands for, so --

7                THE COURT:  What's the committee's position?

8                MS. LIEBERMAN:  Your Honor, we have a fairly

9    interesting situation here in that, as Mr. Felger indicated, we

10   still have some plan issues that are very much under

11   discussion, most significantly about whether there is a cap on

12   the ultimate commitment.  Everyone has reserved their rights on

13   that.  Yet I think the facts of this case are so unusual that

14   it's the committee's position not only to support the breakup

15   fee, but to, frankly, very enthusiastically support it.

16               We certainly are very much aware of the Third

17   Circuit's decision.  Your Honor, and I think the Court has

18   already noted as much, that decision may make a great deal of

19   sense in the customary situation that we've all seen in Chapter

20   11.  A debtor files, shakes the trees looking for offers for

21   363 sale, gets a few offers, picks the one it likes best, and

22   goes forward.  And there's always, of course, the underlying

23   assumption that if it wasn't that one it would have been a

24   different one.

25               Your Honor, there is nothing about this case that

1   neatly fits that scenario.  When our committee was appointed we

2   had a completely closed process from the committee's point of

3   view.  We not only have a better DIP facility with more money,

4   better terms.  We not only have a commitment to the unsecured

5   class that went from $500,000 to $5 million, but Your Honor,

6   just as important to the committee, we now have an open and

7   competitive process.

8        And as part of that, the committee's conversations

9   with Arch, and I have to as -- you know, Mr. Felger can

10  address, I believe, the debtor's conversations, as well, always

11  contemplated that we would be seeking a breakup fee and an

12  expense reimbursement, because Arch has gone to an

13  extraordinary amount of trouble to get us where we are today.

14       I -- they did not have a neat, customary way into

15  this case.  They were not invited in by the debtors.  They

16  weren't in a position where they could simply bid, propose a

17  contract.  Your Honor, the committee was provided with a

18  proposed form of asset purchase agreement by Arch, a proposed

19  form of a plan by Arch, a proposed DIP -- replacement DIP

20  facility, which then turned into an assignment.  I think the

21  amount of work that Arch's professionals have done to get us to

22  this place is exceptional.  And from the committee's point of

23  view they've earned the breakup fee.

24       As to whether $1 million is the right number, we can

25  always go back and forth on that.  This is a transaction valued

Argument - Lieberman                          27

1    at more than $90 million.  That is, by my calculation, a little

2    bit more than one percent, so it's quite -- it's certainly well

3    below the norm in the market place outside of bankruptcy.  Your

4    Honor, I think it's also lower than the norm within the Chapter

5    11 process.

6         And as to the effect it may have on bidding, the

7    bidding procedures contemplate that anybody who wants to come

8    in has to, for an initial bid, take into account the breakup

9    fee and the expense reimbursement that's built into the

10   process.

11        I'm certainly sensitive to the -- to U.S. Trustee's

12   concerns to the point that, well, maybe somebody else would

13   have stepped up.  Your Honor, nobody else did.  We have a

14   committee that was very aggressively looking for other people.

15   There were some expressions of interest.  We hope that they

16   submit bids and are qualified bidders and attend the auction.

17   We will be delighted to see them.  But in terms of who actually

18   stepped up to let us get to this point, who did the work and

19   got us here, we only had one party who did that, and we do

20   believe that they deserve the breakup fee.

21        THE COURT:  Thank you.  Mr. Felger.

22        MR. FELGER:  I guess to back to Your Honor's question

23   to sort of set the paradigm, well, the way I look at it is --

24   and the Third Circuit had said time and again, you look at the

25   market place.  And I think what we can show here, and again,

Argument - Felger                                      28

1    Mr. Chesen is here, and if he were called to testify that's

2    what he would say, that a two to three percent breakup fee in a

3    deal such as this is a market fee for this sort of deal, inside

4    bankruptcy, outside bankruptcy.

