**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, New Jersey 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors and
Debtors-in-Possession

|  |  |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
|  | : FOR THE DISTRICT OF NEW JERSEY |
|  | : CHAPTER 11 |
| SHAPES/ARCH HOLDINGS L.L.C., *et al.*, | : |
|  | : |
|  | : CASE NO. 08-14631 (GMB) |
| Debtors. | : |
|  | : |

**DEBTORS' APPLICATION FOR (I) AUTHORITY TO SELL ALL
OR SUBSTANTIALLY ALL OF THEIR ASSETS, (II) AUTHORITY TO
ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, AND (III) APPROVAL OF THE AUCTION PROCEDURES,
BREAK-UP FEE AND EXPENSE REIMBURSEMENT RELATED THERETO**

Shapes/Arch Holdings L.L.C. and its related debtor entities, the debtors and debtors-in-possession (the "Debtors")[1], by and through their counsel, Cozen O'Connor, respectfully represent the following:

**NOTWITHSTANDING THE FILING OF THIS SALE MOTION, THE DEBTORS**

**INTEND TO CONTINUE TO ATTEMPT TO REACH SATISFACTORY**

**MODIFICATIONS OF THE CBAS WITH ARCH AND THE LABOR UNIONS AND**

**WILL WITHDRAW THIS SALE MOTION AND PROCEED WITH THEIR EFFORT**

**TO CONFIRM THE THIRD AMENDED PLAN IF ACCEPTABLE MODIFICATIONS**

---

[1]        In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C. ("Accu-Weld"); and Ultra L.L.C. ("Ultra").

**ARE REACHED PRIOR TO THE HEARING TO CONSIDER APPROVAL OF THE AUCTION PROCEDURES ON FRIDAY, JUNE 20, 2008.**

## INTRODUCTION

1.      Over the past month and one-half, the Debtors, Arch Acquisition I, LLC ("Arch") and the Committee (as hereinafter defined), have diligently worked to effectuate a plan of reorganization which would enable unsecured creditors to share in an approximate $5,000,000 pool of funds.  One of the conditions to effectuation of such plan is obtaining agreements to modifications of the Debtors' various collective bargaining agreements (the "CBAs") with the Labor Unions (defined below), which, in their current form, are unduly burdensome to the Debtors' business operations.  Notwithstanding the Debtors' good faith proposals and lengthy negotiation sessions with the Labor Unions, the Debtors', working with Arch, have been unable to date to obtain the requisite new or modified CBAs required by Arch.  Absent new or modified CBAs, the Debtors' third amended plan of reorganization (the "Third Amended Plan") cannot be confirmed.

2.      Under the Third Amended Plan, Arch is providing a pool of funds to be used for distribution to the Debtors' creditors, in exchange for one hundred percent (100%) of the reorganized Debtors' equity.  To maximize the return to creditors, the sale of equity through the plan process was subject to a Competitive Process (as defined herein).  As a result of the parties' inability to date to obtain the requisite modified CBAs, the Debtors and Arch have agreed to proceed with the sale of the Debtors' assets under 11 U.S.C. Section 363, subject to higher and better offers.  The proposed Section 363 sale process is essentially no different than the Competitive Process originally approved by this Court as part of the Plan process.  Moreover, the proposed Section 363 sale is designed to create the same pool of funds for the various creditor constituencies as paid by Arch under the Third Amended Plan.

3.      By this application (the "Sale Motion"), the Debtors request, pursuant to sections

105, 363, 365 and 1146 of Chapter 11, Title 11 of the United States Code, as amended (the

"Bankruptcy Code") and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), authorization to auction and, thereafter, sell all or

substantially all of their assets (the "Assets"). In order to facilitate an orderly sale of their Assets,

the Debtors further request that this Court establish various bidding procedures, protections and

guidelines.

4.      Specifically, by and through this Sale Motion, the Debtors request that the Court

enter the following orders:

- The Bidding Procedures Order: The Debtors request that the Court enter an
order (the "Bidding Procedures Order") approving (i) the auction bidding
procedures set forth herein (the "Auction Procedures") in connection with the
proposed sale of the Assets to the Buyer (as defined herein) or a qualified
bidder submitting a higher and better offer, (ii) notice of the auction (the
"Auction") and the sale hearing (the "Sale Hearing"), in the form annexed
hereto as **Exhibit A** (the "Auction and Hearing Notice"), and (iii) establishing
the dates, time and place of the Auction and the Sale Hearing.  The Debtors
further request that the Court confirm that the previously approved break-up fee
and expense reimbursement arrangements with Arch will also apply to this sale
process.

- The Sale Order: The Debtors further request that the Court enter an order (the
"Sale Order") following the Auction for the approval of (i) the sale of the
Assets free and clear of liens, claims and encumbrances, and (ii) the assumption
and assignment of certain executory contracts and unexpired leases in
connection with such sale.

5.      This Sale Motion is divided into two parts. Part I constitutes the Debtors'

expedited request for approval of the Bidding Procedures Order. Part II constitutes the Debtors'

request for approval of the sale of the Assets, including the assumption and assignment of any

executory contracts and unexpired leases, as well as other related relief.[2]  It is intended that, with

---

[2]      By this Sale Motion, the Debtors reserve their right to reject any agreement not to be assumed or assigned
and will seek rejection of such agreements pursuant to this Sale Motion once such agreements are identified.

the Court's permission, there will be a hearing on Part I on an expedited basis, with the relief under Part II to be held at a later date.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to consider the Sale Motion pursuant to 28 U.S.C. § 1334. Consideration of this Sale Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND[3]

### A.      Filing of Debtors' Bankruptcy Cases

7.      On March 16, 2008 (the "Petition Date"), the Debtors commenced with this Court voluntary cases under Chapter 11 of the Bankruptcy Code.  These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor Shapes/Arch Holdings L.L.C.  The Debtors continue to operate their business and manage their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      On March 31, 2008, the Office of the United States Trustee for the District of New Jersey appointed an official committee of unsecured creditors pursuant to section 11 02(a)(1) of the Bankruptcy Code (the "Committee").  No trustee or examiner has been appointed in these Chapter 11 proceedings.

### B.      The Debtors' Business

9.      Shapes/Arch is a holding company that owns each of the four operating companies – Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and

---

[3]      As described in various pleadings filed by the Committee (as defined herein) to date, the Committee does not agree with the portrayal of certain facts and characterizations of certain events leading up to the Debtors' bankruptcy filing.  Therefore, nothing contained herein regarding same should be binding on the Committee or its successors-in-interest.

began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837 (the "Teamsters"), or the United Independent Union, Local No. 1 (the "UIU")(collectively, the "Labor Unions"), and whose terms and conditions of employment are governed currently by the various CBA.[4]

10.     Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees.  Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction.  Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape.  The extruded aluminum exits the press, is cooled and then cut to the necessary lengths.  Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility.  Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, sever days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment.  shapes can produce and ship over 400,000 pounds of extruded aluminum per day.  Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the

---

[4] The Teamsters have two CBAs with certain Debtors, one with Shapes and Delair, and the other with Ultra.  The UIU has three separate CBAs with Accu-Weld, one for each of three Accu-Weld divisions (Manufacturing, Extrusion, and Trucking).

restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

11.    In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

12.    Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

13.    Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

14.    Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

15.    AccuWeld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in. faster production and delivery to the customer.

16.     Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

17.     Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

18.     Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

19.     Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

20.     Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Financial Corporation (the "Lender Group").

