**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

| | |
|---|---|
| In re:<br>SHAPES/ARCH HOLDINGS L.L.C., et al.,<br>Debtors. | : UNITED STATES BANKRUPTCY COURT<br>: FOR THE DISTRICT OF NEW JERSEY<br>: CHAPTER 11<br>:<br>: CASE NO. 08-14631 (GMB)<br>:<br>: |

# DEBTORS' MOTION TO DISALLOW CLAIMS FOR CONTRIBUTION AND IN THE ALTERNATIVE TO ESTIMATE CLAIMS

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors"),[1] the debtors and debtors-in-possession, hereby move (the "Motion") to disallow proofs of claim (the "Claims") filed by parties whose claims are based upon rights of contribution arising from several lawsuits related to certain environmental claims. Because each of the claims is contingent and a request for contribution from the Debtors, the claims should be disallowed pursuant to 11 U.S.C. § 502 (e)(1)(B). In the alternative, the Debtors request that the Court estimate the amounts of the asserted claims for plan voting purposes. In support of the Motion the Debtors represent as follows:

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date (defined below): Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C. ("Accu-Weld"); and Ultra L.L.C. ("Ultra").

**Background**

1.\. On March 16, 2008 (the "Petition Date"), the Debtors filed their respective petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy Code").

2.\. These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3.\. The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.\. No trustee or examiner has been appointed in these cases.

5.\. An official committee of unsecured creditors (the "Committee") was appointed on March 31, 2008, and has been active in these cases since that time.

6.\. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**A.    Background of Debtors' Business Operations**

7.\. Shapes/Arch is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra. The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows. By 1959, the business had expanded and began focusing on producing aluminum extrusions. The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines. On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue. The Debtors have over

2

1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

8.  Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction. Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

9.  In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

10.  Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools.

3

Both product lines are sold through dealers, distributors and major retailers throughout the United States.

11. Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

12. Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

13. Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

14. Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

15. Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home

improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

16. Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

17. Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

18. Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement").  The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Financial Corporation (the "Lender Group").

**B.      The Debtors' Pre-petition Financing**

19. Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), a term loan, and letters of credit.  The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses.  The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity

5

Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

20.     As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million.  Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group.  The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

21.     As of the Petition Date, the outstanding borrowings from the Lender Group were as follows:  (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

22.     The Debtors' Chapter 11 filings were precipitated by a number of factors.  The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008.  The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million.  The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007.  The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

6

23. With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors were struggling to fund their operations under their existing lending arrangement and found themselves in a situation in which they could not repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

24. Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

25. Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

26. The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presented a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

27. With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

## C. Versa Capital Management

28. In late January, 2008, the Debtors began a dialogue with Versa Capital Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest in a possible transaction. Versa expressed interest and conducted extensive due diligence with respect to the Debtors' businesses in late January.

29. Also during this time frame, the Debtors retained Phoenix Management Services, Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors' liquidity issues were and would become over the following weeks and months; and (iii) explore the Debtors' alternatives.

30. In February, Versa, the Debtors and representatives of the owners of Ben LLC engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and provide additional funding and an equity infusion to help the Debtors reorganize). As part of the agreement, Arcus was to become a manager of (but not a member of) Shapes/Arch (with 79.9% of the voting rights) and Ben LLC would retain 100% of the ownership rights and 20.1% of the voting rights. This transaction was made subject to many terms and conditions including, obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for the companies. The Debtors, Versa and the Lender Group ultimately reached an agreement on the terms and conditions upon which Arcus would provide additional financing to the Debtors (and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11 process, as well as provide an exit facility for the Debtors.

8

**D.    The Debtors' Bankruptcy Filing**

31.    In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

32.    Contemporaneously with the filing of the bankruptcy petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provided, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims (the "Arcus Plan").

33.    The Arcus Plan reflected a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of more than $25 million.

34.    The Debtors worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that would present an opportunity to maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses would remain viable so that the Debtors could continue to be one of South Jersey's largest employers for the foreseeable future.

35. At the first day hearing in these cases, this Court entered thirteen (13) Orders granting first day motions on an interim or final basis, including interim orders approving debtor-in-possession financing from the Lender Group and Arcus (the "Arcus DIP Loan").

