**MARK E. FELGER (MF9985)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for the Debtors

| | |
|---|---|
| In re: | : UNITED STATES BANKRUPTCY COURT |
| SHAPES/ARCH HOLDINGS L.L.C., et | : FOR THE DISTRICT OF NEW JERSEY |
| al., | : CHAPTER 11 |
| Debtors. | : |
| | : CASE NO. 08-14631 (GMB) |
| | : |
| | : |

## DEBTORS' MOTION TO DETERMINE ALLOWED CLAIMS OF CLASS CLAIMANTS UNDER SECTION 502(C) OF THE BANKRUPTCY CODE AND RELATED RELIEF

Shapes/Arch Holdings L.L.C. and its related debtor entities (collectively the "Debtors"),[1]

the debtors and debtors-in-possession, hereby move (the "Motion") to determine the amount of

the Allowed Claims with respect to proofs of claim (the "Claims") filed by certain insurers based

upon workers' compensation programs for periods ending prior to the Petition Date and related

relief, and aver in support of the Motion as follows:

### Background

1.      On March 16, 2008 (the "Petition Date"), the Debtors filed their respective

petitions for relief under Chapter 11, Title 11 of the United States Code (the "Bankruptcy

Code").

---

[1] In addition to Shapes/Arch Holdings L.L.C. ("Shapes/Arch"), the following entities, all of
which are wholly owned subsidiaries of Shapes/Arch, also filed petitions on the Petition Date
(defined below):  Shapes L.L.C. ("Shapes"); Delair L.L.C. ("Delair"); Accu-Weld L.L.C.
("Accu-Weld"); and Ultra L.L.C. ("Ultra").

2.      These cases are being jointly administered pursuant to this Court's Order of March 18, 2008 under the lead debtor "Shapes/Arch Holdings L.L.C."

3.      The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.      No trustee or examiner has been appointed in these cases.

5.      An official committee of unsecured creditors (the "Committee") was appointed on March 31, 2008, and has been active in these cases since that time.

6.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

A.      **Background of Debtors' Business Operations**

7.      Shapes/Arch is a holding company that owns each of the four operating companies - Shapes, Delair, Accu-Weld and Ultra.  The Debtors' predecessor was established in New Jersey in 1952 to produce aluminum windows.  By 1959, the business had expanded and began focusing on producing aluminum extrusions.  The Debtors have consistently expanded their businesses over the years by investing in new facilities and technology and by establishing new product lines.  On a consolidated basis, the Debtors' net revenue in 2007 was $273.8 million, with Shapes generating approximately 65% of that revenue.  The Debtors have over 1000 employees, approximately 70% of whom are members of either the International Brotherhood of Teamsters Local 837, or the United Independent Union.

2

8.      Shapes is the largest operating Debtor with 2007 revenue over $179 million and over 600 employees. Shapes is a leading producer of custom aluminum extrusions for a variety of industries, including road and rail transportation and commercial and residential construction. Aluminum extrusion is a process by which a heated aluminum billet is rammed through a die to create the intended shape. The extruded aluminum exits the press, is cooled and then cut to the necessary lengths. Shapes distinguishes itself in the industry because of its extensive large press capacity and because all of its casting, extruding, fabricating and finishing is completed in one facility. Shapes' 525,000 square foot facility, which is located in Delair, New Jersey, operates twenty-four hours per day, seven days a week, with its casthouse (to produce the billets to be pushed through the presses), eight presses of varying sizes, a paint line, an anodizing line and a variety of other fabrication equipment. Shapes can produce and ship over 400,000 pounds of extruded aluminum per day. Shapes has been recognized in the "Guinness Book of World Records" for the largest free standing aluminum structure ever created in connection with the restoration of the Statue of Liberty. Shapes also provided the aluminum scaffolding used in connection with the restoration of the Washington Monument.

9.      In 2007 Shapes' revenues decreased by approximately $35 million compared to 2006. This decrease is, at least in part, attributable to the fact that 65% of Shapes' sales are to the trailer, truck body and railcar sectors, all of which have been experiencing an economic downturn.

