UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY


IN RE:                          . Case No. 08-14631(GMB)
                                .
                                . (Jointly Administered)
SHAPES/ARCH HOLDINGS, LLC,      .
et al.,                         . 401 Market Street
                                . Camden, New Jersey 08101
               Debtors.  .
                                . July 22, 2008
. . . . . . . . . . . . . . . . 12:23 p.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE GLORIA M. BURNS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:              Cozen O'Connor
                              By: MARK E. FELGER, ESQ.
                                  JERROLD N. POSLUSNY,JR., ESQ.
                              Chase Manhattan Centre
                              1201 North Market Street
                              Suite 1400
                              Wilmington, DE  19801

For the Creditors' Committee: Halperin Battaglia Raicht, LLP
                              By:  ALAN HALPERIN, ESQ.
                                   DONNA LIEBERMAN, ESQ.
                              555 Madison Avenue
                              New York, NY  10022


Audio Operator:               Mary Lampone

Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.

_____

J&J COURT TRANSCRIBERS, INC.
268 Evergreen Avenue
Hamilton, New Jersey 08619
E-Mail:  jjcourt@optonline.net

(609) 586-2311  Fax No.  (609) 587-3599

APPEARANCES (Cont'd.):

For the Creditors' Committee: Cole, Schotz, Meisel, Forman &
                                  Leonard
                              By:  FELICE YUDKIN, ESQ.
                              Court Plaza North
                              25 Main Street
                              P.O. Box 800
                              Hackensack, NJ 07602-0800


For the U.S. Trustee:         Office of the U.S. Trustee
                              By:  DONALD F. MacMASTER, ESQ.
                              One Newark Center
                              Suite 2100
                              Newark, NJ 07102


For Arch Acquisitions I,      Greenberg Traurig, LLP
LLC:                          By:  ALAN BRODY, ESQ.
                                   NANCY MITCHELL, ESQ.
                                   JODY DAVIS, ESQ.
                              200 Campus Drive
                              Florham Park, NJ  07932


                              Greenberg Traurig, LLP
                              By:  SEAN W. BEZARK, ESQ.
                              77 West Wacker Drive, Suite 2500
                              Chicago, IL  60601


For Pollution Control         Brown & Connery, LLP
Financing Authority of        By:  JOSEPH M. GAREMORE, ESQ.
Camden County:                6 N. Broad Street
                              Woodbury, NJ  08096


For Century Indemnity Co.:    White and Williams LLP
                              By:  JOSEPH G. GIBBONS, ESQ.
                              1800 One Liberty Place
                              Philadelphia, PA  19103


For Nationwide Industries:    Drinker Biddle & Reath LLP
                              By:  DENNIS TERRELL, ESQ.
                              500 Campus Drive
                              Florham Park, NJ  07932


For Pennsauken Township:      Parker McCay, P.A.
                              By:  OREN KLEIN, ESQ.
                              Route 73 & Greentree Road
                              Marlton, NJ  08054

APPEARANCES (Cont'd.):

For A. Marianni's Sons:          Michelman & Bricker
                                 By:  N. MARLENE FLEMING, ESQ.
                                 811 Church Street
                                 Cherry Hill, NJ  08002

For Liberty Mutual Insurance     Crowell & Moring LLP
Co. & Wausau Underwriters        By:  MATT CHENEY, ESQ.
Insurance Co.:                        KELLY CUSICK, ESQ.
                                 1001 Pennsylvania Avenue, N.W.
                                 Washington, DC  20004

                                 Post & Schell, P.C.
                                 By:  KATHLEEN KERNS, ESQ.
                                 1600 JFK Boulevard
                                 Philadelphia, PA  19103

For Creditor Waste               Buchanan Ingersoll & Rooney, PC
Management of NJ, Inc.:          By:  SAMANTHA SOUTHALL, ESQ.
                                 1835 Market Street, 14th Floor
                                 Philadelphia, PA  19103-2985

For Ward Sand & Materials        Giansante & Cobb, LLC
Company, LLC:                    By:  CAROL ROGERS COBB, ESQ.
                                 23 East Main Street
                                 Moorestown, NJ  08057

For CIT Group/Business           Stradley Ronon Stevens & Young,
Credit, Inc.; JP Morgan           LLP
Chase Bank, N.A. & Textron       By:  MICHAEL J. CORDONE, ESQ.
Financial Corporation:                GARY SCHARMETT, ESQ.
                                 2600 One Commerce Square
                                 Philadelphia, PA  19103

For Arcus Funding and            Blank Rome, LLP
Related Entities:                By:  JOEL L. SHAPIRO, ESQ.
                                 210 Lake Avenue East
                                 Cherry Hill, NJ  08002

For Nicholas Brothers Refuse     Koch & DeMarco
Removal Co., Inc. and            By:  MARY ELIZABETH WOLFE, ESQ.
Twentieth Century Refuse         101 Greenwood Avenue
Removal Co., Inc.:               Jenkintown Plaza, Suite 460
                                 Jenkintown, PA  19046

APPEARANCES (Cont'd.):

For the Trustee:                    JOSEPH D. MARCHAND, ESQ.
                                    117-119 W. Broad Street
                                    Bridgeton, NJ  08302


For Combustion Engineering,         Norris, McLaughlin & Marcus, PA
Inc.:                               By:  MELISSA PENA, ESQ.
                                    875 Third Avenue, 18th Floor
                                    New York, NY  10022


For Quick-Way, Inc.:                Litchfield Cavo, LLP
                                    By:  TOBIN BUTLER, ESQ.
                                    1800 Chapel Avenue West
                                    Suite 360
                                    Cherry Hill, NJ  08002


For SL Industries:                  Saul Ewing LLP
                                    By:  ROBYN F. POLLACK ESQ.
                                    Centre Square West
                                    1500 Market Street
                                    38th Floor
                                    Philadelphia, PA  19102


For Avery Dennison, Prince          Drinker Biddle & Reath LLP
Foods, Crowley Corp.,               By:  DEBORAH L. SHUTT, ESQ
SEPTA, Sears Holding Mgt.           One Logan Square
Corp., Devoe Coatings,              18th & Cherry Streets
Georgia-Pacific Corp.,              Philadelphia, PA  19103
Garrett-Buchanan:


For Ewan, Lightman Drum,            Reed Smith, LLP
D'Imperio & PPL:                    By:  HOWARD A. COHEN, ESQ.
                                         (telephonic appearance)
                                    2500 One Liberty Place
                                    Philadelphia, PA  19103


For DOJ/EPA:                        DOJ/EPA
                                    By:  DONALD FRANKEL
                                    (telephonic appearance)


For Epiq Bankruptcy                 Epiq Bankruptcy Solutions
Solutions:                          By:  DANIEL McELHENY
                                    (telephonic appearance)

1            THE CLERK:  Please rise.  The United States

2  Bankruptcy Court, District of New Jersey is now in session,

3  Honorable Gloria M. Burns, presiding.

4            THE COURT:  Be seated.  Good afternoon.

5            MR. FELGER:  Good afternoon, Your Honor.  Mark Felger

6  of Cozen O'Connor appearing on behalf of the debtors.

7            THE COURT:  Before we start, Mr. Felger, I have a

8  couple people on the telephone.  Let's get them on the record,

9  and then we'll go forward.  Hello, Mr. Cohen?

10           MR. COHEN:  This is Mr. Cohen.

11           THE COURT:  Mr. Cohen, this is Judge Burns, and

12 you're on the courtroom in the matter of Shapes/Arch Holdings,

13 LLC.

14           MR. COHEN:  Good afternoon, Your Honor.

15           THE COURT:  Could you put your appearance on the

16 record, please?

17           MR. COHEN:  Sure.  This is Howard Cohen for PPL,

18 Lightman Drum PRP Group, Ewan PRP Group, and D'Imperio PRP

19 Group.

20           THE COURT:  All right, and I understand there are

21 other gentlemen on the phone as well.

22           MR. COHEN:  That is correct.

23           MR. FRANKEL:  Yes, Donald Frankel is on the phone.

24 I'm with the Justice Department representing EPA in this

25 matter.

J&J COURT TRANSCRIBERS, INC.

1              THE COURT:  Good afternoon.  And Mr.?

2              MR. McELHENY:  Dan McElheny from Epiq Bankruptcy

3    Solutions.  We are the claims agent retained in this matter.

4              THE COURT:  Good afternoon.  Mr. Felger is here in

5    the courtroom.  He just put his appearance on the record, and

6    I'd like everybody else to put their appearance on the record.

7              MR. POSLUSNY:  Good afternoon, Your Honor, Jerrold

8    Poslusny, Cozen O'Connor, on behalf of the debtors.

9              MR. HALPERIN:  Good afternoon, Your Honor.  Alan

10   Halperin, Halperin Battaglia Raicht, on behalf of the

11   Creditors' Committee.

12             THE COURT:  Good afternoon.

13             MS. LIEBERMAN:  Good afternoon, Your Honor.  Donna

14   Lieberman, Halperin Battaglia Raicht, for the Creditors'

15   Committee.

16             MS. YUDKIN:  Felice Yudkin, Cole, Schotz, Meisel,

17   Forman, and Leonard on behalf of the Creditors' Committee.

18             MR. MacMASTER:  Donald MacMaster, Office of the

19   United States Trustee.

20             MR. BRODY:  Good afternoon, Your Honor.  Alan Brody

21   from Greenberg Traurig.  Also with me is Nancy Mitchell and

22   Jody Davis, who have been admitted pro hac vice.  We also have

23   Sean Bezark, who's also with Greenberg Traurig, who has not

24   been admitted pro hac vice.  We -- if we need, we will ask for

25   such admission later on, and we represent Arch Acquisition I,

1  LLC.

2          THE COURT:  Good afternoon.  Anybody else?

3          MR. GAREMORE:  Good afternoon, Your Honor.  Joseph

4  Garemore from the Brown & Connery firm on behalf of the

5  Pollution Control Financing Authority of Camden County.

6          MR. GIBBONS:  Good afternoon, Your Honor.  Joseph

7  Gibbons from White and Williams on behalf of Century Indemnity

8  Company.

9          MR. TERRELL:  Dennis Terrell from Drinker, Biddle,

10  and Reath on behalf of Nationwide Industries, Inc.

11          MR. KLEIN:  Good afternoon, Your Honor.  Oren Klein

12  of Parker McCay on behalf of Pennsauken Township.

13          MS. FLEMING:  Good afternoon, Your Honor.  Marlene

14  Fleming with Michelman and Bricker.  I represent A. Marianni's

15  Sons.

16          MS. KERNS:  Good afternoon, Your Honor.  Kathleen

17  Kerns of Post and Schell on behalf of defendants Liberty Mutual

18  Insurance and Wausau Underwriters Insurance Company, and with

19  me are Matthew Cheney and Kelly Cusick who have been admitted

20  pro hac vice.

21          THE COURT:  Good afternoon.

22          MS. SOUTHALL:  Good afternoon, Your Honor.  Samantha

23  Southall of Buchanan, Ingersoll, and Rooney for Waste

24  Management of New Jersey, Inc., and I have an application for

25  pro hac vice pending.

8

1          MS. COBB:  Good afternoon, Your Honor.  Carol Cobb

2    from Giansante & Cobb on behalf of creditor Ward Sand &

3    Materials Company, Incorporated.

4          MR. CORDONE:  Good afternoon, Your Honor.  Michael

5    Cordone from Stradley, Ronon, Stevens & Young.  I'm also here

6    with Gary Sharmett on behalf of CIT Group and the other CIT

7    lenders as defined in the plan.  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. SHAPIRO:  Joel Shapiro, Blank Rome, on behalf of

10   Arcus Funding and related entities.

11         MS. WOLFE:  Good afternoon, Your Honor.  Mary

12   Elizabeth Wolfe with Koch & DeMarco.  I'm here for Nicholas

13   Brothers Refuse Removal and Twentieth Century.

14         THE COURT:  Good afternoon, everyone.  Mr. Felger.

15         MR. FELGER:  Good afternoon again, Your Honor.  And

16   again I would like to thank Your Honor for indulging us this

17   morning.  I think the time was well spent.  We hadn't yet

18   worked through all of the issues, which is our goal, and folks

19   are still working through some issues out in one of the

20   conference rooms, but we thought it might make sense to begin

21   the record before lunch and then take a lunch break, see if we

22   can resolve the open issues, and then come back and conclude

23   the hearing.

24         I think it makes sense to work from the agenda and

25   give Your Honor an overview of where we are on the four items

1 to start.  The first matter -- does Your Honor have a copy of

2 the agenda?

3          THE COURT:  Somewhere.

4                    (Pause)

5          MR. FELGER:  The first item is listed as a continued

6 matter.  That's the motion of Wells Fargo for relief from the

7 automatic stay.  The status, as set forth on the agenda, is

8 that the motion will be withdrawn if the plan is confirmed, and

9 if the plan is not confirmed, the motion will be adjourned to a

10 mutually convenient date for the parties.

11          THE COURT:  That's fine.

12          MR. FELGER:  And the second matter is the

13 confirmation hearing of the debtors' third amended joint plan

14 of reorganization.  I'll pass that for the time being.

15          The third matter is a motion of certain direct

16 generator defendants in the Pennsauken landfill litigation for

17 relief from the automatic stay.  We've indicated on the agenda

18 that this matter was settled, and that a consent order would be

19 submitted.  When we filed the agenda, we believed we had a

20 deal.  We've attempted to settle a consent order of the last

21 few days including this morning.  We remain optimistic that we

22 will get there.  We just aren't quite there yet.  So that's the

23 status of that one.  Hopefully, we'll be back after lunch to

24 report a settlement of that matter, but if not, my expectation

25 is that it would likely -- we'd likely request an adjournment

1  of that motion.

2        The fourth  matter is the debtors' motion to disallow

3  claims for contribution under 502(b)(1) of the Bankruptcy Code

4  and, in the alternative, to estimate claims.  That was a motion

5  that we filed pursuant to the disclosure statement order that

6  required determination motions and 3018 motions to be filed by

7  I believe it -- I believe the date was June 20th.  A number of

8  objections have been filed to that motion.  We've discussed a

9  number of these objections with the objecting parties and are

10 hopeful that we'll make progress before we come back on the

11 record with respect to some or all of the objections that have

12 been raised.

13        To give Your Honor a little bit of a preview, the --

14 what we've agreed to do is to adjourn the motion with respect

15 to one of the respondents, and that's the clients of Howard

16 Cohen, who is on the telephone today.  His clients are the PRPs

17 with respect to the Ewan, D'Imperio, and Lightman Drum cites,

18 and their issues tie in with the settlements that we've

19 reached, at least the settlement -- the agreement in principal

20 that we've reached with the EPA.  And we'll get into that more

21 later, but the EPA settlement is not a settlement that we'll be

22 requesting that Your Honor approve today.  We'll have to go out

23 on a track which we'll discuss later.

24        The issues relating to Mr. Cohen's clients tie into

25 that settlement, and if that settlement is ultimately executed

1   and approved, the issue -- Mr. Cohen's clients' issues will be

2   resolved with that settlement agreement.  So we have agreed to

3   adjourn the response filed by Mr. Cohen to track the settlement

4   track of the EPA agreement.

5           We've also -- and we're very pleased to report that

6   we've reached a settlement agreement with the plaintiffs in the

7   Pennsauken landfill litigation, which we'll get into more

8   later, but we think that settlement combined with the

9   settlements with the EPA and DEP really go a very long way to

10  wrapping up the entirety of the or very close thereto of the

11  debtors' environmental issues, which again we'll get into more

12  later.

