UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

## ATTORNEY FEE APPLICATION COVER SHEET

IN RE:

SHAPES/ARCH HOLDINGS L.L.C., *et al.*

CASE NO.: 08-14631 (GMB)

CHAPTER: 11

APPLICANT:

HALPERIN BATTAGLIA RAICHT LLP

CLIENT: Official Committee of Unsecured Creditors

CASES FILED: March 16, 2008

COMPLETION OF THIS FORM CONSTITUTES A CERTIFICATION
UNDER PENALTY OF PERJURY.  RETENTION ORDER ATTACHED.

/s/ Alan D. Halperin          9/3/08

Date

---

| SECTION I |
| FEE SUMMARY |

First and Final Fee Application Covering the
Period March 31, 2008 through August 8 2008

| | |
|---|---|
| Total Previous Fees and Expenses Requested: | [1]$379,305.58 |
| Total Fees and Expenses Allowed to Date: | $0.00 |
| Total Retainer (if applicable): | N/A |
| Total Holdback (if applicable): | $74,181.80 |
| Total Received by Applicant: | [2]$243,777.33 |

**Services Rendered Covering Period March 31, 2008 through August 8, 2008**

---

[1] Fees have been requested pursuant to the First Monthly Fee Statement filed on May 14, 2008, the Second Monthly Fee Statement filed on June 10, 2008, the Third Monthly Fee Statement filed on July 8, 2008, and the Fourth Monthly Fee Statement filed on August 8, 2008 (the "Monthly Fee Statements"). No request (other than pursuant to this Application) has been made with respect to August 1st through 8th.

[2] This amount reflects payment for fees and expenses of eighty (80%) percent of fees and one hundred (100%) percent of costs reflected in the First Monthly Fee Statement, the Second Monthly Fee Statement and the Third Monthly Fee Statement.

| | Name of Professional and Title | Year Admitted | Hours | Rate | Fee |
|---|---|---|---|---|---|
| 1. | Alan D. Halperin, Partner | 1991 | 453.8 | $435.00 | $197,403.00 |
| 2. | Robert D. Raicht, Partner | 1987 | 1.2 | $410.00 | $492.00 |
| 3. | Christopher J. Battaglia, Partner | 1997 | 1.9 | $385.00 | $731.50 |
| 4. | Walter Benzija, Partner | 1996 | 43.7 | $370.00 | $16,169.00 |
| 5. | Donna H. Lieberman, Of Counsel | 1984 | 293.4 | $350.00 | $102,690.00 |
| 6. | Debra J. Cohen, Associate | 1992 | 51.5 | $335.00 | $17,252.50 |
| 7. | Ethan D. Ganc, Associate | 2001 | 82.2 | $280.00 | $23,016.00 |
| 8. | Julie D. Dyas, Associate | 2003 | 52.9 | $275.00 | $14,547.50 |
| 9. | Carrie E. Mitchell, Associate | 2005 | 52.0 | $225.00 | $11,700.00 |
| 10. | Monique A. Minto - Gonzalez, Paralegal | N/A | 3.1 | $100.00 | $310.00 |
| 11. | Jeffrey B. Moore, Paralegal | N/A | 15.6 | $95.00 | $1,482.00 |
| 12. | Sydia N. Cooper, Paralegal | N/A | 1.8 | $80.00 | $144.00 |
| 13. | Mary M. Charles - Kennedy, Paralegal | N/A | 13.6 | $75.00 | $1,020.00 |
| | TOTALS | | 1,066.7 | | $386,957.50 |

FEE TOTALS (Page 3)                                          $386,957.50
DISBURSEMENTS TOTALS (Page 4)                                  $8,530.18
FEE APPLICATION PREPARATION (ESTIMATED)                       $12,500.00
TOTAL FEE APPLICATION                                        $407,987.68

**SECTION II**
**SUMMARY OF SERVICES**
**FOR THE PERIOD COVERING MARCH 31, 2008 THROUGH AUGUST 8, 2008**

| Services Rendered | | Hours | Fee |
|---|---|---|---|
| (b) | Asset Sales | 10.4 | $4,482.00 |
| (c) | Claims Review & Analysis | 27.5 | $10,314.00 |
| (d) | Committee Matters | 7.7 | $2,579.50 |
| (e) | DIP Financing | 2.6 | $988.50 |
| (f) | Discovery | 0.4 | $90.00 |
| (g) | Executory Contracts | 0.6 | $261.00 |
| (h) | Fee Application | 6.8 | $1,008.50 |
| (i) | Financing | 55.7 | $22,383.50 |
| (j) | General | 360.5 | $120,542.00 |
| (k) | Meetings & Hearings | 127.0 | $52,814.50 |
| (l) | Motions & Applications | 120.8 | $38,199.00 |
| (m) | Plan & Disclosure Statement | 282.5 | $115,319.00 |
| (n) | Pleadings | 64.2 | $17,976.00 |
| SERVICES TOTALS | | 1,066.7 | $386,957.50 |