5            And the question then, once you establish what the

6    market would bear for such a fee, is does this chill bid -- is

7    it just too high so that it would chill bidders from coming to

8    the table?  And I believe again, if Mr. Chesen were called to

9    testify as our sales consultant who has vetted and approved

10   these procedures, is that no, this initial overbid amount would

11   not chill bidding on these assets.

12           So it seems to me that's the paradigm we need to look

13   at.  Is a million right?  Is two million right?

14           THE COURT:  Why don't we call Mr. Chesen for just

15   some very brief testimony so we can look at that issue, because

16   that is the issue that the Third Circuit brings up in O'Brien,

17   and as I indicated, I think this case is distinguishable from

18   O'Brien in some facts, but the underlying issue is whether --

19   there's a couple standards that are required to be met, and I

20   think if you can shed some light on the testimony.  Did you

21   want to break before we do that?

22           MS. LIEBERMAN:  Yeah, why don't --

23           MR. FELGER:  Maybe we should.

24           MR. DAVIS:  A real five minutes.

25           THE COURT:  All right, a real five minutes.  Okay,

1   why don't you take a few minutes.  I am interested to hear what

2   the expert has to say, the sales consultant, which was

3   negotiated as part of the resolution of this.  I think over the

4   debtor agreed to it, but was not something the debtor was

5   seeking, and it was offered to satisfy the creditors committee

6   and other parties that everything would be a fair and full

7   process here, so I think that would probably be helpful to the

8   Court to hear.  So why don't we take a few -- five to 10

9   minutes.

10               IN UNISON:  Thank you, Your Honor.

11                           (Recess)

12               THE COURT:  Mr. Felger.

13               MR. FELGER:  Yes, Your Honor.  The debtor's would

14   call Mark Chesen to the stand.

15               MARK   E.  CHESEN, DEBTOR'S WITNESS, SWORN

16               THE CLERK:  Please state your name on the record and

17   spell your last name.

18               THE WITNESS:  Mark Elliot Chesen, C-H-E-S-E-N.

19                       DIRECT EXAMINATION

20   BY MR. FELGER:

21   Q    You must be left handed.

22   A    Exactly.

23   Q    Good afternoon, Mr. Chesen.  With whom are you employed?

24   A    National City Capital Markets.

25   Q    And what is your title with Nat City?

1   A    Senior Managing Director and Co-head of the special

2   situations group.

3   Q    And what is it that you do for Nat City?

4   A    We are investment bankers for companies facing financial,

5   operational, and legal problems.

6   Q    And how long have you been with Nat City?

7   A    Approximately a year and a half.

8   Q    And with whom were you employed prior to joining Nat City?

9   A    SSG Capital Advisers.

10   Q    And what did SSG Capital Advisers do?

11   A    Similar to what we do at Nat City, investment bankers to

12   companies facing operational, financial, and legal problems.

13   Q    And what was your title at SSG?

14   A    President.

15   Q    And how long were president of SSG?

16   A    Approximately six years.

17   Q    And prior to joining SSG, with whom were you employed?

18   A    Berwyn Financial.

19   Q    And what did Berwyn Financial do?

20   A    We were a full service investment banking firm

21   representing healthy companies, financial institutions, as well

22   as a special situations group.

23   Q    And what was your title with Berwyn?

24   A    Co-head of the investment banking practice.

25   Q    And how long were you with Berwyn?

1   A     Approximately eight years.

2   Q     And prior to your experience with Berwyn, were you in the

3   investment banking field, or was Berwyn your first foray into

4   investment banking?

5   A     I was invest -- in investment banking prior to Berwyn.  I

6   had been with Meridian Capital Markets, which was the

7   investment banking arm of Meridian Bank Corp, prior to joining

8   Berwyn.

9   Q     And how long were you with Meridian?

10  A     Approximately three years.

11  Q     Was that the beginning of your investment banking career?

12  A     I began my investment banking career at Ernst & Winnie

13  (phonetic), predecessor -- one of the predecessor firms to

14  Earnst & Young in their merger, an acquisition group in Dallas,

15  out of school.

16  Q     So how long have you been involved in the investment

17  banking community?