C.     **The Debtors' Prepetition Financing**

21.     Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable),

a term loan, and letters of credit. The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "<u>PP&E Equity Borrowing Base Component</u>"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

22.    As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

23.    As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "<u>Bank Debt</u>").

24.    The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in

2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

25.     With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors were struggling to fund their operations under their existing lending arrangement and found themselves in a situation in which they could not repay the PP&E Borrowing. Base Component or pay past due obligations to venders in excess of $15 million.

26.     Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business.  Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

27.     Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

28.     The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presented a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

29.     With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period

shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

**D.    Versa Capital Management**

30.    In late January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

31.    Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

32.    In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of the agreement, Arcus was to become a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights), and Ben LLC would retain 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions, including obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on

10

the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

E.     **The Debtors' Bankruptcy Filing**

33.    In light of the available financing from the Lender Group and Versa, and the dire state of the Debtors' businesses and financial affairs, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

34.    Contemporaneously with the filing of the bankruptcy petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provided, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims (the "Arcus Plan").

35.    The Arcus Plan reflected a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Lender Group, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of more than $25 million.

36.    The Debtors worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that would present an opportunity to maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors'

businesses would remain viable so that the Debtors could continue to be one of South Jersey's largest employers for the foreseeable future.

37.    At the first day hearing in these cases, this Court entered thirteen (13) Orders granting first day motions on an interim or final basis, including interim orders approving debtor-in-possession financing from the Lender Group and Arcus (the "Arcus DIP Loan").

**F.    Arch Provides DIP Financing And Sale Proposals On Better Terms**

38.    Approximately two weeks after the Petition Date, on or about April 1, 2008, Arch, an affiliate of Signature Aluminum and H.I.G. Capital Partners, filed an objection to the Debtors' financing motion in which it expressed an interest in providing an alternative financing arrangement on better terms and participating in a sale process pursuant to 11 U.S.C. § 363 or through a revised plan. As further evidence of its commitment to an open and competitive sales process, Arch provided the Debtors and the Committee with, *inter alia*, a Debtor-in-Possession Financing Agreement on better terms than the Arcus DIP Loan, a proposed Order approving such financing from Arch, and an asset purchase agreement providing for a purchase price in excess of the value provided by Arcus in the Arcus Plan. Upon the request of the Committee, Arch converted their asset purchase agreement to a plan of reorganization on better terms than the Arcus Plan, including but not limited to a pool of funds for general unsecured creditors (the "General Unsecured Creditor Pool") of up to $5,000,000 (as opposed to the $500,000 General Unsecured Creditor Pool provided in the Arcus Plan).

39.    On May 1, 2008, after Arch completed its due diligence, and after extensive discovery propounded by the Committee and Arcus and several days of depositions of the parties, Arch provided the Debtors with commitment letters for financing the alternative transaction and the Lender Group advised the Debtors that it would continue funding the Debtors' operations if Arch replaced Arcus. Arch's alternative DIP financing package and the

alternative plan (the "<u>Arch Alternative Proposal</u>") was now free of any due diligence contingencies and any financing contingencies with respect to the debtor-in-possession financing and the exit financing under the alternative plan; provided for the Lender Group's continued funding under its debtor-in-possession revolver facility; included more favorable (less restrictive) covenants and lower interest and fees; provided a higher return for unsecured creditors; and included a full and open competitive process, to ensure that the value of the Debtors' estates would be maximized.

40.    Upon becoming aware that Arch had financing commitments and the Lender Group's agreement to continue funding under its DIP revolver, the Debtors determined that the Arch Alternative Proposal was higher and better than the Arcus Plan. The Debtors then advised Arcus that the Debtors were not prepared to proceed with the hearing on the Arcus Plan's disclosure statement and that the Debtors believed it was in the best interests of the estates to proceed with the Arch Alternative Proposal.

41.    After intense negotiations between and among the Debtors, the Committee, Arcus, the Lender Group, and Arch in the Courthouse on May 1, 2008, including a Chambers conference with the Court, the parties reached an agreement in principle whereby, among other things, Arcus would assign to Arch its rights under the Arcus DIP Loan and Arch would become the plan sponsor under an amended plan (in form substantially similar to the Arch Plan) to be filed by May 12, 2008.

42.    The Debtors' decision to proceed with the Arch Alternative Proposal was announced to the Court late in the day on May 1, 2008 and the parties agreed to submit final orders approving the debtor-in-possession financing and the settlement among the parties.

43.     On May 6, 2008, the Court entered Orders, *inter alia*, granting final approval of the debtor in possession financing from the Lender Group and Arch, as assignee of the Arcus DIP Loan (the "Final DIP Orders"). Among other things, the Final DIP Order (with respect to Arch) approved the assignment of the Arcus DIP Loan to Arch and the Amended and Restated Debtor-in-Possession Term Loan Financing Agreement entered into by and between Arch and the Debtors, dated May 6, 2008 (the "Arch Amended DIP Agreement"). The Arch Amended DIP Agreement provides, *inter alia*, that Arch's obligations are conditioned upon the approval of a specific competitive process (the "Competitive Process"), a break-up fee (the "Break-Up Fee") and reimbursement of expenses (the "Expense Reimbursement"), the terms of which were contained in Schedule C to the Arch Amended DIP Agreement.

44.     On May 12, 2008, the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization (the "Second Amended Plan") was filed, pursuant to which, *inter alia*, (a) Arch, as the Plan Funder (as such term is defined in the Second Plan) agreed to purchase the equity in the reorganized Shapes/Arch, subject to the Competitive Process, and (b) the General Unsecured Creditor Pool in an amount up to $5,000,000 would be created.  Similar to the Arcus Plan, confirmation of the Second Amended Plan was conditioned upon, *inter alia*, the execution of new CBAs in form and substance satisfactory to the Debtors and Arch (the "CBA Condition"). See Second Amended Plan Paragraph 9.1(c).

**G.     The Debtors' Efforts To Market Their Assets For Sale**

45.     On May 19, 2006, the Court entered an Order approving:

(a)     The Competitive Process for the sale of the Debtors' equity through a plan; and

(b)     The Break-Up Fee and Expense Reimbursement to Arch if any alternative plan is chosen by the Debtors and is consummated.

46.    On May 21, 2008, the Court authorized the Debtors' retention of NatCity Investments, Inc. ("Sales Consultant" or "NatCity") as sales consultant/investment banker effective as of May 7, 2008 (the date NatCity commenced its work) to oversee and supervise the sale of the Debtors' equity through its Chapter 11 proceedings, including, but not limited to, the following:

a.    Developing a list of suitable potential buyers who will be contracted by the Debtors;

b.    Supervising the execution of confidentiality agreements for potential buyers;

c.    Supervising due diligence requests and deliverables for all potential buyers;

d.    Soliciting competitive offers from potential buyers;

e.    Advising and assisting the company in structuring the transaction and negotiating the transaction agreements; and

f.    Otherwise assisting and advising the Debtors, as necessary, through closing.