E. **Arch Provides DIP Financing and Sale Proposals on Better Terms**

36. Approximately two weeks after the Petition Date, on or about April 1, 2008, Arch, an affiliate of Signature Aluminum and H.I.G. Capital Partners, filed an objection to the Debtors' financing motion in which it expressed an interest in providing an alternative financing arrangement on better terms and participating in a sale process pursuant to 11 U.S.C. § 363 or through a revised plan. As further evidence of its commitment to an open and competitive sales process, Arch provided the Debtors and the Committee with, *inter alia*, a Debtor-in-Possession Financing Agreement on better terms than the Arcus DIP Loan, a proposed Order approving such financing from Arch, and an asset purchase agreement providing for a purchase price in excess of the value provided by Arcus in the Arcus Plan. Upon the request of the Committee, Arch converted their asset purchase agreement to a plan of reorganization on better terms than the Arcus Plan, including but not limited to a pool of funds for general unsecured creditors of $5,000,000 (as opposed to the $500,000 unsecured pool provided in the Arcus Plan).

37. On May 1, 2008, after Arch completed its due diligence, and after extensive discovery propounded by the Committee and Arcus and several days of depositions of the parties, Arch provided the Debtors with commitment letters for financing the alternative transaction and the Lender Group advised the Debtors that it would continue funding the Debtors' operations if Arch replaced Arcus. Arch's alternative DIP financing package and the alternative plan (the "Arch Alternative Proposal") was now free of any due diligence contingencies and any financing contingencies with respect to the debtor-in-possession financing

and the exit financing under the alternative plan; provided for the Lender Group's continued funding under its debtor-in-possession revolver facility; included more favorable (less restrictive) covenants and lower interest and fees; provided a higher return for unsecured creditors; and included a full and open competitive process, thereby maximizing the value of the Debtors' estates.

38. Upon becoming aware that Arch had financing commitments and CIT's agreement to continue funding under its DIP revolver, the Debtors determined that the Arch Alternative Proposal was higher and better than the Arcus Plan. The Debtors then advised Arcus that the Debtors were not prepared to proceed with the hearing on the Arcus Plan's disclosure statement and that the Debtors believed it was in the best interests of the estates to proceed with the Arch Alternative Proposal.

39. After intense negotiations between and among the Debtors, the Committee, Arcus, the Lender Group, and Arch in the Courthouse on May 1, 2008, including a Chambers conference with the Court, the parties reached an agreement whereby, among other things, Arcus would assign to Arch its rights under the Arcus DIP Loan and Arch would become the plan sponsor under an amended plan (in form substantially similar to the Arch Plan) to be filed by May 12, 2008.

40. The Debtors' decision to proceed with the Arch Alternative Proposal was announced to the Court late in the day on May 1, 2008 and the parties agreed to submit final orders approving the debtor-in-possession financing and the settlement among the parties.

41. On May 6, 2008, the Court entered Orders, *inter alia*, granting final approval of the debtor in possession financing from the Lender Group and Arch, as assignee of the Arcus DIP Loan (the "Final DIP Orders"). Among other things, the Final DIP Order (with respect to

11

Arch) approved the assignment of the Arcus DIP Loan to Arch and the Amended and Restated Debtor-in-Possession Term Loan Financing Agreement entered into by and between Arch and the Debtors, dated May 6, 2008 (the "Arch Amended DIP Agreement"). The Arch Amended DIP Agreement provides, inter alia, that Arch's obligations are conditioned upon the approval of a competitive process set forth on Exhibit C to the DIP Loan Agreement.

F.     **Approval of the Disclosure Statement and Bidding Procedures**

42.    On May 12 and 13, 2008, respectively, the Debtors filed their Second Amended Joint Plan (the "Second Amended Plan") and disclosure statement. Although the Debtors, Arch and the Committee had not agreed on all of the terms of the Second Amended Plan, it was filed in order to avoid a default under the terms of the Arch Amended DIP Agreement. The Second Amended Plan provided for a competitive process by which third parties would have an opportunity to conduct due diligence and participate in an auction to purchase the equity interests in Shapes/Arch (and thus obtain ownership of the equity interests in all of the Debtors) prior to the confirmation hearing.