10.      Delair manufactures maintenance free aluminum fence systems for residential and commercial use, and manufactures America's most recognized brand of above-ground pools. Both product lines are sold through dealers, distributors and major retailers throughout the United States.

3

11.     Delair operates from a 350,000 square foot facility adjacent to Shapes in Delair, New Jersey. Delair's proximity to Shapes provides a competitive advantage because Delair purchases approximately 70% of its product line from Shapes.

12.     Because Delair's sales are largely tied to consumer spending and the housing market, Delair has suffered with that sector of the economy and its 2007 revenues were $5.5 million less than in 2006.

13.     Accu-Weld is a vertically integrated manufacturer of made-to-order vinyl replacement windows and steel doors. Accu-Weld's products are sold to installers, dealers and home improvement retailers throughout the Northeastern, Mid-Atlantic and Midwestern United States. Accu-Weld operates out of a 100,000 square foot facility in Bensalem, Pennsylvania. Unlike many of its competitors, Accu-Weld extrudes its own vinyl profiles, which results in faster production and delivery to the customer.

14.     Accu-Weld's net revenues in 2007 were $24.9 million, down from $37 million in 2006. The loss of revenue is due principally to Accu-Weld ceasing to do business with certain customers that were not profitable or which presented significant, unjustifiable credit risk and the general decline of the housing market.

15.     Ultra is one of the leading suppliers of value branded hardware products in the United States, including locksets, door and window hardware and other decorative hardware. Ultra has over 8,000 products sourced primarily from China. Ultra's products are sold to home improvement and hardware retailers, hardware cooperatives and distributors, home builders and window and door manufacturers.

4

16.     Ultra operates from a 75,000 square foot distribution facility in Pennsauken, New Jersey, with two million cubic feet of storage space.

17.     Ultra's EBITDA decreased by $2.2 million due primarily to sales of hardware to lower margin accounts and the rapid escalation of product costs from China that could not be passed on to Ultra's customers.

18.     Prior to the Petition Date, Shapes, Delair, Accu-Weld and Ultra (as co-borrowers and co-guarantors) became indebted to a lender group consisting of The CIT Group/Business Credit, Inc. ("CIT"), as agent, and Bank One, National Association ("Bank One") pursuant to a financing agreement, dated December 30, 2003 (as amended from time to time, the "Financing Agreement"). The current members of the lender group are CIT, as agent, JPMorgan Chase Bank N.A. (successor to Bank One) ("JP Morgan") and Textron Financial Corporation (the "Lender Group").

**B.     The Debtors' Pre-petition Financing**

19.     Pursuant to the Financing Agreement, the Lender Group provided financing in the form of revolving loans (based upon a percentage of eligible inventory and accounts receivable), a term loan, and letters of credit. The Financing Agreement was amended on fifteen occasions, most recently on or about March 6, 2008, principally to address the needs of the Debtors to borrow funds in excess of what was available based upon their eligible inventory and accounts in light of the cyclical nature of the Debtors' businesses. The fifteenth amendment enabled the Debtors to borrow up to $4.4 million beyond its available borrowing base (the "PP&E Equity Borrowing Base Component"), and required that the Debtors re-pay the PP&E Equity Borrowing Base Component on or before March 14, 2008.

20.     As of the Petition Date, the Financing Agreement provided for a maximum total credit facility of $75.7 million, and a maximum line of credit of $67 million. Shapes/Arch and its parent, Ben LLC, are guarantors of the debt to the Lender Group. The Lender Group has a first priority lien on and security interest in substantially all of the Debtors' assets, including, without limitation, all accounts receivable, inventory, machinery and equipment and real property, and the proceeds thereof.

21.     As of the Petition Date, the outstanding borrowings from the Lender Group were as follows: (i) revolving loans totaling approximately $47.72 million (inclusive of the PP&E Equity Borrowing Base Component); (ii) term loans totaling approximately $8.35 million; and (iii) letters of credit totaling approximately $3.55 million for an aggregate indebtedness to the Lender Group in the amount of $59.62 million (the "Bank Debt").