13          So again there are a number of responses filed to

14  that motion.  Again, the motion was filed in a -- sort of a

15  defensive manner to deal with balloting issues principally,

16  and, you know, the outcome of that motion later today will

17  determine whether with respect to Class 9 under the plan we

18  proceed under 1129(a) or by cram down under 1129(b).

19          So going back to the -- sort of the main attraction

20  for today, the confirmation hearing, we bestowed upon Your

21  Honor a rather thick binder this morning, and I do apologize

22  for that, but we felt it would be an aid to work through the

23  confirmation issues.  And --

24          THE COURT:  I'm glad you gave me so much advance

25  notice of that.

1              MR. FELGER:  Again, I do apologize, Your Honor.  But

2    perhaps what we ought to start with is to work through what's

3    been included in this binder.  It's our view that the binder

4    constitutes the record for the findings that we're going to be

5    asking Your Honor to make and the conclusions of law that we're

6    going to be asking Your Honor to make in connection with

7    hopefully confirming the debtors' third amended plan.

8              And just to walk through it, we've included the --

9    obviously, the third amended plan with exhibits, the joint

10   disclosure statement with exhibits, the notice of filing of the

11   plan supplement, of course with the exhibits, which are

12   important, the plan funding commitment letter evidencing Arch's

13   commitment to fund its obligations under the plan, an amended

14   and restated operating agreement for Shapes/Arch Holdings from

15   and after the effective date, a designation of the post-

16   petition officers and managers, the form of plan administration

17   agreement that will govern the Class 10 Liquidating Trustee's

18   efforts post-effective date, and the debtors' amended

19   liquidation analysis.

20             Items 4 and 5 are the notice of filing of Schedule

21   8.1 to the debtors' third amended plan.  A Schedule 8.1 is the

22   listing of the executory contracts and unexpired leases that

23   the debtors are assuming under the plan.  It's probably

24   appropriate to raise this at this point.

25             We've received four objections to the cure amount in

1  Schedule 8.1 -- in our notice of Schedule 8.1.  We've resolved

2  the -- one of the objections.  I should say we've resolved two

3  of the objections.

4          And with respect to the other two objections, we've

5  agreed to adjourn the issues with respect to the debtors'

6  assumption and rejection and the amount of the cure claim to

7  the extent the debtors decide to assume those contracts to a

8  mutually convenient date, approximately 30 days from now.  And

9  I'll say more about that later.

10          In addition, we have included Items 6 through 9,

11  which are the affidavits of service of the plan voting

12  materials as well as the publication notice that was required,

13  which is, unfortunately, a good portion of what's included in

14  the binder as we were dealing with literally several thousand

15  parties.

16          Item 10 is the declaration of Mr. McElheny of Epiq,

17  who is on the phone setting out Epiq's report of plan voting.

18          Items 11, 12, and 13 are additional declarations.

19  Eleven is the declaration of Mr. Victor, who is our sales

20  consultant who ran our competitive process, which we'll get

21  into more.  Item 12 is the declaration of Steve Grabell, who is

22  the CEO of the company.  That declaration really deals with the

23  lion's share of the 1129(a) requirements.  Item 13 is the

24  declaration of Michael Jacoby of Phoenix Management.  That also

25  deals with certain of the 1129 requirements, principally

1  (a)*(7), that creditors will fair no worse under the plan than

2  in a Chapter 7 feasibility, and also the fact that it's our

3  belief that the plan funding commitment of $90 million will be

4  more than adequate to satisfy the debtors' obligations on the

5  effective date.

6          Item 14 is a stipulated order between the debtor and

7  Arrowwood Indemnity Company.  Arrowwood is one of the Class 7

8  claimants.  They had rejected -- excuse me.  They had rejected

9  the plan.  The other claimant in Class 7, Argonaut, didn't

10  reject the plan but had the same issue that Arrowwood raised,

11  and we agreed to postpone the determination of their respective

12  allowed claims to a later date.  I think we have a date with

13  Your Honor at the end of September to deal with the issues

14  involving Arrowwood and Argonaut, which are encompassed in a

15  motion under 502(c), which we've agreed to carry to that

16  September I think 22nd date.

17          The next item is the notice of the filing of the plan

18  note, which we were required to do under the plan.  We don't

19  expect there to be a plan vote, based upon Mr. Jacoby's

20  declaration, specifically, Exhibit B.  It's our expectation

21  there will be a -- at least a $2 million, perhaps $3 million,

22  cushion under the plan funding commitment of $90 million.  So

23  that again we don't expect there to be a need to have that plan

24  note executed.

25          Item 16, which we'll spend some more time with after

1    lunch, is the modification to the debtors' third amended joint

2    plan, which was filed yesterday afternoon.

3             Item 17 is the confirmation order.  I proposed an

4    order that said the attached plan is confirmed, and I lost.

5             THE COURT:  I would like that.

6             MR. FELGER:  And Item 18 is a supplemental

7    declaration of Dan McElheny.  That was filed I believe this

8    morning or last night reflecting the additional ballots that

9    were submitted by the Pennsauken plaintiffs with whom we

10   settled last night.  So that sort of dovetails with the 502(e)

11   motion.  It's our view that once the 502(e) motion is

12   determined, the lone remaining ballots in Class 9 will be these

13   two accepting ballots submitted by the Pennsauken landfill

14   plaintiffs, which would result in Class 9 accepting the plan

15   and, therefore, enabling us to proceed under 1129(a) versus

16   1129(b).  We'll get into it more, but it's probably a moot

17   point, because we believe that a 1129(b) cram down of that

18   class is not a real issue, since the Ben interests are being

19   canceled under the plan.

20            Now, we received -- in addition to the four

21   objections we received to Schedule 8.1, we have received a

22   number of objections to confirmation.  Just to work through

23   them quickly -- and we'll circle back with them after lunch --

24   we have six objections.

25            The first objection in the notice --  we're just

working down the notice of agenda -- is by the State of New

Jersey, the Division of Taxation.  That was an objection to the

treatment of tax claims under the plan and an assertion that

they held a claim of roughly 30 to 40 thousand dollars against

the debtors.  We worked with the State of New Jersey after they

filed their objection and convinced them that they, in fact,

did not hold a claim against the debtors, and they've agreed to

withdraw their objection to confirmation.

The next objection is an objection by SL Industries,

and that relates to a claim or not, depending on who you're

listening to, of SL Industries with respect to the Puchack Well

Field Superfund site.  We have had discussions with counsel for

SL Industries but have not, at least to this point, resolved

that objection, and it could very well be that that's the lone

objection we'll need to have Your Honor listen to later this

afternoon.

The next objection is the objection of Century

Indemnity Company.  We believe we've resolved the issues with

Century Indemnity Company through the language in the plan

modification and the various settlements that we've entered

into with the DEP and the Pennsauken landfill plaintiffs and

the -- well, I shouldn't say entered into -- the agreement in

principal we have with the EPA.

The objection -- the next objection is the objection

of the Camden County Municipal Utilities Authority, and their

1  objection was that they hold a claim of roughly 60 to 65

2  thousand dollars for unpaid sewer charges.  In reviewing our

3  plan we noted an issue that they didn't seem to fit within any

4  of our classes, so we've made a change in the plan modification

5  to modify the class of real estate claims to include real

6  estates taxes and sewer charges, and with that change that

7  objection's resolved.

8          The next objection was filed by PRPs at Ewan -- the

9  Ewan, D'Imperio, and Lightman Drum sites.  They're represented

10 by Howard Cohen, who is on the phone.  And again, as I

11 indicated earlier with respect to their objection with respect

12 to the 502(b) motion, that's an objection that is resolved

13 through the agreement or agreement in principal with the EPA.

14 And it's my understanding that in connection with our reporting

15 of the settlement with the EPA, that our agreement to adjourn

16 the objection to the 502(b) motion to track the approval

17 process for the EPA settlement, that Mr. Cohen's clients are

18 not pressing an objection to confirmation today.

19         MR. COHEN:  Your Honor, Howard Cohen, Drinker,

20 Biddle, and Reath.  I'm not admitted to practice before this

21 Court, but I ask that I be permitted to just briefly respond,

22 and that is that Mr. Felger's representations are correct.

23         THE COURT:  Anybody have an objection to Mr. Cohen

24 appearing today?

25         MR. FELGER:  No objection.  I would move his

1  admission.

2          THE COURT:  Mr. Cohen, anything else that you want to

3  add?

4          MR. COHEN:  That's all.

5          THE COURT:  All right.  Thank you.

6          MR. COHEN:  Thank you.

7          MR. FELGER:  The last objection to confirmation is

8  the objection filed by Liberty Mutual Insurance and Wausau

9  Underwriters Insurance, and similar to the Century Indemnity

10 situation, we believe we've resolved the issues raised by

11 Liberty Mutual through the plan modification and the agreements

12 with the DEP and Pennsauken landfill plaintiffs and the

13 settlement in principal with the EPA.  And we're pleased to

14 report that we didn't have to burden Your Honor today with five

15 pages of insurance neutrality language.

16          So I'm not sure how Your Honor wants to proceed given

17 the lunch hour.  I could begin to walk through our

18 presentation, which will sort of take us from the disclosure

19 statement hearing -- which I can't believe I'm saying this, but

20 it was two months ago that we were before Your Honor on the

21 disclosure statement -- and sort of bring us through to today

22 and deal with the various conditions that had to be met, the

23 competitive process, and the resolution of the Class 9 claims,

24 how the voting came out, the 1129(a) issues.  And that's going

25 to take some time to work through, and it might be better to

1   have that -- you know, be able to have it uninterrupted rather

2   than begin it and then take lunch.  However --

3            THE COURT:  Well, I know you need -- I don't mind

4   starting, but I know you need some time to still try to

5   negotiate some of these issues, so do you think this is a good

6   breaking time for that, or do you think there's other things

7   that we should do before we break?

8            MR. FELGER:  I'm sorry, Your Honor.  I think folks

9   would like to continue.

10            THE COURT:  Okay.

11            MR. FELGER:  We will --

12            THE COURT:  Why don't you sort of summarize --

13            MR. FELGER:  Right.

14            THE COURT:  -- where you are and what you still need

15   to do, and then we'll take a break --

16            MR. FELGER:  Okay.

17            THE COURT:  -- so you can try to resolve some of

18   those issues, and we'll come back?

19            MR. FELGER:  Perfect.  Okay.  We've come a long way,

20   Your Honor, in the last two months.  When we emerged back on

21   May 23rd with a disclosure statement order in hand, we knew --

22   we all knew that we had a lot of work ahead of us to get to

23   this day.  It started with the first order of business, and

24   that getting our plan voting materials on the street to

25   thousands of interested parties and publishing that notice in

1  the various publications that Your Honor ordered.  That was all

2  done, as I've laid out in our binder, and those affidavits are

3  set out at Item 6 through 9.

4      The first real significant issue we needed to deal

5  with was the -- what we viewed -- the debtor viewed as the one

6  significant plan condition, and that was to negotiate and

7  execute new collective bargaining agreements with our five

8  bargaining units on terms acceptable to the plan funder.  The

9  initial deadline for us to meet that condition was June 15th.

10 As Your Honor will recall, we weren't able to meet that

11 deadline and, in fact, filed a motion to convert this process

12 from a plan process to a 363 sale process, which obviously

13 would've derailed the process that we're here to have Your

14 Honor approve.

15     The parties continued to work and give a lot of

16 credit to our special labor counsel, Paul Lewis, who worked

17 tirelessly with the unions to finally get to a point where we

18 had ratified agreements with our unions on June 18th and June

19 19th and signed agreements on June 23rd.  Those revised

20 collective bargaining agreements went effective on July 1

21 subject to an order confirming the debtors' third amended plan.

22     Those agreements were acceptable and are acceptable

23 to Arch Acquisition.  Arch Acquisition actually participated in

24 the process -- the negotiation process with our unions.  The

25 resolution of those issues provide significant benefits to

1 these estates, and the savings actually approach a million

2 dollars on an annual basis as a result of the hard work of Mr.

3 Lewis and the debtors' principals to get these collective

4 bargaining agreements approved, ratified, and signed up.

5          In addition to the various wage issues and benefits

6 issues, the debtors were saddled with a multi-employer defined

7 benefit pension plan that they really needed to get out of, and

8 that was perhaps the most important issue on Arch Acquisition's

9 plate with respect to that condition, was to get out of the

10 multi-employer pension plan, to withdraw from those plans, and

11 that was effected.  The debtors -- the unions agreed to the

12 debtors' withdrawal from the multi-employer pension plans, and

13 through the negotiations the multi-employer pension plan was

14 replaced by a 401k plan which will result in significant

15 savings for the debtors going forward, several hundred thousand

16 of the almost a million dollar savings -- annual savings that I

17 mentioned.

18          The -- as a sidebar to that but related, the unions

19 filed an administrative expense claim for the withdrawal

20 liability asserting an administrative claim of $7.5 million for

21 the withdrawal from the multi-employer pension plans, which

22 obviously would've caused a real problem with our plan funding

23 commitment cap.  Through negotiations with the unions' counsel,

24 we reached an agreement where they agreed that the claim would

25 be treated as a general unsecured claim rather than an

22

1  administrative claim, and we just received a notice from

2  counsel that it's their belief that that claim is not $7.5

3  million but a claim of less than $5 million.  And, of course,

4  the debtors have not reviewed that and reserve all rights with

5  respect to the ultimate amount of that claim, which presumably

6  will be passed to the Class 10 Liquidating Trustee to

7  investigate and resolve.  But we're pleased to say that at

8  least in terms of dealing with the unions, as of today, they've

9  agreed that it's not entitled to administrative expense

10 priority, and that it's their belief that that claim is under

11 $5 million.

12         So that was the first significant hurdle we overcame,

13 and it was, as I indicated -- it was really in question and in

14 doubt as to whether we were going to be able to get there, and

15 we were, as I mentioned, dangerously close to moving in the

16 direction of a 363 sale process.

17         In addition, at or about the same time we embarked on

18 a competitive process to test the market to make sure that the

19 value that was being paid by Arch Acquisition for the equity in

20 the debtors was fair, and that we hired Scott Victor of NatCity

21 -- I believe the effective date was May 7th -- to coordinate,

22 conduct, supervise, run that process for us.

23         THE COURT:  I've reviewed Mr. Victor's declaration,

24 so I'm familiar with what he says in there.

25         MR. FELGER:  And Mr. Victor is in court today if Your

1 Honor has any issues or questions for Mr. Victor.  And as set

2 out in that declaration, they contacted almost 200 parties,

3 almost 20 signed confidentiality agreements, a number of

4 parties took tours of the facility, but at the end of the day

5 no bids were received by the bid deadline of June 25th, and, as

6 a result, no auction was held on June 27th.

7        In addition, as I indicated earlier with the filing

8 of the Schedule 8.1, the debtors spent considerable time

9 reviewing the dozens and dozens of contracts and unexpired

10 leases that the debtors were a party to in an effort to pull

11 together the Schedule 8.1 that was ultimately filed as

12 required, and by the time required under the plan and the

13 disclosure statement order a supplement was filed to that

14 Schedule 8.1 to address comments from parties and additional

15 due diligence by the debtors including a removal of a party --

16 one of the parties that filed an objection to Schedule 8.1.

17 And that party, for the record, is Metropolitan Lumber.  So as

18 a result of their objection to Schedule 8.1, we removed that

19 contract from the list of contracts to be assumed under the

20 plan.

21        Another significant issue that the debtors had to

22 deal with was and is, continues to be, the resolution of the

23 claims, the Class 9 environmental claims.  As Your Honor may

24 recall from the very first day of the case, we filed a plan

25 that provided treatment for environmental claims, specifically

1  setting out that the EPA's claims would be settled by a payment

2  of $325,000 in the aggregate and a settlement of the DEP claims

3  for a total of $25,000 in the aggregate.  So that proposed

4  treatment, which was not a settlement in any way -- it was by

5  and large an opening offer by the debtors -- was out there as

6  of the first day of this case.