<div style="border:1px solid black; padding:10px;">

**SECTION III**
**SUMMARY OF DISBURSEMENTS**
**FOR THE PERIOD COVERING MARCH 31, 2008 THROUGH AUGUST 8,**
**2008**

</div>

| Disbursements | | | Amount |
|---|---|---|---|
| (a) | Westlaw | | $1,112.28 |
| (b) | PACER | | $360.72 |
| (c) | Facsimile | | |
| | No. of Pages: 9 Rate per Page:$1.00 | | $9.00 |
| (d) | Photocopying: | | |
| | No. of Pages:  8,569;  Rate per Page:  $.20 | | $1,713.80 |
| (e) | Travel | | |
| | Car Service | $1,333.40 | |
| | Rail | $1,602.15 | |
| | Taxi | $73.00 | |
| | Accommodations | $430.89 | $3,439.44 |
| (f) | Long Distance Telephone | | $42.90 |
| (g) | Postage | | $8.64 |
| (h) | Federal Express | | $11.76 |
| (i) | Other (explain): | | |
| | Conference Call Services | $868.51 | |
| | Reimbursable Meals | $558.73 | |
| | Court Transcript | $404.40 | |
| | | | $1,831.64 |
| DISBURSEMENT TOTAL | | | $8,530.18 |

4

---

**SECTION IV**
**CASE HISTORY**

---

(NOTE:  Items (3) through (6) are not applicable to applications under 11 U.S.C. § 506)

(1)      Date case filed:  March 16, 2008

(2)      Chapter under which case commenced:  Chapter 11

(3)      Date of retention:  Order signed April 25, 2008, effective March 31, 2008.
           **See Exhibit A.**
           If limit on number of hours or other limitations to retention, set forth: N/A

(4)      Summarize in brief the benefits to the estate and attach supplements as needed:  See
           narrative portion of fee application.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Alan D. Halperin, Esq.
Donna H. Lieberman, Esq.
HALPERIN BATTAGLIA RAICHT, LLP
555 Madison Avenue – 9th Floor
New York, New York 10022
(212) 765-9100

Attorneys for the Official Committee
 of Unsecured Creditors

| | |
|---|---|
| In re: | Chapter 11 |
| **SHAPES/ARCH HOLDINGS L.L.C., et al.,** | Case No. 08-14631 (Jointly Administered) |
| Debtors. | Judge: Gloria M. Burns |

## FIRST AND FINAL APPLICATION OF HALPERIN BATTAGLIA RAICHT, LLP FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES <u>FOR SERVICES RENDERED IN THESE CASES</u>

TO THE HONORABLE GLORIA M. BURNS,
UNITED STATES BANKRUPTCY JUDGE:

Halperin Battaglia Raicht, LLP ("<u>HBR</u>" or "<u>Applicant</u>"), counsel to the Official

Committee of Unsecured Creditors (the "<u>Committee</u>") of Shapes/Arch Holdings, L.L.C., *et al*.,

the above-captioned debtors and debtors-in-possession (each a "<u>Debtor</u>" and, together, the

"<u>Debtors</u>"), as and for its first and final application, pursuant to 11 U.S.C. §§ 328 and 330 and

Rule 2016 of the Federal Rules of Bankruptcy Procedure, for an allowance of compensation for

services rendered and for reimbursement of expenses incurred for the period commencing March

31, 2008 through and including August 8, 2008 in these cases and for reimbursement for the

preparation of this fee application (the "Application"), respectfully represents:

## BACKGROUND

1.        The Debtors filed voluntary petitions for relief pursuant to Chapter 11 of

Title 11 of the United States Code, as amended (the "Bankruptcy Code") on March 16, 2008 (the

"Filing Date").  The Debtors continued in the management of their affairs as debtors-in-

possession pursuant to 11 U.S.C. §§ 1108 and 1109 of the Bankruptcy Code.  No trustee or

examiner was appointed in the Debtors' cases.

2.         On March 31, 2008, the United States Trustee appointed a creditors'

committee consisting of the following nine (9) members:  Alcan Aluminum Corp.; Rusal

America Corp.; United Parcel Service; Perfect Trade; Coil Plus; Acme Corrugated Box;

Glencore Ltd.; Colorworks Graphics, Inc.; and PSE&G.  At its initial meeting on March 31,

2008, the Committee selected HBR as its counsel to represent the Committee in all matters in the

Debtors' chapter 11 cases and Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") as

its conflicts and local counsel.

3.        As disclosed in its public filings with the Court, Shapes/Arch Holdings

L.L.C. ("Shapes/Arch") is the parent company that owns each of the four operating Debtors, as

follows: Shapes L.L.C. ("Shapes"), Delair L.L.C. ("Delair"), Accu-Weld L.L.C. ("Accu-Weld"),

and Ultra L.L.C. ("Ultra").  Shapes is the largest operating Debtor and the leading producer of

custom aluminum extrusions for a variety of industries.  Delair manufactures maintenance-free

aluminum fence systems for residential and commercial use and above-ground pools.  Accu-

Weld manufactures made-to-order vinyl replacement windows and steel doors.  Ultra is one of

the leading suppliers of value branded hardware products, including locksets, door and window

hardware, and other decorative hardware, in the United States.

       4.      On April 25, 2008, this Court entered an Order authorizing the

Committee's retention of HBR as bankruptcy counsel *nunc pro tunc* to the Filing Date (the

"Retention Order").  A true copy of the Order is attached hereto as **Exhibit A**.

       5.      On March 18, 2008, this Court entered an Administrative Order

Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals (the "Administrative Fee Order").  The Administrative Fee Order provides that

professionals file monthly fee statements on or before the 25th day of each month, with respect to

services rendered and expenses incurred in the prior month.  If there are no objections to a

monthly fee statement, then the professional is entitled to interim payment in the amount of 80%

of the fees and 100% of the expenses requested in the monthly fee statement.

       6.      HBR filed a monthly fee statement for the time period March 31, 2008

through and including April 30, 2008 on May 14, 2008 requesting $156,986 in fees and

$4,196.71 in expenses (the "April Statement").  There were no objections to the April Statement,

and HBR received $125,588.80 in fees (*i.e.* 80%) and $4,196.71 in expenses on account of the

April Statement.