18  A     Approximately 25 years.

19  Q     And for what portion of that time have you been involved

20  principally in the distressed sector of the investment banking

21  world?

22  A     Approximately 20 of those 25 years.

23  Q     Have you had cause to be retained by debtors or creditors

24  committees in Chapter 11 cases?

25  A     We have, yes.

Chesen - Direct (FEL)                                         32

1   Q      And how many times have you personally been involved in

2   such an engagement?

3   A      Approximately 50 times, probably over 50 times.

4   Q      And what is your -- if you have a typical engagement, what

5   is your typical engagement by debtors in Chapter 11 cases?

6   A      Our typical engagement would be to get retained by the

7   debtor pre-petition to market the company prior to company

8   filing Chapter 11, enter the Chapter 11 proceeding with a fully

9   negotiated definitive agreement, go into bankruptcy with the

10  goal of putting the process on an expedited sale process,

11  looking to demonstrate that we have run a full process, cast a

12  wide net as to potential buyers, and then re-market the company

13  on behalf of the debtor in the bankruptcy to closure.

14  Q      And in these engagements are you principally involved in

15  creating these competitive bidding processes, developing these

16  processes for the debtor?

17  A      Yes.

18  Q      And how many times would you say you've done that over

19  your career?

20  A      I would say over, if I've been involved in 50 plus

21  bankruptcies, 35 to 40 of those where we've been the architect

22  behind the procedures and structure of the sale process.

23  Q      And have you been involved in cases in the Third Circuit,

24  Delaware, New Jersey, Pennsylvania?

25  A      Yes.

Chesen - Direct (FEL)                                    33

1   Q    What is -- I take it you're familiar with the concept of a

2   breakup fee?

3   A    Yes.

4   Q    Can you explain what a breakup fee is for the Court?

5   A    A breakup fee is a fee paid to a stalking horse bidder for

6   becoming the stalking horse bidder, and really beginning the

7   sale process, priming the pump to get a sale process up and

8   running.

9   Q    In your experience, would you characterize a breakup fee

10  for a stalking horse bidder as common?

11  A    Yes.

12  Q    Have you been involved in cases where a stalking horse did

13  not request a breakup fee?

14  A    Not that I can remember.

15  Q    Now, are you familiar with the terms of the Arch proposed

16  plan?

17  A    Yes.

18  Q    And do you have an understanding as to the approximate

19  value of that proposal in the plan?

20  A    Yes.

21  Q    And what is that approximate value?

22  A    Approximate value, from what I understand, is 90 million,

23  and there's still a cap issue to be resolved that could change

24  that.

25  Q    And are you familiar with the requested breakup fee by

Chesen - Direct (FEL)                    34

1  Arch in this matter?

2  A    Yes.

3  Q    And what is your understanding of the breakup fee

4  requested by Arch?

5  A    They -- my understanding is they are requesting a million

6  dollar breakup fee, plus reimbursement of out of pocket

7  expenses of 500,000.

8  Q    Now in your experience in developing sales procedures for

9  debtors, is it your understanding that there is a market rate

10  for a breakup fee?

11  A    Yes.

12  Q    And what is that?  Expand upon that answer, what is --

13  what would be a market breakup fee for a stalking horse in a

14  Chapter 11 setting?

15  A    I would say on average a range would be two to three

16  percent, would be what we see most of the time in bankruptcy

17  363 sales.

18  Q    Is that different based upon the amount of the value of

19  the transaction?

20  A    Yes, we -- in smaller transactions, sales in 10, 20, $30

21  million, we've seen breakup fees of three, four, five percent.

22  The larger transactions migrating south -- or, I'm sorry,

23  north, higher than 50 million, tend to migrate to the two,

24  three percent range.

25  Q    And the deals you're describing are all Chapter 11 deals,

1    correct?

2    A    That's correct, Chapter 11 deals involving middle market

3    companies.

4    Q    So is it your view, based upon your experience in

5    developing competitive bid proceedings -- procedures for

6    debtors, that the requested breakup fee is a market breakup fee

7    for a case of this size?