47.    Since its retention, NatCity has actively marketed the Debtors, contacting approximately 180 potential buyers.  To date, NatCity has received responses from numerous parties, and 19 parties have signed confidentiality agreements and have been provided with due diligence materials.  In addition, five parties have made site visits to the facility and indicated interest and engaged in discussions with the Debtors and NatCity concerning a potential transaction.

**H.    Debtors' Third Amended Joint Plan of Reorganization**

48.    On May 23, 2008, the Court entered an Order approving the Joint Disclosure Statement for the Debtors' Third Amended Plan.  Confirmation of the Third Amended Plan is currently scheduled for July 8, 2008.  Pursuant to the Arch Amended DIP Agreement, in the

event the effective date of the Third Amended Plan does not occur on or before July 31, 2008, the Debtors will be in default of the Arch Amended DIP Agreement.

49.     Confirmation of the Third Amended Plan is subject to the CBA Condition and provides that:

> In the event (i) new Collective Bargaining Agreements in form and substance satisfactory to Arch Acquisition are not fully executed or such condition is not waived by Arch Acquisition prior to June 16, 2008 and (ii) the Debtors and Arch Acquisition, jointly, agree to proceed with a sale under section 363 of the Bankruptcy Code, in lieu of proceeding with the Plan and filing a motion under section 1113, then, in such event, Arch Acquisition agrees to serve as the stalking horse bidder in any expedited sale process under section 363 of the Bankruptcy Code.  The section 363 process and the asset purchase agreement shall (i) be on terms, conditions and a timeline acceptable to Arch Acquisition, (ii) provide for a break-up fee and expense reimbursement to Arch Acquisition in the same amount as that approved in connection with the competitive process for this Plan, and (iii) provide for a purchase price (subject to adjustment based on the change from the Plan process to a section 363 sale) consistent with the Plan Funding Commitment (including the Exit Facility) contained herein.  Notwithstanding the foregoing, nothing herein shall obligate Arch Acquisition to provide additional financing or waive any defaults under the Arch Acquisition DIP Agreement in connection with such section 363 sale process.

50.     Immediately after the Petition Date, the Debtors met with the leadership of each of the Labor Unions to advise them of the instant proceedings and the need to renegotiate the Debtors' respective CBAs with the Labor Unions in order to improve operational and economic efficiencies and preserve and create value for the Debtors' estates.  In view of these objectives, in early April 2008, the Debtors presented to each of the Labor Unions written proposals for new CBAs and negotiations ensued.  The Debtors have had multiple bargaining sessions with each of the Labor Unions and have negotiated in good faith, but have not been able to come to terms with the Labor Unions on new CBAs that meet the aforementioned objectives and satisfy the condition precedent for confirmation of the Third Amended Plan.  Third Amended Plan ¶9.1(c).

Accordingly, pursuant to the Third Amended Plan, the Debtors and Arch have agreed to proceed with a sale of the Debtors' assets under Section 363 of the Bankruptcy Code.

51.     The Debtors believe, in their reasonable business judgment and in light of the failure to satisfy the CBA Condition, that it is in the best interests of their estates and creditors to sell the Assets through an auction.  Further, it is critical that the Debtors effect a sale of the Assets as quickly as possible before their debtor-in-possession financing expires, in order to comply with the terms of the Postpetition Credit Agreement and to preserve maximum realizable asset values for the benefit of their estates and creditors.

**I.      The Arch Asset Purchase Agreement**

52.     Arch has provided the Debtors with as asset purchase agreement (the "Arch APA"), a copy of which is annexed hereto as **Exhibit B**.  The Arch APA provides for,[5] *inter alia*, (i) an auction subject to the Competitive Process, and (ii) a stalking horse purchase price of: (a) cash in an amount up to ninety-one million five hundred thousand dollars ($91,500,000.00), in accordance with Section 2.1; and (b) assumption by Arch of the Assumed Liabilities set forth in Sections 1.3.

53.     The value provided by Arch under the Arch APA is the same as the funding commitment which was to be paid by Arch under the Third Amended Plan.  Among other things, the purchase price of up to ninety one million five hundred thousand dollars ($91,500,000.00) includes payment (or satisfaction of) the Arch Acquisition DIP Loan, the CIT DIP Loan and an amount equal to the cash which would have been required to be paid to claimants and the Unsecured Creditors Pool upon the effective date of the Third Amended Plan.  In addition, Arch

---

[5]      This description of the Arch APA is intended only as a summary.  Parties should review the APA for a complete understanding of the transaction.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Arch APA.

has agreed to assume the same liabilities it had previously agreed to assume under the Third Amended Plan, including the cure of certain monetary defaults, payments of ordinary course administrative expense claims and priority paid time off claims in the ordinary course after closing, and payments to perfected purchase money security interest holders, all of which are set forth in more detail in the Arch APA. Accordingly, the Arch APA allows for the sale of the Debtors' assets for essentially the same purchase price as the proposed sale of the reorganized Debtors' equity under the Third Amended Plan, but without the necessity of obtaining modified CBAs.

## RELIEF REQUESTED

54. The Debtors respectfully request, pursuant to sections 105, 363, 365 and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, (a) entry of the Bidding Procedures Order approving (i) the Auction Procedures, and (ii) the Auction and Hearing Notice, and (b) entry of the Sale Order approving (i) the sale of the Assets free and clear of liens, claims and encumbrances to Arch, or a qualified bidder submitting a higher or otherwise better offer, and (ii) the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale of the Assets.

53. The Debtors, with the consent of Arch, expressly reserve the right to modify the relief requested in the Sale Motion or to withdraw the Sale Motion prior to or at the applicable hearings, including the proposed Auction Procedures.

## PART I - APPROVAL OF THE AUCTION PROCEDURES

54. In Part I of this Sale Motion, the Debtors seek expedited approval of the Bidding Procedures Order which contain specific Auction Procedures, including the manner in which the Auction and Hearing Notice is to be provided, as well as the same Bidding Protections

(defined below) previously authorized by this Court to Arch in the event that the Court approves a sale to an alternative purchaser.

55.    As this Court originally found when it approved the Competitive Process, the sale of the Debtors was the subject of intense, arms' length negotiations between and among the parties.  Notably, as a condition of Arch's willingness to enter into the post-petition financing transactions, the Third Amended Plan, foregoing other investment opportunities, committing its resources to pursuing the sale and, importantly, acting as the "stalking horse" for other potential bidders, Arch has always required that the Debtors agree, and seek an expedited order of the Court determining, that the Competitive Process and Bidding Protections be approved by the Court. The Bidding Protections, including the Break-Up Fee and the separate Expense Reimbursement (both defined below), are in recognition of the value Arch has added to these estates as a stalking horse bidder and to reimburse Arch for its expenses in the event it is not approved by the Court as the purchaser of the Debtors or their Assets.