43.    On May 12, 2008, the Debtors filed a motion for approval of bid procedures (the "Bid Procedures Motion") to: (a) control the method by which potentially interested bidders would be able to obtain due diligence, (b) provide the procedures for parties submitting competing bids to follow, and (c) schedule and provide procedures for an auction, if qualified bids are submitted.

44.    On May 20, 2008, the Court granted the Bid Procedures Motion, which required all competing bids to be submitted no later than June 25, 2008, and scheduled an auction for June 27, 2008, if qualified bids are submitted.

CHERRY_HILL\447485\2 220718.000

45. On May 23, 2008, the Court approved the disclosure statement (the "<u>Disclosure Statement</u>") in support of the Debtors' Third Amended Joint Plan (the "<u>Third Amended Plan</u>"). The Third Amended Plan was filed after the Debtors, Arch and the Committee had resolved the issues that had been outstanding at the time the Second Amended Plan was filed. A hearing to consider confirmation of the Third Amended Plan is scheduled for July 8, 2008.

## **Relief Requested**

46. By this Motion, the Debtors respectfully request that the Court disallow the claims listed on <u>Exhibits "A" through "E"</u> (the "<u>Claims</u>") pursuant to 11 U.S.C. § 502(e)(1)(B) because the Claims are contingent and for reimbursement or contribution.[2]

47. At environmental sites like those described in this Motion, the liability of waste contributors generally is joint and several. <u>See, e.g.</u>, <u>New Castle County v. Haliburton NUS Corp.</u>, 111 F.3d 1116, 1121 (3d Cir. 1997). Thus, each of the Claims is one as to which if a Debtor is liable, the claimant is also liable with that Debtor. Moreover, the claims are contingent.

48. Alternatively, because the amounts asserted in the Claims far exceeds the possible total of all past and future cleanup costs, and by a much greater magnitude exceeds any share of liability that could potentially be attributed to any of the Debtors, if the Court determines that the mandatory provisions of section 502(e)(1)(B) of the Bankruptcy Code do not apply to the Claims, then the Debtors request that <u>all</u> of the Claims with respect to each site be

---

[2] The Debtors note that they have filed separate objections to many of the Claims listed on <u>Exhibit "A"</u> on the basis that many of the claims are duplicates and/or were filed against the wrong Debtor.

recharacterized as <u>one</u> claim with respect to each site, and that the one claim for each site be estimated for plan voting purposes.

### A. The Pennsauken Litigation Claims

49. On December 4, 1991, Pennsauken Township and the Authority that owns and operates the Pennsauken Landfill, filed a contribution action entitled <u>Pennsauken Solid Waste Mgmt. Auth., et al. v. Ward Sand Materials Co., Inc., et al.</u>, Dkt. No. L-13345-91, in the Superior Court of New Jersey, Camden County, Law Division. The complaint alleged that one of the Debtors' predecessors, along with numerous other entities, generated wastes containing hazardous substances that were disposed at the "Pennsauken Landfill."

50. The Debtors deny liability at the Pennsauken Landfill on multiple grounds, including, but not limited to (a) the Debtors sent no waste to the Pennsauken Landfill; (b) any waste the Debtors sent to the Pennsauken Landfill was not hazardous; (c) any waste the Debtors sent to the Pennsauken Landfill did not cause the incurrence of any cleanup costs; (d) thousands of other generators sent wastes to the Pennsauken Landfill and therefore any liability of the Debtors is negligible or de minimis; (e) costs incurred and to be incurred at the Pennsauken Landfill are for routine municipal landfill closure costs of which the Debtors are not liable; (f) any waste the Debtors sent to the Pennsauken Landfill is unrelated to and did not cause the incurrence of any groundwater cleanup costs. The Debtors reserve their rights with respect to each of these defenses in the event this Motion is denied in whole or in part.

51. Many entities involved at the Pennsauken Landfill filed proofs of claim against one or more of the Debtors (the "<u>Pennsauken Landfill Claims</u>"). While the circumstances and monetary amounts asserted in the proofs of claim vary from claimant to claimant, in general, the Pennsauken Landfill Claims involve (a) the incurrence of certain past costs at the Pennsauken

14

Landfill to which the claimants assert that the Debtors have made an insufficient contribution, and (b) the expected incurrence of certain future costs at the Pennsauken Landfill.