22.     The Debtors' Chapter 11 filings were precipitated by a number of factors. The principal factor leading to the Debtors' filings is that the economic sectors in which the Debtors operate have experienced a downturn, which decline has affected the Debtors' revenues and EBITDA beginning in late 2006 and continuing through the first quarter of 2008. The Debtors' revenue decreased by about fifteen percent (15%) from $322 million in 2006 to $274 million in 2007, with projected revenue in 2008 of $262 million. The Debtors' EBITDA plummeted from about $21 million in 2006 to about $3.7 million in 2007. The Debtors have been unable to remain current with creditors, in particular, utilities and major suppliers, because of this downturn.

23.     With the contraction in purchases by the Debtors' customer base and the Debtors' overhead remaining largely static, the Debtors were struggling to fund their operations under their existing lending arrangement and found themselves in a situation in which they could not

repay the PP&E Borrowing Base Component or pay past due obligations to venders in excess of $15 million.

24.    Over the course of the four months prior to the Petition Date, the Lender Group worked with the Debtors to attempt to find a solution. In late 2007, CIT Capital Securities LLC, an affiliate of the agent for the Lender Group, was engaged to attempt to obtain additional financing for the business. Despite their efforts, they were unable to identify any lender willing to provide additional, subordinated, financing to the Debtors or to refinance the Bank Debt.

25.    Closer to the Petition Date, the Debtors explored a possible sale/leaseback transaction with certain third parties. The Debtors, however, were not successful in negotiating a transaction that would adequately address the Debtors' needs going forward.

26.    The Debtors also explored potential sale opportunities with existing management and third parties, but elected not to pursue these potential opportunities in favor of the Versa transaction (described hereinbelow) because the Versa transaction presented a better opportunity to preserve the going concern and maximize a recovery for all creditor constituencies.

27.    With the Debtors' need for borrowings in excess of the borrowing base provided for in the Financing Agreement projected to increase to over $7.4 million during the period shortly after the Petition Date, without factoring in any payment to restructuring professionals or to venders on the past due trade debt, and the Lender Group's inability and unwillingness to fund any additional overadvance, the Debtors' continued ability to operate was in substantial doubt without a quick and efficient transaction.

7

C.    **Versa Capital Management**

28.     In late January, 2008, the Debtors began a dialogue with Versa Capital

Management, Inc. ("Versa"), a Philadelphia based private equity firm, to discuss Versa's interest

in a possible transaction.  Versa expressed interest and conducted extensive due diligence with

respect to the Debtors' businesses in late January.

29.     Also during this time frame, the Debtors retained Phoenix Management Services,

Inc. ("Phoenix"), a turnaround and crisis management firm, to (i) assist the Debtors in working

with the Lender Group; (ii) develop cash flow models to determine how severe the Debtors'

liquidity issues were and would become over the following weeks and months; and (iii) explore

the Debtors' alternatives.

30.     In February, Versa, the Debtors and representatives of the owners of Ben LLC

engaged in arms length negotiations which culminated in an agreement whereby Arcus ASI

Funding, LLC and Arcus ASI, Inc. (affiliates of Versa, hereinafter "Arcus"), would, among other

things, commit to lend up to $25 million to the Debtors during the Chapter 11 proceedings (and

provide additional funding and an equity infusion to help the Debtors reorganize).  As part of the

agreement, Arcus was to become a manager of (but not a member of) Shapes/Arch (with 79.9%

of the voting rights) and Ben LLC would retain 100% of the ownership rights and 20.1% of the

voting rights.  This transaction was made subject to many terms and conditions including,

obtaining the Lender Group's commitment to provide debtor-in-possession and exit financing for

the companies.  The Debtors, Versa and the Lender Group ultimately reached an agreement on

the terms and conditions upon which Arcus would provide additional financing to the Debtors

(and the PP&E Equity Borrowing Base Component would be eliminated) during any Chapter 11

process, as well as provide an exit facility for the Debtors.

8

D.      **The Debtors' Bankruptcy Filing**

31.      In light of the available financing from the Lender Group and Versa, and the current state of the Debtors' businesses, the Debtors, their management, representatives of the owners of Ben LLC, and Versa agreed that the Debtors would need to seek bankruptcy protection in order to effectuate the transaction.