7          And over the past I guess three to four weeks,

8  perhaps a little less, the debtors have expended a good deal of

9  resources to get to a meeting of the minds rather than opening

10 offer with the DEP and the EPA and, in addition, determined

11 that if we could reach a resolution with the Pennsauken

12 landfill plaintiffs, that it would, as I indicated earlier, go

13 a long way to wrapping all of the environmental issues for the

14 debtors.

15         I think it's important to mention, as I did with Mr.

16 Lewis in the labor negotiations, folks who have been really

17 instrumental from the debtors' perspective in getting to where

18 we are today with settlements with these parties.  Pete

19 Fountaine of my office, an environmental lawyer, has been very

20 helpful in dealing with the -- and negotiating the settlement

21 with the DEP, which I will describe, which also includes,

22 importantly, an acknowledgment from the DEP that the

23 transactions contemplated under the plan do not trigger ISRA,

24 and that was very important to the debtors and to Arch

25 Acquisition that we were able to convince the and obtain the

1   agreement of the DEP that ISRA was not applicable to the

2   transaction under this plan.

3          In addition to Mr. Fountaine, I need to mention Kevin

4   McKenna and Sean Bezark.  Kevin McKenna has worked tirelessly,

5   including putting off a bunch of vacations, to help us reach a

6   settlement with the Pennsauken landfill plaintiffs.  Mr. Bezark

7   is the environmental counsel for Arch Acquisition and has been

8   invaluable to the process of working through and reaching

9   settlements with the Pennsauken landfill plaintiffs and,

10  particularly, the EPA.  And I'll be careful to say that we

11  don't have an agreement with the EPA yet.  We have an agreement

12  in principal, but we think we're there with them subject to the

13  process we need to work through to get it officially approved

14  by the EPA.

15         I'm sort of hesitant at this point to go through the

16  terms of the settlements with folks who are involved in those

17  issues out of the courtroom.  I mean the issue that we have

18  outstanding is really the Class 9 issues.  We have these

19  settlements with the Pennsauken landfill plaintiffs, the EPA,

20  and the DEP, and we have an objection by SL Industries with

21  respect to the Puchack Well Field site, and we have the issue

22  as to whether the 502(e) motion will be -- (e)(1) motion will

23  be approved, and we're proceeding under 1129(a) or 1129(b) with

24  respect to Class 9.

25         The report of plan voting reflects that with respect

1  to the five impaired -- I should say six impaired classes,

2  Class 5, 6, and 10 have voted in favor of the plan.  Class 10

3  is the class of general unsecured creditors who voted

4  overwhelmingly in support of this plan, 90 plus percent in

5  amount and in number.  So Classes 5, 6, and 10 voted in favor

6  of the plan.  Class 7, as I indicated earlier, had one

7  rejecting ballot that was withdrawn.  So we have an impaired

8  class that has no votes.  So as a result of that, we can't deem

9  it an accepting class and would have to proceed under 1129(b)

10 with respect to Class 7.  It's a class of secured claims, and

11 we believe the treatment under the plan is consistent with the

12 required treatment under 1129(b) for secured claims.

13         The fifth impaired class is Class 9, which I've

14 already spoken to.  We have the two accepting ballots that came

15 in last night, and we have I believe four rejecting ballots

16 that are bound up in our 502(e) motion.  And again, as I

17 indicated earlier, an 1129(b) cram down of that class requires

18 that no one junior to them receive anything under the plan.  As

19 I indicated the Ben interests are being canceled under the

20 plan.

21         The last impaired class is Class 11, the Ben

22 interests, which, of course, are being canceled under the plan.

23 No one junior to Ben is receiving anything under the plan.

24         So it seems to me that we need to take a break.  We

25 need to see if we can resolve the issues with the folks who are

1 out of the courtroom, which would result in a resolution of the

2 joint defense group's lift stay motion.  We'll limit or perhaps

3 eliminate issues with respect to 502(e) and perhaps leave us

4 when they come back, after reporting what's transpired, dealing

5 with one objection.  That's the objection of SL Industries.

6         Other than that, we don't envision any other issues

7 with respect to confirmation of the plan, and we believe that

8 the declarations and documents set out in our binder provide

9 all of the support necessary to confirm the plan under 1129(a)

10 or 1129(b) with respect to Classes 7 and 9.

11         THE COURT:  Anybody else that wants to be heard at

12 this time?  Mr. Halperin.

13         MR. HALPERIN:  I think Mr. -- Alan Halperin, Halperin

14 Battaglia Raicht, on behalf of the Creditors' Committee.  I

15 think Mr. Felger's done a very nice job of summarizing where we

16 are.  I just want to make sure it's very clear to the Court

17 that from our perspective he may have undersold what Herculean

18 effort has gone into getting to where we are today by all of

19 the parties.  I think it just needs a little bit of a

20 reflection to back where we were on day one, and we're sitting

21 here before --

22         THE COURT:  The Herculean effort is not missed by the

23 Court.  I recognize -- I mean I've had -- I've been a recipient

24 of the telephone calls for extensions by debtors' counsel

25 indicating how busy and how difficult it's been, so I -- it's

1    not lost on the Court.

2          MR. HALPERIN:  And it has been.  Mr. Felger and his

3    partner, Mr. Poslusny, and their other partners, Mr. Brody and

4    his partners, and others -- we'll take some kudos, too, but

5    they deserve the lion's share.  They have done a phenomenal job

6    to get where we are today.  I mean we're sitting here --

7    thinking about the mess where we started, we sitting here

8    before you today with a plan and request for confirmation,

9    which the Committee believes is confirmable.  Hopefully,

10   consensually, but if not, you know, by 1129(b), if need be.

11   Collective bargaining is resolved.  EPA messes, environmental

12   messes are cleaned up.  Not just claims but actually cleaning

13   up the mess.  Jobs are preserved.  The business goes forward.

14   Creditors have a meaningful recovery and a trading partner

15   going forward.  So we just wanted to make sure that it's

16   understood that the Unsecured Creditors' Committee is

17   supportive of what is going on here today, and that a lot of

18   work, in fact, has gone into it.  We just wanted to make sure

19   that it was clear that we think it was, if anything, a little

20   undersold, the efforts that went into getting to where we are.

21          THE COURT:  And your comments are well worth hearing.

22   Mr. Brody.

23          MR. BRODY:  Your Honor, if I may?  While -- right

24   before we take this break I just wanted the Court to know that

25   while we are going to attempt to resolve all the open issues

1  with respect to certain of the environmental claimants, so that

2  we could come back and have a shorter day, the -- when we come

3  back from lunch, notwithstanding a resolution, we believe that

4  we are able to confirm this plan, and it is our intention,

5  whether it is resolved consensually or resolved by statements

6  by the Court, to confirm the plan today and move forward.

7            THE COURT:  Mr. Felger.

8            MR. FELGER:  And I would just sort of echo that or

9  embellish on that.  We do have a requirement under the plan

10 that the initial condition was that we have the entry of a

11 confirmation order by July 15th.  It's been extended through

12 today.  So as of today, Arch Acquisition is requiring that

13 there be a confirmation order entered today.  So we have that

14 obviously keeping our feet --

15           THE COURT:  No pressure.  Right, Mr. Felger?

16           MR. FELGER:  -- keeping our feet to the fire.

17 Exactly.  But I guess before we go, assuming that's what Your

18 Honor wanted to do, I wonder if we can let Messrs. McElheny and

19 Victor go onto other pursuits this afternoon.  The --

20           THE COURT:  I'm satisfied with what has been filed

21 with the court, unless somebody else has any issue with it.

22 I've reviewed Mr. McElheny's original certification,

23 declaration, and the supplemental, and I believe that it

24 adequately addressed the issues that were necessary from the

25 balloting agent.  I also reviewed Mr. Victor's certification

1  and declaration, and it was satisfactory to the Court with

2  regard to the sale process and what went forward.  Unless

3  there's anybody in court that would want the opportunity to

4  examine those individuals or question them about anything, I

5  have no objection to them not being present for the balance of

6  the hearing.

7            MR. FELGER:  Thank you, Your Honor.

8            THE COURT:  Anything else?

9            MR. FELGER:  What time would you like us back?

10           THE COURT:  Well, how much time do you think you need

11  I guess as a starting point?  I mean I -- it would be nice --

12  I'm hearing what Mr. Brody says, but I know that you would like

13  to try to resolve, if possible, some of these issues, because

14  they don't seem to be the major part of the issues.  And I

15  definitely understand what Mr. Halperin was indicating about

16  the mammoth amount of work that has gone forward, and if it

17  could be satisfied, the debtors' obligation, in a completely

18  consensual proceeding, that would obviously be ideal, so I

19  wanted to give you the time that you need to do that, if you

20  can.  And if not, you know, we'll deal with whatever issues

21  remain to be decided.  So it's quarter after one now.  What

22  will kind of -- when would you want to come --

23           MR. FELGER:  I'd say we'd take an hour.

24           THE COURT:  Okay.  That's fine.  We'll see where we

25  are at that time.  My Courtroom Deputy will check with you.  If

```
 1   you need more time, we'll go from there, and we'll schedule the
 2   hearing as we can.  I'm going to disconnect the telephone
 3   conference, Mr. Cohen.  And, Mr. Frankel, if you want to have
 4   my Courtroom Deputy contact you when we go back into -- onto
 5   the record, then we can allow you to appear again by telephone,
 6   and I think Mr. McElheny is not going to be needed to be part
 7   of this conference.
 8            MR. COHEN:  That would be fine, Your Honor.
 9            THE COURT:  All right.  Chris, do you have the phone
10   numbers to get back to them?
11            CHRIS:  Yes, I do.
12            THE COURT:  Okay.  All right.  Chris will be in touch
13   with you when we're ready to go back on the record.  Okay?
14   Thank you.
15            ALL:  Thank you, Your Honor.
16                      (Recess)
17            THE COURT:  Be seated.  Let me get the phone
18   participants on.  Hello, Mr. Cohen?
19            MR. COHEN:  Yes, this is Howard Cohen, Your Honor.
20            THE COURT:  All right, then who else is on the line?
21            MR. FRANKEL:  Donald Frankel for EPA.
22            THE COURT:  Hello, Mr. Frankel.
23            MR. FRANKEL:  Hello, Judge.
24            THE COURT:  Anybody else?
25            MR. KLEIN:  Yes, Your Honor, Oren Klein of Parker
```

1  McCay on behalf of Pennsauken Township.

2          THE COURT:  All right.  We're on in the courtroom now

3  continuing the hearing in Shapes/Arch Holdings.  Mr. Felger.

4          MR. FELGER:  Yes, good afternoon, again, Your Honor.

5  Mark Felger, Cozen O'Connor, for the debtors.  Thank you, Your

6  Honor, again for indulging us and also for the assistance in

7  chambers a short while ago.  It proved very helpful as I think

8  we've made some real progress over the last couple of hours.

9          I think what I'd like to deal with first is the -- is

10 Item -- let's see -- Item 3 on the agenda.  Item 3 is the

11 motion of the Direct Generator defendants for relief from the

12 automatic stay, to permit dismissal of the debtors from the

13 joint defense group.

14         THE COURT:  Right.

15         MR. FELGER:  I'm pleased to report that we've settled

16 that motion, and we've resolved it through a consent order.

17 And if the Court will indulge me, I'd like to read what is a

18 relatively short consent order into the record with the view to

19 having it cleaned up and submitted hopefully tomorrow for

20 entry.  And we do have a number of parties that need to sign --

21 actually sign the consent order, so it may actually be a day or

22 two, which is why I'd like to read it into the record.

23         THE COURT:  Okay.

24         MR. FELGER:  "This consent order is entered into by

25 and between the above-captioned debtors and debtors in

1 possession, collectively, with Ben, LLC.  The debtors on one

2 hand, and Boise Cascade Corp., Weyerhaeuser Company, CE Glass,

3 Inc., Rohm and Haas Co., Cook Composites and Polymers Co. on

4 its behalf and on behalf of Superior Varnish and Dryer, and

5 C.J. Osborne Chemicals Co., Devoe Coatings, Inc., Georgia

6 Pacific Corp., Sears Holding Management Corp., Ford Motor Co.,

7 SL Industries, Inc., SL Modern Hardchrome, Our Lady of Lourdes

8 Medical Center, and West Jersey Hospital, on the other hand,

9 collectively, the generator defendants.  The debtors and

10 generator defendants, singly and as a group, being hereinafter

11 referred to collectively as the parties, resolve that generator

12 defendants' motion for relief from the automatic stay to

13 dismiss the debtors from the joint defense group, whereas, the

14 debtors filed their respective voluntary petitions for relief

15 under Chapter 11 of Title 11 of the United States Code on March

16 16th, 2008.

17     Whereas, prior to the petition date one or more of

18 the debtors were a party/parties to a joint defense agreement;

19     Whereas, on or about June 9th, 2008 the generator

20 defendants filed the motions seeking to dismiss the debtors

21 from the joint defense group;

22     Whereas, the debtors have disputed the motion and

23 have informally raised certain issues related to the motion;

24     Whereas, the generator defendants have informally

25 disputed the issues that the debtors informally raised;

1           Whereas, the parties' desire to settle the motion as

2    set forth herein;

3           Whereas, A&H Bloom Construction Co. and the Bloom

4    organization, collectively Bloom, were not signatories to the

5    motion but must execute this consent order as a member of the

6    generator defendants joint defense group.

7           Now, therefore, in consideration of the mutual

8    covenants and promises set forth herein and other good and

9    valuable consideration, the receipt and adequacy of which are

10   hereby acknowledged, the debtors and generator defendants

11   hereby stipulate and agree as follows, (1) the foregoing

12   background is incorporated herein by reference, (2) the motion

13   is resolved as set forth herein, (3) the debtor shall be deemed

14   no longer a member of the joint defense group as of the

15   petition date, (4) within ten days of entry of this consent

16   order, the joint defense group shall pay to debtors' counsel

17   $28,172, which amount represents two wire transfers from

18   debtors' counsel to the joint defense group account.

19          Additionally, the joint defense group shall return

20   five checks totaling $3,656 to Liberty Mutual Insurance

21   Company, which checks were never deposited into the joint

22   defense group financial account."

23          Paragraph (5), "The parties stipulate that the expert

24   reports issued on behalf of the joint defense group, paren,

25   expert report of Charles McClain, PhD., May 23rd, 2008,

1  prepared for generator defendants, expert report prepared for

2  direct generator defendants May 23rd, 2008 prepared by

3  Cornerstone Environmental Group, LLC, expert report prepared

4  for direct generator defendants prepared by Muriel Robinette,

5  New England EnviroStrategies, Inc., May 23rd, 2008,

6  supplemental expert report prepared for direct generator

7  defendants July 10, 208 prepared by Cornerstone Environmental

8  Group, LLC, supplemental and expert report of Charles F.

9  McClain, PhD., July 10, 2008 prepared for generator defendants,

10  and rebuttal report prepared for direct generator defendants

11  prepared by Muriel Robinette, New England EnviroStrategies,

12  Inc., July 9th, 2008, as well as any amendments, supplements,

13  or updates thereto, collectively the expert reports, shall not

14  be deemed an admission by the debtors or Ben, LLC in the

15  Pennsauken action or any other pending or future litigation in

16  any manner including but not limited to arbitration,

17  administrative hearing, mediation, or other forum."