       7.      HBR filed a monthly fee statement for the time period May 1, 2008

through and including May 31, 2008 on June 10, 2008 requesting $89,797 in fees and $2,702.38

in expenses (the "May Statement").  There were no objections to the May Statement, and HBR

received $71,837.60 in fees (*i.e.* 80%) and $2,702.38 in expenses on account of the May

Statement.

8.      HBR filed a monthly fee statement for the time period June 1, 2008

through and including June 30, 2008 on July 8, 2008 requesting $48,413.50 in fees and $721.04

in expenses (the "June Statement").  There were no objections to the June Statement, and HBR

received $38,730.80 in fees (*i.e.* 80%) and $721.04 in expenses on account of the June

Statement.

9.      HBR filed a monthly fee statement for the time period July 1, 2008

through and including July 31, 2008 on August 8, 2008 requesting $75,712.50 in fees and

$776.45 in expenses (the "July Statement").  There were no objections to the July Statement, and

as of the date of this Application, a certificate of no objection has been filed with the Court

(Docket No. 617).  HBR anticipates that is will receive $60,570.00 in fees (*i.e.* 80%) and

$776.45 in expenses on account of the July Statement in advance of the hearing date on this

Application, but has not yet received such payment.[1]

10.      On July 24, 2008, this Court entered its Findings of Fact, Conclusions of

Law and Order Confirming the Debtors' Chapter 11 Plan (the "Confirmation Order").  The

Debtors' Third Amended Plan, dated May 23, 2008, as modified by the Modification of the

Debtors' Third Amended Joint Chapter 11 Plan (collectively, the "Plan) went effective on

August 8, 2008.

---

[1] The monthly fee statements contain HBR's computerized billing records indicating, with
specificity, the services performed and the expenses incurred.  These records have been
previously filed with the Court as exhibits to the monthly fee statements, which can be found at
Docket Nos. 293, 373, 503, and 584.  Copies will be provided to any party-in-interest upon
written request.  Additionally, HBR's computerized billing records, indicating with specificity
the services performed for the period August 1, 2008 through and including August 8, 2008 are
attached hereto as **Exhibit B**.

## REQUEST FOR COMPENSATION

11.     By this Application, Applicant seeks a first and final allowance of compensation for professional services rendered as counsel to the Committee in the total amount of $407,987.68, based upon (i) 1,066.7 hours in professional services rendered and attendant fees of $386,957.50 during the period March 31, 2008 through and including August 8, 2008 (the "Compensation Period"), the effective date of the Debtors' Plan, (ii) reimbursement of actual and necessary expenses incurred by HBR during the Compensation Period in the amount of $8,530.18,  and (iii) an estimated additional $12,500 in fees and expenses in connection with this Application.[2]

12.     Applicant maintains written records of the time expended by attorneys and paraprofessionals in the rendition of their professional services to the Committee.  Such time records are made contemporaneously with the rendering of services by the person rendering such services, and in the ordinary course of HBR's practice.  The records show the name of the attorney or paraprofessional, the date on which the services were performed, the services rendered, and the amount of time spent in performing the services during the Compensation Period.  As stated above, copies of the records not previously provided to the Court are annexed hereto as **Exhibit B**.

13.     Annexed hereto as **Exhibit C** is a list of the attorneys and paraprofessionals who have worked on these cases during the Compensation Period, their date of

---

[2]  This amount includes an estimate of approximately 30 to 35 hours of billable time for work done on this fee application after August 8th and related expenses.

admission to the bar (where applicable), the aggregate time expended by each person, their

current normal hourly billing rate, and the value of the total time expended by each person.

14.     HBR also maintains records of all actual and necessary expenses incurred

in connection with the rendition of its professional services, all of which are also available for

inspection.  A schedule of the categories of expenses and amounts for which reimbursement is

requested is annexed hereto as **Exhibit D**.

15.     The fees charged by HBR in these proceedings are billed in accordance

with its existing billing rates and procedures in effect during the Compensation Period.

## SUMMARY OF PROFESSIONAL SERVICES RENDERED
## AND EXPENSES INCURRED

16.     The following is a summary and overview of the work performed by HBR

in its role as bankruptcy counsel to the Committee during the Compensation Period.  Reference

is made to the contemporaneous time records previously provided to the Court, as well as those

annexed as **Exhibit B**.  The following overview is not intended to be exhaustive, and the Court is

respectfully referred to the time records for a complete detailing of all tasks undertaken and

performed.

### Overview of HBR's Role

17.     As the Court is aware, the period immediately after the appointment of the

Committee and the engagement of HBR was one of intensive litigation.  The Committee and its

professionals were confronted with a "lock-up" agreement that had apparently been entered into

on the eve of bankruptcy, pursuant to which the Debtors ceded almost 80% of the voting control

of the parent Debtor to Versa Capital Management, Inc. ("Versa")[3], agreed to use Versa as their

_____

[3] Versa and several of its affiliates were involved in the initial proposed transactions.  For

DIP lender and plan funder, under a plan that paid virtually nothing to unsecured creditors, and took the position that the agreement with Versa precluded an open and competitive marketing and sale process in Chapter 11.  The DIP loan, which was linked to the Versa plan, was approved on an interim basis prior to the appointment of the Committee.

18.    HBR familiarized itself with all of the information then available, consulted with the Committee and the Committee's other professionals, and devised and coordinated an approach to these cases designed to make the Chapter 11 process a fair and open one, and increase the likelihood of a meaningful recovery for unsecured creditors.  Given the initial posture of these cases and the opposition of both the Debtors and Versa to opening up the process, this meant, among other things, objections to the Debtors' proposed final DIP financing order with Versa, objections to the Debtors' disclosure statement, discussions with third parties interested in bidding on the Debtors' assets, participation in expedited discovery, and the preparation of motions for the appointment of a Chapter 11 trustee and to terminate exclusivity.