8    A    Yes.

9    Q    Are you familiar with the overbid procedures in this

10   competitive bid process?

11   A    Yes.

12   Q    Okay, and is it your view that -- or do you have a view on

13   whether the initial overbid will have an adverse effect on

14   whether other bidders will enter the process?

15   A    In my opinion it will not have an adverse -- it will not

16   affect the auction in an adverse manner.

17            MR. FELGER:  That's all I have, Your Honor.

18            THE COURT:  Mr. MacMaster.

19                      CROSS EXAMINATION

20   BY MR. MACMASTER:

21   Q    Good afternoon, Mr. Chesen.  Donald -- I'm Donald

22   MacMaster, I'm with the Office of the United States Trustee.  I

23   just have a couple questions for you.  Now you say you've been

24   involved in 50 Chapter 11 cases over the course of your career?

25   A    Right, approximately.

1   Q    Okay, and when was the last -- what was the last case you

2   were involved in?

3   A    I'm currently involved in a bankruptcy sale, 363 sale in

4   Atlanta, Verso (phonetic) Technologies.  It filed bankruptcy in

5   the last approximately two weeks.

6   Q    Okay, and what's the size of that sale?

7   A    We're currently going to market -- it has four operating

8   divisions, and we're currently marketing the four companies in

9   four separate 363 sales.  The company is -- it's unclear as to

10  what the value will be, the company just filed Chapter 11 two

11  weeks ago, and our objective is to find four separate stalking

12  horses to step into the shoes of four separate auctions.

13  Q    Okay, so you don't have stalking horses yet in that case?

14  A    Correct.

15  Q    Now you testified that in your opinion the initial overbid

16  of 1.95 million would not have an adverse effect on the marking

17  of the debtor's assets in this case, is that correct?

18  A    Correct.

19  Q    Have you fielded any other offers for the debtor since

20  your retention's been pending?

21  A    No.

22  Q    Can you state with certainty that it won't have any

23  adverse effect on the debtor's marketability?

24  A    No.

25            MR. MACMASTER:  I have no further questions.

1      THE COURT:  Anybody else have questions?  Sir, could

2   you just expand a little bit on your comment that you didn't

3   feel that the overbid would have an adverse effect on the

4   auction.  Based on your experience, why do you say that?

5      THE WITNESS:  Your Honor, I would say that seeing

6   other sophisticated buyers come forward, Sun Capital, for

7   adviser -- for example, coming forward with counsel, other

8   inquiries that we've received from other very substantial, well

9   established private equity funds that want to come into the

10  process, no one is giving any concern about the overbid, that

11  they want to get in and get, you know, get information, you

12  know, see the operation, and it's not been an issue.

13     THE COURT:  Do you think that in a case where the

14  stalking horse bid is 90 million, so that the other bids would

15  be in excess of $90 million, that $1 million would make an

16  extensive difference to potential buyers based on your

17  experiences in other cases?

18     THE WITNESS:  In my experience, that will not make a

19  difference on whether people decide to bid, or at what level

20  they decide to bid, based on the $90 million base purchase

21  price.

22     THE COURT:  Anybody else have any further questions

23  based on the Court's questions?  Thank you, Mr. Chesen.

24     THE WITNESS:  Thank you.

25     THE COURT:  Mr. Felger, do you want to add anything

Colloquy                                         38

1    to your prior argument, and I'll see if anybody else has

2    anything?

3              MR. FELGER:  Your Honor, I have nothing further to

4    add.

5              THE COURT:  Okay, anybody else?  Mr. Brody, did you

6    want to add anything, or any of your partners?

7              MR. BRODY:  No, Your Honor.  Thank you very much.

8              THE COURT:  Okay, anybody else?  The committee?  Mr.

9    MacMaster?

10             MR. MACMASTER:  I have nothing further, Your Honor.

11             MR. BUECHLER:  Just what you said I could address

12   yesterday, after the breakup fee because it does not relate to

13   the breakup.