A.    **The Auction Procedures**

56.    The Debtors request that the Court approve the following Auction Procedures. In light of the failure to satisfy the CBA Condition, the Debtors believe that an auction of the Assets conducted in accordance with the Auction Procedures set forth below will maximize value to the Debtors' estates.

    a.    Auction and Hearing Notice. No later than June 23, 2008, the Debtors shall deliver the Auction and Hearing Notice by facsimile, Federal Express or hand delivery, to (a) all potential purchasers identified by the Debtors or NatCity, (b) the Office of the United States Trustee, (c) counsel to the Creditors' Committee, (d) counsel to Arch, (e) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (f) all known entities holding or asserting a security interest in or lien against any of the Assets, (g) the parties to the Debtors' material executory contracts and unexpired leases that the Debtors believe may be subject to assumption and assignment (or rejection), and (h) all government agencies required to receive notice of proceedings under the Bankruptcy Rules.

b.     Single Sale under the Arch APA. The Assets shall be sold to a single bidder, in a single sale. All bidders shall have signed an agreement in substantially the same form of the Arch APA and on terms no less favorable than the Arch APA, as determined in the Debtors' discretion, in consultation with the Creditors' Committee.

c.     Qualified Bids.  The Arch APA is considered a qualified bid.  To be considered by the Debtors, in consultation with the Committee, an alternative offer for the purchase of the Debtors' Assets must be a qualified bid as provided herein (a "Qualified Bid").  A Qualified Bid must be in writing and submitted so as to be actually received by the Notice Parties listed in the Motion no later than June 30, 2008, at 12:00 noon (the "Bid Deadline").  A Qualified Bid must contain a mark-up of such bidder's proposed asset purchase agreement (the "Alternative APA") to show all modifications from the Arch APA and exceed Arch's purchase price by at least $1,950,000 (consisting of the Break-Up Fee, the Expense Reimbursement, the In Lieu of Termination Fee, and a minimum $150,000 increase to the purchase price) (the "Initial Overbid"). The only material modifications to the Arch APA may be: (i) to replace Arch as the Buyer; (ii) to provide for payment in full, of the Arch Acquisition DIP claim in cash on the Closing Date; (iii) to increase the Purchase Price; (iv) waive or increase caps; and/or (v) improve the treatment of employees or environmental claims in a manner that provides a monetary benefit to the Debtors' estates or reduces claims.  The Break-Up Fee and/or Expense Reimbursement section of the Arch APA will not be applicable to any bidders other than Arch.  The Alternative APA also must include the bidder's proposed schedule of executory contracts and unexpired leases to be assumed.

d.     Bid Requirements.  To be considered a Qualified Bid, a person interested in purchasing the Debtors' Assets must, no later than the Bid Deadline, provide the following additional information to the Notice Parties:

i.     Identification of the potential bidder, its principals, and the representatives thereof who are authorized to appear on the potential bidder's behalf for all purposes, and an explanation of any affiliation with a competitor of any of the Debtors.

ii.     An executed, binding and irrevocable offer in the amount of at least the Initial Overbid that also identifies any potential, non-material modifications to the Arch APA, which Qualified Bid will be irrevocable until at least two days after conclusion of the sale Hearing.

iii.     Written evidence, satisfactory to the Sales Consultant, the Debtors and the Committee, that the potential bidder has the financial wherewithal and ability to fully fund and

consummate the Alternative APA not later than July 31, 2008 (the "Closing Deadline"), which shall include the following: (a) current financial statements, (b) contact information for parties that can confirm financing availability, (c) proof of debt or equity funding commitments, and (d) other information that would show the potential bidder's financial ability to fund the closing of the Alternative APA.

    iv    Provide a good faith deposit of $4,500,000 in the form of a certified check or wire transfer to be held in escrow by the Debtors' counsel (the "Deposit").

    v.    Written confirmation that the potential bidder's offer is not subject to financing or any contingencies other than any contingencies contained in the Arch APA. Potential bidders shall have until 7:00 p.m. (Eastern Time) on July 1, 2008, to definitively satisfy any financing contingencies contained in an otherwise Qualified Bid; if the potential bidder has not removed all financing contingencies by this time, its bid will not be considered a Qualified Bid and the potential bidder will not be eligible to participate in the Auction (defined below).

e.    Deposit Forfeit. The Deposit will be forfeited as liquidated damages and the Successful Bidder (defined below) held liable for compensatory damages if the Successful Bidder fails to close by reason of its breach of the contract of sale to be signed by the Debtors and the Successful Bidder (the "Contract") subject to the terms of the Alternative APA.

f.    No Contingencies. Bids may not be subject to financing, due diligence, environmental, engineering or any other contingencies except as provided in the Arch APA.

g.    Bid Deadline.  Any party wishing to participate in the Auction must submit a Qualified Bid no later than June 30, 2008, at 12:00 noon (Eastern Time) (the "Bid Deadline") to the Notice Parties.  Any bid received after the Bid Deadline (unless extended by the Debtors in consultation with the Committee) shall not constitute a Qualified Bid, and shall not be considered by the Debtors or the Sales Consultant.

h.    Auction.  In the event a Qualified Bid is timely received by the Notice Parties, the Debtors, through the Sales Consultant and in consultation with the Committee, shall conduct an "auction" for competitive bids on July 2, 2008, at 10:00 a.m. at the offices of Cozen O'Connor, 1900 Market Street, Philadelphia, Pennsylvania (the "Auction").  In the event that no Qualified Bids are submitted by the Bid Deadline, then Arch will be deemed the

Successful Bidder and the Debtors shall proceed with court approval of the Arch APA.

i.   <u>Bid Increments</u>. Bidders who have submitted a Qualified Bid may improve their bids at the Auction in increments of no less than $150,000. At the Auction, the Debtors shall take into account Arch's entitlement to the Break-Up and Expense Reimbursement in conducting the auction and at all times in determining which bid is the higher and better bid and ultimately which bid is the highest and best bid. Arch shall also be entitled to credit bid the outstanding amount of the Arch Acquisition DIP Claim. Should overbidding occur, Arch will have the right, but not the obligation, to participate in the bidding and to be approved as the successful bidder based on any such subsequent overbid provided that Arch's overbid is determined to be the highest and best bid. The bidding will be continuous and competitive and will not end until all Qualified Bidders have submitted their last and best offers.

j.   <u>Second Place Bidder</u>. That, at the conclusion of the Auction, the Debtors, through the Sales Consultant, and after consultation with the Committee, shall announce the highest and best bid (the "<u>Successful Bidder</u>") and the second place bidder (the "<u>Second Place Bidder</u>"). The Successful Bidder and the Second Place Bidder shall supplement their respective deposits by wire transfer or other immediately available funds within one (1) business day so that, to the extent necessary, such deposit equals ten percent (10%) of the highest and best bid. If, for any reason, the Successful Bidder fails to consummate the purchase of the Assets, (i) the Second Place Bidder will be deemed to have submitted the highest and best bid, and (ii) the Debtors shall be authorized to effect the sale of the Assets to the Second Place Bidder without further order of the Bankruptcy Court. The Debtors' counsel shall retain the Second Place Bidder's deposit in an interest-bearing trust account until the sale to the Successful Bidder closes, provided that the Second Place Bidder provides Debtors' counsel with a federal tax identification number, at which time the deposit (plus accrued interest, if any) shall be promptly returned to the Second Place Bidder.