### B. The Puchack Wellfield Claims

52. The proofs of claim listed on Exhibit "B" all relate to claims arising out of the Puchack Wellfield, which is located in Pennsauken, New Jersey.

53. There are several issues related to the Puchack Wellfield, which is located in Pennsauken, New Jersey. First the Puchack Wellfield is an EPA National Priority List site because the property is allegedly contaminated with chromium and other hazardous materials. Second, the State of New Jersey Department of Environmental Protection ("NJDEP") has alleged that the Debtors' predecessor(s) and other parties had allegedly discharged hazardous substances into the groundwater. A. & H. Bloom Construction Company has filed a proof of claim against the Debtors seeking contribution from the Debtors.

54. The remaining parties on Exhibit "B" filed contribution claims against the Debtors related to a private action captioned Harris v. Advance Process Supply Co. (Dkt. No. L-03815-02), Superior Court, Camden County). In the Harris case, several plaintiffs sought class certification for alleged damages related to the Puchack Wellfield. The Superior Court denied class certification on June 30, 2006, and the matter is currently on appeal to the Appellate Division.

### C. D'Imperio Site

55. The D'Imperio site is an EPA National Priority List site in Atlantic County, New Jersey, at which one of the Debtors' predecessors was named as a potentially responsible party. Groundwater at this site has been actively remediated for approximately ten years.

15

56. The claims listed on Exhibit "C" seek contribution from the Debtors for remediation of the site. The claims indicate that they are for the Debtors' alleged current or future liability for the remediation costs at the D'Imperio site.

### D. Ewan Site

57. The Ewan site is an EPA National Priority List site in Burlington County, New Jersey, at which one of the Debtors' predecessors was named as a potentially responsible party. Groundwater at this site has been actively remediated at the Ewan site since 1999.

58. The claims listed on Exhibit "D" seek contribution from the Debtors for remediation of the site. The claims indicate that they are for the Debtors' alleged current or future liability for the remediation costs at the Ewan site.

### E. Lightman Drum Site

59. The Lightman Drum site is an EPA National Priority List site in Camden County, New Jersey, at which one of the Debtors' predecessors was named as a potentially responsible party.

60. The claims listed on Exhibit "E" seek contribution from the Debtors for remediation of the site. The claims indicate that they are for the Debtors' alleged current or future liability for the remediation costs at the Lightman Drum site.

### Basis for Relief

#### A. The Claims Should be Disallowed as Contribution Claims

61. Section 502(e)(1) of the Bankruptcy Code provides that:

> the court shall disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that –

16

\* \* \*

> (B) such claim is for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution . . . .

11 U.S.C. § 502(e)(1)(B).

62. In <u>In re G-I Holdings, Inc.</u>, 308 B.R. 196 (Bankr. D.N.J. 2004), the court listed three elements necessary to disallow a claim under section 502(e)(1)(B):

> 1) the claim must be one for reimbursement or contribution; 2) the entity asserting the claim must be liable with the debtor on the claim of a creditor; and 3) the claim must be contingent at the time of its allowance or disallowance.

<u>Id.</u> at 212 (citing <u>In re Allegheny Int'l, Inc.</u>, 126 B.R. 929, 921 (W.D.Pa.), <u>aff'd without opinion</u>, 950 F.2d 721 (3d Cir. 1991)).  <u>See also</u> <u>In re APCO Liquidating Trust</u>, 370 B.R. 625, 631 (Bankr. D.Del. 2007).

63. The Debtors submit that they satisfy all of the above elements related to the Claims.  First, the Claims are, in whole or in part for reimbursement or contribution.  Second, the Claims are made by co-defendants, cross-claimants, and third party plaintiffs in the various environmental cases discussed above.  Finally, because the Debtors liability has not been established with finality in any of the above environmental cases, the Claims are contingent.  Therefore, the Claims should be disallowed under 11 U.S.C. § 502(e)(1)(B).  <u>See, e.g.</u>, <u>In re The Charter Co.</u>, 862 F.2d 1500, 1502-03 (11th Cir. 1989), <u>APCO</u>, 370 B.R. at 637, <u>In re Cottonwood Canyon Land Co.</u>, 146 B.R. 992 (Bankr. D.Colo. 1992), <u>In re Bicoastal Corp.</u>, 141 B.R. 231, 234 (Bankr. M.D.Fla 1992), <u>In re A & H, Inc.</u>, 122 B.R. 84, 85 (Bankr. W.D.Wis. 1990).