32.      Contemporaneously with the filing of the bankruptcy petitions, the Debtors filed a debtor-in-possession financing motion and a plan and disclosure statement that provided, among other things, for the financing of the Debtors' operations during the Chapter 11 process, exit financing for the Debtors upon confirmation of the Debtors' plan of reorganization, payment of all administrative and priority unsecured claims in full, and a dividend to holders of general unsecured claims (the "Arcus Plan").

33.      The Arcus Plan reflected a commitment by (i) the Lender Group to provide the Debtors with revolving loans throughout the Chapter 11 proceedings and upon exiting bankruptcy in the amount of up to $60 million all on terms and conditions more fully set forth in the applicable documents to be executed in favor of the Revolving DIP Lenders, and (ii) Arcus to pay off the Lender Group's term loans, to fund the PP&E Equity Borrowing Base Component, to provide additional working capital for the Debtors, and to fund a dividend to creditors, requiring a total commitment by Versa of more than $25 million.

34.      The Debtors worked diligently over the several weeks prior to the Petition Date, in a difficult setting, toward a solution that would present an opportunity to maximize a return for all creditor constituencies and at the same time maximize the likelihood that the Debtors' businesses would remain viable so that the Debtors could continue to be one of South Jersey's largest employers for the foreseeable future.

35.     At the first day hearing in these cases, this Court entered thirteen (13) Orders

granting first day motions on an interim or final basis, including interim orders approving debtor-

in-possession financing from the Lender Group and Arcus (the "Arcus DIP Loan").

E.     **Arch Provides DIP Financing and Sale Proposals on Better Terms**

36.     Approximately two weeks after the Petition Date, on or about April 1, 2008,

Arch, an affiliate of Signature Aluminum and H.I.G. Capital Partners, filed an objection to the

Debtors' financing motion in which it expressed an interest in providing an alternative financing

arrangement on better terms and participating in a sale process pursuant to 11 U.S.C. § 363 or

through a revised plan.  As further evidence of its commitment to an open and competitive sales

process, Arch provided the Debtors and the Committee with, *inter alia*, a Debtor-in-Possession

Financing Agreement on better terms than the Arcus DIP Loan, a proposed Order approving

such financing from Arch, and an asset purchase agreement providing for a purchase price in

excess of the value provided by Arcus in the Arcus Plan.  Upon the request of the Committee,

Arch converted their asset purchase agreement to a plan of reorganization on better terms than

the Arcus Plan, including but not limited to a pool of funds for general unsecured creditors of

$5,000,000 (as opposed to the $500,000 unsecured pool provided in the Arcus Plan).

37.     On May 1, 2008, after Arch completed its due diligence, and after extensive

discovery propounded by the Committee and Arcus and several days of depositions of the

parties, Arch provided the Debtors with commitment letters for financing the alternative

transaction and the Lender Group advised the Debtors that it would continue funding the

Debtors' operations if Arch replaced Arcus.  Arch's alternative DIP financing package and the

alternative plan (the "Arch Alternative Proposal") was now free of any due diligence

contingencies and any financing contingencies with respect to the debtor-in-possession financing

10

and the exit financing under the alternative plan; provided for the Lender Group's continued

funding under its debtor-in-possession revolver facility; included more favorable (less restrictive)

covenants and lower interest and fees; provided a higher return for unsecured creditors; and

included a full and open competitive process, thereby maximizing the value of the Debtors'

estates.

38.    Upon becoming aware that Arch had financing commitments and CIT's

agreement to continue funding under its DIP revolver, the Debtors determined that the Arch

Alternative Proposal was higher and better than the Arcus Plan. The Debtors then advised Arcus

that the Debtors were not prepared to proceed with the hearing on the Arcus Plan's disclosure

statement and that the Debtors believed it was in the best interests of the estates to proceed with

the Arch Alternative Proposal.

39.    After intense negotiations between and among the Debtors, the Committee,

Arcus, the Lender Group, and Arch in the Courthouse on May 1, 2008, including a Chambers

conference with the Court, the parties reached an agreement whereby, among other things, Arcus

would assign to Arch its rights under the Arcus DIP Loan and Arch would become the plan

sponsor under an amended plan (in form substantially similar to the Arch Plan) to be filed by

May 12, 2008.