18        Paragraph (6), "Neither the joint defense group nor

19  any of the generator defendants or Bloom shall use the expert

20  reports, initial cap, for any purpose against the debtors or

21  Ben, LLC in any pending or future litigation, in any other

22  manner, including but not limited to arbitration,

23  administrative hearing, mediation, or other forum.  Provided,

24  however, that nothing herein or in the plan or confirmation

25  order shall be construed to in any way limit, bar, or preclude

1    the generator defendants using the expert reports as evidence

2    or in arguments to support a reduction and/or credit that

3    reflects a proportionate share of responsibility, if any,

4    allocable to the debtors at trial or during any allocation, ADR

5    process, or legal proceeding in the Pennsauken litigation."

6            Paragraph (7), "Upon entry of this consent order the

7    debtors, on the one hand, and the joint defense group, and each

8    of the generator defendants, including Bloom, on the other

9    hand, hereby generally release and discharge each other, their

10   predecessors, successors, and assigns, their agents, and all

11   attorneys including but not limited to attorneys in the

12   Pennsauken action from all claims which each party may have

13   against the other for all claims relating only to allegations

14   of breach of confidentiality or for violation of the automatic

15   stay.  The parties, however, reserve the right to seek recourse

16   against each other if the debtors, the joint defense group, or

17   any of the generator defendants, including Bloom, breach the

18   confidentiality provisions of the joint defense agreement after

19   the entry of this consent order."

20           Paragraph (8) and the final paragraph, "Unless

21   otherwise specified in this order, the generator defendants and

22   the debtors continue to be bound by the terms and conditions of

23   the joint defense agreement."

24           In addition to the language that I just read into the

25   record, Your Honor, in resolving the issues raised by the joint

1  defense group, we have agreed to add language to the

2  confirmation order which modifies the -- which serves to modify

3  the plan modification that was filed with the court yesterday.

4  And so what we've agreed to do, Your Honor, is add to Paragraph

5  64 of the confirmation order the following.  I hate to take

6  this piecemeal, because we're going to get into the

7  confirmation order hopefully when we move to the confirmation

8  portion of the hearing.  But I think it's important to wrap in

9  everything that we agreed to to resolve that 362 motion, which

10 also resolves their issues with respect to the plan.

11         So what we've agreed to add to Paragraph 64 is in the

12 seventh paragraph of Section 4.4 of the plan modification --

13 the following shall be added to the first sentence after the

14 term contribution at the end of the sixth line, and the words

15 are, "or joint and several by ability."

16         Also the following shall be added to the end of the

17 same sentence, "except to defend any action brought by any such

18 party for contribution or joint and several liability."

19         And we've agreed to add to Paragraph 65, with respect

20 to the settlement of the environmental claims of NJDEP and

21 Pennsauken, in Romanette three, which reads, "are approved in

22 their entirety."  We agreed to change that to read, "are

23 incorporated herein and approved in their entirety."

24         In addition, Your Honor, pursuant to our colloquy in

25 chambers, the Pennsauken landfill plaintiffs agree to share

1 Paragraph 11 of the settlement agreement with the counsel for

2 the joint defense group, and that review played -- certainly

3 played a role in our reaching the settlement that I've just set

4 forth on the record.  I'm not sure if anyone else wished to be

5 heard, but I think that covers what we've agreed to in

6 settlement of that 362 motion.

7          THE COURT:  Anybody else want to be heard with regard

8 to the changes Mr. Felger has put on the record?

9                    (Pause)

10          MR. FELGER:  Mr. Bezark just reminded me that Mr.

11 Garemore, in addition to allowing the -- allowing us to share

12 Paragraph 11 of the settlement agreement with the joint defense

13 group, also allowed us to share that language with counsel for

14 certain transporters in that litigation or in court, and we did

15 so.

16          THE COURT:  Mr. Felger, does that resolve the

17 objections that were filed to the confirmation of the plan by

18 the generator group and their participants?

19          MR. FELGER:  The generator group did not file --

20          THE COURT:  Okay.

21          MR. FELGER:  -- an objection to confirmation.  They

22 filed a -- they filed an objection to the 502(e) motion, and I

23 understand this resolves their objection to the 502(e) motion,

24 and that they will be withdrawing their proofs of claim, but

25 I'd like confirmation of that.

1           MS. POLLACK:  Good afternoon, Your Honor.  Robyn

2  Pollack of Saul Ewing on behalf SL Industries, Inc.  That is

3  correct.  Pending the entry of the agreed upon confirmation

4  order that Mr. Felger will be reading into the record later in

5  these proceedings, SL Industries is withdrawing its Claims

6  Number 547 and 612.

7           THE COURT:  Thank you.

8           MS. PENA:  Good afternoon, Your Honor.  Melissa Pena

9  from the law firm of Noriss, McLaughlin, and Marcus on behalf

10 of Combustion Engineering, Inc.  That is also accurate.

11 Pending the entry of the confirmation order as recited by Mr.

12 Felger, Combustion will be withdrawing its Claim Number 559.

13          THE COURT:  Thank you.

14          MS. COBB:  Your Honor, it doesn't resolve the issues

15 for the other parties, the transporters, and everybody keeps

16 forgetting I'm the former owner of the landfill.  Our issue

17 with it -- with the whole consent decree has got to do with

18 discovery.  It bars us from any discovery.  The direct

19 generators, of course, would like to limit the size of Aluminum

20 Shapes' allocation, because they're in the same group, and they

21 have a potential of, you know, keeping that down so that

22 they're orphan share is down.  But in our particular case, we

23 would like to continue to put on our case against Aluminum

24 Shapes.  While it may be the plaintiff that's liable, we're

25 barred from any discovery, and we're barred from developing

1   evidence, developing expert reports, developing arguments at

2   trial.  We're barred from all this, and we want to put it forth

3   even if Aluminum Shapes isn't at the table, and we don't think

4   this is the right place to do that.

5            THE COURT:  Well, I'm not sure what has been done

6   here other than a resolution between that group and the debtor.

7            MS. COBB:  Okay.  This is in the plan, and I didn't

8   know -- I just didn't want us to be precluded from objecting to

9   the plan.

10           THE CLERK:  Excuse me.  Can you make your appearance,

11  please?

12           MS. COBB:  Oh, yes.  It's Carol Cobb from Giansante &

13  Cobb for Ward Sand & Materials.  I mean if we're going to go

14  forward with the plan, then we'll come back at that time.

15           MR. FELGER:  So Your Honor's question was does that

16  resolve the issues with respect to, I believe, the members of

17  the joint defense group, and I believe it does.  And but my

18  understanding is that all of the joint defense group members

19  are going to withdraw their proofs of claim.  And I don't know

20  if all the joint defense group members are here, but that's our

21  understanding and expectation of the agreement that we reached.

22                      (Pause)

23           MR. FELGER:  With respect to Item 3 I believe it is

24  -- did I lose my agenda?  The motion --

25                      (Pause)

1            MR. FELGER:  I just got a clarification from counsel

2    for SL Industries that they don't have at this point the

3    authority on behalf of all of the members of the joint defense

4    group to withdraw their proofs of claim.  It's certainly our

5    expectation that that's going to happen as part of the deal,

6    but hopefully by the time we conclude, we may have e-mails back

7    confirming that that's the case with respect to the joint

8    defense group members who decided not to appear today.

9                            (Pause)

10           MR. FELGER:  With respect to the -- my agenda has

11   disappeared, but with respect to the motion -- the motion to

12   object to claims under 502(e) and to estimate claims, how we'd

13   like to approach that, Your Honor, is we've reached an

14   agreement, as Your Honor's aware with the Pennsauken landfill

15   plaintiffs, which I'll describe as we move into the

16   confirmation portion of the hearing.  We've also agreed with

17   the joint defense group that at least the members here have

18   agreed to withdraw their claims, and, hopefully, we'll get

19   confirmation that they've all agreed to withdraw their claims.

20           We've agreed with the PRPs at Ewan, D'Imperio, and

21   Lightman, represented by Mr. Cohen on the phone, to adjourn

22   that as it relates to his clients to run parallel with the

23   approval process for the EPA settlement.  What we'd like to do

24   is to adjourn the balance of that motion for a short period for

25   a date that works with Your Honor, perhaps a week to two weeks

1  down the road, so that we can have some additional time to work

2  with the parties that have filed responses and hopefully settle

3  the issues that they've raised in their responses.

4        THE COURT:  Just a minute, Mr. Felger.

5                    (Pause)

6        THE COURT:  When did you want to have that heard?

7  I'm not going to be here on the 31st and 1st, and then I'm not

8  going to be here from the 5th to the 8th, so --

9        MR. FELGER:  I know we have a few dates with Your

10 Honor going out.

11       THE COURT:  What do we have?  Do you know?

12       MR. FELGER:  Jerry, do you know?

13       MR. POSLUSNY:  Your Honor, I believe we have a date

14 -- bear with me one moment, Your Honor.

15       THE COURT:  Sure.

16                   (Pause)

17       MR. POSLUSNY:  I believe we have a date on August

18 25th, Your Honor, which is a motion day.

19       THE COURT:  That's fine.

20       MR. POSLUSNY:  And after that I think the next date

21 we have anything certain is September 22nd, which is probably

22 longer than everybody would want to carry this anyway.

23       THE COURT:  Well, I have -- I mean I -- my only

24 question is should we do this on a motion day, Mr. Felger?  Do

25 you think it's going to --

43

```
 1          MR. FELGER:  It really depends on whether we're able
 2   to make any progress.  Part of my concern is there's a number
 3   of parties, and it could take a while to flesh out and hear all
 4   the stories.  It could take a while, so my sense is it -- you
 5   know, it could take a couple of hours.
 6                         (Pause)
 7          THE COURT:  Mr. Felger, how much time did you want?
 8   I have a couple of days in the week of August 11th.  I have --
 9          MR. FELGER:  Do you have August 11th available?
10          THE COURT:  Well, August 11th is a Monday.  That's a
11   motion day, but I could do it the 12th or the 14th, and then I
12   don't have anything else.  You know, I could give you the --
13   how is that?
14          MR. FELGER:  Okay.  Can we have the 12th, Your Honor?
15          THE COURT:  August 12th at 10:00?
16          MR. FELGER:  Thank you, Your Honor.
17          THE COURT:  Will the adjournment of that motion
18   impact the ability to confirm the plan today?
19          MR. FELGER:  I don't think so, Your Honor.
20          THE COURT:  It's just going to determine what those
21   claims will be at the time, when they're going to treated.
22          MR. FELGER:  Right.  Right.  I mean it'll be our
23   position, unless we reach some accommodation, that they should
24   be disallowed under 502(e)(1), or they are -- I shouldn't say
25   or.  But a settlement with Pennsauken makes it an even stronger
```

44

1   case for the disallowance under 502(e).  But in terms of

2   impacting confirmation, as we move to the confirmation, none of

3   those parties filed objections to confirmation.  A couple of

4   them filed rejecting ballots, but, as I addressed earlier this

5   afternoon, if those ballots would be -- if those claims were

6   disallowed, and those ballots wouldn't count, we would have an

7   accepting class in Class 9 by virtue of the accepting ballots

8   by the Pennsauken landfill plaintiffs.  The ability to confirm

9   under 1129(b) with respect to Class 9 is a simple matter for

10  this Court.  The test is is anyone junior getting anything, and

11  the fact of the  matter is that Ben -- Ben's interests are

12  being canceled and new interests are being reissued to Arch

13  Acquisition for what we find to be fair consideration.  So --

14  and that's -- we've set that out in those very words in Mr.

15  Grabell's declaration in support of confirmation in

16  anticipation of perhaps having to proceed under 1129(b) with

17  respect to Class 9 as opposed to 1129(a).

18          So moving to confirmation, we did spend some time

19  earlier this afternoon walking through the plan and how we got

20  from the disclosure statement hearing to the hearing today, the

21  satisfaction of the CBA plan condition, the completion of the

22  competitive process without any competing bids being submitted,

23  and we walked through the report of plan voting, which is set

24  out in the McElheny declaration and is also set out in the

25  Grabell declaration.

1        We walked through the objections that we received to

2   confirmation and made reference to our plan modification and

3   our confirmation order.  And I think what might be appropriate

4   at this point is to walk through the plan modification to -- or

5   set out for Your Honor the changes that we've made and sort of

6   our -- and set forth our view that these are non-material

7   changes to the plan and changes in resolution of objections

8   that have been filed -- have been filed or raised informally by

9   parties.  The -- does Your Honor have a copy of the

10  modification?

11          THE COURT:  Yes.

12          MR. FELGER:  In Paragraph 1 we're simply clarifying

13  that it's the debtors through the effective date, and from that

14  effective date forward it's the reorganized debtors.

15          Deficiency claim, I don't know if we need to say much

16  there.  It's a clarification to that language raised by certain

17  parties.

18          Paragraph 3, it's the same with respect to

19  environmental claim, clarifications to that definition raised

20  by various parties including the EPA and the insurers.

21          Paragraph 4, modifies Class 2, which I referenced

22  earlier this afternoon.  We've changed Class 2 to include sewer

23  charges to address and resolve the objection by Camden County

24  Municipal Utilities Authority.

25          Paragraph 5, we've modified Class 7 to set out that

1    the claim will be determined after the effective date, and,

2    presently, we have a hearing set before Your Honor for

3    September 22nd to deal with the Argonaut and Arrowwood claims.

4    And that change again resulted in Arrowwood withdrawing its

5    rejecting ballot on the plan.

6            Paragraph 6, is really the guts of this modification

7    and reflects sort of a wholesale expansion of the treatment of

8    Class 9.  Your Honor will recall, and I mentioned it earlier

9    today, that the plan we filed the first day of the case

10   provided for the EPA or offered the EPA $325,000 in full

11   satisfaction of its claims, offered the NJDEP $25,000 in full

12   satisfaction of its claims, and provided that the balance of

13   the environmental claims would -- I believe that first plan

14   provided that it be treated through insurance proceeds.

15           This now three-page provision for the treatment of

16   Class 9 has been heavily negotiated by a number of parties,

17   including HIG, the Committee, the insurers -- the debtors'

18   insurers, the EPA, the Pennsauken plaintiffs, and now certain

19   co-defendants in the Pennsauken landfill litigation.  The --

20   and essentially what we've achieved, Your Honor, is we've

21   achieved three settlements that again essentially resolve all

22   of the debtors' environmental liability but for certain items.

23   And I think what I ought to do is walk through each of these

24   settlements and provide sort of in summary fashion the material

25   terms of these settlements that we've reached with the three

1 parties.  I think the modification does a pretty good job of

2 setting out what the material terms are, but perhaps a bit of

3 expansion would be appropriate.

4       With respect to the EPA, again, procedurally, we

5 don't have a signed agreement with the EPA as I stand here this

6 afternoon.  What we have with the EPA is an agreement in

7 principal subject to additional layers of approval at the EPA.

8 We're hopeful that we will have a signed settlement agreement

9 over the next couple of days, and then it's our understanding

10 that it will -- the agreement will need to go out for public

11 comment over a period to be determined.  I think the typical

12 period, from what I understand, is 30 days.  We've requested

13 the EPA reduce that to 10 days, and they are considering that

14 request, and we're hopeful that they will respond favorably to

15 that request, so that we can move forward and have the

16 agreement signed up and approved by Your Honor within ideally

17 the next two weeks.

18       The settlement -- and I should probably give you a

19 little bit of background.  The EPA filed a proof of claim

20 related to the Swope's site, and the EPA has asserted a right

21 to file additional claims through September 12th, 2008.  The

22 debtors and the EPA have agreed in principal that the debtors

23 shall pay $811,924 to the EPA in full and complete satisfaction

24 of the claims relating to the liquidated sites set forth in the

25 settlement agreement.