19.    The months of April and May saw an exceptionally high level of Committee involvement, as HBR worked almost non-stop to uncover what had occurred in the weeks leading up to the Debtors' bankruptcy filing and to insure that the sale of the Debtors' assets, whether through a section 363 sale or a plan process, was done properly and with consideration of the rights of unsecured creditors.  Eventually, Versa was replaced as both the DIP lender and the plan funder, and an amended plan was negotiated between the Debtors, the new plan funder (Arch Acquisition) and the Committee.

---

convenience, all of the Versa-related entities are referred to as Versa and all of the Arch Acquisition/HIG –related entities are referred to as Arch Acquisition in this Application.

20.     As of the date of this Application, that amended plan (defined herein as

the "Plan") has been confirmed and the effective date of the Plan has occurred.  The Debtors are

now the reorganized debtors, the businesses continue to operate, and a fund of five million

dollars – ten times the amount originally allocated for unsecured claims -- has been placed with

a liquidation trust created for the benefit of holders of allowed unsecured claims.     In addition,

the right to bring avoidance and other actions rests with the trust, with recoveries to benefit the

holders of allowed unsecured claims.

**The DIP Facility**

21.     As noted above, the Debtors initially sought to implement an

extraordinarily fast-paced and, the Committee asserts, highly prejudicial program to deliver the

Debtors' assets to Versa.  This was to be accomplished through questionable debtor-in-

possession financing terms and a defective plan process which were inexorably linked to each

other.  After necessary but extensive diligence, legal research and review of the loan documents,

the Committee, in its Objection to Entry of Final Order Authorizing the Debtors to Obtain Post-

Petition Financing from Versa (Docket No. 164),[4] addressed its concerns about the Initial Plan

and accompanying debtor-in-possession financing.  The Committee was concerned that the

Initial Plan and debtor-in-possession financing were inappropriate, with the Chapter 11 cases

seemingly being manipulated solely for the benefit of Versa, while providing for little, if any,

distribution to unsecured creditors.

22.     HBR prepared and provided to the Debtors and Versa a memorandum

detailing the Committee's objections to the DIP financing terms and proposed order in advance

---

[4] Through its conflicts counsel, Cole Schotz, the Committee also filed an Objection to Entry of
Final Order Authorizing the Debtors to Obtain Post-Petition Financing from CIT Business
Group/Business Credit, Inc. ("CIT").

of filing a formal objection, and when that proved fruitless, subsequently prepared and filed a

formal objection.  HBR also worked with its co-counsel in connection with making discovery

requests and responding to the same, and attending depositions in connection with the DIP

financing and plan issues.

23.      In addition to preparation and negotiation of its own objection to the

proposed debtor-in-possession financing structure, HBR reviewed a myriad of objections and

other pleadings from other parties-in-interest and summarized the significance of these pleadings

for members of the Committee.  The pleadings analyzed included: (i) the Interim Order

Authorizing and Approving Postpetition Financing; (ii) the Objection to Entry of Final Order

Authorizing the Debtors to Obtain Post-Petition Financing by Arch Acquisition I, LLC;

(iii) Pennsauken Township's Limited Objection to Debtors' Post-Petition Financing; (iv) the

U.S. Trustee's  Objection to Entry of Final Order Authorizing the Debtors to Obtain Post-

Petition Financing; (v) the Debtors' Response to Objections to Entry of Final Order Authorizing

the Debtors to Obtain Post-Petition Financing; and (vi) Sun Capital's Objection to Entry of Final

Order Authorizing the Debtors to Obtain Post-Petition Financing, among others.

24.      As discussed below with reference to the Debtors' Plan and Third

Amended Disclosure Statement (the "Disclosure Statement"), the Committee played an essential

and leading role in challenging the proposed "lock-up" arrangements between the Debtors and

Versa and directing the sale of the Debtors' assets through a properly marketed, fair and open

process.  This involved engaging in numerous discussions with representatives of Arch

Acquisition, a potential replacement DIP lender/plan funder, and reviewing drafts of agreements,

plan and sale documents prepared by that potential funder.  Eventually, the Versa DIP facility

was replaced by an Arch Acquisition facility, which not only provided more favorable terms to

the estates, but also increased borrowing limits by five million dollars, additional  liquidity that

proved necessary to get the Debtors through closing of their plan.

25.     Establishing appropriate debtor-in-possession financing and negotiating

the budget with respect thereto were among the key elements to stabilizing the Debtors'

operations and slowing down the Chapter 11 cases enough to allow for a true process.  HBR's

role in analyzing, challenging and finding a replacement for the Versa arrangements involved not

only preparation, drafting and review of numerous pleadings, but preparation and participation in

Committee meetings, teleconferences, and appearances at several hearings before the Court.

**Motion to Appoint Trustee**

26.     Stemming from its concerns that the Debtors were being controlled by an

insider, Versa, who was poised to acquire substantially all of the assets of the Debtors without a

fair and open competitive bidding process, on April 29, 2008, the Committee made a Motion to

Appoint a Chapter 11 Trustee (Docket No. 236).  The Committee was most concerned because it

had been approached by several parties (*e.g.* Arch Acquisition, SunCapital Partners, Longroad

Asset Management, etc.) that were interested in bidding on the Debtors' assets and/or potentially

offering the Debtors better debtor-in-possession financing terms than those the Debtors

supported, and there was an apparent unwillingness on the part of the Debtors to permit any third

parties to conduct due diligence.  The Committee drafted the trustee motion in the belief that the

Debtors' management, whether because it was controlled by Versa or for other reasons, had

assigned its fiduciary responsibilities to Versa (as lender/buyer and controller of the companies)

and, as a result, was unable and/or unwilling to fulfill its fiduciary duties to the Debtors'

creditors and estates.  Hence, the Committee believed that the filing of a motion for the

appointment of a Chapter 11 trustee was necessary and appropriate.