14             THE COURT:  Right, okay.  All right, I've given a lot

15   of consideration to this, and I understand what the U.S.

16   Trustee's point is with regard to this.  And as I think that I

17   articulated before we took the break, this case is different

18   from other cases.  It's different from the facts in O'Brien,

19   it's different from other cases that I've had come before me

20   with regard to breakup fees.  This isn't just a stalking horse

21   coming in with a bunch of other possible bidders, asking the

22   Court to give them a favored position, which is essentially the

23   U.S. Trustee's position, I think, Mr. MacMaster.  And I agree

24   with you in that such a case I would not approve a breakup fee

25   in advance, and maybe not at all, over what the expenses were.

1    And I've often, when those issues have come before

2    me, since basically in every Chapter 11 I think every stalking

3    horse asks for a breakup fee, I generally say let me see what

4    happens with the bidding, let me see how many bidders come in,

5    let me do a comparison, and generally I'm also speaking of a

6    sale of a smaller entity than this case.

7        In this case the facts really are different from the

8    O'Brien situation, and that's why I think it should be dealt

9    differently.  We have a lender who came -- well, an entity,

10   investment company, that came in to the process, which was not

11   their making -- not their doing, and, you know, put up money in

12   advance to allow the debtor to actually get to this point.

13       And as you know, things were pretty bleak in the

14   beginning of the case.  Basically, the first day the debtor

15   said the debtor couldn't operate beyond that day.  The Court

16   didn't approve the Arcis deal, which I agree with you was far

17   from a great deal.

18       But if somebody had not stepped up, and that somebody

19   was the Arch entity, had not stepped up to do the financing,

20   the Court would have been stuck with the unenviable job of

21   deciding whether to approve the Arcis deal or no deal, which

22   from basically the testimony the Court had received at that

23   time, might mean the end of operations of the debtor, which

24   would have substantially, I believe, hurt all the creditors of

25   the case.

Colloquy                                    40

1          And so, in light of that and all the efforts that
2     were made, and actual money put up on the table to provide the
3     debtor with better financing in many aspects than was had
4     before, and the benefit that this Court saw from Arch in really
5     being involved in every aspect of trying to make that deal
6     work, and we had a number of telephone conferences and court
7     appearances, in addition to, I'm sure, many, many other
8     meetings and telephone conferences that the Court wasn't a
9     party to.

10         They worked with the committee to come up with the
11    deal that really was of great assistance to the debtor.  And as
12    I said, I can't imagine a case that I could have a Chapter 11
13    where I wouldn't feel that this entity didn't benefit the
14    estate any more than this case.  If not this case, then there
15    really wouldn't be a case where there was a benefit to the
16    estate greater than that from a potential stalking horse.

17         And the whole idea was integrated with the idea that
18    they would file this plan, and that plan was going to
19    incorporate the need for them to have a breakup fee.  And based
20    on the testimony that's been presented by the sales consultant,
21    which -- the company that was chosen by virtue of an agreement
22    between the debtor and the creditors committee, which was at
23    the assistance of the committee, and not the debtors, to employ
24    a sales consultant, I'm satisfied that a record has been made
25    that convinces the Court that in this particular case, in this

Colloquy                                    41

1    particular instance, that it is appropriate to approve a

2    breakup fee for the Arch organization in this particular plan.

3              I haven't heard any objections to any of the other

4    terms of the bid procedures, absent the reservation for the few

5    issues that still have to be worked out.  I mean, based on the

6    history of this case I'm hopeful that that will happen.  The

7    parties have been hard negotiators, and have been -- but have

8    been able to resolve issues during the first couple months of

9    this case that have gone on.  I'm confident that they will be

10   able work out some of the other details.  But I'm satisfied for

11   the purposes of this issue that the breakup fee is appropriate,

12   and that the bid procedures can be approved as they've been

13   requested.

14             MR. FELGER:  Thank you, your Honor.  I have a revised

15   form of order that includes the change requested by the

16   creditors committee.  Would you like us to have that e-mailed

17   to chambers this afternoon?