k.   <u>Sale Hearing</u>. A hearing to confirm the results of the Auction will be held before the Honorable Gloria Burns, U.S.B.J., at the United States Bankruptcy Court for the District of New Jersey, Camden, New Jersey July 8, 2008 at 10:00 a.m. Eastern Time.

l.   <u>Break-Up Fee, Expense Reimbursement, and Deposit</u>. The $1,000,000 Break-Up Fee and the separate $500,000 Expense Reimbursement, as those terms are defined in the Arch APA, and the procedures in the APA detailing the disbursement to Arch, of the Break-Up Fee and Expense Reimbursement are approved.

m.    <u>Notice</u>.  Any party wishing to participate in the Competitive Process must submit a Qualified Bid no later than June 30, 2008, at 12:00 p.m. (the "<u>Bid Deadline</u>") to the following notice parties (the "<u>Notice Parties</u>"):

| | | |
|---|---|---|
| Mark E. Felger, Esq.<br>Cozen O'Connor<br>1201 North Market Street<br>Suite 1400<br>Wilmington, DE 19801<br>mfelger@cozen.com<br>Counsel for the Debtors | Jerrold N. Poslusny, Jr., Esq.<br>Cozen O'Connor<br>Liberty View<br>Suite 300<br>457 Haddonfield Road<br>Cherry Hill, NJ 08002<br>jposlusny@cozen.com<br>Counsel for the Debtors | J. Scott Victor, Esq.<br>National City Capital Markets<br>Five Tower Bridge, Suite 420<br>West Conshohocken, PA 19428<br>jscott.victor@nationalcity.com<br>Sales Consultant to the Debtors |
| Nancy A. Mitchell, Esq.<br>Greenberg Traurig<br>200 Park Avenue<br>New York, NY 10166<br>nmitchell@gtlaw.com<br><br>Counsel for Arch | Alan J. Brody, Esq.<br>Greenberg Traurig<br>200 Park Avenue<br>Florham Park, NJ 07932-0677<br>brodya@gtlaw.com<br>Counsel for Arch | Alan Halperin, Esq.<br>Halperin Battaglia Raicht<br>555 Madison Avenue<br>9th Floor<br>New York, NY 10022<br>ahalperin@halperinlaw.net<br><br>Co-counsel for the Committee |
| Ilana Volkov, Esq.<br>Cole, Schotz, Meisel, Forman & Leonard<br>Court Plaza North<br>25 Main Street<br>Hackensack, NJ 07601<br>msirota@coleschotz.com<br><br>Co-Counsel for the Committee | Paul A. Patterson, Esq.<br>Stradley, Ronon, Stevens & Young<br>2600 One Commerce Square<br>Philadelphia, PA 19103<br>ppatterson@stradley.com<br><br>Counsel for the Lender Group | |

Any bid received after the Bid Deadline (unless extended by the Debtors in consultation with the Committee) shall not constitute a Qualified Bid (defined below), and will not be considered by the Debtors or the Sales Consultant.

57.    The Debtors believe that establishing the Auction Procedures described above will allow the Debtors to promptly review, analyze and compare all bids received and to determine which bid or bids are in the best interest of the Debtors' estates. Therefore, the Debtors respectfully request that the Court approve the Auction Procedures.

**B.      The Auction and Hearing Notice and Notice of Sale Motion**

58.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify its creditors of the proposed sale of Assets, including a disclosure of the time and place of the Auction, the terms and conditions of the sale and the deadline for filing any objections. The Auction and Hearing Notice complies with Bankruptcy Rule 2002(c) and includes information on the Auction Procedures necessary to enable interested parties to participate in the Auction and the Sale Hearing.

59.     The Debtors propose to serve the Auction and Hearing Notice no later than June 23, 2008 (one business day after the entry of the Bidding Procedures Order), by facsimile, Federal Express or hand delivery, to (a) all potential purchasers identified by the Debtors, (b) the Office of the United States Trustee, (c) counsel to the Creditors' Committee, (d) counsel to Arch, (e) the parties in interest who have requested notice pursuant to Bankruptcy Rule 2002, (f) all known entities holding or asserting a security interest in or lien against any of the Assets, (g) the parties to the Debtors' material executory contracts and unexpired leases that the Debtors believe may be subject to assumption and assignment (or rejection), and (h) all government agencies required to receive notice of proceedings under the Bankruptcy Rules.

60.     On or before June 23, 2008, the Debtors will also serve a copy of this Sale Motion, including all exhibits, by facsimile, Federal Express or hand delivery, upon (i) all parties to material executory contracts and unexpired leases that the Debtors believe will or may be assumed and assigned or rejected, (ii) all known entities holding or asserting a security interest in or lien against any of the Assets, (iii) all taxing authorities whose rights may be affected by the sale of the Assets, (iv) all parties signing confidentiality agreements after March 16, 2008, and (v) all parties that have requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Service List"). The Auction and Hearing Notice provides that any party not

on the Service List that wishes to obtain a copy of this Sale Motion, including all exhibits, may make such a request in writing to Cozen O'Connor, 1201 North Market Street, Suite 1400, Wilmington, DE 19801, Attn: Mark E. Felger, Esq., Telephone (302) 295-2087, Facsimile: (302) 295-2013, Email: mfelger@cozen.com.

### C.    Break-Up Fee, Expense Reimbursement and Overbid Protection

61.    On May 20, 2008, in recognition of the benefits provided by Arch to these estates, and based on the record made at the May 16, 2008 hearing, this Court entered an Order authorizing, *inter alia*, the Break-up Fee and Expense Reimbursement to Arch.

> We have a lender who came -- well, an entity, investment company, that came in to the process, which was not their making -- not their doing, and, you know, put up money in advance to allow the debtor to actually get to this point.
>
> And as you know, things were pretty bleak in the beginning of the case. Basically, the first day the debtor said the debtor couldn't operate beyond that day. The Court didn't approve the Arcis deal, which I agree with you was far from a great deal.
>
> But if somebody had not stepped up, and that somebody was the Arch entity, had not stepped up to do the financing, the Court would have been stuck with the unenviable job of deciding whether to approve the Arcis deal or no deal, which from basically the testimony the Court had received at that time, might mean the end of operations of the debtor, which would have substantially, I believe, hurt all the creditors of the case.
>
> And so, in light of that and all the efforts that were made, and actual money put up on the table to provide the debtor with better financing in many aspects than was had before, and the benefit that this Court saw from Arch in really being involved in every aspect of trying to make that deal work, and we had a number of telephone conferences and court appearances, in addition to, I'm sure, many, many other meetings and telephone conferences that the Court wasn't a party to.
>
> They worked with the committee to come up with the deal that really was of great assistance to the debtor. **And as I said, I can't imagine a case that I could have a Chapter 11 where I wouldn't feel that this entity didn't benefit the estate any more than this case.  If not this case, then there really wouldn't be a case where there was a benefit to the estate greater than that from a potential stalking horse**.