64. Moreover, the Debtors further note that a motion to disallow contribution claims related to the Pennsauken Litigation has been granted in at least one other bankruptcy case.  In <u>In</u>

CHERRY_HILL\447485\2 220718.000

re FV Steel and Wire Co., Case No. 04-22421 (Bankr. E.D.Wis. 2005), FV Steel was alleged to have been a responsible party in the Pennsauken Litigation. FV Steel filed a motion to disallow contribution claims (including, a contribution claim asserted by one of the Debtors) on identical grounds as asserted in this Motion. The court granted that motion, finding that the claims were for contribution and, thus, not allowable under section 502(e)(1)(B). A copy of the order granting LV Steel's motion is attached as Exhibit "F".

B.  The Court Should Estimate the Amount of the Claims for Voting Purposes

65.    In the unlikely event that the Court determines that the mandatory provision of section 502(e)(1)(B) of the Bankruptcy Code does not apply to any of the Claims, then the Debtors request that all of the Claims with respect to each site be recharacterized as one claim with respect to each site, and that the one claim for each site be estimated for plan voting purposes.

66.    Section 502(c) of the Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Under section 502(c), the Court may estimate any contingent or unliquidated claim when delay in the administration of the case would otherwise result. See, e.g., In re Brints Cotton Mfg., Inc., 737 F.2d 1338, 1340-51 (5th Cir. 1984), In re the Nova Real Estate Inv. Trust, 23 B.R. 62, 65 (Bankr. E.D.Va. 1982).

67.    The Claims are contingent and unliquidated. The potential impact upon the Debtors' estates if each of the Claims were allowed in full (instead of considered as one claim for each site, and estimated), could present an obstacle for confirmation of the Third Amended

Plan, and could drastically increase the dollar amount of unsecured claims in the case to the detriment of other, appropriately allowed claims.

### C. Duplicate Claims Should be Disallowed

68. The Debtors note that many of the Claimants filed duplicate claims against one of the Debtors or claims that are duplicates except for the fact that they are filed against different Debtors. In the unlikely event that the Court does not grant relief to the Debtors under subsection A or B, above, the Debtors request that the Court disallow the duplicate or redundant claims listed on Exhibits "A" through "E", so that the Claimants do not unfairly receive multiple distributions for what is, in actuality, one claim.

69. Therefore, the Debtors submit that the Claims should be (i) considered as one claim for each site, and (ii) estimated for purposes of plan voting. Other creditors in these cases would likely be harmed by any other result.

### Reservation

70. The Debtors expressly reserve and preserve the right to object in the future to the Claims on any additional grounds, and to amend, modify and/or supplement this Motion, including, without limitation, to object to amended claims, newly-filed claims, and claims hereafter identified as Claims. Separate notice and hearing will be scheduled for any such objection.

### Notice

71. Notice of this Motion has been provided to: (a) counsel for CIT, (b) counsel for Arch, (c) the Office of the United States Trustee, (d) the Internal Revenue Service, (e) the New Jersey Attorney General, (f) the Commonwealth of Pennsylvania Department of Revenue, (g) counsel to the Committee, (h) all parties that are listed on Exhibits "A" through "E" (i) the

19

United States Environmental Protection Agency, (j) the New Jersey Department of Environmental Protection, and (k) all parties on the Master Service List.  In light of the nature of the relief requested herein, the Debtors submit that no further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court:  (a) grant the Motion; (b) disallow the Claims; and (c) grant such other and further relief as is just and proper.

Dated:  June 20, 2008                    COZEN O'CONNOR

By:   /s/ Jerrold N. Poslusny, Jr.
Mark E. Felger
Jerrold N. Poslusny, Jr.

Attorneys for the Debtors