40.    The Debtors' decision to proceed with the Arch Alternative Proposal was

announced to the Court late in the day on May 1, 2008 and the parties agreed to submit final

orders approving the debtor-in-possession financing and the settlement among the parties.

41.    On May 6, 2008, the Court entered Orders, *inter alia*, granting final approval of

the debtor in possession financing from the Lender Group and Arch, as assignee of the Arcus

DIP Loan (the "Final DIP Orders"). Among other things, the Final DIP Order (with respect to

11

Arch) approved the assignment of the Arcus DIP Loan to Arch and the Amended and Restated

Debtor-in-Possession Term Loan Financing Agreement entered into by and between Arch and

the Debtors, dated May 6, 2008 (the "Arch Amended DIP Agreement").  The Arch Amended

DIP Agreement provides, inter  alia, that Arch's obligations are conditioned upon the approval of

a competitive process set forth on Exhibit C to the DIP Loan Agreement.

**F.**      **Approval of the Disclosure Statement and Bidding Procedures**

42.      On May 12 and 13, 2008, respectively, the Debtors filed their Second Amended

Joint Plan (the "Second Amended Plan") and disclosure statement.  Although the Debtors, Arch

and the Committee had not agreed on all of the terms of the Second Amended Plan, it was filed

in order to avoid a default under the terms of the Arch Amended DIP Agreement.  The Second

Amended Plan provided for a competitive process by which third parties would have an

opportunity to conduct due diligence and participate in an auction to purchase the equity interests

in Shapes/Arch (and thus obtain ownership of the equity interests in all of the Debtors) prior to

the confirmation hearing.

43.      On May 12, 2008, the Debtors filed a motion for approval of bid procedures (the

"Bid Procedures Motion") to:  (a) control the method by which potentially interested bidders

would be able to obtain due diligence, (b) provide the procedures for parties submitting

competing bids to follow, and (c) schedule and provide procedures for an auction, if qualified

bids are submitted.

44.      On May 20, 2008, the Court granted the Bid Procedures Motion, which required

all competing bids to be submitted no later than June 25, 2008, and scheduled an auction for June

27, 2008, if qualified bids are submitted.

12

45.    On May 23, 2008, the Court approved the disclosure statement (the "Disclosure Statement") in support of the Debtors' Third Amended Joint Plan (the "Third Amended Plan"). The Third Amended Plan was filed after the Debtors, Arch and the Committee had resolved the issues that had been outstanding at the time the Second Amended Plan was filed.  A hearing to consider confirmation of the Third Amended Plan is scheduled for July 8, 2008.

### Relief Requested

46.    In connection with their operations, the Debtors maintain certain workers' compensation liability insurance policies.  These policies provide the Debtors' employees with the workers' compensation benefits required under applicable state law (the "Workers' Compensation Programs").

47.    For the periods between April, 2001 and April, 2004, the Debtors were insured by Arrowood Indemnity Company f/k/a Royal Indemnity Company ("Arrowood") under policies providing for a per claim deductible of $250,000, with a maximum yearly deductible ranging from $1.5 million to $1.93 million.  For the period between  May 2004 and April 2006, the Debtors were insured by Argonaut Insurance Company ("Argonaut") under policies providing for a per claim deductible amount to $350,000 per claim and a yearly maximum deductible of $4.1 million.  As security for their deductible obligations, the Debtors have caused cash collateral to be posted and letters of credit to be issued under the above-referenced workers' compensation policies in the aggregate amount of $2,065,000 (the "Collateral" ) in favor Arrowood and Argonaut, which Collateral was arranged and in place before the Petition Date.

48.    In the Third Amended Plan, the Debtors have classified the Claims of Arrowood and Argonaut in Class 9 (the "Class 9 Claimants"). The proposed treatment of the Claims of Class 9 Claimants is to determine the amount of their Allowed Claims; allow the Claimants to retain Collateral in the amount of the Allowed Claims; and require the Class 9 Claimants to refund to the reorganized debtors all Collateral in excess of the amount of their Allowed Claims.