48

1          Specifically, the claims being settled are claims

2   relating to Swope with a $375,000 allocation, D'Imperio sites

3   with a $149,506 allocation, the Ewan sites with a $62,418

4   allocation, and the Lightman Drum site with a $225,000

5   allocation.  The Chemical Control Corporation site is also

6   being settled, and the Berks Associates site is also being

7   settled, but there's no allocation.  The settlement is for $0

8   for those two sites.

9          The other EPA settlement, the EPA is providing

10   contribution protection under CERCLA and has covenanted not to

11   sue the debtors with respect to the settled sites.  The one

12   site that has been carved out of the EPA settlement, it's

13   deemed the discharge site as opposed to a liquidated site, and

14   for which the debtors are not getting contribution protection

15   is the Puchack Well Field Superfund site.  The EPA settlement's

16   been approved by the debtors' insurers, and the debtors'

17   insurers are funding the payment of the settlement under the

18   EPA agreement.

19          It's our understanding that the PRP groups at these

20   sites, specifically, Ewan, D'Imperio, and Lightman Drum, and I

21   believe Swope -- but specifically with respect to Ewan,

22   D'Imperio, and Lightman, we believe that they're on board with

23   that settlement and support that settlement.  And, in fact,

24   they have agreed to adjourn their objection to 502(e) to track

25   the approval of the EPA settlement with the expectation that if

1 the EPA approved -- settlement is ultimately approved, it --

2 their objections will be withdrawn or marked as resolved.

3          The -- does Your Honor have any questions with

4 respect to EPA -- the EPA settlement?

5          THE COURT:  Not specifically.

6          MR. FELGER:  Okay.  The next settlement is the DEP

7 settlement.  Your Honor will recall that the original plan

8 provided for a $25,000 payment to the NJDEP.  The parties have

9 agreed and have actually signed a consent order setting out

10 that the debtors will pay $50,000 in complete satisfaction of

11 all the claims related to the sites referenced in Section 4.4

12 of the plan -- Schedule 4.4 of the plan except for the

13 Douglassville site, which is not subject to the DEP's

14 jurisdiction, and the 9000 River Road site, which is the

15 debtors' property.

16          The consent order -- pursuant to the consent order,

17 the parties have resolved any and all costs the DEP has

18 incurred or will incur in connection the DEP sites.  Again, DEP

19 sites being those sites exclusive of Douglassville and 9000

20 River Road.  And natural resource damages -- again, for natural

21 resource damages except with respect to 9000 River Road for any

22 natural resource of New Jersey that has been or may be injured

23 as a result of the discharge of hazardous substances in

24 connection with the DEP sites.

25          The DEP settlement does not release Shapes with

1    respect to Shapes' obligation to identify and address sources

2    contributing to chromium contamination in the soil and

3    groundwater at 9000 River Road.  And, in fact, Shapes has

4    agreed to continue to perform its obligations with respect to

5    the 9000 River Road site under the memorandum of agreement

6    that's referenced in the plan modification.  And this agree

7    again was approved by the debtors' insurers, and the debtors'

8    insurers will be funding the $50,000 payment to NJDEP and will

9    continue to fund the debtors' obligations under the MOA subject

10    to applicable policy limits.

11         Now, the DEP consent order carves out its claim for

12    natural resources damages for the 9000 River Road site.  The

13    DEP has filed a proof of claim.  I believe it's in the ball

14    park of $7 million for that claim.  The parties reserve all

15    rights with respect to the amount and validity of that claim,

16    but that claim will be treated as a Class 9 claim and will be

17    paid through insurance to the extent of coverage, and if

18    there's a deficiency, the deficiency claim would roll into and

19    be treated as a Class 10 claim.

20         In addition and importantly, as I mentioned earlier

21    today, as part of the negotiations with NJDEP, the DEP issued a

22    letter indicating that the transaction under the plan does not

23    trigger ISRA, and is not -- and ISRA is not applicable to the

24    transaction that's being consummated under the plan.

25         Last and certainly not least is the Pennsauken

51

1  landfill litigation settlement.  The debtors and the Pennsauken

2  landfill plaintiffs have entered into a settlement agreement

3  and release that provides that the debtors will pay the amount

4  of $450,000 to the plaintiffs and will continue to address the

5  hexavalent chromium issue in Pennsauken landfill outer ring

6  Well 6.  Pennsauken will provide -- the plaintiffs will provide

7  the debtors with contribution protection, indemnification for

8  all claims against the debtors in the Pennsauken litigation

9  including but not limited to the direct claims of all

10  transporters, Ward Sand, James Morrissey, Quick-Way, Rice

11  Trucking and Transport, and Super Quick-Way Services, Atlantic

12  Disposal, the DEP, and all other parties and all cross claims

13  and contribution claims of all parties in order to obviate the

14  need for the debtors to participate at the trial or any other

15  proceeding to defend or minimize its allocated share of

16  liability.  The contribution protection specifically includes

17  any released, settled, dismissed party from a list of parties

18  to the Pennsauken litigation.

19       Pennsauken plaintiffs will, among other things,

20  reduce or offset any jury verdict, judgment, recovery,

21  settlement in the Pennsauken litigation by the amount paid by

22  the debtors or the amount equal to the debtors' allocated share

23  of liability, if any, whichever is appropriate to eliminate the

24  existence of any claims, direct or contribution claims by any

25  party against the debtors based on or arising from the

litigation.  And the Pennsauken plaintiffs will release the

debtors, reorganized debtors, and all of its affiliated

entities, including Ben, from any contribution or other claim

based on allegation that debtors' waste or other materials were

deposited or disposed of, at, or transported to the Pennsauken

landfill, that the Pennsauken landfill or its contents

contaminated Puchack.

Pennsauken's settlement does not include the case of

Harris v. Advanced Process Supply Company.  The status of that

case is that it's in appeal, and the debtors were dismissed

from that appeal based upon the bankruptcy.

The terms of the settlement with Pennsauken

plaintiffs have been approved by the debtors' insurers, and the

debtors' insurers will be funding the payments necessary to

consummate that settlement.

Those are the three settlements that we've

negotiated, Your Honor.  Again, we've entered into a consent

order with the New Jersey Department of Environmental

Protection.  We've entered into a settlement agreement with the

Pennsauken plaintiffs, and we've I believe fully negotiated a

settlement agreement with the EPA subject to what I've already

laid out for Your Honor in terms of having that executed and

ultimately proved.

Those settlements are summarized in the plan

modification, and in addition to the plan -- to the summary of

53

1   those settlements in the plan modification, we've included

2   language that provides a release -- or I should say a mutual

3   release with the insurers who are funding these settlements.

4   We've also included language with respect to the contribution

5   protection that's being provided to the debtors under each of

6   these settlements.  Again, the terms of the settlements will

7   govern the extent of that protection.  The --

8           Moving to Paragraph 7, we've made a change to the

9   reserve for plan expenses.  There's a request by the Creditors'

10  Committee which just talks about when the -- any surplus would

11  be released.

12          Paragraph 8, we've made changes to the Section 8.3 on

13  insurance policies which sets out basically that all the

14  insurance policies are being assumed under the plan.  It was

15  limited in the earlier draft to the insurance related to

16  environmental claims.  We wanted to make it clear that it was

17  all insurance.

18          In Paragraph 9 we've amended Section 9.2(c) to move

19  out the effective date from July 31 to August 4th in light of

20  the adjournments that we've had to request of Your Honor.

21  We're hopeful that we'll close before then, but August 4th

22  gives us the ability to wait for a -- hopefully, a final order

23  and then close.

24          Section 10 is a revision at the request of the

25  insurers to be perhaps more specific with respect to certain

54

1  items that can be potentially heard by Your Honor post-

2  effective date.

3          Section 11 is the discharge.  The only change there

4  is to track the injunction paragraph to read before the

5  effective date rather than the entry of the order.

6          Paragraph 12.  A number of changes to Paragraph 12,

7  confirmation injunction.  The main change or what we spent a

8  lot of time with, with respect to this provision, was the

9  concern raised by a number of parties where we had what I'd

10  like to call standard language, because I've seen it in many,

11  many plans.  The language of has, had, or may have a claim, and

12  you'll see it struck.  It said who have held, hold, or may hold

13  any claim.  There was some concern that we were trying to

14  enjoin claims beyond what we may be able to enjoin under

15  applicable law.  So we spent a lot of time with a lot of

16  parties massaging that language and ultimately acquiesced at

17  the request of the EPA to make the change that we did there to

18  make it clear that it deals with claims that arose at any time

19  prior to the effective date, which we believe is consistent

20  with applicable law.

21          There are additional changes to this paragraph that

22  have been made at the request of a number of parties.  At the

23  end we've added a provision that requires parties to -- after

24  the passage of 90 days after the effective date requires them

25  to come to this court and ask for relief from the plan

1    injunction in order to proceed with the liquidation of an

2    environmental claim in a forum other than this court.  And that

3    was requested by our insurers.  In fact, a much stronger and

4    longer period -- stronger language and longer period was

5    requested by our insurers, and we've accommodated their concern

6    and others' concerns by adding this language which we think is

7    a fair compromise.

8           Again, as I've set out earlier, it's our view that as

9    a result of these settlements, we don't believe there are other

10   environmental claims to pursue other than, as I indicated, the

11   NRD proof of claim by the NJDEP, which is a proof of claim

12   that's been filed with this court, which we expect will be

13   resolved through the claims adjudication process before this

14   Court.

15          So in light of our belief that there is anything else

16   out there, we wanted to have this mechanism to require folks to

17   come before this Court and ask for relief from the plan

18   injunction before proceeding in another court, so that we could

19   vet whatever issues there could be with respect to whether they

20   even have a claim that wasn't discharged through the plan.

21          The last -- I shouldn't say the last.  Paragraph 13

22   is the paragraph preservation of insurance, the, quote/unquote,

23   insurance neutrality provision.  We had an insurance neutrality

24   provision that I thought was pretty clear, pretty short and

25   sweet, and we received an objection by the insurers that had a

1  much longer view of the world on insurance neutrality and what

2  it took to be truly neutral, and we've -- after a lot of back

3  and forth with the insurers, we agreed to make the change

4  that's reflected in the modification, which we think makes it

5  pretty clear that the plan is indeed neutral.

6          There is a provision that says that the insurers

7  aren't bound in a current or future litigation by any factual

8  findings or conclusions of law.  We changed that provision to

9  carve out the settlements that have been reached and that are

10  reflected in Section 4.4 of the plan and approved in the

11  confirmation order.  We make it clear that they are indeed

12  bound by that and their commitments thereunder.

13          Paragraph 14, we've made some changes to the Schedule

14  4.4 to update information, and we've attached an updated or a

15  supplement to Schedule 4.4, which is really the universe of the

16  environmental issues that confront the company.  And again,

17  it's our view that the settlements that have been achieved have

18  gone a long way to eliminating environmental -- these

19  environmental claims.

20                        (Pause)

21          MR. FELGER:  With that, I believe we've resolved --

22  with the modification that we filed yesterday, I believe we've

23  resolved all of the objections that have been filed to the plan

24  except for the objection of SL Industries.  Their objection

25  goes to whether they hold a claim with respect to the Puchack

57

1  Well Field Superfund site.  They believe under the <u>Frenville</u>

2  case that they do not hold a claim at this point.  The debtors

3  take a different view.

4       But what they've been requesting is language in the

5  plan or the confirmation order to preserve the right to sort of

6  fight about that issue later, and after a lot of back and forth

7  I think we've reached an agreement with respect to the language

8  that will resolve SL Industries' objection to the plan.  And if

9  you'll indulge me a moment, I'll try to locate that language.

10                              (Pause)

11       MR. FELGER:  Your Honor, what we've agreed to add to

12  the confirmation order is a new Paragraph 67 that will read as

13  follows.  "Notwithstanding anything contained in the plan,

14  Section 4.4 to the plan, the disclosure statement, any plan-

15  related document, and the confirmation order, nothing contained

16  therein shall effect or prejudice the right of SL Industries,

17  Inc. to assert that any obligations of the reorganized debtors

18  with respect to the Puchack Well Field Superfund site are

19  neither claims as defined in the plan and in the Bankruptcy

20  Code nor environmental claims as defined in the plan."  So

21  we've reserved the right for them to argue at a later point

22  whether they hold a claim or an environmental claim.

23       We've also agreed to two additional sentences

24  following the one I just read.  "And to the extent such

25  obligations are neither claims nor environmental claims, they

1  shall not be subject to the discharge or injunction provisions

2  contained in this confirmation order.  To the extent such

3  obligations are claims or environmental claims, they shall be

4  subject to the discharge and injunction provisions contained in

5  the confirmation order."

6          THE COURT:  And that language satisfies the objection

7  of SL Industries?

8          MR. FELGER:  I believe it does.

9          MS. POLLACK:  Yes, it does after --

10         THE COURT:  Ms. Pollack.

11         MS. POLLACK:  After a lot of hard work, it does.  In

12  addition to the language that we negotiated, it's our

13  understanding, as Mr. Felger went through some of the

14  provisions of the plan, that because the Puchack Well Field is

15  not part of the definition of government actions, which is a

16  new term that is part of these settlements, then those

17  provisions of the plan pertaining to government actions do not

18  apply to Puchack.

19         We'd further like the record to reflect that in the

20  event that Puchack is deemed to be an environmental claim, SL

21  Industries reserves its rights to seek to recover under any and

22  all applicable insurance policies.  And with that, we are

23  resolved.

24         MR. FELGER:  Yes, it's basically a reservation of

25  rights by both sides to address the -- for what of a better

59

1   word, the _Frenville_ issue at a later point.

2          THE COURT:  Are there other objections that were

3   filed that have been resolved?

4          MR. FELGER:  Well, we -- as I indicated earlier, we

5   had six plan objections.  The State of New Jersey objection was

6   withdrawn.  The objection by Camden County Municipal Utilities

7   Authority was resolved through our amendment and through our

8   modification.  We had the two objections by the two insurers

9   which have been resolved.

10         THE COURT:  By the language that you're adding and

11  the modification.

12         MR. FELGER:  The language and the modification and

13  the various settlements that we've reached.  We had an

14  objection by SL Industries, which we've just resolved with the

15  language -- the inclusion of the language into the confirmation

16  order.

17         And last, but not least, we had an objection raised

18  by the PRPs at Ewan, D'Imperio, and Lightman, Mr. Cohen's

19  clients, and they've agreed that the agreement in principal

20  that we have with the EPA and the path that we've laid out to

21  approve that settlement resolves their objection to

22  confirmation.  I think Mr. Cohen indicated that earlier this

23  afternoon.  So that resolves all of the objections that have

24  been filed.

25         We had four objections filed to the Schedule 8.1,

60

1  which I alluded to earlier.  We've resolved with respect to Mr.

2  Cohen's -- another one of Mr. Cohen's clients, PPL, and we've

3  -- with respect to Metropolitan Lumber, we've agreed to remove

4  that contract from Schedule 8.1, which we did.  And then with

5  respect to the objections by National -- Nationwide Industries

6  and National City Capital Commercial, we've agreed to adjourn

7  -- and we're going to need a date from Your Honor.  We've

8  agreed to adjourn the 365 -- all 365 issues with respect to

9  their contracts for approximately a month, so that we can

10 continue our discussions.  We've had discussions with both

11 parties in an effort to try to resolve the issues and just

12 haven't been able to get everything buttoned down yet.  So we

13 all thought it made since to put it off for about a month and

14 see if we can resolve those issues.

15        If Your Honor will indulge me for a moment, I did

16 make an agreement with Mr. Cohen to read certain language into

17 the record with respect to his Schedule 8.1 objection, and

18 perhaps rather than me fishing for it in my briefcase, if Mr.