27.     As discussed more fully below with reference to the Plan and Disclosure Statement, with the direction of this Court and through efforts of the Committee and Arch Acquisition, the Debtors ultimately agreed to a replacement DIP financing facility from Arch Acquisition and an open marketing and sale process, with Arch Acquisition as the proposed plan funder under vastly improved terms for the estates and unsecured creditors.  Accordingly, the Committee eventually withdrew its trustee motion.  Nevertheless, the motion was a successful tool for the Committee in assisting it in negotiating appropriate debtor-in-possession financing, and ultimately, fair and appropriate marketing and bidding procedures.

**Plan and Disclosure Statement**

28.     The Debtors filed the Initial Plan and Initial Disclosure Statement on the first day of the Chapter 11 cases, seeking to convey substantially all of their assets to Versa through a transfer of equity, without the benefit of any competitive bidding process. Accordingly, HBR researched and prepared a memorandum which it shared with other parties and then filed its more formal Objection to the Debtors' Proposed Disclosure Statement, dated April 16, 2008 (the "First Disclosure Statement Objection").

29.     In the First Disclosure Statement Objection, the Committee, through HBR, addressed pure failures of disclosure and inconsistencies between the Initial Disclosure Statement and the Initial Plan, *and* raised substantive issues concerning the abuse of the bankruptcy process and the non-confirmability of the Initial Plan.  Among other things, the First Disclosure Statement Objection highlighted for the Court that shortly before filing for bankruptcy protection, the Debtors entered into an agreement with Versa, pursuant to which Versa took control of the Debtors, agreed to provide a DIP loan in the amount of $25 million, upon draconian terms, with hair-trigger defaults, that would preclude the sale of the Debtors'

businesses to any entity other than Versa and prevent any meaningful marketing process, and linked the DIP facility to the Initial Plan. The Committee asserted that the original "negotiated" plan of reorganization would have delivered the Debtors' businesses and assets to Versa for minimal consideration, and provided releases to Versa and other insiders of the Debtors, while providing a distribution to unsecured creditors that was *optimistically* estimated at significantly less than two cents on the dollar. Quite understandably, this proposed outcome was unacceptable to the Committee, particularly in light of the Debtors' failure to appropriately market their assets and the stated interest of other parties in those assets.

30.      The Committee stepped in, in the early days of the Debtors' Chapter 11 cases and negotiated with other parties who expressed interest in the possible acquisition of some or all of the Debtors' assets. The Committee was approached by several interested parties, who expressed an inability to obtain the information they needed to assess an appropriate bid for the Debtors' assets from the Debtors directly. HBR therefore had to assume the unusual role of assisting those parties in obtaining confidentiality agreements and gathering the information they required through appropriate sources.

31.      Following a hearing on the Debtors' Initial Disclosure Statement the Debtors' filed an amended plan and disclosure statement on April 24, 2008 (the "First Amended Plan" and "First Amended Disclosure Statement," as appropriate). Though substantial improvements were made in terms of disclosures regarding the background and proposed disposition of the Debtors' assets under the First Amended Plan and Disclosure Statement, the substantive issues remained and it was necessary for HBR to object to the amended documents as well. On April 29, 2008, the Committee filed its Objection to the First Amended Disclosure Statement (the "Second Disclosure Statement Objection").

32.     In the Second Disclosure Statement Objection, the Committee highlighted that though certain disclosure issues had been remedied through the amended plan and disclosure statement, the inherent problems with the form of disposition of the Debtors' assets remained, particularly the problem of failure to market the Debtors' assets in an open forum in order to maximize value for creditors.  For example, the First Amended Disclosure Statement revealed that the Debtors' wished to implement a bifurcated plan, that allowed for a competitive bidding process *only* if unsecured creditors voted against the First Amended Plan and the Court denied confirmation on the grounds that the treatment of unsecured creditors was not fair and equitable and did not comport with the decision in *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. Partnership*, 526 U.S. 434 (1999).  This convoluted and closed process was unacceptable to the Committee, particularly given concerns that the Debtors would run out of money before the process could be completed.

33.     Further negotiations between the parties-in-interest ensued and through direction of the Court and, among other things, efforts of the Committee, a fair, open, marketing process for the Debtors' assets was finally achieved.  On May 12, 2008, the Debtors filed their Motion for order approving: (a) the competitive process for the sale of the reorganized Debtors' equity under the terms and conditions of the Debtors' Second Amended Plan of Reorganization; and (b) approving a break-up fee and an expense reimbursement to Arch Acquisition (Docket No. 271), which was granted by Order dated May 20, 2008.  After lengthy negotiations rooted all the way back in the Debtors' first day motions, the Committee was finally successful in achieving a fully open process, complete with appropriate marketing of the Debtors' assets, a stalking horse plan funder on vastly improved terms than the Versa proposal, a process for qualifying bids, and a reasonable bid deadline, auction and full sale process run by an

independent third party.  Arch Acquisition replaced Versa as both the DIP lender and the plan

funder, and agreed, among other things, to a five million dollar pot for unsecured creditors and a

competitive process.