18             THE COURT:  Yes, I would like you to e-mail it, and

19   make sure Mr. MacMaster has seen a copy, and any of the other

20   parties that weren't party to the actual agreement.  E-mail it

21   to the Court if you can, and make sure that everybody else has

22   received it.  If there's no objections then I will look at it.

23   If there's any questions we'll reach out for you, otherwise the

24   order will be entered.

25             MR. FELGER:  Okay, thank you very much, Your Honor.

Colloquy                                                42

1    THE COURT:  Mr. Buechler, you have another issue?

2    MR. BUECHLER:  Yes, Your Honor.  Your Honor, on

3    behalf of Sun Capital, I'd like to raise the same issue raised

4    on May 1.  Sun Capital signed earlier today a confidentiality

5    agreement as proposed to it by the debtor's sales consultant,

6    Nat City, and my understanding, I was told on the car ride down

7    to the courthouse, is that was sent back to Mr. Scott Victor

8    (phonetic).

9         Now the issue deals with the site visit, and we're

10   hopeful in having discussions to resolve it, but if we can't

11   get that resolved in the next day or two, we wanted to just

12   give Your Honor the heads up that we will have to come back,

13   and I think Mr. Chesen, when he testified here, hit the nail on

14   the head when he said the other bidders may not have an issue

15   with the breakup fee, but what they need to do is, quote, "They

16   want to get in and see the operations," end quote.

17        And the push back we're having is that because Sun's

18   portfolio company, Indalex (phonetic), which is a competitor of

19   the debtor, as is the stalking horse bidder's portfolio company

20   can be competing bidder.  We need to have our operational

21   people take a tour.  We're willing to live with certain

22   instances where we can't see competitor information.  We

23   propose they cover up certain things when we go there.  We're

24   not talking about a, you know, 10 day tour.  It's a couple of

25   hour tour, it's a large facility.  But we do need to have that

Colloquy                                        43

1   access, and if we can't get that resolved we will be filing a

2   motion on short notice, and just wanted to advise Your Honor

3   that without a tour, with certain reasonable restrictions so

4   that we can't learn anything confidential, such as their

5   customers if that's their concern, by covering up with a sheet

6   or otherwise, then we will not be in a position to move

7   forward, and that would be chilling the competitive bidding

8   process.

9           And just so Your Honor is aware, while HIG and the

10  debtor may say that, you know, they haven't -- or Arch hasn't

11  gone and looked, we do know that the senior officer of Arch

12  previously has been on this fac -- in the facility several

13  occasions during a prior employment, which is why they didn't

14  push that issue, because they have had people who were in

15  there.  So we just want to give Your Honor a heads up.

16          THE COURT:  Mr. Felger, any --

17          MR. FELGER:  I'll leave the standing issue aside,

18  Your Honor.

19          THE COURT:  Right, I --

20          MR. FELGER:  But -

21          THE COURT:  -- don't disagree with --

22          MR. FELGER:  This is a --

23          THE COURT:  -- you're --

24          MR. FELGER:  -- very serious issue for the debtors

25  for this estate.  And we now have a sales consultant in who

Colloquy                    44

1    does this, who lives this, who agrees it's a very, very serious

2    issue.  We have talked with them about it.  We could very well

3    be back before Your Honor to deal with this issue.  But we'll

4    work with Mr. Buechler, try to accommodate them, and if we

5    can't then we may need help from Your Honor.

6              THE COURT:  Well, as I said, I -- I mean, I -- you

7    could probably even ask me for a telephone conference --

8              MR. BUECHLER:  Thank you.

9              THE COURT:  -- and try to do it expeditiously,

10   because I, you know, I want the process to go forward.  I know

11   you do, too, so if there's an issue that you think the Court

12   can be helpful, as I indicated to you, I have a limited

13   schedule availability this week, and I've already given you

14   Friday, so -- and I won't be here Thursday, and I won't be here

15   tomorrow afternoon, so -- and I have three other Chapter 13's

16   on Wednesday.