\*    \*    \*

I'm satisfied that a record has been made that convinces the Court that in this particular case, in this particular instance, that it is appropriate to approve a breakup fee for the Arch organization in this particular plan.

Transcript of May 16, 2008 hearing at 39:9 - 41:2 (copy of which is annexed hereto as <u>Exhibit B</u>) (emphasis added).

62.    The Break-Up Fee and Expense Reimbursement have been material inducements for, and conditions of, Arch's agreeing to act as the stalking horse bidder under the Disclosure Statement, Amended Plan, which lead to the Arch APA.  The Debtors believe that the Break-Up Fee and Expense Reimbursement are fair and reasonable in view of, among other things: (a) the intensive post-petition analysis, due diligence investigation, and negotiation undertaken by Arch, (b) the fact that Arch's efforts have significantly increased the potential distribution to holders of general unsecured claims, and may result in further increases if other entities participate in the Competitive Process, and (c) the fact that the Break-Up Fee and Expense Reimbursement total less than 2% of the estimated purchase price under the Arch APA.

63.    The Debtors request that the Court confirm that the previously approved Break-Up Fee and Expense Reimbursement are approved and shall be paid to Arch in the event an Alternative Bidder is approved and closes.

64.    As previously discussed, the inclusion of the Bidding Protections was an express condition precedent to the execution of the Arch APA and are meant to compensate Arch for the value it adds as a stalking horse bidder and to reimburse Arch for its costs and expenses incurred in the event Arch is not approved as the purchaser of the Assets. Approval of break-up fees and other forms of bidding protections in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in Chapter 11 cases. Under the circumstances of this case, the proposed Bidding Protections are necessary

to enable the Debtors to enter into the stalking horse asset purchase agreement and thereby (i) induce one or more potential purchasers to submit a higher or otherwise better bid that might not otherwise be forthcoming and (ii) increase the likelihood that the Debtors will receive the highest or otherwise best offer for the Assets to the benefit of the Debtors, their estates and creditors.

65.    Ample support exists for the Debtors' request for approval of the Bidding Protections. The United States Court of Appeals for the Third Circuit has considered the standards that should govern an award of break-up fees and related expenses in the context of a chapter 11 case. In re O'Brien Environmental Energy, Inc., 181 F.3d 527 (3d Cir. 1999). In that case, the Third Circuit concluded that the jurisprudence governing the general allowance of administrative claims pursuant to section 503(b) of the Bankruptcy Code should govern the authorization of break-up fees and related expenses for the initial bidder in an auction process. Id. at 535. The Third Circuit explained that "the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." Id.  Accordingly, bidding protections, such as the Break-up Fee and Expense Reimbursement are clearly warranted where the stalking horse bidder, such as Arch, has provided a great benefit to the debtor's estate.  Id. at 533.  See also Transcript of May 20, 2008 hearing at 20:18 - 19 ("if this isn't a case with benefit to the estate, I'm not sure what one is.")

66.    As previously determined by the Court, the Break-Up Fee and Expense Reimbursement will enable the Debtors to ensure the sale of their Assets at a price that the Debtors believe to be fair while, at the same time, providing the Debtors with the potential of

even greater benefit to their estates.  Thus, the Break-Up Fee and the Expense Reimbursement should be approved.

67.    The Debtors also request expedited approval of the Auction Procedures, including the Bidding Protections.  As the Court is well aware, each passing day presents a funding obstacle for the Debtors. Therefore, all reasonable steps should be taken to expedite the sale process. As such, the Debtors have an urgent need to seek expedited approval of the Auction Procedures, including the Bidding Protections, to keep the sale process moving towards a prompt conclusion.

## PART II - APPROVAL OF THE SALE

68.    In Part II of this Sale Motion, the Debtors seek approval of (i) the sale of the Assets free and clear of liens, claims and encumbrances, (ii) the assumption and assignment of certain executory contracts and unexpired leases (or, alternatively, the rejection of any such contracts and leases that are not being assumed by the successful purchaser), and (iii) the exemption of the sale of the Assets from stamp or similar taxes.

## A.    The Sale of the Debtors' Assets Should Be Approved

69.    The Debtors submit that ample authority exists for the approval of the proposed sale of the Assets. Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business free and clear of liens, claims and encumbrances, provides, in relevant part, as follows:

(b)(1)    The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

(f)    The trustee may sell property of the estate under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents; . . .

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

See 11 U.S.C. § 363(b)(1), (f); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.").

70.    Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan. However, courts in the Third Circuit and beyond have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtor. See In re Abbots Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and that the transaction is in good faith); see also Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); Stephens Indus. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) ("bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action"); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Indus. Valley Refrig. & Air Conditioning Supplies, Inc., 77 B.R. 15, 20 (Bankr. E.D. Pa. 1987).

71.    The "sound business purpose" test requires that a debtor establish four elements to sell property outside the ordinary course of business, namely (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtor has obtained a

fair and reasonable price, and (d) good faith. See Abbots Dairies, infra; Titusville, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel, 82 B.R. at 335-36; Industry Valley, 77 B.R. at 21. Courts have made it clear that a debtor's showing of a sound business justification need not be unduly exhaustive, but, rather, a debtor is "simply required to justify the proposed disposition with sound business reason." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

72.    Consideration of the above factors in these cases unequivocally establishes that the proposed sale should be approved.  Since the entry of the Final DIP Order, the Debtors and Arch have worked diligently to effectuate a sale of the Debtors through a plan process. Additionally, the Debtors, with the assistance of NatCity, have actively marketed the companies as part of the Competitive Process.  In fact, as set forth hereinabove, the Debtors have been marketing their businesses for several months.  The Debtors' decision to sell the Assets is based upon their sound business judgment in consideration of its ongoing liquidity crisis, the inability to obtain new CBAs, and their duty to maximize the value of the Assets as a going concern for the benefit of their estates and creditors.

73.    The Arch APA represents the best offer received to date for the proposed acquisition of the Assets. To ensure that the value of the Assets is maximized, however, the Arch APA is expressly subject to higher and better offers. The Debtors believe there is no better evidence of value than what the market will ultimately bear. The Auction Procedures described herein (including the Competitive Process) will ensure that the Debtors receive the maximum value for the Assets and that the purchase price ultimately realized by the estates will be fair and reasonable. Accordingly, the Debtors submit that consideration of the business

reasons articulated herein leads to the inescapable conclusion that the Debtors should be authorized to sell the Assets.