49.    On May 11, 2008, Argonaut filed proofs of claim against each of the Debtors asserting a Claim of "$921,000 plus contingent and unliquidated amounts." Argonaut assets that $170,000 of its Claim is a secured claim and $751,000 is an unsecured claim. A true and correct copy of one of the five identical proofs of claim is annexed hereto as Exhibit "A" and incorporated by reference.

50.    On or about May 12, 2008, Arrowood filed a proof of claim in the Shapes Arch case asserting a secured claim in the amount of $393,970, which represents Arrowood's estimate of the Debtors' ultimate obligation under the insurance policies. Arrowood asserts in its proof of claim that it is holding Collateral valued at $453,531. A true and correct copy of Arrowood's proof of claim is annexed hereto as Exhibit "B."

51.    According to the Debtors' books and records, (i) the Debtors believe that their ultimate obligation to Argonaut under Argonaut's insurance policies is $467,993; and (ii) Argonaut has Collateral worth $1,550,000. As such, the Debtors believe that Argonaut's Allowed Claim should be set at $467,993; that Argonaut should be allowed to retain Collateral in the amount of its Allowed Claim; and that Argonaut should be directed to release or return the balance of its Collateral to the reorganized debtors. A chart setting forth the Debtors' analysis is annexed hereto as Exhibit "C" and incorporated by reference.

52.     According to the Debtors' books and records, (i) the Debtors believe that their ultimate obligation to Arrowood under Arrowood's insurance policies is $41,596; and (ii) Arrowood has Collateral worth $515,000.  As such, the Debtors believe that Arrowood's Allowed Claim should be set at $41,596; that Arrowood shall be allowed to retain Collateral in the amount of its Allowed Claim; and that Arrowood should be directed to release or return the balance of the Collateral to the reorganized debtors.  A chart setting forth the Debtors' analysis is annexed hereto as Exhibit "D" and incorporated by reference.

A.     **The Court Should Estimate the Amount of the Claims under Section 502(c)**

53.     By this Motion, the Debtors respectfully request that the Court determine the amount of the Allowed Claims held by Argonaut and Arrowood and direct the return or release of the excess Collateral in order to facilitate confirmation of the Third Amended Plan.

54.     Section 502(c) of the Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this section – (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c).  Under section 502(c), the Court may estimate any contingent or unliquidated claim when delay in the administration of the case would otherwise result.  See, e.g., In re Brints Cotton Mfg., Inc., 737 F.2d 1338, 1340-51 (5th Cir. 1984), In re the Nova Real Estate Inv. Trust, 23 B.R. 62, 65 (Bankr. E.D.Va. 1982).

55.     The Claims are contingent and unliquidated.  The potential impact upon the Debtors' estates if each of the Claims were allowed in full and Argonaut and Arrowood were allowed to retain the Collateral for an indefinite period could present an obstacle for confirmation of the Third Amended Plan.

**Reservation**

56.     The Debtors expressly reserve and preserve the right to object in the future to the

Claims on any additional grounds, and to amend, modify and/or supplement this Motion,

including, without limitation, to object to amended claims, newly-filed claims, and claims

hereafter identified as Claims.  Separate notice and hearing will be scheduled for any such

objection.

**Notice**

57.     Notice of this Motion has been provided to: (a) counsel for CIT, (b) counsel for

Arch, (c) the Office of the United States Trustee, (d) counsel for Argonaut, (e) counsel for

Arrowood, and (f) counsel to the Committee.  In light of the nature of the relief requested herein,

the Debtors submit that no further notice is necessary.


WHEREFORE, the Debtors respectfully request that the Court:  (a) grant the Motion; (b)

determine the amount of the Allowed Claims of Argonaut and Arrowood; (c) direct the return or

release of excess Collateral; and (d) grant such other and further relief as is just and proper.

Dated:  June 20, 2008                    COZEN O'CONNOR

                                         By: ___/s/ Jerrold N. Poslusny, Jr.___
                                            Mark E. Felger
                                            Jerrold N. Poslusny, Jr.

                                            Attorneys for the Debtors

16