19 Cohen has it, which I think he might, perhaps he can read it,

20 and I can acknowledge it.

21        MR. COHEN:  Sure.  Howard Cohen, Drinker, Biddle, and

22 Reath on behalf of PPL Energy Plus.  Let me read the language

23 on the record.  "PPL Energy Plus, LLC, PPL, and the debtors are

24 parties to certain agreements whereby, among other things, the

25 debtor agreed to buy energy from PPL at an agreed upon

1  contractual rate.  The debtors are assuming such agreements

2  under their third amended plan, which is the plan that is

3  before the Court today.  Accordingly, the debtors and/or

4  reorganized debtors will be required to perform going forward

5  in accordance with the terms of the agreement.

6         As of the petition date, no less than $646,936.95 was

7  due PPL under the agreement.  The debtors and/or reorganized

8  debtors agreed to pay PPL on the effective date of assumption

9  of the agreement all pre- and post-petition amounts owed PPL

10  through the effective date of assumption of the agreement."

11  That is the language, Your Honor.

12         THE COURT:  Mr. Felger.

13         MR. FELGER:  I would say that is accurate with two

14  modifications.  One is that the payment will be on as soon as

15  practical after the effective date, and the -- and we didn't

16  agree to the no less than language.  We agreed that the

17  obligation was, in fact, the amount that Mr. Cohen read in to

18  the record.

19         MR. COHEN:  Fair enough.  As of the petition date,

20  that was the correct amount.  With those representations, PPL

21  will agree that their objection is resolved.

22         THE COURT:  All right.  Mr. Felger.

23         MR. FELGER:  And Mr. Poslusny has just given me some

24  language that Nationwide Industries wanted us to add to the

25  confirmation order.  You'll recall that's the -- one of the two

1  objecting parties to Schedule 8.1 that we've agreed to adjourn.

2  They've asked us to add in to the plan, "Notwithstanding

3  anything in the plan to the contrary, the debtor, the

4  reorganized debtor, and Nationwide Industries, Inc. reserve all

5  rights under Section 365 if the cure claim cannot be resolved,"

6  which is perfectly fine with us.

7       Your Honor, based upon the record created today,

8  including all of the exhibits that we've presented to Your

9  Honor, specifically, the declarations of McElheny, Grabell,

10  Jacoby, and Victor, we believe that the requirements of 1129(a)

11  and (b) have been met, and that the plan ought to be confirmed.

12       In addition to the exhibits that we have presented in

13  the binder and the declarations that I've just mentioned, I'd

14  like to make a proffer of testimony on behalf of Sean Ozbalt in

15  support of confirmation.  And Mr. Ozbalt is in the courtroom

16  today, and if called to testify, Mr. Ozbalt would testify that

17  he's an officer of Arch Acquisition I, LLC and is authorized to

18  make this declaration on behalf of Arch.

19       He would testify that Arch is a post-petition lender

20  of the debtors and the plan funder as such terms defined in the

21  debtors' third amended joint plan of reorganization.  That Arch

22  is an affiliate of Signature Aluminum, a leading aluminum

23  extrusion business in North America with eight facilities in

24  the U.S. and Canada that manufacture aluminum log, billet, and

25  extruded products.  He would testify that Signature is a

portfolio company of HIG Capital, a leading private equity

investment firm with in excess of $6.5 billion of committed

equity capital available to support its investment activities.

Mr. Ozbalt would testify that Arch's commitment to

acquire the membership interests in Shapes/Arch is expressly

conditioned upon the execution of new collective bargaining

agreements with the debtors' unions on terms acceptable to

Arch.  Arch is in receipt of new collective bargaining

agreements that have been executed by the debtors' unions and

the terms of new collective bargaining agreements are

acceptable to Arch.  He would testify that the new collective

bargaining agreements became effective on July 1, 2008 subject

to confirmation of the plan, and, as such, this condition to

confirmation has been satisfied.

He would also testify that in consideration for

receiving 100 percent of the new LLC interests in reorganized

Shapes/Arch Holdings, LLC it will be issued as of the effective

date of the plan.  Arch or its designee has committed to the

follow, (1) to provide all necessary funding to met its

obligations under the plan funding commitment as defined in

Sections 1.88 and 5.5 of the plan, including the exit facility

as defined in Sections 1.59 and 5.4 of the plan, (2) to provide

all necessary funding to pay or cause the reorganized debtors

to satisfy the plan funding commitment excluded items as

defined in Section 1.87 of the plan, and (3) to unconditionally

1  guarantee the plan note to be issued by the reorganized debtors

2  under the plan, if necessary.  Further, HIG is committed to

3  unconditionally guarantee the plan note if it becomes necessary

4  to issue the plan note.

5        Lastly, Mr. Ozbalt would testify that Arch or its

6  designee has or will have on the effective date funding

7  sufficient to satisfy all of its obligations under the plan and

8  intends to provide the requisite funding on the effective date

9  in order for the plan to become effective and be consummated.

10        THE COURT:  Does anybody have any objection to the

11  Court considering the proffer by Mr. Felger or want the

12  opportunity to examine the witness on the stand?

13        MS. COBB:  Are you asking for an objection to the

14  plan?

15        THE COURT:  No, I'm asking if anybody objects to the

16  testimony of Mr. Ozbalt being allowed as a proffer rather than

17  taking his testimony or anybody wants to question him.

18        MS. COBB:  No.

19        THE COURT:  All right.  Hearing no objection, the

20  Court will accept the testimony -- the proffer of the testimony

21  as offered by Mr. Felger and dispense with the necessity for

22  actual testimony.

23                    (Pause)

24        MR. FELGER:  Your Honor, we've -- we submitted a form

25  of confirmation order yesterday, and we've throughout the

1   evening and the day have made changes to the confirmation

2   order, as Your Honor probably expects.  And what I'd like to do

3   is walk through the changes that we've made to the confirmation

4   order to address additional concerns raised by various parties.

5                           (Pause)

6               THE COURT:  Before we go over that, should we not

7   just have an overview of the debtors' meeting 1129(a)?  I think

8   that's pretty much addressed by virtue of the declarations that

9   you filed here, but the issue of 1129(b), how you believe that

10  it's been met by the debtor.  And then let's hear if anybody

11  else has anything on the record before we get to the entry of

12  the order.

13              MR. FELGER:  Right.  Let's go right to the bible.

14              THE COURT:  Okay.

15              MR. FELGER:  As we've indicated, earlier, Your Honor,

16  Classes 7 and 9 have not voted to accept the plan.  Class 7 is

17  a class of secured creditors.  Class 9 is a class of unsecured

18  creditors.

19              With respect to Class 7, which are insurers under

20  workers comp programs, where they're holding collateral to

21  secure the debtors' deductible obligations.  It's our view that

22  the debtors -- that the insurers are holding considerably more

23  collateral than is necessary to cover their exposure under

24  their -- with respect to their workers comp programs.  So what

25  we've agreed to do is to address that issue at the end of

1    September, but basically what we're looking to do is to fix the

2    amount of their secured claim, determine what the amount of the

3    secured claim is, and enable them to hold collateral sufficient

4    to -- of the collateral that they have to cover their claim.

5              So 1129(b) -- 1129(b)(2)(a) sets out, "With respect

6    to a class of secured claims, the plan provides that the

7    holders shall retain the liens to the extent of the allowed

8    amount of such claims," which is precisely what we're

9    providing, "and that such holder shall receive on the account

10   of such claim deferred cash payments totaling at least the

11   allowed amount of the claim as of the effective date of the

12   plan," which again is what we're providing.  That they have

13   exposure.  They have collateral.  We're going to fix the amount

14   of the collateral, and they'll be fully secured and paid and

15   treated in a manner consistent with 1129(b)(2)(a).

16             THE COURT:  With regard to Class 9?

17             MR. FELGER:  Class 9 is a class of unsecured claims,

18   so we're looking at 1129(b)(2)(b), and it provides, "With

19   respect to a class of unsecured claims," and it's either (a) --

20   either (1) -- Romanette 1 or Romanette 2.  And Romanette 2

21   says, "The holder of any claim or interest that's junior to the

22   claim -- claims of such class will not receive or retain under

23   the plan on account of such junior claim or interest any

24   property."  And then it goes on to address an exception in the

25   case of an individual.

1              Here the Ben, LLC interests are being canceled under

2    the plan, and new interests are being issued to a new party,

3    our plan funder, for considerable and fair consideration.  So

4    based upon the requirements of 1129(b)(2)(a) and (b)(2)(b), we

5    believe that the plan is confirmable over the non-vote of Class

6    7 and the rejecting vote of Class 9.  As we indicated earlier,

7    and as the declaration sets out, the other impaired classes

8    have voted in favor of the plan, and, in fact, the Class 10

9    trade creditors have voted overwhelmingly in support of the

10   plan.

11             THE COURT:  And do I understand correctly that the

12   Class 9 creditors would be -- the ones that haven't resolved it

13   would be subject to whatever insurance coverage there is to the

14   extent there is --

15             MR. FELGER:  Correct.

16             THE COURT:  -- would be treated in any deficiency as

17   an unsecured creditor?

18             MR. FELGER:  Correct.  To the extent that there are

19   any remaining environmental claims -- and the only one we

20   believe is out there is this NRD claim by NJDEP -- that's how

21   they'd be treated, through insurance.  And if there's any

22   deficiency, it would fold into Class 10.  The beauty of these

23   settlements is that it really gets us to a point where we

24   believe there will be very little, if any, claims that spill

25   into Class 10.

1                    THE COURT:  Mr. Halperin.

2                    MR. HALPERIN:  Your Honor, Alan Halperin.  Just for

3     the record, from the preliminary information the Committee has

4     -- obviously, we need to do some more homework, and there's

5     been a lot of work going just to make sure the plan applies.  I

6     believe Mr. Felger's correct.  I don't believe there will be

7     very little spillover.  We don't believe there will be any

8     based upon what we've heard from the insurance policies.  In

9     fact, there will probably be oodles of coverage left at the end

10    of the day.  The waterfall makes perfect sense.  It works.  I

11    only bring this up just to make it clear that the Committee is

12    reserving the Class 10 Trustee's rights to address these claims

13    to the extent it does impact the ability of the Class 10

14    Trustee to make distributions to other unsecured creditors.  It

15    will be dealt with, but yes, the waterfall would work that way.

16                    THE COURT:  Which would meet the absolute priority

17    rule and allow an 1129(b) confirmation.

18                    MR. HALPERIN:  Absolutely.

19                    THE COURT:  Does anybody else want to be heard with

20    regard to confirmation of the plan?

21                    MR. FRANKEL:  Your Honor, this is Don Frankel with

22    the Justice Department representing the EPA.

23                    THE COURT:  Yes, Mr. Frankel.

24                    MR. FRANKEL:  We have an issue with respect to the

25    plan modifications, Paragraph 3, the last sentence of it is

1  inaccurate, and it may be that the debtors were intending to

2  make this change.  But it reads, "With respect to the Puchack

3  Well Field Superfund site, comma, the EPA is treating this site

4  as a discharge site and covenanting to sue the debtors with

5  respect to this site, comma, but the EPA is not providing

6  contribution protection with respect to this site."  Our issue

7  with that language is that -- well, first, we're obviously not

8  covenanting to sue the debtors, and, in fact, we're not

9  providing any covenant not to sue with respect to the Puchack

10  site.  So we would ask that that sentence be revised to -- just

11  to make it accurate.

12          THE COURT:  Mr. Felger.

13          MR. FELGER:  Yes, so then I -- and I apologize.  I

14  neglected to say this as I went through, but I made a mental

15  note to do it and then got distracted.  We have made additional

16  changes to the confirmation order to address the additional

17  sort of late-in-the-day changes requested by the EPA, and

18  that's one of them.  So we've made that -- we've made that

19  change in the revised version of the confirmation order, but I

20  just haven't gotten to walking through the revisions to the

21  confirmation order yet.  So that -- we've addressed that.  Mr.

22  Frankel raised that concern with us, and we've addressed it in

23  the confirmation order.

24          THE COURT:  Is that satisfactory to you, Mr. Frankel?

25          MR. FRANKEL:  Yes, it -- once I hear what their fix

1  is in the confirmation order, I think it'll be satisfactory.

2          THE COURT:  All right.  We'll hold your objection

3  until we get to that.

4          MR. FRANKEL:  Okay.  I had a couple of other issues

5  with the confirmation order as well, but I want to hear what

6  changes are being made before I raise any of those.

7          THE COURT:  Okay.  Fine.  Yes?

8          MS. COBB:  Excuse me, Your Honor.  Carol Cobb from

9  Giansante & Cobb on behalf of Ward Sand & Materials Company,

10  Incorporated.  We are the former owner of the Pennsauken

11  landfill.  We just had a couple of -- first of all, I just

12  wanted to say we didn't get this until 3:15 yesterday, and

13  that's why nothing was formally filed.  I was in a deposition.

14  I didn't get out of there until 5:45.  I didn't have the

15  opportunity to do anything between then and now, and I wanted

16  the opportunity to discuss it with my client.

17          First, it appears to us as though this -- the

18  settlement, at least in our case -- and I'm not going to speak

19  to the NJDEP or the EPA -- is mainly to benefit the insurance

20  company and not the debtor.  They're trying to discharge all

21  liability towards insurance, and after this is confirmed we are

22  permanently enjoined, barred, and restrained from instituting,

23  prosecuting, or litigating in any manner any claim or action

24  for contribution against the debtors and the reorganized

25  debtors together with such parties, successors, assigns, and

1  insured based upon liability or responsibility or asserted or

2  potential liability or responsibility either directly or

3  indirectly of the debtors or the reorganized debtors arising

4  from or related to the claims, acts, facts, transactions,

5  occurrences, statements, or admissions that are, could have

6  been, or may be alleged in the government's actions or the

7  Pennsauken litigation or any other action brought -- that might

8  be brought by, through, or on behalf of for the benefit of the

9  EPA, the NJDEP, the Pennsauken landfill litigation plaintiffs.

10         There are other actions.  We -- I know the Harris

11  action was excluded, but that's coming back, Your Honor.  I

12  have talked to the plaintiffs in that action.  Yes, we are up

13  at the Appellate Division.  They all got out on statute of

14  limitations issues.  They're going to rename the class.  It's

15  going to be minors.  There's no statute of limitations issues

16  with regards to the minors.  We just want to be protected from

17  that, and the way we want to be protected from that is to be

18  able to do discovery, but we're also barred from discovery.

19         If the plaintiffs want to -- the plaintiffs of

20  Pennsauken want to agree to not do any discovery against the

21  debtors, that's okay with us, but I don't know why in the plan

22  we are now barred from obtaining discovery from the debtors and

23  reorganized debtors or developing evidence in discovery against

24  the reorganized debtors.  If we're left behind and the

25  plaintiffs are responsible for this matter, we would like to

pursue it against Aluminum Shapes as if they were in there,

because we would like their liability, of course, to be as

large as possible, so that the plaintiffs have to offset this

amount to our litigation.  We really want the right to have

discovery in this matter.  We feel that this plan is barring us

from doing that, and that's mainly our main concern with

regards to it.

        We were in Exide, Metal Bank of America, and we were

also in King Arthur.  In every one of those litigations we

lifted the stay, and we moved against insurance companies, and

we took what we got, and we moved forward.  In this one they're

settling within.  They're restricting our rights, and I think

the winner in this case is the insurance companies.

        THE COURT:  Mr. Felger.