      34.     Newly framed around the open sale process, the Debtors filed a second

amended plan and disclosure statement jointly and, ultimately the (third amended) Plan and

Disclosure Statement.  The Committee, through HBR, was intimately involved in the negotiation

of plan terms and revising of the plan and plan-related documents, including the form of

Confirmation Order, and drafted the plan administration agreement that would govern the trust

being created for the benefit of holders of allowed unsecured claims (the "Class 10 Trust").

      35.     Additionally, HBR was in constant communication with the sale facilitator

appointed under the Second Amended Plan, as well as the bidders and potential bidders, to

ensure an open and fair process was achieved and to help maximize the prospects for an auction

and increased creditor recoveries.

      36.     HBR engaged in particularly intense negotiations with the Debtors about

the scope of releases under the Plan, as the Committee wished to reserve its rights with respect to

insiders.  In addition, there was a period of several weeks during which HBR and counsel to

Arch Acquisition engaged in almost continuous discussion about whether the Plan would contain

a funding cap, what that cap would be and the implications for unsecured creditors if the

amounts payable on the effective date of the Plan exceeded the cap.  Ultimately, numbers were

agreed to and the concept of a "plan note" in favor of the Class 10 Trust was added to the Plan,

so that the five million dollars allocated to allowed unsecured claims would be protected even if

funding needs on the effective date somewhat exceeded the agreed cap.  The form of plan note

was prepared by HBR and filed with the Court.

37.    Tangential to the Committee's review of the Initial Plan and Disclosure Statement, as well as participation in the negotiations of and review of the First Amended Plan and Disclosure Statement and, ultimately, the Plan and Disclosure Statement, there were numerous other pleadings filed in relation to the Plan that required review, summary and discussion for the Committee's purposes.  Among those pleadings were: (i) the Objection of the U.S. Trustee to the Disclosure Statement; (ii) the Objection of Arch Acquisition to the Disclosure Statement; (iii) the Objection of the U.S. Trustee to the Amended Disclosure Statement; (iv) the Objection of Arch Acquisition to the Amended Disclosure Statement; (v) the Response of CIT to Objections to the Disclosure Statement; and (iv) approximately twenty (20) responses either to the adequacy of the various disclosure statements and/or confirmation of the Plan from other parties-in-interest.  The Committee also reviewed and negotiated with the Debtors regarding their ultimately defunct Motion to Sell Substantially All of the Debtors' Assets and to Assume and Assign Executory Contracts and Unexpired Leases filed on June 17, 2008 (the "Sale Motion," Docket No. 380).  The Sale Motion was withdrawn on June 24, 2008 following the resolution of certain labor negotiations, and the assets were marketed and disposed of pursuant to the Plan.

38.    Additionally, as the outcome of negotiations with the Debtors' unions and certain environmental authorities had a direct impact on whether the Plan could be confirmed, and whether the Plan would be largely consensual or hotly contested, HBR was in regular communication with counsel to Arch Acquisition and the Debtors regarding the progress of these negotiations.  HBR also worked to minimize the impact of these negotiations on the Class 10 claims pool.   Ultimately, highly favorable resolutions of both labor and environmental issues

were achieved and with respect to the environmental issues, embodied in the modification to the third amended plan.

39.    In preparation for confirmation of the Plan, the Committee conferred with the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC regarding the form of ballots, as well as tabulation of ballots once received.  As noted above, the Plan was confirmed and the Confirmation Order was entered on July 24, 2008, and the Committee assisted the Debtors in achieving effectiveness of the Plan, including preparation and review of the documents to govern the post-confirmation plan trust.

**The Debtors' Exclusive Periods**

40.    Given that the Debtors filed the Initial Plan and Disclosure Statement seeking to sell substantially all of their assets to Versa, an insider, on April 29, 2008, the Committee filed its Motion for an Order Pursuant to Section 1121(d) of the Bankruptcy Code Terminating the Debtors' Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances (Docket No. 238).  As discussed above with reference to debtor-in-possession financing, appointment of a Chapter 11 trustee, and the Plan and Disclosure Statement process, initially, the Debtors resisted an open and fair marketing effort for their assets.  In support of its efforts to adequately market the sale of the Debtors' assets and maximize the value of the estates for the benefit of creditors, the Committee asserted that termination of the Debtors' exclusive periods was necessary, given the fast track pursuant to which the Debtors wished to confirm a plan and close on the sale of their assets.  The Committee believed that under the circumstances at hand, the market testing of the value of the Debtors' assets/equity through termination of the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto was not optional, but was affirmatively required by Supreme Court precedent in the *LaSalle* case.

41.     Similar to the result with the Committee's motion to appoint a Chapter 11 trustee, the Committee resolved its motion to terminate the Debtors' exclusive periods because the Debtors, through direction of this Court and efforts of the Committee, ultimately consented to a fair and open marketing process for the disposition of their assets with a non-insider stalking horse bidder, Arch Acquisition.  Thus, the Committee was able to withdraw its motion and advance the efforts to consummate the auction and sale process.

### Review of First Day Motions and Orders

42.     In addition to financing and other case shaping motions, HBR reviewed, summarized and answered questions from the Committee regarding the Debtors' petitions and the implications of all of the first day motions and proposed orders in the cases, including, without limitation: (a) the Debtors' cash management motion, (b) the Debtors' pre-petition wages motion; (c) the Debtors' pre-petition taxes motion; (d) the Debtors' motion to establish a bar date for the Chapter 11 cases; (e) the Debtors' retention motions for debtors' counsel, claims and noticing agent, restructuring advisors, etc.  As the Debtors filed a plan and accompanying disclosure statement on the Filing Date, review of substantial documentation on behalf of the Committee was undertaken immediately by HBR upon retention.