17             But I will try to fit -- I will try to fit you in if

18   you need time before Friday.  Perhaps, if you can't resolve

19   this, maybe we can do something on Friday, if that's, you know

20   -- you know, perhaps there's a way that in consultation with

21   the sales consultant you can work out something --

22             MR. BUECHLER:  I think Mr. Felger just has to

23   remember what his sales consultant just testified.  He used the

24   phrase bidders have, quote, "see the operations."

25             THE COURT:  Well, I'm just saying that I think that

1    hopefully Mr. Chesen can help you find a way to let Mr.

2    Buechler's client see what you think they need to see, and keep

3    apart those things that don't need to be seen.  Perhaps a

4    discussion with either him or his client may hone down the

5    specifics of what they want to see, and then you can try to

6    accommodate that to the best of your ability, and if not, you

7    know, the Court will get involved.

8            Although, quite frankly, I'm probably not going to

9    know the details of what you're, you know, what you're seeing,

10   you know, and it's basically the Court's opinion that you need

11   to be able to resolve this in a way that, I guess, expands the

12   ability for interested parties to see what they need to see,

13   and keeping the debtor's confidential information confidential.

14   So see what you can do.  If you need to have a hearing or a

15   discussion, I'm more than willing to try to accommodate you

16   with a telephone conference, if we can find the time for that,

17   or on Friday if we need to, without the need for a formal

18   motion, you know, if that's appropriate.

19           MR. FELGER:  Fair enough.

20           THE COURT:  Okay.

21           MR. FELGER:  Thank you, Your Honor.

22           THE COURT:  All right, yes, Mr. Patterson.

23           MR. PATTERSON:  Your Honor, if I may, unrelated to

24   today's proceedings, hopefully in the category of saving the

25   estate some money.  We do have some pending motions, motions to

Colloquy                                              46

1    appoint trustees, and also to terminate exclusivity.   I believe

2    they are scheduled to be heard next Wednesday.   If I'm

3    recalling our May 6 call correctly, Your Honor ordered answers

4    filed by this Wednesday.   I don't -- I'm not sure if the debtor

5    has prepared any responses yet.   I know we haven't.   I don't

6    know if those are going to be adjourned.

7            THE COURT:   I thought to a certain extent, you know,

8    I thought some of those things were on kind of the hold them in

9    advance when we were here before.

10           MR. MACMASTER:   Your Honor, I understand that there's

11   an objection deadline on the 21st to both trustee motions, and

12   I'm -- I haven't seen the revised disclosure statements so, you

13   know, it's obviously hypothetically possible everything could

14   collapse between now and Friday.   I'm hoping it won't but --

15           THE COURT:   I hope not, too.   All these hearings.

16           MR. MACMASTER:   That having been said, I'd be happy

17   to adjourn the motions out further to --

18           THE COURT:   All right, we've got a motion --

19           MR. MACMASTER:   -- make sure nobody has to file an

20   unnecessary --

21           THE COURT:   Your motion to appoint a trustee -- or is

22   your motion to convert -- well, what is your motion?   I have --

23   there are several motions --

24           MR. FELGER:   It's trustee, I think.

25           THE COURT:   Right.

Colloquy                                    47

1        MR. MACMASTER:  No, mine is for the appointment of

2   the trustee.  I believe the committee's is for the appointment

3   of a trustee.

4        MS. LIEBERMAN:  Your Honor, and we have --

5        THE COURT:  And to terminate exclusivity.

6        MS. LIEBERMAN:  -- to terminate ex -- yes, the

7   hearing date is currently the 28th, and we, like the U.S.

8   Trustee's Office, would be happy to adjourn that approximately

9   two weeks, just a holding date.

10       THE COURT:  All right, let me see what we have.   June

11   11?