74.     The Debtors recognize that the timeline proposed for the Auction Procedures is compressed.  However, as set forth above, the Debtors have been marketing their businesses through NatCity since early May, and numerous parties have conducted significant due diligence to proceed with a transaction if they are inclined to submit an offer.  The change from the Competitive Process under the Third Amended Plan to the Auction Procedures under this Sale Motion should not adversely affect any third party from making a bid, because (i) the material terms of the Arch APA are substantially the same as the Third Amended Plan, and (ii) the proposed timeline provides an additional five (5) days to submit a competing offer than under the Competitive Process.

**B.      Sale Free and Clear of Liens, Claims and Encumbrances**

75.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

<u>See</u> 11 U.S.C. § 363(f); <u>In re Elliot</u>, 94 B.R. 343, 354 (E.D. Pa. 1988) (section 363(f) written in

disjunctive; court may approve sale "free and clear" provided at least one of the subsections is

met). The Debtors expect that they can satisfy the requirements of Section 363(f).

76.     In order to facilitate the sale of the Assets, the Debtors require authorization to

sell their assets free and clear of any and all liens or interests that may be asserted, with such

liens to attach to the sale proceeds, except to the extent a purchaser agrees to purchase and take

title to the Assets subject to such liens.

77.     Here, the Debtors believe that Arch, CIT and other secured creditors have or will

have consented to the proposed sale of the Assets on the terms and conditions set forth in the

Arch APA. In any event, all liens on the Assets will be satisfied or will attach to the proceeds of

a sale of the Assets with the same force, effect and priority as such liens have on the Assets,

subject to the rights and defenses, if any, of the Debtors and any party in interest with respect

thereto. Accordingly, the Debtors submit that the sale of the Assets free and clear of liens,

claims and encumbrances satisfies the statutory prerequisites of section 363(f) of the

Bankruptcy Code.

## C.    <u>Assumption and Assignment of Executory Contracts and Unexpired Leases</u>

78.     In order to facilitate and effect the sale of the Assets, the Debtors also seek to

assume and assign certain executory contracts and unexpired leases to the purchaser of the

Assets to the extent required. Section 365 of the Bankruptcy Code authorizes a debtor to

assume and/or assign its executory contracts and unexpired leases subject to the approval of the

bankruptcy court:

(a)     Except as provided in . . . subsections (b), (c), and (d) of this section, the
trustee, subject to the court's approval, may assume or reject any
executory contract or unexpired lease of the debtor.

(b)(1)  If there has been a default in an executory contract or unexpired lease of

the debt the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee:

(A)    cures, or provides adequate assurance that the trustee will promptly cure such default;

(B)    compensates or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)    provides adequate assurance of future performance under such contract or lease…

(f)(2)    The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

See 11 U.S.C. §§ 365(a), (b)(1), (f)(2). Accordingly, section 365 authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.

79.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.Y. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

80.   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

81.   In connection with the Sale Hearing, the Debtors will provide evidence that all requirements for the assumption and/or assignment of the executory contracts and unexpired leases proposed to be assigned to the purchaser of the Assets will be satisfied. It is an express condition of the Auction Procedures that competitive bidders submit, *inter alia*, sufficient financial and other information to assess the bidder's compliance with section 365 of the Bankruptcy Code. The Debtors will provide all parties to executory contracts and unexpired leases to be assumed and assigned pursuant to the Sale Motion with adequate assurance information and an opportunity to be heard. Thus, the Debtors respectfully submit that by the conclusion of the Sale Hearing, assumption and assignment of the executory contracts and unexpired leases should be approved.

**D.**      **Rejection of Unsold Contracts and Leases**

82.   In the event that there are any executory contracts or unexpired leases that remain unsold at the conclusion of the Auction, the Debtors reserve the right to request authority at the Sale Hearing to reject any or all such unsold executory contracts and unexpired leases on five (5) business days notice to counter parties.  After concluding the Auction and selling the Assets, the unsold executory contracts and unexpired leases may be valueless to the Debtors and would only create an administrative expense burden on the Debtors' estates. Therefore, the

Debtors request authority to reject, as of the date of the Sale Hearing, some or all executory contracts and unexpired leases they believe to have no value on five (5) business days notice to counter parties.

**E.    Cure Amounts**

83.    In order to ascertain the net benefit to the estate from the assignment of its executory contracts and unexpired leases, the Debtors need to accurately determine the extent of its cure obligations, if any. Consequently, the Debtors intend to file with the Court and serve upon the parties to the Debtors' executory contracts and unexpired leases that the Debtors believe may be subject to assumption and assignment (or rejection), a list and description of all of its executory contracts and unexpired leases to be assumed and assigned as part of the winning bid (together, the "Executory Contracts"), and the cure amounts (the "Cure Amounts"), if any, reflected in the Debtor's books and records as of the date such exhibit (the "Executory Contract Exhibit") is filed with the Court.

84.    A separate hearing to consider any objections to the proposed Cure Amounts will be held on a date to be established by the Court. The Debtors request that any party failing to object to the proposed assumption and assignment of its Executory Contract and the listed cure amount (if any) be deemed to consent to the treatment of its Executory Contract under section 365 of the Bankruptcy Code and this Sale Motion, including, but not limited to, the Cure Amounts. See Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to sale motion, creditor deemed to consent); Pelican Homestead v. Wooten (In re Gabel), 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same). Moreover, the Debtor requests that each such party be deemed to consent to the assumption and assignment of its Executory Contract notwithstanding any anti-alienation provision or other restriction on assignment. See 11 U.S.C. §§ 365(c)(1)(B), (e)(2)(A)(ii) and (f).

F.      **Exemption of Sale from Bulk Sale Statutes and Reservation
of Rights Regarding 1146 Exemption**

85.     The Debtors have not conducted a comprehensive study of such requirements for
every state, city and town in which the Assets are located. However, certain of the statutes and
regulations may provide that if a liquidation or bankruptcy sale is court authorized, then a
company need not comply with such statutes or regulations. Moreover, in the context of
bankruptcy cases such as these, where creditors are given notice of the proposed sale in
advance, as well as an opportunity to be heard before this Court, the application of such statutes
and regulations would be redundant and unnecessary. Accordingly, the Debtors seek the
authorization to consummate the sale of the Assets without the necessity of complying with any
state or local bulk transfer law or other requirements.

86.     The Debtors are mindful of the recent decision by the United States Supreme
Court in Florida Department of Revenue v. Piccadilly Cafeterias, Inc., __ U.S. ___, 2008 WL
2404077 (2008), and reserve the right to request that the sale be exempted from stamp or
similar taxes under Section 1146 of the Bankruptcy Code in the event that the Debtors proceed
with confirmation of the Third Amended Plan, as such plan may be amended, substantially
contemporaneously with approval of the Sale Motion.

## WAIVER OF MEMORANDUM OF LAW

87.     The Motion does not raise any novel issues of law and, accordingly, the Debtors
respectfully request that the Court waive the requirement contained in D.N.J. LBR 9013-2 that
a separate memorandum of law be submitted

## NOTICE

88.     Notice of this Motion has been provided to: (a) counsel for CIT, (b) counsel for
Arch, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New

Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) counsel to the Committee, (h) all parties that have signed confidentiality agreements since March 16, 2008, and (i) all parties on the Master Service List.  In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

## <u>NO PRIOR REQUEST</u>

WHEREFORE, the Debtors respectfully request entry of orders substantially in the forms filed concurrently herewith granting the relief requested in this Sale Motion and for such other and further relief as may be just and proper.