        MR. FELGER:  I think what I'm hearing is the same

objections that we've heard from the joint defense group, and I

mean perhaps what makes sense is for me to take a minute to see

if that same resolution works for -- on that issue -- works for

the Ward Sand issue.  It seems it's the same -- they're raising

the same issue that -- I believe they're raising the same issue

that the joint defense group folks raised, which was resolved

in our consent order.  Perhaps you can indulge -- I don't know

if others wish to be heard.  Maybe we should hear from others.

        MS. WOLFE:  Your Honor, I represent one -- two of the

transporters, Nicholas Brothers and Twentieth Century, and

1    we've been sitting here since 10:00, and literally, with the

2    exception of speaking with debtors' counsel for about five

3    minutes, all of this is a mystery to us.  I did not receive the

4    plan modification.  I didn't -- you know, other than what

5    counsel read, without having it in front of me, I need to

6    reserve my right to object to that to the extent it affects the

7    rights of my client, and I haven't had the opportunity to do

8    this.

9         The other issue from my standpoint is the proof of

10   claim issue, which you were not now hearing today, which is why

11   I was here, is now being postponed towards August.  I would

12   like to be able to determine a date that's convenient for me as

13   well, and maybe the other transporters who have been sitting

14   here to ten hours, as opposed to -- I'm just not sure.  I don't

15   have my calendar here.  But the issues raised by Ward Sand are

16   also an issue to us.  To the extent that the debtors'

17   allocation is larger, that decreases our responsibility.  So I

18   need to look at that plan and those hold harmless agreements,

19   you know, before I can say I have no objection to the plan, and

20   that's not something that was provided to me.

21        THE CLERK:  State your name for the record, please.

22        MS. WOLFE:  Mary Elizabeth Wolfe.

23        MS. SOUTHALL:  Good evening, Your Honor.  Samantha

24   Southall, Buchanan, Ingersoll, and Rooney, for Creditor Waste

25   Management of New Jersey, and I just want to go on record as

1   joining in Ms. Cobb's comments.

2           MS. FLEMING:  I'm Marlene Fleming.  I represent A.

3   Marianni's Sons.  We are also a transporter in the case and

4   have the same issues as raised by Ward Sand and Waste

5   Management.

6           THE COURT:  Mr. Felger.

7           MR. FELGER:  Well, it sounds like they have the

8   concerns that the joint defense group had, which were resolved

9   in the consent order as opposed to in the confirmation order.

10  The issues with discovery, I don't know how we help them with

11  that.  The Pennsauken litigation's been going on 20 years.  As

12  I understand it, discovery is closed, so I don't know what they

13  do with respect to discovery in that litigation when it's

14  closed.

15          But with respect to the relief that was afforded to

16  the other co-defendants in resolution of their similar concerns

17  with the plan modification -- and I'm going to need just to

18  chat briefly with our plan funder, but perhaps that's the --

19  that's the way to resolve that issue.

20          THE COURT:  Well, I mean I do recognize that you made

21  these modifications, and they haven't really had a lot of

22  chance to review them, go over them with their clients, and

23  determine what the impact is upon them.  I mean the result may

24  be that they -- you know, their claims will get what their

25  claims get, but if you can resolve some of these issues with

1  regard to some of their concerns, I think that would be

2  helpful.  I mean it's hard for me to say, well, they can't

3  raise their objections now when you made substantial changes in

4  the plan by virtue of the modification that was filed.

5           MR. FELGER:  Understood.

6           THE COURT:  Well, it's 7:00.  What would you propose

7  we do?

8           MR. BRODY:  Your Honor, if I may?

9           THE COURT:  Mr. Brody.

10          MR. BRODY:  If I may?  When somebody has been here

11 for so long as everybody in this courtroom, we've now been here

12 since before 10:00, all working towards resolution of

13 resolution of resolution.  It seems that we've done this so

14 many days.  But I have to speak up when I hear somebody who

15 stands here and says, Your Honor, I've been here for ten hours,

16 and nobody has talked to me, or, Your Honor, I've been here ten

17 hours, and this is the first I'm hearing about it.  Or worse,

18 Your Honor, I've been here ten hours, and I just got to read

19 something, and now I have to call my client.  I'm sorry, Your

20 Honor, I have to speak up.  Maybe most of us have been working

21 around the clock to get this done.  The plan modification was

22 sent to her yesterday.  She's been here all day.  I've been

23 walking around.  Mr. Felger's been walking around.  Poslusny's

24 walking around.  The Creditors' Committee's been walking

25 around.  Not once did these people come and say I'd like to see

1  if I could work this out.  We need to get this done.  They've

2  had every opportunity.  Every opportunity.  They chose to sit

3  here.  I can't force them to come to me, because most of the

4  four people that came here I didn't even know had a problem.

5  Your Honor, you're right.  It is 7:00.  This is the last issue

6  that's on the table.  We need to confirm.

7          THE COURT:  All right.  Can -- do you think that a

8  few minutes of time to discuss this would be helpful?

9          MR. BRODY:  Your Honor, I think that two minutes of

10  this time is all that it's going to take.

11          THE COURT:  All right.  Let's take five, as it never

12  takes what is said.

13          MR. BRODY:  Thank you, Your Honor.  I appreciate

14  that.

15          THE COURT:  We'll be back in five minutes or so.

16          MR. FELGER:  Your Honor, that's a hard five?

17          THE COURT:  Yes, I'm going to be up at five after.

18  See what you can do to get these things resolved.  Mr. Cohen,

19  Mr. Frankel, and Mr. Klein, do you want to stay on hold or --

20          MR. COHEN:  Your Honor, let's stay on hold.

21          THE COURT:  All right.  I'm just going to leave you

22  on here in the courtroom, and you'll hear a lot of commotion

23  and discussion.  They're going to be on the phone, if that's --

24          MR. BRODY:  Yes, Your Honor, we don't want to lose

25  anybody.

77

1          THE COURT:  All right, so if you'd just be patient,

2     in about five or six minutes we'll be back on the record.

3          MR. COHEN:  Thank you, Your Honor.

4

5                         (Recess)

6          THE COURT:  Be seated.  Mr. Cohen, are you still on

7     there?

8          MR. COHEN:  Yes, Your Honor.

9          THE COURT:  And Mr. Frankel and Mr. Klein?

10         MR. KLEIN:  Yes, Your Honor.

11         THE COURT:  Mr. Felger.

12         MR. FELGER:  Yes, Your Honor.

13         THE COURT:  How are we doing?

14         MR. FELGER:  Thank you again for indulging us.  I'm

15    unfortunately looking for my plan modification.  I seem to be

16    misplacing my operative documents quite a bit today.

17         THE COURT:  Well, there are a few of them.

18         MR. FELGER:  Yes.  Your Honor, what we've agreed to

19    do is to -- and again it would be done in the confirmation

20    order -- is that we are going to modify the -- in Section -- in

21    Paragraph 6, Section 4.4, the seventh paragraph that begins,

22    "Notwithstanding anything else to the contrary."  At the bottom

23    of that paragraph on that page the last line begins,

24    "Reorganized debtors."

25         THE COURT:  Paragraph 6.

                    J&J COURT TRANSCRIBERS, INC.

1          MR. FELGER:  I'm sorry.  I'm sorry.

2          THE COURT:  Paragraph 6.

3          MR. FELGER:  And I apologize that these -- there's no

4    page numbers.  One, two --

5          THE COURT:  Okay.  Well, I'm at Page 6.

6          MR. FELGER:  The fifth page.

7          THE COURT:  Okay, the fifth page?

8          MR. FELGER:  Yes, the paragraph in the middle of the

9    page.  It begins, "Notwithstanding anything else."

10         THE COURT:  I must have counted wrong.

11         MR. FELGER:  Do you have the plan modification?

12         THE COURT:  I've got the plan modification.  I have

13   Section 6.  It says, "Section 4.4 is hereby modified as

14   follows," at the top.

15         MR. FELGER:  Right, and turn two pages from there.

16         THE COURT:  Okay.  Okay.  I've got,

17   "Notwithstanding."

18         MR. FELGER:  "Notwithstanding."  The bottom of that

19   page, the line that begins, "Reorganized debtors," there's a

20   parenthetical that says, "except in the Pennsauken litigation."

21   And then on the top of the next page there's another

22   parenthetical that provides, "except in the Pennsauken

23   litigation."

24         THE COURT:  Right.

25         MR. FELGER:  And what we've agreed to do is to strike

1  those two parentheticals and to add a new parenthetical at the

2  end of that line that provides that, "Nothing contained herein

3  is intended to enlarge or limit the discovery that's available

4  in the applicable litigation."  So that the intent is we're not

5  looking to modify whatever rights folks have to discovery in

6  the particular litigation that's affected.

7           THE COURT:  Ms. Cobb, does that satisfy you?

8           MS. COBB:  Yes, it does, Your Honor.  I'm not going

9  to withdraw my --

10          THE COURT:  Can you just come up here, because I

11 won't be able to get you recorded?

12          MS. COBB:  Okay.  With respect to the confirmation of

13 the plan that does.  I cannot withdraw my claim until I talk to

14 my client.  And with all due respect, I printed this out last

15 night.  I did approach somebody at 9:00 this morning, and I

16 don't want anybody to think that we were just sitting around

17 waiting.

18          THE COURT:  Well, I -- everybody's tired now.

19          MS. COBB:  Yes, I know.

20          THE COURT:  The temperature in here has gone up.

21 Apparently, the air conditioning stops at a certain point.

22          MS. COBB:  Yes, I understand.

23          THE COURT:  And not within my control, and so I think

24 everybody -- and I recognize that I think everybody here who's

25 been involved has been trying to fight so many fires that maybe

1  it just didn't get done, this one issue.  So --

2          MS. COBB:  Yes, and I appreciate that.

3          THE COURT:  -- that notwithstanding --

4          MS. COBB:  Yes.

5          THE COURT:  -- are you satisfied now with the

6  language, and whatever else happens with your claim will be --

7          MS. COBB:  It will be held for another day.

8          THE COURT:  Exactly.

9          MS. COBB:  Thank you.

10          THE COURT:  Thank you.  Anybody -- any of the other

11  parties who came up?  I don't remember everybody's name, but

12  does anybody have any problems with this change in the

13  language?

14          MS. SOUTHALL:  Good evening, Your Honor.  Samantha

15  Southall.  We have no -- we're fine with the changes.

16          THE COURT:  Counsel.

17          MS. WOLFE:  Your Honor, Mary Elizabeth Wolfe.  We

18  have no problem, and if we could schedule the proof of claim

19  motion for --

20          THE COURT:  We will.  As soon as we get this done,

21  we'll pick a date that's avail -- that everybody's available.

22          MS. WOLFE:  Thank you, Your Honor.

23          MS. FLEMING:  Marlene Fleming for A. Marianni's Sons.

24  We have no problem with the language as it's stated.

25          THE COURT:  Mr. Felger, while we have everybody here,

1   why don't we pick a date to have this motion heard.  I know we

2   talked about some time in August.  Is that what -- I'm trying

3   to remember, because I know we have several things scheduled.

4            MR. FELGER:  I think we --

5            MR. BRODY:  August 12 at 10:00 would be fine, Your

6   Honor.

7            MR. FELGER:  We agreed to August 12th at 10:00.

8            THE COURT:  Okay.  These issues --

9            MR. BRODY:  That's the same day.

10           THE COURT:  -- will also be August 12th?

11           MR. FELGER:  That's the 503 --

12           MS. WOLFE:  Your Honor, I don't think I'm available

13  that day.  I know the 25th was mentioned as well, and that

14  would be a day I was available.  But that -- I have court-

15  ordered depositions that day, the 12th.

16           THE COURT:  Can we change the date?

17           MR. FELGER:  How about the 11th?  I think mentioned

18  the 11th might be available.

19           THE COURT:  The 11th is a Monday.  I could do it that

20  day.  The only thing is these hearings tend to take up time,

21  and I have my whole motion list.  But I also have the 14th.

22  Would that --

23           MS. WOLFE:  The 14th, that would be fine.

24           THE COURT:  How about you, Mr. Felger?

25           MR. FELGER:  The 14th works.

82

1           THE COURT:  How -- anybody else have a problem with

2  the 14th?

3                    (No verbal response)

4           THE COURT:  All right.  Let's change that 503 motion.

5  It'll be on August 14th at 10:00.  In the meantime, hopefully,

6  you will reach out to each other and maybe resolve some of

7  these issues.

8           MR. FELGER:  Yes, I will certainly endeavor, Your

9  Honor.

10          THE COURT:  All right.  That now being resolved, are

11 we ready to move forward for confirmation?

12          MR. FELGER:  Yes.  I wanted to make one

13 clarification.  Is Mr. Frankel still on the line?

14          MR. FRANKEL:  Yes, I am.

15          MR. FELGER:  Okay.  No need.  No need.  I thought

16 there was a clarification necessary.  What I'd like to do is

17 walk through the changes to the confirmation order, Your Honor.

18 Does Your Honor have a copy of the confirmation order that was

19 submitted yesterday?

20          THE COURT:  Findings of fact and conclusions of law

21 and order?

22          MR. FELGER:  Yes.

23          THE COURT:  Yes.

24                    (Pause)

25          THE COURT:  Mr. Felger, I just want to bring up

83

```
 1   something.  It's in the order, but I might as well.  I did tab

 2   it, but you're asking me to make the order effective

 3   immediately and waive Rule 3020(e) in the order.  I really

 4   didn't see that in anything -- maybe you can point me to it --

 5   in anybody's declaration, and so I need something on the record

 6   as to you're requesting that relief and the basis for your

 7   request rather than just having it in the order.

 8                       (Pause)

 9            MR. FELGER:  Your Honor, I just had a quick caucus

10   with the Committee and HIG, and I think the view is that we

11   would like that relief.  We believe that really is appropriate

12   under the circumstances.  The --

13            THE COURT:  I need you to make a record as to the

14   reasons that you need that, then I can grant it.

15            MR. FELGER:  Right.

16            THE COURT:  You put in the order -- I can glean from

17   most of the other issues -- you know, all the declarations you

18   filed all the different issues with regard to the confirmation.

19   Nowhere do I recall seeing the reason -- I have in my mind what

20   I think is the reason, but if you would just elucidate the

21   Court on why this is necessary for the debtor to have this

22   relief, and then I can just rule on it.

23            MR. FELGER:  Right.  The -- obviously, the debtors

24   have been operating in pretty precarious financial straits

25   prior to the bankruptcy and throughout the course of the
```

84

1 bankruptcy, and that really hasn't changed.  It's critical, in

2 our view, that we get to closing as soon as possible given sort

3 of the vagaries of the debtors' sales and financing needs.

4 We're hopeful that we'll be able to close as early as -- you

5 know, we're prepared to close tomorrow if HIG is prepared to

6 close.  So I think the real need here for having that relief is

7 driven by the debtors' financing needs and overall financial

8 condition at this point.

9            THE COURT:  Anybody want to add anything?  Mr.

10 Halperin.

11            MR. HALPERIN:  Your Honor, the debtor is operating

12 pursuant to a specific budget, and as Mr. Felger indicated

13 earlier, there is a cap as to the funding under the plan.

14 There's some wiggle room.  That's what the plan note was about,

15 but that is only in the event we get to the point that we all

16 hope we'll never get to, which is $90 million.

17            There have been efforts both by Phoenix for the

18 debtor and J.H. Cohn for the Committee to fix what the numbers

19 are that are necessary to confirm and to make sure that, in

20 fact, we will fall within the cap, which is a plan condition

21 and the conditioned funding of the plan.  We think we're there.

22 We think we have some cushion, but there are certain things

23 that may ultimately hit or not hit depending upon where certain

24 admin claims come in that haven't been dealt yet, depending

25 upon whether we go through another payroll period, which if we

1    go past the end of the month, we're going to hit another one,

2    and that adds more money on to the administrative expense.