### Retention Applications

43.     HBR and the Committee's conflicts and local counsel, Cole Schotz, worked together to prepare, file and serve their respective retention applications, and to  resolve any potential conflicts of interest and establishing protocols to ensure no duplication of efforts among the professionals for the most efficient representation of the Committee.  HBR's retention application was filed on April 4, 2008.  There were no objections to the retention and the Retention Order was entered on April 25, 2008.

44.     HBR also assisted J.H. Cohn LLP ("<u>JH Cohn</u>"), the Committee's financial

advisor and forensic accountant with its retention application and exhibits, dated April 4, 2008.

There were no objections to the retention and the Order was entered on April 25, 2008.

<div align="center"><b><u>Monthly Fee Statements</u></b></div>

45.     In terms of case administration, as mentioned above, the Debtors sought

and obtained the Administrative Fee Order to govern the interim payment of professionals

retained in the Debtors' Chapter 11 cases.  In accordance with the Administrative Fee Order,

HBR prepared and filed Monthly Fee Statements for the months of April through July 2008,

monitored the docket in order to respond to any responses to the Monthly Fee Statements and,

ultimately, submitted requests for disbursement from the Debtors.  As of the date hereof, HBR

has received payment of 80% of its fees and 100% of its expenses with respect to the Monthly

Fee Statements for April-June 2008.  The notice period for the July 2008 Monthly Fee Statement

has just passed without objection and HBR anticipates that appropriate and timely disbursement

will be made.  HBR will advise the Court of the status of any disbursements made to it with

respect to the July 2008 Monthly Fee Statement at or prior to the hearing on this Application.  In

addition, HBR reviewed the fee statements submitted by other professionals retained in these

cases.

<div align="center"><b><u>Miscellaneous</u></b></div>

<div align="center"><b><i>Appearances at Hearings, 341 Meetings and Memoranda to Committee</i></b></div>

46.     HBR represented the Committee at all relevant hearings before this Court

and proceedings before the US Trustee in the Chapter 11 cases, including the § 341 meeting of

creditors that took place on April 15, 2008.  Additionally, HBR prepared legal memoranda to the

Committee in numerous instances where memoranda provided the most efficient method in

addressing a given topic.  Through HBR efforts, the Committee was a well informed and active

participant in these cases.

### *Motion to Continue Customer Practices and Programs*

47.    In addition to the Debtors' various first day motions seeking authority to

honor various pre-petition obligations (*i.e.* payment of taxes, wages, etc.) on April 7, 2008, the

Debtors made a Motion for an Order Authorizing Continuation of Certain Customer Practices

and Programs (Docket No. 114).  HBR reviewed and summarized the motion for

appropriateness, per the Committee's request.  The Order approving the motion was entered on

April 23, 2008.

### *Pre-Petition Sales Commissions*

*48.*    Similarly to the Debtors' motion regarding customer practices and

programs, on May 9, 2008 the Debtors made a Motion for an Order Authorizing but Not

Directing the Payment of Prepetition Sales Commissions (Docket No. 262).  HBR reviewed and

summarized the motion for appropriateness, and communicated with Debtors' counsel for

additional information, per the Committee's request.  The Order approving the motion was

entered on May 20, 2008.

### *Retention of Ordinary Course Professionals*

49.    On March 28, 2008, the Debtors filed their Application For Retention of

Professional Ordinary Course Professionals as Ordinary Course Professionals (Docket No. 79).

HBR reviewed and summarized the motion for appropriateness and, where appropriate,

communicated with Debtors' counsel for additional information, per the Committee's request.

The Order approving the motion was entered on April 23, 2008.  In accordance with the motion,

the Committee reviewed the fee statements of retained ordinary course professionals throughout the Chapter 11 cases and discussed any irregularities with counsel.

### Monthly Operating Reports

50.     In accordance with the practices and procedures required by the Office of the US Trustee, the Debtors filed Monthly Operating Reports, including Schedules of Cash Receipts and Disbursements, Statement of Operations, Balance Sheet, etc.  HBR reviewed these documents for the benefit of the Committee and discussed the details thereof, as appropriate.

### Confidentiality Agreements

51.     As is customary, the members of the Committee were asked to enter into confidentiality agreements in order to receive and review certain materials to be provided during the course of the Debtors' Chapter 11 cases.  HBR assisted the Committee in reviewing the confidentiality agreements and coordinated execution of the agreements with counsel to the Debtors.

### Confidential Information

52.     On April 4, 2008, as is common in similar Chapter 11 cases, the Committee made its Motion for an Order Confirming that the Committee is Not Required to Provide General Access or Otherwise Generally Disclose (A) Confidential Information of the Debtors or (B) Information Subject to Any Privilege (Docket No. 106).  HBR prepared the motion and accompanying exhibits, discussed the significance of the motion with the Committee, and sought entry of the proposed Order, which was entered by the Court on May 9, 2008.

### Lift-Stay Motions

53.     During the course of the Debtors' Chapter 11 cases, various parties (Jaguar Credit Corporation, Wells Fargo Equipment Finance, Inc., Jennifer Sheehan, De Lage

Landen Financial Services, Inc., etc.) filed requests for the automatic stay to be lifted so that they

could exercise rights against certain collateral.  HBR reviewed these motions, as appropriate, and

discussed the details thereof with the Committee and the Debtors' professionals.