12       MR. MACMASTER:  I'm not sure if the debtor --

13       MR. FELGER:  Yeah, I mean, my -- I mean, our concern

14   is we'd like to see them withdrawn rather than continue to have

15   them hanging out there, because we don't feel there's any basis

16   for those motions any longer.  I mean, we're almost inclined to

17   -- you know, we don't want to incur that cost, but we really

18   don't want them continuing to litter Your Honor's docket.  And

19   if we're going to put it out maybe a week, extend our objection

20   past the disclosure statement hearing so that folks can get

21   comfortable that we have a disclosure statement hearing

22   approved, but I'm not going to agree to continue to adjourn

23   this out.

24       MS. LIEBERMAN:  Your Honor, at this moment, given

25   that we're not quite where we need to be, we're not comfortable

Colloquy                                                    48

1    withdrawing the motions.  We are happy to extend the objection

2    deadline to Friday, by which time we hope that --

3          THE COURT:  Why don't we -- why don't we -- let's

4    move them.  I have available June 11, which is two weeks from

5    when they're on, and I'll just say -- and I don't have anything

6    else on that day right now.  So we'll say that they either get

7    withdrawn, resolved, or something between now and then.  That

8    gives time for the disclosure process to get going and we'll

9    see where we are.  And then when we get close to, you know,

10   closer to that date, hopefully the committee and the U.S.

11   Trustee will be satisfied and withdraw, and whoever else has

12   motions pending will withdraw.

13         MR. PATTERSON:  Your Honor, what would we use for a

14   response date in that case?

15         THE COURT:  Let's put the response date the week

16   before that, which would be June 4.

17         MR. PATTERSON:  Thank you.

18         MR. BRODY:  Your Honor, there is one that can be

19   withdrawn today, which is Arch's motion to terminate

20   exclusivity.  That one can completely be withdrawn.

21         THE COURT:  Okay, we'll mark that withdrawn.

22         MR. BRODY:  Thank you, Your Honor.

23         MR. MACMASTER:  And if I may raise one more point?

24   The objection deadline to the disclosure statement is currently

25   Wednesday, as well.  Am I correct on that?

Colloquy                                                   49

1        MR. FELGER:  I believe that's right.  That's correct.

2        MR. MACMASTER:  We haven't seen the disclosure

3  statement.  I don't know if he'll move it to till Thurs -- I

4  mean, we may not see it until Wednesday.  I don't know when

5  we'll see it.

6        THE COURT:  Well, I'm just going to say this.  I

7  guess everybody who would be interested is probably here, so

8  I'll take the objections up until the hearing, really, because

9  I know we're on a short time period.  I mean, I prefer I didn't

10  get them Friday morning because I won't have much time to

11  review them.

12        MR. MACMASTER:  Not my preference.

13        THE COURT:  But if you want to even bring it up at

14  the hearing, I assume the debtor's going to be still discussing

15  things, unless everything is final.  If there's objections and

16  you just get it on -- I mean, because I'm anticipating I may

17  well get it on Thursday so, you know, there's not going to be

18  time to have a written objection.  So if you want to just e-

19  mail the objection in summarized forms on Thursday, and just

20  bring it out at the hearing on Friday, that's fine.

21        MR. FELGER:  That's fine.

22        THE COURT:  Because I know that the parties are still

23  discussing that, so I don't want to limit the ability to do

24  that.  I don't want to put the time off.  I guess we'll see

25  when we get here on Friday whether you're ready to go or not.

Colloquy                                    50

1         MR. FELGER:  Right.

2         THE COURT:  Hopefully you've worked it out and you've

3   resolved the objections, but if somebody still has something

4   pending, I'll be happy to hear it.  Okay?

5         MR. FELGER:  That's fine.

6         THE COURT:  Anything else?

7         MR. FELGER:  Thank you, Your Honor.

8         THE COURT:  Thank you.

9         IN UNISON:  Thank you, Your Honor.

10

11                         *  *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1                                CERTIFICATION

2

3        "I, MICHAEL L. HALLMAN, certify that the foregoing is a correct

4        transcript from the electronic sound recording of the

5        proceedings in the above-entitled matter."

6

7        _Michael Hallm_____                          06/04/2008

8        MICHAEL L. HALLMAN                              DATE