Dated:  June 17, 2008

COZEN O'CONNOR

By:     <u>/s/ *Jerrold N. Poslusny, Jr.*</u>
        Mark E. Felger
        Jerrold N. Poslusny, Jr.

        Attorneys for the Debtors

EXHIBIT A

**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

| | |
|---|---|
| In re:<br>SHAPES/ARCH HOLDINGS L.L.C., et al.,<br><br>Debtors. | : UNITED STATES BANKRUPTCY COURT<br>: FOR THE DISTRICT OF NEW JERSEY<br>: CHAPTER 11<br>:<br>: CASE NO. 08-14631 (GMB)<br>: |

**NOTICE OF AUCTION PROCEDURES,**
**AUCTION DATE AND SALE HEARING**

PLEASE BE ADVISED that, on June 20, 2008, pursuant to a motion by the Debtors dated June 17, 2007 (the "Sale Motion"), the United States Bankruptcy Court for the District of New Jersey (the "Court") entered an Order (the "Scheduling Order") approving the auction procedures set forth in the Sale Motion (the "Auction Procedures") in connection with the proposed sale by the Debtors of all or substantially all of its assets (the "Assets").

PLEASE BE FURTHER ADVISED that, pursuant to the Auction Procedures, any bidder desiring to submit a bid at the Auction (a "Bid") shall send a letter indicating its interest in bidding addressed to Debtors' undersigned counsel and Debtors' sales consultant, NatCity Investments, Inc., Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, PA 19428, Attn: J. Scott Victor, Tel: 610-940-5802, Fax: 610-940-3875, to seek to become a qualified bidder by signing a confidentiality agreement and providing the requisite financial and other information (a "Qualified Bidder"), so that such Bid is actually received no later than June 30, 2008 at 2:00 p.m. Eastern Time.

**The Auction Procedures contain detailed requirements for the submission of all bids and should be reviewed carefully.**

PLEASE BE FURTHER ADVISED that, pursuant to the Auction Procedures, the Auction will be conducted at the offices of Cozen O'Connor, 1900 Market Street, Philadelphia, Pennsylvania, on July 2, 2008 at 10:00 a.m. Eastern Time (the "Auction Date"). Any person seeking to participate as a bidder at the Auction shall comply with the Auction Procedures.

PLEASE BE FURTHER ADVISED that, objections, if any, to the relief requested in the Sale Motion (other than objections to Cure Amounts, which shall be filed and served as provided below) and any filed supplements thereto, including objections relating to the assumption and assignment of executory contracts and unexpired leases and/or a sale of the Assets, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served upon:

| | |
|---|---|
| Mark E. Felger, Esq.<br>Cozen O'Connor<br>1201 North Market Street<br>Suite 1400<br>Wilmington, DE  19801<br>mfelger@cozen.com<br>Counsel for the Debtors | Jerrold N. Poslusny, Jr., Esq.<br>Cozen O'Connor<br>Liberty View<br>Suite 300<br>457 Haddonfield Road<br>Cherry Hill, NJ  08002<br>jposlusny@cozen.com<br>Counsel for the Debtors |
| Nancy A. Mitchell, Esq.<br>Greenberg Traurig<br>200 Park Avenue<br>New York, NY  10166<br>nmitchell@gtlaw.com<br>Counsel for Arch | Alan J. Brody, Esq.<br>Greenberg Traurig<br>200 Park Avenue<br>Florham Park, NJ  07932-0677<br>brodya@gtlaw.com<br>Counsel for Arch |
| Ilana Volkov, Esq.<br>Cole, Schotz, Meisel, Forman & Leonard<br>Court Plaza North<br>25 Main Street<br>Hackensack, NJ  07601<br>msirota@coleschotz.com<br>Co-Counsel for the Committee | Alan Halperin, Esq.<br>Halperin Battaglia Raicht<br>555 Madison Avenue<br>9th Floor<br>New York, NY  10022<br>ahalperin@halperinlaw.net<br>Co-counsel for the Committee |

2

PLEASE BE FURTHER ADVISED that objections to the Cure Amounts set forth in the Executory Contract Exhibit, if any, shall (i) be in writing; (ii) specify with particularity the basis of the objection and the Cure Amount allegedly due and owing such party; (iii) be accompanied by appropriate supporting documentation demonstrating the calculation of the Cure Amount, as claimed; and (iv) be filed with the Court by July 2, 2008 at 4:00 p.m. (the "Objection Deadline") and simultaneously served upon the Notice Parties so as to be actually received by the Objection Deadline. If the objection relates only to the Cure Amount of an assigned executory contract or unexpired lease, such contract or lease may be assumed by the Debtors and assigned to Arch or the Successful Bidder as applicable; provided, however, that the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by this Court, shall be held in escrow pending further order of this Court or mutual agreement of the parties as to the proper Cure Amount for such assigned contract or lease.

PLEASE BE FURTHER ADVISED that the Court has scheduled July 8, 2008 at 10:00 a.m. Eastern Time as the date for a hearing (the "Sale Hearing") to consider entry for an order, pursuant to the Sale Motion, authorizing and approving (i) the sale of the Assets free and clear of all liens, claims, and encumbrances, (ii) the assumption and assignment of certain executory contracts and unexpired leases in connection with the sale of the Assets (or the rejection of any such agreements not to be sold) and (iii) the exemption of the sale from stamp or other similar taxes. The Sale Hearing may, however, be adjourned from time to time by announcement at the Sale Hearing in open Court.

PLEASE BE FURTHER ADVISED that the Court has scheduled July __, 2007 at _:_ _.m. Eastern Time as the date for a hearing to consider any objections to the proposed amounts to be cured pursuant to section 365 of the Bankruptcy Code.

3

PLEASE BE FURTHER ADVISED that the Debtors have requested the right in the Sale Motion to reject at and as of the Sale Hearing any executory contract or unexpired lease not to be assumed and assigned as part of the sale of the Assets upon five (5) business days notice to counter parties.

PLEASE BE FURTHER ADVISED that, pursuant to the Auction Procedures, the Debtors may (i) upon the consent of Arch, amend the Auction Procedures or impose additional terms and conditions at or prior to the Auction, and (ii) to reject any or all such Bids if, in the Debtors' judgment, any such Bid is not for a fair and adequate price.

PLEASE BE FURTHER ADVISED that all requests for information concerning the Assets should be in writing directed to Scott Victor -  Tel: 610-940-5802, Fax: 610-940-3875.

Dated: June 17, 2008                                    COZEN O'CONNOR
                                                        By: /s/ Jerrold N. Poslusny, Jr.
                                                            Mark E. Felger
                                                            Jerrold N. Poslusny, Jr.

                                                        Attorneys for Debtors

**EXHIBIT B**

[The Asset Purchase Agreement will be filed with the Court prior to the hearing to approve the Auction Procedures]