3            So it's more out of an abundance of caution.  We hope

4    we won't need it, but we could find ourselves in a position

5    where, in fact, we are bumping up against that cap.  We don't

6    have the ability to close in shorter than ten days, and,

7    therefore, it is necessary.  Hopefully, it won't be used, but

8    it's necessary to have it in the arsenal just in case,

9    otherwise, the plan in theory could unravel.

10            THE COURT:  Thank you.  I'm satisfied that you've met

11    the standard that you need to satisfy the Court that the waiver

12    of Rule 3020(e) is appropriate in this particular case.  I

13    haven't heard any objection from anybody.  I will allow that to

14    be part of the order.

15            MR. FELGER:  Thank you, Your Honor.  Working through

16    the confirmation order, Your Honor, the first change is on Page

17    16, Paragraph 28, where we've added, "The clarification free

18    and clear of all claims that arose on or before the effective

19    date."

20            THE COURT:  All right, and that -- that goes at the

21    end?

22            MR. FELGER:  Your Honor, I apologize.  I thought we

23    had given you a black line, but perhaps that hasn't happened.

24            THE COURT:  No, I just have the original copy.

25                    (Pause)

                    J&J COURT TRANSCRIBERS, INC.

86

1         MR. FELGER:  May I approach?

2                      (No verbal response)

3         THE COURT:  Okay.

4         MR. FELGER:  It's on Paragraph 28.

5         THE COURT:  "Free of any restrictions?"  Is that

6    the --

7         MR. FELGER:  Yes, we've added, "that arose on or

8    before the effective date."

9         THE COURT:  Okay.

10        MR. FELGER:  In Paragraph 29, we've added that same

11   parenthetical, also capitalized liens and claims as they are

12   defined terms in the plan.

13        In Paragraph 30, we need to insert a hearing date.

14        THE COURT:  And is that -- that's the August 14th

15   that we just -- right?  This is on the -- or do you want a

16   different date for the executory contract?

17        MR. FELGER:  Perhaps a later date.  I think you had

18   an August 25th date perhaps?

19        THE COURT:  25th.  That's a motion day.  I mean if

20   you think that it's not going to be a whole-day affair, we can

21   put it on at 2:00 on the 25th.

22        MR. FELGER:  I don't think it's going to be a lengthy

23   hearing.

24        THE COURT:  All right.  August 25th at 2:00.

25        MR. FELGER:  Okay.  In addition, we agreed to add a

1  sentence, at the end of that sentence inserting the hearing

2  date, at the request of Nationwide Industries.

3  "Notwithstanding anything in the plan to the contrary, the

4  debtor or reorganized debtor and Nationwide Industries, Inc.

5  reserve all rights under 365 if the cure claim cannot be

6  resolved."  And that's language I read into the record earlier.

7           THE COURT:  And do you have a copy with that language

8  in it?

9           MR. FELGER:  No, I do not.  That's a new insert.

10  We're going to have to make a further revision and submit it to

11  Your Honor.

12          THE COURT:  All right.  Well, can we conclude the

13  hearing today and have the order entered tomorrow but be

14  effective today?  Would that be satisfactory to you, Mr. Brody?

15          MR. BRODY:  Yes, it would, Your Honor.  As long as

16  all the statements -- all the changes to the order are read

17  into the record and the record is so ordered, that would be

18  fine, Your Honor.

19                     (Pause)

20          MR. FELGER:  The next change is a cleanup change on

21  Paragraph 49, "and discharge, except as otherwise provided for

22  in the plan, this confirmation order."

23          THE COURT:  What page was that?

24          MR. FELGER:  Paragraph 49 --

25          THE COURT:  Paragraph.

                    J&J COURT TRANSCRIBERS, INC.

88

1            MR. FELGER:  -- Page -- it's Page 30 in my copy, but

2   I'm not sure if it's Page 30 in Your Honor's copy.

3                      (Pause)

4            MR. FELGER:  I'm sorry, Your Honor.  There is one

5   more change going back.  I'm trying to keep all my notes

6   straight here.  End of Paragraph 35, plan administration

7   agreement, we're adding a sentence to the end of Paragraph 35.

8   It says, "The plan does not provide for the substantive

9   consolidation of the debtors following the effective date, but

10  the holders of claims in Class 10 shall be deemed filed against

11  the consolidated debtors and shall be deemed one claim against

12  or obligation of the debtors as if they were consolidated and

13  shall receive one distribution from the debtors' estates in

14  accordance with Section 4.5 of the plan."  Just to make it

15  clear that all of the creditors are treated in Class 10 with

16  one claim against the pool.

17           We have a small change in Page 32, Paragraph 50, a

18  parenthetical in the middle of the page, "including without

19  limitation Section 3.7 of the plan," rather than, "hereof."

20           We have a small change in 52, "preservation of

21  insurance."  "The confirmation order," changed to, "This

22  confirmation order."

23           In Paragraph 60 on Page 37 of my version we're adding

24  the following at the end of that paragraph.  Paragraph, "This

25  order controlling."  At the end we're going to add, "Provided,

1  however, that in the event of any inconsistency between this

2  order and Section 6.2, 11.8, and/or 11.10 of the plan, those

3  plan sections shall govern."

4          On Page 38 in Paragraph 64, "Plan modification,"

5  we've added two sentences there which addresses the settlement

6  with the joint defense group.  It reads as follows.  "In the

7  seventh paragraph of Section 4.4 of the plan modification the

8  following shall be added to the first sentence after the word

9  contribution at the end of the sixth line, 'or joint and

10 several liability.'"

11         Also, the following shall be added to the end of the

12 same sentence, "except to defend any action brought by any such

13 party for contribution or joint and several liability."

14         In Paragraph 65, "the settlement of the environmental

15 claims of NJDEP and Pennsauken," in Romanette 3 at the bottom

16 of the page, at least on my version the bottom of the page, the

17 words "are approved in their entirety" has been edited to read,

18 "are incorporated herein and approved in their entirety."

19         The next page in Paragraph 65 we made a change to

20 strike, "Notwithstanding the foregoing the Court notes that,"

21 and have inserted, "with respect to the paragraph in Section

22 4.4 of the plan modification describing the settlement with,"

23 and we struck five lines of text to remove the EPA from that

24 paragraph principally, so that it now reads, "The settlement

25 with the Pennsauken landfill plaintiffs."  The first sentence

1  is revised as follows.  It provides, "In accordance with the

2  terms of the settlement agreement and general liability release

3  between the debtors and Pennsauken landfill plaintiffs,

4  Pennsauken landfill plaintiffs shall receive the sum of

5  $450,000, and the debtor shall address hexavalent chromium

6  issues with respect to the Pennsauken landfill MW6 in full and

7  complete satisfaction of the Pennsauken landfill plaintiffs'

8  claims, paren, as that term is defined in the Pennsauken

9  agreement against the debtors including all claims raised in

10  the litigation referenced on Page 24 of the disclosure

11  statement, paren, defined term, the Pennsauken litigation."

12         And then we've added 66 -- Paragraph 66 to describe

13  the settlement or the state of the settlement of the

14  environmental claims of EPA, and that reads as follows.  "The

15  debtors and EPA have entered into an agreement in principal

16  subject to the approval of the appropriate governmental

17  officials that is generally described at Section 4.4 of the

18  plan.  If the debtors and EPA are able to consummate this

19  agreement, a settlement agreement will be lodged with the court

20  and subject to a public comment period that shall be no more

21  than 30 days.  At the time the settlement agreement is lodged

22  with the court, the reorganized debtors will request that the

23  Court approve the settlement agreement, but the hearing on the

24  reorganized debtors' request shall not be held until the United

25  States informs the Court of any public comments on the

1  settlement agreement and the United States' responses to those

2  comments.  After the close of the public comment period the

3  United States will file with the Court any comments received as

4  well as a United States response to the comments, and, if

5  appropriate, will request that the Court approve the settlement

6  agreement.  The United States may withdraw or withhold its

7  consent if the comments regarding the settlement agreement

8  disclose facts or considerations indicating that the settlement

9  agreement is not in the public interest.  With respect to the

10 paragraph in Section 4.4. of the plan modification describing

11 the contemplated settlement with the PA, the last sentence is

12 revised to read as follows, 'The settlement agreement is

13 expected to treat the Puchack Well Field Superfund site as a

14 discharged site but not provide contribution protection with

15 respect to that site.'"  And that addresses Mr. Frankel's

16 comment from earlier in the hearing.

17         We've also agreed to add the paragraph that I read

18 into the record earlier, Paragraph -- which would be Paragraph

19 67 of the confirmation order, which will read as follows,

20 "Notwithstanding anything contained in the plan, Schedule 4.4

21 to the plan, the disclosure statement, any plan-related

22 document in the confirmation order, nothing contained therein

23 shall affect or prejudice the right of SL Industries, Inc. to

24 assert that any obligations of the reorganized debtors with

25 respect to the Puchack Well Field Superfund site, EPA I.D.

1  Number NJD981084767, defined as the Puchack site, are neither

2  claims as defined in the plan, in the Bankruptcy Code, nor in

3  environmental claims as defined in the plan.  To the extent

4  such obligations are neither claims nor environmental claims,

5  they shall not be subject to the discharge or injunction

6  provisions contained in this confirmation order.  To the extent

7  such obligations are claims or environmental claims, they shall

8  be subject to the discharge and injunction provisions contained

9  in the confirmation order."

10         I believe those are all of the changes that we've

11  agreed to make to the confirmation order to address comments of

12  interested parties in resolution of objections.  We would at

13  this time move the entry of the binder of exhibits forming the

14  record of the confirmation hearing, and we would respectfully

15  request that Your Honor enter the confirmation order confirming

16  the debtors' third amended plan as modified.

17         THE COURT:  Anybody else want to be heard?

18              (No verbal response)

19         THE COURT:  All right.  I will move the -- I will

20  admit the binder documents as part of the record, and the Court

21  having heard the -- having reviewed the declarations that have

22  been filed in support of confirmation of the plan, having

23  reviewed the plan, the comments, settlements, heard the

24  argument of counsel, resolution of the various issues, being

25  satisfied that the provisions of 1129(a) have been met, in

```
 1   particular, that the plan complies with the provisions of the

 2   Bankruptcy Code, that the proponent has complied with the

 3   provisions of the Bankruptcy Code, that the plan has been

 4   proposed in good faith and not by any means forbidden by law,

 5   that the payments required for costs will be -- have been paid,

 6   will be paid, or will be approved for payment, that the

 7   disclosure of the individuals who will serve post-petition as

 8   officers or directors of the debtor have been disclosed, that

 9   there is no regulatory agency that will -- that is necessary to

10   approve this, that each impaired class has -- that the -- I

11   believe all the classes except two impaired classes have

12   accepted the plan pursuant to the provisions of Chapter 11, and

13   that the classes that have not accepted will not be treated --

14   are not unfairly impacted and can be crammed down pursuant to

15   the provisions of 1129(b).

16        That priority claims will be paid at the -- by the

17   effective date of the plan or otherwise agreed to by the

18   parties.  That at least one impaired class has accepted the

19   plan.  It does not appear to the Court that confirmation is

20   likely to be followed by liquidation or further reorganization.

21   That the bankruptcy fees have been paid or will be paid by the

22   effective date, and that the debtor is not subject to

23   retirement benefit payments that would impact the ability to

24   confirm the plan nor subject to a domestic support obligation

25   -- obligations.
```

1            And, in addition, that the debtor has shown that the

2    provisions of 1129(b) have been met by virtue of the fact that

3    no claim of a lower class classification will be -- will

4    receive a distribution ahead of a higher class of creditors,

5    and that the plan is fair and equitable and meets the absolute

6    priority rule.

7            This Court is satisfied that the provisions of

8    1129(a) and (b) have been met and will enter an order of

9    confirmation set forth as has been provided in the order that

10   has been submitted to the Court today, as modified by Mr.

11   Felger's comments on the record, and upon submission of that

12   order, that order will be entered confirming the plan.

13           Thank you, Mr. Felger, and I -- Mr. Brody?

14           MR. BRODY:  I'm sorry, Your Honor.  Earlier you had

15   mentioned that the order would be signed tomorrow but effective

16   as of today?

17           THE COURT:  And it would be --

18           MR. BRODY:  Thank you. Your Honor.

19           THE COURT:  The order will be effective as of today,

20   although it will be signed tomorrow, and you can put language

21   in the preamble that the order will be effective as of today.

22           I just want to say for the record that the Court

23   recognizes the huge amount of work that all counsel to this

24   proceeding has gone -- that has gone forward by all counsel,

25   especially the debtors' counsel, the Committee, and the fund --

1    plan funders' counsel, the huge amount of time that's been

2    devoted to this, and all of the multiple issues that have come

3    before the Court under the expedited basis that the debtor has

4    needed to move.  And, quite frankly, based on how things went

5    in the very beginning of the case, it was a huge accomplishment

6    to by now reach the position that it has and to have the plan

7    reach confirmation and to have the confirmation approved.  And

8    I want to commend all of the parties and their counsel for the

9    work that was done with regard to moving this case to

10   confirmation.  Thank you, Your Honor.

11        MR. FELGER:  Thank you, Your Honor.  I'd like to also

12   thank Your Honor for your patience, your assistance along the

13   way.  Our chambers conferences with Your Honor proved

14   invaluable each and every time, and so again we'd like to thank

15   you.  I'd also like to thank all the counsel in the courtroom.

16   It was a real pleasure dealing with really terrific bankruptcy

17   counsel in this case.

18        I think I'd be remiss if I didn't mention the really

19   first rate, terrific work of the non-bankruptcy lawyers who

20   were instrumental to getting us to this point.  I mentioned

21   earlier, and I'll mention them again, Kevin McKenna and Pete

22   Fountaine and Sean Bezark on the environmental issues just did

23   a terrific job of getting us to where we are today.

24        On the labor side, Paul Lewis of the Stevens & Lee

25   firm and Jonathan Israel of the Greenberg firm, doing a

1   terrific job in getting us where we needed to be with the

2   collective bargaining agreements.

3           And last, but not least, I'd be remiss if I didn't

4   mention the really Herculean, terrific job done by the debtors'

5   management, Mr. Grabell, Mr. Sorenson (phonetic), and Mr.

6   Galland (phonetic).  Before Mr. Galland left for perhaps

7   greener pastures, they did a terrific job under really, really

8   difficult situations and handled it every step of the way with

9   just a lot of class.

10          THE COURT:  And, as you know, Mr. Felger, that's how

11  a Chapter 11 process is supposed to work, a lot of

12  negotiations, resolution.  When the -- when that happens,

13  that's -- the process works well, and you end up with a good

14  result such as we had today.

15          I know there's still a few more things that have to

16  be done, but I think that the majority of the hills have been

17  climbed here, and we can move forward with the rest of the

18  things that have to go forward.  I will look for the order

19  tomorrow, Mr. Felger.

20          MR. FELGER:  Yes, you will have it tomorrow.

21          THE COURT:  And --

22          MR. FELGER:  Thank you very much, Your Honor.

23          THE COURT:  Thank you.

24          MR. BRODY:  Thank you, Your Honor.

25          THE COURT:  Everybody be careful going home.  It's

1  almost 8:00 and rather late now, so --

2                      *  *  *  *  *

3             C E R T I F I C A T I O N

4        I, PATRICIA C. REPKO, court approved transcriber,

5  certify that the foregoing is a correct transcript from the

6  official electronic sound recording of the proceedings in the

7  above-entitled matter, and to the best of my ability.

8

9  /s/ Patricia C. Repko            DATE:  July 30, 2008
10  PATRICIA C. REPKO
11  J&J COURT TRANSCRIBERS, INC.