### *Review of Director/Officer Insurance Policies*

54.    At the direction of the Committee, HBR reviewed the Debtors' insurance

policies regarding pre-petition actions of directors and officers and outlined the potential causes

of action for review and discussion.  Additionally, given the existence of potential claims, HBR

prepared a letter to the Debtors' insurers advising them of the claims the estates may have under

such policies, to ensure coverage was triggered prior to expiration.

### *Claims Objections*

55.    Prior to confirmation of the Plan, the Committee also reviewed several

claims objections prepared by the Debtors in preparation for the balloting process.  HBR

summarized the claim objections for the Committee and discussed the impact of the objections

on the estates.

### *Analysis of Chapter 5 Causes of Action*

56.    In preparation for confirmation of the Plan and transition of certain causes

of action of the estates, including those arising under Chapter 5 of the Bankruptcy Code to the

post-confirmation liquidation trust, the Committee's financial advisors, JH Cohn, prepared

requests for information to the Debtors in order to begin an analysis of potential preference and

fraudulent conveyance actions.  HBR assisted JH Cohn with these requests and discussed the

impact of such actions with the Committee.

## FACTORS TO BE CONSIDERED IN AWARDING ATTORNEYS' FEES

57.     The factors to be considered in awarding attorneys' fees are enumerated in

*In re First Colonial Corporation of America*, 544 F.2d 1291, 1298 - 99 (5th Cir.), *reh'g denied*,

547 F.2d 573, *cert.* denied*, Baddock v. American Benefit Life Insur. Co.*, 431 U.S. 904 (1977),

and are as follows:  (a) the time and labor required, (b) the novelty and difficulty of issued raised,

(c) the skill required to perform the legal services properly, (d) the preclusion of other

employment due to acceptance of the case, (e) the customary fee, (f) whether the fee is fixed or

contingent, (g) time limitations imposed by the client or other circumstances, (h) the amount

involved and the results obtained, (i) the experience, reputation and ability of the attorneys,

(j) undesirability of the case, and (k) the nature and length of the professional relationship.  HBR

respectfully submits that consideration of these factors should result in the allowance of the full

compensation requested.

58.     HBR respectfully submits that the fee sought in this case is reasonable

given the issues confronted and the work performed and is commensurate with fees HBR has

been awarded in other cases, as well as with fees charged by other attorneys of comparable

experience and expertise.  Many of the matters in this case were contested, and HBR frequently

had to work under significant time pressure, late into the evening and over weekends.  HBR

professionals rendered substantial, yet cost effective, services necessary to address each and

every issue that confronted the Committee in these cases.  Moreover, HBR was at risk for its fees

as the carve-out for Committee professionals under the initial debtor-in-possession loan was

woefully inadequate.

59.     The professional services rendered by HBR required a high degree of

professional competence and expertise so that a true sale and marketing process could be

achieved, consideration for unsecured creditors improved, and the estates could survive to

confirm the Plan.  It is respectfully submitted that the services rendered to the Committee were

performed efficiently, effectively and economically and the results achieved are significantly

better than what had initially been proposed for unsecured creditors.  The results achieved are

particularly noteworthy given the stiff resistance the Committee faced when it urged the Debtors

to deviate from the process that had been embarked upon.

60.    With respect to the level of compensation, § 330 of the Bankruptcy Code

provides, in pertinent part, that the Court may award a professional reasonable compensation for

actual necessary services rendered by such professional based upon consideration of all of the

relevant factors, including time spent, rates charged, necessity or benefit of services rendered,

reasonableness of time spent and cost of comparable services other than in a bankruptcy case.

See 11 U.S.C. § 330(a).  The clear Congressional intent and policy expressed in this section is to

provide for adequate compensation in order to continue to attract qualified and competent

practitioners to bankruptcy cases.

61.    During the Compensation Period, HBR professionals expended an

aggregate of 1,066.7 hours in rendering services on behalf of the Debtor for a total fee of

$386,957.50.  HBR submits that its fee is reasonable for the work performed in these cases

during the Compensation Period.

62.    In addition, HBR incurred out-of-pocket expenses in connection with the

rendition of the professional services described above in the sum of $8,530.18, for which HBR

respectfully requests reimbursement in full.  None of these expenses reflect HBR's overhead

costs and all of the expenses were incurred exclusively in connection with these cases.

63.     Finally, HBR has included in this Application an estimate of $12,500 for time spent and expenses incurred in connection with the preparation of the Application after the Compensation Period.  In the event that HBR bills less than the estimated amount, it will reduce the amount sought or promptly remit any excess amount paid to it, as appropriate.

## CONCLUSION

64.     No agreement or understanding exists between HBR and any other person for the sharing of any compensation to be received for professional services rendered or to be rendered in connection with these cases.

65.     No prior application has been made to this or any other Court for the relief requested herein for the Compensation Period, nor has any payment been received by HBR on account of the legal services rendered or on account of the out-of-pocket expenses incurred in connection therewith, except as disclosed herein.

WHEREFORE, HBR respectfully requests that this Court enter an order (a) approving the allowance of $386,957.50 for services rendered during the Compensation Period, (b) approving the reimbursement of HBR's out-of-pocket expenses during the Compensation Period in the amount of $8,530.18, (c) approving the allowance of $12,500 for fees and expenses relating to this Application and (d) granting such other and further relief as this Court may deem just and proper.

Dated: New York, New York
          September 3, 2008

                              **HALPERIN BATTAGLIA RAICHT, LLP**
                              Counsel to the Official Committee
                               of Unsecured Creditors

                              By:      _/s/ Alan D. Halperin_
                                        Alan D. Halperin, Esq.

Donna H. Lieberman, Esq.
555 Madison Avenue, 9th Floor
New York, New York 10022
(212) 765-9100